| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| Southern District of New York |
| Case number *(if known)*: _____ Chapter 15 |

☐ Check if this is an amended filing

## Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding    12/15

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).**

| | |
| --- | --- |
| 1. **Debtor's name** | Silicon Valley Bank (Cayman Islands Branch) |
| 2. **Debtor's unique identifier** | **For non-individual debtors:**<br>☐ Federal Employer Identification Number (EIN) ___ ___ – ___ ___ ___ ___ ___ ___ ___<br>☑ Other 193670 . Describe identifier Cayman Islands Reg. No.<br><br>**For individual debtors:**<br>☐ Social Security number: xxx – xx– ____ ____ ____ ____<br>☐ Individual Taxpayer Identification number (ITIN): **9** xx – xx – ____ ____ ____ ____<br>☐ Other _____ . Describe identifier _____ . |
| 3. **Name of foreign representative(s)** | Michael Pearson, Andrew Childe and Niall Ledwidge |
| 4. **Foreign proceeding in which appointment of the foreign representative(s) occurred** | Grand Court Cayman Islands, Financial Services Div., Cause No. FSD 163/2023 |
| 5. **Nature of the foreign proceeding** | *Check one:*<br>☐ Foreign main proceeding<br>☐ Foreign nonmain proceeding<br>☑ Foreign main proceeding, or in the alternative foreign nonmain proceeding |
| 6. **Evidence of the foreign proceeding** | ☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.<br><br>☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.<br><br>☐ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.<br>_____<br>_____ |
| 7. **Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?** | ☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)<br>☑ Yes |

| Debtor | Silicon Valley Bank (Cayman Islands Branch) | Case number (if known) |
|---|---|---|
| | Name | |

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i)   all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii)   all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

Country where the debtor has the center of its main interests:

Cayman Islands

Debtor's registered office:

FFP Cayman, Harbour Centre, 2nd Floor
Number        Street

159 Mary Street
P.O. Box

George Town KY1-9006
City          State/Province/Region    ZIP/Postal Code

Cayman Islands
Country

Individual debtor's habitual residence:

N/A
Number        Street

P.O. Box

City          State/Province/Region    ZIP/Postal Code

Country

Address of foreign representative(s):

Same as above
Number        Street

P.O. Box

City          State/Province/Region    ZIP/Postal Code

Country

**10. Debtor's website** (URL)

https://svbcaymanliquidation.com

**11. Type of debtor**

*Check one:*

☑ Non-individual (*check one*):

   ❑ Corporation.  Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

   ❑ Partnership

   ☑ Other.  Specify: Estate and Trust under Cayman Law

❑ Individual

| Debtor | Silicon Valley Bank (Cayman Islands Branch) | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**12. Why is venue proper in *this district*?**

Check one:

☑ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

_____.

☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

_____.

---

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✗ _____      Michael Pearson, as JOL
  Signature of foreign representative        Printed name

Executed on   01/18/2024
              MM / DD / YYYY

✗ _____      _____
  Signature of foreign representative        Printed name

Executed on   _____
              MM / DD / YYYY

---

**14. Signature of attorney**

✗ /s/ Warren Gluck                    Date   01/18/2024
  Signature of Attorney for foreign representative   MM / DD / YYYY

Warren Gluck
Printed name
Holland & Knight LLP
Firm name
31 West 52nd Street
Number        Street
New York                                 NY        10019
City                                     State     ZIP Code

(212) 513-3200                           warren.gluck@hklaw.com
Contact phone                            Email address

4701421                                  NY
Bar number                               State

---

Warren E. Gluck, Esq.
John J. Monaghan, Esq. (*pro hac vice* forthcoming)
Paul M. Aguggia, Esq. (*pro hac vice* forthcoming)
Marie E. Larsen, Esq.
HOLLAND & KNIGHT LLP
31 W. 52nd Street
New York, NY 10019
Telephone:  212-513-3200
Fax: 212-385-9010
Warren.Gluck@hklaw.com
John.Monaghan@hklaw.com
Paul.Aguggia@hklaw.com
Marie.Larsen@hklaw.com

*Counsel for the Joint Official Liquidators*
*of Silicon Valley Bank (Cayman Islands Branch)*
*(in Official Liquidation)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------- | | |
| In re: | : | Chapter 15 |
| | : | |
| SILICON VALLEY BANK (CAYMAN ISLANDS BRANCH) (in Official Liquidation) | : | Case No. ____-_____ |
| | : | |
| | : | |
| | : | |
| Debtor in a Foreign Proceeding.[1] | : | |
| | : | |
| | : | |
| ------------------------------------------------------- | | |

**VERIFIED PETITION FOR RECOGNITION OF**
**FOREIGN INSOLVENCY PROCEEDING PURSUANT TO**
**SECTIONS 1504, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE**

        Michael Pearson, Andrew Childe, and Niall Ledwidge, in their capacity as the duly appointed

joint  official  liquidators  and  foreign  representatives  (together,  the  **"JOLs"**  or  **"Foreign**

---

[1] Silicon Valley Bank is registered under Part IX of the Cayman Islands Companies Act, with registration number 193670.

**Representatives**") of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation), an estate in official liquidation ("**SVB Cayman**" or the "**Debtor**") under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") and associated regulations, including the Companies Winding Up Rules (2023 Consolidation) (the "**CWR**"), the Insolvency Practitioners Regulations, and the June 30, 2023 Winding Up Order issued by the Grand Court (the "**Winding Up Order**"), by their undersigned United States counsel, Holland & Knight LLP, respectfully submit this Verified Petition and Incorporated Memorandum of Law (together, the "**Petition**"), and the accompanying Declaration of Michael Pearson, dated January 18, 2024 (the "**Pearson Decl.**") and the exhibits thereto, for entry of an Order pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"):

(i) recognizing the Cayman Proceeding as a foreign main proceeding under 11 U.S.C. §§ 1502, 1515, 1517(a) and (b)(1), or, in the alternative, as a foreign nonmain proceeding pursuant to 11 U.S.C. § 1517(b)(2) of the Bankruptcy Code;

(ii) recognizing the JOLs as the foreign representatives of SVB Cayman under 11 U.S.C. §§ 101(24) and 1517(a)(2), and the estate of SVB Cayman as the exclusive debtor of and agent for the SVB Cayman depositors;

(iii) requiring the turnover of assets of SVB Cayman, including SVB Cayman's books and records, to the JOLs pursuant to 11 U.S.C. §§ 542 and 1521(a)(4), (a)(7) and (b);

(iv) permitting the JOLs, pursuant to 11 U.S.C. §§ 1520 and 1521, to conduct discovery directed to, among others, the Federal Deposit Insurance Corporation in its corporate capacity ("**FDIC-C**"), and the the Federal Deposit Insurance Corporation, in its capacity as receiver for Silicon Valley Bank, Santa Clara and Silicon Valley Bridge Bank, N.A. ("**FDIC-R**," and collectively with FDIC-C, the "**FDIC**"); and

(v) granting such other and further relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

1.      This chapter 15 case goes to the heart of the intersection between Cayman Islands and United States banking and insolvency law.  SVB Cayman was established as a foreign branch of SVB – the only SVB foreign branch licensed to accept deposits. By operation of Cayman law and as consented to by Silicon Valley Bank, the SVB Cayman branch is governed by Cayman law, regulated by Cayman regulators, and subject to the Cayman winding up procedures that are triggered upon a Cayman branch's insolvency and failure.  Creditors-depositors of SVB Cayman exercised their right to seek the winding up of SVB Cayman, and the Grand Court ordered the winding up of SVB Cayman and appointed the JOLs on June 30, 2023.

2.      Meanwhile, the FDIC, pursuant to its statutory authority, has been acting as receiver for Silicon Valley Bank and its successor bridge bank since March 2023 (the "**SVB Receivership**").  The JOLs recognize the FDIC's receivership authority under federal law upon the failure of a domestic, FDIC-insured bank, and submit that the SVB Receivership is of no impediment to the Cayman Proceeding or its recognition pursuant to Chapter 15.

3.      The impetus for the filing of the Cayman Proceeding was the FDIC's arbitrary decision to grant "insured deposit" classification to certain account holders of SVB Cayman, but deny similar classification to the remaining SVB Cayman account holders.  This disparate treatment was purportedly predicated on the basis of the alleged geographic location of the "insured" deposit "credits" being "in" the United States at the time of the SVB collapse, despite identical language in *every* SVB Cayman account agreement stating that SVB Cayman accounts are not FDIC-insured and are only payable and collectible in the Cayman Islands.

4.      The JOLs' have spent the months following their appointment investigating the potential reasons for this arbitrary decision and the practical reality is apparent:  the accounts classified

as general unsecured creditors in the SVB Receivership are overwhelmingly held by account holders of Chinese origin or associated with Chinese interests, while the holders of Cayman accounts classified as insured are geographically neutral.  The actions of the FDIC raise significant national origin concerns and merit further investigation.

5.      It has become increasingly clear that the ostensible basis for the disparate treatment – the "credits" of the insured accounts were geographically located "in" the United States whereas the others were not – is specious at best.  All of the three account products' credits were geographically located in the United States at all times material.

6.      It has also become increasingly apparent that FDIC-R has failed in its duties to SVB Cayman as a direct deposit and account holder with SVB in the United States.  In particular, and at all times material, the entirety of the SVB Cayman balances were held with SVB in the United States in a numbered account that is now known to the JOLs. And troublingly, at no point has FDIC-R notified SVB Cayman of its account's status, balances or other mandatory protections legally due.

7.      Each of these items is serious in isolation and are more serious together.  The conduct of this matter is eerily reminiscent of the matter *Adagio Investment Holding Ltd. v. FDIC Corp. et al,* 338 Supp.2d 71 (D.D.C. 2004) in which a rare summary judgment order was issued in *plaintiff's* favor upon proof that defendants misrepresented the digital situs of the plaintiffs' accounts and funds and engaged in machinations toward altering such status toward the prioritization of the FDIC's subrogated indemnity claims.  In that matter, District Judge Huvelle held that the FDIC defendants had exceeded their authority and violated the Plaintiffs' core rights.

8.      In sum, there are only two options which appear to exist: (i) either the cash associated with the SVB Cayman accounts, including but not limited to the SVB Cayman branch account and the three sets of SVB Cayman depository accounts were always located in the United States, in which case

*all* SVB Cayman accounts should be classified as insured deposits and be provided with a full guarantee by the FDIC-C under the systemic risk exception; and (ii) in any event, all of the SVB Cayman accounts and the SVB Cayman depositor accounts were subject to Cayman Islands law and the control of Cayman Islands Monetary Authority ("**CIMA**") and the Cayman Islands Courts, such that the depletion of these accounts constituted an *ultra vires* and *void ab initio* act that results in a constructive trust.

9.      To that end, the JOLs request recognition of the Cayman Proceeding, as a foreign main proceeding regarding the estate of SVB Cayman, primarily to obtain this Court's assistance in obtaining discovery into SVB Cayman's claims and other assets, including but not limited to assets in the form of claims, in the United States in order to efficiently administer its estate as ordered by the Grand Court through the Winding Up Order.

10.     The Second Circuit holds that "[u]nique to the Bankruptcy Code," Chapter 15 of the Bankruptcy Code contains a statement of purpose, which is "to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency." *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 132 (2d Cir. 2013) (citing 11 U.S.C § 1501(a)). Chapter 15 and the Model Law "are designed to optimize disposition of international insolvencies by facilitating appropriate access to the court system of a host country (the United States, in the case of Chapter 15) by a representative of an insolvency proceeding pending in a foreign country." *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 292 (Bankr. S.D.N.Y. 2018).

11.     Consequently, "Chapter 15 expresses a strong preference for providing assistance to foreign representatives in appropriate circumstances. *That congressional preference is not to be lightly disturbed*." *In re Platinum Partners Value Arbitrage Fund L.P*, No. 18CV5176 (DLC), 2018 WL 3207119, at *4 (S.D.N.Y. June 29, 2018) (emphasis added).

12.     As set forth in greater detail below, SVB Cayman is the subject of the Cayman Proceeding, an insolvency proceeding under the Companies Act pursuant to, *inter alia*, the Winding Up Order of the Grand Court entered on June 30, 2023. As this Petition, the accompanying Pearson Declaration, and the exhibits thereto demonstrate, the Cayman Proceeding should be recognized as a foreign main proceeding.

13.     The Foreign Representatives seek precisely the type of relief that chapter 15 was designed to provide, and the Cayman Proceeding and this Petition meet all the requirements for recognition and the requested relief. In particular, the JOLs were appointed by the Grand Court to wind up and administer the Debtor's assets and liabilities, in connection with the Cayman Proceeding pursuant to the Companies Act, a law relating to insolvency or adjustment of debt. *Pearson Declaration*, ¶¶ 71-90.  Moreover, the relevant account documents are explicit in relation to the exclusive jurisdiction of the Cayman courts, the prohibition in relation to the collection of Cayman depositor debts outside of the SVB Cayman branch, and the debtor status of the SVB Cayman branch in relation to the SVB Cayman depositors.  *Pearson Declaration*, ¶¶ 19-25.

14.     Likewise, the Cayman Proceeding is a collective judicial proceeding as referenced in 15 U.S.C. § 101(23), subject to the oversight and control of the Grand Court, encompassing all creditors and stakeholders of the Debtor, which is pending in the Cayman Islands, the country in which SVB Cayman was formed and was licensed, maintains registered offices, maintains its center of main interests ("**COMI**"), and where SVB Cayman is engaged in substantial, non-transient, ongoing economic activity. *Pearson Declaration*, ¶¶ 6-7, 57-60.

15.     Pursuant to section 1516(c) of the Bankruptcy Code, the Cayman Islands is presumed to be the Debtor's COMI because the Debtor has maintained its registered office there both prior to the commencement of the Cayman Proceeding and through the date hereof. *Pearson Declaration*, ¶¶ 9-10.

This Petition and the accompanying Pearson Declaration further demonstrate that the Debtor's creditors, customers, and counterparties had clear and actual knowledge that the Debtor was a Cayman Islands-registered and regulated branch, governed by Cayman Islands law. *Pearson Declaration*, ¶¶ 19-25. Further, since entry of the Winding Up Order, the JOLs have overseen the winding up of SVB Cayman primarily from their offices at FFP in the Cayman Islands, including implementation and oversight of the Governmental Outreach (defined below) strategy which has been the focus of the first six months of the liquidation. *Pearson Declaration*, ¶¶ 57-69. Accordingly, the Cayman Proceeding is a "foreign main proceeding" within the meaning of sections 101(23), 1502(4), 1516(c), and 1517(b)(1) of the Bankruptcy Code.

