**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------

In re:                                          :        Chapter 15
                                                :
SILICON VALLEY BANK (CAYMAN       :        Case No. __-_____
ISLANDS   BRANCH)   (in   Official    :
Liquidation)                                   :
                                                :
              Debtor in a                     :
              Foreign                          :
              Proceeding.[1]                  :
                                                :
--------------------------------------------------------

### DECLARATION OF MICHAEL PEARSON IN SUPPORT OF (I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN INSOLVENCY PROCEEDING PURSUANT TO SECTIONS 1504, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE AND (II) APPLICATION FOR ORDER TO SHOW CAUSE WHY PROVISIONAL RELIEF PURSUANT TO 11 U.S.C. §§ 105(A), 1519, AND 1521 SHOULD NOT BE GRANTED

I, Michael Pearson, hereby declare under penalty of perjury under the laws of the United States as follows:

1.      Andrew Childe, Niall Ledwidge, and I are the duly appointed joint official liquidators and foreign representatives (together, the "**JOLs**" or "**Foreign Representatives**") of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation), an estate in official liquidation ("**SVB Cayman**" or the "**Debtor**") under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") and associated regulations, including the Companies Winding Up Rules (2023 Consolidation)

---

[1] Silicon Valley Bank is registered under Part IX of the Cayman Islands Companies Act, with registration number 193670.

(the "**CWR**"), the Insolvency Practitioners Regulations, and the June 30, 2023 Winding Up Order issued by the Grand Court (the "**Winding Up Order**").

2.     I respectfully submit this declaration (the "**Declaration**") in support of the JOLs' *Verified Petition for Recognition of Foreign Insolvency Proceeding Pursuant to Sections 1504, 1509, 1515, 1517, 1520, and 1521 of the Bankruptcy Code* in connection with the Official Form B 401 *Chapter 15 Petition for Recognition of a Foreign Main Proceeding* (together, the "**Chapter 15 Petition**") which seeks entry of an Order pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"):

(i)     recognizing the Cayman Proceeding as a foreign main proceeding under 11 U.S.C. §§ 1502, 1515, 1517(a) and (b)(1), or, in the alternative, as a foreign nonmain proceeding pursuant to 11 U.S.C. § 1517(b)(2) of the Bankruptcy Code;

(ii)    recognizing the JOLs as the foreign representatives of SVB Cayman under 11 U.S.C. §§ 101(24) and 1517(a)(2), and the estate of SVB Cayman as the exclusive debtor of and agent for the SVB Cayman depositors;

(iii)   requiring the turnover of assets of SVB Cayman, including SVB Cayman's books and records, to the JOLs pursuant to 11 U.S.C. §§ 542 and 1521(a)(4), (a)(7) and (b);

(iv)    permitting the JOLs, pursuant to 11 U.S.C. §§ 1520 and 1521, to conduct discovery directed to, among others, the Federal Deposit Insurance Corporation in its corporate capacity ("**FDIC-C**"), and the Federal Deposit Insurance Corporation, in its capacity as receiver for Silicon Valley Bank, Santa Clara and Silicon Valley Bridge Bank, N.A. ("**FDIC-R**," and collectively with FDIC-C, the "**FDIC**"); and

(v)     granting such other and further relief as the Court may deem just and proper, filed concurrently herewith.

3.     I further submit this Declaration in support of the JOLs' *Application for Order to Show Cause Why Provisional Relief Pursuant to 11 U.S.C. §§ 105(a), 1519, and 1521 Should Not Be Granted* (the "**Application**"), which seeks entry of an order to show cause why provisional discovery authority and related relief pursuant to Bankruptcy Code sections 105(a), 1519(a)(1) through (3), and 1521(a)(4) should not be granted, filed concurrently herewith. To that end, this Declaration is respectfully

submitted pursuant to Rule 9077-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

## I.    SVB Cayman

### A.    The Creation of SVB Cayman

4.    Founded in 1983, Silicon Valley Bank, Santa Clara ("**SVB**") was an FDIC-insured, state-chartered bank headquartered in California and established to provide banking services to Silicon Valley's growing number of technology companies.  While SVB had affiliate relationships and joint ventures with foreign banks in China and the United Kingdom, SVB Cayman was the only deposit-taking foreign branch maintained by SVB.

5.    On August 16, 2007, SVB registered in the Cayman Islands as a foreign company under Part IX of the Companies Act.  Parts V and IX of the Companies Act are attached as **Exhibit 1**.

6.    On August 30, 2007, SVB applied for and was granted a Class "B" banking license from the Cayman Islands Monetary Authority ("**CIMA**") under the Cayman Islands Banks and Trust Companies Act (2021 Revision) (the "**BTC Act**").  A true and correct copy of the BTC Act is attached hereto as **Exhibit 2**. Pursuant to the BTC Act, SVB Cayman as the holder of a "B" class banking license may not, amongst other things, take deposits from any person resident in the Cayman Islands, other than another licensee or an exempted or ordinary non-resident company which is not carrying on business in the Cayman Islands.

7.    Following its registration in the Cayman Islands and the granting of a Class "B" license from CIMA, SVB had an active branch in the Cayman Islands, the established SVB Cayman branch.  Due to its receipt of a Class "B" banking license, SVB agreed that SVB Cayman was regulated by CIMA and subject to the winding up procedures set forth under applicable Cayman Islands law.

8.    The primary purpose of SVB Cayman was for deposit products.

9.      Prior to the commencement of the Cayman Proceeding, SVB Cayman maintained a registered office at Cainvest Bank & Trust, 103 South Church St., 5th Floor, Georgetown, Grand Cayman, Cayman Islands.

10.      Upon their appointment, the JOLs changed the registered office of SVB Cayman to FFP Cayman ("**FFP**"), 2nd Floor Harbour Centre, 159 Mary Street, Georgetown, Grand Cayman, Cayman Islands, which remains SVB Cayman's registered office to date.

