**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | : | Chapter 15 |
|  | : |  |
| SILICON VALLEY BANK | : | Case No. __-_____ |
| (CAYMAN ISLANDS BRANCH) (in | : |  |
| Official Liquidation) | : |  |
|  | : |  |
| Debtor in a | : |  |
| Foreign | : |  |
| Proceeding.[1] | : |  |

-----------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION
## FOR ORDER TO SHOW CAUSE WHY PROVISIONAL RELIEF
## <u>PURSUANT TO 11 U.S.C. §§ 105(A), 1519, AND 1521 SHOULD NOT BE GRANTED</u>

Warren E. Gluck, Esq.
John J. Monaghan, Esq. (*pro hac vice* forthcoming)
Paul M. Aguggia, Esq. (*pro hac vice* forthcoming)
Marie E. Larsen, Esq.
HOLLAND & KNIGHT LLP
31 W. 52nd Street
New York, NY 10019
Telephone:  212-513-3200
Fax: 212-385-9010
Warren.Gluck@hklaw.com
John.Monaghan@hklaw.com
Paul.Aguggia@hklaw.com
Marie.Larsen@hklaw.com

*Counsel for the Joint Official Liquidators*
*of Silicon Valley Bank (Cayman Islands Branch)*
*(in Official Liquidation)*

---

[1] Silicon Valley Bank is registered under Part IX of the Cayman Islands Companies Act, with registration number 193670.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................2

JURISDICTION AND VENUE .........................................................................................5

BACKGROUND ................................................................................................................6

   I.   THE CREATION OF SVB CAYMAN.............................................................................6

      A.   The Cayman-Regulated Deposit Products Offered by SVB Cayman.........................7

      B.   SVB Cayman's Domestic Account with SVB's U.S. Office....................................9

   II.   THE COLLAPSE OF SVB AND SALE TO FIRST-CITIZENS BANK ........................................10

   III.   THE POST-SVB COLLAPSE "ORPHANING" OF SVB CAYMAN AND EVENTS LEADING UP TO THE COMMENCEMENT OF THE CAYMAN PROCEEDING...........................................12

   IV.   THE JOLS' GOVERNMENT OUTREACH STRATEGY AND THE DISALLOWANCE OF THE PROVISIONAL PROOF OF CLAIM .......................................................................................13

RELIEF REQUESTED......................................................................................................16

BASIS FOR RELIEF ........................................................................................................16

   I.   THE PROVISIONAL RELIEF REQUESTED IS WITHIN THE SCOPE OF SECTION 1519 AND 1521 AND IS NECESSARY AND APPROPRIATE UNDER THE CIRCUMSTANCES..................17

   II.   PROVISIONAL RELIEF IN THE FORM OF DISCOVERY IS CONSISTENT WITH THE PUBLIC INTEREST AND IS NECESSARY TO PREVENT IRREPARABLE HARM ...............................19

      A.   There is a Substantial Likelihood of Recognition of the Cayman Proceeding as a Foreign Main Proceeding and Application of the Requested Relief .........................19

      B.   Absent the Requested Provisional Relief, the Debtor Will Suffer Irreparable Harm. ......................................................................................................................20

      C.   The Balance of Hardships Weighs in Favor of the Debtor. ......................................21

      D.   Granting the Provisional Relief Would Be in the Public Interest. ............................23

NO PRIOR REQUEST .....................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*AG Route Seven P'ship v. United States,*
   57 Fed. Cl. 521 (2003) ...........................................................................24

*Ambase v. United States,*
   61 Fed.Cl. 794 (2004) ..........................................................................24

*Bankr. Estate of Norske Skogindustrier ASA v. Cyrus Capital Partners, L.P.,*
   629 B.R. 717 (Bankr. S.D.N.Y. 2021) ..................................................2

*In re Caldas,*
   274 B.R. 583 (Bankr. S.D.N.Y. 2002) ..................................................21

*In re Calpine Corp.,*
   365 B.R. 401 (S.D.N.Y. 2007) ..............................................................19

*In re China Hosps., Inc.,*
   No. 19-13767 (SCC), Dkt. No. 14 (Bankr. S.D.N.Y. Nov. 25, 2019) ....................17

*In re Cinque Terre Fin. Grp. Ltd.,*
   No. 16-11086-jlg, Dkt. No. 47 (Bankr. S.D.N.Y. May 16, 2016) ..........................17

*In re Cinque Terre Fin. Grp. Ltd.,*
   No. 16-11086-jlg, Dkt. No. 9 (Bankr. S.D.N.Y. Apr. 29, 2016) ...........................17

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.,*
   482 B.R. 96 (Bankr. S.D.N.Y. 2012) ....................................................21

*In re Farenco Shipping Co. Ltd.,*
   No. 11-14138(REG), Dkt. No. 8 (Bankr. S.D.N.Y. Sept. 7, 2011) ........................18

*Frazer v. United States,*
   288 F.3d 1347 (Fed. Cir. 2002) ..............................................................24

*In re Hanjin Shipping Co., Ltd.,*
   No. 16-27041 (JKS), 2016 WL 6679487 (Bankr. D.N.J. Sept. 20, 2016) ..............21

*In re Lyondell Chem. Co.,*
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) ..................................................19

*O'Melveny & Meyers v. FDIC,*
   512 U.S. 79 (1994) ................................................................................24

*In re Sphinx, Ltd.,*
   351 B.R. 103 (Bankr. S.D.N.Y. 2006) ..................................................19

*In re SVB Financial Grp.*,
No. 23-10367 (MG) (Bankr. S.D.N.Y.) ECF Nos. 239, 251, 254, 265, 345,
346, 389, 390, 391, 504, 506, 658, 659, 660, 661................................................................22

*In re Toft*,
453 B.R. 186 (Bankr. S.D.N.Y. 2011) ................................................................................21

**Statutes and Court Rules**

11 U.S.C. § 101(15) ..............................................................................................................20

11 U.S.C. § 101(23) ..............................................................................................................20

11 U.S.C. § 101(24) ..............................................................................................................20

11 U.S.C. § 105(a) ........................................................................................................1, 6, 16

11 U.S.C. § 108(a) ..................................................................................................................2

11 U.S.C. § 1501(a) ..............................................................................................................23

