**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>SILICON VALLEY BANK (CAYMAN ISLANDS BRANCH),[1]<br><br>Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No: 24-10076 (MG) |

**DECLARATION OF THOMAS LOWE KC IN SUPPORT OF FDIC'S OPPOSITION TO CHAPTER 15 RELIEF**

1. I am a barrister and King's Counsel. I operate from Wilberforce Chambers in London and from offices in the Cayman Islands. Wilberforce Chambers is a well-known association of barristers who practice in various areas of commercial and private client law. The primary focus of my work is an offshore in the field of company, insolvency and commercial law. In the course of my practice, I regularly appear in the Courts of the Cayman Islands and British Virgin Islands have also appeared and advised on matters in Bermuda.

2. I have been instructed by Denton LLP, US counsel for the Federal Deposit Insurance Corporation in its corporate capacity ("FDIC-Corporate") and in its capacities as receiver for Silicon Valley Bank, Santa Clara ("FDIC-R1"), and as receiver for Silicon Valley Bridge Bank, N.A. ("FDIC-R2," and, collectively with FDIC-R1 the "FDIC-Rs" and with FDIC-Corporate, the "FDIC" or "Objectors"), in the above-captioned proceedings to express my opinion on certain questions of the law of the Cayman Islands, as set out below. I understand this declaration will be submitted in connection with the opposition of FDIC to the application for Chapter 15 recognition and for provision al relief by the

[1] I understand that there is no legal entity called "Silicon Valley Bank (Cayman Islands Branch)." "Silicon Valley Bank" was registered under Part IX of the Cayman Islands Companies Act, with registration number 1963670. The Cayman Islands Branch is a branch of Silicon Valley Bank.

joint official liquidators appointed by in the above-captioned proceeding.

3. I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Cayman Islands law, in light of the matters set out below and in my CV, a copy of which is attached as Exhibit A.

**<u>Professional qualifications</u>**

4. I am a practicing member of the Bars the Cayman Islands, and England and Wales and the British Virgin Islands and hold practicing certificates from each of those jurisdictions. I first qualified as a barrister in England and Wales in September 1985.

5. I was appointed as Queen's Counsel of England and Wales in 2008 and am now King's Counsel in all those jurisdictions in which I am admitted to practice.

6. I was first admitted ad hoc to the bar of the Cayman Islands in 1997 and have been generally admitted since 2010. I am a British citizen. I am also a Permanent Resident of the Cayman Islands.

***My academic qualifications***

7. I received a LLB (Honours) in Law from London School of Economics in England in 1984 where I was awarded an Upper Second Class Honours degree. I received a masters of law (LLM Honours) in law from the University of Cambridge (Jesus College) in 1986 where I was awarded a First Class Degree. I completed what was then Part I, a course then known as the Bar Vocational Course, at the Inns of Court School of Law in London in 1985 where I won a number of prizes. I am a member of the Inner Temple, and the Chancery Bar Association.

***My Professional Work Experience***

8. Between October 1985 and March 2010, I practiced full-time as a self-employed barrister

at the English Bar in London, specializing in commercial litigation (including litigation involving Cayman Islands law). I am a member of Wilberforce Chambers[2], based in Lincolns Inn, London, whose members are widely regarded for engaging in complex chancery and commercial disputes.

9. I was first admitted to the Cayman Islands Bar on an *ad hoc* basis in 1997 and repeatedly thereafter and obtained general admission in 2010 where I now hold a Permanent Resident's Certificate (which enables me to live and work in the Cayman Islands without immigration restrictions or controls). Since 2010 to date, I have practiced full-time at the Cayman Islands Bar, while also maintaining my English Bar practicing certificate.

10. I specialize in commercial litigation, company law and contentious insolvency (although I also have a broader practice, extending to all areas of civil and public law). In addition to many unreported and confidential disputes that I have advised and worked on, I have appeared as Counsel in a number of pieces of litigation that have resulted in public reported judgments of the courts of the Cayman Islands and Bermuda a number of these are listed in my CV, a copy of which is attached.

11. I have previously been asked to provide expert opinion evidence on issues of Cayman Islands law before various US Courts.