16.     Further, as described more fully below, SVB Cayman qualifies as a chapter 15 debtor in all respects. SVB Cayman is an "estate" and "trust" under Cayman Islands law, and it is therefore an "entity" eligible to seek relief under Chapter 15 of the Bankruptcy Code under sections 1502(1) (defining debtor to mean an "entity") and 101(15) (defining "entity" to include a "person, *estate*, *trust*, governmental unit, and United States Trustee"). 11 U.S.C. § 1502(1); 101(15) (emphasis added). Further, at the time of this Petition, SVB Cayman is neither a domestic bank nor a foreign bank with domestic banking activities, and thus is not prohibited from being a debtor under section 109(b) of the Bankruptcy Code.

17.     Lastly, granting recognition would not be manifestly contrary to the public policy of the United States under section 1506 of the Bankruptcy Code. FDIC-R stands in the shoes of Silicon Valley Bank, an entity which, prior to receivership, consented to the application of Cayman law (including but not limited to Cayman bankruptcy law) as well as SVB Cayman's regulation by Cayman authorities and the jurisdiction of the Grand Court. When acting as receiver, the FDIC is a private party, not the United States. *See O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 88 (1994) (further holding

that there is no federal public policy which requires Courts to ignore well-settled law concerning imputing acts to FDIC receivers). The JOLs respectfully submit that permitting the FDIC's action here to stand would prove a disaster to U.S. and international banking policy; permitting the FDIC to acquire and transfer assets belonging to foreign branch account holders to satisfy over-insured domestic account holders would result in a plummeting of confidence in the stability of foreign branches of U.S. banks. *See Adagio Inv. Holding Ltd. v. FDIC*, 338 F.Supp.2d 71, n. 19 (D.D.C. 2004) (citing *Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1201 (D.C.Cir. 1998) (noting that, if the FDIC could take property without due process, serious constitutional problems would be presented)).

18.     For all of these reasons and as will be shown below, the JOLs respectfully submit that: (i) the Cayman Proceeding is a foreign main proceeding within the meaning of sections 101(23) and 1502(4) of the Bankruptcy Code; (ii) the JOLs are the duly appointed foreign representatives of the Debtor within the meaning of section 101(24); (iii) the JOLs and the Petition comply with all the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4); and (iv) recognition of the Cayman Proceeding would not be contrary to public policy under Bankruptcy Code section 1506.

19.     Under the circumstances, this Court can and should enter an order recognizing the Cayman Proceeding as a foreign main proceeding under section 1517(b)(l).

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to the entry of a final order by this Court in connection with this Petition to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

21.     This case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of a petition for recognition of the Cayman Proceeding under section 1515 of the Bankruptcy Code.

22.     As discussed in further detail below, venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1410(1).  First, the Debtor's principal business operations in the United States are being conducted in the Southern District of New York. One of the JOLs, Niall Ledwidge, is a Managing Director of Stout, a global advisory firm specializing in corporate finance, accounting, and transaction advisory, valuation, financial disputes, claims, and investigations, in New York, New York. *Pearson Decl.*, ¶¶ 57, 105,. In his capacity as a JOL of the Debtor, Mr. Ledwidge has participated in SVB Cayman's primary United States activities through congressional outreach and efforts to recover assets of SVB Cayman in the United States from his office in New York, New York and will further act as a United States-based resource center for SVB Cayman creditors with questions or problems. *Pearson Decl.*, ¶ 57.  Second, the principal assets of the Debtor are located in the District, in the form of potential litigation claims to be filed against FDIC-C, as well as the pending proof of claim filed by the JOLs in the chapter 11 bankruptcy of SVB Financial Group.  The JOLs further understand that, subsequent to the collapse of SVB in March 2023 (the "**SVB Collapse**"), previous members of SVB's executive management are currently managing SVB's holding company and affiliates, all from offices in Manhattan, and the Chapter 11 proceedings in which such claims would be filed are in this District. *See in re SVB Financial Group*, Case. No. 23-10367-mg (S.D.N.Y.) at ECF No. 43.

23.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

24.     The statutory predicates for the relief requested herein are sections 1504, 1509, 1515, 1517, 1519, 1520, and 1521 of the Bankruptcy Code.

## FACTUAL BACKGROUND

### I.     SVB Cayman

#### A.     The Creation of SVB Cayman

25.     Founded in 1983, Silicon Valley Bank, Santa Clara ("**SVB**") was an FDIC-insured, state-chartered bank headquartered in California and established to provide banking services to Silicon Valley's growing number of technology companies. *Pearson Decl.*, ℙ 4.  While SVB had affiliate relationships and joint ventures with foreign banks in China and the United Kingdom, SVB Cayman was the only deposit-taking foreign branch maintained by SVB. *Pearson Decl.*, ℙ 4.

26.     On August 16, 2007, SVB registered in the Cayman Islands as a foreign company under Part IX of the Companies Act. *Pearson Decl.*, ℙ 5.

27.     On August 30, 2007, SVB applied for and was granted a Class "B" banking license from CIMA  under the Cayman Islands Banks and Trust Companies Act (2021 Revision) (the "**BTC Act**"). *Pearson Decl.*, ℙ 6.  Pursuant to the BTC Act, SVB Cayman as the holder of a "B" class banking license may not, amongst other things, take deposits from any person resident in the Cayman Islands, other than another licensee or an exempted or ordinary non-resident company which is not carrying on business in the Cayman Islands. *Pearson Decl.*, ¶ 6.

28.     Following its registration in the Cayman Islands and the granting of a Class "B" license from CIMA, SVB had an active branch in the Cayman Islands, the established SVB Cayman branch.

29.     The primary purpose of SVB Cayman was for deposit products. *Pearson Decl.*, ℙ 8.

30.     Prior to the commencement of the Cayman Proceeding, SVB Cayman maintained a registered office at Cainvest Bank & Trust, 103 South Church St., 5th Floor, Georgetown, Grand

Cayman, Cayman Islands. *Pearson Decl.*, ⁋ 9.

31.     Upon their appointment, the JOLs changed the registered office of SVB Cayman to FFP Cayman ("**FFP**"), 2nd Floor Harbour Centre, 159 Mary Street, Georgetown, Grand Cayman, Cayman Islands, which remains SVB Cayman's registered office to date. *Pearson Decl.*, ⁋ 10.

**B.      Cayman Regulation of SVB Cayman**

32.     SVB Cayman was at all times overseen, regulated, and licensed by CIMA, which serves as the Cayman Islands' primary financial services regulator and was otherwise subject to the Cayman Islands Banking laws.  *Pearson Decl.*, ⁋ 11.

33.     CIMA was established pursuant to the Monetary Authority Law (2016 revision) ("**CIMA Act**").  The CIMA Act provides that CIMA's principal function includes actions "to regulate and supervise financial services business carried on in or from within the Islands in accordance with this law and the regulatory laws." *Pearson Decl.*, ¶ 12 (citing *CIMA Act*, § 6(1)(b)(i)).

34.     The BTC Act provides express statutory authority for CIMA to seek the liquidation of a foreign branch which falls under the regulatory authority of CIMA.  Pursuant to Section 18 of the BTC Act, where CIMA is of the opinion, amongst other things, that an entity regulated and licensed by CIMA "is or appears likely to become unable to meet its obligations as they fall due" or "is carrying on business in a manner detrimental to the public interest [and] the interests of its depositors…", CIMA may:

- appoint a person to advise the licensed branch on the proper conduct of its affairs and to prepare a report to CIMA thereon (an "**Advisor**").  *See BTC Act*, § 18(1)(iv);

- seek authority from the Grand Court to appoint a person to assume control of the licensed branch's affairs (a "**Controller**") with powers akin to a receiver.  *See BTC Act*, § 18(1)(v); and

- on receipt of any report prepared by an Advisor or Controller, revoke a branch's license and

make an application to the Grand Court for the winding up and liquidation of the foreign branch. *See BTC Act*, § 18(4)(d).

*Pearson Decl.*, ¶ 13.

35.     The BTC Act also sets forth a detailed procedure for a licensee which wishes to terminate banking activity in the Cayman Islands.  Section 20 of the BTC Act provides in full:

> (1) A licensee which has ceased to carry on the business in respect of which the [license] was granted may apply to the Authority to surrender its [license] if it —
>
> > (a) has ceased to carry on such business, and produces evidence that it has repaid all deposits held by it and has transferred all trust assets held or administered by it: or
> >
> > (b) is being wound up voluntarily and produces evidence that it is solvent and able forthwith to repay all deposits held by it and all its other creditors and has transferred all trust assets held or administered by it, and the Authority may thereupon approve the surrender.
>
> (2) In the case of an application under paragraph (b) of subsection (1) the Authority may apply to the Court for the licensee to be wound up either by that Court or subject to its supervision, and on the making of such an order the provisions of the Companies Act (2021 Revision) relating to the winding up of a company by or subject to the supervision of that Court shall, *mutatis mutandis*, apply.

*Pearson Decl.*, ¶ 14 (citing *BTC Act*, § 20).[2]

36.     CIMA publishes the Cayman Island Monetary Authority Enforcement Manual (the "**Enforcement Manual**") in order to set out the policies and procedures to be followed by CIMA, its committees and its officers in performing CIMA's regulatory functions under Cayman law. *Pearson Decl.*, ¶ 15. A true and correct copy of the Enforcement Manual is attached to the Pearson Declaration as <u>Exhibit 4.</u> The Enforcement Manual is applicable and binding on all parties subject to CIMA's regulatory functions, which includes SVB Cayman and the SVB Receivership's (defined below)

---

[2] These provisions of Cayman law are set forth to evidence the consent to Cayman court jurisdiction and Cayman bankruptcy law upon regulation by CIMA.  Creditors of a company registered as a foreign company in the Cayman Islands are also permitted to seek the winding up of the foreign company in the Grand Court if the foreign company (i) has property located in the Cayman Islands; (ii) is carrying on business in the Cayman Islands; (iii) is the general partner of a limited partnership; or (iv) is registered under Part IX.  *Pearson Decl.*, ¶ 72.

predecessor-in-interest, Silicon Valley Bank.  *Pearson Decl.*, ¶ 15 (citing *Enforcement Manual*, § 3.1).

37.    The Enforcement Manual provides CIMA with broad powers to regulate the holders of banking licenses in the Cayman Islands, including: (i) suspension of a banking license; (ii) imposition or amendment of conditions on a banking license; (iii) requiring the substitution of a director, operator, senior officer, general partner, promoter, insurance manager or shareholder of a licensee; and (iv) appointment of a person to assume control of the affairs of a licensee, or advise the license on the proper conduct of its affairs.  *Pearson Decl.*, ¶ 16 (citing *Enforcement Manual*, §§ 10.1, 10.2).

38.    Moreover, CIMA or the creditors of a licensed bank or foreign registered company are empowered to apply to the Grand Court of the Cayman Islands for an order directing that the company be wound up in accordance with the Companies Act or a limited liability company be wound up in accordance with the Limited Liability Companies Act.  In this case, the creditors of SVB Cayman made such an application and obtained such an order, before any similar application by CIMA was accomplished.  *Pearson Decl.*, ¶ 17.

**C.      The Cayman-Regulated Deposit Products Offered by SVB Cayman**

39.    SVB Cayman offered three types of accounts to customers: 1) Eurodollar Sweep Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account (collectively, the "**SVB Cayman Deposit Accounts**"). When SVB failed in March 2023, SVB Cayman's customers had, in the aggregate, approximately $866 million deposited in all three types of accounts. *Pearson Decl.*, ¶ 18.

i.    *Eurodollar Sweep Account*

40.    The Eurodollar Sweep Account was a business account maintained at SVB Cayman.  In the account agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch."  At the time of the SVB Collapse (defined below), there were forty-

four (44) active Eurodollar Sweep Accounts, with total account balances of $389,562,086. *Pearson Decl.*, ¶ 19. A true and correct copy of a template account agreement for a Eurodollar Sweep Account ("**Sweep Agreement**") is attached to the Pearson Declaration as Exhibit 5.

41.     The Sweep Agreement states: "The SVB Eurodollar Sweep Account provides clients with a convenient way to earn interest while keeping their funds available for banking needs. Client balances automatically transfer or 'sweep' between the Deposit Account [located in the United States] and the interest-bearing SVB Eurodollar Sweep Account held at Silicon Valley Bank's Cayman Islands Branch." *Pearson Decl.*, ¶ 20.

42.     The Sweep Agreement contains provisions notifying SVB Cayman customer-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he SVB Eurodollar Sweep Account shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Sweep Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Pearson Decl.*, ¶ 21.

ii.     *Eurodollar Money Market Account*

43.     A Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman customers. In the account agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman

14

Islands branch office." At the time of the SVB Collapse, there were one-hundred six (106) active

Eurodollar Money Market Accounts, with total account balances of $108,400,111. *Pearson Decl.*, ⁋

22. A true and correct copy of a template account agreement for a Eurodollar Money Market Account

("**Money Market Account Agreement**") is attached to the Pearson Declaration as Exhibit 6.

44.    The Money Market Account Agreement contains provisions notifying SVB Cayman

customer-depositors of the applicability of Cayman law, that their accounts are only payable and

collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply

with Cayman law:

> [T]he Eurodollar Money Market Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Money Market Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Pearson Decl.*, ⁋ 23.

       iii.    *Eurodollar Operating Account*

45.    The Eurodollar Operating Account was a traditional business operating account that was

not interest bearing.  In the account agreement, SVB affirmatively stated that the SVB Eurodollar

Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office."  *Pearson*

*Decl.*, ⁋ 24.  At the time of the SVB Collapse, there were four hundred eighty-four (484) active

Eurodollar Operating Accounts, with total account balances of $368,212,751. *Pearson Decl.*, ⁋ 24 A

true and correct copy of a template account agreement for a Eurodollar Operating Account ("**Operating Account Agreement**") is attached to the Pearson Declaration as Exhibit 7.

46.     The Operating Account Agreement contains provisions notifying SVB Cayman customer-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Pearson Decl.*, ¶ 25.