**B.**      **Cayman Regulation of SVB Cayman**

11.      SVB Cayman was at all times overseen, regulated, and licensed by CIMA, which serves as the Cayman Islands' primary financial services regulator and was otherwise subject to the Cayman Islands Banking laws.

12.      CIMA was established pursuant to the Monetary Authority Law (2016 revision) ("**CIMA Act**").  A true and correct copy of Parts I-II, V, and VII of the CIMA Act is attached hereto as **Exhibit 3**. The CIMA Act provides that CIMA's principal function includes actions "to regulate and supervise financial services business carried on in or from within the Islands in accordance with this law and the regulatory laws." *See CIMA Act*, § 6(1)(b)(i).

13.      The BTC Act provides express statutory authority for CIMA to seek the liquidation of a foreign branch which falls under the regulatory authority of CIMA.  Pursuant to Section 18 of the BTC Act, where CIMA is of the opinion that, amongst other things, an entity regulated and licensed by CIMA "is or appears likely to become unable to meet its obligations as they fall due" or "is carrying on business in a manner detrimental to the public interest [and] the interests of its depositors…", CIMA may:

- appoint a person to advise the licensed branch on the proper conduct of its affairs and to prepare a report to CIMA thereon (an "**Advisor**").  *See BTC Act*, § 18(1)(iv);

- seek authority from the Grand Court to appoint a person to assume control of the licensed branch's affairs (a "**Controller**") with powers akin to a receiver.  *See BTC Act*, § 18(1)(v);

- on receipt of any report prepared by an Advisor or Controller, revoke a branch's license and make an application to the Grand Court for the winding up and liquidation of the foreign branch. *See BTC Act*, § 18(4)(d).

14.      The BTC Act also sets forth a detailed procedure for a licensee which wishes to terminate banking activity in the Cayman Islands.  Section 20 of the BTC Act provides in full:

(1) A licensee which has ceased to carry on the business in respect of which the [license] was granted may apply to the Authority to surrender its [license] if it —

(a) has ceased to carry on such business, and produces evidence that it has repaid all deposits held by it and has transferred all trust assets held or administered by it: or

(b) is being wound up voluntarily and produces evidence that it is solvent and able forthwith to repay all deposits held by it and all its other creditors and has transferred all trust assets held or administered by it, and the Authority may thereupon approve the surrender.

(2) In the case of an application under paragraph (b) of subsection (1) the Authority may apply to the Court for the licensee to be wound up either by that Court or subject to its supervision, and on the making of such an order the provisions of the Companies Act (2021 Revision) relating to the winding up of a company by or subject to the supervision of that Court shall, mutatis mutandis, apply.

*BTC Act*, § 20.

15.      CIMA publishes the Cayman Island Monetary Authority Enforcement Manual (the "**Enforcement Manual**") in order to set out the policies and procedures to be followed by CIMA, its committees and its officers in performing CIMA's regulatory functions under Cayman law.  A true and correct copy of the Enforcement Manual is attached hereto as **Exhibit 4**.  The Enforcement Manual is applicable and binding on all parties subject to CIMA's regulatory functions, which includes SVB Cayman and the SVB Receivership's (as defined below) predecessor-in-interest, Silicon Valley Bank. *See Enforcement Manual*, § 3.1.

16.     The Enforcement Manual provides CIMA with broad powers to regulate the holders of banking licenses in the Cayman Islands, including: (i) suspension of a banking license; (ii) imposition or amendment of conditions on a banking license; (iii) requiring the substitution of a director, operator, senior officer, general partner, promoter, insurance manager or shareholder of a licensee; and (iv) appointment of a person to assume control of the affairs of a licensee, or advise the license on the proper conduct of its affairs.  *See Enforcement Manual*, §§ 10.1, 10.2.

17.     Moreover, CIMA or the creditors of a licensed bank or foreign registered company are empowered to apply to the Grand Court of the Cayman Islands for an order directing that the company be wound up in accordance with the Companies Act or a limited liability company be wound up in accordance with the Limited Liability Companies Act.  In this case, the creditors of SVB Cayman made such an application and obtained such an order, before any similar application by CIMA was accomplished.

### C.     The Cayman-Regulated Deposit Products Offered by SVB Cayman

18.     SVB Cayman offered three types of accounts to customers: 1) Eurodollar Sweep Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account (collectively, the "**SVB Cayman Deposit Accounts**").  When SVB failed in March 2023, SVB Cayman's customers had, in the aggregate, approximately $866 million deposited in all three types of accounts.

#### i.     *Eurodollar Sweep Account*

19.     The Eurodollar Sweep Account was a business account maintained at SVB Cayman.  A true and correct copy of a template account agreement for a Eurodollar Sweep Account ("**Sweep Agreement**") is attached hereto as **Exhibit 5**.  In the Sweep Agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch."  *Sweep Agreement*, p. 1. At the time of the collapse of SVB (the "**SVB Collapse**"), there were forty-four (44)

active Eurodollar Sweep Accounts, with total account balances of $389,562,086.

20.    The Sweep Agreement states: "The SVB Eurodollar Sweep Account provides clients with a convenient way to earn interest while keeping their funds available for banking needs. Client balances automatically transfer or 'sweep' between the Deposit Account [located in the United States] and the interest-bearing SVB Eurodollar Sweep Account held at Silicon Valley Bank's Cayman Islands Branch." *Sweep Agreement*, p. 1.

21.    The Sweep Agreement contains provisions notifying SVB Cayman customer-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he SVB Eurodollar Sweep Account shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Sweep Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Sweep Agreement*, p. 3.