11 U.S.C. § 1502 ...................................................................................................................20

11 U.S.C. § 1504 .....................................................................................................................5

11 U.S.C. § 1515 ................................................................................................................5, 20

11 U.S.C. § 1517(a) ...........................................................................................................4, 16

11 U.S.C. § 1519(a) ..................................................................................................... *passim*

11 U.S.C. § 1519(e) ...............................................................................................................19

11 U.S.C. § 1521(a)(4) ................................................................................................ *passim*

11 U.S.C. § 1521(a)(5) ..........................................................................................................16

11 U.S.C. § 1522(a) .........................................................................................................21, 22

11 U.S.C. § 1525 ...................................................................................................................23

12 U.S.C. § 1813(l)(5) ...........................................................................................................10

12 U.S.C. § 1813(m) ..............................................................................................................10

12 U.S.C. § 1821(a)(1) ...........................................................................................................10

28 U.S.C. § 157 .......................................................................................................................5

iii

28 U.S.C. § 1334.................................................................................................................5

28 U.S.C. § 1410.................................................................................................................5

Fed. R. Bankr. P. 2002(q)................................................................................................16

Fed. R. Bankr. P. 2004.....................................................................................................22

Fed. R. Bankr. P. 7008.......................................................................................................5

Fed. R. Bankr. P. 9006.....................................................................................................22

S.D.N.Y. L.B.R. 9077-1......................................................................................................6

**Other Authorities**

U.S. Const. art. III..............................................................................................................5

H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005)........................................22

#238969063_v2

Andrew Childe, Niall Ledwidge and Michael Pearson, in their capacities as the duly appointed joint official liquidators ("**JOLs**" or "**Foreign Representatives**") of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation), an estate in official liquidation ("**SVB Cayman**" or the "**Debtor**") under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**"), pursuant to the Cayman Islands Companies Act (2023 Revision) (the "**Companies Act**") and associated regulations, including the Companies Winding Up Rules (2018) (collectively, the "**CWR**") and the Insolvency Practitioners Regulations, by their undersigned United States counsel, Holland & Knight LLP, respectfully submit this Memorandum of Law in support of their Application (the "**Application**"), seeking entry of an Order to show cause why provisional discovery authority pursuant to sections 105(a), 1519(a)(1) through (3), and 1521(a)(4) of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**") should not be granted.

In support of the Application, the JOLs have contemporaneously filed, and hereby incorporate by reference, the Official Form Petition commencing the above-captioned Chapter 15 proceeding (the "**Chapter 15 Case**"), the Verified Petition and exhibits thereto (together with the Official Form Petition, the "**Petition**"), and the accompanying Declaration of Michael Pearson executed on January 18, 2024 (the "**Pearson Declaration**") and the exhibits attached thereto.

Through the Application, the JOLs seek entry of an order granting provisional relief to prevent irreparable harm to SVB Cayman and the Cayman Proceeding pending recognition pursuant to sections 105(a), 1519, and 1521 of the Bankruptcy Code, in the form of an order provisionally granting immediate rights to obtain discovery through the examination of witnesses, taking of evidence or the delivery of information directed at the Federal Deposit Insurance

Corporation, in its corporate capacity ("**FDIC-C**") and the Federal Deposit Insurance Corporation, in its capacity as receiver for Silicon Valley Bank, Santa Clara and Silicon Valley Bridge Bank, N.A. ("**FDIC-R**", and collectively with FDIC-C, the "**FDIC**") regarding the Debtor's assets, affairs, rights, obligations and/or liabilities pursuant to 11 U.S.C. § 1521(a)(4);

In further support of this Application, the JOLs state as follows:

## **PRELIMINARY STATEMENT**

1.      The JOLs are in urgent need of discovery in order to support a fulsome, good faith pleading of causes of action that SVB Cayman has against FDIC-R, which claims must be filed by February 23, 2024, due to the artificial deadline set by the FDIC in a "snail mail" notice mailed to the JOLs' former prospective counsel on the day following Christmas.  These aggressive litigation tactics – typically resorted to in the most extreme of circumstances – is particularly surprising given the JOLs' concerted efforts since September 2023 to use appropriate diplomatic channels to schedule a meeting with the FDIC, in the hopes that a cooperative resolution could be reached that respected and took into account the interests of all parties and the U.S. and international banking communities.

2.      As set forth in further detail below, the need for provisional relief is of no fault of the JOLs; instead, it is an emergency of the FDIC's own making, due to its disallowance of SVB Cayman's provisional proof of claim over the holidays and the FDIC's assertion that the sixty (60) day window to file a court action appealing the disallowance is applicable to SVB Cayman.[1]

---

[1] It is the JOLs' position that, upon chapter 15 recognition of the Cayman Proceeding, section 108(a) of the Bankruptcy Code operates to toll the sixty (60) day deadline for SVB Cayman to file its district court action against the FDIC-R until two years after the date of the recognition order.  *See Bankr. Estate of Norske Skogindustrier ASA v. Cyrus Capital Partners, L.P.*, 629 B.R. 717, 738-740 (Bankr. S.D.N.Y. 2021) (applying section 108(a) of the Bankruptcy Code to a chapter 15 debtor's claims under Norwegian law).  Until FDIC-R consents to the JOLs' position or otherwise extends the sixty (60) day filing deadline, the provisional relief requested herein is urgently needed.

2

3.      The FDIC-imposed bar date to file claims in the SVB receivership was Monday, July 10, 2023, shortly after the JOLs' appointment and prior to their selection of United States counsel.  Under the circumstances, the JOLs caused to be filed a provisional and placeholder proof of claim on behalf of SVB Cayman through their prospective counsel Alston & Bird.  Concurrently with the filing, the FDIC indicated that the FDIC would consider a supplement to the provisional proof of claim given the circumstances.

4.      During the course of the Cayman Proceeding, the JOLs have obtained a clearer picture of the harm caused upon SVB Cayman and its creditors-depositors due to the actions of the FDIC.  The FDIC appears to have engineered an outcome disparity by which holders of certain Cayman accounts received "insured deposit" status (which sits at top of the SVB receivership waterfall) while certain other SVB Cayman depositors did not, despite the fact that all SVB Cayman accounts were classified as not FDIC-insured prior to the collapse of Silicon Valley Bank (the "**SVB Collapse**").