***The Questions Addressed***

12. I have been asked to describe the main features of liquidations in the Cayman Islands (see Section II below) and express an opinion on the following questions of law:

(a) Does the Order of 11 January 2024 have *res judicata* or binding effect under Cayman law? (see Section III below)

(b) Were the Joint Official Liquidators (the "JOLs") of the Company in fact trustees

---

[2] an association of barristers which is not a legal entity

or representatives of an estate for the purposes of Cayman law? (see Section III below)

(c) Is the Winding Up Order to be understood as a partial winding up order of SVB in respect of the Company's Cayman branch? (see Section IV below)

## I. THE LEGAL SYSTEM OF THE CAYMAN ISLANDS

13. The legal systems of the Cayman Islands is a separate legal system with its own separate bodies of legislation and case law, even though there is a considerable degree of overlap and similarity between the two. Indeed, it may be helpful if, as a starting point, I provide some background (by way of summary only) to the law of the Cayman Islands law and its legal system.

**Background**

14. The Cayman Islands is a "British Overseas Territories". As such, it is both a self-governing but dependent territory of the United Kingdom. is a separate legal jurisdiction from the United Kingdom rather than a "colony" (since the Cayman Islands has its own written Constitution, own legislature, and own independent court systems). In common with other British Overseas Territories and former colonies,

15. English law was introduced to the Cayman Islands at the date when it was settled in 1772. The Cayman Islands was a part of Jamaica until 1962 when it seceded and inherited the Jamaican statute law applicable at the time but which has now almost entirely been replaced by Cayman statutes. The reception of English law into the Cayman Islands is set out in Section 40 of the Interpretation Act (1995 Revision) which provides that "*all such laws and statutes of England as were prior to commencement of 1 George 1* [i.e. 1772 AD] *esteemed, introduced, used or accepted or received as laws in the Cayman Islands shall continue to be laws in the* [Cayman] *Islands save insofar as any such laws have been or may be repealed or amended by any law of the* [Cayman] *Islands*".

16. The systems of law in the Cayman Islands is therefore founded on the English legal system, although there is a distinct body of Caymanian statute law and Caymanian case law. The Cayman case law dates back to the 1960s. Since the 1980s, in particular, there has been an exponential growth in the local jurisprudence of each of the two jurisdictions, following the growth in international finance and cross-border commercial transactions.

17. The Cayman Islands each enact statutes and regulations. English statutes have no general application to Bermuda or the Cayman Islands unless expressly extended to them. The specific sources of Cayman Islands law relevant to this opinion concern the common law as applied in each jurisdiction and the Cayman Island Companies Act((the "Companies Act"[3]).

18. Final appeals against decisions of the Court of Appeal for the Cayman Islands are entertained by the Judicial Committee of the Privy Council, which, although based in London in the United Kingdom, is the highest appellate court for the Cayman Islands. The Judicial Committee of the Privy Council is a Court that is ordinarily made up of a five-judge tribunal. Its composition consists of senior members of the judiciary of the Supreme Court of the United Kingdom (formerly the House of Lords, and the highest appellate court for England and Wales, Scotland, and Northern Ireland), as well as other senior judges from Commonwealth jurisdictions.

***The Common Law Principle of Precedent in the Cayman Islands***

19. Non statutory common law in the Cayman Islands law, following English law in this regard, is based upon the principle of precedent. The Courts in the Cayman Islands are both courts of common law and equity.

20. Under the doctrine of precedent, certain judicial decisions are 'binding' on other judges,

---

[3] The Companies Act was first enacted in 1961 but has been amended and revised over the years. The current version of the Companies Act is the 2023 Revision.

in that their essential reasoning or *'ratio decidendi'*[4] must be followed and applied, unless they are properly capable of being distinguished. In particular:

(a) A judge of the Grand Court of the Cayman Islands (the first instance superior court of record of the Cayman Islands) is bound to follow and apply any relevant decision of the same tier of Court unless it is obviously wrong[5], any relevant decision of the Court of Appeal of the Cayman Islands, and any relevant decision of the Privy Council. [6]

(b) The Court of Appeal of the Cayman Islands, in turn, is bound to follow and apply any relevant decision of the same tier of Court unless it is obviously wrong and any relevant decision of the Privy Council.

(c) Previous relevant decisions of the Privy Council are binding on the Privy Council itself, except in exceptional circumstances. The Privy Council can depart from, or overrule, a previous decision, when, for example, the previous decision is thought to be wrong and impeding the proper development of the law or to have led to results which were unjust or contrary to public policy.[7]

21. Under the doctrine of precedent, certain judicial decisions or parts of judicial decisions (such as *'obiter dicta',* which are judicial comments or findings that do not form part of the essential reasoning), may be treated as persuasive, and, depending on the facts of the case, the seniority and experience of the tribunal, and the quality of their reasoning, should ordinarily be followed and applied, unless they are plainly wrong, were not fully or properly argued or reasoned (or failed to take into account relevant authorities), or are

---

[4] The *'ratio decidendi'* of a case has been defined as any rule of law expressly or impliedly treated by the Court as a necessary step in reaching its conclusion, having regard to its reasoning.