## D.     SVB Cayman's Domestic Deposit Account with SVB

47.     In the course of the JOLs' investigation, the JOLs have learned that prior to the SVB Collapse, it was the regular practice for SVB Cayman to deposit all of its cash with SVB in a deposit account located in the United States.  SVB Cayman's sole asset was the depository liability owed by SVB in connection with this account (the "**SVB Cayman Domestic Account**").  *Pearson Decl.*, ¶ 26. In particular, the JOLs' investigation has revealed that the SVB Cayman branch maintained a domestic account in the United States at SVB's main headquarters with account number xxxx0000 and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where it was made

clear that this was only SVB Cayman's bank account (as there were no other foreign deposit taking branches) and that the credits located in this domestic account were SVB Cayman's sole asset and located in the United States. *Pearson Decl.*, ¶ 26.

48.    Additionally, the JOLs investigation has revealed that SVB's main headquarters maintained domestic, United States sitused accounts for each and all of the three products offered at SVB Cayman with the following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).   The significant indication is that all of these credits were geographically located in the United States. *Pearson Decl.*, ¶ 27.

**D.    The Intra-Group Service Level Agreement**

49.    The relationship between SVB and SVB Cayman was governed by an Intra-Group Service Level Agreement, entered into by and between SVB Cayman, as recipient, and Silicon Valley Bank (US Head Office), as provider (the "**SLA**").  *Pearson Decl.*, ¶ 28. A true and correct copy of the SLA is attached to the Pearson Declaration as Exhibit 8.

50.    The recitals to the SLA expressly note that SVB Cayman is regulated by CIMA, that SVB is separately regulated by the California Department of Business Oversight and the Federal Reserve, and that the SLA is being entered into on an "arm's length basis."  *Pearson Decl.*, ¶ 29.

51.    Under the SLA, SVB Cayman looked to SVB's California office for staffing needs in select service areas such as finance, IT services, legal and risk management (the "**Shared Services**"). For each Shared Service, SVB and SVB Cayman were each required to appoint separate representatives, known as "Agreement Managers," who served as the primary point of contact with the corresponding party. *Pearson Decl.*, ¶ 30.

52.    Each Agreement Manager had full authority to act for, and on behalf of, the respective party on all matters relating to the SLA.  Further, each Agreement Manager was required to meet with his or her counterpart at regular intervals to discuss compliance with the terms of the SLA, any issues of concern to either party, and proposed solutions for addressing issues of concern. *Pearson Decl.*, ¶ 31.

53.    The SLA acknowledged that CIMA and other Cayman governmental agencies regulated SVB Cayman, and provided:

> In providing the Services, the Provider agrees to: A. Comply with all applicable Regulatory Requirements and Compliance Requirements necessary to perform its obligations under this Agreement; and B. Obtain and maintain all necessary licences, permits, consents and regulatory approvals from the relevant Regulators, if any, and to the extent applicable, necessary to perform its obligations under this Agreement.

*Pearson Decl.*, ¶ 32.

54.    The SLA further provided that SVB Cayman was the primary contact and reporting person for any inquiries from CIMA:

> The Recipient will be responsible, unless otherwise agreed in writing by the Parties, for all communications and correspondence with its Regulator(s) (which, for the purposes of this Agreement, shall be the Cayman Island Monetary Authority) in relation to the receipt of the Services and this Agreement. The Provider will direct enquiries from the Recipient's Regulator relating to this Agreement to the Recipient unless the enquiry is specifically addressed to, or concerns, the Provider or the Provider is prevented from doing so by applicable Law or Regulatory Requirements. Each Party shall provide the other Party and/ or any Regulator all reasonable assistance in connection with any enquiry or investigation by any Regulator concerning this Agreement or the relevant Party and shall notify the other Party of any enquiries or investigations unless prevented from doing so by applicable Law or Regulatory Requirements.

*Pearson Decl.,* ¶ 33.

55.    While it relied on SVB's operational staff, risk management, and infrastructure in certain circumstances, SVB Cayman also operated independently of SVB in many respects. For example, SVB Cayman's day-to-day management was vested in a dedicated Cayman Branch team

under the leadership of a Cayman Branch Executive Director. *Pearson Decl.*, ⁋ 34. Under the SLA, SVB Cayman was permitted to terminate the SLA on 60 days' notice, and it reserved the right to independently audit SVB's books and records. *Pearson Decl.*, ⁋ 34.

56.     Additionally, SVB Cayman's corporate governance was vested with the Cayman Branch Operating Committee, which provided leadership and strategic oversight for all of SVB Cayman's activities. *Pearson Decl.*, ⁋ 35.

## II.    Collapse of SVB and Sale to First-Citizens Bank

57.     On March 8, 2023, SVB liquidated investments to cover deposits; this included selling off U.S. treasuries and mortgage-backed securities at a $1.8 billion loss. *Pearson Decl.*, ⁋ 36.

58.     On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in the SVB Collapse. *Pearson Decl.*, ⁋ 37.

59.     On March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition. *Pearson Decl.*, ⁋ 38 The DFPI Order Taking Possession of Property and Business is attached to the Pearson Declaration as Exhibit 9.

60.     As a result, DFPI ordered that SVB's property and business be placed into a receivership. As referenced above, the FDIC has been administering the SVB Receivership since March 2023. The JOLs understand that SVB Cayman's books and records concerning its pre-liquidation operations and management are located in the United States, as FDIC-R obtained possession of such records upon the SVB Collapse, and the estate of SVB Cayman arose upon the SVB Collapse and insolvency.' *Pearson Decl.*, ⁋ 39.

61.     On March 13, 2023, via a Transfer Agreement (the "**Transfer Agreement**"), FDIC-R transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB Cayman to Silicon Valley Bridge Bank, N.A. (the "**Bridge Bank**"), which was newly created and operated by the FDIC as receiver pursuant to applicable federal law. *Pearson Decl.*, ⁋ 40. A true and correct copy of the Transfer Agreement is attached to the Pearson Declaration as Exhibit 10.

62.     Generally, depositors at FDIC-insured depository institutions are insured up to a maximum amount of $250,000.  *See* 12 U.S.C. §§ 1821(a)(1)(A), (a)(1)(E).  Congress established the federal Deposit Insurance Fund ("**DIF**"), which is funded with deposit insurance premium payments collected from banking institutions, and guarantees repayments of insured deposits up to the statutory insured limit of $250,000 upon a bank's failure. *See* 12 U.S.C. § 1821(a)(4).

63.     Other than the $250,000 cap, the other limitations on FDIC insurance status include (i) that the depositor be a U.S. citizen and (ii) that the account is payable in the United States.  *See* 12 U.S.C. §§ 1813(l)(5) and 1813(m).

64.     On March 12, 2023, a joint statement press release (the "**Joint Statement Press Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were transferred to FDIC-R, assuring all SVB depositors that they would have full access to their money on Monday morning, March 13, 2023 and that they would be made whole, beyond the standard insured amount of $250,000. *Pearson Decl.*, ⁋ 41. A true and correct copy of the Joint Statement Press Release is attached to the Pearson Declaration as Exhibit 11.

65.     The FDIC's announcement was based upon Treasury Secretary Janet Yellen's invocation of the systemic risk exception (the "**SRE**"), which was based on the unanimous recommendation of the FDIC-C, the Federal Reserve, and in consultation with the President of the

United States.  Such invocation mandates the FDIC-C to insure and pay the full amount of all deposits for all insured depositors of SVB above the $250,000 cap, and further removed the requirement that the insured account holder be a US person within the meaning of the Federal Deposit Insurance Act. These decisions at best, left only the geographic credit situs limitation intact.

66.     On March 27, 2023, the FDIC entered into a Purchase and Assumption Agreement (the "**P&A Agreement**") with First-Citizens Bank & Trust Company ("**First-Citizens**"), covering certain SVB deposits and loans transferred to and then held at the Bridge Bank. *Pearson Decl.*, ⁋ 42.  A true and correct copy of the P&A Agreement is attached to the Pearson Declaration as Exhibit 12.

67.     The P&A Agreement included a purchase of approximately $72 billion of the Bridge Bank's assets at a discount.  Notably, the P&A Agreement gave First-Citizens the express option to purchase the Canadian, German, and Hong Kong foreign branches (all of which did not accept deposits and only provided lending services), but did not provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits).[3] As a result, SVB Cayman was not purchased by or transferred to First-Citizens pursuant to the P&A Agreement and was excluded from the Receivership and its process. *Pearson Decl.*, ⁋ 43.

## III.    The Post-SVB Collapse "Orphaning" of SVB Cayman and Events Leading Up to the Commencement of the Cayman Proceeding

68.     On March 31, 2023, the depositors-creditors of SVB Cayman that held Eurodollar Operating Accounts and Eurodollar Money Market Accounts received a notice stating that balances held by customers in accounts at SVB Cayman are not deposits, and therefore, that their status as a

---

[3] The Canada, India, Germany, and Israel branches of SVB were not licensed by their respective local authorities to accept deposits. The United Kingdom affiliate (with its own Denmark and Sweden branches) was separately incorporated as Silicon Valley Bank UK.  The China affiliate operated as an independent joint-venture with Shanghai Pudong Development Bank. *Pearson Decl.,* ⁋ 43 n.2.

result of SVB's failure is that of general unsecured creditor, which is junior in priority to both insured and uninsured depositors. *Pearson Decl.*, ¶ 45.

69.     During the course of the JOLs' investigation, the JOLs learned that account holders for Eurodollar Sweep Accounts did not receive any such notice, with their accounts being granted "insured deposit" status, even though the account agreements for each of the three SVB Cayman Deposit Accounts contains identical language that the Cayman accounts are not FDIC-insured and are payable and collectible only in the Cayman Islands.  *Pearson Decl.*, ¶ 46.

70.     Accordingly, in what appears to be an arbitrary decision, the FDIC has provided holders of the Eurodollar Sweep Accounts with "insured depositor" status, granting them a full guarantee by the FDIC under the SRE.  The stated justification for this decision is that certain amount of the funds associated with the Eurodollar Sweep Accounts had "swept back" into an FDIC-insured deposit account located in the United States at or around the time of SVB's entry into receivership.  *Pearson Decl.*, ¶ 47.

71.     The FDIC's arbitrary decision does not on its face appear to comport with the 12 U.S.C. § 1813(l)(5) definition of an insured account (rather the Eurodollar Sweep Account is a "foreign account" [*i.e.* uninsured]). The decision to include the Eurodollar Sweep Accounts within the insurance therefore appears to have been at least, in part, a discretionary decision by the FDIC. Wherein, by implication, the geographic limitation on insurance and depositor status was *NOT waived* along with the account limit and US account holder limitations.  It follows as a corollary that the FDIC exercised its discretion to *not* include the Eurodollar Money Market and Eurodollar Operating Accounts within the insured pool as a matter of discretion on the basis that their credits were not geographically located

in the United States (the "**Discretionary Insurance Decision**").[4]

72.     As an initial matter, it appears that the FDIC's analysis is and was wrong.  All three of the accounts' credits were located in SVB accounts located in the United States, as were the credits located in SVB Cayman's segregated account at SVB.

73.     Moreover, the apparently false justifications' credibility are diminished wherein the JOLs' investigation to date has revealed that more than 90% of the uninsured depositors of SVB Cayman are of Chinese origin or China-investment connected, while the demographics of the SVB Cayman insured depositors are mixed and nominal.  *Pearson Decl.*, ¶ 48.  Despite this, due to the nature of international investment practices, the JOLs have learned through their investigation that significant U.S. investors and international investors have also been rendered collateral damage of the FDIC's decisions.  *Pearson Decl.*, ¶ 48.

74.     This stark outcome – at the very least – merits an investigation into the reasons for the outcome disparity. Two potential avenues of inquiry will be whether the discretionary decisions to over-insure the Sweep Account depositors above $250,000 and waive the US person limitation, but not waive the U.S. Geographic situs limitation (by implication) was either arbitrary and capricious or an impermissible exercise of discretion based upon national origin – especially under circumstances where the only possible party impacted by the US Geographic situs limitation was SVB Cayman and its depositors – given SVB Cayman was the sole foreign deposit-taking branch of Silicon Valley Bank.

75.     Further investigation is also needed into the precise authorization and mechanism by

---

[4] It should be noted that the Discretionary Insurance Decision bears only a slight resemblance to the FDIC's arbitrary decision not to apply the SRE to the SVB deposit account in the name of SVBFG, which resulted in the chapter 11 bankruptcy filing of SVBFG and litigation pending before the Southern District of New York and the Northern District of California.  The FDIC's discretionary decision as to SVBFG was on the basis that SVBFG was an insider of SVB and that FDIC has valid setoff claims against SVBFG.  In the present case, there can be no rational basis to classify the SVB Cayman Deposit Accounts, held by independent depositors, as "insider" accounts, and the FDIC-R has not asserted any type of setoff claim to date.

which FDIC-R, stepping into the powers of Silicon Valley Bank's former management, "moved" the SVB Cayman depositors' funds into the receivership estate without the safeguards and approvals required of all licensed bank branches in Cayman.

76.     Given the JOLs' awareness that no such authorization was ever provided to FDIC-R, the culmination of the analysis prepared by the JOLs to date is a simple syllogism: *either* the money was (digitally) "located" in Cayman in which case the transfer of funds associated with the Cayman accounts to FDIC-R, which occurred without the assent of CIMA, the SVB Cayman Agreement Manager, or the Grand Court, constituted an *ultra vires* and *void ab initio* act and an unconstitutional taking under the 5th Amendment of the U.S. Constitution resulting in a constructive trust, *or* (more likely) the digital situs of the funds was in the United States at the time of the transfer, and such funds should either and both have been covered by FDIC insurance or deemed "deposits" within the meaning of the relevant FDIC priority statutes.

77.     Even setting aside whether the transfer of credits constituted an impermissible and *ultra vires* act and the resulting constructive trust, any post-failure transfers or attempted machinations by FDIC-C or FDIC-R are moot from the perspective of deciding whether the same are insured deposits or deposits within the SVB Receivership waterfall.  *See, Adagio,* 338 F.Supp.2d at 80 (citing the FDIC Manual Of Instructions for Claim Agents for the proposition that "the rights of depositors are fixed as of the moment of the institution's closing…").

78.     Even more distressing is the fact that the JOLs, who were appointed in June 2023, have so far received no notice from the FDIC concerning the status of the SVB Cayman Domestic Account. *Pearson Decl.*, ¶ 26.  The SVB Cayman Domestic Account constitutes a depository liability owed by SVB to SVB Cayman and is located in the United States, and as such would appear to fall within the fully-insured accounts covered by Secretary Yellen's invocation of the SRE.