### ii.    *Eurodollar Money Market Account*

22.    A Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman customers. A true and correct copy of a template account agreement for a Eurodollar Money Market Account ("**Money Market Account Agreement**") is attached hereto as **Exhibit 6**. In the Money Market Account Agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman Islands

branch office." *Money Market Account Agreement*, p. 1.  At the time of the SVB Collapse, there were one-hundred six (106) active Eurodollar Money Market Accounts, with total account balances of $108,400,111.

23.    The Money Market Account Agreement contains provisions notifying SVB Cayman customer-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Money Market Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below.  You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.

> SVB Eurodollar Money Market Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Money Market Account Agreement*, p. 2-3.

### iii.    *Eurodollar Operating Account*

24.    The Eurodollar Operating Account was a traditional business operating account that was not interest bearing.  A true and correct copy of a template account agreement for a Eurodollar Operating Account ("**Operating Account Agreement**") is attached hereto as **Exhibit 7**.  In the Operating Account Agreement, SVB affirmatively stated that the SVB Eurodollar Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office."  *Operating Account Agreement*, p. 1.  At the time of the SVB Collapse, there were four hundred eighty-four (484) active

Eurodollar Operating Accounts, with total account balances of $368,212,751.

25.     The Operating Account Agreement contains provisions notifying SVB Cayman customer-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below.  You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.

> SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Operating Account Agreement*, p. 2-3.

**D.      SVB Cayman's Domestic Deposit Account with SVB**

26.     Since our appointment as JOLs, through our investigation, we have learned that prior to the SVB Collapse, it was the regular practice for SVB Cayman to deposit all of its cash with SVB in a deposit account located in the United States.  SVB Cayman's sole asset was the depository liability owed by SVB in connection with this account (the "**SVB Cayman Domestic Account**"). Notwithstanding the fact that the JOLs were appointed over six months ago in June 2023, the JOLs have to date received no notice from the FDIC concerning the status of the SVB Cayman Domestic Account.  In particular, the JOLs' investigation has revealed that the SVB Cayman branch maintained a domestic account in the United States at SVB's main headquarters with account number xxxx0000

and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where it was made clear that this was *only* SVB Cayman's bank account (as there were no other foreign deposit taking branches) and that the credits located in this domestic account were SVB Cayman's sole asset and located in the United States.

27.     Additionally, the JOLs' investigation has revealed that SVB's main headquarters maintained domestic, United States sitused accounts for each and all of the three products offered at SVB Cayman with the following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).   The significant indication is that all of these credits were geographically located in the United States.

### E.     The Intra-Group Service Level Agreement

28.     The relationship between SVB and SVB Cayman was governed by an Intra-Group Service Level Agreement, entered into by and between SVB Cayman, as recipient, and Silicon Valley Bank (US Head Office), as provider (the "**SLA**").   A true and correct copy of the SLA is attached hereto as **Exhibit 8**.

29.     The recitals to the SLA expressly note that SVB Cayman is regulated by CIMA, that SVB is separately regulated by the California Department of Business Oversight and the Federal Reserve, and that the SLA is being entered into on an "arm's length basis."  *SLA*, Recitals.

30.     Under the SLA, SVB Cayman looked to SVB's California office for staffing needs in select service areas such as finance, IT services, legal and risk management (the "**Shared Services**"). *SLA*, Schedule 1. For each Shared Service, SVB and SVB Cayman were each required to appoint separate representatives, known as "Agreement Managers," who served as the primary point of contact

with the corresponding party. *SLA*, §§ 5.1, 5.2.

31.     Each Agreement Manager had full authority to act for, and on behalf of, the respective party on all matters relating to the SLA. *SLA*, § 5.2(c). Further, each Agreement Manager was required to meet with his or her counterpart at regular intervals to discuss compliance with the terms of the SLA, any issues of concern to either party, and proposed solutions for addressing issues of concern. *SLA*, § 5.3.

32.     The SLA acknowledged that CIMA and other Cayman governmental agencies regulated SVB Cayman, and provided:

> In providing the Services, the Provider agrees to: A. Comply with all applicable Regulatory Requirements and Compliance Requirements necessary to perform its obligations under this Agreement; and B. Obtain and maintain all necessary licences, permits, consents and regulatory approvals from the relevant Regulators, if any, and to the extent applicable, necessary to perform its obligations under this Agreement.

*SLA*, § 12.1.

33.     The SLA further provided that SVB Cayman was the primary contact and reporting person for any inquiries from CIMA:

> The Recipient will be responsible, unless otherwise agreed in writing by the Parties, for all communications and correspondence with its Regulator(s) (which, for the purposes of this Agreement, shall be the Cayman Island Monetary Authority) in relation to the receipt of the Services and this Agreement.

> The Provider will direct enquiries from the Recipient's Regulator relating to this Agreement to the Recipient unless the enquiry is specifically addressed to, or concerns, the Provider or the Provider is prevented from doing so by applicable Law or Regulatory Requirements.

> Each Party shall provide the other Party and/ or any Regulator all reasonable assistance in connection with any enquiry or investigation by any Regulator concerning this Agreement or the relevant Party and shall notify the other Party of any enquiries or investigations unless prevented from doing so by applicable Law or Regulatory Requirements.

*SLA*, §§ 13.1, 13.2, 13.3.

34.     While it relied on SVB's operational staff, risk management, and infrastructure in

certain circumstances, SVB Cayman also operated independently of SVB in many respects.  For example, SVB Cayman's day-to-day management was vested in a dedicated Cayman Branch team under the leadership of a Cayman Branch Executive Director.  Under the SLA, SVB Cayman was permitted to terminate the SLA on 60 days' notice, and it reserved the right to independently audit SVB's books and records.  *SLA*, §§ 11, 19.

35.     Additionally, SVB Cayman's corporate governance was vested with the Cayman Branch Operating Committee, which provided leadership and strategic oversight for all of SVB Cayman's activities.

**II.     Collapse of SVB and Sale to First-Citizens**

36.     On March 8, 2023, SVB liquidated investments to cover deposits; this included selling off U.S. treasuries and mortgage-backed securities at a $1.8 billion loss.