5.      This stark outcome – at the very least – merits an investigation into the reasons for the outcome disparity. Two potential avenues of inquiry will be whether the discretionary decisions to over-insure the Sweep Account depositors above $250,000 and waive the US person limitation, but not waive the US geographic situs limitation (by implication) was either arbitrary and capricious or an impermissible exercise of discretion based upon national origin – especially under circumstances where the only possible party impacted by the US geographic situs limitation was SVB Cayman and its depositors – given SVB Cayman was the sole foreign deposit-taking branch of Silicon Valley Bank.

6.      Further investigation is also needed into the precise authorization and mechanism by which the FDIC, stepping into the powers of Silicon Valley Bank's former management,

"moved" the SVB Cayman depositors' funds into the receivership estate without the safeguards and approvals required of all licensed bank branches in Cayman.

7.      Due to the significant interests of the U.S., Cayman and international banking community, as well as the serious harm caused upon SVB Cayman depositor-creditors as well as the SVB Cayman branch as discussed below and in the Petition, the JOLs took the approach in the first instance to attempt to seek meetings with the FDIC, in hopes that a fair and just resolution could be reached, backed by near daily meetings with members of the U.S. Congress.

8.      The JOLs understood that, by December 6, 2023, the FDIC was contacted by at least one Congressional office asking for a January 2024 meeting between the FDIC and the JOLs, and the JOLs understood that planning for this meeting was in process.

9.      On January 3, 2024, a scanned copy of a letter from FDIC-R to Alston & Bird was received by Holland & Knight, which appears to have been mailed by FDIC-R on December 26, 2023.  The letter purports to disallow SVB Cayman's claim on the generic and unsupported grounds that it was "not proven to the satisfaction of the Receiver (the **Claim Denial Letter**)."[2]

10.      The Claim Denial Letter purports to trigger a 60-calendar day window to commence litigation against the FDIC-R.  Despite further inquiry to the FDIC, the FDIC has declined to discuss the claim denial further.

11.      Accordingly, the JOLs now seek certain provisional relief between the date hereof and this Court's entry of the proposed order recognizing the Cayman Proceeding as a "foreign main proceeding" within the meaning of section 1517 of the Bankruptcy Code.  The JOLs request

---

[2] It is noteworthy that FDIC counsel chose to utilize regular not air-based United States mail as the sole mechanism for notice of the rejection of claims and catalyzing a 60 day clock to former prospective counsel to the JOLs, Alston & Bird, and not Holland & Knight.  The FDIC had actual knowledge that Holland & Knight was representing the JOLs in relation to this matter, were engaged in active discussions with Holland & Knight regarding a policy meeting, and further declined to utilize the known email contact information by which they had previously corresponded.

that this Court immediately authorize discovery directed at the FDIC in support of the claims that

the JOLs must now file in response to the Claim Denial Letter by February 23, 2024.

12.     Without the relief requested herein, SVB Cayman will be faced with the prospect

of a significant disruption to the Cayman Proceeding, including the infliction of irreparable harm

upon the SVB Cayman estate by preventing it from obtaining the necessary information for filing

a complete and accurate set of claims against the FDIC-R by the 60-day bar date arbitrarily set by

the FDIC.

13.     Chapter 15 of the Bankruptcy Code is intended to prevent precisely this negative

effect on a foreign debtor's insolvency proceedings.  Therefore, and for reasons further described

herein, in the Petition and in the Pearson Declaration, the JOLs respectfully submit that provisional

relief is urgently needed.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157,

and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, dated January 31, 2012.  The Debtor confirms its consent, pursuant

to Bankruptcy Rule 7008, to the entry of a final order by this Court to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

15.     This case has been properly commenced pursuant to section 1504 of the Bankruptcy

Code by the filing of a petition for recognition of the Cayman Proceeding under section 1515 of

the Bankruptcy Code.

16.     For the reasons set forth in the Petition, venue is proper in this District pursuant to

28 U.S.C. § 1410 because the Debtor holds property and its U.S.-based principal place of business

within this District.

17.     The statutory bases for relief are sections 105(a), 1519(a)(3), and 1521(a)(4) of the Bankruptcy Code and Rule 9077-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## **BACKGROUND**

### I.     **The Creation of SVB Cayman**

18.     The Verified Petition and supporting Pearson Declaration, which are incorporated by reference as if fully set forth herein, describe in detail SVB Cayman's business and the events leading up to the Cayman Proceeding and this Chapter 15 case.  To avoid redundancy, the salient facts for purposes of this Application are as follows.

19.     Founded in 1983, Silicon Valley Bank, Santa Clara ("**SVB**") was an FDIC-insured, state-chartered bank headquartered in California and established to provide banking services to Silicon Valley's growing number of technology companies. *Pearson Decl.*, ¶ 4.  While SVB had affiliate relationships and joint ventures with foreign banks in China and the United Kingdom, SVB Cayman was the only deposit-taking foreign branch maintained by SVB. *Pearson Decl.*, ¶ 4.

20.     On August 16, 2007, SVB registered in the Cayman Islands as a foreign company under Part IX of the Companies Act. *Pearson Decl.*, ¶ 5.

21.     On August 30, 2007, SVB applied for and was granted a Class "B" banking license from the Cayman Islands Monetary Authority ("**CIMA**") under the Cayman Islands Banks and Trust Companies Act (2021 Revision) (the "**BTC Act**"). *Pearson Decl.*, ¶ 6.

22.     Following its registration in the Cayman Islands and the granting of a Class "B" license from CIMA, SVB had an active branch in the Cayman Islands, the established SVB Cayman branch.

6

23.     The primary purpose of SVB Cayman was for deposit products.  *Pearson Decl.*, ⁋ 8.

24.     SVB Cayman was at all times overseen, regulated, and licensed by CIMA, which serves as the Cayman Islands' primary financial services regulator, and was otherwise subject to the Cayman Islands Banking laws.  *Pearson Decl.*, ⁋ 11.

25.     The BTC Act, as well as the Cayman Island Monetary Authority Enforcement Manual promulgated thereunder, provides CIMA with broad authority to regulate a foreign branch in the Cayman Islands (such as SVB Cayman), including but not limited to the authority to seek the involuntary winding up of the foreign branch.  *Pearson Decl.*, ⁋⁋ 16-17.