[5] See e.g. Alibaba.com [2012] 1 CILR 272 [63]-[64]. I do not propose to exhibit this judgment to my Declaration, but I understand that it can be made available if necessary.

[6] (see Weavering Macro Fixed Income Fund v Ernst & Young (unreported, 5 May 2015, Quin J) . I do not propose to exhibit this judgment to my Declaration, but I understand that it can be made available if necessary.

[7] *Gibson v The United States of America* [2007] 1 WLR 2367, per Lord Brown at paragraph 22. I do not propose to exhibit this judgment to my Declaration, but I understand that it can be made available if necessary.

properly capable of being distinguished.

22. Furthermore, the Cayman Islands courts often treat English case law as being persuasive, for two principal reasons (subject to the circumstances of any particular case):

(a) Firstly, many Cayman Islands statutes are based upon current or former United Kingdom legislation. For example, in the corporate law context, the Cayman Islands' Companies Act (2023 Revision) is largely based on the UK's Companies Act 1862, although there have been a number of provisions omitted, added and amended to meet each jurisdiction's unique circumstances, some of which have been modelled on statutory provisions from other common law jurisdictions[8] or which have been drafted specifically for the jurisdictions after local consultation and legislative debate. As a result, decisions of the Superior Courts of England and Wales with respect to provisions of United Kingdom statute law which are identical to or similar to Caymanian statutory provisions are considered in the Cayman Islands to be highly persuasive authorities, and such decisions are in practice often followed.

(b) Secondly, the decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) on matters of common law and statutory interpretation are extremely persuasive in the Cayman Islands since the Supreme Court of the United Kingdom (formerly the House of Lords), sitting as the highest appellate Court for the United Kingdom, and the Privy Council, sitting as the highest appellate Court for the Cayman Islands, share common membership, in terms of the identities of the judges[9]. The Court of Appeal of the Cayman Islands routinely follows decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) as effectively binding in common law matters, The only circumstance when it would not do so is when unless there are clear

[8] By way of example, the statutory provisions relating to the amalgamation of companies, were modelled on Canadian legislation.
[9] See Lord Diplock's speech in *De Lasala v De Lasala* [1980] AC 546, Privy Council at 558. I do not propose to exhibit this judgment to my Declaration, but I understand that it can be made available if necessary.

circumstances in which the social and economic conditions of the Cayman Islands justify a departure from English precedent.

23. The common law in the Cayman Islands consists of an ever-growing body of case law relied upon to fill gaps in the law not covered by legislation. Because the jurisprudence of the Cayman Islands is relatively recent (reports of cases before the 1980s are sparse), its courts naturally look to other jurisdictions for persuasive precedent. For this reason, the Courts of the Cayman Islands frequently refer to English case law from the English Court of Appeal or High Court as well as the case law of other jurisdictions that follow English common law as persuasive authority (such as Australia, New Zealand, Hong Kong, Bermuda, the British Virgin Islands or Singapore). Given that such case law can be relied upon, the Courts are expected to have regard to the reasoning in those cases and have a basis for not accepting a clear proposition from such case law.

## II. LIQUIDATION OF CAYMAN ISLAND COMPANIES

24. Part V of the Companies Act[10] and the Company Winding Up Rules[11] ("CWR") deal with the winding up of Companies in the Cayman Islands. It was originally in the same form as the UK Companies 1862 although since 2008 in particular, a number of amendments were made.

25. Winding up proceedings are commenced by petition. Here, the petitioners in the Cayman proceedings had standing as creditors to petition (see Section 94(1)(a)). Notwithstanding that the company was not incorporated in the Cayman Islands, the petitioners relied on the Court's jurisdiction to wind up the Company (see Section 91(d)(iv). The grounds for winding up relied upon by Doyle J were that the Company was unable to pay its debts (see Sections 92(d) and 93) and that it was just and equitable to wind up the Company because there was a need to investigate its affairs (see Section 92(e)).