IV.     **The Cayman Proceeding**

79.     On June 13, 2023, certain SVB Cayman depositor-creditors which had been classified as uninsured, general creditors of the SVB Receivership (collectively, the "**Creditors Group**"), submitted a Winding Up Petition to the Grand Court (the "**Petition**") seeking, *inter alia*, the winding up of SVB Cayman under the Companies Act, and the appointment of joint official liquidators for SVB Cayman. *Pearson Decl.*, ⁋ 50. A true and correct copy of the Petition is attached to the Pearson Declaration as Exhibit 13.

80.     As noted above, on June 30, 2023, the Grand Court of the Cayman Islands issued the Winding Up Order. *Pearson Decl.*, ⁋ 51. A true and correct copy of the Winding Up Order is attached to the Pearson Declaration as Exhibit 14.

81.     In addition to powers delineated in the Companies Act and its implementing regulations, the Winding Up Order authorizes the JOLs to act jointly and severally as joint official liquidators of SVB Cayman. *Pearson Decl.*, ⁋ 52.

82.     The Winding Up Order also authorizes the JOLs to appoint attorneys and professional advisors in the Cayman Islands and the United States, and to hire staff to assist in performance of their duties. These powers are exercisable within and outside of the Cayman Islands. *Pearson Decl.*, ⁋ 53.

83.     On July 21, 2023, the Grand Court entered a Judgment explaining the justifications for the Winding Up Order (the "**July 2023 Opinion**"). In the July 2023 Opinion, the Grand Court found that jurisdiction existed under section 91(d)(iv) of the Companies Act for the Grand Court to order SVB Cayman's winding up, *notwithstanding* the SVB Receivership, and confirmed that doing so is just and equitable given the public interest in investigating and understanding its depositors-creditors' position relative to SVB, and to protect their interests. *Pearson Decl.*, ¶ 54. A true and correct copy of the July 2023 Opinion is attached to the Pearson Declaration as Exhibit 15.

84.     Furthermore, the Grand Court noted in the July 2023 Opinion that granting the Petition and commencing the Cayman Proceeding was appropriate because:

> I am satisfied that [SVB Cayman] has and has had sufficient connections with the Cayman Islands.  It had an active branch here and entered into contracts governed by Cayman law and it took Cayman deposits.  It is regulated by the Cayman Islands Monetary Authority.  There is a clear and sufficient connection with the Cayman Islands.

*Pearson Decl.,* ¶ 55 (quoting July 2023 Opinion, ¶ 57).

85.     On January 11, 2024, the Grand Court entered an Order: (i) sanctioning the filing of an application by the JOLs for recognition pursuant to Chapter 15 of the US Bankruptcy Code; and (ii) holding that, under Cayman law, the JOLs are the representatives of an estate and a trust that is subject to Cayman Islands proceedings (the "**Sanction Order**").  *Pearson Decl*., ₱ 56. A true and correct copy of the Sanctions Order is attached to the Pearson Declaration as Exhibit 16.

86.     Since the Cayman Proceeding began on June 30, 2023, the JOLs have been in control of SVB Cayman from FFP's Cayman's office in the Cayman Islands. *Pearson Decl*., ₱ 57.  Messers. Pearson and Childe reside in the Cayman Islands and have performed all work in connection with the Cayman Proceeding from the Cayman Islands, while Mr. Ledwidge is based in New York and has conducted activities in connection with the Cayman Proceeding and SVB Cayman in New York, New York.  *Pearson Decl.*, ₱ 57.

87.     Since their appointment, and pursuant to the Winding Up Order and the provisions of the Companies Act and related regulations, the JOLs have undertaken the following actions from the

Cayman Islands, designed to facilitate the orderly winding up of SVB Cayman for the benefit of its

creditors and other stakeholders:

a.   Drafting and submitting to the Grand Court the First Report of the Joint Official Liquidators, dated September 12, 2023;

b.   Directing the strategy and activities for the Governmental Outreach strategy implemented by the JOLs (defined and discussed below)

c.   Transitioning the registered office of SVB Cayman to FFP Cayman;

d.   Hiring Cayman Islands counsel and United States counsel;

e.   Issuing notice of their appointment to various Cayman Islands-based governmental bodies, including public notice which was published in the Cayman Islands Gazette on July 5, 2023;

f.   Advertising their appointment and the commencement of the Cayman Proceeding in publications in other jurisdictions, including the South China Morning Post;

g.   Attending to all required statutory filings with the Grand Court and the Cayman regulatory agencies;

h.   Establishing a website to keep depositors-creditors apprised of the Cayman Proceeding, which is located at https://svbcaymanliquidation.com;

i.   Liaising with Cainvest Bank & Trust, SVB Cayman's former registered service provider, to preserve and seek access to SVB Cayman's statutory books and records;

j.   Applying for de-registration of SVB Cayman with CIMA in light of the commencement of the Cayman Proceeding;

k.   Liaising with CIMA on the steps being taken during the initial phase of the winding up of SVB Cayman;

l.   Obtaining information from CIMA relevant to the winding up of SVB Cayman;

m.   Regularly communicating with depositors-creditors to address queries and concerns regarding the winding up process;

n.   Convening and holding a first meeting of creditors on September 20, 2023;

o.   Notifying creditors of the formation of a Liquidation Committee for SVB Cayman and communicating with the Liquidation Committee in formal and regularly scheduled, minuted meetings;

p.   Preparing and submitting a Proof of Debt form for creditors-depositors;

q.   Filing claims on behalf of depositors-creditors in both the SVB Receivership referenced above (July 10, 2023), as well as the chapter 11 bankruptcy proceeding of SVB Financial Group ("**SVBFG**") (August 11, 2023);

r.      Preparing a Notice of Appointment and Claims Submission Process letter, which was distributed to all depositors-creditors of SVB Cayman;

s.      Continued to investigate the asset position of SVB Cayman; and

t.      Pursuant to section 110(4) of the Companies Act and Order 8 Rule 1 of the CWR, determining that SVB Cayman is insolvent, for purposes of the relevant provisions of the Companies Act.

*Pearson Decl.*, ¶ 58.

88.     The JOLs also have transferred a sum of $15,000  (the "**Stout Holding**") to a trust account held by Stout in New York.  The Stout Holding remains undrawn.  *Pearson Decl.*, ¶ 59.

89.     The JOLs' forthcoming tasks in conjunction with the Cayman Proceeding include, but are not limited to:

a.      Continuing to seek copies of the statutory books and records of SVB Cayman, which are believed to be in FDIC-R's possession;

b.      Completing the deregistration of any licenses with Cayman Islands regulators;

c.      Preparing the second status report for the Grand Court, which is due in early 2024;

d.      Continuing regular meetings with the SVB Cayman Liquidation Committee and depositors-creditors of SVB Cayman;

e.      Pursuing ongoing claims to further recovery efforts for the depositors-creditors, as well as SVB Cayman's direct claim in connection with its deposit account with SVB;

f.      Adjudicating claims submitted in the Cayman Proceeding, if any; and

g.      Further liaising with CIMA to work collaboratively in the Cayman Proceeding.

*Pearson Decl.*, ¶ 60.

## V.      **The JOLs' Government Outreach Strategy and the Disallowance of the Provisional Proof of Claim**

90.     The FDIC-imposed bar date to file claims in the SVB Receivership was Monday, July 10, 2023, shortly after the JOLs' appointment and prior to the selection of United States counsel.  Under the circumstances, the JOLs caused to be filed a provisional and placeholder proof of claim ("**Provisional Proof of Claim**").  A true and correct copy of the Provisional Proof of Claim is attached

to the Pearson Declaration as Exhibit 17.  In correspondence and communications with counsel for the FDIC, it agreed to consider a supplement to the Provisional Proof of Claim at a later date, notwithstanding the bar date in effect.  *Pearson Decl.*, ¶ 61.

91.     In the months following their appointment, the JOLs' core strategy, developed through the FPP team in the Cayman Islands, had revolved around considerations of political reality.  Because this matter (i) implicates significant United States, Cayman and international banking interests, and (ii) SVB Cayman and the SVB Cayman depositors possess significant and fundamental legal and equitable rights to redress and remedy, the JOLs concluded that the best approach in the first instance would be to seek a significant and high-level meeting with the FDIC-C and FDIC-R, appropriately backed by legislative outreach (the "**Government Outreach**").  *Pearson Decl.*, ¶ 62.

92.     In the best-case scenario, as a result of such a meeting, rational minds could examine the salient issues and points of mutual interest and devise an outcome that satisfies all interests.  In the worst-case scenario, the JOLs could be assured that all possible steps toward amicable resolution had been taken before resorting to litigation.

93.     In furtherance of this goal, a team led by Holland & Knight attorney and former Congressman James "Jim" Davis has, since September of 2023, engaged in a significant and nearly daily lobbying campaign toward explaining to Members of Congress, many of whom were unaware that there were U.S. victims of the SVB Cayman collapse, that there is in fact a significant segment of U.S. interests who will not receive a recovery if the claims of SVB Cayman depositors are categorized as "unsecured creditor claims" by the FDIC.  *Pearson Decl.*, ¶ 64.

94.     Beginning on December 6, 2023, the FDIC was contacted by at least one Congressional office asking for a high-level meeting between FDIC-C, FDIC-R and the JOLs to occur in January 2024.  The JOLs understood that planning for this meeting was underway subject to details on the

identity of the participants and the finalization of dates.  *Pearson Decl.*, ¶ 65.

95.     Significant work into framing the meeting and the issues to be discussed have taken place since September 2023.   In keeping with all parties seemingly cooperative efforts to avoid the time, expense and uncertainties of litigation, the JOLs neither commenced a Chapter 15 recognition application nor supplemented the Provisional Proof of Claim, waiting instead until the meeting(s) occurred such that the parties would have maximal freedom to develop and prepare potential solutions and resolutions.  *Pearson Decl.*, ¶ 66.

96.     On January 3, 2024, a scanned copy of a letter (the "**Claim Denial Letter**") from the FDIC-R was received by Alston & Bird (U.S. counsel previously considered for full engagement by the JOLs and the sole filer of the Provisional Proof of Claim), which letter appears to have been mailed on December 26, 2023, while the discussions regarding the planned meeting between the JOLs' lobbying team at Holland & Knight  lobbying team, Congressional staffers, and the FDIC were ongoing.  The Claim Denial Letter purports to disallow SVB Cayman's claim on the unexplained ground that it was "not proven to the satisfaction of the Receiver."  *Pearson Decl.*, ¶ 67. A true and correct copy of the Claim Denial Letter is attached to the Pearson Declaration as Exhibit 18.

97.     On January 3, 2024, a request for a telephone call with counsel for the FDIC was made via email by Holland & Knight to discuss the Claim Denial Letter.  In particular, the Claim Denial Letter appears to be a final resolution, triggering a 60-day window to commence litigation in response to the Claim Denial Letter, and fundamentally is out of step with the process and high-level meetings under discussion and fundamentally out of step with planning a high-level meeting, as well as the contemplated and agreed supplemental claim submission.  *Pearson Decl.*, ¶ 68.

98.     In response to Holland & Knight's January 3rd email, FDIC-R has declined to discuss the Claim Denial Letter and its implications further.  *Pearson Decl.*, ¶ 69. A true and correct copy of

the FDIC Counsel's response is attached to the Pearson Declaration as Exhibit 19.

## VI.   Insolvency Proceedings Under the Cayman Islands Companies Act

99.     Under Cayman Islands law, the legal framework relating to the reorganization of debtors in insolvency located and registered in the Cayman Islands is contained in the Companies Act. *Pearson Decl.*, ¶ 70.

### A.      Liquidation of Cayman Islands Companies

100.    Part V of the Companies Act governs the winding up of companies in the Cayman Islands. Part V applies to companies formed or registered under the Companies Act or its predecessors, including companies that are formed as foreign registered companies.  *Pearson* Decl., ¶ 71.

101.    Specifically, the Grand Court may make winding up orders in respect of foreign companies which are registered under Part IX of the Companies Act, such as SVB Cayman, just as CIMA may independently obtain liquidation under the same, explicitly referenced provisions. *Pearson Decl.*, ¶ 72.

102.    Part V is supplemented by the following rules and regulations made pursuant to section 155 of the Companies Act: the CWR, the Insolvency Practitioners' Regulations 2018 (the "**IPR**"), and the Foreign Bankruptcy Proceedings (International Cooperation) Rules 2018. *Pearson Decl*., ¶ 73.

103.    A company may be wound up in one of three ways: (a) voluntarily, following the passing of a special resolution of its shareholders or pursuant to a mandatory term in its constitutional documents; or (b), by order of and under the supervision of the Grand Court (termed "Official Liquidation" because it is carried out by officers of the Court).  *Pearson Decl*., ¶ 74.

104.    Here, the Creditors' Group sought winding up of SVB Cayman because SVB Cayman was unable to pay its debts within the meaning of section 93 of the Companies Act and pursuant to the explicit and unambiguous account agreements setting forth the exclusive SVB Cayman-Depositor

relationship and the exclusive jurisdiction of the Cayman Islands law and courts. *Pearson Decl.*, ¶ 75.

105.    Unless otherwise ordered by the Grand Court, Schedule 3, Part I to the Companies Act sets out the powers that the JOLs may exercise with the sanction of the Grand Court and Schedule 3, Part II sets out the powers the JOLs may exercise without sanction. *Pearson Decl.*, ¶ 76.

106.    In this case, the Grand Court issued the Winding Up Order on June 30, 2023, resulting in the appointment of the JOLs. It is not possible to reverse a winding up order, other than via appeal, and there has been no appeal of the Winding Up Order. *Pearson Decl.*, ¶ 77.

**B.      The General Rules and Procedures for Liquidation by the Grand Court**

107.    The official liquidation of a company in the Cayman Islands is carried out by liquidators appointed by and under the supervision of the Grand Court pursuant to certain statutory mechanisms set out in the Companies Act. *Pearson Decl.*, ¶ 78.

108.    The Grand Court has jurisdiction in respect of (among other things) the winding up of companies which are registered under Part IX of the Companies Act.  The Financial Services Division of the Grand Court, which supervises the Cayman Proceeding, deals with proceedings involving the winding up of companies.  *Pearson Decl.*, ¶ 79.

109.    The Cayman Proceeding is a court-supervised, collective process. The JOLs are appointed and supervised by the Grand Court and owe fiduciary duties to the Grand Court including to ensure that the interests of the SVB Cayman stakeholders are protected. *Pearson Decl.*, ¶ 80.

110.    A general principle underlying the Cayman Islands' insolvency regime is that the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.  This

is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors. *Pearson Decl.*, ¶ 81 (citing *Companies Act*, § 140).