37.     On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in the SVB Collapse.

38.     On March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition.  As a result, DFPI issued the *Order Taking Possession of Property and Business* on March 10, 2023 (the "**DFPI Order**").  The DFPI Order is attached hereto as **Exhibit 9**.

39.     As a result, DFPI ordered that SVB's property and business be placed into a receivership.  The FDIC, pursuant to its statutory authority, has been acting as receiver for Silicon Valley Bank and its successor bridge bank since March 2023 (the "**SVB Receivership**").  The JOLs understand that SVB Cayman's books and records concerning its pre-liquidation operations and

management are located in the United States, as FDIC-R obtained possession of such records upon the

SVB Collapse, and the estate of SVB Cayman arose upon the SVB Collapse and insolvency.

40.     On March 13, 2023, via a Transfer Agreement (the "**Transfer Agreement**"), FDIC-R

transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB

Cayman to Silicon Valley Bridge Bank, N.A. (the "**Bridge Bank**"), which was newly created and

operated by the FDIC as receiver pursuant to applicable federal law.  A true and correct copy of the

Transfer Agreement is attached hereto as **Exhibit 10**.

41.     On March 12, 2023, a joint statement press release (the "**Joint Statement Press**

**Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair

Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were

transferred to FDIC-R, assuring all SVB depositors that they would have full access to their money on

Monday morning, March 13, 2023 and that they would be made whole, beyond the standard FDIC

insured amount of $250,000. A true and correct copy of the Joint Statement Press Release is attached

hereto as **Exhibit 11.**

42.     Subsequently, on March 27, 2023, the FDIC entered into a Purchase and Assumption

Agreement (the "**P&A Agreement**") with First-Citizens Bank & Trust Company ("**First-Citizens**"),

covering certain SVB deposits and loans transferred to and then held at the Bridge Bank. A true and

correct copy of the P&A Agreement is attached hereto as **Exhibit 12**.

43.     The P&A Agreement included a purchase of approximately $72 billion of the Bridge

Bank's assets at a discount.  Notably, the P&A Agreement gave First-Citizens the express option to

purchase the Canadian, German, and Hong Kong foreign branches (all of which did not accept deposits

and only provided lending services),[2] but did not provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits). *See P&A Agreement* §§ 1.3 (defining "Foreign Branches" to mean "the Canadian Branch Assets, the German Branch Assets, and the Hong Kong Branch Assets"); § 2.6 (providing option to purchase the Foreign Branches).

44.     As a result, SVB Cayman was not purchased by or transferred to First-Citizens pursuant to the P&A Agreement and was excluded from the SVB Receivership and its process.

**III.    The Post-SVB Collapse "Orphaning" of SVB Cayman and Events Leading Up to the Commencement of the Cayman Proceeding**

45.     On March 31, 2023, it is my understanding that the depositors-creditors of SVB Cayman that held Eurodollar Operating Accounts and Eurodollar Money Market Accounts received a notice stating that balances held by customers in accounts at SVB Cayman are not deposits, and therefore, that their status as a result of SVB's failure is that of general unsecured creditor, which is junior in priority to both insured and uninsured depositors.

46.     During the course of the JOLs' investigation, the JOLs learned that account holders for Eurodollar Sweep Accounts did not receive any such notice, with their accounts being granted "insured deposit" status, even though the account agreements for each of the three SVB Cayman Deposit Accounts contains identical language that the Cayman accounts are not FDIC-insured and are payable and collectible only in the Cayman Islands.

47.     As a result, the FDIC has provided holders of the Eurodollar Sweep Accounts with "insured depositor" status, granting them a full guarantee by the FDIC under the SRE.    The stated

---

[2] The Canada, India, Germany, and Israel branches of SVB were not licensed by their respective local authorities to accept deposits.    The United Kingdom affiliate (with its own Denmark and Sweden branches) was separately incorporated as Silicon Valley Bank UK.    The China affiliate operated as an independent joint-venture with Shanghai Pudong Development Bank.

justification for this decision is that certain amount of the funds associated with the Eurodollar Sweep Accounts had "swept back" into an FDIC-insured deposit account located in the United States at or around the time of SVB's entry into receivership. However, and as detailed below, it is the JOLs' express understanding that *all* of the credits associated with all of the SVB Cayman accounts were geographically sitused in the United States at all times material.

48.     Notably, the JOLs' investigation to date has revealed that more than 90% of the uninsured depositors of SVB Cayman are of Chinese origin or China-investment connected (and 99% by value), while the demographics of the SVB Cayman insured depositors are mixed and nominal. Despite this, due to the nature of international investment practices, the JOLs have learned through the course of our investigation that significant U.S. investors and international investors have also been rendered collateral damage of the FDIC's decisions.

49.     The JOLs understand that, subsequent to the SVB Collapse, previous members of SVB's executive management are currently managing SVB's holding company and affiliates, all from offices in Manhattan. *See in re SVB Financial Group*, Case. No. 23-10367-mg (S.D.N.Y.) at ECF No. 43.

## IV.     The Cayman Proceeding

50.     In the wake of the SVB Collapse and the FDIC's subsequent pronouncements, on June 13, 2023, certain SVB Cayman depositor-creditors which had been classified as uninsured, general creditors of the SVB Receivership (collectively, the "**Creditors Group**"), submitted a Winding Up Petition to the Grand Court (the "**Petition**") seeking, *inter alia*, the winding up of SVB Cayman under

the Companies Act, and the appointment of joint official liquidators for SVB Cayman.  A true and correct copy of the Petition is attached hereto as **Exhibit 13**.