26.     The relationship between SVB and SVB Cayman was governed by an Intra-Group Service Level Agreement, entered into by and between SVB Cayman, as recipient, and Silicon Valley Bank (US Head Office), as provider (the "**SLA**").  *Pearson Decl.*, ⁋ 28. A true and correct copy of the SLA is attached to the Pearson Declaration as Exhibit 8.

27.     The SLA expressly acknowledges that SVB Cayman is regulated by CIMA, that SVB is separately regulated by the California Department of Business Oversight and the Federal Reserve, and that the SLA is being entered into on an "arm's length basis." *Pearson Decl.*, ⁋ 29.

28.     Under the SLA, SVB and SVB Cayman were each required to appoint separate representatives, known as "Agreement Managers," who served as the primary point of contact with the corresponding party.  *Pearson Decl.*, ⁋ 30.  Each Agreement Manager had full authority to act for, and on behalf of, the respective party on all matters relating to the SLA. *Pearson Decl.*, ⁋ 31.

A.     **The Cayman-Regulated Deposit Products Offered by SVB Cayman**

29.     SVB Cayman offered three types of accounts to customers: 1) Eurodollar Sweep Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account (collectively, the "**SVB Cayman Deposit Accounts**"). When SVB failed in March 2023, SVB

Cayman's customers had, in the aggregate, approximately $866 million deposited in all three types of accounts. *Pearson Decl.*, ❡ 18.  A description of each of the SVB Cayman Deposit Accounts is as follows:

- *Eurodollar Sweep Account* – The Eurodollar Sweep Account was a business account maintained at SVB Cayman.  In the account agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch."  At the time of the SVB Collapse, there were forty-four (44) active Eurodollar Sweep Accounts, with total account balances of $389,562,086. *Pearson Decl.*, ❡ 19.

- *Eurodollar Money Market Account* – A Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman customers.  In the account agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman Islands branch office." At the time of the SVB Collapse, there were one-hundred six (106) active Eurodollar Money Market Accounts, with total account balances of $108,400,111.  *Pearson Decl.*, ❡ 22.

- *Eurodollar Operating Account* – The Eurodollar Operating Account was a traditional business operating account that was not interest bearing.  In the account agreement, SVB affirmatively stated that the SVB Eurodollar Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office."   At the time of the SVB Collapse, there were four hundred eighty-four (484) active Eurodollar Operating Accounts, with total account balances of $368,212,751. *Pearson Decl.*, ¶ 24.

30.     The account agreements for the SVB Cayman Deposit Accounts contain identical language notifying SVB Cayman customer-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman, the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law.  For example, the account agreement for the Eurodollar Operating Account provides:

> [T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.

> SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands.

These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

*Pearson Decl.*, ⁋ 25.

**B.    SVB Cayman's Domestic Account with SVB's U.S. Office**

31.    In the course of the JOLs' investigation, the JOLs have learned that prior to the SVB Collapse, it was the regular practice for SVB Cayman to deposit all of its cash with SVB in a deposit account located in the United States.  SVB Cayman's sole asset was the depository liability owed by SVB in connection with this account (the "**SVB Cayman Domestic Account**"). *Pearson Decl.*, ⁋ 26.  In particular, the JOLs' investigation has revealed that the SVB Cayman branch maintained a domestic account in the United States at SVB's main headquarters with account number xxxx0000 and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where it was made clear that this was only SVB Cayman's bank account (as there were no other foreign deposit taking branches) and that the credits located in this domestic account were SVB Cayman's sole asset and located in the United States.  *Pearson Decl.*, ¶ 27.

32.    Additionally, the JOLs' investigation has revealed that SVB's main headquarters maintained domestic, United States sitused accounts for each and all of the three products offered at SVB Cayman with the following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).  The significant indication is that all of these credits were geographically located in the United States as well.  *Pearson Decl.*, ¶ 28.

## II.   **The Collapse of SVB and Sale to First-Citizens Bank**

33.     On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in the SVB Collapse. *Pearson Decl.*, ⁋ 37.

34.     On March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition. As a result, DFPI ordered that SVB's property and business be placed into a receivership. The FDIC, pursuant to its statutory authority, has been acting as receiver for Silicon Valley Bank and its successor bridge bank since March 2023 (the "**SVB Receivership**"). *Pearson Decl.*, ⁋⁋ 38-39.

35.     On March 13, 2023, via a Transfer Agreement (the "**Transfer Agreement**"), FDIC-R transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB Cayman to Silicon Valley Bridge Bank, N.A. (the "**Bridge Bank**"), which was newly created and operated by the FDIC as receiver pursuant to applicable federal law. *Pearson Decl.*, ⁋40. A true and correct copy of the Transfer Agreement is attached to the Pearson Declaration as Exhibit 10.

36.     Generally, depositors at FDIC-insured depository institutions are insured up to a maximum amount of $250,000. *See* 12 U.S.C. §§ 1821(a)(1)(A), (a)(1)(E). Other than the $250,000 cap, the other limitations on FDIC insurance status include (i) that the depositor be a U.S. citizen and (ii) that the account is payable in the United States. *See* 12 U.S.C. §§ 1813(l)(5) and 1813(m).

37.     On March 12, 2023, a joint statement press release (the "**Joint Statement Press Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair

Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were transferred to FDIC-R, assuring all SVB depositors that they would have full access to their money on Monday morning, March 13, 2023 and that they would be made whole, beyond the standard insured amount of $250,000. *Pearson Decl.*, ��P 41. A true and correct copy of the Joint Statement Press Release is attached to the Pearson Declaration as Exhibit 11.

38.     The FDIC's announcement was based upon Treasury Secretary Janet Yellen's invocation of the systemic risk exception (the "**SRE**"), which was based on the unanimous recommendation of the FDIC-C, the Federal Reserve, and in consultation with the President of the United States.  Such invocation mandates the FDIC-C to insure and pay the full amount of all deposits for all insured depositors of SVB above the $250,000 cap, and further removed the requirement that the insured account holder be a US person within the meaning of the Federal Deposit Insurance Act.  These decisions at best, left only the geographic credit situs limitation intact.