26. A winding up order is made in respect of "the company". This means that it is the

[10] References to Sections below are unless otherwise stated references to the Companies Act (2023 Revision)
[11] Made under Section 154

Company as a whole that is wound up as a single juridical entity. There is no jurisdiction to make a winding up order in respect of part of the Company or part of its undertaking.

27. Here, the petitioners sought to wind up an entity they called Silicon Valley Bank (Cayman Branch). Acknowledging in his Judgment that only a company can be wound up in the Companies Act (and not a branch or any other part thereof), Justice Doyle's Winding-Up Order wound up Silicon Valley Bank. There are certain legal consequences that result automatically as a result of the Winding-Up order having been granted in respect of Silicon Valley Bank. Those consequences apply to the entirety of Silicon Valley Bank.

28. A winding up order affects the Company and its stakeholders in a number of ways. I discuss the consequences in proprietary terms below. The most significant consequences are set out below:

(a) On the making of a winding up order, all proceedings are automatically stayed and no other suit may be commenced or continued against the company without leave of the Court (see Section 97(1)).

(b) Any attachment, distress or execution levied put in force against the property of the company from the date of the commencement of liquidation[12] is void (see Section 97(2)).

(c) Any disposition from the date of the commencement of liquidation is void unless the Court otherwise orders (see Section 99)

(d) Winding up does not cause the immediate dissolution of the company whose assets are administered pursuant to a statutory scheme for distribution. Dissolution which terminates the existence of a company does not occur until its affairs have been fully wound up (see Section 152(2)).

29. Generally, a winding up gives rise to an enforcement process on behalf of **all** the creditors

---

[12] Defined in Section 100

and in respect of **all** of the assets. The creditors give up their rights in return for a right to prove in the liquidation for a dividend from all of the assets. All the Company's creditors are entitled to prove.

30. The winding up order that was made by the Court on 11 January 2024 gives rise to "official liquidation" (see Section 105), the administration of the Company being notionally in the hands of the Court. A liquidation displaces the powers of directors to administer the affairs of the Company. A Court invariably appoints liquidators to carry out the administration. When, as is the case here, more than one liquidator has been appointed, they are described as "joint official liquidators" or "JOLs".

31. The function of official liquidators are shortly states and simply expressed as being "*to collect, realise and distribute "the company's assets" its creditors and, if there is a surplus, to the persons entitled to it*" (see Section 110(1)(e)). The function of official liquidators relates the company as a whole. The reference to "assets" is to **all** of the assets of the company, not merely to part. The "creditors" (present, future or contingent or preferred or secured[13]) to whom distributions are to be made, are **all** of the creditors of the company and not just a section. These are the only material functions a liquidator has.[14]

32. There is no jurisdiction in a Cayman Court to disapply the JOLs' functions and Doyle. J did not purport to make such an order. The winding up order means the JOLs' necessarily have duties to the entire body of SVB's creditors and not simply a section of them and that those duties relate to the collection of the entirety of the assets of SVB wherever they may be and not merely a section of them. The JOLs are not simply representatives of a section of SVB: they are liquidators of "the company", meaning the whole of SVB.

[13] Secured creditors whose rights have accrued to enforce their security can realise their security in satisfaction of their claims outside the liquidation. Such secured assets do not form part of the Company's property. The official liquidators must respect such claims (see Sections 140(2) and 142). Secured creditors can normally prove for any debt not satisfied by the security.

[14] A liquidator is also empowered to investigate affairs of "the company" (see Section 102). Since the power in Section 102 is not directed at the functions set out in Section 110(1)(e), the fact that this power is conferred on the JOLs implies that, in an appropriate case, it is an additional function to investigate and report to the Court and authorities.

33. Creditors of the company (present, future or contingent) have to "*prove*" their debts in accordance with Section 139(1). This section entitles all of the creditors to prove for their debts. It is not confined to a section of local creditors. That right cannot be modified by Court Order.

34. Distribution is to take place rateably or *pari passu* (see Section 140(1)) first to preferred and secured creditors and then to the general body of creditors. As elsewhere, in the Cayman Islands *pari passu* is a fundamental statutory rule of insolvency. The liquidators' duty is to collect assets on behalf of all creditors and distribute those assets to all of the creditors *pari passu.* The JOLs can only distribute what they collect but their duty remains as per Section 110(1) to collect all of the assets.