111.    Section 97(1) of the Companies Act provides that upon the entry of a winding up order, a stay is implemented such that no suit or other proceeding may be commenced or continued against the company except with leave of the Grand Court and subject to such terms as the Grand Court may impose. *Pearson Decl.*, ¶ 82.

112.    This automatic stay serves to promote the JOLs' ability to deal with the claims of creditors collectively and comprehensively. *Pearson Decl.*, ¶ 82.

113.    Winding up proceedings under the Companies Act are collective proceedings. All creditors have an opportunity to be heard by the Grand Court, and no creditor will be prejudiced because it is foreign-based. *Pearson Decl.*, ¶ 83.

**C.      The Role and Powers of the JOLs**

114.    The JOLs are fiduciaries and officers of the Grand Court. The powers of SVB Cayman's managers are displaced by entry of the Winding Up Order and the appointment of the JOLs. *Pearson Decl.*, ¶ 84.

115.    To be eligible for appointment as an official liquidator, the proposed appointee(s) must comply with the provision of the IPR, which include requirements as to: (a) professional qualifications: official liquidators are typically highly experienced and qualified accountants, with expertise as insolvency practitioners; (b) residency in the Cayman Islands; (c) insurance; and (d) independence. A foreign practitioner can also be appointed as an official liquidator of a Cayman company, provided it is a joint appointment with a Cayman-based insolvency practitioner and provided they comply with

certain requirements including professional qualifications, independence and insurance. *Pearson Decl.*, ¶ 85.

116.    Winding up hearings are open to the public, and any member or creditor may attend to be heard on the question of who should be appointed as official liquidators. This may include appearances by stakeholders in order to oppose the appointment of voluntary liquidators who have nominated themselves for appointment as official liquidators, and it may include challenge on the basis of an alleged lack of independence. *Pearson Decl.*, ¶ 86.

117.    The JOLs' powers arise from Schedule 3 of the Companies Act, the CWR and Orders of the Grand Court. Broadly speaking, the JOLs are empowered, as agents of SVB Cayman, to collect, take possession, retain, manage and realize SVB Cayman's property for the benefit of creditors and other stakeholders. *Pearson Decl.*, ¶ 87.

118.    Schedule 3, Part I to the Companies Act (as supplemented by the CWR) sets out the following powers that the JOLs may exercise with the prior approval (referred to as "sanction" under Cayman Islands law) of the Grand Court:

    a.    Bring or defend any action or other legal proceeding in the name and on behalf of the company;

    b.    Carry on the business of the company so far as may be necessary for its beneficial winding up;

    c.    Dispose of any property of the company to a person who is or was related to the company;

    d.    Pay any class of creditors in full;

    e.    Make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the company or for which the company may be rendered liable;

    f.    Compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor

or person apprehending liability to the company;

g.    Deal with all questions in any way relating to or affecting the assets or the winding up of the company, take any security for the discharge of any such call, debt, liability or claim and give a complete discharge in respect of it;

h.    Sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

i.    Raise or borrow money and grant securities therefor over the property of the company;

j.    Engage staff (whether or not as employees of the company) to assist in the performance of their functions; and

k.    Engage attorneys and other professionally qualified persons to assist in the performance of their functions.

*Pearson Decl.*, ⁋ 88.

119.    Schedule 3, Part II of the Companies Act (as supplemented by the CWR) sets out the powers that the JOLs may exercise without the Grand Court's prior approval:

a.    Take possession of, collect and get in the property of the company and for that purpose to take all such proceedings as they consider necessary;

b.    Do all acts and execute, in the name and on behalf of the company, all deeds, receipts and other documents and for that purpose to use, when necessary, the company seal;

c.    Prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and ratably with the other separate creditors;

d.    Draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company, with the same effect with the respect of the company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business;

e.    Promote a scheme of arrangement pursuant to section 86 of the Companies Act;

f.    Convene meetings of creditors and contributories; and

g.    Do all other things incidental to the exercise of these powers.

*Pearson Decl.,* ⁋ 89.

120.    Often the order of the Grand Court appointing official liquidators will explicitly

authorize them to exercise some of the powers set forth in Schedule 3, Part I of the Companies Act (i.e. no further approval will be required in order for those powers to be exercised), as is the case with the Winding Up Order.  For example, Paragraph 5 of the Winding Up Order authorizes the JOLs to, without further sanction or intervention from the Grand Court, appoint such counsel, attorneys, professional advisors whether in Cayman Islands or elsewhere, as they may consider necessary to advise and assist them in the performance of their duties in accordance with Order 25 of the Companies Winding Up Rules (2023 Consolidation).  *Pearson* Decl., ¶ 90; *Winding Up Order*, ¶ 5.

121.    As the Official Liquidators of SVB Cayman, the JOLs' practical duties include: (a) determining whether SVB Cayman is solvent, insolvent, or of doubtful solvency; (b) ascertaining the assets and liabilities of SVB Cayman; and (c) establishing the identities of SVB Cayman's stakeholders. The solvency determination is significant because it determines who are treated as the stakeholders in the Cayman Proceeding – that is, whether it is the shareholders (in the case of a solvent liquidation), the creditors (in the case of an insolvent liquidation) or both (where the company is of doubtful solvency). *Pearson Decl.*, ¶ 91.

122.    As fiduciaries and officers of the Grand Court, the JOLs are duly authorized and empowered by the Grand Court to investigate the affairs of SVB Cayman, to administer the distribution of its assets, and to act as the duly authorized representatives of SVB Cayman. As official liquidators, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of SVB Cayman, but are also empowered as agent to assert claims on behalf of SVB Cayman's creditors, such as the uninsured holders of SVB Cayman Deposit Accounts. *Pearson Decl.*, ¶ 92.

123.    The Companies Act provides for notice to creditors of the commencement of the insolvency proceeding, of the process for submission of claims, of creditors' meetings, and of voting

on the insolvency plan, which notices may be given by publication on the website designated therefore by the justice system. *Pearson Decl.*, ¶ 93..

124.    The Companies Act provides for classification of creditors and treatment in accordance with statutory priority. *Pearson Decl.*, ¶ 94 (citing *Companies Act*, § 140). A key principle underlying the Companies Act and the Cayman Proceeding is that the claims of creditors within the same class are treated on a *pari passu* basis. *Pearson Decl.*, ¶ 94 (citing *Companies Act*, § 140). Notice is given to creditors of the process and deadline for submission of claims. *Pearson Decl.*, ¶ 94.

## RELIEF SOUGHT

125.    By this Verified Petition, the Foreign Representatives seek the following relief:

   a. recognizing the Cayman Proceeding as a foreign main proceeding under 11 U.S.C. §§ 1502, 1515, 1517(a) and (b)(1), or, in the alternative, as a foreign nonmain proceeding pursuant to 11 U.S.C. § 1517(b)(2) of the Bankruptcy Code;

   b. recognizing the JOLs as foreign representatives of SVB Cayman under 11 U.S.C. §§ 101(24) and 1517(a)(2), and the estate of SVB Cayman as the exclusive debtor of and agent for the SVB Cayman depositors;

   c. requiring the turnover of assets of SVB Cayman, including SVB Cayman's books and records, to the JOLs pursuant to 11 U.S.C. §§ 542 and 1521(a)(4), (a)(7) and (b);

   d. permitting the JOLs, pursuant to 11 U.S.C. §§ 1520 and 1521, to conduct discovery directed to, among others, the FDIC; and

   e. granting such other and further relief as the Court may deem just and proper.

## BASIS FOR RECOGNITION

126.    Section 109(a) of the Bankruptcy Code implements certain threshold requirements and limitations for eligibility to be a debtor under the United States Bankruptcy Code. Additionally, Section 1502(1) outlines entities eligible to be a debtor under chapter 15 of the Bankruptcy Code, and section 1501 outlines when chapter 15 is applicable. As described below, chapter 15 applies to this case under section 1501, and SVB Cayman is eligible to be a debtor thereunder pursuant to sections 109 and 1502.

127.    Further, section 1517 of the Bankruptcy Code mandates entry of an order recognizing a "foreign proceeding" if it appears that recognition will not undermine U.S. public policy and: "(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign non-main proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a).

128.    While "not explicit" in Section 1517(a), the "foreign proceeding and the foreign representative must meet the definitional requirements set out in sections 101(23) and 101(24)." *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 608 (Bankr. S.D.N.Y. 2017) (quoting 8 COLLIER ON BANKRUPTCY ¶ 1517.01 (16th ed. 2017)).

129.    Provided the putative foreign representative meets the burden of proof, recognition is "mandatory if the requirements of Section 1517(a) are met." *In re Oi Brasil Holdings Coöperatief U.S.*, 578 B.R. 169, 194 (Bankr. S.D.N.Y. 2017), *reconsideration denied*, 582 B.R. 358 (Bankr. S.D.N.Y. 2018).

130.    Each of those requirements is met here, and entry of an order substantially in the form of the Proposed Order will significantly aid the Foreign Representatives' efforts to efficiently and comprehensively address all insolvency creditors' claims through the Cayman Proceeding, ensuring fair and equitable treatment of SVB Cayman's creditors and interest holders.

I.    **SVB Cayman is Eligible for Relief and Recognition under Sections 101, 109, 1501, and 1502 of the Bankruptcy Code.**

A.    **SVB Cayman is an "Entity" Subject to be a "Debtor" under Chapter 15 of the Bankruptcy Code**

131.    Section 1502(1) provides that a "debtor" under chapter 15 of the Bankruptcy Code means "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1). In turn, section 101(15) defines "entity" to "include[] a person, **estate**, **trust**, governmental unit . . . ." 11 U.S.C.

§ 101(15) (emphasis added).  The legislative history for Section 1502(1) of the Bankruptcy Code notes: "'Debtor' is given a special definition for this chapter.  This definition does not come from the Model Law, but is necessary to eliminate the need to refer repeatedly to 'the same debtor as in the foreign proceeding.'"  See H.R. Rep. 109-31, Part I, 107, 2005 U.S.C.A.N. 88.

132.    The determination of debtor eligibility is made as of the time of the chapter 15 petition is filed, not any prior date. *See In re The Irish Bank Resolution Corp. Ltd,* 538 B.R. 692, 697 (Bankr. D. Del. 2015) (noting that in determining chapter 15 eligibility, the "relevant time period to consider is the date of the filing of the Chapter 15 petition, not the debtor's 'entire operational history.'").

133.    As described above, SVB Cayman is, and at all times since its inception has been, governed by Cayman Islands law. Under Cayman Islands law, the entry of the Winding Up Order operated to create an insolvency estate and trust subject to winding up under the Companies Act to be administered by the JOLs under the Supervision of the Grand Court.  Indeed, the Sanction Order entered by the Grand Court affirmatively found the JOLs to be representatives of a "trust" and an "estate" under Cayman Islands law and subject to the Cayman Proceeding. *See Sanction Orde*r at ¶ 2.

134.    As of the date hereof, SVB Cayman is an insolvency estate and statutory trust existing under and being wound up in accordance with Cayman Islands law.  The Debtor is therefore an "estate" and "trust" and, as described below, the Cayman Proceeding is a "foreign proceeding" satisfying section 1502(1) of the Bankruptcy Code.

135.    Accordingly, as an insolvency estate and trust under Cayman Islands law, SVB Cayman is an "entity" eligible to be a debtor under chapter 15 of the Bankruptcy Code.

**B.      Chapter 15 Applies to SVB Cayman and the Cayman Proceeding under Sections 1501 and 109 of the Bankruptcy Code**

136.    As referenced above, section 1501 of the Bankruptcy Code provides that chapter 15 applies where, as here, "assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding." 11 U.S.C. § 1501(b)(1). Section 1501 goes on to limit the application of chapter 15, however, providing that it is inapplicable to a proceeding concerning "an entity . . . identified for exclusion by section 109(b)." *Id.* at § 1501(c). Section 109(b) provides that various entities are excluded from eligibility as a debtor under the Bankruptcy Code, including "a domestic insurance company, bank, savings bank, cooperative bank . . . or similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act." 11 U.S.C. § 109(b)(2).

137.    Additionally, section 109(b)(3) excludes from bankruptcy eligibility "a foreign bank, savings bank, cooperative bank, savings and loan association, building and loan association, or credit union, that has a branch or agency (as defined in section 1(b) of the International Banking Act of 1978) in the United States." 11 U.S.C. § 109(b)(3).[5]

138.    As described below, SVB Cayman is an insolvency estate and trust under Cayman Islands law, which conducts no banking or other operations aside from its winding up and it is therefore neither a "domestic bank" or a "foreign bank" excluded from chapter 15 eligibility under section 109(b).

        i.      *SVB Cayman is Not a "Domestic Bank" and is Not Excluded from Chapter 15 Eligibility under Bankruptcy Code Sections 1501(c) and 109(b)(2)*

---

[5] "Agency" is defined to mean "any office or any place of business of a foreign bank located in any State of the United States at which credit balances are maintained incidental to or arising out of the exercise of banking powers, checks are paid, or money is lent but at which deposits may not be '\accepted from citizens or residents of the United States." 12 U.S.C. § 3101(1).

139.    SVB Cayman has never operated as a "bank" within the United States, and at all times in its operations SVB Cayman was registered only in the Cayman Islands and subject to CIMA regulation. *See Pearson Decl.,* ¶ 6. While SVB itself was a "domestic bank," by the FDIC's own admission, upon the commencement of an FDIC receivership, a failed bank ceases to exist. *F.D.I.C. v. N. Savannah Props., LLC*, 686 F.3d 1254, 1259–60 (11th Cir. 2012).

140.    As reflected in the Winding Up Order and the Sanction Order, SVB Cayman now exists as an insolvency estate and trust to be administered under Grand Court supervision for the benefit of its creditors and stakeholders. As a Cayman Islands insolvency estate that has been "orphaned" by virtue of the SVB Receivership and the failure to transfer SVB Cayman to First-Citizens, SVB Cayman is not a "domestic bank" for purposes of section 1501(c) and 109(b)(2).

ii.    *SVB Cayman is Not a "Foreign Bank" with a Branch or Agency in the United States and is Not Excluded from Chapter 15 Eligibility under Bankruptcy Code Sections 1501(c) and 109(b)(3)*

141.    Likewise, SVB Cayman is not a "foreign bank" with branches or agencies in the United States within the meaning of section 109(b)(3). As described above, SVB Cayman is an insolvency estate and statutory trust with the sole purpose of the orderly, efficient, and impartial administration of the winding up of its affairs under the Companies Act.