51.     As noted above, on June 30, 2023, the Grand Court of the Cayman Islands issued the Winding Up Order.  A true and correct copy of the Winding Up Order is attached hereto as **Exhibit 14.**

52.     In addition to powers delineated in the Companies Act and its implementing regulations, the Winding Up Order authorizes the JOLs to act jointly and severally as joint official liquidators of SVB Cayman.  *Winding Up Order*, ¶ 4.

53.     The Winding Up Order also authorizes the JOLs to appoint attorneys and professional advisors in the Cayman Islands and the United States, and to hire staff to assist in performance of their duties.  These powers are exercisable within and outside of the Cayman Islands.  *Winding Up Order,* ¶ 5.

54.     On July 21, 2023, the Grand Court entered a Judgment explaining the justifications for the Winding Up Order (the "**July 2023 Opinion**").  In the July 2023 Opinion, the Grand Court found that jurisdiction existed under section 91(d)(iv) of the Companies Act for the Grand Court to order SVB Cayman's winding up, *notwithstanding* the SVB Receivership, and confirmed that doing so is just and equitable given the public interest in investigating and understanding its depositors-creditors' position relative to SVB, and to protect their interests.  A true and correct copy of the July 2023 Opinion is attached hereto as **Exhibit 15**.

55.     Furthermore, the Grand Court noted in the July 2023 Opinion that granting the Petition and commencing the Cayman Proceeding was appropriate because:

> I am satisfied that [SVB Cayman] has and has had sufficient connections with the Cayman Islands.  It had an active branch here and entered into contracts governed by Cayman law and it took Cayman deposits.  It is regulated by the Cayman Islands

Monetary Authority.  There is a clear and sufficient connection with the Cayman Islands.

*July 2023 Opinion*, ¶ 57.

56.     On January 11, 2024, the Grand Court entered an Order: (i) sanctioning the filing of an application by the JOLs for recognition pursuant to Chapter 15 of the U.S. Bankruptcy Code; and (ii) holding that, under Cayman law, the JOLs are the representatives of an estate and a trust that is subject to Cayman Islands proceedings (the "**Sanction Order**").  A true and correct copy of the Sanction Order is attached hereto as **Exhibit 16**. As such, SVB Cayman now exists as an insolvency estate and trust to be administered under Grand Court supervision for the benefit of its creditors and stakeholders.

57.     Since the Cayman Proceeding began on June 30, 2023, my fellow JOLs and I have been in control of SVB Cayman from FFP's Cayman's office in the Cayman Islands.  Mr. Childe and I reside in the Cayman Islands and have performed all work in connection with the Cayman Proceeding from the Cayman Islands.  Mr. Ledwidge is based in and has conducted activities in connection with the Cayman Proceeding from New York, New York, and has and will continue to act as a United States-based resource center for SVB Cayman creditors with questions or concerns.

58.     Since our appointment, and pursuant to the Winding Up Order and the provisions of the Companies Act and related regulations, the JOLs have undertaken the following actions from the Cayman Islands, designed to facilitate the orderly winding up of SVB Cayman for the benefit of its creditors and other stakeholders:

a.     Drafting and submitting to the Grand Court the First Report of the Joint Official Liquidators, dated September 12, 2023;

b.     Directing the strategy and activities for the Governmental Outreach strategy implemented by the JOLs (defined and discussed below)

c.     Transitioning the registered office of SVB Cayman to FFP Cayman;

d.     Hiring Cayman Islands counsel and United States counsel;

e.   Issuing notice of their appointment to various Cayman Islands-based governmental bodies, including public notice which was published in the Cayman Islands Gazette on July 5, 2023;

f.   Advertising their appointment and the commencement of the Cayman Proceeding in publications in other jurisdictions, including the South China Morning Post;

g.   Attending to all required statutory filings with the Grand Court and the Cayman regulatory agencies;

h.   Establishing a website to keep depositors-creditors apprised of the Cayman Proceeding, which is located at https://svbcaymanliquidation.com;

i.   Liaising with Cainvest Bank & Trust, SVB Cayman's former registered service provider, to preserve and seek access to SVB Cayman's statutory books and records;

j.   Applying for de-registration of SVB Cayman with CIMA in light of the commencement of the Cayman Proceeding;

k.   Liaising with CIMA on the steps being taken during the initial phase of the winding up of SVB Cayman;

l.   Obtaining information from CIMA relevant to the winding up of SVB Cayman;

m.   Regularly communicating with depositors-creditors to address queries and concerns regarding the winding up process;

n.   Convening and holding a first meeting of creditors on September 20, 2023;

o.   Notifying creditors of the formation of a Liquidation Committee for SVB Cayman and communicating with the Liquidation Committee in formal and regularly scheduled, minuted meetings;

p.   Preparing and submitting a Proof of Debt form for creditors-depositors;

q.   Filing claims on behalf of depositors-creditors in both the SVB Receivership referenced above (July 10, 2023), as well as the chapter 11 bankruptcy proceeding of SVB Financial Group ("**SVBFG**") (August 11, 2023);

r.   Preparing a Notice of Appointment and Claims Submission Process letter, which was distributed to all depositors-creditors of SVB Cayman;

s.   Continued to investigate the asset position of SVB Cayman; and

t.   Pursuant to section 110(4) of the Companies Act and Order 8 Rule 1 of the CWR, determining that SVB Cayman is insolvent, for purposes of the relevant provisions of the Companies Act.

59.   The JOLs also have transferred a sum of $15,000 (the "**Stout Holding**") to a trust account held by Stout in New York.  The Stout Holding remains undrawn.

18

60.     Our forthcoming tasks as JOLs in conjunction with the Cayman Proceeding include, but are not limited to:

    a.    Continuing to seek copies of the statutory books and records of SVB Cayman, which are believed to be in FDIC-R's possession;

    b.    Completing the deregistration of any licenses with Cayman Islands regulators;

    c.    Preparing the second status report for the Grand Court, which is due in early 2024;

    d.    Continuing regular meetings with the SVB Cayman Liquidation Committee and depositors-creditors of SVB Cayman;

    e.    Pursuing ongoing claims to further recovery efforts for the depositors-creditors, as well as SVB Cayman's direct claim in connection with its deposit account with SVB;

    f.    Adjudicating claims submitted in the Cayman Proceeding, if any; and

    g.    Further liaising with CIMA to work collaboratively in the Cayman Proceeding.