39.     On March 27, 2023, the FDIC entered into a Purchase and Assumption Agreement (the "**P&A Agreement**") with First-Citizens, covering certain SVB deposits and loans transferred to and then held at the Bridge Bank. *Pearson Decl.*, ⁏P 42.  A true and correct copy of the P&A Agreement is attached to the Pearson Declaration as Exhibit 12.

40.     The P&A Agreement included a purchase of approximately $72 billion of the Bridge Bank's assets at a discount.  *Pearson Decl.*, ⁏P 43.  Notably, the P&A Agreement gave First-Citizens the express option to purchase the Canadian, German, and Hong Kong foreign branches (all of which did not accept deposits and only provided lending services), but did not provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits).  As a result, SVB Cayman was not purchased by or transferred to First-Citizens pursuant

to the P&A Agreement and was excluded from the SVB Receivership and its process. *Pearson Decl.*, ¶¶ 43-44.

### III.   The Post-SVB Collapse "Orphaning" of SVB Cayman and Events Leading Up to the Commencement of the Cayman Proceeding

41.    On March 31, 2023, the depositors-creditors of SVB Cayman that held Eurodollar Operating Accounts and Eurodollar Money Market Accounts received a notice that balances held by customers in accounts at SVB Cayman are not deposits, and therefore, that their status as a result of SVB's failure is that of general unsecured creditor, which is junior in priority to both insured and uninsured depositors. *Pearson Decl.*, ¶ 45.

42.    During the course of the JOLs' investigation, the JOLs learned that account holders for Eurodollar Sweep Accounts did not receive any such notice, with their accounts being granted "insured deposit" status, even though the account agreements for each of the three SVB Cayman Deposit Accounts contains identical language that the Cayman accounts are not FDIC-insured and are payable and collectible only in the Cayman Islands.  *Pearson Decl.*, ¶ 46.

43.    Accordingly, in what appears to be an arbitrary decision, the FDIC has provided holders of the Eurodollar Sweep Accounts with "insured depositor" status, granting them a full guarantee by the FDIC under the SRE.  The stated justification for this decision is that certain amount of the funds associated with the Eurodollar Sweep Accounts had "swept back" into an FDIC-insured deposit account located in the United States at or around the time of SVB's entry into receivership.  However, it is the JOLs' express understanding that *all* of the credits associated with all of the SVB Cayman accounts were geographically sitused in the United States at all times material. *Pearson Decl.*, ¶ 47.

44.    The decision to include the Eurodollar Sweep Accounts within the insurance appears to have been at least, in part, a discretionary decision by the FDIC.  It follows as a corollary

that the FDIC exercised its discretion to *not* include the Eurodollar Money Market and Eurodollar Operating Accounts within the insured pool as a matter of discretion on the basis that their credits were not geographically located in the United States (the "**Discretionary Insurance Decision**").

45.     As an initial matter, it appears that the FDIC's analysis is and was wrong. All three of the accounts' credits were located in SVB accounts located in the United States, as were the credits located in SVB Cayman's segregated account at SVB.

46.     Moreover, the apparently false justifications' credibility is diminished wherein the JOLs' investigation to date has revealed that more than 90% of the uninsured depositors of SVB Cayman are of Chinese origin or China-investment connected (and 99% by value), while the demographics of the SVB Cayman insured depositors are mixed and nominal. *Pearson Decl.*, ¶ 48. Despite this, due to the nature of international investment practices, the JOLs have learned through their investigation that significant U.S. investors and international investors have also been rendered collateral damage of the FDIC's decisions. *Pearson Decl.*, ¶ 48.

47.     Even more distressing is the fact that the JOLs, who were appointed in June 2023, have so far received no notice from the FDIC concerning the status of the SVB Cayman Domestic Account. *Pearson Decl.*, ¶ 26. The SVB Cayman Domestic Account constitutes a depository liability owed by SVB to SVB Cayman and is located in the United States, and as such would appear to fall within the fully-insured accounts covered by Secretary Yellen's invocation of the SRE.

**IV.     The JOLs' Government Outreach Strategy and the Disallowance of the Provisional Proof of Claim**

48.     The FDIC-imposed bar date to file claims in the SVB Receivership was Monday, July 10, 2023, shortly after the JOLs' appointment and prior to the selection of United States counsel. Under the circumstances, the JOLs caused to be filed a provisional and placeholder proof

of claim ("**Provisional Proof of Claim**").  A true and correct copy of the Provisional Proof of Claim is attached to the Pearson Declaration as Ex. 17.  In correspondence and communications with counsel for the FDIC, it agreed to consider a supplement to the Provisional Proof of Claim at a later date, notwithstanding the bar date in effect. *Pearson Decl.*, ¶ 61.

49.     In the months following their appointment, the JOLs' core strategy had revolved around considerations of political reality.  Because this matter (i) implicates significant United States, Cayman and international banking interests, and (ii) SVB Cayman and the SVB Cayman depositors possess significant and fundamental legal and equitable rights to redress and remedy, the JOLs concluded that the best approach in the first instance would be to seek a significant and high-level meeting with the FDIC, appropriately backed by legislative outreach (the "**Government Outreach**"). *Pearson Decl.*, ¶ 62.

50.     In the best-case scenario, as a result of such a meeting, rational minds could examine the salient issues and points of mutual interest and devise an outcome that satisfies all interests.  In the worst-case scenario, the JOLs could be assured that all possible steps toward amicable resolution had been taken before resorting to litigation. *Pearson Decl.*, ¶ 63.

51.     In furtherance of this goal, a team led by Holland & Knight attorney and former Congressman James "Jim" Davis has, since September of 2023, engaged in a significant and nearly daily lobbying campaign toward explaining to Members of Congress, many of whom were unaware that there were U.S. victims of the SVB Cayman collapse, that there is in fact a significant segment of U.S. interests who will not receive a recovery if the claims of SVB Cayman depositors are categorized as "unsecured creditor claims" by the FDIC. *Pearson Decl.*, ¶ 64.

52.     Beginning on December 6, 2023, the FDIC was contacted by at least one Congressional office asking for a high-level meeting between FDIC and the JOLs to occur in

January 2024.  The JOLs understood that planning for this meeting was underway subject to details on the identity of the participants and the finalization of dates.  *Pearson Decl.*, ¶ 65.