35. In order to fulfil their statutory function in Section 110(1), official liquidators have the powers set out in Schedule 3 (see Section 110(2)). Certain powers are automatically conferred on the official liquidators (Schedule 3 Part II[15]), while other powers are conferred only by order of the Court (Schedule 3 Part I[16]). The Court can limit the powers of the JOLs but that does not result in any disapplication of the JOLs' functions under Section 110(1). In fact, the Judge did not disapply the automatic powers in Schedule 3 Part II so that the JOLs have those powers with respect to the entirety of the Company.

36. Here, the winding up order of 29 June 2023 only conferred limited additional powers on the JOLs. By its Order of 11 January 2024,[17] the Court made a specific order under Schedule 3 Part I sanctioning the JOLs filing applications for recognition under Chapter 15.

37. Whilst the 29 June 2023 winding-up order limited the JOLs' powers to "... *acting in respect of the assets and affairs of the Cayman Islands branch of the Company and its creditors...*", it could not limit the functions of the JOLs. The JOLs have a statutory duty to fulfill their functions in respect of the entirety of the company over which they were appointed (Silicon Valley Bank) and not merely in respect of a division, subsection,

---

[15] set out in Mr. Pearson's declaration at paragraph 89
[16] set out in Mr. Pearson's declaration at paragraph 88
[17] see Exhibit 16 of Declaration of Michael Pearson)

office, or branch of that company.

## III. PROPRIETARY EFFECTS OF A WINDING UP ORDER

***The Declaratory Order of 11 January 2024***

38. I note that the Order of 11 January 2024, having authorized the JOLs to seek Chapter 15 recognition, Doyle J made an order on the papers that "*the JOLs are the representatives of an estate or trust that is subject to the Cayman Island proceedings*". I have been asked to explain what might be meant by "an estate" or "trust" in this context. I have not seen the "papers" which were submitted and upon which Doyle J made his decision. There is no description of the "estate" or "trust" in the Order.

39. It should be noted that this order reads like a declaration *in rem* (i.e. against all the world). Unlike the UK[18], in an official liquidation there is no statutory provision in the Cayman Islands which entitles the Court to give directions and make the declaratory order it made. A Court in the Cayman Islands does have inherent jurisdiction to give directions to a liquidator (see Re Accenture, Doyle J unrep 3 November 2022). It can sanction action under CWR Order 11 Rule 1 but that is not what paragraph 2 of the Order of 11 January 2024 purported to do.

40. In my view, such an order is not binding on creditor or other third parties (including the FDIC) under the law of the Cayman Islands. It is plain in the Cayman Islands that when directions are given to a liquidator, the Court does not make an order which is binding on creditors or others who were not before the Court. The decision does not give rise to *res judicata* or issue estoppel, unless they were joined as parties to the application of the liquidator so as to render the hearing *inter partes* (see McPherson & Keay, "The Law of Company Liquidations" 5th ed. ("McPherson") at pp586-590 [9-043]-[9-047] and see GB Nathan & Co Pty Ltd [1991] 24 NSWLR 674 at 680, Re Belmont Asset Based Lending Ltd [2011] 2 CILR 484 at p491 [12]- [13] and Re Accenture supra). In Re Accenture Doyle J reviewed many of the relevant cases. In all those instances when an English or

---

[18] See Section 112(1) of the UK Insolvency Act 1986

Cayman Court has made declaratory order to bind third parties the courts have ensured that the affected parties or a representative has had an opportunity to be heard.

41. Here, the application that resulted in order was, as I understand it, made "on the papers" and therefore without notice to anyone. If that is factually correct then I do not believe that the Grand Court would expect any third party to have been bound by the declaration in paragraph 2 of the Order of 11 January 2024.

***The JOLs are not "Trustees" and Creditors are Not "Beneficiaries"***

42. I have therefore considered whether in fact it would be correct to describe the JOLs as Trustees. Since I know of no special facts relied upon, the argument that the JOLs are to be treated as trustees of a trust or representatives of an estate, would, if correct, apply to every liquidation in the Cayman Islands. Since the features of a liquidation in the Cayman Islands are not materially different to those of a UK liquidation, it would also be true of every English liquidation. In my opinion that is not the case.

43. Once placed into liquidation, the company ceases to have beneficial title to its assets which are said to become "*subject to a statutory scheme of distribution among the entire body of creditors and members.*" (see generally Ayerst above, McPherson p340-350 [7-008] [19]). Courts in England frequently adopt the proposition that a winding up order gives rise to a "*statutory trust*" (see e.g. Stichting Shell Pensioenfonds v Krys [2015] AC 616 at [14]).