142.    An analogous case involving a foreign bank that had historically maintained branches in the United States but had wound down and terminated those branches prior to filing a chapter 15 petition is instructive. In *in re The Irish Bank Resolution Corp.*, the United States District Court for the District of Delaware affirmed the bankruptcy court's holding that, because the debtor no longer maintained United States branches *at the time the chapter 15 petition was filed*, it was eligible for chapter 15 relief, and any historic domestic ties did not render the debtor ineligible under chapter 15. *In re The Irish Bank Resolution Corp. Ltd*, 538 B.R. 692, 697 (Bankr. D. Del. 2015).

143.    Specifically, in *Irish Bank*, special liquidators were appointed to liquidate Irish Bank Resolution Corporation Ltd. ("**IBRC**"). The liquidators filed a petition for recognition of the Irish liquidation proceeding in the United States pursuant to chapter 15 of the Bankruptcy Code, which the bankruptcy court granted. A group of United States-based creditors, however, appealed the order granting recognition arguing that, among other things, IBRC was not eligible for chapter 15 relief because it had a branch in the United States as recently as several months prior to the chapter 15 filing. The district court affirmed the bankruptcy court's grant of recognition, finding that a debtor's eligibility should be determined as of the chapter 15 filing date, and because there was no evidence that the debtor had a branch or agency in the U.S. as of the date of the chapter 15 filing, the IBRC was eligible for Chapter 15 relief. *Id.* at 696-97.

144.    The concepts employed by the court in *Irish Bank* are equally applicable here.  As of the date of this Petition, SVB Cayman has no branches in the United States and has no banking operations in the United States, aside from the winding up and administration of its estate.  Rather, SVB Cayman exists exclusively as an insolvency estate under the authority of the JOLs pursuant to orders of the Grand Court, with no operations other than asset recovery and administration for the benefit of creditors and with an eye towards its ultimate liquidation. Accordingly, SVB Cayman is not a "foreign bank" with branches or agency in the United States.

**C.    SVB Cayman is Eligible for Relief under Section 109(a) of the Bankruptcy Code**

145.    Section 109(a) of the Bankruptcy Code provides that a debtor must reside or have a domicile, a place of business, or property in the United States.  *See Drawbridge Special Opportunities Master Fund LP v. Barnet (In re Barnet)*, 77 F.3d 238, 246-48 (2d Cir. 2013).  This provision does not require a specific quantum of property in the United States, nor does it indicate when or for how long

such property must have a United States *situs*.  *See, e.g., In re Berau Capital Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).

146.    SVB Cayman holds significant assets within the United States.  First, as discussed above, the JOLs' are aware of the undisclosed SVB Cayman Domestic Account, a U.S.-based account with SVB in the name of SVB Cayman.  *Pearson Decl.*, ¶ 26. *See, e.g., In re Olinda Star Ltd.*, 614 B.R. 28, 39 (Bankr. S.D.N.Y. 2020) ("Courts in this Circuit have held that section 109(a) can be satisfied by bank accounts in the United States.")

147.    Second, SVB Cayman, on behalf of itself and as agent for its creditors-depositors, holds numerous potential claims to be asserted in the United States against the FDIC and third parties in connection with the SVB Cayman Domestic Account and the Discretionary Insurance Decision.  *See In re Octaviar Administration Pty Ltd.*, 511 B.R. 361 (Bankr. S.D.N.Y. 2014) (holding that claims to be asserted in the United States qualifies as property in the United States under Section 109(a)).

148.    Third, SVB Cayman's books and records concerning its pre-liquidation operations and management are located in the United States, as FDIC-R obtained possession of such records upon the SVB Collapse.

149.    Lastly, SVB Cayman satisfies the asset requirement through the Stout Holding, which remains undrawn in the U.S.-based trust account with Stout. *See Pearson Decl.*, ¶ 59. Courts regularly hold that these types of holdings deposited in a New York bank account satisfy the "property in the United States" eligibility requirement of section 109(a).  *See, e.g., In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017), *appeal dismissed*, 585 B.R. 31 (S.D.N.Y. 2018), *aff'd*, 764 Fed. Appx. 46 (2d Cir. 2019) (finding venue when New York counsel held a debtor's retainer in a New York account).

150.    Accordingly, SVB Cayman has sufficient assets in the United States to satisfy section

109(a).

## II.    Venue is Proper in the Southern District of New York

151.    Venue for chapter 15 cases is governed by 28 U.S.C. § 1410, which provides:

A case under chapter 15 of title 11 may be commenced in the district court of the United States
for the district—

> (1) in which the debtor has its principal place of business or principal assets in the United
> States;
>
> (2) if the debtor does not have a place of business or assets in the United States, in which
> there is pending against the debtor an action or proceeding in a Federal or State court; or
>
> (3) in a case other than those specified in paragraph (1) or (2), in which venue will be
> consistent with the interests of justice and the convenience of the parties, having regard
> to the relief sought by the foreign representative.

28 U.S.C. § 1410.

152.    The chapter 15 venue statute provides a hierarchy of choices. *In re Suntech Power*

*Holdings Co., Ltd.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014).  In other words, if a foreign debtor has its

principal assets *or* its principal place of business in a certain district, the foreign debtor *must* file its

chapter 15 petition in that district.  If the foreign debtor does not have assets or a principal place of

business in the U.S., paragraph 2 applies, and the foreign debtor is required to file the chapter 15

petition in the district where litigation is pending against the foreign debtor.  If neither paragraph

applies, the foreign debtor may apply paragraph 3, and has discretion to file the chapter 15 petition in

the venue the foreign representative believes is consistent with "the interests of justice and convenience

of the parties."  When a chapter 15 case is initially brought in a proper venue, the foreign debtor's

choice of forum is entitled to great weight.  *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399

(Bankr. S.D.N.Y. 2014).   If transfer of venue of a chapter 15 case "would merely shift the inconvenience from one party to another, the debtor's choice of forum should not be disturbed." *Id.*

153.    Here, the Southern District of New York is the proper venue for this chapter 15 case, because the Debtor's principal place of business in the United States and its principal assets are located in the District.   First, the Debtor's principal business operations in the United States are being conducted in the Southern District of New York. One of the JOLs, Niall Ledwidge, is based in New York, New York.  *Pearson Decl.*, ¶ 105. In his capacity as a JOL of the Debtor, Mr. Ledwidge has conducted SVB Cayman's primary United States activities through the Government Outreach and efforts to recover assets of SVB Cayman in the United States from his office in New York, New York. *Pearson Decl.*, ¶¶57, 62 n.3.  This is sufficient to find this District to be the proper venue for this case. *See in re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014) (for purposes of 28 U.S.C. § 1410, determining that a

Debtor's principal place of business refers to the place where a debtor's officers direct, control, and coordinate the debtor's activities).

154.    Second, the principal assets of the Debtor are located in the District, in the form of potential litigation claims to be filed against FDIC-C as well as the pending proof of claim filed by the JOLs in the chapter 11 bankruptcy of SVBFG.  The JOLs further understand that, subsequent to the SVB Collapse, previous members of SVB's executive management are currently managing SVB's holding company and affiliates, all from offices in Manhattan.  *See in re SVB Financial Group*, Case. No. 23-10367-mg (S.D.N.Y.) at ECF No. 43.

155.    Accordingly, for the reasons stated above, venue is proper in this district pursuant to 28 U.S.C. § 1410(1).

III.    **The Cayman Proceeding Should be Recognized under Chapter 15 as a Foreign Proceeding.**

156.    As referenced above, section 1517 provides the requirements for entry of an order recognizing a "foreign proceeding" if it appears that recognition will not undermine U.S. public policy and: "(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign non-main proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a).

157.    While "not explicit" in Section 1517(a), the "foreign proceeding and the foreign representative must meet the definitional requirements set out in sections 101(23) and 101(24)." *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 608 (Bankr. S.D.N.Y. 2017) (quoting 8 COLLIER ON BANKRUPTCY ¶ 1517.01 (16th ed. 2017)).

158.    Provided the putative foreign representative meets the burden of proof, recognition is "mandatory if the requirements of Section 1517(a) are met." *In re Oi Brasil Holdings Coöperatief U.S.*, 578 B.R. 169, 194 (Bankr. S.D.N.Y. 2017), *reconsideration denied*, 582 B.R. 358 (Bankr. S.D.N.Y. 2018).

159.    Each of the foregoing requirements is satisfied here, rendering the Cayman Proceeding entitled to recognition under chapter 15 of the Bankruptcy Code.

A.    **The Cayman Proceeding is a Foreign Proceeding.**

160.    The Cayman Proceeding satisfies the definition of "foreign proceeding" as required by section 1517(a)(1) of the Bankruptcy Code.

161.    Section 101(23) of the Bankruptcy Code defines a foreign proceeding as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). Accordingly, seven elements are relevant to determine if 11 U.S.C. § 101(23) has been satisfied: "(1) [the existence] of a proceeding; (2) that is judicial or administrative; (3) that is collective in nature; (4) that is in a foreign country; (5) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (6) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (7) which is for the purposes of reorganization or liquidation." *In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018). The Cayman Proceeding satisfies each of these requirements.

162.    First, the Cayman Proceeding is a "proceeding," which, for these purposes, is a "statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets" and includes "acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." *In re Culligan Ltd.*, Case No. 20-12192 (JLG), 2021 WL 2787926, at *8 (Bankr. S.D.N.Y. July 2, 2021).

163.    The Cayman Proceeding was commenced pursuant to the Companies Act, which governs the liquidation of Cayman Islands companies. The Companies Act and CWR provides that a foreign registered company's liquidation may be conducted by court-appointed liquidators under the supervision of the Grand Court, and it sets forth the permitted scope and powers of the liquidators, including specifying whether the powers can be exercised with or without the sanction of the Grand Court. As in this case, the Companies Act is commonly used in conjunction with the liquidation of Cayman Islands companies. *See, e.g., In re Ascot Fund*, 603 B.R. 271, 278 (Bankr. S.D.N.Y. 2019); *Ocean Rig*, 570 B.R. at 700; *Culligan*, 2021 WL 2787926, at *8 (noting that "[c]ourts in this district

routinely recognize insolvency proceedings … offshore jurisdictions that have analogous English-law

based frameworks") (citations omitted).

164.     Second, the Cayman Proceeding is a "judicial or administrative proceeding" because it

is subject to the supervision of the Grand Court. The Grand Court appointed the JOLs, and the Winding

Up Order, as well as the Companies Act and the CWR, delineates both the powers that the JOLs may

invoke with court sanction and without.  *See Ocean Rig*, 570 B.R. at 702 (finding that the liquidators

were "subject to the control of the [Grand] Court" indicates the liquidation in the Cayman Islands is a

foreign judicial proceeding).  The Grand Court supervises the JOLs and has jurisdiction to hear any

disputes arising out of the Cayman Proceeding, including with respect to distribution of assets.  *See,*

*e.g., Ascot Fund*, 603 B.R. at 278 (that the "Cayman Proceeding is overseen by the Cayman Court"

illustrates that it is a judicial proceeding for which recognition is proper); *Ocean Rig*, 570 B.R. at 700

(same).

165.     The Cayman Proceeding is a "collective … proceeding" because it considers the rights

and obligations of all creditors.  *Pearson Decl.*, at ¶¶ 80-83.  In leading this process as the court-

appointed fiduciaries of SVB Cayman, the JOLs must consider the interests of all parties and must treat

them in an even-handed and fair manner.  The Companies Act requires the JOLs to convene meetings

to discuss omnibus issues (including of creditor(s)) and obligates the JOLs to distribute assets of SVB

Cayman *pari passu* and in the interest of all interested parties.  *Pearson Decl*., ¶ 81.  Moreover, the

Companies Act affords aggrieved parties the right to seek court determination on certain issues and to

have an opportunity to be heard.  *See, e.g., In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr.

S.D.N.Y. 2017), *appeal dismissed*, 585 B.R. 31 (S.D.N.Y. 2018), *aff'd*, 764 Fed. Appx. 46 (2d Cir.

2019) (a proceeding commenced under Part V of the Companies Act is a "collective judicial

proceeding[]"); *In re Ascot Fund*,  603 B.R. 271, 278 (Bankr. S.D.N.Y. 2019).

166.     Fourth, the Cayman Proceeding is pending in the Cayman Islands, a foreign country.

167.     Fifth, the Cayman Proceeding proceeds under the auspices of the Companies Act, which is a statutory scheme "relating to insolvency or adjustment of debt" pursuant to 11 U.S.C. § 101(23). The Companies Act is such a statute because it is applicable to corporate insolvencies, including the Cayman Proceeding, and governs the resolution of any debts owed by or to SVB Cayman, as overseen by the Grand Court. *See Ocean Rig*, 570 B.R. at 701.

168.     Sixth, the assets and affairs of SVB Cayman are subject to the control or supervision of the Grand Court in an official liquidation such as this. For instance, the JOLs cannot collect or realize any assets of SVB Cayman without approval of the Grand Court. Likewise, the Grand Court's approval is required before the JOLs can dispense of any property of SVB Cayman. *See, e.g., Ocean Rig*, 570 B.R. at 701.

169.     Finally, the Cayman Proceeding exists "for the purpose of reorganization or liquidation." The primary reason for the commencement and administration of the Cayman Proceeding is to administer the winding up of SVB Cayman for the benefit of all interested parties by collecting on its assets, investigating its potential claims, and satisfying creditors.

170.     Courts in this District routinely hold that insolvency proceedings under Cayman Islands law qualify as "foreign proceedings" under chapter 15 of the Bankruptcy Code. *See, e.g., Ascot Fund*, 603 B.R. at 286 (recognizing official liquidation proceeding in front of the Grand Court and under the Companies Act); *Ocean Rig*, 570 B.R. at 707 (recognizing provisional liquidation in front of Grand Court and under the Companies Act as foreign proceeding); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416-420 (Bankr. S.D.N.Y. 2014) (same); *In re Huy Vietnam Grp. Ltd. (in Official Liquidation)*, No. 21-10339-jlg (Bankr. S.D.N.Y. May 5, 2021) (ECF No. 10) (same); *In re Frontera Res. Caucasus Corp.*, No. 19-13418-mew (Bankr. S.D.N.Y. Jan. 21, 2020) (ECF No. 19) (recognizing

liquidation proceeding in the Cayman Islands as a foreign main proceeding); *In re Pinnacle Glob. Ptrs. Fund I Ltd.*, 19-11573 (MKV) (Bankr. S.D.N.Y. July 2, 2019) (ECF No. 14) (same); *In re Platinum Ptrs. Value Arbitrage Fund (in Official Liquidation)*, No. 16-12282 (MG) (Bankr. S.D.N.Y. Nov. 23, 2016) (ECF No. 27) (same).