## V.     The JOLs' Government Outreach Strategy and the Disallowance of the Provisional Proof of Claim

61.     The FDIC-imposed bar date to file claims in the SVB Receivership was Monday, July 10, 2023, shortly after our appointment as JOLs, and prior to our selection of United States counsel. Under the circumstances, the JOLs caused to be filed a provisional and placeholder proof of claim ("**Provisional Proof of Claim**").  A true and correct copy of the Provisional Proof of Claim is attached hereto as **Exhibit 17**.  In correspondence and communications with counsel for the FDIC, it agreed to consider a supplement to the Provisional Proof of Claim at a later date, notwithstanding the bar date in effect.

62.     In the months following our appointment as JOLs, our core strategy, developed through the FPP team in the Cayman Islands, had revolved around considerations of political reality.  Because this matter (i) implicates significant United States, Cayman and international banking interests, and (ii) SVB Cayman and the SVB Cayman depositors possess significant and fundamental legal and equitable

rights to redress and remedy, the JOLs concluded that the best approach in the first instance would be to seek a significant and high-level meeting with the FDIC-C and FDIC-R, appropriately backed by legislative outreach (the "**Government Outreach**").[3]

63.     In the best-case scenario, as a result of such a meeting, rational minds could examine the salient issues and points of mutual interest and devise an outcome that satisfies all interests.  In the worst-case scenario, the JOLs could be assured that all possible steps toward amicable resolution had been taken before resorting to litigation.

64.     In furtherance of this goal, a team led by Holland & Knight attorney and former Congressman Jim Davis has, since September of 2023, engaged in a significant and nearly daily lobbying campaign toward explaining to Members of Congress, many of whom were unaware that there were U.S. victims of the SVB Cayman collapse, that there is in fact a significant segment of U.S. interests who will not receive a recovery if the claims of SVB Cayman depositors are categorized as "unsecured creditor claims" by the FDIC.

65.     Beginning on December 6, 2023, the FDIC was contacted by at least one Congressional office requesting for a high-level meeting between FDIC-C, FDIC-R, and the JOLs to occur in January 2024.  The JOLs understood that planning for this meeting was underway subject to details on the identity of the participants and the finalization of dates.

66.     Significant work into framing the meeting and the issues to be discussed have taken place since September 2023.   In keeping with all parties seemingly cooperative efforts to avoid the time, expense, and uncertainties of litigation, the JOLs neither commenced a Chapter 15 recognition

---

[3] As detailed herein, the bulk of the JOLs' activities have been conducted in the Cayman Islands.  In his capacity as a JOL of the Debtor, Mr. Ledwidge has conducted SVB Cayman's primary United States activities through the Government Outreach and efforts to recover assets of SVB Cayman in the United States from his office in New York, New York.

application nor supplemented the Provisional Proof of Claim, waiting instead until the meeting(s) occurred such that the parties would have maximal freedom to develop and prepare potential solutions and resolutions.

67.     On January 3, 2024, a scanned copy of a letter (the "**Claim Denial Letter**") from the FDIC-R was received by Alston & Bird (U.S. counsel previously considered for full engagement by the JOLs and the sole filer of the Provisional Proof of Claim), which letter appears to have been mailed on December 26, 2023, while the discussions between the Holland & Knight lobbying team and Congressional staffers and the FDIC about the planned meeting with the JOLs were ongoing.  A true and correct copy of the Claim Denial Letter is attached hereto as **Exhibit 18**.  The Claim Denial Letter purports to disallow SVB Cayman's claim on the unexplained ground that it was "not proven to the satisfaction of the Receiver."

68.     On January 3, 2024, Holland & Knight requested via email to hold a telephone call with counsel for the FDIC to discuss the Claim Denial Letter, specifically to discuss that the Claim Denial Letter appears to be a final resolution, triggering a 60-day window to commence litigation in response to the Claim Denial Letter, and fundamentally out of step with planning a high-level meeting, as well as the contemplated and agreed supplemental claim submission.

69.     In response to Holland & Knight's January 3rd email, FDIC-R has declined to discuss the Claim Denial Letter, the claim denial, and the implications of the foregoing further.  A true and correct copy of the email from FDIC Counsel to Holland & Knight indicating that "FDIC personnel are not available to discuss claim denials" is attached hereto as **Exhibit 19**.

**VI.     Insolvency Proceedings Under the Cayman Islands Companies Act**

70.     Under Cayman Islands law, the legal framework relating to the reorganization of debtors in insolvency located and registered in the Cayman Islands is contained in the Companies Act.

### A.    Liquidation of Cayman Islands Companies

71.     Part V of the Companies Act governs the winding up of companies in the Cayman Islands.  Part V applies to companies formed or registered under the Companies Act or its predecessors, including companies that are recognized as foreign registered companies.

72.     Specifically, the Grand Court may make winding up orders in respect of foreign companies which are registered under Part IX of the Companies Act, such as SVB Cayman, just as CIMA may independently obtain liquidation under the same, explicitly referenced provisions. Creditors of a company registered as a foreign company in the Cayman Islands are also permitted to seek the winding up of the foreign company in the Grand Court if the foreign company (i) has property located in the Cayman Islands; (ii) is carrying on business in the Cayman Islands; (iii) is the general partner of a limited partnership; or (iv) is registered under Part IX.

73.     Part V is supplemented by the following rules and regulations made pursuant to section 155 of the Companies Act: the CWR, the Insolvency Practitioners' Regulations 2018 (the "**IPR**"), and the Foreign Bankruptcy Proceedings (International Cooperation) Rules 2018.