53.     Significant work into framing the meeting and the issues to be discussed have taken place since September 2023.   In keeping with all parties seemingly cooperative efforts to avoid the time, expense and uncertainties of litigation, the JOLs neither commenced a Chapter 15 recognition application nor supplemented the Provisional Proof of Claim, waiting instead until the meeting(s) occurred such that the parties would have maximal freedom to develop and prepare potential solutions and resolutions.  *Pearson Decl.*, ¶ 66.

54.     On January 3, 2024, a scanned copy of the Claim Denial Letter from the FDIC was received by Alston & Bird (U.S. counsel previously considered for full engagement by the JOLs and the sole filer of the Provisional Proof of Claim), which letter appears to have been mailed on December 26, 2023, while the discussions between the  Holland & Knight lobbying team and Congressional staffers and the FDIC about the planned meeting with the JOLs were ongoing.  The Claim Denial Letter purports to disallow SVB Cayman's claim on the unexplained ground that it was "not proven to the satisfaction of the Receiver." *Pearson Decl.*, ¶ 67. A true and correct copy of the Claim Denial Letter is attached to the Pearson Declaration as Exhibit 18.

55.     On January 3, 2024, a request for a telephone call with counsel for the FDIC was made via email by Holland & Knight to discuss the Claim Denial Letter.  In particular, the Claim Denial Letter appears to be a final resolution, triggering a 60-day window to commence litigation in response to the Claim Denial Letter, and fundamentally is out of step with  planning a high-level meeting as well as the contemplated and agreed supplemental claim submission.  *Pearson Decl.*, ¶ 68.

15

56.     In response to Holland & Knight's January 3rd email, the FDIC has declined to discuss the Claim Denial Letter or its implications further.  *Pearson Decl.*, ¶ 69.

## RELIEF REQUESTED

57.     The JOLs urgently need to obtain discovery from the FDIC to obtain accurate information in order to identify and plead all of SVB Cayman's potential claims in response to the Claim Denial Letter within the sixty (60)-day window—an artificial deadline set by the FDIC while discussions were being contemplated and scheduled.   By this Application, the JOLs respectfully request that this Court, pursuant to sections 105(a), 1519(a)(3), and 1521(a)(4) and (5) of the Bankruptcy Code, enter an order substantially in the form of the Proposed Order, immediately authorizing urgent discovery measures pursuant to 11 U.S.C. 1521(a)(4).

## BASIS FOR RELIEF

58.     Pursuant to section 1517 of the Bankruptcy Code, an order recognizing a foreign proceeding may only be entered after notice and a hearing.   11 U.S.C. § 1517(a).   Pursuant to Bankruptcy Rule 2002(q), the notice period must be at least twenty-one (21) days.  Fed. R. Bankr. P. 2002(q).   However, pending entry of an order recognizing a foreign proceeding, section 1519 of the Bankruptcy Code authorizes the Court to grant certain relief to the proposed foreign representatives on a provisional basis.   Specifically, section 1519(a) of the Bankruptcy Code provides:

> From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including-
>
> (1) staying execution against the debtor's assets;
>
> (2) entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other

circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(3) any relief referred to in paragraph (3), [or] (4) . . . of section 1521(a).

11 U.S.C. § 1519(a).  Section 1521(a)(4) authorizes the Court to "provide for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities."  11 U.S.C. § 1521(a)(4).

59.     Absent provisional relief, the JOLs would be unable to obtain and analyze essential information regarding actions taken by the FDIC, which is necessary for the JOLs to be able to effectively file a complaint in response to the Claim Denial Letter on or before the sixty (60) day deadline, February 23, 2024.

**I.      The Provisional Relief Requested is Within the Scope of Section 1519 and 1521 and Is Necessary and Appropriate Under the Circumstances**

60.     Section 1519 of the Bankruptcy Code permits foreign representatives to request that this Court provide certain provisional relief to foreign debtors, including the relief the JOLs currently seek, pending a ruling on the Petition.  Courts grant such relief where it is "urgently needed" to protect the foreign debtor's assets in the United States. *See* 11 U.S.C. §1519(a).

61.     Various forms of provisional relief are frequently granted to foreign representatives pending a hearing on recognition of a foreign proceeding. Indeed, the relief requested on a provisional basis herein is exactly the type of relief envisioned by sections 1519(a) and 1521(a)(4), and Courts within this district have previously granted requests for provisional relief akin to that requested herein based on similarly exigent circumstances. *See, e.g., In re China Hosps., Inc.*, No. 19-13767 (SCC), Dkt. No. 14 (Bankr. S.D.N.Y. Nov. 25, 2019) (granting provisional relief under section 1519(a), including pursuant to sections 1521(a)(4)); *In re Cinque Terre Fin. Grp. Ltd.*, No. 16-11086-jlg, Dkt. No. 9 (Bankr. S.D.N.Y. Apr. 29, 2016) (granting provisional relief to authorize foreign liquidator conduct expedited discovery); *In re Cinque Terre Fin. Grp. Ltd.*, No. 16-11086-

jlg, Dkt. No. 47 (Bankr. S.D.N.Y. May 16, 2016) (authorizing expedited discovery); *In re Farenco Shipping Co. Ltd.*, No. 11-14138(REG), Dkt. No. 8 (Bankr. S.D.N.Y. Sept. 7, 2011) (granting the enumerated provisional relief under section 1519(a) and authorizing expedited discovery under section 1521(a)(4)).

62.     For the reasons stated herein, SVB Cayman will be subjected to further serious harm to the detriment of its stakeholders if this Court does not grant the relief requested. *Pearson Decl.* ¶ 95-99. Thus, an immediate, provisional order granting the JOLs the right to conduct discovery against the FDIC pending a ruling on the Petition is "urgently needed" to protect the Debtor and its assets until the date on which this Court enters the recognition order.