44. However, the Australian High Court has described the trust analogy as misleading Linter Textiles Australia Ltd. (in liquidation) v. Commissioner of Taxation (2005) 20 ClR 592 (H Ct of Aust.). Kirby J pointed out that in Ayerst the trust analogy was used as an aid to interpret a taxing statute.[20] A leading commentator warns that the use of trust

[19] and see Mitchell v Carter [1997] 1 BCLC 673 at 686

[20] "*The reference to 'trust property' in the earlier English authorities was not, as such an attempt to import all of the features of the law of trusts into defined statutory relationships following a company liquidation. Self-evidently, that could not have been intended by the knowledgeable and experienced judges involved. Instead, it was an attempt (in effect in an aside in the course of reasoning) to explain the construction and operation of a statute in terms that would have been understood by lawyers in the English Court of Chancery in 1874, who had the responsibility of applying the pertinent statute. The analogy was not the essence of the reasoning of the English judges.*"

concepts is by analogy[21]

45. In the well-known House of Lords decision Ayerst v CK Construction [1976] AC 167 at p180 Lord Diplock deprecated the attempt in earlier cases[22] of equating a liquidation with a trust:

> "*All that was intended to be conveyed by the use of the expression "trust property" and "trust in these and subsequent cases ... was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic of which distinguished trust property from other property viz that it could not be used or disposed of for the benefit of other persons.*"

46. Although the company is divested of its beneficial interest in the property upon liquidation, a liquidation does not give rise to a genuine trust.

(a) Unlike bankruptcy, liquidators do not take ownership of the Company's property, legal title to which remains in the Company. Not having legal title to the assets, the liquidators cannot be trustees of those assets. The liquidators act as agents of the company and are in a fiduciary position. However, legal title remains with the Company. If anybody is a trustee it would be the Company.

(b) The creditors are not beneficiaries with any form of proprietary interest. Creditors give up their right and accept that a liquidation is a collective enforcement procedure in return from a dividend from the assets which have been recovered for the collective benefit of the creditors and/or members.

(c) Liquidations are not mentioned in the Cayman Trust Act as a species of trusts (2021 Revision). In the rare cases when liquidators become trustees there are recognizable arguments for this which do not apply generically to all liquidations (see e.g. *Berkeley Applegate Ltd* [1989] BCLC 28, Re Caledonian Securities Ltd [2016] CIL 309).

---

[21] *Goode on Principles of Corporate Insolvency Law, 5th ed.*. paragraph .[3-09]
[22] See Oriental Inland Steam Co (1874) 9 Ch 557 at 559 per James LJ who described the property as trust property

**There is No Cayman Trust or Cayman Estate**

47. To the extent that it is correct to describe the Cayman liquidation as giving rise to a statutory "trust", that would apply to the entirety of the company. Here, the assets subject to that statutory trust would necessarily comprise all of the assets of SVB and not simply branch assets. The creditors who are interested in receiving distributions comprise all of SVB's creditors and not simply those of the Cayman branch. As far as the JOLs are concerned this is a consequence of Section 110(1). As I have said there is no jurisdiction to alter the scope of Section 110(1) to confine its operation to a branch of a Cayman company.

48. I am asked whether the liquidation estate falls within the definition of an estate. On occasions (see e.g. Stichting Shell at paragraph 15) the company's property is also referred to as an "estate" but that is not a technical description any more than the trust analogy is. However, "the estate" refers to the entirety of the Company's property and not some smaller aspect of it. It makes no sense to refer to the assets of the Cayman branch or its Cayman creditor body as an insolvent estate. Insofar as it makes sense to use that description, the "estate: comprises the entirety of SVB's assets and is subject to the claims of all of its creditors. The JOLs could only appear as representatives of the entirety of this estate and not merely a branch.

## IV. POWERS TO WIND UP FOREIGN COMPANY IN THE CAYMAN ISLANDS

**A Liquidation in Place of Incorporation is Unitary and Universal**

49. It is a fundamental principle of English common law as followed in the Cayman Islands that the status of a corporation is to be determined by the *lex incorporationis*. This means that the Cayman Islands would expect the liquidation to be dealt with in the place of incorporation (see Sun Cheong Creative Developmen Holdings Ltd unrep Chief Justice 20 October 2020 at paragraph 8 and Re GTI Holdings Doyle J unrep 22 February 2022 paragraphs [38]-[62])[23].