171.    For the foregoing reasons, the Cayman Proceeding is a "foreign proceeding" within the meaning of section 1517(a)(1) of the Bankruptcy Code.

**B.      The Chapter 15 Case Has Been Commenced by Duly Authorized Foreign Representatives and Meets All Other Requirements for Recognition**

172.    Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding. Section 101(24) of the Bankruptcy Code defines "foreign representative" to mean:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).   The requirement that a foreign representative be authorized in a foreign proceeding is "not an onerous one." *In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 717 (Bankr. S.D.N.Y. 2019).

173.    For the reasons explained above, the Cayman Proceeding is a "foreign proceeding."

174.    The JOLs have been appointed by the Grand Court to serve as the joint official liquidators of SVB Cayman pursuant to the Companies Act, the CWR, and the Winding Up Order. The JOLs are authorized to administer the assets and affairs of SVB Cayman. *See Pearson Decl.*, ¶ 87. To that end, the Foreign Representatives, as JOLs, will continue to administer and wind up SVB Cayman in the Cayman Proceeding. The Foreign Representatives therefore satisfy the requirements of section 101(24) of the Bankruptcy Code and should be determined to be "foreign representatives"

within the meaning of that section pursuant to the Commencement Order. *See, e.g., In re OAS S.A.*, 533 B.R. 83, 92–95 (Bankr. S.D.N.Y. 2015) (holding that the term "foreign representatives" includes individuals authorized by the debtor itself to act in the context of foreign proceedings, such as in the situation of a debtor in possession).

175.    Further, the Sanction Order authorizes the JOLs to seek recognition under chapter 15 of the Bankruptcy Code as foreign representatives.    *See* 11 U.S.C. § 1516(a) ("If the decision [commencing the foreign proceeding] … indicates … that the person … is a foreign representative, the court is entitled to so presume."); *Culligan*, 2021 WL 2787926, at *9 (citing 11 U.S.C. § 1516(a) in support of appointing Bermudan liquidators authorized by the foreign liquidation order as foreign representatives).

176.    Notably, two recent decisions in this District recognizing Cayman Islands-based liquidators as "foreign representatives" rely on the explicit authority set forth in the appointment order to file a Chapter 15 proceeding. *See, e.g., Ascot Fund*, 603 B.R. at 278; *Ocean Rig*, 570 B.R. at 701 (section 101(24) of the Bankruptcy Code was satisfied where foreign representatives submitted a Cayman Islands court order authorizing them to "seek relief under chapter 15 of Title 11 of the United States Bankruptcy Code and to take such steps arising in connection therewith that the [provisional liquidators] may consider appropriate").

177.    For these reasons, the JOLs squarely fall within the definition of section 101(24) of the Bankruptcy Code and should be recognized as the foreign representatives of SVB Cayman.

178.    In addition to being a foreign main proceeding brought by duly appointed foreign representatives, the Cayman Proceeding meets all other requirements for recognition under section 1515 of the Bankruptcy Code. The Petition is accompanied by a certified copy of the Winding Up Order issued by the Grand Court and related orders and judgments, which evidences the

commencement of the Cayman Proceeding and the designation of the JOLs as foreign representatives of the Debtor. The Petition also is accompanied by the Pearson Declaration that contains a statement identifying all foreign proceedings with respect to SVB Cayman that are known to the Foreign Representatives. *See* 11 U.S.C. §§ 1515(b), (c).

179.     The Petition likewise is accompanied by a statement containing the information required by Bankruptcy Rule 1007, including the disclosures required by Bankruptcy Rule 7007.1, a statement indicating all other persons or entities known to the Foreign Representatives that are authorized to administer foreign proceedings with respect to SVB Cayman, a list of all parties to litigation with SVB Cayman in the United States, and a list of all parties against whom provisional relief is being sought. All documents supporting the Petition are in English. *See* 11 U.S.C. § 1515(d).

## IV.     The Cayman Proceeding is a Foreign Main Proceeding.

180.     The Cayman Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code because SVB Cayman's COMI is indisputably in the Cayman Islands. *Pearson Declaration*, ¶¶ 57-59.

181.     The Bankruptcy Code defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). A foreign proceeding "shall be recognized" as a foreign main proceeding if, among other conditions, it is pending in the country where the debtor has its COMI as of the date of the petition for recognition. 11 U.S.C. § 1502(4).  *See also In re Fairfield Sentry Ltd.¸* 714 F.3d 127, 127 (2d Cir. 2013).  A principle relevant to identifying COMI is that "COMI lies where the debtor conducts its regular business, so that the place is identifiable by third parties."  *Id*. at 129.[6]

---

[6] A debtor has only one COMI.  *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 79 (Bankr. S.D.N.Y 2011) ("[E]very entity has a center of main interests.").

182.    Although the Bankruptcy Code does not define "center of main interests," pursuant to section 1516(c) of the Bankruptcy Code, in the absence of evidence to the contrary, the debtor's registered office, which in this case is and always has been the Cayman Islands, is presumed to be its COMI. 11 U.S.C. §1516(c). *See also In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010) (holding that debtor's registered jurisdiction was its COMI where debtor established the section 1516 presumption, and no evidence was presented rebutting that presumption). The legislative history of chapter 15 indicates that this presumption was "designed to make recognition as simple and expedient as possible" in cases, as here, where COMI is not controversial.  See H. Rep. 109-31 pt. 1, at 112-13 (2005).

183.    SVB Cayman was a licensed branch under the laws of the Cayman Islands, and since its formation, maintained a registered office in the Cayman Islands. SVB Cayman's registered office is currently the JOLs' office at FFP in the Cayman Islands.  This creates a presumption that the Cayman Islands is SVB Cayman's center of main interests.  *See* 11 U.S.C. § 1516(c).

184.    In any case, a foreign debtor's COMI is determined at the time the Chapter 15 petition is filed.  *In re Fairfield Sentry Ltd.,* 714 F.3d 127, 137 (2d Cir. 2013) ("a debtor's COMI should be determined based on its activities at or around the time the Chapter 15 petition is filed, as the statutory text suggests."); *In re Millennium Global Emerging Credit Master Fund Limited,* 458 B.R. 63 (Bankr. S.D.N.Y. 2011).  Where, as here, a debtor has engaged in substantial restructuring efforts through its foreign court-appointed trustees prior to the filing of the Chapter 15 petition, courts will consider such activities in the determination of the debtor's COMI. *Fairfield Sentry Ltd.*, 714 F.3d at 137.

185.    On this basis, the liquidations of numerous entities with limited activities in the foreign jurisdiction prior to winding up have been recognized by this Court as foreign main proceedings pursuant to Chapter 15. *See, e.g., In re Niton Fund SPC*, 15-13252 (SMB) (Bankr. S.D.N.Y.); *In re*

*Richcourt Euro Strategies Inc., et. al,* 15-12273 (REG) (Bankr. S.D.N.Y.); *In re Tranen Capital Alternative Investment Fund Ltd.,* No. 15-12620 (Bankr. S.D.N.Y. Oct. 29, 2015); *In re Lawndale Group S.A.,* No. 15-11352 (SCC) (Bankr. S.D.N.Y. July 6, 2015); *In re Pioneer Freight Futures*, No. 13-12324 (Bankr. S.D.N.Y. Aug. 23, 2013); *In re Farenco Shipping Co. Ltd.,* No. 11-14138 (REG) (Bankr. S.D.N.Y Feb. 24, 2012).

186.    In addition to the presumption provided under section 1516, courts consider any relevant factor, including: (i) the location of the debtor's assets; (ii) the location of the debtor's books and records; (iii) the location of the majority of the debtor's creditors; (iv) the commercial expectations and knowledge of the debtor's creditors; and (v) the location of those who actually manage the debtor. *See, e.g., In re Suntech Power Holdings Co., Ltd.,* 520 B.R. at 416; *In re Grand Prix Assocs.*, No. 09-16545, 2009 WL 1410519, at *22 (Bankr. D.N.J. May 18, 2009). These factors, however, are not dispositive or exclusive, and none of the factors are required. *See In re Fairfield Sentry Ltd.*, 714 F.3d at 137-38. Further, courts have also looked to whether a Chapter 15 debtor's COMI would have been readily ascertainable to parties in interest, such as the debtor's creditors. *See Grand Prix Assocs.*, 2009 WL 1410519, at *6.

187.    Applying the foregoing factors to this case, there is no doubt that SVB Cayman's COMI is currently the Cayman Islands.  Prior to the SVB Collapse, the creditors-depositors of SVB Cayman all looked to the Cayman Islands as the home of SVB Cayman, as each Cayman account agreement expressly provided that the accounts were *payable and collectible* only at the SVB Cayman Islands branch.  *Pearson Decl.*, ¶¶ 21, 23, 25. Further, by operation of Cayman Islands law, accounts held by depositors with SVB Cayman were under the exclusive jurisdiction of the Grand Court and governed by Cayman law.  *Pearson Decl.*, ¶¶ 21, 23, 25.  Due to its receipt of a Class "B" banking license, Silicon Valley Bank agreed that SVB Cayman was regulated by CIMA and subject to the

winding up procedures set forth under applicable Cayman Islands law. *Pearson Decl.*, ¶ 6. In short, all relevant stakeholders – from SVB to SVB Cayman depositors should have and did regard the Cayman Islands to be SVB Cayman's center of main interests.

188.    Currently, the JOLs are operating and overseeing the winding up of SVB Cayman from the Cayman Islands, as discussed above. *Pearson Decl.*, ¶¶ 57-59. The JOLs are investigating SVB Cayman's intangible rights in the form of potential claims, liabilities, and regulatory issues, which is and will continue to be controlled and coordinated by the JOLs from the Cayman Islands. *Pearson Decl.*, ¶ 57-59. For the past six months, the JOLs have also coordinated and overseen the Government Outreach from FFP's office in the Cayman Islands. *Pearson Decl.*, ¶ 62.

189.    Since the commencement of the Cayman Proceeding, other than the work by Mr. Ledwidge in New York., substantially all activities associated therewith have been conducted and/or overseen by the JOLs from the Cayman Islands. Among other things, the JOLs have overseen and filed all necessary notices, are engaged in the process of investigating and assessing the claims of SVB Cayman and its depositors-creditors, are gathering information about the operation and management of SVB Cayman prior to the SVB Collapse, and are engaged in discussions with creditors and interest holders and the SVB Cayman Liquidation Committee. *Pearson Decl.*, ¶¶ 58-59_.

190.    The *Suntech* opinion issued by this Court is instructive. In *Suntech*, the Court held that the activities of a Cayman provisional liquidator were sufficient to establish the Cayman Islands as the debtor's COMI, even though the debtor's principal place of business prior to foreign liquidation was in China. *In re Suntech Power Holdings Co., Ltd.,* 520 B.R. at 419. In *Suntech*, day to day operations of the debtor was left to a board of directors, while the JOLs in this case assert absolute management control over SVB Cayman subject to the supervision of the Grand Court. *In re Suntech Power Holdings Co., Ltd.,* 520 B.R. at 417.

191.     As set forth above, as well as in the accompanying Pearson Declaration, it is respectfully submitted that the level of liquidation and ongoing activity in this case substantially exceeds what this Court and other Courts have previously found sufficient to establish COMI.

192.     Under the circumstances, the Foreign Representatives submit that there is ample evidence and precedent to support recognition of the Cayman Proceeding as a foreign main proceeding.

## IV.     Granting Recognition Would not be Manifestly Contrary to the Public Policy of the United States

193.     Lastly, granting recognition of the Cayman Proceeding as a foreign main proceeding will not be "manifestly contrary to the public policy of the United States" pursuant to section 1506 of the Bankruptcy Code. Rather, recognition of the Cayman Proceeding as a foreign main proceeding is consistent with U.S. policy. 11 U.S.C. § 1506; *see also Fairfield Sentry*, 714 F.3d at 139 ("[T]he word 'manifestly' in international usage restricts the public policy exception to the *most fundamental policies of the United States.*") (emphasis in original).

194.     Courts "interpret this exception as a narrow one that should be applied sparingly." *ENNIA Caribe*, 594 B.R. at 640 (citation omitted).  The proper focus is on whether a foreign proceeding violates "fundamental standards" of procedural "fairness."  *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010). *See also Culligan*, 2021 WL 2787926, at *14 (noting that section 1506 generally does not prohibit recognition even when debtor has engaged in bad faith) (citations omitted).

195.     As set forth above, chapter 15 was enacted to, among other things, promote (i) cooperation between United States courts and foreign courts in cross-border insolvency cases, (ii) the

protection of all interested parties in a cross-border insolvency, and (iii) the "maximization of the value of the debtor's assets." *See* 11 U.S.C. § 1501(a).

196.    The Cayman Proceeding is clearly not "manifestly contrary to the public policy of the United States."  The Companies Act is consistent with approaches to liquidation in other countries, including with respect to the powers of the JOLs (that can be exercised with or without sanction), the *pari passu* allocation of assets, and the overarching supervision of the Grand Court.  *See Ocean Rig*, 570 B.R. at 707 (holding that "[g]ranting recognition of the Cayman Proceedings advances the public policy objectives" of chapter 15); *In re Millard*, 501 B.R. 644, 651-653 (Bankr. S.D.N.Y. 2013) (refusing to invoke the "public policy" exception to deny recognition of a Cayman Islands proceeding because the liquidators sought to "protect against asset grabbing … which is a traditional basis for the invocation of chapter 15 relief"); *ENNIA Caribe*, 594 B.R. at 640-41 (rejecting "due process concerns" that may implicate the public policy exception in part because of a "variety of legal procedures" permitted to challenge the foreign proceeding).

197.    Indeed, recognition of the Cayman Proceeding and enforcing the Winding Up Order in the U.S. will enable this Court to effectively assist the Grand Court in the fair and orderly administration of SVB Cayman's assets by ensuring that JOLs are able to robustly protect SVB Cayman's interests in the United States, including through investigation into SVB Cayman's claims and other assets in the United States, thus serving to protect and maximize the value of the SVB Cayman's assets. Thus, the JOLs' objectives advance fundamental policies of the Bankruptcy Code and U.S. law and are not contrary to them.