74.     A company may be wound up in several ways: (a) voluntarily, following the passing of a special resolution of its shareholders or pursuant to a mandatory term in its constitutional documents; or (b) by order of and under the supervision of the Grand Court (termed "Official Liquidation" because it is carried out by officers of the Grand Court).

75.     Here, the Creditors' Group sought winding up of SVB Cayman because SVB Cayman was unable to pay its debts within the meaning of section 93 of the Companies Act and pursuant to the explicit and unambiguous account agreements setting forth the exclusive SVB Cayman-Depositor relationship and the exclusive jurisdiction of the Cayman Islands law and courts. *Petition*, ¶ 7.

76.     Unless otherwise ordered by the Grand Court, Schedule 3, Part I to the Companies Act

sets out the powers that the JOLs may exercise with the sanction of the Grand Court and Schedule 3, Part II sets out the powers the JOLs may exercise without sanction. *See Companies Act*, Schedule 3.

77.     In this case, the Grand Court issued the Winding Up Order on June 30, 2023, resulting in the appointment of the JOLs.  It is not possible to reverse a winding up order, other than via appeal, and there has been no appeal of the Winding Up Order.

**B.      The General Rules and Procedures for Liquidation by the Grand Court**

78.     The official liquidation of a company in the Cayman Islands is carried out by liquidators appointed by and under the supervision of the Grand Court pursuant to certain statutory mechanisms set out in the Companies Act.

79.     The Grand Court has jurisdiction in respect of (among other things) the winding up of companies which are registered under Part IX of the Companies Act.  The Financial Services Division of the Grand Court, which supervises the Cayman Proceeding, deals with proceedings involving the winding up of companies.

80.     The Cayman Proceeding is a court-supervised, collective process.  The JOLs have been appointed to wind up and administer the Debtor's assets and liabilities under the supervision of the Grand Court, and owe fiduciary duties to the Grand Court including to ensure that the interests of the SVB Cayman stakeholders are protected.

81.     A general principle underlying the Cayman Islands' insolvency regime is that the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.  This is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors. *Companies Act*, § 140.

82.     Section 97(1) of the Companies Act provides that upon the entry of a winding up order,

a stay is implemented such that no suit or other proceeding may be commenced or continued against the company except with leave of the Grand Court and subject to such terms as the Grand Court may impose. *Companies Act*, § 97(1). This automatic stay serves to promote the JOLs' ability to deal with the claims of creditors collectively and comprehensively.

83.     Winding up proceedings under the Companies Act are collective proceedings, considering the interests of all creditors in an unbiased, equitable manner. All creditors have an opportunity to be heard by the Grand Court, and no creditor will be prejudiced because it is foreign-based.

      **C.**      **The Role and Powers of the JOLs**

84.     The JOLs are fiduciaries and officers of the Grand Court. The powers of SVB Cayman's managers are displaced by entry of the Winding Up Order and the appointment of the JOLs.

85.     To be eligible for appointment as an official liquidator, the proposed appointee(s) must comply with the provision of the IPR, which include requirements as to: (a) professional qualifications: official liquidators are typically highly experienced and qualified accountants, with expertise as insolvency practitioners; (b) residency in the Cayman Islands; (c) insurance; and (d) independence. A foreign practitioner can also be appointed as an official liquidator of a Cayman company, provided it is a joint appointment with a Cayman-based insolvency practitioner and provided they comply with certain requirements including professional qualifications, independence and insurance.

86.     Winding up hearings are open to the public, and any member or creditor may attend to be heard on the question of who should be appointed as official liquidators. This may include appearances by stakeholders in order to oppose the appointment of voluntary liquidators who have

nominated themselves for appointment as official liquidators, and it may include challenge on the basis of an alleged lack of independence.

87.     The JOLs' powers arise from Schedule 3 of the Companies Act, the CWR and Orders of the Grand Court.  Broadly speaking, the JOLs are empowered, as agents of SVB Cayman, to collect, take possession, retain, manage and realize SVB Cayman's property for the benefit of creditors and other stakeholders.

88.     Schedule 3, Part I to the Companies Act (as supplemented by the CWR) sets out the following powers that the JOLs may exercise with the prior approval (referred to as "sanction" under Cayman Islands law) of the Grand Court:

a.  Bring or defend any action or other legal proceeding in the name and on behalf of the company;

b.  Carry on the business of the company so far as may be necessary for its beneficial winding up;

c.  Dispose of any property of the company to a person who is or was related to the company;

d.  Pay any class of creditors in full;

e.  Make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the company or for which the company may be rendered liable;

f.  Compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company;

g.  Deal with all questions in any way relating to or affecting the assets or the winding up of the company, take any security for the discharge of any such call, debt, liability or claim and give a complete discharge in respect of it;

h.  Sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

i.  Raise or borrow money and grant securities therefor over the property of the company;

j.      Engage staff (whether or not as employees of the company) to assist in the performance of their functions; and

k.      Engage attorneys and other professionally qualified persons to assist in the performance of their functions.

*Companies Act*, Schedule 3, Part I.

89.      Schedule 3, Part II of the Companies Act (as supplemented by the CWR) sets out the powers that the JOLs may exercise without the Grand Court's prior approval:

a.      Take possession of, collect and get in the property of the company and for that purpose to take all such proceedings as they consider necessary;

b.      Do all acts and execute, in the name and on behalf of the company, all deeds, receipts and other documents and for that purpose to use, when necessary, the company seal;

c.      Prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and ratably with the other separate creditors;

d.      Draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company, with the same effect with the respect of the company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business;

e.      Promote a scheme of arrangement pursuant to section 86 of the Companies Act;

f.      Convene meetings of creditors and contributories; and

g.      Do all other things incidental to the exercise of these powers.