63.     In particular, it will be in the interest of the JOLs and SVB Cayman to obtain written, document and deposition discovery on the following topics before any mandatory legal summons and complaint is filed, presently due on or around February 23, 2024:

    a. The precise authorization and mechanism by which FDIC, stepping into the powers of SVB's former management, "moved" the SVB Cayman depositors' funds into the SVB receivership estate and the geographic location of the credits associated with the SVB Cayman depositors' accounts at the time of the failure;

    b. The circumstances by which the FDIC determined to exclude only the SVB Cayman branch from the assignment to the Bridge Bank and the role, if any, that national origin played in such decisions;

    c. The circumstances by which the FDIC subsequently determined to insure roughly 50% of the total SVB Cayman deposits, the "Sweep Accounts," on the basis that the Sweep Account deposits were "located" in the United States, but not the remainder of the SVB Cayman deposits, despite the fact that it appears all SVB Cayman account credits were maintained in the United States and the role, if any, that national origin played in such decisions; and

    d. The circumstances by which the FDIC failed to notify SVB Cayman or the JOLs of the existence of the SVB Cayman Domestic Account;

    e. FDIC-R's consent to Cayman law, Cayman jurisdiction and the precise liquidation proceedings at issue, as well as their decisions not to object to the Cayman liquidation proceedings despite their notice of the same;

    f. FDIC-R's breach of their agreement to consider a supplemental and amended proof of claim on behalf of SVB Cayman;

g. The basis upon which FDIC-R rejected the SVB Cayman claims and any aspect of the claims not "proved to the satisfaction of the receiver" under circumstances where a meeting was being set by and between the FDIC and SVB Cayman precisely to discuss the nature of the SVB Cayman claims

64. These facts, and others, will support a fulsome pleading of the causes of action that

SVB Cayman is required to file on or before February 23, 2024.

## II. Provisional Relief in the Form of Discovery Is Consistent with the Public Interest and is Necessary to Prevent Irreparable Harm

65. Establishing that the debtor meets the applicable standards for injunction is a threshold requirement for the granting of provisional relief under chapter 15. *See* 11 U.S.C. § 1519(e); *In re Sphinx, Ltd.*, 351 B.R. 103, 111 n.8 (Bankr. S.D.N.Y. 2006) ("Section 1519 of the Code provides that the bankruptcy court may grant provisional relief, under the standards, procedures and limitations applicable to an injunction . . . ."). Under Second Circuit precedent, a preliminary injunction should be issued if the following elements are satisfied: (1) there is a likelihood of success on the merits, (2) there is an imminent irreparable harm to the debtors' assets in the absence of an injunction, (3) the balance of harms tips in favor of the moving party, and (4) the public interest weighs in favor of an injunction. *See In re Lyondell Chem. Co.*, 402 B.R. 571, 588 (Bankr. S.D.N.Y. 2009) (citing *Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.)*, 354 B.R. 45 (Bankr. S.D.N.Y. 2006), aff'd 365 B.R. 401 (S.D.N.Y. 2007)). In evaluating these factors, courts take a "flexible approach and no one factor is determinative." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007). The JOLs respectfully submit that each of these four elements is easily satisfied here.

### A. There is a Substantial Likelihood of Recognition of the Cayman Proceeding as a Foreign Main Proceeding and Application of the Requested Relief

66. The JOLs' request for recognition of the Cayman Proceeding is likely to succeed because, as set forth in exhaustive detail in the Petition and the Pearson Declaration, recognition

of the Cayman Proceeding as a foreign main proceeding is warranted and proper: (i) the Cayman Proceeding is a foreign main proceeding pursuant to sections 101(23) and 1502(4) of the Bankruptcy Code, (ii) the JOLs are the authorized foreign representatives of the Debtor within the meaning of section 101(24) of the Bankruptcy Code, (iii) SVB Cayman qualifies as a "debtor" as that term is defined in section 1502(a)(1) of the Bankruptcy Code because it is an "entity", which includes a "person, *estate, trust*, governmental unit and United States trustee" *see* 11 U.S.C. § 101(15) (emphasis added), and (iv) the Petition was properly filed in accordance with section 1515 of the Bankruptcy Code, together with all required fees, documents and supporting information required under the Bankruptcy Code and applicable Bankruptcy Rules.

67.    Based on the foregoing, SVB Cayman has a substantial likelihood of obtaining recognition of the Cayman Proceeding as a foreign main proceeding and obtaining the relief requested provisionally herein on a final basis upon recognition, and accordingly, this factor is satisfied.

**B.    Absent the Requested Provisional Relief, the Debtor Will Suffer Irreparable Harm.**

68.    Granting the requested provisional relief is essential to prevent irreparable damage to SVB Cayman and the Cayman Proceeding.  The urgent discovery requested is essential because (i) the JOLs cannot currently access SVB Cayman's books and records, and the correspondence related thereto, which, upon information and belief, are in the possession of FDIC; and (ii) the internal actions of the FDIC, including but not limited to actions relating to the Discretionary Insurance Decision and the failure to notify SVB Cayman of the SVB Cayman Domestic Account, cannot be fully pled without access to discovery.

69.     The provisional relief requested herein is necessary on an immediate basis to protect SVB Cayman's claims to be filed in response to the Disallowance of Claim, which claims must be filed on or before February 23, 2024.  *Pearson Decl.*, ¶¶ 96-99.

70.     Bankruptcy courts regularly acknowledge that the dissipation of a foreign debtor's assets, which in this case involves third party claims, constitutes irreparable harm.  *See, e.g.*, *In re Caldas*, 274 B.R. 583, 598 (Bankr. S.D.N.Y. 2002) (quoting *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988)).  Unless the requested relief is granted, the Debtor will face the immediate and irreparable harm of the inability to obtain crucial information concerning the FDIC's actions, all of which must be accurately pled on or before February 23, 2024.

71.     Accordingly, the urgent need for discovery from the FDIC justifies the granting of provisional relief prior to the entry of an order granting recognition of the Cayman Proceeding as a foreign main proceeding in order to prevent irreparable harm.

**C.      The Balance of Hardships Weighs in Favor of the Debtor.**

72.     The JOLs submit that the irreparable harm to SVB Cayman in the absence of provisional relief significantly outweighs any harm to the parties which may be affected by the relief requested herein.  Section 1522(a) authorizes courts to grant relief under sections 1519 and 1521 where, as here, "the interest of creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).  The Bankruptcy Code does not define "sufficiently protected," and courts "have great leeway to determine what that is."  *In re Hanjin Shipping Co., Ltd.*, No. 16-27041 (JKS), 2016 WL 6679487, at *5 (Bankr. D.N.J. Sept. 20, 2016). In general, courts will determine sufficient protection by balancing the respective parties' competing interests.  *See CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the

relief."). The legislative history of section 1522 provides that this requirement was intended to prevent "the foreign proceeding [from] *seriously and unjustifiably* injuring United States creditors." H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005) (emphasis added).