[23] I note this was not referred to in the judgment of Doyle J in this matter of 21 July 2023. I have not seen the written

50. The primacy of the corporate domicile was described in HiH Casualty General Insurance [2008] 1 WLR 852 as follows:

> *"6. Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law, namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets."*[24]

51. Universalism means that the liquidators of a Cayman liquidation would be expected to perform their functions with regards to all the assets worldwide and distribute them to all the creditors. As the Privy Council explained in Stichting Shell Pensioenfonds v Krys supra at pp625-6:

> *"14. In the British Virgin Islands, as in England, the making of an order to wind up a company divests it of the beneficial ownership of its assets, and subjects them to a statutory trust for their distribution in accordance with the rules of distribution provided for by statute: Ayerst v C & K (Construction) Ltd [1976] AC 167. In the case of a winding up of a BVI company in the BVI, this applies not just to assets located within the jurisdiction of the winding up court, but all assets world-wide. In England, this follows from the unqualified terms of section 144(1) of the Insolvency Act 1986. In the British Virgin Islands, it is provided for in terms by section 175(1) of the Insolvency Act 2003, combined with the inclusive definition of "asset" in section 2(1) ("every description of property, wherever situated"). It reflects the ordinary principle of private international law that only the jurisdiction of a person's domicile can effect, a universal succession to its assets. They will fall to be distributed in the BVI liquidation pari passu among unsecured creditors and, to the extent of any surplus, among its members."*

52. In my view, this statement is as true of the law of the BVI and UK as it is of the law of

---

submissions which were presented to the Court. The Judge was presumably cognizant of this principle and therefore made what might be viewed as an ancillary liquidation order (see below).

[24] The principle of universalism whereby the English Courts render such assistance as they can to the place of primary liquidation was confirmed by the Privy Council in *Singularis Holdings v PriceWaterhouseCoopers* [2015] AC 1675

the Cayman Islands. In the Cayman Islands the counterpart to Section 144 of the UK Insolvency Act 1986 and Section 175 of the BVI Insolvency Act is in Section 110(1) by which it is a function of a liquidator to gather the "the assets of the company" and Schedule 3 Part II paragraph (a) which empowers the liquidator to take possession of the property of the "company". It is clear to me that these provisions refer to all of the assets of the company all of the property of the company.

53. As explained in Stichting Shell Pensioenfonds, when a winding up order is made in the Cayman Islands all assets worldwide, wherever situate, are deemed to be part of the estate being wound up. *"The statutory trusts extend to [foreign] assets, and so does the statutory obligation to collect and realise them and to deal with their proceeds in accordance with the statutory scheme."* (see Re International Tin Council [1987] Ch 419 at p, 447 per Millett J). This statement was affirmed by Lord Hoffmann in HIH Casualty General Insurance "*In theory, such an order operates universally, applies to all the foreign company's assets and brings into play the full panoply of powers and duties under the Insolvency Act 1986 like any other winding up order.*"

**Ancillary Liquidations**

54. English common law as followed in the Cayman Islands has long recognized that a foreign company can be liquidated in England and that is the case even if it is already in liquidation in its place of incorporation or elsewhere. A liquidation of a foreign corporation may be a full liquidation, albeit with the practical territorial limits of what a liquidator might do or what is described as an "ancillary" liquidation. Here, the Judge made an order which does not purport to be a classic ancillary liquidation.

55. Because of the principle that insolvency proceedings should be unitary and universal proceedings in the place of incorporation, it is generally the rule that England will operate only an "*ancillary*" liquidation to the principal or primary liquidation in the place of incorporation (see In Re English, Scottish and Australian Chartered Bank [1893] 3 Ch 385 at p394). There was never any statutory basis for an ancillary liquidation in England. The concept was adopted because of the practical difficulties of winding up a foreign

company. There has been no reported order for an ancillary liquidation in the Cayman Islands but I have no doubt that insofar as possible a Cayman Court would follow the English practice.