198.    Any objection of the FDIC as to recognition on public policy grounds is without merit. To the contrary, if the actions of the FDIC are permitted to stand without judicial intervention, it will prove to be disastrous banking policy for the United States as well as the international banking

community to which the United States belongs.  In particular, it is one thing for the FDIC to make an

arbitrary decision to insure certain foreign deposits and not others, but it is another thing for the cash

assets associated with those deposits to be orphaned and transferred to First-Citizens so as to allow for

or subsidize pay-outs to the insured class *in excess* of the amount of insurance guaranteed. To permit

this result and precedent would be fundamentally bad policy - it would create a comparatively small

super-priority class of "losers" that bear the first brunt of any United States bank failure. If this were

repeated across the spectrum of United States banks operating internationally, it would make foreign

deposits at American financial institutions one of the *least* safe ways to store money and would

undermine confidence in the banking system as a result.

199.    Further, at least in its capacity as receiver, the FDIC is estopped from objecting to the

ability of SVB Cayman to wind up its affairs under applicable Cayman law. The FDIC as receiver

stands in the shoes of SVB.  *O'Melveny*, 512 U.S. at 86 (1994); *Frazer v. United States*, 288 F.3d 1347,

1354 (Fed. Cir. 2002) ("the FDIC is not the government"); *AG Route Seven P'ship v. United States*, 57

Fed. Cl. 521, 534 (2003) ("the FDIC's attendant role herein [as receiver] is tantamount to that of a

private party, and not the government per se"); *Ambase v. United States*, 61 Fed.Cl. 794, 796–97 (2004)

(holding that a claim against the FDIC as receiver is not a claim against the government).

200.    As set forth above and in the Pearson Declaration, the FDIC as receiver is bound by

SVB's consent to exclusive Cayman regulatory and court jurisdiction over SVB Cayman and its

accounts, and the process by which SVB Cayman may be wound up under the supervision of the Grand

Court.  Writing for a unanimous Supreme Court, Justice Scalia held that there is no federal policy that

permits federal courts to disturb well-settled law concerning imputation of a failed bank's acts to an FDIC receiver. *O'Melveny*, 512 U.S. at 87-88 (1994).

201.    Accordingly, U.S. public policy overwhelmingly favors recognition and chapter 15 recognition of the Cayman Proceeding would not be manifestly contrary to the public policy of the United States.

## V.    The Court Should Grant the JOLs' Requested Relief under Sections 1520 and 1521 of the Bankruptcy Code.

### A.    The Bankruptcy Court has Broad Authority to Grant the Requested Additional Relief

202.    In addition to recognition of the Cayman Proceeding as a foreign main proceeding, the JOLs request that, upon recognition of the Cayman Proceeding, the Court grant additional appropriate relief pursuant to sections 1520 and 1521 of the Bankruptcy Code. Specifically, the JOLs request that this Court enter an order pursuant to 11 U.S.C. § 1520 and 1521: (1) requiring the turnover of the books and records of SVB Cayman to the JOLs pursuant to 11 U.S.C. §§ 542 and 1521(a)(4), (a)(7) and (b); and (2) granting additional discovery relief under 11 U.S.C. §§ 1520 and 1521, directed to, among others, the FDIC.

203.    Section 1521(a) of the Bankruptcy Code provides, in relevant part, that:

> [u]pon recognition of a foreign proceeding … where necessary to effectuate the purposes of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief including . . .
>
> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities" … [and]
>
> (7) granting any additional relief that may be available to a trustee.

11 U.S.C. § 1521(a)(4), (7).[7]

204.    The additional relief afforded under 11 U.S.C. § 1521(a)(7) encompasses the relief

provided by 11 U.S.C. § 542(e), which provides in pertinent part that:

> [s]ubject to any applicable privilege, after notice and a hearing, the court
> may order an attorney, accountant, or other person that holds recorded
> information, including books, documents, records, and papers, relating
> to the debtor's property or financial affairs, to turn over or disclose such
> recorded information to the trustee."

11 U.S.C. § 542(e); *see also In re Platinum Ptrs. Value Arbitrage Fund L.P.*, 583 B.R. 803, 810 (Bankr.

S.D.N.Y. 2018) ("Courts have held that a foreign representative may seek discovery pursuant to section

542(e).")

205.    To best effectuate the purposes of chapter 15, post-recognition relief under section 1521

"is largely discretionary and turns on subjective factors that embody the principles of comity." *In re

Comair Ltd.*, No. 21-10298(JLG), 2021 WL 5312988, at *9 (Bankr. S.D.N.Y. Nov. 14, 2021); *see also

In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114-15 (Bankr. S.D.N.Y. 2012) (summarizing the

significance of affording comity in cross-border insolvency proceedings).

206.    Section 1521(a)(4) of the Bankruptcy Code "confers exceedingly broad discretion …

that would further the purposes of chapter 15 and protect the debtor's assets and the interests of

creditors." *In re Inversora Eléctrica de Buenos Aires*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016); *see

also Millennium Glob.*, 471 B.R. at 346 ("Section 1521(a)(4) provides specifically that the Court may

enter an order providing for 'the taking of evidence or the delivery of information concerning the

debtor's assets, affairs, rights, obligations or liabilities.' … By its terms, this provision enables a

---

[7] Section 1521(a)(7) exempts certain relief afforded elsewhere in the Bankruptcy Code, none of which apply here. *See AJW Offshore, Ltd.*, 488 B.R. 551, 558 (Bankr. E.D.N.Y. 2013) ("Notably, §§ 542 and 543 are that may be available to a trustee and are not among those sections explicitly excluded.").

Foreign Representative to take broad discovery concerning the property and affairs of a debtor.") *AJW*

*Offshore*, 488 B.R. at 559 (citing to treatise stating that "[s]ection 1521 is a broad reservoir of equitable

power" which enables courts to "grant any appropriate relief ... to effectuate the purpose of chapter 15

and to protect the assets of the debtor or the interests of creditors") (citation omitted).

207.    Further, courts have recognized that the scope of discovery sought via 11 U.S.C. §

1521(a)(4) is particularly broad when the foreign representative is "gathering information which will

enable them to comply with their duties." *Platinum Ptrs.*, 583 B.R. at 821.

208.    Section 1521(a)(7) "authorizes the court to grant to the foreign representative the sort

of relief that might be available to a trustee appointed in a full bankruptcy case." *Inversora*, 560 B.R.

at 655.

209.    Pursuant to section 1507 of the Bankruptcy Code, the Court may also grant discretionary

relief to provide additional assistance beyond that permitted under section 1521 to a foreign

representative.  11 U.S.C. § 1507(a).

210.    In exercising discretion to grant relief under this section, courts are guided by the

standards set forth in section 1507(b) of the Bankruptcy Code, which provides that a court:

> [i]n determining whether to provide additional assistance ... shall
> consider whether such additional assistance, consistent with the
> principles of comity, will reasonably assure—(1) just treatment of all
> holders of claims against or interests in the debtor's property; (2)
> protection of claim holders in the United States against prejudice and
> inconvenience in the processing of claims in such foreign proceeding;
> (3) prevention of preferential or fraudulent dispositions of property of
> the debtor; (4) distribution of proceeds of the debtor's property
> substantially in accordance with the order prescribed by this title; and (5)
> if appropriate, the provision of an opportunity for a fresh start for the
> individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b); *see also Olinda Star*, 614 B.R. at 46-47 ("Pursuant to section 1507, the court is

authorized to grant any 'additional assistance' available under the Bankruptcy Code or under 'other

laws of the United States,' provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b).") (citations omitted).

211.    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title."

212.    Relief under section 1521(a) is available only if the interests of "the creditors and the other interested entities, including the debtor, are sufficiently protected." *Comair Ltd.*, 2021 WL 5312988, at *8 (quoting 11 U.S.C. § 1522(a)).

213.    While the Bankruptcy Code does not provide a definition of "sufficient protection," the legislative history of section 1522 suggests that this requirement is meant to prevent the rights of United States creditors of the foreign debtor from being "seriously and unjustifiably injur[ed]."  H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005); *see also ENNIA Caribe*, 596 B.R. at 322 (explaining that "sufficient protection" embodies three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.") (citation omitted).

214.    As such, courts have "great leeway" in determining whether the rights of all relevant parties are "sufficiently protected" and will generally consider a balancing of competing interests.  *See In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").

**B.      The Requested Relief will Aid in Implementing the Purposes of Chapter 15, Protect the Assets of SVB Cayman and Interests of SVB Cayman's Creditors**

215.    The relief requested in this Petition is proper and will serve the underlying purposes of chapter 15, including aid of foreign insolvency proceedings.

216.    First, the JOLs seek turnover of SVB Cayman's books and records because the books and records are central to the ongoing investigation of SVB Cayman's assets and other claims, and because, thus far, the JOLs' requests for consensual production of such materials by the FDIC have been fruitless.  The JOLs have been denied access to the records of SVB Cayman, notwithstanding the JOLs' status as the sole court-appointed fiduciaries entrusted with administration of SVB Cayman.  These documents will undoubtedly provide a clear picture of the claims SVB Cayman may hold against U.S. entities, and information on how the assets of SVB Cayman were handled (including but not limited to the potential transfer to First-Citizens, notwithstanding the fact that First-Citizens did not acquire SVB Cayman, and that such transfer was neither authorized by CIMA, nor even disclosed in advance) in the wake of the SVB Collapse.

217.    The Debtor's books and records will likely assist the JOLs in determining the asset position of SVB Cayman, as the JOLs' efforts in administration and winding up of SVB Cayman are necessarily hamstrung by the present incomplete access to SVB Cayman's records.

218.    For these reasons, the JOLs' turnover request plainly seeks information relating to SVB Cayman's "property or financial affairs" under 11 U.S.C. §§ 542(e) and 1521(a)(7) and should be granted.  *See Comair Ltd.*, 2021 WL 5312988, at *10 (noting that "courts have ordered chapter 15 discovery … where the foreign representative could not obtain the debtor's books and records it required to assure an economic and expeditious administration of the debtor's estate") (citations and internal citations omitted).

219.    For many of the same reasons, this Petition's request for discovery under 11 U.S.C. § 1521(a)(4) will likewise further the orderly wind-down of SVB Cayman because it will buttress the JOLs' efforts to investigate the assets and financial affairs of SVB Cayman, to the benefit of all stakeholders.

220.    Information within the exclusive possession of the FDIC will be critical to the Cayman

Proceeding.  In particular, the JOLs' exercise of their fiduciary responsibilities to SVB Cayman as

mandated by the Grand Court necessitate such discovery, as these entities have access not only to the

books and records of SVB Cayman, but also to events leading up to the SVB Collapse, the decisions

leading up to the transfer of the bulk (but not all) of SVB's assets to First-Citizens, and the "orphaning"

of SVB Cayman, which ultimately precipitated the Cayman Proceeding.  *See Comair Ltd.*, 2021 WL

5312988, at *10 (concluding that the foreign representative's statutory duty under foreign law to

"investigate the company's affairs, business, property, and financial situation" justified issuing

discovery requests under 11 U.S.C. § 1521(a)(4)).

221.    In light of the aim of chapter 15 to "optimize disposition of international insolvencies"

by providing foreign representatives appropriate access to the U.S. court system, *see B.C.I. Fins. Pty

Ltd.*, 583 B.R. at 292, and the JOLs' current inability to access basic information about SVB Cayman's

current and historical financial position and assets in the United States, the JOLs respectfully submit

that the requested discovery authority is appropriate and necessary "to effectuate the purposes of

[chapter 15] and to protect the assets of the debtor."  11 U.S.C. § 1521(a)(4).

222.    The JOLs' requested relief provides sufficient protections to SVB Cayman's creditors

and other interested parties.

223.    For example, the requested relief contributes to the just treatment of all holders of claims

against SVB Cayman.  Additional information in the forms of SVB Cayman's books and records, and

via discovery from parties including the FDIC, can only benefit SVB Cayman's creditors and

stakeholders because such information may provide more clarity into SVB Cayman's remaining assets

and claims, thereby enhancing the potential for realization.

224.    Further, the requested relief does not directly impact the distribution of proceeds in the Cayman Proceeding, so sufficient protection is inapplicable.

225.    No previous application for the relief requested in this Petition has been made in this or any other court in the United States.

## VI.    Request for Waiver of Local Bankruptcy Rule 9013-1(a)

226.    It is respectfully requested that this Court waive and dispense with the requirement set forth in Rule 9013-l(a) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York that any motion filed shall be accompanied by a memorandum of law on the grounds that the relevant authorities in support of the Petition are contained herein.

## NOTICE

227.    Contemporaneously herewith, the Debtor has filed the *Motion for Order Specifying Form and Manner of Service of Notice*. The Foreign Representatives shall provide service and notice of this Petition in accordance with the procedures and deadlines specified in the Order entered by this Court on such proposed form and manner of notice, which shall constitute sufficient service and notice of this Petition.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the JOLs respectfully submit that the Petition satisfies the requirements for the recognition of the JOLs as SVB Cayman's "foreign representatives," and for recognition of the Cayman Proceeding as SVB Cayman's "foreign main proceeding," and requests entry of an order, substantially in the form of **Exhibit A** to this Petition, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: January 18, 2024
       New York, New York                    HOLLAND & KNIGHT LLP


                                             /s/ Warren E. Gluck
                                             Warren E. Gluck, Esq.
                                             John J. Monaghan, Esq. (*pro hac vice* forthcoming)
                                             Paul M. Aguggia, Esq. (*pro hac vice* forthcoming)
                                             Marie E. Larsen, Esq.
                                             HOLLAND & KNIGHT LLP
                                             31 W. 52nd Street
                                             New York, NY 10019
                                             Telephone:  212-513-3200
                                             Fax: 212-385-9010
                                             Warren.Gluck@hklaw.com
                                             John.Monaghan@hklaw.com
                                             Paul.Aguggia@hklaw.com
                                             Marie.Larsen@hklaw.com

                                             *Counsel for the Joint Official Liquidators of Silicon
                                             Valley Bank (Cayman Islands Branch) (in Official
                                             Liquidation)*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Michael Pearson declares as follows:

My colleagues Andrew Childe and Niall Ledwidge and I are the duly appointed representatives (the "**Foreign Representatives**") of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation), an estate in official liquidation ("**SVB Cayman**") under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") and associated regulations, including the Companies Winding Up Rules (2023 Consolidation) (the "**CWR**"), the Insolvency Practitioners Regulations, and the June 30, 2023 Winding Up Order issued by the Grand Court (the "**Winding Up Order**").  I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Insolvency Proceedings Pursuant to Sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "**Verified Petition**"). I have read the Verified Petition, am informed, and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of January, 2024, in Grand Cayman, Cayman Islands

_____.
Michael Pearson
*Foreign Representative of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation)*