*Companies Act*, Schedule 3, Part II.

90.      Often the order of the Grand Court appointing official liquidators will explicitly authorize them to exercise some of the powers set forth in Schedule 3, Part I of the Companies Act (i.e. no further approval will be required in order for those powers to be exercised), as is the case with the Winding Up Order.  For example, Paragraph 5 of the Winding Up Order authorizes the JOLs to, without further sanction or intervention from the Grand Court, "appoint such counsel, attorneys, professional advisors whether in Cayman Islands or elsewhere, as they may consider necessary to advise and assist

them in the performance of their duties in accordance with Order 25 of the Companies Winding Up Rules (2023 Consolidation)." *Winding Up Order*, ¶ 5.

91.     As the Official Liquidators of SVB Cayman, the JOLs' practical duties include: (a) determining whether SVB Cayman is solvent, insolvent, or of doubtful solvency; (b) ascertaining the assets and liabilities of SVB Cayman; and (c) establishing the identities of SVB Cayman's stakeholders.  The solvency determination is significant because it determines who are treated as the stakeholders in the Cayman Proceeding – that is, whether it is the shareholders (in the case of a solvent liquidation), the creditors (in the case of an insolvent liquidation) or both (where the company is of doubtful solvency).

92.     As fiduciaries and officers of the Grand Court, the JOLs are duly authorized and empowered by the Grand Court to investigate the affairs of SVB Cayman, to administer the distribution of its assets, and to act as the duly authorized representatives of SVB Cayman.  As the Official Liquidators, the JOLs are empowered under Cayman Islands law to assert claims not only on behalf of SVB Cayman, but are also empowered as agent to assert claims on behalf of SVB Cayman's creditors, such as the uninsured holders of SVB Cayman Deposit Accounts.

93.     The Companies Act provides for notice to creditors of the commencement of the insolvency proceeding, of the process for submission of claims, of creditors' meetings, and of voting on the insolvency plan, which notices may be given by publication on the website designated therefore by the justice system.

94.     The Companies Act provides for classification of creditors and treatment in accordance with statutory priority. *Companies Act*, § 140. A key principle underlying the Companies Act and the Cayman Proceeding is that the claims of creditors within the same class are treated on a *pari passu*

basis. *Companies Act*, § 140. Notice is given to creditors of the process and deadline for submission of claims. *See Companies Act*, § 139.

**VII.    The JOLs' Urgent Need for Provisional Discovery Relief**

95.    As described in detail in the Application, additional, immediate, provisional relief is required for the JOLs to efficiently conduct the Cayman Proceeding and protect the interests of SVB Cayman's creditors and stakeholders pursuant to the Winding Up Order.

96.    The requested provisional relief is necessary on an immediate basis to protect SVB Cayman's claims to be filed in response to the Claim Denial Letter, which the FDIC has made an urgent need because of its assertion that the Claim Denial Letter starts the clock on for 60 day window for SVB Cayman to file a court action appealing the disallowance of the Provisional Proof of Claim.

97.    As set forth in the Application, the JOLs are otherwise without access to crucial information regarding SVB Cayman's claims, including potential claims against FDIC-R, which claims the FDIC asserts must be filed by February 23, 2024.

98.    Specifically, as the Application describes in detail, it is critical for the JOLs to have access to fundamental information regarding SVB Cayman's assets and affairs, not only with respect to potential claims held against U.S. entities, but also information on the handling of SVB Cayman assets in the wake of the SVB Collapse and with respect to the transfer of assets under the P&A Agreement.

99.    Provisional relief is urgently required because this crucial information is within the exclusive possession of the FDIC-C and FDIC-R and is necessary not only for the efficient administration of the Cayman Proceeding, but also to enable the JOLs to fulfill their statutory and fiduciary duties in the Cayman Proceeding, particularly in light of the 60 day deadline set in motion by the Claim Denial Letter.

## VIII.   Section 1515(c) Statement

100.    I am informed by United States counsel that section 1515(c) of the Bankruptcy Code

provides that "*[a] petition for recognition shall be accompanied by a statement identifying all foreign

proceedings with respect to that debtor that are known to the foreign representative.*"

101.    In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that, to

my knowledge, the only foreign proceeding (as I am informed by United States counsel that such term

is defined in section 101(23) of the Bankruptcy Code) pending with respect to SVB Cayman is the

Cayman Proceeding.

## IX.   List Pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure

102.    I am informed by United States counsel that Rule 1007(a)(4) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that a foreign representative filing a petition

for recognition under chapter 15 of the Bankruptcy Code shall file with the petition:

> (A) a corporate ownership statement containing the information described in Rule
> 7007.1; and (B) unless the court orders otherwise, a list containing the name and address
> of all persons or bodies authorized to administer foreign proceedings of the debtor, all
> parties to litigation pending in the United States in which the debtor is a party at the
> time of the filing of the petition, and all entities against whom provisional relief is sought
> under § 1519 of the Code.

103.    In accordance with Bankruptcy Rules 1007(a)(4) and 7007.1, I hereby provide the

following information.

104.    To the best of my knowledge, no corporation own 10% or more of any class of SVB

Cayman's equity interest.

105.    The JOLs are the duly appointed official liquidators of SVB Cayman, authorized to

administer the Cayman Proceeding.  The address for me and Mr. Childe is FFP Limited, 2nd Floor

Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands.  The address for

Mr. Ledwidge is Stout, 120 West 45th Street, Suite 2900, New York, NY 10036.

106.    To the best of my knowledge, SVB Cayman is not presently a party to any other litigation in the United States.

107.    As detailed in the Application, the JOLs are seeking provisional relief against the FDIC.


[REMAINDER OF PAGE INTENTIONALLY BLANK]

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 18, 2024
Executed in Grand Cayman, Cayman Islands

_____
MICHAEL PEARSON

*Joint Official Liquidator of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation)*