73.     In this case, creditors in the United States will not be seriously and unjustifiably harmed. The requested relief is narrowly tailored to discovery against the FDIC, due to the FDIC being the only party with access to the urgently needed information. Granting the relief requested herein will benefit the Debtor and its stakeholders by permitting the JOLs to submit an accurate and complete set of claims in response to the FDIC's Claim Denial Letter, with the ultimate aim of equitable distribution in the Cayman Proceeding, pending this Court's determination of whether the Cayman Proceeding should be recognized as a foreign main proceeding.

74.     Indeed, the JOLs are requesting only that this Court grant the preliminary relief from the date of the hearing on the Application to the date of the hearing on the Petition in order to enable the JOLs to move swiftly and obtain the necessary discovery from the FDIC.

75.     Further, the relief sought by SVB Cayman is more narrowly tailored than the discovery relief sought in the chapter 11 proceeding pending with respect to SVB Financial Group ("**SVBFG**"). In that case, various motions seeking authority to issue discovery requests and subpoenas to the FDIC and others on an expedited basis pursuant to Rules 2004 and 9006 of the Federal Rules of Bankruptcy Procedure were granted by the bankruptcy court.[3] Specifically, this Court granted *ex parte* requests to serve discovery pursuant to Rule 2004 filed not only by SVBFG, but also by the Official Committee of Unsecured Creditors and the ad hoc groups. As a result, Rule 2004 subpoenas were served with court authority upon the FDIC-C, FDIC-R, First-Citizens, the Federal Reserve Board, the Federal Reserve Bank of San Francisco, California Department of

---

[3] *See In re SVB Financial Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y.) ECF Nos. 239, 251, 254, 265, 345, 346, 389, 390, 391, 504, 506, 658, 659, 660, 661.

Financial Protection and Innovation, various of SVBFG's third party banking consultants, and current and former directors and officers of SVBFG and SVB, among others. Given the above, there should be minimal burden on the FDIC collecting and producing documents to the JOLs given the discovery productions already required by this Court.

76. Accordingly, the balance of harms weighs firmly in favor of granting the requested provisional relief in favor of SVB Cayman.

**D.      Granting the Provisional Relief Would Be in the Public Interest.**

77. Granting the requested provisional relief would be in the public interest because it would in fact effectuate the public policy underpinnings of Chapter 15, among which are: (i) to foster fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested parties, including the debtor; (ii) to protect and maximize the value of the debtor's assets; (iii) to facilitate the rescue of financially troubled businesses, thereby protecting investment and preserving employment; and (iv) to promote cooperation between the courts and court-appointed administrators in the United States with those in competent foreign jurisdictions involved in cross-border insolvency cases. *See* 11 U.S.C. §§ 1501(a), 1525.

78. As set forth above, the JOLs are seeking to examine witnesses and obtain documents and information regarding SVB Cayman's claims in response to the Claim Denial Letter, for ultimate recovery by the SVB Cayman estate. The JOLs seek this relief in order to carry out their duties in the Cayman Proceeding and to efficiently administer the Debtor's estate for the benefit of all of the Debtor's stakeholders. For these reasons, the public interest weighs in favor of granting an injunction.

79. Further, the JOLs submit that if the actions of the FDIC are permitted to stand without judicial intervention, it will prove to be starkly in contrast to the public interest, including the interests of the U.S. banking community. In particular, it is one thing for the FDIC to make an

arbitrary decision to insure certain foreign deposits and not others, but it is another thing for the cash assets associated with those deposits to be orphaned and transferred to First-Citizens so as to allow for or subsidize pay-outs to the insured class *in excess* of the amount of insurance guaranteed. To permit this result and precedent would be fundamentally bad policy.  If this were repeated across the spectrum of United States banks operating internationally, it would make foreign deposits at American financial institutions one of the *least* safe ways to store money and would undermine confidence in the banking system as a result.

80.     Further, the Supreme Court has unanimously held that in its role as receiver, the FDIC is a private party and not the United States, and accordingly there is no strong federal policy in connection with FDIC receiver claim disputes and the risk of payments from the FDIC insurance fund.  *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 86-88 (1994); *also see Frazer v. United States*, 288 F.3d 1347, 1354 (Fed. Cir. 2002) ("the FDIC is not the government"); *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 534 (2003) ("the FDIC's attendant role herein [as receiver] is tantamount to that of a private party, and not the government per se"); *Ambase v. United States*, 61 Fed.Cl. 794, 796–97 (2004) (holding that a claim against the FDIC as receiver is not a claim against the government).

81.     For the reasons set forth herein, the JOLs respectfully request that, pending the hearing on the Petition, the Proposed Order be approved in all respects and that the terms and provisions of the Proposed Order be implemented.

## **NO PRIOR REQUEST**

82.     No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, the Joint Official Liquidators respectfully request that this Court enter the

Proposed Order, substantially in the form of **Exhibit A** to the Application, granting the relief

requested herein and such other and further relief as may be just and proper.

Dated: January 18, 2024
      New York, New York        HOLLAND & KNIGHT LLP


          /s/ Warren E. Gluck
        Warren E. Gluck, Esq.
        John J. Monaghan, Esq. (*pro hac vice* forthcoming)
        Paul M. Aguggia, Esq. (*pro hac vice* forthcoming)
        Marie E. Larsen, Esq.
        HOLLAND & KNIGHT LLP
        31 W. 52nd Street
        New York, NY 10019
        Telephone:  212-513-3200
        Fax: 212-385-9010
        Warren.Gluck@hklaw.com
        John.Monaghan@hklaw.com
        Paul.Aguggia@hklaw.com
        Marie.Larsen@hklaw.com

        *Counsel for the Joint Official Liquidators*
        *of Silicon Valley Bank (Cayman Islands Branch)*
        *(in Official Liquidation)*