56. When an ancillary liquidation occurs in the Cayman Islands, the Court should, as a matter of inherent jurisdiction, limit the powers of the liquidator to collecting in Cayman assets. The English liquidators have no power to collect assets in other jurisdictions unless permitted by those jurisdictions. This point was explained in HIH by Lord Hoffmann who said at paragraph 9:

> *"But the judicial practice which developed in such a case was to limit the powers and duties of the liquidator to collecting the English assets and settling a list of the creditors who sent in proofs. The court, so to speak, "disapplied" the statutory trusts and duties in relation to the foreign assets of foreign companies. This practice was based partly upon the pragmatic consideration that any foreign country which applied our own rules of private international law would not recognise the title of an English ancillary liquidator to the company's assets. But it was also based upon the principle of universalism."*

57. The role of ancillary liquidators is to remit the assets to the place of principal liquidation, so as to ensure that distribution can be made in the jurisdiction which has universal primacy. I note that is not the order that was made in the present case. Remitting the assets is subject to any mandatory rules applicable to the English liquidation (see BCCI No 10 [1997] Ch 213 at pp239-240 and 246 per Scott VC).[25] There is some authority for the proposition that assets should not be remitted by an English or Cayman liquidator if the place of primary liquidation discriminates against creditors because they are creditors based in Cayman. However, as HIH shows the fact that the foreign jurisdiction does not give the same *pari passu* priority to all unsecured creditors is not discrimination. In that case Australian creditors were dealt with more favourably than English creditors but that was not treated as discrimination.

---

[25] An English first instance decision Re Felixstowe Dock and Ry Co v United States Lines [1989] QB 360 which suggested that in an English liquidation of a foreign company distribution of English assets to English creditors is regarded as wrong (see Cross Border Insolvency 4th ed pp332-334, Sir Peter Millet Cross-Border Insolvency: the Judicial Approach (1997) Int Insolvency Review 99-113, AWB Geneva SA v North America Steamships [2007] EWHC 1167 Comm).

58. However, whilst a court would ordinarily have been expected to limit the powers and duties of liquidators in the winding up of a foreign company, it is not bound to make an ancillary order as opposed to a full order. If it has jurisdiction to put a company into liquidation, it makes a winding up order and it is for the Court to determine whether to limit the powers and functions of the liquidators. If it chooses not to do so, none of the English case law requires that. The scope of the liquidation depends on the winding up order that is made.

59. A partial winding up order is not possible. When a company only has a branch in England, the English Court could not reasonably expect to wind up the whole company. It was beyond question that a branch was not an entity capable of being separately wound up (see BCCI SA [1992] BCLC 570 at p574 per Lord Browne-Wilkinson). If an ancillary liquidation is ordered to reflect the practical limits of the liquidation, the Court would have to limit the powers of the liquidator.

**The Order Made in the Present Case**

60. Indeed, in the present Doyle J recognized that a partial winding up order was not possible in seeking to limit the scope of the JOLs' powers in the winding up order. That order was that the JOLs' "*powers shall be limited to acting in respect of the assets and affairs of the Cayman Island branch of the Company and its creditors*".

61. However, the limits placed upon the JOLs are not those of an ancillary liquidation.

(a) I therefore doubt that Doyle J was making an ancillary order at all. He was making an order limited to Cayman as a foreign branch and there is simply no precedent for that. A branch cannot be separately wound up[26].

(b) As I have said in an ancillary liquidation the role of the liquidators is to gather in the local assets and settle a list of local creditors and remit that to the primary place of liquidation. The liquidators in the present case were not directed to

---

[26] I understand SVB is being liquidated by the federal agency with exclusive jurisdiction to liquidate it in its place of incorporation

collect assets and remit them to the US receivership. The Judge seemed to have made an order which would allow the liquidators to collect local assets and distribute to local creditors.

(c) The problem which exists if the Court attempts to do more than remit assets to the foreign jurisdiction, is that doing more is likely to be inconsistent with the statutory regime under which the JOLs are required to operate. The Court may be able to direct the JOLs and limit powers under Schedule 3 but it cannot alter the statutory functions of the JOLs under Section 110(1) which require them to collect *all* of the assets and to distribute them *pari passu* to *all* of the creditors, whatever the terms of the winding up order.

62. Given that the duties of the liquidators require distributions to all "creditors" of the Company, the ancillary liquidators cannot be given powers to distribute whatever assets they may collect to a smaller class of creditors. A liquidator is expected to act impartially as between all creditors involved in a liquidation (see *Gooch's Case* (1871) 7 Ch App 207 at p211 and McPherson pp500-501). Having collected all the assets and identified all the creditors, the liquidator then has a duty to distribute (see McPherson p641).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Thomas Lowe KC
12 February 2024

Tia Oswald
Notary Public in and for the Cayman Islands
My commission expires on 31st January 25