# Exhibit B

| TAB | DESCRIPTION | PAGE NOs |
|---|---|---|
| **Cayman Cases** | | |
| 1. | *In Re Ascentra Holdings, Inc (In Official Liquidation)*, Unreported Judgment of Doyle J, 3 November 2022 | 1-56 |
| 2. | *In Re Belmont Asset Based Lending Limited* [2011 (2) CILR 484] | 57-68 |
| 3. | *In Re Caledonian Securities Limited (In Official Liquidation)* [2016 (1) CILR 309] | 69-94 |
| 4. | *In Re GTI Holdings Limited*, Unreported Judgment of Doyle J, 22 February 2022 | 95-124 |
| 5. | *In Re Sun Cheong Creative Development Holdings Limited*, Unreported Judgment of Smellie CJ, 20 October 2020 | 125-157 |
| **English Cases** | | |
| 6. | *AWB (Geneva) SA & Anor v North America Steamships Ltd & Anor* [2007] 2 CLC 117 | 158-174 |
| 7. | *Ayerst (Inspector of Taxes) v C & K (Construction) Ltd* [1976] AC 167 | 175-189 |
| 8. | *In Re Bank of Credit and Commerce* [1992] BCLC 570 | 190-198 |
| 9. | *In Re Bank of Credit and Commerce* [1994] 1 WLR 708 | 199-209 |
| 10. | *In Re Berkeley Applegate (Investment Consultants) Ltd* [1989] BCLC 28 | 210-227 |
| 11. | *In Re Contract Corporation* (1871-72) LR 7 Ch App 207 | 228-234 |
| 12. | *In Re English, Scottish, and Australian Chartered Bank* [1893] 3 Ch 385 | 235-270 |
| 13. | *Felixstowe Doc & Railway Co v United States Lines Inc* [1989] QB 360 | 271-300 |
| 14. | *In Re G B Nathan and Co Pty Ltd* [1991] 24 NSWLR 674 | 301-318 |
| 15. | *In Re HIH Insurance Ltd* [2008] 1 WLR 852 | 319-344 |
| 16. | *Mitchell & Anor v Carter & Anor* [1997] BCLC 673 | 345-360 |
| 17. | *Singularis Holdings Ltd v PricewaterhouseCoopers* [2015] AC 1675 | 361-417 |
| 18. | *Stitching Shell Pensioenfonds v Krys and Anor* [2015] AC 616 | 418-441 |
| **Textbooks / Literature** | | |
| 19. | *Compulsory Winding Up*, McPherson & Keay's Law of Company Liquidation, 5th Ed, Chapter 9 | 442-445 |
| 20. | *Vesting of Property on Liquidation*, Emmet & Farrand on Title, Vol. 1, Chapter 11 | 446 |
| 21. | *Ownership of Property*, McPherson & Keay's Law of Company Liquidation, 5th Ed, Chapter 7 | 447-449 |
| 22. | *The Principles of Corporate Insolvency Law*, Goode on Principles of Corporate Insolvency Law, 5th Ed, Chapter 3 | 450-461 |
| 23. | *Functions of the Liquidator*, Powers of the Liquidator, Chapter 9 | 462-563 |
| 24. | *Cross-Border Insolvency: The Judicial Approach*, Sir Peter Millet, Vol 6 | 564-578 |
| **Legislation** | | |
| 25. | Companies Act (2023 Revision), Part V | 579-616 |
| 26. | Companies Winding Up Rules (2023 Consolidation), Order 11 | 617-620 |

Digitally signed by Advance Performance Exponents Inc
Date: 2022.11.03 09:33:30 -05:00
Reason: Apex Certified
Location: Apex


**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**FSD NO. 189 OF 2021 (DDJ)**

**IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)**

**AND IN THE MATTER OF ASCENTRA HOLDINGS, INC. (IN OFFICIAL LIQUIDATION)**

| | |
|---|---|
| **Appearances:** | Blair Leahy KC, Guy Cowan, Nienke Lillington and Katie Logan of Campbells LLP on behalf of the Joint Official Liquidators of Ascentra Holdings, Inc (in official liquidation) |
| | Nikki Singla KC, Jessica Williams, Caitlin Murdock and Catie Wang of Harneys on behalf of Shang Peng Gao Ke, Inc. SEZC |
| **Before:** | The Hon. Justice David Doyle |
| **Heard:** | 20 and 21 September 2022 |
| **Draft Judgment circulated:** | 28 October 2022 |
| **Judgment delivered:** | 3 November 2022 |

## HEADNOTE

*Jurisdiction of the court to give directions to official liquidators in respect of a sanction application made by them pursuant to section 110 of the Companies Act*


FSD2021-0189 Page 1 of 56 2022-11-03

**INDEX**


| **HEADING** | **PAGE** |
|---|---|
| | |
| **Introduction** | 4 |
| **The Amended Summons** | 4 |
| **Jurisdictional and procedural issues** | 5 |
| **Section 110 and Schedule 3 of the Companies Act** | 7 |
| **Order 11 of the Companies Winding Up Rules, 2018** | 8 |
| **Section 129 of the Act** | 9 |
| **Section 138 of the Act** | 10 |
| **Section 48 Trusts Act (2021 Revision)** | 11 |
| **Some authorities:** | 12 |
| *DD Growth Premium* | 13 - 14 |
| *Belmont Asset* | 15 - 17 |
| *Emergent Capital* | 17 - 18 |
| *Traianedes* | 18 - 19 |
| *Polarcus* | 20 - 22 |
| *Re Exchange Securities* | 22 - 24 |
| *London Iron and Steel* | 25 - 26 |
| *Sealey and Milman* | 26 - 29 |

| | |
|---|---|
| *Marley* | 29 - 30 |
| *Macedonian Orthodox Community Church* | 30 - 32 |
| *Mento Developments* | 32 - 34 |
| *McPherson* | 34 |
| *CanArgo* | 34 - 37 |
| **Conclusion on jurisdictional issue** | 37 |
| **One other procedural issue – alleged abuse** | 39 |
| **The relief sought by the JOLs** | 41 |
| **The relevant law** | 43 |
| **The Deed** | 47 |
| **The submissions** | 50 |
| *Ms Leahy's submissions on behalf of the Company* | 50 - 52 |
| *Mr Singla's submissions on behalf of SPGK Cayman* | 52 - 54 |
| **Determination of the construction issue** | 54 |
| **The relief granted** | 55 |
| **Draft order and ancillary applications** | 56 |




FSD2021-0189 Page 3 of 56 2022-11-03

# JUDGMENT

## Introduction

1. Even before I opened the 28 page skeleton argument of Shang Peng Gao Ke, Inc. SEZC ("SPGK Cayman") dated 14 September 2022 authored by Nikki Singla KC of Wilberforce Chambers, Jessica Williams and Caitlin Murdock of Harneys, I had concerns as to whether the joint official liquidators ("JOLs") of Ascentra Holdings Inc (the "Company"), represented by Blair Leahy KC of Twenty Essex, Guy Cowan, Nienke Lillington and Katie Logan of Campbells LLP, had adopted the correct procedure in respect of the relief they were requesting from the court.

2. Having considered the skeleton arguments and the oral submissions on 20 and 21 September 2022 on various jurisdictional and procedural issues I have concluded that the court had jurisdiction to entertain the summons of the JOLs dated 6 May 2022 and amended on 25 May 2022 pursuant to Grand Court Rules Order 32, rule 2 (3) (the "Amended Summons"). I have further concluded that the JOLs had adopted the correct procedure and that I should exercise my discretion in favour of the JOLs and grant them some relief. I give my reasons for reaching these conclusions as follows.

## The Amended Summons

3. The Amended Summons is stated to be pursuant to section 110 (2) of the Companies Act (2022 Revision) (the "Act") and seeks "orders and directions" that "pursuant to paragraph 7 of Part 1 of Schedule 3 of the Act" the JOLs "be authorised" to treat approximately


FSD2021-0189 Page 4 of 56 2022-11-03

US$11 million in accounts held at Bank of the West (the "BoW Funds") as unencumbered assets of the Company. Paragraph 2 of the Amended Summons reads as follows:

> "Further, or in the alternative, the JOLs be authorised pursuant to paragraph 1 and/or paragraph 7 of Part II of Schedule 3 of the Act, to take possession of, collect and/or get in the BoW Funds."

4. At paragraph 3 of the Amended Summons the JOLs seek that their costs of and incidental to their Amended Summons shall be paid from the assets of the Company as an expense of the official liquidation.

5. The JOLs say that the Amended Summons "gives rise to a short point of construction, namely whether, pursuant to the terms of [a Deed of Mutual Release dated 5 May 2021], the BoW Funds should be transferred to SPGK Cayman or retained within the liquidation estate." It is common ground that SPGK Cayman is not a creditor or contributory of the Company.

**<u>Jurisdictional and procedural issues</u>**

6. In his skeleton argument Mr Singla made various complaints in respect of the procedure adopted by the JOLs and submitted that where substantive rights are involved the appropriate way of proceeding is not by way of the JOLs seeking directions from the court but by way of an *inter partes* action with the usual orders for discovery and the giving of evidence. Mr Singla submitted that it was plainly inappropriate for the JOLs to seek to have determined the beneficial ownership of the BoW Funds within the sanction jurisdiction and the Application should accordingly be dismissed. Mr Singla's position

was that formal pleadings, discovery and cross-examination was required for a proper determination of the issues and the matter should proceed by way of an *inter partes* proceeding.

7. Mr Singla did not initially question the jurisdiction of the court. At paragraph 114 of his skeleton he accepted that the JOLs had the right to apply to the court for advice when difficult questions arise and that a sanction application can raise substantive rights of the parties, which the court can go on to resolve. However he stressed that where substantive rights are required to be so resolved, the appropriate way of proceeding is for the court to make directions that the issue proceed by way of taking on the character of an *inter partes* action. Indeed he initially maintained this position in his opening oral submissions:

> "… we are not contending that there are no circumstances, as a matter of jurisdiction, where liquidators can come to this court under section 110 and obtain relief which ultimately or incidentally has the effect of determining rights to property. What we do say is that as the procedure is currently being used, it is a matter of your discretion. It is wrong to use this procedure here, on its face, the very purpose of the summons is to obtain what Your Lordship will recognise as being effectively interpleader-type action, i.e. an action purely to determine proprietary rights to an asset … the sanction jurisdiction has a very useful role derived from the old trust jurisdiction to obtain the court's directions and advice …" (Transcript Day 1, pages 5 and 6).

8. The court having raised questions in respect of its jurisdiction under section 110 of the Act Mr Singla, somewhat opportunistically, changed horses and his closing oral submissions were to the effect that this court did not have jurisdiction under section 110 of the Act. We


FSD2021-0189 Page 6 of 56 2022-11-03

will therefore have to consider these jurisdictional and procedural issues in respect of section 110 of the Act in some detail.

**<u>Section 110 and Schedule 3 of the Companies Act</u>**

9. Under section 110 (1) of the Act it is the function of an official liquidator (a) to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and (b) to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.

10. Section 110 (2) of the Act provides that the official liquidator may:

(a) with the sanction of the Court, exercise any of the powers specified in Part 1 of Schedule 3; and

(b) with or without that sanction, exercise any of the general powers specified in Part II of Schedule 3.

11. Under section 110 (3) of the Act it is provided that the "exercise by the liquidator of the powers conferred" by section 110 "is subject to the control of the Court" and provision is made to enable creditors and contributories to "apply to the court with respect to the exercise or proposed exercise of such powers."

12. The Amended Summons refers to paragraph 7 of Part 1 of Schedule 3 to the Act and paragraphs 1 and 7 of Part II of Schedule 3 to the Act.

13. Paragraph 7 of Part 1 of Schedule of the Act provides:

> "Power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim or to give a complete discharge in respect of it."

14. Paragraph 1 of Part II of Schedule 3 to the Act provides as follows:

> "The power to take possession of, collect and get in the property of the company and for that purpose to take all such proceedings as he considers necessary."

15. Paragraph 7 of Part II of Schedule 3 to the Act provides as follows:

> "The power to do all other things incidental to the exercise of his powers."

**Order 11 of the Companies Winding Up Rules, 2018**

16. Order 11 of the Companies Winding Up Rules, 2018 concerns what are referred to as "sanction applications". Order 11 rule 1 (2) provides that sanction applications shall be made by summons in CWR Form No 16.

17. Order 11 rule 3 relates to the hearing of sanction applications. Order 11 rule 3 (3) provides that:

> "The Court may direct that, when a sanction application gives rise to an issue in respect of the substantive rights as between the company and any creditor or

contributory or any class thereof, it shall be adjudicated as an *inter partes* proceeding as between shareholders, creditors or any class of shareholders or creditors (as the case may be), for which purposes the court may –

(a) make a representation order; and/or
(b) direct that the official liquidator's role shall be limited in such way as The (sic) Court thinks fit; or
(c) direct that the official liquidator shall take no further part in the proceeding."

**<u>Section 129 of the Act</u>**

18. Section 129 (1) of the Act headed "Reference of questions to Court" provides:

"The voluntary liquidator or any contributory may apply to the Court to determine any question arising in the voluntary winding up of a company or to exercise, as respects the enforcing of any calls or any other matter, all or any of the powers which the Court might exercise if the company were being wound up under the supervision of the Court."

19. Section 129 (2) of the Act provides:

"The Court, if satisfied that the determination of the question or the required exercise of power will be just and beneficial, may accede wholly or partly to the application on such terms and conditions as it think fit, or make such other order on the application as it thinks just."

20. Section 129 of the Act only applies to voluntary liquidators and contributories. It does not apply to official liquidators. It is common ground between the parties that there is no equivalent section for official liquidators, although Ms Leahy submits that section 110 is treated locally as enabling the court to give directions to JOLs in respect of issues arising during the course of liquidations.

**Section 138 of the Act**

21. For the sake of completeness I should also refer to section 138 of the Act a provision referred to by Ms Leahy in her oral submissions when she produced an English authority (*Re London Iron and Steel Co Ltd* [1990] BCLC 372; discovered by Mr Cowan within the JOLs' team of lawyers) which Ms Leahy optimistically referred to as the JOLs' "silver bullet" – a simple solution to a complicated jurisdictional problem. Mr Singla put it in the category of an unhelpful "lead bullet" and submitted in effect that it simply confirmed that by seeking to proceed by way of the Amended Summons the JOLs had adopted the wrong procedure.

22. Section 138 (1) of the Act (not referred to in the Amended Summons) provides:

> "Where any person has in his possession any property or documents to which the company appears to be entitled, the Court may require that person to pay, transfer or deliver such property or documents to the entitled liquidator."

23. Section 138 (2) of the Act provides that where the official liquidator seizes or disposes of any property which he reasonably believed belonged to the company, he shall not be

personally liable for any loss or damage caused to its true owner except in so far as such losses or damage is caused by his own negligence.

**<u>Section 48 Trusts Act (2021 Revision)</u>**

24. It may also be helpful, as in my consideration of the authorities I refer to some of the relevant trust cases by way of analogy, I set out the provision of the Trusts Act which enables trustees to seek directions from the court. Section 48 of the Trusts Act (2021 Revision) provides:

> "Application to the Court for advice and directions
>
> 48. Any trustee or personal representative shall be at liberty, without the institution of suit, to apply to the Court for an opinion, advice or direction on any question respecting the management or administration of the trust money or the assets of any testator or intestate, such application to be served upon, or the hearing thereof to be attended by, all persons interested in such application, or such of them as the Court shall think expedient; and the trustee or personal representative acting upon the opinion, advice or direction given by the Court shall be deemed, so far as regards that person's own responsibility, to have discharged that person's duty as such trustee or personal representative in the subject matter of the said application: Provided, that this shall not indemnify any trustee or personal representative in respect of any act done in accordance with such opinion, advice or direction as aforesaid, if such trustee or personal representative shall have been found to have committed any fraud, wilful concealment or misrepresentation in obtaining such


FSD2021-0189 Page 11 of 56 2022-11-03

opinion, advice or direction, and the costs of such application as aforesaid shall be in the discretion of the Court."

25. It can be seen that sections 110 and 129 of the Act contain no equivalent express statutory indemnity to that contained in section 48 of the Trusts Act (2021 Revision).

**Some authorities**

26. Other than reference to legislative provisions the JOLs in their skeleton argument referred to no authorities on the procedural and jurisdictional issues. SPGK Cayman in its skeleton argument referred to:

(1) *In the matter of DD Growth Premium 2X Fund* 2013 (2) CILR 361 ("*DD Growth Premium*");

(2) *In the matter of Re Belmont Asset Based Lending Limited* 2011 (2) CILR 484 ("*Belmont Asset*");

(3) *Emergent Capital Limited* 2012 (1) CILR 12 ("*Emergent Capital*"); and

(4) *Traianedes in his capacity as Deed Administrator of Mercury Brands Group Pty Ltd* [2010] FCA 1140 (Federal Court of Australia) ("*Traianedes*").

I now turn to a review of these authorities.


FSD2021-0189 Page 12 of 56 2022-11-03

*DD Growth Premium*

27. Smellie CJ in *DD Growth Premium* at paragraph 30 set out the general legal principles applying to the sanction of the exercise of a liquidator's powers in the context of the proposed entering of a funding amendment agreement and a conditional fee agreement as follows:

(1) the decision whether to sanction the exercise of a power falling within Part 1 of the Third Schedule is a decision of the court (*Re Greenhaven Motors Ltd* [1999] BCC 463; [1999] 1 BCLC 635);

(2) in exercising its discretion as to sanction, the court must consider all the relevant evidence;

(3) the court must consider whether the proposed transaction is in the commercial best interests of the company, reflected *prima facie* by the commercial judgment of the liquidator (*Re Edennote Ltd (No 2)* [1997] 2 BCLC 89);

(4) the court should give the liquidators' views considerable weight unless the evidence reveals substantial reasons for not doing so;

(5) the liquidator is usually in the best position to take an informed and objective view;

(6) unless the court is satisfied that, if the Fund is not permitted to enter the compromise in question, there will be better terms or some other deal on offer the choice is between the proposed deal and no deal at all.

I appreciate that the context of *DD Growth Premium* was very different to the context of the case presently before me.

28. In *Income Collecting 1 – 3 Months T-Bills Mutual Fund (in official liquidation)* in a judgment delivered on 21 January 2022 I briefly touched upon section 110 of the Act and the relevant law in respect of sanction applications generally and made reference to *Edennote*.

29. Jones J in *UCF Fund Limited* 2011 (1) CILR 305 considered section 110 (2) of the Act in further detail and stressed that JOLs should not seek "blanket authorisation" to exercise the statutory powers. JOLs needed to file evidence to justify specific powers in the particular circumstances of the case. Jones J at page 309 stated that the purpose of section 110 (2) of the Act was "to subject official liquidators to the general supervisory jurisdiction of the court", adding:

> "In respect of the Part 1 powers, the onus is on the official liquidator to make a sanction application in every case, whether or not the exercise of the power is controversial. In respect of Part II powers, the onus is on the creditors or contributories to make a sanction application if they disapprove of the way in which the official liquidator has exercised or intends to exercise the powers."

30. See also Smellie CJ's ruling in *Premier Assurance Group* (FSD unreported judgment 26 April 2022) for sanction of a liquidator's decision to treat mistaken payments as held on constructive trust and repaid accordingly.


FSD2021-0189 Page 14 of 56 2022-11-03

*Belmont Asset*

31. Jones J in *Belmont Asset* further explored the nature of the court's sanction jurisdiction. In that case Bear Stearns claimed to be an ordinary secured creditor of the company. On legal advice the JOLs in that case concluded that Bear Stearns should be admitted to proof as an ordinary unsecured creditor but did not in fact follow this advice. Instead, they made a sanction application by which they sought the direction of the court that Bear Stearns be admitted to proof. In response three shareholders issued a summons for directions and argued that the JOLs should take no further part in the proceeding. At the hearing the three shareholders were supported by another three shareholders (the "Six Shareholders"). The Six Shareholders submitted that the JOLs should have either adjudicated the proof or adopted a neutral position and made a sanction application. The Grand Court made an order for directions that the sanction application be treated as an application by Bear Stearns against Finter Bank Zurich Ltd (one of the Six Shareholders which agreed to act in a representative capacity on behalf of all six) whether to determine upon the true construction of an option agreement, Bear Stearns was a creditor for approximately US$60 million and that the JOLs take no further part in the application or alternatively for leave to appeal to the Court of Appeal.

32. Jones J held that when a sanction application took on the character of an *inter partes* action between stakeholders in which substantive rights against the company would be determined, the court could authorise or direct that the JOLs take no further part in the proceedings in order to avoid incurring unnecessary expense. Though the court was not persuaded that the JOLs' continued participation in the application would serve any useful purpose, the direction that the JOLs take no further part in the sanction application was unnecessarily prescriptive. The court would vary it to provide that the JOLs were

authorised to take no further part in the application, but if they participated, they would do so at their own risk as to costs. No leave to appeal would have been given as the case raised a pure liquidation case management issue and no point of principle which ought to be considered by the Court of Appeal. It is clear from the judgment of Jones J (see for example paragraph 9) that the judge had been told that there was no dispute about the underlying facts or quantum and he directed that the parties should prepare an agreed statement of facts. It is also clear from the judgment (see paragraph 16) that the issue in that case was "a pure point of law which will be decided upon an agreed statement of facts, based upon documentary evidence which has already been put before the court by the JOLs, counsel instructed by Finter should be perfectly capable of putting the contrary argument against treating Bear Stearns as an ordinary unsecured creditor. In reality there is nothing more for the JOLs to do …."

33. At paragraph 12 on page 491 the following comments of Jones J are recorded:

> "In the ordinary case the purpose of a sanction application is to provide the liquidator with guidance (which may be permissive or prescriptive) and to protect him against a claim for breach of duty. However a sanction application may raise substantive issues in which case the court can go on and resolve substantive rights, thus making it unnecessary for a separate action to be commenced by or against the company."

34. Jones J then referred to *Traianedes* and *Emergent Capital,* which I shall consider later in this judgment. Jones J at paragraph 13 added:

> "When a sanction application takes on the character of an *inter partes* action, it is open to the court to authorise or direct that the official liquidators take no further part in the proceedings which they have commenced. The purpose of giving such a direction is to avoid incurring unnecessary expense …"

35. At paragraph 15 Jones J referred to the liquidation process and the liquidator's role "which is to collect and realise the assets and then distribute them in accordance with the statutory scheme."

*Emergent Capital*

36. Jones J in *Emergent Capital* considered further the nature of a sanction application. At paragraph 3 he referred to the procedural history and the fact that the official liquidators had made a sanction application for directions in respect of a dispute about the respective shareholdings of the company's only two shareholders, namely KTC and RAAL. Jones J had made an order the effect of which was that the sanction application would take on the character of an *inter partes* action between KTC (as applicant) and RAAL (as respondent) by which their substantive rights against the company would be determined. Jones J directed the service of pleadings and the exchange of witness statements as if the matter was an action commenced by writ. Jones J at paragraph 3 also records that the trial lasted five days and "was conducted in exactly the way in which it would have been had the originating process been a writ issued by KTC, as opposed to a sanction application issued by the official liquidators."

37. Jones J at paragraph 6 stated that sanction applications "made by official liquidators or stakeholders, are the mechanism whereby the court gives directions (which may be

permissive or prescriptive) about the way in which the official liquidators should exercise or refrain from exercising their powers in the interests of all the creditors or shareholders as the case maybe. The directions resulting from a sanction application take effect for the benefit of the estate as a whole …"

38. At paragraph 8 Jones J added:

> "As a matter of procedure and as a matter of form, the application was a sanction application. In substance it was not. In substance, the order for directions had the effect of converting it into an *inter partes* action between KTC as applicant and RAAL as respondent. They are the only parties with an interest. The official liquidators took no part in the application."

39. Jones J at paragraph 9, refers to his directions "that a sanction application should be treated as an *inter partes* action between the only two shareholders. In my judgment the proposition that I erred in principle in adopting this course is quite simply unarguable."

*Traianedes*

40. Finklestein J sitting in the Federal Court of Australia in *Traianedes* in his concise and impressive reasons for judgment delivered on 21 October 2010 in Melbourne dealt with directions under section 447D of the Corporations Act 2001 and at paragraph 6 stated:

> "Generally speaking, a power to give directions does not involve making orders that either bind, or affect the rights of, third parties: *Re GB Nathan & Co Pty Ltd (In liquidation)* 1991 24 NSWLR 674. The principal purpose for giving directions

to an administrator is so that he/she can obtain protection from liability in respect of what he/she does in accordance with the direction."

41. At paragraph 8 Finkelstein J stated:

> "So far I have been speaking of an ordinary application for directions. Often, however, proceedings commenced for purposes of obtaining a direction will raise substantive issues. In that circumstance, it is common for the court, provided the necessary parties have been joined, to go on and resolve substantive rights, thus making it unnecessary for the administrator to begin a separate action: *Re GB Nathan* at 680. This is a case where proceedings for directions have been transformed into a suit inter-partes".

42. Finkelstein J, who was in effect considering an application to adduce additional evidence, at paragraph 9 stated:

> "When an application for directions takes on the character of a suit between parties and raises for determination a dispute concerning claimed rights or the commission of alleged wrongs, the application brings with it the usual rules of civil practice and procedure. According to those rules there are only limited circumstances in which additional evidence can be led in the hope of producing a different outcome".

*Polarcus*

43. Amongst the supplementary case law filed late by the JOLs on 16 September 2022 is *Polarcus Limited (in official liquidation)* a judgment of Kawaley J dated 6 July 2022 in respect of a matter decided on the papers.

44. Kawaley J in *Polarcus* considered an application by JOLs for a declaration that, as a matter of Cayman Islands law, the company, acting by its JOLs was authorised to acquire quotas pursuant to a quota purchase agreement to be entered into by the company and to authorise the JOLs to incorporate a special purpose vehicle for the purpose of acquiring the quota. It is clear from paragraph 2 of the judgment that the need for the JOLs' powers to be confirmed only arose because the acquisition limb of a larger transaction involving the disposition of assets required regulatory approval from a jurisdiction unfamiliar with the local insolvency law regime. Kawaley J also confirmed that the court possessed the jurisdiction to grant declaratory relief within winding up proceedings. Kawaley J referred to section 110 of the Act and at paragraph 7 stated:

> "The liquidators powers, defined in Schedule 3, and derived from the Companies Act 1948 (UK), are correspondingly broad as well and include carrying on the Company's business so far as may be necessary and broad powers to compromise claims which may be asserted against the Company by creditors and claims the Company may have against its debtors."

45. Kawaley J at paragraph 15 referred to section 129(1) of the Act and the ability of a voluntary liquidator to apply to the court to determine any question arising in the voluntary winding up. Kawaley J at paragraph 16 stated:

"Official liquidators, creditors and/or contributories are entitled to have the court determine whether the proposed exercise of a liquidator's powers is legally permissible or not. Most applications for directions made by official liquidators are made *ex parte*, as occurred in the present case. Sometimes the Court is asked to declare that the power to enter a transaction exists. On other occasions the Court may be asked to declare, as between the Company and the stakeholder, what the correct legal position is in relation to, for instance, the terms upon which a distribution are made."

46. Kawaley J at paragraph 17 referred to two examples where an applicant "seeks directions which are in substance declarations as to the rights of the company and its creditors or contributories." In *Re Ascot Fund* (FSD unreported judgment 11 January 2021) Kawaley J considered an application by liquidators for "directions" in relation to the proposed basis of a distribution. Facts were agreed and the issues in dispute were argued by counsel for the joint official liquidators and counsel for a representative party. Kawaley J stated "In substance, this was an *inter partes* determination of the rights of the parties and the Court granted declaratory relief in relation to the disputed legal issues." Kawaley J in *Polarcus* also referred to Segal J's judgment in *Re Direct Lending Income Feeder Fund Inc* (FSD unreported judgment 9 May 2022). At paragraph 10 Segal J noted that there was in the Cayman Islands "no explicit power to seek directions as there is in the UK Insolvency Act 1986 (see section 112(1)…), an application for an order seeking sanction for the exercise of (and permission to exercise) their powers is, as a matter of practice, referred to as an application for directions in this jurisdiction."

47. It may be useful to set out section 112 (1) headed "Reference of questions to court" which reads:

> "The liquidator or any contributory or creditor may apply to the court to determine any question arising in the winding up of a company, or to exercise, as respects the enforcing of calls or any other matter, all or any of the powers which the court might exercise if the company was being wound up by the court."

48. On the first day of the hearing I referred to a number of other authorities which I thought may shed some light on the jurisdictional and procedural issue before the court. Just before the luncheon adjournment on Day 2, the JOLs produced a supplemental authorities bundle containing these authorities and some additional authorities. I now refer to some of these authorities and also an authority from Guernsey which before the luncheon adjournment on Day 2, I also referred to counsel for consideration.

*Re Exchange Securities*

49. Mervyn Davies J sitting in the Chancery Division of the High Court of England and Wales in *Re Exchange Securities & Commodities Ltd and others* [1983] BCLC 186 dealt with ten applications for leave pursuant to section 231 of the Companies Act 1948 to commence proceedings against each relevant company notwithstanding the appointment of provisional liquidators of the companies. The applications were made on the footing that those who had invested the money were not mere creditors in the windings up but rather beneficiaries under trusts. As and when a sum was handed over for investment, it was, it was said, impressed with a trust so that in the course of the liquidation an investor or beneficiary was entitled to trace his money into the funds now held by the liquidator. The

judge was not asked to decide any questions relating to the trusts at the hearing for leave before him. Mervyn Davies J at page 192 stated:

> "It is no part of my duty to say now whether or not there subsists such trust interests as counsel for the applicants (Mr Stewart) contends for. If it were plain to me that such interests did not subsist I should say so and that would be an end of the application, but such is not plain to me. There is I think an arguable case about the nature of the investors' or plaintiffs' rights. It follows that I should consider further whether or not to accede to the application. If I do, then all questions about the nature of the investors' rights will be answered in the litigation that will ensue."

50. In that case Mr Heslop for the respondents adopted some words in *Buckley on the Companies Acts* (14th edn, 1981) Vol 1, p 580 as follows:

> "But, in general, leave to institute or proceed with an action will only be given where some question arises which cannot be properly determined in the winding up and for the determination of which an action is requisite."

51. From that footing Mr Heslop said that everything the proposed plaintiffs sought in their proposed action would be offered to them by the liquidator in the course of the liquidation. The argument ran as follows: Section 246 (3) enables a liquidator to apply to the court for directions. The provisional liquidator would make use of that sub-section to determine what trust interests, if any, subsist. The respondents to the summons would be representatives of various classes of investors and a representative of the general creditors and the liquidator's neutrality would be preserved. Advantages in relying on the ordinary liquidation machinery in this way were (a) that all proceedings would be in one court, (b)

that the liquidator could see that all competing claimants were found and (c) that the laborious working out of a Chancery writ action would be avoided. Mr Stewart (for the applicants) said that his proposed proceedings might be commenced by originating summons. Mervyn Davies J was plainly persuaded by Mr Heslop's pragmatic submissions as he concluded at page 195:

> "My decision is that the companies are not to be at liberty to commence the proposed proceedings… I must do what is right and fair in the circumstances… It seems right and fair to me, in the circumstances of this case, not to allow the action. The approach should be, I think, that leave should be refused under s231 if the action proposed raises issues which can be conveniently decided in the course of the winding up. It seems plain to me that the issues which would be discussed in the proposed Chancery action can perfectly well be decided in the ordinary course of the liquidation. Now the liquidator is aware of the trust claims and, moreover, has by his counsel undertaken to put before the court in a neutral fashion the issue whether or not the various classes of investors have trust issues, it seems to me quite unnecessary to allow a separate action to decide these issues. I add that there seems to me to be positive benefit in having the issues decided in the liquidation because the procedure should be quicker and less expensive than writ or originating summons proceedings."

The judge was also concerned at page 196 that "nothing could be more calculated to make more for delay in the liquidation and add to the expense than to have the liquidator dealing not merely with the difficulties of the liquidation but also having to defend the action desired by investors."

*London Iron and Steel*

52. Warner J in *Re London Iron and Steel Co Ltd* [1990] BCLC 372 considered the court's jurisdiction under section 234 (2) of the Insolvency Act 1986 which is in similar format to section 138 of the Act. The concise and accurate headnote to the report of that case reads:

> "The court has jurisdiction under s234 (2) of the Insolvency Act 1986 to order property to be handed over to the office-holder designated in s234 (1) of that Act even though there is a dispute as to its ownership."

53. In that case, an application by joint administrative receivers appointed by a debenture holder for an order that the respondents surrender to the receivers possession of some motor cars, including "Rolls Royces and Mercedeses", came before the court in October 1989 and directions were given about evidence and a number of affidavits were sworn. The hearing was in November 1989 and on that occasion a preliminary point was taken by Mr Nugee (counsel for the respondents) that the procedure under section 234 was inappropriate where there was a genuine dispute about the company's entitlement to the property in question. In such a case counsel contended that the office-holder must bring proceedings by writ to have the dispute resolved. Mr Registrar Scott decided the question against the respondents and they appealed to Warner J.

54. Warner J reviewed two previous cases and four textbooks and in effect held that the dispute could be decided within the context of section 234. Warner J at page 376 added:


FSD2021-0189 Page 25 of 56 2022-11-03

"Counsel for the respondents did not suggest that his clients would suffer, or might suffer, any prejudice or injustice because of the adoption by the receivers of this form of procedure."

55. Warner J referred to the relevant procedural rules for pleadings, discovery and interrogatories and cross-examination including other directions provided for in Part 7 of the Insolvency Rules of England and Wales and added:

"So that, if I were to allow this appeal and reverse the decision of Mr Registrar Scott, the only result would be additional delay and costs."

*Sealey & Milman*

56. Counsel helpfully brought to my attention *Sealy & Milman: Annotated Guide to the Insolvency Legislation 2020* (23rd edition) which includes the following notes under section 234:

"Under earlier provisions corresponding to the present section, the courts had held that its procedure was not appropriate to determine questions of disputed ownership, but in *Re London Iron & Steel Co Ltd* [1990] B.C.C. 159 Warner J held that the words "to which the company appears to be entitled", coupled with the comprehensive rules laid down in IR 2016 Pt 12 are of sufficient scope to enable the court to settle such matters; and it now seems that the courts entertain such questions as a matter of course …"

57. The authors refer to numerous examples including the relatively recent case of *Conn v Ezair* [2019] EWHC 1722 (Ch). In that case (which was heard on 17, 18 and 19 June 2019) His Honour Judge Halliwell sitting as a judge of the High Court of England and Wales in a judgment delivered on 4 July 2019 considered an application by joint administrators for an order under section 234(2) requiring the respondent to transfer to them registered title to six properties. The application raised issues as to the nature of a sub-purchaser's rights in respect of registered land and the operation of the equitable doctrine of conversion and proprietary estoppel. Witnesses were called to give evidence but were not cross-examined at length. In that case the respondent had made an admission to the effect that following a 2003 Agreement the company steps into the shoes of NEL and Mr Ezair held the properties on trust for the company. Mr Ezair sought to modify or resile from the admission and the judge declined to give him permission to do so, commenting at paragraph 34 that: "Mr Ezair can be taken to have a clear understanding of the concept of a beneficial ownership and trusts. When stating that he held "ownership on trust for the Company", he can be taken to have accepted that, whilst the legal title was vested formally in his name, the Properties would be held for and on behalf of the Company."

58. At paragraph 89 the judge referred to relief under section 234 being discretionary. Counsel for the respondent (Mr Lander) had submitted that relief should be declined for a number of reasons namely:

(1) Section 234 was manifestly inappropriate for the present case on the basis that it amounts to a summary jurisdiction designed for use in simple and straightforward cases. In more difficult or complex cases, office holders can generally be expected to issue proceedings by way of ordinary action, in the name of the company. They can be expected to bring such claims under CPR Part 7. In addition to paying the standard

court fees for such a claim, they will be expected to file statements of case and comply with the procedure governing case management and disclosure. They can also be met with an application for security for costs;

(2) In view of the fact that section 234 does not confer jurisdiction on the Court to entertain pecuniary claims or claims to an account and damages, the court is being invited in the present case to deal in isolation with the issues of title. It is thus unable to see the dispute in its full perspective. Moreover, there is likely to be wasteful duplication of time if and when the court considers any application on the part of the Company for an account of the rents due;

(3) More seriously, Mr Lander submitted that Mr Ezair, as a trustee is entitled to be indemnified out of the trust assets in respect of his expenses and he is entitled to a lien over the properties in respect of the same. If an order is made for the transfer of the properties Mr Ezair will be deprived of his lien.

59. Although recognising some substance in each of these submissions the first instance judge was not persuaded that it would be inappropriate for him to grant the relief requested. Judge Halliwell provided his reasons as follows:

(1) the proceedings were issued as long ago as November 2017. Since then the court had made directions for disclosure, delivery of witness statements and the determination of the preliminary issue in relation to the administrators' entitlement to relief. By consent in November 2018 the court made a series of directions providing, *inter alia*, for the case to be referred to trial with an estimated duration of four days. Had it been

envisaged the administrators have adopted the wrong procedure, the issue should have been addressed at the formative stage of the proceedings;

(2) it had been fully understood since the hearing before HHJ Eyre QC on 9 July 2018, if not before, that the issue of title in these proceedings will have to be heard separately from the parties' respective claims for pecuniary relief. Whilst it is true that this will involve separate judicial determinations on overlapping issues and a certain amount of duplication of costs and expense, there is no logical reason why they cannot be heard separately. If the relief was declined, the title issues will have to be re-visited on a future occasion and further costs consumed in doing so;

(3) Mr Ezair has adduced evidence in relation to some of his outgoings on the properties but he has also been in receipt of the rents which he has failed to account for and which likely exceed the indemnity;

(4) it is now some 20 months since the company was placed in administration. Mr Ezair holds the properties on trust for the company and the administrators seek to realise the properties as part of their statutory function. The judge could see no good reason to decline to make an order providing for the properties to be transferred to the administrators immediately so that they can be realised in the proper course of the administration.

*Marley*

60. Lord Oliver delivering the judgment of the Board of the Judicial Committee of the Privy Council in *Marley v Mutual Security Merchant Bank and Trust Co Ltd* [1991] 3 ALL ER


FSD2021-0189 Page 29 of 56 2022-11-03

198 considered issues arising in respect of the estate of Robert (Bob) Nesta Marley deceased. In that case the court at first instance had approved a conditional contract for the sale of the principal assets of the estate including "the Cayman Music Inc catalogue" and the Court of Appeal of Jamaica had in substance dismissed the appellant's appeals. The relief had been opposed by the widow and 11 children. Lord Oliver at page 201 stated what he described as "two general propositions" without citing any authority in support of such propositions. Firstly where a trustee applies to the court for directions and surrenders his discretion to the court, full and proper information must be provided and:

> "Secondly, it should be borne in mind that in exercising its jurisdiction to give directions on a trustee's application the court is essentially engaged solely in determining what ought to be done in the best interests of the trust estate and not in determining the rights of adversarial parties. That is not always easy, particularly where, as in this case, the application has been conducted as if it were hostile litigation …"

*Macedonian Orthodox Community Church*

61. In *Macedonian Orthodox Community Church St Petka Incorporated v His Eminence Petar the Diocesan Bishop of the Macedonian Orthodox Diocese of Australia and New Zealand* [2008] HCA 42 the High Court of Australia, that jurisdiction's final court of appeal, considered the court's jurisdiction and discretion under section 63 of the Trustee Act 1925 (NSW) which enabled a trustee to apply to the court for an opinion advice or direction on any question respecting the management or administration of the trust property, or respecting the interpretation of the trust instrument. In a densely reasoned judgment Gummow ACJ, Kirby, Hayne and Heydon JJ commented at paragraph 56 that there was

nothing in section 63 which limited its application to "non-adversarial" proceedings. The senior Australian judges considered *Marley* at paragraph 104 and stated:

> "105. While accepting that it was not beyond power to give judicial advice that determined substantive rights in contested proceedings, the Court of Appeal appeared to think that it was so powerful a discretionary factor that generally this should not be done, and that this was decisive in the present case. The Attorney-General argued that the Privy Council in *Marley's* case was not establishing a dichotomy, as the Court of Appeal appears to have thought, between ascertaining the best interests of the trust on the one hand and not determining adversarial rights on the other, the former function being permissible and the latter not. Rather the Privy Council was concerned to make the point that the court's sole purpose in giving judicial advice is to determine what ought to be done in the best interests of the trust estate, and that while it was not the court's purpose to determine the rights of adversaries, that could be done as a necessary incident of determining what course ought to be followed in the best interests of the trust estate.
>
> 106. In the present context, that conclusion would appear to be supported by s63(3)-(4) of the Act, which contemplate the use of evidence in some cases, by the notice procedures in s 63(4) and (8)-(10), and by the possibility of appeal contemplated by s 63(11) – all steps which could be material if there were a risk that the judicial advice given might affect the rights of adversaries. That is, while the time and cost involved in giving judicial advice at an early stage of litigation, when the issues involved in disputes about rights may not be fully sharpened and it may not be possible for the

factual position to be as efficiently exposed as in a trial, may be factors relevant to a decision not to grant judicial advice but to let the matter be examined in conventional litigation, they are not factors which either automatically bar judicial advice or are so weighty as generally to compel the court not to grant the advice. If they were, the consequence would be that advice would either never, or only very exceptionally, be given on the issue whether trustees should defend proceedings instituted against them for breach of trust. Nothing in the language of s 63 suggests this outcome.

107. Further, some forms of advice about adversarial cases may be in the best interests of the trust estate. An approach that treats an adversarial character as being always, or at least very often, fatal to the success of a judicial advice application, contradicts what the Privy Council saw as the sole function of the court…"

At paragraph 125 the judges concluded that:

> "Palmer J only determined the rights of adversarial parties to the limited extent necessary to ensure the protection of the best interests of the trust estate."

*Mento Developments*

62. *Macedonian Orthodox Community Church* was applied in *Mento Developments (Aust) Pty Ltd (in liq) v Wixart Pty Ltd* [2009] VSC 343 by Robson J sitting in the Commercial Court of the Supreme Court of Victoria at Melbourne. In that case Robson J considered section

479 (3) of the Corporations Act 2001 (comparable to s447 D) which provided that a liquidator may apply to the court for directions in relation to "any particular matter arising under the winding up". Wixart submitted that the function of a liquidator's summons for directions is to give him advice as to his proper course of action in the liquidation; it is not to determine the rights and liabilities arising from the company's transactions before the liquidation. The liquidator submitted that there was sufficient flexibility in the procedures of the Court to convert an application for directions into proceedings for the determination of substantive rights.

63. Robson J at paragraph 49 set out his views. In his view:

> "(1) The liquidator is entitled to seek directions on his administration of the winding up even though the issue about which he seeks a direction may be or become an adversarial issue in other proceedings.
>
> (2) The direction or advice is to be directed to advising the liquidator on whether or not he or she is justified in conducting the winding up in a certain way and not deciding disputes between competing parties.
>
> (3) The direction or advice should not seek to resolve an issue between competing parties but the fact that the advice may tend to foreclose an issue in other disputed proceedings is not of special significance in the court exercising its discretion to give private advice to the liquidator.

(4) Where a liquidator seeks advice on an issue which may be contested between competing parties, the court should be alert to not going further than is necessary to give the advice sought …"

*McPherson*

64. The Australian publication McPherson *Law of Company Liquidation* 3rd edition chapter 9 "Right to Assistance and Advice" at paragraph 9-049 (footnotes omitted) states:

> "While courts have generally said that they are unable to bind other parties, they have made orders declaratory of substantive rights and intended to be binding on parties to the proceedings where the proceedings have commenced as a liquidator's application for directions. It has been said that court procedures are sufficiently flexible to enable directions' proceedings to be changed to permit determination of substantive rights. The caveat expressed by McLelland J should be noted, namely that such a fundamental change in the nature of the proceedings should not be allowed unless the court is satisfied that the persons affected consent to this action."

These comments are repeated at paragraph 9-047 of the fourth edition.

*CanArgo*

65. In *CanArgo Limited (in liquidation)* [2020] GRC 064 Lt Bailiff Hazel Marshall KC sitting in the Royal Court of Guernsey set out the law in detail concerning applications by liquidators in compulsory liquidations seeking assistance from the courts. The Lieutenant Bailiff referred to the "extremely broadly drafted" section 426 of the Companies

(Guernsey) Law 2008 which provided that a liquidator of a company may seek the court's directions in relation to any matter arising in relation to the winding up of the company and upon such an application the court may make such order as it thinks fit. The Guernsey judge felt that there were two limitations. Firstly, it is envisaged that "directions" be given rather than "orders" being made and secondly, it is aimed at "assisting the liquidator to conduct the liquidation" (paragraph 43). The judge at paragraph 46 stated that section 426 contemplated there being "directions" regarding the future course of the conduct of the liquidation and "whether the liquidators can or cannot, or should or should not, do something (and possibly, what) in the future. It would therefore have been within the scope of the section for the liquidators to bring a draft of the [Conditional Asset Purchase Agreement] before the court and to ask for the court's direction as to whether they should follow their inclination to execute it."

66. The judge also at paragraph 46 added:

> "In any event, though, it also appears to me that as the Joint Liquidators are appointed by the court order, the court would have an inherent jurisdiction to direct and assist its officers in the performance of their duties."

67. At paragraph 50 the judge had difficulty in envisaging any situation in which the court would ever be likely to accept the surrender of a liquidator's discretion adding:

> "What the court will do, rather, is to assist the liquidator in carrying out his functions, by giving him directions as to the appropriate *process* to follow in order to enable him to make the decision himself, and provide him with the comfort that, if he follows the court's directions, he will be protected from subsequent attack or

criticism by any aggrieved person. Of course, in the course of carrying out this function, the court can, if necessary or appropriate in the particular circumstances (and always with any appropriate parties joined) make determinations of fact or right or legal principle, but this will be as part of the function of assisting the liquidator to discharge his own functions as liquidator. The objective of s426 is to assist the liquidator to make liquidation decisions, and not for the court to take over the conduct of the liquidation."

68. The judge at paragraph 52 referred to the analogy with trust cases where trustees seek the blessing of the court to a decision and at paragraph 55 felt that the court's powers in trustee cases provide "a helpful guide to the proper scope of the court's function when its powers of assistance are invoked by such an office-holder. In a company administration or liquidation context, the court's powers will therefore include power to "bless" a decision of a liquidator or administrator in a similar way to the power available in a trust context."

69. At paragraph 138(3) the judge stated:

"… if it is sought to bind any party to the result of the application, that party will need to be convened and heard on the matter."

70. At paragraph 138 (4) the judge added:

"The court's "blessing" simply provides the office-holder with a judicial determination that, *on the evidence put before the court at the relevant time*, (this is to be emphasised) the decision which he took was a proper decision because it was taken in a proper way, and within the general bounds of what could be a

> reasonable decision in the circumstances … As regards any party to the application, it will create a *res judicata* on the relevant facts."

**Conclusion on jurisdictional issue**

71. I note that at first instance Segal J in *Direct Lending Income* (FSD unreported judgment 9 May 2022) accepted that there was no explicit power to seek directions but stated at paragraph 10 (e) that "an application for an order seeking sanction for the exercise of (and permission to exercise) their powers is, as a matter of practice, referred to as an application for directions in this jurisdiction." Segal J at paragraph 10 (h) added:

> "sanction applications seeking directions regarding the manner in which official liquidators are to exercise their powers and conduct the liquidation and which determine the rights of creditors or contributories in the liquidation are not uncommon. But they do need to be properly structured and prepared …"

72. I also note, again at first instance, Kawaley J in *Polarcus* held that the Grand Court did have jurisdiction to grant declaratory relief in a winding-up proceeding. At paragraph 16 adding:

> "Official liquidators, creditors and/or contributories are entitled to have the Court determine whether the proposed exercise of a liquidator's powers is legally permissible or not."

73. Ms Leahy helpfully brought my attention to *Alibaba.com Limited* 2012 (1) CILR 272 where Cresswell J at paragraphs 63 and 64 referred to the position of decisions of courts


FSD2021-0189 Page 37 of 56 2022-11-03

of co-ordinate jurisdiction quoting from 11 *Halsbury's Laws of England* 5th edition at paragraph 98 (2009):

> "There is no statute or common law rule by which one court is bound to abide by the decision of another court of co-ordinate jurisdiction. Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong …"

74. Parker J in *Padma Fund* (FSD unreported judgment 8 October 2021) at paragraph 84 stated that a decision of another judge of the Grand Court, Financial Services Division should be followed unless the judge is convinced that it is wrong, and special care must be taken in circumstances where the judge heard argument by experienced lawyers and wrote a fully reasoned judgment. Parker J referred to *China Shanshui Cement Group Limited* 2015 (2) CILR 255 where Mangatal J at paragraph 64 stated: "I appreciate that, in the interests of judicial comity and certainty, I would be inclined to follow the judgment, unless I am convinced that it is wrong. I am also, on the other hand, cognizant that if I am convinced that the decision is wrong, I cannot shy away from not following it." Kawaley J in *Simamba v Health Services Authority* 2019 (2) CILR 213 at paragraph 68 stated: "I accept the defendant's submission that courts of coordinate jurisdiction should ordinarily follow previous decisions unless satisfied that the previous decisions are wrong."


FSD2021-0189 Page 38 of 56 2022-11-03

75. In my judgment, following the guidance of Jones J in *Belmont Asset*, Segal J in *Direct Lending* and Kawaley J in *Polarcus* (which I am far from convinced were plainly wrong a la *Alibaba* and in fairness Mr Singla does not seek to persuade me otherwise) I think this court does have jurisdiction within the context of section 110 of the Act to entertain the sanction application by the JOLs for directions. It is perhaps not ideal that there is no statutory equivalent to section 129 of the Act for JOLs. Section 110 of the Act, however, plainly places the exercise of the powers of a liquidator under the control of the Court and it does not take a crowbar to slip in adequate jurisdiction within the court to properly assist the JOLs in the circumstances of this case. In this case the JOLs seek to exercise their powers and treat the BoW Funds as unencumbered assets of the Company. The questions raised do impact on the assets or potential assets of the Company. I am accordingly satisfied that I have jurisdiction to consider the Amended Summons.

76. Before determining how I should exercise my jurisdiction and discretion in this case there is one other procedural issue to deal with first.

**<u>One other procedural issue – alleged abuse</u>**

77. On behalf of SPGK Cayman it was also argued that the Amended Summons should be dismissed as it is an abuse of process. Reliance was placed on the well known English case of *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 and the court's inherent power to dismiss proceedings as an abuse of process to prevent misuse of its procedure especially where manifest unfairness may be caused to a party in litigation.

78. Reference was also made to *Divine-Bortey v Brent London Borough Council* [1998] I.C.R. 886 (Court of Appeal of England and Wales). This case applied *Henderson v Henderson*

(1843) 3 Hare 100 and considered the law of estoppel in the context of racial discrimination. Potter LJ at paragraph 898 stated:

> "The basis of the rule in *Henderson* is the avoidance of multiplicity of litigation in relation to a particular subject or set of circumstances in order to avoid the prejudice to a defendant which inevitably results in terms of wasted time and cost, duplication of effort, dispersal of evidence and risk of inconsistent findings which are involved if different courts at different times are obliged to examine the same substratum of fact which gives rise to the subject of litigation."

79. The identity of the various litigation issues between the JOLs and SPGK Cayman was not immediately apparent from a reading of SPGK Cayman's skeleton argument. At paragraph 3(3) of SPGK Cayman's skeleton it was stated that there were a number of "significant issues in dispute between the JOLs and SPGK" but unhelpfully these were not described in the skeleton argument. SPGK Cayman's position was that "the issues should be dealt with in one substantive proceeding." A small portion of meat was put on the skeleton at paragraph 15 whereby it is stated:

> "The Court should note that the JOLs dispute the separation of the SPGK group from Ascentra, and SPGK's separate entitlement to funds generated by SPGK's sales. This is the so-called "wider dispute" which has been the subject of extensive correspondence from the JOLs for several months. The "wider dispute" is yet to be commenced by the JOLs but the JOLs have made it plain that they reserve their right to issue "such proceedings as may be necessary in any jurisdiction and against any relevant parties in the event that it is not resolved amicably.""

80. Mr Yoshida in his first affidavit starting at page 23 refers to various issues in dispute between the JOLs and SPGK entities that are not included in the Amended Summons.

81. In short, suffice to say I am not persuaded on the basis of the evidence, information and limited arguments presently before the court that I should dismiss the Amended Summons on the grounds of abuse of process. I should record that wisely the somewhat sweeping and generalised abuse arguments were not pressed before the court with much vigour, and eventually morphed into case management suggestions which I did not find persuasive either.

**The relief sought by the JOLs**

82. Having satisfied myself on the jurisdictional issue I turn now as to whether it is appropriate, as between the JOLs and SPGK Cayman, to exercise my discretion and to grant the relief requested by the JOLs.

83. One further initial question is whether it would be appropriate and fair to exercise such jurisdiction and proceed pursuant to section 110 of the Act in the circumstances of this case. Mr Singla's main complaints were in effect that his client would be prejudiced as in the context of these proceedings there had been no pleadings, no discovery or cross-examination of witnesses and no time to make a rectification application. Frankly I found those complaints somewhat hollow and it appeared to me that his client was impermissibly seeking to further delay the determination of the issues raised in the Amended Summons. Mr Singla's client agreed directions and various consent orders prior to this matter coming on for a two day hearing. There were no applications for additional pleadings, specific

discovery or for cross-examination. Moreover there was no prior application seeking relief by way of rectification.

84. I take into account the overriding objective and I think that much time and money would be wasted if I was simply to dismiss the Amended Summons and require the JOLs to start a fresh action or if I was to adjourn and convert the Amended Summons proceedings into *inter partes* proceedings with directions for pleadings, discovery and cross-examination. Mr Singla's generalised concerns in respect of lack of detailed pleadings, discovery and cross-examination did not persuade me that it would be unfair to his client for the court to determine the issues raised in the Amended Summons. In my judgment Mr Singla's client was not unduly prejudiced by the court proceeding to determine the issues raised in the Amended Summons, after the two day hearing at which it had an opportunity to put relevant evidence and submissions before the court.

85. I questioned Ms Leahy as to the precise nature of the relief sought by the JOLs. Was it simply a direction or was it a declaration? Ms Leahy stated that the JOLs would be happy with either.

86. The Amended Summons seeks "orders and directions" that pursuant to paragraph 7 of Part 1 of Schedule of the Act the JOLs be authorised to treat the BoW Funds as unencumbered assets of the Company. Further that the JOLs be authorised to take possession of, collect and/or get in the BoW Funds. The JOLs also requested that the costs of and incidental to the Amended Summons be paid from the assets of the Company as an expense of the official liquidation. For the brief reasons which follow I am content to make such directions.

87. I agree with Ms Leahy that the Amended Summons gave rise to a short point of construction namely whether pursuant to a Deed of Mutual Release dated 5 May 2021 (the "Deed") it is appropriate to direct the JOLs to treat the BoW Funds as unencumbered assets of the Company. I also agree that the wider dispute between SPGK Cayman and the Company is obviously not for determination in these proceedings. I do not accept Mr Singla's submission that such wider dispute needs to be determined before this court can give the JOLs directions in respect of the BoW Funds. I do however have full regard to the factual matrix put before the court by Mr Singla.

**The relevant law**

88. It may be helpful if I briefly set out some of the relevant law. Ms Leahy helpfully referred to a recent summary of the relevant principles applicable to the construction of commercial documents provided by Popplewell J in the High Court of England and Wales in *Lukoil* [2018] EWHC 163 (Comm) at paragraph 8. The court's task is to ascertain the objective meaning of the language which the parties have chosen in which to express their agreement. The court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant.

89. These principles have been followed in the Cayman Islands. Smellie CJ in *FIA Leveraged Fund* 2012 (1) CILR 248 at paragraph 80 stated:

> "In the modern world, while the approach to the construction of contracts will allow the words used in the contractual documents to speak for themselves, the words

used must ultimately be understood to bear the meaning which they would convey to a reasonable person against the relevant background of the transaction entered into …"

90. In *Tempo Group Limited v Fortune East Asia Holding Corporation* 2015 (2) CILR Note 5 the Cayman Islands Court of Appeal applied English authority and held that if the meaning of a contractual term is ambiguous and two or more constructions seem consistent with the natural meaning of the words used, the court is entitled to prefer the construction which is most commercially sensible.

91. Mr Singla helpfully referred the court to *J P Morgan v Finter Bank Zurich Limited* 2012 (2) CILR 12 where Jones J applied *Investors' Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 and emphasised the reference to the "matrix of fact" and the inclusion of "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man" but excluding "the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification."

92. Mr Singla also highlighted the following:

> "The 'rule' that words should be given their 'natural and ordinary meaning' reflects the common-sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had …"

93. On the subject of mistake and construction Lord Hoffmann in the well known case of *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101 at paragraphs 22 to 25 refers to the relevant authorities and the two conditions that must be satisfied to enable "correction of mistakes by construction." First there must be a clear mistake on the face of the document and secondly it must be clear what correction ought to be made in order to cure the mistake. This is not a separate branch of the law. In deciding whether there is a clear mistake the court is not confined to reading the document without regard to its background and context. As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration. At paragraph 25 Lord Hoffmann stated:

> "All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant …"

94. On the law in respect of unilateral mistake Ms Leahy asks the court to consider *Thomas Bates Ltd v Wyndham's (Lingerie) Ltd* [1981] 1 WLR 505 in the Court of Appeal of England and Wales, Buckley LJ at pages 514 to 516. The reference to equitable estoppel in *Snell on Equity*: "if one party to a transaction knows that the instrument contains a mistake in his favour but does nothing to correct it, he (and those claiming under him) will be precluded from resisting rectification on the ground that the mistake is unilateral and not common". Buckley LJ at page 516 stated that for the doctrine of unilateral mistake to apply it must be shown:



FSD2021-0189 Page 45 of 56 2022-11-03

> "…first, that one party A erroneously believed that the document sought to be rectified contained a particular term or provision, or possibly did not contain a particular term or provision which, mistakenly, it did contain; secondly, that the other party B was aware of the omission or the inclusion and that it was due to a mistake on the part of A; thirdly, that B has omitted to draw the mistake to the notice of A. And I think there must be a fourth element involved, namely, that the mistake must be one calculated to benefit B. If these requirements are satisfied, the court may regard it as inequitable to allow B to resist rectification to give effect to A's intention on the ground that the mistake was not, at the time of execution of the document, a mutual mistake."

95. In respect of common mistake Ms Leahy referred me to *FSHC Group Holdings Limited v Glas Trust Corporation Limited* [2019] EWCA Civ 1361 where Leggatt LJ got his teeth into this area of the law. At paragraph 46:

> "At a general level, the principle of rectification based on a common mistake is clear. It is necessary to show that at the time of executing the written contract the parties had a common intention (even if not amounting to a binding agreement) which, as a result of mistake on the part of both parties, the document failed to record. This requires convincing proof to displace the natural presumption that the written contract is an accurate record of what the parties agreed."

96. At paragraph 176:

> "We consider that we are bound by authority, which also accords with sound legal principle and policy, to hold that, before a written contract may be rectified on the

basis of a common mistake, it is necessary to show either (1) that the document fails to give effect to a prior concluded contract or (2) that, when they executed the document, the parties had a common intention in respect of a particular matter which, by mistake, the document did not accurately record. In the latter case it is necessary to show not only that each party to the contract had the same actual intention with regard to the relevant matter, but also that there was an "outward expression of accord" – meaning that, as a result of communication between them, the parties understood each other to share that intention."

97. Ms Leahy and Mr Singla were agreed as to the relevant law in respect of a *Quistclose* trust claim and in particular the question being whether the parties intended the money to be at the free disposal of the recipient and his freedom to dispose of the money was necessarily excluded by an arrangement that the money should be used exclusively for the stated purpose (*Twinsectra v Yardley* [2002] 2 AC 164; *Prickly Bay Waterside Ltd v British American Insurance Company Ltd* [2022] UKPC 8).

**<u>The Deed</u>**

98. Having briefly referred to some of the relevant law I now turn to the Deed. I have considered the whole of the Deed. It is dated 5 May 2021 and is stated to be between the Company and SPGK Cayman and various other parties. At recital (A) there is reference to various services having been provided to the Company and others. Recital (B) refers to the discontinuance of such services and a Commission Payment Services Agreement to provide services "going forward and for a limited time period." Recital (C) refers to the resignation of Theodore Sanders ("Mr Sanders"). Recital (D) refers to another agreement and the paying of accrued commissions and expenses and various sums of money are

defined as the "Funds". Recital (E) is important and provides that Mr Sanders has, at the request of the Company, been using Asian Offshore Services ("AOS") and SPGK International's Bank of the West accounts (the "AOS Accounts") to pay vendors and corporate credit cards on behalf of the Company and has previously provided the Company statements to these accounts. It is further provided that as part of the terms of the Deed AOS shall remit the balance of funds held on behalf of the Company in the AOS Accounts to the account of the Company as detailed in Schedule 2 to the Deed within ten calendar days of the date of execution of the Deed by all of the parties. Schedule 2 is entitled "Account to which funds from Designated Bank Accounts will be transferred" and the Beneficiary Account Name is Scuderia Bianco Pte Ltd who, it is common ground, had a cash management agreement with the Company. Recital (F) concerns the removal of Mr Sanders as an authorised signatory. Recital (G) provides that the Company and others wish AOS and/or SPGK International ("SPGK") to provide use of their Bank of West accounts to the Company and others for a period of time under mutually agreeable terms. Recital (H) refers to Mr Sanders providing the board of the Company with unaudited financial statements. Recital (I) states that the parties wish to document their agreement that AOS and/or SPGK holds the Funds (defined in Recital (D)) on trust for the benefit of the Company and to the order of the Company and will remit the Funds to the Company within ten calendar days of the date of the Deed.

99. Clause 3.1 provides that the parties agree that:

> "i. AOS and/or SPGK hold the Funds held in an account with BlackTower Financial Management Group in the Cayman Islands on trust for the benefit of [the Company] and to the order of [the Company], and AOS and/or

SPGK shall remit the Funds to the Recipient Bank Account (as defined below) on the Closing Date.

ii. [Mr Sanders] before the Closing Date and at the expense of [the Company] (i) request from the relevant bank, copies of up to date bank account statements in respect of each of the bank accounts set out in Schedule 1 hereto (the "Designated Bank Accounts"), (ii) procure the wire transfer of all monies held in each of the Designated Bank Accounts to the bank account details of which are set out in Schedule 2 hereto (the "Recipient Bank Account"), and (iii) request that each of the Designated Bank Accounts is closed."

100. Under clause 3.1 iii. Mr Sanders at the expense of the Company is to use reasonable endeavours to assist the Company and others to amend the authorised signatory on bank accounts. Clause 3.1 iv. states that SPGK and SPGK PTE LTD shall enter the Commission Payment Services Agreement. Clause 3.1 v. states that Mr Sanders shall provide to the board of the Company unaudited financial statements of the Company.

101. Schedule 1 is entitled "Designated Bank Accounts" and the first two named accounts are "Bank of the West-Asian Offshore Services" and "Bank of the West – SPGK International", the two accounts with which the Amended Summons is concerned.

102. Ryunosuke Yoshida has executed the Deed for the Company, SPGK Cayman and SPGK Pte Ltd. Mr Sanders has executed the Deed for himself and for AOS and SPGK.


FSD2021-0189 Page 49 of 56 2022-11-03

**The Submissions**

103. I now turn to some of the main submissions put before the court.

*Ms Leahy's submissions on behalf of the Company*

104. Ms Leahy in her submissions on the construction of the Deed says that everything turns on recital (E) and clause 3.1(i) and (ii). She described recital (D) as a complicated recital which addresses the BlackTower funds which are not in issue in respect of the Amended Summons. The reference to the Funds in the Deed is to the BlackTower funds. Ms Leahy says that there was an obligation to remit the BlackTower funds, which she says it is common ground were always the property of the Company, also to Scuderia Bianco.

105. Ms Leahy says it is quite clear that the obligation on Mr Sanders and the companies was to transfer the money in the Bank of West accounts that appear in Schedule 1 to the Company by remitting them to Scuderia Bianco. Recital (E) makes it clear that Mr Sanders and the companies are holding the monies in the Bank of West accounts on behalf of the Company and that AOS shall remit the funds to the Company to the account of the Company as detailed in Schedule 2, and then clause 3.1 ii. provides for the remission of all funds in the designated bank accounts which include the AOS accounts, to the recipient bank account. Ms Leahy says that the construction is obvious when the Deed is read as a whole and also explains why in clause 3.1 (ii) the expenses of complying with that provision were to be borne by the Company. Ms Leahy says that in effect SPGK Cayman concedes that it says what it says but that Mr Singla adds that in recital (E) there is an obvious mistake that the court can correct through construction.



FSD2021-0189 Page 50 of 56 2022-11-03

106. Ms Leahy says that there is no clear and obvious mistake in this case. Ms Leahy says Mr Singla's next point is if there is not an obvious mistake then they have a claim for mistake and rectification. Mr Singla in his skeleton does not say whether they rely on a unilateral mistake or a common mistake. If a unilateral mistake, SPGK Cayman needs to show it erroneously believed that the Deed made provision for the transfer of the BoW Funds to itself and not to the Company and that the other parties were aware of its mistake and omitted to draw the mistake to its attention and the mistake was calculated to benefit those other parties.

107. Ms Leahy also referred to the resignation email of Mr Sanders dated 27 January 2021 stating that "SPGK International's … results should be consolidated into the unaudited financial statements for Ascentra" and also the response from Yoshio Matsuura and Ryunosuke Yoshida dated 23 February 2021 with the heading "Ascentra Holdings, Inc." adding:

> "We agree that SPGK International's results should be consolidated into the unaudited financial statements of Ascentra … To us, there has never been any fundamental disagreement as to how Ascentra's assets are to be treated. Sums are held by SPGK International and Asian Offshore Services on trust for Ascentra and we are amending the Deed of Release, that you sent, to reflect this."

108. Ms Leahy says that the difficulty SPGK Cayman faces is what was said in the resignation response which was signed by its beneficial owner (Mr Yoshida) namely that the relevant funds were held on trust. Moreover as to the awareness of the other parties Mr Yoshida

was a director of SPGK Cayman and the Company at the relevant time and signed the Deed for both parties. Ms Leahy described unilateral mistake as a complete non-runner.

109. Having referred to the relevant law on common mistake Ms Leahy submits that SPGK Cayman cannot point to a single outward expression of accord. The resignation letter, the response and the Deed all undermine any suggestion that the parties had an actual shared or common intention that the BoW Funds would be transferred to SPGK Cayman so common mistake is also a non-runner.

110. On the *Quistclose* trust claim Ms Leahy submits that if the Sanders' companies were providing cash management services to SPGK Cayman and the Company that means that the monies going into the BoW accounts were mixed with Ascentra Group monies and that mix in itself would defeat the *Quistclose* trust claim because the Sanders' companies would not have been free just to use the pot of cash to spend on the relevant operational expenses of the two separate groups. Moreover if the Deed says what Ms Leahy says it says then the Deed brought any *Quistclose* trust to an end.

*Mr Singla's submissions on behalf of SPGK Cayman*

111. Mr Singla in his detailed address on the construction of the Deed referred me to what he described as the factual matrix, which I have full regard to but, for brevity's sake, do not set it out in this judgment. I note the reference to Mr Yoshida's affidavit, the letter from Alix Partners and the documents. Mr Singla commented on the lack of evidence from Mr Sanders or "other actors in this business". Mr Singla stressed that the court should consider the evidence in respect of cash flows and movements adding "if I can't show or persuade


FSD2021-0189 Page 52 of 56 2022-11-03

your Lordship … that there was a proprietary base in [SPGK Cayman] before the deed was signed, I'm stuffed … Without proprietary base, I've got no case …"

112. Mr Singla submitted there was not a great deal of commingling of funds from other sources. The monies are coming from Planet Payment. The revenues have come from PRC customers. Mr Singla submitted that there was no evidence that the Company had a proprietary base in the tracing exercise that had been conducted.

113. Mr Singla took me through the Deed including the recitals. Mr Singla referred to the definition of "Funds" in recital (D) and the word "trust" in respect of the BlackTower funds.

114. Mr Singla submitted that when Mr Matsuura and Mr Yoshida sent their resignation response they were looking at a deed of release dealing purely with BlackTower funds. Mr Singla submitted that insofar as we are dealing with Bank of West accounts those services can only be a reference to commission payment services. Mr Singla referred to Schedule 2 and stated that Scuderia Bianco is not the account of the Company. He accepted that Scuderia Bianco managed cash for the Company but added that it also managed cash for SPGK Cayman. Mr Singla submitted that in recital (E) where there is a reference to the Company that should read SPGK Cayman.

115. Mr Singla emphasised that recital (E) refers to funds "held on behalf of [the Company] and does not use the word "trust" and says nothing about the true ultimate beneficial ownership of the funds. Mr Singla submitted that Recital (E) was poorly drafted and also mistakenly drafted in that SPGK Cayman should have been inserted in place of the reference to the Company. As part of the process of construction the court has the power to correct obvious mistakes in the written expression of the parties and once corrected the contract is interpreted in its correct form. Mr Singla says that the "mistake and the correction are

clear". Reference is made to Recitals (A), (B) and (G) and Mr Singla submitted that taken together they clearly proceed on the basis that AOS and SPGK have been providing in the past commission payment services to SPGK Cayman and SPGK Singapore and both SPGK Cayman and SPGK Singapore intend to continue the arrangement by entering into a new commission payment services agreement. Mr Singla says recital (E) which refers to "various services" needs to be read not only with the underlying facts (movement of cash flow) but also with other documents including the agreements with Planet Payment and the Consulting Service Agreement between SPGK LLC (a wholly owned subsidiary of SPGK Cayman) and AOS which clearly shows that AOS was handling funds on behalf of SPGK Cayman. Mr Singla submitted that the Deed did "not reflect the true position which has been demonstrated by the Alix Report." The main thrust of Mr Singla's submissions was that the error (and the correction required) to Recital E is clear: for the Company, read SPGK Cayman.

116. Mr Singla submitted that "overwhelmingly, monies are going into the BoW accounts for a purpose, which is to pay commission payments that are due. It's my submission that these monies, 11 million odd, should be paid for commission outstanding as at the date received." (Day 2 pages 94 – 95). The monies are subject to a "*Quistclose* agreement", submitted Mr Singla. Mr Singla submitted that in order to deal with the mistake/rectification points the court would need documents and there has been no discovery in this case.

**<u>Determination of construction issue</u>**

117. I have considered the respective arguments on the proper construction of the Deed. Both sides make reference to Clause 3.1 which I have considered in detail. I note also in particular Recital E. I have considered all the recitals and the whole Deed.

118. I agree with Ms Leahy that on the true construction of the Deed when read as a whole, the BoW Funds were to be remitted to Scuderia Bianco to be held for the Company.

119. There is nothing in Mr Singla's trust or mistake/rectification arguments. If Mr Singla's client wished to obtain rectification relief from the court in respect of the Deed it should have applied long before now. Furthermore, there is no plain and obvious mistake. The mistake/rectification arguments appear quite hopeless.

120. Mr Singla during his oral submissions did not address me in detail in respect of the alleged *Quistclose* trust, although I note all he writes in his skeleton argument on this topic. I have considered the evidence and arguments presented. Sometimes the doctrines of equity do not easily fit into a commercial context especially where the position is governed by express contractual agreements or arrangements. In my judgment the evidence in this case does not establish a *Quistclose* trust. The comingling is a strong indicator that no such trust was intended. The Deed speaks for itself and is also a contra indicator to any *Quistclose* trust. The requirements for and the features of a *Quistclose* trust are not established or present in this case.

**<u>The relief granted</u>**

121. In conclusion based on the evidence and arguments placed before the court I am content to grant the JOLs the following relief by way of directions to the JOLs:

(1) the JOLs may treat the BoW Funds as unencumbered assets of the Company;

(2) the JOLs may take possession of, collect and/or get in the BoW Funds; and

(3) the JOLs costs of and incidental to the Amended Summons may be paid from the assets of the Company as an expense of the official liquidation.

**Draft order and ancillary applications**

122. The attorneys should, within the next 7 days, file a draft order reflecting these directions for my approval. Any ancillary applications (such as costs) should be filed within 14 days together with a concise skeleton argument (no more than 5 pages) in support and any concise skeleton argument (no more than 5 pages) in opposition within 10 days thereafter. I will determine any ancillary applications on the papers.

David Doyle

**THE HON. JUSTICE DAVID DOYLE**
**JUDGE OF THE GRAND COURT**

**[2011 (2) CILR 484]**

# IN THE MATTER OF BELMONT ASSET BASED LENDING LIMITED

*Grand Court, Financial Services Division*

(Jones, J.)

**19 December 2011**

*Companies—liquidators—powers and duties—no unqualified right to be heard in sanction application under CWR, O.11, r.3(2) or r.4(2)(b) at company's expense—company in liquidation not party to liquidation proceedings but "subject-matter" of proceedings—if sanction application takes on form of inter partes action, court may authorize or direct JOLs to take no part—continued participation then at own risk as to costs*

Joint official liquidators were appointed to wind up the company on the just and equitable ground (in proceedings reported in *2010 (1) CILR 83*).

The petitioner, Bear Stearns, which applied in its capacity as a contributory, subsequently claimed to be an ordinary unsecured creditor of the company ("the Fund"). On legal advice, the JOLs concluded that Bear Stearns should be admitted to proof as an ordinary unsecured creditor but did not in fact follow this advice. Instead, they made a sanction application by which they sought the direction of the court that Bear Stearns be admitted to proof. In response, three shareholders issued a summons for directions and argued, *inter alia*, that the JOLs should take no further part in the proceeding. At the hearing, the three shareholders were supported by three unpaid redeemed shareholders (collectively "the Six Shareholders"). The Six Shareholders submitted that the JOLs should have either adjudicated the proof or adopted a neutral position and made a sanction application. The Grand Court made an order for directions that, *inter alia*, the sanction application be treated as an application by Bear Stearns against Finter Bank Zurich Ltd. (one of the Six Shareholders, which agreed to act in a representative capacity on behalf of all six) and that the JOLs take no further part in the application. The JOLs sought a variation of the direction that they take no further part in the application or alternatively for leave to appeal to the Court of Appeal. Finter applied for an order under the Companies Winding up Rules 2008, O.24, r.9(2)(a) and (b) that the applicants be deprived of their right to be paid the costs of the application out of the Fund's assets.

The JOLs submitted that (i) by virtue of O.11, r.3(2) and pursuant to their duty under O.11, r.4(2)(b) to swear an affidavit in reply to any sanction application, official liquidators had an unqualified right to be heard on every aspect of a sanction application; and (ii) as the purpose of

the sanction application was to resolve an issue about the contractual rights as between Bear Stearns and the Fund, the Fund was the respondent with a right to be heard. Finter submitted that the JOLs should be deprived of their right to be paid the costs of the present application out of the Fund's assets on the basis that their application was "unnecessary" or "unreasonable" within the meaning of O.24, r.9(2)(a) and (b).

**Held,** allowing the JOLs' application and rejecting the Six Shareholders' application:

(1) O.11, r.3(2) did not give the JOLs an unqualified right to be heard on every aspect of a sanction application at the expense of the company. When a sanction application took on the character of an *inter partes* action between stakeholders in which substantive rights against the company would be determined, the court could authorize or direct that the JOLs take no further part in the proceeding in order to avoid incurring unnecessary expense. Moreover, the JOLs' duty under O.11, r.4(2)(b) did not give them an ongoing right to be heard. They had already put the relevant documents in evidence and the evidence was undisputed and accepted by all parties as complete (paras. 12–14).

(2) The Fund was not a "party" to the liquidation proceeding; it was the "subject-matter" of the proceeding. The JOLs did not make the sanction application as agent on behalf of the company, but commenced it in their own right. It followed that the Fund had not been deprived of any right to be heard (para. 15).

(3) Though the court was not persuaded that the JOLs' continued participation in the application would serve any useful purpose, the direction that the JOLs take no further part in the sanction application was unnecessarily prescriptive. The court would vary it to provide that the JOLs were authorized to take no further part in the application but if they participated, they would do so at their own risk as to costs (para. 17).

(4) No leave to appeal would have been given as the case raised a pure liquidation case management issue and no point of principle which ought to be considered by the Court of Appeal (para. 18).

(5) As the JOLs were successful in their application to vary the direction, it was not "unnecessary" or "unreasonable" within the meaning of O.24, r.9(2)(a) and (b) and they should not therefore be denied their costs of the application (para. 19).

**Cases cited:**

(1) *Emergent Capital Ltd., In re,* 2011 (2) CILR 315, applied.

(2) *Traianedes v. Mercury Brands Group Pty. Ltd. (No. 2)*, [2010] FCA 1140, applied.

**Legislation construed:**

Companies Winding Up Rules 2008, O.11, r.3(2): The relevant terms of this paragraph are set out at para. 12.

O.11, r.4(2): "When a sanction application is made by the liquidation committee or any creditor or contributory—

. . .

(b) it shall be the duty of the official liquidator to swear an affidavit in reply or make a report which states whether he—

(i) supports the application; or

(ii) opposes the application, in which case his affidavit or report must contain the evidence and analysis upon which he relies in opposition to the application; or

(iii) adopts a neutral position, in which case his affidavit or report must contain any evidence, not already before the Court, which he considers to be relevant to the Court's decision."

O.16, r.1(4): The relevant terms of this paragraph are set out at para. 6.

O.24, r.9(2): "The official liquidator's costs of making a sanction application shall be paid out of the assets of the company unless the Court is satisfied that—

(a) the application ought not to have been made because the directions sought by the official liquidator were unnecessary and served no useful purpose; [or]

(b) the directions sought by the official liquidator were wholly unreasonable . . ."

Companies Law (2011 Revision), s.110(3): The relevant terms of this sub-section are set out at para. 13.

*P. Hayden* and *S. Dickson* for the applicants;

*F. Hughes* for the respondent;

*A. Bolton* for Bear Stearns.

1. **JONES, J.:** This is an application by the Official Liquidators of Belmont Asset Based Lending Ltd. (referred to as "the Fund" and "the JOLs") for an order that my order for directions made on November 24th, 2011 in connection with a sanction application be varied or, alternatively, for leave to appeal to the Court of Appeal.

2. The Fund was put into compulsory liquidation on the basis of a contributory's petition presented by Bear Stearns on the ground that the Fund had "lost its substratum" in that it was no longer possible to carry on its investment business in accordance with the reasonable expectations of its participating shareholders (see *2010 (1) CILR 83*). For present purposes it is relevant to make two observations about the hearing on the winding-up petition. First, Bear Stearns was represented by Mourant

Ozannes and Mr. Simon Dickson, a senior associate of the firm, appeared on its behalf. Second, Bear Stearns did not claim to be a creditor and the winding-up order was made on the assumption that the Fund was solvent as against its ordinary unsecured creditors.

3. Bear Stearns subsequently claimed to be an ordinary unsecured creditor for US$62,865,599, being the amount of the "strike" allegedly payable by the Fund as at December 31st, 2008 pursuant to the option agreement dated April 27th, 2007. Bear Stearns has not actually submitted a proof of debt and the manner in which its claim was asserted has not been explained to the court. The JOLs took advice about this claim from Mourant Ozannes, the attorneys who acted for Bear Stearns on the winding-up petition. They obtained an opinion from Mr. Ian Milligan, Q.C. Based upon this legal advice, the JOLs have concluded that, upon the true construction of the option agreement, Bear Stearns should be admitted to proof as an ordinary unsecured creditor. This conclusion and their reasons for it are set out in their second report dated July 8th, 2011, para. 6.1.4 of which states as follows:

"Of particular significance, the liquidators have carefully considered the position of [Bear Stearns] and concluded that [Bear Stearns] should rank as an unsecured creditor of the [Fund] for approximately $61m., plus accruing interest. This claim, discussed further below, will rank ahead of all other parties including deferred creditors, i.e. redeemed but unpaid shareholders."

Paragraph 6.5 of the second report comprises a detailed analysis of the option agreement and sets out the JOLs' reasons for reaching their conclusion that Bear Stearns' claim should be admitted to proof. However, for reasons which have not been satisfactorily explained to the court, the JOLs have *not* actually admitted Bear Stearns to proof.

4. The conclusion that Bear Stearns is an ordinary unsecured creditor for US$61m. is highly significant from the point of view of the Fund's shareholders and unpaid redeemed shareholders. The JOLs' estimate of the likely realizations is between US$41.3m. (at worst) and US$51.6m. (at best). It follows that the consequence of admitting this claim is that the Fund would be insolvent and there will be no distribution to the shareholders. Nor will there be any distribution to the unpaid redeemed shareholders whose claims rank behind those of the ordinary unsecured creditors. The only other ordinary unsecured creditors whose claims would rank equally with Bear Stearns are three former service providers. Paragraph 7.2 of the second report states that US$79,654 has been paid (presumably at a time when the JOLs still considered the Fund to be solvent) and that further claims of €16,545, $24,092 and CHF5,816 have been received. By themselves, these claims are not material to the final outcome of the liquidation but the interest of these creditors coincides with that of the Six

Shareholders. Their claims will be paid in full only if Bear Stearns' claim is rejected.

5. In spite of publishing a report to the shareholders in which the JOLs state unequivocally their conclusion that Bear Stearns should be admitted to proof as an ordinary unsecured creditor for approximately US$61m., they have not actually done so. Instead, they issued a summons on August 5th, 2011 by which they seek a direction of the court that Bear Stearns be admitted to proof in the amount of US$59,957,747 plus interest, pursuant to the Companies Law (2011 Revision), s.149. The time estimate given for the hearing of this summons was two days. On August 26th, 2011, a copy of the summons was sent to all the Fund's shareholders and creditors under cover of a letter from the JOLs' attorneys in which they proposed a timetable for serving evidence and skeleton arguments in opposition. In response, Bear Stearns gave notice of its intention to appear and support the JOLs' application. Three shareholders, namely Belmont SPC, Finter Bank Zurich Ltd. and Commerzbank AG, issued a summons for directions on October 25th, 2011 and argued, *inter alia*, that the JOLs should take no further part in the proceeding. When this summons came on for hearing on November 18th, 2011, the three shareholders were supported by three unpaid redeemed shareholders whose claims will rank after Bear Stearns' claim. They are ABN Fund Services Bank (Cayman), Barclays Bank Plc and Andorra Banc Agrigol Reig SA. For convenience, I shall refer to all these shareholders and unpaid redeemed shareholders collectively as "the Six Shareholders."

6. The position adopted by the Six Shareholders may be summarized as follows. First, they rightly make the point that official liquidators must be independent and must act with complete impartiality as between the various stakeholders who have competing claims as against the Fund. In particular, the Companies Winding Up Rules 2008, O.16, r.1(4) states that—"it is the duty of the official liquidator to adjudicate the creditors' claims, for which purpose he acts in a quasi-judicial capacity," which implies a duty to ensure that interested parties are given a fair hearing and a duty to observe the rule against bias. It is said that the JOLs have offended these rules by retaining Bear Stearns' former attorney to make the sanction application in respect of its own claim. For this reason alone, it is said that the JOLs should take no further part in this proceeding, in spite of the fact that Bear Stearns is now represented by different attorneys. There may be circumstances in which it is not inappropriate for official liquidators to retain the same attorneys who acted for the petitioning creditor/shareholder, but this case illustrates why it is generally wrong to do so. However, I declined to make any ruling about the propriety of retaining Mourant Ozannes, or continuing to do so after it became known that Bear Stearns would make what was bound to be a contentious claim.

I would have made the same order for directions even if this issue had not been raised.

7. Secondly, it was submitted that the JOLs should have dealt with Bear Stearns' proof of debt in one of two alternative ways. It is said that they should have adjudicated the proof, as it is their duty to do under CWR, O.16, r.1(4). If the JOLs had decided to admit the claim, then the shareholders would have been entitled to inspect the proof and the supporting documents, including any legal opinions (CWR, O.16, r.8), and make an application to the court for an order that it be expunged (CWR, O.16, r.20). Alternatively, if the JOLs considered that it was inappropriate for them to resolve the legal issues raised on this particular claim, they should have adopted a neutral position and made a sanction application, thus allowing each side of the argument to be put before the court in an *inter partes* proceeding between the competing stakeholders. I agree with these propositions. In fact, the JOLs have not adopted either course. On the one hand, they have not actually adjudicated the claim, with the result that the shareholders' right to inspect the proof and make an expungement application has not been triggered. On the other hand, they did not adopt a neutral stance. Instead, the JOLs have published a report in which they have stated, in unequivocal terms, their conclusion that Bear Stearns is entitled to be admitted to proof and they have issued a summons which seeks an order to this effect. The Six Shareholders felt that the JOLs were, in effect, "acting as Bear Stearns' advocate" on the sanction application and doing so at the expense of the estate. During the course of the original hearing on November 18th, the JOLs' counsel (Mr. Simon Dickson) told me that it was their intention to adopt a neutral position at the hearing and "to put both sides of the argument." Today, their counsel (Mr. Peter Hayden) said that the JOLs in fact intend to argue that Bear Stearns should be admitted to proof. The Six Shareholders say that Bear Stearns should be left to argue its own case and that it will serve no useful purpose for the JOLs to participate any further in this proceeding.

8. Thirdly, the Shareholders submitted that the JOLs' refusal to disclose the opinion of Mr. Ian Milligan, Q.C. unfairly prejudices all the stakeholders, including Bear Stearns. Whether or not the JOLs were entitled to assert a claim of legal professional privilege as against the Fund's shareholders and creditors, it was submitted that the JOLs ought not to do so. It was submitted that copies of the opinion, which has been obtained at the expense of the estate, should be disclosed to both the Shareholders and to Bear Stearns. In the event, the JOLs undertook to provide a redacted copy of the opinion to both sides with the result that it was not necessary for me to make any ruling on this part of the Six Shareholders' summons.

9. In all the circumstances of this case, I came to the conclusion that the proper course, and the most expedient course from a case management perspective, was to make a direction that the sanction application brought

by the JOLs be treated as an application by Bear Stearns (as applicant) against Finter Bank Zurich Ltd. ("Finter") (which agreed to act in a representative capacity) as respondent to determine whether, upon the true construction of the option agreement between Bear Stearns and the Fund, Bear Stearns is a creditor for the principal amount of US$59,957,747. I was told that there is no dispute about the underlying facts and so I directed that the parties should prepare an agreed statement of facts. Nor is there any dispute about quantum. It is agreed that Bear Stearns is either entitled to be admitted for the full amount of US$59,957,747 (plus interest) or not at all. I directed that the JOLs should take no further part in the application, except to the extent that their assistance might be sought in connection with the statement of facts.

10. Bear Stearns had notice of the hearing which took place on November 18th, but was not represented by counsel on that occasion. For this reason a draft of my intended order was sent to Bear Stearns' attorneys who were given an opportunity to make submissions. In the event, I made an order reflecting directions which were to a large extent agreed between the attorneys for Bear Stearns and the Six Shareholders, as set out in their joint letter dated November 24th. In summary, I directed, *inter alia*, that—

(a) the sanction application by which the JOLs seek an order authorizing and directing them to admit the claim of Bear Stearns shall be treated as an application by Bear Stearns (as applicant) against Finter Bank Zurich Ltd. ("Finter") (as representative respondent) to determine whether, upon the true construction of the option agreement, Bear Stearns is a creditor for US$59,957,747 plus interest;

(b) the JOLs shall take no part in the application;

(c) Bear Stearns and Finter shall prepare (with the JOLs' assistance) an agreed statement of facts on the basis of which the application will be determined; and

(d) various orders for costs.

11. By their summons dated November 24th, 2011 the JOLs now seek orders that they (a) be "joined as a party to the application for directions"; and (b) be "permitted to attend and make representations" to the court. Expressed in this way, the summons reflects a misunderstanding of the order for directions because the JOLs are a party to the sanction application and they have already been heard on it. What they actually seek is a variation of the direction that they take no further part in the application. Their grounds for varying this particular part of my order are as follows.

12. First, it is submitted that, by virtue of CWR, O.11, r.3(2), official liquidators have an absolute right to be heard on every aspect of every sanction application whether or not their participation would serve any

useful purpose and that the court has no jurisdiction to deprive them of their right or, if it does have an inherent jurisdiction, it should not have been exercised in the circumstances of this case. CWR, O.11, r.3(2) provides as follows:

"The official liquidator has the right to be heard on every sanction application and it is the official liquidator's duty to attend and be prepared to assist the Court in respect of any sanction application made by the liquidation committee or any creditor or contributory."

It goes without saying that an official liquidator has a right to be heard on his own sanction application. The purpose of CWR, O.11, r.3(2) is to give him a right to be heard on a sanction application made by a liquidation committee or any individual creditor or contributory, in effect preventing them from making an *ex parte* application. I do not accept that, upon its true construction, this rule gives official liquidators an unqualified right to appear and be heard at every stage of every application at the expense of the estate, even if the application takes on the character of an *inter partes* action between stakeholders in which substantive rights against the company will be determined. In the ordinary case the purpose of a sanction application is to provide the liquidator with guidance (which may be permissive or prescriptive) and to protect him against a claim for breach of duty. However, a sanction application may raise substantive issues in which case the court can go on and resolve substantive rights, thus making it unnecessary for a separate action to be commenced by or against the company. The JOLs' counsel referred me to *Traianedes* v. *Mercury Brands Group Pty. Ltd. (No. 2)* (2), a decision of the Federal Court of Australia in which Finkelstein, J. observed that it is common for the Australian court to proceed in this way. This court has followed the Australian example, as it did most recently in *In re Emergent Capital Ltd. (1)*. In that case the official liquidators commenced a sanction application by which they sought a direction whether or not to rectify the company's share register, which necessarily required the court to determine the validity of a share issue which had had the effect of substantially diluting the interest of one of the shareholders. The resolution of this issue turned on a number of disputed matters, in particular whether the company's directors had acted in breach of fiduciary duty. I directed that the issue be determined as between the company's two shareholders, who were the only parties in interest, for which purpose I directed the service of pleadings and the matter proceeded in the same manner as the trial of an action commenced by writ. Having found that the directors had acted in breach of duty, the resulting order took the form of a direction that the liquidators rectify the register. Having commenced the sanction application and obtained directions for trial of the substantive issue, the official liquidators took no further part in the proceeding because it would have served no useful purpose for them to do so.

13. When a sanction application takes on the character of an *inter partes* action, it is open to the court to authorize or direct that the official liquidators take no further part in the proceeding which they have commenced. The purpose of giving such a direction is to avoid incurring unnecessary expense. Mr. Hayden submits that this approach is wrong in law and that official liquidators have an unqualified right to participate in every aspect of every such proceeding, whether or not it would serve any useful purpose, although he concedes that they might thereby expose themselves to an order that their fees and expenses of doing so be disallowed. I do not accept this proposition. By the Companies Law (2011 Revision), s.110(3): "The exercise by the liquidator of the powers conferred by this section is subject to the control of the Court . . ." This means that the court has jurisdiction to make orders which either (a) direct a liquidator whether or not to exercise a power; or (b) authorize him to exercise or refrain from exercising a power. It also means that the court has jurisdiction to direct the liquidator to exercise a power in a particular way. In the ordinary course, the court's jurisdiction is exercised in response to a sanction application but it can be exercised of its own motion. However, it is also well established that the court does not exercise this jurisdiction by substituting its own commercial judgment for that of its official liquidator. In the context of this case, the court has jurisdiction to direct the JOLs to exercise their power of adjudication by directing them to admit Bear Stearns to proof or not, as the case may be. Similarly, the court has jurisdiction to direct them not to participate any further in the sanction application or, alternatively, authorize them not to do so. In my judgment, Mr. Hayden's interpretation of CWR, O.11, r.3(2) is inconsistent with the Companies Law, s.110(3); inconsistent with the established practice of this court; and would lead to an absurd result. Logically, if Mr. Hayden is right that official liquidators have an unqualified right to participate in every stage of every sanction application, including those which take on the character of *inter partes* proceedings, whether or not it would serve any useful purpose, of which the liquidator is the sole judge, then they (and their lawyers) must be entitled to be remunerated for doing so. This would be an absurd result. Mr. Hayden recognizes that the court must have jurisdiction under the Companies Law (2011 Revision), s.109(1) and the CWR, O.24, r.9 to disallow payment of the liquidator's remuneration and legal fees out of the assets incurred in connection with the conduct of a sanction application, notwithstanding that it was properly commenced. I think this amounts to an acceptance that the court's jurisdiction to control official liquidators extends to controlling the way in which they deal with or participate in sanction applications. As officers of the court, official liquidators are never given a blank cheque.

14. It is also submitted that the JOLs have a duty under CWR, O.11, r.4(2)(b) to swear an affidavit in reply to any evidence adduced by Bear Stearns and/or Finter. As I understand this submission, it is another aspect

of the jurisdictional argument in that it is said that I had no jurisdiction to make para. 4 of the order for directions because it somehow interferes with the JOLs' duty under CWR, O.11, r.4(2)(b). Mr. Hayden's submission that the JOLs must remain actively involved in this application and must review all the legal arguments deployed by Bear Stearns and Finter in order to avoid the risk, no matter how remote, that some material factual evidence might not be put before the court is wholly unrealistic. It reflects a misunderstanding of the JOLs' role in this case. They have already sworn an affidavit to which they have exhibited copies of all the relevant documentary evidence. This evidence is undisputed and all counsel (including Mr. Hayden) are agreed that it appears to be complete. As reflected in para. 5 of my order for directions, counsel are also agreed that the outstanding issue can and should be determined on the basis of an agreed statement of facts. In these circumstances, Mr. Hayden's submission based upon CWR, O.11, r.4(2)(b) appears to me to be artificial and contrived. The JOLs have already put the relevant documents in evidence. There is no suggestion that the bundle of documents is incomplete, but if it turns out that some relevant document has been omitted, the JOLs may be asked (or directed) to swear an additional affidavit.

15. Secondly, it is said that because the purpose of the sanction application is to resolve an issue about the contractual rights as between Bear Stearns and the Fund—"it is [the Fund] which must be the respondent"—and that I had no jurisdiction—"to deprive the Fund of its right to be heard." This argument reflects a misunderstanding of the liquidation process and the liquidator's role, which is to collect and realize the assets and then distribute them in accordance with the statutory scheme. The Fund continues to exist as a legal entity throughout the liquidation process and ceases to exist only when the order for dissolution is made. However, it is wrong to characterize the Fund as a "party" to the liquidation proceeding. It is the "subject-matter" of the proceeding. The right to commence a sanction application is a right arising under the Law and the Rules which belongs to its official liquidators personally. They do not make the application as agent on behalf of the company. The company is not a party to the application. It is the subject-matter of the application, the outcome of which will be an order directing or authorizing the liquidator to exercise or refrain from exercising his powers in some way. The mere fact that a sanction application takes on the form of an *inter partes* proceeding between stakeholders does not change the fact that the company is the subject-matter of the proceeding. The Fund never was a "party" to the sanction application in the sense that the JOLs commenced the application as agent on its behalf. The JOLs commenced the sanction application in their own right and the end result will be a direction addressed to them personally requiring them to admit Bear Stearns to proof or not, as the case may be. It follows that para. 4 of my order for directions has not deprived the Fund itself of any right to be heard. It

merely constitutes a decision that, in the particular circumstances, it is appropriate for the court to determine what direction to give to the JOLs without any further input from them.

16. The order for directions is a procedural one which does not itself determine any substantive rights and is therefore capable of being varied, but I should only vary it if there has been some material change of circumstances or some relevant point has arisen which was not taken into account at the original hearing. Clearly, there has been no change of circumstance. In effect, I have given counsel for the JOLs a second opportunity to explain why it would serve some useful purpose to incur the cost of their continued involvement in the application. Mr. Hayden's arguments are wholly unconvincing. The reality is that Bear Stearns is perfectly capable of arguing its own case. Since the JOLs have already come down in Bear Stearns' favour, the only person who can put the contrary argument in the interests of the other stakeholders is Finter, acting in its representative capacity. Since the issue is a pure point of law which will be decided upon an agreed statement of facts, based upon documentary evidence which has already been put before the court by the JOLs, counsel instructed by Finter should be perfectly capable of putting the contrary argument against treating Bear Stearns as an ordinary unsecured creditor. In reality, there is nothing more for the JOLs to do, or at least not unless they are asked by the court to contribute for some reason which is at present unforeseeable.

17. In my judgment this case has given rise to an ordinary liquidation case management issue, which has to some extent been obscured and made unduly contentious by an unfortunate combination of circumstances. The fact that Bear Stearns' own attorneys are now acting for the JOLs and are advocating a position which is highly favourable to their former client and highly unfavourable to all the other stakeholders inevitably exposes the JOLs and Mourant Ozannes to criticism. The fact that the JOLs claim to have devoted a substantial amount of time, effort and money towards establishing that Bear Stearns is entitled to be treated as a creditor raises questions because Bear Stearns originally claimed to be a shareholder and has not even filed any proof of debt. Whilst it is perhaps understandable that this combination of circumstances should have generated some heated argument, at the end of the day this is a straightforward liquidation case management issue. I am not persuaded that the JOLs' continued participation in this application will serve any useful purpose but, on reflection, I do think that para. 4 of my order for directions was unnecessarily prescriptive. I will vary it to provide that—"the JOLs are authorized to take no further part in the application." If they participate, they will do so at their own risk as to costs. The Six Shareholders accept that the JOLs are entitled to their costs of commencing the sanction application and preparing the evidence, but they have put the JOLs on notice that if it turns out

that their continued participation has served no useful purpose, they will be faced with an argument that the additional costs incurred should be disallowed under CWR, O.24, r.9(2)(a).

18. Having allowed the JOLs' application to vary my order for directions, it is not necessary for me to go on and consider whether to grant leave to appeal. However, I would have refused leave to appeal on the basis that this is a pure liquidation case management issue and it raises no point of principle which ought to be considered by the Court of Appeal.

19. Finally, I reject the Six Shareholders' application for an order pursuant to CWR, O.24, r.9(2)(a) and (b) depriving the JOLs of their right to be paid the costs of this application out the Fund's assets. The JOLs have succeeded in persuading me to vary para. 4 of my order for directions and so it cannot be said that their application was "unnecessary" or "unreasonable" within the meaning of these rules.

*Application allowed.*

*Mourant Ozannes* for the applicants; *Conyers Dill & Pearman* for the respondent; *Appleby* for Bear Stearns.

**[2016 (1) CILR 309]**

## IN THE MATTER OF CALEDONIAN SECURITIES LIMITED (IN OFFICIAL LIQUIDATION)

GRAND COURT, FINANCIAL SERVICES DIVISION (Smellie, C.J.) May 5th, 2016

*Companies—liquidators—liquidation of securities investment business—court may order liquidators' fees and expenses of returning custody assets to customers to be paid from custody assets (held on trust by company)—costs to be proportionate and reasonably incurred in returning assets to beneficial owners—if complex liquidation of securities company with 188 custody asset customers, liquidators' costs may be divided proportionately between customers (with 30:70 cash to securities weighting) rather than requiring strict accounting of exact cost of returning each customer's assets*

The applicants applied for an order entitling them to recover their fees and expenses from assets held on trust by the company of which they were liquidators.

The applicants were joint official liquidators of a company which, prior to its liquidation, had provided fiduciary and custody brokerage services. The company (and various sub-custodians) held cash and securities on trust for its 188 customers ("custody asset customers"). At the time of appointment of the liquidators, the value of the custody assets was approximately US$573m.

Returning the assets to their beneficial owners was a complex process. The applicants incurred indirect costs (including the cost of forensic work, the steps taken to secure data held by the company and the preliminary attempt to sell the business of the company); trading costs (including the cost of retaining essential company staff and overhead costs incurred by the company); legal costs; voluntary liquidation costs; and disbursements (*i.e.* personal payments made by the applicants in relation to statutory advertising and filing of notices at the Registry of Companies). The applicants applied for an order entitling them to recover sums in respect of their fees and expenses from the trust assets. The court authorized them to deal with the custody assets in accordance with the instructions of each customer. They were not required to deal with any customer's assets until the customer paid 1% of its assets (or authorized such payment) into a reserve account established by the applicants. That account was established and distributions were made to a large majority of customers.

The applicants brought the present application seeking an allowance for their work in relation to the custody assets generally (not in relation to the liquidation of the company); the extent of any such allowance; and directions as to how it should be satisfied (*i.e.* from the reserve generally, or in some other manner). They submitted that the court had an equitable jurisdiction to grant an order enabling them to have recourse to the custody assets to recover their fees and expenses. As regards apportionment, the applicants identified several different methods, none of which the objectors accepted. The applicants acknowledged that none of the methods was precise but proposed that the court should approve the method whereby the reserve of each custody asset customer would bear a proportionate share of the total costs by reference to the total value of all custody assets, subject to a cash to securities adjustment of 30:70, which reflected the increased costs of dealing with securities compared to cash.

Four customers, who (together with the liquidation committee of one of the sub-custodians, which also expressed concern) were the beneficial owners of 55% of the assets, objected to the application. They submitted that, since the assets from which the applicants wished to recover their costs and expenses were trust assets and did not form part of the company's liquidation estate, the applicants were obliged simply to return them to their beneficial owners with no deductions in respect of their fees and expenses other than the actual costs of returning the assets. The objectors were concerned that they would be disproportionately affected by the requirement to contribute 1% of their assets to the reserve. They submitted *inter alia* that (a) the applicants' proposed method of apportionment was inequitable because it required customers whose legal position was straightforward to bear a higher proportion of the costs on the ground that they held a greater proportion of the trust assets even though the legal position of some customers who held fewer assets was more complex and expensive to resolve; and (b) the applicants should instead be required to calculate and charge each customer the exact costs incurred in returning its trust assets. In relation to the quantum of the fees and expenses that the liquidators sought to recover, the objectors submitted that (a) if the applicants were permitted to recover their fees and expenses from the assets by virtue of their role as agents of necessity for the liquidated company, they could only recover expenses that were reasonably incurred and proportionate to the end to be achieved; (b) the court should require them to explain and justify specifically each aspect of the costs that they sought to recover; (c) the test of reasonableness was whether a prudent man in similar circumstances would have spent his money in the way that the liquidators did; and (d) to this end, the court should appoint an independent assessor to scrutinize the applicants' claims for fees and expenses.

**Held,** allowing the application:

(1) The court had an inherent equitable jurisdiction to order liquidators' fees and expenses to be paid from trust property held by a company in

liquidation provided such fees and expenses were reasonably incurred in returning the trust property to those beneficially entitled to it. The complex work carried out by the applicants in the present case had been necessarily required and it had been for the benefit all customers. The applicants' skill and labour might not have added directly to the respective value of the underlying custody assets of each trust but, taken as a whole, they doubtlessly added value to the assets in the sense that the work was necessary before any of the assets could have been retrieved for the benefit of the custody asset customers. If the applicants had not done the work, the same tasks would have had to be carried out by someone else, probably a receiver, at similar or greater expense. Furthermore, the applicants were officers of the court, not mere intermeddlers, and were not expected to undertake their work for the benefit of the custody asset customers at their own expense. The costs and expenses strictly referable to the winding up of the company (including the liquidators' remuneration) were payable out of the company's own assets and not the assets held on trust, but the custody assets were available for the reasonable fees, costs and expenses incurred in sorting out the assets and continuing to manage or administer them (para. 33; paras. 41–48; para. 55; paras. 60–63).

(2) The applicants' proposed method of apportionment would be adopted. Although it was imprecise and imperfect in that it would require some assets which were simple to administer to subsidize others which were more expensive, sharing their fees and expenses between all customers proportionate to the value of their assets was broadly the best way to ensure fairness and equality. It was not an attempt at an exact accounting for the costs of administering the respective custody assets but was, in broad terms, the best that the applicants could do to meet the rule that equality was equity (equality in this sense meaning that the respective custody assets were all allocated the same percentage share of the costs (subject to the 30:70 cash to securities ratio)). A liquidator recovering his costs in these circumstances would not necessarily be required to follow the same strict duty to account that would ordinarily be expected of a trustee. The method proposed by the objecting customers would require the applicants to incur significant extra expense in calculating exactly how much had been spent returning each customer's assets and would be imprecise in any event because some of the applicants' work was not specific to the assets of any particular customer. The objectors' proposal would be inequitable as there would also be a risk that the applicants would not recover all of their costs: apart from the reserve, the custody assets had already been paid out to most customers and there was no fund available to meet any further costs found to be due (paras. 65–74).

(3) The liquidators could only recover fees and expenses that had been reasonably incurred and proportionate to the end to be achieved. The relevant considerations included (a) the amount of time worked; (b) the complexity of the case; (c) any exceptional responsibilities required; (d) the effectiveness of the liquidators' operation; and (e) the value and nature

of the property involved (here, the custody assets) relative to the expense of the work undertaken. The applicants had not yet provided sufficient detail in respect of these matters. They would be required to provide to the objectors and the liquidation committee of the sub-custodian detailed information to explain and justify each aspect of the costs they sought to recover and invite their argument as to quantum. As the majority of the costs claimed were expenses in respect of payments to third parties rather than the liquidators' own remuneration, there was no need to incur the expense of appointing an independent assessor. If there were no agreement on quantum, the issue could be returned to the court (paras. 75–84).

**Cases cited:**

(1) *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, 2010 (1) CILR 553, referred to.
(2) *Allanfield Property Ins. Servs. Ltd.* v. *Aviva Ins. Ltd.*, [2016] Lloyd's Rep. I.R. 217; [2015] EWHC 3721 (Ch), referred to.
(3) *Ayerst (Inspector of Taxes)* v. *C. & K. (Constr.) Ltd.*, [1976] A.C. 167; [1975] 3 W.L.R. 16; [1975] 2 All E.R. 537, considered.
(4) *Berkeley Applegate (Investment Consultants) Ltd., In re*, [1989] Ch. 32; [1988] 3 W.L.R. 95; [1988] 3 All E.R. 71; [1989] BCLC 28; (1987), 4 BCC 274; further proceedings, *sub nom. In re Berkeley Applegate (Investment Consultants) Ltd. (No. 3)* (1989), 5 BCC 803, applied.
(5) *Boardman* v. *Phipps*, [1967] 2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, referred to.
(6) *Caledonian Bank Ltd., In re*, 2015 (1) CILR 143, referred to.
(7) *China Pacific S.A.* v. *Food Corp. of India (The Winson)*, [1982] A.C. 939; [1981] 3 W.L.R. 860; [1981] 3 All E.R. 688; [1982] 1 Lloyd's Rep. 117, followed.
(8) *Downshire Settled Estates, In re*, [1953] Ch. 218; [1953] 2 W.L.R. 94; [1953] 1 All E.R. 103, followed.
(9) *Duke of Norfolk's Settlement Trusts, In re*, [1982] Ch. 61; [1981] 3 W.L.R. 455; [1981] 3 All E.R. 220, referred to.
(10) *G.B. Nathan & Co. Pty. Ltd., In re* (1991), 24 NSWLR 674; 5 ACSR 673; 9 ACLC 1291, referred to.
(11) *Lehman Bros. Intl. (Europe)* v. *CRC Credit Fund Ltd.*, [2012] 3 All E.R. 1; [2012] Bus. L.R. 667; [2012] 1 BCLC 487; [2012] UKSC 6, referred to.
(12) *Marine Mansions Co., In re* (1867), L.R. 4 Eq. 601, referred to.
(13) *Mirror Group Newspapers plc* v. *Maxwell (No. 2)*, [1998] BCC 324; [1998] 1 BCLC 638, referred to.
(14) *Scott* v. *Nesbitt* (1808), 14 Ves. Jun. 438; 33 E.R. 589, referred to.
(15) *SPhinX Group, In re*, 2012 (2) CILR *N* [11], considered.
(16) *Wight* v. *Eckhardt Marine G.m.b.H.*, 2003 CILR 211; [2004] 1 A.C. 147; [2003] 3 W.L.R. 414; [2003] BCC 702; [2004] 2 BCLC 539; [2003] UKPC 37, referred to.

*R. Levy, Q.C.* for the joint official liquidators;
*T. Lowe, Q.C.* for Global Asset Allocation Fund, Saad Investments Finance Company (No. 5) Ltd. and Bristol Investment Fund Ltd.;
*D. Harby* for Nova Holding Group Ltd.;
*J. Hale* for the liquidation committee of Caledonian Bank Ltd.

1 **SMELLIE, C.J.:** This application concerns the entitlement of the joint official liquidators ("the JOLs") of Caledonian Securities Ltd. ("CSL") to fees and expenses from the assets held by CSL on trust for its customers and, where such entitlement is established, the quantum of such fees and expenses.

2 The position of the JOLs is that they should be allowed to recover their fees and expenses from a reserve of a percentage of the assets which has been established by order of this court, as explained below.

**Background**

3 Caledonian Bank Ltd. ("CBL") and CSL (together "the companies") are ordinary resident limited liability companies incorporated in 2007 and 2011 respectively under the Companies Law (2013 Revision). CBL held a "Category A" banking licence in the Cayman Islands, and CSL held a full securities investment business licence to carry on business in and from the Cayman Islands.

4 The licences were revoked by the Cayman Islands Monetary Authority ("CIMA") on February 16th, 2015, following the appointment of Claire Loebell and Keiran Hutchinson of Ernst & Young as controllers of the companies on February 10th, 2015.

5 Ms. Loebell and Mr. Hutchinson were later appointed as the JOLs of the companies by winding-up orders made on February 23rd, 2013 upon a petition presented by the CIMA.

6 CSL's business was the provision of fiduciary custody and brokerage services to its customers and the JOLs have established that it provided such services to 188 customers. The assets under CSL's custody and that of the various sub-custodians engaged by it (which included CBL) are comprised of cash and securities. As such, their value has fluctuated but, as at the date of the appointment of the JOLs, the value was in the order of US$573m.

7 Accordingly, and upon receiving confirmatory legal advice as to the nature of their position, the JOLs found themselves in control of substantial assets that did not belong beneficially to the companies (generally referred to in the evidence as "custody assets"), but rather were controlled by the companies as trust assets for their customers (likewise referred to as "custody asset customers").

8 In keeping with further advice from leading counsel, the JOLs, by summons dated May 11th, 2015 (the "May 11th, 2015 summons") sought an order:

(i) entitling them (subject to complying with all relevant anti-money-laundering regulations) to deal with custody assets at the direction of custody asset customers; and

(ii) directing that the custody asset customers would pay the JOLs for acting in accordance with their instructions.

9 The May 11th, 2015 summons was heard on June 24th, 2015 and on that day by order the JOLs were authorized:

(i) to deal with those assets that are held to the order of CSL in its capacity as provider of custodian services to customers of CSL or are held to the order of CBL as sub-custodian of CSL in accordance with the instructions of each custody asset customer and subject to the JOLs being satisfied, in each case, that the instructing custody asset customer is properly bound by the securities terms and conditions;[1]

(ii) to establish a reserve account equal to 1% of each custody asset customer's custody assets ("the reserve"); and

(iii) the JOLs would not be required to deal with any custody assets customer's custody assets until satisfied (in the JOLs' absolute discretion) that the relevant custody asset customer had paid the 1% or authorized the JOLs to deduct it from its custody assets to form part of the reserve.

10 On the basis of the June 24th, 2015 order, distributions have been made to a large majority of custody asset customers and the reserve has been established albeit, in some instances as will be discussed below, without the authorization of certain custody asset customers.

11 By her third affidavit filed in these proceedings, Claire Loebell explains the circumstances which are presented as justifying the position taken by the JOLs for recovery of their costs from the reserve.

12 In summary, she attests that the companies' record keeping was far from perfect, and that it took a great deal of time for the JOLs to acquire a complete picture of the companies' affairs as regards custody asset customers and their custody assets. These investigations included determining (a) the identity of all the custody asset customers; (b) the extent and location of their respective custody assets (that is, the identity of the

1 Those comprising the contracts by which custody assets were held by CSL as custodian. Clause 2.1 of CSL's securities terms and conditions expressly stated that: "Broker [*i.e.* CSL] shall hold the Property [*i.e.* all cash, securities and investments deposited] in trust for you, viz: the respective Custody Asset Customer."

sub-custodian and the specific assets held by it, if not held by CSL itself); (c) what contractual documentation the custody asset customers and/or the sub-custodians had with the companies; and (d) whether the custody asset customers had completed all relevant know-your-client and other anti-money-laundering documentation; and so on.

13 Whereas when the May 11th, 2015 summons was issued it appeared to be the case that CSL had 175 custody asset customers, it subsequently was established that in fact it had 188. For the purposes of the May 11th, 2015 summons, the JOLs segregated the custody asset customers into six categories, each depending upon the contractual arrangements that the JOLs understood their members to have with CSL.

14 Pursuant to the order of June 24th, 2015, the JOLs were thus able to deal with the assets of a very large number of custody asset customers. For the purposes of the present application, the JOLs have broken down the general body of custody asset customers into two groups, namely:

(i) "resolved customers"—being those customers whose custody assets (save for their 1% contribution to the reserve) have been, or will shortly be, dealt with in accordance with their instructions; and

(ii) "unresolved customers"—being those customers who, for a variety of reasons, such as a refusal to contribute 1% to the reserve, unresponsiveness or non-compliance with anti-money-laundering requirements, are not yet capable of having their custody assets dealt with in accordance with their instructions.

15 Whilst the hearing of the May 11th, 2015 summons determined how the JOLs could deal with custody assets, including the creation of the reserve, it did not determine:

(a) whether the JOLs should be granted an allowance for their work in relation to custody assets generally;

(b) the extent of that allowance; or

(c) how such allowance should be satisfied (that is, whether from the reserve generally, or in some other manner).

16 These three questions now arise for resolution. The essential difficulty is that the custody assets are trust assets held on behalf of the custody asset customers and so do not belong to the liquidation estate of CSL. Accordingly, the JOLs have no direct legal entitlement to recover their fees and expenses *qua* liquidators of CSL from the custody assets.

17 The distinction between the costs of the JOLs incurred in relation to the liquidation of CSL and the fees and expenditure of the JOLs relative to their work done in relation to the custody assets generally must therefore be strictly observed. As will become clearer below, it is in respect only of

the latter that I am asked to grant allowance from the custody assets upon the JOLs' present application.

18 While the vast majority of the custody asset customers are on notice of the JOLs' application and have raised no objection, those four appearing as represented by Mr. Lowe, Q.C. and Mr. Harby ("the objectors") object on the primary basis that, as the custody assets are trust assets which do not belong to the liquidation estate of CSL, the JOLs have no right of recourse to them to meet their fees or expenses but are obliged simply to return them to the respective custody asset customers, it being conceded that they may withhold from the reserve only so much as is referable to the actual costs of returning the respective custody assets. While the objectors are a tiny minority in number of 188, they represent (along with the liquidation committee of CBL ("the LC"), which also expresses concern) some 55% in value of the custody assets and so are concerned that they would be disproportionately affected by having to contribute 1% of their assets to the reserve. They assert that there is in law no basis for requiring the respective custody asset customers to subsidize the costs attendant upon returning the assets of other customers or the general costs of the liquidation; and that it is inequitable for those custody asset customers whose legal position is straightforward to bear a comparatively higher proportion of costs simply because they have a higher value of assets under custody than those who may have less valuable assets under custody but whose position may be more complex and/or time consuming and would therefore require more investment of resource to resolve.

19 The pivotal issues to be decided can therefore be framed as follows: (a) what jurisdiction may I invoke for the allocation of the costs so as to recognize the JOLs' entitlement to recover from the reserve; (b) in what proportions are the costs to be allocated if, as proposed by the JOLs, there should be different apportionments for different groups of custody asset customers; and (c) are the amounts of the costs reasonable and proportional?

**The costs incurred by the JOLs**

20 Ms. Loebell explains in her third affidavit that the costs incurred by the JOLs are broken down into a number of categories (and sub-categories). On behalf of the JOLs, Mr. Levy, Q.C. emphasizes the importance of the court's understanding that the JOLs were faced with a complicated task and invites me to pay close attention to Ms. Loebell's explanation of the work done and the costs incurred. The various heads of costs or expenses incurred and work done are summarized as follows:

(a) Indirect costs—these included the costs of forensic investigations carried out by the JOLs' staff, the steps taken to secure data held by CSL, and the costs of the JOLs' preliminary attempt to sell the business of CSL:

(i) As regards computer imaging work, Ms. Loebell explains that this work was undertaken by a forensic investigation and dispute services team engaged especially for the purposes. This work was necessary in order for the JOLs to have a complete forensic copy of all of CSL's data (wherever stored), not only for the purposes of identifying and preserving information relating to custody asset customers, but also in order to respond to proceedings commenced by the US Securities and Exchange Commission ("SEC") which exposed custody asset customers to risk by way of a temporary restraining order ("TRO") imposed at the behest of the SEC over custody assets order and which was the most proximate cause of CSL's controllership by CIMA and its current winding up. Some 107,360 documents were reviewed, 75,481 of which related to trading of securities that were the subject of the SEC complaint.

(ii) As to the costs associated with a possible sale of CSL's business, Ms. Loebell explains that, had CSL's business been transferred to a third party, then the subsequent costs the JOLs incurred would likely have been avoided as that third party would have become the custodian. Had the business been sold, it is to be assumed that the third party would have continued CSL as a going concern without disruption to the custodianships. The costs incurred in seeking to sell the business were therefore, it is proposed, largely incurred for the benefit of custody asset customers and are properly recoverable from the reserve.

(iii) As things have turned out, the reality is that the indirect costs amount to US$1,457,706 and CSL's general liquidation assets (that is, non-trust property not comprised of the custody assets) are US$1,112,633; a shortfall of US$345,023. The manner in which this shortfall will be treated by the JOLs is discussed below.

(b) Trading costs, which comprise:

(i) The costs of retaining essential CSL staff—those with the historical institutional knowledge of the custody asset customers and their respective custody assets—knowledge which would otherwise not have been available to the JOLs except at great expenditure, time and costs to acquire that

knowledge. Costs attributable to these staff members include salary and costs eventually associated with their termination.

(ii) The overhead costs incurred by CSL (electricity, water, *etc.*, and essential information services such as Bloomberg terminals).

(iii) The JOLs' actual time costs (described as covering an array of work such as reconciling accounts, dealing with CSL staff and sub-custodians, and processing custody assets including ensuring that know-your-client and other anti-money-laundering provisions are complied with, dealing with lawyers, complying with the JOLs' statutory duties to the court *qua* JOLs *etc.*), and

(iv) The costs charged to CSL by the independent sub-custodians and which the JOLs have, as far as possible, carefully allocated so as to ensure that they are charged to the respective custody assets.

(c) Legal costs, which include:

(i) Cayman Islands counsel's fees for preparing the May 11th, 2015 summons and supporting documentation, for advising on the legal status of custody asset customers and dealing with correspondence from them, and for dealing with the instant summons; and

(ii) the costs of US counsel in dealing with certain foreign sub-custodians (Morgan Stanley and Trade Station), who refused to deal with the JOLs in the absence of an order from the US court recognizing the JOLs' appointment.

(d) Voluntary liquidation costs—these costs were incurred through the actions of third parties because, shortly after the appointment of the controllership over CSL, its sole shareholder resolved to place CSL into voluntary liquidation. There was a hearing on February 12th, 2015 at which this court held that, whilst the voluntary liquidation was validly commenced, the voluntary liquidators appointed did not have power to control CSL as that power had vested in the controllers (a written ruling to similar effect in relation to CBL was handed down in *In re Caledonian Bank Ltd.* (6)). Thus, the costs of the voluntary liquidation must be met from the liquidation estate of CSL as no order was made against the sole shareholder personally.

(e) Disbursements—these are personal out-of-pocket payments made by the JOLs for which, to date, they have not been reimbursed and are said to have been incurred in relation to statutory advertising and filing of notices at the Registry of Companies.

21 Whilst the JOLs consider that the indirect costs—item (a)—are properly attributable to the custody asset customers, they propose to meet them from CSL's general assets, *i.e.* not from the reserve. As Ms. Loebell explains and as already mentioned, the indirect costs amount to US$1,457,907 and CSL's general assets are only US$1,112,633. There will therefore be the shortfall of US$345,023 also already mentioned and this will be absorbed by the JOLs. She explains that the JOLs are prepared to absorb these costs by way of providing a discount to their remuneration for the benefit of their liquidation estate. It is said that, in reality, this (along with future indirect costs of US$27,499 to be incurred) amounts to a substantial discount of 13.5% in the costs which would otherwise be proposed to be passed on to the custody asset customers. As will become clearer at para. 26 below, these two sums amounting to US$372,522 approximate a reduction of 25% in the JOLs' fees for their own services.

**Apportionment of costs**

22 The JOLs have communicated with the custody asset customers setting out the bases for the costs incurred (as described above) and the JOLs' proposed methods of meeting them. Such communication was first sent on October 5th, 2015 to 152 recipients but feedback was received from only three (now among the objectors) who opposed on differing bases, namely:

(i) A custody asset customer who had only cash on deposit and who argued that, as its cash position was easier to deal with, it did not believe the JOLs' proposal (which included a proportional weighting of costs depending on the relative ease or complication of dealing with respective custody assets) was equitable so far as it was concerned;

(ii) A custody asset customer whose assets comprised cash, securities and certificates and who objected to the JOLs' entitlement to recover their costs as against its assets at all, as a matter of principle; and

(iii) A custody asset customer who disputed that it is subject to the order of June 24th, 2015 and has therefore refused to provide its consent to the JOLs withholding its contribution to the reserve (resulting in the JOLs being unable to distribute its assets).

23 The JOLs recognize that, despite having spent a very significant amount of time dealing with the small minority in number of the custody asset customers who oppose (and who include the objectors), it would have been inappropriate to have entered into any agreement with them as the JOLs are obliged to deal equitably with *all* custody asset customers and any "deal" with one or more could be to the financial detriment of the others. Hence the instant application for the approval of the court in relation to the JOLs' ultimate proposal for apportionment of the costs.

**The JOLs' ultimate proposal for apportionment**

24 Having identified some seven different methods for apportionment, none of which received the acceptance of the objectors, the JOLs now propose for the court's acceptance their seventh method. They do so even while recognizing that none of the possible methods of apportionment is precise or perfect. The JOLs acknowledge that the only near-precise solution would be that which is proposed by the objectors—*viz.* to determine exactly how much time and money was spent in dealing with each custody asset customer and its respective custody assets (which in itself would be extremely difficult in relation to costs incurred prior to the commencement of distribution of custody assets; that is, prior to June 24th, 2015). However, and in any event, such a methodology, even if practicable, would still be imperfect as it would involve a degree of allocation by the JOLs, as certain work and expenses (such as reconciliation of accounts, electricity costs, Bloomberg fees, costs of CSL staff who did not and do not keep time sheets with narratives of tasks undertaken *etc.*) are not specific to particular custody asset customers. Accordingly, "precision" or "perfection" could only be achieved following an enormous amount of reconstructive work and at enormous cost. And even this premise, the JOLs say, should itself be queried because it would be no more than a mathematical apportionment of costs to each individual custody asset customer, which would not necessarily be truly reflective of the relative value and impact of the work undertaken in relation to the individual customer's custody assets.

25 Accordingly, the JOLs propose to base the apportionment on the actual costs incurred as at February 26th, 2016 and further on the JOLs' budgeted figures going forward until the "crystallization date," by which time they hope to have dealt fully with the custody asset customers. That would result in a total costs figure of US$4,233,419 ("the total costs") and which figure makes a full allowance for the indirect costs.

26 That being the overall context, it is important to note that, of the total costs, the JOLs' own remuneration will be less than one-quarter, *viz.* US$987,315. The rest—US$3,246,104—will comprise the trading costs, legal costs, voluntary liquidation costs and a small sum for disbursements, all as discussed above. And this figure of US$987,315 takes account of the US$372,500 in liquidation costs which the JOLs will forego.

27 The JOLs say that they have estimated as accurately as they can the total value of all custody assets as at the crystallization date ("the total value") and the reserve of each custody asset customer would bear a proportionate share of the total costs by reference to the total value, subject to a "cash to securities adjustment" of 30:70, which will reflect the respective costs of dealing with cash as opposed to securities. This would be their ultimate proposal for apportionment and would be applied to costs

incurred after June 24th, 2015, the date when the distribution of custody assets actually commenced.

28 Their proportionate share having been identified to be withheld from the reserve, resolved customers will each have a specific amount deducted and the balance attributable to their 1% will be returned to them following the outcome of this application.

29 As regards unresolved customers, if their assets are dealt with following the hearing of the instant summons and before the crystallization date, they would have been dealt with in the same manner save that in cases where their 1% contribution to the reserve has not yet been received, the exact calculated reserve amounts would be deducted from their assets and retained by the JOLs prior to transfer of their custody assets. However, unresolved customers remaining after the crystallization date will also be charged individually for any costs incurred that are directly attributable to them. This is only fair, say the JOLs, as the costs of dealing with those who object to the process should fall on them and not be charged to the resolved customers, who are entitled to have the balance of their 1% returned as soon as possible. It is, of course, possible that an unresolved customer may need to contribute more than 1% of its custody assets if the resolution is protracted. However, the JOLs do not anticipate that there will be many such customers and there may well be the need for a further application to the court after the crystallization date for directions on how to deal with such customers, once the final quantum of costs is known.

30 At para. 147 of her third affidavit, Ms. Loebell sets out a table showing the impact of the JOLs' ultimate proposal on the customers as described above. This shows that, depending on the nature and value of the assets, customers will eventually pay less than 1%—they will actually pay between 0.57% and 0.882% of the value of their custody assets, with "cash only" customers paying the lower percentage and "securities only" customers paying the higher percentage.

31 It is further noted by the JOLs that certain custody asset customers had their custody assets held by certain sub-custodians (namely MMO Harris/Curtland and RBC Investor Services Trust) who required CSL to pay the fees of executing transactions, rather than charging them directly to the assets under their respective sub-custodianship. As mentioned above, it is therefore proposed that those custody asset customers should bear the actual fees referable to such transactions, to be recovered by the JOLs from their respective reserves.

32 I now turn to consider the pivotal issues as framed at para. 19 above.

**Issue 1: jurisdiction and entitlement**

33 As first expounded in *In re Berkeley Applegate (Investment Consultants) Ltd.* (4) and as applied on many subsequent occasions (including by this court in *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (1)), it must now be regarded as settled principle that the court has an inherent equitable jurisdiction to direct that fees and expenses are paid from trust property held by a company in liquidation where such fees and expenses are reasonably incurred by the liquidator in returning the trust property to those entitled to it.

34 In *Berkeley Applegate*, the business of the company prior to its liquidation was to place funds on behalf of individual investors on the security of mortgages of freehold property which mortgages were taken in the company's name. All investors were provided with an investment scheme which stated, *inter alia*, that no costs whatsoever would be incurred by them. Apart from the assets of the liquidation estate of the company itself, moneys held in clients' accounts awaiting investment and the benefit of the mortgages were held as assets on trust by the company for the investors. At the commencement of the winding up, funds standing to the credit of the clients' accounts amounted to about £1.2m. plus interest of £29,509 and the total loans made and secured by mortgages amounted to about £10.2m. The expenses and fees of the liquidator were considerable and greatly exceeded the free assets of the liquidation estate of the company, which were therefore insufficient to meet them.

35 In directing that the liquidator could recover the excess of his expenses and fees from the trust assets, the principle was stated by Deputy Judge Edward Nugee, Q.C. as follows ([1989] Ch. at 50–51):

> "The authorities establish, in my judgment, a general principle that where a person seeks to enforce a claim to an equitable interest in property, the court has a discretion to require as a condition of giving effect to that equitable interest that an allowance be made for costs incurred and for skill and labour expended in connection with the administration of the property. It is a discretion which will be sparingly exercised; but factors which will operate in favour of its being exercised include the fact that, if the work had not been done by the person to whom the allowance is sought to be made, it would have had to be done either by the person entitled to the equitable interest (as in *In re Marine Mansions Co.*, L.R. 4 Eq. 601 and similar cases) or by a receiver appointed by the court whose fees would have been borne by the trust property (as in *Scott* v. *Nesbitt*, 14 Ves. Jun. 438); and the fact that the work has been of substantial benefit to the trust property and to the persons interested in it in equity (as in *Phipps* v. *Boardman* [1964] 1 W.L.R. 993). In my judgment this is a case in which the jurisdiction can properly be exercised."

36 Apart from the nature of the assets being trust assets, other circumstances of *Berkeley Applegate* are strikingly comparable to those presented here.

37 Not only was the liquidator in *Berkley Applegate* required to perform functions relative to the general liquidation of the company, he was also required to undertake time consuming, complicated and costly functions which were directly and exclusively referable to the administration of the trust assets, their investment and ultimate return to the investors. These included:

(1) preliminary investigations to anticipate the consequences of the liquidation which subsequently occurred, including a preliminary identification of potential claimants and the classes into which they fell;

(2) dealing with inquiries from investors and borrowers (at peak involving up to 100 telephone calls and up to 50 letters per day);

(3) ascertainment of assets, including matching the sums paid to the company by the investors with the sums advanced by the company to borrowers, confirming the respective investments by reference to certificates of investment, reconciling the company's clients' accounts with associated records to confirm the respective interests in the clients' accounts, and so on; and

(4) management of the investments, including recoveries from delinquent mortgagors and reconciling loans which had in fact been repaid; in short, carrying on the company's mortgage business, although without lending money afresh pending winding up.

38 That was all work which had to be carried out by the liquidator apart from a certain amount of work in relation to pure liquidation matters. That work incurred 250 man hours whereas about 3,300 man hours had been spent (by the time of the hearing before Deputy Judge Nugee) on the matters described above referable to the investors' trust claims.

39 As, it is accepted by counsel before me, would be the case here, it was common ground before Deputy Judge Nugee that there was no statutory authority for the payment of any part of the liquidator's expenses and fees out of trust assets. In this regard, the statutory authority for recovery of a liquidator's costs comes primarily from s.115 of the Insolvency Act 1986 (and in almost identical terms here from s.109(1) of the Companies Law (2013 Revision)): "All expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims."

40 It is clear, as Deputy Judge Nugee also observed (*ibid.*, at 41) that the company's assets did not, for the purpose of these statutory provisions

(including also r.4.127 of the Insolvency Rules 1986 UK or the comparable Cayman Islands Insolvency Practitioners' Regulations 2008 ("IPR") dealing with payment of liquidators' remuneration and expenses) include assets held by it in trust for others. And this is so notwithstanding that the duty of the liquidator as prescribed by the statute to wind up the company's affairs may necessarily involve dealing to some extent with assets which the company holds as trustee.

41 The inherent jurisdiction to be invoked to make allowance for the liquidators' costs and expenses from assets held in trust is therefore grounded entirely in equity.

42 In tracing its roots, Deputy Judge Nugee harkened back to the earlier cases in equity which treated expenditure by trustees on the preservation or protection of trust property as being closely analogous to the "salvage" jurisdiction earlier recognized in *In re Marine Mansions Co.* (12), *Scott* v. *Nesbitt* (14), *Boardman* v. *Phipps* (5), *In re Duke of Norfolk's Settlement Trusts* (9) and said by Evershed, M.R. and Romer, L.J. in *In re Downshire Settled Estates* (8) ([1953] Ch. at 235) to be exercisable—

> ". . . where a situation has arisen in regard to the [trust] property (particularly a situation not originally foreseen) creating what may be fairly called an 'emergency'—that is a state of affairs which has to be presently dealt with, by which we do not imply that immediate action then and there is necessarily required—and such that it is for the benefit of everyone interested under the trusts that the situation should be dealt with by the exercise of the administrative powers proposed to be conferred for the purpose."

43 The situation which had arisen in this case, particularly from the intervention of the SEC, presented CSL as trustee with no less an unforeseen "emergency" than the kind contemplated in that *dictum.* It was an emergency which fell to the JOLs to be dealt with as agents of CSL, as will be further explained below, once CSL's winding up commenced.

44 The work which they subsequently undertook, as described in detail by Ms. Loebell and as outlined above in this judgment, was both "necessarily required" as well as intended and indeed has redounded to the benefit of all the custody asset customers, albeit in varying degrees of benefit if viewed individually and separately.

45 "Benefit" has undoubtedly been the result, even if the import of what was done cannot, except now at further great expense, be precisely attributed or related to the respective custody assets of each customer.

46 The question which I am now called upon to answer is thus the same question of principle as confronted Deputy Judge Nugee in *Berkeley Applegate* (4), which is whether any part of the JOLs' expenses or fees can be paid out of the trust assets, either directly or by way of payments to

CSL. Here, I am further asked to decide how the expenses and fees should be allocated, questions which the Deputy Judge left for later determination and which came to be determined by Peter Gibson, J. (*In re Berkeley Applegate (Investment Consultants) Ltd. (No. 3)*), as will also be discussed below.

47 At this juncture, what is clear here is that, as in *Berkeley Applegate* itself (and in the several earlier cases considered by Deputy Judge Nugee), as a condition of giving effect to the equitable right of the custody asset customers, this court has a discretion to ensure that a proper allowance is made to the JOLs for their fees and expenses. Their skill and labour may not have added directly to the respective value of the underlying custody assets of each trust but, taken as a whole, I am satisfied that they have doubtlessly added value to the custody assets in the sense that the work undertaken was as a whole necessary before any of the assets could be retrieved for the benefit of the custody asset customers.

48 And as was also observed in *Berkeley Applegate* ([1989] Ch. at 50), if the liquidator (here the JOLs) had not done this work, it was inevitable that it, or at all events a great deal of it, would have had to have been done by someone else, most likely here a receiver, and at similar if not greater expense.

49 The circumstances of this case therefore bear all the hallmarks of one suitable for the application of the "salvage" jurisdiction and, subject to the further discussions on apportionment and quantum, as justifying the allowances of the JOLs' fees and expenses as defined by the total costs to be paid from the reserve.

50 Nonetheless, Mr. Lowe, Q.C. invites me to distinguish the *Berkeley Applegate* case and the application in it of the inherent equitable jurisdiction by Deputy Judge Nugee on the basis that it is no authority for the proposition which he sees as presented by the JOLs here. This, as he sees it, is the proposition that the JOLs, who are not themselves trustees but liquidators and as such are only the agents of CSL, may receive their compensation in a manner that would be inconsistent with CSL's duties as trustees and inconsistent with the contracts under which the custody asset customers invested their assets with CSL in their respective trusts. To the contrary, submits Mr. Lowe, CSL itself would have had no authority to deduct from trust assets fees and expenses that were not strictly referable to the account of such assets as undertaken for the benefit of the respective trusts and so the JOLs can themselves have no such authority either. Put bluntly, said Mr. Lowe, the JOLs have no authority to require any of the separate trusts comprised of the respective custody assets to subsidize the costs of any other trust. Yet that is what is proposed here by the JOLs, as he sees it, as some trusts, including those of higher values than the objectors', would pay much more in dollar terms than the value of the work actually undertaken for their assets.

51 *Berkeley Applegate* (4), he submits, is no authority for the proposition that the court has an inherent jurisdiction to allow the JOLs to apply such a subsidy, which would be the result of the JOLs' ultimate proposal if it is approved. For this submission, Mr. Lowe relies heavily on his understanding that, unlike in the present case where there are 188 separate trusts for the custody asset customers, in *Berkeley Applegate* Deputy Judge Nugee's analysis and decision were premised on there having been a single trust fund, as all the investments taken by the company had been taken in and "pooled" as a single fund for lending on mortgages. It is on that basis, says Mr. Lowe, that the commensurate "pooling" of costs was justified in *Berkeley Applegate*.

52 A thorough reading of Deputy Judge Nugee's judgment shows, however, that Mr. Lowe is mistaken in that understanding of its premise.

53 First, Deputy Judge Nugee examined what would have been the likely outcome if the liquidator had not intervened to deal with the trust assets ([1989] Ch. at 41):

> "It is clear also that if a receiver of the trust assets had been appointed by the court, the court would have had jurisdiction under R.S.C., Ord. 30, r.3 [as this court would have had under Grand Court Rules, O.30, r.3] to authorise the payment of remuneration out of the trust assets or their income. The appointment of a receiver would have presented difficulties in the present case, however, because until the liquidator had done a good deal of work the necessary basis of fact for such an appointment had not been established; and moreover *each mortgage was held on a distinct trust for a distinct investor or group of investors.*" [Emphasis supplied.]

54 Directly on point here, the words in emphasis confirm the fact that in *Berkeley Applegate* (4) as in this case, the investments were held on distinct and separate trusts. Accordingly, to my mind, the present circumstances as examined above and those in *Berkeley Applegate* are sufficiently analogous to justify the application here of the principles from that case.

55 The analogy is particularly borne out by the comparable work undertaken here by the JOLs. Although the JOLs were not in the same "impossible situation" (*ibid.*) as the liquidator found himself in *Berkeley Applegate* in having first to do extensive investigatory work before being able to identify just what assets belonged to each individual trust, the JOLs report that the record-keeping by CSL was "far from perfect" and significant investigatory work had to be done to identify and locate the respective custody assets, as described above. So too was the work necessarily done to secure the return of custody assets which were subject of the SEC complaint and TRO. Similarly, the work undertaken by the JOLs to recover the assets from those recalcitrant sub-custodians in New

York who refused at first to release them in the absence of the JOLs having obtained court recognition there. These, along with the other areas of activity undertaken in relation to the custody assets, were all valuable and important undertakings for the benefit of the custody asset customers, viewed as a whole.

56 Nonetheless, in dealing with Mr. Lowe's objections, and in adopting the *Berkeley Applegate* approach, I should elaborate upon my understanding of the principles by addressing the fact that the custody assets are indeed trust assets held by CSL as trustee, as distinct from the assets of CSL forming part of its liquidation estate. This fact also defines the relationship between the JOLs acting as liquidators and their role as agent of CSL as corporate trustee.

57 As was authoritatively explained by the House of Lords in *Ayerst (Inspector of Taxes)* v. *C. & K. (Constr.) Ltd.* (3) ([1976] A.C. at 177) (considered and approved on appeal from this jurisdiction by the Privy Council in *Wight* v. *Eckhardt Marine G.m.b.H.* (16) (2003 CILR 211, at para. 21)), a liquidator does not obtain the legal title to the assets of the company by way of them being vested in him as trustee (still less the legal title to assets held by his company as trustee). As Lord Diplock explained in *Ayerst* ([1976] A.C. at 177), emphasizing the difference between the assets of the company itself and those which it may hold for the benefit of others:

> "(3) All powers of dealing with the company's assets, including the power to carry on its business so far as may be necessary for its beneficial winding up, are exercisable by the liquidator for the benefit of those persons only who are entitled to share in the proceeds of realisation of the assets under the statutory scheme. The company itself as a legal person, distinct from its members, can never be entitled to any part of the proceeds. Upon completion of the winding up, it is dissolved (section 274).
>
> The functions of the liquidator are thus similar to those of a trustee (formerly official assignee) in bankruptcy or an executor in the administration of an estate of a deceased person. *There is, however, this difference: that whereas the legal title in the property of the bankrupt vests in the trustee and the legal title to property of the deceased vests in the executor, a winding-up order does not of itself divest the company of the legal title to any of its assets.* Though this is not expressly stated in the Act it is implicit in the language used throughout Part V, particularly in sections 243 to 246 which relate to the powers of liquidators and refer to 'property . . . to which the company is . . . entitled,' to 'property . . . belonging to the company,' to 'assets . . . of the company' and to acts to be done by the liquidator 'in the name and on behalf of the company.'" [Emphasis supplied.]

58 This limitation on the liquidator's legal title was expressly, albeit in different words, recognized by Deputy Judge Nugee in coming to his decision that the jurisdiction nonetheless existed in equity to grant a liquidator his reasonable fees and expenses from assets held by his company in trust when properly incurred in dealing with such assets for the benefit of those beneficially interested in them (*Berkeley Applegate* (4) ([1989] Ch. at 44)):

> "A liquidator is not a trustee for anyone: he is a substitute for the board of directors. He is only the agent of the company, and is more akin to the board than is a trustee in bankruptcy; and even a trustee in bankruptcy acquires no title to trust assets vested in the bankrupt."

59 And further as regards the circumstances of Berkeley Applegate's liquidation (*ibid.*, at 50):

> "It is true that the legal title to the mortgages and to the clients' accounts is not vested in the liquidator but remains in the company; but the investors still need the assistance of a court of equity to secure their rights . . . As a condition of giving effect to their equitable rights, the court has in my judgment a discretion to ensure that a proper allowance is made to the liquidator. His skill and labour may not have added directly to the value of the underlying assets in which the investors have equitable interests; but he has added to the estate in the sense of carrying out work which was necessary before the estate could be realised for the benefit of the investors. As was the case in *Scott* v. *Nesbitt*, 14 Ves. Jun. 438, if the liquidator had not done this work, it is inevitable that the work, or at all events a great deal of it, would have had to be done by someone else, and on an application to the court a receiver would have been appointed whose expenses and fees would necessarily have had to be borne by the trust assets. On the evidence before me, the beneficial interests of the investors could not have been established without some such investigation as has been carried out by the liquidator.
>
> The allowance of fair compensation to the liquidator is in my judgment a proper application of the rule that he who seeks equity must do equity."

60 And so the Deputy Judge squarely recognized that the jurisdiction was not premised on any notion of legal or contractual title to the assets of the company being vested in the liquidator but was firmly rooted in equity.

61 Thus I am further fortified in my conclusion that the jurisdiction exists and can appropriately be applied in this case. It is a jurisdiction which can be exercised in relation to a liquidator (or other fiduciary such as a receiver) by analogy with an ancient jurisdiction developed in relation to a trustee which is based upon the court's inherent power to ensure the

proper administration of trusts. As Deputy Judge Nugee also explained, it was declared in *In re Duke of Norfolk's Settlement Trusts* (9) ([1982] Ch. at 77–78) that when the court authorizes remuneration, it is not giving effect to any supposed contract between the trustees and the settlor but is exercising its ancient jurisdiction to secure the competent administration of the trust property.

62 And so, while it is accepted that the costs and expenses strictly referable to the winding up of a company (including the liquidators' remuneration) are payable out of the company's own assets and not out of assets it holds on trust, *Berkeley Applegate* (4) is now established authority[2] for the principle that the trust assets will be available for fees, costs and expenses incurred in sorting out what is trust property and in continuing to manage or administer that property, as opposed to the costs of winding up the corporate trustee.

63 I accept that the jurisdiction should be applied here having regard to the work that was necessarily done by the JOLs for the benefit of the custody asset customers and so as to allow the JOLs their reasonable fees and expenses from the custody assets by way of the reserve. This was work which would have had to have been done by someone else if not done by the JOLs and at untold expense. And by way of emphasis, I add that the JOLs, having assumed their role as officers of the court, are not mere officious intermeddlers and so are not to be expected to undertake their work done for the benefit of the custody asset customers at their own expense.

2 And so regarded in the leading textbooks: see Underhill & Hayton, *Law of Trusts & Trustees*, 17th ed., para. 43.14, at 572 (2007); *Snell's Equity*, 31st ed., para. 7–58, at 165 (2005); *Lewin on Trusts*, 18th ed., para. 20–177, at 669 (2008); Goff & Jones, *The Law of Unjust Enrichment*, 8th ed., para. 18–64, at 488–489 (2011). *Berkeley Applegate* was also recently cited with approval in a case before the Supreme Court of England and Wales in *Lehman Bros. Intl. (Europe)* v. *CRC Credit Fund Ltd.* (11) ([2012] 3 All E.R. 1, at para. 101, *per* Lord Walker, J.S.C.) (albeit in a partially dissenting judgment). *Berkeley Applegate* has also been applied in Australia and Canada on many occasions as cited in Goff & Jones (*op. cit.*). See also *In re G.B. Nathan & Co. Pty. Ltd.* (10), where it was assumed that the liquidator had taken over the office of trustee formerly occupied by his insolvent company and been allowed to recover his costs *qua* trustee by reference to *Berkeley Applegate* and specific Australian statutory provisions, the equivalent of which we do not have in the Cayman Islands. Counsel also brought to my attention the very recent judgment in *Allanfield Property Ins. Servs. Ltd.* v. *Aviva Ins. Ltd.* (2), in which Keyser, J. applied *Berkeley Applegate*, albeit *obiter*.

**Issue 2: apportionment**

64 In accepting the reasonableness of the JOLs' ultimate proposal for apportioning the fees and expenses as described above,[3] I should add some further observations here.

65 Requiring them to now attempt the improbable task of allocating the costs as they were incurred before June 24th, 2015 and strictly for the account of the respective custody asset customers would not only subject them to further onerous and expensive work, it would also place them at further risk of not recovering the costs for that work. This would obviously be the case because, apart from the reserve, the custody assets (but for the unresolved customers) have been paid out and so there would be no fund available to meet the further costs or to meet any difference which would be found to be allocable to and owed by the resolved custody asset customers, those who have already been paid out.

66 Thus for this further reason also it would be inequitable to require the JOLs to attempt the exercise of exact accounting proposed by Mr. Lowe on behalf of the objectors.

67 In accepting the JOLs' ultimate proposal, which is acknowledged to be both imprecise and imperfect, I must recognize though that there might indeed be an element of cross-subsidy as between the custody assets in the distribution of the total costs. The JOLs do not pretend that the costs to be allocated to some of the larger trusts of custody assets at say 0.882% of their value, amounting to several hundreds of thousands of dollars,[4] precisely reflect the costs of the work done respectively in relation to or on account of those specific assets.

68 On this view of the exercise, the apportionment and allocation is, as I have acknowledged, in no sense an attempt at an exact accounting for the costs of administering the respective custody assets. Rather, it is in broad terms the best that the JOLs can do to meet the rule that equality is equity—"equality" in this sense meaning that the respective custody assets are all allocated the same percentage share of the costs (subject to the 30:70 cash to securities ratio).

---

3 I note that, among the other six proposals and as further explained in response to a query from me, the JOLs did consider the "equal method" of apportionment but this was discounted as unworkable quite early on for reasons including that the resultant costs (US$4,233,419 ÷ 188 = US$22,518) would have exceeded the total value of the assets of many custody asset customers (*i.e.* 22% of all custody asset customers).

4 For instance, the custody assets comprised of the trust held for one of Mr. Lowe's clients, Global, is worth about US$64m., resulting in an allocation of costs of some US$530,412 to Global, as Mr. John Cullinane of Global explains (and protests) in his affidavit filed in these proceedings.

69 In applying the ancient jurisdiction developed for trustees by analogy here to the liquidation of the corporate trustee that is CSL, the JOLs are made an allowance for their expenses and fees arising in the context of the overall administration of all custody assets under the trusteeship of CSL for which they act as agent. They have not assumed the role of CSL as trustee nor the strict duty to account that would ordinarily be appurtenant to that role and it is on this basis that, within the bounds of what is fair and reasonable, the custody asset customers who seek the assistance of a court of equity must do equity by contributing what is a fair, if imprecise, share of the overall costs.

70 Finally on this issue, as already noted (at para. 46 above), in *Berkeley Applegate* (4) the questions of apportionment and quantum were not dealt with by Deputy Judge Nugee but left and came to be dealt with later by Peter Gibson, J.

71 As to how the costs and expenses were to be apportioned between mortgage investors and investors who simply had moneys on client accounts, the respective claimants in *Berkeley Applegate* were at odds. The former advocated a *pari passu* sharing of expenses, whereas the latter submitted that the costs of distributing funds held on trust in the client accounts were obviously less than those for dealing with mortgage investors. Accordingly, they proposed that only 5% of the costs should be attributed to client account investors and the balance as between the mortgage investors.

72 The liquidator proposed a third approach referencing a cut-off date and explained that, prior to that date, all the work had been undertaken for the benefit of investors generally, and suggested that, prior to that date, the costs should be apportioned on a *pari passu* basis. After that date, he suggested an apportionment of 90:10 as between the mortgage investors (who had been more expensive to deal with) and the client account investors (who had been less expensive to deal with).

73 Noting that the liquidator's proposed method for apportioning costs was not precise and suffered from being "rough and ready," Peter Gibson, J. nonetheless accepted it.

74 The *Berkeley Applegate* (4) case thus serves as precedent also for the further proposition, which I adopt and apply here, that a liquidator allowed to recover his costs on the basis of the principle which the case decides will not necessarily be required to follow the same strict accounting approach as would be expected of a trustee.

**Issue 3: quantum**

75 In anticipation of my decision as explained above to allow the JOLs to recover their costs from the reserve, Mr. Lowe, supported strongly by

Ms. Hale on behalf of the LC in this regard, submitted that I should not approve of the quantum of the total costs without requiring the JOLs to explain and justify each aspect specifically.

76 Mr. Lowe emphasized that the basis upon which liquidators can recover fees and expenses from trust assets at the expense of trust creditors without their respective agreement is in their role as agents of necessity and so is rooted in the principles of restitution and unjust enrichment. Thus the JOLs would not be entitled to recover whatever expenses they incur or remuneration they generate in terms of work hours. Rather, since they are to be treated as agents of necessity (as in a situation of salvage, as discussed in *Berkeley Applegate* (4) by analogy with the rules of maritime salvage, rules which were authoritatively explained in *The Winson* (7) by Lord Simon), in return for taking care of the goods (here the assets), the JOLs have "a correlative right to charge the owner of the goods with the expenses reasonably incurred . . ." (*The Winson* ([1982] A.C. at 960, *per* Lord Diplock)).

77 That test of reasonableness, submits Mr. Lowe, is whether a prudent man faced with similar circumstances would lay out or hazard his money in the way that the JOLs have done. Further, it is not enough to say that the JOLs have acted within their powers: the expenditure and remuneration must "be reasonable in itself as well as proportionate to the end to be achieved," citing the famous *dictum* of Ferris, J. from *Mirror Group Newspapers plc* v. *Maxwell (No. 2*) (13) ([1998] BCC at 333–334) as approved and applied by this court in *In re SPhinX Group* (15).

78 In *In re SPhinX*, it was held that, when the court determined whether it would approve liquidators' fees and expenses under s.109(2) of the Companies Law (2010 Revision) and reg. 10 of the Insolvency Practitioners' Regulations ("IPR"), it would ask if the remuneration sought was fair and reasonable in all the circumstances. These considerations included (i) the amount of time worked; (ii) the complexity of the case; (iii) any exceptional responsibilities required; (iv) the effectiveness of the liquidators' operation; and (v) the value and nature of the property involved (here the value of the custody assets) relative to the expense of the work undertaken. Thus a central issue will be the proportionality of the work done to the results achieved.

79 In assessing all of these factors, it was also recognized in *In re SPhinX* that the court will give significant latitude to the commercial judgment of the liquidators.

80 Mr. Lowe, supported by Ms. Hale for the LC, submits that these principles are to be no less applicable to an assessment of the fees and expenses of the JOLs simply because they are to be recovered on the equitable basis of agency of necessity rather than on the statutory basis as liquidation expenses, as discussed above.

81 This is a proposition which I readily accept and adopt as applicable in the circumstances of this case. However, Mr. Lowe and Ms. Hale invite me to go further—again citing *In re SPhinX* as precedent—and appoint an independent assessor to scrutinize the JOLs' work and charges and then to report and advise the court on the reasonableness or otherwise of their claim for fees and expenses.

82 I just as readily refuse this invitation as I see no need here for an independent assessor where three-quarters of the JOLs' expenses do not involve payments of their own fees but payments to third parties for work done at the behest of the JOLs. I see no justification for requiring either the liquidation estate or the custody assets (neither was specified in the arguments) to incur the expense of an independent assessor.

83 What I shall grant the proposers, though, is that there is as yet an absence of detail of the kind of information identified in *In re SPhinX* (15) (items (i)–(v) above) as needed to explain the JOLs' fees and expenses to the standards of the IPR or as may be required to meet with a liquidation committee's or the court's approval.

84 There being no formal liquidation committee in place for CSL, I am therefore persuaded that it is appropriate to require the JOLs to provide the records and other relevant information to the LC (representing CBL as a custody asset customer) and to the objectors (and to any other custody asset customer who may ask) and invite their agreement as to quantum. This is the process that would ordinarily apply for the approval of a liquidator's fees and expenses incurred in relation to a liquidation estate and can be adapted here to afford the custody asset customers a similar degree of transparency and accountability.

85 I should note, in fairness to the JOLs, that, as Mr. Levy explained, they do not object to this course. Indeed, the records are already available in the form of receipts, time sheets and the like and I am assured that they can be made presentable for the purposes of the assessment of the LC and the objectors in keeping with the standards of the IPR by analogy to the practice which is established for the approval of liquidator's fees and expenses.

86 But it is expected that this will involve some further work on the part of the JOLs for which, says Mr. Levy, they are also entitled to recover the costs.

87 I reserve my views on this issue of further costs to await the outcome and on that basis will direct the JOLs to prepare and present the records to allow for the scrutiny of the LC and the objectors.

88 It is very much to be hoped that there will be agreement over the quantum of the total costs, especially as but less than 25% of them represent the JOLs' own remuneration.

89 The rest, as explained above, are said to comprise their expenses incurred on behalf of the custody assets and it would be surprising if the JOLs, as officers of this court and experienced fiduciaries, have been less than reasonable in allowing them to their third party service providers.

90 If the LC and objectors manage to agree on quantum, then there would of course be no need for further recourse to the court. This too is very much to be desired, as experience has shown that contested hearings over the quantum of fees and expenses can themselves be time consuming and costly.

91 Accordingly, I approve of the JOLs' ultimate proposal for the apportionment and allocation of the costs as among the custody asset customers to be recovered from the reserve and defer the issue of quantum to be agreed, failing which that issue may be returned for determination by the court.

92 The JOLs are entitled to the costs of the instant summons to be paid on the indemnity basis from the reserve and it is so ordered.

*Orders accordingly.*

Attorneys: *Walkers* for the joint official liquidators; *Harneys* for Global Asset Allocation Fund, Saad Investments Finance Company (No. 5) Ltd. and Bristol Investment Fund Ltd.; *Loeb Smith* for Nova Holding Group Ltd.; *Appleby* for the liquidation committee of Caledonian Bank Ltd.

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 102 OF 2020 (DDJ)**

**IN THE MATTER OF THE COMPANIES ACT (2021 REVISION)**

**AND IN THE MATTER OF GTI HOLDINGS LIMITED**

| | |
|---|---|
| **Appearances:** | Jonathon Milne and Sean-Anna Thompson of Conyers Dill & Pearman on behalf of GTI Holdings Limited |
| **Before:** | The Hon. Justice David Doyle |
| **Heard:** | 22 February 2022 |
| **Orders made:** | 22 February 2022 |
| **Draft Reasons for Judgment circulated:** | 15 March 2022 |
| **Reasons for Judgment approved:** | 15 March 2022 |

**HEADNOTE**

*The importance of the place of a company's incorporation when making a winding up order – position where the Hong Kong Court makes a winding up order in respect of a company incorporated under the laws of the Cayman Islands – issues of comity in respect of the Grand Court of the Cayman Islands and the Hong Kong Court – the courts of the Cayman Islands should generally, under well-established principles of private international law, assume the primary role in respect of winding up proceedings involving companies incorporated under the laws of the Cayman Islands*

**REASONS FOR JUDGMENT**

**Introduction**

1. On 22 February 2022, I made a winding up order and appointed joint official liquidators. I now deliver my reasons.

2. GTI Holdings Limited (the "Company") was incorporated in the Cayman Islands on 9 June 2004.

3. By petition dated 22 May 2020, the Company presented a petition for an order that it be wound up on the ground of its inability to pay its debts and that Osman Mohammed Arab, Lai Wing Lun (both of RSM Hong Kong) and Claire Marie Loebell of R&H Restructuring (Cayman) Ltd be appointed as joint official liquidators of the Company ("JOLs").

4. By summons dated 28 May 2020, the Company applied for an order that the individuals it had identified as potential JOLs be appointed joint provisional liquidators ("JPLs") of the Company to review all issues relating to the feasibility of a debt restructuring plan (the "Restructuring Proposal").

5. By order made on 28 May 2020, Parker J sitting in the Financial Services Division of the Grand Court of the Cayman Islands, the Company's place of incorporation, appointed JPLs of the Company for restructuring purposes.

6. By order made on 13 May 2021, Claire Marie Loebell was released from the performance of her duties as one of the JPLs of the Company and Owen Walker of R&H Restructuring (Cayman) Limited was appointed in her stead.

7. The JPLs applied for and were granted, from time to time, various orders from this court pending the progression of the Restructuring Proposal.

8. The evidence placed before this court indicated that:

(1) a winding up petition (HCCW 51 of 2020) first came to be heard before Harris J in Hong Kong on 13 July 2020 and was, after several adjournments pursuant to consent summonses filed by the Company and the petitioners, last listed before Harris J as recently as 8 November 2021;

(2) on 24 September 2020, the JPLs made an application in Hong Kong and Harris J of the Hong Kong Court by order dated 9 November 2020 recognised the appointment of the JPLs for restructuring purposes and allowed the JPLs to exercise certain powers in Hong Kong. Harris J specifically ordered that if the JPLs wished to apply for a stay or other directions in respect of the proceedings before the Hong Kong Court of any sort in consequence of the recognition of their appointment by the Hong Kong Court such application should be listed before Harris J or such other judge as he shall direct. It was ordered that the JPLs should write to the clerk to Harris J seeking case management directions for the determination of any application that they wish to make pursuant to the order of Harris J;

(3) on 17 December 2020, the Company applied to the Hong Kong Court in HCMP 2303 of 2020 for an order that it be at liberty to convene a meeting of the creditors of the Company ("Scheme Meeting") for the purpose and, if thought fit, approving a proposed scheme of arrangement. On 20 December 2020 Harris J heard the Company's application for directions to convene the Scheme Meeting and gave some comments and guidance and invited the Company to submit a revised Scheme Document to him for his consideration. Matters appeared to have been somewhat delayed while queries from regulators were addressed and financial information updated. The Company needed more time to (i) finalise its audited results after which the Company could then continue to address the queries of the Stock Exchange of Hong Kong Limited ("SEHK") and (ii) prepare a draft revised Scheme Document which would incorporate changes made to address queries from regulators and updated developments of the Group (including the audited results). On 8 November 2021, Harris J directed that the fresh application to convene the Scheme Meeting due to be heard on 23 November 2021 be vacated and re-fixed for 29 March 2022;

(4) an adjourned hearing of the only remaining winding up petition in HCCW 51 of 2020 was listed for 22 November 2021 in Hong Kong. The Company reached an agreement with the petitioner to further adjourn the hearing of the petition by way of consent summons. However I am informed that on 15 November 2021 Linda Chan J of the Hong Kong Court considered that the hearing should take place because there were other supporting creditors of the petition and their agreement to the proposed adjournment had not been sought and obtained. It appears from paragraph 17 of Linda Chan J's reasons for judgment delivered on 2 December 2021 that 7 of 23 creditors supported the petition and another 4 by letter dated 19 November indicated that they "endorse" the stance of the petitioner. It appears that only a minority of what were described in the judgment as the "Supporting Creditors" were in favour of a winding up order

being made by the Hong Kong Court. In passing I am reminded of the observations of Segal J in *Grand T G Holdings Limited* (FSD; unreported judgment delivered 22 August 2016 released for publication 30 August 2018) at paragraph 6 that in normal circumstances considerable weight should be given to the fact that the petitioner is an unpaid creditor with a debt which is not bona fide disputed on substantial grounds but as a winding-up order is a class remedy it is well established that the court should consider the views of other creditors and have regard to the interests of creditors generally.

**<u>The making of the winding up order in Hong Kong</u>**

9. Much to the surprise and concern of the Company and the JPLs (who as I understand the position were not represented at the hearing) Linda Chan J of the Hong Kong Court, in face of opposition from the Company and against the initial wishes of the petitioning creditor, made what she described as "the usual winding up order" against the Company on 22 November 2021 and gave the reasons for her judgment on 2 December 2021.

10. The JPLs say that despite the fact that the judge was aware (see paragraph 13(10) of her judgment) that the hearing in respect of convening a meeting in respect of the Scheme was due to be held on 29 March 2022 (pursuant to the order made by Harris J on 8 November 2021) the judge (at paragraph 15 of her judgment) could see "no proper basis for the Company to seek a further adjournment of the Petition." At paragraph 18 Linda Chan J stated: "In assessing the feasibility or otherwise of the proposed restructuring, the Court will have to take into account the views of the unsecured creditors as they have the right to decide whether the proposed restructuring is one which they are prepared to accept. It is not for the Company or the PLs to decide whether it is in the interests of the creditors to accept the proposed restructuring." Linda Chan J did "not think that the proposed Scheme is feasible" (paragraph 19 of her judgment). It appears that Linda Chan J relied on 4 main reasons:

(1) only creditors whose aggregate claims against Company account for 48% of the total indebtedness are willing to consider the proposed Scheme;

(2) one of the creditors relied on by the Company is Champion Alliance Industries Limited a secured creditor and it is wrong for the Company to include its claim as part of the 48% creditors who are willing to consider the proposed scheme;

(3) as there is no evidence to show that the proposed Scheme has the support of 75% in value of the claims of the unsecured creditors, there is no basis for the Company to contend that the proposed Scheme is one which can be implemented; and

(4) without any audited financial statements for the 18 months ended 30 June 2021 it is difficult to see how the Company can satisfy SEHK's requirements.

Linda Chan J at paragraph 20 added:

> "More importantly, it is clear from the evidence before the Court that despite the appointment of the PLs for about 18 months, the financial position of the Group has *not* improved and the Company remained unable to comply with the basic obligation of publishing its audited financial statements."

Linda Chan J at paragraph 22 stated:

> "It is highly undesirable for the Company with a substantial net deficit to remain in operation as a going concern. The continued increase in net deficit is prejudicial to the interests of the unsecured creditors. They are entitled to ask the Court to put the Company into liquidation without any further delay."

11. I am informed that there was no appeal against the winding up order in Hong Kong.

12. Mr Milne respectfully submits that "the territorial approach taken by the Hong Kong Court (in this instance) appears to be at odds with the Cayman Court's consistent focus and application of principles of comity and cooperation".

13. Mr Milne highlights the main concerns of the JPLs in respect of the winding up order made by Linda Chan J in the Hong Kong Court on 22 November 2021 and the reasons subsequently delivered on 2 December 2021 as follows (with reference to paragraph numbers being to paragraph numbers in the judgment):

"a. Chan J made the winding-up order on 22 November 2021 despite being aware of these Cayman Islands proceedings and the fact that Harris J had recognised the JPLs' appointment by the Cayman Islands Court (see para 9);

b. Chan J made the winding-up order on 22 November 2021 despite being aware of the fact that Harris J had given recent case management directions for a convening hearing in relation to the scheme of arrangement on 29 March 2022 (see para.13(10));

c. Chan J made the winding-up order on 22 November 2021 despite 48% by value of creditors of the Company expressing a willingness to consider the restructuring plans at the convening hearing and only 6.4% by value of creditors objecting to moving forward with the restructuring (para. 19(1));

d. Chan J appears to have overlooked the "*present and voting*" component of the 75% by value threshold for schemes of arrangement in both Hong Kong and the Cayman Islands. Accordingly, having disregarded the fact that only 54.4% by value of creditors have expressed a view to date and the fact that the overwhelming majority of that group wish to consider a restructuring, Chan J arrives at the definitive conclusion that "*there is no basis for the Company to contend that the proposed Scheme is one which can be implemented*" (see para. 19(3));

e. The petitioning creditor in Hong Kong had signed a consent summons indicating its agreement to have the Hong Kong petition adjourned.

However, regardless of the agreement between the parties, Chan J declined to vacate the hearing (see para. 16); and

f. Chan J made the winding-up order on 22 November 2021 despite the views expressed by the Company and by the JPLs appointed by the Cayman [Court] that the implementation of the scheme of arrangement would be beneficial to the creditors and shareholders of the Company as the creditors would likely obtain only a minimal recovery in liquidation (see para. 10(13))."

14. I am informed that the Hong Kong provisional liquidator in a court-ordered winding-up is required to convene separate meetings of the creditors and contributories of the Company for the appointment of a liquidator in place of the provisional liquidator.

15. I am further informed that a creditor submitted an application to the Hong Kong Court on 6 December 2021 seeking a dispensation of the first meeting of creditors and contributories and the appointment of the JPLs as the joint and several liquidators of the Company in Hong Kong. The application was supported by at least 40 creditors who, in aggregate, hold a total debt of approximately HK$616 million, representing approximately 49% of the estimated total liabilities of the Company at the relevant time. By letter dated 15 December 2021 the clerk to Linda Chan J indicated that:

"Her Ladyship made the following directions on 15 December 2021:

1. The Court is not minded to make the order sought in the application. It does not appear that there is sufficient justification for the Applicant to displace the usual requirements of PLs to convene meetings of creditors to ascertain their view on the appointment of Liquidators and committee of inspection.
2. As the Applicant does not intend to pursue the application tomorrow the hearing is vacated.
3. Costs reserved.
4. Liberty to apply."

16. It appears as things presently stand that the Hong Kong Official Receiver is the provisional liquidator of the Company in Hong Kong.

17. The JPLs wish to co-ordinate and collaborate with the Official Receiver in Hong Kong to ensure a cost-effective and sensible outcome for the Company's stakeholders.

18. Despite the Hong Kong winding up order, the directors of the Company and Mega Yield Enterprise Development Limited (the "Investor") remain confident that the Restructuring Proposal is still viable. It was stated that the JPLs, if appointed JOLs, would consider all possible options to endeavour to maximise recoveries for stakeholders, including but not limited to, continuing to explore the Restructuring Proposal with creditors.

**<u>The summons in the Cayman Islands</u>**

19. By summons dated 14 January 2022 the JPLs sought an order that the winding up petition in this jurisdiction be listed for a hearing on or after 28 January 2022. Parker J (the originally assigned judge to this case) was heavily committed in another hearing already set down for a lengthy period so the hearing was set for 10am on 22 February 2022 before me.

20. By letter dated 16 February 2022, Ms Maureen Chan Acting Assistant Principal Solicitor for the Official Receiver in Hong Kong stated:

> "Upon the winding up order being made against the Company on 22 November 2021 in captioned proceedings in Hong Kong, the Official Receiver has become the provisional liquidator of the Company.
>
> The winding up proceedings in the Cayman Islands and the winding up proceedings in Hong Kong are separate court proceedings. The winding up proceedings in Hong Kong do not subject to the winding up proceedings in the Cayman Islands and any order made therein. In the circumstances, any order of appointment of provisional liquidators or liquidators in the Cayman Islands has

no effect on the winding up of the Company in Hong Kong. As the provisional liquidator of the Company, the Official Receiver is endeavoring to arrange for the first meetings of the contributories and creditors to be convened as and when the pandemic safety restrictions in Hong Kong allow.

In any event, nothing contained in this letter should be taken or construed as submission of the winding up proceedings in Hong Kong to those in the Cayman Islands or any admission of the consent, obligation or liability on the part of the Official Receiver and provisional liquidator of the Company under any order proposed to be sought at the hearing of the petition at the Grand Court of the Cayman Islands on 22 February 2022 or any adjourned hearing thereof."

21. It appears that the dates for the first meeting of the creditors and contributories have not yet been set and they appear some way off unless they can take place remotely, in view of the present restrictions on gatherings imposed in Hong Kong because of COVID-19.

22. It was in these circumstances that the JPLs applied for a winding up order and their appointment as JOLs in the jurisdiction of the Cayman Islands, the place of incorporation of the Company.

23. This is against the backdrop of the JPLs being appointed by this court and Harris J of the Hong Kong Court recognising them in Hong Kong. It is also against the backdrop of Harris J in Hong Kong setting the date of 29 March 2022 as the hearing date in Hong Kong to convene a meeting to consider the proposed Scheme. There then appears to the JPLs an inexplicable apparent volte face by the Hong Kong Court and the making of a winding up order on 22 November 2021 by Linda Chan J, against the wishes of the Company and the initial wishes of the petitioning creditor and in a manner seemingly inconsistent with the previous orders of Harris J of the Hong Kong Court.

24. The JPLs say that a winding up order is appropriate and necessary in the Cayman Islands for the following principal reasons:

(1) Although the Company has some subsidiaries in Hong Kong, it also has many subsidiaries in other places such as Cambodia, BVI, Cayman Islands and the People's Republic of China. The appointment of JOLs in the place of the Company's incorporation will be more effective than the appointment of the Hong Kong Official Receiver as provisional liquidator. A winding up order made in Hong Kong over a foreign company, as recognised by the Hong Kong judiciary, may have limited effect outside Hong Kong in respect of subsidiaries. A winding-up order made by the Grand Court of the Cayman Islands against a company incorporated under the laws of the Cayman Islands will be more effective internationally in respect of subsidiaries outside Hong Kong than a winding-up order made by a Hong Kong Court. Mr Milne refers to *China Huiyan Juice Group Limited* [2020] HKCFI 2940 and *Li Yiqing v Lamtex Holdings Limited* [2021] HKCFI 622 and submits that if there are subsidiaries in Mainland China (or indeed elsewhere), as in this case, and the holding company is incorporated in an offshore jurisdiction, it would normally be appropriate for the place of incorporation to be the primary insolvency jurisdiction to give liquidators the prospect of obtaining control of such subsidiaries for the benefit of the company's stakeholders;

(2) The JOLs with their knowledge of the Group would be much better placed to bring forward the restructuring plan in the best interests of all creditors, secured and unsecured;

(3) Mr Milne referred to paragraph 74 of Mr Lai's fifth affirmation affirmed on 14 January 2022. Mr Lai makes the following points:

> "The Hong Kong court, in making the winding-up order, referred to responses received from creditors representing 48% of the value of the total debt. Such creditors have indicated they would be willing to consider a scheme of arrangement and support advancing the restructuring plans. Of the remaining 52% in value only 6.4% in value have expressly objected to moving forward with the restructuring

proposal. Accordingly, 45.6% of the total creditor group by value have not expressed a view at this stage";

(4) Mr Milne reinforces those points with the submission that for the Scheme to be passed the relevant number will be in respect of those present and voting within the relevant class and not a percentage of all creditors;

(5) Mr Milne stressed that the best way forward would be to make a winding up order in this jurisdiction and appoint the JPLs as JOLs. Mr Milne asked the court to consider the unattractive alternatives:

(i) The JPLs are discharged from office but there is still a foreign winding up on foot where a Cayman company is unable to pay its debts; or

(ii) The JPLs are still in place despite the Hong Kong Court winding up order and there is confusion over the status of the directors in the context of audited accounts requiring urgent sign off;

(6) Mr Milne submitted that the best way forward would be for a winding up order to be made in this jurisdiction and the JPLs appointed JOLs in the place of incorporation of the Company. Moreover, the JOLs would be far better placed than the Hong Kong Official Receiver to progress the scheme in the best interests of all creditors some of whom are in Hong Kong but many creditors are also outside Hong Kong;

(7) Mr Milne submitted that there was a reasonable chance for the Scheme to progress. Linda Chan J focused on the negative deficit in the Company's financial position but Mr Milne submitted that there had recently been some good news. Mr Milne referred to the evidence of Mr Lai. In his fifth affirmation Mr Lai at paragraph 63 states:

> "The Group's performance in its three major segments (i.e. (i) production, sale and trading of textile products; (ii) RMB banknotes clearing up services [relating to cleaning, ironing and packaging folding banknotes] and others; and (iii) trading of petroleum and chemical products) has seen considerable improvement, especially for the three months ended 30 September 2021...";

(8) Mr Milne submitted in effect that there seems to be some light at the end of the dark financial tunnel. Mr Lai at paragraph 67 refers to the considerable improvement in the Group's major segments and concludes that:

> "… the results for the Group's major segments have shown improvement for the three months ended 30 September 2021, compared to the previous results. In particular, the Group's revenue and gross profit for the three months ended 30 September 2021 has significantly increased."

At paragraph 68 Mr Lai adds:

> "Such improvement and results also demonstrated one big step of the restructuring work carried out by the Company since the JPLs' appointment on 28 May 2020 pursuant to the Appointment Order. Recent financial performance demonstrates a significant improvement in revenue and profitability of the Group's business. As described above, a key focus of the restructuring efforts has been to turn around or close loss-making businesses while reviving and/or expanding profitable business lines within the Group."

At paragraph 69(b) Mr Lai refers to the Groups operations and customers in Cambodia, PRC, France, Japan and Africa and the expectation that "the operation in both mask and the textile products will grow continuously throughout the year ending 30 June 2022."

At paragraphs 71 – 73 Mr Lai adds:

> "71. The Management is of the view that, if the Restructuring Plan is approved and implemented, the Company would have additional financial resources to continue to further expand its existing business, which is beneficial to the creditors of the Company. In particular, the Management is optimistic about the performance of the Group's major segments, the performance of which has already improved for the three months ended on 30 September 2021, and expects the growth in revenue will continue in the future, especially when the general market condition recovered from the impact of COVID-19.
>
> 72. In addition, most of the debts of the Company will be settled upon implementation of the Restructuring Plan. In such case, the Company will no longer have to incur substantial finance costs and the Company's net income would be closer to its gross profit.
>
> 73. The Creditors of the Company would likely obtain a minimal recovery under liquidation scenario and needless to mention, the potential recovery of the shareholders would likely be nil. In light of recent improvements and the expected development of the business of the Company, the JPLs agree with the Company that the implementation of the Restructuring Plan would remain beneficial to the creditors of the Company as well as the shareholders of the Company and so far, based on the regular communication between the Company and the creditors, majority of them do support the restructuring."; and

(9) Mr Milne rightly emphasised with some considerable persuasive force the importance of the place of the Company's incorporation. I will deal with this

recurring issue and some of the relevant authorities in the law section of this judgment.

34. In short summary, Mr Milne submitted that this case is a paradigm example of an international group which would benefit from a single insolvency proceeding of its holding company taking place in the jurisdiction of incorporation.

**Law**

35. I now turn to some of the relevant law which was engaged in respect of the relief I granted on 22 February 2022.

*The Companies Act*

36. Under section 92(d) of the Companies Act a company may be wound up by the court if the company is unable to pay its debts.

*The Insolvency Practitioners' Regulations 2018*

37. Mr Milne also refers to my judgment in *Global Fidelity Bank, Ltd (In voluntary liquidation)* (FSD; unreported judgment reason delivered 20 August 2021) in respect of the independence, qualification, residency and insurance requirements of official liquidators. I had full regard to that judgment and the evidence before the court on these issues.

*The primacy of the place of incorporation of a company in the context of winding up proceedings*

38. It is a very serious step for a foreign court to make a winding-up order against a company incorporated under the laws of another jurisdiction. The Hong Kong Court took that step on 22 November 2021 for the reasons stated in the judgment delivered on 2 December 2021. Usually the best and most appropriate way forward is to leave it

to the courts of the place of incorporation of the company to deal with applications for winding up orders and to be treated as the courts with primary jurisdiction. As Chief Justice Smellie stated at paragraph 6 of his oft-cited judgment in *Sun Cheong Creative Development Holdings Limited* (FSD; unreported 20 October 2020) in considering which jurisdiction is the more appropriate to assume the role of primary insolvency proceeding all things being equal "this will generally be assumed to be the place of incorporation of the company." I accept that such comments were made in the context where "an appointment has yet to be made" but the Chief Justice in respect of a company incorporated under the laws of the Cayman Islands "accepted that the starting point would be for the Company to be wound up by, or reorganised under the supervision of this Court, unless there were compelling reasons justifying the displacement of the Cayman Islands as the primary jurisdiction." At paragraph 8 the Chief Justice stressed that:

> "It is not the practice of this Court to defer automatically to winding up proceedings begun in a foreign jurisdiction simply because a petition was presented there first in time."

At paragraph 53 the Chief Justice added:

> "…any insolvency proceedings, including any restructuring or scheme of arrangement, should be supervised by the Grant Court of the Cayman Islands as the court of the place of incorporation of the Company."

39. Harris J in *Joint Official Liquidators of A Company v B & C* [2014] 5 HKC 152 dealt with a number of applications made by liquidators including an application that the liquidators and their appointment in the Cayman Islands be recognised. The headnote to the judgment indicates that it was held that generally matters concerning the constitution and management of the affairs of a foreign company were determined by the law of the place of its incorporation and if under the law of the place of incorporation

a liquidator is appointed his authority should be recognised in Hong Kong. Harris J referred to my decision (in my then capacity as a Deemster in the Isle of Man) in *Impex Services Worldwide Ltd* 2003-05 MLR 115 and Kawaley J's decision (in his capacity as a Judge in Bermuda) in *Re Founding Partners Global Fund Ltd* [2011] Bda LR 22 and stated at paragraph [17] that the significance of such decisions was that "they serve to demonstrate the extent to which the courts in different common law jurisdictions are adopting a consistent and expansive view of the extent to which established common law principles require the court to recognise foreign liquidators and allow the court to provide assistance to them". Harris J (at paragraph [18]), recognising and accepting well established principles of the common law and private international law, took the view that the Hong Kong Companies Court should adopt a similar approach.

40. In international insolvency cases, the common law and the principles of private international law all emphasise the importance and primacy of the place of a company's incorporation.

41. Deputy High Court Judge William Wong SC in *Moody Technology Holdings Limited (in provisional liquidation for restructuring purposes)* [2020] HKCFI 416 referred, in an illuminating and informative judgment, at paragraph 46 to the importance of the law of a company's incorporation (citing *Re Z-Obee Holdings Ltd* [2018] HKLRD 165 at 13 per Harris J) and rightly described this as "orthodox and well established."

42. Lawrence Collins J in *Drax Holdings Limited* [2003] EWHC 2743 (Ch) at paragraph 24 in the language of the day stated:

> "…The English court will not wind up a foreign company where it has no legitimate interest to do, for that would be to exercise an exhorbitant jurisdiction contrary to international comity …"

At paragraph 29, Lawrence Collins J recognised that a scheme of arrangement between a company and its members "would essentially be a matter for the courts of the place of incorporation." Lawrence Collins J at paragraph 30 recognised that in the case of a

creditors' scheme which involved the alteration of contractual rights "international effectiveness" required that regard be had to the courts in the country of incorporation but also to the courts of the country whose law governs the contractual obligations:

> "Otherwise dissentient creditors may disregard the scheme and enforce their claims against assets (including security for the debt) in countries outside the country of incorporation."

43. In international insolvency cases, I agree that it is especially important to adopt a broad internationalist global outlook rather than a narrow, insular territorial approach. As a well-established and fundamental principle of private international law it is also important to have proper regard to the primacy of the law of the place of the relevant company's incorporation. Lord Sumption confirmed such an approach in *Singularis Holdings Limited v PriceWaterhouseCoopers* [2014] UKPC 36 at paragraph 23 of his judgment when he stated:

> "…The principle of modified universalism is a recognised principle of the common law. It is founded on the public interest in the ability of foreign courts exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a world-wide basis, notwithstanding the territorial limits of their jurisdiction. The basis of that public interest is not only comity, but a recognition that in a world of global businesses it is in the interest of every country that companies with transnational assets and operations should be capable of being wound up in an orderly fashion under the law of the place of their incorporation and on a basis that will be recognised and effective internationally…".

44. In the somewhat urgent circumstances of *Silver Base Group Holdings Ltd* (FSD; unreported judgment 8 December 2021), I touched upon the importance the law attaches to the place of incorporation. I stated:

> "6. The Company is incorporated under the laws of the Cayman Islands. I have full regard to the importance of the laws of the place of a company's

incorporation and the international recognition of light-touch provisional liquidators appointed for restructuring purposes. See *The Law of Insolvency* 5th Edition (2020) Ian Fletcher at paragraph 30-054; *Dicey, Morris & Collins* on *The Conflict of Laws* (Fifteenth Edition) rules 175 and 179; Chief Justice Smellie in *Sun Cheong*; Harris J in *Re China Huiyan Juice Group Limited* [2020] HKCFI 2940 (19 November 2020) and Harris J in *Li Yiging v Lamtex Holdings Ltd* [2021] HKCFI 622.

7. Ian Fletcher puts it well at paragraph 30-054 when he refers to the long accepted fundamental principle that the law of the place of a company's incorporation is primarily, "possibly immutably", competent to control all questions concerning a company's initial formation and subsequent existence. Dicey Rule 179 sets out the common law and private international law position that the authority of a liquidator (and I would add a provisional liquidator) appointed under the law of the place of incorporation should be recognised in other jurisdictions.

8. Dicey Rule 175(2) under the heading "Corporations and Insolvency" citing at footnote 78 caselaw from as long ago as 1843 states:

> "All matters concerning the constitution of a corporation are governed by the law of the place of incorporation."

This fundamental principle has been etched on my mind ever since *Buckmaster and Moore v Fado Investments* 1984 – 86 MLR 252 (in respect of foreign partnerships) – challenging experiences in court are always memorable.

9. Lord Sumption (who also sits in the Hong Kong Court of Final Appeal) at paragraph 23 of his much read judgment in *Singularis Holdings Limited v PriceWaterhouseCoopers* [2014] UKPC 36 also emphasised the importance, in international insolvency cases, of respecting and having full regard to the laws of the relevant company's place of incorporation."

45. Mr Milne emphasised another relevant quote from Fletcher, a leading work on the international law of insolvency, at paragraph 28:009:

> "… it is fully in accord with both principle and authority, so far as English law is concerned, to regard all questions concerning the creation, continuing existence, and ultimate dissolution of a company as being primarily governed by the law of the place in which that company has undergone formation. Hence the courts of that country are considered to constitute the proper *forum* for proceedings to bring about the insolvent liquidation of the company, and English law will recognise the effectiveness of any resultant decree whereby the company is declared to be dissolved, and its legal personality terminated."

46. England and Wales and the Cayman Islands are not alone in respecting the primacy of the law of the place of a company's incorporation. Other sophisticated common law jurisdictions (including Bermuda and Hong Kong) have also delivered judgments that generally respect the primacy of the place of the company's place of incorporation.

47. Chief Justice Hargun sitting in the Supreme Court of Bermuda in *Stephen John Hunt v Transworld Payment Solutions U.K. Limited* [2020] SC (Bda) 14, Com, 6 March 2020 at paragraph [32] stated:

> "The general rule is that the court will recognise at common law only the authority of the liquidator appointed under the law of the place of incorporation of the company."

48. It has also been recognised at the highest level in Hong Kong. In *Kam Leung Siu Kwan v Kan Kwan Lai* (2015) 18 HKCFAR 501 in a strong joint judgment by former Chief Justice Geoffrey Ma and Lord Millett NPJ (with whom Ribeiro PJ, Tang PJ and Fok PJ agreed) at paragraph [19] it was stated: "…the most appropriate jurisdiction in which to wind up a company is the jurisdiction where it is incorporated …." and referred for the necessity for there to be "good reason" to exercise the "abnormal jurisdiction" (sometimes previously described as "exhorbitant" or as "usurping" the functions of the

courts of the country of incorporation although the Hong Kong Court of Final Appeal described such labels as unhelpful and potentially misleading) of winding up a foreign company.

49. The appeal before the Hong Kong Court of Final Appeal involved a company incorporated in the British Virgin Islands. At paragraph [25] this well respected court of final appeal referred to:

> "…the starting point that the country of incorporation normally provides the most appropriate jurisdiction in which to seek a winding up order …"

50. The court recognised, as the Court of Appeal had observed, that "creditors are not personally attached to the state of incorporation whereas the shareholders of a foreign company or their predecessors will usually have voluntarily adopted and approved the law of the state of incorporation as the law governing the company's legal status." I would merely add that, although shareholders in effect agree to be bound by the laws of the place of incorporation of the company, sophisticated commercial creditors must also be taken to have knowledge that the company they are contracting with is generally governed by the laws of its place of incorporation which as a matter of private international law usually has primacy.

51. Harris J in *Re China Huiyuan Juice Group Limited* [2020] HKCFI 2940 at paragraph 19 also referred to the acknowledgement by the Hong Kong Court of Final Appeal in *Han Leung Sui Kwan v Kan Kwan Lai* (2015) HKCFAR 501 that:

> "…the normal and most appropriate course for a person seeking to wind-up a company is to issue the necessary application in its place of incorporation."

52. Harris J at paragraph 21 refers to the assumption of Ma CJ and Lord Millett NPJ in the Hong Kong Court of Final Appeal that, in the context of a solvent foreign incorporated company with immediate subsidiaries also incorporated in an offshore jurisdiction, "it

would probably not be possible for a liquidator appointed in Hong Kong to be able to change the board of the subsidiaries or alter the register of shareholders."

53. Harris J at paragraph 21 referred to the difficulties with subsidiaries outside Hong Kong and prefaced his remarks by referring to:

> "the need for the petitioner to demonstrate sufficient benefit that the petitioner will derive from a winding-up order to justify making an order in Hong Kong rather than requiring the Petitioner to take what will normally be the more appropriate step and seek to wind-up the Company in its place of incorporation."

54. It should also be emphasised that, while a winding up in the place of incorporation will normally be given priority, recognition and extra territorial effect of a foreign winding up elsewhere only has operation in that foreign jurisdiction. See for example *Re International Tin Council* [1987] 1 Ch. 419 which involved an international organization established by treaty in 1956 with its headquarters in London. The issue in that case was whether such an organisation could be compulsorily wound up by the English court. In dealing in general terms with jurisdiction, Millett J at page 445 stated:

> "The status of a foreign corporation is a matter of private international law and is governed by the law of the country of incorporation."

55. At page 447 Millett J adds:

> "Although a winding up in the country of incorporation will normally be given extra-territorial effect, a winding up elsewhere has only local operation."

56. Millett J in the *Tin Council* judgment, with his eye rightly on the global position and comity in respect of an English court exceptionally making a winding up against a foreign company, adds at pages 446 – 447:

> "Where the company is simultaneously being wound up in the country of its incorporation, the English court will naturally seek to avoid unnecessary conflict, and so far as possible to ensure that the English winding up is conducted as ancillary to the principal liquidation."

57. In the present case, it is to be hoped that the Hong Kong Court would also strive to avoid unnecessary conflict and ensure that the Hong Kong winding up is conducted as ancillary to the principal liquidation of the Company which is incorporated in the Cayman Islands.

58. Sir Richard Scott V-C sitting in the High Court of England and Wales in *Bank of Credit and Commerce International S.A.* [1997] Ch 213 held that where a foreign company was in liquidation in its place of incorporation, any winding up in England would be ancillary thereto. Sir Richard Scott at pages 238 - 248 dealt with the issue of ancillary liquidations and recognised that Sir Nicholas Browne-Wilkinson V-C and Sir Donald Nicholls V-C, his two distinguished predecessors, had also intended that "the winding up of B.C.C.I in this country would be an "ancillary" liquidation with the Luxembourg liquidation constituting the principal liquidation" (B.C.C.I being incorporated under the laws of Luxembourg). Sir Richard Scott added at page 238 what he regarded as "common ground" that:

> "It is equally clear from the terms of the Luxembourg winding up order of 3 January 1992 and the several judgments of the Luxembourg courts that the Luxembourg courts regard the Luxembourg winding up as the principal winding up."

It is plain that these distinguished and commercially experienced English judges respected the position and decisions of the courts in the company's place of incorporation.

59. I end the law section of this judgment by referring to Harris J's relatively recent judgment in *Li Yiqing v Lamtex Holdings Limited* [2021] HKCFI 622 where at paragraph 7 the learned judge stated:

> "A winding up in a company's country of incorporation will as a matter of Hong Kong rules of private international law be given extra-territorial effect in Hong Kong."

60. Harris J at paragraph 22 adds:

> "The current position in Hong Kong is that the court recognises only insolvency practitioners appointed in the place of incorporation."

61. Harris J at paragraph 31 referred to the common structure of a Cayman incorporated holding company, which owns intermediate subsidiaries incorporated in the British Virgin Islands, which own Mainland subsidiaries and stated:

> "… in cases in which a listed company's business is in the Mainland it may be necessary because of the common structure of such groups for the holding company, if it is incorporated in an offshore jurisdiction, to be wound up in its place of incorporation in order for liquidators to have any prospect of obtaining control of Mainland subsidiaries. If this is a material consideration it would normally be appropriate for the place of incorporation to be the primary insolvency jurisdiction."

62. Harris J at paragraph 32, with years of valuable experience presiding over international insolvency cases, was acutely conscious of and sensitive to comity concerns and added:

> "Another consideration is the principles of comity. Generally, the courts of Hong Kong are slow to ignore the express requests of other courts particularly in the present context of a request from the court of the jurisdiction of the company's incorporation. It is but one factor to which regard is to be had. It is, however, a weighty one, which requires careful scrutiny of the reasons advanced by a party asking the Hong Kong court not to comply with a request."

**Main reasons for making the winding up order in the Cayman Islands and appointing JOLs**

63. Having referred to some of the relevant law, I turn now to my main reasons for making the winding up order in the Cayman Islands and appointing the JOLs.

64. I made a winding up order because the Company was unable to pay its debts.

65. I appointed the JPLs as JOLs as I felt that they were best placed to take matters forward in the best interests of the Company, its creditors and other relevant stakeholders.

66. I took into account the views of the Company's stakeholders and in the interests of comity the views expressed by the Hong Kong Court and the Hong Kong Official Receiver. The directors of the Company, a substantial group of creditors in number and by value and the Investor were all supportive of a winding-up order being made in the Cayman Islands and supportive of the JPLs being appointed as JOLs. I noted carefully the orders made and judgments issued by the Hong Kong Court and I noted that the Hong Kong Official Receiver did not express a view other than to say that the proceedings in Hong Kong and the Cayman Islands were "separate and distinct." There was substantial support for and no opposition to the orders sought by the JPLs on behalf of the Company on 22 February 2022.

67. I also took into account the fact that a winding up order made by the Hong Kong Court would have limited effect on subsidiaries outside Hong Kong and that an order made by a court in the place of incorporation of the Company should be more effective internationally in accordance with well-established principles of private international law. This was another good reason why the Cayman Islands in this case should be the primary jurisdiction in respect of the winding up of the Company.

*Comity concerns*

68. I subjected Mr Milne to a barrage of questions and requests for further assistance at the hearing as, although I was persuaded that the Company was unable to pay its debts and there was no opposition to the winding up order being made (and due notice had been given of the hearing), I was hesitant to make an order which may appear, at least to some, to be stepping on the toes of Linda Chan J in Hong Kong. The judges in the Cayman Islands take great care to avoid potential conflict with courts in friendly foreign jurisdictions, especially Hong Kong in view of the very strong connections between the two countries and the importance of the legitimate financial business conducted in and from them. It is plainly in the best interests of the Cayman Islands and Hong Kong that such business continues to flourish and that both jurisdictions have a mutual respect for each other.

69. Chief Justice Smellie in *Sun Cheong* referred to comity concerns at page 23 under the heading "URGENCY AND COMITY" and at paragraph 3 indicated that he was providing reasons for orders which he made on 31 July 2020 "not only for the sake of those interested in the Company but also in deference to the Hong Kong Court whose jurisdiction is also engaged."

70. In *Silver Base,* I also referred to and dealt with comity concerns in respect of the Hong Kong Court.

71. Parker J in *Altair Asia Investments Limited* (FSD; unreported judgement 16 March 2020) at paragraph 67 stated:

> "…Comity and cooperation is particularly important in the field of cross-border insolvency and it would not be appropriate for this court to proceed to a judgment on the disputed debt by determining the Petition before Mr Justice Harris has handed down judgment."

72. Segal J in *China Agrotech Holdings Limited (in liquidation)* 2019 (2) CILR 302 at paragraph 68(d) stated:

> "It also seems to me to be right, for the reasons given by Mr Lowe, that there are strong grounds for believing that the risk of inconsistent judgments is low. I am anxious, however, to avoid any discourtesy to or conflict with the Hong Kong court and would, had the Hong Kong court expressed the wish to do so, have been prepared to defer giving judgment pending further discussions between the parties and the courts regarding the need for steps to be taken to coordinate the Cayman and Hong Kong proceedings (I have for some time suggested to the liquidators that consideration be given to court to court communication for this purpose if the need arose)."

73. Kawaley J in *Guoan International Limited* (FSD; unreported judgment reasons delivered 29 October 2021) at paragraph 8 stated, in the particular circumstances of the case before him,:

> "…Having regard to considerations of comity, and the importance of judicial cooperation in commercial matters in the winding-up sphere in particular, I considered this court should not make an immediate winding-up order in circumstances where the Hong Kong Courts might, possibly in relatively short order, suspend and ultimately set aside the judgment upon which the Petitioners relied."

Kawaley J at paragraph 37 added:

> "It is moreover important in the interests of comity, as I observed in the course of argument, that the Cayman Islands courts are astute to avoid accidentally undermining the integrity of parallel or related proceedings before the Hong Kong courts…"

Kawaley J at paragraph 38 referred to the views he expressed in "the course of the hearing about the importance of showing due deference to the Hong Kong Courts in the context of overlapping proceedings."

74. Cayman judges have sensibly had comity concerns at the forefront of their minds when determining issues in proceedings before the Grand Court of the Cayman Islands when there are connected proceedings in foreign friendly jurisdictions such as Hong Kong. I did not want to place the Grand Court of the Cayman Islands in potential conflict with the Hong Kong Court. Having considered the position in detail I concluded, taking into account all relevant factors including the primacy of the place of incorporation, comity concerns, the views of stakeholders, and the lack of opposition, that it was just and appropriate to make the orders which I made on 22 February 2022.

75. It is, of course, entirely a matter for the Hong Kong Court but I express the wish that it gives the JOLs recognition and assistance. On 1 March 2022, I made an order that a letter of request be issued and directed to the Hong Kong Court seeking its assistance in aid of the Grand Court in these proceedings. It was respectfully requested that the Hong Kong Court recognise the order of 22 February 2022 ordering that the Company be wound up and appointing the JOLs.

76. It appears, at least in the first instance, to be a matter for the creditors and contributors as to who shall be appointed liquidators to replace the Hong Kong Official Receiver as provisional liquidator. I would respectfully suggest that it appears, at least to this court, that it may be more effective and efficient and would plainly save time and avoid duplication if the JOLs this court has appointed were also appointed as liquidators in Hong Kong. This, to my mind at least, would appear to be in the best interests of all creditors but at the end of the day it will be a matter for them to vote upon the position as they see fit and subject to any intervention of the Hong Kong Court.

77. Harris J, for good reason, adjourned the convening meeting hearing to 29 March 2022 in Hong Kong and again it will be for the Hong Kong Court to make whatever order it

sees fit on that day but it seems to me that the creditors of the Company, incorporated under the laws of the Cayman Islands, should at least be given an opportunity to vote on the proposed Scheme. Creditors should not be lightly deprived of their vote on the Scheme. Hopefully the court hearing in Hong Kong will go ahead on 29 March 2022 whether in person or remotely and the Scheme Meeting will be convened to ascertain the views of the creditors on the Scheme and in an endeavour to achieve the requisite majority for the approval of the Scheme in the best interests of the creditors.

*Three specific areas in respect of the draft order*

78. There were three specific areas in respect of the draft order as filed by the attorneys that needed attention:

Firstly, the draft originally at paragraph 4 provided:

> "The Joint Official Liquidators be authorised to exercise powers in accordance with Part I and Part II of Schedule e to the Act."

The Part II powers are exercisable without sanction of the Court. The Part I powers are only exercisable with sanction. Yet again I had to remind local attorneys of the judgment of Jones J in *UCF Fund Limited* 2011 (1) CILR 3015. Normally a court should not give "blanket authority" to exercise powers contained in Part I. An application for sanction needs to be based on specific circumstances or transactions in which the exercise of the relevant power(s) was appropriate and needs to be supported by relevant evidence. It would normally be inappropriate and wrong in principle for the court to authorise a liquidator to exercise all Part I powers as the liquidator saw fit without further reference to the court, simply on the basis that it might become appropriate to exercise such powers.

Secondly, in the specific circumstances of this case I was willing to authorise the JOLs to take such action as may be necessary or desirable to obtain recognition in Hong Kong

and thought it best to include a specific paragraph to this effect as it did not prima facie appear to be covered in the Part II powers.

Thirdly, in the specific circumstances of this case I also concluded that it was appropriate to provide the JOLs with power to authorise the directors of the Company to approve the audited financial results of the Company. The JOLs do not feel able to sign off on the accounts. The directors have the necessary knowledge and information to do that. The sooner they do that the better as it appears necessary to satisfy the SEHK and for the Scheme to progress in the best interests of the creditors.

**Conclusion**

79. It was for these main reasons that I made the orders which I did on 22 February 2022.

David Doyle

**THE HON. JUSTICE DAVID DOYLE**
**JUDGE OF THE GRAND COURT**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 169 OF 2020 (ASCJ)**

**IN THE MATTER OF COMPANIES LAW (2020 REVISION) ("the Companies Law").**

**AND IN THE MATTER OF SUN CHEONG CREATIVE DEVELOPMENT HOLDINGS LIMITED ("the Company")**

**Appearances: Marc Kish and Gemma Lardner of Ogier for the Company.**

## REASONS

**Cayman Islands company listed on the Hong Kong Stock Exchange – petitions for winding up filed before Hong Kong Court – application to this Court by the company for appointment of provisional liquidators for "soft touch" restructuring – applicable principles.**

1. The Company is incorporated in this jurisdiction and is registered in Hong Kong and listed on the Hong Kong Stock Exchange ("**HKSE**"). It is the holding company of a corporate group (the "**Sun Cheong Group**") which designs, develops, manufactures and sells a large range of plastic household products. The Group's products are manufactured in mainland China ('the PRC") and sold either under the brand name of "clipfresh" or on an "original design manufacturing" basis. The Group distributes its products within Hong Kong and abroad, including Australia, the United Kingdom, the United States, New Zealand and Germany.

2. By its petition filed on 27 July 2020, the Company petitioned for its own winding up ("**the Petition**"). However, by *ex parte* summons filed on the same date, the Company applied for the postponement of the Petition and the appointment of representatives of FTI Consulting (Cayman) Limited and FTI Consulting (Hong Kong) Limited as its joint provisional liquidators, pursuant to section 104(3) of the Companies Law. By this process the Company seeks to be given an opportunity to restructure its assets and liabilities under the supervision of this Court instead of being placed into official liquidation by the High Court of Hong Kong, pursuant to a petition (one of two) already pending before that Court.

3. On 31 July 2020 I acceded to the Company's application. I now provide these reasons not only for the sake of those interested in the Company but also in deference to the Hong Kong Court whose jurisdiction is also engaged.

4. On behalf of the Company, it was submitted that it is undoubtedly in the best interests of the Sun Cheong Group's employees, shareholders and creditors, that the Company be given an opportunity to restructure its assets and liabilities under the supervision of this Court, before the irreversible step of placing it into official liquidation is taken by the Hong Kong Court, in circumstances where:

   a. The Company has a historical record of generating significant revenue and profit prior to 2019;

   b. There is already a "white knight" investor in place who is willing to inject HK $75 million in funding into the Company;

   c. There has been a wholesale change of the board of the Company (the "**Board**"),

providing independence, as well as significant financial and distressed asset expertise at Board level; and

d. An independent financial report has estimated that, on the basis of an immediate winding up, creditors would be unlikely to receive a return of any more than 1 cent on the dollar.

5. It was said to be critical, on the date of hearing, that the JPLs be appointed on an urgent basis in order to avoid the making of a winding up order by the Hong Kong Court, where one (of the two) creditor's petitions was listed to be heard on 3 August 2020. It was said to be obvious that the grant of that petition could damage irrevocably the ability of the Company to restructure its liabilities and preserve value for its stakeholders.

6. Such considerations, critical as they were, could not in and of themselves have been determinative of whether this Court should assume jurisdiction where there may be proper grounds for insolvency proceedings in another jurisdiction. Rather, I acceded to the hearing of the ex parte summons on the basis that where proceedings have been issued in more than one jurisdiction but an appointment has yet to be made, the starting point for the Court (as the case law to be discussed below reveals), should be to consider which jurisdiction is the more appropriate to assume the role of primary insolvency proceeding. All other things being equal, this will generally be assumed to be the place of incorporation of the company, being the place that its investors, service providers and trade creditors would typically associate with, among other things, the company's registered office and the law governing the duties of its board of directors and its Articles of Association. In the present case, I accepted that the starting point would be for the

Company to be wound up by, or reorganised under the supervision of this Court, unless there were compelling reasons justifying the displacement of the Cayman Islands as the primary jurisdiction. It will become apparent below that such countervailing factors as were disclosed were considered.

7. It was also recognised that there have however, been instances where a foreign court has assumed the role of primary insolvency proceeding in respect of Cayman Islands domiciled companies and where this has been acknowledged by this Court, which went on to recognise office holders appointed by the foreign court. The cases show that such instances are typically limited to circumstances where:

   a. there is a particularly strong nexus between the company and the foreign jurisdiction such that the legitimate expectation of interested parties as to the locus of the primary insolvency proceedings, has shifted to that foreign jurisdiction;[1]

   b. the foreign court had already appointed officers seeking to effect a restructuring for the benefit of stakeholders; and

   c. where there were no competing proceedings in the Cayman Islands.

8. It is not the practice of this Court to defer automatically to winding up proceedings begun in a foreign jurisdiction simply because a petition was presented there first in time. Instead this Court will consider, on the case by case basis, whether it is satisfied

[1] Akin to the concept of COMI-shifting where the jurisdiction concerned has enacted legislation pursuant to the UNCITRAL Model Law or, in the common law context, in deference to the principles of "modified universalism" (see further below), where the Court recognises the order of a foreign Court to wind up a Cayman Islands company on the basis of significant connections to the foreign jurisdiction, such as in ***Re China Agrotech Holdings Limited*** 2017 (2) CILR 526 ("***China Agrotech***").

that there is a genuine intention on the part of the company to present a plan of re-organisation in the Cayman Islands, and the merits of the proposal for carrying out such a plan for the benefit of the company's shareholders and creditors worldwide.

9. It was submitted on behalf of the Company and I accepted that it would be far more appropriate in the present case for this Court to make an order appointing the JPLs in Cayman, notwithstanding the impact that order will likely have on the proceedings in Hong Kong. To the extent that any creditors may oppose the appointment of the JPLs, those views can be articulated upon the return date of the Company's summons, once all other proceedings against the Company have been stayed. In the intervening period, I was satisfied that representatives of the firm of FTI Consulting with insolvency practitioners in both jurisdictions, should be appointed to safeguard the assets of the Company for the benefit of creditors.

## BACKGROUND

*Company Overview*

10. As mentioned above, the Sun Cheong Group is involved in the design, manufacture and sale of plastic household products which are sold either under the brand name of "clipfresh" or on an "original design manufacturing" basis.

11. In the affidavit evidence filed in support of the summons and Petition[2], it is explained that as income levels increase and living standards improve, there has been increased demand in developed economies such as the United States, the United Kingdom,

[2] Primarily that contained in the First and Second Affirmations of Chan Sui On Bill ("Mr Bill Chan"), the executive director of the Company.

Australia and Hong Kong for premium household products which are safe, environmentally friendly and aesthetically appealing. Accordingly, until 2019, the Sun Cheong Group was a successful and profitable business, generating annual revenue in excess of HK $300 million (US $38 million) and returning dividends to its shareholders, approximately 30% of whom are members of the public who subscribed for shares through the HKSE.

12. The Company's recent financial difficulties are said to have arisen from an unfortunate confluence of events in 2019 and 2020 which include: [3]

a. The need to relocate the Company's factory twice in 18 months because the first premises were not appropriate for the Company's business, necessitating additional and unforeseen capital expenditure of RMB48.9 million (approximately US $7 million), causing attendant disruptions to production and consequential lost revenue.

b. The trade war between China and the United States, which led to a significant drop in the value of the Australian dollar as against the US dollar (to which the Hong Kong dollar is pegged), meaning that the value of the Company's sales in Australia were significantly diminished and the Company's revenue proportionately reduced. This coincided with stricter lending terms from financiers due to the deterioration of the global economy more broadly. In particular, the reduction of available credit lines from the Company's banks led

[3] Per the First Affirmation of Mr Bill Chan, paragraphs 21 to 22.

to liquidity issues for the Company.

c. The departure of Mr Tong Ying Chiu Eddie ("**Mr Eddie Tong**"), the founder and ex- chairman of the Company and legal representative of the Group's factories in in the PRC, due to health reasons, without any transition period. Mr Eddie Tong's sudden departure, together with the fact that the Company was only in the initial stages of investigating new investment/financing options to enable it to make a proposal to the Group's creditors, ultimately resulted in a winding up order being made against Chase On Development Limited ("**Chase On**"), an indirect, wholly owned subsidiary of the Company.

d. The incidence of the COVID-19 pandemic, which significantly disrupted production and sales in the first six months of 2020.

13. Mr Bill Chan affirms that as a result of these events, the Company is indebted to 11 different bank creditors (the "**Bank Creditors**") in the sum of HK $168 million and has net liabilities of HK $155.2 million. A number of creditors (Nanyang Commercial Bank, Fubon Bank (Hong Kong) Limited, O-Bank Co., Ltd and DBS (Hong Kong) Limited) commenced civil proceedings in the High Court of the Hong Kong Special Administrative Region (the "**Hong Kong Court**") to recover amounts owing to them by the Company in its capacity as guarantor of the debts of Chase On (together, the "**Debt Claims**").

14. There are also the aforementioned two winding up petitions on foot against the Company in the Hong Kong Court (the "**HK Petitions**"):

a. On 13 December 2019, CTBC Bank Co Ltd ("**CTBC**") presented a petition to

wind up the Company for non-payment of HK $44.3 million (the "**CTBC Petition**"). The CTBC Petition was listed for hearing on 3 August 2020 and unless this Court granted the relief sought by the Company and appointed the JPLs, it was highly likely that the Company would have been wound up on that date. It is for this reason to be expanded upon below, that the application was taken on the urgent basis.

b. On 19 January 2020, Orix Asia Limited ("**Orix**") presented a further petition to wind up the Company for non-payment of HK $ 7 million (the "**Orix Petition**"). The Orix Petition was next listed for hearing on 2 September 2020.

15. The evidence in support of the application, elaborated by the First Affidavit of Mr Cheung Wai Lein Jacky (the Counsel from the firm of Loeb & Loeb LLP appointed to the Company ("Mr Jacky Cheung")), is that the Company does not have sufficient assets to satisfy the debts which are the subject of the Debt Claims or the HK Petitions. Both Mr Bill Chan and Mr Jacky Cheung also explain the restructuring proposal.

**RESTRUCTURING OPTIONS**

*Details of Restructuring Proposal*

16. The Cachet Group is the proposed "white knight" investor for the Company. The Cachet Group's relationship with the Sun Cheong Group began in April 2019 when an affiliate of Cachet Group, Cachet Multi Strategy Fund SPC ("**Cachet SPC**"), entered into a loan agreement in the sum of HK $150 million with Uni-Pro Ltd ( "**the loan agreement**" and "**Uni Pro**"), the majority shareholder of the Company (holding 50.5% of the Company's issued shares).

17. Cachet SPC is an exempted company incorporated with limited liability and registered as a segregated portfolio company under the laws of the Cayman Islands, with registration number OG-315809. It focusses on distressed debt investing through its two segregated portfolios:

   a. Cachet Special Opportunities SP, a hybrid equity/private credit segregated portfolio fund; and

   b. Cachet Deep Value Fund SP, a private credit segregated portfolio fund.

18. Cachet Asset Management Limited ("**Cachet Asset Management**") is a Hong Kong Securities and Futures Investment Commission-licensed wealth and fund management specialist in Greater China, and is the Investment Manager of Cachet SPC.

19. Uni-Pro's obligations under the loan agreement were secured by:

   a. Guarantees provided by Mr Eddie Tong (the Company's ex-chairman), Ms Sylvia Ng (an ex-director and Mr Eddie Tong's wife) and Mr Ivan Chan, all of whom were directors of the Company at the time; and

   b. a debenture dated 16 January 2020 incorporating fixed and floating charges over all the undertaking, property, assets, goodwill, rights and revenues of Uni-Pro, including but not limited to its shares in the Company.

20. Following Uni-Pro's default under the loan agreement, on 3 June and 8 June 2020, Cachet SPC appointed Mr Cheung Hok Hin Alan of Wing United CPA Limited ("**Mr Alan Cheung**" or "**Receiver**") as a receiver over the shares in the Company held by



GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

Uni-Pro and Mr Ivan Chan respectively, comprising 68.31% of the total issued share capital of the Company.

21. If the Company were wound up, Cachet SPC would not be able to recover all of the monies owed under the Uni-Pro loan.

22. However, the Cachet Group believes that the Company's new management (which includes Mr Bill Chan, its executive director) will be able to salvage the Sun Cheong Group provided that JPLs are given an opportunity to work alongside them. As such, on 12 June 2020, the Cachet Group provided immediate bridging finance to the Company in the sum of HK$10,000,000 in order to enable the Company to investigate and, if appropriate, implement a restructuring of the Company.

23. On 26 June 2020, Cachet Group appointed FTI Consulting (Hong Kong) Limited as an independent financial advisor to advise Cachet Group in relation to the merits of a potential investment in the Company and its subsidiaries. Cachet Group instructed FTI to prepare a report for the benefit of both Cachet Group and the Bank Creditors. A copy of the Independent Financial Advisor Report (the "**FTI Report**") was provided on 14 July 2020.

24. The restructuring proposal in the FTI Report (the "**Proposed Restructuring**") provides for a capital and debt restructuring whereby Cachet Group will subscribe for shares in the Company in the amount of HK $75 million and the proceeds of the share subscription will be allocated as follows:

a. HK $60 million for a creditors' settlement to be distributed by way of scheme

of arrangement;

b. HK $10 million for working capital; and

c. HK $5 million for payment of professional fees and expenses.

25. An important aspect of the Proposed Restructuring is that once the scheme of arrangement has become effective, it is intended that the Company will transfer to the scheme administrator all rights in any cause of action or claim against former management, auditors and advisors to a special purpose vehicle to be established by the scheme administrator. This means that the creditors have the prospect of receiving a pro rata distribution of the settlement amount of HK$60 million, plus any proceeds of the investigations and claims pursued by the scheme administrator. In contrast, in an official liquidation scenario, there is likely to be very little cash available for distribution to creditors at all and little to no funding to support investigations or pursuit of claims.

26. The Proposed Restructuring would also be closely supervised and scrutinised by this Court pursuant to the provisions governing schemes of arrangement under section 86 of the Companies Law.

*Viability of Restructuring Proposal*

27. This must be considered recognising that antithetically in an official liquidation there is, as is usually the case, only one option available to the liquidators: a forced sale of assets, potentially at distressed values. Accordingly, I was urged to accept that in the event that the Company is wound up:

a. The assets of the Sun Cheong Group (primarily plant and equipment) have very little re-sale value as they are unique to the Sun Cheong Group's business. The



GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

Report estimates that their sale value is unlikely to exceed 10% of their book value and notes that they are, in any event, subject to a first ranking charge in favour of KM Plastic, which is the seller, so there are unlikely to be any proceeds of sale returned to the unsecured creditors.

b. Although the Company's "listing status" may have value of up to HK $150 million, recent transactions have demonstrated a decreasing trend in price that is further worsened by the COVID-19 environment. Further, in order to extract value from the Company's "listing status", one of the key determinants of the value to be derived is whether there is a white knight investor available to provide sufficient resources and capital in order for the Company to maintain its operations.

c. Other valuable contractual rights will be lost, including rights of use in relation to the Sun Cheong Group factories in the PRC.

d. Preferential payments will need to be made to the PRC Government in respect of taxes and to employees in respect of severance and other entitlements, which would rank ahead of any payments to the general body of creditors and potentially extinguish any funds available for distribution (but would not necessarily need to be paid in a restructuring scenario).

28. Additionally, the shareholders of the Company, 30% of whom are public investors, would receive nothing at all in an official liquidation.

29. Conversely, as explained in paragraphs 16 to 22 above, pursuing the Proposed Restructuring by way of scheme of arrangement under the supervision of the JPLs and

this Court provides creditors with a realistic prospect of a return of approximately 30% of their debt (the Proposed Restructuring contemplates distributing HK $60 million among creditors whose current liabilities as at 31 December 2020 amounted to HK $195.5 million). It is estimated that the restructuring could be completed in as little as 17 weeks, which is likely far quicker than an official liquidation would provide a return to creditors (if such a return was even available). It also provides for HK $10 million of working capital to be injected into the Company to get it back on its feet for the long term benefit of shareholders (and creditors, should any elect a debt for equity swap, for example) and leaves open the prospect of further returns to creditors if the scheme administrator makes any recoveries from claims against third parties.

30. While the Company has struggled in recent months, there are a number of business lines which management of the Company has identified as being potential sources of revenue, provided that the Company is provided with working capital and a pathway to discharge its liabilities, as contemplated by the Proposed Restructuring. In particular:

a. The Company has been developing a master cook-shop business since 2018 which is an online platform for kitchen and household products. It was suspended in late 2019/early 2020 due to a change in management but the Company considers launching this platform now would benefit from the change in customer shopping preferences as a result of the COVID-19 pandemic.

b. The Company is currently finalising the relevant agreement with customers for a medical equipment manufacturing business. This business line would also benefit from the recent COVID-19 pandemic which has increased demand for

medical equipment, substantial parts of which are made from plastic.

c. The Company's staple business of plastic manufacturing remains in demand with stable profit margins.

d. The Company has obtained distribution rights in Hong Kong for *Quantum PPF*, which is described as a famous brand of energy efficient coated glass for buildings and vehicles.

e. There is already a "white knight" investor lined up to provide the funding proposed under the Proposed Restructuring and confirmation from independent financial advisors (and the proposed JPLs) that the Proposed Restructuring is realistic and commercially viable.

31. Having regard to all the foregoing and in particular the circumstances which led to the Company's insolvency and its prospects for recovery, I regarded it as plain that the appointment of JPLs to facilitate a restructuring is in the best interests of the Company's stakeholders.

**APPOINTMENT OF JOINT PROVISIONAL LIQUIDATORS**

32. Section 104(3) of the Companies Law provides that the Court may appoint joint provisional liquidators after the presentation of a winding up petition[4] on the application of the Company where a two-limbed test is satisfied:

a. The Company is or is likely to become insolvent; and

[4] The Company is authorised by article 162(2) of its Amended and Restated Articles of Association to present a petition for the Company to be wound up: Mr Chan's 1st Affirmation, page 55. See also Section 94(2) of the Companies Law and ***China Shanshui Cement Group*** [2015] (2) CILR 255 which establishes and explains that a company may resolve to present a petition for winding up only if authorised by its articles.

b. The Company intends to present a compromise or arrangement to its creditors.

33. The Court's power to adjourn a winding up petition in order to facilitate such a restructuring is derived from section 95(3) of the Companies Law which enables the Court upon hearing the winding up petition to adjourn the hearing conditionally or unconditionally.

*Discretionary Power*

34. Given the pendency of the HK Petitions, it became of crucial importance that by virtue of section 97 of the Companies Law, when a winding up order is made or a provisional liquidator is appointed, no suit, action or other proceedings shall be proceeded with or commenced against a company except with the leave of the Court and subject to such terms as the Court may impose.

35. Under sections 104(3) and 95(3) of the Companies Law, the Court has a broad and flexible discretion. The breadth and flexibility of this discretion was first described by this Court in ***In the Matter of the Fruit of the Loom*** (Unreported, 26 September 2000but noted at 2000 CILR Note 7) ("***Fruit of the Loom***"). The breadth of the Court's discretionary power under section 104(3) to facilitate the rescue of a company was described as follows:

> *"The discretionary power vested in the Court by section 99 [as it then was] of the Companies Law is **very wide**. As the orders already made herein recognise, the power admits of a discretion which the Court will be prepared to use to appoint provisional liquidators as the basis for the rescue of a company. This is subject to the Court being satisfied that such appointment would be for the benefit of those having the financial interest in the company to be rescued This Court must be satisfied that the order would be for the general benefit of creditors and subject to creditors' prior interests, the benefit of shareholders.*

> *In the absence of jurisdiction given by specific statutory powers in the Courts for the making of administration orders over the affairs of companies, it is apt that the* ***flexible discretionary power*** *given in section 99 for the appointment of provisional liquidators be used to enable the rescue of a company where it is just to do so in the sense described above*" (emphasis added).

36. This discretion was affirmed more recently by Parker J in ***CW Group Holdings Limited*** (unreported, 3 August 2018) at [36] ("***CW Group Holdings***") and by Kawaley J in ***ACL Asean Towers Holdco Limited*** (Unreported, 8 March 2019) ("***ACL Asean***") at [11].

37. As to how the Court's broad discretion is to be exercised, there is no prescriptive list of factors to be taken into consideration. However, matters to which the Court may have regard include:

   a. The express wishes of creditors (though the Court should be cautious not to "*count up the claims of supporting and opposing creditors*" per Segal J in ***Grand T G Gold Holdings Limited*** (Unreported 21 August 2016) ("***Grand T G Gold***") at [6(f)iv)]);

   b. Whether the refinancing is likely to be more beneficial than a winding up order; (***Fruit of the Loom*** at p 9-10)

   c. That there is a real prospect of refinancing and/or a sale as a going concern being effected for the benefit of the general body of the creditors; (***Re Fruit of the Loom*** (*ibid*));and

   d. The considered views of the board as to the best way forward. (***CW Group Holdings*** at [72].

38. In this case, while the Petitioner and the Company are one and the same and the application for the appointment of JPLs is being made *ex parte,* the effect of the Court's order will be to stay the HK Petitions (by virtue of section 97 of the Companies Law), thereby necessitating an adjournment of those proceedings for the period of the provisional liquidation. In those circumstances, in deference to the Hong Kong Court's expectation of comity and to the principles of modified universalism which seek to maximise enterprise value for the sake of all stakeholders[5], I regarded it as important that this Court considered the general principles outlined above on which it will exercise its discretion to adjourn a winding up petition of an admittedly insolvent company.

39. I recognised that three creditors in particular, CTBC, Orix and American Express Travel Related Services Company, Inc. ("**AMEX**") are likely to oppose any order in the Cayman Islands which would have the effect of requiring an adjournment of the HK Petitions (CTBC and Orix being the petitioners themselves and AMEX having previously expressed opposition to an adjournment of one of the HK Petitions).[6] However, according to Mr Bill Chan in his First Affirmation:

a. No other creditors have expressed support for the immediate winding up orders sought by the HK Petitions;

[5] Defined by Lord Hoffman ***In Re HIH Casualty and General Insurance*** [2008] 1 WLR 852 at [30] as requiring that the *"[local] courts should, so far as consistent with justice and [local] public policy, co-operate with the courts in the country of the principal liquidation to ensure that all of the company's assets are distributed to its creditors under a single system of distribution*". The principle was reaffirmed by Lord Sumpton on behalf of the Privy Council in ***Singularis*** [2014] UK PC 36 at [23]. "…The principle of modified universalism is a principle of the common law. It is founded on the public interest of the courts exercising insolvency jurisdiction in the case of the company's incorporation to conduct an orderless winding up of its affairs on a world-wide basis, notwithstanding the territorial limits of their jurisdiction…" And all as discussed by Segal J in ***Re China Agrotech***.

[6] See the letter from K & L Gates on behalf of AMEX to the Company on 14 July 2020, indicating that it is unwilling to accept any proposal which does not provide a full repayment of its debt: Mr Bill Chan's Second Affirmation, page 386.

b. Letters of support for the Company's application for the appointment of JPLs have been provided by two creditors, as well as the Receiver appointed by Cachet SPC and Cachet Group itself (in its capacity as creditor of the Company and prospective "white knight" investor); and

c. A number of Bank Creditors actively engaged with FTI in relation to the Restructuring Proposal, in the course of a creditor meeting held on 22 July 2020. Based on the feedback provided, a revised timeline was put to Bank Creditors following the meeting to which no one had objected as at the date of Mr Bill Chan's First Affirmation.

40. That being the wider context, I accepted that the Court should be cautious not to abrogate the rights of the majority of the Company's creditors who may be better served by exploring a restructuring than an immediate winding up order.

41. As explained above, there is also independent evidence before the Court that the refinancing is likely to be more beneficial than a winding up order and that there is a real prospect of such a refinancing being effected. There is no better evidence of this than the willingness of Cachet Group, an experienced distressed debt investor, to invest HK $75 million in the Proposed Restructuring.

42. Finally, the resolution of the Board to seek the appointment of the JPLs confirms that it is the considered view of the Board that a restructuring is in the best interests of the Sun Cheong Group.

43. For all of the reasons set out above, I was satisfied that the broad discretion under section 104(3) should be exercised in favour of the relief sought by the Company.



GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

*The Company is or is likely to become insolvent*

44. But what of the strict requirements of the two-limbed test of section 104(3) itself as set out above at [32]? The Company has acknowledged in its evidence (per Mr Bill Chan) that it is cash flow insolvent. The meaning and purpose of this first-limb of the test "is or is likely to become insolvent", are therefore satisfied. As was recently reaffirmed by this Court, it would be unjust to a company's creditors to impose on them the regime of a "soft touch" provisional liquidation, if the company is able to pay its debts as they fall due but only for the purpose of allowing the company to improve and perhaps expand its business. See ***In Re OneTradex Ltd (in provisional liquidation)*** FSD 166 of 2019 (ASCJ) written judgment delivered 1 October 2020 (Unreported) at [7] applying dictum of Vinelott J from ***In Re Primarkes*** [1989] BCLC 734.

45. In circumstances where a creditor has submitted a winding up petition in respect of an undisputed debt (as two creditors have in the HK Petitions), the primary approach of the Court will be that the creditor is entitled to a winding up order *ex debito justiciae* (as of right), unless special reasons can be shown that the relief should not be granted. This principle was explained by Park J in ***Re Lummus Agricultural Services Ltd*** [2001] 1 BCLC 137 at 141(g-h):

> *"I begin with the basic proposition that, although both s122 (which uses the word 'may') and s 123 give the Court a discretion to make a winding up order, it is well settled that if a creditor with standing to make an application wants to have the company wound up, and if the Court is satisfied that the company is unable to pay its debts, a winding up order will follow unless there are some special reasons why it should not. It is sometimes said that in such a case, a petitioning creditor is entitled to a winding up order 'ex debito justiciae'. I therefore start with the assumption that such an order should be made in this case. and the*

*burden of the argument rests on Mr Lightman to show me why it should not".*

46. However, it is now broadly accepted in the Cayman Islands that an intention on the part of the Company to present a compromise or arrangement under section 104(3) can be sufficient justification to depart from this principle. In particular:

   a. In ***ACL Asean***, Kawaley J observed (at [26] that "*where an insolvent company takes the initiative and seeks to implement a court-supervised restructuring, this Court will accord the company's management a generous margin of appreciation when faced with attempts by creditors to impose a full-blown provisional or official liquidation instead.*"

   b. In ***Grand TG Gold***, Segal J accepted that the Company was insolvent but nevertheless concluded (at [6(f)] ) that "*While I accept the seriousness of and take fully into account these concerns, I consider that on balance the most appropriate course, having regard to the interest of all the Company's creditors as a whole and all the circumstances, is to adjourn the petition for a suitable period that is long enough to allow the Company to make and demonstrate substantial progress in advancing the Resumption Proposal but short enough to permit a further review of the position by the Court to ensure that the position of creditors is being protected and to review whether a winding up order should be made.*"

   c. In ***CW Group Holdings***, Parker J accepted that the Company was insolvent but concluded (at [76 to 77] that "*To allow the company to continue as a going*



GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

*concern and to give the board and its advisers the best possible opportunity to secure a favourable restructuring is in my view in the best interests of the body of general creditors as a whole. By contrast the winding up of the company and the commencement of official liquidation is likely to have an adverse impact on the business: on contractual and other relationships; future trading prospects; market reputation and position, and regulatory relationships, all of which would adversely affect the value of the Company*."

d. In ***Re Abraaj Holdings*** (Unreported, 4 January 2019), McMillan J pointed to the fact that the creditor opposing an adjournment "*failed to establish or even to identify any immediate tangible benefit to be derived from an official liquidation, as distinct from the very wide ranging scope of the provisional arrangements already in place*"

The rights of the HK Petitioners are of course to be determined by the Hong Kong Court in accordance with Hong Kong law in relation to the HK Petitions. However, the foregoing principles reflect how their rights would be viewed had they petitioned in the Cayman Islands. And so, notwithstanding the HK Petitioners' rights to a winding up order *ex debito justiciae*, I was satisfied that compelling reasons have been demonstrated for this Court to exercise its discretion to make an order in these proceedings which would have the effect of adjourning the HK Petitions in this instance.

*Intention to present a compromise or arrangement*

47. As to this, the second limb of the section 104(3) test, the Company has made clear its intention to present a compromise or arrangement, which is sufficient to satisfy this second limb. Importantly, in that respect, the language of section 104(3) does not impose a requirement on the Company to already have a pre-formulated restructuring plan. Nor does it require the Company to provide evidence of the viability of its restructuring plan.

48. The requirements of this limb of the test were considered by Parker J in ***CW Group Holdings*** where he specifically considered the language that the Company "*intends*" to present a compromise or arrangement to its creditors. Parker J accepted (at [70] that "*it is not necessary for there to be a formulated plan at this stage for the appointment of provisional liquidators on behalf of the Company.*" The rationale for this approach was described by him as follows in terms which must now be regarded as settled principle in Cayman Islands law (at [36]:

> "*The rationale for that language is to give effect to the practice which has developed of appointing provisional liquidators to provide companies with some 'breathing space' before the actions of creditors, acting in their own interests, might interfere with attempts to reach a consensual restructuring or if that should prove not to be possible, a scheme of arrangement – see* ***Esal (Commodities) Ltd*** *[1985] BCLC 450 at page 460 Harman J.*"

49. Where the Court is in any doubt as to the viability of such a restructuring plan, it is also well accepted that it can appoint JPLs for the purpose of preparing a report on the prospects of success of a restructuring plan.[7]

[7] ***ACL Asean*** and ***Grand TG Gold*** (both above); and ***Enka Insaat Ve Sanayi AS, Capital City Investment BV v Mass Energy Group***

50. In this case, where there is no reason to doubt the viability of the proposed restructuring, the principles are a fortiori applicable in favour of the Company's application. Here the Company comes to the Court with a detailed restructuring plan, a "white knight" investor in place, and confirmation from independent financial advisors that the proposed restructuring is both viable and in the best interests of creditors. While the terms of the Proposed Restructuring remain to be agreed with creditors, this will take place within the framework of a scheme of arrangement to be promoted under section 86 of the Companies Law.

51. Accordingly, I accepted that both limbs of the test under section 104(3) have been satisfied and that it is appropriate in all the circumstances that the Court exercises its broad discretion to adjourn the Petition (which would also have the effect of prompting the adjournment of the HK Petitions) and appoint the JPLs to facilitate the restructuring of the Company for the benefit of all stakeholders, by way of scheme of arrangement under section 86 of the Companies Law, or otherwise. Having regard to the pendency of the HK Petitions, the appointment of the JPLs was granted on the urgent basis and I turn below to expand upon the reasoning in that regard.

## URGENCY AND COMITY

52. I should express more fully, my thinking for the taking of this application on the ex parte basis. It became critical that the JPLs were appointed to the Company before Monday 3 August 2020, being the date on which it was likely that a winding up order may be made

***Holdings Ltd and others***, (FSD 188 of 2020 (ASCJ). (Unreported 4 May 2020).

in the Hong Kong Court in respect of the Company on the CTBC Petition, the effect of which would be to limit the options available to the Company in pursuing its intended plan of reorganisation. If such an order were to be made by the Hong Kong Court, it was likely to become more difficult to promote a scheme of arrangement under section 86 of the Companies Law (and/or a parallel scheme of arrangement in Hong Kong) as, among other things:

a. Any provisional liquidators appointed in the Cayman Islands may have difficulty obtaining recognition in Hong Kong in circumstances where other insolvency practitioners will have been appointed there as official liquidators; and

b. There was likely to be significant duplication of efforts and costs between the Hong Kong official liquidators and the Cayman JPLs.

53. As already discussed, the Company submitted and I accepted that any insolvency proceedings, including any restructuring or scheme of arrangement, should be supervised by the Grand Court of the Cayman Islands as the court of the place of incorporation of the Company. This was in light also of the circumstances where the Cayman Islands is an advanced and reputable international financial centre which frequently deals with international disputes involving Cayman Islands companies[8] and shareholders in and creditors of a Cayman Islands company may have a "*reasonable*

[8] ***Daiwa Capital Markets Europe Limited v Mr Maan Abdul Wahed Al Sanea*** (Unreported, 19 August 2019)

*expectation that the courts here are competent and able to resolve any complex dispute that may arise in an efficient and just manner.*"[9]

54. I also had in mind that the common law jurisdiction to recognise and assist foreign insolvency officeholders appointed in the country of incorporation of a company is well established in Hong Kong. As explained by Mr Jacky Cheung: "*There is an established line of case authority that the HK Court will provide recognition and assistance to offshore joint provisional liquidators in aid of offshore court proceedings*" and there are numerous examples of the Hong Kong Court recognising Cayman appointed restructuring provisional liquidators in Hong Kong (and adjourning petitions in Hong Kong to facilitate this); see for instance: ***China Oil Gangran Energy Group Holdings Limited (in Provisional Liquidation)*** [2020] HKCFI 825 and ***Moody Technology Holdings Limited (in Provisional Liquidation)*** [2020] 4 HKC 78.

55. On the other hand, while the Grand Court will also grant reciprocal recognition and assistance of foreign insolvency officeholders appointed in the country of incorporation, the jurisdiction of the Grand Court to recognise and grant assistance to liquidators of Cayman Islands incorporated companies appointed by the courts of another country is more limited. In the instances where the Grand Court has recognised insolvency practitioners appointed to Cayman Islands companies by foreign courts, the Court has identified the following relevant considerations having regard to one or other of the categories of circumstances identified at [7] above:

[9] Per Smellie CJ in ***KTH Capital Management Limited v China One Financial Limited & Others*** [2004-5] CILR 213 **[AB/18]**.

a. Whether parallel proceedings will only serve to incur additional costs and unnecessary delay. In ***Re China Agrotech*** above the Court recognised Hong Kong liquidators of a Cayman Islands company as having authority to act on behalf of the company for the purpose of presenting a petition for a scheme of arrangement in the Cayman Islands as part of a corporate restructuring, which involved a parallel scheme in Hong Kong.

b. Whether reputational, regulatory or policy reasons militate in favour of a Cayman Islands proceeding (***China Agrotech***).

c. The breadth of powers available in each jurisdiction. It is worth nothing that "soft touch" provisional liquidation is not available under Hong Kong Law.[10] In ***Changgang Dunxin Enterprise Company Limited*** (Unreported, 1 March 2018) , Mangatal J recognised the appointment of JPLs over a Cayman Islands company by the Courts of Hong Kong for the purpose of applying on behalf of the company for the same individuals to then be appointed as JPLs of the company in the Cayman Islands. It was proposed that the JPLs would then seek recognition of their appointment in Hong Kong and, if recognised, that they would be discharged as JPLs in Hong Kong and would conduct parallel restructuring proceedings in the Cayman Islands and Hong Kong in their capacity as Cayman Islands JPLs of the company. A relevant factor in seeking the application was the broader powers to effect a corporate restructure

[10] Cheung 1st Affirmation, paragraph 29 and ***Re Legend International Resorts Ltd*** [2006] 3 HKC 565

available to JPLs in the Cayman Islands. Mangatal J held that it was appropriate to grant the Hong Kong JPLs recognition for the purpose of making an application to the Grand Court for the winding up of the Company and to seek the Hong Kong JPLs' appointment as JPLs of the company in the Cayman Islands.

d. Whether comparable relief has been sought in the foreign jurisdiction. In the Bermudian decision of ***In re Dickson Group Holdings Ltd*** 2008 BDA LR 34 ("***Re Dickson***"), Kawaley J (as he then was) approved the entry by the Company into a scheme of arrangement sanctioned by the Courts of Hong Kong (impliedly recognising the Hong Kong appointees), pursuant to which its creditors would receive part-payment of the debts owed to them, and the Company could then be returned to trading in the hands of new investors.

e. Whether the foreign petitioner is seeking to wind up the Company or avoid the need for a winding up; see ***Re Dickson***.

f. The locus of the Company's business.

56. Thus, it appears from the cases that the Grand Court has considered the purpose of the appointment on each occasion that it has been asked to recognise insolvency practitioners appointed to a Cayman Islands domiciled company by a foreign court. Where the purpose has been to facilitate a restructuring or otherwise avoid the need to wind up the company, the cases show that the Court will be more willing to grant recognition as being in the best interests of the company's stakeholders. Conversely, the Grand Court will be slow to give primacy to pure winding-up proceedings brought overseas in respect of a



GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

Cayman Islands company where it is satisfied that there is an intention on the part of the company to present a plan of reorganisation for the benefit of its creditors.

57. In this case, both HK Petitions seek orders that the Company be wound up. The Company successfully argued that if such an order were made in Hong Kong, there would be important public policy grounds on which the Grand Court should be disinclined to recognise such an appointment, particularly where the Company itself and a number of creditors wish to explore the possibility of pursuing a restructuring by way of a Cayman Islands scheme of arrangement.[11]

58. Moreover, while the Company is listed on the HKSE, is registered as a foreign company in Hong Kong and has submitted to the jurisdiction of the Hong Kong courts, 87.5% of the Company's business is outside of Hong Kong. Accordingly, it was accepted that any insolvency proceedings should be commenced in and supervised by the Grand Court of the Cayman Islands.

59. As the purpose of appointing the JPLs in the Cayman Islands is to enable them to effect a restructuring scheme, it is appropriate that an application to give effect to the scheme would be made pursuant to section 86 of the Companies Law. Enabling this Court to supervise both the winding-up proceedings in respect of the Company as well as the planned Scheme of Arrangement is likely to avoid unnecessary duplication of costs and delays in resolving the Company's situation.

[11] See letters of support from Mr Kit Wong, Mr Benjamin Lau, Mr Alan Cheung and Cachet Group: Mr Bill Chan's 1st Affirmation, pages 398 to 402.

## A FULL AND FRANK DISCLOSURE

60. On an *ex parte* application such as this, the applicant has a duty of full and frank disclosure, which requires the applicant to identify all defences that may be available to the respondent(s). I therefore note that the Company raised the following five issues (A-E) for my consideration.

*A. Reliability of Financial Information*

61. While FTI undertook extensive analysis of the Sun Cheong Group's cash flows and financial records, procured valuations of its assets and met with management to understand the Group's structure and business operations, they were not able to undertake an analysis of certain aspects of the Group's finances, such as its trade receivables and payables, due to the Company's lack of access to certain financial records. As such, their findings as to assets and liabilities may need to be revised when this information becomes available.

*B. Departure of Mr Eddie Tong and Investigations of Previous Board*

62. There have been significant changes to the Board over the last 6 months which may give rise to concerns on the part of creditors or shareholders as to the viability of any restructuring. In particular as Mr Jacky Cheung and Mr Bill Chan explain:

   a. The sudden departure of Mr Eddie Tong and his wife as executive directors in December 2019 and shortly thereafter the resignations of Mr Ivan Chan, Mr Wei Un and Ms Jiselle Chan as executive directors in June 2020;

   b. The resignation of five non-executive directors between August 2019 and 10

June 2020; and

c. The identification by former executive directors of transactions between the Company and Chase On which may require investigation by the liquidators of Chase On.

63. However, the Company's position is that these changes in fact reflect the Company's focus on taking the necessary steps to address the serious challenges faced by the Company. I was urged to accept that the Company's new management is actively working on a debt restructuring plan in the interests of all creditors. Further, that the timeline of the steps taken since Cachet Group's decision to act as white knight, as outlined in the Company's letter to the Court sent prior to the hearing on 24 June 2020, reinforces the new Board's commitment to advancing the interests of creditors and shareholders.

*C. HK Petitions*

64. The HK Petitions have been on foot for over 6 months and Mr Justice Harris of the Hong Kong Court expressed the view at the hearing of the CTBC Petition that the Court would not be willing to adjourn the CTBC Petition again when it came back before him on 3 August 2020 in the absence of a concrete settlement agreement between CTBC and the Company. No such settlement has been reached.

65. In those circumstances, CTBC (and AMEX, who also supported the making of a winding up order) may argue that the Company has had sufficient time to consider, present and negotiate restructuring terms. However, given the demonstrated efforts of the Company to progress the Restructuring Proposal as quickly as possible once a "white

knight" was identified and having regard to the potentially significant benefits to creditors and other stakeholders of a restructuring over an immediate winding up order, in my view the balance of convenience lies in favour of urging further adjournment of the Hong Kong Petitions.

*D. Listing Status*

66. While the "listing status" of a Company registered on the HKSE has historically been worth up to HK $150 million (see paragraph 27(b) above), there has been a decreasing trend in price in more recent transactions (which has been worsened by the COVID-19 pandemic) and it remains difficult to extract value from the listing status due to the tightening of rules. The evidence reveals that the sale process can also be time consuming and expensive. As such, the potential sale of the listing is by no means a guaranteed source of revenue for the Company in a provisional liquidation scenario.

67. Having said that, in the event that a winding up order is made, it would be much more difficult to sell the listing for the reasons explained at paragraph 27(b) above.

*E. Independence of Proposed JPLs*

68. In the course of preparing the FTI Report, members of the firm met and worked with management of the Company and as such, some creditors may be concerned about the independence of the nominated JPLs. However, the test for independence of an insolvency practitioner in the Cayman Islands as set out in section 6(2) of the Insolvency Practitioner Regulations is whether the insolvency practitioner or his firm has acted in relation to the company as its auditor within 3 years of the appointment. The test is an objective one which was set out in ***Hadar Fund Ltd*** [2013] (2) CILR Note 4 and cited

more recently by me ***In the Matter of Alpha Re Limited (in Voluntary Liquidation)*** (Unreported , 23 February 2018) at [74] as follows:

> "*The independence of insolvency practitioners from any particular company, as required by the Insolvency Practitioners' Regulations 2008, reg. 6(1) depends upon the existence (or non-existence) of professional or economic relations* <u>*with that company*</u> *which, in the opinion of the court, precludes the appearance of complete impartiality. It is not sufficient that the practitioners be honest and capable. When determining whether a particular professional or economic relationship leads to a conclusion about whether an insolvency practitioner can be properly regarded as independent, the court must identify the relationship and determine whether it is capable of impairing the appearance of independence and, if so, whether it is sufficiently material to the liquidation in question that a fair minded stakeholder would reasonably object to the appointment of the nominated practitioner in question*" (emphasis added).

69. In this instance, FTI was engaged to prepare the FTI Report by the Cachet Group and not the Company and purported to do so for the benefit for the Cachet Group and the Bank Creditors, not the Company. As such, the Company submitted that there is no basis on which the relationship between FTI and the Company is capable of impairing the appearance of independence.

70. Moreover, similar objections were raised in relation to a nominee in ***CW Group Holdings*** at [67] where Parker J observed that "*it makes sense to appoint as a provisional liquidator a firm which is already in possession of a great deal of information with which to carry on acting in the interests of efficiency and economy*" and emphasised that "[o]*nce appointed, the joint provisional liquidators would act as officers of the court and in the best interests of all of the company's creditors and stakeholders, irrespective*

*of who sought the appointment. I have no doubt that those proposed by the Company would do so in this case*". I accepted that those same principles would also apply here.

71. FTI have separately been appointed as joint official liquidators ("**JOLs**") of the Company's wholly-owned subsidiary Chase On in Hong Kong. The Company does not consider that FTI's appointment as JOLs of Chase On constitutes a relationship with the Company so as to impair the appearance of independence such that a fair minded stake holder would reasonably object to their appointment as JPLs. Rather, the Company submitted and I accepted that, in the attendant circumstances, this is a further reason that FTI should be appointed as the JPLs. As Parker J held in ***CW Group Holdings Limited*** at [67] : "*It makes sense to use entities from the same group to allow for better coordination and communication between* [in that case] *Singapore and Hong Kong which is likely to be of value to the company as they further engage with creditors to seek to propose and implement a restructuring.*"

72. I accepted that, to the extent that any conflict may arise in the future, if for example the Company identifies potential claims against Chase On, this can be dealt with at the appropriate time (by appointment of a conflict liquidator or otherwise).

Hon Anthony Smellie
Chief Justice

20 October 2020

# AWB (Geneva) SA & Anor v North America Steamships Ltd & Anor.

[2007] EWCA Civ 739

Court of Appeal (Civil Division).
Chadwick, Latham and Thomas L JJ.
Judgment delivered 18 July 2007.

*Anti-suit injunction – Stay of proceedings – Swap transactions – Forward freight swap agreements on terms of ISDA master agreement – Canadian company entered into swap agreements – Swap contracts contained English law and exclusive jurisdiction clause – Market rate moved against it and it became insolvent – Canadian trustee in bankruptcy affirmed subsequent swaps which remained 'in the money' – Trustee brought proceedings under Companies' Creditors Arrangement Act of Canada seeking to prevent counterparties refusing to pay under swaps – Counterparties sought anti-suit injunction on basis of jurisdiction clause and declaration that events of default had occurred under ISDA terms by reason of failure to pay and bankruptcy – Canadian insolvency proceedings not within jurisdiction clause – Anti-suit injunction not available – Judge wrong to stay claim for declarations – Commercial Court should decide meaning of ISDA terms which was of importance to financial markets and would assist Canadian court.*

**This was an appeal by the claimants (AWB and Pioneer) from a judgment ([2007] 1 CLC 749) refusing an anti-suit injunction and staying Commercial Court proceedings for a declaration.**

**AWB and Pioneer had entered into forward freight swap contracts with the defendant (NASL) on terms governed by the International Swaps and Derivatives Association (ISDA) master agreement. During 2006 AWB, as seller, entered into six swaps with NASL, as buyer; four of those covered the period October to December 2006 and two the period January to December 2007. Pioneer entered into one swap with NASL for the period January to December 2007. Each of the swaps was, by the express terms of each swap and the terms of the ISDA master agreement, made subject to English law and jurisdiction.**

**NASL entered into the swaps as seller because it believed the market rate would decline over the term of the contracts; in fact, during 2006, the rates increased significantly and, as a result, NASL became obliged to make significant payments under the swaps. In November 2006, NASL became insolvent. By the end of the year NASL had incurred liabilities under the swaps of approximately US$47m against moneys due to it of approximately US$6m. As regards the swaps between NASL and AWB, under the four agreements in respect of 2006, payments from NASL to AWB amounted in total to just over US$2.5m; notice of**

**default was served by AWB in respect of the outstanding amounts. However, in 2007, the market moved in NASL's favour. In respect of the AWB and Pioneer swaps for January and February 2007 approximately US$2.8m would be due to NASL and, if the market did not change, a total sum of US$12.5m could be due to NASL by the end of 2007 from AWB (less the credit due for the 2006 swaps) and US$9.8m from Pioneer.**

**The position taken by AWB and Pioneer was that they were not liable to make any payments under the 2007 swaps, since, under the terms of clause 2(a)(iii), it was a condition precedent to the performance of their obligations that no event of default had occurred. They contended that events of default had occurred under clause 5(a)(i) and 5(a)(vii)(2), (3) and (6) as a result of NASL's failure to pay and NASL's bankruptcy. NASL and its Canadian trustee in bankruptcy disputed that.**

**The trustee elected, on behalf of the estate of NASL, to affirm the swaps and filed a petition under the Companies' Creditors Arrangement Act of Canada (CCAA) seeking an initial order preventing counterparties to the swaps from refusing to perform any obligations or make any payment to NASL under the swaps on the ground of NASL's insolvency or inability to pay.**

**AWB and Pioneer sought an interim anti-suit injunction and a declaration that events of default had occurred and were continuing and that AWB and Pioneer were therefore not obliged to make any payment to NASL under the swaps. The judge refused an anti-suit injunction, holding that the trustee's application to the Canadian court was not a breach of the exclusive jurisdiction clause, and stayed the claim for declaratory relief pending the outcome of the trustee's application in Canada.**

*Held*, **allowing the appeal in part:**

**1. If the proceedings in Canada were proceedings which related to a dispute under the contract, then that would be characterised as a contractual issue and subject to the exclusive jurisdiction clause which was wide in its scope. However that was not the nature of the proceedings in Canada. Those proceedings were part of insolvency proceedings and the issues that arose within them were governed by Canadian law. The trustee's application to the Canadian court in relation to the exercise of its insolvency jurisdiction was not within the clause.**

**2. Whether any relief that might be granted by the Canadian court had any effect on the contractual obligations under the swaps was governed by English law as the proper law of the swaps. Such issues would not arise until after the Canadian court had ruled on the proposals put forward by the trustee.**

© DSP Publishing Ltd

**3. The challenge made by the trustee to the meaning of the swaps involved a contention that certain clauses of the ISDA master agreement were ineffective. That agreement was widely used in all types of derivative transactions on the international markets and thus played an important role in the efficient functioning of the international financial markets and their financial stability. The trustee's contentions could, if correct, therefore have ramifications for the financial markets. The sooner the issues raised were determined, the better. It would also be very helpful to the judge considering the proposal of the trustee in the Canadian CCAA proceedings to have the decision on the interpretation of the ISDA master agreement by the Commercial Court which had the jurisdiction to adjudicate on those issues in accordance with English law. The Commercial Court should hear the claim for the declaration and the appeal against the stay was allowed.**

The following cases were referred to in the judgment of Thomas LJ:

*Adams v National Bank of Greece and Athens SA* [1961] AC 255.
*Antony Gibbs & Sons v La Société Industrielle et Commerciale des Métaux* (1890) 25 QBD 399.
*Capital Prime Properties plc v Worthgate Ltd* [2000] 1 BCLC 647.
*Charter Reinsurance Co Ltd v Fagan* [1996] CLC 977; [1997] AC 313.
*Leyland DAF Ltd v Automotive Products plc* [1994] 1 BCLC 245.
*National Bank of Greece and Athens SA v Metliss* [1958] AC 509.
*Wight v Eckhardt Marine GmbH* [2004] 1 AC 147.

Ali Malek QC and David Quest (instructed by Reed Smith Richards Butler LLP) for the appellant.

Robin Dicker QC and Stephen Robins (instructed by Holman Fenwick & Willan) for the respondents.

JUDGMENT

**Thomas LJ: The issues and the decision of the court**

1. The parties to this action are international traders who entered into Forward Freight Swap contracts (swaps) on terms governed by the International Swaps and Derivatives Association (ISDA) Master Agreement. Two issues arise: (1) whether the jurisdiction clause which provides for the exclusive jurisdiction of the English courts entitles the claimants to an anti-suit injunction preventing the trustee of bankruptcy of the first defendant from pursuing certain relief in Canadian insolvency proceedings; and (2) whether an action in the Commercial Court for a declaration as to the meaning and effectiveness of certain of the standard terms of the ISDA Master Agreement which are governed by English law should be stayed pending those insolvency proceedings. The Commercial Judge, Field J, refused the anti-suit

injunction and stayed the proceedings for a declaration in the Commercial Court. He refused permission to appeal. The application for permission was referred to the Court with the hearing to follow immediately if permission was given. A

2. At the conclusion of the hearing, in view of a pending hearing in Canada on 15 June 2007, the Court gave its decision: B

(i) Permission to appeal against the refusal of the anti-suit injunction was refused on the grounds that the proceedings in Canada were not within the scope of the clause.

(ii) Permission to appeal against the stay was granted and the appeal allowed on the grounds that it was important for the Commercial Court to determine, at a hearing fixed for 24 July 2007, the dispute as to the meaning of the ISDA Master Agreement. This was governed by English law and it would also be helpful to the court in Canada hearing the bankruptcy proceedings to know the decision of the Commercial Court on the meaning of the Master Agreement. The court stated that it would give more detailed reasons in judgments that would be handed down. C D

3. I now give my detailed reasons.

**The swaps**

4. The parties to the swaps were: E

(i) The first claimant (AWB), a company incorporated in Switzerland and carrying on business in Geneva. It is the subsidiary of an Australian wheat trading company.

(ii) The second claimant (Pioneer), a company incorporated in the British Virgin Islands and carrying on business in Beijing. It is a subsidiary of Pioneer Iron and Steel Group and specialises in providing dry bulk ship chartering and operating services. F

(iii) The first defendant (NASL), a company incorporated in British Columbia. It carried on business in Vancouver as a shipbroker and ship charterer. G

5. During 2006 AWB, as seller, entered into six swaps with NASL, as buyer; four of these covered the period October to December 2006 and two the period January to December 2007. Pioneer entered into one swap with NASL for the period January to December 2007. Under swaps of this type, the parties agree on a route, a settlement date or dates and a contract rate for the route. They also agree upon the method of calculating a market rate, known as the 'settlement rate' for the route; this is normally calculated by reference to rates on the Baltic Exchange Index. On specified monthly dates known as 'the settlement date', a settlement sum is calculated as the difference between the settlement rate and the contract rate multiplied by the specified contract quantity. If the settlement rate is greater than the contract rate on that date the seller pays the buyer the settlement sum and vice versa, if the contract rate exceeds the H

settlement rate. The parties are, in effect, hedging future movements in the freight market against their views of the way in which the market will move.

6. Each of the swaps was made subject to the ISDA Master Agreement. Each of the swaps was also made by the express terms of each swap and the terms of the ISDA Master Agreement subject to English law and jurisdiction in the following terms:

*Clause 16 of the swap*:

> 'Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and subject to the exclusive jurisdiction of the High Court of Justice in London, England …'

*Clause 13(b) of the ISDA Master Agreement*:

> 'With respect to any suit, action or Proceedings relating to this Agreement ("proceedings"), each party irrevocably:
>
> (i) submits to the jurisdiction of the English courts, if this Agreement is governed by English law …'

7. Only two terms of the ISDA Master Agreement are relevant to the dispute between the parties as to the meaning and effectiveness of the swaps under English law,

*Clause 2(a)(iii)*:

> 'Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.'

*Clause 5*:

> '(a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:
>
> (i) *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party.

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(3) makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets.'

**The movement in the market**

8. NASL entered into the swaps as seller because it believed the market rate would decline over the term of the contracts; in fact, during 2006, the rates increased significantly and, as a result, NASL became obliged to make significant payments under the swaps. On 29 November 2006, NASL became insolvent. By the end of the year NASL had incurred liabilities under the swaps of approximately US$47m against moneys due to it of approximately US$6m.

9. As regards the swaps between NASL and AWB, under the four agreements in respect of 2006, payments from NASL to AWB amounted in total to just over US$2.5m; notice of default was served by AWB in respect of the outstanding amounts on 20 November 2006 and 17 January 2007.

10. However, in 2007, the market moved in NASL's favour. In respect of the AWB and Pioneer swaps for January and February 2007 approximately US$2.8m would be due to NASL and, if the market does not change, a total sum of US$12.5m could be due to NASL by the end of 2007 from AWB (less the credit due for the 2006 swaps) and US$9.8m from Pioneer.

11. The position taken by AWB and Pioneer is that they are not liable to make any payments under the swaps that cover 2007, as, under the terms of clause 2(a)(iii), it is a condition precedent to the performance of their obligations that no event of default has occurred and is continuing. They contend that events of default have occurred under clause 5(a)(i) and 5(a)(vii)(2), (3) and (6) as a result of NASL's failure to pay and NASL's bankruptcy. As set out at paragraph 15(i) below, NASL and the second defendant (the Trustee) dispute this.

**The events relating to NASL's Bankruptcy**

12. The material events of NASL's bankruptcy can be briefly summarised:

(i) On 29 November 2006 NASL filed an assignment in bankruptcy under the Bankruptcy and Insolvency Act Canada; under the provisions of that Act all of its property vested in the Trustee.

(ii) A meeting of creditors took place on 5 January 2007. The Trustee's appointment was approved and inspectors appointed to assist in the administration of NASL's estate.

(iii) On 8 January 2007 the inspectors authorised the Trustee to affirm the 2007 swaps, but the Trustee declined to do this unless it was clear that it would not incur any personal liability by doing so. An application was made to the Supreme Court of British Columbia seeking appropriate declarations. The application was heard by Tysoe J.

(iv) Tysoe J in a judgment delivered on 28 February 2007 held that it was necessary for the Trustee to affirm the swaps in order to take the benefit of them, as it would thereby assure the other party that it would not be treated as an unsecured creditor in respect of the obligations it performed after the date of the bankruptcy. He also held that the affirmation of the 2007 swaps by the Trustee would not make the Trustee personally liable in respect of NASL's obligations, so long as the Trustee affirmed on behalf of the bankrupt estate and not in its personal capacity. AWB and Pioneer opposed the Trustee's application under a reservation of jurisdiction and are now appealing against that judgment.

(v) On 5 March 2007 the Trustee elected, on behalf of the estate of NASL, to affirm the swaps and notified AWB and Pioneer of this.

(vi) On 20 February 2007 the Trustee filed a petition under the Companies' Creditors Arrangement Act of Canada (CCAA). The Trustee asserted that the petition was part of a plan by the Trustee to preserve and realise existing tax losses, convert NASL's debt into equity and enforce the 2007 swaps against Pioneer and AWB. Under the petition, the Trustee stated:

(a) NASL had estimated liabilities of US$63m against its principal asset of about US$17m due under swaps of which US$10.5m related to the 2007 swaps of AWB and Pioneer.

(b) The swaps contained provisions to the effect that the counterparty to the contract might be relieved of its obligation to pay NASL as a result of the bankruptcy of NASL and other insolvency related defaults under the swaps.

(c) The sum of US$17m due under the swaps would be uncollectible unless the Trustee was able to file proceedings under the CCAA and in effect cure the insolvency defaults under the various swaps by way of a compromise with the creditors of NASL, so that NASL would be rendered solvent. This could be done if the Trustee

was able to obtain an order from the court prohibiting AWB and Pioneer from relying on insolvency defaults under the various swaps which constituted the receivables of NASL or an order waiving those defaults.

(d) It therefore sought an initial order; paragraph 21 of the draft of that order was in the following terms:

> 'THIS COURT ORDERS that no party to any agreement with NASL respecting forward freight swap agreements ("FFA Contracts") may refuse to perform any obligations or make any payment to NASL under any such FFA Contracts as a result of (a) the insolvency of NASL (b) the assignment in bankruptcy by NASL (c) the appointment of the Trustee or Monitor in respect of NASL (d) the inability of NASL to pay its debts (e) the initiation of these proceedings or any other proceeding or matter related to or arising out of the insolvency of NASL or (f) the non-payment of amounts by NASL under such FFA Contracts (subject to any rights of set off).'

**The proceedings in the Commercial Court**

13. AWB and Pioneer commenced these proceedings on 19 March 2007 and sought an interim anti-suit injunction on 26 March 2007. They also sought to join the Trustee as a party; the order for joinder was made by the judge. Before us, NASL and the Trustee were represented by the same legal team.

14. In their application before the judge and before this court, AWB and Pioneer contended:

(i) As there has been an event of default, they were no longer obliged to make any further payments under the swaps as, by the terms of Clause 2a(iii), the obligation was subject to a condition precedent that no event of default had occurred and was continuing.

(ii) As the Trustee did not accept this, a declaration should be made by the court that events of default have occurred and were continuing; that AWB and Pioneer were therefore not obliged to make any payment to NASL under the swaps.

(iii) If the Canadian Court made an order in the terms of paragraph 21 of the draft initial order, the effect would be to deprive them of their contractual defence under the swaps. They would therefore become debtors in Canada to NASL for very large sums. Effect might then be given to that decision if the Trustee sought to enforce the order in England under s. 426 of the *Insolvency Act* 1986 or in other jurisdictions.

(iv) An anti-suit injunction should therefore be granted restraining NASL and the Trustee from proceeding with their claim for relief in British Columbia sought under

paragraph 21 of the draft initial order. The injunction was limited solely to that paragraph as that paragraph was not relief that was the ordinary consequence of a company being insolvent, as it was an attempt to saddle these two companies with significant liabilities, contrary to the express terms of a standard form international agreement, for the benefit of NASL's other creditors.

15. NASL and the Trustee:

(i) Made clear in the evidence and skeleton argument served on their behalf that they do not accept the contentions put forward by AWB and Pioneer as to the meaning and effect of the terms of the ISDA Master Agreement under English law, their proper law. When asked in the course of argument what their position was, counsel made it clear that the Trustee had not finally decided whether to oppose the declaration sought by AWB and Pioneer as to the meaning and effect of the ISDA standard terms as a matter of their proper law, but the Trustee's position was that:

(a) There had not been an event of default under the swaps; the effect of the proceedings in Canada would be to remedy the position as to the past and ensure there was no ongoing event of default.

(b) The provisions of clauses 2 and 5 of the ISDA Master Agreement were ineffective in so far as they purported to relieve a party of his duty to perform the contract when the other party was insolvent; they constituted a fraud on the operation of bankruptcy provisions.

(ii) Contended that it was inappropriate to grant an anti-suit injunction on a number of grounds but in particular:

(a) The jurisdiction clause did not extend to the bankruptcy proceedings in Vancouver.

(b) It was a recognised principle of international insolvency that the appropriate forum for bankruptcy proceedings was Canada as NASL was a Canadian company. It was proper therefore to apply to a court to take the steps contemplated in Canada in connection with a scheme of arrangement and to seek the assistance of the English court to enforce it in due course

**Canadian law**

16. Before the judge evidence of Canadian law was provided by the Hon. James M Farley QC, the retired supervising judge of the Superior Court of Ontario Commercial List where insolvency proceedings were heard and Douglas I Knowles QC a practitioner in Vancouver specialising in insolvency throughout Canada.

17. The findings made by the judge in relation to the material provisions of the Canadian law of insolvency in paragraphs 9–10, 12–15 and 19 of his judgment were not in issue before us and can be briefly summarised:

(i) There is more than one insolvency regime in Canada; the two relevant regimes were the bankruptcy proceedings under the Bankruptcy and Insolvency Act and restructuring proceedings under the CCAA; they were distinct.

(ii) The purpose of the CCAA is to facilitate compromises and arrangements between companies and their creditors and debtors as an alternative to bankruptcy and thus to enable insolvent companies to continue in business.

(iii) A plan of reconstruction under the CCAA is binding on all creditors if approved by specified majorities of creditors by value in each class and the court; the court has to be satisfied of a number of matters including that the plan is fair and reasonable. The judge drew a comparison at paragraph 11 of his judgment with English law; AWB and Pioneer did not accept that this was correct. It is not necessary to consider for present purposes whether the judge was correct or not.

(iv) The Canadian Court is empowered to stay proceedings which have been taken or might be taken in respect of the company; stays can be granted to restrain a counterparty to a contract with the company from relying on prior breaches committed by the company which would permit the counterparty to exercise a remedy against the debtor. The Canadian Courts have made orders which provided that no party to a contract with the company can refuse to perform or terminate a contract by reason of a default or event of default arising out of the insolvency of the company.

(v) The initial order sought by the Trustee was the first step in the CCAA process; if the plan was approved, then the court would make a final order. It was within the jurisdiction of the Canadian Court to make an order in the terms of paragraph 21 of the initial order sought by the Trustee, but there was a disagreement between the experts as to whether such an order would be made; the evidence of the expert called by AWB and Pioneer was that the making of such an order would be unique for several reasons, including that the CCAA would be used to defeat the effect of the events of default clause and thereby use the CCAA as a sword rather than a shield.

18. It is important to note that whilst AWB is an actual creditor of NASL in the insolvency, Pioneer is merely a contingent creditor. Unless the market moves in favour of Pioneer it will cease to be a contingent creditor.

19. There was a dispute between the parties as to whether AWB and Pioneer had submitted to the jurisdiction of the Canadian courts for the purpose of the bankruptcy and CCAA proceedings; this was not an issue for this court to determine at this stage and it is therefore unnecessary to deal with this matter.

© DSP Publishing Ltd 

**The decision of the judge**

20. The judge decided that there was no breach of the jurisdiction clause at paragraphs 28 and 29 of his judgment:

> 'The exclusive jurisdiction element of clause 16 applies, in my judgment, where one of the parties is seeking a judicial determination on the rights or obligations of one or both of them existing under the contract. In my view, in applying to the Canadian Court under the CCAA, the Trustee is not seeking such a determination. Rather, it is seeking relief in insolvency proceedings that is intended to prohibit various counterparties, including AWB and Pioneer, from relying on certain contractual rights which they might otherwise be entitled to rely on. In other words, the petition against NASL is not an attempt by the Trustee to assert NASL's contractual rights against AWB and Pioneer under the 2007 [swaps] but is an application to the Canadian Court to apply the free standing statutory regime of the CCAA.
>
> The position would be the same if it was NASL which was applying to the Canadian Court under the CCAA. Such an application would not constitute a breach of clause 16 nor any other breach of the 2007 [swaps], for NASL did not covenant not to become insolvent or to make its own voluntary assignment in bankruptcy; nor did it promise only to be made bankrupt or go into liquidation in England, nor to take any steps in its bankruptcy that might prejudice the ability of AWB and Pioneer to enforce their rights under the 2007 [swaps].'

21. The judge also held that the application by the Trustee under the CCAA was not unconscionable or oppressive or vexatious. AWB and Pioneer knew, or had the means of knowing, that NASL carried on business and were incorporated in Canada; accordingly it was predictable that if NASL were to become insolvent, the insolvency would fall to be dealt with under the applicable Canadian legislation; it was a common feature of insolvency regimes that contractual rights could be overwritten. He also considered that not only would the English court recognise the insolvency proceedings in Canada as NASL were incorporated there, but it would consider itself under a duty both at common law and under s. 426 of the *Insolvency Act* 1986 to give such aid and assistance to the foreign court as it could give.

**Issues (1): The scope of the jurisdiction clause and the claim to an anti-suit injunction**

22. I therefore turn to the first question that arose – whether the proceedings under the CCAA are within the scope of the jurisdiction clause and if so whether an anti-suit injunction should be granted.

23. In approaching the question as to whether the proceedings in Canada are within the scope of the clause, it is important to distinguish between that issue of construction

and issues of the recognition and enforcement of any order that may be made in those proceedings in England and Wales. The latter, as it will be necessary to make clear, arose neither in the application before the judge nor in this appeal. It does not follow that, if the proceedings under the CCAA are not within the jurisdiction clause, this conclusion has any effect on the question of the recognition of those proceedings or the enforcement of any order made.

*(a) Matters that were common ground*

24. There were a number of uncontroversial submissions made by AWB and Pioneer:

(i) Each of the swaps contained an exclusive jurisdiction clause. The Trustee abandoned the reservation made in the skeleton argument.

(ii) The construction of the exclusive jurisdiction clause and clauses 2 and 5 of the ISDA Master Agreement (as incorporated into the swaps) were governed by English law as was the effect of those clauses in this jurisdiction.

(iii) The Trustee by affirming the contracts took the contracts subject to the jurisdiction clause

*(b) The application of the clause to the CCAA proceedings*

25. AWB and Pioneer contended that the relief sought in the CCAA proceedings by the Trustee in paragraph 21 of the draft initial order was not directed at protecting NASL's estate or maintaining the *status quo*. Although the Trustee had made clear that the Canadian court was not being asked to rule on the existing rights and obligations of the parties under the swaps, that court was being asked to create new rights by preventing AWB and Pioneer from relying on existing rights. Any new rights could only be contractual rights. The action of the Trustee in seeking the relief under paragraph 21 was therefore to be characterised not as action in respect of insolvency, but as a matter which affected the contract and so was within the jurisdiction clause:

(i) NASL had no on going business.

(ii) The purpose of the Trustee was not to restructure the company.

(iii) The Trustee was not seeking to preserve the estate from its creditors, but was seeking to make a claim against AWB and Pioneer.

(iv) It was in fact trying to impose liabilities on Pioneer which was not a creditor of the company by making it a debtor.

(v) It was not seeking to ensure that AWB had to bring into account any debts it might owe NASL, but to expose it to significant liabilities it would not otherwise have.

It was, in short, an attempt to re-write the contractual obligations and therefore fell within the jurisdiction clause.

26. I cannot accept the submission. Clearly, if the proceedings in Canada were proceedings which related to a dispute under the contract, then that would be characterised as a contractual issue and subject to the exclusive jurisdiction clause which I accept is wide in its scope.

27. However that is not the nature of the proceedings in Canada. Those proceedings are part of insolvency proceedings and the issues that arise within them are governed by Canadian law. The issues encompassed within insolvency proceedings are wide. AWB and Pioneer accepted that those included questions of whether claims should be recognised and admitted in the insolvency, the relative priority among creditors, avoidance of pre-insolvency transfers as preferences and fraudulent transfers. In my view, the scope of the insolvency proceedings extends to the present claim for relief in Canada as it is relief sought within the proceedings. AWB is a creditor and Pioneer is, at present, a contingent creditor. They are therefore within the potential jurisdiction of the insolvency proceedings and accept that the Canadian Court can, in relation to certain insolvency issues, exercise its jurisdiction. It is, in my view, a matter for the Canadian Court to decide on the relief that it is prepared to grant within the scope of those proceedings as it is concerned with issues of insolvency and not with issues that relate to the contractual obligations under the agreement. The application in relation to the exercise of its insolvency jurisdiction is therefore not within the clause.

28. Whether any relief that may be granted has any effect on the contractual obligations under the swaps is a matter to be determined after the Canadian Court has made its decision, as the question of the effectiveness of any order made by the Canadian court is governed by English law as the proper law of the swaps. It is to this entirely separate question that it is necessary briefly to turn.

*(c) The effect on the swaps of any plan approved by the Canadian Courts*

29. Issues relating to the effect on the swaps and the recognition by the courts here and elsewhere of any orders made by the Canadian court in giving effect to any plan approved by the Canadian court will arise if and when the Trustee seeks to enforce the orders in this jurisdiction or seeks the assistance of the court in relation to a plan approved by the court in Canada. It is then that the issue as to the effect, if any, on the swaps will fall to be determined.

30. Many issues were canvassed in the skeleton arguments and in oral argument as to effect of any order made in the Canadian proceedings on the swaps in this and other jurisdictions. Some were uncontroversial:

(i) The validity of foreign legislative provisions which seek to modify or annul the provisions of the contract must be judged by the provisions of the proper law. As was said in *Vita Foods*,

> 'If a court has before it a contract good by its own law or the proper law of the contract, it will in proper cases give effect to the contract and ignore the foreign law.'

(ii) There are numerous examples of the courts of England and Wales holding that the provisions of a foreign law were ineffective in varying a contract governed by English law: *National Bank of Greece v Metliss* [1958] AC 509 (p. 526, 529), *Adams v National Bank of Greece* [1961] AC 255 (p. 274, 282, 286).

31. However there were a number of matters where there was a considerable dispute between the parties; three of the principal matters can be briefly summarised:

(i) It was contended by AWB and Pioneer that a decision under the CCAA to grant relief in the terms of paragraph 21 of the draft initial order would not affect the rights under the swaps. The issue as to whether the obligations were modified as a result of any plan approved by the Canadian court was to be characterised as a matter of contract and so governed by English law as the proper law of the contract: *Wight v Eckhardt Marine GmbH* [2004] 1 AC 147. Any order made in the terms sought would be ineffective under English law in modifying any rights under the swaps. The Trustee, on the other hand, contended that any plan which included an order in the terms of paragraph 21 of the draft initial order would have the effect of overriding the rights under the swaps, as the court would be carrying out an administrative (or delegated legislative) function rather than one of an adjudicative nature and would thereby be entitled to create new rights. In giving effect under s. 426 to any such order, an English court would be applying English law as giving assistance under s. 426 was part of English law and therefore the order could take effect under the proper law of the contract.

(ii) AWB and Pioneer relied on *Gibbs v La Société Industrielle et Commerciale des Métaux* (1890) 25 QBD 399. The Court of Appeal (Lord Esher MR, Lindley and Lopes L JJ) held in that case that a French company which was party to a contract governed by English law was not discharged from liability under the contract by the operation of French insolvency law; the other party was not bound by the law of a country to which they had not agreed to be bound. This remained good law: passages in *Dicey, Morris and Collins on the Conflicts of Law* at pages 1450, 1523 and 1592–1597 were relied on. It was, however, submitted by the Trustee that this decision would no longer prevent an English court from recognising and giving effect to any plan of reconstruction made by the courts in Canada under the CCAA; the effectiveness upon an insolvency of the clauses in issue in the ISDA Master Agreement were governed by insolvency law and not the proper law of the contract.

The trustee relied also on the provisions of European Union law (including Council Regulation (EC) No 1346/2000) in support of its contention. The judge expressed the view at paragraph 33 of his judgment that there was force in this submission. AWB and Pioneer contended that it was the proper law of the contract that continued to govern these issues; they referred to *Fletcher, Insolvency in Private International Law*, 2nd edition at paragraph 2.85 and submitted that the judge was wrong.

(iii) It was contended by AWB and Pioneer that the judge was also wrong in the conclusion which he reached that the regime under the CCAA, including the relief being sought under paragraph 21 of the draft initial order, was comparable with similar regimes under English law; in particular, he was wrong in his conclusion in relation to the specific relief sought that it was a common feature of insolvency regimes that contractual rights could be overridden. There was reference to *Charter Re v Fagan* [1996] CLC 977; [1997] AC 313, *Leyland DAF Ltd v Automotive Products* [1994] 1 BCLC 245 and *Capital Prime Properties plc v Worthgate Ltd* [2000] 1 BCLC 647. It would therefore be inappropriate for the court in England to give assistance under s. 426.

32. These issues simply do not arise on this appeal; they relate to the effect of any order of the Canadian Court on the contractual rights and the recognition an English court might give to such an order. They do not arise now as the Canadian court has yet to consider the proposals put forward by the Trustee. It would therefore be inappropriate now to express a view on the various submissions made. For the same reason, I express no view on the correctness or otherwise of the views expressed by the judge on these issues; the issues did not arise for decision before him.

33. As the proceedings under the CCAA in Canada are not within the scope of the clause, the further issue as to whether the court should exercise its discretion to grant an anti-suit injunction does not arise.

34. For these reasons I therefore considered that permission to appeal on the issue relating to the jurisdiction clause should be refused.

**Issue (2): The determination of the meaning of the swaps**

35. At paragraph 15(i), I set out the position of the Trustee in relation to the interpretation of the swaps. Mr Cheevers, a licensed trustee in bankruptcy who acts for the Trustee, stated in his witness statement that, as he considered that the proceedings under the CCAA would have an overriding effect it was considered the more efficient course and the one in the best interests of creditors not to seek to have the contractual issues determined at this stage, but for the matters to be resolved in the CCAA proceedings in accordance with and by the operation of various provisions of Canadian insolvency law. The view was put forward by Mr Farley QC (who provided expert evidence on behalf of the Trustee) that it would appear likely that a Canadian Court would regard the provisions in clauses 2 and 5 of the ISDA Master Agreement

as entitling it to invoke the principle of 'fraud upon the bankruptcy law' on a public policy basis; that would be because the insolvent estate would be deprived of a valuable asset which would otherwise be available to creditors.

36. The Commercial judge was of the view that, as he had refused to grant an anti-suit injunction, there would be no point in the Commercial Court hearing the claim for a declaration as to the meaning of the swaps until after the Canadian court had declined to make the proposed initial draft order or final order. The Trustee contended that the judge was right, not only for this reason, but also because under Canadian law there was an automatic stay of all proceedings against NASL; it would in all the circumstances be the better course to stay these proceedings in England in the same way pending the resolution of the CCAA proceedings in Canada. It would not be right for the court to make any declaration or determination of the rights under the swaps until an application was made under s. 426.

37. I do not agree. The challenge made by the Trustee to the meaning of these swaps involves a contention that certain clauses of the ISDA Master Agreement are ineffective. The ISDA Master Agreement is widely used in all types of derivative transaction on the international markets and thus plays an important role in the efficient functioning of the international financial markets and their financial stability. The Trustee's contentions could, if correct, therefore have ramifications for the financial markets. The sooner the issues raised are determined, the better.

38. In my view, it would also be very helpful to the judge considering the proposal of the Trustee in the Canadian CCAA proceedings to have the decision on the interpretation of the ISDA Master Agreement by the Commercial Court which has the jurisdiction to adjudicate on these issues in accordance with English law. If the Trustee is correct that the Master Agreement has the effect for which it contends, then when considering the reasonableness of the plan under the CCAA, the judge will know that the clauses are ineffective by their proper law. If, on the other hand, the Trustee is wrong then the judge will know that the clauses are effective by the proper law of the contract and be in a better position to consider the proposal in paragraph 21 of the initial draft order as part of his assessment of the reasonableness of the plan. He will be able, in the knowledge that the clauses in issue are valid by their proper law, to have regard to the potential effect of a Canadian court approving paragraph 21 of the draft initial order proposed by the Trustee in the wider context of derivative transactions made on the terms of the ISDA Master Agreement.

39. It is for these reasons I considered that permission should be granted and the appeal allowed on this issue.

**The cross-appeal**

40. NASL and the Trustee sought permission to cross-appeal on the basis that, as the judge had found that the claims for declarations were unnecessary and premature,

he should have declined to exercise jurisdiction under CPR Rule 11(1) in respect of NASL and should have found that the Trustee was not a necessary and proper party. It follows from the view I have expressed that the Commercial Court should hear the claim for the declaration that the application for permission to cross-appeal made by NASL and the Trustee should be refused.

**Latham LJ:**

41. I agree.

**Chadwick LJ:**

42. I also agree.

(*Appeal allowed in part*)

[HOUSE OF LORDS]

AYERST (INSPECTOR OF TAXES) . . . . . RESPONDENT

AND

C. & K. (CONSTRUCTION) LTD.. . . . . . APPELLANTS

1975 April 14, 15, 17; May 21 — Lord Diplock, Viscount Dilhorne, Lord Kilbrandon and Lord Edmund-Davies

*Revenue—Income tax—Discontinuance of trade—Compulsory liquidation of company—Business of liquidated company sold to subsidiary company—Nature of ownership of shares of subsidiary company held by liquidated company—" Beneficial ownership "—Whether discontinuance of trade—Whether subsidiary company entitled to income tax relief for losses of liquidated company—Companies Act* 1948 (11 & 12 *Geo.* 6, *c.* 38), *s.* 243—*Finance Act* 1954 (2 & 3 *Eliz.* 2, *c.* 44), *s.* 17 (1), (4) (*b*) (*c*), (5), (6) (*a*) (*b*)

*Company—Winding up—Company's assets—Compulsory order—Whether company retains beneficial ownership of assets—Companies Act* 1948, *s.* 243

By section 17 of the Finance Act 1954:

> " (1) A trade carried on by a company, . . . shall not be treated for any of the purposes of the Income Tax Acts as permanently discontinued, nor a new trade as set up and commenced, by reason of a change . . . in the persons engaged in carrying on the trade, if the company is the person or one of the persons so engaged immediately before the change and on or at any time within two years after the change the trade . . . belongs to the same persons as the trade or such an interest belonged to at some time within a year before the change, . . . (4) For the purposes of this section—. . . (*c*) a trade or interest therein belonging to a company shall, where the result of so doing is that the conditions for subsection (1) . . . of this section to apply to a change are satisfied, be treated in any of the ways permitted by the next following subsection. (5) For the purposes of this section, a trade or interest therein which belongs to a company carrying it on may be regarded— . . . (*b*) in the case of a company which is a subsidiary company, as belonging to a company which is its parent company, or as belonging to the persons owning the ordinary share capital of that parent company, . . . (6) For the purposes of the last foregoing subsection—(*a*) references to ownership shall be construed as references to beneficial ownership, . . ."

The taxpayer company, registered as a private company, carried on the business of building and civil engineering. Out of 100 of its issued shares 99 were owned by M. Ltd., a company trading as building and civil engineering contractors, which in 1962 was ordered to be compulsorily wound up. In 1963 the whole of its business was sold to the taxpayer company, which was assessed to income tax under Schedule D for the years 1962–63 and 1963–64. The taxpayer company claimed to be entitled under section 17 of the Finance Act 1954 to set off against those assessments the unrelieved losses and

capital allowances of M. Ltd. The special commissioners so decided. Templeman J., whose judgment the Court of Appeal affirmed, reversed that decision. A

On the taxpayer company's appeal:—

*Held*, dismissing the appeal, that when a company was ordered to be wound up under the Companies Act 1948 the effect was to divest it of the "beneficial ownership" of its assets within the meaning of the expression in section 17 (6) (*a*) of the Finance Act 1954, since it could not use them for its own benefit, and accordingly the taxpayer company was not entitled to set off the unrelieved losses and capital allowances of M. Ltd. against its own assessments to income tax (post, pp. 180F, 181A–D). B

*Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409 approved.

Decision of the Court of Appeal [1975] 1 W.L.R. 191; [1975] 1 All E.R. 162 affirmed.

C

The following cases are referred to in their Lordships' opinions:

*Albert Life Assurance Co., In re; The Delhi Bank's case* (1871) 15 S.J. 923.

*Commissioner of Stamp Duties (Queensland)* v. *Livingston* [1965] A.C. 694; [1964] 3 W.L.R. 963; [1964] 3 All E.R. 692, P.C.

*General Rolling Stock Co., In re* (1872) 7 Ch.App. 646. D

*Knowles* v. *Scott* [1891] 1 Ch. 717.

*Oriental Inland Steam Co., In re, Ex parte Scinde Railway Co.* (1874) 9 Ch.App. 557.

*Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409; [1969] 2 All E.R. 670; 45 T.C. 360.

The following additional cases were cited in argument: E

*Anglo-Oriental Carpet Manufacturing Co. Ltd., In re* [1903] 1 Ch. 914.

*Barleycorn Enterprises Ltd., In re* [1970] Ch. 465; [1970] 2 W.L.R. 898; [1970] 2 All E.R. 155, C.A.

*Brooklands Selangor Holdings Ltd.* v. *Inland Revenue Commissioners* [1970] 1 W.L.R. 429; [1970] 2 All E.R. 76.

*Calgary and Edmonton Land Co. Ltd., In re* [1975] 1 W.L.R. 355; [1975] 1 All E.R. 1046. F

*Calgary and Edmonton Land Co. Ltd.* v. *Dobinson* [1974] Ch. 102; [1974] 2 W.L.R. 143; [1974] 1 All E.R. 484.

*Carron Iron Co.* v. *MacLaren* (1855) 5 H.L.Cas. 416, H.L.(E.).

*Central Sugar Factories of Brazil, In re Flack's case* [1894] 1 Ch. 369.

*Commercial Bank Corporation of India and the East, In re* (1866) 1 Ch.App. 538.

*English Sewing Cotton Co. Ltd.* v. *Inland Revenue Commissioners* (1947) 176 L.T. 481; [1947] 1 All E.R. 679, C.A. G

*Farrow's Bank Ltd., In re* [1921] 2 Ch. 164, C.A.

*Gerard* v. *Worth of Paris Ltd.* [1936] 2 All E.R. 905, C.A.

*Inland Revenue Commissioners* v. *Olive Mill Ltd. (In Liquidation)* [1963] 1 W.L.R. 712; [1963] 2 All E.R. 130.

*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328.

*Paraguassu Steam Tramroad Co., In re* (1872) 8 Ch.App. 254. H

*Parway Estates Ltd.* v. *Inland Revenue Commissioners (Note)* (1958) 45 T.C. 135, Upjohn J. and C.A.

*Rudewa Estates Ltd.* v. *Commissioner of Stamp Duties* [1966] E.A. 576.

A *Vocalion (Foreign) Ltd., In re* [1932] 2 Ch. 196.
*Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. 1077; [1969] 1 All E.R. 364, C.A.

APPEAL from the Court of Appeal.

This was an appeal brought by leave of the House of Lords from an order made by the Court of Appeal (Stamp and Scarman L.JJ. and
B Brightman J.) on October 28, 1974, affirming an order made by Templeman J. on November 27, 1973, allowing an appeal by the present respondent, William George Ayerst (H.M. Inspector of Taxes) by way of case stated from a determination of the Commissioners for the Special Purposes of the Income Tax Acts. By that determination the special commissioners had allowed an appeal by the appellant company C. & K. (Construction) Ltd. against assessments to income tax made upon it under
C Schedule D in respect of the profits of its trade of building and civil engineering under the provisions of the Income Tax Act 1952 for the years 1962–63 and 1963–64. By the order of Templeman J., affirmed by the Court of Appeal, it was ordered that the assessments be restored and the case remitted to the special commissioners for them to adjust the assessments in accordance with his judgment.

D For many years prior to and until January 18, 1963, Mactrac Ltd. carried on the trade of builders and civil engineering contractors. Throughout that period the issued share capital of the appellant company (formerly Disorods Ltd.) was £100 divided into 100 shares of £1 each. Mactrac was the legal and beneficial owner of 99 shares and the beneficial owner of the remaining share. From January 18, 1962, until after January 18, 1963, the shareholders of Mactrac remained unchanged. On March 3, 1962,
E a receiver of Mactrac was appointed by a debenture holder. A statement of affairs was, after the liquidation of Mactrac, prepared by the directors and secretary and showed an estimated deficiency as to both creditors and members on March 31, 1962, in the total sum of £389,977. On May 21, 1962, a petition for the compulsory winding up of Mactrac on the ground of its insolvency was presented by a creditor. On June 4, 1962,
F a compulsory winding-up order was made against Mactrac. On January 18, 1963, the receiver of Mactrac, acting with the approval of the liquidator, sold its trade to the appellant company. On that date the unrelieved losses incurred by Mactrac in its trade amounted to £326,486 and its unrelieved capital allowances amounted to £82,025. On February 19, 1963, the receiver of Mactrac, acting with the approval of its liquidator, sold to an outside purchaser the issued share capital of the appellant company.
G The appellant company was assessed to tax under Case 1 of Schedule D in the sum of £350 for 1962–63 and in the sum of £1,000 for 1963–64.

The appellant company claimed that it was entitled under section 17 of the Finance Act 1954 to set off against these assessments the unrelieved losses and capital allowances of Mactrac. The special commissioners allowed the appeal of the appellant company against the assessments and
H adjourned the case for the agreement of figures.

*C. N. Beattie Q.C.*, *Richard Sykes* and *Rex Bretten* for the appellant company. The trade was " carried on " until January 18, 1963, by Mactrac

within section 17 (1). From January 18, 1963, the trade was carried on by the appellant company which under the section is entitled to bring forward the unrelieved losses and capital allowances of Mactrac and set them off against its income tax assessments for 1962–1963 and 1963–1964. Although Mactrac was in liquidation it had not been divested of its beneficial ownership before the transfer. A trade can belong to a person either as trustee or as beneficial owner. A

The only question is whether a company in liquidation is beneficial owner of its assets. It is admittedly the legal owner. It remains beneficial owner whether the liquidation is voluntary or compulsory liquidation and whether it is a members' winding up, a creditors' winding up or a compulsory winding up. B

A company in liquidation does not hold its assets as trustee. The liquidator is in a fiduciary position, but the assets do not belong to him but to the company. He is neither the legal owner of them nor a trustee: section 133 of the Companies Act 1862 which creates statutory duties but no trust. A company is always holding its assets for the benefit of somebody, since somebody always has an interest in them. C

The foundation of the difficulties in the present case is *In re Oriental Inland Steam Co., Ex parte Scinde Railway Co.* (1874) 9 Ch.App. 557 which decided that a company in liquidation is not the beneficial owner of its assets. It is not to be assumed that in enacting it Parliament had in mind every remote decision on beneficial ownership. Reliance is placed on *Knowles* v. *Scott* [1891] 1 Ch. 717. D

The assets of a company in liquidation remain its property beneficially, though the liquidator is to deal with them in a special way to ensure that the creditors are paid off in accordance with their priorities and that the surplus is distributed among the contributories in accordance with their interests, but this does not mean that, pending the realisation and distribution of the assets, the company is not the beneficial owner of them: see *In re Farrow's Bank* [1921] 2 Ch. 164, 170 and *Rudewa Estates Ltd.* v. *Commissioner of Stamp Duties* [1966] E.A. 576. It must be wrong to draw a distinction between a case where a company is solvent and one where it is not, because one cannot know which it is until the end of the liquidation. *Calgary and Edmonton Land Co. Ltd.* v. *Dobinson* [1974] Ch. 102, 106, 107 and *In re Calgary and Edmonton Land Co. Ltd.* [1975] 1 W.L.R. 355, 359 show that creditors and contributories of a company in liquidation are not the beneficial owners of the company's assets. Should it be held that neither was the company itself the beneficial owner of its assets, the result would be that the beneficial ownership would be in suspense. *Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409, 414, which is identical with the present case, was wrongly decided. E F G

Beneficial ownership of assets is in suspense during the course of administration: *Commissioner of Stamp Duties (Queensland)* v. *Livingston* [1965] A.C. 694. While the doctrine of suspense of beneficial ownership is necessary in the case of a deceased person, because on his death he is no longer there to be the beneficial owner and those who inherit cannot become beneficial owners until administration has been completed, that doctrine should not be extended to any case in which it is not necessary, e.g., a contract of sale in *Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. H

1077. It is not necessary to treat beneficial ownership as in suspense in the case of a company in liquidation, because it remains in existence and is available to be treated as the beneficial owner.

*English Sewing Cotton Co. Ltd.* v. *Inland Revenue Commissioners* (1947) 176 L.T. 481 is authority for saying that, though one's property may be encumbered, one does not cease to be the beneficial owner. If a man mortgages his house and undertakes not to grant leases, he does not cease to be beneficial owner. The mere fact that restrictions are imposed by law or contract on his right to use his property does not deprive him of the beneficial ownership.

When property is held in trust the beneficial ownership is necessarily divided. The beneficial interest in that case is not in suspense but is always somewhere. The life tenant is not the beneficial owner, nor is the remainder-man, but the two together have the beneficial ownership. Where there are several beneficiaries under a trust, the beneficial ownership resides in them collectively.

The company acts through its agent, the liquidator, who must carry out his statutory duty. The beneficial ownership remains in the company.

*Sykes* following. Under the provisions of the Companies Act 1948 relating to liquidation there is no question of a trust or of suspension of the beneficial ownership. A liquidation may be voluntary, compulsory or subject to supervision. A voluntary liquidation may be a creditors' or a members' liquidation. Both in a voluntary and a compulsory liquidation the company may be either solvent or insolvent. In a liquidation creditors, post-liquidation creditors and shareholders all have interests in the assets. The relevant provisions of the Companies Act 1948 are sections 212, 226, 227, 228, 231, 232, 243, 244, 245, 257, 265, 273, 281, 282, 285 (2), 296 (2), 301, 302, 303, 307, 309, 316, 319 (5), 333 and 357.

Unlike a deceased person, a company remains alive during a winding up. It dies only at its dissolution and at the end of the winding up. Unlike the case of the assets of a bankrupt its assets remain in its ownership after the start of the liquidation. The liquidator is clothed with the powers of a superior director by a statute which imposes on him particular duties. No one but the company has any beneficial interest in its assets. The only right of a creditor or a contributory is to require the company to do that which the statute has imposed on it. The company receives the fruits of its assets (e.g., dividends on shares which it owns). By its liquidation it can sell assets in order to pay its creditors as and when, through its liquidation, it thinks fit, subject to the limitations imposed by its constitution. There is no question of the fruits of its assets being held on any trust or being enjoyed by anyone but the company. Under an appropriate constitution the position of a company in liquidation could be similar to that of a company not in liquidation. There is no suspension of the beneficial ownership of its assets.

If a creditor initiated an execution on a company's assets in a foreign country the question would arise whether the court could exercise its discretion to stop it. The liquidator might initiate liquidation proceedings in the country where the assets were situated, since most civilised countries have insolvency laws enabling insolvent companies to be liquidated. As

to the right of a foreign creditor to prosecute his remedy where he thinks fit, see *Carron Iron Co.* v. *MacLaren* (1855) 5 H.L.Cas. 416, 436–437. A A
creditor in a foreign country is not amenable to the English courts, nor is it possible for the English courts to prevent him from levying execution there and retaining the fruits. But when a creditor amenable to the English courts seeks to levy execution, but has not yet put the execution in train, they can restrain him from doing so. When the execution has been commenced but has not been completed, the English courts will allow him B
to continue on terms that he accounts to the liquidator for the fruits of the execution. When a creditor amenable to the jurisdiction has completed the execution and is holding the fruits of it, the English courts, without there being a trust of the assets of the company, can require the creditor to disgorge the fruits of the execution. It is a fundamental principle that the creditors must share pari passu. For the courts to take such action it C
is not necessary that there should be a trust.

*Leonard Bromley Q.C.* and *Peter Gibson* for the respondent. As to the functions of and control over the liquidator, see sections 250 and 251 of the Act of 1948 and rules 59 and 78 of the Companies (Winding up) Rules 1949.

The Companies Act imposes a statutory scheme on the administration of the assets of a company in liquidation, whether compulsory or voluntary: D
see sections 257 and 302 of the Act of 1948. After the discharge of the liabilities it is the members, and not the company, who take the balance: see section 265 and rule 195 and also sections 309 and 319. On a liquidation the expenses must be paid including the liquidator's remuneration: see *In re Barleycorn Enterprises Ltd.* [1970] Ch. 465.

On beneficial ownership, *Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. 1077 was rightly decided. The question in the present case is E
whether the quality of such rights as Mactrac had in the assets immediately before and after the transfer in 1963 amount to beneficial ownership, i.e., whether the trade " belongs to the same persons as the trade . . . belonged to at some time within a year before the change." Attention must be directed to the period immediately before and after the transfer. The nature and quality of the rights Mactrac had in its assets immediately F
before the transfer to C. & K. on January 18, 1963, did not amount to beneficial ownership of those assets.

" Ownership " in section 17 (6) (*b*) and (*c*) means beneficial ownership. Reliance is placed on *Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. 1077, 1096 (Lord Donovan), 1096–1097 (Harman L.J.), 1097 (Widgery L.J.). The right formulation of the question is: Has the company beneficial ownership? That is how Lord Donovan formulated it and what Harman G
L.J. said indicates the essential quality of the beneficial ownership. A company in liquidation does not have beneficial ownership of its assets. The question is whether Mactrac in liquidation had the right to deal with its assets as its own. Mactrac did not have that and did not have " beneficial ownership." What was said in the *Wood Preservation* case [1969] 1 W.L.R. 1077 was adopted in *Brooklands Selangor Holdings Ltd.* v. *Inland* H
*Revenue Commissioners* [1970] 1 W.L.R. 429, 448–450. See also *Parway Estates Ltd.* v. *Inland Revenue Commissioners* (*Note*) (1958) 45 T.C. 135, 148.

A The effect of the Companies Act is not, in winding up, to impose obligations in personam. It is concerned with the application of the assets which are to be applied under a statutory scheme of administration.

The duties of the liquidator are to be carried out for the benefit of classes of persons who do not include the company as such. The benefits of realisation of the assets are for those who take under the statutory scheme and not the company.

B In such circumstances the company is not the beneficial owner of the assets.

Reliance is placed on *In re Oriental Inland Steam Co.*, 9 Ch.App. 557, 559. See also *In re Commercial Bank Corporation of India and the East* (1866) 1 Ch.App. 538, 545.

The liquidator had duties in the administration of the assets under the statutory scheme and was obliged to take account of the directions of the C creditors: see sections 246 (1) and 257 of the Act of 1948. It had attributes of a trust, though not with all the characteristics of a trust as developed by equity. For over a hundred years the description of trust has often been adopted in describing the statutory scheme, though this may be misleading. There has been imposed on the assets, not on the company, a scheme of administration: see *Halsbury's Laws of England*, 4th ed., vol. 7 (1974), D pp. 648–649, paras. 1110 and 1111, which repeat, with small and immaterial changes, what was said in the previous edition. See also pp. 649–650, para. 1112 and p. 683, para. 1180.

In *In re Albert Assurance Co. Ltd.; The Delhi Bank's* case (1871) 15 S.J. 923 was the first statement of principle in relation to what is now section 257 of the Act of 1948. It is cited in *Buckley's Companies Acts*, 13th ed. (1957), p. 512. *In re General Rolling Stock Co.* (1872) 7 Ch.App. E 646 is significant because the Court of Appeal held that there was a trust, overruling a decision by Lord Romilly M.R.: see also *In re Paraguassu Steam Tramroad Co.* (1872) 8 Ch.App. 254, 260. In *In re Oriental Inland Steam Co.*, 9 Ch.App. 557, 559, 560, James L.J. referred to a trust in terms which made it clear that he was referring to the trust created by the Act and Mellish L.J. said that the beneficial interest was clearly taken out of F the company. See also *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Knowles* v. *Scott* [1891] 1 Ch. 717; *In re Central Sugar Factories of Brazil* [1894] 1 Ch. 369 and *In re Anglo-Oriental Carpet Manufacturing Co. Ltd.* [1903] 1 Ch. 914. The cases are consistent and numerous. The relevant passage in *Buckley's Companies Acts*, 7th ed. (1897), p. 282 is to be found in the 2nd ed. (1875) and is repeated in the 13th ed. (1957), p. 498 (see also p. 512).

G The highest point against the respondent is *In re Farrow's Bank Ltd.* [1921] 2 Ch. 164, 170 but it is no authority on the point whether a company in liquidation has beneficial ownership of its assets. In the judgments there is no reference to *In re Oriental Inland Steam Co.*, 9 Ch.App. 557, and accordingly it cannot be supposed that it was disapproved.

In section 42 (3) of the Finance Act 1938, relating to national defence H contribution (the forerunner of profits tax), it is said that in that section and in Part I of Schedule 4 to the Act references to ownership shall be construed as references to beneficial ownership. In section 17 (6) (*a*) of the Finance Act 1954 it was said that for the purposes of subsection (5)

references to ownership were to be construed as references to beneficial ownership and by subsection (6) (*c*) the tracing provisions were related to Part I of Schedule 4 to the Act of 1938. "Beneficial ownership" means the same thing in both the Acts. The Act of 1938 also dealt with beneficial ownership in relation to stamp duties: see section 50. As to stamp duties, see section 55 of the Finance Act 1927 and section 42 of the Finance Act 1930, amended by section 27 (2) of the Finance Act 1967. As to excess profits tax, see sections 12 (1), 14 (1) and 17 of the Finance (No. 2) Act 1939. The legislature clearly and consistently refers to "beneficial ownership" in the sense submitted, as established by the authorities.

*Gerard* v. *Worth of Paris Ltd.* [1936] 2 All E.R. 905, carries the matter no further; the circumstances there were wholly exceptional. The *English Sewing Cotton* case, 176 L.T. 481, was not wrongly decided but it was not concerned with liquidation at all and the authorities on winding up were not cited. See Lord Greene M.R. on "beneficial interest" at p. 484. The proper question is not: where is the beneficial interest? It is: has the company got it? The statutory scheme is for the benefit of persons other than the company, i.e., for creditors and contributories: and see section 302 of the Companies Act 1948.

*In re Oriental Inland Steam Co.*, 9 Ch.App. 557, was followed in *In re Vocalion (Foreign) Ltd.* [1932] 2 Ch. 196, 204, 209 and the relevant part of the ratio was followed in *Inland Revenue Commissioners* v. *Olive Mill Ltd. (in Liquidation)* [1963] 1 W.L.R. 712. It was also impliedly followed in *Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409, 414. Nothing in *Livingston's* case [1965] A.C. 694, 708, 712 is against the respondent; the court was not concerned to ask whether the executor had beneficial ownership. *In re Oriental Inland Steam Co.*, 9 Ch.App. 557, was rightly decided on the grounds stated in the judgments and nothing in the *Carron Iron Co.* case, 5 H.L.Cas. 416, detracts from it. The right test of beneficial ownership is the power to deal with property as one's own. It is not right to call the company a beneficial owner where it has no right to deal with the property as its own or to benefit from it.

*Gibson* following. Compare the position of a receiver as agent of a company with that of a liquidator. The agency of a receiver ends on the liquidation of his principal, when a new situation arises and the receiver thereafter acts as principal. A liquidator is empowered to do certain things for and on behalf of the company. But it is a strange form of agency when the principal cannot do what the agent is able to do. In the usual agency situation (such as a receivership) the agent ceases to be able to exercise his power when the principal cannot act. This points to the special fettered status of a company in liquidation.

In section 17 of the Act of 1954 Parliament has imposed an arbitrary test, beneficial ownership, which is well known to the legislature. It is wrong to assume that the test was intended to be satisfied in a liquidation situation.

*Beattie Q.C.* in reply. The *English Sewing Cotton* case, 176 L.T. 481, is authority for the meaning of "beneficial ownership" and applies to section 17 of the Act of 1954. One is not deprived of beneficial ownership simply because one's property is encumbered. In the case of a tree preservation order one is deprived of the right to cut it down but not of the beneficial

A ownership. A company in liquidation, though it must pay its creditors, holds its property for its own benefit. Its assets remain its assets though they must be dealt with in a particular way. As regards beneficial ownership there is no difference between compulsory and voluntary liquidation: see section 302 of the Companies Act 1948. The liquidator has fiduciary duties imposed by statute but is not really a trustee. The beneficial ownership is not in the creditors.

B In *Brooklands Selangor Holdings Ltd.* v. *Inland Revenue Commissioners* [1970] 1 W.L.R. 429 the company which owned the shares was bound by the scheme entered into to transfer them to someone else. The beneficial ownership had gone when the relevant contract of sale was entered into. The *Parway Estates* case, 45 T.C. 135, was similar. Neither case is of assistance in the present problem. In *In re General Rolling Stock Co.*, C 7 Ch.App. 646, 647, 648–649, though the decision of Lord Romilly M.R. was reversed, his reasoning was not attacked.

A company only ceases to be the beneficial owner of its assets if the beneficial ownership passes to someone else. A man remains the beneficial owner of his property, however much the law may restrain the use of it.

In *Livingston's* case [1965] A.C. 644 there was no question of equitable ownership.

D

Their Lordships took time for consideration.

May 21. LORD DIPLOCK. My Lords, the only question that has been argued in your Lordships' House is whether when a company is ordered to be wound up under the Companies Act 1948 the effect of the winding-up order is to divest the company of the "beneficial ownership" of its E assets within the meaning of that expression as it is used in section 17 (6) (*a*) of the Finance Act 1954.

Under the Income Tax Acts a trader who has sustained a trading loss in any year of assessment or has incurred expenditure for which he is entitled to claim capital allowances to an amount which exceeds the taxable profits of the trade for that year, is entitled to carry forward the loss or the excess F and set it off against his taxable profits of that trade in subsequent years of assessment; but before the Finance Act 1954 this right of set-off was lost upon his ceasing permanently to carry on the trade. In the case of trading companies section 17 of the Finance Act 1954 allowed some piercing of the corporate veil by providing exceptions to the general rule as to cessation. The effect of the exception that is relevant to this appeal is that where the trade continues to be carried on by a successor that is a sub-G sidiary company of the company that previously carried on the trade, the successor company may avail itself of the right of set-off that would have been available to its predecessor if it had continued to carry on the trade itself.

It is not now disputed that upon the true construction of this section a successor company is only to be treated as a subsidiary company of a parent H company as predecessor if and so long as not less than three-quarters of its ordinary share capital is in the "beneficial ownership" of the parent company whether directly or through another company or companies or partly directly and partly through another company or companies. This

makes it unnecessary to set out again and analyse the various subsections and paragraphs which justify this conclusion. They are quoted in the judgment of Templeman J. None of them throws any light upon the sense in which the expression "beneficial ownership" is used in section 17 (6) (*a*) or lends support to the view that it bears any other meaning than that which would have been ascribed to it in 1954 as a term of legal art as descriptive of the proprietary interest in its assets of a company incorporated under the Companies Act 1948 at successive stages of its existence from incorporation to the commencement of winding up and from the commencement of winding up to dissolution.

Nor do I find it necessary to restate the particular facts that give rise to this appeal, beyond saying that it concerns two companies: a parent company which was ordered to be compulsorily wound up and the appellant company of which all the shares were held by the parent company or its nominee. The parent company had carried on a trade. The trade continued to be carried on after the making of the winding-up order until the assets and goodwill of the trade were transferred to the appellant company. After the transfer the shares in the appellant company were sold to a third party and the proceeds of sale distributed in the liquidation of the parent company.

The appellant company relies upon section 17 of the Finance Act 1954 as entitling it to set off against its taxable profits from the trade in two years of assessment after the transfer, the trading losses and claims to capital allowances which had accrued to the parent company in the years of assessment before the transfer. It is common ground between the parties that the appellant company's right to do so depends upon whether its shares were still in the "beneficial ownership" of the parent company at the time of the transfer notwithstanding that by then the parent company had been ordered to be wound up.

My Lords, the making of a winding-up order brings into operation a statutory scheme for dealing with the assets of the company that is ordered to be wound up. The scheme is now contained in Part V of the Companies Act 1948 and extends to voluntary as well as to compulsory winding up; but in so far as it deals with compulsory winding up its essential characteristics have remained the same since it was first enacted by the Companies Act 1862. The procedure to be followed when a company is being wound up varies in detail according to whether this is done compulsorily under an order of the court or voluntarily pursuant to a resolution of the company in general meeting, and, in the latter case, whether it is a members' voluntary winding up or a creditors' voluntary winding up; but the essential characteristics of the scheme for dealing with the assets of the company do not differ whichever of these procedures is applicable. They remain the same as those of the original statutory scheme in the Companies Act 1862. For the sake of simplicity, in stating the essential characteristics of the statutory scheme I propose to refer only to those sections of the Companies Act 1948 which apply in a compulsory winding up and to omit those sections which have a corresponding effect in the case of a voluntary winding up.

Upon the making of a winding-up order:

A (1) The custody and control of all the property and choses in action of the company are transferred from those persons who were entitled under the memorandum and articles to manage its affairs on its behalf, to a liquidator charged with the statutory duty of dealing with the company's assets in accordance with the statutory scheme (section 243). Any disposition of the property of the company otherwise than by the liquidator is void (section 227).

B (2) The statutory duty of the liquidator is to collect the assets of the company and to apply them in discharge of its liabilities (section 257 (1)). If there is any surplus he must distribute it among the members of the company in accordance with their respective rights under the memorandum and articles of association (section 265). In performing these duties in a compulsory winding up the liquidator acts as an officer of the court (section 273); and if the company is insolvent the rules applicable in the C law of bankruptcy must be followed (section 317).

(3) All powers of dealing with the company's assets, including the power to carry on its business so far as may be necessary for its beneficial winding up, are exercisable by the liquidator for the benefit of those persons only who are entitled to share in the proceeds of realisation of the assets under the statutory scheme. The company itself as a legal D person, distinct from its members, can never be entitled to any part of the proceeds. Upon completion of the winding up, it is dissolved (section 274).

The functions of the liquidator are thus similar to those of a trustee (formerly official assignee) in bankruptcy or an executor in the administration of an estate of a deceased person. There is, however, this difference: that whereas the legal title in the property of the bankrupt vests E in the trustee and the legal title to property of the deceased vests in the executor, a winding-up order does not of itself divest the company of the legal title to any of its assets. Though this is not expressly stated in the Act it is implicit in the language used throughout Part V, particularly in sections 243 to 246 which relate to the powers of liquidators and refer to "property . . . to which the company is . . . entitled," to "property . . . belonging F to the company," to "assets . . . of the company" and to acts to be done by the liquidator "in the name and on behalf of the company."

The question in this appeal is whether the legal title to its property which remains in the company after the commencement of the winding up still carries with it any beneficial interest in that property, so as to leave the property in the company's "beneficial ownership" within the meaning of section 17 (6) (*a*) of the Finance Act 1954.

G My Lords, the concept of legal ownership of property which did not carry with it the right of the owner to enjoy the fruits of it or dispose of it for his own benefit, owed its origin to the Court of Chancery. The archetype is the trust. The "legal ownership" of the trust property is in the trustee, but he holds it not for his own benefit but for the benefit of the cestui que trust or beneficiaries. Upon the creation of a trust in the H strict sense as it was developed by equity the full ownership in the trust property was split into two constituent elements, which became vested in different persons: the "legal ownership" in the trustee, what came to be called the "beneficial ownership" in the cestui que trust. But it did not

follow even in equity that a person could only be the legal owner without being at the same time the beneficial owner in cases where it was possible to identify some other person or persons in whom the beneficial ownership had become vested. Executorship of an estate in course of administration provides one example which does not owe its origin to statute. No one would suggest that an executor, who was not also a legatee, was beneficial owner as well as legal owner of any of the property which was in the full ownership of the deceased before his death. He could not enjoy the fruits of it himself or dispose of it for his own benefit. Yet because an estate while still in course of administration was incapable of satisfying the technical requirement of a "trust" in equity that there had to be specific subjects identifiable as the trust fund, it was impossible to identify, at any rate in the case of residuary legatees, a person or persons in whom the beneficial ownership in any particular property forming part of the estate was vested: see *Commissioner of Stamp Duties (Queensland)* v. *Livingston* [1965] A.C. 694, 707–708 *per* Viscount Radcliffe. Another example, which owes its origin to statute, is to be found in the law of bankruptcy. The legal ownership of the bankrupt's property becomes vested in the trustee in bankruptcy. Here, while the property is still being administered, not only is there a similar absence of specific subjects identifiable as the trust fund but also the fact that the right to share in the proceeds of realisation of the property is dependent upon the creditor making a claim to prove in the bankruptcy makes it impossible until the time for proof has expired to identify those persons for whose benefit the trustee is administering the property. Both these factors would, in equity, have prevented that property possessing those characteristics of trust properties which have the consequence of vesting the beneficial ownership of any part of the undistributed property in those persons who will eventually become entitled to share in the proceeds of realisation. Nevertheless, as the very word "trustee" used in the statute implies, the beneficial ownership is not vested in him. He cannot enjoy the fruits of it himself or dispose of it for his own benefit. He is under a duty to deal with it as directed by the statute for the benefit of all the creditors who come in to prove a valid claim. It is no misuse of language to describe the property as being held by the trustee on a statutory trust if the qualifying adjective "statutory" is understood as indicating that the trust does not bear all the indicia which characterise a trust as it was recognised by the Court of Chancery apart from statute.

The argument advanced for the appellant company is that it makes all the difference that, upon the winding up of a company, the company does not cease to be the legal owner of its property as does a person who dies or is adjudicated bankrupt. The contention is that so long as a person, in whom the full ownership of property has once been vested, continues to retain the legal ownership he can only be divested of the beneficial ownership as a result of its becoming vested in some other person or persons. This does not occur except where a "trust," in the strict sense as it was recognised in equity, is created in the property. Such a trust is not created by Part V of the Companies Act 1948 upon the making of a winding-up order; since, for the same reasons as apply in the case of bankruptcy, the persons entitled to share in the proceeds of realisation of the

A company's property are not invested with the beneficial ownership of that property while it is still being administered by the liquidator.

My Lords, I do not see how it can make any relevant difference that the legal ownership remains in the person in whom the full ownership was previously vested instead of being transferred to a new legal owner. Retention of the legal ownership does not prevent a full owner from divesting himself of the beneficial ownership of the property by declaring that he
B holds it in trust for other persons. I see no reason why it should be otherwise when an event occurs which by virtue of a statute leaves him with the legal ownership of property but deprives him of all possibility of enjoying the fruits of it or disposing of it for his own benefit.

The nature of a company's interest in its assets after a winding-up order had been made first fell to be considered by the Court of Chancery under
C the Companies Act 1862. It was, perhaps, inevitable that the court should find the closest analogy in the law of trusts. In one of the earliest reported cases, *In re Albert Life Assurance Co., The Delhi Bank's case* (1871) 15 S.J. 923, 924 Lord Cairns puts it:

> ". . . the assets of the company from the moment of winding up, . . . become fixed and inalienable; the executive and the direction of
> D the company are unable to alienate them or to part with them for any purpose; they become fixed and impressed with the trust declared by section 98,"—(which corresponds to section 257 (1) of the Act of 1948)—" a trust by which all the assets of the company are to be applied in discharge of the liabilities of the company."

In the following year one finds Mellish L.J. equiparating the status of a
E company's assets under a winding-up order with the assets of a debtor in bankrupty or under a decree of the Court of Chancery in an administration suit: *In re General Rolling Stock Co.* (1872) 7 Ch.App. 646, 649.

The question of the beneficial ownership of the company's property was dealt with explicitly by both James L.J. and Mellish L.J. in *In re Oriental Inland Steam Co.* (1874) 9 Ch.App. 557:

> F " The English Act of Parliament has enacted that in the case of a winding up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; . . ." (*per* James L.J. at p. 559).
>
> G " No doubt winding up differs from bankruptcy in this respect, that in bankruptcy the whole estate, both legal and beneficial, is taken out of the bankrupt, and is vested in his trustees or assignees, whereas in a winding up the legal estate still remains in the company. But, in my opinion, the beneficial interest is clearly taken out of the company. What the statute says in section 95 is, that from the time
> H of the winding-up order all the powers of the directors of the company to carry on the trade or to deal with the assets of the company shall be wholly determined, and nobody shall have any power to deal with them except the official liquidator, and he is to deal with them

for the purpose of collecting the assets and dividing them amongst the creditors. It appears to me that that does, in strictness, constitute a trust for the benefit of all the creditors, . . ." (*per* Mellish L.J. at p. 560). A

The authority of this case for the proposition that the property of the company ceases upon the winding up to belong beneficially to the company has now stood unchallenged for a hundred years. It has been repeated in successive editions of *Buckley on the Companies Acts* from 1897 to the present day. Nevertheless your Lordships are invited by the appellant company to say that it was wrong because it was founded on the false premise that the property is subject to a " trust " in the strict sense of that expression as it was used in equity before 1862. B

My Lords, it is not to be supposed that in using the expression " trust " and " trust property " in reference to the assets of a company in liquidation the distinguished Chancery judges whose judgments I have cited and those who followed them were oblivious to the fact that the statutory scheme for dealing with the assets of a company in the course of winding up its affairs differed in several aspects from a trust of specific property created by the voluntary act of the settlor. Some respects in which it differed were similar to those which distinguished the administration of estates of deceased persons and of bankrupts from an ordinary trust; another peculiar to the winding up of a company is that the actual custody, control, realisation and distribution of the proceeds of the property which is subject to the statutory scheme are taken out of the hands of the legal owner of the property, the company, and vested in a third party, the liquidator, over whom the company has no control. His status, as was held by Romer J. in *Knowles* v. *Scott* [1891] 1 Ch. 717 differs from that of a trustee " in the strict sense " for the individual creditors and members of the company who are entitled to share in the proceeds of realisation. He does not owe to them all the duties that a trustee in equity owes to his cestui que trust. All that was intended to be conveyed by the use of the expression " trust property " and " trust " in these and subsequent cases (of which the most recent is *Pritchard* v. *M. H. Builders* (*Wilmslow*) *Ltd.* [1969] 1 W.L.R. 409) was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons. C D E F

My Lords, the expression " beneficial owner " in relation to the proprietary interest of a company in its assets was first used in a taxing statute in 1927. Section 55 of the Finance Act 1927 provided for relief from capital and transfer stamp duty in cases of reconstruction or amalgamation of companies where shares in a transferee company were issued as consideration for the acquisition of the undertaking of the transferor company. Subsection (6) (*a*) (*b*) and (*c*) made provision for three exceptions to the right to this relief. The exception provided for in paragraph (*b*) is expressed to depend upon whether within a period of two years from a specified date the " . . . [transferor] . . . company ceases, otherwise than in consequence of reconstruction, amalgamation *or liquidation*, to be the beneficial owner of G H

A the shares so issued to it." From this can be inferred a recognition by Parliament that when a company is in liquidation it ceases to be the " beneficial owner " of its assets within the meaning of that expression as used by the draftsman in a taxing statute.

The expressions " beneficial owner " and " beneficial ownership " appear again in section 42 (2) (*b*) of the Finance Act 1930 in connection with what companies were to be treated as associated companies for the purpose of B relief from transfer stamp duty, and in section 42 of the Finance Act 1938. This dealt with grouping of profits of parent and subsidiary companies for the purpose of national defence contribution. The definition of subsidiary company, which incorporates the reference to the requirement of " beneficial ownership " of its shares by its parent company, is in the same words as the corresponding definition in section 17 (6) of the Finance Act 1954.

C So when those words were repeated in the Finance Act 1954 not only was there a consistent line of judicial authority that upon going into liquidation a company ceases to be " beneficial owner " of its assets as that expression has been used as a term of legal art since 1874, but also there has been a consistent use in taxing statutes of the expressions " beneficial owner " and " beneficial ownership " in relation to the proprietary interest of a company in its assets which started with the Finance Act 1927, where D the context makes it clear that a company upon going into liquidation ceases to be " beneficial owner " of its assets as that expression is used in a taxing statute.

I would dismiss this appeal.

VISCOUNT DILHORNE. My Lords, I have had the advantage of reading E the speech of my noble and learned friend, Lord Diplock. I agree with it and that this appeal should be dismissed.

LORD KILBRANDON. My Lords, I have the advantage of reading the speech prepared by my noble and learned friend, Lord Diplock. I agree with his conclusions, and would therefore dismiss this appeal.

F LORD EDMUND-DAVIES. My Lords, for the reasons appearing in the speech of my noble and learned friend, Lord Diplock, I too would dismiss this appeal.

*Appeal dismissed.*

Solicitors: *Masons; Solicitor of Inland Revenue.*

G F. C.

H

# Re Bank of Credit and Commerce International SA

CHANCERY DIVISION (COMPANIES COURT)
SIR NICOLAS BROWNE-WILKINSON V-C
22, 30 JULY 1991

*Winding up – Order sought against bank – Adjournment of the order sought – Basis on which the court would grant the adjournment*

The Bank of England sought a winding-up order against the Bank of Credit and Commerce International SA (BCCI) a bank which was incorporated in Luxembourg. BCCI carried on a business around the world and its headquarters were in Abu Dhabi. The basis on which the bank sought the order was that it was in the public interest that BCCI should be wound up and that it was insolvent. The principal shareholder in BCCI sought an adjournment of the petition for a period of six months to determine if the affairs of BCCI could be restructured. The court was concerned that if it granted the order of adjournment sought that the provisional liquidators would not obtain information which they sought from Abu Dhabi and that the adjournment would prejudice the interests of employees and creditors.

**Held –** Adjournment sought would be granted. In granting the adjournment the court was concerned with the question of whether or not information would be made available to, inter alia, the provisional liquidators and the court had been assured that this had been dealt with to the satisfaction of the provisional liquidators. The court was also concerned with the position of the employees during the period when the company continued to operate since until a winding-up order was made they were not entitled to claim for redundancy payments from public funds and there was considerable doubt as to how the employees would be paid during the period when the proceedings on the winding-up petition were adjourned. As regards employees, the court was satisfied that a scheme put forward by the principal shareholder for the payment of the employees' wages would adequately protect their interests. Lastly, the court was also concerned that a delay in making a winding-up order would prejudice the sterling depositors since until such an order was made the depositors would not be entitled to obtain compensation from a statutory scheme set up to protect depositors in failed banks. As regards the depositors, a scheme had been put forward which would go a long way to avoiding hardship to the majority of small depositors and accordingly the prejudice caused to the creditors would be mitigated. Given that the provisional liquidators would obtain the information that they sought, and that the interests of the employees and sterling depositors would be protected, the court would grant the order sought to adjourn the hearing of the winding-up petition for approximately five months.

**Petition**

By a petition dated 5 July 1991 the Bank of England applied to wind up the Bank of Credit and Commerce Internaional SA (BCCI), a company registered

and incorporated in Luxembourg, on the grounds that it was in the public interest to wind up BCCI and that BCCI was insolvent. The facts are set out in the judgment of the court.

*Gabriel Moss QC* and *Mark Phillips* (instructed by *Freshfields*) for the Bank of England.
*Michael Crystal QC, Richard Sheldon* and *Robin Dicken* (instructed by *Freshfields*) for the commissaire of BCCI SA and the provisional liquidators.
*Martin Pascoe* (instructed by *Freshfields*) for one of the provisional liquidators.
*David Johnson QC, Richard Hacker* and *William Trower* (instructed by *Simmons & Simmons*) for the majority shareholders.
*William Blackburne QC, Richard Adkins* and *David Alexander* (instructed by *Allen & Overy*) for the directors of BCCI SA.
*James Wadsworth QC, Laurence West-Knights* and *David Mabb* (instructed by *Richards Butler*) for creditors.
*Edwards Evans-Lombe QC* and *Peter Griffiths* (instructed by *Edwin Coe & Co*) for creditors.
*John Cherryman QC* and *Brian Mark* (instructed by *Slater Links*, Manchester) for creditors.
*Peter Havey* (instructed by *Zaiwalla & Co*) for creditors.

**SIR NICOLAS BROWNE-WILKINSON V-C.** This is the hearing of a petition to wind up the Bank of Credit and Commerce International SA (BCCI). The petition is presented by the Bank of England on the grounds of it being in the public interest that it should be wound up, or alternatively on the grounds that BCCI is insolvent.

BCCI is part of a larger group. The holding company is registered and incorporated in Luxembourg; so is BCCI itself. There is a related company, a co-subsidiary of BCCI, BCCI Overseas, which is incorporated in the Grand Cayman Islands.

The petition is founded on allegations contained in a report prepared by Price Waterhouse earlier this year, detailing allegations of dishonest and fraudulent conduct of BCCI in years past, as a result of which funds running to billions of dollars are not available.

The majority shareholders consist of various aspects of the government of Abu Dhabi. They are also creditors, to the extent of some $1.4 billion.

In years past the business of BCCI has been conducted primarily from London, though its headquarters has now been transferred to Abu Dhabi. The accounts and records of BCCI have been kept in such a form that it is extremely difficult to reconstruct what has occurred. Nobody is able currently to reach any accurate view as to the extent of its insolvency. The provisional liquidators estimate that any deficiency is likely to be substantial.

It is not necessary for me to go into the detail of the matter at this stage because I am faced with an application to adjourn the hearing of the winding-up petition. The frontrunner in that application is the government of Abu Dhabi itself, supported by BCCI. The government of Abu Dhabi has in the past supported BCCI to a very substantial extent. According to the evidence put in by the government of Abu Dhabi, a further restructuring support operation was in an advanced stage of negotiation on 5 July, the date on which the petition was presented. According to the same evidence, the government of Abu Dhabi

was given no warning of the pending presentation of the petition. I must make it clear that the Bank of England has not had any opportunity to answer that evidence at all, or to explain the circumstances. The fact is that the majority shareholders (the government of Abu Dhabi) according to the evidence feel affronted by what has happened. They are faced with a position in which they cannot implement the proposed restructuring operation that was, according to them, nearly agreed, but they still wish to pursue the possibility of investigating the matter sufficiently to see whether some other form of rescue operation can or cannot be worked out.

Apart from one factor, there can be no doubt in my mind that if such a restructuring can be negotiated, so that BCCI is reconstituted on a basis which is not only financially viable and the management beyond reproach, that will be in the interests of all depositors and creditors.

But, there is a big 'if'. It does not follow that because people wish to achieve an objective they will necessarily achieve it. In the meantime, the complexity of the case is such that any negotiations leading to a successful outcome are likely to take up to six months. The question is: what is to happen during that period?

Of the accounts in this country, the sterling depositors in the UK amount to some 48,400 in number to an amount of some £652m. Of those, there are 36,800 depositors whose deposits are between nothing and £1,000. The total amount owed to those 36,000 is £4.7m. There are 2,600 depositors with between £1,000 and £2,000 on deposit. The amount owed to them by BCCI is approximately £3.6m. There are 5,900 depositors with between £2,000 and £20,000 deposited. The total owed to them is £40.5m. The remaining depositors, that is to say depositors of £20,000 and upwards (the largest deposit is around £33m) amount to 3,100 in number, to whom is owed £603.6m. Those are the sterling deposits. In addition, the overseas non-sterling deposits held in London are some 17,000 in number, in which the deposits total some $2.15 billion.

Under the statutory deposit protection scheme, sterling deposits in this country are entitled to be paid up to 75% of the amount owed, up to a maximum of £15,000. The small depositors are likely to be in considerable personal hardship as a result of the freezing of all the bank accounts. It is on that ground that the Bank of England is pressing for this petition to be heard, since, unless and until a winding-up order is made, no payment can be made out under the protection scheme. To my mind, that is a very real consideration, and one which has to be set against the prospects of a better recovery by the creditors as a whole if – and it is an 'if' – a scheme can be worked out to restructure the bank.

In addition, there are a number of employees of BCCI in this country. They are being paid by the provisional liquidators up until the end of this month. Thereafter, the question whether they should continue to be paid may prove to be a very difficult one. It is hard to see why the body of creditors as a whole should continue to finance the employment of these employees by the payment of their wages indefinitely unless there is a high degree of certainty that a rescue will come into operation. Therefore, the future payment of the salaries of the employees must be a matter of considerable doubt after the end of this month. Unless and until a winding-up order is made, redundancy payments out of the public funds and other similar payments cannot be made. Therefore, the postponement of the making of a winding-up order is likely to operate adversely to the employees of BCCI as well as to the small depositors.

Those are the circumstances that I have to take into account in considering whether or not to grant an adjournment.

a The government of Abu Dhabi and others ask me to stand the matter over for a month in order to discover whether or not there is any hope of successful reconstruction discussions. If that were to happen and it then came back to me in a month's time, and I was told there were prospects of successful discussions, then I would have to stand the petition over for another five months. At some b stage, somebody is going to have to grapple with the problem of what is to happen to the small depositors and the employees. I see no reason why that should not be sooner rather than later. I can see no reason why, if the will is there, a fund cannot be provided to relieve immediately the needs of the small depositor by way of loans to them to be repaid either (if BCCI is saved) out of their credit balances, or (if BCCI is not saved) out of their entitlement from the c compensation fund. If some such scheme can be put together, then a longer adjournment can be granted, much to the benefit of the creditors as a whole, again on the assumption that something will be done about the employees.

There is one further factor that I should mention. The provisional liquidator and his counterpart under Luxembourg law have in the past been having certain difficulties in getting information from the headquarters of BCCI in Abu Dhabi. d I am told, and I am sure it is true, that if useful discussions as to restructuring are to take place, everybody will need to have as accurate and clear information as possible as to what has been going on and as to what the present position is. I have no doubt that if I stand this matter over for a short while, Mr Johnson, on behalf of the Abu Dhabi government, will be in a position to give assurances e that free access will be given to the provisional liquidators to all information. Certainly, if that were not to be forthcoming, there would be great difficulties in tolerating any long adjournment of the matter.

Therefore, paying due regard to the quite enormous costs that must be involved in gathering this galaxy of legal talent in this court, I propose to adjourn the matter for eight days, for the matter to be investigated to see if some form of f interim compensation scheme can be provided for the small depositor, and the position of the employees in the interim looked after and, that that there are assurances forthcoming from Abu Dhabi as to the availability of all necessary information to the provisional liquidators.

It has, of course, been very helpful to hear seven leading counsel on behalf of different groups of opposing creditors but I must remind the parties that, in the g normal case, the order made as to costs is to allow one set of costs for opposing creditors and one set of costs for supporting creditors. I do suggest that if people are so anxious about the money that they may unhappily have lost in BCCI, they should make every effort to consolidate their representations on the resumed hearing of this winding-up petition. At the moment, I have not detected any h very clear difference of interest between a number of the groups represented before me. No doubt there can be some saving in costs on the next occasion. So, I will stand the matter over for eight days, and hope that something can be put together.

i *Matter stood over for eight days.*

Celia Fox Barrister.

30 July 1991. The following judgment was delivered.

**SIR NICOLAS BROWNE-WILKINSON V-C.** This is a winding-up petition brought by the Bank of England under s 92 of the Banking Act 1987, to wind up the Bank of Credit and Commerce International SA which I refer to as 'BCCI'. BCCI is a company incorporated in Luxembourg. There are many other companies in the same group. The holding company is also incorporated in Luxembourg. Another company, BCCI Overseas, is incorporated in the Grand Cayman Islands. The holding company also has numerous subsidiaries incorporated in various other jurisdictions around the world.

The petition is based on two grounds, one, that it is in the public interest to wind up BCCI, the second, that BCCI is insolvent.

The evidence in support suggests that there has been very widespread fraud, also worldwide, in the running of BCCI in the past. It also suggests that the current position is that BCCI is substantially insolvent. It has depositors in many countries all round the world: it has assets in many countries all round the world. This winding-up petition is a petition to wind up BCCI as a whole, not simply the United Kingdom branch of it. A winding-up petition could not be brought simply to wind up the English branches of BCCI.

When the matter was before me eight days ago, an application was made by the ruler of Abu Dhabi and the Abu Dhabi government as majority shareholders in BCCI for an adjournment. I stood the matter over for eight days for three matters to be considered. The first was that provisional liquidators appointed by this court and a commissaire appointed by the courts in Luxembourg were encountering difficulties in obtaining information from Abu Dhabi. I wished to have that looked into.

The second point to be investigated was the position of the employees of BCCI in this country whose future during a prolonged adjournment would be very difficult. They were not entitled to redundancy payments until a winding-up order was made, nor would the provisional liquidators necessarily be in a position to continue their employment.

The third matter to be considered was the position of sterling depositors in England. Under the deposit protection scheme established by the Banking Act 1987, on the making of a winding-up order depositors would be entitled to receive payment of up to 75% of their loss to a maximum of £15,000. The effect of a prolonged adjournment of a winding-up petition would be that those depositors would not be entitled to receive their compensation under the scheme. Those three matters seemed to me matters directly relevant to the question whether or not to grant the adjournment sought by the majority shareholders with a view to investigating the position and possibly putting forward a scheme for a partial or total rescue of BCCI could be worked out.

The matter now comes back to me and proposals have been put forward to deal with all three of those matters.

As to the first, namely the availability of information to the commissaire appointed by the Luxembourg court and to the provisional liquidators, I am happy to say that has been dealt with to the satisfaction of the provisional liquidators and the commissaire.

As to the employees, a scheme has been worked out between the majority shareholders and the provisional liquidators along the following lines. On 31 July the majority shareholders will pay £1.2m to the provisional liquidators,

being a sum estimated to provide sufficient to pay 14 days' salaries and expenses for English employees. Every seven days thereafter, it is the intention of the majority shareholders – though there is no binding obligation as I understand it – to pay such further sums to the provisional liquidators as are calculated to provide enough to cover salaries and expenses for a further seven days. The provisional liquidators are to hold those moneys paid to them on trust to pay salaries and expenses of the staff. In the event that the majority shareholders do not make any payment at the commencement of the seven-day period the provisional liquidator will apply to the court, or dismiss some or all of the employees. However, the provisional liquidators will not dismiss any employee without giving seven days' notice of their intention so to do to the majority shareholders.

In the meantime, the majority shareholders and the provisional liquidators are to continue discussions concerning the formulation and implementation of a possible redundancy scheme. It is hoped, though no more, that such redundancy scheme will produce a sum equal to the statutory redundancy payments which would be obtained by employees dismissed in the event of winding up.

It is to be emphasised, as was emphasised to me in argument, that employees of BCCI in this country must appreciate that nothing that is being put forward at this stage provides them with any guarantee of the continuation of their jobs.

The third element relates to the position of those who have deposited money in England in sterling. A scheme has been worked out in principle (though the detailed drafting of it remains to be completed) under which a fund will be established. The majority shareholders have already remitted to this country the sum of £50m of which £43m will be allocated to the fund. The fund is to be vested in the Law Debenture Trust Corp plc, and it is to be administered by the provisional liquidators, or possibly only one of them, Mr Morris. The fund will be held on trust to make payments to United Kingdom sterling depositors on the same terms as they would be entitled under the deposit protection scheme had a winding-up order been made, but subject to the following alterations. Instead of a maximum payment of £15,000 under the statutory scheme, the maximum payment will be £5,000; payments out of the fund will be by way of loan only. However, the majority shareholders and the fund will not be entitled (subject to one exception) to recover from the recipients moneys advanced by way of loan out of the fund, save by recovery from the deposit protection scheme (if a winding-up order is eventually made) or from BCCI (if negotiations for a rescue scheme prove successful). The majority shareholders will be obtaining from each depositor who receives an advance out of the fund irrevocable mandates directed to the deposit protection scheme and to BCCI, directing repayment either from the scheme, or from the fund. The sole exception to the inability of the majority shareholders to recover the debt directly from the depositor is this: if a depositor has received an interim payment out of the fund and seeks to revoke his irrevocable mandate, the majority shareholders would be entitled to recover the advance from the depositor direct.

Those proposals fall short of putting the United Kingdom sterling depositors in exactly the same position as they would be if a winding-up order were made today. In particular, the limit of £5,000 as the maximum payment out of the fund is plainly less beneficial than the maximum of £15,000 under the statutory scheme.

However, when I suggested this scheme at the first hearing, my concern was

directed, not so much to the putting in place the whole statutory scheme, but to ensuring that there would not be, so far as possible, suffering by the small depositor all of whose money had gone as a result of the unhappy position that has now arisen in relation to BCCI. The scheme now proposed seems to me to achieve that result. Out of the 48,400 United Kingdom sterling depositors, 39,400 had deposits with BCCI of £2,000 or less. Those depositors will be better off under this proposal than under an immediate winding-up order, since they will receive exactly the same amount as they would under the statutory scheme, and in addition they have the chance – no more than a chance – of recovering the remaining 25% of their deposit which, if a winding-up order were to be made today, would look very dubious indeed. In addition to them, all those depositors with not more than £6,666-odd on deposit will also be in the same position as those to whom I have just referred. It is only those who have deposits in excess of the £6,666-odd who will be worse off under the proposal than they would be if an immediate winding-up order were to be made.

In my judgment those proposals are adequate to cover short-term suffering and are indeed, generous, since the money is put forward by the government of Abu Dhabi in circumstances where they are under no legal obligation so to do in order to alleviate immediate suffering.

It was, therefore, rather to my surprise that I found the Bank of England opposing the application now made by the majority shareholders to adjourn the hearing until 2 December, to enable first the whole complicated situation within BCCI and its associates to be investigated and, secondly, having done that to see whether there can be put forward proposals for a partial or total restructuring and refinancing of BCCI.

The provisional liquidators, and in particular the commissaire appointed by the Luxembourg court, are in discussion with the majority shareholders. The provisional liquidators support the adjournment and consider a period of four months as an appropriate and necessary period in order for the research to take place.

The grounds of opposition by the bank are stated in an affidavit that has been sworn. The first ground is that the small depositors who would be entitled to 75% of their deposits up to £15,000 under the statutory scheme should get that full amount under the interim proposal being put forward by the majority shareholders. The bank has not proved willing itself to contribute any cash towards that objective.

Secondly, it is said that BCCI is insolvent. That has not been proved though I am very far from saying it is untrue. But the very purpose of this adjournment is to lead to a position where the court does not at this stage investigate the truth or falsity of the allegations made. The bank feels that it is its responsibility to look after the position of the small depositors. It is said that the provision of less than the full maximum £15,000 casts doubts over the willingness of the majority shareholders to make funds available for a rescue. It is said that the bank is concerned, in a case where the most serious allegations of widespread fraud are made against the conduct of BCCI, that the winding up should proceed and that the necessary investigations should take place. Finally, it is said that there are no firm proposals put forward by the majority shareholders as to the terms on which any rescue could be effected.

Two small depositors also oppose the adjournment. It is not clear to me that they themselves are actually prejudiced by it, since I understood them to be

depositors of under £2,000. But their position is the same as that put forward by the Bank of England, namely they think they would do better, like other small depositors, if there were an immediate winding up.

I have no hesitation in rejecting the Bank of England's grounds for opposing an adjournment. This case raises, and will continue to raise, enormous problems. BCCI is a Luxembourg bank; it is not an English bank. As I understand it, if a winding up goes forward the assets of BCCI worldwide will be applicable for the creditors of BCCI worldwide. The attempt to put a ring fence around either the assets or the creditors to be found in any one jurisdiction is, at least under English law as I understand it, not correct, and destined to failure. I believe the position will prove to be the same in most other countries and jurisdictions. It is a matter of profound regret to me that there is no international convention regulating international insolvency. This case, I hope, if it does nothing else may concentrate people's minds on the necessity for such a convention. What we do have are some rather dated rules of private international law which will regulate the disposal of the assets in the event that no rescue scheme is possible. It will require the most difficult and complicated attempts at co-operation between the different national jurisdictions which I hope will be forthcoming. I am told that such co-operation is already forthcoming from at least three other jurisdictions including Abu Dhabi itself with a view to co-ordinating what is an overwhelmingly difficult problem given the absence of any international structure whether the case is dealt with by way of winding up or by schemes of arrangement, my present understanding is that all assets worldwide will have to be taken into account, as will all creditors. It is for that reason primarily that I am quite unable to accept the Bank of England's grounds for objecting to an adjournment in this case.

One aspect of their objection concentrates on the position of those creditors who are sterling creditors of branches in this country who will, to the extent that I have tried to indicate, be worse off than if an immediate winding-up order were to be made. They number, at the most, some 9,000 creditors. The evidence before me states there are 1.25m depositors of BCCI worldwide. It is the interests of the depositors as a whole which I believe this court ought to consider. Though it can, and should, take into account particular classes of creditors, no class such as the sterling depositor in this country can have the right to stand in the way of what otherwise might be in the interests of the creditors of BCCI as a whole. I am bound to say that the case put forward by the Bank of England seems to be putting undue stress on the interests of English sterling creditors at the expense of other creditors. The truth of the matter, as far as I can see, is that if any substantial recovery is to be made by the creditors of BCCI as a whole, worldwide, the best and possibly the only hope is the restructuring proposals which may be put forward by the government of Abu Dhabi. To stand in the way of that possibility is not to serve the interests of the depositors of this company viewed as a whole but to approach the matter on an insular basis.

I entirely accept the point made by the bank that if the allegations made are true, BCCI has been conducted in a way which is scandalously fraudulent and it would be in the public interest to put an end to it. Weighing that, and taking it into account, I am influenced by the fact that no question of further fraudulent dealing by BCCI in this country can occur in the interim. There are provisional liquidators in charge of the operation. The risk of perpetuation of that fraud in day-to-day dealings in the future is non-existent. Accordingly, though I can

well understand the desire of the Bank of England to demonstrate that banks conducted in the way they allege BCCI has been conducted cannot survive, I do not believe that it is essential in the immediate interests either of the public or the depositors that that should be demonstrated at this stage.

Finally, the ground that there is no concrete proposal put forward seems to me to carry no weight at all. Mr Moss QC, for the Bank of England, accepted when it was put to him that the intervention of the world regulatory authorities on 5 July 1991 completely altered the restructuring proposals that had been under discussion. In addition there are major, and possibly impossible, tasks of research to be done to try and disentangle what has happened in BCCI. The estimate of duration of such inquiries of six months does not seem to me to be in any way inordinate. It is necessary, as it seems to me, to provide sufficient time for that to be done.

I have considered the bank's alternative proposals the first of which suggested there should be an adjournment only until October. However, I reject that because on the material before me (which includes the estimate made by the provisional liquidators and the commissaire himself) that would be an inadequate period for useful progress to be made. Secondly, the bank suggested that I should make a winding-up order, but suspend its operation pending the inquiries and possible negotiations taking place. That I have no hesitation in rejecting. I do not know, and cannot have any insight into, the reasons which are leading the majority shareholders to consider a restructuring. They have said, and I am bound to accept it, that if a winding-up order is made they will have no further interest in seeking to rescue BCCI in any way. Since I do not know what their basic motivation is, I am quite unable to make an assessment as to whether they do or do not understand the full implications of a winding-up order with a stay. I must accept what they say – if a winding-up order is made that is the end of any rescue at all. On that footing I reject any suggestion that I can make a winding-up order today since that will put an end to any hope of rescue.

For those reasons I propose to grant the adjournment until 2 December. The documentation is not yet in place. I am assured that it is likely to be within the week. If the documentation is not in place within seven days, I direct the provisional liquidators to apply back to me for further directions. In any event, I give liberty to restore the winding-up petition (on 14 days' notice) to the Bank of England as the petitioner, to the provisional liquidators, to the majority shareholders and to BCCI itself. If any other creditor or person interested wishes to have the winding-up petition restored, they should apply to the provisional liquidators who will take the necessary steps to bring the matter to the court's attention when it can be dealt with and considered.

Finally, I should say this. It is anticipated that an interim scheme for depositors will not take any longer to put in place and produce cash payments than would the statutory scheme if I had made a winding-up order. It is hoped, and nobody should attach more importance than is appropriate to the word 'hoped', that payments will start in August.

*Order accordingly.*

Celia Fox Barrister.

[COURT OF APPEAL]

# *In re BANK OF CREDIT AND COMMERCE INTERNATIONAL S.A.*
# *In re BANK OF CREDIT AND COMMERCE INTERNATIONAL (OVERSEAS) LTD.*

1993 Nov. 9, 10; 19 — Dillon, Nolan and Roch L.JJ.

*Injunction—Mareva injunction—Jurisdiction—Worldwide injunction granted to liquidators alleging fraud—Whether liquidators to obtain leave before commencing proceedings abroad*

Following allegations of massive frauds, allegedly perpetrated by senior executives of three banking companies which were all part of the same group, one company was compulsorily wound up in England and Luxembourg and an associated company was wound up in the Cayman Islands. The liquidators sought compensation pursuant to the Insolvency Act 1986 from M., a former director of one of the companies, and his close associate, K., for their alleged complicity in the frauds and applied to the English High Court for worldwide *Mareva* relief which was granted ex parte. The injunctions were continued inter partes on various undertakings by the liquidators including one not, without the leave of the court, to seek to enforce the injunction in any country other than England and Wales.

On appeal by M. and K., contending that the undertaking was inadequate to protect against multiplicity of suits:—

*Held*, allowing the appeal in part, that, although there was no reason why the leave of the English court should be required for applications by the liquidators to the court in Luxembourg, since the English liquidation was ancillary to the Luxembourg liquidation, in all other cases it was reasonable, in order to avoid possible oppression, to require the liquidators to obtain leave to start further proceedings in other jurisdictions founded on the same or similar facts; but that it was highly undesirable that any part played by liquidators in providing material for a prosecution of fraud and the enforcement of regulatory procedures in an international case should be fettered by undertakings given solely because the liquidators were seeking worldwide *Mareva* relief to preserve assets in the hope of achieving an effective judgment in civil proceedings for the benefit of the general creditors; that, further, it did not follow from the fact that the liquidators preferred their claims to be litigated in England that the English courts should be put in the position of deciding in what foreign countries prosecutions should proceed; and that, accordingly, it would be unreasonable to exact from the liquidators any undertaking which required the liquidators to obtain leave before making complaints or laying informations with a view to criminal proceedings in foreign countries (post, pp. 715D–G, 716F, H–717A, D–E, 718G).

Decision of Rattee J. varied.

The following cases are referred to in the judgment of Dillon L.J.:

*Arrows Ltd. (No. 4), In re* [1993] Ch. 452; [1993] 3 W.L.R. 513; [1993] 3 All E.R. 861, C.A.

*Ashtiani v. Kashi* [1987] Q.B. 888; [1986] 3 W.L.R. 647; [1986] 2 All E.R. 970, C.A.

*Babanaft International Co. S.A. v. Bassatne* [1990] Ch. 13; [1989] 2 W.L.R. 232; [1989] 1 All E.R. 433, C.A.

*Channel Tunnel Group Ltd. v. Balfour Beatty Construction Ltd.* [1993] A.C. 334; [1993] 2 W.L.R. 262; [1993] 1 All E.R. 664, H.L.(E.)

*Derby & Co. Ltd. v. Weldon* [1990] Ch. 48; [1989] 2 W.L.R. 276; [1989] 1 All E.R. 469, C.A.
*Haiti (Republic of) v. Duvalier* [1990] 1 Q.B. 202; [1989] 2 W.L.R. 261; [1989] 1 All E.R. 456, C.A.
*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803, H.L.(E.)
*Société Nationale Industrielle Aerospatiale v. Lee Kui Jak* [1987] A.C. 871; [1987] 3 W.L.R. 59; [1987] 3 All E.R. 510, P.C.

The following additional cases were cited in argument:

*Australian Commercial Research and Development Ltd. v. ANZ McCaughan Merchant Bank Ltd.* [1989] 3 All E.R. 65
*Bank of Credit and Commerce International S.A. (No. 2), In re* [1992] B.C.C. 715, Sir Donald Nicholls V.-C. and C.A.
*Barclays Bank Plc. v. Homan* [1993] B.C.L.C. 680, C.A.
*Behbehani v. Salem (Note)* [1989] 1 W.L.R. 723; [1989] 2 All E.R. 143, C.A.
*British & Commonwealth Holdings Plc. (Nos. 1 and 2), In re* [1992] Ch. 342; [1992] 2 W.L.R. 931; [1992] 2 All E.R. 801, C.A.; [1993] A.C. 426; [1992] 3 W.L.R. 853; [1992] 4 All E.R. 876, H.L.(E.)
*Cloverbay Ltd. (Joint Administrators) v. Bank of Credit and Commerce International S.A.* [1991] Ch. 90; [1990] 3 W.L.R. 574; [1991] 1 All E.R. 894, C.A.
*McHenry v. Lewis* (1882) 22 Ch.D. 397, C.A.
*Rosseel N.V. v. Oriental Commercial Shipping (U.K.) Ltd.* [1990] 1 W.L.R. 1387; [1990] 3 All E.R. 545, C.A.
*Sociedade Nacional de Combustiveis de Angola U.E.E. v. Lundqvist* [1991] 2 Q.B. 310; [1991] 2 W.L.R. 280; [1990] 3 All E.R. 283, C.A.
*Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460; [1986] 3 W.L.R. 972; [1986] 3 All E.R. 843, H.L.(E.)
*Tate Access Floors Inc. v. Boswell* [1991] Ch. 512; [1991] 2 W.L.R. 304; [1990] 3 All E.R. 303

INTERLOCUTORY APPEAL from Rattee J.

Following an order for the compulsory winding up of the Bank of Credit and Commerce in England on 14 January 1992, the liquidators, Christopher Morris, Nicholas Roger Lyle, John Parry Richards, Stephen John Akers, Ian Wright, Robert Axford and Michael Mackey applied ex parte for worldwide *Mareva* relief against the first respondent, Sheikh Khalid Salem Bin Mahfouz, and the third respondent, Mr. Harron Rashid Kahlon, on the basis of their alleged complicity in the frauds which had led to the winding up of the bank. Vinelott J. granted the injunctions on 10 December 1992. On 30 July 1993 Rattee J. continued the injunctions subject to the liquidators' undertakings, inter alia, (d) not without leave of the court to use any information obtained by reason of the disclosure provisions in the order except in applications in chambers or in camera for the purpose of securing compliance with the *Mareva* injunction in these proceedings and (e) not without leave of the court to seek to enforce the *Mareva* injunction in any country other than England and Wales.

By notices of appeal dated 2 and 3 September 1993 the first and third respondents appealed against the *Mareva* injunctions contending that the liquidators should have also undertaken, not without leave of the court, (i) to seek orders of a like or similar nature (including for the avoidance of doubt orders conferring a charge or other security against the first respondent or the third respondent or their assets or (ii) to commence against the first respondent or the third respondent new proceedings based on the same or similar subject matter as the proceedings (including for the

avoidance of doubt the making of any new complaints laying of any information or similar procedure to criminal authorities.) A

The facts are stated in the judgment of Dillon L.J.

*David Richards Q.C.*, *Matthew Collings* and *Richard Morgan* for the first respondent.

*William Stubbs Q.C.*, *Stephen Smith* and *Ian Peacock* for the third respondent. B

*Michael Crystal Q.C.* and *Richard Sheldon* for the liquidators.

*Cur. adv. vult.*

19 November. The following judgments were handed down.

C

DILLON L.J. The court has before it appeals by the first and third respondents to these proceedings, Sheikh Mahfouz and Mr. Kahlon, against an order of Rattee J. made on 30 July 1993. That order provided that worldwide *Mareva* injunctions against Sheikh Mahfouz and Mr. Kahlon, which had originally been granted ex parte by Vinelott J. on 10 December 1992, should continue in force until the trial of these proceedings or further order in the meantime. The continuation of the D *Mareva* injunctions is not disputed; what is in issue is the scope of the undertakings which the applicants in these proceedings should be required to give to the court if the injunctions are thus continued. It is said for Sheikh Mahfouz and Mr. Kahlon that in certain respects indicated in their notices of appeal the undertakings should, for the protection of Sheikh Mahfouz and Mr. Kahlon, be more stringent than the undertakings which E the judge was prepared to accept.

When the appeals were first opened it was urged that there were two quite separate respects in which the undertakings accepted by the judge were deficient. By the end of the hearing, however, the parties had agreed varied undertakings in respect of one of those respects, and accordingly this judgment is only directed to the other of them, which has for convenience been labelled "multiplicity of suits." F

It is of course elementary that the terms of a *Mareva*, or other, injunction and the conditions, by way of cross-undertaking or otherwise, on which it should be granted, must be dependent on the particular circumstances of the individual case, and are matters for the discretion of the judge. There is no single form of injunction with cross-undertakings which is universally applicable. Subject however to the special features of G the individual case, there is a considerable similarity in the problems which arise in different cases, and there is virtue in having a measure of uniformity in the practice. In *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48, 59, Nicholls L.J. said:

> "The jurisdiction is established, but what is still being worked out, in this fast developing area of law, is the manner in which, in practice, H the court should exercise its discretionary power under this wide jurisdiction. One important matter in this regard concerns the limitations and safeguards normally appropriate to be built into restraint and disclosure orders regarding overseas assets."

In my experience, this process of working out is still continuing. Indeed that is underlined by the recent clarification by the House of Lords in *Channel Tunnel Group Ltd. v. Balfour Beatty Construction Ltd.* [1993] A.C.

334 of passages in the speech of Lord Diplock in *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210 which were regarded as fundamental to the jurisprudence in regard to the grant of *Mareva* and other injunctions.

The first special features of this case concern the nature of the proceedings and their international context.

The proceedings are brought in the Companies Court by seven individuals as applicants. They are entitled "In the Matter of Bank of Credit and Commerce International S.A. and Bank of Credit and Commercial International (Overseas) Ltd.," but in the usual way those companies are not themselves parties to the proceedings. Bank of Credit and Commerce International S.A. ("B.C.C.I.") is a company incorporated in Luxembourg which carried on business in England and elsewhere; it had 47 offices or branches in 13 countries. Bank of Credit and Commerce International (Overseas) Ltd. ("Overseas") is a company incorporated in the Cayman Islands; it had 63 offices or branches in 28 countries.

B.C.C.I. was ordered to be compulsorily wound up by the High Court in England on 14 January 1992, and of the seven applicants in these proceedings the first four are accountants (of the English firm Touche Ross) who on 14 January 1992 were appointed to be the liquidators of B.C.C.I. for the purposes of the English winding up. B.C.C.I. is also in liquidation in Luxembourg under an order of the Luxembourg Court of 3 January 1992. The liquidators in Luxembourg are a further partner in Touche Ross and two Luxembourg lawyers. Technically the English winding up is ancillary to the Luxembourg winding up. The appointment of the English liquidators of B.C.C.I. by the English court gives them no authority to act on behalf of B.C.C.I. in any jurisdiction other than England and Wales.

Overseas was ordered to be compulsorily wound up by order of the Cayman Islands court on 14 January 1992. The fifth, sixth and seventh applicants in these proceedings, who are accountants in the Canadian associate firm of Touche Ross, are the liquidators of Overseas appointed by the Cayman Islands court.

The proceedings are also entitled "In the Matter of the Insolvency Act 1986." That is because the substantive relief claimed in the proceedings is relief under various provisions of the Insolvency Act 1986 viz: (a) fraudulent trading (section 213); (b) wrongful trading (section 214); (c) misfeasance (section 212); and (d) transactions at an undervalue (section 238).

It is thus relief which can only be granted by a United Kingdom court in respect of a company within the meaning of the Insolvency Act 1986. B.C.C.I. is such a company, because, although incorporated elsewhere, it carried on business in this country and was registered and is being wound up here. Overseas is not, but the liquidators of Overseas, acting pursuant to letters of request from the Cayman Islands court, claim the same relief under section 426 of the Insolvency Act 1986, the Cayman Islands having been designated as a "relevant country or territory" for the purposes of that section under the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (S.I. 1986 No. 2123).

Because of the manner in which the affairs of B.C.C.I. and Overseas were run by the managements before liquidation, a pooling agreement has been entered into and has been approved by the courts in England, the Cayman Islands and Luxembourg, under which, broadly, the realisations by the liquidators of B.C.C.I. and Overseas, after payment of costs of

liquidation and preferential claims, will form a single fund to be divided rateably among the general creditors of both companies. There are limitations to the pooling agreement, however, one of which is that certain jurisdictions are regarded as "ring-fenced" in the sense that under the local law of these jurisdictions assets of, e.g., B.C.C.I. within such a jurisdiction are required to be applied in satisfaction of liabilities incurred within the jurisdiction in priority to liabilities incurred elsewhere. There are also special arrangements applicable to the United States of America in that under a plea agreement entered into in proceedings in the United States between the United States, acting by the Justice Department, and the people of the state of New York, acting by the district attorney of New York County, on the one hand and B.C.C.I., Overseas, B.C.C.I.'s parent company, Bank of Credit and Commerce International Holdings (Luxembourg) S.A. ("Holdings"), and certain other companies on the other hand all assets of all those companies in the United States are to be forfeited to the United States, and a fund known as the "Worldwide Victims Fund" was to be established on the terms of the plea agreement.

In these circumstances it is not surprising that there is close co-operation between the British and Luxembourg liquidators of B.C.C.I., the liquidators of Overseas, the Luxembourg liquidators of Holdings, which was incorporated in Luxembourg and is in liquidation there, and the liquidators of certain other companies in the B.C.C.I. group which are not material to this judgment. Disclosure of information to such liquidators was, so far as the English court is concerned, authorised by successive orders of Sir Nicolas Browne-Wilkinson V.-C. and Sir Donald Nicholls V.-C.

It is the case of the liquidators of B.C.C.I., Overseas and Holdings that those companies are insolvent as a result of massive frauds perpetrated by senior executives of the B.C.C.I. group. Certain former executives face criminal charges, involving very large sums of money, in this country or elsewhere. So far as Sheikh Mahfouz and Mr. Kahlon are concerned, the liquidators seek compensation from them in these proceedings for, as it has been put, their complicity in the fraudulent conduct of the senior executives. That complicity is said to be shown by a series of transactions as set out in the points of claim. It is claimed that Sheikh Mahfouz and Mr. Kahlon are liable to contribute to the assets of B.C.C.I. and Overseas the total deficiency as regards creditors of those companies, or alternatively such sums as the court thinks proper.

Sheikh Mahfouz is a national of Saudi Arabia and resident in that country. He is a director of the second respondent in these proceedings, National Commercial Bank, Saudi Arabia, which is, or was, a substantial bank in Saudi Arabia. We are told that Sheikh Mahfouz was a director—although it is said on his behalf that he was only a non-executive director—of B.C.C.I., Overseas and Holdings between dates in 1986 and 1989.

Mr. Kahlon is a national of Pakistan, and at present resident there. He was however at material times resident in Saudi Arabia and was, we are told, employed there by the second respondent or by Sheikh Mahfouz. He is described as Sheikh Mahfouz's "right hand man."

We are told that Sheikh Mahfouz and Mr. Kahlon have been indicted in a New York court on charges of fraud in relation to the affairs of the B.C.C.I. group, although they have not so far appeared, or been brought before the court, in those proceedings.

A So far as *Mareva* injunctions are concerned, it has been recognised since *Ashtiani v. Kashi* [1987] Q.B. 888, an early case in this field, that to grant a worldwide *Mareva* injunction against a defendant is not an automatic step. Special grounds have to be shown, and the court has been concerned that if a worldwide *Mareva* is granted it should not be enforced oppressively by a multiplicity of applications in different countries throughout the world.

B The practice developed through successive cases, particularly *Babanaft International Co. S.A. v. Bassatne* [1990] Ch. 13 and *Republic of Haiti v. Duvalier* [1990] 1 Q.B. 202 where the position was somewhat different as the French courts were involved and the Civil Jurisdiction and Judgments Act 1982 applied. Then in *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48, 59 counsel for the plaintiff proposed, as it is put by Nicholls L.J.:

C "that this point should be dealt with by the plaintiff giving to the English court an undertaking in terms which will preclude them from making any application to a foreign court to enforce the order without first obtaining leave from the English court."

Nicholls L.J. considered that that would be a convenient course. He commented, at p. 59:

D "On any application for such leave, which normally would be inter partes, the judge can be expected to have before him what we do not have, namely, evidence of the law and practice in the country or countries in which the order is sought to be enforced."

May L.J. said, at p. 55, that such an undertaking, viz. an undertaking to leave to the English court any decision whether action should be taken by E the plaintiff in any foreign jurisdiction in respect of any of assets of the defendants, "should generally be part of any worldwide pre-judgment *Mareva*." Parker L.J. said, at p. 57:

"In those circumstances it appears to me that there is every justification for a worldwide *Mareva*, so long as, by undertaking or proviso or a combination of both, (a) oppression of the defendants F by way of exposure to a multiplicity of proceedings is avoided, (b) the defendants are protected against the misuse of information gained from the ordinary order for disclosure in aid of the *Mareva*, and (c) the position of third parties is protected. Whether, ultimately, the order in personam will be converted into an order attaching some or all of the assets disclosed will of course depend on (i) the court here giving the plaintiffs leave to proceed in a jurisdiction in which assets G have been found and (ii) the decision of the court in such jurisdiction whether to make an order."

In accordance with the practice there indicated, the liquidators who are the applicants readily give Rattee J., and stand by in this court, undertakings (d) and (e) (following other undertakings commonly given and not material to this appeal) which are to the following effect: (d) not H without leave of the court to use any information obtained by reason of the disclosure provisions in the order except in applications in chambers or in camera for the purpose of securing compliance with the *Mareva* injunction in these proceedings and (e) not without leave of the court to seek to enforce the *Mareva* injunction in any country other than England and Wales.

In the court below and in the notice of appeal it was contended for Sheikh Mahfouz and Mr. Kahlon that undertaking (d) was inadequate to

protect the confidentiality of the information disclosed, and undertaking (e) was inadequate as a protection against multiplicity of suits. In the event, however, while noting as part of the relevant circumstances that undertaking (d) has been given, we have only to consider whether the judge was justified in accepting undertaking (e) without further restriction to prevent multiplicity of suits. A

So far as undertaking (e) is concerned, what was sought before Rattee J. on behalf of Sheikh Mahfouz and Mr. Kahlon was that there should be added to undertaking (e) words to the effect "or to commence against Sheikh Mahfouz or Mr. Kahlon any new proceedings based upon the same or similar subject matter as these proceedings." B

It has since been discovered that the actual order made by this court in *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48 on 29 July 1988 was somewhat wider than might perhaps have been supposed from the passages which I have cited from the judgments in this court. In addition to a confidentiality undertaking not, for present purposes, dissimilar to undertaking (d) in the present case, there was an undertaking (B) as follows: C

> "(B) Without the leave of the English court not in any country other than England and Wales (i) to seek to enforce paragraph numbered 1 of this order or (ii) to seek orders of a like or similar nature (including for the avoidance of doubt orders conferring a charge or other security) against the first and second defendants or (iii) to commence or take any further steps in the prosecution of any proceedings against the first and second defendants." D

Applying that, what is now sought on behalf of Sheikh Mahfouz and Mr. Kahlon is to add to the prohibition, without leave of the court, in undertaking (e), prohibitions (ii) and (iii) so that it would read: E

> "Not without the leave of the court in any country other than England and Wales (i) (as in undertaking (e)) (ii) to seek orders of a like or similar nature (including for the avoidance of doubt orders conferring a charge of other security) against Sheikh Mahfouz or Mr. Kahlon or their assets or (iii) to commence against Sheikh Mahfouz or Mr. Kahlon new proceedings based upon the same or similar subject matter as these proceedings (including for the avoidance of doubt the making of any new complaints laying of any information or similar procedure to criminal authorities)." F

So far as (ii) is concerned, it is of course directly taken, with a minor drafting addition, from the order made in *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48 and it may in some cases be a useful addition to the order. But I regard it as unnecessary in the present case, where the applicants who have given the undertaking (e) are experienced liquidators who are officers of the English court, and I am wholly unable to conclude that Rattee J. erred in the exercise of his discretion in failing to add on to undertaking (e) a minor embellishment which no one suggested to him. G H

The proposed sub-paragraph (iii) is much more important. It falls into two parts. The first, relating to the commencement of new proceedings, is what was put before the judge. The second—the part between the brackets—is new and is to indicate that the first part is to extend to making complaints or laying information with a view to criminal proceedings in foreign countries. I propose to deal with that second part first.

A Under English law if it appears to a liquidator that any past or present officer or member of a company has been guilty of an offence in relation to the company, there is a duty to pass that information to the prosecuting authority, or in the case of a voluntary winding up to the official receiver. That arises under sections 218 and 219 of the Insolvency Act 1986: see *In re Arrows Ltd. (No. 4)* [1993] Ch. 452, 469. There are also obligations under the Company Directors Disqualification Act 1986.

B Apart from that, in the present case in the United States plea agreement which I have mentioned and which was entered into with the sanction of the English court, the liquidators, as being within the definition of "court appointed fiduciaries," are under obligations to co-operate with and supply "investigative information" to the United States Department of Justice and the district attorney of New York.

C In addition, there are criminal proceedings, brought by the Luxembourg Procureur (Public Prosecutor) in the name of the state pending against Sheikh Mahfouz in Luxembourg. These were instituted following a complaint made by Holdings and B.C.C.I. acting by their Luxembourg liquidators, Overseas, acting by its Cayman Islands liquidators, and B.C.C.I.'s English branches acting by the English liquidators. Also, as a result of letters rogatory issued by the Luxembourg juge d'instruction to D the Swiss authorities, there is a separate criminal investigation against Sheikh Mahfouz being conducted by a Swiss investigating magistrate in Geneva.

I regard it as highly undesirable that the part that liquidators can play in providing material for a prosecution of fraud and the enforcement of regulatory procedures should, in international cases, be fettered by E undertakings just because the liquidators seek worldwide *Mareva* relief to preserve assets in the hope of achieving an effective judgment in civil proceedings for the benefit of the general creditors. Moreover the fact that in the present case the liquidators prefer that their civil claims against Sheikh Mahfouz and Mr. Kahlon should be litigated and decided in England does not, to my mind, make it logical that the English courts should be put into a position to decide in what foreign countries F prosecutions of Sheikh Mahfouz and Mr. Kahlon should proceed. It is not suggested that they should be prosecuted in England rather than elsewhere.

I would accordingly refuse to exact from the applicant liquidators any undertaking in the term of the words in brackets in the proposed sub-paragraph (iii) above. The confidentiality of disclosures of means pursuant G to the order of Rattee J. will of course remain protected by the separate undertaking (d) already mentioned.

I turn then to the final question whether an undertaking should be required of the liquidators in the terms of the first part of the proposed sub-paragraph (iii).

The judge dealt with this in a short supplementary judgment which he delivered following submissions and discussion after a much longer—and, H I think, reserved—judgment with which we are not concerned, which he had delivered earlier on 30 July 1993. He considered that Sheikh Mahfouz and Mr. Kahlon would be adequately protected by the two undertakings which had been proffered by the liquidator applicants, and he considered also, without expanding on it, that to impose an obligation on the liquidators not to commence any other proceedings based on the same or similar subject matter to that comprised in these proceedings without the leave of the court would place the liquidators under an "inappropriate"

restriction in that it would give Sheikh Mahfouz and Mr. Kahlon A
protection from possible further proceedings from which he saw no reason why they should be protected as a term of the *Mareva* injunction.

The logic of the situation, as I see it, is that the oppression potentially inherent in the worldwide enforcement of a worldwide *Mareva* injunction is adequately cured by an undertaking, such as undertaking (e), which gives the English court control over the enforcement of the *Mareva*
injunction. In *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48, 59 Nicholls L.J. B
referred only to

> "an undertaking in terms which will preclude them from making any application to a foreign court to enforce the order without first obtaining leave from the English court."

The further undertaking in the first part of the proposed sub-paragraph C
(iii) is concerned with a different matter, the issuing by the same plaintiffs against the same defendants of separate proceedings in different jurisdictions arising out of the same subject matter. As appears from the judgment of the Judicial Committee delivered by Lord Goff of Chieveley in *Société Nationale Industrielle Aerospatiale v. Lee Kui Jak* [1987] A.C. 871, the issue by the same plaintiffs against the same defendants of
separate proceedings in different jurisdictions arising out of the same D
subject matter may be oppressive, and if it is shown to be oppressive it may be restrained either absolutely or on terms. It does not automatically follow, as a matter of logic, that if a person obtains a worldwide *Mareva* injunction and to prevent oppression in the enforcement of the injunction he is required to give an undertaking not to make any application to a
foreign court to enforce the injunction without first obtaining leave of the E
English court, he *must* also be required to give a further undertaking as a safeguard against a somewhat different form of possible oppression, not to issue any fresh proceedings in a foreign court arising out of the same subject matter without first obtaining the leave of the English court.

But it may nonetheless be reasonable that he should be required to give such an undertaking, if it seems prima facie oppressive that he should
be free to start further proceedings in other jurisdictions founded on the F
same facts as are the basis of the English proceedings.

In the present case, special considerations apply to the court in Luxembourg, because the English liquidation of B.C.C.I. is ancillary to the Luxembourg liquidation. I can see no reason why the English court should have to give prior permission for applications to be made by the liquidators to the court in Luxembourg.

G
Subject to that, however, the position is that the liquidators have, so far, chosen the English court as their preferred court for bringing civil proceedings against Sheikh Mahfouz and Mr. Kahlon, because of the breadth of the remedies available in the English court under the Insolvency Act 1986. Sheikh Mahfouz and Mr. Kahlon have submitted to the jurisdiction here.

Once the affidavits of Sheikh Mahfouz and Mr. Kahlon as to their H
assets are available to the liquidators, they may well wish to bring proceedings to enforce the *Mareva* injunctions in the courts of foreign states where assets will have been shown to be. That is covered by undertaking (e).

But I cannot at the moment conceive what other proceedings the English or Cayman Islands liquidators may want to bring, either in their own names or in the names of B.C.C.I. or Overseas, against Sheikh

A Mahfouz or Mr. Kahlon, in foreign courts other than the courts of Luxembourg, arising out of the matters which are the subject of the present proceedings. It seems to me therefore reasonable to avoid possible oppression that the liquidators should be required to give the form of undertaking in the first part of the proposed sub-paragraph (iii) in respect of civil proceedings in foreign courts other than the courts of Luxembourg.

I regard it as desirable that the practice in these matters should develop B uniformly and I can see good reason for the form of order made by this court in *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48, although we have no transcript of the discussion which must have preceded it.

The liquidators accept that the normal restriction on enforcing the *Mareva* injunction in foreign courts without the prior leave of the English court is as applicable to them as to other litigants. I do not see why a C restriction in the terms of the first part of the proposed sub-paragraph (iii) should not also be as applicable to them as to other litigants, with the qualification as to Luxembourg that I have mentioned.

The judge regarded it as an inappropriate restriction as it would give Sheikh Mahfouz and Mr. Kahlon protection from possible further proceedings from which he saw no reason why they should be protected. But he has not explained, and I cannot see, why it is an inappropriate D restriction. Moreover without knowing what the possible further proceedings are he cannot say that there is no reason why the Sheikh and Mr. Kahlon should be protected from them. That is somewhat similar to the point made by Nicholls L.J. in his judgment in *Derby & Co. Ltd. v. Weldon* [1990] Ch. 48, 59 to which I have already referred.

I would therefore allow this appeal on the multiplicity of suits issue to E the extent of requiring from the liquidators an undertaking in the terms of the first part of the proposed sub-paragraph (iii) in relation to the commencement of new civil proceedings in foreign courts other than the courts of Luxembourg.

NOLAN L.J. I agree with the order proposed. It must now be taken to be well settled, in this court at least, that a plaintiff who seeks a F worldwide *Mareva* injunction and an affidavit of the defendant's assets will only succeed if he can satisfy the count that (1) he will not make improper use of the information contained in the affidavit, and (2) he will not engage in vexatious and oppressive proceedings against the defendant in other jurisdictions.

The parties have now agreed as to the manner in which the first, and I G think the less problematical, of these conditions should be satisfied. I would hope that it should be possible for an agreement on similar lines to be reached in most cases. Whatever the practical difficulties may be in enforcing the confidentiality undertaking and in avoiding the pitfalls created by R.S.C., Ord. 24, r. 14A, the principle that the information disclosed by the defendant should only be used by the plaintiff for the purpose of securing compliance with the *Mareva* injunction is H straightforward.

It is much more difficult to define and guard against the risk that the defendant may suffer from vexatious and oppressive proceedings by the plaintiff in other jursidictions. The matter cannot in my judgment suitably be governed by a standard form of undertaking. Each case must be considered according to its facts. The particular facts which to my mind have to be borne in mind in the present case are that the plaintiffs are liquidators acting under the provisions of the Insolvency Act 1986, that

A the liquidation of B.C.C.I. in this country is ancillary to its liquidation in Luxembourg, that Sheikh Mahfouz and Mr. Kahlon are non-residents who have submitted to the jurisdiction of the English court, and that the proceedings being brought against them by the liquidators in this country are the main action against them.

I was at one time inclined to the view that the status of the plaintiffs as liquidators in a winding up by the court should dispense them from the B obligation to give an undertaking in the wide terms of the first part of the proposed sub-paragraph (iii). They are senior members of their professions, acting as officers of the court. It is inconceivable that they would embark on litigation abroad without taking independent legal advice. The prospect of their engaging in vexatious and oppressive litigation must be remote in the extreme.

C Mr. Crystal, however, for the liquidators, does not claim that any special regard should be had to their status as liquidators so far as civil proceedings are concerned. He accepts, as I understand it, that in this respect they should be treated like any other plaintiff who obtains a worldwide *Mareva* injunction. His objection to the proposed undertaking is that the English proceedings, although the main proceedings, are part of a concerted worldwide effort to recover the proceeds of fraud from the D respondents, and that both in principle and as a practical matter it would be wrong to subject the liquidators to the delay, expense and inconvenience of coming to the English court before taking proceedings abroad. It seems to me, however, that so far as practical considerations are concerned the liquidators in the present case are better placed than most plaintiffs. They are accustomed to obtaining the directions of the court, and these E directions may reasonably be expected to assist rather than impede the progress of the concerted worldwide proceedings. Thus, if the prior approval of the English court were given for particular proceedings to be taken abroad, it would be that much more difficult for the respondents to contend subsequently that the liquidators should be enjoined from pursuing them. The control exercised by the court may very well have the effect of reducing rather than increasing the cost and duration of the F liquidation.

More generally, if no special status is to be accorded to liquidators acting as officers of the court, I agree with Dillon L.J. that there is much to be said for a degree of uniformity in the undertakings required from plaintiffs in these circumstances as regards multiplicity of suits. I also agree on grounds of public policy that the undertakings should not extend to criminal or regulatory proceedings abroad; and that, since the G liquidation here is ancillary to the liquidation in Luxembourg, the undertakings should not extend to any proceedings in that country.

For these reasons, as well as those given by Dillon L.J., I too would allow the appeal to the extent indicated by the proposed order.

ROCH L.J. I agree.

H

*Appeal allowed in part with liquidators to pay half of costs.*

*Solicitors: Nabarro Nathanson; Gouldens; Lovell White Durrant.*

G. F.

# Re Berkeley Applegate (Investment Consultants) Ltd
# Harris v Conway and others

CHANCERY DIVISION
EDWARD NUGEE QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT
23, 24, 27 JULY, 27 NOVEMBER 1987

*Voluntary winding up – Liquidator – Remuneration – Costs – Liquidator incurring costs and expending skill and labour in administering property held on trust by company for its investors – Whether liquidator's remuneration and costs could be paid out of trust property if company's assets insufficient.*

As part of its mortgage investment business a company advanced funds on behalf of investors on the security of mortgages on freehold property taken out in the company's name. The company went into liquidation and at the commencement of liquidation proceedings the company held the mortgage loans and funds credited to the clients' accounts and awaiting investment together with the interest accrued on those funds on trust for its investors. Following preliminary investigations it appeared likely that the costs incurred and skill and labour expended by the liquidator in administering the trust property would greatly exceed the company's free assets which were not subject to any trust. As a result the liquidator applied, inter alia, for the court to determine whether any part of his costs and remuneration could be paid out of the trust property either directly or by way of payment to the company.

**Held** – In giving effect to an equitable interest in trust property the court had a discretion to require an allowance to be made for costs incurred and for skill and labour expended in administering the property. Accordingly, the liquidator was entitled to be paid his costs and remuneration out of the trust property if the company's assets were found to be insufficient to compensate him, particularly since his work had benefited the trust and would have had to be done either by the investors or by a receiver appointed by the court whose fees would have been borne by the trust property. A declaration to that effect would accordingly be made.

**Cases referred to in judgment**

*Anglo-Austrian Printing and Publishing Union, Re, Brabourne v Anglo-Austrian Printing and Publishing Union* [1895] 2 Ch 891.

*Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46, [1966] 3 WLR 1009, HL; *affg* [1965] 1 All ER 849, [1965] Ch 992, [1965] 2 WLR 839, CA; *affg* [1964] 2 All ER 187, [1964] 1 WLR 993.

*Boynton (A) Ltd, Re, Hoffmann v A Boynton Ltd* [1910] 1 Ch 519.

*Bullock v Lloyds Bank Ltd* [1954] 3 All ER 726, [1955] Ch 317, [1955] 2 WLR 1.

*Downshire Settled Estates, Re, Marquess of Downshire v Royal Bank of Scotland* [1953] 1 All ER 103, [1953] Ch 218, [1953] 2 WLR 94, CA.

*Duke of Norfolk's Settlement Trusts, Re* [1981] 3 All ER 220, [1982] Ch 61, [1981] 3 WLR 455, CA; *rvsg in part* [1978] 3 All ER 907, [1979] Ch 37, [1978]
a 3 WLR 655.

*Exchange Securities and Commodities Ltd, Re (No 2)* [1985] BCLC 392.

*Falcke v Scottish Imperial Insurance Co* (1886) 34 ChD 234, CA.

*Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd* [1942] 2 All ER 122, [1943] AC 32, HL.

b *Glasdir Copper Mines Ltd, Re, English Electro-Metallurgical Co Ltd v Glasdir Copper Mines Ltd* [1906] 1 Ch 365, CA.

*Introductions Ltd v National Provincial Bank Ltd* [1969] 1 All ER 887, [1970] Ch 199, [1969] 2 WLR 791, CA; *affg* [1968] 2 All ER 1221.

*Introductions Ltd, Re (No 2)* [1969] 3 All ER 697, [1969] 1 WLR 1359.

*Macadam, Re, Dallow and Moscrop v Codd* [1945] 2 All ER 664, [1946] Ch
c 73.

*Marine Mansions Co, Re* (1867) LR 4 Eq 601.

*Merry v Pownall* [1898] 1 Ch 306.

*Morrison v Morrison* (1855) 2 Sm & G 564, 65 ER 527.

*Neesom v Clarkson* (1845) 4 Hare 97, 67 ER 576.

*Northern Milling Co, Re* [1908] 1 IR 473, Ir HC.

d *Oriental Hotels Co, Re, Perry v Oriental Hotels Co* (1871) LR 12 Eq 126.

*Regent's Canal Ironworks Co, Re, ex p Grissell* (1875) 3 ChD 411, CA.

*Scott v Nesbitt* (1808) 14 Ves 438, [1803–13] All ER Rep 216, 33 ER 589.

*Staffordshire Gas and Coke Co, Re* [1893] 3 Ch 523.

e **Cases also cited**

*Aga Estate Agencies Ltd, Re* [1986] BCLC 346.

*Bainbrigge v Blair* (1845) 8 Beav 588, 50 ER 231.

*Bolton (R) & Co, Re* [1895] 1 Ch 333, CA.

*Bonelli's Electric Telegraph Co, Re, Cook's Claim (No 2)* (1874) LR 18 Eq 656.

*Chapman v Chapman* [1954] 1 All ER 798, [1954] AC 429, HL.

f *Henry v Hammond* [1913] 2 KB 515, DC.

*Hibbert v Cooke* (1824) 1 Sim & St 552, 57 ER 218.

*Neill v Neill* [1904] 1 IR 513.

*New, Re* [1901] 2 Ch 534, [1900–3] All ER Rep 763, CA.

*Richards v Collins* (1912) 23 OWR 499, Ont DC.

*SCF Finance Co Ltd v Masri (No 2)* [1987] 1 All ER 175, [1987] QB 1002, CA;
g *affg* [1986] 1 All ER 40.

*Strapp v Bull Sons & Co* [1895] 2 Ch 1, CA.

*Wise v Perpetual Trustee Co Ltd* [1903] AC 139, PC.

**Originating summons**

h Roger John Harris, the liquidator of Berkeley Applegate (Investment Consultants) Ltd (the company), applied to the court, by summons dated 12 March 1987, seeking, inter alia, the determination of the following questions: (1) whether the company held the legal estates of various legal mortgages (a) on trust for those persons who had currently contributed to the principal sums lent under those legal charges, (b) on trust for those who had provided funds
i to the company for investment and who had not at the commencement of the winding up received payment in full of their funds, or (c) as part of the assets of the company available for application in the course of the winding up; (3)

whether the company held sums standing to the credit of certain of its accounts
at the Torquay branch of the Royal Bank of Scotland, designated 'clients'
accounts', (a) on trust for those shown as having sums standing to their credit a
in clients' accounts, (b) on trust for all those who had provided funds to the
company for investment and who had not at the commencement of the winding
up received payment in full of their funds or (c) as part of the assets of the
company available for application in the course of the winding up; (6) whether
the sum of £29,509 currently held in clients' accounts (a) was held on trust for b
those having balances in the clients' accounts, (b) was held on trust for all those
who had provided funds to the company for investment and who had not at
the commencement of the winding up received payment in full of their funds
or (c) formed part of the assets of the company available for application in the
course of the winding up. The applicant also sought, inter alia, in so far as it
might be necessary an order for payment to the liquidator as remuneration c
and/or fees, expenses, costs, disbursements and liabilities in such sum as the
court should deem just out of the assets of the company and (in so far as they
did not form part of those assets) out of the funds in the clients' accounts and
the sums realised from the legal charges or (if and to the extent that the legal
charges were not realised) from the beneficial owners, and in so far as any of d
the property was held to be trust property an order that the company be entitled
to be paid and to retain such sum or sums as the court should think fit by way
of remuneration as trustee of the property. The respondents were (1) Beryl
Jessie Mary Conway, who represented those persons who had supplied funds
to the company for investment which had been lent under legal charges, (2)
John Leslie Applegate and Sandra Elspeth Phyllis Applegate (the executors of e
the estate of Albert Leslie Applegate), who represented those who had supplied
funds to the company which were recorded as standing to the credit of the
clients accounts, and (3) Victor C F Clark, who represented the unsecured
creditors.

*Anthony Mann* for the liquidator. f
*Richard de Lacy* for the first respondent.
*Kevin Garnett* for the second respondents.
*Peter Griffiths* for the third respondent.

*Cur adv vult* g

24 July. The following judgment was delivered.

**EDWARD NUGEE QC.** I have before me a summons issued by the liquidator
of a company named Berkeley Applegate (Investment Consultants) Ltd. The
principal business of the company was described by its directors as being to h
act as agent to place funds on behalf of individual investors and obtain first
mortgages over freehold property. In outline the way in which it operated was
as follows. Individual investors would pay the sum which they wished to invest
to the company. The company would then lend the money it received to
approved borrowers on mortgage, the mortgage being taken in the name of the
company. The sums advanced to borrowers were generally in excess of the i
sums received from any one investor, so that the money advanced to any one
borrower was generally derived from the investments of a number of distinct

investors. The company kept records which showed the source from which each advance was derived, and the borrower paid interest direct to the investors whose investments had been applied in making the particular advance to him. Between the time when the investors paid their money to the company and the time when the company applied it in making an advance, the money was held in one of four clients' accounts operated by the company, where it earned interest. When the money was applied in making an advance, the company would pay to the investor the amount of interest his money had earned while it was in the clients' account, less interest at the rate of 2% on the principal which it kept for itself. When a borrower repaid an advance, the money would be placed in one of the clients' accounts and in due course applied in making another advance on mortgage. The interest earned in the meanwhile would be paid to the investor, unless he instructed the company to reinvest the interest as well as the principal. The investors were entitled to withdraw all or part of their capital at any time on 30 days' notice. If they did so at a time when it was invested in an advance to a borrower, the company would substitute another investor's money by means of book entries, so that it was not necessary to call in the mortgage advance to which the original investor's money had been applied. At the commencement of the winding up there were about 1085 investors who had placed money with the company, and the company had made about 125 advances on mortgage, the total amount of loans being about £10·2 m. The money in the clients' accounts awaiting investment on mortgage was about £1·2 m, which was held for about 275 investors. The summons raises a number of questions. The principal questions which arise are whether the money in the clients' accounts or the benefit of the mortgages is held on trust for the investors or forms part of the assets of the company available for application in the course of the company's winding up.

[His Lordship considered the way in which the company's business was operated and also considered the submissions of counsel. His Lordship held that the money in the clients' accounts and the benefit of the mortgages were held on trust for the investors. His Lordship then heard further submissions regarding the liquidator's expenses and remuneration.]

*Cur adv vult*

27 November. The following judgment was delivered.

**EDWARD NUGEE QC.** In answer to questions 1, 3 and 6 of this summons I have held that certain assets standing in the name of the company are held on trust for the investors who paid money to the company for investment. At the commencement of the winding up these assets consisted of the benefit of about 125 loans made to borrowers from the company and secured by mortgages, the total amount of the loans being about £10·2 m; the money standing to the credit of the company's clients' accounts, amounting to about £1·2 m; and a sum of £29,508·92 representing interest on money in the clients' accounts. The assets of the company which are not subject to any trust are of uncertain value. They consist of cash at the bank amounting at the commencement of the liquidation to about £34,000, the proceeds of sale of the company's motor vehicles, which have realised about £11,000, a substantial sum said to be due in respect of interest, of which only about £2,000 has been recovered to date, and the

uncertain proceeds of a number of actions for negligence which the company has commenced against valuers who acted for it in connection with the making of loans on security which has proved to be insufficient. Since the company made good to the investors the shortfall which arose on the realisation of the relevant securities, the benefit of these actions should accrue for the benefit of the company.

The remaining questions of the summons concerned the expenses and remuneration of the liquidator. These have been very considerable, and are likely greatly to exceed the free assets of the company. The work undertaken by the liquidator and his solicitors can be summarised under five heads.

(1) Preliminary investigation. This was carried out in the month before the decision to wind up was taken, to see whether a liquidation was appropriate or necessary and to identify some of the potential problems. The work involved a general investigation into the company's affairs and a preliminary identification of potential claimants and the classes into which they fell. Most of it was useful in the liquidation and would have had to be done anyway. It was at this stage that an assessment of the nature of the proprietary claims of the investors first had to be formed, and the liquidator obtained counsel's opinion which was to the effect that, on a preliminary view of the facts, the company's clients' accounts and secured lendings were trust assets amd that the investors were accordingly not entitled to vote at the creditors' meeting.

(2) Inquiries from investors and borrowers. The investors were given notice of the creditors' meeting, which was held on 15 January 1987, and this precipitated an avalanche of inquiries from anxious investors and borrowers, both to the liquidator and to his solicitors. The liquidator estimated that immediately before the creditors' meeting inquiries were being made at the rate of up to 100 telephone calls and up to 50 letters a day, and that they continued at this level for a month after the meeting before beginning to reduce.

(3) Ascertainment of assets. In addition to the ascertainment of the company's free assets, this has involved matching the sums paid to the company by the investors with the sums advanced by the company to the borrowers, checking the company's records and the investors' certificates of investment, reconciling the company's clients' accounts with the associated records, and compiling a schedule of mortgage advances showing the investors whose money has been applied to each advance, and a schedule of those interested in the clients' accounts.

(4) Management of investments. Although interest was normally paid direct by the borrowers to the investors, on occasions the borrowers fell behind and the investors asked the liquidator or his solicitors to take steps to recover the arrears. The liquidator felt that these requests could not be ignored, and in nine cases recovery proceedings have been commenced. There have also been 31 redemptions where loans totalling about £2·3 m have been repaid, and the liquidator's staff and solicitors have had to deal with those redemptions. The liquidator has also had to supply certificates of interest paid and received for tax purposes. In short, the liquidator has continued to carry on the company's mortgage business, though without lending money afresh.

(5) General liquidation affairs. The liquidator has also, of course, had a certain amount of work in relation to pure liquidation matters. He estimates, however, that up to the end of May 1987 only about 250 man-hours were spent on this work, whereas about 3,300 man-hours were spent on matters relating

to the investors' proprietary claims; and time to still being spent at the rate of 650 man-hours per month, the great majority of it in connection with the trust assets and the investors' interests in them.

The liquidator's disbursements include substantial sums paid out for insurance cover on the mortgaged properties, and solicitors' costs of more than £30,000, a large part of which was incurred in dealing with inquiries from investors.

It is common ground that there is no statutory authority for the payment of any part of the liquidator's expenses or remuneration out of the trust assets. Rule 4.127 of the Insolvency Rules 1986, SI 1986/1925, provides that '(1) The liquidator is entitled to receive remuneration for his services as such', and specifies how that remuneration is to be fixed. Section 115 of the Insolvency Act 1986 provides:

> 'All expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims.'

Rule 4.218 sets out the order of priority in which the expenses of the liquidation are payable out of the assets, subject to any order of the court to the contrary; and the remuneration of the liquidator is included as one of the expenses there mentioned. It is clear, however, that the company's assets do not, for the purpose of these provisions, include assets held by it on trust for others. This is so notwithstanding that the duty of the liquidator under s 100 of the 1986 Act to wind up the company's affairs necessarily involves dealing to some extent with the assets which it holds as trustee.

It is clear also that if a receiver of the trust assets had been appointed by the court, the court would have had jurisdiction under RSC Ord 30, r 3 to authorise the payment of remuneration out of the trust assets or their income. The appointment of a receiver would have presented difficulties in the present case, however, because until the liquidator had done a good deal of work the necessary basis of fact for such an appointment had not been established, and moreover each mortgage was held on a distinct trust for a distinct investor or group of investors.

It appears that there has been an increase in recent years in the number of companies going into liquidation which hold part of their assets on trust for their clients or customers. In a significant number of these cases the free assets of the company are not sufficient to cover the costs of establishing and verifying the facts. The difficulty which faces a liquidator in a case of this kind was well put by Mr Harris, the liquidator in the present case, in the evidence which he gave in support of this application:

> 'If the legal charges or client account balances are held not to be assets of the company, and if I cannot obtain remuneration out of that property, then I, and any other liquidator approaching the liquidation of companies where there may be proprietary claims to the apparent assets, will be in an impossible situation. Often one cannot tell whether there can be a proprietary claim, or whether an individual asset is one to which such a claim may relate, without carrying out considerable investigative work in the first place. It is unrealistic to expect some sort of application to be

> made to the court in advance of doing any work, because without an investigation it will not be possible to present an intelligible case on such an application. At the end of the day the work has to be done by someone, and it is usually (and certainly in the present case) best done by the liquidator.'

The order which the liquidator now seeks is an order for the payment to him as remuneration and/or fees, expenses, costs, disbursements and liabilities such sum as to the court shall seem just, out of the assets of the company and out of the funds in the clients' accounts and the sums realised from the mortgages or from the investors if and to the extent that the mortgages are not realised and, as a less satisfactory alternative, an order that the company be entitled to be paid and retain such sums as the court shall think fit by way of remuneration as trustee of the trust assets. The question which I am now asked to determine is the question of principle, namely whether any part of the liquidator's expenses or remuneration can be paid out of the trust assets, either directly or by way of payment to the company. If the answer to that question is Yes, I am not asked at this stage to decide how the expenses and remuneration should be borne as between the company's assets and the trust assets, nor am I asked to determine whether any particular item of expenses or remuneration claimed by the liquidator should be allowed. Both these questions will require consideration in due course if payment can properly be made out of the trust assets, but there is not sufficient evidence to enable them to be decided at present. The liquidator is, however, entitled to know before he incurs further expense whether his proper expenses and proper remuneration for his work will be met from the trust assets in the event of the company's own assets proving insufficient.

There is no reported authority directly in point. I was referred to two cases in which the official receiver was acting as liquidator of a company which was in the course of being wound up by the court. In *Re Introductions Ltd (No 2)* [1969] 3 All ER 697, [1969] 1 WLR 1359 the company had been incorporated for the purpose of giving services and information to overseas visitors. Subsequently, it embarked on the business of pig-farming. Members of the public were invited to purchase sows, and the company undertook to maintain the sows and sell the progeny for the benefit of their owners. The scheme was not financially successful, and was held by Buckley J and the Court of Appeal to be ultra vires: see *Introductions Ltd v National Provincial Bank Ltd* [1968] 2 All ER 1221; *on app* [1969] 1 All ER 887, [1970] Ch 199. The official receiver as liquidator collected the assets of the company, which consisted of a number of freehold farms and the company's pigs and were derived wholly from the pig-breeding business, and sought directions as to the payment of his costs and the costs of the liquidation generally. He pointed out that there was no provision in the Companies (Board of Trade) Fees Order 1929, SR & O 1929/831, for him to charge fees for his services in an 'ultra vires case', although in similar circumstances it had been the practice of the official receiver to do so. He further stated that in his opinion the statement of affairs which he had prepared would materially assist in the distribution of the assets irrespective of their eventual disposition and that he was unable to proceed with his duties as liquidator unless and until the court should have given directions with regard to the costs of the liquidation, in that the company had no assets available

other than those obtained by it in the course of its ultra vires trading. Stamp J, in a four-line judgment, said ([1969] 3 All ER 697, [1969] 1 WLR 1359):

> 'A labourer is worthy of his hire. It is quite plain that I must direct payment of the Official Receiver's costs, charges and expenses out of the assets, without prejudice as to how any of the costs, charges and expenses ought ultimately to be borne.'

However, the application was unopposed, none of the investors being represented, and no distinction appears to have been made between the farms, which, subject to the consequences of the business being ultra vires, were the property of the company, and the pigs, some at least of which may have been held on a constructive trust for the investors, although it appears from the report that, despite the system of marking, it was not possible to identify them as belonging to any particular individual.

In *Re Exchange Securities and Commodities Ltd* (*No 2*) [1985] BCLC 392 the facts were nearer to those of the present case. Orders were made for the compulsory winding up of 12 associated companies, and the Official Receiver became the provisional liquidator of each company. Four of the companies invited deposits from the public for investment in commodities, commodity futures, unit trusts, insurance bonds and the like; and the investors claimed that money they had deposited was impressed with a trust. The Official Receiver issued applications under s 246(3) of the Companies Act 1948 to determine the issues raised by these claims, joining representative investors as respondents. In July 1984 Vinelott J directed that the respondents be entitled until further order to be paid their costs out of the assets reputedly belonging to the companies. In March 1985 the matter came back before him on the Official Receiver's application that his proper fees and expenses should rank as a first charge on the assets reputedly belonging to the companies in priority to the trust claims. At that point of time the extent and validity of the trust claims had not been finally established. Counsel for the Official Receiver submitted that the court had an inherent jurisdiction to direct the payment to the Official Receiver of a just allowance for his services, and in addition to direct the payment or reimbursement of all costs and expenses reasonably incurred by him in getting in and protecting and in taking steps necessary to ascertain the true ownership of the assets held by the companies. Counsel for the representative investors accepted, in Vinelott J's view rightly, that the court had jurisdiction to authorise the payment of a just allowance to the Official Receiver for his services and in reimbursement of costs and expenses reasonably so incurred. A number of authorities were referred to, but it appears that he limited his argument to a submission that, as the difficulties which had confronted the Official Receiver arose from the failure of each company to keep trust assets distinct from other assets, all costs and expenses in connection with the unravelling of the accounts (other than the costs of the s 246(3) applications) should be borne by the assets other than the trust assets so far as sufficient, save only that expenses directly related to the realisation and preservation of the trust assets, such as insurance premiums, should fall exclusively on the trust assets (see [1985] BCLC 392 at 403). Vinelott J considered it premature to endeavour to formulate principles which would govern the incidence of costs and expenses incurred by or on behalf of the Official Receiver until after the questions relating

to the trust claims and other questions had been determined. He accordingly made a declaration, inter alia, that the fees and proper expenses of the Official Receiver as provisional liquidator would rank as a charge on the assets held by or reputedly belonging to the companies in priority to any trust claims, but without prejudice to the ultimate incidence thereof as between trust and other assets.

In the present case counsel for the first respondent representing the investors whose money has been applied in making mortgage advances, supported by counsel for the second respondents, representing the investors whose money is still in the company's clients' accounts, challenges the right of the liquidator to be paid anything out of the trust assets in excess of the amounts which the company itself could have recovered under the terms on which deposits were invited from the public. Counsel for the first respondent points out that the two cases to which I have referred were both cases of compulsory winding up in which the official receiver, by virtue of his office, automatically becomes the liquidator until another liquidator is appointed: see s 136(2) of the Insolvency Act 1986. In the present case the company is in voluntary liquidation, and Mr Harris had an opportunity of considering the position before accepting office as liquidator. He submits that what the liquidator has done amounts to the officious conferment of a benefit; and that, in the words of Bowen L J in *Falcke v Scottish Imperial Insurance Co* (1886) 34 ChD 234 at 248, 'Liabilities are not to be forced upon people behind their backs any more than you can confer a benefit upon a man against his will'. A liquidator is not a trustee for anyone: he is a substitute for the board of directors. He is only the agent of the company, and is more akin to the board than is a trustee in bankruptcy; and even a trustee in bankruptcy acquires no title to trust assets vested in the bankrupt. Counsel's submissions on behalf of the first respondent go to the root of what was accepted in *Re Exchange Securities and Commodities Ltd (No 2)* [1985] BCLC 392 and I have heard full argument on the question whether the court has jurisdiction to make any such order as is sought by the liquidator.

In support of his submission that such jurisdiction exists, counsel for the liquidator referred me first to the cases which were cited to Vinelott J. In a number of them the contest was between the liquidator and a secured creditor. In *Re Marine Mansions Co* (1867) LR 4 Eq 601 a debenture holder had a specific charge on the leasehold land and buildings of the company. The liquidator sold two properties for a sum in excess of the amount owing on the debentures. Page Wood V-C held that the debenture holder was entitled to be paid his principal, interest and costs out of the proceeds of sale, after deducting only the liquidator's costs of realising the property together with certain expenses incurred by the liquidator in rendering the property fit for sale and rent paid by him to the landlord, to which the debenture holder made no objection. The other costs incurred by the liquidator in the winding up and any remuneration payable to him were postponed to the rights of the debenture holder. A similar conclusion was reached by Wickens V-C in *Re Oriental Hotels Co, Perry v Oriental Hotels Co* (1871) LR 12 Eq 126: the expenses of the realisation of the property by the liquidator took priority over any claim of the mortgagee, but the mortgagee's claim was paramount to the general costs of the winding up. I do not find these two cases of very much assistance. In both of them the mortgagee could have sold regardless of the winding up and the liquidator was in effect selling on his behalf. The expenses which he incurred

for the purposes of selling to the best advantage were of a different character from the expenses incurred by the liquidator in the present case. Nevertheless, they recognise that where a mortgagee permits a liquidator to sell the company's property which is subject to his mortgage, he cannot claim the entire proceeds of sale without allowing the liquidator the costs which he has properly incurred in connection with the sale.

In *Re Regent's Canal Ironworks Co, ex p Grissell* (1875) 3 ChD 411 liquidators appointed by the court in a voluntary winding up under the supervision of the court carried on the business of the company for nine years under a number of orders of the court which were expressed to be without prejudice to the claims of the debenture holders. Eventually, under a further order of the court, they realised the property which was subject to the debenture, which consisted of certain leaseholds, machinery and plant. The liquidators claimed to be allowed the costs of carrying on the business in priority to the debenture holders. The Court of Appeal held that the costs properly incurred in realising the properties comprised in the security were payable out of the proceeds of sale, and subject thereto the proceeds belonged to the debenture holders. James LJ said (at 426):

> 'I am of opinion that the claim on behalf of the liquidators cannot be sustained. No doubt it is a very hard case for them that they have had to deal with an insolvent company, but they ought to have looked into that matter before they incurred expenses and made themselves liable. Those who render services to an insolvent company, or an insolvent person, frequently find they have to go without payment, and the liquidators should not have incurred disbursements which they had no means of being reimbursed.'

He would have allowed costs properly incurred in preserving the property, such as the cost of repairs, the payment of rates and taxes necessary to prevent a forfeiture or putting a person in to take care of the property (but not payments made as part of the current outgoings of the business); but the liquidators had not paid anything of that kind.

Counsel for the first respondent relied on this case as authority for the proposition that the inherent jurisdiction for which counsel for the liquidator contended does not exist. I do not think it proves any guidance either way. It was in essence quite a straightforward case in which the liquidator and the contributories thought it was for their own benefit that the business should be carried on, and the debenture holders were content to rely on their security (see 3 ChD 411 at 420–421 per James LJ). When the business failed and the security was realised, only the costs of realisation could properly be charged against the debenture holders. The position was no different in principle from that which existed in *Re Marine Mansions Co* and *Re Oriental Hotels Co*. *Re Northern Milling Co* [1908] 1 IR 473 was a case in the High Court of Ireland to the same effect.

Similar reasoning was adopted by Kekewich J in *Re Staffordshire Gas and Coke Co* [1893] 3 Ch 523, where the question was whether the costs of persons who successfully applied to be struck off the list of contributories were payable in priority to the costs of the liquidation. The liquidator was allowed the costs of realising the assets of the company, and would have been allowed

'expenditure, if any there has been, in the preservation of property coming under the head of "salvage"' (see [1893] 3 Ch 523 at 528). The costs of the applicants took priority over the liquidator's costs of resisting the application.

In *Re Anglo-Austrian Printing and Publishing Union, Brabourne v Anglo-Austrian Printing and Publishing Union* [1895] 2 Ch 891 misfeasance proceedings were brought by the liquidator against certain officers of the company under s 10 of the Companies (Winding up) Act 1890 and a sum of £7,000 was recovered. The sum recovered was subject to a debenture. It was not disputed that the liquidator was entitled to deduct the costs incurred by him in the misfeasance proceedings; but the petitioning creditor claimed that his costs too should have priority as they were essential to the salvage of the fund, because the particular proceedings under the 1890 Act could not have been taken unless there had been a winding up order, and there could not have been a winding up order unless there had first been a petition. Vaughan Williams J held that these costs could not be brought within the doctrine of salvage, and therefore, with regret, that they could not be given priority. Counsel for the first respondent says that if there had been any such inherent jurisdiction as is claimed by counsel for the liquidator the court could have allowed the petitioner his costs in priority to the debenture holders. There is some force in this, but the petitioning creditor stands on a rather different footing from the liquidator; and it does not appear that the wider question of inherent jurisdiction, of which salvage is only one aspect, was really argued.

In two further cases, *Re Glasdir Copper Mines Ltd, English Electro-Metallurgical Co Ltd v Glasdir Copper Mines Ltd* [1906] 1 Ch 365 and *Re A Boynton Ltd, Hoffmann v A Boynton Ltd* [1910] 1 Ch 519, the court had appointed a receiver in a debenture holder's action, in order to preserve and realise the company's property, and authorised him to borrow money for that purpose. In both cases it was held that the receiver's costs and remuneration took priority over the claims of the persons from whom he borrowed the money. In *Re A Boynton Ltd* Warrington J pointed out that the receiver was an officer of the court, and summarised the position of the lenders as follows ([1910] 1 Ch 519 at 525):

> 'They come in and take a charge upon the assets of a business which is in course of realization by the Court, and in my opinion they can take in satisfaction of their charge no more than that which is actually realised. The plaintiff has incurred his costs of the action, and the receiver has given his services, in the endeavour to realise as large a fund as possible for the benefit of the several persons having charges on it, and I think they are both entitled to be indemnified before the fund is applied in payment of these charges.'

These cases are clearly distinguishable from the present case. Counsel for the liquidator suggested that they illustrated a general principle that work carried on for the benefit of others should be paid for at the expense of those others, and that the position of the debenture holders was very similar to that of the investors in the present case, in that the assets subject to the debenture were no longer the assets of the company; but I do not think that there is a very close analogy between a liquidator in a voluntary winding up who has incurred

expense in dealing with assets which never belonged beneficially to the company and a receiver acting on the directions of the court who has incurred expense in realising assets of the company which were subject to a debenture.

Having referred me to all the cases which were cited in *Re Exchange Securities and Commodities Ltd (No 2)* [1985] BCLC 392, counsel for the liquidator accepted that Vinelott J did not have a line of cases before him which established the jurisdiction on which he relied; but nevertheless Vinelott J was satisfied that there was jurisdiction, at all events where the official receiver was acting as liquidator. Counsel submitted that the source of the jurisdiction was to be found first in the maxim that he who seeks equity must do equity and second in the inherent jurisdiction to promote the proper administration of trusts, which includes the doctrine of salvage; and he submitted that these two sources are not distinct but overlap. *Re Marine Mansions Co* (1867) LR 4 Eq 601 and subsequent cases in which the liquidator had been allowed the costs incurred in preserving mortgaged property might be seen as based on the maxim or on the jurisdiction to promote the proper administration of trusts; but reimbursement of expenses was not enough for his purposes: what he sought was an order authorising reasonable remuneration for the liquidator. He submitted that the court's jurisdiction to award compensation for services rendered was supported by two comparatively recent cases, *Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46 and *Re Duke of Norfolk's Settlement Trusts* [1981] 3 All ER 220, [1982] Ch 61.

In *Boardman v Phipps* trustees of a will held shares in a company. Mr Boardman, who was the solicitor to the trustees, and Mr Phipps, who was a beneficiary, obtained confidential information about the company by acting as self-appointed agents for the trustees. With the aid of that information they made a take-over bid on their own behalf for the outstanding shares in the company, so as to obtain control and, by a liquidation of assets, make a repayment of capital to the shareholders. The assets of the company proved to be worth far more than the amount paid for the shares. The trustees made a handsome profit on their shares, and Mr Boardman and Mr Phipps an even larger one on theirs. Wilberforce J held that they must account to the beneficiaries for the profit they had made, less their expenditure incurred to enable it to be realised (see [1964] 2 All ER 187 at 208, [1964] 1 WLR 993 at 1018). He continued:

> 'But, in addition to expenditure, should not the defendants be given an allowance or credit for their work and skill? This is a subject on which authority is scanty; but COHEN J in *Re Macadam, Dallow and Moscrop v Codd* ([1945] 2 All ER 664, [1946] Ch 73) gave his support to an allowance of this kind to trustees for their services in acting as directors of a company. It seems to me that this transaction, ie the acquisition of a controlling interest in the company, was one of a special character calling for the exercise of a particular kind of professional skill. If Mr Boardman had not assumed the role of seeing it through, the beneficiaries would have had to employ (and would, had they been well advised, have employed) an expert to do it for them. If the trustees had come to the court asking for liberty to employ such a person, they would in all probability have been authorised to do so, and to remunerate the person in question. It seems to me that it would be inequitable now for the

beneficiaries to step in and take the profit without paying for the skill and labour which has produced it.'

Wilberforce J's decision was affirmed in the Court of Appeal (see [1965] 1 All ER 849, [1965] Ch 992), where Lord Denning MR equated the case to an action for restitution of the kind described in *Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd* [1942] 2 All ER 122 at 135, [1943] AC 32 at 61 and said that the claim for restitution should not be allowed to extend further than the justice of the case demanded, and that generous remuneration should be allowed to the agents (see [1965] 1 All ER 849 at 857, [1965] Ch 992 at 1020), and in the House of Lords (see [1966] 3 All ER 721, [1967] 2 AC 46), where Lord Cohen and Lord Hodson agreed with Wilberforce J that payment should be allowed on a liberal scale in respect of the work and skill employed in obtaining the shares and the profits therefrom (see [1966] 3 All ER 721 at 744, 749, [1967] 2 AC 46 at 104, 112).

In *Re Duke of Norfolk's Settlement Trusts* [1981] 3 All ER 220, [1982] Ch 61 a settlement authorised one of the plaintiffs, a trustee company, to charge remuneration in accordance with its usual scale of fees in force at the date of the settlement. The substantial redevelopment of the settled estates involved the trustees in work entirely outside anything which could reasonably have been foreseen when they accepted office. The plaintiffs sought an order under the inherent jurisdiction authorising increased remuneration for the plaintiff company. In the High Court Walton J held that he had jurisdiction to authorise additional remuneration in respect of past work, but that he had no inherent jurisdiction to authorise for the future any general increases in the remuneration provided for the trustee company under the settlement (see [1978] 3 All ER 907, [1979] Ch 37). The Court of Appeal held that there was an inherent jurisdiction to increase the remuneration of a trustee, on the basis that in doing so the court was 'exercising its ancient jurisdiction to secure the competent administration of the trust property' (see [1981] 3 All ER 220 at 230, [1982] Ch 61 at 78 per Fox LJ). Fox LJ continued ([1981] 3 All ER 220 at 230, [1982] Ch 61 at 79):

> 'I appreciate that the ambit of the court's inherent jurisdiction in any sphere may, for historical reasons, be irrational and that logical extensions are not necessarily permissible. But I think that it is the basis of the jurisdiction that one has to consider. The basis, in my view, in relation to a trustee's remuneration is the good administration of trusts. The fact that in earlier times, with more stable currencies and with a plenitude of persons with the leisure and resources to take on unremunerated trusteeships, the particular problem of increasing remuneration may not have arisen does not, in my view, prevent us from concluding that a logical extension of admitted law which is wholly consistent with the apparent purpose of the jurisdiction is permissible. If the increase of remuneration be beneficial to the trust administration, I do not see any objection to that in principle.'

Having established that the court has jurisdiction in certain cases to authorise remuneration to be paid out of trust funds to trustees or others acting in a fiduciary relationship to the trust, counsel for the liquidator referred me to a

number of cases in which, he submitted, the court had applied the principle that he who seeks equity must do equity. In *Scott v Nesbitt* (1808) 14 Ves 438,
a [1803–13] All ER Rep 216 consignees (or managers) of a West Indian estate who had been appointed out of court claimed a lien on the estate for expenses incurred in managing it in priority to mortgagees of the estate. The Master's report stated that he did not find that there was any law or usage in the West Indies under which the consignee was entitled to such a lien. Lord Eldon LC,
b however, upheld the claim on ordinary principles of equity as applied to estates in this country and said (14 Ves 438 at 444, [1803–13] All ER Rep 216 at 218):

> '... the concerns of the estate could not be carried on without consignees; and all moral justice requires, that for what in the fair discharge of their duty they became liable to in respect of the management of the
> c estate they should be indemnified, with priority to the claim of those, who have interests in the estate, to be so managed, before any person can have any benefit from it. If any probable cause had been laid before the Court when the Decree was made in 1783, a receiver, or consignee and manager, would have been granted; whose fair expenses would have been paid in the first instance, before this Court would have permitted anything
> d to be taken by the parties entitled; and it may be represented rather as the effect of accident, that this question arises now, than that a consignee might not have been appointed; who would have been immediately entitled to the benefit, which is now claimed.'

e A similar decision was given by Stuart V-C in *Morrison v Morrison* (1855) 2 Sm & G 564, 65 ER 527, where consignees of an estate in Tobago were appointed by the court in proceedings to which a mortgagee was not party. Questions arose concerning priority of title to a fund in court, being the amount of the compensation money awarded to the owner of the estate in respect of slaves on the estate on their emancipation. Stuart V-C said (2 Sm & G 564 at
f 576, 65 ER 527 at 532):

> 'To permit the mortgagee to take this compensation money, or any other part of the proceeds of this estate, or any fund in this cause belonging to the mortgagee or other owners of the estate, without reimbursing the consignee the debt found due to him for the management on behalf of all
> g the owners, would be a violation of those principles of natural justice on which Lord *Eldon* said he proceeded in the case of *Scott v Nesbitt*.'

Counsel for the first respondent submitted that these two cases could be distinguished because the outlay by the consignee was for the purpose of
h producing income, and the party who had not consented to the consignee's appointment could not make the consignee account for the income without reimbursing him his expenditure. In the present case, on the other hand, the liquidator's expenditure was incurred in the internal management of the company, and the investors are not seeking any form of relief against him. He sought to distinguish *Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46
i on similar grounds. The beneficiaries, he submitted, had an election either to affirm the transaction in which Mr Boardman and Mr Phipps assumed to act as agents for the trust, in which case they were obliged to pay their expenses

and compensation for their skill and labour, or to refuse to treat them as agents, in which case they would not have been entitled to any payment but could have kept the profits for themselves. In the present case the liquidator's work has *a* not added to the assets of the investors, and the investors are not obliged to pay him anything.

In my judgment counsel's submissions for the first respondent are based on too narrow a view of the principles on which the court acts. It is true that the legal title to the mortgages and to the client account is not vested in the *b* liquidator but remains in the company; but the investors still need the assistance of a court of equity to secure their rights. In this respect their position is different from that of the claimant in *Falcke v Scottish Imperial Insurance Co* (1886) 34 ChD 234 at 251, where Bowen L J said: 'It is not even a case where the owner of the saved property requires the assistance of a Court of Equity ... to get the property back.' As a condition of giving effect to their equitable *c* rights, the court has in my judgment a discretion to ensure that a proper allowance is made to the liquidator. His skill and labour may not have added directly to the value of the underlying assets in which the investors have equitable interests; but he has added to the estate in the sense of carrying out work which was necessary before the estate could be realised for the benefit of the investors. As was the case in *Scott v Nesbitt* (1808) 14 Ves 438, [1803–13] *d* All ER Rep 216, if the liquidator had not done this work it is inevitable that the work, or at all events a great deal of it, would have had to be done by someone else, and on an application to the court a receiver would have been appointed whose expenses and fees would necessarily have had to be borne by the trust assets. On the evidence before me, the beneficial interests of the *e* investors could not have been established without some such investigation as has been carried out by the liquidator.

The allowance of fair compensation to the liquidator is in my judgment a proper application of the rule that he who seeks equity must do equity. As Wigram V-C stated in *Neesom v Clarkson* (1845) 4 Hare 97 at 101, 67 ER 576 at 578: *f*

> 'That ... is a rule of unquestionable justice, but which decides nothing in itself; for you must first inquire what are the equities which the Defendant must do, and what the Plaintiff ought to have.'

16 Halsbury's Laws (4th edn) para 1303, which in my judgment correctly states *g* the law, comments:

> 'The rule means that a man who comes to seek the aid of a court of equity to enforce a claim must be prepared to submit in such proceedings to any directions which the known principles of a court of equity may *h* make it proper to give; he must do justice as to the matters in respect of which the assistance of equity is asked.'

The authorities establish, in my judgment, a general principle that where a person seeks to enforce a claim to an equitable interest in property, the court has a discretion to require as a condition of giving effect to that equitable *i* interest that an allowance be made for costs incurred and for skill and labour expended in connection with the administration of the property. It is a discretion

which will be sparingly exercised; but factors which will operate in favour of its being exercised include the fact that if the work had not been done by the person to whom the allowance is sought to be made, it would have had to be done either by the person entitled to the equitable interest (as in *Re Marine Mansions Co* (1867) LR 4 Eq 601 and similar cases) or by a receiver appointed by the court whose fees would have been borne by the trust property (as in *Scott v Nesbitt* (1808) 14 Ves 438, [1803–13] All ER Rep 216), and the fact that the work has been of substantial benefit to the trust property and to the persons interested in it in equity (as in *Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46). In my judgment this is a case in which the jurisdiction can properly be exercised.

It seems to me that this principle is entirely consistent with the basis on which the Court of Appeal acted in *Re Duke of Norfolk's Settlement Trusts* [1981] 3 All ER 220, [1982] Ch 61. What the Court Appeal held in that case was that if the increase of the trustees' remuneration was beneficial to the trust administration, there was an inherent jurisdiction to require the beneficiaries to accept, as a condition of effect being given to their equitable interests, that such an increase in remuneration should be authorised. The court there was concerned with the good administration of a settlement of a conventional kind; but the jurisdiction which was held to be exercisable in that case is in my judgment equally exercisable in other cases in which a person seeks to enforce an interest in property to which he is entitled in equity. The principles on which a court of equity acts are not divided into watertight compartments but form a seamless whole, however necessary it may be for the purposes of exposition to attempt to set them out under distinct headings. I have already referred to the way in which Kekewich J in *Re Staffordshire Gas and Coke Co* [1893] 3 Ch 523 treated expenditure on the preservation of trust property as coming under the head of 'salvage', and the petitioning creditor in *Re Anglo-Austrian Printing and Publishing Union* [1895] 2 Ch 891 sought to persuade Vaughan Williams J to do the same. It is of interest that in *Re Duke of Norfolk's Settlement Trusts* [1978] 3 All ER 907 at 925, [1979] Ch 37 at 59 at first instance Walton J regarded the cases in which the court authorises additional remuneration in order to secure the services of a particular trustee as also being 'closely analogous to "salvage"'. I think this can fairly be regarded as confirmation of the underlying unity of the inherent jurisdiction which is exercised in such diverse circumstances as those which existed in *Re Marine Mansions Co*, *Scott v Nesbitt*, *Boardman v Phipps* and *Re Duke of Norfolk's Settlement Trusts*.

Another example of the exercise of the inherent jurisdiction which seems to me to fall within the same principle occurs when the court sets aside a settlement for undue influence or on the bankruptcy of the settlor. Although there is no longer any property subject to the settlement, the court has a discretion to allow the trustees to take their costs out of the fund before handing it over to the successful litigant: see *Merry v Pownall* [1898] 1 Ch 306 at 310–311 and *Bullock v Lloyds Bank Ltd* [1954] 3 All ER 726 at 730–731, [1955] Ch 317 at 327.

The particular aspect of the inherent jurisdiction which is sometimes referred to as 'salvage' was said by Evershed MR and Romer LJ in *Re Downshire Settled Estates, Marquess of Downshire v Royal Bank of Scotland* [1953] 1 All ER 103 at 110, [1953] Ch 218 at 235 to be exercisable—

> 'where a situation has arisen in regard to the [trust] property (particularly a situation not originally foreseen) creating what may be fairly called an "emergency", that is, a state of affairs that has to be presently dealt with – by which we do not imply that immediate action then and there is necessarily required – and such that it is for the benefit of everyone interested under the trusts that the situation should be dealt with by the exercise of the administrative powers proposed to be conferred for the purpose.'

The situation which existed in the present case immediately before the commencement of the winding up could similarly fairly be called an emergency; and, although the observations of Evershed MR and Romer LJ were directed to the court's jurisdiction to confer administrative powers on trustees, the cases to which I have referred show that the inherent jurisdiction is wider than this and extends to making an allowance for costs incurred and skill and labour expended by those who have acted without obtaining the prior authority of the court.

I should notice three particular objections which were made to the existence of the jurisdiction in the present case. First it was said that the liquidator was not in the position of a trustee, in that the legal interest in the trust assets remained throughout in the company and did not vest in him. In my judgment this does not preclude the court from making an allowance to him out of the trust assets in respect of his expenses and remuneration, although it is no doubt a factor to consider when determining to what extent compensation for his expenditure of money, skill and labour should be borne by the trust assets rather than the company's own assets. In several of the cases to which I have referred, the person to whom the court made an allowance was not in the ordinary sense a trustee, although like the liquidator he was subject to fiduciary obligations; and the fact that he was not a trustee did not prevent the court from making a payment to him out of the trust assets. The salvage jurisdiction referred to in *Re Downshire Settled Estates* was described in terms which were restricted to the conferment of powers on trustees; but Evershed M R and Romer L J recognised that salvage was only one aspect of the inherent jurisdiction, and the court's powers are clearly not exercisable only in favour of those who hold office as express trustees.

Second it was said that the contract between the company and the investors relieved the investors from any liability for further payments. I have referred in my earlier judgment to the summary of the investment scheme which was provided to all investors and which stated, inter alia, that 'No costs whatsoever are incurred by the Investor'. While this is again a factor to consider when the court comes to determine how any costs and remuneration of the liquidator should be borne, and would no doubt carry much weight if the question was whether the company itself should be entitled to payment of any part of the expenses incurred by it out of the trust assets, it does not in my judgment preclude the court from exercising the inherent jurisdiction in favour of the liquidator. It is significant that in *Re Duke of Norfolk's Settlement Trusts* [1981] 3 All ER 220, [1982] Ch 61 an argument that the trustees' remuneration could not be increased because it was based on contract and the court had no power to vary the terms of a contract was rejected by the Court of Appeal. The circumstances in that case were of course different from those existing

here; but if the terms of a settlement do not prevent the court from exercising its inherent jurisdiction in favour of the trustees in a proper case, I do not consider that the terms of the investment scheme in the present case prevent it from doing so in favour of the liquidator.

Third, it was said that the business carried on by the company was contrary to s 1 of the Banking Act 1979, and that this is a ground for declining to exercise the inherent jurisdiction. It is not necessary for me to express any view on the legality of the company's business, which appears to be a question of some difficulty. I am satisfied that, even if it was illegal, this does not preclude the court from exercising the jurisdiction in favour of the liquidator, whose own conduct is blameless in this respect.

Accordingly, I propose to declare that the liquidator is entitled to be paid his proper expenses and remuneration out of the trust assets if the assets of the company are insufficient. I am not deciding how such expenses and remuneration should be borne as between the company's assets and the trust assets, nor as between the different classes of trust assets, nor whether any part of them should be borne by the trust assets if the company's own assets should in the end prove sufficient to meet them. It is premature to determine questions of incidence when the full extent of the liquidator's claims to expenses and remuneration are not yet known, and the assets of the company may yet be swelled as a result of the litigation in which it is engaged. But the liquidator is entitled to know at this stage that his proper expenses and remuneration will be paid if necessary out of the trust assets, and that he will not be left at the end of the winding up with the possibility of receiving no recompense for his work or of having to bear part of the expenses out of his own pocket.

*Declaration accordingly.*

Solicitors: *Bond Pearce*, Plymouth (for the liquidator); *Boyce Hatton*, Torquay (for the first respondent); *Fynmores*, Bexhill-on-Sea (for the second respondents); *Fairchild Greig & Wells* (for the third respondent).

Jacqueline Metcalfe Barrister.

butories who transferred their shares after it was contracted; and that the sums contributed by the B contributories respectively be applied exclusively in payment of the debts which were incurred before the dates of the respective transfers, and remained unpaid at the commencement of the winding-up."

L. JJ.
1871
MORRIS' CASE.

Solicitors: Messrs. *Ashurst, Morris, & Co.;* Messrs. *Uptons & Co.;* Messrs. *Crosley & Burn.*

---

## *In re* CONTRACT CORPORATION.

L. JJ.
1871
*Dec.* 22.
1872
*Jan.* 12,
*Feb.* 13.

### GOOCH'S CASE.

*Winding-up—Practice—Production of Documents—Affidavit—Official Liquidator.*

The official liquidator of a company is in the position of a receiver or manager of partnership assets appointed by the Court. Where he represents the company in a suit against strangers, or in a proceeding in the winding-up against an alleged contributory, the adverse party has a right to the same discovery from him as from an ordinary litigant. But where the question is whether a past shareholder is to be placed on list B, and, if so, what is the extent of his liability, that being a question which does not concern the company, the official liquidator is only bound to afford equal facilities to the shareholder and the creditors, but not to make discovery at the instance of either party.

The decision of the Master of the Rolls reversed.

Observations on *In re Barned's Banking Company, Ex parte Contract Corporation* (1).

THIS was an appeal from an order of the Master of the Rolls made in the winding-up of the *Contract Corporation, Limited* directing the official liquidator to make an affidavit as to the documents in his possession.

In January, 1865, Mr. *Gooch* transferred his shares in the company to a person named *Adams.* In August following *Adams* transferred his shares to *Dove,* and in December, 1865, *Dove* transferred them to *Beal.*

On the 22nd of March, 1866, the Petition was presented under which the company was ordered to be wound up, at which time *Beal's* name was on the register as holder of the shares.

*Adams* and *Dove* were both infants, but *Beal* was of full age.

(1) Law Rep. 2 Ch. 350.

L. JJ. 1871-2 GOOCH'S CASE.

Under these circumstances the official liquidator sought to put *Gooch* on the list of contributories, on the ground that his transfer to *Adams* was invalid, and that he still remained a shareholder; and in the alternative of the defect in the transfer being held to have been cured by the subsequent dealings with the shares, he sought to put *Gooch* on the B list of past members, on the ground that he remained a member till December, 1865, when the transfer to *Beal* was made.

In support of his defence to this alternative claim, *Gooch* called upon the official liquidator to make an affidavit as to all documents in his possession relating to the questions at issue. The Master of the Rolls made the order asked for, considering that the official liquidator was in the same position as an ordinary Defendant; and from this decision the official liquidator appealed.

Sir *R. Baggallay*, Q.C., and Mr. *Chitty*, for the Appellant:—

The official liquidator is not a litigant; he is merely an officer of the Court; and the documents in his possession are in possession of the Court in the same way as if they were deposited with the Clerk of Records and Writs. It is his duty to give every facility both to contributories and creditors, but he could not make such an affidavit as is required of him without a complete examination of all the books and other documents of the company, which would enormously increase the costs and delay of a winding-up. This would be especially the case in questions relating to the B list, for the particulars of each creditor's debt would have to be gone into. The practice of litigants in a Chancery suit bears no analogy to the present case; for in Chancery there are pleadings which raise specific issues. But here every defence is open, and the official liquidator could not know to what particular points to direct his search. The contributories are in the position of partners; they are entitled to free access to the partners' books, but they must search them themselves, and cannot call on the other partners to make an affidavit of their contents.

[They referred to the *Companies Act*, 1862, ss. 92, 94, 99, 154, 156. Gen. Ord. of November, 1862, rules 58, 68, 74.]

Mr. *Morgan*, Q.C., and Mr. *Bagshawe*, for Mr. *Gooch*:—

The official liquidator is not merely an officer of the Court; he

stands in the place of the directors; the property of the company is under his control, and in litigious proceedings he is in a position analogous to the secretary or other public officer of a company who is made a party for purposes of discovery; *In re Barned's Banking Company, Exparte Contract Corporation* (1). In the ordinary practice in Chancery the duty of making such an affidavit, and the right to require it, are extended to persons not formally parties, such as the officers of a company: *Ranger* v. *Great Western Railway Company* (2); *Rochdale Canal Company* v. *King* (3); and to creditors: *In re M'Veagh* (4). In the present case the real contest is respecting *Gooch's* liability as a past member, and the litigation is between him and a particular class of creditors. The official liquidator represents for this purpose that particular class; they do not appear and contest the question themselves: *Weston's Case* (5). The inconvenience alleged is no answer to the application. It is the duty of the official liquidator to be well acquainted with the documents; and all we want to know is, which of the debts to which *Gooch* was liable have been paid off, and which are in existence.

[They also referred to the 11 & 12 Vict. c. 45, s. 118; the *Companies Act*, 1862, s. 94; 15 & 16 Vict. c. 86, s. 18.]

Mr. *Chitty*, in reply.

---

1872

Feb. 13. SIR W. M. JAMES, L.J., delivered the judgment of the Court as follows:—

This is an appeal from an order of the Master of the Rolls directing the Appellant, the official liquidator of the company, to make an affidavit as to the documents in his possession.

The Respondent is a person who is sought by the official liquidator to be placed on the list of contributories, on the ground that an alleged transfer made by his testator, being to an infant, was a nullity, and that he continued to be a shareholder.

There was an alternative claim under these circumstances. The

(1) Law Rep. 2 Ch. 350.
(2) 4 De G. & J. 74.
(3) 15 Beav. 11.
(4) 1 D. J. & S. 399.
(5) Law Rep. 6 Eq. 17.

L. JJ.
1872
GOOCH'S CASE.

infant himself made a transfer, which was accepted and registered, and there have been subsequent dealings with the shares, and it is suggested that if these dealings with the shares preclude the right to go back to the original void transfer, and treat all subsequent dealings as avoided, at all events there was a time during which the infant alone was the nominal shareholder, and during that time the transferor is liable to be, as the then shareholder, placed on list B.

This is the contention on the one part; on the part of the Respondent he, of course, denies that his testator was a continuing shareholder, and, with respect to the claim to put him on the list B, he alleges that the statutory requisites do not exist; that is to say, that there are no debts of the company dating back beyond the time at which he ceased to be a member—at least none which there were not assets of the company sufficient to discharge.

It is with a view to discovery in support of this contention that the Appellant is asked to make the affidavit as to documents.

The argument of the Appellant is, that he is not a litigant, or in the position of a litigant, with respect to the questions at issue; that he is an officer of the Court, and nothing but an officer of the Court, who has neither power nor duty to do anything except under the orders and directions of the Judge, and that his possession of the books and papers of the company is, in truth, as much the possession of the Court by him as if they were deposited with the Clerk of the Records and Writs, or with any other officer of the Court.

It has been pointed out to us that by the Act of Parliament provision is made for giving to any person interested access to all the books and papers in the liquidator's possession; and it has been argued with great force before us that if, in every question to be settled in the winding-up of a company, every creditor, every contributory, every officer of the company, is entitled *ex debito justitiæ*, to treat the official liquidator as a litigant, and to compel him to make discovery, and for the purposes of such discovery to make the necessary examination of all the books and papers in his custody, in order to ascertain which of them relates or contains entries relating to the matter in controversy, it would add enormously and fearfully to the costs, already enormous and fearful, of a winding-up.

We think that there is very great weight in the considerations so presented to us: a winding-up is, in truth, a partnership suit, and the official liquidator is the receiver and manager of the partnership assets, and also fills the character of an accountant to make up the books and accounts, so as to ascertain each partner's share of liability and share of surplus, if there should be any. And it would certainly be a very novel thing to treat a receiver and manager appointed by the Court, or an accountant appointed by the partners themselves, as a person liable to be treated as a Defendant for the purposes of discovery. And we can find nothing in the Act of Parliament which authorizes an official liquidator to be treated otherwise than such a receiver, or manager, or accountant would be liable to be treated. The express provision that the official liquidator is to act in every respect under the authority of the Court would seem, on the contrary, to shew that there can be no necessity for treating the liquidator as a litigant Defendant. In truth, it is of the utmost importance that the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding-up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect.

If a person interested in any such case desires to see any books or papers, it is the duty of the liquidator to give him not only access to them, but to give him every assistance and facility in finding out which are the relevant books and papers he requires; and if the liquidator has already ascertained any books or papers bearing on the subject, he should frankly place this information at the service of the party. But this is a very different thing from the liquidator being obliged, at the instance of every person interested in every question arising, to employ that time which, unfortunately, is so costly to the contributories, in making that fresh and careful investigation of the papers and documents in his pos-

L. JJ. 1872 GOOCH'S CASE.

session which would be requisite to enable him truthfully to make the ordinary affidavit which is required from a party or *quasi* party called on to make discovery.

Our attention, however, has been called to the language of the Lords Justices in a case relating to this very company, *In re Barned's Banking Company, Ex parte Contract Corporation* (1); who, in their observations, refer to the liquidator as being in a position analogous to the secretary or other public officer of a corporation made a Defendant for the purposes of discovery, and who is compellable to make the same discovery as a Defendant proper would be compelled to make.

The point which actually arose in that case was, whether an official liquidator examined as a witness could protect himself from answering; and it was held that he could not. We see no reason to dissent from that decision; nor from the reasons or observations of our predecessors when rightly applied to the proper kind of case.

Among the other duties of an official liquidator, it may fall to him to represent the company as a party litigant. The company can only sue or be sued through his agency, and where there is such a suit, or where there is in the winding-up a proceeding, which is in substance, though not in form, a bill or action by or against the company, then, from the very necessity of the case, the adverse party has a right to deal with the official liquidator as the litigant, and to obtain from him the same measure of discovery in the same manner as he would from any other litigant. That is the principle of that case, and that principle sufficiently indicates the limits of its application.

It has, however, in our judgment, no application, except to a very limited extent, to the case before us. So far as there is any question whether the Respondent is or is not still liable to be put on the list as an actual present shareholder, that is a question between him on the one side and the company on the other; and the Respondent is entitled to have, if he requires it, the usual discovery as to that liability, that is to say, a discovery of everything relating to the particular shares in question since the transfer by the Respondent to the infant out of which the question arises. But with regard to the real question between the parties, viz.,

(1) Law Rep. 2 Ch. 350.

whether the statutory requisites exist for placing the Respondent on list B, and if so, what is the extent of his liability; that is a question with which the existing company has really no concern. That company must pay to its uttermost farthing in any event. And whether beyond the claim against the company any particular creditor or creditors has or have claims against any past member or members of the company, is a question as to which every creditor may have his hand against every other creditor, and against every past shareholder; and every past shareholder may have his hand against every other past shareholder, and against every creditor. The official liquidator, as the officer of the Court, is bound to see that in this free fight everybody has a fair field and no favour, and to act strictly in the interests of truth and justice, and none other. But the official liquidator, as the representative of the existing body, is no party, or *quasi* party, either for discovery or otherwise, to any such litigation.

This case, in truth, shews how impossible it would be to proceed with a winding-up if this distinction were not observed. The real controversy is whether there were, at a particular date, debts which have not been since discharged wholly or partially, and which there are not or were not assets available to satisfy. The discovery sought would be a discovery of all the books and papers relating to every debt due or claimed at that date, and to everything done subsequently with reference to such debts, and all the books and papers shewing the assets of the company, which are or ought to be forthcoming.

We are of opinion that the order of the Master of the Rolls should be discharged; but if the Respondent desires it, we will substitute for it an order on the official liquidator, to make the usual affidavit as to documents relating to the particular shares, in respect of which he is sought to be placed on the list of present contributories. There will be no costs, but the official liquidator will take his out of the estate.

Solicitors for the Appellant: Messrs. *Linklater, Hackwood, & Co.*
Solicitor for the Respondents: Mr. *H. W. Vallance.*

# *In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.

C. A.
1893.
VAUGHAN WILLIAMS, J.
*July* 1.
C. A.
*July* 12, 13.

*Company—Winding-up—Scheme of Arrangement—Meeting of Creditors—Proxies—Creditors Abroad—Companies Act,* 1862 (25 & 26 *Vict. c.* 89), *s.* 91—*Joint Stock Companies Arrangement Act,* 1870 (33 & 34 *Vict. c.* 104), *s.* 2—*Stamp Act,* 1891 (54 & 55 *Vict. c.* 39), *s.* 15, *sub-s.* 3; *s.* 80.

A chartered banking company, the principal business of which was in *Australia,* stopped payment, and was ordered to be wound up in this country. A scheme of reconstruction was proposed, by which a new bank was to be established, which was to defray the liabilities of the old bank with certain exceptions. The Judge directed meetings of the shareholders and creditors to be held in order to ascertain their wishes as to the scheme. It being necessary that this should be done without delay, and the great majority of the creditors being resident in *Australia,* the Judge made an order directing a form of proxy to be sent by the Official Receiver by telegraph to *Australia* appointing specified persons to vote for or against the scheme at the *London* meeting; the proxy papers were to be executed by the creditors in *Australia* and deposited at the offices of the company at the principal cities in *Australia* not later than three days previous to the meeting in *London,* and the particulars and number of the proxies for and against the scheme were to be telegraphed to the Official Receiver. This was done, and the result declared at the meeting in *London,* when it was found that more than the statutory number of the creditors, including the Australian creditors, were in favour of the scheme, but that if the Australian votes were not counted the resolution in favour of the scheme would not have been carried. Under these circumstances the Judge sanctioned the scheme. Some of the Scotch and English creditors appealed from this decision on the grounds (1.) that the scheme was improvident and unfair towards the creditors generally; (2.) that the Judge had no power to order the result of the Australian proxies to be communicated by telegram to the meeting, but that the proxies ought to have been produced at the meeting; (3.) that the Australian proxy papers were irregular in naming a particular person as agent for the voter; (4.) that as to some of the proxy papers, which were stamped with a penny stamp, the day of the meeting at which they were to be used was not inserted, and, therefore, they were void under sect. 80 of the *Stamp Act,* 1891 :—

*Held* (affirming the decision of *Vaughan Williams,* J.), (1.) that following the principles laid down in *In re Alabama, New Orleans, Texas and Pacific Junction Railway Company* (1), as there was nothing unreasonable or unfair in the scheme as between different classes of creditors, the Court would defer to the expressed opinion of the great majority of the creditors; (2.) that the Judge had power under the *Joint Stock Companies*

(1) [1891] 1 Ch. 213.

*Arrangement Act*, 1870, s. 2, to direct the particulars of the Australian proxies to be telegraphed to the Official Receiver and the proxies to be counted at the meeting, there being no necessity that the proxy papers should be produced at the meeting; (3.) that the proxy papers were not irregular on account of the agent being named on the form; and (4.) that the proxies on which the day of meeting was not named would be good if stamped with a ten shilling stamp within thirty days of their being received in *England* under sect. 15, sub-sect. 3, of the *Stamp Act*, 1891.

THE *English, Scottish, and Australian Chartered Bank* was a chartered banking company whose business was principally in *Australia*, and which had branches at *Melbourne, Sydney, Adelaide*, and *Brisbane*. The bank having stopped payment, a winding-up order was made by Mr. Justice *Vaughan Williams*, and a scheme was afterwards proposed for the reconstruction of the company under the provisions of the *Joint Stock Companies Arrangement Act*, 1870. Under this scheme it was proposed that a new bank should be formed and registered under the *Companies Acts*, to be called the *English, Scottish, and Australian Bank, Limited*, with a share capital of £1,575,000, in 45,000 shares of £35 each. Certain specified claims to the amount of £838,000 were to be borne by the old bank, and the remainder of the liabilities were to be borne by the new bank, which was to take over the assets of the old bank with certain exceptions. The new bank was to pay in cash the preferential debts of the old bank, and all its debts on current account under £50 in amount, and to pay the rest of the unsecured creditors of the old bank, as to one-fourth in debenture stock, as to one-fourth in terminable deposit receipts, and as to the remaining half in inscribed deposit stock. Mr. Justice *Vaughan Williams* made an order directing meetings to be held of the creditors and shareholders to ascertain whether they consented to this scheme. The far greater number of the creditors of the bank resided in *Australia*, and the learned Judge accordingly directed meetings to be held in *Melbourne, Sydney, Adelaide*, and *Brisbane*, as well as in *London*, at which the shareholders and creditors might vote personally or by proxy. For this purpose he directed that the Official Receiver should send a form of proxy to the shareholders and creditors in *Great Britain* and also in *Australia*. The form of proxy sent to the creditors in *Great Britain* empowered a named person, or, him failing,

another named person, "as my proxy, to act for me at the meeting to be held in *London* on the 12th of June, 1893, for the purpose of considering, and, if thought fit, approving a scheme of arrangement dated the 17th of May, 1893, with or without modifications; which meeting is to be held pursuant to orders made in this matter on the 18th of May, 1893, and at such meeting, or any adjournment thereof, to vote for me and in my name for the said scheme, either with or without such modifications as my proxy may approve." In the margin opposite the word "for" was this note: "If against, strike out the word 'for' and insert the word 'against.'" The proxies furnished to the creditors in *Australia* were substantially in the same form, but a large number of them did not contain the date of the meeting to be held in *London*.

The order of the Judge then contained the following provision: "That the creditors and contributories in *Australia* be at liberty to give proxies to persons to be designated by the Official Receiver for or against the scheme, or to any other persons entitled to vote at the meetings whom they may think proper; provided that such proxies be deposited at the offices in *Melbourne* or *Sydney* of the company not later than three days prior to the holding of the meetings in *London*, and that particulars of the proxies so deposited be communicated by telegram to the Official Receiver for use at the meetings."

Under this order the Official Receiver telegraphed to his representative in *Australia* the form of proxy to be sent to the shareholders and creditors in that country. Meetings were held in *Melbourne*, *Sydney*, *Adelaide*, and *Brisbane*, and the scheme was approved by them all, and proxies for the meetings in *London* were deposited in pursuance of the order. The particulars of these proxies were telegraphed to the Official Receiver and were counted at the *London* meetings. At the meeting of creditors in *London* 143 creditors, whose debts amounted to £192,139, voted for the scheme, and 33 creditors, whose debts amounted to £75,646, voted against it. The Australian proxies shewed that 5299 creditors, whose debts amounted to £2,436,832, voted for the scheme, and 126 creditors, whose debts amounted to £74,508, voted against it. The total of the debts represented was

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.

£2,779,125. Under these circumstances there was a sufficient statutory majority in favour of the scheme, but not without counting the Australian proxies.

The Official Receiver accordingly presented a petition for the sanction of the scheme, which was opposed by seven Scotch insurance companies, namely, the *North British and Mercantile*, the *Edinburgh Life*, the *Scottish Widows' Fund*, the *Scottish Union and National*, the *Life Association of Scotland*, the *Caledonian*, and the *Scottish Life*, who were creditors for £92,000, and other dissentient depositors to a large amount, representing debts amounting together with those of the Scotch companies to about £262,293.

The petition was heard before Mr. Justice *Vaughan Williams* on the 1st of July, 1893.

*Latham*, Q.C., and *Howard Wright*, for the Petitioner, the Official Receiver and Liquidator of the Bank, stated the facts, and asked the Court to sanction the scheme.

*Finlay*, Q.C., *Beale*, Q.C., and *C. E. E. Jenkins*; *Buckley*, Q.C., and *Warrington*; *Vernon R. Smith*, *Moloney*, and *A. J. Allen*, for the opposing creditors:—

The scheme is framed in the interest of the contributories rather than in that of the creditors. The assets being ample, the creditors have nothing to fear from a winding up by the Court. The *Joint Stock Companies Arrangement Act*, 1870, contemplates the preparation and sanctioning of a fair scheme, but does not authorize the sacrifice of the interests of creditors in favour of those of shareholders. The assent of the requisite number of creditors has not been obtained. How is the majority of creditors to be ascertained? The meetings held in *Australia* cannot be taken into account. The proxies given in *Australia* and telegraphed to this country cannot be accepted, and if they are not counted, the majority required by the Act has not been obtained. The proxies themselves are not good. They are not neutral, and they are so framed that they cannot without difficulty be altered so as to authorize voting against the scheme. Another objection is, that the proxies were not produced at the meeting. The proxy must be in writing, and it is the invariable practice, when

voting by proxy is allowed, to require the production of the proxy papers at the meeting. The old shareholders who take shares in the new bank may escape from liability by assigning their shares, unless the new bank is wound up within a year after the transfer.

Sir *H. Davey*, Q.C., and *Whinney*, for a committee of creditors in favour of the scheme, and *Cozens-Hardy*, Q.C., and *Swinfen Eady*, for other creditors supporting the petition :—

No one has been misled by the proxy paper, the form of which is sufficient to enable persons to vote for or against the scheme. The first question is whether the votes of the creditors in *Australia* were given in the proper manner. That depends on general considerations, on the constitution of the company, and on the order of the Court. Although the bank carried on business in *Australia*, it was an English company, and this is the principal winding-up. The case is therefore governed by the English Act of Parliament. Sect. 2 of the Act empowers the Court to order that a meeting of " the creditors or any class of creditors " " shall be summoned in such manner as the Court shall direct." Every creditor, whether in *Australia* or *England*, has a right to vote, and any meeting at which the Court had omitted to give the Australian creditors an opportunity of voting would be an idle form. The longer matters remain unsettled the more difficult it will be to put the bank on its legs again, and if any scheme is to be started to set it going again, it is necessary that what is to be done should be done quickly. This is a new case requiring new action. The Court was asked to order preliminary meetings to be held in *Australia*; but these were not meetings within the Act of 1870, but meetings called to ascertain the views of the Australian creditors. The Australians have never complained that they have had no opportunities of discussing the situation. It is a favourite argument of minorities to insist that they have not had an opportunity of full and adequate discussion. Sect. 2 of the Act of 1870 enables votes to be given by proxy; but it leaves it to the Court to say how the voting by proxy is to be effected. The fallacy seems to be that the proxy is the paper and not the person appointed to vote.

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.

There is no statute, rule, or practice requiring proxy papers to be deposited at the meeting. If the practice is to be laid down by analogy to Table A of the *Companies Act*, 1862, or to the *Companies (Winding-up) Act*, 1890, the persons who vote do not bring their proxy papers to the meeting, but such papers are deposited previously to the meeting. There is no provision even requiring the appointment of the proxy to be in writing. The question really is whether the proxy is duly authorized to act.

[VAUGHAN WILLIAMS, J.:—The proxy may be good here without going so far as to say that it need not have been in writing.]

At any rate, there is no authority that the paper must be produced at the meeting. If the voice of the Australian creditors was to be heard at all, it was necessary to provide that the deposit of proxy papers should be made in some other way. The order accordingly provided for their being deposited in *Australia*, and provision was made that the result of the proxy voting should be notarially cablegrammed to this country. Therefore, the only ground of objection is that the papers were deposited in *Australia* and not in *London*. But the Court, having regard to the circumstances, was entitled to provide special machinery for such a new case as this. Notwithstanding the time which has elapsed, no one has ventured to suggest that the notarial cablegram is incorrect. The Court was bound to ascertain the views of the Australian creditors. The English creditors are not a "class of creditors" within the meaning of sect. 2. The locality of certain creditors does not make them a class. The scheme is one which ought to be sanctioned. The Court has to see that the provisions of the statute have been complied with, that the majority has acted *bonâ fide*, that the minority has not been overridden by a majority having interests of its own clashing with those of the minority, and that the scheme is one as to which persons acting honestly, and viewing the scheme in the interests of those whom they represent, take a view which can be reasonably taken by honest men: *In re Alabama, New Orleans, Texas and Pacific Junction Railway Company* (1).

(1) [1891] 1 Ch. 213.

The Court may take judicial notice of the difficulty which now exists of raising money in *Australia*, and that to pay off creditors a large sum would have to be got out of assets for which the company cannot get a bid. The memorandum and articles can be so framed as to prevent the old shareholders escaping from their liabilities.

*Beale*, in reply.

VAUGHAN WILLIAMS, J.:—

This is a petition by which I am asked to sanction a scheme which, it is said, the creditors of the bank have approved at a meeting held in pursuance of an order made by me under the *Joint Stock Companies Arrangement Act*, 1870, on the 18th of May, 1893. When that order was applied for, I told the Applicants that they took it at their own risk. It was quite obvious that the order asked for was a novel order, and one which was intended to meet a state of things which, as far as I know, had not previously arisen. One obvious difficulty was that a great part—in fact the majority—of the creditors of the bank were not resident in this country, but in the Australian colonies. The meeting of creditors which it was proposed to hold was a meeting at which it was quite plain that all creditors of the bank had a right to be present and to express their views by their vote; but it was urged that it would be quite useless to attempt to carry the proposed scheme into effect if the meeting was postponed until instruments of proxy from *Australia* had been sent to this country; and it was suggested that this difficulty might be got over in this way—that telegrams might be sent to the colonies stating the substance of what was proposed to be done in *England*, and putting before the Australian creditors the very scheme which it was proposed to submit at the meeting, that forms of proxy might be telegraphed and supplied to the Australian creditors by an agent of the Official Receiver in *England*, that the creditors in *Australia* could execute those proxies in favour of persons in *England*, and that when the meeting came to be held these Australian creditors would be able to be present at the meeting by means of these proxies. And, in order that it might not be

said that the Australian creditors were voting without having in the colony any discussion of the scheme submitted to the creditors, it was suggested that my order should direct the holding of subsidiary meetings in the colonies at which the matter could be discussed before the Australian creditors executed the proxies sent to them for execution. I had very considerable doubt whether I had jurisdiction to make the order asked for, but I did make it. It was an order which had been drafted with great care, and was as well drafted and as well adapted for the purpose for which it was intended as could be—provided only that I had the jurisdiction to make the order at all.

When I came to consider whether I had jurisdiction to make the order, I could not, it seemed to me, but take into consideration what I may call the tide of authority. The decisions of twenty years or a quarter of a century ago shew the strongest possible feeling that one ought never to deprive any creditor of his common law right, and ought never to require him to give up anything to which he is by law entitled, at the will of the majority of the creditors, unless all the steps which are provided by the statute have been most carefully followed, and the tendency was to construe in the strictest possible manner any statute which gave to the majority of creditors the right to impose their will upon the minority. But I do not think that anyone who has followed the subsequent decisions—whether under the *Companies Acts* or the *Bankruptcy Acts*—will hesitate to say that the tendency of late has been rather to favour the power of the majority of creditors to impose their will upon the minority and to construe the legislation upon the subject with some freedom. In fact, whatever the subject-matter of legislation, the tendency of the Courts, rightly or wrongly, has been to construe Acts of Parliament with freedom, and to approach nearer to legislation by construction than the Judges in former days used to consider themselves entitled to do. I therefore feel that I ought to construe this Act of Parliament freely, and to try, as far as I can, to adapt it to the particular necessity which has arisen in this case.

The scheme is objected to on two grounds. Those two grounds divide themselves into a number of minor heads; but the two

main categories of objection are as follows: First, there is the legal objection that the scheme has not been adopted by the proper majority (that is to say, by a majority of three-fourths in value, because, if you take the creditors in the *United Kingdom* only, you have not got that majority, and it is admitted that that is so) and that although if you include the Australian creditors who claim to have been present by proxy you have got the necessary majority, as a matter of law those persons have no right to be counted as having been present by proxy at the meeting. The second category of objections is that the scheme is not really a scheme of arrangement or a scheme of compromise at all, but that what it does is merely to take away from creditors who, on the balance-sheets presented to the creditors, are entitled to a large payment in cash—to a payment in cash which would amount to a large percentage of their debt—the right to receive that payment, and to substitute for it a payment of nearly 25 per cent. coupled with the right to receive annuities, more or less secured, and more or less in priority to creditors and shareholders of the new bank proposed to be constructed on the ruins of the old bank.

I will deal with the two classes of objections separately. First, as to the legal objection: Before reading the words of the Act of Parliament I should like to consider a little what it is, and where its place is amongst Acts of Parliament. It seems to me that the *Joint Stock Companies Arrangement Act*, 1870, is only one in a series of Companies Acts. It is a unit going to make up the statutory total which governs the law of companies in this country, and I treat it as supplemental, therefore, to the principal Act of 1862, and I agree that in all probability it is right to treat it as an enlargement of the provisions of the 159th section of the Act of 1862. That section provides as follows: "The liquidators may, with the sanction of the Court, where the company is being wound up by the Court or subject to the supervision of the Court, and with the sanction of an extraordinary resolution of the company where the company is being wound up altogether voluntarily, pay any classes of creditors in full, or make such compromise or other arrangement as the liquidators may deem expedient with creditors or persons claiming to be creditors, or

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
Vaughan Williams, J.

persons having or alleging themselves to have any claim, present or future, certain or contingent, ascertained or sounding only in damages against the company, or whereby the company may be rendered liable." But although I regard the Act of 1870 as supplemental to the *Companies Act* of 1862, and, perhaps, to the section I have read, I would point out that it is plain that the Act of 1870 is really an Act which relates to liquidation, and which substitutes in form a mode of liquidation for that which prevails under the general provisions of the Act of 1862. The arrangement to be submitted to the creditors is an arrangement between "a company which is, at the time of the passing of this Act or afterwards, in the course of being wound up," and, therefore, in construing sect. 2 of the Act of 1870, one should bear in mind that the Act is not only a complement to the *Companies Act*, 1862, but is also a mode of liquidation. I mention that because it furnishes, to my mind, one line for the construction of the statute, and that is this, that, in construing the statute, one must bear in mind the principles upon which liquidations are conducted, in different countries and in different Courts, of one concern. One knows that where there is a liquidation of one concern the general principle is—ascertain what is the domicil of the company in liquidation; let the Court of the country of domicil act as the principal Court to govern the liquidation; and let the other Courts act as ancillary, as far as they can, to the principal liquidation. But although that is so, it has always been held that the desire to assist in the main liquidation—the desire to act as ancillary to the Court where the main liquidation is going on—will not ever make the Court give up the forensic rules which govern the conduct of its own liquidation.

Having said that, I propose to read the section. [His Lordship read sect. 2 of the *Joint Stock Companies Arrangement Act*, 1870, and continued as follows:—]

It seems to me that the right course to take under the section may vary according as the Court has to deal with a principal or ancillary liquidation. According to my view, I have here to deal with a principal liquidation, and, that being so, I am bound to make provision for creditors in all parts of the world

coming in and being heard if they think fit. When once one has arrived at that conclusion, the question is how such provision is to be made. It is quite plain that the creditors who are abroad cannot be expected to come and be present personally. They must therefore be present by proxy. One cannot doubt that, in ascertaining what is the meaning of being present by proxy, and how a creditor is to be present by proxy, one must have regard to the *Companies Acts* generally.

Now, under the *Companies Acts* generally, there can be, to my mind, no doubt that the authority of the proxy must be in writing, and I consider it as quite plain that when this section speaks of being present by proxy, it means a proxy authorized in the way pointed out by the previous statutes and the practice under the *Companies Acts*—that is, by an instrument in writing. There was no difficulty in enabling the creditors abroad to execute such proxies, because, with the advantage of the cable telegraph, the direction to hold the proposed meeting could be communicated to them, and a form of proxy sent to each creditor entitled to vote. But it was said further, not only that the instrument of proxy must be in writing, but that such instrument must be produced at the meeting. Proxies by creditors are no new thing. They have been used in all sorts of legislation relating to the administration of estates, and no doubt, generally speaking, the instrument of proxy (whether it has or has not been previously deposited in Court or with an officer named by the Court) is produced at the meeting. But am I bound by such a practice in a case where its adoption would defeat the scheme, and perhaps damage the interest of creditors generally? I have come to the conclusion that I am not bound by that practice, that there is no statutory practice laid down, and that there is no rule requiring the production of the proxy at the meeting. It is true that sect. 2 of the Act of 1870 says only that the "meeting of such creditors or class of creditors shall be summoned in such manner as the Court shall direct," and does not say that the voting shall be conducted or that the proceedings shall be held in such manner as the Court may direct; but I think that the Court has an inherent power to direct the mode in which meetings shall be held, and the mode in which proxies

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
Vaughan Williams, J.

shall be evidenced, and to determine all such questions as whether it is necessary that the proxy should be produced at the meeting.

On the whole, therefore, I have come to the conclusion that the legal objection fails. I think that I had jurisdiction to make the order which I have made, and that such order has been properly carried out. Divers minor objections have been made to the mode in which the order has been carried out, but I have arrived at the conclusion that I ought not to give way to those objections. Therefore I hold as a fact that this scheme has been agreed to by a majority in number representing three-fourths in value of the creditors, present either in person or by proxy.

Having arrived at that conclusion, there still remain the very grave objections which have been urged against this scheme. I confess that I have very little belief in creditors of a company being able to look after their own interests. It is a matter of history that—never mind what safeguards may be suggested, never mind what statutory precautions may be given—the creditors of an individual bankrupt have never been roused to look after their own interests. One Lord Chancellor after another has a pet scheme which he thinks will really rouse the creditors to a sense of what is due to themselves, and so far educate them as to make it safe to entrust them with the management of their own affairs; but experience shews that creditors, whether of a company or of an individual man, never can be trusted to take care of themselves. The disjected forces of individual creditors are a mere nothing as against the consolidated forces of those who are often deeply interested in bringing about an adoption of the scheme which is presented to the creditors. Schemes are presented to the creditors in bankruptcy and in the liquidation of companies more often than not, I have no hesitation in saying, for the purpose of veiling some wrong that has been done, or for the purpose of serving some interest which is wholly antagonistic to the interest of the creditors. If any one takes the trouble to look through a list of the phœnix companies which have been based upon a reconstruction after the failure of some big bank or company, and to

put down on the one side the number of such phœnix companies which have been successful, and on the other side the number of such companies which have been failures, one side will be full and the other side will be nearly empty, and I say that for that reason, speaking for myself, I am not at all disposed to think that the creditors are able to take care of themselves, or ready to suppose that when the Legislature threw upon a Judge the duty of sanctioning the scheme agreed to by the creditors, he, in the absence of fraud, or in the absence of voting obviously for oblique reasons, was practically bound to sanction the scheme adopted by the creditors.

I think that the Judges who administered the law shortly after the passing of the *Bankruptcy Act*, 1869, shewed a much truer perception of the weakness of creditors and of the intention of the Legislature. They by no means adopted a scheme simply because a majority of the creditors voted in favour of the scheme and there was no affirmative evidence of any corruption or any wrong motive of voting. They took the scheme and looked at it, and ascertained from broad grounds whether it was plainly for the benefit of the creditors; and if it appeared not to be for the benefit of the creditors, or if the benefit to accrue to the creditors was unintelligible and difficult to grasp, the scheme was never sanctioned or approved. But I am well aware that under the *Companies Acts* it has always been different. Under the *Companies Acts* greater attention has been given to the wishes of the creditors, and I feel that the very words of some of the sections of the *Companies Acts* as to the regard to be had to the wishes of creditors justify the conclusion that the Legislature may have meant something more with regard to the wishes of creditors in the case of companies than it was held to have meant with regard to individual bankrupts under the *Bankruptcy Act*. At all events, be that how it may, I am of opinion that I have no choice but to follow the rule that has been laid down by the Court of Appeal in *In re Alabama, New Orleans, Texas and Pacific Junction Railway Company* (1). I do not now, any more than I did in the course of the argument, agree with the suggestion made by Sir *Horace Davey* as to the meaning of the

(1) [1891] 1 Ch. 213.

C. A.
1893

*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.

Vaughan Williams, J.

following words of Lord Justice *Lindley* (1): "The Court must look at the scheme, and see whether the Act has been complied with, whether the majority are acting *bonâ fide*, and whether they are coercing the minority in order to promote interests adverse to those of the class whom they purport to represent." Sir *Horace Davey* suggested that the Courts had no option or discretion but to approve the scheme, unless there was evidence which justified them in saying that the majority were not acting *bonâ fide*, or were "coercing the minority in order to promote interests adverse to those of the class whom they purport to represent"—a passage which Sir *Horace Davey* seemed to think was practically identical in effect—a mere alternative statement —with that immediately preceding, "whether the majority are acting *bonâ fide*." But it seems to me that the words of Lord Justice *Lindley*, which immediately follow those which I have read, shew that that is not what Lord Justice *Lindley* meant. He proceeds as follows: "And then see whether the scheme is a reasonable one or whether there is any reasonable objection to it, or such an objection to it as that any reasonable man might say that he could not approve of it." Then Lord Justice *Lindley*, when he proceeds to deal with Mr. *Rigby's* argument in detail, plainly declines to treat the matter as resting upon the mere basis that the resolution of the creditors, not having been shewn to be *malâ fide*, leaves him no discretion. He goes on to deal with the question of whether the scheme is a reasonable scheme or not, and says (2), "Therefore, if you look at it from a commercial point of view, and not from a lawyer's point of view, you are in a decidedly better position by this scheme than you would be if things were left alone. That is the view of the majority. Now can anybody say that this is not a reasonable view for the majority to take? Whether they have other interests or not, I think we ought to see whether anything can be said against the reasonableness of the view taken by the majority of the first debenture-holders, without reference to whether they are second debenture-holders, or whether they are shareholders or not. Can anybody say that this scheme is not in a commercial sense extremely advantageous to them, having

(1) [1891] 1 Ch. 239. (2) [1891] 1 Ch. 242.

regard to their position?" Then Lord Justice *Bowen* and Lord Justice *Fry* deal with the matter in much the same way, with this exception, that it is quite obvious that they think that the *onus* of shewing that the scheme is unreasonable is rather on those that object to the scheme than on the majority of the creditors who have supported it. These two judges seem to me to hold that the duty of the Court is to approve of the scheme, unless there is something before it which shews it either that the scheme was not made in good faith, or that it is a scheme that, so far from being fair and reasonable, is one that an intelligent and honest man, acting alone in respect of his interests, could not approve of.

I have had very considerable doubt upon this point. It does seem to me that there are very serious objections to this scheme. I am not at all sure that if I had been a creditor I should have voted in favour of the scheme. It seems to me that there are large available liquid assets which might be paid over immediately to the creditors, but which are appropriated really to the establishment of a new bank. But then it is said that the majority of creditors clearly think (and the expert witnesses whose affidavits have been read to me clearly think) that this available sum cannot probably afford more than a dividend of some 6*s*. 8*d*., or it may be 10*s*., in the pound to creditors; and it is said that if this scheme is adopted—if this new bank is established—the illiquid assets can be gradually realized, and that the result will be that the creditors, if they do not get directly from the bank 20*s*. in the pound, will get annuities and deferred payments which will be saleable in the market, and which will eventually give them the equivalent of the remaining 13*s*. 4*d*., or 10*s*. in the pound, as the case may be. I am not prepared to say, having regard to the facts and the decision in the case I have referred to, that the majority of creditors have not any right to impose this scheme upon the minority—that is to say, any right to insist upon the creditors giving up a portion of cash immediately payable to them with the view of obtaining a better realization and a larger ultimate payment. Therefore, I have come to the conclusion that I ought to approve this scheme.

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
Vaughan Williams, J.

I only wish to say further, that I have had a considerable doubt whether the information which was put before the meeting was information sufficient to enable them to deal properly with the matter. The one incident of the £900,000 debt due from two debtors, as to which the creditors apparently were so little regardful of their interests that they did not care to make any inquiries, is sufficient to shew how very uncertain the information was which was laid before the creditors. The statements made before me to-day go to shew that this uncertainty of statement, this unreliability of estimate of assets, is no new thing of to-day with this bank. It seems to have gone on for years, appearing, it may be honestly, but certainly appearing in the balance-sheets in a most misleading way, creating a fictitious reserve fund which had no existence whatever except on paper. I have considerable doubt whether I ought not to send back this scheme for reconsideration by the creditors with the fuller information; and that is a course which I should certainly have preferred here; but I am prevented from so doing because I feel that to postpone a scheme of this character is to defeat it. Under those circumstances, although I think that much more information could and ought to have been placed before the creditors, at the same time I cannot quite bring myself to refuse my sanction to this scheme.

But although I give my sanction to the scheme, it is only a provisional sanction; I shall make no final order, and I shall give no direction whatever to the Official Receiver as to handing over the assets of the old bank to the new bank, until I am satisfied as to the constitution of the new bank, as to its articles of association, and as to its corporate existence. Therefore, all that my decision on the petition amounts to to-day is this, that I am prepared to give effect to the scheme, when I have been satisfied as to the proper constitution and corporate existence of the new company, under conditions which are really suitable for carrying this scheme into effect.

F. E.

C. A.

From this order the Scottish companies appealed. The appeal came on to be heard on the 12th of July, 1893.

*Finlay*, Q.C., *Beale*, Q.C., and *C. E. E. Jenkins*, for the Appellants:—

The *Joint Stock Companies Arrangement Act*, 1870, s. 2, gives power to a majority of creditors to bind a minority, but that is only a power to bind the dissentients by resolutions passed with a view to the benefit of the creditors as such. Here the company is solvent; so the creditors will not be benefited by the scheme. Then we say that the proxy papers were not neutral, as they ought to have been; they were "leading," they were filled up as proxies authorizing a special person therein named to vote "for" the scheme with a marginal note stating that if the creditor wished to vote against the scheme he must strike out "for" and substitute "against." Moreover, if the creditor wished to vote against the scheme and the marginal note were strictly followed, the paper would be made nonsense, for it would run, to vote "against the scheme with or without such modifications, &c." A voter who was not very intelligent would find it difficult to adapt the form. The proxy papers contain in substance a strong official recommendation to vote for the scheme, and are in violation of the 13th and 14th rules of the *Companies (Winding-up) Act*, 1890 (53 & 54 Vict. c. 63). Some of the proxies are bad under the *Stamp Act*, 1891, s. 80, because the time at which the meeting is to be held is not specified. As regards all the Australian proxies, a cablegram stating what proxies there are is an improper mode of voting. Such a proceeding obliges you to assume that the proxies are all good. The Australian creditors were not present in person or by proxy at the meeting, for the proxies are all at *Melbourne* or *Sydney*, and the chairman cannot test them as he ought to do.

[A. L. SMITH, L.J.:—Suppose only 100 votes wanted, and 6000 proxies are sent in?]

That will not do. The chairman must determine at the time whether the votes are good; he cannot go on the principle that out of 6000 proxies there must be at least 100 good ones. Sect. 80 of the *Stamp Act*, 1891, makes it necessary that the proxies should be produced. We submit that the Judge had no jurisdiction to allow voting by telegram. The proceedings

in *Australia* shew that the voters there were not actuated by business considerations, but by what they call patriotic motives, and votes given from motives of that kind ought not to bind a minority who look at the matter on business grounds. *In re Alabama, New Orleans, Texas and Pacific Junction Railway Company* (1) does not lay down any such principle as Mr. Justice *Vaughan Williams* deduced from it. His Lordship puts the case on very much the same footing as an application for a new trial on the ground that the verdict is against the evidence—where a new trial is not to be granted unless the verdict is such as twelve reasonable men could not come to. The Court was not intended to confirm the scheme unless it was outrageously unreasonable, but to exercise its own judgment as to whether the scheme is reasonable, and its sanction was made necessary in order that an unreasonable scheme might not be forced on a dissentient minority. The scheme places the creditors in a worse position than they would be in under a winding-up, and is not a reasonable one. They get nothing but interest, and are in fact made annuitants where there are assets enough to pay them in full.

*Latham*, Q.C., and *Howard Wright*, for the Official Liquidator, took no part in the argument.

Sir *H. Davey*, Q.C., and *Whinney*, for a committee of creditors in favour of the scheme; and *Cozens-Hardy*, Q.C., and *Swinfen Eady*, for other creditors supporting the same view:—

The vast majority of the creditors approve of this scheme. The Appellants leave out of sight that the shareholders are English, the bulk of the creditors Australian. They also leave out of sight that one of the most valuable assets of the bank is the goodwill of the business, which may recover itself if freed from the immediate burden of creditors pressing for payment. The Appellants also leave out of sight that the bulk of the assets consists of property in *Australia*, which in the present state of things there could not be realized without a ruinous sacrifice. If this bank is not reconstructed probably the other

(1) [1891] 1 Ch. 213.

Australian banks which have stopped payment cannot be, and the Australian creditors are more likely to come to a sound conclusion as to the result of that than the English ones are. The result of a general failure to reconstruct would be to throw an enormous amount of property on the market. It has been urged that this is a scheme to enrich the shareholders at the expense of the creditors; but it is in fact a scheme to utilize the goodwill of the bank for the benefit of both. The creditors will get interest from the first. The scheme is stamped with honesty by its not containing what the Scotch creditors want—an undertaking to pay off the debts by a small number of instalments. The business could not be carried on with that undertaking—the credit of the bank would be gone—the Government of *Victoria* would probably no longer keep their account there. The dissentient creditors complain that they only get £4 per cent. instead of their money down; but there is reason to believe that the perpetual £4 per cent. would be worth £100 in the market, for public confidence in the bank is not wholly gone, and there is reason to believe that it may carry on business successfully. The dissentients assume that they can get 20*s.* in the pound—but when? A large portion of the assets consists of sheep-walks, and if everybody is wanting to sell sheep-walks and nobody has money to buy them, payment of the debts in full under a winding-up would be delayed indefinitely, if it ever took place at all.

With respect to the validity of the votes of the Australian creditors, there is nothing in the Act of 1862 or in that of 1870 to suggest that the written authorities are to be produced at the meeting. The "proxy" is the agent, not the written authority; and if the agent is properly appointed there is no necessity for proving his authority at the meeting. The written authorities are directed by the Act to be deposited at the office of the company. This was done in the present case: the authorities of the Scotch creditors were deposited at *Edinburgh*, and those of the Australian creditors at the principal cities there. They are deposited for the purpose of verification, and the Australian authorities could only be verified in *Australia*. It would be most unfair if the Australian creditors, who are the

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.

great majority of the whole body, were to be overridden by the English creditors; and, on the other hand, if the Court had waited for the Australian proxy papers to be sent to *England* the object of the scheme would have been frustrated. The form of the proxy papers was not misleading if read with ordinary intelligence, nor contrary to the 13th and 14th rules of the *Companies (Winding-up) Act,* 1890, which apply only to meetings summoned under sect. 6 of that Act. With respect to the *Stamp Act,* the objection is worthless, for the proxies might be made for no particular meeting and stamped with a 10*s.* stamp, and by sect. 15, sub-sect. 3, of the *Stamp Act,* 1891 (54 & 55 Vict. c. 39), such proxy, if executed out of *England,* may be stamped after it is sent to *England.* [They also referred to *Buckley* on the *Companies Acts* (1).]

*Finlay,* in reply.

LINDLEY, L.J.:—

This is an appeal from an order made by Mr. Justice *Vaughan Williams* which has not yet been drawn up, but which may be shortly stated to be the approval provisionally of a scheme for reconstructing this *English, Scottish, and Australian Chartered Bank.* I say provisionally, because, in the absence of the formal order, I must be guided by what I see in his judgment, in which he says: "I shall make no final order, and I shall give no direction whatever to the Official Receiver as to handing over the assets of the old bank to the new bank, until I am satisfied as to the constitution of the new bank, as to its articles of association, and as to its corporate existence. Therefore, all that my decision on the petition amounts to to-day is this, that I am prepared to give effect to the scheme, when I have been satisfied as to the proper constitution and corporate existence of the new company, under conditions which are really suitable for carrying this scheme into effect."

The Appellants in this case are creditors of the bank which I have mentioned to the extent of £92,000. They are Scotch companies who have advanced money by way of deposit to this

(1) 6th Ed. pp. 488, 631, 744, 752.

bank. The bank itself is a chartered bank; it is not registered under the *Companies Act*, 1862. It has a nominal capital of a million and a half; it has £900,000 paid up, and there is a reserve liability to the same amount. It stopped payment on the 12th of April last. A petition to wind it up was presented on the 13th of the same month; and on the 26th an order was made and a provisional liquidator was appointed. On the 18th of May an order was made for meetings to be held, and I will call attention to that presently.

The constitution of the bank is important. The bulk of the shareholders are English people—they are not Australians at all; and that is a matter which strikes me as extremely important in considering some of the objections which have been made to the votes of the Australian creditors. It has been represented that they have been induced by feelings of patriotism and a desire to support this bank and to reconstruct it and make a strong bank. That observation would have twice the force it has if these people were shareholders. But they are not: they are creditors.

The liabilities of this bank are stated very succinctly in the table which is attached to the petition. The main liabilities are on the deposit and current accounts, which come to nearly five million pounds. The assets are set down on the other side, and the main assets—the assets which have to be got in some way or other in order to pay these liabilities—are represented as bills receivable, loans, and advances against securities, £5,300,000. Now everything depends on the realization of those assets. The bank is represented to be solvent. The table which is before me shews that it is, and it shews further that there is a good margin of excess of assets over liabilities; and that if the assets could be realized there would be enough and more than enough to pay 20*s.* in the pound. Further, the affidavits shew that if these assets could be realized—I do not say now, but if times got better and the assets were realized and the creditors could wait—they might get their money in the long run. But the state of things is very anomalous in *Australia.* It is impossible to shut our eyes to the fact that this is not the only bank that stopped payment—I will not say broke, but stopped payment—and the consequence is that it is perfectly impossible at this present

C. A.
1893
*In re* English, Scottish, and Australian Chartered Bank.
Lindley, L.J.

moment to realize these assets at anything like 20*s.* in the pound. The assets consist of loans made on land, sheep-farms, and similar property. There is such an enormous quantity of that kind of property on the market, and there are so few purchasers of that property, that if it is brought on the market rapid realization is utterly hopeless.

Now, in considering this or any other scheme for paying creditors less than 20*s.* in the pound, it is absolutely necessary not only to look at the scheme, but to look at the other side. Where is the money to come from? We start with this, that the creditors ought to be paid 20*s.* in the pound. If it is there for them to have, they ought to have it at the expense of the shareholders; there is no question at all about that. But can they get it? If they cannot get it, then it becomes necessary to consider and decide upon some alternative scheme for giving them less than that to which they are entitled.

In this case I come to a conclusion upon the evidence upon two or three points which I think are perfectly plain. The first point is this. It is agreed on all hands, and there is no controversy about it, that anything like sudden realization, anything like a forced sale, would be utterly ruinous to the creditors. They would incur so large a loss that any reasonable alternative scheme would appear better than that to the great bulk of them. I think the evidence also shews that time may be usefully gained in one way, and one way only, and that is by keeping the bank going in some way or other. If you cannot keep the bank going, that alternative scheme of terminable payments will fall through. It will not be a practical scheme unless the bank is kept going. Having arrived at that, there then come the various methods of keeping the bank going, and the scheme before us is one. Whether it is the best one is another matter altogether. I shall say something more about that presently. But I do not think that it is just to say that this is a mere scheme to resuscitate the bank and not pay the creditors. If I thought that was the scheme, I should negative it without the slightest hesitation; but I think the true view of it is this, that it is a scheme for paying the creditors by resuscitating the bank, and I do not believe the creditors can

get paid in any other way. That is the result to my mind from the perusal and study of this evidence. Now, having arrived at that conclusion, I shall say no more about the so-called patriotism of the Australians. I dare say they are patriotic, but here they are creditors and nothing else. They are not shareholders. They care nothing about the bank except for the purpose of getting their money out of it, and although they take different views from the Scotch creditors and may be influenced, for anything I know, by a desire to keep the bank going, yet the object of keeping the bank going in their idea is to get their money, and beyond that there is no reason to suppose they care anything at all about the bank.

That being the broad conclusion from the facts, I come now to consider the objections which have been made to this scheme and to the function of the Court. The scheme has been carried by an enormous majority of creditors if they are all counted. But that is not enough. The *Joint Stock Companies Arrangement Act* of 1870 requires, not only that a scheme of this kind shall be passed by three-fourths of the creditors, but it requires something more. Sect. 2 says this: "Where any compromise or arrangement shall be proposed between a company which is, at the time of the passing of this Act or afterwards, in the course of being wound up, either voluntarily or by or under the supervision of the Court, under the *Companies Acts,* 1862 and 1867, or either of them, and the creditors of such company, or any class of such creditors, it shall be lawful for the Court, in addition to any other of its powers, on the application in a summary way of any creditor or the liquidator, to order that a meeting of such creditors or class of creditors shall be summoned in such manner as the Court shall direct, and if a majority in number representing three-fourths in value of such creditors or class of creditors present either in person or by proxy at such meeting shall agree to any arrangement or compromise, such arrangement or compromise shall, if sanctioned by an order of the Court, be binding on all such creditors or class of creditors, as the case may be, and also on the liquidator and contributories of the said company."

Now the duty of the Court in acting upon that section has been

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
Lindley, L.J.

discussed and explained more than once, and I do not know that I can usefully add anything to what I said before, and to what my Brothers *Bowen* and *Fry* said before, in the case of *In re Alabama, New Orleans, Texas and Pacific Junction Railway Company* (1). I adhere to what I said there, and I will read a short passage from my judgment (2): "What the Court has to do is to see, first of all, that the provisions of that statute have been complied with; and, secondly, that the majority have been acting *bonâ fide.* The Court also has to see that the minority is not being overridden by a majority having interests of its own clashing with those of the minority whom they seek to coerce. Further than that, the Court has to look at the scheme and see whether it is one as to which persons acting honestly, and viewing the scheme laid before them in the interests of those whom they represent, take a view which can be reasonably taken by business men. The Court must look at the scheme, and see whether the Act has been complied with, whether the majority are acting *bonâ fide,* and whether they are coercing the minority in order to promote interests adverse to those of the class whom they purport to represent; and then see whether the scheme is a reasonable one or whether there is any reasonable objection to it, or such an objection to it as that any reasonable man might say that he could not approve of it." Lord Justice *Fry* expressed himself to the same effect, in somewhat different language. He said (3): " Under what circumstances is the Court to sanction a resolution which has been passed approving of a compromise or arrangement? I shall not attempt to define what elements may enter into the consideration of the Court beyond this, that I do not doubt for a moment that the Court is bound to ascertain that all the conditions required by the statute have been complied with; it is bound to be satisfied that the proposition was made in good faith, and, further, it must be satisfied that the proposal was at least so far fair and reasonable, as that an intelligent and honest man, who is a member of that class, and acting alone in respect of his interest as such a member, might approve of it. What other circumstances the Court may take into consideration I will not attempt to forecast." Now, it

(1) [1891] 1 Ch. 213. (2) [1891] 1 Ch. 238.
(3) [1891] 1 Ch. 247.

is quite obvious from the language of the Act and from the mode in which it has been interpreted, that the Court does not simply register the resolution come to by the creditors or the shareholders, as the case may be. If the creditors are acting on sufficient information and with time to consider what they are about, and are acting honestly, they are, I apprehend, much better judges of what is to their commercial advantage than the Court can be. I do not say it is conclusive, because there might be some blot in a scheme which had passed that had been unobserved and which was pointed out later.

While, therefore, I protest that we are not to register their decisions, but to see that they have been properly convened and have been properly consulted, and have considered the matter from a proper point of view, that is, with a view to the interests of the class to which they belong and are empowered to bind, the Court ought to be slow to differ from them. It should do so without hesitation if there is anything wrong; but it ought not to do so, in my judgment, unless something is brought to the attention of the Court to shew that there has been some material oversight or miscarriage.

Having made these observations, I pass on to consider what the objections made to this scheme are. First of all, I will take the objections which I will refer to as technical—that is, the objections relating to the proxies. I have read from the statute words which shew that there must be three-fourths of the creditors present in person or by proxy. "Proxy" there means some agent properly appointed. Now, in this particular case the Australian creditors were present by the person whom they had, in fact, appointed. He was there. They were therefore present, not in person of course, but they were present by proxy. Then comes this difficulty, that the proxy papers—the authority empowering their agent to appear and vote for them—were not in this country. That particular difficulty was foreseen and so was provided for by that part of Mr. Justice *Vaughan Williams'* order to which I am about to refer. I do not mean the order appealed from, but the order convening the meeting. The position of affairs is peculiar. This bank had branches—in fact, main offices —in various places in *Australia, Sydney, Melbourne, Adelaide,* and

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
Lindley, L.J.

*Brisbane,* and they had depositors, the great bulk of whom were Australians, and they had to be consulted as to what was to be done. Time was important, and Mr. Justice *Vaughan Williams,* in the order convening the meeting, put in this clause: "It is ordered that the service by post of the circular letter, with form of proxy and copy scheme, shall be deemed to be good service, as if the same had been posted and sent in the ordinary course of post seven days before the day appointed for the meeting." Then comes a special provision which is quite novel (I do not think any of us have seen it before) and which is extremely ingenious, and the question is whether the learned Judge exceeded his powers by putting it—"And it is ordered, that the creditors be at liberty to vote at the said meetings personally or by proxy, and that the creditors or contributories in *Australia* be at liberty to give proxies to persons to be designated for the purpose by the applicant"—that is, by the Official Receiver—" for or against the scheme, or to any other person entitled to vote at the meeting whom they may think proper, provided that such proxies be deposited at the office of the company in *Melbourne* or *Sydney* not later than three days prior to the holding of the meetings in *London,* and that particulars of the proxies so deposited be communicated by telegram to the Official Receiver for use at the said meetings."

Now, that is an entirely new form of order. I need hardly say that it is adapted to the necessities of the time—it is ingeniously using the improved methods of communication by telegraph, which it would be folly to shut out and not use if you can do it. The question is now whether the learned Judge had power to make such order. That turns upon the power conferred upon him by the statute under which he convenes meetings, and the most important section with reference to this particular point is sect. 91 of the *Companies Act* of 1862, coupled with the section of the Act of 1870, which I have already read. Sect. 91 of the Act of 1862 says this: "The Court may, as to all matters relating to the winding-up, have regard to the wishes of the creditors or contributories, as proved to it by any sufficient evidence, and may, if it thinks it expedient, direct meetings of the creditors or contributories to be summoned, held, and conducted

in such manner as the Court directs, for the purpose of ascertaining their wishes, and may appoint a person to act as chairman," and so on. The Act of 1870, sect. 2, which has to be read with the Act I have just read, enables the Court, "in addition to any other of its powers, on the application in a summary way of any creditor or the liquidator, to order that a meeting of such creditors or class of creditors shall be summoned in such manner as the Court shall direct." And then it goes on with the provision about the majority which I have before referred to.

Now, it appears to me, under the authority of sect. 91 of the Act of 1862, this novel form of order is not beyond the power of the Judge. He had power to direct that these proxies should be filled up in *Australia*, that they should be deposited in the offices which are mentioned, and that the result of the proceedings might be acted upon in this country even before the proxy papers came over. I think it was within his power to do it, and, being within his power to do it, I do not hesitate to say it is a power with which we should not dream of interfering. That is what was done. Therefore, so far as that somewhat important point is concerned, it appears to me there was nothing irregular in the proceedings at this meeting.

But then it is argued that these Australian proxy papers and the votes given upon them ought all to be rejected because of the *Stamp Act*. Now, the *Stamp Act* which is in question is the *Stamp Act* of 1891 (54 & 55 Vict. c. 39), and the section relating to the powers of attorney and proxy papers is sect. 80. That must be construed with reference to the schedule which imposes the duties. I will read the schedule first: "Letter or Power of Attorney, and Commission, Factory, Mandate, or other instrument in the nature thereof. (1.) For the sole purpose of appointing or authorizing a proxy to vote at any one meeting at which votes may be given by proxy, whether the number of persons named in such instrument be one or more . . . one penny." Then come some sub-clauses which are not important, and clause 6 is: "Of any kind whatsoever not hereinbefore described . . . 10 shillings." Now, reading sect. 80 we find that sub-sect. 1 enables you to use a proxy paper for one meeting with a penny stamp upon it, and then sub-sect. 2 says: "The

duty of one penny may be denoted by an adhesive stamp, which is to be cancelled by the person by whom the instrument is executed"—that is, the person who is intending to vote by proxy—"and a letter or power of attorney or voting paper charged with the duty of one penny is not to be stamped after the execution thereof by any person." Therefore, if these were proxies requiring penny stamps they would be all bad. There being no penny stamp upon them, they having been signed without a stamp upon them, the Act is imperative that the duty of a penny is not to be stamped after the execution thereof by any person. Sub-sect. 3 runs on and makes it still plainer: "Every person who makes or executes, or votes, or attempts to vote, under or by means of any such letter or power of attorney or voting paper, not being duly stamped, shall incur a fine of £50, and every vote given or tendered under the authority or by means of the letter or power of attorney or voting-paper, shall be void." Therefore it is quite plain that if it turned on the penny stamp section the whole of these proxies would be bad. It is said they do not turn on the penny stamp section, but they turn on the 10*s.* stamp section, and if so, then the objection fails. It seems to me that that is the true answer to this objection, bearing in mind that these proxies were not sent out with a penny stamp upon them; they might have been if there had been time, and then they would have been all right; but they are sent out without any stamp at all. They are instruments intended to be executed in a foreign country. The penny stamp not being applicable, they must have a 10*s.* stamp; but the moment you get out of the stringency of the penny stamp section you come within sect. 15, which relates to the stamping of instruments executed abroad. Sect. 15 says this: "Save where other express provision is in this Act made, any unstamped or insufficiently stamped instrument may be stamped after the execution thereof"—that does not apply to the penny stamp, because there is an express provision to the contrary; but it does apply to the 10*s.* stamp, as to which there is no express provision to the contrary. Then, passing on to sub-sect. 3 of sect. 15, "Provided, that save where other express provision is made by this Act in relation to any particular instrument;

(*a*) Any unstamped or insufficiently stamped instrument which has been first executed at any place out of the *United Kingdom*, may be stamped, at any time within thirty days after it has been first received in the *United Kingdom* on payment of the unpaid duty only." Therefore, it appears to me that the answer given to this stamp objection, which at one time looked a little formidable, is complete. Coupling that with the conclusion at which I have already arrived, that that particular clause in the order of Mr. Justice *Vaughan Williams* is not *ultrà vires*, it seems to me the objection to these proxy papers fails. It is not true that the Australian creditors were not present at this meeting by their proxy. Their "proxy"— that is to say, their agent appointed by them—was present. When you come to the proxy paper the difficulty is got over by the 10*s*. stamp, and the case does not fall within the penny stamp clause. That disposes of that objection.

I pass on now to consider the real substance of this matter. It is urged before us that the scheme was one which ought not to be forced on dissentient creditors. I have already read the Act and explained the duty of the Court to see that a dissentient minority is not unduly coerced. One must look now at this scheme, and, as I have already said, one must bear in mind the alternative. Bearing in mind the alternative to which I have already alluded, and to which I do not propose to allude again, can we say that this scheme is one which creditors cannot reasonably think to their advantage and the advantage of those who belong to the same class as themselves? That depends upon the scheme itself. Now, looking at the scheme, of course one sees objections to it. If I were a creditor I should see objections to it. I do not say I should not vote for it—probably I should; but that is not material. Every creditor who does not get his due would see objections to it if he could get more; but if he cannot get more, it is another thing. [His Lordship then considered the details of the scheme and the objections which had been made to it, and continued:—]

I do not hesitate to say that, forming the best judgment I can of this scheme, it has been honestly framed in the interests of the creditors, and, giving the Australian creditors all their due for

patriotism, I fail to see that they have sacrificed their interests as creditors to any patriotism for the colony or for the bank. They see plainly enough that in the condition of affairs in the colony they cannot get their money unless they adopt some such scheme as this. Then it is said they have not had an opportunity of considering any other scheme which might be suggested. I do not think that is necessary. If you lay before creditors a scheme which they think is sufficient, I do not think it is the province of the Court to say that every conceivable scheme which the ingenuity of man can suggest was not laid before them and submitted to them. They are business men. They have looked at it, they know their own interest, and they have approved the scheme by a vast majority in favour of it. It appears to me that the learned Judge was perfectly right, that this scheme ought to be confirmed, and this appeal be dismissed with costs.

LOPES, L.J.:—

Two objections are taken to this scheme: the first is an objection to it on the merits; the second is a more technical objection, namely, that it has not been approved of by the statutory number of creditors. Now, this would be quite true if the English creditors alone were considered; but if the Australian creditors are counted as well as the English, there is no doubt the scheme would be carried by an overwhelming majority. What is contended is this, that the votes of the Australians ought not to be counted having regard to the mode in which those votes were obtained. That I will deal with presently.

Now the scheme of arrangement is a scheme under the Act of 1870, s. 2, and the material part of the section is this:—[His Lordship read a portion of the section.]

This enables a majority of creditors, provided there is a proper statutable number, to bind the dissentient minority. Now, the mode in which this power is to be exercised has, to my mind, been very well and correctly laid down in the *Alabama, &c., Railway Company's Case* (1), which has already been referred to. What I understand to be decided by that case is this, that it is not sufficient for the Court to ascertain that the statutory condi-

(1) [1891] 1 Ch. 213.

tions have been complied with; the Court must go further than that, and be satisfied that the statutable majority which are to bind the dissentient minority have acted *bonâ fide*, that they have not acted adversely to those whom they professed to represent, and, lastly, that the arrangement contemplated is a reasonable arrangement, such as that which a man of business would reasonably approve. With regard to the word "reasonably" it must always be borne in mind the word "reasonably" is a relative term: it means reasonably with regard to the particular circumstances of the case. What is reasonable in one case might be unreasonable in another. The reasonableness must be always regarded with reference to other alternatives. For instance, an arrangement giving a very small benefit to creditors, if the alternative were absolute ruin to the company and no benefit to the creditors, would I think be reasonable. In considering the scheme which is before us I am very much influenced by this.

The Australian creditors almost unanimously approve of this scheme. Who can better know the state of things in *Australia* than these Australian creditors? They are there upon the spot, they know all the details connected with the bank, they know all the circumstances which are likely to make the bank a flourishing concern or the contrary, and it appears to me that nobody in this country, or anywhere else except *Australia*, can express a view so cogent with regard to this matter as these Australian creditors. Really it does not stop there, because if evidence is of any value in this country, we have also a strong body of expert evidence obtained from stockbrokers in this country to the effect that they highly approve of the scheme, and they believe, having regard to all the circumstances of the case, that it is a scheme which will be most likely to end in a benefit to the creditors at large. Now, in these circumstances, I am unable to say this scheme is unreasonable. I think the learned Judge has come to a very proper conclusion in sanctioning this scheme.

Then as to the other objections with regard to the votes, although it is said these Australian votes ought not to be counted, the first question raised is whether the Judge had any power to make the order he did. No doubt it is a new form of

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
Lopes, L.J.

order, and I take it it is an order which would be made in very exceptional circumstances, such as the present. It appears to me, when you refer to sect. 91 of the *Companies Act* of 1862, it clearly authorizes that which the learned Judge has done. It is also to be borne in mind that the Act of 1870, under which the scheme is sanctioned, incorporates the Act of 1862; it is to be read with that Act. Now, the words of the 91st section of the *Companies Act* of 1862 are these: "The Court may, as to all matters relating to the winding-up, have regard to the wishes of the creditors or contributories, as proved to it by any sufficient evidence, and may, if it thinks it expedient, direct meetings of the creditors or contributories to be summoned, held, and conducted in such manner as the Court directs, for the purpose of ascertaining their wishes." That appears to me to confer upon the learned Judge power to do precisely that which he has done in these circumstances, and I think that what he has done is a proper and desirable thing, having regard to the circumstances. The object being to ascertain the wishes of the creditors both in *England* and elsewhere, it is a matter upon which I do not think anybody can have any doubt.

Then an objection has been taken which has been characterized as a stamp objection. That has been gone into at length by my Brother *Lindley*, and I have very little to say about it further than this, that if these proxy papers were stamped with a penny stamp in this country before they were executed, it appears to me that the votes could not have been sustained, and it appears to me these proxies would be bad. But there I think Mr. *Cozens-Hardy* has taken the case entirely out of the penny stamp section, because he brings them under sect. 15 as documents executed out of the *United Kingdom*, and within the schedule making them subject to a 10*s*. duty. It appears to me, therefore, that they are documents which may be stamped, after they have been used and executed, in the way I suppose these proxies will be stamped when they arrive in this country.

On the whole, therefore, I come to the conclusion that this appeal must be dismissed with costs. I think the order made by the learned Judge was a most proper and right one under the circumstances.

A. L. SMITH, L.J.:—

I wish to add a few remarks upon a point which for the first time arises in this case, that is as to whether or not the electric telegraph can be made use of to carry out what was eminently needed, and indeed was absolutely necessary to do justice in this case. Now, in my judgment the answer to this depends in the main upon what power Mr. Justice *Vaughan Williams* had in this winding-up matter, because it must be admitted that he has not had before him the best evidence of these instruments of proxy, as I will call them. But what are the powers given to the learned Judge in winding-up matters? I turn to sect. 91 of the Act of 1862, and there is a phrase there which to me is very significant. It says: "The Court may, as to all matters relating to the winding-up, have regard to the wishes of the creditors or contributories, as proved to it by"—what?—"by any sufficient evidence." Now, that is a phrase which is put in for the purpose of enlarging the powers of the Judge who has to adjudicate in these winding-up matters. It clearly abrogates the necessity of his acting upon strict legal evidence. That is quite clear. It allows him to act upon secondary evidence if he thinks fit; and it seems to me that it empowers the Judge in matters of winding-up, when he wants to ascertain what are the wishes of creditors or contributories, to act upon any evidence which he thinks sufficient for the purpose of arriving at the truth with regard to their wishes. That I apprehend to be the true meaning of these words, "by any sufficient evidence."

Now, what have we got next? We have next to turn to the section of the Act which provides how and in what way it is to be ascertained whether three-fourths in value of the creditors agree to the proposed scheme. That brings me to the Act of 1870. Sect. 2 of that Act has been read many times. I will not read it again; but the three-fourths are to be ascertained by the votes of the creditors "either in person or by proxy at such meeting." It will be noted that it is not stated "by an instrument of proxy." When you come to one or two sections in the other Acts, you will find a distinction which is drawn between an "instrument of proxy" and "a proxy," and it seems to me that it is manifest that that line in this section

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
A. L. Smith, L.J.

"either in person or by proxy" means "either in person or by his lawfully constituted agent," and not by the instrument of proxy or the proxy paper. Now suppose—and I expect there is plenty of evidence in this case to support such a supposition, and no doubt Mr. Justice *Vaughan Williams* adopted it—suppose these Australian creditors, by a duly signed and deposited instrument of proxy in *Australia*, had delegated the authority to a Mr. *Smith* to go to this meeting in *London* and vote for them, where is there anything in the Acts to say that Mr. *Smith* must shew an instrument of proxy to satisfy the meeting or the Court afterwards that he is the duly authorized agent of the Australians? Mr. *Finlay* was unable to point to any statute that enacts the necessity for the agent to have the instrument of proxy with him. It seems to me it is not necessary in such a case as this for the instrument to be produced in order to enable a judge to decide whether the votes are to be counted or not; the Act enacts that he may act as regards ascertaining the wishes of the creditors upon any evidence which seems sufficient to him. The agent comes and says to the Judge, "I can assure you upon oath that I have these proxies, and that they are deposited in *Melbourne*." Why will not that do, assuming there is no reason to doubt its truth? Then, again, suppose there had been a letter written from *Melbourne*, why should not the letter be accepted if the Judge has no reason to doubt it and considers it sufficient? Then we come to the last point. Suppose a telegram is sent, and the Judge has no reason to doubt it and believes it, why should not he act upon it? Has he authority to act upon it? It seems to me he has.

It was to meet those points that this skilfully drawn order of Mr. Justice *Vaughan Williams* was made. He was in a difficulty about time, and every one was in a difficulty about time. In my judgment, he had jurisdiction to make that order, and therefore as a matter of law, if the Judge considered the evidence sufficient, and if he had no reason to doubt the truthfulness of it, as Mr. Justice *Vaughan Williams* had not, these votes were rightly counted and ought not to have been rejected.

Then it was urged by Mr. *Finlay* that even if this were so the *Stamp Act* would defeat these proxies, and he called our atten-

tion to the Act of 1891. But when that Act is accurately understood and when not only sect. 80 is read, but the schedule and sect. 15 are read, it is perfectly manifest that the true construction of that Act is that if you want to use a proxy for one meeting with a penny stamp, then you must affix the stamp and cancel it before it is used, and if you use it without that stamp being affixed and cancelled before it is used, you are liable to a penalty, and the vote is void. But if you do not want to use a penny stamp, but you want to use a form of proxy without a penny stamp for more meetings than one, then you may go under the schedule (I am only stating what is the purport of the Act) with a 10*s.* stamp, and if the document has been executed abroad without the 10*s.* stamp, you have thirty days after it reaches this country to stamp it. Therefore this objection about the penny stamp does not apply to this case, because these proxies when they get here can be stamped with a 10*s.* stamp within thirty days after their arrival. I would also point out that, on looking over the Act, I notice that although the 10*s.* stamp would be an enormous sum to pay in this case upon the voting papers, the exact number of which I forget, still there is a dispensing power, as you would expect to find, which the Government can apply and it need not exact the last farthing. Therefore it seems to me, as regards these points of law which were raised about the Australian votes that they both of them fail.

There was another point taken, that the instruments of proxy were bad because they had the name of the person who was to be agent in the papers themselves when they were sent out, and rules 13 and 14 of the Act of 1890 were referred to; but again Mr. *Cozens-Hardy* has satisfied me that they had no application to the case. Those rules refer to a perfectly different matter.

Then there is another point taken, that there was no special day named in the proxy paper. If it is a proxy paper to carry a 10*s.* stamp it is not necessary—so that objection also fails.

Then it was said it was a misleading document, and that it led the creditors in *Australia* to vote for the scheme when they otherwise would have voted against it. All I can say is, I cannot adopt that view. It is quite true that the paper is not

C. A.
1893
*In re* ENGLISH, SCOTTISH, AND AUSTRALIAN CHARTERED BANK.
A. L. Smith, L.J.

grammatical. If an Australian creditor struck out the "for" and put in "against," the last part of it would not make good sense, and if he wanted to be absolutely correct in his grammar he ought to have run his pen to the end of the clause; but to say that that proxy paper was misleading as printed, is to say what I cannot adopt.

Now I come to the judgment of Mr. Justice *Vaughan Williams.* I agree with him in the main, and therefore I am going to support him; but I must say I think he was hypercritical in the remarks he made on the judgment of this Court delivered by Lord Justice *Lindley*, Lord Justice *Bowen*, and Lord Justice *Fry*—for I declare on reading the judgment of the *Alabama, &c., Railway Company's Case* (1) I cannot conceive anything clearer than the judgment of the Lords Justices. In my opinion it is not open to the criticisms which Mr. Justice *Vaughan Williams* has subjected it to, and I think that Mr. Justice *Vaughan Williams* with a willing mind could have applied the law to this case perfectly easily.

A point was taken by Mr. *Finlay* and pressed upon us, viz., that in the scheme we are sanctioning there is no provision as in some of the other schemes whereby the existing shareholders were prevented from slipping out of their liabilities. If that is necessary, it seems to me, as Mr. Justice *Vaughan Williams* still has control over the scheme, he can insert it or have it inserted in the articles of association.

[His Lordship then made some other remarks on certain details of the scheme, and concluded by giving his decision that the appeal must be dismissed with costs.]

Solicitors: *Freshfields & Williams; Slaughter & May; Parker, Garrett & Co.; Murray, Hutchins & Co.*

(1) [1891] 1 Ch. 213.

M. W.

[QUEEN'S BENCH DIVISION] A

# FELIXSTOWE DOCK & RAILWAY CO. v. UNITED STATES LINES INC.
# FREIGHTLINERS LTD. v. UNITED STATES LINES INC.
# EUROPE CONTAINER TERMINUS (B.V.) v. UNITED STATES LINES INC.

B

1987 Feb. 12, 16, 26, 27; March 12 — Hirst J.

*Injunction—Mareva injunction—Order of foreign court—Restraining order by U.S. bankruptcy court in respect of U.S. shipping company—English and European plaintiffs claiming payment for services rendered to company—Plaintiffs obtaining Mareva injunctions against company over assets in England—Whether restraining order to be recognised by English courts—Whether injunctions to be set aside* C

The defendants, a United States incorporated company carrying on a worldwide shipping business, also operated in England and were registered under the Companies Act 1985 as an overseas company. Following severe financial difficulties the defendants petitioned the United States bankruptcy court for reorganisation under chapter 11 of the United States Federal Bankruptcy Code which provided a procedure for placing a financially distressed company under court protection so that the company could reorganise its financial position and pay its creditors under a scheme. The United States bankruptcy court made a restraining order under chapter 11 staying all claims against the defendants within and outside the United States. Under the chapter 11 reorganisation the defendants intended to close down their English and European operations and to concentrate their activities in North America. The plaintiffs, who were English and European trade creditors of the defendants, commenced proceedings in the English court seeking payment for services which they had provided. They obtained *Mareva* injunctions restraining the defendants from removing their English assets from the jurisdiction. D E

On the defendants' application to set aside the *Mareva* injunctions on the ground, inter alia, that the English court should recognise the restraining order of the United States bankruptcy court and allow it to govern the disposition of the defendants' English assets:— F

*Held*, dismissing the application, that the restraining order made by the United States bankruptcy court was an order in personam which did not have to be accorded recognition by the English courts; that although the English courts would wish to co-operate with the United States bankruptcy court on the restraining order, the degree and nature of any co-operation had to be governed by English bankruptcy practice which did not favour an order which removed an overseas company's English assets entirely outside the control of the English courts; that the continuation of the *Mareva* injunctions would not unjustly impede the chapter 11 proceedings in the United States nor would it cause any prejudice to the defendants since the English assets could not be distributed in England without the intervention of ancillary winding up proceedings; that if the *Mareva* injunctions were discharged the English assets would be removed from the jurisdiction and used to G H

A keep the defendants as a going concern in North America which, although it would benefit the creditors there, would cause the plaintiffs in England irreparable prejudice; and that, in the circumstances, the *Mareva* injunctions should be continued (post, pp. 373A–C, 375E—376A, 379D–G, 387A–D, 389A–G).

*In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273, C.A. and *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396, H.L.(E.) applied.

B *Travers v. Holley* [1953] P. 246, C.A. distinguished.

*Cunard Steamship Co. Ltd. v. Salen Reefer Services A.B.* (1985) 773 F. 2d 452 considered.

The following cases are referred to in the judgment:

*American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396; [1975] 2 W.L.R. 316; [1975] 1 All E.R. 504, H.L.(E.)
C *Budget Services Co. v. Better Homes of Virginia Inc.* (1987) 804 F. 2d 289
*Canada Southern Railway v. Gebhard* (1883) 109 U.S. 527
*Commercial Bank of South Australia, In re* (1886) 33 Ch.D. 174
*Cretanor Maritime Co. Ltd. v. Irish Marine Management Ltd.* [1978] 1 W.L.R. 966; [1978] 3 All E.R. 164, C.A.
*Cunard Steamship Co. Ltd. v. Salen Reefer Services A.B.* (1985) 773 F. 2d 452
*English, Scottish and Australian Chartered Bank, In re* [1893] 3 Ch. 385
D *Galbraith v. Grimshaw* [1910] A.C. 508, H.L.(E.)
*Macaulay v. Guaranty Trust Co. of New York* (1927) 44 T.L.R. 99
*Mobil Sales and Supply Corporation v. Owners of Pacific Bear* [1979] H.K.L.R. 125
*Modern Terminals (Berth 5) Ltd. v. States Steamship Co.* [1979] H.K.L.R. 512
*National Labor Relations Board v. Bildisco & Bildisco* (1984) 465 U.S. 513
*Oriental Inland Steam Co., In re, Ex parte Scinde Railway Co.* (1874) L.R. 9
E Ch.App. 557
*Rainbow v. Moorgate Properties Ltd.* [1975] 1 W.L.R. 788; [1975] 2 All E.R. 821, C.A.
*Schemmer v. Property Resources Ltd.* [1975] Ch. 273; [1974] 3 W.L.R. 406; [1974] 3 All E.R. 451
*Suidair International Airways Ltd., In re* [1951] Ch. 165; [1950] 2 All E.R. 920
*Toga Manufacturing Ltd., In re* (1983) 28 B.R. 165
F *Travers v. Holley* [1953] P. 246; [1953] 3 W.L.R. 507; [1953] 2 All E.R. 794, C.A.
*Trepca Mines Ltd., In re* [1960] 1 W.L.R. 1273; [1960] 3 All E.R. 304, C.A.
*United States v. Whiting Pools Inc.* (1983) 462 U.S. 198
*Victrix Steamship Co. S.A. v. Salen Dry Cargo A.B.* (1986) 65 B.R. 466
*Vocalion (Foreign) Ltd., In re* [1932] 2 Ch. 196
*Wolf v. Weinstein* (1963) 372 U.S. 633

G

SUMMONSES

FELIXSTOWE DOCK & RAILWAY CO. v. UNITED STATES LINES INC.

On 25 November 1986 the plaintiffs, Felixstowe Dock & Railway Co. ("F.D.R."), applied ex parte and were granted by Leggatt J. a *Mareva* injunction restraining the defendants, United States Lines Inc. ("U.S.L."),
H a company incorporated in the United States of America, from removing assets out of the jurisdiction and requiring the defendants to ensure that a balance of £400,000 remained in the United Kingdom. On 28 November F.D.R. issued a writ against U.S.L. claiming £367,922·44 in respect of dock

dues, quay rent, wharfage, stevedoring and other charges incurred by the defendants as owners or operators of vessels berthed at F.D.R.'s docks at Felixstowe between 1981 and 1986. By summons dated 30 January 1987 U.S.L. applied to discharge or vary the injunction. A

FREIGHTLINERS LTD. v. UNITED STATES LINES INC.

By writ dated 2 December 1986 the plaintiffs, Freightliners Ltd. ("F.L.") claimed against the defendants, U.S.L., £236,717·20 being the balance due and payable by U.S.L. to F.L. in respect of transport and ancillary services provided at the U.S.L.'s request. On 18 December F.L. applied ex parte and were granted by Ognall J. a *Mareva* injunction restraining U.S.L. from removing any of their assets out of the jurisdiction, save with the consent of F.L.'s solicitors. On 2 January the injunction was varied by Hoffmann J. to enjoin depletion of U.S.L.'s assets below £650,000 with the express purpose of giving combined *Mareva* protection to F.D.R. and F.L. On 6 February U.S.L. issued a summons to discharge or vary the injunction. B C

EUROPE CONTAINER TERMINUS (B.V.) v. UNITED STATES LINES INC.

On 25 February 1987 the plaintiffs, Europe Container Terminus (B.V.) ("E.C.T."), a company registered in the Netherlands, applied ex parte and were granted by Evans J. a 24-hour *Mareva* injunction restraining the defendants U.S.L. from removing assets out of the jurisdiction and requiring them to ensure that sufficient assets remained in the United Kingdom to cover debts of approximately £1,692,000 owed to E.C.T. in respect of stevedoring and other facilities provided for U.S.L.'s vessels between 1983 and 1986. On 26 February 1987 E.C.T. applied for a continuation of the 24-hour *Mareva* injunction which had been granted the day before. D E

The applications were heard in chambers but judgment was given in open court.

The facts are stated in the judgment. F

*David Steel Q.C.* and *Charles Haddon-Cave* for F.D.R.
*William Norris* for F.L.
*Jonathan A. Harvie* for E.C.T.
*Geoffrey Brice Q.C.* and *Nigel Meeson* for the defendants, U.S.L.

*Cur. adv. vult.* G

12 March. HIRST J. read the following judgment.

*Introduction*

These are two summonses by the defendants, United States Lines Inc. ("U.S.L."), to set aside *Mareva* injunctions for sums totalling £650,000 granted against them in two actions in which the respective plaintiffs are Felixstowe Dock & Railway Co. ("F.D.R.") and Freightliners Ltd. ("F.L."). H

The basis of each summons is that U.S.L. were, on 24 November 1986, granted a restraining order under chapter 11 of the United States Federal Bankruptcy Code by Judge Howard C. Buschman in the United States District Court for the Southern District of New York (in Bankruptcy).

The purpose of such an order, in a nutshell, is to enable an insolvent company to survive as a going concern, while undergoing a major programme of reorganisation and retrenchment under the supervision of a creditors' committee and the court, maintaining an even-handed balance of the interests of all its creditors, all claims against the company being frozen meantime.

The main foundation of this application, as originally presented by Mr. Brice on behalf of U.S.L. is that, on grounds of international comity, the English courts should recognise the order of the United States bankruptcy court, and allow it to govern the disposition of U.S.L.'s assets in England, so as to enable them to be dealt with in accordance with that order; that the *Mareva* injunctions, by retaining assets here, prevents those assets being administered in accordance with the intentions of the chapter 11 scheme, and that if the *Mareva* injunctions continue the plaintiffs will gain priority over other creditors.

Mr. Steel and Mr. Norris, on behalf of F.D.R. and F.L. respectively, resist the applications on the grounds that it is for the English courts to deal in the insolvency context with the disposition of assets in England; that the *Mareva* injunctions were ancillary to claims properly brought here by English companies in respect of debts incurred by U.S.L. in England; that the continuance of the *Mareva* orders will in no way give the plaintiffs any priority over other creditors; and that, by contrast, the discharge of the *Mareva* injunctions will cause the plaintiffs serious prejudice, including as originally contended the risk of exposing themselves to contempt proceedings in the United States and wasted legal costs here.

The case thus raises issues of far-reaching general importance and it is for that reason that I am, at the request of all counsel, delivering this judgment in open court.

On the day before the final resumed hearing another creditor of U.S.L., a Dutch company called Europe Container Terminus (B.V.) ("E.C.T."), were granted a 24-hour ex parte *Mareva* injunction by Evans J. similar to that already obtained by the other two plaintiffs, though for a considerably larger sum. This application, presented by Mr. Harvie on behalf of E.C.T. is also now before me and, subject to one or two points, stands or falls on the same consideration as applies to the other two.

In future when I refer to the plaintiffs I mean all three plaintiff companies: and any future references to English creditors or the like of course include E.C.T.

*The history of this application*

This application was opened on Thursday 12 February 1987, and, as already noted, was based essentially on comity between the United States bankruptcy court and the English courts, and also, of course, on general considerations of discretion which always underlie applications in this field.

The hearing continued on Monday 16 February, when this application remained on the same basis. However, over the weekend, U.S.L.'s advisers

in the United States, Messrs. Milbank, Tweed, Hadley and McCloy, in response to the submissions made on behalf of the two plaintiffs, radically altered their stance in relation to the contempt aspect of the United States proceedings, and this departure was presented by Mr. Brice on their behalf to the court. There had been no opportunity for the plaintiffs to investigate the significance of this change, or to obtain the advice of their United States lawyers, Messrs. Healy and Baillie, and consequently it was necessary to adjourn the application for this purpose. A B

The adjourned hearing resumed on Thursday 26 February, and a good deal of further evidence pertaining to the above problem and other discretionary aspects was placed before the court. In addition, and much more importantly (i) U.S.L. placed before the court a substantial variation of the restraining order made by Judge Buschman on U.S.L.'s application three days before on 23 February; and (ii) U.S.L. for the first time mounted a new and fundamental attack on the *Mareva* orders, to the effect that the court had no jurisdiction to make or continue such orders, on the grounds that U.S.L. by virtue of the restraining order had ceased to be the beneficial owners of their property, and that therefore such property was no longer amenable to the *Mareva* jurisdiction. C

If, of course, this contention was correct, it would totally undermine the injunctions, and all the arguments based on comity and general discretion would become completely irrelevant. I shall consider it straight away. The argument was based on one of two recent authorities decided in the Hong Kong Supreme Court, namely a decision of Trainor J. in *Modern Terminals (Berth 5) Ltd. v. States Steamship Co.* [1979] H.K.L.R. 512, in which he specifically declined to follow a decision of the previous year by Cons J. in *Mobil Sales and Supply Corporation v. Owners of Pacific Bear* [1979] H.K.L.R. 125. Each of these cases concerned chapter 11 proceedings in relation to different United States shipping companies, and each depended on the consideration of a number of United States decisions in lower courts. Trainor J. held that the proper interpretation of these United States cases was to divest the subject company of its beneficial ownership in its assets and to revest them in the company in a different capacity as a trustee for the benefit of the creditors. Cons J., on consideration of the same authorities, had reached the diametrically opposite conclusion, and held that the subject company remained in beneficial ownership. D E F

The theory adopted by Trainor J. became known as the "new entity" theory, and was treated with considerable reservation in subsequent cases in the lower courts in the United States.

Finally, the matter was considered by the United States Supreme Court in *National Labor Relations Board v. Bildisco & Bildisco* (1984) 465 U.S. 513. The majority opinion of the court, delivered by Rehnquist J., stated at p. 1188: G

> "Much effort has been expended by the parties on the question of whether the debtor is more properly characterised as an 'alter ego' or a 'successor employer' of the pre-bankruptcy debtor, as those terms have been used in our labor decisions . . . We see no profit in an exhaustive effort to identify which, if either, of these terms represents the closest analogy to the debtor-in-possession. Obviously if the latter were a wholly 'new entity,' it would be unnecessary for the Bankruptcy H

Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing."

On the strength of this decision by the court of highest authority, Messrs. Healy and Baillie expressed the view that the "new entity" theory had been discredited and was no longer viable. U.S.L.'s United States' advisors sought to distinguish the *Bildisco* case, 465 U.S. 513 by reference to two other earlier Supreme Court authorities, namely *United States v. Whiting Pools Inc.* (1983) 462 U.S. 198 and *Wolf v. Weinstein* (1963) 372 U.S. 633.

Suffice it to say that, having considered both these cases, they do not seem to me to touch in any way on the critical point. Consequently I have come to the conclusion that Healy and Baillie's interpretation of the *Bildisco* case is the correct one, that the "new entity" theory is indeed discredited, and that in consequence U.S.L. remain in beneficial ownership of their assets, while of course remaining obliged to operate their business in accordance with the provisions of chapter 11, and under the supervision of the creditors' committee and the court. If the position were otherwise, it is very difficult to see why all the elaborate provisions of the restraining order quoted below were in any way necessary. Consequently the jurisdiction point fails, and the case ends, as it began, turning on the crucial issues of comity and discretion.

*United States Lines Inc.*

U.S.L. have for many years carried on a very large world-wide shipping business. They are incorporated in the State of Delaware, United States, their operational headquarters being in Cranford, New Jersey. They also carry on business in England from an address in Knightsbridge, together with a local office in Felixstowe, and are registered as an overseas company under section 691 of the Companies Act 1985. Their holding company is a New York registered company called McLean Industries Inc.

In 1986 U.S.L. encountered very severe financial difficulties, as a result of which they petitioned the United States bankruptcy court under chapter 11 on 24 November, and on the same day Judge Buschman made the restraining order, to which I shall in due course refer in more detail.

The chapter 11 petition contained details of U.S.L.'s financial position on a consolidated basis as at 27 September 1986, showing assets totalling U.S. \$1·250 billion, and liabilities totalling U.S. \$1·272 billion, i.e., an excess of less than 2 per cent. of liabilities over assets. So far as England is concerned, its total liabilities (i.e. liquidated claims) amount to £2·4 million (including those of the plaintiffs) and there are believed to be still further creditors. The company's total English assets amount to approximately £720,000, so that there is a very substantial imbalance between English assets and liabilities, the latter exceeding the former by a factor of about 3·3, while of course only constituting a minute percentage of the global total which runs into over a thousand billion dollars.

It is common ground that under the chapter 11 reorganisation and retrenchment it is the intention of U.S.L. to close down entirely their

English and European operations and concentrate their shipping activities mainly in North America. This is a consideration of great importance, as will ultimately appear. A

*The plaintiffs' claims and the Mareva injunctions*

F.D.R. are a statutory body responsible for the operations of the dock and railway at Felixstowe. Up to the end of 1986 U.S.L. vessels had for several years loaded and discharged at Felixstowe. F.D.R.'s claims totalling £367,922·44 comprise run-of-the-mill charges which remained unpaid for berthing and dock facilities, together with stevedoring and wharfage services for U.S.L. vessels at Felixstowe. While not formally conceded, no defence to this claim has been foreshadowed, and F.D.R. intend to proceed under R.S.C., Ord. 14 unless the effect of my order makes such a course effectively valueless. F.D.R.'s *Mareva* injunction was sought, and granted ex parte by Leggatt J., on 25 November 1986, i.e., the day after the chapter 11 restraining order, and the existence of that order was very properly disclosed to the judge in F.D.R.'s affidavit in support. The *Mareva* restrained removal from the jurisdiction of assets so as not to deplete them below £400,000. B C

F.L. are a container company based in London, which provided, maintained and inspected containers used by U.S.L. F.L.'s claim totalling £236,717·20 was in respect of run-of-the-mill charges for such services which remained unpaid, and of which, as I am informed by counsel, upwards of £200,000 is almost certainly undisputed, so that F.L. also intend to proceed under Order 14 subject to the same reservation. F.L.'s *Mareva* injunction was granted by Ognall J. on 18 December 1986 and here again the existence of the chapter 11 order was very properly drawn to the judge's attention. Originally the F.L. *Mareva* prohibited removal of any of U.S.L.'s assets from the jurisdiction save with the consent of the plaintiffs' solicitors, but this was varied on 2 January 1987, also after full proper disclosure, by Hoffmann J., so as to enjoin any depletion of assets below £650,000, with the express purpose of giving combined *Mareva* protection to F.D.R. and F.L. D E

E.C.T. are registered in the Netherlands, and provided stevedoring and allied facilities for U.S.L. vessels over the period May 1983 to December 1986. Their claims total approximately 5·4 million Dutch florins, equivalent to approximately £1,692,000. They duly served proceedings on U.S.L. in this country, and subsequently U.S.L. entered an appearance and served a defence. Procedurally, therefore, their action here is soundly based and they also intend to take Order 14 proceedings. Mr. Harvie adopted all the arguments of Mr. Steel and Mr. Norris, many of which had been developed before his clients appeared on the scene. F G

*Chapter 11 proceedings*

The evidence concerning the operation of chapter 11 in United States bankruptcy law is derived from two sources. These are (i) a most helpful opinion of Judge Buschman himself, delivered at a status conference on 11 February 1987 (i.e., the day before the start of the present hearing) and directed by him to be furnished to this court; (ii) a memorandum by the defendants' United States legal adviser, Mr. John G. Gellene, of Milbank H

Tweed, which is accepted by all parties to be accurate. This is such an important aspect of the case that I think it right to quote the salient parts of this evidence verbatim rather than attempting to summarise.

First I quote some of the opening passages of Mr. Gellene's memorandum:

> "Chapter 11 of the United States Bankruptcy Code provides a procedure for placing a financially distressed company under court protection so that the company can attempt to reorganize its financial condition and make provision for paying its obligations. In a chapter 11 case, the company becomes subject to the supervision of the United States bankruptcy court, a 'unit' or division of the United States District Court, the general federal trial court. The provisions of the United States Bankruptcy Code, along with orders of the bankruptcy court which may be issued from time to time, impose certain duties and restrictions upon the company's management which would not otherwise exist. In a chapter 11 case, management of the debtor continues to operate its business as a 'debtor in possession' unless the bankruptcy court appoints a trustee. Generally speaking, a trustee is only appointed upon a showing of fraud, dishonesty or gross mismanagement . . . An important feature of chapter 11 is that a 'debtor in possession' has the same duties and powers as a trustee. A debtor in possession is therefore obligated to treat similarly situated creditors equally, and to refrain from conduct that is not in the best interests of creditors. If the status of a United States bankruptcy trustee is recognized under the law of another country, there may be grounds for recognizing the status of a 'debtor in possession' as the equivalent of a trustee for purposes of foreign law."

The judge prefaced his opinion as follows:

> "Counsel for U.S.L. has informed the court that the debtor shall be making application to the English court to modify or vacate such injunctions. In connection with that application, counsel has advised that it may be useful for the English court to have this court's view on certain general matters of United States bankruptcy law. These matters are: first, the extent of this court's jurisdiction over the assets and property of a debtor in a case under chapter 11 of the U.S. Bankruptcy Code; second, the issue of reciprocity, namely, whether this court would extend comity to the orders and judgments of a foreign court, specifically an English court, in bankruptcy matters; third, whether there may be any adverse discrimination in a chapter 11 case in the treatment of the claims of foreign creditors—specifically, English creditors located in the United States. Counsel has requested that the court express its view on these subjects in a manner that could be conveyed to the English court. While the request is unusual, perhaps unprecedented, this court is disposed to entertain it. The courts in the United States have repeatedly recognized that relations among nations are furthered by recognition of and giving comity to proceedings in other countries. In this circuit, for example, an admiralty arrest of a vessel belonging to a company involved in a Swedish bankruptcy proceeding was dismissed so that the Swedish proceeding could

administer that property: *Cunard Steamship Co. Ltd. v. Salen Reefer Services A.B.* (1985) 773 F. 2d 452. If this court were in the position of the English court being presented with the application of U.S.L. the views of a jurist in another country to whom a bankruptcy or reorganization proceeding has been assigned would be welcomed as a means of providing general guidance in matters of foreign law. In the spirit of furthering the relations among nations, I shall address myself generally to the three subjects raised by counsel."

Judge Buschman describes the source and scope of the bankruptcy jurisdiction of his court as follows:

"The intended scope of bankruptcy and reorganization jurisdiction extends beyond the borders of the United States . . . The nature of the jurisdiction is in rem. The res, the estate of the debtor created by the commencement of a bankruptcy or reorganization case, is viewed as a single entity to be dealt with in a single proceeding. The claims and interests of all creditors, foreign and domestic, are to be addressed in the course of the proceeding. The broad scope of bankruptcy jurisdiction under United States law is intended to permit similarly situated creditors, regardless of where they are located, to be treated equally in a bankruptcy or reorganization case. Discrimination on the basis of citizenship is not permitted. All creditors are given the opportunity to file claims against the estate and their recovery is not limited to the assets in their own country. To achieve equality of treatment of all similarly situated creditors, wherever located, United States law contains several provisions. Central to that goal are the requirements that claims arising prior to the filing of the petition are to be paid after the estate has been administered. If the debtor is liquidated, the proceeds are distributed rateably. If the debtor is to be reorganized, creditors are to be paid pursuant to a plan of reorganization. Concomitantly, a debtor is generally prohibited from paying claims of foreign and domestic creditors which arise prior to the filing of the petition except through such a distribution or plan. Fragmentation is not contemplated for it would defeat the purpose. Another measure designed to promote equal treatment among all similarly situated creditors is the 'automatic stay' which comes into force on the commencement of a bankruptcy or reorganization case with the filing of the petition. Under section 362 of Title 11, United States Code, all creditors are generally stayed and restrained from commencing or continuing judicial action against the debtor that was or could have been commenced pre-petition. All creditors are also generally stayed and restrained from enforcing their claims against any property of the debtor until and unless relief from the automatic stay is obtained for cause shown. By these provisions creditors do not obtain preferred treatment through enforcement actions begun after the commencement of the chapter 11 case and the estate is able to be administered. In addition, United States law recognizes that it may often be impracticable for creditors, because of the amount they are owed or for other reasons, to examine the myriad of matters that do not directly affect their interests by requiring in all reorganization

A cases, of which U.S.L. is one, the appointment of an unsecured creditors' committee charged with the fiduciary duty of representing all unsecured creditors in matters that concern that group as a whole. Principal among the duties of such committees is the negotiation of a plan of reorganization providing for a return to unsecured creditors. The expenses of the committee are borne by the debtor. These include counsel and accountants' fees and the fees of other professionals B such as investment brokers. All plans for reorganization must be submitted to all creditors for their consideration and vote before they can be confirmed by this court and thereby have binding effect. Each creditor, regardless of citizenship, has one vote and, also, an equal opportunity to be heard in opposition to the plan."

C Reverting now to Mr. Gellene, the formulation of a plan of reorganisation under chapter 11 is described as follows:

"The goal of a chapter 11 case is a 'plan of reorganization,' which provides for the treatment of the claims of creditors and of the interest of equity security holders. In general, the formulation of a plan of reorganization involves negotiations among the debtor, the official creditors' committee, other committees which may be appointed to D represent specific categories of creditors and equity security holders, and other interested parties. A plan of reorganization will generally divide creditors into one or more classes, depending upon whether they are secured or unsecured and whether unsecured claims have statutory priority in right of payment . . . Under a plan of reorganization, an unsecured creditor, including secured creditors to E the extent that the value of collateral is insufficient, is entitled to receive property of a value at least equal to what the creditor would receive in the event of the debtor's liquidation, taking into account the statutory priorities just described. A secured creditor under a plan is entitled to property at least equal in value to the value of its security interest in the debtor's property. However a secured creditor is not necessarily entitled to realize its claim upon collateral subject to its F security interest if the debtor can otherwise provide at least equivalent value. The debtor has the exclusive right to propose a plan of reorganization for 120 days following the filing of its chapter 11 petition. This exclusive time period can and often is extended upon request of the debtor, particularly in large, complex cases such as that of U.S.L. Once this exclusive period lapses, creditors or other G interested parties may propose a plan. A plan of reorganisation must be submitted to creditors and equity security holders for their acceptance . . . A plan of reorganization may be approved or '*confirmed*' by the bankruptcy court if it meets the statutory requirements of the Bankruptcy Code and, in particular, if it is accepted by each class of creditors and equity security holders."

H Towards the end of his opinion, the judge reverts to the question of comity in the following terms:

"As to the question of comity being afforded in the United States to proceedings under foreign bankruptcy law, particularly English law,

> reference is made to the recent case in *Cunard Steamship Co. Ltd. v. Salen Reefer Services A.B.* (1985) 773 F. 2d 452, and to the long established decision of the United States Supreme Court in *Canada Southern Railway Co. v. Gebhard* (1883) 109 U.S. 527. These show that this country early on recognized that United States citizens should be bound by foreign debtor–creditor arrangement proceedings and now recognizes that to permit arrests or attachments by United States citizens of debtor property would defeat that purpose." A B

I shall return later to these two United States authorities.

*The restraining order*

The imposition of the "automatic stay" was achieved by a restraining order issued by Judge Buschman on 24 November 1986 on the application, inter alia, of U.S.L. as follows, so far as relevant: C

> "It is . . . ordered, that all persons, entities and governmental units, wherever located, including those located outside the United States, and all persons acting on their behalf, including sheriffs, marshalls, constables and other or similar law enforcement officials, are hereby stayed, restrained and enjoined, effective immediately from the following: (1) commencing or continuing a judicial, administrative or other action or proceeding against any of the debtors that was or could have been commenced on or before 24 November 1986; (2) commencing or continuing a judicial, administrative or other action or proceeding against any of the debtors to recover a claim against any of the debtors that arose on or before 24 November 1986; (3) issuing, serving or otherwise employing legal process of any type, including writs or orders of attachment, arrest, sequestration or foreclosure, in connection with an action or proceeding against any of the debtors referred to in paragraphs (1) or (2); (4) any act enforcing a judgment obtained on or before 24 November 1986 against any of the debtors or their property, wherever located, including vessels and other property of the debtors located outside the United States; (5) any act to obtain possession of or exercise control over property of the debtors' estates, including vessels, cargo, containers, chassis and other equipment in the possession or under the control of the debtors, whether such property is located within or outside the United States; (6) any act to create, perfect or enforce any lien against property of the debtors' estates, including vessels, cargo, containers, chassis and other equipment in the possession or under the control of the debtors, whether such property is located within or outside the United States; (7) any act to collect, assess or recover a claim against any of the debtors that arose on or before 24 November 1986; and (8) the set-off of any debt owing to one of the debtors that arose on or before 24 November 1986 against any claim against such debtor; . . ." D E F G

H

*The Insolvency Act 1986*

This very recent enactment, applicable in England and Scotland, was based on the recommendations of the Cork Committee in their report

entitled "Insolvency Law and Practice" (1986) (Cmnd. 8558). It is convenient to refer at this stage to the relevant sections which establish a new bankruptcy procedure called an "administration order." The Act of 1986 came into force as recently as 29 December 1986. The procedure for administration orders is contained in Part II of the Act, and the material sections, so far as relevant, are:

> "8(1) Subject to this section, if the court—(*a*) is satisfied that a company is or is likely to become unable to pay its debts (within the meaning given to that expression by section 123 of this Act), and (*b*) considers that the making of an order under this section would be likely to achieve one or more of the purposes mentioned below, the court may make an administration order in relation to the company. (2) An administration order is an order directing that, during the period for which the order is in force, the affairs, business and property of the company shall be managed by a person ('the administrator') appointed for the purpose by the court. (3) The purposes for whose achievement an administration order may be made are—(*a*) the survival of the company, and the whole or any part of its undertaking, as a going concern; . . . (*d*) a more advantageous realisation of the company's assets than would be effected on a winding up; and the order shall specify the purpose or purposes for which it is made.
>
> "10(1) During the period beginning with the presentation of a petition for an administration order and ending with the making of such an order or the dismissal of the petition—(*a*) no resolution may be passed or order made for the winding up of the company; (*b*) no steps may be taken to enforce any security over the company's property, or to repossess goods in the company's possession under any hire-purchase agreement, except with the leave of the court and subject to such terms as the court may impose; and (*c*) no other proceedings and no execution or other legal process may be commenced or continued, and no distress may be levied, against the company or its property except with the leave of the court and subject to such terms as aforesaid."

Section 11 provides that on the making of an administration order any winding up petition shall be dismissed and any administrative receiver shall vacate office. Sections 13 to 15 lay down the mode of appointment of the administrator and his powers, including the power to do all such things as may be necessary for the management of the company. Section 17 provides for the administrator's duties, including a duty to take into his custody and control all the properties to which the company appears to be entitled, and to manage the affairs, business and property of the company. He is also enjoined to summon a meeting of creditors if he is requested so to do by one tenth in value of the company's creditors or is directed to do so by the court.

Under section 23 he is obliged to send to all creditors and other interested parties a statement of his proposals for achieving the purposes of the order within three months (or such longer period as the court may allow) of the making of the order. Section 26 allows for the appointment of

a creditors' committee. Section 27 lays down various provisions for protecting the interests of creditors and members. A

Mr. Brice strongly relied on the close similarity between this new English procedure and chapter 11. The main distinction, of course, between the two procedures is that in the United States the debtor company remains in possession, while here there is an independent administrator. Mr. Harvie placed strong reliance on this contrast, and submitted that, while the administrator here was in the true sense a trustee, the fiduciary B duties resting upon a company as a debtor in possession under chapter 11 were of a very low and rudimentary order, since they could only be removed from possession in cases of fraud, dishonesty or gross mismanagement. In my judgment, having regard to the provisions of section 1107 of the United States Federal Bankruptcy Code, which specifically provides that the company is bound by all the duties of a C trustee, and to Judge Buschman's opinion, this is not a valid contrast. I therefore accept Mr. Brice's argument that, at any rate on a broad approach, the comparison between the two procedures is a valid one.

*The basic issues*

I now proceed to summarise the relevant authorities both English and D United States, the parties' rival submissions thereon, any relevant facts, and my general conclusions under the following headings. (1) The *Mareva* jurisdiction. (2) Comity under English law. (3) English bankruptcy procedure. (4) The relevant United States authorities on comity and bankruptcy procedure. (5) Contempt in the United States.

*(1) The Mareva jurisdiction* E

The general jurisdiction to grant a *Mareva* injunction is now, of course, to be found in section 37(3) of the Supreme Court Act 1981 which provides:

> "The power of the High Court under subsection (1) to grant an interlocutory injunction restraining a party to any proceedings from removing from the jurisdiction of the High Court, or otherwise dealing F with, assets located within that jurisdiction shall be exercisable in cases where that party is, as well as in cases where he is not, domiciled, resident or present within that jurisdiction."

This, as is common ground, vests in the court a wide judicial discretion to be exercised on equitable principles, to provide interlocutory relief in personam but not giving the plaintiff any proprietary rights over the frozen G assets, nor operating as a charge upon them: see *Cretanor Maritime Co. Ltd. v. Irish Marine Management Ltd.* [1978] 1 W.L.R. 966, 972–975, *per* Buckley L.J.

So far as the present case is concerned Mr. Brice submitted that a *Mareva* injunction is intended to prevent a debtor removing his assets from the jurisdiction so as unjustly to avoid meeting his liabilities, but not to be H used as a mechanism to undermine the effect of an order such as one made pursuant to chapter 11.

Mr. Steel and Mr. Norris submitted that the fundamental purpose of the *Mareva* injunction is to protect the plaintiffs against the defendants

A transferring assets abroad so as to make themselves judgment-proof,
leaving the plaintiffs with worthless judgments, and that any question of
discharge or variation of the *Mareva* injunction in this case is essentially
one of discretion; the court should have regard to all the circumstances of
the case in order to determine what justice requires.

In my judgment it is indeed incumbent on the court to take into
account all the relevant circumstances in the exercise of its discretion. In
B the present case, of course, the United States chapter 11 procedure is a
very important circumstance, but it cannot in my judgment properly be
treated in any way as an overriding consideration, so as to accord it any
kind of paramountcy or dominance over all the others, as Mr. Brice's
formulation (with its reference to "undermining") tends to do. At the end
of the day, this being an application for an interlocutory injunction, the
C court must weigh up the competing assertions of the parties as to the
irreparable prejudice which would follow from the continuance or discharge
of the *Mareva* injunction, as the case may be, and the overall balance of
convenience, applying the very well established principles laid down by the
House of Lords in *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C.
396. I consider these aspects in the concluding sections of my judgment.

D *(2) Comity in English law*

In *Travers v. Holley* [1953] P. 246 the Court of Appeal considered the
question of recognition of a divorce decree granted in the courts of New
South Wales applying principles similar to those applicable in England.
Hodson L.J. stated, at p. 257:

> "where it is found that the municipal law is not peculiar to the forum
> E of one country but corresponds with a law of a second country, such
> municipal law cannot be said to trench upon the interests of that
> country. I would say that where, as here, there is in substance
> reciprocity, it would be contrary to principle and inconsistent with
> comity if the courts of this country were to refuse to recognize a
> jurisdiction which mutatis mutandis they claim for themselves. The
> F principle laid down and followed since the *Le Mesurier* case [1895]
> A.C. 517 must, I think, be interpreted in the light of the legislation
> which has extended the power of the courts of this country in the case
> of persons not domiciled here."

Somervell and Jenkins L.JJ. concurred.

In *In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273 the court considered
G the position of a foreign applicant in an English company liquidation where
the former sought to prove a debt in respect of which he was at the
relevant time the holder of a judgment in his favour in the courts of
Yugoslavia. Hodson L.J. (with whose judgment Ormerod and Harman
L.JJ. agreed) stated, at pp. 1280–1282:

> "There was a further argument addressed to this court which derives
> from the decision in a matrimonial case, *Travers v. Holley*, where it
> H was held in a divorce suit that where the courts of New South Wales
> and the English courts claimed the same jurisdiction, it would be
> contrary to principle and inconsistent with comity if the courts of this
> country refused to recognise a jurisdiction which mutatis mutandis

they claimed for themselves. Arguing from that, reliance was placed upon a dictum of Denning L.J. in *In re Dulles' Settlement (No. 2)* [1951] Ch. 842, 851 . . . It is argued, relying on the observations of Denning L.J., that in effect we should in this case ignore the position as it has always been understood in this country since not only *Emanuel v. Symon* [1908] 1 K.B. 302 but other cases which have been decided, and give effect to the judgment of the Yugoslav court in toto, whether it is an action in personam or not. I find myself unable to take that step. The decision in *Travers v. Holley* was a decision limited to a judgment in rem in a matter affecting matrimonial status, and it has not been followed, so far as I am aware, in any case except a matrimonial case. Moreover, it is quite clear from the legislature's recognition of the rule in the Foreign Judgments (Reciprocal Enforcement) Act 1933, that the classification of actions which was referred to by Buckley L.J. in *Emanuel v. Symon* has been recognised in this country. Having regard to the Act of 1933, it would be a step which I for one am not prepared to take, to say that the *Travers v. Holley* point really affects the whole of this question of jurisdiction as to the enforcement of a foreign judgment, and that *Emanuel v. Symon* ought to be treated as a case which need not be regarded as binding upon this point because the court there had not addressed itself thereto."

*In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273 has been frequently followed, including for example in *Schemmer v. Property Resources Ltd.* [1975] Ch. 273 where Goulding J. rejected a claim by a foreign receiver to recover the assets of an English company in England, stating, inter alia, at p. 287:

> "I think, however, that in view of well-known later decisions *Travers v. Holley* must be followed only with caution outside its own subject matter of matrimonial status."

In the light of, inter alia, these authorities the law is stated in *Dicey & Morris, Conflict of Laws*, 10th ed. (1980), p. 741, under rule 143 and the ensuing comment:

> "The authority of a liquidator appointed under the law of the place of incorporation is recognised in England.
>
> "Comment
>
> "The effect of a foreign winding up order in England has seldom been before the courts. Rule 143 is however justified because the law of the place of incorporation determines who is entitled to act on behalf of a corporation. If under that law a liquidator is appointed to act then his authority should be recognised here. A case has never arisen where recognition of a liquidator's authority was sought by reference to an appointment made in the exercise of a foreign jurisdiction similar to that conferred on the English courts in regard to companies incorporated outside the United Kingdom. The protagonist of recognition in such a case could urge that 'it would be contrary to principle and inconsistent with comity if the courts of this country were to refuse to recognise a jurisdiction which mutatis mutandis they

A claim for themselves.' However even if an appeal to comity has any force (which is doubtful) it is improbable, with one possible exception, that the liquidator's authority would be recognised as extending beyond those affairs of the company which are local to the country where the appointment was made. The exception is where there is no likelihood of a liquidation in the country of incorporation. This B treatment of the argument based on comity is defensible because where there is a liquidation in the country of incorporation and the English courts exercise their own jurisdiction to make an order, they seem concerned to ensure that the liquidator should not go beyond dealing with the company's English affairs without special direction. Such concern is not shown where there is no likelihood of a liquidation in the country of incorporation."

C

Mr. Brice submits that *Travers v. Holley* [1953] P. 246 forms a very close analogy to the present case, and while firmly disclaiming any suggestion that the restraining order is binding or enforceable here, he argues that, having regard to that order, with its express extra-territorial effect, the position here is "betwixt and between" *Travers v. Holley* and *In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273, though with a strong bias D towards the former, on the footing that the United States restraining order is in effect an order in rem affecting the status of U.S.L. He also relies on other cases cited and distinguished in *Schemmer v. Property Resources Ltd.* [1975] Ch. 273, under which foreign receivers and the like have been held entitled to proceed in England (e.g., *Macaulay v. Guaranty Trust Co. of New York* (1927) 44 T.L.R. 99 where a receiver of a foreign company E appointed under an order which was described as "a combination of a winding-up order and an administration order" was held entitled to recover sums standing to the credit of the company in an English bank).

Mr. Steel and Mr. Norris both submitted that the proper approach to comity is that, having regard to the decision in *In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273 and its successors, English law while of course F according recognition of the authority of foreign liquidators, does not accord recognition to any decree of a foreign court in personam or indeed in any other field outside the realm of status, which, they submit, is not applicable in the present case.

As all counsel of course recognise, this is not a case where U.S.L. are in terms seeking to enforce the restraining order, nor to obtain a stay of G the English actions. These authorities are therefore relied upon by way of helpful analogy rather than of direct application.

Approaching the matter on this basis, I am quite satisfied that this is not a *Travers v. Holley* type case and that *In re Trepca Mines Ltd.* (which itself arose in the context of a company insolvency) provides the surer guide in the present context. The chapter 11 order cannot be treated as affecting the status of U.S.L. having regard to the United States Supreme H Court rejection of the "new entity" theory; and I am quite satisfied that the restraining order as such, having regard to its terms, is essentially an order "in personam," even though the nature of the United States bankruptcy jurisdiction generally is "in rem."

I wish however to stress that the court would in principle always wish to co-operate in every proper way with an order like the present one made by a court in a friendly jurisdiction (of which the United States is a most conspicuous example). But whether this is appropriate in any given case, and if so the precise nature and extent of such co-operation, must depend on the particular sphere of activity in question and the English law applicable thereto as discussed in the ensuing section of this judgment, together with the overall circumstances. A B

*(3) English bankruptcy procedure*

It is not in dispute (i) that the English courts have jurisdiction to wind up U.S.L. here, both on the ground that it is registered in England and on the ground that it has assets here; and (ii) that Part II of the Insolvency Act 1986 does not give the English court jurisdiction to make an administration order in respect of a foreign company. C

In this section I focus on the authorities which relate to English bankruptcy procedure in cases where there is a substantial foreign element, and I deal first with four cases involving foreign registered companies. In *In re Commercial Bank of South Australia* (1886) 33 Ch.D. 174, a petition was presented in England to wind up an Australian incorporated banking company carrying on its main business in Australia, but with a branch office in London. North J. granted the petition, stating, at p. 178: D

> "The question is whether the English creditors ought to be left to recover their debts in a winding-up of the company in Australia, their debts having been contracted here, and there being a large amount of assets here. Two winding-up petitions have been presented here, and all I know about the proceedings in Australia is, that an order has been made for the appointment of provisional liquidators. I have no proper proof that a winding-up order has been made there. At any rate, if it has been made, it was not made till at least a month after the petitions were presented here. I think, therefore, that the English creditors are entitled to have a winding-up order made by this court. I do not think it would be right to insert any special directions in the order; this is not the proper time for giving such directions. But I will say this, that I think the winding-up here will be ancillary to a winding-up in Australia, and, if I have the control of the proceedings here, I will take care that there shall be no conflict between the two courts, and I shall have regard to the interests of all the creditors and all the contributories, and shall endeavour to keep down the expenses of the winding-up so far as is possible, I think it clear that there is jurisdiction to make a winding-up order; the cases which have been cited show that there is jurisdiction . . ." E F G

In *In re English, Scottish, and Australian Chartered Bank* [1893] 3 Ch. 385, 394 Vaughan Williams J., at first instance, stated in a case dealing with an English scheme connected with the winding up in Australia of an Australian-based banking company incorporated in Australia: H

> "One knows that where there is a liquidation of one concern the general principle is—ascertain what is the domicil of the company in liquidation; let the court of the country of domicil act as the principal

A court to govern the liquidation; and let the other courts act as ancillary, as far as they can, to the principal liquidation. But although that is so, it has always been held that the desire to assist in the main liquidation—the desire to act as ancillary to the court where the main liquidation is going on—will not ever make the court give up the forensic rules which govern the conduct of its own liquidation."

B The Court of Appeal (Lindley, Lopes and A. L. Smith L.JJ.) upheld this decision.

In *In re Vocalion (Foreign) Ltd.* [1932] 2 Ch. 196, 206 Maugham J. stated the general principle:

"Finally it must be remembered that there may be winding-up orders made in the foreign country where the company has carried on
C business and possesses assets. The view of this court is that the principal winding-up should be in the principal domicil of the corporation, and that any other winding-up order should be ancillary to the principal winding-up."

In *In re Suidair International Airways Ltd.* [1951] Ch. 165, 173–174 Wynn-Parry J., in considering applications ancillary to the winding up of a
D South African based company incorporated in South Africa, cited the passage quoted above from Vaughan Williams J. and then proceeded as follows:

"It appears to me that that must be the common sense of the matter, and that that passage enunciates a principle which, so far as I know, has never been doubted. Then it is said that all that that passage
E refers to is questions of procedure; that section 325 concerns a question of substantive law; and that therefore the passage, when properly regarded, is not any obstacle to the adoption by the court of the argument put forward on behalf of the liquidator. To that I would make two answers: first, I do not read Vaughan Williams J., as confining himself to what, on a narrow view, may be said to be
F matters of procedure. I think that he intended his observations and the statement of the principle to apply to the decision of all questions arising in the ancillary liquidation. Secondly, even if that passage could be read otherwise, I should be prepared for myself to say that I can see no sound reason for distinguishing between matters of procedure viewed in that narrow sense and matters of substantive right. It appears to me that the simple principle is that this court sits to
G administer the assets of the South African company which are within its jurisdiction, and for that purpose administers, and administers only, the relevant English law; that is, primarily, the law as stated in the Companies Act 1948, looked at in the light, where necessary, of the authorities. If that principle be adhered to, no confusion will result. If it is departed from, then for myself I cannot see how any other result
H would follow than the utmost possible confusion. Who could lay down as a clear and exhaustive proposition where the court was to draw the line in any particular case between administering the English law and the law of the main liquidation?"

In *In re Oriental Inland Steam Co., Ex parte Scinde Railway Co.* (1874) L.R. 9 Ch.App. 557 the Court of Appeal considered the position of judgment creditors in India of an English-registered company carrying on business in India, holding that they should not be entitled to attach the company's property in India and thus secure priority over other creditors. James L.J., with whose judgment Mellish L.J. agreed, stated, at p. 558: A

> "The winding-up is necessarily confined to this country. It is not immaterial to observe, that there could now be no possibility, having regard to the decision of the Supreme Court of Calcutta, in *Bank of Hindustan v. Premchand* (1868) 5 Bom. O.C. 83 which we must take to be quite right, of treating this case as if there were an auxiliary winding-up in India. If this is so with regard to a company domiciled in England, but having its business and assets in India, there would be no ground for the contention on the part of the appellants that they would obtain an equitable and rateable distribution of the assets between the creditors. All the assets there would be liable to be torn to pieces by creditors there, notwithstanding the winding-up, and there would be an utter incapacity of the courts there to proceed to effect an equitable distribution of them. The English Act of Parliament has enacted that in the case of a winding-up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; and, being so, it has ceased to be liable to be seized by the execution creditors of the company. There may, no doubt, be some difficulty in the way of dealing with assets and creditors abroad. The court abroad may sometimes not be disposed to assist this court, or take the same view of the law as the courts of this country have taken as to the proper mode of dealing with such companies, and also with such assets. If so, we must submit to these difficulties when they occur. In this particular case there is no such difficulty. There were assets fixed by the Act of Parliament with a trust for equal distribution amongst the creditors. One creditor has, by means of an execution abroad, been able to obtain possession of part of those assets. The Vice-Chancellor was of opinion that this was the same as that of one cestui que trust getting possession of the trust property after the property had been affected with notice of the trust. If so, that cestui que trust must bring it in for distribution among the other cestuis que trust. So I, too, am of opinion, that these creditors cannot get any priority over their fellow-creditors by reason of their having got possession of the assets in this way. The assets must be distributed in England upon the footing of equality." B C D E F G

Finally in this section I should refer to a case in the House of Lords, *Galbraith v. Grimshaw* [1910] A.C. 508, where a somewhat different topic was under consideration, namely whether a sequestration order under Scottish bankruptcy law should override an attachment in England obtained H

by an English creditor prior to the Scottish order. Lord Dunedin stated, at p. 513:

> "Now so far as the general principle is concerned it is quite consistent with the comity of nations that it should be a rule of international law that if the court finds there is already pending a process of universal distribution of a bankrupt's effects it should not allow steps to be taken in its territory which would interfere with that process of universal distribution; and that I take to be the doctrine at the bottom of the cases of which *Goetze & Sohn v. Aders Preyor & Co.* (1874) 2 R. 150 is only one example. But if you wish to extend that not only to the question of recognizing a process of universal distribution but also of introducing the law of relation back, then it seems to me you at once get into rather great difficulties, because the question at once arises, according to which law will you apply the doctrine of relation back?"

The House of Lords held that it should be according to the local (English) law of the attachment.

Here of course there is no winding up proceeding as such in England, so these cases also are cited by all counsel as helpful by way of analogy, and I shall approach them in the same way.

Mr. Steel and Mr. Norris submit that the first four of the above cited cases show that the English practice is to regard the courts of the country of incorporation as the principal forum for controlling the winding up of a company, but that in so far as that company has assets here, the usual practice is to carry out an ancillary winding up in England in accordance with our own rules, while working in harmony with the foreign courts. Applying this principle, they submit that the English courts would not and should not favour an order which removed the English assets entirely outside their control.

Mr. Brice stresses that the procedure followed in these same four cases recognised the proceedings in the foreign court as the principal proceedings, and submits that the continuation of the *Mareva* injunction here will unjustly impede the United States chapter 11 proceedings, which are plainly the principal proceedings in this case. Mr. Brice also places strong reliance on the *Oriental* case, L.R. 9 Ch.App. 557, submitting that it provides a clear precedent for the order he seeks and that, 112 years on, it follows from the policy there laid down that a *Mareva* injunction should be refused.

In my judgment Mr. Steel and Mr. Norris are right in their interpretation of the first four cases, though of course it does not necessarily follow therefrom that the *Mareva* injunction should continue. For reasons which will appear hereafter I do not accept Mr. Brice's argument that the continuation of the *Mareva* will unjustly impede the chapter 11 proceedings in the United States, although I do of course accept (as do the plaintiffs themselves) that they are the principal proceedings.

So far as the *Oriental* case is concerned, I think that it does no more than enshrine in eloquent and emphatic terms the general principle (which is not in dispute here) that the whole purpose of liquidation proceedings is to hold the scales even between the various classes of creditors by imposing

a trust, and I do not think it gives any really useful guidance in the specific *Mareva* context. A

The opening passage quoted from Lord Dunedin in the *Galbraith* case [1910] A.C. 508, 513, on which Mr. Brice also strongly relied, seems to me again to do no more than stress the same general principle, and it is significant that, while upholding it, the House of Lords still gave preference to English law when deciding whether the Scottish bankruptcy order related back in order to override the attachment. B

*(4) Relevant United States authorities on comity and bankruptcy procedure*

In the leading United States Supreme Court case of *Canada Southern Railway Co. v. Gebhard* (1883) 109 U.S. 527 (cited by Judge Buschman in his opinion of 11 February 1986) the Supreme Court in 1883 considered the effect of a Canadian Parliamentary scheme of arrangement for a Canadian railway company vis-à-vis its mortgage creditors. In the opinion of the court delivered by Waite C.J. the following principle was stated, at pp. 537–538: C

> "A corporation of one country may be excluded from business in another country . . . but, if admitted, it must, in the absence of legislation equivalent to making it a corporation of the latter country, be taken, both by the government and those who deal with it, as a creature of the law of its own country, and subject to all the legislative control and direction that may be properly exercised over it at the place of its creation. Such being the law, it follows that every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony. It follows, therefore, that anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere." D E F G

This is a very important statement of general principle, but it is not directly in point here.

In *Cunard Steamship Co. Ltd. v. Salen Reefer Services A.B.* (1985) 773 F. 2d 452 (also cited by Judge Buschman) the United States Court of Appeals 2nd Circuit held that the district court properly exercised its discretion in vacating an attachment, in connection with an arbitration claim under a charterparty by the plaintiff English company, of United States assets belonging to the defendant Swedish company, in the exercise H

A of comity towards Swedish liquidation proceedings. The judgment stated, at p. 456:

> "The district court aptly described the question before it as 'whether an American court, as a consequence of a Swedish court's adjudication of the insolvency of a Swedish business entity, should vacate an admiralty attachment obtained by an English corporation in an effort
> B to force London arbitration of an alleged debt between the Swedish and English corporations.' . . . In the United States the leading case on the concept of comity is *Hilton v. Guyot* (1895) 159 U.S. 113. In that case, the Supreme Court described comity as: the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own
> C citizens or of other persons who are under the protection of its laws."

And, at p. 459:

> "Cunard has not demonstrated that the laws or public policy of the United States would be violated or in any way infringed by according comity to the Swedish bankruptcy proceedings. Indeed, the facts
> D amply support the district court's conclusion that the public policy of the United States would be best served by recognising the Swedish proceedings and thereby 'facilitat[ing] the orderly and systematic distribution of the assets of Salen.' The district court noted that comity would not be granted if it would result in prejudice to United States citizens."

E Earlier the court had rejected the contention of Cunard that Salen's exclusive remedy lay under section 304 of the United States Bankruptcy Code. This lays down a procedure for ancillary bankruptcy proceedings against the assets in the United States of a debtor against whom the principal bankruptcy proceedings have been taken in another country. The judgment concluded, at p. 461:

> F "In view of the foregoing, we hold that, while an ancillary proceeding pursuant to section 304 of the Bankruptcy Code is the preferred statutory remedy, in this case, the district court properly exercised its discretion in granting comity to the Swedish bankruptcy court, and vacating the attachment of Salen's assets in the United States. The judgment of the district court is, therefore, affirmed."

G Mr. Brice, of course, strongly relied on the passage which I have quoted referring to comity, and submitted that this court should reciprocate here in the same vein. This is a fair plea so far as it goes, but its effect is, in my judgment, considerably blunted by the reservation in the concluding passage of the judgment. A similar result was reached in a closely analogous case, also arising out of the Salen bankruptcy proceedings in Sweden, namely *Victrix Steamship Co. S.A. v. Salen Dry Cargo A.B.*
H (1986) 65 B.R. 466. Victrix, a Panamanian company, had attached assets in the United States in an attempt to enforce an arbitration award in England against Salen on which the Commercial Court had entered a judgment pursuant to section 26 of the Arbitration Act 1950. The United States

District Court of the Southern District of New York held that "a section 304 proceeding in the bankruptcy court would be the preferable forum for this case, however it is not the exclusive forum." They then proceeded to cite the six criteria laid down statutorily in the United States Bankruptcy Code for guidance in section 304 cases namely: A

> "(1) the just treatment of all holders of claims against or interests in such estate; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceedings; (3) prevention of preferential or fraudulent dispositions of property of such estate; (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; (5) comity; and (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns." B C

The court held that none of these applied, and, in the case of criterion no. 2, commented: "Victrix is not a United States creditor but a Panamanian corporation whose sole contact with this country appears to be this law suit." As a result the attachment was vacated.

Mr. Steel relied on this last quotation to show that in effect the United States bankruptcy court discriminates in favour of United States citizens. He also cited in support of the same proposition another bankruptcy case, *In re Toga Manufacturing Ltd.* (1983) 28 B.R. 165, in which the United States bankruptcy court in Chicago considered an application by a Canadian trustee of a Canadian debtor for an injunction against United States creditors from commencing or continuing actions against the debtor or its assets in the United States. Having considered the section 304 tests, and taken judicial notice of the fact that there would be no inconvenience if the United States creditors had to litigate in Canada, the court rejected the application mainly on the basis that the relevant creditors had a secured claim in the United States which would not be available in Canada, thus invoking criterion no. 2. D E

In my judgment it is the fact that the debts were secured, rather than the fact that the relevant creditors happened to be United States companies that was the ratio of the *Toga* case, and I do not think it is justifiable to conclude that there is any kind of unfair discrimination on the basis of either that or the *Victrix* case, 65 B.R. 466 particularly in the light of the unequivocal statements of Judge Buschman to the contrary. F

However, I do think these cases show: (i) that a section 304 proceeding (i.e., an ancillary proceeding in the United States courts) is the normal preferred procedure, rather than, as in fact happened in the *Cunard* case, 773 F. 2d 452 and the *Victrix* case, 65 B.R. 466, simply handing over the whole matter including the assets to the foreign court which is conducting the principal bankruptcy proceedings. In other words, the decision made in the *Cunard* and *Victrix* cases, on which Mr. Brice places such strong reliance, is the exception rather than the rule; and (ii) that comity, albeit important, is only one of six important considerations. G H

It follows that, were a precisely reverse situation to the present to arise in the United States, I feel some considerable doubt whether the United States courts would discard the "preferred solution" under section 304 in

A favour of the solution reached in the *Cunard* and *Victrix* cases, since the position would be in no way comparable with that arising in those two cases.

*(5) Contempt in the United States*

On 29 December 1986 Judge Buschman gave a judgment, of which I B have a transcript, in a case brought in connection with the present chapter 11 proceedings by U.S.L. against G.A.C. Marine Fuels Ltd., an English company. This arose out of actions in rem brought by G.A.C., after the chapter 11 proceedings and with knowledge of them, in the courts of Hong Kong and Singapore respectively, to arrest U.S.L. vessels and to recover the cost of bunkers supplied to such vessels in the ordinary course of business prior to the chapter 11 petition. This was held to constitute a civil C contempt of the United States bankruptcy court, and, since G.A.C. have a presence in the United States so that they are amenable to the court's jurisdiction, a fine of U.S. $5,000 was imposed for each day during which G.A.C. failed to take the necessary steps to vacate the Hong Kong and Singapore proceedings.

I am informed that this judgment is at present under appeal, but I must D of course treat it for present purposes as valid. This posed no idle threat to F.D.R. and F.L. The G.A.C. case was described in the Milbank Tweed memorandum as having a significant impact upon English creditors, and placing them in peril of contempt if, having a sufficient presence in the United States, they sought to enforce their claims against U.S.L. in England. Much more important, on 12 and 18 December 1986, respectively, U.S.L.'s English solicitors threatened F.D.R. and F.L. in the most E peremptory terms with contempt proceedings in the United States. These threats, and their related aspects, were of course in the forefront of the original arguments of counsel for F.D.R. and F.L. If they lost the *Mareva* orders, they submitted, there would be no point in continuing the English actions, although they had been perfectly properly brought to enforce straightforward English claims, and as a result substantial costs would be F thrown away. They would then have no alternative but to seek to prove their claims in the United States, thus submitting themselves to United States jurisdiction and exposing themselves to the threatened contempt proceedings (at present neither F.D.R. nor F.L. has any presence in the United States). The strength of these arguments was immediately manifest.

As a result, over the weekend intervening between the first and second days of this hearing, U.S.L. came up with an offer contained in a letter G dated 13 February 1987 from their United States' advisors not to seek any orders for contempt and to seek modifications of the restraining order to allow these English actions to continue to adjudication, provided the *Mareva* injunctions are vacated and the funds transferred to the United States. This was accompanied by a letter from the counsel to the creditors' committee, White & Case, consenting to these terms and conditions. This, to say the least of it, was a remarkable volte face. Mr. Steel and counsel H appearing that day for F.L., both of whom only learnt of the offer as they entered court, were naturally concerned as to the efficacy of the undertakings, in particular as to whether U.S.L. had power of their own motion to waive contempt proceedings in a United States court. As a

result, as already noted, it was necessary to adjourn the case for these matters to be investigated. A

During the adjournment U.S.L. made a further application to Judge Buschman for a variation of the restraining order, having, I should make it clear, notified Healy and Baillie of an intention so to apply. As a result Judge Buschman made the variation order dated 23 February, beginning with a number of introductory "Findings and Determinations," all but the last of which I need not read, since they related mainly to the "new entity" B point:

"Considerations of fairness to foreign creditors and easing the burden to them of having to come before this court to establish the facts upon which the case rests and comity for foreign law require that provision be made for the liquidation of claims by foreign creditors of U.S.L. in the courts and tribunals of the country in which such claims arose, C provided that (i) recognition would be granted to money judgments rendered in the foreign country and (ii) creditors are not thereby enabled to obtain preferential recoveries upon their claims by enforcing foreign judgments against property of the U.S.L. bankruptcy estate located outside the United States. The apparent conflict between the jurisdiction of this court and the English court should be resolved by D reciprocal considerations of comity. The vesting of the property of U.S.L. in its bankruptcy estate and the prohibition on collective efforts to prevent preferential treatment of creditors should be recognized by the English court. In return the burden and inconvenience of English creditors to litigate and liquidate their claims against U.S.L. in this court should be eased by permitting them to do so in the English court, the judgments of which should be recognized by this E court so that judgments obtained in the English courts will be conclusive evidence of the amounts of claims by English creditors for purposes of the chapter 11 case. Upon the foregoing findings and determinations and after due deliberation, it appearing to this court that the relief being sought by U.S.L. is in the best interests of the estate of U.S.L. and its creditors, it is ordered: 1. Subject to the F conditions set forth in paragraph 2, the automatic stay provided by section 362 of the Bankruptcy Code and the restraining order issued by this court in the above-captioned chapter 11 cases dated 24 November 1986 are modified for the sole purpose of permitting (but not requiring) persons or companies domiciled in England to commence and continue lawsuits for damages against U.S.L. in the courts of England in order to fix and liquidate the claims of such persons and G companies for purposes of allowances in the chapter 11 case of U.S.L. This modification shall be deemed to be effective as from 24 November 1986, so that any conduct that would otherwise constitute a violation of the automatic stay of the restraining order shall not be grounds for contempt sanctions or for claims for damages. 2. The relief granted in paragraph 1 is expressly conditioned upon the entry of a final order by the courts of England vacating [the F.D.R. and F.L. *Mareva* H injunctions] and upon the transfer by U.S.L. of the property covered by said orders to the United States, subject to the jurisdiction of this court."

Mr. Brice's submission was that this variation totally and conclusively eliminated the plaintiffs' objection based on the risk of contempt proceedings and the wasted costs. So far as the wasted costs are concerned, Mr. Steel and Mr. Norris of course did not demur. So far as contempt is concerned, they very properly conceded that the plaintiffs' fears were substantially allayed, in that there was no possibility of any contempt or allied proceedings either at the instance of U.S.L. or at the instance of the United States bankruptcy court itself. However, they submitted that the risk was not entirely eliminated, having regard to the provision in section 362(H) of the United States Bankruptcy Code which provides as follows in relation to a stay under the chapter 11 procedure:

> "An individual injured by any wilful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

This, they submitted, might furnish a disgruntled creditor with a claim, since it is plain, and established by authority, that this jurisdiction is not contingent on a finding of contempt: see *Budget Service Co. v. Better Homes of Virginia Inc.* (1986) 804 F. 2d 289.

Mr. Brice, in response, relied on paragraph 1 of the concluding section of the variation order, and submitted that, since it was backdated to 24 November 1986, there was no possibility of any individual establishing that he had been injured by any wilful violation of a stay, since, as a result of the backdated variation, none of the plaintiffs' actions in England could constitute any such violation. In my judgment this argument is unanswerable, and I hold that the risk of contempt or allied proceedings has now vanished entirely so far as F.D.R. and F.L. are concerned. E.C.T. are of course not specifically covered by the variation order, since they are not an English-registered company, but U.S.L.'s American advisors have given an undertaking to apply to the United States bankruptcy court for an amendment to the variation order so that it will cover them also. I feel confident that this will be granted, thus putting them in the same case as the other two plaintiffs.

*Prejudice and balance of convenience*

In the first place, U.S.L. contend that, if the *Mareva* order continues, the fair and equal treatment of creditors will be frustrated or impeded since either the present two plaintiffs or perhaps one of the other creditors would obtain judgment and then follow that up with garnishee proceedings against the bank, thus enabling them to obtain priority over the other creditors. Secondly, release of the *Mareva* order would result in the moneys at present frozen here being transferred to the United States and applied equitably for the benefit of the creditors as a whole under the chapter 11 scheme, always subject to the control of the creditors' committee and ultimately of the court. Under paragraph 1102 of the United States Bankruptcy Code 1982 the plaintiffs can apply to join the creditor's committee, or seek the appointment of a special committee. Thirdly, and more generally, Mr. Brice invited the court to approach the case from the point of view of creditors generally world-wide, rather than from the point

of view of the plaintiffs, in the best interests of international trade. I shall A deal with the last of these three points at the end of this judgment.

The anxiety underlying the first point is, I am quite satisfied, basically unsound. If the *Mareva* injunctions continue, the money will stay in London in the safe hands of Citibank. Moreover it is well established that, in the case of an insolvent respondent, the court will not permit the equitable remedy of a garnishee order to be used to enable a judgment B creditor to gain priority over other creditors: see *Rainbow v. Moorgate Properties Ltd.* [1975] 1 W.L.R. 788, 793, *per* Buckley L.J. For good measure, I can, and shall, as a condition of continuing the *Mareva* orders, require notice of the chapter 11 proceedings and their consequences to be given to the bank (though they probably know all about this already): and I can and shall also require an undertaking from the plaintiffs not to take any steps to release the frozen funds until after the expiry of a reasonable C period of notice to U.S.L., during which U.S.L. would, as Mr. Brice accepts, be free to apply to the English court for a winding up order; technically this would require the consent of the United States bankruptcy court, but in such circumstances that is extremely unlikely to be witheld.

As to the second point, I consider that the considerations there advanced, when properly analysed, tell strongly against U.S.L. rather than D in their favour. If these were ordinary winding up proceedings under which U.S.L.'s assets would be collected together and distributed totally and rateably amongst all their creditors, U.S.L.'s argument under this head would have substantial force. But it is nothing of the kind. This is a scheme to re-organise the company as a going concern, but on a much narrower commercial base limited to North America. No doubt this will be of great benefit both to U.S.L. themselves, and also to their North E American creditors, who may well both be able to recover their debts or at least a substantial dividend thereon, and also, if the scheme succeeds, continue their commercial relationship with U.S.L. as hitherto. Meanwhile, it seems to me commercially inevitable that some of the United States creditors will be paid off at least in part in order to induce them to carry on doing business with U.S.L. during the reconstruction period; this is not F contested by Mr. Brice.

But the position of the plaintiffs is entirely different. They are English creditors whose business is based here and does not extend at all to North America; it follows that, in view of the intended withdrawal of U.S.L. from Europe, there could be no possible benefit to them in seeing the *Mareva* funds repatriated to the United States, and ploughed into U.S.L.'s G general funds being used in the above manner in the effort to keep U.S.L. afloat as a going concern. They could of course apply to join the creditors' committee, and a letter from the United States Trustee of the Southern District of New York dated 19 February 1987, states that if they made such a request, and showed sufficient interest and willingness to participate in the committee's activities and deliberations, either personally or through local representatives or counsel, the request would be considered favourably. H However it seems extremely doubtful whether such effort or expense would really be worthwhile in proportion to the very small influence European creditors would be likely to be able to bring in the circumstances:

naturally, and understandably, the creditors' committee will be concentrating on North American business.

In *Mobil Sales and Supply Corporation v. Owners of Pacific Bear* [1979] H.K.L.R. 125, 134 in Hong Kong, Cons J. described the chapter 11 process as "not a process of universal distribution but a process of deliberately preferential distribution" and this description was strongly relied upon by counsel for all the plaintiffs. In my judgment this somewhat pungent comment has more than a grain of truth in it, provided it is not interpreted as connoting any criticism of the chapter 11 system, or any suggestion of unfair discrimination. Indeed, I would stress that it is difficult to see how either a chapter 11 scheme or its English counterpart can operate successfully on any other footing during the convalescence of the company; but where, as here, the plaintiffs will, for perfectly sound commercial reasons from U.S.L.'s point of view, be entirely outside the scope of the reconstruction, they can have nothing to gain and much to lose from the transfer of their *Mareva* funds to the United States; it follows that such transfer must, in my judgment, redound substantially to their prejudice.

Moreover, whereas the retention of the *Mareva* funds here will give the plaintiffs and their fellow European creditors security for a worthwhile percentage of their debts, this same fund, if transferred to the United States, will be a mere drop in the ocean of the total assets, and therefore no more than the slimmest marginal benefit to U.S.L. and the United States creditors. Furthermore, even assuming the worst case from U.S.L.'s point of view, namely an English winding up and distribution of the English assets exclusively to the European creditors, there will be no significant prejudice to the United States creditors having regard to the great disparity between the asset-to-liability ratio here and the same ratio overall.

It is of course central to U.S.L.'s case that, in principle, there should be one single insolvency proceeding only. This is perhaps most clearly epitomised in a paragraph of the "Findings and Determinations" preceding the variation order:

> "The interests of efficiency, minimising costs of administration and fairness to all creditors of United States Lines wherever located, required that all property of the U.S.L. bankruptcy estate be administered subject to the jurisdiction of this court in a single judicial proceeding."

However, evidence recently uncovered by F.D.R., and, rather surprisingly, not disclosed by U.S.L. until prompted, shows that there are already separate insolvency proceedings either under way or pending in France, the Netherlands, Belgium, and perhaps West Germany.

The French proceedings are particularly striking. On 5 December 1986 two U.S.L. vessels then situated at a shipyard at St. Nazaire were placed under provisional arrest by the French courts on the petition of two French creditors of U.S.L. Since then detailed negotiations have taken place between U.S.L. and representatives of the general body of French creditors. As a result, on 11 February 1987, U.S.L. petitioned the United States bankruptcy court for leave to sell the two vessels, and to pay off the

French creditors, both secured and unsecured out of the proceeds. The petition is supported by an affidavit sworn on 11 February 1987 by Mr. Greggory B. Mendenhall, a vice-president of U.S.L. A

Mr. Mendenhall testifies that the cost of placing the vessels in a condition in which they could be returned to an operating function is considerably in excess of their value, and that substantial charges are accruing for laying them up in France. The total sale price is approximately U.S. $3.2 million, of which about U.S. $1.8 million will be repatriated to the United States after payment of all French creditors secured and unsecured together with all expenses, if leave is granted. U.S.L.'s evidential position on this aspect of the case is far from satisfactory. Mr. Mendenhall's affidavit was obtained by F.D.R. from their French correspondents, and produced in evidence here by F.D.R.'s solicitors. When asked specifically by F.D.R.'s solicitors to explain this aspect of the case, Milbank Tweed replied somewhat blandly that "United States Lines is negotiating with counsel for French creditors for the sale of two vessels . . . to satisfy the claims of priority creditors," (25 February) and "the sale of property of United States Lines in France . . . has not been consummated" (26 February). Mr. Brice submits that this in no way constitutes a departure from U.S.L.'s general position, but is the only way they can sell valuable ships, which the French authorities will not release on any other terms. B C D

Even if I assume that this explanation is correct (and it could and should have been given in evidence rather than forensically), it seems to me that Mr. Steel is fully justified in pointing out that this settlement in France, if approved, involves not only a serious breach of the "single proceedings" theory, but also a preference (in the interests no doubt of expediency) of one particular group of creditors. Thus one central plank of U.S.L.'s case is significantly weakened. A further difficulty seems to me to be posed by the combination under the variation order of a recognition that England is the forum conveniens for the determination of the plaintiffs' claims with the insistence that it is improper for this court to exercise its power to grant conventional ancillary relief by way of *Mareva* injunction. This attitude is graphically and perhaps not entirely unfairly categorised by Mr. Steel as "tit-for-tat." I find it difficult to see why it is right for the claims themselves to continue in England, but wrong for the English courts to exercise their normal powers to grant ancillary relief, particularly since it is common ground that the *Mareva* injunction gives the plaintiff no proprietary interest or secured status. E F

I should refer briefly to one final point affecting F.D.R. only. Under various statutory provisions, which I need not recite, and which are agreed, they have preferential status to arrest vessels to enforce stevedore charges and dock dues. The evidence shows that they had the opportunity to arrest a U.S.L. vessel in Felixstowe, and did not do so; looking at the evidence, however, it seems to me that their prime motive in not so doing was to avoid rocking the boat, rather than because they relied on the protection of the *Mareva* injunction. Mr. Steel also submits that, since it is open to F.D.R. to take in rem proceedings against vessels already detained in foreign ports, the discharge of the *Mareva* here would be a pointless exercise; however I accept Mr. Brice's argument that, since the *Mareva* G H

A provides no security, this is not a material consideration; it follows that I place no weight on F.D.R.'s special preferential position in this respect.

*Conclusions*

As already noted, Mr. Brice invited me to view this case from the point of view of the whole body of creditors rather from that of the plaintiffs, and to consider the interests of international trade. In my judgment my task is not to view the matter (to use Mr. Brice's metaphor) from either B one end of the telescope or the other, but to endeavour, as I have done, to balance in the equation all relevant factors of which the chapter 11 proceedings and international trade are but two, albeit very important ones, giving every one due weight. I have already concluded that the doctrine in *Travers* v. *Holley* [1953] P. 246 is not applicable. Moreover, the normal English procedure in the present circumstances is, I find, for any winding up proceedings to be conducted here ancillary to the principal C United States proceedings, and under our rules, in which respect we seem to be in line with the United States view on section 304 as expressed in the *Cunard* case, 773 F. 2d 452 and the *Victrix* case, 65 B.R. 466. Having regard to those cases I am by no means convinced by Mr. Brice's concluding submission that, if the boot were on the other leg, the United States court would inevitably release the assets to allow repatriation here.

So far as prejudice is concerned, I am satisfied that U.S.L. will suffer D no material prejudice if the *Mareva* injunctions continue, since the assets will remain safely here, and there is no prospect of their being distributed without the intervention of ancillary winding up proceedings. Moreover, while a desire to concentrate proceedings in the United States is fully understandable, the experience in France and elsewhere in Europe shows that this aspiration must and does yield to the exigencies of the local situation. Once it is conceded, as it has been, albeit conditionally, that E England is the appropriate forum for the resolution of the claims themselves, any objection in principle to the acknowledged forum conveniens continuing a conventional ancillary order seems to me extremely weak.

On the other hand, if the *Mareva* orders are discharged, I consider that the present plaintiffs will suffer very substantial prejudice, seeing that the funds will be used to keep U.S.L. alive as a going concern in a manner F from which the plaintiffs cannot possibly derive any benefit, because of U.S.L.'s withdrawal from Europe.

Taking all these aspects into account, bearing in mind the test in *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396, I have concluded that U.S.L. will suffer no prejudice if the *Mareva* injunctions are continued, whereas the plaintiffs will suffer irreparable prejudice if they are not, and that the overall balance of convenience strongly favours their continuance. It follows that, in the exercise of my discretion, I shall continue the *Mareva* G injunctions in all three cases.

*Order accordingly.*

*Solicitors: Westhorp Ward & Catchpole, Ipswich; Simon Osborne; Norton Rose Botterell & Roche; Hill Dickinson & Co.*

M. F.

H

# THE NEW SOUTH WALES LAW REPORTS

## Volume 24

1990-1992

*Published for*

THE COUNCIL OF LAW REPORTING FOR NEW SOUTH WALES

*by*

THE LAW BOOK COMPANY LIMITED

A

# RE G B NATHAN AND CO PTY LTD (IN LIQ)

Equity Division: McLelland J

1, 4 July, 6 September 1991

B

*Companies — Winding up — Conduct of liquidation — Application to court for directions by liquidator — Function of application — Corporations Law, s 479(3).*

*Companies — Winding up — Remuneration of liquidator — Where trust assets — Payable from non-trust assets where property available — General principles — Corporations Law, s 556.*

C

*Companies — Winding up — Liquidators — Duties and liabilities of — Administration of trust assets held by company — General principles.*

*Held*: (1) The only proper subject of a liquidator's application for directions pursuant to the *Corporations Law*, s 479(3), is the manner in which the liquidator should act in carrying out his functions as such, and the only binding effect of, or arising from, a direction in pursuance of such an application is that the liquidator, if he has made full and fair disclosure to the court of the material facts, D will be protected from liability for any alleged breach of duty as liquidator to a creditor or contributory or to the company in respect of anything done by him in accordance with the direction. (679F-G)

(2) Where work done by a liquidator in relation to trust assets may properly be considered as having been done for the purpose of winding up the affairs of the company, any remuneration and expenses attributable to that work should be paid out of the (non-trust) property of the company in accordance with the *Corporations Law*, s 556, to the extent that there is such property available. To the extent that there is not sufficient available property, allowance should E normally be made to the liquidator out of trust assets. (688G-689B)

(3) The *Corporations Law*, s 495(1), places upon the liquidator the duty to act in a responsible way in the administration of the trust in the name of the company. (688C-F)

*Re Crest Realty Pty Ltd (In Liq) and the Companies Act* [1977] 1 NSWLR 664 and *Re Berkeley Applegate (Investment Consultants) Ltd (In Liq)* [1989] Ch 32, followed.

(4) Winding up the affairs of the company which holds trust property F comprehends the liquidator identifying the trust assets and those entitled to them and taking such steps as may be appropriate in the circumstances for the purpose of divesting from the company the trust assets and any continuing obligations in relation to them. (689B)

*Note*:

A Digest — CORPORATIONS (3rd ed) [226], [189], [202], [188]; COMPANY LAW (2nd ed) [287], [223], [249], [230]

G

CASES CITED

The following cases are cited in the judgment.

*ADM Franchise Pty Ltd, Re* (1983) 7 ACLR 987; 1 ACLC 987.
*Anmi Pty Ltd v Williams* [1981] 2 NSWLR 138.
*Augustus v Permanent Trustee Co (Canberra) Ltd* (1971) 124 CLR 245.

A A *Balfe v Blake* (1850) 1 IR Ch R 365.
*Berkeley Applegate (Investment Consultants) Ltd (In Liq), Re* [1989] Ch 32.
*Berkeley Applegate (Investment Consultants) Ltd (No 3), Re* (1989) 5 BCC 803.
*Blackbird Pies (Management) Pty Ltd (No 2), Re* [1970] QWN 14.
*Bunnett Deceased, Re* (1864) 10 Jur NS 1098.
*Byron Moore Journeaux Ltd (In Liq), Re* [1990] VR 683.
*Chisholm v Gilchrist* (1902) 2 SR (NSW) (Eq) 84; (1902) 19 WN (NSW) 140.
*Crest Realty Pty Ltd (In Liq) and the Companies Act, Re* [1977] 1 NSWLR 664.
B B *David v Frowd* (1833) 1 My & K 200; 39 ER 657.
*Davies, Re* (1888) 38 Ch D 210.
*Dean v Allen* (1855) 20 Beav 1; 52 ER 502.
*Eastern Capital Futures Ltd, Re* (1989) 5 BCC 223.
*Evans v Evans* (1910) 10 SR (NSW) 594; 27 WN (NSW) 163.
*Furness, Re* [1943] Ch 415.
*Gardner v London Chatham and Dover Railway Co (No 1)* (1867) LR 2 Ch App 201.
*Gilchrist, Re Trusts of Will of* (1867) 6 SCR (NSW) Eq 74.
C C *Harrison v Mills* [1976] 1 NSWLR 42.
*Health, Ministry of v Simpson* [1951] AC 251.
*Indopal Pty Ltd, Re* (1987) 12 ACLR 54; 5 ACLC 278.
*Lorenz's Settlement, Re* (1861) 1 Dr & Sm 401; 62 ER 433.
*Murdoch v Crawford* [1986] VR 97.
*Odessa Promotions Pty Ltd, Re* (1979) ACLC 32, 103.
*Pinnock v Hull* (1876) 2 VLR (Eq) 18.
*Rosanove v O'Rourke* [1988] 1 Qd R 171.
D D *Royle, Re* (1889) 43 Ch D 18.
*Sawyer v Birchmore* (1836) 1 Keen 391; 48 ER 357.
*Securitibank Ltd (In Liq), Re* [1978] 1 NZLR 97.
*Securitibank Ltd, Re* [1978] 2 NZLR 133.
*Securitibank Ltd (No 2), Re* [1978] 2 NZLR 136.
*Securitibank Provident Fund Ltd (In Liq), Re* (1984) 73 FLR 264; 9 ACLR 56; 2 ACLC 594.
*Sportsman's Leisure & Hobby Warehouse Pty Ltd (In Liq), Re* [1990] 2 Qd R 93.
E E *Staff Benefits Pty Ltd and the Companies Act, Re* [1979] 1 NSWLR 207.
*Standard Insurance Co Pty Ltd, Re* (1963) 5 FLR 292; 80 WN (NSW) 1355.
*Suco Gold Pty Ltd (In Liq), Re* (1983) 33 SASR 99.
*TTC (SA) Pty Ltd (In Liq), Re* (1983) 32 SASR 532.
*Thomas v Griffith* (1860) 2 Giff 504; 66 ER 211.
*Union Trustee Co of Australia Ltd, Re; McColm and Earl of Suffolk* [1936] QWN 6.
*Universal Distributing Co Ltd (In Liq), Re* (1933) 48 CLR 171.
*Waller v Barrett* (1857) 24 Beav 413; 53 ER 417.
F F *Ward, Re* (1987) 66 CBR (NS) 165.
*Williams v Headland* (1864) 4 Giff 505; 66 ER 806.

The following additional cases were cited in argument:

*Askrigg Pty Ltd v Student Guild of the Carter University of Technology* (1989) 18 NSWLR 738.
*Gray v Bridgestone Australia Ltd Ewing v Fiandri Pty Ltd* (1986) 10 ACLR 677.
*Grime Carter & Co Pty Ltd v Whytes Furniture (Dubbo) Pty Ltd* (1983) 7 ACLR 540.
G G *Northumberland Insurance Co Ltd, Re (No 2)* (1975) 1 ACLR 142.
*Speedifix Building Products Pty Ltd (In Liq), Re* (1987) 11 ACLR 863; 5 ACLC 866.

Summons for Directions

This was the hearing of an application by a liquidator for directions under the *Corporations Law*, s 479(3).

*B A J Coles*, for the applicant (liquidator). A

*D L Williams*, for Panuane Trading Pty Ltd.

*S N Diamond*, for certain claimants to Bank of Singapore block deposit.

*G K Burton*, for certain claimants to bank bills and a claimant to Bank of Singapore named deposit.

*S R Webster* (solicitor), for Chinatex (Aust) Wool Co Pty Ltd. B

*J R S Bowers*, for Top Glory (Aust) Pty Ltd.

*M Dempsey*, for Phillip Street Properties Pty Ltd.

*Cur adv vult*

6 September 1991 C

**McLELLAND J.** This is an application by the liquidator of G B Nathan & Co Pty Ltd (GBN) for directions under s 479(3) of the *Corporations Law* as to (1) whether he is entitled or bound to deal with certain moneys and securities as being held on trust by GBN for certain of its clients, or as available for unsecured creditors, and (2) whether he is entitled to deduct therefrom the costs, charges and expenses of the winding up.

The application is made by notice of motion (as amended on 1 July 1991) D to which there are no named respondents, filed in the winding up proceedings. However in response to a circular letter from the liquidator inviting them to do so, numerous clients of GBN have appeared by solicitor or counsel who have, without objection, participated in the hearing of the application, and some of whom have, again without objection, put evidence before the Court.

In these circumstances I consider it desirable, before going to the substance of the directions sought, to say something about the nature and E scope of a liquidator's application for directions.

**Nature and scope of application for directions:**

Section 479 is in the following terms:

> "479. (1) Subject to this Part, the liquidator shall, in the administration of the property of the company and in the distribution of the property among its creditors, have regard to any directions given by F resolution of the creditors or contributories at any general meeting or by the committee of inspection, and, in case of conflict, any directions so given by the creditors or contributories override any directions given by the committee of inspection.
>
> (2) The liquidator may convene general meetings of the creditors or contributories for the purpose of ascertaining their wishes, and he or she shall convene meetings at such times as the creditors or G contributories by resolution direct or whenever requested in writing to do so by at least one-tenth in value of the creditors or contributories.
>
> (3) The liquidator may apply to the Court for directions in relation to any particular matter arising under the winding up.
>
> (4) Subject to this Part, the liquidator shall use his or her own

discretion in the management of affairs and property of the company and the distribution of its property."

The legislative pedigree of s 479 may be traced back to s 23 of the *Companies (Winding up) Act* 1890 (UK) (53 & 54 Vict, c 63), which in turn derived from s 89 of the *Bankruptcy Act* 1883 (UK) (46 & 47 Vict, c 52) which itself was based on s 20 of the *Bankruptcy Act* 1869 (UK) (32 & 33 Vict, c 71). An early precursor of a liquidator's application for directions may be found in s 34 of the *Joint Stock Companies Winding Up Act* 1848 (UK) (11 & 12 Vict, c 45), which provided for an official manager (an early form of liquidator) to "take the Directions of the Master from Time to Time with reference to all Proceedings necessary to be done or taken in order to [sic] the complete and effectual winding up of the Affairs of the Company . . .".

A statutory procedure for application for directions by a trustee, executor or administrator was introduced by s 30 of the *Law of Property Amendment Act* 1859 (UK) (22 & 23 Vict, c 35).

These various statutory provisions for directions were a development from the practice of the Court of Chancery under the general law in giving directions to those entrusted with the administration of property under the control of the court. Two main classes of such persons were (1) trustees of trust property, or executors or administrators of a deceased estate, under administration by the court pursuant to a decree for general administration, and (2) receivers (and managers) appointed by the court in respect of property the subject of litigation. In such cases the exercise by those persons (to whom I will collectively refer as official administrators) of administrative or managerial functions was subject to close control by the court and in many instances they could safely exercise their powers only with the approval, and in accordance with the directions, of the court see, eg, as to trustees, *Re Furness* [1943] Ch 415, and as to receivers and managers, *Gardner v London Chatham and Dover Railway Co* (No 1) (1867) LR 2 Ch App 201 at 211 and *Rosanove v O'Rourke* [1988] 1 Qd R 171 at 173.

Generally speaking, if the court gave a direction to an official administrator who had made a full and fair disclosure to the court of the material facts, the official administrator might act in accordance with the direction without thereby incurring personal liability to any of the persons in whose interests the administration was being conducted, for example, creditors or beneficiaries of a deceased estate: see *Waller v Barrett* (1857) 24 Beav 413; 53 ER 417; *Dean v Allen* (1855) 20 Beav 1; 52 ER 502; *Williams v Headland* (1864) 4 Giff 505, 66 ER 806; *Pinnock v Hull* (1876) 2 VLR (Eq) 18 at 24-25 and *Chisholm v Gilchrist* (1902) 2 SR (NSW) (Eq) 84 at 86; (1902) 19 WN (NSW) 140.

The protection of the official administrator, acting under a direction of the court, from personal liability would not however affect the rights of creditors and beneficiaries as between themselves: see *Waller v Barrett; David v Frowd* (1833) 1 My & K 200; 39 ER 657; *Sawyer v Birchmore* (1836) 1 Keen 391; 48 ER 357; *Thomas v Griffith* (1860) 2 Giff 504; 66 ER 211 and *Ministry of Health v Simpson* [1951] AC 251 at 268.

Section 30 of the 1859 Act made the protection of the official administrator explicit in terms which broadly reflected the position under the general law following a decree for general administration:

"... the Trustee, Executor, or Administrator acting upon the Opinion,

Advice, or Direction given by the said Judge shall be deemed, so far as regards his own Responsibility, to have discharged his Duty as such Trustee, Executor, or Administrator in the Subject Matter of the said Application; provided nevertheless that this Act shall not extend to indemnify any Trustee, Executor, or Administrator in respect of any Act done in accordance with such Opinion, Advice, or Direction as aforesaid, if such Trustee, Executor, or Administrator shall have been guilty of any Fraud or wilful Concealment or Misrepresentation in obtaining such Opinion, Advice, or Direction; . . ."

In *Re Lorenz's Settlement* (1861) 1 Dr & Sm 401; 62 ER 433, in relation to s 30 of the 1859 Act, Kindersley V-C said (at 404-405; 434):

> "Now, my understanding of that section of the Act is that it was intended by the Legislature that the Court should have the power to advise a trustee or executor as to the management and administration of the trust property in the manner which will be most for the advantage of the parties beneficially interested, but not to decide any question affecting the rights of those parties inter se . . . .
>
> It is true that, in some cases, the Court has (unadvisedly, as I think), upon a petition under this section, given its opinion on questions affecting the rights of parties. But I believe that the Judges generally now consider that it ought not to be done."

(See also *Re Bunnett Deceased* (1864) 10 Jur NS 1098 and *Re Trusts of Will of Gilchrist* (1867) 6 SCR (NSW) Eq 74.)

Section 30 of the 1859 Act did not empower the court to go beyond what could properly be done under a decree for general administration (as is evidenced by decisions given in relation to O 55, r 3 of the *Rules of the Supreme Court* 1883 (UK) which in a practical sense superseded s 30 of the 1859 Act: see the *Annual Practice* (1883) at 636); eg, *Re Davies* (1888) 38 Ch D 210 and *Re Royle* (1889) 43 Ch D 18 discussed in *Augustus v Permanent Trustee Co (Canberra) Ltd* (1971) 124 CLR 245 at 254.

The court had no jurisdiction under a decree for general administration to decide questions as against persons making proprietary claims adverse to the trust or estate in question (see *Evans v Evans* (1910) 10 SR (NSW) 594 at 596-597; (1910) 27 WN (NSW) 163) except possibly by consent (see *Royle* (at 21)), and compliance with a direction of the court would presumably offer no protection against such a claimant: cf *Balfe v Blake* (1850) 1 Ir Ch R 365, where a receiver was held not to be protected by a direction of the court against a claim by a stranger to the litigation in which the receiver had been appointed.

As Simpson CJ in Equity said in *Evans* (at 597):

> ". . . where the question raised is against a third person, as to whether certain assets which are claimed as belonging to the estate, belonged to the estate or to the third person, obviously that matter cannot be dealt with in an administration suit, except to this extent: an administration decree can be made, and an inquiry directed as to what assets belonged to the estate; and then the Master on that inquiry will report that a certain sum of money is outstanding in the name of Z, which Z claims to belong to him. All the Master could do would be to direct that proper proceedings should be taken against Z."

The substance of s 30 of the 1859 Act was enacted in New South Wales by

s 30 of the *Trust Property Act* 1862 (26 Vict No 12), and continued by s 20 of the *Trustee Act* 1898. It is of interest to note that in the course of a debate in the Legislative Council on the *Trustee Bill* of 1924, the Honourable J B Peden (Professor of Law at the University of Sydney and principal draftsman of the Bill which became the *Trustee Act* 1925) said that:

> "... no one has ever suggested in modern times that [an application under s 20 of the 1898 Act on a question of management or administration] had anything whatever to do with the question as to who are the persons entitled ... it was suggested many years ago that it was possible to go into the rights of beneficiaries and construe an instrument under s 20, but it is so long ago I have forgotten when it was. I doubt if for half a century anybody has raised [that] contention."

(New South Wales Parliamentary Debates 15 October 1924, 2731 at 2748.)

The position in this regard was altered by explicit provisions as to the binding effect of a direction of the court on a question as to the identity, or rights as between themselves, of beneficiaries, in s 63 of the *Trustee Act* 1925, but even under this provision, an application for directions is ordinarily inappropriate where factual issues require to be determined (see, eg, *Harrison v Mills* [1976] 1 NSWLR 42 at 45-46), and the determination of proprietary claims adverse to the relevant trust or estate has never been within the scope of such a provision: cf *Re Union Trustee Co of Australia Ltd; McColm and Earl of Suffolk* [1936] QWN 6.

There are significant similarities between the winding up of a company under the control of the court, and the administration of a deceased estate under the control of the court, and there are also similarities between the status of a court-appointed liquidator and that of a court-appointed receiver. It is reasonable to conclude that the statutory procedures for directions enacted in relation to trustees in bankruptcy by the 1869 Act and in relation to liquidators of companies by the 1890 Act were intended, so far as was consistent with the statutory framework, to be of the same nature and attended by the same incidents as the equivalent procedures under the general law, and under s 30 of the 1859 Act. It is also reasonable to conclude that the same considerations apply to s 479 of the *Corporations Law* which (like s 379 of the *Companies (New South Wales) Code*) is in practically identical terms to s 23 of the 1890 Act.

The historical antecedents of s 479(3), the terms of that subsection and the provisions of s 479 as a whole combine to lead to the conclusion that the only proper subject of a liquidator's application for directions is the manner in which the liquidator should act in carrying out his functions as such, and that the only binding effect of, or arising from, a direction given in pursuance of such an application (other than rendering the liquidator liable to appropriate sanctions if a direction in mandatory or prohibitory form is disobeyed) is that the liquidator, if he has made full and fair disclosure to the court of the material facts, will be protected from liability for any alleged breach of duty as liquidator to a creditor or contributory or to the company in respect of anything done by him in accordance with the direction.

Modern Australian authority confirms the view that s 479(3) "does not enable the court to make binding orders in the nature of judgments" and that the function of a liquidator's application for directions "is to give him advice as to his proper course of action in the liquidation; it is not to

determine the rights and liabilities arising from the company's transactions before the liquidation": see *Re Security Provident Fund Ltd (In Liq)* (1984) 73 FLR 264 at 265; 9 ACLR 56 at 57; 2 ACLC 594 at 595; *Murdoch v Crawford* [1986] VR 97 at 99; *Re Sportsman's Leisure & Hobby Warehouse Pty Ltd (In Liq)* [1990] 2 Qd R 93 at 96 and *Re Byron Moore Journeaux Ltd (In Liq)* [1990] VR 683 at 684; see also *Re TTC (SA) Pty Ltd (In Liq)* (1983) 32 SASR 532 at 535 and, in relation to a receiver's application for directions, *Re Odessa Promotions Pty Ltd* (1979) ACLC ¶40-523 at 32,105-32,106. Canadian authority is to similar effect. In *Re Ward* (1987) 66 CBR (NS) 165 at 171, Dickson J of the Supreme Court of New Brunswick said in relation to the equivalent provision under the (Canadian) *Bankruptcy Act*:

> "It seems well settled in law that in an application under s 16 of the Act a court must confine itself, in giving directions, to matters concerning administration of the estate and has no authority to resolve substantive matters in dispute between a trustee and a third party."

It should be observed that there are instances where a court has, in proceedings commenced as a liquidator's application for directions, gone on to make orders declaratory of substantive rights, clearly intended to be of binding effect on the parties to the proceedings, and where necessary has made representative orders for this purpose: see, eg, *Re Staff Benefits Pty Ltd and the Companies Act* [1979] 1 NSWLR 207 and cf *Re Securitibank Ltd (In Liq)* [1978] 1 NZLR 97; *Re Securitibank Ltd* [1978] 2 NZLR 133 and *Re Securitibank Ltd (No 2)* [1978] 2 NZLR 136. The procedures of the court are sufficiently flexible to enable proceedings commenced as an application for directions to be changed into proceedings for the determination of substantive rights, and this is sometimes a convenient course in order to avoid the need to commence further proceedings involving additional cost and delay: see, eg, *Anmi Pty Ltd v Williams* [1981] 2 NSWLR 138 at 156-157. However it is important that the distinction between the two kinds of proceedings be not lost sight of or blurred, and such a fundamental change should not be permitted unless the court is satisfied that those affected either consent to that course (see, eg, *Re Standard Insurance Co Pty Ltd* (1963) 5 FLR 292; 80 WN (NSW) 1355 and *Murdoch* (at 100-101)), or will not suffer injustice in consequence of the alteration to the status of the proceedings.

I should add that it does not necessarily follow that there is no appeal from an order of the court made on a liquidator's application for directions, although there are statements to this effect in some of the Australian cases commencing with the decision of Hanger J in *Re Blackbird Pies (Management) Pty Ltd (No 2)* [1970] QWN 14. The availability of an appeal in any particular case must depend upon the legislative provisions and rules regarding appeals in the particular court: cf *Re Securitibank Ltd* [1978] 2 NZLR 133. The availability of an appeal is primarily a matter for decision by the relevant appellate court, but in New South Wales it seems to me to be at least strongly arguable that an order made upon a liquidator's application for directions would constitute an interlocutory order from which an appeal would lie to the Court of Appeal with leave, pursuant to s 101(2)(e) of the *Supreme Court Act* 1970, and cases may arise where the practical consequences of the giving of directions could justify an appeal.

The primary matters of significance in the present application arising from the above considerations are that any directions which may be given to the

liquidator (a) will not give rise to any conclusive determination as between GBN and its clients as to (i) whether particular assets held by GBN are held in trust for those clients or (ii) whether any such trust assets may properly be applied by the liquidator in payment of his remuneration and expenses; and (b) will not protect the liquidator against the claims of clients asserting that assets held by GBN are held in trust for those clients. However if the liquidator acts in accordance with any such directions (assuming full and fair disclosure of the material facts) he will be protected from claims by unsecured creditors or by contributories (or by the company itself), of any alleged breach of his duties as liquidator by so acting.

**Claims to ownership of assets:**

The next matter for consideration is whether the liquidator should give effect to the respective claims to assets alleged to be held on trust by the company without requiring those claims to be established in substantive proceedings, or further investigated.

It appears from the material before the Court that GBN is a wholly owned subsidiary of Nathans Ltd (NL) and that another company in the same group, Nathans Nominees Pty Ltd (NN), is a wholly owned subsidiary of GBN. GBN was a licensed money market dealer and, among other things, it invested money on behalf of clients who had deposited funds with it for this purpose. The ordinary course of dealing in such cases was that the funds were received by GBN on terms that they would be invested in some specified way agreed (ordinarily by telephone) between a representative of GBN and the client before receipt of the funds and confirmed by letter from GBN upon such receipt. The investments comprised either loans to other companies or institutions or the purchase of bank-accepted bills of exchange. Examples of standard form letters sent by GBN to clients upon receipt of funds for investment in each of these categories are as follows:

"We confirm having arranged the following deposit on your behalf.

Date of Deposit ........................................3/11/89
Amount Deposited ....................................$7,000.00
Interest Rate ....................................17.500 per cent pa
Term ..........................................................24 HR CALL
Security ..............................SECURED BY BANK BILLS

The deposit was placed with:
HAMBROS AUSTRALIA LIMITED
Settlement: NATHANS TO PICK UP AND BANK
Thank you for entrusting us with this transaction.

for and on behalf of:
G B NATHAN & CO PTY LIMITED

We confirm the sale to you of the following securities.

| | |
|---|---|
| Securities:.................................. | BANK ACCEPTED BILLS OF EXCHANGE |
| Drawer:........................................ | VARIOUS |
| Acceptor:...................................... | NATIONAL AUSTRALIA BANK |
| Face Value:.................................. | $100,000.00 |
| Maturity Date:.............................. | 13/06/91 |
| Days to Maturity:.......................... | 94 |
| Yield:............................................ | 11.4000 per cent |
| Settlement Value:.......................... | $94,147.85 |

Settlement:.................................. BILLS TO BE HELD IN SAFE CUSTODY

Our fees as arranged are $75.00. These have been deducted.

Yours faithfully,

G B NATHAN & CO PTY LIMITED"

It appears that the relevant records of GBN were kept on computer. There is before the Court a print-out from those records dated 1 May 1991 entitled "G B NATHAN & CO PTY LIMITED. NATHAN'S BORROWINGS. BORROWERS LISTING" which has been referred to as "the GBN Borrowers Listing". That document contains particulars of each "borrower" (that is, the company or institution with which GBN placed funds) and in respect of each "borrower" particulars of each "depositor" (that is, the client from which GBN received the funds) and particulars of (inter alia) the date of investment, the amount, the term and interest rate applicable to each "depositor".

The liquidator has caused to be prepared a reconciliation between the GBN Borrowers Listing and information obtained from each of the "borrowers" therein listed. The total amount of principal as shown in the GBN Borrowers Listing was $37,034,394.50. The reconciliation has resulted in the following dissection of this amount:

| | |
|---|---|
| (1) Funds held by companies or institutions in the names of GBN's clients, authority to conduct operations being vested in the clients— | $4,961,481.12 |
| (Less amount in this category not included in the GBN Borrowers Listing — | 5,000.00) |
| (2) Funds held by companies or institutions in the name of GBN or its nominee — | 5,404,887.31 |
| (3) Funds held by companies or institutions in the names of GBN's clients, authority to conduct operations being vested in GBN — | 17,297,650.97 |
| (4) Funds claimed by the companies or institutions not to be held by them (non-existent or previously closed accounts) — | 9,375,375.10 |
| | $37,034,394.50 |

The material before the Court does not clearly establish the reason for the discrepancy represented by item (4). To the extent that it includes investments which were in fact made but which have been redeemed by reason of direct dealings between the clients and the relevant companies or institutions, it may be accounted for by the absence of notification to GBN of those dealings. It is not clear that all the funds in item (4) fall into this category, although it is possible that they may. No claim appears to have been made by any client of GBN to the ownership of funds in item (4).

A challenge was made to the reliability of the GBN Borrowers Listing on behalf of Panaune Trading Pty Ltd (Panaune), Chinatex Aust (Wool) Co Pty Ltd and Top Glory (Aust) Pty Ltd, each of which companies is shown in the GBN Borrowers Listing as having substantial funds invested by way of loan to NL. The basis of this challenge was evidence relating to deposits made by each of those companies either with GBN or NL. There is evidence tracing some of these funds from bank accounts of NL into accounts of other companies in the NL group, and their application for various purposes. Some

of the funds deposited by Panaune to the credit of a United States dollar account in the name of NL with Hong Kong Bank of Australia Ltd can be traced through accounts in the name of GBN called Client Investment Accounts. By letter dated 21 November 1990 from NL to Panaune it was confirmed that the original deposit of $US442,334.90 by Panaune with interest capitalised and converted to United States dollars (totalling $US446,822.72) had been extended for a further month. GBN's daily transaction listing for 22 November 1990 included a somewhat complex series of entries, several of which mutually cancelled out leaving a "repayment" of $442,334.90 and "deposits" of $442,334.90 and $4,487.82 (totalling $446,822.72). The GBN Borrowers Listing shows $US446,822.72 invested by Panaune with NL in a United States dollar account with interest due amounting to $A32,709.86. It is to be observed that the GBN Borrowers Listing shows what appears to be the correct amount of Panaune's funds invested with NL in a United States dollar account and an amount of accrued interest in Australian dollars which is not suggested to be incorrect.

I am unable to attach any particular significance for present purposes to the fact that after deposits had been made by these three companies some of the funds then passed into or through accounts of other companies in the NL group including GBN Client Investment accounts. There seems little doubt that each of the depositor companies intended that its funds be invested by way of loan to NL, and this is what in fact happened and is what is recorded in the GBN Borrowers Listing. The only matter that arguably takes these transactions out of the ordinary is that there are some direct dealings between the respective clients and NL without the intervention of GBN. But there is nothing to suggest that in the hands of NL the funds invested were other than loans to that company, which was at liberty to disburse the borrowed funds as it saw fit.

The directions sought relate to five classes of investments identified in the schedule to the amended notice of motion, all of which fall under categories (2) and (3) above.

I will deal with them separately.

*(1) The bank bills*:

(a) ANZ Bank Ltd (XANZ01).

(b) National Australia Bank Ltd (XNAB01).

There are four bank bills. Each is shown in the GBN Borrowers Listing as representing the funds of a particular client. All the bills have now matured and the proceeds are under the control of the liquidator. Subject in each case to evidence corroborative of a trust having been, or being, produced to the liquidator by the client there is no reason why the liquidator should not deal with the bills (and their proceeds) as being held on trust for the respective clients. Evidence in the form of a letter from GBN to the client contemporaneous with the purchase of the bill to the effect of the second of the draft standard letters earlier referred to would be sufficient for this purpose. I note that such evidence has already been produced to the liquidator by Ms Lilli Vogel (in respect of two bills for $50,000 and $70,000) and by Vogel Staff Superannuation Fund (in respect of a bill for $100,000).

*(2) Deutschmark Account:*

Commonwealth Bank of Australia Deutschmark Account (ACOM01).

This account is shown in the GBN Borrowers Listing as representing the funds of a client, Deemcept Pty Ltd. The account exists and the deposit is intact. I note that in the liquidator's affidavit and also in the letter from GBN to the client confirming the deposit the amount is designated as "$" rather than "DM", and I am proceeding on the assumption that these are obvious mistakes. I note that evidence corroborative of the existence of a trust has already been produced to the liquidator by the client. There is no reason why the liquidator should not deal with the funds in this account as being held on trust for the client.

*(3) The Block Account:*

Bank of Singapore (SSIN03) (Block Deposit).

This is a deposit with the Bank of Singapore (Australia) Ltd in an account styled "Nathan Nominees Pty Limited Account 99/2" held by NN as agent for GBN. As at 25 June 1991, the funds in the account totalled $3,277,064.57 plus accrued interest. According to the liquidator's affidavit the claims for principal made against this account also total $3,277,064.57, from which GBN is entitled to brokerage to the extent of approximately $3,000 on the liquidator's assessment.

The GBN Borrowers Listing shows "Bank of Singapore (SSIN03)" as "borrower" representing the funds of 103 clients. The account was opened on 20 March 1991 with funds transferred from an account with Hambros Australia Ltd styled "Nathan Nominees Pty Limited Account 99" also held by NN as agent for GBN. The purpose of these "block deposits" as they have been called was to enable the funds of investors with relatively small amounts of money to be pooled together in order to obtain a higher rate of interest or more security than would have been available to each investor on an individual basis. Subject again in each case to evidence corroborative of a trust having been, or being, provided to the liquidator by the client there is no reason why the liquidator should not deal with the funds in this account as being held on trust for the respective clients in accordance with their respective contributions, subject to the deduction of any brokerage to which GBN is entitled. Evidence in the form of a letter from GBN to the client confirmatory of the existence of the trust and specifying the amount then held would be sufficient for this purpose. I note that many such letters have already been produced to the liquidator.

*(4) The Named Accounts:*

(a) Bank of Singapore (SSIN01) (Named Accounts).
(b) Westpac Banking Corporation (SWAP01).
(c) Hambros (SKAM01).

(a) The GBN Borrowers Listing, under the name "Singapore Bank Aust SSIN01" as "borrower" shows particulars of deposits from forty-five named clients. In respect of each such deposit there was a separate account opened with the Bank of Singapore in the name of the client "C/- G B Nathan & Co Pty Limited". Initially those accounts could be operated only by GBN, but prior to the liquidator's appointment, GBN through a receiver and manager of its property, authorised the Bank of Singapore to permit those accounts to be operated directly by the named clients. Only six of the clients still have

funds in the accounts in question. I do not see any reason to doubt that entitlement to the funds in these accounts was vested beneficially in the named account holders and should be treated by the liquidator accordingly subject to any entitlement which GBN may have to the payment of brokerage.

(b) On 28 March 1990, GBN lodged a deposit with Westpac Banking Corporation, Royal Exchange Branch, in the amount of $500,000 for a term of fifteen months in the name "G B Nathan & Co Pty Limited on account of Phillip Street Properties Pty Limited as trustee for the George Street Unit Trust". This deposit is shown in the GBN Borrowers Listing as representing the funds of Phillip Street Properties Pty Ltd, and there is other material before the Court confirming this. There is nothing to suggest that the benefit of this deposit is not held by GBN on trust for Phillip Street Properties Pty Ltd and it should be dealt with by the liquidator on this basis.

(c) As at 17 June 1991, a sum of $60,000 was held by Hambros Australia Ltd in an account in the name of De La Sala Pty Ltd. In the GBN Borrowers Listing under the name of "Hambros" as "borrower", De La Sala Pty Ltd is shown as the "depositor" in the amount of $60,000. The only other evidence about this is that investigations by the liquidator's staff have revealed that "De La Sala Pty Limited, which had funds deposited in the Hambros Block Deposit began dealing directly with Hambros as from 30 April 1991. This appears to be the only account which remained with Hambros, following the transfer of the block account from Hambros to the Bank of Singapore on 20 March 1991".

Without further information I am not prepared to give any particular directions concerning this account: it may be that further inquiries will demonstrate that none are required.

**G B Nathan & Co Pty Ltd — Client Investment Account held with the Commonwealth Bank of Australia, Stock Exchange Branch:**

The material before the Court is insufficient to warrant any directions being given in relation to this account.

**Liquidator's remuneration and expenses from trust assets:**

The question of the payment of a liquidator's remuneration and expenses from assets held by a company on trust has been the subject of detailed consideration in the Full Supreme Court of South Australia in *Re Suco Gold Pty Ltd (In Liq)* (1983) 33 SASR 99, a decision which has been applied in this Court: see, eg, *Re ADM Franchise Pty Ltd* (1983) 7 ACLR 987; 1 ACLC 987 and *Re Indopal Pty Ltd* (1987) 12 ACLR 54; 5 ACLC 278. However those cases differ from the present case in that they involved companies which were trustees of trading trusts. In pursuance of the relevant trusts the companies carried on business as trustees, in the course or for the purposes of which they incurred debts. The critical part of the decision in *Re Suco Gold Pty Ltd (In Liq)* may be found in the following passage from the judgment of King CJ, with whom Jacobs J and Matheson J agreed (at 110):

> "... It is part of the duty of the trustee company to incur debts for the purposes of the trust businesses and, of course, to pay those debts. Upon winding up those debts can only be paid in accordance with the provisions of the *Companies Act*. This requires necessarily that there be a liquidator and that he incur costs and expenses and be paid

remuneration. Section 292 provides that there be paid the costs and expenses of winding up, the taxed costs of the petitioner and the remuneration of the liquidator 'in priority to *other* unsecured debts'. (italics mine). The expression '*other* unsecured debts' appears to imply that the costs and expenses of winding up, the petitioner's costs and the liquidator's remuneration are regarded by the statute as debts of the company. As the company's obligation as trustee to pay the debts incurred in carrying out the trust cannot be performed unless the liquidation proceeds, it seems to me to be reasonable to regard the expenses mentioned above as debts of the company incurred in discharging the duties imposed by the trust and as covered by the trustee's right of indemnity. If that reasoning is wrong, I would, like Lush J in *Re Enhill Pty Ltd* (1982) 7 ACLR 8, be prepared to rely on the principle enunciated by Dixon J in *Re Universal Distributing Co Ltd (In Liq)* (1933) 48 CLR 171 at 174-175."

In the present case, the company did not (at least to any significant extent) either carry on a business as trustee, or incur debts in that capacity. The primary rationale of *Re Suco Gold Pty Ltd (In Liq)* therefore has no present application.

The case of *Re Universal Distributing Co Ltd (In Liq)* (1933) 48 CLR 171, referred to by King CJ, concerned a company in compulsory liquidation, the whole of the assets of which were charged in favour of a debenture holder for an amount which exceeded their value. It was held that although the security interest of the debenture holder prevailed over any entitlement of the liquidator to recover his expenses and remuneration, such of the expenses and remuneration of the liquidator as were attributable to the realisation of the assets the benefit of which passed to the debenture holder were properly payable out of the proceeds of realisation.

An analogous principle was applied in *Re Berkeley Applegate (Investment Consultants) Ltd (In Liq)* [1989] Ch 32 which had some similarity to the present case. There, a company had carried on business by receiving money from depositors and investing funds so received in mortgages in the name of the company. When the company went into liquidation it held numerous mortgages and substantial sums of money which were determined to have been held on trust for depositors, as well as certain free assets. The liquidator carried out a substantial amount of work (in which he incurred substantial expenses) including (a) a general investigation of the company's affairs and a preliminary identification of potential claimants and the classes into which they fell (for the most part carried out immediately prior to the liquidation), (b) responding to what was described as "an avalanche of enquiries from anxious investors and borrowers", (c) ascertaining the company's assets, including the free assets, which involved matching the sums paid to the company by the investors with the sums advanced by the company to the borrowers, checking the company's records and the investors' certificates of investment, reconciling the company's clients' accounts with the associated records, and compiling a schedule of mortgage advances showing the investors whose money was applied to each advance, and a schedule of those interested in the clients' accounts, (d) continuing to carry on the mortgage business to the extent of recovering interest in arrears and dealing with mortgage redemptions, and (e) general liquidation matters

unrelated to investors' claims. The free assets were insufficient to meet the liquidator's expenses and remuneration. It was common ground that there was no statutory authority for the payment of any part of the liquidator's expenses or remuneration out of trust assets. The question before the Court was whether any part of the liquidator's expenses or remuneration could be paid out of the trust assets if the assets of the company were insufficient. Mr Edward Nugee QC (sitting as a deputy High Court Judge in the Chancery Division) answered this question in the affirmative (at 50-51) on the basis of what he held to be a general principle established by the authorities:

> "... that where a person seeks to enforce a claim to an equitable interest in property, the court has a discretion to require as a condition of giving effect to that equitable interest that an allowance be made for costs incurred and for skill and labour expended in connection with the administration of the property. It is a discretion which will be sparingly exercised; but factors which will operate in favour of its being exercised include the fact that, if the work had not been done by the person to whom the allowance is sought to be made, it would have had to be done either by the person entitled to the equitable interest (as in *In Re Marine Mansions Co* LR 4 Eq 601 and similar cases) or by a receiver appointed by the court whose fees would have been borne by the trust property (as in *Scott v Nesbitt* 14 Ves Jun 438); and the fact that the work has been of substantial benefit to the trust property and to the persons interested in it in equity (as in *Phipps v Boardman* [1964] 1 WLR 993)."

The principle was applied by Morritt J in *Re Eastern Capital Futures Ltd* (1989) 5 BCC 223.

In subsequent proceedings in relation to the Berkeley Applegate company (*Re Berkeley Applegate (Investment Consultants) Ltd (No 3)* (1989) 5 BCC 803), it was held by Gibson J that a distinction should be drawn between expenses and remuneration of the liquidator in winding up the company on the one hand, and expenses and remuneration of the liquidator in administering the trust property held by the company as trustee on the other hand, the former being payable solely out of the assets of the company pursuant to the English section substantially equivalent to s 556(1)(a) of the *Corporations Law*, and the latter being payable solely out of the trust assets in accordance with the principle established in the earlier proceedings. The English section (s 115 of the *Insolvency Act* 1986) provided: "All expenses properly incurred in the winding up including the remuneration of the liquidator are payable out of the company's assets in priority to all other claims."

In relation to this, Gibson J said (at 805):

> "The point is to my mind a short one, and largely one of first impression. Looking at sec 115, for my part I have no doubt that the remuneration of the liquidator for administering trust assets which are not the assets of the company and the costs and expenses incurred by the liquidator, again not in getting in or paying out or distributing the assets of the company, but in administering trust assets, are outside the wording of the section. To my mind it is clear that the section is simply dealing with the winding up of the company, involving as it does the

> getting in of the assets of the company, ascertaining its creditors, paying its liabilities in accordance with the statutory provisions and distributing any surplus. I do not think that on any ordinary reading 'expenses properly incurred in the winding up, including the remuneration of the liquidator' would include expenses and remuneration which the liquidator has incurred and has been awarded by the court in respect of the work he has done administering the trust property held by the company as trustee, and in my judgment the section must be construed as limited to the liquidator's expenses in, and remuneration for, dealing with assets of the company. Take the reference to the remuneration of the liquidator. There is no doubt to my mind that that does not include what the court in its inherent jurisdiction has awarded to the liquidator in respect of the work he has been doing not as liquidator but as trustee in administering the trust assets. Similarly the other expenses that are referred to as being incurred in the winding up cannot be expenses in relation to what are not the assets of the company."

I do not consider that the distinction between work done and expenses incurred by the liquidator in the winding up, on the one hand, and work done and expenses incurred in administering property held by the company as trustee, on the other hand, can be drawn as easily as this passage may suggest. In the first place, it is clearly the duty of a liquidator for the purposes of the winding up to identify the assets of the company, and in particular to ascertain whether particular assets under the control of the company are beneficially owned by the company or by others. Secondly, in fulfilling his function to "do all such ... things as are necessary for winding up the affairs of the company ..." (see s 477(2)(m) of the *Corporations Law* and cf s 479(4)), the liquidator cannot disregard the fact that the company holds property in trust for others. In *Re Crest Realty Pty Ltd (In Liq) and the Companies Act* [1977] 1 NSWLR 664 (a case of a creditors' voluntary winding up) Needham J said (at 672):

> "... In the absence of any statutory provision regulating the administration of trusts of which a company in liquidation is the trustee, it seems to me that s 261(1) of the *Companies Act* [of which s 495(1) of the *Corporations Law* is the present equivalent] places upon the liquidator the duty to act in a responsible way in the administration of the trust in the name of the company."

There cannot be any substantial difference in this regard between a liquidator's duties in a voluntary winding up and in a winding up by the court. What the duty to "act in a responsible way" will involve and what degree of "administration" of the trust is necessary must depend upon the particular circumstances. In some cases an application to the court for the appointment of a new trustee may be an appropriate course; in other cases an application for the appointment of a receiver and manager of the trust assets may be warranted; see, eg, *Re IndoPal Pty Ltd* (at 57; 281).

Where, as appears to be the position in the present case, the company holds assets on what are virtually bare trusts for other persons, there seems to be no sufficient reason why the liquidator should not simply cause the company to comply with any demand by the beneficial owners to transfer the assets to them, thus giving effect to, and terminating, the trusts. In such a case, the work of the liquidator in causing those assets to be transferred to

those entitled to them wears the double aspect of work properly carried out for the purposes of the winding up, as well as work carried out in the "administration" of the trusts. It seems to me that to the extent that there is a conflict between the views of Gibson J in *Re Berkeley Applegate (Investment Consultants) Ltd (No 3)* and the views of Needham J in *Re Crest Realty Pty Ltd (In Liq) and the Companies Act* in the respective passages quoted above, as to the duties of a liquidator in relation to trust property held by the company, the views of Needham J are to be preferred, at least where "administration" is confined to the processes of identifying the trust assets and those entitled to them and taking such steps as may be appropriate in the circumstances for the purpose of divesting from the company the trust assets and any continuing obligations in relation to them, all of which processes may fairly be comprehended in "winding up the affairs of the company".

Where work done by a liquidator in relation to trust assets may properly be considered as having been done for the purpose of "winding up the affairs of the company", it is I think consistent with general principle that any remuneration and expenses attributable to that work be paid out of the (non-trust) property of the company in accordance with s 556 of the *Corporations Law*, to the extent that there is such property available. To the extent that there is not sufficient available property, bearing in mind that generally speaking "a liquidator is not liable to incur any expense in relation to the winding up of a company unless there is sufficient available property" (s 545), it would normally be appropriate to apply the principle referred to by Deputy Judge Nugee QC in the passage quoted earlier from *Re Berkeley Applegate (Investment Consultants) Ltd (In Liq)* and make an allowance to the liquidator out of trust assets. In the present case there is nothing to suggest that there is any relevant insufficiency of available property of the company to meet the liquidator's remuneration and expenses. The evidence suggests that there are realisable assets available to the liquidator of the order of $100,000. Accordingly there is no occasion for any allowance for the liquidator's remuneration and expenses to be made from trust assets.

The orders of the Court will be as follows:

1. Direct that the liquidator of G B Nathan & Co Pty Ltd (GBN) would be justified in dealing with the assets referred to in cll 1, 2, 3 and 4(a) and 4(b) of the schedule to the amended notice of motion filed 1 July 1991 as being held on trust by GBN for the respective clients shown as depositors in respect of those assets in the GBN Borrowers Listing, being annexure B to the affidavit of Kevin Richard Shirlaw of 25 June 1991, subject:

   (a) in the case of each of Camberlee Investments Pty Ltd and the respective clients claiming the assets referred to in cl 3 of the said schedule, to evidence corroborative of the existence of the trust having been, or being, produced to the liquidator by or on behalf of the client; and

   (b) to the deduction of any amounts properly payable to the company from such assets in respect of brokerage.

2. Direct that the said liquidator would not be justified in deducting from the said assets any costs, charges and expenses of the winding up.

I will hear any submission that any party may wish to make on the

question of the costs of this application. Subject to any such submission my tentative view is that the following orders for costs are appropriate:

3. Order that the costs of the liquidator on the trustee basis be paid out of the assets of the company as an expense of the winding up.

4. Order that the costs of all other parties represented on the hearing of this application (except R C Boulton) on the common fund basis be paid out of the assets of the company as expenses of the winding up but deferred in priority to such other costs, charges and expenses referred to in par (a) and par (b) of s 556(1) of the *Corporations Law* as have been incurred to date, provided that only one set of costs be so paid in respect of the costs of Panaune Trading Pty Ltd, Chinatex Aust (Wool) Co Pty Ltd and Top Glory (Aust) Pty Ltd.

The reason for making special provision in respect of Panaune, Chinatex and Top Glory is that none of those companies was the beneficial owner of any of the specific assets concerning which directions were sought, and their respective interests appeared to be identical, with no justification for separate representation at the expense of the company's assets.

*Orders accordingly*

Solicitors for the applicant (liquidator): *Clayton Utz*.

Solicitors for Panuane Trading Pty Ltd: *Bradfield & Scott*.

Solicitors for certain claimants to Bank of Singapore block deposit: *Townsend Partners & Madgwicks*.

Solicitors for certain claimants to bank bills and a claimant to Bank of Singapore named deposit: *Parish Patience*.

Solicitors for Chinatex (Aust) Wool Co Pty Ltd: *Ratner Chiu & Co*.

Solicitors for Top Glory (Aust) Pty Ltd: *Minter Ellison*.

Solicitors for Phillip Street Properties Pty Ltd: *Robilliard & Robilliard*.

I M NEWBRUN,
*Barrister*.

House of Lords

# **In re* HIH Casualty and General Insurance Ltd

# *In re* FAI General Insurance Co Ltd

# *In re* World Marine and General Insurance Pty Ltd

# *In re* FAI Insurances Ltd

# McGrath and others *v* Riddell and another

[2008] UKHL 21

2007 Dec 11, 12;
2008 April 9

Lord Hoffmann, Lord Phillips of Worth Matravers, Lord Scott of Foscote, Lord Walker of Gestingthorpe and Lord Neuberger of Abbotsbury

*Insolvency — Winding up — Foreign company — Companies incorporated in Australia also registered in and conducting business in England — Principal liquidation in Australia — Ancillary liquidation in England — Scheme for pari passu distribution of assets under Australian law different from English law — Whether English court should exercise discretion to direct remission of English assets to Australian liquidators — Whether discretion arising under common law or solely under statute — Insolvency Act 1986 (c 45), s 426(4)(5)*

Four insurance companies which were incorporated in Australia and managed in Australia were authorised under the Insurance Companies Act 1982 to carry on insurance business in the United Kingdom, although the majority of their assets and liabilities remained in Australia. In 2001 the four companies became insolvent and the Supreme Court of New South Wales made winding up orders in respect of them and appointed liquidators in Australia. Pursuant to letters of request issued by the Australian court, joint provisional liquidators were appointed in England by the High Court. In 2005 the Australian court issued a letter of request to the High Court, pursuant to section 426(4) of the Insolvency Act 1986[1], asking that the English provisional liquidators be directed, after payment of their expenses, to remit the assets to the Australian liquidators for distribution. The judge declined to make the direction on the ground that the scheme for pari passu distribution in the Australian liquidation was not substantially the same as under English law, in that the Australian scheme gave preference to insurance creditors to the prejudice of other creditors. The Court of Appeal upheld his decision.

On appeal by the Australian liquidators and two representative Australian insurance creditors—

*Held*, (1) that Australia had been designated a "relevant country" for the purposes of section 426(4) of the 1986 Act and English courts were, therefore, required to assist the Australian courts in exercising jurisdiction in relation to insolvency and had a discretion to order remission of assets located in England to Australia; and that in the exercise of that discretion an English court could order remission of assets located in England to a liquidator in a country whose insolvency scheme was not in accordance with English law (post, paras 29, 37, 44, 59, 61, 62, 63, 66, 68, 69, 76, 82, 83).

*Per* Lord Scott of Foscote and Lord Neuberger of Abbotsbury. A discretion to order remission of assets to a liquidator in a country whose insolvency scheme is not

[1] Insolvency Act, s 426(4)(5): see post, para 55.

in accordance with English law only arises under section 426 (post, paras 59–62, 66, 69, 74–77).

*Per* Lord Hoffmann and Lord Walker of Gestingthorpe. A discretion to order remission of assets to a country whose insolvency scheme is not in accordance with English law also arises under the inherent powers of the court under common law, pursuant to the principle that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all of a company's assets are distributed to its creditors under a single system of distribution (post, paras 10, 11, 18–21, 24, 26, 27, 30, 63).

*In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 and *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA considered.

(2) Allowing the appeal, that the mere fact that under the insolvency laws applicable in Australia there would be a significant class of preferential creditors whose debts would not have priority under English law was insufficient reason to refuse to remit the English assets; that there was nothing unacceptably discriminatory or unfair about the Australian insolvency scheme in relation to preferential creditors which would justify an English court refusing to exercise its discretion to remit; and that, accordingly, it was appropriate, in all the circumstances of the case, to order remission of the English assets to Australia for distribution by the Australian liquidators in accordance with Australian law (post, paras 31–34, 36, 37, 42–45, 59, 61, 62, 63, 65, 79–83).

Decision of the Court of Appeal [2006] EWCA Civ 732; [2007] Bus LR 250; [2007] 1 All ER 177 reversed.

The following cases are referred to in the opinions of their Lordships:

*AssetInsure Pty Ltd v New Cap Reinsurance Corpn Ltd* (2006) 225 CLR 331; 226 ALR 1
*Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All ER 537, HL(E)
*Bank of Credit and Commerce International SA, In re (No 10)* [1997] Ch 213; [1997] 2 WLR 172; [1996] 4 All ER 796
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR 689; [2006] 3 All ER 829, PC
*Dallhold Estates (UK) Pty Ltd, In re* [1992] BCLC 621
*England v Smith* [2001] Ch 419; [2000] 2 WLR 1141, CA
*English, Scottish, and Australian Chartered Bank, In re* [1893] 3 Ch 385, Vaughan Williams J and CA
*Drax Holdings Ltd, In re* [2003] EWHC 2743 (Ch); [2004] 1 WLR 1049; [2004] 1 All ER 903
*Forster v Wilson* (1843) 12 M & W 191
*HIH Casualty and General Insurance Ltd, In re* (2005) 215 ALR 562
*Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA
*International Tin Council, In re* [1987] Ch 419; [1987] 2 WLR 1229; [1987] 1 All ER 890
*Matheson Brothers Ltd, In re* (1884) 27 Ch D 225
*Mitchell v Carter* [1997] 1 BCLC 673, CA
*New Cap Reinsurance Corpn Ltd v Faraday Underwriting Ltd* (2003) 117 FLR 52
*Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1, CA
*Stein v Blake* [1996] AC 243; [1995] 2 WLR 710; [1995] 2 All ER 961, HL(E)
*Suidair International Airways Ltd, In re* [1951] Ch 165; [1950] 2 All ER 920

The following additional cases were cited in argument:

*Debtor (Order in Aid No 1 of 1979), In re A; Ex p Viscount of the Royal Court of Jersey* [1981] Ch 384; [1980] 3 WLR 758; [1980] 3 All ER 665

*African Farms Ltd, In re* [1906] TS 373
*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904; [2005] 1 All ER 871, PC
*Alfred Shaw & Co Ltd, In re; Ex p MacKenzie* (1897) 8 QLJ 93
*Artola Hermanos, In re* (1890) 24 QBD 640, CA
*Australian Federal Life and General Assurance Co Ltd, In re* [1931] VR 317
*Ayres v Evans* (1981) 56 FLR 235
*Banco de Portugal v Wadell* (1880) 5 App Cas 161, HL(E)
*Bank of Credit and Commerce International SA, In re (No 8)* [1998] AC 214; [1997] 3 WLR 909; [1997] 4 All ER 568, HL(E)
*Bank of Credit and Commerce International SA, In re (No 9)* [1994] 1 WLR 708; [1994] 3 All ER 764
*Bankers Trust International Ltd v Todd Shipyards Corpn* [1981] AC 221; [1980] 3 WLR 400; [1980] 3 All ER 197, PC
*Banque des Marchands de Moscou (Koupetschesky) v Kindersley, In re* [1951] Ch 112; [1952] 1 All ER 1269, CA
*Cavell Insurance Co Ltd, In re* (2006) 269 DLR (4th) 679
*Cleaver v Delta American Reinsurance Co* [2001] UKPC 6; [2002] 2 AC 328; [2001] 2 WLR 1202, PC
*Colorado, The* [1923] P 102, CA
*Commercial Bank of South Australia, In re* (1886) 33 Ch D 174
*Compania Merabello San Nicholas SA, In re* [1973] 1 Ch 75; [1972] 3 WLR 471; [1972] 3 All ER 448
*Federal Bank of Australia Ltd, In re* (1893) LJ Ch 561; 68 LT 728, CA
*Focus Insurance Co Ltd, In re* [1997] 1 BCLC 219
*Galbraith v Grimshaw* [1910] AC 508, HL(E)
*Goetze v Aders Preyor & Co* (1874) 2 R 150
*Jackson, In re* [1973] NI 67
*Kloebe, In re; Kannreuther v Geiselbrecht* (1884) 28 Ch D 175
*Levy's Trusts, In re* (1885) 30 Ch D 119
*Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512
*National Benefit Assurance Co, In re* [1927] 3 DLR 289
*National Employers' Mutual General Insurance Association Ltd, In re* (1995) 15 ASCSR 624
*Osborn, In re; Ex p Tree* [1931-32] B & CR 189
*Sefel Geophysical Ltd, In re* (1988) 70 CBR 97; 54 DLR (4th) 117
*Solomon v Ross* (1764) 1 H Bl 131
*Standard Insurance Co Ltd, In re* [1968] Qd R 118
*Thurburn v Steward* (1871) LR 3 PC 478, PC
*Treco, In re* (2001) 240 F 3d 148
*Union Theatres Ltd, In re* (1933) 35 WALR 89
*Wilson, Ex p, Douglas, In re* (1872) LR 7 Ch App 490

**APPEAL** from the Court of Appeal

This was an appeal by (1) Anthony McGrath and Christopher Honey, being the joint liquidators appointed by the Supreme Court of New South Wales of HIH Casualty and General Insurance Ltd ("HIH"), FAI General Insurance Co Ltd ("FAIG"), World Marine and General Insurance Pty Ltd ("WMG") and FAI Insurance Ltd ("FAII"), and (2) Amaca Pty Ltd and Amaba Pty Ltd, as representatives of insurance creditors of those companies, with leave of the House (Lord Hoffmann, Lord Walker of Gestingthorpe and Lord Mance) granted on 18 October 2007 against a decision of the Court of Appeal (Sir Andrew Morritt C, Tuckey and Carnwath LJJ) given on 9 June 2006 dismissing their appeal against a decision by David Richards J, sitting in the Chancery Division of the High Court of Justice, given on 7 October

2005, refusing the Australian liquidators' application, under section 426 of the Insolvency Act 1986, for directions to the provisional English liquidators of the companies, Thomas Alexander Riddell and John Mitchell Wardrop, to transfer the assets collected by them in the liquidation to the Australian liquidators.

The facts are stated in the opinions of Lord Hoffmann and Lord Scott of Foscote.

*Jonathan Sumption QC, Simon Mortimore QC* and *Tom Smith* for the Australian liquidators.

*Geoffrey Vos QC* and *Peter Arden QC* for the insurance creditors.

*William Trower QC* and *Jeremy Goldring* for the English provisional liquidators.

Their Lordships took time for consideration.

9 April 2008. **LORD HOFFMANN**

1 My Lords, this appeal arises out of the insolvent liquidation of the HIH group of Australian insurance companies. On 15 March 2001 four of them presented winding up petitions to the Supreme Court of New South Wales. Some of their assets—mostly reinsurance claims on policies taken out in London—were situated in England. To realise and protect these assets, provisional liquidators were appointed in England. In Australia, the court has made winding up orders and appointed liquidators. The Australian judge has sent a letter of request to the High Court in London, asking that the provisional liquidators be directed, after payment of their expenses, to remit the assets to the Australian liquidators for distribution. The question in this appeal is whether the English court can and should accede to that request. The alternative is a separate liquidation and distribution of the English assets in accordance with the Insolvency Act 1986.

2 The English and Australian laws of corporate insolvency have a common origin and their basic principles are much the same. The general rule is that after payment of the costs of liquidation and the statutory preferred creditors, the assets are distributed pari passu among the ordinary creditors: see section 107 of the 1986 Act and section 555 of the Corporations Act 2001 (Cth). But Australia has a different regime for insurance companies. I need not trouble your Lordships with the details. It is sufficient to say that, in broad outline, it requires assets in Australia to be applied first to the discharge of debts payable in Australia (section 116(3) of the Insurance Act 1973 (Cth)) and the proceeds of reinsurance policies to be applied in discharge of the liabilities which were reinsured (section 562A of the Corporations Act 2001 (Cth)). It is agreed that if the English assets are sent to Australia, the outcome for creditors will be different from what it would have been if they had been distributed under the 1986 Act. Some creditors will do better and others worse. Approximate figures are given in the judgment of Sir Andrew Morritt C in the Court of Appeal [2007] Bus LR 250, para 17. Generally speaking, insurance creditors will be winners and other creditors will be losers.

3 The Australian court made its request pursuant to section 426(4) of the Insolvency Act 1986: "The courts having jurisdiction in relation to

A insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in . . . any relevant country . . ."

4 The Secretary of State has power under subsection (11) to designate a country as "relevant" and has so designated Australia. Subsection (5) describes the assistance which a UK court may give. A request from the court of a relevant country is

> "authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction. In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law." B

5 This provision was introduced into insolvency law in consequence of a recommendation in fairly general terms by the Cork Committee in 1982: see Report of the Review Committee on Insolvency Law and Practice (Cmnd 8558), ch 49. The committee drew attention to the inadequacy of the statutory provisions for international co-operation in personal bankruptcy and their complete absence in the law of corporate insolvency. C

6 Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law, namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets. D E

7 This was very much a principle rather than a rule. It is heavily qualified by exceptions on pragmatic grounds; elsewhere I have described it as an aspiration: see *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, 517, para 17. Professor Jay Westbrook, a distinguished American writer on international insolvency has called it a principle of "modified universalism": see also *Fletcher*, *Insolvency in Private International Law*, 2nd ed (2005), pp 15–17. Full universalism can be attained only by international treaty. Nevertheless, even in its modified and pragmatic form, the principle is a potent one. F

8 In the late 19th century there developed a judicial practice, based upon the principle of universalism, by which the English winding up of a foreign company was treated as ancillary to a winding up by the court of its domicile. There is no doubt that an English court has jurisdiction to wind up such a company if it has assets here or some other sufficient connection with this country: *In re Drax Holdings Ltd* [2004] 1 WLR 1049. And in theory, such an order operates universally, applies to all the foreign company's assets and brings into play the full panoply of powers and duties under the Insolvency Act 1986 like any other winding up order: see Millett J in *In re International Tin Council* [1987] Ch 419, 447: "The statutory trusts extend to [foreign] assets, and so does the statutory obligation to collect and realise them and to deal with their proceeds in accordance with the statutory scheme." G H

9 But the judicial practice which developed in such a case was to limit the powers and duties of the liquidator to collecting the English assets and settling a list of the creditors who sent in proofs. The court, so to speak, "disapplied" the statutory trusts and duties in relation to the foreign assets of foreign companies. This practice was based partly upon the pragmatic consideration that any foreign country which applied our own rules of private international law would not recognise the title of an English ancillary liquidator to the company's assets. But it was also based upon the principle of universalism. In *In re Matheson Brothers Ltd* (1884) 27 Ch D 225 Kay J appointed a provisional liquidator, as in this case, to protect the English assets of a New Zealand company which was being wound up in New Zealand. He said, at pp 230 and 231:

> "what is the effect of the winding up order which it is said has been made in New Zealand? This court upon principles of international comity, would no doubt have great regard to that winding up order and would be influenced thereby"—but there was nevertheless jurisdiction to make a winding up order, and therefore to appoint a provisional liquidator, to protect the English assets.
>
> "I consider that I am justified in taking steps to secure the English assets until I see that proceedings are taken in the New Zealand liquidation to make the English assets available for the English creditors pari passu with the creditors in New Zealand."

10 It seems clear from the last sentence that Kay J envisaged the English assets being distributed in the New Zealand liquidation, provided that English creditors shared pari passu with New Zealand creditors. It was on the authority of this and similar statements in other cases that Sir Richard Scott V-C held in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213, 247 that an English court had power in an ancillary liquidation (provisional or final) to authorise the English liquidators to transmit the English assets to the principal liquidators. The basis for the practice could only be what Kay J called principles of international comity, the desirability of a single bankruptcy administration which dealt with all the company's assets.

11 It is this jurisdiction, reinforced by the provisions of section 426, which the Australian liquidators (supported by two Australian insurance creditors who stand to gain from the application of Australian law) invite the court to exercise. But David Richards J [2006] 2 All ER 671, in a judgment which carefully examined all the arguments and authorities, held that the jurisdiction did not extend to authorising the assets to be remitted to principal liquidators for distribution which was not pari passu but gave preference to some creditors to the prejudice of others. The Court of Appeal (Sir Andrew Morritt C, Tuckey and Carnwath LJJ) [2007] Bus LR 250 held that there was such a jurisdiction, which might be exercised if distribution in the country of the principal liquidation produced advantages for the non-preferred creditors which counteracted the prejudice they suffered. But the present case offered no such advantages. The appeal was therefore dismissed.

12 My Lords, I would entirely accept that there are no administrative savings to be gained from remitting the assets to Australia. In order to avoid delay in distributing the available assets, the English provisional liquidators

and the Australian liquidators have co-operated in securing the approval of two alternative schemes of arrangement, one based on the outcome which would occur if all the assets were distributed according to Australian law and the other on the outcome of separate liquidations in England and Australia. Depending upon your Lordships' decision, one or the other will be carried into effect. All that remains is to press button A or button B. So the question is whether an order for remittal should be made, not to achieve any economies in the winding up, but simply because it is the right thing to do. Is it what principle and justice require?

13 The judge denied the existence of a power to order remittal to Australia on two grounds. The first was the absence of a power in the English court to disapply any part of the statutory scheme for the collection and distribution of the assets of an insolvent company. That included the provision in section 107 for pari passu distribution. The second was the weight of authority, in the specific context of an ancillary winding up, which laid emphasis upon the fact that the co-operation of the English court was given on the assumption that there would be a pari passu distribution in the principal liquidation.

14 In my opinion there is force in both of these reasons but the judge carried them too far. There is no doubt that, at least until the passing of section 426, an English court and an English liquidator had no option but to apply English law to whatever they actually did in the course of an ancillary winding up. As Wynn-Parry J said of an ancillary winding up in *In re Suidair International Airways Ltd* [1951] Ch 165, 173: "this court sits to administer the assets of the South African company which are within its jurisdiction, and for that purpose administers, and administers only, the relevant English law . . ."

15 Similarly Sir Richard Scott V-C decided in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 that in settling a list of creditors, the English court was bound to apply English law. It could not disregard rule 4.90 of the Insolvency Rules 1986 (SI 1986/1925), which requires that the amount owing by the company to the creditor or vice versa shall be determined after setting off mutual debts against each other.

16 However, Sir Richard Scott V-C went further and directed the English ancillary liquidators not to remit the assets in their hands to the principal liquidators in Luxembourg (which did not recognise rights of set off) without making provision to ensure that the overall distributions to English creditors were in accordance with English law.

17 On the facts of the case I think, if I may respectfully say so, that the decision was correct. The mutual debts which were set off against each other appear to have been entirely governed by English law, which regards set off as a matter of substantial justice between the parties: see *Forster v Wilson* (1843) 12 M & W 191, 204. The court of the principal winding up in Luxembourg had made it clear that it was going to apply its lex fori and disallow the set off, notwithstanding the close connection of the transactions with England. In the circumstances, I think that justice required that a remittal of the assets should have been qualified by a provision which ensured that the English set off was given effect. Luxembourg has not been designated a "relevant country" under section 426 and there was accordingly no jurisdiction to apply Luxembourg law, but, as at present advised, I think that even if there had been, I would not have thought it

A appropriate to do so. The mutual debts were too closely connected with England.

18 Where I respectfully part company with my noble and learned friend, Lord Scott, is in relation to the reason which he gave, and maintains in his speech in this appeal (which I have had the privilege of reading in draft) for deciding that he should not remit the assets to Luxembourg without protecting the position of creditors who had proved in England. In B my opinion he was right to do so as a matter of discretion. But he says that he had no jurisdiction to do otherwise because creditors in an English liquidation (principal or ancillary) cannot be deprived of their statutory rights under English law.

19 In my opinion, however, the judicial practice to which I have referred and which my noble and learned friend approved in *In re Bank of* C *Credit and Commerce International SA (No 10)* [1997] Ch 213 is inconsistent with the broad proposition that creditors cannot be deprived of their statutory rights under the English scheme of liquidation. The whole doctrine of ancillary winding up is based upon the premise that in such cases the English court may "disapply" parts of the statutory scheme by authorising the English liquidator to allow actions which he is obliged by statute to perform according to English law to be performed instead by the D foreign liquidator according to the foreign law (including its rules of the conflict of laws.) These may or may not be the same as English law. Thus the ancillary liquidator is invariably authorised to leave the collection and distribution of foreign assets to the principal liquidator, notwithstanding that the statute requires him to perform these functions. Furthermore, the process of collection of assets will include, for example, the use of powers to E set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme.

20 Once one accepts, as my noble and learned friend rightly accepted in *In re Bank of Credit and Commerce International SA (No 10)*, that the logic of the ancillary liquidation doctrine requires that the court should have power to relieve an English ancillary liquidator from the duty of distributing the assets himself but can direct him to remit them for distribution by the F principal liquidator, I think it must follow that those assets need not be distributed according to English law. The principal liquidator would have no power to distribute them according to English law any more than the English liquidator, if he were doing the distribution, would have power to distribute them according to the foreign law.

21 It would in my opinion make no sense to confine the power to direct G remittal to cases in which the foreign law of distribution coincided with English law. In such cases remittal would serve no purpose, except some occasional administrative convenience. And in practice such a condition would never be satisfied. Almost all countries have their own lists of preferential creditors. These lists reflect legislative decisions for the protection of local interests, which is why the usual English practice is, when remittal to a foreign liquidator is ordered, to make provision for the H retention of funds to pay English preferential creditors. But the existence of foreign preferential creditors who would have no preference in an English distribution has never inhibited the courts from ordering remittal. I think that the judge was inclined to regard these differences as de minimis variations which did not prevent the foreign rules from being in substantial

compliance with the pari passu principle. But they are nevertheless foreign A
rules. The fact that the differences were minor might be relevant to the question of whether a court should exercise its discretion to order remittal. But any differences in the English and foreign systems of distribution must destroy the argument that an English court has absolutely no jurisdiction to order remittal because it cannot give effect to anything other than the English statutory scheme.

B
**22** The other ground relied upon by the judge was based upon a number of statements by eminent judges (including Sir Richard Scott V-C in *In re Bank of Credit and Commerce International SA (No 10)*) to the effect that the object of an ancillary liquidation was to ensure that all the company's assets worldwide were made available for distribution pari passu to all its creditors. One example is the passage I have quoted from the judgment of
Kay J in *In re Matheson Brothers Ltd* 27 Ch D 225, 231 (see para 9 above) in C
which he said that he would continue the provisional liquidation "until I see that proceedings are taken in the New Zealand liquidation to make the English assets available for the English creditors pari passu with the creditors in New Zealand." That, said David Richards J, showed that pari passu distribution in the principal liquidation was a sine qua non for the assistance of the ancillary liquidator.

D
**23** In my opinion, however, such observations have to be read in their context. Kay J was plainly anxious to secure that English creditors were treated equally with New Zealand creditors. He never directed his mind to the question of whether it would matter if New Zealand law gave preferences on grounds unrelated to the residence or nationality of the creditor. And your Lordships have not been referred to any case in which
this question has been considered. In my opinion the authorities relied upon E
by the judge do not justify limiting the court's jurisdiction.

**24** It follows that in my opinion the court had jurisdiction at common law, under its established practice of giving directions to ancillary liquidators, to direct remittal of the English assets, notwithstanding any differences between the English and foreign systems of distribution. These differences are relevant only to discretion.

F
**25** Even on the question of whether the court should make the kind of provision for protecting rights of set off which Sir Richard Scott V-C made in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213, much will depend upon the degree of connection which the mutual debts have with England. If the country of principal liquidation does not recognise bankruptcy set off and the mutual debts arise out of transactions in
that country, it is hard to see why an English court should insist on rights of G
set off being preserved in respect of claims by the foreign creditors against assets which happen to be in England. The English court would be entitled to exercise its discretion by remitting the assets to the principal jurisdiction and leaving it to apply its own law. (Compare *In re Paramount Airways Ltd* [1993] Ch 223, discussing the discretion not to apply the English law on voidable dispositions.)

H
**26** It was submitted by the appellants that the argument for the existence of such a jurisdiction under section 426 was even stronger, because it expressly gives the court power to apply the foreign insolvency law to the matter specified in the request. As Sir Andrew Morritt C said [2007] Bus LR 250, para 49, section 426 is "itself part of the statutory scheme", no less

than section 107. The court therefore has power to apply the Australian law of distribution. It may be that it does, but in my opinion that is not what a court directing remittal of the assets is doing. It is exercising its power under English law to direct the liquidator to remit the assets and leave their distribution to the courts and liquidators in Australia. It is they who apply Australian law, not the English ancillary liquidator. As Morritt LJ said in *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, 517, a court asked for assistance under section 426 may exercise "its own general jurisdiction and powers" as well as the insolvency laws of England and the corresponding laws of the requesting state. The power to direct the remittal of assets collected in an ancillary liquidation falls within the former category.

27 This point highlights, I think, the difference between my noble and learned friend Lord Scott and myself. In relying upon section 426, Lord Scott holds that a court which directs remittal of the English assets to the Australian principal liquidator is applying the insolvency law of Australia. My own view is that the order cannot be characterised in this way and that the court is exercising a power, established well before the 1986 Act, under the insolvency law of England.

28 The power to remit assets to the principal liquidation is exercised when the English court decides that there is a foreign jurisdiction more appropriate than England for the purpose of dealing with all outstanding questions in the winding up. It is not a decision on the choice of the law to be applied to those questions. That will be a matter for the court of the principal jurisdiction to decide. Ordinarily one would expect it to apply its own insolvency laws but in some cases its rules of the conflict of laws may point in a different direction. Section 426, on the other hand, extends the jurisdiction of the English court and the choice of law which it can make in the exercise of its own jurisdiction, whether original or extended. For example, section 426 can confer jurisdiction to make an administration order in respect of a foreign company when that jurisdiction is ordinarily confined to UK companies: *In re Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621. Or it may enable the court to apply a foreign law when, as in *In re Suidair International Airways Ltd* [1951] Ch 165, it would otherwise be obliged to apply only English law, as in *England v Smith* [2001] Ch 419 (Australian law applied to examination of accountant connected with insolvent Australian company). But the present case involves neither an extension of the English jurisdiction or an application by the English court of a foreign law.

29 I therefore agree with the Court of Appeal that the court has jurisdiction, even if not for precisely the same reasons. But the Court of Appeal nevertheless decided that the jurisdiction should not be exercised because the outcome for some creditors would be worse than if the English assets were distributed according to English law. There was, said Carnwath LJ [2007] Bus LR 250, para 72, no "rule of private international law, or any other countervailing benefit" which would require the court to disregard the principles applicable under English insolvency law.

30 I must respectfully disagree. The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18th century. That principle

requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution. That is the purpose of the power to direct remittal.

31 In the present case I do not see that it would offend against any principle of justice for the assets to be remitted to Australia. In some cases there may be some doubt about how to determine the appropriate jurisdiction which should be regarded as the seat of the principal liquidation. I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the company's business has no real connection. The Council Regulation on insolvency proceedings (Council Regulation (EC) No 1346/2000 of 29 May 2000) uses the concept of the "centre of a debtor's main interests" as a test, with a presumption that it is the place where the registered office is situated: see article 3(1). That may be more appropriate. But in this case it does not matter because on any view, these are Australian companies. They are incorporated in Australia, their central management has been in Australia and the overwhelming majority of their assets and liabilities are situated in Australia.

32 It is true that Australian law would treat insurance creditors better and non-insurance creditors worse than English law did at the relevant time. But that seems to me no reason for saying that the Australian law offends against English principles of justice. As it happens, since the appointment of the provisional liquidators, English law has itself adopted a regime for the winding up of insurance companies which gives preference to insurance creditors: see regulation 21(2) of the Insurers (Reorganisation and Winding Up) Regulations 2004 (SI 2004/353), giving effect to the European Parliament and Council Directive 2001/17/EC on the reorganisation and winding up of insurance companies. So English courts are hardly in a position to say that an exception to the pari passu rule for insurance creditors offends against basic principles of justice.

33 Furthermore, it seems to me that the application of Australian law to the distribution of all the assets is more likely to give effect to the expectations of creditors as a whole than the distribution of some of the assets according to English law. Policy holders and other creditors dealing with an Australian insurance company are likely, so far as they think about the matter at all to expect that in the event of insolvency their rights will be determined by Australian law. Indeed, the preference given to insurance creditors may have been seen as an advantage of a policy with an Australian company.

34 As for UK public policy, I cannot see how it would be prejudiced by the application of Australian law to the distribution of the English assets. There is no question of prejudice to English creditors as such, since it is accepted that although section 116(3) of the Insurance Act 1973 (Cth) gives creditors whose debts are payable in Australia a first call upon Australian assets, this provision will not in practice prejudice the interests of creditors in the English assets. Furthermore, if there were to be a separate liquidation of the English assets in England, all creditors would be entitled to prove. Those

A Australian (or other foreign) creditors who see an advantage in proving in England after bringing into hotchpot their dividends in Australia would no doubt do so. But UK public policy does not require them to be afforded this facility.

35 The fact that there are assets in England is principally the result of the companies having placed their reinsurance business in the London B market. For the purposes of deciding how the assets should be distributed, that seems to me an entirely adventitious circumstance. Indeed, it may not be to the advantage of London as a reinsurance market if the distribution of the assets of insolvent foreign reinsurance companies is affected by whether they have placed their reinsurance business in London rather than somewhere else.

36 In my opinion, therefore, this is a case in which it is appropriate to C give the principle of universalism full rein. There are no grounds of justice or policy which require this country to insist upon distributing an Australian company's assets according to its own system of priorities only because they happen to have been situated in this country at the time of the appointment of the provisional liquidators. I would therefore allow the appeal and make the order requested by the Australian court.

D

**LORD PHILLIPS OF WORTH MATRAVERS**

37 My Lords, I have had the benefit of reading in draft your Lordships' speeches. They contain areas of common ground that result in the conclusion that this appeal should be allowed. I share those areas of common ground and agree with the result to which they lead. They are: (i) section 426(4) and (5) of the Insolvency Act 1986 gives the court E jurisdiction to accede to the request of the Australian court and (ii) on the facts of this case the court ought to accede to that request.

38 I had initially reservations about the second proposition. The business of insurance has certain special characteristics. These include the fact that, for a premium paid at the start of the contractual relationship the insurer undertakes obligations that may extend over a considerable F future period. It is commonplace for countries to regulate insurance business under conditions that require insurers to demonstrate that they have adequate resources to meet such obligations before being authorised to enter into contracts of insurance. That is certainly the case in the United Kingdom. It appears also to be the case in Australia.

39 Where the law of a country requires an insurer to maintain assets, G which may include rights under contracts of reinsurance, that are designed to protect policy holders who have taken out insurance within that country, one would normally expect the insolvency law of that country to afford priority to those policy holders in relation to such assets. In such circumstances, one would not expect rules of private international law or international comity to require the transfer of those assets to liquidators in another country who would not recognise such priority.

H

40 There are now in place in this jurisdiction Regulations which make special provision for distribution to creditors of insolvent insurance companies. These are the Insurers (Reorganisation and Winding-up) Regulations 2004 (SI 2004/353) which implement European Parliament and Council Directive 2001/17/EC of 19 March 2001.

41 These Regulations do not apply to the insolvencies with which this appeal is concerned because they were not in force when the provisional liquidators were appointed. Those insolvencies are, however, subject to Australian legislation whose overall effect will be, if the English assets are remitted to the Australian liquidators, that insurance and reinsurance creditors as a whole will benefit at the expense of other creditors in the case of the three insurance companies where remission had an effect. On the other hand insurance and reinsurance creditors whose liabilities are not in Australia will (except in the case of FAII) be worse off. This is not, however, the result of any special priority given to them under English law.

42 When considering the exercise of discretion under section 426(4) and (5) of the 1986 Act the following matters seem to me to be material. (i) The companies in liquidation are Australian insurance companies. (ii) Australian law makes specific provision for the distribution of assets in the case of the insolvency of such companies. (iii) These do not conflict with any provisions of English law in force at the material time designed to protect the holders of policies written in England. (iv) The policy underlying these provisions appears to accord with the policy of Regulations that have since been introduced in this jurisdiction.

43 These matters have persuaded me that it is in accordance with international comity and with the principle of universalism, as explained by my noble and learned friend, Lord Hoffmann, that the English court should accede to the request of the Australian liquidators.

44 These are my reasons for agreeing that this appeal should be allowed. I do not propose to stray from the firm area of common ground onto the controversial area of whether, in the absence of statutory jurisdiction, the same result could have been reached under a discretion available under the common law.

## LORD SCOTT OF FOSCOTE

*Introduction*

45 My Lords, this appeal concerns the question whether the English assets of four insolvent Australian insurance companies, each of which is in compulsory liquidation in Australia and, in England, is under the control of provisional liquidators appointed by the High Court pursuant to a request made by the Australian liquidators, should in principle be remitted to the Australian liquidators for distribution in accordance with the Australian statutory scheme applicable to the liquidation of insolvent insurance companies, or should be retained in England and distributed in accordance with the English statutory scheme. Both David Richards J at first instance and the Court of Appeal (Sir Andrew Morritt C and Tuckey and Carnwarth LJJ) held that an order for the remission of the English assets to the Australian liquidators could not, or should not, be made. The Australian liquidators and two of the Australian insurance creditors have appealed to this House. The respondents are the provisional liquidators appointed by the High Court. The appeal depends on the answer to the question I have referred to, and the answer to that question depends, in my opinion on how section 426(4) and (5) of the Insolvency Act 1986 should be applied in a case such as this. The facts that have given rise to a need for an answer to the question are fully set out in the 7 October 2005 judgment of David

A Richards J [2006] 2 All ER 671, paras 9–21, and the judgment of Sir Andrew Morritt C [2007] Bus LR 250, paras 2–9. It is not necessary for me to do more than outline the nature of the problem that has arisen and sufficient of the details to explain why I, and I believe all your Lordships, have come to a different conclusion from that reached by the courts below.

*The facts*

B **46** The four insolvent companies were incorporated in Australia. They are conveniently referred to in the judgments below as HIH, FAIG, WMG and FAII and I shall so refer to them. They are members of the HIH Group which, until its collapse in March 2001, was the second largest insurance group in Australia. Its corporate members, 274 in number, included eight companies that were licensed insurance companies in Australia. The four C companies with which this appeal is concerned were among them but were authorised also, under the Insurance Companies Act 1982, to carry on insurance business in the United Kingdom, and did so, as well as carrying on business in Australia and elsewhere. The majority of the assets and liabilities of the four companies are located in Australia but each has significant assets and liabilities in England. The relative size of the assets and liabilities in each D of these countries can be judged from the table set out in para 12 of David Richards J's judgment and, for convenience, repeated here. The figures are approximate, based on estimates as at 31 March 2005 and expressed in millions of Australian dollars.

| *Assets* | HIH | FAIG | FAII | WMG |
|---|---|---|---|---|
| Australia | 864 | 799 | 33 | 15 |
| E UK | 206 | 23 | 10 | 8 |
| Total | 1,111 | 892 | 43 | 23 |
| *Liabilities* | | | | |
| Australia | 3,488 | 2,274 | 1,903 | 35 |
| UK | 882 | 5 | 85 | 12 |
| F Elsewhere | 129 | 50 | 154 | 0 |
| Total | 4,500 | 2,329 | 2,142 | 47 |

The figures demonstrate the great preponderance of Australian assets and Australian liabilities over those in the United Kingdom.

**47** Winding up orders in respect of the four companies were made in Australia on 27 August 2001 (they had previously been in provisional G liquidation). Petitions for winding up orders against the four companies in England had been presented on 24 July 2001 by a corporate member of the HIH Group that was a creditor of each of the companies. Those petitions remain pending but each of the companies is insolvent and, pursuant to letters of request issued by the Australian court on 10 September 2001, the High Court in England made orders appointing the respondents joint provisional liquidators (and at the same time revoking a similar H appointment that had been made before the presentation of the petitions). The orders appointing the provisional liquidators do not contain any provision permitting the remission of English assets to Australia.

**48** On 4 July 2005 the New South Wales Supreme Court issued a letter of request asking the High Court in England to assist the Australian

liquidators by hearing and determining an application issued on the same day. The application asked the High Court to direct the provisional liquidators in England to pay over to the Australian liquidators "all sums collected, or to be collected, by them in their capacity as English provisional liquidators, after paying or providing for all proper costs, charges and expenses of the English provisional liquidators". This application, together with an application to the High Court by the provisional liquidators for directions, was heard by David Richards J and led to his judgment to which I have referred. He rejected the Australian liquidators' request for the direction above referred to.

**49** It had been common ground that the way in which a winding up of the four companies would be most satisfactorily achieved would be via a scheme of arrangement approved under section 411 of the Corporations Act 2001 in Australia and section 425 of the Companies Act 1985 in England. The schemes would need to reflect the priorities that would be applicable to the distribution of assets among creditors if the liquidations were to run their ordinary course (see para 4 of David Richards J's judgment). It was here that the problem which led to David Richards J's refusal to make the order for remission to Australia of the English assets arose. Australian law has certain statutory provisions relating to insurance companies which depart from the insolvency principle of a pari passu distribution of assets among unsecured creditors. It is necessary to describe the effect of those provisions.

**50** Section 116(3) of the Australian Insurance Act 1973 provides that, in the winding up of a company authorised under the Act to carry on insurance business, "the assets in Australia of the [company] shall not be applied in the discharge of its liabilities other than its liabilities in Australia unless it has no liabilities in Australia". The Australian courts have held that "assets in Australia" in section 116(3) means assets in Australia at the time of the winding up: *New Cap Reinsurance Corpn Ltd v Faraday Underwriting Ltd* (2003) 117 FLR 52 and *In re HIH Casualty and General Insurance Ltd* (2005) 215 ALR 562. It is common ground, therefore, that section 116(3) would not apply to assets transferred or remitted to Australia after the commencement of the winding up. Moreover, in the *New Cap Reinsurance* case 117 FLR 52 it was held that the principle of hotchpot applied in relation to section 116(3) so that creditors with "liabilities in Australia" who received distributions from the proceeds of "assets in Australia" would not be entitled to participate in a distribution of the proceeds of other assets until the same level of dividend had been paid on debts which were not liabilities in Australia. David Richards J held that section 116 did not constitute a bar to an order directing remission to Australia of the English assets of the four companies and there has been no cross-appeal on that point.

**51** Section 562A of the Australian Corporations Act 2001 does, however, present a more substantial problem. The section is fully set out in para 44 of the judgment of David Richards J. It provides, in summary, that the reinsurance recoveries of an insurance company must be distributed, in priority to other creditors, to those creditors who have insurance claims against the company. It has been held by the High Court of Australia that the term "contract of insurance" in section 562A(1) includes a contract of reinsurance and that "contract of reinsurance" includes a contract of retrocession: *AssetInsure Pty Ltd v New Cap Reinsurance Corpn Ltd* (2006) 225 CLR 331. Accordingly, it is common ground that section 562A confers

on all creditors of an insurance company with insurance and reinsurance claims priority over all other creditors in respect of reinsurance, including retrocession, recoveries. Moreover, section 562A(4) gives the court power, in relation to amounts received under a contract of reinsurance or retrocession, to confer further priority on a particular insurance or reinsurance creditor, in "a manner that the court considers just and equitable in the circumstances". Section 562A has no territorial limits. Its application is mandatory so far as Australian liquidators are concerned. And, in *In re HIH Casualty and General Insurance Ltd* 215 ALR 562, 591 the Supreme Court of New South Wales held that the principles of hotchpot do not apply so as to require dividends received by a creditor under section 562A(3) or (4) to be brought into account by the creditor when proving against other assets of the insolvent insurance company.

52 By contrast, David Richards J held, and it was common ground before the Court of Appeal and not disputed before your Lordships, that, in a winding up in England governed by English distribution rules, creditors who had received dividends under section 562A in Australia would have to bring them into account, by way of hotchpot, when claiming dividends in the English winding up.

53 The approximate effect on creditors of the remission to Australia of the English assets, according to a table produced by the Australian liquidators and the English provisional liquidators (but not agreed by the third and fourth appellants) is set out below.

| **Type of creditor** | **Company** | **Anticipated dividend (cents/A$) if there is no remission of English assets** | **Anticipated dividend (cents/A$) if there is remission of English assets** |
|---|---|---|---|
| *Insurance/reinsurance creditors with liabilities in Australia* | HIH | 25.8 | 28.5 |
| | WMG | 49.0 | 55.1 |
| | FAII | 1.3 | 13.3 |
| *Insurance/reinsurance creditors with liabilities that are not liabilities in Australia* | HIH | 25.4 | 19.3 |
| | WMG | 49.0 | 39.49 |
| | FAII | 1.3 | 12.8 |
| *Other creditors with liabilities in Australia* | HIH | 25.4 | 19.3 |
| | WMG | 49.0 | 44.9 |
| | FAII | 1.3 | 0.9 |
| *Other creditors with liabilities that are not liabilities in Australia* | HIH | 25.4 | 19.3 |
| | FAII | 1.3 | 0.4 |

According to the agreed statement of facts and issues (para 41) the Australian liquidators believe that the dividends receivable by the creditors of FAIG would be unaffected by the remission.

54 Following the judgment of David Richards J the proposed schemes of arrangement were redrafted. They have, as I understand it, been drafted on alternative footings, dependant on whether your Lordships dismiss this

appeal and hold that David Richards J and the Court of Appeal were right to refuse to direct the remission of the English assets to Australia, or allow this appeal and hold that in principle the English assets ought to be remitted to Australia. These schemes of arrangement providing for alternative modes of distribution, I understand, have been approved both in Australia and in England. How they will be implemented depends upon your Lordships' decision, first, whether the High Court has power to direct the remission of the English assets to Australia and, second, whether in the circumstances of this case that power should, in principle, be exercised. There are two possible sources of such a power. One, espoused by my noble and learned friend Lord Hoffmann, whose opinion I have had the advantage of reading in draft, is an inherent power in the court established not by statute but by previous judicial decisions. The other is section 426 of the Insolvency Act 1986, introduced into our law, as Lord Hoffmann has explained (para 5 of his opinion), in consequence of a recommendation by the Cork Committee in 1982.

*Section 426*

55 The section is headed "Co-operation between courts exercising jurisdiction in relation to insolvency" and subsections (4) and (5) provide as follows:

> "(4) The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.
>
> "(5) For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction. In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law."

By the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (SI 1986/2123) Australia was designated a "relevant country" for the purposes of section 426.

56 David Richards J, in para 112 of his judgment, expressed the conclusion that:

> "in an English liquidation of a foreign company, the court has no power to direct the liquidator to transfer funds for distribution in the principal liquidation, if the scheme for pari passu distribution in that liquidation is not substantially the same as under English law."

He said that he regarded that conclusion as an application of my reasoning in *In re Bank of Credit and Commerce International (No 10)* [1997] Ch 213. I think, with respect, that that was a mistaken basis for his conclusion. My reasoning in *In re Bank of Credit and Commerce International (No 10)* related only to the inherent power of the court. It had nothing to do with section 426. *In re Bank of Credit and Commerce International (No 10)* was concerned with the question of remission of assets from England to

Luxembourg, the country where Bank of Credit and Commerce International had been incorporated and the seat of the principal liquidation. Luxembourg had not been designated a "relevant country" for the purposes of section 426. A letter of request under section 426, asking for the remission to Luxembourg of the assets held by the English liquidators, had not been, and could not have been, issued by the Luxembourg court to the High Court. The issue was whether the High Court had an inherent jurisdiction to authorise the English liquidators, conducting an ancillary liquidation in England, to remit assets to the liquidators conducting the principal liquidation and, if so, the scope of that inherent jurisdiction. It was common ground in *In re Bank of Credit and Commerce International (No 10)* that the High Court had no statutory jurisdiction to remit the assets or to direct the liquidators to do so.

57 Although David Richards J expressed his conclusion as a lack of "power" to give the direction sought by the Australian liquidators, I think, reading his judgment as a whole, that he was not really taking a jurisdictional point but was concluding that it would not be right to direct a remission of assets in circumstances where the remission would reduce the dividends that would have been recovered under the English scheme of insolvency distribution by those creditors who were not insurance creditors. That certainly was the approach of Sir Andrew Morritt C when the case reached the Court of Appeal. He said [2007] Bus LR 250, para 35 that "the concept of 'assistance' should not be restrictively construed so as to limit the jurisdiction of the court" and that the assistance that the New South Wales court had requested by its letter of request of 4 July 2005 did not fall "outside the ambit of that concept." He concluded, at para 50:

> "if the companies were in liquidation in England the court in England would have jurisdiction to entertain a request under section 426 for directions to the liquidators in England to transfer the assets collected by them to the liquidators in the principal liquidation even though the result of such a transfer would be to interfere with the statutory scheme imposed on those assets by [the] Insolvency Act 1986"

With all of that I respectfully agree. The Chancellor went on to consider whether the High Court could "properly" give the requested direction. That, he thought, was the critical question: para 36. Again, I respectfully agree.

58 The reason why the Chancellor concluded that the court's power under section 426 to direct the provisional liquidators to remit the English assets to Australia ought not to be exercised appears from para 52 of his judgment. He held that, on the authority of *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497 and *England v Smith* [2001] Ch 419, the court should comply with the letter of request issued by the Australian court "if it may properly do so", and went on to say:

> "That will involve a consideration of all the circumstances including whether the transfer sought will prejudice the creditors or any class of them and whether there would be other advantages sufficient to counteract such prejudice. In relation to the facts of this case it is quite clear that the transfer sought would prejudice all creditors of each of the companies except FAIG and except Australian insurance and reinsurance creditors of HIH, WMG and FAII and non-Australian insurance and

reinsurance creditors of FAII. The advantage to the latter classes of creditor cannot counteract the prejudice suffered by all the other classes. Nor can those advantages and any benefit obtained from avoiding duplication enable the court to conclude that a transfer would be for the benefit of the estate as a whole."

The last sentence in this citation was a response to a submission made by the Australian liquidators that the remission of the English assets should be directed if it would be for the benefit of the estate or the creditors as a whole: see para 51 of the Chancellor's judgment.

59 The Chancellor's reasoning does not, however, seem to me to explain why the identification of disadvantage to creditors other than the insurance and reinsurance creditors referred to should require the conclusion that the English assets should not be remitted to Australia. The exercise of the section 426 power so as to direct the remission of the assets to Australia would not constitute the disapplication of the English insolvency scheme. Section 426 is part of the English insolvency scheme. To hold that the power under the section to direct the remission of assets from the country where an ancillary liquidation is being conducted (England) to the country where the principal liquidation is being conducted (Australia) cannot be exercised if the effect would be to reduce the amount of dividends receivable in England by any class of creditors, or, I suppose, by any individual creditor, would be to deprive the section, at least in relation to remission of assets from an ancillary to a principal liquidation, of much of its intended potential to enable a single universal scheme for insolvency distribution to be achieved. If an ancillary liquidation is being conducted in England under an insolvency scheme that does not include section 426, e g where the country of the principal liquidation is not a United Kingdom country and has not been designated a "relevant country or territory"; the position seems to me quite different. The English courts have a statutory obligation in an English winding up to apply the English statutory scheme and have, in my opinion, in respectful disagreement with my noble and learned friend Lord Hoffmann, no inherent jurisdiction to deprive creditors proving in an English liquidation of their statutory rights under that scheme. I expressed that opinion in *In re Bank of Credit and Commerce International (No 10)* [1997] Ch 213 and remain of that opinion. Luxembourg was not a "relevant country or territory". Australia, however, is and, accordingly, section 426 is part of the statutory scheme applicable under the 1986 Act to these four Australian companies. I do not think it would be proper for the courts of this country, in reliance on an inherent jurisdiction, in effect to extend the benefits of section 426 to a country that had not been designated a "relevant country or territory" by the Secretary of State, and thereby to deprive some class of creditors of statutory rights to which they would be entitled under the English statutory insolvency scheme. There is no case law that supports the proposition that the inherent jurisdiction can be used so as to bring about such deprivation.

60 Indeed, the case law is to an entirely contrary effect. Vaughan Williams J said in *In re English, Scottish and Australian Chartered Bank* [1893] 3 Ch 385, 394:

"One knows that where there is a liquidation of one concern the general principle is—ascertain what is the domicile of the company in

liquidation; let the court of the country of domicile act as the principal court to govern the liquidation; and let the other courts act as ancillary, as far as they can, to the principal liquidation. *But although that is so, it has always been held that the desire to assist in the main liquidation—the desire to act as ancillary to the court where the main liquidation is going on—will not ever make the court give up the forensic rules which govern the conduct of its own liquidation*" (my emphasis).

In *In re Suidair International Airways Ltd* [1951] Ch 165, 173 Wynn-Parry J, having cited the passage from the judgment of Vaughan-Williams J in *In re English, Scottish and Australian Chartered Bank* cited above, said:

> "It appears to me that the simple principle is that this court sits to administer the assets of the South African company which are within its [i e the English court's] jurisdiction, and for that purpose administers, and administers only, the relevant English law; that is, primarily, the law as stated in the Companies Act 1948 looked at in the light, where necessary, of the authorities. If that principle be adhered to, no confusion will result. If it is departed from, then for myself I cannot see how any other result would follow than the utmost possible confusion."

I cited these authorities, and others, in *In re Bank of Credit and Commerce International (No 10)* [1997] 1 Ch 213, 246, in coming to the conclusion that:

> "the ancillary character of an English winding up does not relieve an English court of the obligation to apply English law, including English insolvency law, to the resolution of any issue arising in the winding up which is brought before the court."

**61** It is, of course, desirable as a general proposition that there should be one universally applicable scheme of distribution of the assets of an insolvent company. And it is also obvious that, in general, where a company is being wound up not only in its place of incorporation but also in other countries where it carried on some of its business, the winding up process in the latter countries should be regarded as ancillary to the principal winding up being conducted in the country of its incorporation. In such a case there is, therefore, a potential conflict between, on the one hand, the desirability of that general proposition and, on the other hand, the undesirability of the confusion to which Wynn-Parry J referred in the *Suidair* case [1951] Ch 165 coupled with the obligation of English courts to accord to claimant creditors in an English winding up the statutory rights to which they are entitled under English insolvency statutes. This conflict has been resolved by Parliament in enacting section 426. Section 426 has become part of the statutory scheme. But the resolution achieved by section 426 does not apply to all countries. It does not apply where the principal winding up is being conducted in a country which is neither part of the United Kingdom nor has been designated by the Secretary of State as a "relevant country or territory". The proposition that the assistance and directions sought by the Australian court and the Australian liquidators in the present case could be given under an inherent power of the court without reliance on section 426(4) and (5) is, in my respectful opinion, unacceptable. It would mean that the assistance and directions could be

given in relation to a winding up being conducted in a foreign country that had not been designated a "relevant country or territory" by the Secretary of State. It would constitute the usurpation by the judiciary of a role expressly conferred by Parliament on the Secretary of State. Moreover, the issue is one that does not arise in the present case. If the assistance and directions sought cannot, on a proper exercise of the court's discretion, be given pursuant to section 426(4) and (5), they could hardly be given as a proper exercise of the court's inherent power. Exactly the same considerations would come into play. And, as I understand it, your Lordships all agree that the directions sought should be given.

**62** If the country of the principal winding up is a "relevant country or territory" for section 426 purposes and the liquidators in that country have requested English liquidators to remit to them the assets collected in England so that they (the principal liquidators) can, pursuant to the insolvency law of that country, implement a universal scheme of pari passu distribution to ordinary unsecured creditors, the request is one to which, in principle, the English liquidators ought, in my opinion, to accede. I agree, as I think is common ground, that the English liquidators should first discharge the debts of those creditors who, under the English insolvency scheme, are entitled to preferential payment. There may be other circumstances in which a refusal to remit assets pursuant to such a request might be justified. It has been suggested that a refusal would be justified if it would give rise to "manifest injustice to a creditor". So indeed it might. But reliance simply on the fact that under the insolvency scheme applicable to the principal winding up there would be a significant class or classes of preferential creditors whose debts would not have priority under the English insolvency scheme is not, in my opinion, sufficient to justify a refusal. It would, in my opinion, as I hope I have made apparent, have been sufficient if the country of the principal winding up had not been a "relevant country or territory" for section 426 purposes. These four companies are Australian companies whose principal place of business, as well as their place of incorporation, was Australia. The Australian statutory scheme allows insurance and reinsurance creditors of insolvent insurance companies to be paid in priority to ordinary creditors. There is nothing unacceptably discriminatory or otherwise contrary to public policy in these statutory provisions. The general acceptability by English law standards of the Australian insolvency scheme is confirmed by the designation of Australia as a "relevant country or territory" for section 426 purposes. I can see no sufficient reason why the Australian liquidators' request for the remission of the English assets should not be acceded to. I would allow this appeal but repeat that I would do so on the footing that the power to accede to the Australian liquidators' request derives from section 426 and not from any inherent jurisdiction of the court.

## LORD WALKER OF GESTINGTHORPE

**63** My Lords, I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with his opinion, which dispels several obscurities on the authorities and clarifies the nature of the court's powers under section 426 of the Insolvency Act 1986. I too would allow this appeal and make the order requested by the Supreme Court of New South Wales.

A LORD NEUBERGER OF ABBOTSBURY

**64** My Lords, this appeal concerns the English assets of four insolvent Australian insurance companies, in compulsory liquidation in Australia and in provisional liquidation in England, pursuant to the Australian liquidators' request. The question is whether those assets should be remitted to the Australian liquidators for distribution in accordance with the Australian insolvency regime, or whether they should be distributed here in accordance B with the English insolvency regime.

**65** Your Lordships all agree that the answer is that the assets should be remitted for distribution in accordance with the Australian insolvency regime, albeit that the Australian liquidators and the English provisional liquidators have very sensibly agreed what the practical consequences are to be in either case, as my noble and learned friend Lord Hoffmann explains in C para 12 of his speech (which I have had the opportunity of seeing in draft), so that there will be no need for any formal remittal. However, there is disagreement as to the basis upon which the assets can be distributed in accordance with the Australian insolvency regime. Accordingly, I shall give my reasons for allowing the appeal, albeit that they can be expressed relatively shortly, as the relevant facts, statutory provisions, case law and the relevant principles are comprehensively covered in the preceding speeches.

D **66** The question I shall primarily address is whether the remittal of the English assets to the Australian liquidators for distribution in accordance with the Australian insolvency regime can be effected pursuant to the established judicial practice described in paras 8 and 9, or whether it can only be effected pursuant to section 426 of the Insolvency Act 1986. I have come to the conclusion that, while remittal of assets can be effected pursuant E to established judicial practice, the power to do so where the distribution will not be in accordance with the English insolvency regime derives from section 426.

**67** The main substantive features of the English insolvency regime in relation to unsecured creditors can be broadly summarised as follows. First, preferential creditors (listed in Schedule 6 to the 1986 Act) enjoy priority on a pari passu basis as between themselves (sections 175 and 386 of the F 1986 Act). Secondly, all other creditors rank behind them, also on a pari passu basis as between themselves (rule 4.181 of the 1986 Rules). Thirdly, there is a mandatory set-off requirement (rule 4.90 of the 1986 Rules) as explained by Lord Hoffmann (albeit in a bankruptcy context) in *Stein v Blake* [1996] 1 AC 243.

**68** As a matter of general principle, it seems to me that, at any rate in the G absence of section 426(4) and (5), where a company is wound up in this country, its assets are held on terms that they must be applied in accordance with that statutory insolvency regime: see *Ayerst v C & K (Construction) Ltd* [1976] AC 167, 176E–177F. As Millett LJ put it in *Mitchell v Carter* [1997] 1 BCLC 673, 686,

> "the making of a winding up order divests the company of the H beneficial ownership of its assets which cease to be applicable for its own benefit. They become instead subject to a statutory scheme for distribution among the creditors and members of the company."

**69** This principle applies in the case of an English liquidation of a foreign company. In particular, section 221(1) of the 1986 Act confirms that

the provisions of that Act "about winding up" apply to "unregistered companies", which includes foreign companies, in the same way that they apply to English companies. That is confirmed by the judgment in *In re International Tin Council* [1987] Ch 419, 446–447. As Millett J there explained, the application of the English insolvency regime applies in theory to all the assets of the foreign company, and in theory and practice to its assets within the jurisdiction. In the absence of a provision such as section 426, I therefore find it difficult to see on what basis an English court could have jurisdiction to disapply the English insolvency regime to assets in this jurisdiction of a company subject to a winding up order made by an English court.

70 Of course, in this case the companies have not been the subject of a winding up order in England, although winding up petitions have been presented and provisional liquidators appointed. Further, as David Richards J said in his judgment at first instance [2006] 2 All ER 671, para 184, there is "a significant prospect that, in the absence of schemes of arrangement, winding up orders would be made" by the High Court in respect of each of the four companies. He went on to say, it was "a principal function" of the provisional liquidators "to safeguard the assets of the companies for the benefit of those interested in their distribution in the event of a winding up." Accordingly, he considered that he should not authorise them to do anything whose "effect would be to undermine the proper working out of the statutory insolvency scheme which would be mandatory if winding up orders were made".

71 That appears to me to be right. It seems clear that the companies are insolvent, and that the only reason that the English court has accepted jurisdiction is because the Australian courts have ordered them to be wound up because of their insolvency. Although no formal winding up orders have been made, provisional liquidators have been appointed ultimately because of the companies' insolvency. In those circumstances, I consider that the court's powers should not be more flexible or wider in connection with the remitting or distribution of assets than if formal winding up orders had been made. Accordingly, I approach the issue, as the parties and the courts below did, on that basis.

72 There appears to be no suggestion in any of the earlier authorities cited to your Lordships that the court, when exercising its jurisdiction to remit to another jurisdiction for distribution the assets of a company subject to a winding up order in this country, could authorise the distribution of those assets other than in accordance with the English insolvency regime. However, there are judicial observations which emphasise the mandatory nature of the English regime, although they are not directly concerned with the question of remittal, in relation to foreign insolvent companies. I have in mind the observations of Vaughan Williams J (whose decision was upheld by the Court of Appeal) in *In re English, Scottish and Australian Chartered Bank* [1893] 3 Ch 385, 394 and of Wynn-Parry J in *In re Suidair International Airways Ltd* [1951] Ch 165, 173–174, as applied by Sir Richard Scott V-C in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213, 246D–E. The relevant passages are quoted by my noble and learned friend, Lord Scott of Foscote (whose speech I have had the opportunity of seeing in draft), in para 60.

A 73 In paras 95–107 of his excellent judgment at first instance, David Richards J considered a number of cases in this jurisdiction, Canada and Australia, in which courts were invited to remit to foreign liquidators local assets of a foreign company which was being wound up. In all those cases, it was made clear that the court had to be satisfied that the foreign liquidators would distribute pari passu, in accordance with the domestic insolvency regime. Of course, it can be said that those cases merely emphasise the B importance of the pari passu principle, but they appear to me to indicate that the courts concerned were seeking to ensure that the principles of their local insolvency regime were honoured.

74 I accept that in no case where the court has been asked to exercise its power to remit assets to liquidators in another jurisdiction has it refused to do so on the grounds that the categories of preferential creditors, or other C aspects, of that other jurisdiction's insolvency regime differed from those in this country. However, I do not consider that that argument goes anywhere, because, so far as I am aware, that point has not been raised in any case where the court has been invited to remit assets. Even if the court would have had power to remit in such circumstances at some point in the past, it seems to me that, absent section 426 of the 1986 Act, it would not have such power now.

D 75 I accept that, on this basis, the value of the English court's inherent ancillary liquidation power is very much more circumscribed than if it could effectively disapply, or authorise the disapplication of, the English insolvency regime. However, the fact that the English court has an inherent power to relieve an ancillary liquidator in this country from the duty of distributing the assets himself, and to order that the assets be remitted to be E distributed by a foreign liquidator, does not mean that it necessarily follows that those assets can then be distributed other than in accordance with the English insolvency regime. The fact that English assets are bound to be distributed in accordance with certain principles does not prevent the assets being passed to someone else so that they can be distributed in accordance with those principles, but it would prevent the passing on of those assets for distribution in accordance with different principles. If this is right, it means F that the court's inherent power to remit assets is, I accept, of much more limited value than if the law were otherwise, but the power would nonetheless not be valueless: it could assist in achieving administrative convenience.

76 The notion that the court has inherent jurisdiction to remit English assets to liquidators in another jurisdiction on the basis that the insolvency G regime of that jurisdiction would apply, seems to me to sit uneasily with the provisions of section 426(4) and (5), at least in relation to remittal of assets. The inherent jurisdiction to remit must be exercisable in relation to any other country whereas section 426 only applies to a "relevant country or territory", i e one designated by the Secretary of State. If the courts had an inherent power to remit to a country with a different insolvency regime, either the courts could exercise that power in relation to a country which H was not so designated, or section 426 impliedly restricts the inherent jurisdiction to designated states. The former possibility renders the significance of designation questionable in a case where remittal is sought; indeed it can be said to involve the inherent jurisdiction almost thwarting the statutory purpose. The latter possibility not only involves an implication as

to the effect of section 426 which is not exactly obvious: it would mean that the inherent power (if it ever existed) had very little, if any, further purpose.

77 Accordingly, in agreement with Lord Scott, were it not for section 426, I would have been of the view that this appeal should be dismissed.

78 I should add that I agree with Lord Hoffmann when he says that "the common law power to remit is about choice of jurisdiction, whereas section 426 is about choice of law", at least in relation to the present type of case. What section 426(5) says in terms is that an English court, to which an appropriate request is made, may "apply . . . the insolvency law which is applicable by [the foreign court making the request]". Whether the English court does that in the present case by ordering the English provisional liquidators to distribute in accordance with the Australian regime, or whether it orders remittal of the assets to Australia in accordance with its common law powers, to enable the Australian liquidators to distribute in accordance with the Australian regime, is a decision for the English court in each case. However, the questions whether to remit assets to another country and whether to apply, or to permit the application of, the distribution law of that country are two different issues, although resolution of the latter question will no doubt often dictate the answer to the former question. I consider that the first of those questions is governed by the common law and the second is governed by section 426 of the 1986 Act.

79 That leads me to the second aspect which I should deal with, namely the ultimate issue in this case: should the English court accede to the Australian liquidators' request to remit the English assets for distribution in accordance with the Australian insolvency regime? This aspect can be disposed of more quickly, as I agree with all your Lordships that this would be an appropriate case for remission of the English assets to Australia for distribution by the liquidators in accordance with Australian law. It is true that this will mean that some of the creditors will be worse off than under a distribution in accordance with the English insolvency regime, but, by the same token, it will mean that some of the creditors will be better off. That is almost inevitable where one applies any regime which differs in any way from the English regime.

80 More importantly, I do not consider that any fundamental principle of English insolvency law would be offended, or any unfairness would be perpetrated, by the application of the Australian insolvency regime. Under Australian law, preferential treatment is accorded to certain creditors of insurance companies, who would not have been given such treatment in English law. However, that does not in itself mean that the application of the Australian regime should be rejected. Further, as my noble and learned friend, Lord Phillips of Worth Matravers (whose speech I have read in draft) points out, the companies are, and always have been, Australian insurance companies, and Australia has been designated as a "relevant country or territory" for section 426 purposes. Clearly the fact that Australia has been so designated cannot be the end of the matter, but it does indicate, at least in general terms, that the Secretary of State considers that the insolvency law of Australia is acceptable in principle in this jurisdiction.

81 More particularly, the notion of preferential creditors is, and long has been, part of our insolvency regime, and it is almost inevitable that different insolvency regimes will have slightly different categories of

preferential creditors. It cannot be right that such differences should always, or (arguably) even frequently, be a bar to an order for remittal, as that would appear inconsistent with the purpose of section 426(4) and (5), especially in view of the slightly mystifying reference therein to "the rules of private international law". The fact that the categories of preferential creditors have changed significantly in this jurisdiction more than once over the past 15 years rather underlines the point. Further, there is nothing unreasonable or unfairly discriminatory in the application of the Australian statutory provisions with regard to preferential creditors in this case. On the contrary, as Lord Hoffmann and Lord Phillips point out in paras 32 and 40 respectively, since 2004 the English insolvency regime has now included preferential provisions for insurance companies which are very similar to the Australian regime. It is not as if the Australian regime would distribute assets between groups of unsecured creditors (whether preferential or not) other than on a pari passu basis, or has significantly different set-off rules from those which apply in this jurisdiction.

82 Accordingly, although I take the view that it would not have been open to an English court to make the order sought by the Australian liquidators in the absence of section 426(4) and (5) of the 1986 Act, I consider that a different answer is appropriate in light of section 426. David Richards J and the Court of Appeal thought otherwise, but that was at least in part because they were constrained by the reasoning in *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497 (much of which is unexceptionable as Lord Hoffmann and Lord Scott have said).

83 For these reasons, I too would allow this appeal.

*Appeal allowed.*
*Assets ordered to be remitted to Australia.*
*Submissions on costs invited within 14 days.*

*Solicitors: Norton Rose LLP; Clifford Chance LLP; Freshfields Bruckhaus Deringer.*

B L S

a
# Mitchell and another v Carter and another, Re Buckingham International plc

b
CHANCERY DIVISION (COMPANIES COURT)
BLACKBURNE J
10, 11 OCTOBER 1996

COURT OF APPEAL, CIVIL DIVISION
c LEGGATT, MILLETT AND ALDOUS LJJ
21 FEBRUARY 1997

*Insolvency – Liquidation – Applicants obtaining judgment against company – Applicants obtaining writs of garnishment in Florida – Liquidators seeking to stay garnishment – Applicants applying to restrain*
d *liquidators – Whether court had jurisdiction to hear the application – Insolvency Act 1986, ss 167(3), 168(5) and 183.*

On 18 July 1994 the applicants obtained judgment against Buckingham International plc, the company. On 27 April 1995 joint administrative receivers of the company were appointed. On 8 May 1996 the Circuit Court
e of Florida recognised the applicants' judgment and issued writs of garnishment in respect of sums owed to the company by seven of the company's US subsidiaries. These writs were the equivalent to the English court's garnishee orders nisi. Before the garnishment process in Florida could be completed and the debts collected, the receivers presented a petition to
f wind up the company and liquidators were appointed. Among the powers conferred on the liquidators was the power to apply for relief under s 304 of the United States Bankruptcy Code to stay the writs of garnishment issued on the applicants' behalf in the Florida court and any other attempt by them to enforce the judgment obtained against the company. On 24 May 1996 the liquidators obtained a temporary restraining order in the United States
g preventing the applicants from commencing or continuing any proceedings against the company in the United States. The applicants issued an ordinary application in the company's winding up for an order that in the event of a winding-up order being made the rights conferred on the liquidator by s 183(1) of the Insolvency Act 1986 in respect of the writs of garnishment obtained in Florida, be set aside in favour of the applicants pursuant to
h s 183(2)(c) and a declaration that the applicants be at liberty to retain the benefit of those writs notwithstanding the winding-up order. On 1 August 1996 Rattee J ordered the trial of a preliminary issue as to whether the court had the jurisdiction to determine the application under s 183(2)(c) or any other provision or principle of law. Blackburne J dismissed the application
i and the applicants appealed.

**Held** (per Blackburne J) – The court had no jurisdiction under s 183(2)(c) of the Insolvency Act 1986 to make the order the applicants sought since s 183

did not extend to executions or attachments in foreign jurisdictions. Moreover, the court had no jurisdiction to make the declaration sought where the applicants were seeking by lawful process in a foreign jurisdiction a to attach debts owed to the company and the liquidators were taking steps by lawful process in that jurisdiction to challenge that action. It was not appropriate for the applicants to seek to establish in this jurisdiction, by declaration or otherwise, the propriety of what they were seeking by due process to achieve in the foreign jurisdiction. The fact that the liquidators b might have invoked the court's inherent equitable jurisdiction to restrain the applicants from continuing with their garnishment proceedings in Florida, or that if their s 304 challenge to those proceedings failed, they might at some future date seek to invoke that jurisdiction, so as to deny the applicants the fruits of those garnishment proceedings, did not entitle the applicants to invoke the English court processes with a view to obtaining an order that c they were entitled to do in Florida what they were currently seeking to do. Nor did s 167(3) and s 168(5) of the 1986 Act assist the applicants, since the propriety of the liquidators' action in mounting a challenge to the applicants' garnishment proceedings in Florida was not the subject of the present application and as such had nothing to do with any jurisdiction conferred on the court by those provisions. d

**Held** (per Court of Appeal: appeal allowed) – The question in dispute between the parties was whether, under English law, the appellants or the respondents were entitled to the debts sought to be attached by the United States' garnishment proceedings, notwithstanding the winding-up order. It e was accepted that the court had no jurisdiction under s 183 of the Insolvency Act 1986 to make the order sought as that section had no extraterritorial effect, but the court did have jurisdiction to decide a question of priorities in an English liquidation and thus whether the appellants could retain the fruits of the garnishment proceedings, if awarded them, and to act by way of declaration since that was a matter of English law. The court had jurisdiction f over liquidators and had power to act by way of declaration or injunction to restrain any act which would not be lawful. Therefore if the court decided that the respondents were not entitled to any sum awarded by the United States' court, the court could prevent them from pursuing the proceedings and seeking to recover that sum. Moreover, the jurisdiction of the English court did not depend on which of the parties made the application. g Accordingly, if the court should decide that the appellants were entitled to the fruits of the garnishment proceedings and that the liquidators were not entitled to any sum awarded by the United States' court, it could prevent the liquidators from pursuing their proposed proceedings under s 304 of the US Bankruptcy Code. h

**Cases referred to in judgments**

*Ayerst (Inspector of Taxes) v C & K (Construction) Ltd* [1975] 2 All ER 537, [1976] AC 167, [1975] 3 WLR 16, HL.

*Barclays Bank plc v Homan* [1993] BCLC 680, Ch D and CA. i

*Leon v York-o-Matic Ltd* [1966] 3 All ER 277, [1966] 1 WLR 1450.

*Lockley v National Blood Transfusion Service* [1992] 2 All ER 589, [1992] 1 WLR 492, CA.

*North Carolina Estate Co, Re* (1889) 5 TLR 328.
*Oriental Inland Steam Co, Re, ex p Scinde Rly Co* (1874) 9 Ch App 577.
a *Roberts Petroleum Ltd v Bernard Kenny Ltd* [1983] BCLC 28, [1983] 1 All ER 564, [1983] 2 AC 192, [1983] 2 WLR 305, HL.
*Vocalion (Foreign) Ltd, Re* [1932] 2 Ch 196, [1932] All ER Rep 519.

**Cases also cited or referred to in skeleton arguments**
b *Bank of Tokyo v Karoon* [1986] 3 All ER 468, [1987] AC 45n, CA.
*Castanho v Brown & Root (UK) Ltd* [1981] 1 All ER 143, [1981] AC 557, HL.
*Distin, Re, ex p Ormiston* (1871) 24 LT 197.
*Tait & Co, Re, Ex p Tait* (1872) LR 13 Eq 311.

c **Application**

By an amended application dated 1 August 1996, the applicants, Geoffrey John Mitchell and Louis David Holloway, applied for an order (1) that in the event of a winding-up order being made on the petition presented to the court on 21 May 1996 the rights conferred on the liquidator of the company by s d 183(1) of the Insolvency Act 1986 in respect of writs of garnishment obtained in the State of Florida in the United States of America be set aside in favour of the applicants pursuant to s 183(2)(c) of the 1986 Act and/or that the applicants be at liberty to retain the fruits and/or benefit of the said writs of garnishment notwithstanding the winding-up order made therein; and (2) for the trial of a preliminary issue: whether, having regard to the fact e that the applicants were seeking to enforce their judgment by proceedings in the State of Florida, USA, the court had jurisdiction to determine the application therein under s 183(2)(c) of the 1986 Act or any other provision or principle of law and, if so, what provision or principle of law. The facts are set out in the judgment.

f *Eben Hamilton QC* and *Robin Hollington* (instructed by *Comptons*) for the applicants.
*Gabriel Moss QC* and *William Trower* (instructed by *Clifford Chance*) for the respondents.

g **BLACKBURNE J.** I have before me a preliminary issue directed by Rattee J on 1 August 1996 which arises in the winding up of Buckingham International plc, which I will refer to simply as 'the company'. The relevant background is as follows.

On 18 July 1994 the applicants before me, a Mr Mitchell and a Mr Holloway, obtained judgment against the company in the sum of just over h £3.68m. It was the culmination of protracted proceedings stretching back to early 1988, arising out of the sale by the applicants to the company of a successful business venture. Some months later, on 27 April 1995, joint administrative receivers of the company were appointed by its bankers, to whom the company was heavily indebted. Wishing to execute on their i judgment, the applicants then took steps to have their judgment 'recognised' in the Circuit Court of Florida. This they succeeded in achieving on 8 May 1996. By then the amount of the judgment, inclusive of interest, was $6.97m or so, the judgment being recognised in US dollars rather than sterling.

On the same day, on the application of the two applicants, the same Florida court issued so-called writs of garnishment in respect of sums owing to the company by each of seven companies, being US subsidiaries of the *a* company, arising out of the sale of certain hotels. The effect of the writs of garnishment, so far as material, was approximately equivalent to a garnishee order nisi in our courts.

The applicants, if the debts owed by the US subsidiaries were to be attached, had to resort to process outside the jurisdiction of the English *b* court, since under RSC Ord 49, r 1, garnishee proceedings can only be taken if the garnishee is within the jurisdiction. Florida law enabled them to do this in relation to the debts owed by the seven subsidiaries in question.

Before the garnishment process in Florida can be completed and an order made having the approximate effect of an order absolute under English law, *c* and the debts collected in satisfaction of the applicants' judgment debt, the company's joint administrative receivers presented a petition to wind up the company and obtained ex parte from Knox J an order for the appointment of two partners in Ernst & Young as provisional liquidators. Among the many powers conferred on them by Knox J's order was the power to apply, if so advised, for relief under s 304 of the United States Bankruptcy Code, *d* inter alia, to stay the seven writs of garnishment issued on the applicants' behalf in the Florida court, and any other attempt by them to enforce the judgment obtained against the company on 18 July 1994. Section 304, as I understand it, enables persons, such as the provisional liquidators of an English company, to apply to the US bankruptcy courts by way of ancillary insolvency proceedings for injunctive relief, inter alia, to prevent the *e* commencement or continuation of any action with a view to the enforcement of any judgment against the English company with respect to its assets located in the United States.

On 24 May 1996 the provisional liquidators obtained a temporary restraining order from the US Federal Bankruptcy Court for the Middle *f* District of Florida against the applicants under s 304, preventing them from commencing or continuing any proceedings against the company in the United States, and in particular from continuing the garnishment proceedings against the seven US subsidiaries then pending in the local Florida court. That order has been continued from time to time, and currently continues until the *g* end of this month. In the meantime, on 10 July 1996, the company was ordered to be wound up and the provisional liquidators continued in office as the joint liquidators of the company.

The provisional liquidators had to resort to some kind of restraint proceedings against the applicants if the latter were to be prevented from attaching the debts owed to the company by the US subsidiaries in *h* satisfaction of the judgment debt. This is because s 130(2) of the Insolvency Act 1986 (the 1986 Act) provides:

> 'When a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or *i* commenced against the company or its property, except by leave of the court and subject to such terms as the court may impose.'

It does not operate extra-territorially to stay executions abroad. See *Re Vocalion (Foreign) Ltd* [1932] 2 Ch 196, [1932] All ER Rep 519. If, therefore, the provisional liquidators had not resorted to restraint proceedings against them the applicants would have been entitled to proceed with their application to attach the debts owed to the company by its US subsidiaries, which, if successful, would have resulted in a reduction of the assets likely on the evidence before me to be available to meet the company's unsecured claims of some £21m or more from £6m to some £1.7m.

There were effectively two courses of action available to the provisional liquidators to prevent this from happening: apply to the US bankruptcy court under s 304; alternatively, apply to the English court under the court's inherent or equitable jurisdiction to proceed in personam against the applicants to restrain them from taking any proceedings in the US to attach the debts owed by the seven subsidiaries. That such a jurisdiction exists has not been in question before me.

The provisional liquidators chose, under the authority to do so expressly conferred upon them by the order appointing them made by Knox J, to resort to s 304 proceedings in Florida; it is in the very place, if not the very court, in which the applicants were in the course of attaching the debts owed by the US subsidiaries. In my view, they were perfectly entitled to pursue that option and, on what I have seen, there is no credible basis for suggesting that their action in so doing was in any way improper. I mention this because, initially at any rate, Mr Hamilton QC, for the applicants, suggested that in proceeding in Florida under s 304 rather than in this country under the court's inherent or equitable jurisdiction, the provisional liquidators were motivated by a wish to make things difficult for the applicants. That suggestion was quickly withdrawn after protest from Mr Moss QC, for the liquidators.

I now come to the proceedings which are now before me. On 11 June 1996 the applicants issued an ordinary application in the company's winding up, then provisional, for an order—

> 'That in the event of a winding-up order being made on the petition presented to this court herein on 21st May 1996 the rights conferred on the liquidator of the company by section 183, sub-section (1) of the above-mentioned Act [that is the 1986 Act] in respect of writs of garnishment obtained in the State of Florida in the United States of America be set aside in favour of the Applicants pursuant to section 183, sub-section (2), paragraph (c) of the said Act.'

The application evidently proceeded on the basis that s 183 of the 1986 Act extended to executions and attachments in foreign jurisdictions.

Section 183(1) provides as follows:

> 'Where a creditor has issued execution against the goods or land of a company or has attached any debt due to it, and the company is subsequently wound up, he is not entitled to retain the benefit of the execution or attachment against the liquidator unless he has completed the execution or attachment before the commencement of the winding up.'

Section 183(2)(c) provides that:

> 'the rights conferred by sub-section (1) on the liquidator may be set a aside by the court in favour of the creditor to such extent and subject to such terms as the court thinks fit.'

The purpose of the application was to persuade the court under s 183(2)(c), that for a variety of reasons the applicants should be entitled, notwithstanding the winding up of the company, to retain the benefit of their b garnishment then under way in Florida. The applicants, I should say, are extremely aggrieved over the way the company has behaved towards them in connection with the issues giving rise to their action – in fact a counterclaim against the company – and over the way that that litigation was conducted. Among other matters, they contend that they were subject to delaying tactics c of one kind or another in their efforts to obtain judgment, and that, but for such tactics, they would have obtained judgment at a very much earlier date, and that having obtained judgment they would have recovered what was owing to them. On this hearing I have not been concerned to go into these matters, which all occurred before the provisional liquidators were appointed, and I have not heard what, so far as they can shed light on this, d the liquidators have to say by way of answer.

It is now accepted by Mr Hamilton that in fact s 183 does not extend to executions and attachments in foreign jurisdictions. Whether it is because the applicants were persuaded that that was so or for other reasons, application was made by them to Rattee J on 1 August 1996, and an order was made by consent, firstly for amendment of their application, and secondly for the trial e of the preliminary issue which is now before me.

The application, as amended, seeks an order that—

> 'in the event of a winding-up order being made on the petition presented to this court herein on 21st May, 1996 the rights conferred on f the liquidator of the company by section 183(1) of the above-mentioned Act in respect of writs of garnishment obtained in the State of Florida in the United States of America be set aside in favour of the Applicants pursuant to section 183, sub-section (2), paragraph (c) of the said Act, and/or that the Applicants be at liberty to retain the fruits and/or benefit of the said writs of garnishment notwithstanding the winding-up order g made herein.'

The preliminary issue is as follows:

> 'Whether, having regard to the fact that the Applicants are seeking to enforce their judgment by proceedings in the State of Florida, USA, the h court has jurisdiction to determine the application herein under section 183, sub-section (2), paragraph (c) of the Insolvency Act 1986 or any other provision or principle of law and, if so, what provision or principle of law.'

i

The preliminary issue is curiously worded. It merely asks whether jurisdiction exists; it does not deal with what should happen to the proceedings in Florida if jurisdiction is found to exist.

I am in no doubt that the court has no jurisdiction under s 183(2)(c) to make the order which the applicants seek. As Mr Moss submitted, and as Mr Hamilton accepted, s 183 does not extend to executions or attachments in foreign jurisdictions.

More questionable, in my view, is whether in the circumstances of this case the court has jurisdiction to make an order sought by way of amendment to the application—

> 'that the Applicants be at liberty to retain the fruits and/or benefits of the said writs of garnishment notwithstanding the winding up order made herein'.

In essence, the applicants seek a declaration as to their entitlement to retain the benefit of their garnishment proceedings in Florida. The question raised by the preliminary issue is whether the court has jurisdiction to make such a declaration if not under s 183(2)(c), then under some other statutory provision or some principle of law and, if so, which.

I can well see that if after the applicants had attached the debts owed by the seven US subsidiaries the liquidators were to challenge their right to retain the benefit of those debts the applicants would be entitled to come to the court to seek a declaration that they were so entitled. In that sense, the court would have jurisdiction to grant the relief sought. I can also just accept that even if the applicants had not completed the process of attaching the debts but their right to continue with their process were under challenge by the liquidators the applicants might be entitled to come to the court to seek a declaration that they were entitled to proceed with their attachment proceedings. What, however, I am not willing to accept is that where, as here, the applicants are seeking by lawful process in a foreign jurisdiction to attach debts owed to the company and the liquidators are taking steps by lawful process in that jurisdiction, albeit in a different court, to challenge that action, it is appropriate for the applicants to seek in this jurisdiction to establish, by declaration or otherwise, the propriety of what they are seeking by due process to achieve in the foreign jurisdiction. The fact that the provisional liquidators might have invoked the court's inherent or equitable jurisdiction to restrain the applicants from continuing with their garnishment proceedings in Florida, or that if their s 304 challenge to those proceedings fails, they might at some future date seek to invoke that jurisdiction so as to deny the applicants the fruits of those garnishment proceedings does not, as it seems to me, entitle the applicants at this stage to invoke the English court processes with a view to obtaining an order that they are entitled to do what in Florida they are currently seeking to do.

I am not therefore persuaded that, given the proceedings which the applicants are themselves taking in Florida and the liquidators' challenge in Florida to those proceedings it is appropriate for this court to assume and exercise a declaratory or similar jurisdiction with a view to pronouncing on the entitlement of the applicants to pursue their Florida proceedings and, if successful, to retain the fruits of those proceedings.

Mr Hamilton submitted that it is open to the applicants under ss 167(3) and 168(5) of the 1986 Act to challenge the exercise by the liquidators of their powers, and that those provisions provide a statutory means of enabling

the applicants to obtain the court's ruling on the issue raised by their application. Section 167(3) provides that:

> 'The exercise by the liquidator in a winding up by the court of the powers conferred by this section [and those are the powers which are set out in sub-ss (1) and (2)] is subject to the control of the court, and any creditor or contributory may apply to the court with respect to any exercise or proposed exercise of any of those powers.'

And section 168(5) provides:

> 'If any person is aggrieved by any act or decision of the liquidator, that person may apply to the court; and the court may confirm, reverse or modify the act or decision complained of, and make such order in the case as it thinks just.'

In my view those provisions do not assist the applicants. The propriety of the liquidators' action in mounting in Florida a challenge to the applicant's garnishment proceedings is not the subject of the present application; rather, the application is concerned to establish the entitlement of the applicants to attach the debts owed by the seven US subsidiaries. Whether they are, or are not, so entitled has nothing to do, as it seems to me, with any jurisdiction conferred on the court by either of those sub-sections.

In the circumstances, I propose to answer the preliminary issue by stating that, having regard to the action of the applicants in seeking to enforce their judgment by proceedings in Florida, and to the action of the liquidators in challenging those proceedings by separate proceedings in Florida, the court does not have jurisdiction under s 183(2)(c), of the 1986 Act or otherwise to determine the amended application herein.

[After hearing further submissions from counsel his Lordship continued:]

A small point has arisen on the question of costs, which is whether I should accede to the application of the liquidators that in addition to the ordinary provision that the question of the applicants' liability for the liquidators' costs should be postponed I should supplement the order by a provision entitling the liquidators to retain out of any dividends payable to the applicants the amount of the liquidator's taxed costs in these proceedings in so far as those costs have not otherwise previously been discharged.

In support of that I am referred to *Lockley v National Blood Transfusion Service* [1992] 2 All ER 589, [1992] 1 WLR 492, which is authority for the following propositions:

> '(1) A direction for the set-off of costs against damages or costs to which a legally aided person has become or becomes entitled in the action may be permissible.
>
> (2) The set-off is no different from and no more extensive than the set-off available to or against parties who are not legally aided.
>
> (3) The broad criterion for the application of set-off is that the plaintiff's claim and the defendant's claim are so closely connected that it would be inequitable to allow the plaintiff's claim without taking into

> account the defendant's claim. As it has sometimes been put, the defendant's claim must, in equity, impeach the plaintiff's claim.' (See [1992] 2 All ER 589 at 593–594, [1992] 1 WLR 492 at 496–497.)

Mr Hamilton submits that I should not accede to this application and simply allow the order to be made leaving the question of contribution to be dealt with at some later stage.

I am persuaded that the principles set out in *Lockley v National Blood Transfusion Service* are applicable to this case. It seems to me that the costs which have been incurred by the liquidators in these proceedings are closely related to the applicants' purpose in bringing these proceedings, which is to establish their right to attach assets of the company, the result of which, if successful, will reduce the amount available for distribution to the general body of unsecured creditors in the liquidation. The liquidators' costs of these proceedings which I have ordered the applicants to pay have been incurred in protecting the amount of the estate available for distribution among the general body of the company's creditors.

It seems to me that the costs incurred and the subject matter of the litigation are sufficiently closely connected to justify the application of the principles set out in *Lockley v National Blood Transfusion Service*, and I shall therefore make the particular order that the liquidators seek in relation to their costs.

*Application dismissed.*

**Appeal**

By notice dated 16 January 1997 the applicants, Geoffrey John Mitchell and Louis David Holloway, appealed with the leave of the court (McCowan, Millett and Auld LJJ), against the decision of Blackburne J on 11 October 1996, whereby it was declared that the court had no jurisdiction under s 183(2)(c) of the Insolvency Act 1986 or otherwise to determine the amended application. The facts are set out in the judgment of Aldous LJ.

*Eben Hamilton QC* and *Robin Hollington* (instructed by *Comptons*) for the applicants.

*Gabriel Moss QC* and *William Trower* (instructed by *Clifford Chance*) for the respondents.

**ALDOUS LJ** (giving the first judgment at the invitation of Leggatt LJ). The appellants, Mr Geoffrey Mitchell and Mr Louis Holloway, appeal with leave of this court against the judgment and order of Blackburne J of 11 October 1996.

In September 1986 the appellants sold their shares in a business to Buckingham International plc (Buckingham). Completion was due to take place in February 1988, but Buckingham disputed the appellants' entitlement to the purchase price and started proceedings against them. The trial did not take place until the summer of 1994. Ferris J gave judgment for the appellants for just over £3.6m. The money was not paid, and the appellants threatened to present a petition for a winding-up order. It is not necessary to

go into the reasons why the judgment debt has not been paid, but it is the evidence of the appellants that they have been badly wronged.

On 27 April 1995, ANZ Merchant Bank Ltd appointed Messrs McKillon & Lewis as joint administrative receivers of Buckingham. Thereafter the appellants took steps to have their judgment recognised in the United States of America. This they achieved in Florida on 8 May 1996. They immediately issued seven writs of garnishment in respect of debts owed to Buckingham by seven of its subsidiaries. I understand that the effect of those writs was equivalent to a garnishee order nisi in this country.

On 21 May 1996 the administrative receivers applied to wind up Buckingham. Knox J, upon an ex parte application, appointed the respondents to this appeal as provisional liquidators. He also gave permission for proceedings to be started by them in the United States. Pursuant to that order, three days later the respondents obtained from the Federal Bankruptcy Court for the Middle District of Florida a temporary injunction pursuant to s 304 of the US Bankruptcy Code restraining the applicants from commencing or continuing any proceedings against Buckingham in the USA and from continuing the garnishment proceedings against the seven US subsidiaries. There have been further hearings in the Florida court, but everything has been stayed pending resolution of these proceedings which were started on 11 June 1996. In them the appellants seek an order—

> ‘That in the event of a winding-up order being made on the petition presented to this Court herein on 21st May, 1996 the rights conferred on the liquidator of the company by section 183(1) of the above-mentioned Act [the Insolvency Act 1986] in respect of writs of garnishment obtained in the State of Florida in the United States of America be set aside in favour of the Applicants pursuant to section 183, sub-section (2), paragraph (c) of the said Act, and/or that the Applicants be at liberty to retain the fruits and/or benefit of the said writs of garnishment notwithstanding the winding-up order made herein.’

The last 28 words of that order were added by amendment on 8 October 1996 and I understand, from the outline submissions put in on behalf of the applicants, that before Blackburne J the appellants applied (if the judge thought it was necessary) to add the words ‘pursue and/or’ after the words ‘liberty to’.

Despite the amendment and proposed amendment, the parties do not agree as to what would be the effect of such an order if granted. The appellants submitted that the action of the respondents was preventing them from completing their garnishment proceedings and enjoying any fruits that came from them. The dispute in this country was whether the appellants or respondents were entitled to such fruits and, if it be the appellants, whether the respondents should continue to prevent that happening. Thus the grant of an order declaring the appellants were at liberty to retain the benefits of the garnishment proceedings would make it clear that the respondents would be acting unlawfully by proceeding further with their proceedings in the Bankruptcy Court in Florida.

The respondents submitted that the order sought did not challenge the respondents' actions in taking proceedings in the United States of America and therefore the court had no jurisdiction. I agree – it does not say so in terms. Thus it was said that the matter the appellants actually wished to raise, whether they were entitled to the fruits of the US proceedings, was not contained in the order sought, and leave would not be granted for any amendment.

On 1 August 1996 Rattee J directed that this preliminary issue be tried:

> 'Whether, having regard to the fact that the Applicants are seeking to enforce their judgment by proceedings in the State of Florida, USA, the court has jurisdiction to determine the application herein under section 183, subsection 2, paragraph (c) of the Insolvency Act 1986 or any other provision or principle of law and, if so, what provision or principle of law.'

Unfortunately that question did not clarify what was in issue between the parties. Perhaps that happened because a preliminary issue was ordered instead of deciding the issue of jurisdiction in context, and also because the order sought was not perhaps as clear as might be.

There is no doubt in my mind that what is in dispute between the parties is the right to the debts owed by the seven United States subsidiaries. Are the appellants or the respondents entitled to them? If it be the appellants, then they are entitled to complete the garnishment proceedings in the USA and keep any proceeds. If it be the respondents, then the appellants should not interfere and would have to hand over any proceeds obtained, even if they were successful in the US proceedings. I believe that the parties were not under any misapprehension as to what was in dispute, nor was the judge.

The question for the court is whether it has jurisdiction to decide whether the appellants under English law should be entitled to the fruits of the garnishment proceedings in the USA if completed satisfactorily in their favour. If they are entitled to those fruits, the respondents' actions in the USA to prevent them from obtaining those fruits are, in my view, unlawful. If they are not, then the proceedings by the appellants in the USA are a waste of time and money as success would be snatched away from them by the order of the English court requiring them to pay over the proceeds to the respondents.

Before coming to the judgment of the judge, it is convenient to record two propositions of law which are not in dispute.

(1) Section 183 of the Insolvency Act 1986, which is referred to in the order sought, has no extra-territorial effect.

(2) The exercise of powers by liquidators in a winding up by the court is subject to the control of the court, and claiming creditors can apply to the court for direction as to any exercise or proposed exercise of the liquidator's powers.

The judge held that the court had no jurisdiction under s 183 of the 1986 Act to make the order sought. That is accepted to be right. He went on (see p 679, above):

> 'More questionable, in my view, is whether in the circumstances of this case the court has jurisdiction to make an order sought by way of

> amendment to the application, "that the Applicants be at liberty to retain the fruits and/or benefits of the said writs of garnishment notwithstanding the winding up order make herein". In essence, the applicants seek a declaration as to their entitlement to retain the benefit of their garnishment proceedings in Florida. The question raised by the preliminary issue is whether the court has jurisdiction to make such a declaration if not under s 183(2)(c), then under some other statutory provision or some principle of law and, if so, which.'

That passage of the judge's judgment was not criticised by the appellants. Mr Moss QC, who appeared on behalf of the respondents, submitted that the judge did not mean what he said and, in particular, he did not mean 'entitled' when he said 'entitlement'. He said that he could not have meant entitled because the issue to which the judge referred was not raised by the order sought. If that was the point that had been raised, then it required a challenge to the order of Knox J and that had not been done.

I believe it is clear what the judge meant. I have no doubt that he realised what the dispute was. It was a dispute as to whether the appellant was entitled to retain the fruits of the proceedings in the United States, if any were awarded.

The judge continued (see p 679, above):

> 'I can well see that if after the applicants had attached the debts owed by the seven US subsidiaries the liquidators were to challenge their right to retain the benefit of those debts the applicants would be entitled to come to the court to seek a declaration that they were so entitled. In that sense, the court would have jurisdiction to grant the relief sought. I can also just accept that even if the applicants had not completed the process of attaching the debts but their right to continue with their process were under challenge by the liquidators the applicants might be entitled to come to the court to seek a declaration that they were entitled to proceed with their attachment proceedings.'

The applicants supported that conclusion. They submitted that, as a matter of fact, the respondent liquidators were challenging their right to retain the fruits of the garnishment proceedings if awarded. Further, they were challenging the right of the appellants to the benefit of the debts owed to the seven US subsidiaries. That in essence amounted to a challenge to the lawfulness of the respondents' action in seeking to prevent them obtaining money to which they say they were entitled.

However, the judge went on (see p 679, above):

> 'What, however, I am not willing to accept is that where, as here, the applicants are seeking by lawful process in a foreign jurisdiction to attach debts owed to the company and the liquidators are taking steps by lawful process in that jurisdiction, albeit in a different court, to challenge that action, it is appropriate for the applicants to seek in this jurisdiction to establish, by declaration or otherwise, the propriety of what they are seeking by due process to achieve in the foreign jurisdiction. The fact that the provisional liquidators might have invoked

the court's inherent or equitable jurisdiction to restrain the applicants from continuing with their garnishment proceedings in Florida, or that if their s 304 challenge to those proceedings fails, they might at some future date seek to invoke that jurisdiction so as to deny the applicants the fruits of those garnishment proceedings does not, as it seems to me, entitle the applicants at this stage to invoke the English court processes with a view to obtaining an order that they are entitled to do what in Florida they are currently seeking to do. I am not therefore persuaded that, given the proceedings which the applicants are themselves taking in Florida and the liquidators' challenge in Florida to those proceedings it is appropriate for this court to assume and exercise a declaratory or similar jurisdiction with a view to pronouncing on the entitlement of the applicants to pursue their Florida proceedings and, if successful, to retain the fruits of those proceedings.'

The judge then went on to answer the preliminary issue by stating that, having regard to the action of the applicants in seeking to enforce their judgment by proceedings in Florida and to the action of the liquidators in challenging those proceedings, the court did not have jurisdiction to determine the amended application.

Mr Hamilton QC on behalf of the appellants reminded us in his outline submissions that the question before the court concerned the court's jurisdiction, not whether that jurisdiction should be exercised in a particular way. He submitted that the judge was wrong to consider, let alone to conclude, that the appellants' action in seeking the declaration was not appropriate. Further, he submitted that the judge had failed to keep in mind the dispute to which he had referred earlier in his judgment.

The US garnishment proceedings were started by the appellants to attach the debts of seven US subsidiaries. The question in dispute between the parties was whether the appellants or the respondents were entitled to them, if awarded. That the judge isolated as the issue. If the appellants were entitled to the benefit of those debts, then the action of the respondents seeking to prevent the appellants obtaining them was unlawful. If the respondents were entitled to them, then the garnishment proceedings were a waste of time as, even if successful, the court would order the proceeds to be paid to the respondents. The appellants submitted that the issue of whether they could retain the fruits of the garnishment proceedings, if they got them, should be decided by the English court; that was a matter of English law and was appropriate to be decided at this stage. The court had jurisdiction to make that decision and to act by way of declaration to secure the position of the person who succeeded.

I believe that the submission of the appellants is correct.

It is accepted that the court had jurisdiction over the liquidators and, as such, has power to act by way of declaration or injunction to restrain an act which would not be lawful. Thus, if the court should decide that the liquidators were not entitled to any sum which would be awarded by the United States' court, the court could prevent the liquidators from pursuing the proceedings and seeking to recover that sum.

In this case the dispute between the parties concerns debts in America and in particular whether the appellants or the respondents are entitled to debts

sought to be attached by the garnishment proceedings. The court does, in my view, have jurisdiction to decide whether the fruits of those garnishment proceedings, if successful, should be retained by the appellants. If they should, then it would not be appropriate for the liquidators to continue with their proceedings in the USA. a

I cannot accept the submission of Mr Moss made based upon *Leon v York-o-Matic Ltd* [1966] 3 All ER 277, [1966] 1 WLR 1450 that there was no jurisdiction. That was a case which gave guidance as to the grounds upon which the court would exercise its jurisdiction. But the question before this court is whether there is jurisdiction. We have not been concerned with the facts and, in particular, whether the facts do provide a good ground for the exercise of the discretion. Similarly, I do not believe that *Roberts Petroleum Ltd v Bernard Kenny Ltd* [1983] BCLC 28, [1983] 2 AC 192 has any application in this case as it is accepted that s 183 does not apply. b c

Mr Moss also submitted that there cannot be jurisdiction as the question posed was hypothetical as there were as yet no fruits because the garnishment proceedings in the United States were only at a nisi stage. He relied upon the words of Lord Brightman in *Roberts Petroleum* to support that case. But that submission is not directed to what I believe is the issue before the court. The question is whether the appellants are entitled to retain the fruits, if awarded to them in the United States, of their garnishment proceedings. The respondents' submissions are based upon an unwarranted restricted meaning of the order sought. d

In my view, the judge came to the wrong conclusion and I therefore would allow this appeal. e

**MILLETT LJ.** It would be unfortunate to say the least if the English Insolvency court had no jurisdiction to decide a question of priorities in an English liquidation, and doubly unfortunate if it could not do so even when a foreign court had deferred to its decision or adjourned its own proceedings to await its decision. f

The making of a winding-up order divests the company of the beneficial ownership of its assets which cease to be applicable for its own benefit. They become instead subject to a statutory scheme for distribution among the creditors and members of the company. The responsibility for collecting the assets and implementing the statutory scheme is vested in the liquidator subject to the ultimate control of the court. The creditors do not themselves acquire a beneficial interest in any of the assets, but only a right to have them administered in accordance with the statutory scheme. These principles were established in *Ayerst (Inspector of Taxes) v C & K (Construction) Ltd* [1975] 2 All ER 537, [1976] AC 167. They apply to all the assets of the company, both in England and abroad, for the making of a winding-up order is regarded as having worldwide effect. g h

The powers of the court are, of course, more limited. But it has power to take whatever steps are open to it within the territorial limits of its own jurisdiction to enable the liquidator (one of its own officers) to get in and realise for the benefit of the creditors all the assets of the company which are subject to the statutory scheme, wherever in the world they may be. Where the assets are overseas and are subject to an uncompleted process of execution, they are nevertheless subject to the statutory scheme. Once the i

execution is complete, however, and the assets have been successfully seized by the execution creditor, then they cease to be subject to the statutory scheme and the liquidator's ability to collect them for the benefit of the creditors is defeated. This is because s 183 of the Insolvency Act 1986 applies only to execution proceedings in England and because the liquidator and the other creditors have no beneficial interest in the assets which could sustain a restitutionary claim.

Accordingly, a creditor who successfully completes a foreign execution is able to gain priority over the unsecured creditors. To prevent this, the English court has jurisdiction to restrain creditors from bringing or continuing the foreign execution process (see, for example, *Re Oriental Inland Steam Co, ex p Scinde Rly Co* (1874) 9 Ch App 557 and *Re North Carolina Estate Co* (1889) 5 TLR 328). In all the cases in which the court has hitherto exercised this jurisdiction, the creditors in question were resident in England. In *Re Vocalion (Foreign) Ltd* [1932] 2 Ch D 196, Maugham J did not doubt that the jurisdiction existed, even in the case of a creditor who was properly served here but was resident abroad, and who was merely seeking to recover a debt due to him by resorting to the courts of his own country; but he declined to exercise the jurisdiction in such a case. But although the English court has jurisdiction to grant what amounts to an anti-suit injunction in order to restrain execution proceedings in a foreign court which would prevent the liquidator from getting in the assets, it has often been said that it is a jurisdiction to be exercised with caution.

The position today is that stated by Hoffmann J in *Barclays Bank plc v Homan* [1993] BCLC 680. There must be a good reason why the decision to stop foreign proceedings should be made here rather than there. The normal assumption is that the foreign judge is the person best qualified to decide if the proceedings in his court should be allowed to continue. Comity demands a policy of non-intervention. Accordingly in the present case the court was not asked to restrain the appellants from continuing with their proceedings in Florida, but rather the liquidator was authorised to apply to the Florida Bankruptcy Court under s 304 of the United States Bankruptcy Code. But in the modern spirit of co-operation in cross-border insolvency proceedings, the judge of the court in Florida has deferred to the decision of this court, being the court seised of the liquidation. That, it seems to me, is a relevant change of circumstances which allows the English court to reconsider whether or not it should authorise the liquidators to continue to oppose the garnishment proceedings in Florida, or should instead direct the liquidators to withdraw their opposition.

The question in my judgment, as my Lord has said, is whether the appellants, as judgment creditors, ought to be permitted to proceed with the garnishment proceedings in Florida and to retain the fruits of the garnishment free from any further interference by the liquidator. The preliminary question on which the judge and now this court have been asked to rule is whether the English court has any jurisdiction to take such a step. It is admitted that the court has jurisdiction to direct the liquidator to intervene in foreign garnishment proceedings, and it appears to me that it follows that the English court has jurisdiction to direct him not to do so. Moreover, the jurisdiction of the English court does not depend on which of the parties makes the application.

The main thrust of the argument for the respondents in this court is that that is not the application which is before us. It is said that the application needs to be amended in order to ask for an order requiring the liquidators to withdraw their opposition to the Florida garnishment proceedings, that leave to amend would not be given because no proper grounds for making the order could be put forward; and that accordingly the application should be dismissed. But in my judgment that is a misreading of the application as presently drawn. It asks, so far as material, for an order that the appellants be at liberty to pursue and retain the fruits and/or benefits of the writs of garnishment notwithstanding the winding-up order. The appellants do not need the leave of the English court to continue the garnishment proceedings in Florida, for they are sui juris; nor do they need a declaration of the English court that they would be entitled to retain the benefits of the writ of garnishment once completed, for that is not disputed. Accordingly, when they ask the court for a declaration that they may be at liberty to continue the proceedings, and ask for that declaration in proceedings to which the liquidators are parties, their application can, in my judgment, have only one meaning: that they be at liberty to pursue the garnishment proceedings free from the opposition of the liquidators. In my judgment, the appellants are seeking (and have always been understood to be seeking) a declaration that the appellants should be at liberty to proceed with the garnishment proceedings in Florida, complete them, and retain the benefits of the garnishment without further objection from, or opposition by, the liquidator. If it was not so understood, then the application would not have been so strenuously resisted.

It is then said, in reliance upon the case of *Leon v York-o-Matic Ltd* [1966] 3 All ER 277, [1966] 1 WLR 1450, that there are no grounds upon which the application can succeed. That may be so. It is not a matter for us. In that case the court decided that it had jurisdiction but that the plaintiff had not made out a case for the exercise of the jurisdiction. We are sitting on appeal from a judge who was asked to give a preliminary ruling on the existence of the jurisdiction. We are not concerned with the question whether the appellants have made out or ever can make out a case for the jurisdiction to be exercised.

In my judgment, if good grounds can be established for the declaration sought by the application, the court has jurisdiction to grant it. I would allow the appeal.

**LEGGATT LJ.** I agree with both judgments.

*Appeal allowed.*

Dilys Tausz Barrister.

A

Privy Council

# Singularis Holdings Ltd *v* PricewaterhouseCoopers

## [2014] UKPC 36

[on appeal from the Court of Appeal for Bermuda]

B

2014 April 29, 30; Nov 10

Lord Neuberger of Abbotsbury PSC, Lord Mance, Lord Clarke of Stone-cum-Ebony, Lord Sumption JJSC, Lord Collins of Mapesbury

*Bermuda — Insolvency — Jurisdiction — Company wound up in Cayman Islands — Liquidators seeking order in Bermuda requiring auditors to produce information* C *relating to company's affairs — Judge purporting to exercise common law power to order production of information which could have been ordered under statute in domestic insolvency — Whether power at common law to assist foreign court of insolvency jurisdiction by making order — Whether order appropriate in circumstances where foreign court could not make equivalent order — Whether court able to exercise powers analogous to statutory powers which were exercisable in domestic insolvency but did not apply to foreign insolvency —* D *Companies Act 1981 (No 59 of 1981), s 195*

A Cayman Islands company was wound up in the Cayman Islands and liquidators were appointed. In order to trace the company's assets, the liquidators wished to obtain information relating to the company's affairs from the company's auditors, a Bermuda registered partnership. They obtained from the Cayman Islands court an order requiring the auditors to transfer or deliver up certain documents but, E under Cayman Islands law, that order only extended to material belonging to the company. In order to obtain material belonging to the auditors themselves, the liquidators made an application in Bermuda for an order requiring the auditors to produce all documents in their possession relating to the affairs of the company. Under section 195 of the Bermudan Companies Act 1981[1], the Supreme Court of Bermuda had power to make such an order but only in relation to a company which that court had ordered to be wound up. However, the Chief Justice, sitting in the F Supreme Court of Bermuda, exercised what he termed a common law power to order the auditors to produce information which they could have been ordered to produce under section 195 if the company had been wound up in Bermuda. On the auditors' appeal, the Court of Appeal for Bermuda doubted whether there was jurisdiction to make such an order in circumstances where section 195 did not apply but set aside the order on the basis that, in any event, it was not an appropriate exercise of discretion because it was an order made in support of a Cayman Islands liquidation G which could not have been made by the Cayman Islands court.

On the liquidators' appeal—

*Held*, advising that the appeal be dismissed, (1) (Lord Neuberger of Abbotsbury PSC and Lord Mance JSC dissenting) that there was a power at common law to assist the officers of a foreign court of insolvency jurisdiction or equivalent public officers by ordering the production of information in oral or documentary form which was necessary for the administration of a foreign winding up, but the H power was not available to enable them to do something which they could not do under the law by which they had been appointed; and that, although the fact that express provision was made in Bermuda for the powers exercisable on the winding up of companies to which the Companies Act 1981 applied did not exclude the use of

[1] Companies Act 1981, s 195: see post, para 4.

© 2015 The Incorporated Council of Law Reporting for England and Wales

common law powers in relation to other companies which lay outside the scope of the statute altogether, it was not a proper exercise of the power of assistance for the Bermudan court to make the order sought by the liquidators since the material which they sought in Bermuda was not obtainable under the domestic law of the court which had appointed them (post, paras 19, 25, 28–29, 31, 33, 109–115).

*Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133, HL(E), *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, HL(E) and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236, SC(E) applied.

(2) That the common law power of the court to recognise and grant assistance to foreign insolvency proceedings was primarily exercised through the existing powers of the court; that, although those powers could be extended or developed through the traditional judicial law-making techniques of the common law, the judiciary could not, by analogy, extend the scope of insolvency legislation to cases where it did not apply, and a domestic court did not have power to assist a foreign court by doing anything which it could properly have done in a domestic insolvency and could not acquire jurisdiction by virtue of any such power; and that, accordingly, the Bermudan court could not, by analogy, apply the statutory powers under the Companies Act 1981 as if the foreign insolvency were a domestic insolvency (post, paras 18, 32, 36, 38, 64, 82–83, 94, 108, 109, 122, 134, 149, 162).

Dicta of Lord Walker of Gestingthorpe in *Al Sabah v Grupo Torras SA* [2005] 2 AC 333, para 35, PC applied.

*Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, PC and *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61 not followed.

*Quaere*. Whether information which the auditors acquired solely in their capacity as the company's auditors can be regarded as belonging exclusively to them simply because the documents in which they recorded that information are their working papers and as such their property (post, para 30).

Decision of the Court of Appeal for Bermuda [2013] CA (Bda) 7 Civ affirmed.

The following cases are referred to in the judgments:

*African Farms, In re* [1906] TS 373
*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904; [2005] 1 All ER 871, PC
*Arab Monetary Fund v Hashim (No 5)* [1992] 2 All ER 911
*Ashworth Hospital Authority v MGN Ltd* [2002] UKHL 29; [2002] 1 WLR 2033; [2002] 4 All ER 193, HL(E)
*Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All ER 537, HL(E)
*Banco Nacional de Cuba v Cosmos Trading Corpn* [2000] 1 BCLC 813, CA
*Bank of Credit and Commerce International SA (No 10), In re* [1997] Ch 213; [1997] 2 WLR 172; [1996] 4 All ER 796
*Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112
*Bent v Young* (1838) 9 Sim 180
*CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005] 2 HKC 589
*Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26; [2007] 1 AC 508; [2006] 3 WLR 689; [2006] 3 All ER 829; [2006] 2 All ER (Comm) 695, PC
*Colonial Government v Tatham* (1902) 23 Natal LR 153
*Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; [1997] 3 WLR 871; [1997] 3 All ER 673, CA
*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2006] UKHL 49; [2007] 1 AC 558; [2006] 3 WLR 781; [2007] 1 All ER 449, HL(E)
*Dreyfus v Peruvian Guano Co* (1889) 41 Ch D 151
*England v Smith* [2001] Ch 419; [2000] 2 WLR 1141, CA

© 2015 The Incorporated Council of Law Reporting for England and Wales

A *Gurr v Zambia Airways Corpn Ltd* [1998] ZASCA 16; [1998] 2 All SA 479 (A)

*HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR 852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)

*Impex Services Worldwide Ltd, In re* [2004] BPIR 564

*Incorporated Council of Law Reporting for England and Wales v Attorney General* [1972] Ch 73; [1971] 3 WLR 853; [1971] 3 All ER 1029, CA

*International Tin Council, In re* [1987] Ch 419; [1987] 2 WLR 1229; [1987] 1 All ER
B 890

*Jones v Kaney* [2011] UKSC 13; [2011] 2 AC 398; [2011] 2 WLR 823; [2011] 2 All ER 671, SC(E)

*Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349; [1998] 3 WLR 1095; [1998] 4 All ER 513, HL(E)

*McKerr, In re* [2004] UKHL 12; [2004] 1 WLR 807; [2004] 2 All ER 409, HL(NI)

*Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2009] UKHL 43;
C [2010] 1 AC 90; [2009] 3 WLR 385; [2009] Bus LR 1269; [2009] 4 All ER 847; [2010] 1 All ER (Comm) 220; [2009] 2 Lloyd's Rep 473, HL(E)

*Matheson Bros Ltd, In re* (1884) 27 Ch D 225

*Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512

*Moolman v Builders & Developers (Pty) Ltd* [1989] ZASCA 171; [1990] 2 All SA 77 (A)

*Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133; [1973] 3 WLR 164; [1973] 2 All ER 943, HL(E)

D *Orr v Diaper* (1876) 4 Ch D 92; 25 WR 23

*P & O Nedlloyd BV v Arab Metals Co (No 2) (The UB Tiger)* [2006] EWCA Civ 1717; [2007] 1 WLR 2288; [2007] 2 All ER (Comm) 401; [2007] 2 Lloyd's Rep 231, CA

*Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2009] EWHC 1912 (Ch); [2009] 2 BCLC 400; *(Revenue and Customs Comrs intervening)* [2011] UKSC 38; [2012] 1 AC 383; [2011] 3 WLR 521; [2011] Bus LR 1266; [2012]
E 1 All ER 505, SC(E)

*Phoenix Kapitaldienst GmbH, In re* [2012] EWHC 62 (Ch); [2013] Ch 61; [2012] 3 WLR 681; [2012] 2 All ER 1217

*Picard v Primeo Fund* 2013 (1) CILR 164, Grand Ct (Jones J); 2014 (1) CILR 379, CA (Cayman Islands)

*Prest v Prest* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1; [2013] 4 All ER 673, SC(E)

F *PricewaterhouseCoopers v Saad Investments Co Ltd* [2014] UKPC 35; [2014] 1 WLR 4482, PC

*R v Bourne* [1939] 1 KB 687; [1938] 3 All ER 615, CCA

*R (Child Poverty Action Group) v Secretary of State for Work and Pensions* [2010] UKSC 54; [2011] 2 AC 15; [2011] 2 WLR 1; [2011] PTSR 185; [2011] 1 All ER 729, SC(E)

*R (Mohamed) v Secretary of State for Foreign and Commonwealth Affairs (No 1)*
G [2008] EWHC 2048 (Admin); [2009] 1 WLR 2579, DC

*R (Nicklinson) v Ministry of Justice (CNK Alliance Ltd intervening)* [2014] UKSC 38; [2015] AC 657; [2014] 3 WLR 200; [2014] 3 All ER 843, SC(E)

*R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2011] EWCA Civ 1587, CA

*R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2012] EWHC 1737 (Admin); [2013] 1 All ER 161, DC; [2013] EWCA Civ 118; [2014] QB 112;
H [2013] 3 WLR 439; [2013] 3 All ER 95, CA

*Rubin v Eurofinance SA (Picard intervening)* [2012] UKSC 46; [2013] 1 AC 236; [2012] 3 WLR 1019; [2013] Bus LR 1; [2013] 1 All ER 521; [2013] 1 All ER (Comm) 513; [2012] 2 Lloyd's Rep 615, SC(E)

*Seagull Manufacturing Co Ltd, In re* [1993] Ch 345; [1993] 2 WLR 872; [1993] 2 All ER 980, CA

© 2015 The Incorporated Council of Law Reporting for England and Wales

*Smith Kline and French Laboratories Ltd v Global Pharmaceutics Ltd* [1986] RPC 394, CA A
*Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly Inland Revenue Comrs)* [2012] UKSC 19; [2012] 2 AC 337; [2012] 2 WLR 1149; [2012] Bus LR 1033; [2012] 3 All ER 909, SC(E)
*Tucker (RC) (A Bankrupt), In re, Ex p Tucker (KR)* [1990] Ch 148; [1988] 2 WLR 748; [1988] 1 All ER 603, CA
*Turners & Growers Exporters Ltd v The Ship "Cornelis Verolme"* [1997] 2 NZLR 110 B
*Upmann v Elkan* (1871) LR 12 Eq 140; LR 7 Ch App 130
*Williams v Central Bank of Nigeria* [2014] UKSC 10; [2014] AC 1189; [2014] 2 WLR 355; [2014] 2 All ER 489, SC(E)

The following additional case was cited in argument:

*Atlas Bulk Shipping A/S, In re; Larsen v Navios International Inc* [2011] EWHC 878 (Ch); [2012] Bus LR 1124 C

**APPEAL** from Court of Appeal for Bermuda

On 4 March 2013 Kawaley CJ in the Supreme Court of Bermuda made an order (i) recognising the status of the joint official liquidators of Singularis Holdings Ltd, a Cayman Islands company ordered by the Grand Court of the Cayman Islands to be wound up, and (ii) requiring the company's auditors, D PricewaterhouseCoopers, a Bermuda registered partnership, to produce all documents in their possession relating to their affairs.

The auditors appealed against the production order. On 18 November 2013 the Court of Appeal for Bermuda (Zacca P, Auld JA and Bell AJA) [2013] CA (Bda) 7 Civ allowed the appeal against the production order.

The liquidators appealed pursuant to permission granted on 21 March E 2014 by the Court of Appeal for Bermuda (Zacca P, Evans and Scott Baker JJA). The issues for the Privy Council, as set out in the parties' statement of agreed facts and issues, were (1) whether the court had power at common law to make an order by way of judicial assistance under or in terms analogous to section 195 of the Bermudan Companies Act 1981 in respect of a company in liquidation in the Cayman Islands; (2), if so, whether assistance should be granted or refused, as a matter of discretion; F and (3) in particular, whether the liquidators were entitled to relief which would not be available to them in the Cayman Islands under Cayman Islands law.

The facts are stated in the judgment of Lord Sumption JSC.

*Gabriel Moss QC*, *Felicity Toube QC*, *Stephen Robins* and *Rod Attride-Stirling* (of the Bermudan Bar) (instructed by *Blake Morgan LLP*) for the G liquidators.

The Supreme Court of Bermuda's common law power to grant judicial assistance in cross-border insolvencies supplies the jurisdiction to require the auditors to disclose documents relating to the company. The fact that the liquidators cannot obtain the relevant documents from the auditors in the Cayman Islands is no basis for refusing to provide such assistance as a H matter of discretion. It is necessary to distinguish between (1) "recognition" and "judicial assistance" and (2) "recognition of insolvency proceedings" and "recognition of judgments". In its strict narrow sense, "recognition" refers to mandatory rules by which one jurisdiction gives direct effect in its

© 2015 The Incorporated Council of Law Reporting for England and Wales

own jurisdiction to a legal act in another. Thus if a winding up order is made in the Cayman Islands as the place of the company's registration, Bermuda in accordance with its common law conflicts rules gives effect to that to the extent of recognising the Cayman Islands liquidators as the sole authorised agents of the company under Cayman Islands law, able to act on behalf of the company in Bermuda: see *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), vol 2, rule 179. Bermudan conflicts rules do not however recognise mandatory "effects" of the Cayman Islands winding up proceedings, such as the statutory stay: see *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117. Beyond mandatory common law recognition rules, the case law has developed discretionary judicial assistance: see *Dicey, Morris & Collins*, 15th ed, paras 30-107, 30-108. Common law judicial assistance has two key differences from recognition: (1) recognition is mandatory, whereas judicial assistance is discretionary; (2) recognition gives effect to foreign law, whereas judicial assistance applies domestic law: see *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508. It is also important to distinguish between recognising foreign insolvency proceedings and recognising judgments arising from foreign insolvency proceedings. Common law mandatory conflicts rules make entirely different provision for each. Thus a winding up proceeding in the Cayman Islands for a company registered there must be recognised in Bermuda to the extent of the appointment and authority of the liquidators. However, a judgment in personam is only recognised if certain criteria such as submission to jurisdiction are met: see *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236. Where a foreign winding up proceeding is recognised, in the sense that the authority of the liquidators is accepted, the recognising court is not obliged to offer any assistance. However, absent good reason not to assist, such as the need to protect local creditors, such assistance should be given: see *Rubin v Eurofinance SA*, para 29.

Outside the European Union and in countries where the UNCITRAL Model Law has not been enacted, judicial assistance in cross-border insolvencies may be classed as of two different types. Model 1 involves the provision of assistance through the commencement of an ancillary insolvency proceeding such as liquidation. The doctrine of ancillary liquidations is one by which the court has a common law power to assist a foreign liquidator by granting relief governed by the local law alone, even if that local law gives rise to the right to obtain relief of a type or character not available in the primary liquidation; conversely, there may be relief available under the law of the main proceedings which is not available under the law of the ancillary winding up: see *In re Matheson Bros Ltd* (1884) 27 Ch D 225 and *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213. Model 2 involves the provision of assistance without the commencement of an ancillary liquidation. Relief of this type is available where the relief sought is the examination of individuals and the production of documents: see *Rubin v Eurofinance SA* [2013] 1 AC 236, paras 29, 31, 33. Two alternative conceptual foundations for the model 2 power emerge from the authorities. Route A involves a common law hypothesis by which the court may grant assistance as if the foreign company were being wound up locally—on that basis, the foreign company is treated as if it were a company to which the local winding up legislation applies, even if it could

© 2015 The Incorporated Council of Law Reporting for England and Wales

not in fact fall within the definitions required to make it such a company: see *In re African Farms* [1906] TS 373; *Moolman v Builders & Developers (Pty) Ltd* [1990] 2 All SA 77 (A) and *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, para 22. Route B involves the provision of assistance through the exercise of the assisting court's general, non-statutory powers, including inherent equitable and common law powers, or non-insolvency statutory powers, without any reliance on any particular provision of the local winding up legislation. On either basis, in the present case, the liquidators were able to obtain the assistance of the Bermudan Supreme Court, and it is right for them to have that assistance.

The most authoritative statement of the common law assumption in route A continues to be the *Cambridge Gas* case, para 22. The judgment has two distinct limbs. Firstly, the ordinary rules of private international law relating to the enforcement of foreign judgments do not apply to insolvency—this limb of the judgment was disapproved in *Rubin v Eurofinance SA* [2013] 1 AC 236 but it is of no relevance to the present appeal, which is not concerned with recognition of a judgment. Secondly, route A means that a domestic court can provide assistance by doing whatever it could have done in the case of a domestic insolvency. This second limb has been followed widely: see *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61, para 62; *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2009] 2 BCLC 400, para 48; *In re Atlas Bulk Shipping A/S* [2012] Bus LR 1124, paras 30–32 and *Picard v Primeo Fund* 2013 (1) CILR 164, para 41. The development of this common law jurisdiction is a legitimate and typical example of the necessary evolution of the common law to meet the changing needs of the times: see *Jones v Kaney* [2011] 2 AC 398, para 112. The ability of the common law to adapt itself to new circumstances and changing needs is one of its strengths. Such changes are not necessarily incremental but may be radical: see *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, 377–379. The role of the common law is to cover those areas which are not governed by statute. Those considerations are particularly relevant in the field of cross-border insolvency. Commercial necessity in the modern globalised world requires judicial assistance to be given to foreign insolvency proceedings, particularly where large sums are involved and assets or documents are missing: see *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, 827, and *Turners & Growers Exporters Ltd v The Ship "Cornelis Verolme"* [1997] 2 NZLR 110, 126. It is also essential for offshore jurisdictions to be able to ensure that they can apply their laws and procedures to make sure that the use of their jurisdiction in cross-border business does not facilitate fraud or the hiding of assets or documents. Such policies have led to the development of the principle of modified universalism: see the *Cambridge Gas* case [2007] 1 AC 508; *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 and *Rubin v Eurofinance SA* [2013] 1 AC 236. Where there is a local proceeding, such as ancillary liquidation, the court having control over that local proceeding is required to assist the main proceeding. Where there is no local proceeding, the argument for judicial assistance is even more compelling, since there is no alternative insolvency proceeding. Whatever needs to be done in the local jurisdiction can only be done by way of judicial assistance. Common law judicial assistance does not require reciprocity. Local creditors and policies

© 2015 The Incorporated Council of Law Reporting for England and Wales

are protected by the fact that the giving of judicial assistance is discretionary. The provision of such assistance at common law is not inconsistent with *Al Sabah v Grupo Torras SA* [2005] 2 AC 333. The observations, at para 35, in relation to the position at common law are obiter. Further and in any event, the views expressed are not persuasive, since the point was not fully developed in argument. Moreover, para 35 was superseded by the *Cambridge Gas* case [2007] 1 AC 508, in which the Privy Council set out detailed views on the question of common law assistance having heard full argument. There is nothing in the local legislation in the present case to forbid the court from granting assistance in this way in cross-border insolvencies. Accordingly, as a matter of jurisdiction, route A enables the court to make an order under section 195 of the Bermudan Companies Act 1981 on the basis of the common law hypothesis identified in the *Cambridge Gas* case [2007] 1 AC 508, para 22, as if the company were in ancillary liquidation in Bermuda.

Alternatively, route B involves the provision of assistance through the exercise of the assisting court's general and non-statutory powers (including inherent and common law powers), without any reliance on any specific provisions of the local winding up legislation: see *In re Impex Services Worldwide Ltd* [2004] BPIR 564 and *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd (Revenue and Customs Comrs intervening)* [2012] 1 AC 383. Those powers are present in the instant case. There is an inherent and/or common law and/or equitable power to compel discovery or a power in a statutory provision which is not limited in application to local liquidations. The inherent powers of a court of equity are vested in the Supreme Court of Bermuda: see section 12 of the Supreme Court Act 1905. As a consequence, the equitable jurisdiction to compel discovery in aid of proceedings in some other court remains exercisable by the Supreme Court of Bermuda. A non-statutory power to compel discovery can be exercised by way of judicial assistance in a cross-border insolvency case: see *In re Impex Services Worldwide Ltd* [2004] BPIR 564 and *Rubin v Eurofinance SA* [2013] 1 AC 236. The power to order discovery under Ord 24, r 12 of the Bermudan Rules of the Supreme Court 1985 applies only to cases falling within that rule, outside its scope the court's general equitable power to compel discovery continues to apply. Accordingly, route B enables the court to make an order under Ord 24, r 12, if it is applicable, or, if it is not, under the court's general equitable jurisdiction to compel discovery, which is preserved by section 12 of the Supreme Court Act 1905. [Reference was made to *Dreyfus v Peruvian Guano Co* (1889) 41 Ch D 151 and *In re Atlas Bulk Shipping A/S; Larsen v Navios International Inc* [2012] Bus LR 1124.]

As a matter of discretion, such assistance should be provided to the liquidators. The documents sought are in the possession of the auditors, are not available from any other source and will be crucial to the recovery of assets for the benefit of the company's creditors and to the ascertainment of the company's liabilities. The fact that the Cayman Islands court could not itself make an order for production of the documents provides no basis for refusing assistance. First, the objection does not apply to assistance through the commencement of an ancillary liquidation in which local statutory provisions are applied without any such restriction and there is no principled reason why it should apply to assistance without an ancillary liquidation, which will apply only domestic law. Secondly, to withhold assistance on

© 2015 The Incorporated Council of Law Reporting for England and Wales

that basis would largely undermine the concept of assistance. If the Grand Court of the Cayman Islands were able to make an effective order in those terms, the liquidators would not require assistance from the Supreme Court of Bermuda. The requested court providing common law judicial assistance can only apply its own law. That law will invariably differ in some respects from the courts having jurisdiction over the applicant who seeks judicial assistance. It cannot be unfair or unreasonable vis-à-vis the auditors to apply the law of its own country of incorporation in requiring disclosure. Accordingly, the court has jurisdiction at common law to assist the liquidators by requiring the auditors to disclose relevant documents and there is no reason for declining to assist as a matter of discretion.

*David Chivers QC*, *Paul Smith* and *Scott Pearman* (of the Bermudan and English Bars) (instructed by *Herbert Smith Freehills LLP*) for the auditors.

The Bermudan court has no jurisdiction at common law to grant assistance to a foreign liquidator by ordering the disclosure of documents or the examination of witnesses. Developments in the common law of Bermuda may be modelled upon equivalent developments in England or in other common law jurisdictions but it is essential to understand why any particular development is necessarily to be incorporated as part of the common law of Bermuda and special care must be taken where the statutory landscape is different. The common law principle identified in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 was that there had developed a practice whereby the English court permitted an English liquidator to transmit to a foreign liquidator funds to enable a pari passu distribution to worldwide creditors to be made. Subject to that principle, an English liquidator was bound by English law, including English insolvency law. Indeed, an English ancillary liquidation might, due to the overriding requirement of English rules of set-off, prevent rather than promote the worldwide parri passu distribution of assets. Where there is an English liquidation of a foreign company there is no additional "assistance" given to a foreign liquidator. Any remedies sought in the winding up will have to be through the actions of the English liquidator. Further, the common law consequence of the English winding up may either assist or not assist the foreign liquidator depending upon the provisions under consideration. The "long arm" reach of the English winding up jurisdiction has meant that English courts have considered assistance from the perspective of an English liquidation. The only common law intervention was to suspend the operation of the English statutory scheme in favour of the foreign liquidation by "disapplying" the statutory scheme and directing the remission of assets: see *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 9. Beyond that, English law has not developed a general common law power of assistance. The analysis of common law powers in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 was undertaken in the context of an English jurisprudence based upon the disapplication of English statutory law in the context of a "long arm" jurisdiction to wind up. In countries which have not adopted that model of winding up the question of assistance is very different. The issue is the source—indeed the very existence—of a power which a foreign liquidator seeks to be exercised by a local court. That cannot be resolved by reference

© 2015 The Incorporated Council of Law Reporting for England and Wales

A to the existence of a very different English common law power in the context of a very different English juridical position, but if anything can be taken from the English common law position it is that the common law is recognising a single system of distribution under the principles of universalism.

The principles of universalism, modified or not, provide no juridical basis to credit the Bermudan court with the power to make an order in terms of B section 195 of the Companies Act 1981 in respect of a foreign entity not the subject of its winding up jurisdiction. The principle is concerned with the collection and distribution of assets: see *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 6 and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236, paras 11–20. However, it says nothing, and can say nothing, about the powers of different local courts C around the world to make collateral orders as regards how assets are to be collected, let alone what coercive powers of the local court may be exercised in favour of the foreign liquidator. The principle can provide no justification for recognising common law powers to provide assistance to foreign liquidators beyond those which are necessary to give effect to the principle, viz, the powers to ensure that there is a unitary system for the collection and D distribution of assets. Neither *In re African Farms* [1906] TS 373 nor the principle of modified universalism leads to the conclusion that the assisting court has common law powers to treat a foreign liquidator as if he were a domestic liquidator of a domestic company. *In re African Farms* was concerned with enforcing foreign rights as a matter of comity. It was no part of its ratio that the court had common law powers beyond those involving the collection and distribution of assets. There is no principle brought into E play by *Moolman v Builders & Developers (Pty) Ltd* [1990] 2 All SA 77 (A) which requires local powers to be given to a foreign liquidator where those powers do not exist in the liquidator's home jurisdiction. The case is not authority for the proposition that assistance at common law may include making orders for examination which could not be ordered in a foreign jurisdiction. *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 concerns F the enforcement of a foreign judgment. The question of what would happen if the foreign liquidation involved a company which could not be wound up in the domestic court was not addressed. It does not stand as authority for the proposition that a domestic court has a common law power to make orders in favour of a foreign liquidator simply because had the company been a domestic company such an order could have been made in favour of a G domestic liquidator. It did not directly address the application of a statutory provision at all. *Al Sabah v Grupo Torras SA* [2005] 2 AC 333 was cited in the *Cambridge Gas* case [2007] 1 AC 508 but the analysis at para 35 of the *Al Sabah* case of the limits on the power of the courts to give assistance was not questioned. The Board should follow its own decision in the *Al Sabah* case since para 35 is directly on point and should be determinative of the H appeal. *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61 was wrongly decided and was in any case prior to the decision in *Rubin v Eurofinance SA* [2013] 1 AC 236. Accordingly, the court has no jurisdiction at common law to grant assistance to a foreign liquidator by ordering the disclosure of documents or the examination of witnesses. The court has no inherent power or equitable power or power under its rules of court to give such

© 2015 The Incorporated Council of Law Reporting for England and Wales

disclosure. There are no grounds for extending the common law to give such powers to a foreign liquidator. The application of Cayman law in Bermuda was a universalist principle, but the liquidators' claim to the application of a law which went beyond Cayman law was not. Principles of universalism do not require or justify such an extension and any such extension and the circumstances in which such powers may be exercised are matters to be considered by the legislature of Bermuda. [Reference was made to *Bent v Young* (1838) 9 Sim 180.]

*Moss QC* replied

The Board took time for consideration.

10 November 2014. The following judgments were handed down.

**LORD SUMPTION JSC**

*Introduction*

1 This appeal is closely connected with the concurrent appeal in *PricewaterhouseCoopers v Saad Investments Co Ltd* ("SICL") [2014] 1 WLR 4482. The two appeals concern related companies incorporated in the Cayman Islands, both of which have been ordered by the Grand Court of the Cayman Islands to be wound up. Hugh Dickson, Stephen Akers and Mark Byers of Grant Thornton Special Services (Cayman) Ltd were appointed by that court as the joint official liquidators of both companies. The background to both appeals is set out in the advice of the Board on that appeal, delivered by Lord Neuberger of Abbotsbury PSC, and it need not be repeated here.

2 The common feature of both appeals is that they concern attempts on the part of the liquidators to obtain from the companies' former auditors PricewaterhouseCoopers ("PwC"), information, whether in oral or documentary form, relating to the companies' affairs. The evidence is that the liquidators have been unable to trace certain assets which they consider must have existed, and that relevant information about those assets is likely to be in the possession of PwC. This has not been accepted in terms, but neither has it been disputed. The Board will proceed on the footing that it is correct.

3 The Grand Court of the Cayman Islands has power under section 103 of the Cayman Islands Companies Law to order any person, whether or not resident in the Islands, who has a relevant connection to a company in liquidation (including its former auditor) to "transfer or deliver up to the liquidator any property or documents belonging to the company." The Grand Court has made such an order against PwC, and the Board was told that PwC has complied with it. Consistently with the provision conferring the power, it extends only to material belonging to the companies.

4 Both the SICL and the Singularis appeals concern attempts by the liquidators to obtain material belonging to the auditors themselves, principally their working papers, by invoking the corresponding powers conferred on the Supreme Court of Bermuda. They are in wider terms, which are not limited to information belonging to the company. Section 195 of the Companies Act 1981 of Bermuda provides:

© 2015 The Incorporated Council of Law Reporting for England and Wales

"*Power to summon persons suspected of having property of company etc*

"(1) The court may, at any time after the appointment of a provisional liquidator or the making of a winding up order, summon before it any officer of the company or persons known or suspected to have in his possession any property of the company or supposed to be indebted to the company, or any person whom the court deems capable of giving information concerning the promotion, formation, trade, dealings, affairs or property of the company.

"(2) The court may examine such person on oath, concerning the matters aforesaid, either by word of mouth or on written interrogatories, and may reduce his answers to writing and require him to sign them.

"(3) The court may require such person to produce any books and papers in his custody or power relating to the company, but, where he claims any lien on books or papers produced by him, the production shall be without prejudice to that lien, and the court shall have jurisdiction in the winding up to determine all questions relating to that lien."

5 The power of the Bermuda court under section 195 is exercisable only in respect of a company which that court has ordered to be wound up. It was therefore dependent in this case on the existence of a power to wind up a company incorporated outside Bermuda. In the case of SICL the Supreme Court of Bermuda made a winding up order, and then made an order for production and oral examination against PwC in the winding up. However, in the SICL appeal the Board has advised Her Majesty [2014] 1 WLR 4482 that the winding up order must be stayed because (with immaterial exceptions) the court had no jurisdiction to wind up a company incorporated outside Bermuda. The consequence is that all proceedings in the winding up of SICL have ceased to be effective, including the order made under section 195.

6 In the case of Singularis a different procedure was adopted. No winding up order was ever sought or made in Bermuda. Instead, Kawaley CJ made an order recognising in Bermuda the status of the liquidators by virtue of their appointment by the Grand Court of the Cayman Islands, and exercising what he termed a common law power "by analogy with the statutory powers contained in section 195 of the Companies Act" to order PwC and Paul Suddaby (an officer of PwC) to produce the same documents which they could have been ordered to produce under section 195. PwC were also ordered to have a partner, employee or agent acceptable to the liquidators available to answer oral or written interrogatories. The liquidators were given leave to serve the proceedings on Mr Suddaby and any other "partners or officers" of PwC out of the jurisdiction.

7 The Court of Appeal (Bell AJA, Zacca P and Auld JA) [2013] CA (Bda) 7 Civ set aside the Chief Justice's order. Bell AJA and Zacca P doubted whether there was jurisdiction to make a section 195 order at common law in circumstances where section 195 did not apply. But the ground of their decision was that it was not in any event an appropriate exercise of discretion, because the court should not make an order in support of a Cayman liquidation which could not have been made by the Cayman court itself. They regarded the liquidators' claim as "unjustifiable forum shopping". Auld JA agreed with this, but went further. In his view, there

© 2015 The Incorporated Council of Law Reporting for England and Wales

was no jurisdiction because the Bermuda court could not disregard the limitation of section 195 of the Bermuda Act to cases where a winding up order could be and had been made. A

8 Accordingly two issues arise on the present appeal. The first is whether the Bermuda court has a common law power to assist a foreign liquidation by ordering the production of information (in oral or documentary form), in circumstances where (i) the Bermuda court has no power to wind up an overseas company such as Singularis and (ii) its statutory power to order the production of information is limited to cases where the company has been wound up in Bermuda. The second issue is whether, if such a power exists, it is exercisable in circumstances where an equivalent order could not have been made by the court in which the foreign liquidation is proceeding. B

C

*A common law power?*

9 The common law of Bermuda is the same, in every relevant respect, as that of England. The difficulty is that in England the common law concerning cross-border insolvencies has developed to fill the interstices in what is essentially a statutory framework, and the statutory framework differs in significant respects in Bermuda. The main difference is that the English courts have jurisdiction to wind up unregistered companies, including those incorporated outside the United Kingdom. This jurisdiction has existed since it was first conferred by section 199 of the Companies Act 1862 (25 & 26 Vict c 89). It is currently conferred by section 221 of the Insolvency Act 1986. The Bermuda courts have no equivalent power. D

10 The English courts have for at least a century and a half exercised a power to assist a foreign liquidation by taking control of the English assets of the insolvent company. The power was founded partly on statute and partly on the practice of judges of the Chancery Division. Its statutory foundation was the power to wind up overseas companies. The exercise of this power generated a body of practice concerning what came to be known as ancillary liquidations. The English court would order the winding up in England of a company already in liquidation or likely to go into liquidation under the law of its incorporation, provided that there was a sufficient connection with England and a reasonable possibility of benefit to the petitioners. In theory, the effect of the winding up order was to create a statutory trust of the worldwide assets of the company to be dealt with in accordance with English statutory rules of distribution: *Ayerst v C & K (Construction) Ltd* [1976] AC 167, *Banco Nacional de Cuba v Cosmos Trading Corpn* [2000] 1 BCLC 813, 819–820 (Sir Richard Scott V-C). In practice, as Millett J pointed out in *In re International Tin Council* [1987] Ch 419, 446–447, "Although a winding up in the country of incorporation will normally be given extra-territorial effect, a winding up elsewhere has only local operation." The English courts recognised the limits of the international reach of their own proceedings by treating the English winding up as ancillary to the principal winding up in the country of the company's incorporation. They exercised their power of direction over the liquidator by limiting his functions to getting in the English assets and to dealing with them in such a way as to bring about a distribution of the company's worldwide assets on as uniform a basis as was consistent with certain overriding principles of English insolvency law. The earliest reported case in which the practice was E F G H

© 2015 The Incorporated Council of Law Reporting for England and Wales

recognised is the decision of Kay J in *In re Matheson Bros Ltd* (1884) 27 Ch D 225, but it is likely to have been older than that. In these cases, the court is exercising the ordinary powers of the English court to control the winding up of a company, which are wholly statutory. But the court was using them for a purpose which differed from that for which they were conferred, and on principles which departed from those applicable by law in the winding up of an English company. To that extent only, the English courts were exercising a common law power.

11 In Bermuda, the court has no jurisdiction to conduct an ancillary liquidation, except in the (irrelevant) case of a company to which Part XIII of the Companies Act is expressly applied. The question what if any power the court has to assist a foreign liquidation without conducting an ancillary liquidation of its own, must depend on the nature of the assistance sought. Winding up proceedings have at least four distinct legal consequences, to which different considerations may apply. First, the proceedings are a "mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established", to use the expression of Lord Hoffmann in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, para 14. Inherent in this function of a winding up is the statutory trust of the company's assets, to which I have already referred, and an automatic stay of other modes of execution. Second, it provides a procedural framework in which to determine what are the provable rights of creditors in cases where they are disputed. Third, it brings into play statutory powers to vary the rights of persons dealing with the company or its assets by impugning certain categories of transaction. These powers are less extensive in Bermuda than they are in England, but include the avoidance of dispositions after the commencement of the winding up and fraudulent preferences. Fourth, it brings into play procedural powers, generally directed to enabling the liquidator to locate assets of the company or to ascertain its rights and liabilities. In Bermuda these include the power under section 195 of the Companies Act to order the production of information. In England, the corresponding statutory powers would all be exercisable in an ancillary liquidation.

12 The main purpose of the winding up order in England is usually to enable the court to take control of the English assets of the company, so as to remove them from the free-for-all which would have resulted if creditors were entitled to gain priority by levying execution on them. But, even without a winding up, the court could, on ordinary principles of private international law, have recognised as a matter of comity the vesting of the company's assets in an agent or office-holder appointed or recognised under the law of its incorporation. For many years before a corresponding rule was recognised for the winding up of foreign companies, the principle had been applied in the absence of any statutory powers to the English moveable assets of a foreign bankrupt which had been transferred to an office-holder in an insolvency proceeding under the law of his domicile. Moreover, while the same rule did not apply to immovable property, the court would ordinarily appoint the foreign office-holder a receiver of the rents and profits: see *Dicey, Morris & Collins, The Conflict of Laws*, 15th ed (2012), vol 2, rules 216 and 217. The more difficult question in such cases was whether the court, in the absence of winding up proceedings, could impose a

© 2015 The Incorporated Council of Law Reporting for England and Wales

stay on creditors trying to levy execution against the English assets equivalent to the automatic stay that would by statute have followed the initiation of winding up proceedings.

13 That question appears to have been first addressed in the common law world in the important decision of the full court of the Supreme Court of the Transvaal in *In re African Farms Ltd* [1906] TS 373. African Farms Ltd was an English company with substantial assets in the Transvaal. It was in liquidation in England. There was no power to wind it up in the Transvaal because the number of members had fallen below the minimum required to qualify it as a "company" for the purpose of the statutory power of winding up. The leading judgment was given by the great South African judge Sir James Rose Innes, then Chief Justice of the Transvaal. Having recognised the absence of a statutory power to wind up the company, he continued, at p 377:

> "It only remains to consider whether we are justified in recognising the position of the English liquidator. And by that expression I do not mean a recognition which consists in a mere acknowledgment of the fact that the liquidator has been appointed as such in England, and that he is the representative of the company here; I mean a recognition which carries with it the active assistance of the court. A declaration, in effect, that the liquidator is entitled to deal with the Transvaal assets in the same way as if they were within the jurisdiction of the English courts, subject only to such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws. If we are able in that sense to recognise and assist the liquidator, then I thin[k] we should do so; because in that way only will the assets here be duly divided and properly applied in satisfaction of the company's debts. If we cannot do so, then this result follows, that the directors cannot deal with the property here, and that the liquidator cannot prevent creditors seizing it in execution of their judgments. Unnecessary expenses will be incurred, and the estate will be left to be scrambled for among those creditors who are in a position to enforce their claims."

Innes CJ then considered (p 378) the objection that "the grant of assistance to the English liquidator, in a case where the court could not wind up itself, may possibly be open to the objection that we are doing by indirect means what the law has given us no power to do directly." He rejected the submission because its acceptance would have prevented the court from recognising the power of the liquidator to dispose of property or rights of the company under the law of its incorporation, contrary to ordinary principles of private international law: see pp 378–380. He went on, at pp 381–382:

> "The true test appears to me to be not whether we have the power to order a similar liquidation here, but whether our recognising the foreign liquidation is actually prohibited by any local rules; whether it is against the policy of our laws, or whether its consequences would be unfair to local creditors, or on other grounds undesirable . . . So far from such circumstances being present here, the case before us is one in which every consideration of equity and convenience demands that the position of the English liquidator should be recognised. Unless that can be done then, as

© 2015 The Incorporated Council of Law Reporting for England and Wales

> already pointed out, the Transvaal assets are at the mercy of the first creditor who can manage to secure a writ of execution."

In the result, the court recognised the liquidator by virtue of his appointment in England as being entitled to the sole administration of the company's assets in the Transvaal, on terms that the liquidator:

> "recognise the right of all creditors in this colony to prove their claims against the company before the master; and that the admission or rejection of such claims, the liability of the company therefor to the extent of its assets in the Transvaal, and all questions of mortgage or preference in respect of such assets, shall be regulated by the laws of this colony, as if the company had been placed in liquidation here."

The proved claims of local creditors were ordered to be satisfied rateably from the local assets and the balance made available for distribution to other creditors. Execution of the local judgment creditor's judgment was stayed to enable this to be done.

14 It is right to point out (i) that the recognition of the English liquidator's power of disposition over the company's assets in the Transvaal was no more than what he was entitled to as a matter of private international law; (ii) that the conduct of what amounted to an ancillary liquidation in the Transvaal was expressed as a discretionary condition of the court's recognition order; and (iii) that the Transvaal court no doubt had the same inherent power as the English court to stay enforcement of its own judgments. But the decision is nevertheless a significant one, because in substance what the court was doing was to direct the assets of the company to be dealt with as if it was in liquidation in the Transvaal, when there was no power to conduct a liquidation there. It also deprived an existing judgment creditor of what was on the face of it an accrued and absolute right under his judgment and exposed him to having his debt written down to a figure consistent with the rateable distribution of assets in the Transvaal. The court therefore unquestionably modified the rights of the company and its creditors. Moreover, the sole basis on which it did so was the inherent power of the court to assist the orderly liquidation of the company's affairs pursuant to a foreign winding up order. As Innes CJ put it, at p 377, "recognition . . . carries with it the active assistance of the court." Or, in the words of the concurring judgment of Smith J (at p 390), the basis of the order was the recognition and enforcement of rights and the recognition of a status acquired under a foreign law, unless they conflict with the law or policy of the jurisdiction in which they were sought to be enforced.

15 The flexibility and breadth of the English court's powers in an ancillary liquidation, together in more recent times with the incorporation into English law of a number of international schemes of judicial co-operation, have had the effect of arresting the development of the common law in England in this area. However, the issue returned in 2006 with the decision of the Privy Council in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508. In this case the Privy Council, affirming the decision of the Staff of Government Division in the Isle of Man, held that effect should be given in the Isle of Man to the judicial reorganisation by a Federal Bankruptcy Court in the United States of a group of Liberian ship-owning

© 2015 The Incorporated Council of Law Reporting for England and Wales

companies. The effect of the reorganisation was to vest the shares of an Isle of Man company in the committee of creditors, in circumstances where the US court had neither jurisdiction in rem over the shares (because they were rights situated outside its territorial jurisdiction) nor jurisdiction in personam over the shareholders (because they were not present in the US and took no part in the US proceedings). The principal shareholder, Cambridge Gas, objected on the ground that it was not bound by the decision of the US court. The advice of the Board was given by Lord Hoffmann. He discerned in the English case law a consistent "aspiration" to produce a result equivalent to that which would obtain if there were a single universal bankruptcy jurisdiction. He regarded this "principle of universality" as having been the foundation of the decision in *In re African Farms* [1906] TS 373, and considered that it justified the Isle of Man courts in giving effect to the US reorganisation plan [2007] 1 AC 508, paras 16–21. In his view, and that of the Board, the absence of jurisdiction in rem or in personam in the US court was irrelevant, because the jurisdiction was founded not on any obligation on the part of Cambridge Gas to comply with the judgments of the Federal Bankruptcy Court but on the duty of the Isle of Man court to assist a foreign principal liquidation so as to achieve a universal distribution of the assets on, as far as possible, a common basis. At paras 13–14, he said:

> "13. . . . Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds on which it did so. The judgment itself is treated as the source of the right.
>
> "14. The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established."

The essence of the decision and the reasoning which supported it is to be found, at paras 20–22:

> "20. . . . But the underlying principle of universality . . . is given effect by recognising the person who is empowered under the foreign bankruptcy law to act on behalf of the insolvent company as entitled to do so in England. In addition, as Innes CJ said in the Transvaal case *In re African Farms Ltd* [1906] TS 373, 377, in which an English company with assets in the Transvaal had been voluntarily wound up in England, 'recognition which carries with it the active assistance of the court' . . .
>
> "21. Their Lordships consider that these principles are sufficient to confer on the Manx court jurisdiction to assist the committee of creditors, as appointed representatives under the Chapter 11 order, to give effect to the plan . . .
>
> "22. . . . At common law, their Lordships think it is doubtful whether assistance could take the form of applying provisions of the foreign insolvency law which form no part of the domestic system. But the domestic court must at least be able to provide assistance by doing

© 2015 The Incorporated Council of Law Reporting for England and Wales

whatever it could have done in the case of a domestic insolvency. The purpose of recognition is to enable the foreign office holder or the creditors to avoid having to start parallel insolvency proceedings and to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum."

The provisions of the domestic system of insolvency of the Isle of Man, which were relevant in *Cambridge Gas*, were the statutory provisions for sanctioning a scheme of arrangement in the course of a winding up. Because the Isle of Man courts would have had power to wind up Navigator and sanction a scheme of arrangement on terms substantially the same as those of the judicial reorganisation approved by the Federal Bankruptcy Court, it could give effect to the reorganisation plan at common law. "Why therefore," asked Lord Hoffmann (para 25), "should the Manx court not provide assistance by giving effect to the plan without requiring the creditors to go to the trouble of parallel insolvency proceedings in the Isle of Man?" *Cambridge Gas* is authority, if it is correct, for three propositions. The first is the principle of modified universalism, namely that the court has a common law power to assist foreign winding up proceedings so far as it properly can. The second is that this includes doing whatever it could properly have done in a domestic insolvency, subject to its own law and public policy. The third (which is implicit) is that this power is itself the source of its jurisdiction over those affected, and that the absence of jurisdiction in rem or in personam according to ordinary common law principles is irrelevant.

**16** The first and second propositions were revisited by Lord Hoffmann in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852. HIH was an Australian insurance company in liquidation in Australia. A winding up petition had been presented in England and provisional liquidators appointed to conduct an ancillary liquidation. The question at issue was whether the English court should accede to a letter of request from the Australian court inviting it to direct the English provisional liquidators to remit the assets in their hands to the Australian liquidators, in circumstances where they would be distributed there in accordance with statutory priorities which differed from those applicable in a domestic winding up in England. At paras 6–7, Lord Hoffmann said:

"6. Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based on what English judges have for many years regarded as a general principle of private international law, namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets.

"7. This was very much a principle rather than a rule. It is heavily qualified by exceptions on pragmatic grounds; elsewhere I have described it as an aspiration: see *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, 517, para 17. Professor Jay Westbrook, a distinguished American writer on international insolvency has called it a principle of 'modified universalism': see also *Fletcher, Insolvency in Private*

© 2015 The Incorporated Council of Law Reporting for England and Wales

> *International Law*, 2nd ed (2005), pp 15–17. Full universalism can be attained only by international treaty. Nevertheless, even in its modified and pragmatic form, the principle is a potent one."

Reviewing the English case law, Lord Hoffmann discerned in it a "golden thread running through English cross-border insolvency law since the 18th century" which, adopting a label devised by Professor Jay Westbrook, he called the "principle of (modified) universalism" (para 30):

> "That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

17 The Committee in *HIH* was unanimous in holding that the assets should be remitted to Australia, but they were divided in some aspects of their reasoning. Lord Hoffmann, with whom Lord Walker of Gestingthorpe agreed, considered that the court had an inherent power to direct the remittal of the assets at common law. However, that view was not adopted by the rest of the Committee. Lord Scott of Foscote and Lord Neuberger of Abbotsbury considered that the power was wholly derived from section 426 of the Insolvency Act 1986. Lord Phillips of Worth Matravers held that the statutory power was a sufficient jurisdictional basis for the proposed direction, and declined to decide whether jurisdiction could have been established at common law. It is, however, important to appreciate that this difference of opinion related not to the principle of universalism itself, nor to the juridical basis of the power to assist a foreign liquidation in general. The difference was about whether that power could be exercised in a manner which would deprive creditors proving in England of their statutory right under section 107 of the Insolvency Act 1986 to a pari passu distribution according to English rules of priority. The principle justifying judicial assistance in a foreign insolvency which was stated in *In re African Farms* [1906] TS 373 and affirmed in *Cambridge Gas* was [1906] TS 373, 377 subject to "such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws" or, as it was put more broadly in *HIH* itself [2008] 1 WLR 852, para 30, "justice and UK public policy". The division in the Committee in *HIH* was about whether this meant that it was subject to the mandatory requirements of section 107 of the Insolvency Act 1986. The relevance of section 426 in the view of Lord Scott and Lord Neuberger was that on their construction of that section it authorised the treatment of the assets in accordance with the law of the foreign jurisdiction notwithstanding its inconsistency with mandatory rules of English law: see Lord Scott, at para 61, and Lord Neuberger, at para 68. Absent that provision, the remittal of the assets to Australia would have been contrary to English law. Lord Phillips did not, any more than Lord Scott and Lord Neuberger, question the principle of modified universalism. Indeed, he regarded it as determinative of the manner in which the discretion should be exercised, albeit leaving open the question of its juridical source: see para 44.

18 *Cambridge Gas* [2007] 1 AC 508 marks the furthest that the common law courts have gone in developing the common law powers of the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A court to assist a foreign liquidation. It has proved to be a controversial decision. So far as it held that the domestic court had jurisdiction over the parties simply by virtue of its power to assist, it was subjected to fierce academic criticism and held by a majority of the Supreme Court to be wrong in *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236. So far as it held that the domestic court had a common law power to assist the foreign B court by doing whatever it could have done in a domestic insolvency, its authority is weakened by the absence of any explanation of whence this common law power came and by the direct rejection of that proposition by the Judicial Committee in *Al Sabah v Grupo Torras SA* [2005] 2 AC 333, a case cited in argument in *Cambridge Gas* but not in the advice of the Board. Lord Walker, giving the advice of the Board in *Al Sabah*, had expressed the view that there was no inherent power to set aside Cayman trusts at the C request of a foreign court of insolvency, in circumstances where a corresponding statutory power existed under the Cayman Bankruptcy Law but did not apply in the circumstances. The Board considers it to be clear that although statute law may influence the policy of the common law, it cannot be assumed, simply because there would be a statutory power to make a particular order in the case of domestic insolvency, that a similar D power must exist at common law. So far as *Cambridge Gas* suggests otherwise, the Board is satisfied that it is wrong for reasons more fully explained in the advice proposed by Lord Collins of Mapesbury. If there is a corresponding statutory power for domestic insolvencies there will usually be no objection on public policy grounds to the recognition of a similar common law power. But it cannot follow without more that there is such a power. It follows that the second and third propositions for which E *Cambridge Gas* [2007] 1 AC 508 is authority cannot be supported.

19 However, the first proposition, the principle of modified universalism itself, has not been discredited. On the contrary, it was accepted in principle by Lord Phillips, Lord Hoffman and Lord Walker in *HIH* [2008] 1 WLR 852, and by Lord Collins of Mapesbury (with whom Lord Walker and Lord Sumption JJSC agreed) in *Rubin v Eurofinance SA* F [2013] 1 AC 236. Nothing in the concurring judgment of Lord Mance JSC in that case casts doubt on it. At paras 29–33, Lord Collins summarised the position in this way:

> "29. Fourth, at common law the court has power to recognise and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign office-holders in G insolvencies with an international element. The underlying principle has been stated in different ways: 'recognition . . . carries with it the active assistance of the court': *In re African Farms Ltd* [1906] TS 373, 377; 'This court . . . will do its utmost to co-operate with the US Bankruptcy Court and avoid any action which might disturb the orderly administration of [the company] in Texas under Chapter 11': *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117.
>
> H "30. In *Crédit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827, Millett LJ said: 'In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention . . . It is becoming widely

© 2015 The Incorporated Council of Law Reporting for England and Wales

accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former.'

"31. The common law assistance cases have been concerned with such matters as the vesting of English assets in a foreign office-holder, or the staying of local proceedings, or orders for examination in support of the foreign proceedings, or orders for the remittal of assets to a foreign liquidation, and have involved cases in which the foreign court was a court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign country or, if a company, was incorporated there . . .

"33. One group of cases involved local proceedings which were stayed or orders which were discharged because of foreign insolvency proceedings. Thus in *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112 an English injunction against a Texas corporation in Chapter 11 proceedings was discharged; cf *In re African Farms Ltd* [1906] TS 373 (execution in Transvaal by creditor in proceedings against English company in liquidation in England stayed by Transvaal court), applied in *Turners & Growers Exporters Ltd v The Ship 'Cornelis Verolme'* [1997] 2 NZLR 110 (Belgian shipowner in Belgian bankruptcy: ship released from arrest); *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512 (stay in Hong Kong of execution against Nevada corporation in Chapter 11 proceedings in United States federal court in California), followed in *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005] 2 HKC 589 (stay of Hong Kong proceedings against Chinese state-owned enterprise in Mainland insolvency). Cases of judicial assistance in the traditional sense include *In re Impex Services Worldwide Ltd* [2004] BPIR 564, where a Manx order for examination and production of documents was made in aid of the provisional liquidation in England of an English company."

In the Board's opinion, the principle of modified universalism is part of the common law, but it is necessary to bear in mind, first, that it is subject to local law and local public policy and, secondly, that the court can only ever act within the limits of its own statutory and common law powers. What are those limits? In the absence of a relevant statutory power, they must depend on the common law, including any proper development of the common law. The question how far it is appropriate to develop the common law so as to recognise an equivalent power does not admit of a single, universal answer. It depends on the nature of the power that the court is being asked to exercise. On this appeal, the Board proposes to confine itself to the particular form of assistance which is sought in this case, namely an order for the production of information by an entity within the personal jurisdiction of the Bermuda court. The fate of that application depends on whether, there being no statutory power to order production, there is an inherent power at common law do so.

**20** The fundamental question is whether a power of compulsion of this kind requires a statutory basis. For this purpose, it is important to distinguish between evidence and information. By evidence, the Board

© 2015 The Incorporated Council of Law Reporting for England and Wales

means evidence to prove facts in legal proceedings. The power to compel a person to give evidence in legal proceedings was not originally statutory. Like the power to order discovery, it was an inherent power of the Court of Chancery, devised by judges to remedy the technical and procedural limitations associated with the proof of fact in courts of common law. In England, it was first put on a statutory basis by the Perjury Act 1563 (5 Eliz 1, c 9), which extended the power to issue a subpoena ad testificandum to all courts of record. In Bermuda, its basis is now section 4 of the Evidence Act 1905. The origins of these powers in the procedural history of the English courts go some way to explain why those courts have always disclaimed any inherent power to compel the furnishing of evidence for use in foreign proceedings: see *Bent v Young* (1838) 9 Sim 180, 192 (Shadwell V-C); *Dreyfus v Peruvian Guano Co* (1889) 41 Ch D 151; *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2013] 1 All ER 161 (Divisional Court), paras 58–63. No such power existed in England until it was created by statute, initially by the Foreign Tribunals Evidence Act 1856 (19 & 20 Vict c 113).

**21** What is sought in this case, however, is not evidence for use in forensic proceedings but information required for the performance of the liquidators' ordinary duty of identifying and taking possession of assets of the company. In *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2014] QB 112, para 12 the Court of Appeal doubted whether the distinction between evidence and information was helpful, and their doubt was probably justified in that case, where information was being sought for use in foreign proceedings. But the distinction is of broader legal significance. The courts have never been as inhibited in their willingness to develop appropriate remedies to require the provision of information when a sufficiently compelling legal policy calls for it.

**22** The classic modern illustration is the jurisdiction recognised by the House of Lords in *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133. The House, drawing mainly on the earlier decisions in *Orr v Diaper* (1876) 4 Ch D 92; 25 WR 23 and *Upmann v Elkan* (1871) LR 12 Eq 140; LR 7 Ch App 130, recognised a common law power to order the production of information about the identity of a wrongdoer where the defendant had been involved, even innocently, in the wrong. Such an order, as they recognised, would not have been available to compel the giving of evidence, because of the long-standing objection of courts of equity to a bill of discovery against a "mere witness": see, in particular, pp 173–174 (Lord Reid). In *Smith Kline and French Laboratories Ltd v Global Pharmaceutics Ltd* [1986] RPC 394 the Court of Appeal in England applied the same principle to information about the identity of a wrongdoer outside the jurisdiction. These decisions were founded not on the procedural requirements for proving facts in English litigation, but on the recognition of a duty to provide the information in certain circumstances. The duty of a person who had become involved in another's wrongdoing was held [1974] AC 133, 175 (Lord Reid) to be to "assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers"; cf p 195 (Lord Cross of Chelsea). It is, however, clear that this duty was of a somewhat notional kind. It was not a legal duty in the ordinary sense of the term. Failure to supply the information would not give

© 2015 The Incorporated Council of Law Reporting for England and Wales

rise to an action for damages. The concept of duty was simply a way of saying that the court would require disclosure. Indeed, Lord Morris of Borth-y-Gest (pp 181–182) thought that the duty would not arise until the court had held that the conditions were satisfied. Viscount Dilhorne (p 190) agreed and so, it seems, did Lord Cross: p 198. Lord Kilbrandon, citing with apparent approval the South African decision in *Colonial Government v Tatham* (1902) 23 Natal LR 153, observed (p 205) that the duty lay "rather on the court to make an order necessary to the administration of justice than on the respondent to satisfy some right existing in the plaintiff."

**23** The present case is not a *Norwich Pharmacal* case. The significance of *Norwich Pharmacal* in the present context is that it illustrates the capacity of the common law to develop a power in the court to compel the production of information when this is necessary to give effect to a recognised legal principle. In the Board's opinion, an analogous power arises in the present case. Relief is not being sought by way of assistance to a litigant who can rely on ordinary forensic procedures for the purpose. It is being sought by the officers of a foreign court. The principle of modified universalism is a recognised principle of the common law. It is founded on the public interest in the ability of foreign courts exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a worldwide basis, notwithstanding the territorial limits of their jurisdiction. The basis of that public interest is not only comity, but a recognition that in a world of global businesses it is in the interest of every country that companies with transnational assets and operations should be capable of being wound up in an orderly fashion under the law of the place of their incorporation and on a basis that will be recognised and effective internationally. This is a public interest which has no equivalent in cases where information may be sought for commercial purposes or for ordinary adversarial litigation. The courts have repeatedly recognised not just a right but a duty to assist in whatever way they properly can. The Bermuda court has properly recognised the status of the liquidators as officers of that court. The liquidators require the information for the performance of the ordinary functions attaching to that status. Their acknowledged right to take possession of the company's worldwide assets is of little use without the ability to identify and locate them, if necessary with the assistance of the court. The information is unlikely to be available in any other way. None of the reasons which account for the common law's inhibition about the compulsory provision of evidence have any bearing on the present question. The right and duty to assist foreign office-holders which the courts have acknowledged on a number of occasions would be an empty formula if it were confined to recognising the company's title to its assets in the same way as any other legal person who has acquired title under a foreign law, or to recognising the office-holder's right to act on the company's behalf in the same way as any other agent of a company appointed in accordance with the law of its incorporation. The recognition by a domestic court of the status of a foreign liquidator would mean very little if it entitled him to take possession of the company's assets but left him with no effective means of identifying or locating them.

**24** There are two reported cases in which an order for the production of documents or information has been made by way of common law assistance to a foreign court. The first is *Moolman v Builders & Developers (Pty) Ltd*

© 2015 The Incorporated Council of Law Reporting for England and Wales

[1990] 2 All SA 77 (A), a decision of the Supreme Court of South Africa. The appeal arose out of the winding up in the Transkei of a company incorporated there, at a period of South African history when the Transkei was in law a foreign country. The liquidator sought an order of the South African court for the examination of certain persons in South Africa with a view to locating assets of the company. Such an order would have been available to him by statute if there had been an ancillary liquidation in South Africa, but there was no statutory power to wind up this particular company in South Africa. The court held that a power to make such an order at common law was within the principle of *In re African Farms Ltd* [1906] TS 373. The second case is *In re Impex Services Worldwide Ltd* [2004] BPIR 564, a decision of the High Court of the Isle of Man. Section 206 of the Isle of Man Companies Act 1931 conferred a power to order an examination but only in relation to a Manx company. Deemster Doyle nevertheless gave effect by way of common law judicial assistance to a letter of request of the High Court in England seeking the examination of persons in the Isle of Man on behalf of the liquidator of an English company. The Board would not wish to endorse all of the reasoning given in these judgments, in particular those parts which appear to support the concept of applying statutory powers by mere analogy in cases outside their scope. But the Board considers that the decisions themselves were correct in principle.

25 In the Board's opinion, there is a power at common law to assist a foreign court of insolvency jurisdiction by ordering the production of information in oral or documentary form which is necessary for the administration of a foreign winding up. In recognising the existence of such a power, the Board would not wish to encourage the promiscuous creation of other common law powers to compel the production of information. The limits of this power are implicit in the reasons for recognising its existence. In the first place, it is available only to assist the officers of a foreign court of insolvency jurisdiction or equivalent public officers. It would not, for example, be available to assist a voluntary winding up, which is essentially a private arrangement and although subject to the directions of the court is not conducted by or on behalf of an officer of the court. Secondly, it is a power of assistance. It exists for the purpose of enabling those courts to surmount the problems posed for a worldwide winding up of the company's affairs by the territorial limits of each court's powers. It is not therefore available to enable them to do something which they could not do even under the law by which they were appointed. Thirdly, it is available only when it is necessary for the performance of the office-holder's functions. Fourth, the power is subject to the limitation in *In re African Farms Ltd* [1906] TS 373 and in *HIH* [2008] 1 WLR 852 and *Rubin* [2013] 1 AC 236, that such an order must be consistent with the substantive law and public policy of the assisting court, in this case that of Bermuda. It follows that it is not available for purposes which are properly the subject of other schemes for the compulsory provision of information. In particular, as the reasoning in *Norwich Pharmacal* [1974] AC 133 and *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2013] 1 All ER 161; [2014] QB 112 (at both levels) shows, common law powers of this kind are not a permissible mode of obtaining material for use in actual or anticipated litigation. That field is covered by rules of forensic procedure and statutory provisions for obtaining evidence in foreign jurisdictions which liquidators, like other litigants or

© 2015 The Incorporated Council of Law Reporting for England and Wales

potential litigants, must accept with all their limitations. Moreover, in some jurisdictions, it may well be contrary to domestic public policy to make an order which there would be no power to make in a domestic insolvency. Finally, as with other powers of compulsion exercisable against an innocent third party, its exercise is conditional on the applicant being prepared to pay the third party's reasonable costs of compliance.

**26** Order 11, rule 1(2) of the Rules of the Bermuda Supreme Court (as applied by order 11, rule 9(1)) authorises the service of an originating summons, petition, notice of motion or similar originating process out of the jurisdiction without leave in respect of any "claim which by virtue of any enactment the court has power to hear and determine". Because the common law power of the court to compel the production of information in aid of a foreign liquidation is not statutory nor derived from any analogy with the statute, this rule had no application to it. There is a more general power to serve originating process (other than a writ) out of the jurisdiction with the leave of the court under Order 11, rule 9(4), but it is not exercisable against persons whose engagement in the affairs of a foreign company has no connection with Bermuda and there is no implicit statutory authority for such a course: see *In re Seagull Manufacturing Co Ltd* [1993] Ch 345. It follows that on any view the Chief Justice had no power to authorise the service out of the jurisdiction on Mr Suddaby or other partners or officers of PwC who were not within the jurisdiction of the court. The most that he could do, in a case within the ambit of the power, was order PwC, as the only party present within the jurisdiction, to comply for their own part and to take reasonable steps to procure the co-operation of others.

*Application to the present case*

**27** The Board has summarised the limitations on the common law power to compel the production of information. Of these limitations, two are potentially relevant in the case of Singularis.

**28** The first arises from PwC's argument that the order sought against them is not consistent with the law or public policy of Bermuda, because the statutory power to compel the production of information under section 195 of the Bermuda Companies Act impliedly excludes the possibility of an equivalent power at common law. The argument is that because section 195 is limited to cases where the company is being wound up in Bermuda, it would be inconsistent with the statutory scheme to recognise a common law power which, if it existed, would be subject to no such limitation. The Board is not persuaded by this. The existence of a statutory power covering part of the same ground may impliedly exclude a common law power covering the whole of it. But it does not necessarily do so. An implied exclusion of non-statutory remedies arises only where the statutory scheme can be said to occupy the field. This will normally be the case if the subsistence of the common law power would undermine the operation of the statutory one, usually by circumventing limitations or exceptions to the statutory power which are an integral part of the underlying legislative policy: see *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558, para 19 (Lord Hoffmann); *R (Child Poverty Action Group) v Secretary of State for Work and Pensions* [2011] 2 AC 15, paras 27–34 (Lord Dyson JSC). There is, however, no reason to suppose that the limitation of the power under section 195 of the Companies Act to

© 2015 The Incorporated Council of Law Reporting for England and Wales

companies in the course of winding up in Bermuda reflects a legislative policy adverse to assisting foreign courts of insolvency jurisdiction. It simply reflects the limits of the ambit of the Act. The relevant provisions of the Act have been analysed in the advice of the Board in *PricewaterhouseCoopers v Saad Investments Co Ltd* [2014] 1 WLR 4482. In summary, the effect of section 4 is that it applies to companies incorporated in Bermuda or authorised to carry on business there. However, the fact that express provision is made for the powers exercisable on the winding up of companies to which the Act applies, does not in the Board's opinion exclude the use of common law powers in relation to other companies which lie outside the scope of the statute altogether.

29 The second limitation which is relevant presents more formidable problems for the joint liquidators. The material which they seek in Bermuda would not be obtainable under the law of the Cayman Islands pursuant to which the winding up is being carried out there. Where a domestic court has a power to grant ancillary relief in support of the proceedings of a foreign court, it is not necessarily an objection to its exercise that the foreign court had no power to make a corresponding order itself. Thus in *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818, the English court made a worldwide *Mareva* injunction in support of Swiss proceedings against Mr Cuoghi in circumstances where the Swiss court could not have made such an order. But that decision cannot be taken to reflect a universal principle. The critical factors which justified the order in that case were that there was an unqualified statutory power to give ancillary relief and that the Swiss court's inability to make the order was due to the fact that Mr Cuoghi was not resident in Switzerland whereas he was resident in England. Rather different considerations apply to the common law power with which the Board is presently concerned. Its whole juridical basis is the right and duty of the Bermuda court to assist the Cayman court so far as it properly can. It is right for the Bermuda court, within the limits of its own inherent powers, to assist the officers of the Cayman court to transcend the territorial limits of that court's jurisdiction by enabling them to do in Bermuda that which they could do in the Cayman Islands. But the order sought would not constitute assistance, because it is not just the limits of the territorial reach of the Cayman court's powers which impede the liquidators' work, but the limited nature of the powers themselves. The Cayman court has no power to require third parties to provide to its office-holders anything other than information belonging to the company. It does not appear to the Board to be a proper use of the power of assistance to make good a limitation on the powers of a foreign court of insolvency jurisdiction under its own law. This was in substance the ground on which the liquidators failed in the Court of Appeal when they characterised the present application as "forum shopping". In the opinion of the Board it is correct.

30 The liquidators have not contended at any stage of this litigation that the order which they seek can be justified at common law independently of the power of the Bermuda court to assist a foreign court of insolvency jurisdiction. Moreover, they have accepted before the Board that the information which they seek belongs to PwC and was therefore properly excluded from the order made by the Grand Court of the Cayman Islands. Whether this was correct was not therefore a point argued before the Board. None the less, the Board would not wish to part with this case without

© 2015 The Incorporated Council of Law Reporting for England and Wales

expressing their doubts about whether information which PwC acquired solely in their capacity as the company's auditors can be regarded as belonging exclusively to them simply because the documents in which they recorded that information are their working papers and as such their property.

*Conclusion*

31 The Board will humbly advise Her Majesty that this appeal should be dismissed.

**LORD COLLINS OF MAPESBURY**

*Introduction*

32 In my opinion the appeal should be dismissed because the ground on which the joint liquidators based their appeal is unsupportable, namely that the court has at common law the ability to exercise powers which are analogous to statutory powers which would have been exercisable in the case of a domestic insolvency, but which do not apply in the international context. This opinion is intended to explain why that conclusion is inescapable in the light of the relationship between the judiciary and the legislature.

33 As the Supreme Court confirmed in *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236 the court has a common law power to assist foreign winding up proceedings so far as it properly can. In my view, in common with Lord Sumption JSC and despite Lord Mance JSC's powerful opinion to the contrary, the Bermuda court has the power to make an order against persons subject to its personal jurisdiction in favour of foreign liquidators for production of information for the purpose of identifying and locating assets of the company, provided they have a similar right under the domestic law of the court which appointed them. I therefore agree with Lord Sumption JSC that this was not a proper case for exercise of that power.

34 The existence of a common law power to order information (otherwise than by analogy with local statutory powers) was not pursued by the liquidators on the appeal, and it was virtually disclaimed by them until questioning by the Board (quoted in Lord Mance JSC's opinion at para 128) may have led them to adopt it as a subsidiary basis for their appeal.

35 Consequently the parties are entitled to have the views of the Board on the argument which was actually put before it, in essence whether *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 ("*Cambridge Gas*") correctly decided that the court has a common law power to assist foreign winding up proceedings by exercising powers which are analogous to statutory powers which would have been exercisable in the case of a domestic insolvency, but do not apply to the international insolvency.

36 The primary way in which the case was put by the liquidators was that the common law develops to meet changing circumstances and that in international insolvencies the common law should be developed by the adoption of a principle that where local legislation does not provide for relevant assistance to a foreign office holder, the legislation should be applied by analogy "as if" the foreign insolvency were a local insolvency.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A This argument was accepted by the Chief Justice. But it involves a fundamental misunderstanding of the limits of the judicial law-making power, and should not go unanswered.

37 A second reason for dealing with the main point of the liquidators' appeal was that the question whether local legislation could be applied by analogy arose in an appeal in the Cayman Islands Court of Appeal, and that court gave only an interim judgment pending the decision of this Board on B this appeal: *Picard v Primeo Fund* 2013 (1) CILR 164. That case, as will appear below, involved anti-avoidance proceedings for the recovery of assets, and not (as in the present case) proceedings to obtain information to recover assets. On the principal argument of the liquidators, there is no material difference between this case and the Cayman Islands case. In each case the argument was that the local legislation should, if it does not apply C according to its terms (and there is a question about this in the Cayman Islands case), be applied by analogy or on an "as if" basis. The Board took the view that it would be failing in its duty if it did not reach this question on this appeal, and simply left the Cayman Islands Court of Appeal to decide the matter with a possible further appeal to the Privy Council. That appeal has recently been settled, but the point of principle may still arise.

38 In my judgment the answer to the present appeal is to be found in the D following propositions. First, there is a principle of the common law that the court has the power to recognise and grant assistance to foreign insolvency proceedings. Second, that power is primarily exercised through the existing powers of the court. Third, those powers can be extended or developed from existing powers through the traditional judicial law-making techniques of the common law. Fourth, the very limited application of legislation by E analogy does not allow the judiciary to extend the scope of insolvency legislation to cases where it does not apply. Fifth, in consequence, those powers do not extend to the application, by analogy "as if" the foreign insolvency were a domestic insolvency, of statutory powers which do not actually apply in the instant case.

*The practical issue*

F

39 Both the Cayman Islands and Bermuda have statutory provisions for the examination of persons connected with an insolvent company. In England the statutory power is contained in the Insolvency Act 1986, section 236.

40 This is an exclusively statutory power, which goes back a very long way. As early as the Statute of Bankrupts Act 1542 (34 & 35 Hen 8, c 4), the G authorities (including, among others, the lord chancellor and the chief justices) were given power to examine on oath persons who were suspected of having property (including debts) belonging to the debtor. The Joint Stock Companies Act 1844 (7 & 8 Vict c 110) gave a similar power to the court in the case of companies, and there is a continuous line of statutory authority in both corporate and personal insolvency confirming (and extending) the power thereafter to the present day.

H

41 The provisions of neither the Cayman Islands nor Bermuda statutes apply to the material sought by the liquidators in this case. That is because: (1) the power in section 103 of the Cayman Islands Companies Law to order any person, whether or not resident in the Cayman Islands, who has a relevant connection with a company in liquidation (including its former

© 2015 The Incorporated Council of Law Reporting for England and Wales

auditor) to "transfer or deliver up to the liquidator any property or documents belonging to the company" extends only to material belonging to the companies (subject to what Lord Sumption JSC says at para 29); and (2) the "power to summon persons suspected of having property of company etc" in section 195 of the Companies Act 1981 of Bermuda does not apply because the power is exercisable only in respect of a company which that court has ordered to be wound up, and in the SICL appeal the Board has advised that the winding up order must be stayed because the court has no jurisdiction to wind up a company incorporated outside Bermuda, to which Part XIII of the Companies Act is not expressly applied: *PricewaterhouseCoopers v Saad Investments Co Ltd* [2014] 1 WLR 4482.

**42** The problem in this and other similar or analogous cases has arisen largely in relation to those British colonies, dependencies, and overseas territories, such as Bermuda, and the Isle of Man, which do not have the statutory powers to assist foreign office-holders which exist under United Kingdom law. Consequently, except in a rare situation to which I will revert, the practical result of this appeal is largely confined to such countries, or those countries (such as the Cayman Islands) where the extent of the statutory powers is controversial.

**43** Some of these territories do have such powers. The British Virgin Islands has given effect to the UNCITRAL Model Law in the Insolvency Act 2003, Part XIX, which contains powers to assist foreign office-holders, but only from countries or territories which are designated by the Financial Services Commission. There are nine such countries or territories, including the United States and the United Kingdom. Section 470 of the Insolvency Act 2003 preserves the power of the court to provide assistance under any other rule of law.

**44** The Cayman Islands Companies Law, section 241, gives the court power to make orders ancillary to a foreign bankruptcy proceeding (including the power to require a person in possession of information relating to the business or affairs of a bankrupt: section 241(1)(d)). But the application of these powers to anti-avoidance proceedings has been controversial. The Cayman Islands Court of Appeal reserved pending the outcome of this appeal the question whether the anti-avoidance provisions of its law can be used at common law (in addition to, or alternatively to, its statutory power to do so) in aid of a US bankruptcy proceeding: *Picard v Primeo Fund* 2014 (1) CILR 379. As mentioned above, the appeal has recently been settled.

**45** In the United Kingdom, except where the EU Insolvency Regulation (Council Regulation (EC) 1346/2000 of 29 May 2000 on insolvency proceedings (OJ 2000 L160, p 1)) applies, the English court has a very wide power to wind up foreign companies, and where a foreign company is being wound up in England the liquidator is generally free to invoke the relevant provisions of the Insolvency Act 1986 in discharge of his functions, which would include the power to ask for examination under the Insolvency Act 1986, section 236.

**46** Where the foreign company is not being wound up in England, under the Cross-Border Insolvency Regulations 2006 (SI 2006/1030), which give effect to the UNCITRAL Model Law, the court may co-operate to the maximum extent possible with foreign courts or foreign representatives: article 25(1). By article 21(1) of the 2006 Regulations, on recognition of a

© 2015 The Incorporated Council of Law Reporting for England and Wales

foreign proceeding, the English court may grant appropriate relief, including the examination of witnesses, and the taking of evidence or the delivery of information concerning (inter alia) the debtor's assets. Secondary proceedings may be opened in the United Kingdom, but only where the debtor has an establishment in the United Kingdom and only as regards assets in the United Kingdom.

**47** Under section 426 of the Insolvency Act 1986 the English court with jurisdiction in relation to insolvency is to assist the courts having the corresponding jurisdiction in any other part of the United Kingdom "or any relevant country or territory" (section 426(4)) by applying the law of either jurisdiction (section 426(5), a very difficult section: see *Dicey, Morris & Collins, Conflict of Laws*, 15th ed (2012), vol 2, para 30-110 et seq). These powers apply to only a limited numbers of countries (including Australia, the Bahamas, and the Isle of Man).

**48** An order for examination may be made under this section in aid of a foreign liquidation. In *England v Smith* [2001] Ch 419 it was held, in a case of an order for examination under Australian law of a person concerned with the affairs of a company, that application of the law of the requesting state should not be circumscribed by limitations to be found in the corresponding provisions of section 236 of the 1986 Act unless some principle of English public policy were infringed.

**49** Where the EU Insolvency Regulation applies, a foreign officeholder may exercise all the powers conferred on him by the law of the state of the opening of proceedings: article 18(1).

**50** Accordingly the statutory powers of the UK courts to assist foreign office-holders to trace assets are very extensive. It follows that the existence of a common law power to order examination will almost certainly never arise in England, and the same is true of the other statutory powers of which foreign office-holders may wish to take advantage. This is subject to what is said below about *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61, where clawback under the Insolvency Act 1986, section 423 (transactions at an undervalue) was sought and granted, in a case where the EU Insolvency Regulation did not apply because the German company involved was an investment undertaking; the UNCITRAL Model Law did not apply because the 2006 Regulations were not in effect at the relevant time; and Germany was not a relevant country for the purposes of section 426(4).

*Assistance at common law in international insolvency*

**51** The UK Supreme Court accepted, and re-confirmed, in *Rubin v Eurofinance SA* [2013] 1 AC 236 that at common law the court has power to recognise and grant assistance to foreign insolvency proceedings: para 29.

**52** In my judgment in *Rubin v Eurofinance SA*, at para 29, I quoted what Millett LJ had said in *Crédit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827:

> "In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention . . . It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not

© 2015 The Incorporated Council of Law Reporting for England and Wales

inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former."

53 The common thread in those cases in which assistance has been given is the application or extension of the existing common law or statutory powers of the court.

54 Most of the cases fall into one of two categories. The first group consists of cases where the common law or procedural powers of the court have been used to stay proceedings or the enforcement of judgments. Several of these cases were mentioned in *Rubin v Eurofinance SA* [2013] 1 AC 236, para 33. They include (subject to what is said below) *In re African Farms Ltd* [1906] TS 373, where execution in Transvaal by a creditor in proceedings against an English company in liquidation in England was stayed by the Transvaal court, which was applied in *Turners & Growers Exporters Ltd v The Ship "Cornelis Verolme"* [1997] 2 NZLR 110 (Belgian shipowner in Belgian bankruptcy: ship released from arrest); and *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, where an English injunction against a Texas corporation in Chapter 11 proceedings was discharged; and two cases in Hong Kong: *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512 (stay in Hong Kong of execution against Nevada corporation in Chapter 11 proceedings in United States federal court in California), followed in *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005] 2 HKC 589 (stay of Hong Kong proceedings against Chinese state-owned enterprise in Mainland insolvency).

55 In my judgment too much has been read into *In re African Farms Ltd* [1906] TS 373. It was not mentioned in any English case until it was cited in argument in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213, 219, for the proposition that the English court will not allow funds to be transmitted to the jurisdiction of the foreign court of the principal winding up without first making provision for the local secured, preferential and statutory creditors, and then subsequently approved in *Cambridge Gas*. It had never been mentioned in the classic company law texts, *Buckley*, *Gore-Browne*, and *Palmer* (nor in *Williams on Bankruptcy*), nor in *Fletcher, Insolvency in Private International Law*, 2nd ed (2005). It received only a passing mention in the successive editions of *Forsyth* on South African private international law now called *Private International Law: The Modern Roman-Dutch Law* (now 5th ed (2012), p 456), although it has been mentioned (obiter) with approval by the Supreme Court of Appeal of South Africa: *Gurr v Zambia Airways Corpn Ltd* [1998] 2 All SA 479 (A).

56 Apart from the stay of execution ordered against a secured creditor (Standard Bank) which had obtained a judgment, the only part of the order in *In re African Farms Ltd* [1906] TS 373 which is relevant for present purposes is the order that all questions of mortgage or preference be regulated by Transvaal law as if the company had been placed in liquidation in the Transvaal. It is not stated how that was to be achieved, but it is significant that Innes CJ said, at p 382: "Such conditions are not easy to devise; and it is possible that to place the foreign liquidator in such a position as to ensure beyond doubt a distribution such as I have indicated would require reciprocal legislation in the two countries". Even though the company could not have been wound up in the Transvaal, the decision is

© 2015 The Incorporated Council of Law Reporting for England and Wales

certainly not authority for the proposition that local statutory law may be applied by analogy.

57 *In re Impex Services Worldwide Ltd* [2004] BPIR 564 also falls into the category of the use or extension of the existing powers of the court. In that case a Manx order for examination and production of documents was made in aid of the provisional liquidation in England of an English company. That was referred to in *Rubin v Eurofinance SA* [2013] 1 AC 236, para 33 as a case of judicial assistance in the traditional sense because the order was based on a request by the English court, but the decision was not the subject of examination before the Supreme Court and cannot be said to have been approved by it. The request could not be accommodated under the Manx Companies Act 1931, or under the inherent jurisdiction of the court, but the order was made at common law without articulation of its basis.

58 A second group of cases is where the statutory powers of the court have been used in aid of foreign insolvencies. The best known example is the use of the long-standing power to wind up foreign companies which are being wound up (or even have been dissolved) in the country of incorporation. In *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 Sir Richard Scott V-C conducted an exhaustive analysis of the cases on ancillary liquidations, and concluded (at p 246): (1) Where a foreign company was in liquidation in its country of incorporation, a winding up order made in England would normally be regarded as giving rise to a winding up ancillary to that being conducted in the country of incorporation. (2) The winding up in England would be ancillary in the sense that it would not be within the power of the English liquidators to get in and realise all the assets of the company worldwide: they would necessarily have to concentrate on getting in and realising the English assets. (3) Since in order to achieve a pari passu distribution between all the company's creditors it would be necessary for there to be a pooling of the company's assets worldwide and for a dividend to be declared out of the assets comprised in that pool, the winding up in England would be ancillary in the sense, also, that it would be the liquidators in the principal liquidation who would be best placed to declare the dividend and to distribute the assets in the pool accordingly. (4) None the less, the ancillary character of an English winding up did not relieve an English court of the obligation to apply English law, including English insolvency law, to the resolution of any issue arising in the winding up which was brought before the court.

59 *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 also falls within this category because the majority in the House of Lords decided that the power of the English court to accede to the letter of request from the Australian court, inviting it to direct the English provisional liquidators to remit the assets in their hands to the Australian liquidators derives from section 426 of the Insolvency Act 1986.

60 As part of the majority in *HIH* Lord Scott of Foscote (at para 59) re-affirmed what he had said in *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213:

> "The English courts have a statutory obligation in an English winding up to apply the English statutory scheme and have, in my opinion, in respectful disagreement with my noble and learned friend Lord

© 2015 The Incorporated Council of Law Reporting for England and Wales

Hoffmann, no inherent jurisdiction to deprive creditors proving in an English liquidation of their statutory rights under that scheme."

See also Lord Neuberger of Abbotsbury at para 72.

*The liquidators' argument and the Chief Justice's decision*

**61** The primary argument of the liquidators before the Board, which had found favour with the Chief Justice as the principal ground of his decision (which he described as "more principled" at para 49), was that the Bermuda court should apply directly the examination provisions of section 195 of the Companies Act 1981 by analogy.

**62** That was said to be based on what Lord Hoffmann had said in *Cambridge Gas* [2007] 1 AC 508, para 22:

> "What are the limits of the assistance which the court can give? . . . At common law, their Lordships think it is doubtful whether assistance could take the form of applying provisions of the foreign insolvency law which form no part of the domestic system. But the domestic court must at least be able to provide assistance by doing whatever it could have done in the case of a domestic insolvency. The purpose of recognition is to enable the foreign office holder or the creditors to avoid having to start parallel insolvency proceedings and to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum."

**63** In the Court of Appeal in the present case Auld JA had described the development of the common law jurisdiction to grant assistance to a foreign liquidator as if the foreign company were being wound up locally as amounting to impermissible "legislation from the bench." In answer, the liquidators in their argument to the Board relied on many dicta to the effect that the common law develops to meet changing circumstances.

**64** In my view to apply insolvency legislation by analogy "as if" it applied, even though it does not actually apply, would go so far beyond the traditional judicial development of the common law as to be a plain usurpation of the legislative function.

*Judicial law-making*

**65** The liquidators are plainly right to say that the common law develops, sometimes radically, to meet changing circumstances. It hardly requires citation of authority to make that point. No one now doubts that judges make law, although English and Scottish judges were slow to acknowledge it until the seminal writings by Lords Reid, Denning and Devlin, citation of which is unnecessary. But there are limits to their power to make law. In *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, 378 Lord Goff of Chieveley said:

> "When a judge decides a case which comes before him, he does so on the basis of what he understands the law to be. This he discovers from the applicable statutes, if any, and from precedents drawn from reports of previous judicial decisions. Nowadays, he derives much assistance from academic writings in interpreting statutes and, more especially, the effect of reported cases; and he has regard, where appropriate, to decisions of

© 2015 The Incorporated Council of Law Reporting for England and Wales

judges in other jurisdictions. In the course of deciding the case before him he may, on occasion, develop the common law in the perceived interests of justice, though as a general rule he does this 'only interstitially,' to use the expression of OW Holmes J in *Southern Pacific Co v Jensen* (1917) 244 US 205, 221. This means not only that he must act within the confines of the doctrine of precedent, but that the change so made must be seen as a development, usually a very modest development, of existing principle and so can take its place as a congruent part of the common law as a whole. In this process, what Maitland has called the 'seamless web,' and I myself (*The Search for Principle*, Proc Brit Acad vol LXIX (1983) 170, 186) have called the 'mosaic,' of the common law, is kept in a constant state of adaptation and repair . . ."

**66** What Justice Holmes said in the passage to which Lord Goff referred was: ". . . I recognise without hesitation that judges do and must legislate, but they can do so only interstitially." The point was developed by Justice Cardozo in *The Nature of the Judicial Process* (1921), at pp 103, 113:

"We must keep within those interstitial limits which precedent and custom and the long and silent and almost indefinable practice of other judges through the centuries of the common law have set to judge-made innovations . . . We do not pick our rules of law full-blossomed from the trees . . . [The judge] legislates only between gaps. He fills the open spaces in the law . . ."

**67** More recently similar points have been made by eminent judges of our time. Judge Richard Posner said in *How Judges Think* (2008), p 86: "The amount of legislating that a judge does depends on the breadth of his 'zone of reasonableness'—the area within which he has discretion to decide a case either way without disgracing himself."

**68** And Lord Bingham of Cornhill said, in *The Business of Judging* (2000), p 32: "On the whole, the law advances in small steps, not by giant bounds."

**69** The approach which is articulated by Lord Sumption JSC is itself an example of the development of the common law since, as Lord Mance JSC's opinion clearly shows, it goes beyond what has previously been understood to be the power of the court to order information.

*The judiciary and legislation*

**70** But that is not the issue on this part of the appeal, which is whether, as the liquidators argue, legislation may be extended by the judiciary to apply to cases where the legislature has not applied it. It raises a much more radical question than the familiar question whether a common law rule should be extended or developed or whether the extension or development should be left to Parliament.

**71** The latter question arises frequently and yields different answers. In the human rights context, it was the subject of intense debate in the recent case on assisted suicide: *R (Nicklinson) v Ministry of Justice (CNK Alliance Ltd intervening)* [2015] AC 657. In the private law area, for example, the majority in *Jones v Kaney* [2011] 2 AC 398 decided to remove immunity from expert witnesses. The minority thought that that was a question which should be left to consideration by the Law Commission and reform by Parliament.

© 2015 The Incorporated Council of Law Reporting for England and Wales

72 By contrast, in *Rubin v Eurofinance SA* [2013] 1 AC 236 the majority considered that a change in the law relating to foreign judgments to apply a different rule (removing the need for a jurisdictional basis) in the context of insolvency was a matter for the legislature. Similarly members of the present Board have at various times made the same point in other contexts: *Prest v Prest* [2013] 2 AC 415, para 83 (Lord Neuberger of Abbotsbury PSC); *Test Claimants in the FII Group Litigation v Revenue and Customs Comrs (formerly Inland Revenue Comrs)* [2012] 2 AC 337, para 200 (Lord Sumption JSC); *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd (Revenue and Customs Comrs intervening)* [2012] 1 AC 383, para 174 (Lord Mance JSC).

73 But I emphasise that that is not the issue here. Nor is the issue the question whether legislation may influence the development of a common law rule. A famous early example where that was regarded as legitimate was *R v Bourne* [1939] 1 KB 687, where a direction was given that the eminent obstetrician Aleck Bourne was entitled as a defence to an abortion charge to rely by analogy on the provision of the Infant Life (Preservation) Act 1929 that infanticide could be justified to preserve the life of the mother.

74 The question of the extent to which statutes may influence the development of the common law is a well known and controversial one. Professor Atiyah addressed the questions in this way ("Common Law and Statute Law" (1985) 48 MLR 1, 6):

> "is [it] possible for the courts to take account of statute law, in the very development of the common law itself? Can the courts, for instance, use statutes as analogies for the purpose of developing the common law? Can they justify jettisoning obsolete cases, not because they have been actually reversed by some statutory provision, but because a statute suggests that they are based on outdated values? Could the courts legitimately draw some general principle from a limited statutory provision, and apply that principle as a matter of common law?"

75 In each of those situations it is not difficult to find cases which justify the forms of reasoning which Professor Atiyah identifies. But none of them comes anywhere near what the Board is asked to do in this case.

76 Nor is the issue whether a statutory rule may be taken into account in the exercise of a discretion. An example is the use of statutory limitation periods in the exercise of the equitable doctrine of laches: *P & O Nedlloyd BV v Arab Metals Co (No 2)* [2007] 1 WLR 2288; *Williams v Central Bank of Nigeria* [2014] AC 1189, para 12.

77 Nor is the issue whether the courts may develop the common law by entering or re-entering a field regulated by legislation. As Lord Nicholls of Birkenhead said in *In re McKerr* [2004] 1 WLR 807, para 30, the courts have been slow to do that because "otherwise there would inevitably be the prospect of the common law shaping powers and duties and provisions inconsistent with those prescribed by Parliament."

*The equity of a statute*

78 What the liquidators propose is very much more radical. It is that the court should apply legislation, which ex hypothesi does not apply, "as if" it applied.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A **79** That proposition is reminiscent of the concept of the "equity of a statute". When used properly today, it means no more than interpreting a statute by reference to its purpose or the mischief which it was designed to cure: e g *Incorporated Council of Law Reporting for England and Wales v Attorney General* [1972] Ch 73, 88.

**80** But it once meant something which "has been relegated to the limbo of legal antiquities" (Loyd, "The Equity of a Statute" (1909) 58 U Pa L Rev B 76), and had been formulated in this way: "Equitie is a construction made by the judges that cases out of the letter of a statute yet being within the same mischief or cause of the making of the same, shall be within the same remedy that the statute provideth . . ." (Co Litt Lib I, Ch II, para 21, quoting Bracton).

**81** Under that doctrine the courts felt themselves free to enlarge a C statute so as to apply it to situations which were not covered by the words of the statute but were regarded by the courts as within its spirit and analogous: Burrows, "The Relationship between Common Law and Statute in the Law of Obligations" (2012) 128 LQR 232, 241; Atiyah, "Common Law and Statute Law" (1985) 48 MLR 1, 7–8. That concept of the "equity of a statute" fell into disfavour in the 18th century and was abandoned by the D beginning of the 19th century, and the judges were no longer able in effect to exercise a direct legislative function.

**82** The liquidators' argument is that the common law rule of assistance in insolvency matters extends to the application of local legislation even though as a matter of its legislative scope it does not apply to the case in hand. In the present case the argument is that, even if section 195 of the Companies Act 1981 does not apply to foreign companies, it should be E applied by analogy or "as if" the Cayman Islands company were a Bermuda company.

**83** In my judgment, that argument is not only wrong in principle, but also profoundly contrary to the established relationship between the judiciary and the legislature. To the extent that it depends on some part of the opinion in *Cambridge Gas* [2007] 1 AC 508, that decision was not only F wrong in its recognition of the New York order regulating the title to Manx shares, as decided in *Rubin v Eurofinance SA* [2013] 1 AC 236, it was also wrong to apply the Manx statutory provisions for approval of schemes of arrangement by analogy or "as if" they applied.

*Cambridge Gas*

G **84** The essence of the decision in *Cambridge Gas* [2007] 1 AC 508 was that the New York order would be recognised, and would be given effect because a similar scheme could have been sanctioned as a scheme of arrangement under the Isle of Man law.

**85** The facts of *Cambridge Gas* are set out in *Rubin* [2013] 1 AC 236, paras 36 et seq. For present purposes it is only necessary to recall that a gas transport shipping business venture ended in failure, and resulted in a H Chapter 11 proceeding in the US Bankruptcy Court in New York. The question for the Privy Council on appeal from the Isle of Man was whether an order of the New York court was entitled to implementation in the Isle of Man. The New York court had rejected the investors' plan and accepted the bondholders' plan.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A

**86** The corporate structure of the business was that the investors owned, directly or indirectly, a Bahaman company called Vela Energy Holdings Ltd ("Vela"). Vela owned (through an intermediate Bahaman holding company) Cambridge Gas, a Cayman Islands company. Cambridge Gas owned directly or indirectly about 70% of the shares of Navigator Holdings plc ("Navigator"), an Isle of Man company. Navigator owned all the shares of an Isle of Man company which in turn owned companies which each owned one ship.

B

**87** The New York order vested the shares in Navigator (the Isle of Man company) in the creditors' committee, which subsequently petitioned the Manx court for an order vesting the shares in their representatives. The Manx Staff of Government Division acceded to this petition by making an order under the Manx Companies Act 1931, section 101, rectifying the share register by entering the creditors' committee as shareholders. In the Privy Council [2007] 1 AC 508, para 23, Lord Hoffmann rejected this solution on this basis: the power was exercisable when "the name of any person is, without sufficient cause, entered in or omitted from the register". But for that purpose it was necessary to show that by the law of the Isle of Man the company was obliged to do so. The source of such an obligation could be found only in an order of the court, pursuant to its common law power of assistance, which required the company to make such an entry. Consequently, the argument based on section 101 was therefore circular. The prior question was whether the court has power to declare that the Chapter 11 plan should be carried into effect.

C

D

**88** The Privy Council held that the plan could be carried into effect in the Isle of Man. The reasoning was as follows. First, if the judgment had to be classified as in personam or in rem the appeal would have to be allowed, but bankruptcy proceedings did not fall into either category. Second, the principle of universality underlay the common law principles of judicial assistance in international insolvency, and those principles were sufficient to confer jurisdiction on the Manx court to assist, by doing whatever it could have done in the case of a domestic insolvency. Third, exactly the same result could have been achieved by a scheme of arrangement under the Isle of Man Companies Act 1931, section 152.

E

F

**89** In *Rubin* [2013] 1 AC 236, a majority of the Supreme Court (Lord Collins of Mapesbury with whom Lords Walker of Gestingthorpe and Sumption JJSC agreed) decided that *Cambridge Gas* was wrongly decided because the shares in Navigator owned by Cambridge Gas (a Cayman Islands company) were, on ordinary principles of the conflict of laws, situated in the Isle of Man, and the shareholder relationship between Navigator and Cambridge Gas was governed by Manx law. Consequently the property in question, namely the shares in Navigator, was situate in the Isle of Man, and therefore also not subject to the in rem jurisdiction of the US Bankruptcy Court. There was therefore no basis for the recognition of the order of the US Bankruptcy Court in the Isle of Man. Lord Mance JSC, in his concurring judgment, left the correctness of the decision open, and Lord Clarke of Stone-cum-Ebony JSC, dissenting, thought that it was correctly decided.

G

H

**90** I have already quoted the passage in *Cambridge Gas* [2007] 1 AC 508, para 22 in which Lord Hoffmann said that "the domestic court must at least be able to provide assistance by doing whatever it could have done in

© 2015 The Incorporated Council of Law Reporting for England and Wales

the case of a domestic insolvency" and that the purpose of recognition of the foreign office-holders was to "to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum."

91 The effect of this part of the opinion in *Cambridge Gas* was to make an order equivalent to one which could have been made under a Manx scheme of arrangement without going through the statutory procedures for approval of a scheme. The passages in the opinion which are relevant are these:

> "24. In the present case it is clear that the New York creditors, by starting proceedings to wind up the Navigator companies and then proposing a scheme of arrangement under section 152 of the Companies Act 1931, could have achieved exactly the same result as the Chapter 11 plan. The Manx statute provides: '(1) Where a compromise or arrangement is proposed between a company and its creditors . . . the court may on the application in a summary way of the company or of any creditor or member of the company, or, in the case of a company being wound up, of the liquidator, order a meeting of the creditors . . . to be summoned in such manner as the court directs. (2) If a majority in number representing three-fourths in value of the creditors . . . agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the court, be binding on all the creditors . . . and also on the company or, in the case of a company in the course of being wound up, on the liquidator and contributories of the company.'
>
> "25. The jurisdiction is extremely wide. All that is necessary is that the proposed scheme should be a 'compromise or arrangement' and that it should be approved by the appropriate majority. Why, therefore, should the Manx court not provide assistance by giving effect to the plan without requiring the creditors to go to the trouble of parallel insolvency proceedings in the Isle of Man? . . .
>
> "26. . . . as between the shareholder and the company itself, the shareholder's rights may be varied or extinguished by the mechanisms provided by the articles of association or the Companies Act. One of those mechanisms is the scheme of arrangement under section 152. As a shareholder, Cambridge is bound by the transactions into which the company has entered, including a plan under Chapter 11 or a scheme under section 152. It is the object of such a scheme to give effect to an arrangement which varies or extinguishes the rights of creditors and shareholders. Thus, in the case of an insolvent company, in which the shareholders have no interest of any value, the court may sanction a scheme which leaves them with nothing . . . The scheme may divest the company of its assets and leave the shareholders with shares in an empty shell. It may extinguish their shares and recapitalise the company by issuing new shares to others for fresh consideration. Or it may, as in this case, provide that someone else is to be registered as holder of the shares. Whatever the scheme, it is, by virtue of section 152, binding on the shareholders when it receives the sanction of the court. The protection for the shareholders is that the court will not sanction a scheme, even if adopted by the statutory majority, if it appears unfair. And no doubt the discretion to refuse assistance in the implementation of an equivalent plan

© 2015 The Incorporated Council of Law Reporting for England and Wales

which has been confirmed in a foreign jurisdiction would be exercised on similar lines. But no such question arises in this case. Although it must be accepted that Cambridge did not technically submit to the jurisdiction in New York, it had no economic interest in the proceedings and ample opportunity to participate if it wished to do so. It would therefore not be unfair for the plan to be carried into effect. Their Lordships therefore consider that the Court of Appeal was right to order its implementation."

92 It is to be noted that Lord Hoffmann said that the New York creditors *could have achieved* exactly the same result as the Chapter 11 plan by a scheme of arrangement under the Companies Act 1931, section 152, and asked why the Manx court could not provide assistance by giving effect to the plan without requiring the creditors to go to the trouble of parallel insolvency proceedings in the Isle of Man.

93 Those proceedings required the calling of meetings and the passage of appropriate resolutions. The majority of the UK Supreme Court decided in *Rubin v Eurofinance SA* [2013] 1 AC 236 that *Cambridge Gas* was wrongly decided on the ground that the New York court did not have jurisdiction over title to shares in a Manx company. The question whether there was any lawful basis for applying the legislation on an "as if" basis, or of dispensing with the statutory procedure, did not therefore arise in *Rubin v Eurofinance SA*. But for the reasons I have given, in my judgment there can be no doubt that, unless Manx law allowed the relaxation of the statutory procedures for the approval of schemes of arrangement, the judiciary was not entitled to apply those procedures by analogy at common law.

*The application of Cambridge Gas*

94 It follows in my view that those courts which have relied on these passages to apply legislation which the legislature had not itself seen fit to apply are wrong, including the decision of the Chief Justice in the present case.

95 That conclusion also applies to the decision in *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61. In that case a company incorporated in Germany for the apparent purpose of investing individuals' funds in futures trading was used as a vehicle for a worldwide fraud. The German administrator applied for relief pursuant to the Insolvency Act 1986, section 423 (transactions at an undervalue) against former investors of the company who were resident in England, claiming back initial investment funds and fictitious profits for the benefit of the company's creditors by setting aside transactions entered into at an undervalue.

96 As I have said, the EU Insolvency Regulation did not apply because the German company involved was an investment undertaking; the UNCITRAL Model Law did not apply because the 2006 Regulations were not in effect at the relevant time; and Germany was not a relevant country for the purposes of section 426(4).

97 Proudman J decided that the court had the power at common law to recognise a foreign administrator and to provide him with the same assistance as it was entitled to provide in a domestic insolvency; and that since proceedings to set aside antecedent transactions were central to the purpose of an insolvency the court therefore had jurisdiction to authorise the administrator to invoke section 423. Applying *Cambridge Gas* Proudman J

© 2015 The Incorporated Council of Law Reporting for England and Wales

held that the power to use the common law to recognise and assist an administrator appointed overseas "includes doing whatever the English court could have done in the case of a domestic insolvency": para 62.

98 In my judgment that decision is wrong because it involved an impermissible application of legislation by analogy.

99 In *Picard v Primeo Fund* 2013 (1) CILR 164 the US bankruptcy trustee of the principal Bernard Madoff company sought to claw back payments made by the company to a Cayman Islands company. The claims were based on US law (fraudulent transfers and preferential payments) and on Cayman law (preferential payments). The Cayman Islands have mutual assistance provisions (Companies Law (2012 Revision), sections 241–242), but the judge (Jones J) held that they did not apply because the power to make orders "ordering the turnover to a foreign representative of any property belonging to a debtor" did not apply to property which was only recoverable under transaction avoidance provisions.

100 The judge then went on to decide that the Cayman court was able to apply the Cayman voidable preferences provision of its law (section 145) to the payments made by the US company to the Cayman company, by applying *Cambridge Gas* and *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61.

101 On 16 April 2014 the Court of Appeal of the Cayman Islands (consisting of Sir John Chadwick P and Mottley and Campbell JJA )2014 (1) CILR 379, reversed Jones J on the first part of the case and held that the Cayman court was entitled to apply the Cayman anti-avoidance provisions under the assistance provisions of Cayman company law, because the making of a transaction avoidance order restores to the debtor the property which is the subject of that order, and so enables the court to order the "turnover" of that restored property to the foreign representative: para 45.

102 The Court of Appeal did not reach the question whether Jones J was entitled to apply the Cayman anti-avoidance provision at common law. The court had been informed that an issue central to that question, namely whether *Cambridge Gas* should be followed, was before the Court of Appeal for Bermuda. Because the matter was before this Board and shortly to be heard, the Court of Appeal was invited to hand down an interim judgment dealing only with the issues on the mutual assistance statutory provisions. The appeal has now been settled. It follows from what I have said that the decision of Jones J on the present aspect of the case was wrong.

*Al Sabah v Grupo Torras SA*

103 There was also a prior opinion of the Privy Council, in which what was said is directly contrary to the approach in *Cambridge Gas* advocated by the liquidators. In *Al Sabah v Grupo Torras SA* [2005] 2 AC 333 the trustee in bankruptcy of a debtor in The Bahamas obtained from the Bahaman court a letter of request directed to the Grand Court of the Cayman Islands seeking its aid in setting aside two Cayman trusts established by the debtor. The Grand Court (affirmed by the Court of Appeal of the Cayman Islands) held that it had jurisdiction to provide such assistance under either section 156 of the Bankruptcy Law of the Cayman Islands or section 122 of the Bankruptcy Act 1914 (which provided for mutual assistance between bankruptcy courts throughout the UK and the Empire) or under the court's inherent jurisdiction, and that it should as a

© 2015 The Incorporated Council of Law Reporting for England and Wales

matter of discretion grant the Bahaman trustee powers under section 107 of the Cayman Bankruptcy Law to enable him to set aside the trusts. The Privy Council held that (i) section 156 of the Cayman Bankruptcy Law did not apply, but that (ii) section 122 had not been repealed in its application to the Cayman Islands and did apply, so that there was jurisdiction to authorise the Bahaman trustee to exercise the statutory power even though it might not have been available to him if the trusts had been governed by Bahaman law.

104 But the Board in an opinion given through Lord Walker of Gestingthorpe said, at para 35:

> "The respondents relied in the alternative . . . on the inherent jurisdiction of the Grand Court. This point was not much developed in argument and their Lordships can deal with it quite shortly. If the Grand Court had no statutory jurisdiction to act in aid of a foreign bankruptcy it might have had some limited inherent power to do so. But it cannot have had inherent jurisdiction to exercise the extraordinary powers conferred by section 107 of its Bankruptcy Law in circumstances not falling within the terms of that section. The non-statutory principles on which British courts have recognised foreign bankruptcy jurisdiction are more limited in their scope [citing what is now *Dicey, Morris & Collins, Conflict of Laws*, 15th ed (2012), vol 2, paras 31R-059 et seq] and the inherent jurisdiction of the Grand Court cannot be wider."

105 The Board plainly considered that the court had no power to apply the Bankruptcy Law "in circumstances not falling within" the Law. In *In re Phoenix Kapitaldienst GmbH* [2013] Ch 61, above, Proudman J distinguished this clear statement on the basis that she should follow what she described as "the later and more considered views expressed by Lord Hoffmann and approved by Lord Walker" in the *HIH* case [2008] 1 WLR 852, namely that the court was able, if consistent with justice and UK public policy, to achieve the aim of a unitary and universal bankruptcy law. In *Picard v Primeo Fund* 2013 (1) CILR 164 Jones J explained the dictum in *Al Sabah* as meaning that the common law cannot be invoked to apply provisions of the Bankruptcy Law to achieve an objective outside its scope.

106 Neither of these supposed distinctions is valid. There is nothing in *HIH* to support Proudman J's suggestion that Lord Walker had changed his view, and Jones J's suggestion that Lord Walker was only directing his intention to objectives outside the scope of the Bankruptcy Law is wholly inconsistent with Lord Walker's plain words that the court does not have an inherent jurisdiction to exercise the powers conferred by the Bankruptcy Law "in circumstances *not falling within the terms* of that section." (Emphasis added.)

107 In my judgment Lord Walker's dictum in the opinion in *Al Sabah v Grupo Torres* [2005] 2 AC 333, para 35 (in which, among others, Lords Hoffmann and Scott concurred) was plainly right, and, to the extent it is inconsistent with the passage in *Cambridge Gas* applying the Isle of Man scheme of arrangement provisions on an "as if" basis, it is to be preferred to *Cambridge Gas*.

108 I would therefore humbly advise Her Majesty not only that the appeal should be dismissed, but also that to have allowed it on the basis of the liquidators' primary argument would have involved Her Majesty's judges in a development of the law and their law-making powers which

© 2015 The Incorporated Council of Law Reporting for England and Wales

would have been wholly inconsistent with established principles governing the relationship between the judiciary and the legislature and therefore profoundly unconstitutional.

LORD CLARKE OF STONE-CUM-EBONY JSC

109 I agree that this appeal should be dismissed for the reasons given by Lord Sumption JSC. I add a short judgment of my own on the first issue raised by Lord Sumption JSC in para 8, namely whether the Bermuda court has a common law power to assist a foreign liquidation by ordering the production of information (in oral or documentary form) in circumstances where (i) the Bermuda court has no power to wind up an overseas company such as Singularis and (ii) its statutory power to order the production of information is limited to cases where the company has been wound up in Bermuda. The second issue is whether, if such a power exists, it is exercisable in circumstances where an equivalent order could not have been made by the court in which the foreign liquidation is proceeding.

110 I have reached the conclusion that, for the reasons given by Lord Sumption JSC, the answer to the first issue is that the Bermuda court does have such a power. The steps which lead me to that conclusion are these. While the recognition of such a power in an ancillary liquidation has not thus far been recognised at common law, it is common ground that the common law has developed step by step and that it may be extended or developed in appropriate circumstances. It follows that the question is whether the circumstances are appropriate to justify the recognition of such a power in this class of case.

111 As Lord Sumption JSC demonstrates in para 20, significant developments have been made by the common law in the past. They included the power to compel a person to give evidence, which was not originally statutory. As Lord Sumption JSC puts it, like the power to order discovery, it was an inherent power of the Court of Chancery devised by judges to remedy the technical and procedural limitations associated with the proof of facts in courts of common law. I agree with Lord Sumption JSC (at para 23) that the significance of the *Norwich Pharmacal* case [1974] AC 133 in the present context is that it illustrates the capacity of the common law to develop a power in the court to compel the production of information when it is necessary to do so in order to give effect to a recognised legal principle.

112 The recognised legal principle in the present case is the principle of modified universalism derived from *Cambridge Gas* [2007] 1 AC 508: see paras 19 and 23 in Lord Sumption JSC's judgment. I agree with him that it is founded on the public interest in the ability of foreign courts exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a worldwide basis notwithstanding the territorial limits of their jurisdiction. An important aspect of that public interest is a recognition that in a world of global businesses it is in the interest of every country that companies with transnational assets and operations should be capable of being wound up in an orderly fashion under the law of the place of their incorporation and on a basis that will be recognised and effective internationally. I also agree with Lord Sumption JSC at para 23 (i) that this is a public interest which has no equivalent in cases where information may be sought for commercial

© 2015 The Incorporated Council of Law Reporting for England and Wales

purposes or for ordinary adversarial litigation; (ii) that the Bermuda court has properly recognised the status of the liquidators as officers of that court; (iii) that the liquidators require the information for the performance of the ordinary functions attaching to that status; (iv) that the information is unlikely to be available in any other way; (v) that none of the reasons which account for the common law's inhibition about the compulsory provision of evidence have any bearing on the present question; (vi) that the right and duty to assist foreign office-holders which the courts have acknowledged on a number of occasions would be an empty formula if it were confined to recognising the company's title to its assets in the same way as any other legal person who has acquired title under a foreign law, or to recognising the office-holder's right to act on the company's behalf in the same way as any other agent of a company appointed in accordance with the law of its incorporation; and (vii) that the recognition by a domestic court of the status of a foreign liquidator would mean very little if it entitled him to take possession of the company's assets but left him with no effective means of identifying or locating them.

113 These are powerful factors. What then are the limits? I agree with Lord Sumption JSC that, as he puts it at para 25, the Board would not wish to encourage the promiscuous creation of other common law powers to compel the production of information but that the limits of this power are implicit in the reasons for recognising its existence. He gives four reasons. (1) It is available only to assist the officers of a foreign court of insolvency jurisdiction or equivalent public officers. It would not, for example, be available to assist a voluntary winding up, which is essentially a private arrangement and although subject to the directions of the court is not conducted by or on behalf of an officer of the court. (2) It is a power of assistance and exists for the purpose of enabling those courts to surmount the problems posed for a worldwide winding up of the company's affairs by the territorial limits of each court's powers; so that it is not available to enable them to do something which they could not do even under the law by which they were appointed. (3) It is available only when it is necessary for the performance of the office-holder's functions. (4) It is subject to the limitation that such an order must be consistent with the substantive law and public policy of the assisting court, in this case that of Bermuda. I further agree with Lord Sumption JSC that it follows that it is not available for purposes which are properly the subject of other schemes for the compulsory provision of information. Common law powers of this kind are not a permissible mode of obtaining material for use in actual or anticipated litigation. That field is covered by rules of forensic procedure and statutory provisions for obtaining evidence in foreign jurisdictions which liquidators, like other litigants or potential litigants, must accept with all their limitations. Moreover, in some jurisdictions, it may well be contrary to domestic public policy to make an order which there would be no power to make in a domestic insolvency.

114 I further agree with Lord Sumption JSC, for the reasons he gives in para 28, that the common law power is not impliedly excluded by reason of section 195 of the Bermuda Companies Act but that it cannot be applied on the facts of this case because there is no similar power in the Cayman Islands and it would not be a proper use of the power of assistance to make good a

© 2015 The Incorporated Council of Law Reporting for England and Wales

limitation on the powers of a foreign court of insolvency jurisdiction under its own law.

115 Like Lord Sumption JSC, I appreciate that it is important that this development should not open the floodgates to different unrelated classes of case. However, I see no reason why it should. I appreciate that Lord Mance JSC has reached a different conclusion. I do not pretend that it is possible to predict precisely how the development of the principle, which has been identified by Lord Sumption JSC and which both Lord Collins of Mapesbury and I support, will proceed. I agree with Lord Mance JSC that it is a step forward but do not agree that it is a step leap. I also agree with him (at para 137) that courts have tended to confine remedies of the kind we are discussing to situations where there is a recognisable legal claim to protect, based either on a title or right to property or on some wrongdoing supported by appropriate evidence. However, there is no reason why the common law should not be developed, provided that the development is measured and supports a recognised principle.

116 It will not always be easy to draw the line between permissible applications and impermissible applications. However, Lord Sumption JSC has identified, not only the policy, but also the principle derived from the policy and some of the limitations to its exercise, which to my mind provide a sensible approach for the future. I respectfully disagree with Lord Mance JSC when he says at para 146 that this is a development which is neither permissible nor appropriate. In doing so, I express no view on Lord Mance JSC's concerns (expressed in paras 120 and 121) as to the breadth of the terms of the order and as to the lack of safeguards to protect against costs or loss. These may well be sound and can be investigated in a case where such issues fall for decision. That is not this case because of the narrow ground on which the appeal must be dismissed.

**LORD MANCE JSC**

117 There are two potential issues of importance on this appeal: (a) whether the common law power to assist a foreign (Cayman Islands) liquidation enables the Bermudan courts to order anyone within its jurisdiction who may have relevant information or documentation about the company's assets (or, possibly also, its affairs generally) to attend for questioning about and disclose the same; (b) whether, if this power exists, it should be exercised by ordering such disclosure and questioning when the Cayman Islands courts have no equivalent power over persons within their jurisdiction.

118 I agree with Lord Sumption JSC that the short answer to the second question is negative. So it is unnecessary on this appeal to answer the first question, although Lord Sumption JSC has devoted the major part of his opinion to this question. I understand why it might be helpful if the Board could give a clear answer to it, but I think it unfortunate that it should try to do so on this appeal, bearing in mind the limitations in the way in which the question has been argued at all lower stages (see para 122 below) and its largely unexplored ramifications: see generally paras 130–145 below.

119 Before addressing the second issue in detail, it is relevant—and in my view important—to note three points. The first is the Chief Justice's order which the Court of Appeal set aside, and which the liquidators ask the

© 2015 The Incorporated Council of Law Reporting for England and Wales

Board to restore. The respondents, PwC, were (by clause 3a) ordered within 14 days to provide to the joint official liquidators ("JOLs")

> "all information they may have, including information and documentation in their possession, power, custody or control, concerning the promotion, formation, trade, dealings, affairs or property of the company [and] for the avoidance of doubt, such information and documentation to be provided is not to be limited to audit information . . ."

In addition PwC was (by clause 3d)

> "required to have a partner and/or employee or agent acceptable to the JOLs, examined on oath forthwith, within ten (10) days of being called on to meet by the JOLs, concerning the matters aforesaid, by word of mouth and on written interrogatories, and be required to reduce his/her answer to writing and require him/her to sign this . . ."

By clause 3e the JOLs were given leave to serve "Paul Suddaby and any other partners or officers of PwC . . . out of the jurisdiction", specific liberty was given to examine Paul Suddaby and he was specifically ordered to produce information in accordance with clause 3a. Clause 3f provided that

> "If PwC . . . does refuse to comply with any of the orders set out herein, it and its partners and officers shall be in contempt of court and they may be imprisoned, fined or their assets seized."

120 No doubt in case clause 3 did not go far enough, clause 4 provided:

> "Further and without limiting the generality of the foregoing, that the documentation referred to in Exhibit HD-7 of Hugh Dickson's third affidavit dated 7 February 2013 be produced within seven days by PwC . . . , in relation to [Singularis] . . . That the JOLs be able to obtain all information and documentation described herein that is in the possession, power, custody, or control of PwC . . . , whether this be in Bermuda, Dubai, or wherever it may be located."

Redaction was only to be permitted where necessary to protect information of a confidential nature belonging to third parties, and clause 4b required that:

> "the relevant partners and officers of PwC . . . do confirm on oath that all the documents requested have been produced."

The only exempt documents were to be those required to be produced in the Cayman Islands—that is documents actually belonging to Singularis.

121 No provision was made for the JOLs to meet, still less secure, any costs that PwC or its partners, officers or agents would incur complying with such an order, and no undertaking was given to meet any such costs or any other loss or liability that might result from doing so—even though PwC had asked the Chief Justice to deal with this aspect. This omission was raised in the Court of Appeal, where it remained relevant in relation to the order against SICL which that court upheld. PwC suggested that costs could be in the order of $500,000 and the JOLs argued that management time spent in compliance could not be recovered. The Court of Appeal declined to make any order or require any undertaking "in the absence of authority" and "particularly in circumstances where the cost of compliance is far from

© 2015 The Incorporated Council of Law Reporting for England and Wales

A clear". "Absence of authority" is hardly surprising in relation to an order which was itself effectively unprecedented. PwC's costs of compliance would clearly be likely to be very substantial. Whether or not they were or could be quantified when the order was made, PwC should have been protected in respect of them. Common justice and established practice relating to freezing injunctions, *Anton Pillar* orders and *Norwich Pharmacal* relief should have confirmed the need for an appropriate order or B undertaking in that respect.

122 The second point is that, in respect of Singularis, the only basis of Kawaley CJ's order against PwC and its officers was that the Bermudan courts have a common law power to grant assistance in aid of the Cayman Islands liquidation by applying local procedural remedies, in particular either "by directly applying" or "by analogy with" section 195 of the C Bermudan Companies Act 1981, although it was common ground that this section does not in terms apply. This was also the only case put by the JOLs' written submissions to or adjudicated on by the Court of Appeal as well as the only basis on which permission was sought to appeal to the Board. Kawaley CJ considered that he could none the less rely directly on section 195 by virtue of inter alia *In re African Farms* [1906] TS 373, D *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236 (paras 8, 49–74), or alternatively that he could proceed "by analogy with" it: paras 8, 36–48. The Court of Appeal held the contrary: see para 52, per Bell AJA, para 1, per Zacca P, and paras 4–59, per Auld JA. There is a hint in paras 49(1) and 50 of Auld JA's case that the JOLs may have begun to put their case more E widely in oral submissions by suggesting some wider power based on "modified universalism" and independent of the Bermudan statutory power. But, if this is so, it can have received little prominence. Only before the Board has focus been directed to such an argument. As to the submission which was pursued below and accepted by Kawaley CJ, I agree with Lord Sumption JSC and Lord Collins of Mapesbury that there is no basis for F judicial re-fashioning of, or action outside the bounds of but by analogy with, domestic legislation such as section 195. The Chief Justice's order cannot therefore be justified on the basis on which he made it. But it is perhaps ironic that so firm a rejection of any possibility of the domestic court exercising the powers conferred on domestic liquidators should be replaced by an embrace of the possibility of the domestic court giving effect to the wishes and/or powers of foreign liquidators: see paras 130 et seq below.

G 123 Neither court below addressed any observations to the question whether any jurisdiction existed or, if it existed, could properly be exercised to make orders against and serve Paul Suddaby and other partners or officers of PwC outside the jurisdiction of the Bermudan court. As paras 119 and 120 above show, the Chief Justice's order did that, though without joining Mr Suddaby or any other officer or partner in their personal capacities. In H their written submissions before the Court of Appeal, the JOLs submitted that section 195 gave jurisdiction to serve abroad and relied on the English authority of *In re Seagull Manufacturing Co Ltd* [1993] Ch 345 (decided under a section of the Insolvency Act 1986 using similar terms to section 195). Once one concludes, as the Board has, that section 195 is applicable neither directly nor by analogy, the question becomes whether there can be

© 2015 The Incorporated Council of Law Reporting for England and Wales

any such common law jurisdiction to order service out, on pain of sanctions, as that for which the JOLs argue. A

124 Approaching the matter on that basis, it is clear that the Chief Justice's order must on any view have gone well beyond any jurisdiction which exists at common law in relation to PwC's partners and officers outside the Bermudan jurisdiction, as opposed to PwC itself which was within such jurisdiction. The area was examined in *Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2010] 1 AC 90, para 12, where B the House of Lords (in a judgment given by myself with which all other members of the House concurred) spoke in these terms of:

> "the limitation of the court's power to enforce the attendance of witnesses or fine defaulting witnesses. From the Statute of Elizabeth 1562 (5 Eliz 1, c 9) onwards, this had been regulated by statute and had never extended beyond the United Kingdom. The procedure enacted in relation C to other jurisdictions involves the taking of evidence, on commission or otherwise, with the assistance of the foreign court. The service of a writ of subpoena is still only possible under section 36 of the Supreme Court Act 1981 in respect of persons in one of the parts of the United Kingdom. The limitation of the court's power in this respect corresponds with the principle of international law, summarised robustly by Dr Mann in his D Hague lecture 'The Doctrine of Jurisdiction in International Law', *Recueil des Cours*, 1964-I, *The Definition of Jurisdiction,* p 137): 'Nor is a state entitled to enforce the attendance of a foreign witness before its own tribunals by threatening him with penalties in case of non-compliance. There is, it is true, no objection to a state, by lawful means, inviting or perhaps requiring a foreign witness to appear for the purpose of giving evidence. But the foreign witness is under no duty to comply, and to E impose penalties on him and to enforce them either against his property or against him personally on the occasion of a future visit constitutes an excess of criminal jurisdiction and runs contrary to the practice of states in regard to the taking of evidence as it has developed over a long period of time.' "

125 The issue in *Masri* was whether a power under rules (CPR r 71) F made under statutory authority extended to enable an order for examination of an officer of a judgment creditor company, who was out of the jurisdiction. The House held that, in view of the presumption against extra-territoriality, it did not. In the course of so doing, it considered prior authority on other powers with a statutory basis. In *In re Tucker (RC) (A Bankrupt), Ex p Tucker (KR)* [1990] Ch 148, section 25(1) of the G Bankruptcy Act 1914 gave the court power to summon before it for examination "any person whom the court may deem capable of giving information respecting the debtor, his dealings or property". But the Court of Appeal set aside an order obtained by a trustee in bankruptcy for the examination of the debtor's brother, a British subject resident in Belgium. Dillon LJ, after noting the limitations of the powers to serve out of the jurisdiction (then contained in RSC Ord 11) and to subpoena witnesses, said H against this background that he "would not expect section 25(1) to have empowered the English court to haul before it persons who could not be served with the necessary summons within the jurisdiction of the English court": p 158E–F.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A **126** In contrast, in *In re Seagull Manufacturing Co Ltd* [1993] Ch 345, section 133 of the Insolvency Act 1986 authorised the public examination of a narrower category of persons, viz

> "any person who— (a) is or has been an officer of the company; or (b) has acted as liquidator or administrator of the company or as receiver or manager . . . or (c) not being a person falling within paragraph (a) or B (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company",

and rule 12.12 of the Insolvency Rules 1986 (SI 1986/1925) gave the court express authority to order service out of the jurisdiction of any process or order requiring to be so served for the purposes of insolvency proceedings. The Court of Appeal upheld an order made for the public examination of a C former director living in Alderney. Peter Gibson J, with whose judgment the other members of the court concurred, said (p 354F–H) that:

> "Where a company has come to a calamitous end and has been wound up by the court, the obvious intention of this section was that those responsible for the company's state of affairs should be liable to be subjected to a process of investigation and that investigation should be in D public. Parliament could not have intended that a person who had that responsibility could escape liability to investigation simply by not being within the jurisdiction. Indeed, if the section were to be construed as leaving out of its grasp anyone not within the jurisdiction, deliberate evasion by removing oneself out of the jurisdiction would suffice."

**127** Although the House in *Masri* [2010] 1 AC 90 regarded E impracticability of enforcement as a factor of greater significance than Peter Gibson J had suggested, it acknowledged the public interest served by section 133, and referred (in para 23) to "The universality of a winding up order, in the sense that it relates at least in theory to all assets wherever situate". That factor being absent in *Masri*, it could lend no assistance to the argument that CPR r 71 extended extra-territorially. But the important F feature of all these cases is that they turned on express statutorily conferred powers. There was no suggestion in any of them of any relevant common law power in any of the areas discussed.

**128** The third point is that the JOLs' case has been at all times and is advanced solely on the basis that PwC have documents and information which it would help the JOLs to inspect and about which it would be helpful for them to be able to question PwC and its officers. The basis is not that G PwC have property or assets of Singularis (beyond the documents which they have already been ordered by the Cayman Islands court to produce); nor is it that PwC have themselves done anything wrong or that they have been or are mixed up in any third party's wrongdoing. The House of Lords authority *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133 was not relied upon, or even among the authorities put, before the H Supreme Court. It was mentioned in passing during the final oral submissions in reply of Mr Moss QC for the JOLs, when the transcript records this exchange:

> "*Lord Mance JSC*. If they are accountants, as you told me earlier that they were, then on the face of it there is an advisory relationship and if

© 2015 The Incorporated Council of Law Reporting for England and Wales

you wish to know something which you yourself have mislaid or don't have from your accountant advisers one might think there was quite a good case for saying they owed a duty to disclose it to you, to help you. A

"*Mr Moss*. There might be an arguable case relating to that advice, but what we're interested in are these audit documents which go to the assets of the company. I don't know whether the accounting had anything to do with that at all.

B

"*Lord Collins*. Is there nowhere a *Norwich Pharmacal* order can be obtained?

"*Mr Moss*. Well, yes. We've had a discussion about this. The problem with *Norwich Pharmacal* is that it is based on fraud.

"*Lord Collins*. Any wrongdoing, I think.

"*Lord Sumption JSC*. It is based on wrongdoing generally.

"*Mr Moss*. Yes, but it does involve alleging wrongdoing. You would have to allege that PwC became innocently mixed up in that wrongdoing— C

"*Lord Clarke JSC*. They only have to be innocently mixed up.

"*Mr Moss*. Yes.

"*Lord Sumption JSC*. That's a fairly low threshold, after all the Customs and Excise were about as innocent mixed up people almost that you could probably want. D

"*Mr Moss*. Yes. The result of that would be if we can get *Norwich Pharmacal* relief, then the Bermuda courts do have common law powers to give us exactly the type relief that we have here. It actually comes to the same thing. It wouldn't make much sense to send us right back to the Chief Justice to then ask for *Norwich Pharmacal* relief— E

"*Lord Mance JSC*. It may not be as easy as that. You haven't formulated it as *Norwich Pharmacal*.

"*Mr Moss*. Yes, it would have to be abandoned and reformulated as a *Norwich Pharmacal*, but in substance it comes to the same sort of end. What that perhaps illustrates is that what we have and what we seek to maintain, or rather we have at one stage and the Court of Appeal have taken it away on a rather narrow ground, but we seek to have back is not something that radical in these types of circumstances, where there is a gigantic deficit, there has clearly been wrongdoing, documents have been taken and not available. It's exactly the kind of context in which one would expect relief to be given. It's not extravagant in any shape or form." F

G

**129** Contrary to Mr Moss's submission, the JOLs are seeking to do something very radical, and there is a deep dividing line between the basis on which they put their case and *Norwich Pharmacal*. The JOLs are seeking (a) to justify a far wider and more stringent order than could ever be obtained in *Norwich Pharmacal* proceedings and (b) to do so on the basis of an unverified assertion that they would, if they had tried, have been able to obtain a *Norwich Pharmacal* and without exposing themselves to the trouble and difficulty of showing that PwC were mixed up in any sort of wrongdoing about which they have any relevant information or documentation. I see neither force nor attraction in Mr Moss's invitation to prejudge the outcome of normal procedures by short-cutting them. H

© 2015 The Incorporated Council of Law Reporting for England and Wales

130 In the light of these points, I come to the substance of the argument now presented. That is that a common law power exists to assist any foreign liquidation by ordering any person (whether or not an officer or agent of the company) to attend and be interrogated and produce documentation and information, on pain of contempt, in the manner which the JOLs advocate. The only explicit limits to the jurisdiction for which the JOLs now contend is that it should not be inconsistent with the law or policy of the forum. The negative answer which the Board is giving to the second issue on this appeal means that there would exist a further limitation, that the jurisdiction would not exist or be exercisable to enable an order which could not be made against a person within the jurisdiction of the country of the insolvency.

131 Lord Sumption JSC now suggests that the principle should be further limited to any court-ordered liquidation (though that, in turn, leaves uncertain the status of any winding up under supervision in any jurisdiction where that possibility, which existed formerly under section 311 of the English Companies Act 1948, still exists). Although Lord Sumption JSC speaks at one point of this as a "means of identifying or locating" assets (para 23), elsewhere he speaks of "enabling [foreign] courts to surmount the problems posed for a worldwide winding up of the company's affairs by the territorial limits of each court's powers": para 25. The order in fact made by the Chief Justice was, as noted, of great width. The scope of the proposed common law jurisdiction is therefore uncertain.

132 The suggested jurisdiction is said to follow from the principle of "modified universalism". This is a principle developed in English common law over the last 20 years with the strong support of Lord Hoffmann, though recognised over a 100 years ago in a Transvaal case which was itself until recently lost in (unfair) obscurity. *In re African Farms* [1906] TS 373, was decided by Sir James Innes, who in addition to his own great legal distinction was grandfather of the distinguished wartime humanitarian lawyer Helmuth James von Moltke. The essence of the principle consists, as Lord Sumption JSC notes in his para 14(i), in the recognition by one court of the foreign liquidator's power of disposition over the company's assets in the domestic jurisdiction. That justified an order restraining their disposition or seizure inconsistently with the foreign liquidation. The novelty of this decision lay in the making of such an order in circumstances where there was no power to wind up the company in the domestic forum. In this respect, therefore, the co-operation extended in *In re African Farms* went a step further than that demonstrated in *In re Matheson Bros Ltd* (1884) 7 Ch D 225, where Kay J was, in the light of the fact that the English courts would have had power to wind the relevant foreign company up in England, prepared to secure English assets to prevent English creditors executing against them, pending steps in the company's winding up in its country of incorporation to make the assets available for the company's English creditors pari passu with its foreign creditors.

133 The principle may also justify an order for the remission of the assets out of the jurisdiction to the foreign liquidator, if the foreign liquidation rules would distribute them in the same way as the domestic jurisdiction. Even if the foreign liquidation rules would distribute them differently, but there is express statutory power enabling the remission to take place none the less, the principle may lend support to the exercise of that express statutory power. Beyond that, I do not read the majority of the

© 2015 The Incorporated Council of Law Reporting for England and Wales

House in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 as going, and anything that any of its members did say more widely about the existence or scope of a common law power was on any view obiter, since the appeal was decided on the basis that there existed express statutory authority for a remission although the assets would be distributed in the Australian liquidation differently from the way in which they would have been distributed in the English liquidation.

134 I agree with Lord Sumption JSC and Lord Collins that the second and third propositions for which *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 stands cannot be supported. A domestic court does not have power to assist a foreign court by doing anything which it could properly have done in a domestic insolvency; and it cannot acquire jurisdiction by virtue of any such power. As to the first proposition, for reasons which I explained in *Rubin v Eurofinance SA* [2013] 1 AC 236, *Cambridge Gas* can, if correct, stand for no more than the proposition that a domestic court should, so far as it can consistently with its own law, recognise a foreign bankruptcy order and deal with identifiable assets within its jurisdiction consistently with the way in which the foreign insolvency would deal with them. In another earlier decision of the Board, *Al Sabah v Grupo Torras SA* [2005] 2 AC 333, para 35, Lord Walker said, aptly in my view, that the Cayman court "might have had some limited inherent power" to act in aid of the Bahaman winding up, but that it could not have the suggested power to set aside a voidable disposition modelled on a section in the Cayman Island bankruptcy legislation governing domestic liquidation which did not in terms apply in relation to a Bahaman winding up.

135 Where I part company with Lord Sumption JSC is in his assertion that the hitherto limited principle of modified universalism which I have just described extends to or justifies (or would be "an empty formula" without) the assumption or exercise of a common law power to "haul" anyone before the court (to use Dillon LJ's word in *Ex p Tucker* [1990] Ch 148), to be interrogated and to produce documentation on pain of being in contempt, simply because it would be useful for the foreign liquidator to be able to do so and might enable him to locate some assets (or better understand the company's affairs). There is a step leap between enforcing rights to identifiable assets and obliging third parties to assist with documentation and information in order to discover a company's assets (or, still more widely, in order to enable insolvency practitioners to understand a company's affairs). Lord Sumption JSC relies in para 23 on the House of Lords' decision in *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133 as illustrating "the capacity of the common law to develop a power in the court to compel the production of information when this is necessary to give effect to a recognised legal principle." But the reference to "a recognised legal principle" begs the question whether the principle of modified universalism extends beyond the protection of identifiable assets within the jurisdiction, to enable orders to be made compelling third parties to assist with the provision of information and documentation which may assist the tracing of such assets (or otherwise assist the insolvency practitioners in their understanding of the company's affairs).

136 Information is a precious commodity, but it is not one which is generally capable of being extracted in court from private individuals

© 2015 The Incorporated Council of Law Reporting for England and Wales

A without special reason; and the potentially intrusive, vexatious and costly nature of the exercise of any power to do so is apparent from the form of the Chief Justice's order in this case. The common law has not hitherto accepted any such jurisdiction. The existence of foreign insolvency proceedings, conducted for the benefit of creditors, does not appear to me to provide any justification for doing so now. The mere fact that insolvency practitioners are, at least in a compulsory liquidation, officers of the foreign court charged B with winding up its affairs seems quite insufficient at common law, though it may be a factor which assists determine the scope of Parliament's likely intention where relevant legislation exists. There are many ordinary creditors, litigants and other persons who would like a facility to gather information to discover or trace assets or to assist them to pursue claims or to conduct their affairs generally. It is unclear what the logic is or would be C for restricting the suggested common law power to foreign insolvencies. However much it may be intended, by using adjectives like "promiscuous", to discourage attempts to bring within this new jurisdiction either domestic insolvencies (if and where no complete common law scheme exists) or situations entirely outside the insolvency context, such attempts seem bound to occur. In the absence of any clear justification for giving insolvency practitioners the unique common law privilege which the JOLs now claim, D such attempts may well be difficult to resist. Although I disagree with it, such attempts can only be encouraged by the statement at the end of para 21 of Lord Sumption JSC's opinion that "The courts have never been as inhibited in their willingness to develop appropriate remedies to require the provision of information when a sufficiently compelling legal policy calls for it."

E 137 In reality, far from displaying uninhibited willingness to develop appropriate remedies requiring the provision of information, courts have in my view been careful to confine such remedies to situations where there is a recognisable legal claim to protect, based either on a title or right to property or on some wrongdoing supported by appropriate evidence. Thus: (i) A court has jurisdiction to protect identifiable property rights, which would include ordering a person shown to be likely to have property belonging to F the company to deliver it up or disclose its whereabouts. (ii) A sustainable case of wrongdoing is the basis for the well-established jurisdiction to order the disclosure of information by or in conjunction with the making of an asset freezing (formerly *Mareva*) order or a search (*Anton Pillar*) order. (iii) The legal principle recognised in *Norwich Pharmacal* is that persons innocently mixed up in wrongdoing could be expected to disclose a limited G amount of information and documentation about it to assist the victims.

138 On this appeal, no case has been advanced under any of these heads. The first could cover the disclosure by an agent of information which he held for, or owed a duty to pass to, his principal. As the transcript extract quoted in para 128 above confirms, no case is advanced on any such basis. Moreover, auditors are not agents, they are independent contractors engaged to review a company's accounts and report in accordance with H statutory and professional requirements—in which connection there has been no suggestion of any failure or shortcoming on PwC's part. The second and third situations depend on evidence of wrongdoing, which has again not been asserted or attempted to be established. The third situation in particular bears no resemblance to the present case, in which it is said that

© 2015 The Incorporated Council of Law Reporting for England and Wales

innocent third parties can be compelled to produce information and documentation, without any allegation or evidence of wrongdoing, on insolvency practitioners showing that this could be useful to enable them to locate assets or better to understand the company's affairs. A

139 It is notable that, even in the context of wrongdoing, the courts have been at pains to emphasise the narrow scope of the *Norwich Pharmacal* jurisdiction. It is "an exceptional one": *Ashworth Hospital Authority v MGN Ltd* [2002] 1 WLR 2033, para 57, per Lord Woolf CJ. It depends on the existence of wrongdoing. The person with information must have been mixed up, however innocently in wrongdoing: *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2014] QB 112. Originally the jurisdiction was confined to discovery of the identity of the wrongdoer: *Ashworth Hospital Authority*, para 26, per Lord Woolf CJ; *Arab Monetary Fund v Hashim (No 5)* [1992] 2 All ER 911, 914, per Hoffmann J, emphasising that it was "no authority for imposing on 'mixed up' third parties a general obligation to give discovery or information when the identity of the defendant is already known." B C

140 More recently, the Divisional Court has said that *Norwich Pharmacal* may extend beyond the discovery of the identity of a wrongdoer or of a "missing piece of the jigsaw", but under the strict caveat that "the action cannot be used for wide ranging discovery or the gathering of evidence and is strictly confined to necessary information": *R (Mohamed) v Secretary of State for Foreign and Commonwealth Affairs (No 1)* [2009] 1 WLR 2579, para 133, cited by the Court of Appeal in *R (Omar) v Secretary of State for Foreign and Commonwealth Affairs* [2011] EWCA Civ 1587 at [4]. D

141 Lord Sumption JSC suggests (para 20) that it will be possible in the present situation to draw a distinction between information which can permissibly be sought and evidence which cannot. At least two problems arise in this connection. First, it is, as I have noted, unclear whether any distinction or limitation is proposed between on the one hand information and documentation relating to assets and on the other hand information and documentation relating more generally to the company's affairs. Any such distinction or limitation seems likely in any event to be in practice illusory. An insolvency practitioner is ultimately only interested in assets and their distribution. Any questioning put, or information or documentation sought, will be scrutinised with a view to identifying assets, in whatever form, even if they only consist of potential claims for maladministration or negligence. E F

142 The second problem is that the distinction between information and evidence seems likely also to be illusory. Evidence is at least confined to the issues in identified litigation, domestic or foreign. In contrast, the proposed relief sought against PwC is completely unconfined, in nature and scope. The later *Omar* case [2014] QB 112 highlights (para 12) a justified scepticism about maintaining a distinction between information and evidence which gives cause for caution about further extension by analogy of the *Norwich Pharmacal* jurisdiction to circumstances where identifiable wrongdoing is not in issue. The Chief Justice's remark in para 80 that "PwC . . . is not an overt target for adverse litigation brought by the JOLs at this stage" was I think also shrewd. Who can doubt that the JOLs would, in their examination both of the working papers and other documents and information disclosed by PwC and in their questioning of the partners and G H

© 2015 The Incorporated Council of Law Reporting for England and Wales

officers attending under an order such as that made by the Chief Justice, have a close eye on the possibility that this might show some possible claim against PwC as auditors? The Chief Justice's ensuing comment that the court should take "a healthily sceptical approach in evaluating the complaints made about the validity and scope of the ex parte orders", because "it seems clear that a combative and sophisticated defensive strategy has been engaged" appears to me in contrast unjustified. The jurisdiction to make or justification for such an order cannot depend on the defensive strategy adopted to resist it.

143 The principle now advanced by the JOLs lacks any substantial authority. The two first instance authorities cited by Lord Sumption JSC in para 24 offer the weakest of encouragement for the novel jurisdiction now proposed. *Moolman v Builders & Developers (Pty) Ltd* [1990] 2 All SA 77 (A) treats the issue as one of applying *In re African Farms* [1906] TS 373, giving as the only reason that information is necessary if the ultimate aim of recovery of assets is to be realised. The court then in fact applied the statutory provisions of the forum on an "as if" basis [1990] 2 All SA 77 (A), sub-paragraph (d) on pp 4–5 and p 16. That I agree with Lord Sumption JSC and Lord Collins is not a sustainable approach.

144 The judgment in *In re Impex Services Worldwide Ltd* [2004] BPIR 564 suggests a breadth of common law power which would again be completely unlimited in its scope, enabling the Manx court "if it thinks fit" to make "an order summoning before it any person whom the court deems capable of giving information concerning the promotion, formation, trade, dealings and affairs or property of the company": para 106(8). Deemster Doyle explained this on the basis that (para 107):

> "Friendly and sophisticated jurisdictions which respect the rule of law and human rights need to be aware that if things go wrong in their jurisdiction and entities in the Isle of Man have information, documentation and evidence in their possession custody control or power that would assist them, then the Manx courts, in a proper case and subject to suitable safeguards and protections where necessary, will offer judicial co-operation and assistance where that is reasonably requested by the judicial authority in that friendly jurisdiction. When the call for help comes the Manx courts will, in proper cases, answer the call positively and provide the necessary co-operation and assistance."

English liquidators were the beneficiary of the far reaching principle thus promulgated, but I cannot accept that it represents English or Bermudan common law. If there might seem to be a hint in the Deemster's phrase "if things go wrong" that the reasoning and order may have been based on wrongdoing, that does not appear to be borne out by the full account of the background and proposed questions given earlier in his judgment. Like the order made by the Chief Justice in the present case, the Deemster's ready acceptance of the scope of the assistance which might be provided as extending to any information about the company's promotion, formation, trade, dealings and affairs or property as well as to evidence once again indicates the difficulty that there could be in keeping this novel power within bounds.

© 2015 The Incorporated Council of Law Reporting for England and Wales

145 Lord Collins's approving dictum in *Rubin v Eurofinance SA* [2013] 1 AC 236, para 33, quoted by Lord Sumption JSC in his para 19, is found in a paragraph listing a series of authorities on modified universalism, in circumstances where there was no examination in argument or in the Board's opinion of differences between them, or between situations where identifiable assets were in issue and other situations. But another dictum of Lord Collins in that case is in my view relevant. At para 129, he said that:

> "The law relating to the enforcement of foreign judgments and the law relating to international insolvency are not areas of law which have in recent times been left to be developed by judge-made law. As Lord Bridge of Harwich put it in relation to a proposed change in the common law rule relating to fraud as a defence to the enforcement of a foreign judgment, 'if the law is now in need of reform, it is for the legislature, not the judiciary, to effect it': *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 489."

That stands in stark contrast with the development of common law powers which the majority on this appeal supports.

146 The description of *In re Impex* [2004] BPIR 564 as a case of "judicial assistance in the traditional sense" can be seen now to be on any view unsustainable, and Lord Sumption JSC himself says (para 24) that he "would not wish to endorse all of the reasoning given" in the judgments in either *Moolman* [1990] All SA 77 (A) or *In re Impex*. He instances "in particular" those parts which appear to support the concept of applying statutory powers by mere analogy. That leaves open—in the context of the JOLs' present case that the Bermudan court can assist the Cayman Islands' liquidation without relying on Bermudan law—how far his approach accepts or disapproves the breadth of the reasoning and orders in *In re Impex* (see the previous paragraph)—or indeed in the present case: see paras 119–120 above. That is another of the unresolved uncertainties about the scope of the proposed new jurisdiction.

147 In these circumstances, and although anything said may be obiter, I am not at present persuaded that it is appropriate to extend the common law power to assist by ordering the provision of information beyond categories which have some recognisable basis in current law, that is cases where there is (a) evidence that the person ordered to provide the information or documentation has property belonging to the insolvent company, or (b) evidence of some wrongdoing by the person so ordered or (c) evidence of some wrongdoing by another person in which the person so ordered was or is innocently mixed up. A general common law power to order the disclosure of information and documentation by, and the questioning of, anyone, either because a foreign liquidator shows that this may assist him identify or recover assets anywhere in the world or, a fortiori, because it would enable him understand the company's affairs, goes not only beyond anything which it is necessary to contemplate on this appeal, but is also beyond anything that I can, as at present advised, regard as permissible or appropriate.

148 I therefore consider that the appeal must be dismissed, because of the negative answer given to the second issue. But I would, if necessary, also have considered that it should be dismissed on the ground that a negative answer should be given on the first issue.

© 2015 The Incorporated Council of Law Reporting for England and Wales

**LORD NEUBERGER OF ABBOTSBURY PSC**

149 I agree with the other members of the Board that we should humbly advise Her Majesty that this appeal should be dismissed. However, there is an issue which divides the members of the Board. It is whether, as Lord Sumption and Lord Clarke of Stone-cum-Ebony JJSC and Lord Collins of Mapesbury consider, the appeal should only be dismissed on the grounds (i) that there is no common law power to apply legislation which applies to domestic insolvencies by analogy to foreign insolvencies, and (ii) that the Bermudan courts should not exercise a common law power ("the Power") described by Lord Sumption JSC in para 25, because, as he explains in paras 29–30, the Cayman Islands courts have no such power, or whether, as Lord Mance JSC concludes, the appeal should also be dismissed on the ground (iii) that the common law power in question does not exist. On that issue, if it is appropriate to decide whether the alleged power exists, I would be in agreement with Lord Mance JSC.

150 As this is a judgment which dissents from the majority view on ground (iii), and there is little which I wish to add to the judgment of Lord Mance JSC, I can express my reasons relatively shortly.

151 It is unnecessary to decide whether the Power exists, because we are all agreed that, even if it does, it should not be exercised. I accept, of course, that we can decide (albeit, at least arguably, strictly only obiter) whether the Power exists. However, as it is not necessary for us to rule on that issue in order to dispose of this appeal, we should, in my opinion, be very cautious of doing so. While judges in a final court of appeal, perhaps particularly in a common law system, should give as much guidance as they can as to the substantive and procedural law in any area, they must always bear in mind the risks inherent in determining issues which do not have to be decided in order to dispose of the case before them.

152 As new problems arise, and as societal values and practices, technological techniques and business practices change, it is inevitable that judges can and should introduce new common law principles or procedures or make alterations to established common law principles and procedures. However, such developments should always be adopted cautiously, not least because, even with the benefit of submissions from advocates and consideration of previous cases, textbooks and articles, the wider implications of any new principle or alteration to an existing principle are very hard to assess. The need for caution in this connection is, in my view, supported by the judicial observations cited by Lord Collins in paras 65–68, although those observations were made in relation to a different aspect of the need for caution.

153 In the present case, there is obvious force in the point that the Board should determine whether the common law power alleged by the liquidators exists, as it is an important issue on which the sooner an authoritative decision is given the better, especially in the light of the somewhat confused state of the law as revealed in the judgments in this case.

154 However, that very confusion underlines the need for caution. The extent of the extra-statutory powers of a common law court to assist foreign liquidators is a very tricky topic on which the Board, the House of Lords and the Supreme Court have not been conspicuously successful in giving clear or consistent guidance: see the judgment of Lord Hoffmann on behalf of the Board in *Cambridge Gas Transportation Corpn v Official Committee of*

© 2015 The Incorporated Council of Law Reporting for England and Wales

A *Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508, all five opinions in the House of Lords in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, and the judgment of Lord Collins of Mapesbury for the majority of the Supreme Court in *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236, discussed by Lord Sumption JSC at paras 16–19, and the judgment of Lord Collins in this case.

155 The message I take from those cases is that, at least in this area, it B would be better for the Board to approach any case in this field with a view to deciding it on a relatively minimalist basis, rather than by seeking to lay down general principles which it is not necessary to determine, particularly when those principles involve extending the court's powers in a way which may have substantial ramifications. While Lord Sumption JSC's explanation of the nature and extent of this alleged common law power appears very attractive, I think it could lead to all sorts of problems and C uncertainties, as is implicit in the qualifications which Lord Sumption JSC makes, at para 25. It is all very well saying that they can be dealt with when they arise, but the fact that it is apparent that there will be problems and complications if the law is developed in a certain way suggests to me that the development should not be adopted unless it is necessary to do so. Accordingly, as it is unnecessary to decide whether the common law power exists, I would have preferred to leave the issue to be decided when it needs D to be—with the benefit of the powerful arguments either way contained in the judgments on this appeal, which, with all respect to counsel, range more widely and deeply than the arguments which the Board heard during the hearing.

156 If, however, it is incumbent on me to express a view, I would conclude, in agreement with Lord Mance JSC, that the alleged common law E power does not exist. He has set out the grounds for that conclusion convincingly, and they include reasons both of principle and of practicality. Accordingly, I do not propose to repeat those reasons, but there are one or two points I would like to emphasise.

157 The extreme version of the "principle of universality", as propounded by Lord Hoffmann in *Cambridge Gas*, has, as Lord Sumption JSC explains, effectively disappeared, principally as a result of the F reasoning of Lord Collins speaking for the majority in *Rubin*, and speaking for the Board in this appeal. However, as with the Cheshire Cat, the principle's deceptively benevolent smile still appears to linger, and it is now invoked to justify the creation of this new common law power. It is almost as if the Board is suggesting that, while we went too far in *Cambridge Gas* and should pull back as indicated in *Rubin*, we do not want to withdraw as G completely as we logically ought. In my view, the logic of the withdrawal from the more extreme version of the principle of universality is that we should not invent a new common law power based on the principle.

158 The limitation of the Power to insolvency cases may be seen by many to be questionable. More specifically, the limitation to liquidations which are being conducted by officers of a foreign court seems to me to be potentially arbitrary. Companies may be in court-imposed liquidation in H many jurisdictions when it is "just and equitable" to wind them up, even if they are solvent: I do not see why liquidators in such a case should be able to invoke the Power when other people running solvent companies could not do so. Further, there is no reason why a statutory regime should not provide

© 2015 The Incorporated Council of Law Reporting for England and Wales

that voluntary liquidations are to be conducted under the aegis of the court, and, if so, the Power would seem to apply in such cases. And the status of administrators in administrations may be unclear in this connection.

**159** The need to make subtle distinctions also concerns me. Thus, the distinction between information and documentation which is obtainable under this power, and "material for use in actual or anticipated litigation", appears very likely to give rise to difficult practical problems. I appreciate that these problems can arise in other circumstances, but that is not a reason for extending the circumstances in which these problems may arise; and, as the facts of this case suggest, I suspect that they are particularly likely to arise in relation to the exercise of the Power. Similarly, the question what is necessary for the performance of a liquidator's functions, which is said to be a prerequisite for the exercise of the Power, seems to be a fertile area for uncertainty and dispute.

**160** More broadly, these distinctions seem to me to embody the sort of requirements one would expect to see in a statutory code rather than in judge-made law. As the judicial observations cited by Lord Collins suggest, judge-made law should be limited to "very modest development[s] . . . of existing principle", and should be made "in small steps" or "within . . . interstitial limits". Although I accept that the United Kingdom courts have been prepared to recognise a new common law right in *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133, the right involved was only exercisable in very specific circumstances where a serious wrong had been committed. I do not consider that that decision alters the fact that the creation of the Power would represent a development in the law which is, as Lord Mance JSC puts it, "radical". It may not seem radical in the sense that it can be said to be a fairly routine feature of the extreme "principle of universality" enunciated by Lord Hoffmann in *Cambridge Gas* [2007] 1 AC 508, but that view is no longer maintainable given that extreme principle has now been rejected by Lord Collins, speaking for the majority of the House of Lords in *Rubin* [2013] 1 AC 236 and for the Board on this appeal.

**161** The contention that judges should not be creating the Power is reinforced when one considers the extent of domestic statutory law and international convention law in the area of international insolvency. Examples of such laws are described and discussed in paras 40–50 of Lord Collins's judgment. In this highly legislated area, I consider that the Power which is said to arise in this case is one which should be bestowed on the court by the legislature, and not arrogated to the court of its own motion.

**162** I acknowledge the force of the arguments the other way, which are so clearly set out by Lord Sumption JSC. However, as already intimated, while I agree with the judgment of Lord Collins and otherwise agree with the judgment of Lord Sumption JSC, I would for my part reject the existence of the Power, if it is appropriate to decide that issue at all.

JILL SUTHERLAND, Barrister

© 2015 The Incorporated Council of Law Reporting for England and Wales

Privy Council

# Stichting Shell Pensioenfonds *v* Krys and another

[On appeal from the Eastern Caribbean Court of Appeal]

## [2014] UKPC 41

2014 Oct 8, 9; Nov 26

Baroness Hale of Richmond DPSC, Lord Clarke of Stone-cum-Ebony, Lord Wilson, Lord Sumption, Lord Toulson JJSC

*Conflict of laws — Jurisdiction — Anti-suit injunction — Dutch creditor obtaining pre-judgment garnishing attachment in Dutch court in respect of assets in Dutch bank account of company incorporated in British Virgin Islands — Company subsequently wound up in British Virgin Islands and liquidators appointed by court — Liquidators obtaining injunction to restrain creditor from prosecuting Dutch proceedings — Whether court precluded from granting anti-suit injunction restraining foreign creditors from bringing proceedings in courts of their own country — Whether necessary to show that creditor had acted vexatiously or oppressively by invoking jurisdiction of foreign court — Whether injunction rightly made*

The defendant, a regulated Dutch pension fund incorporated in The Netherlands, invested large sums in F Ltd, a company incorporated in the British Virgin Islands. F Ltd invested in a scheme controlled by M, who was subsequently convicted of a major fraud. Immediately after M's arrest the defendant obtained a pre-judgment garnishing attachment from a Dutch court over approximately US$71m in F Ltd's account in the Dublin branch of a Dutch bank. About six months later a court in the British Virgin Islands made an order for the winding up of F Ltd and appointed the claimants as liquidators. The claimants applied in the British Virgin Islands for an injunction to restrain the defendant from pursuing the proceedings against F Ltd in The Netherlands. Bannister J refused the application but the Eastern Caribbean Court of Appeal allowed the claimants' appeal and granted the anti-suit injunction.

On the defendant's appeal—

*Held*, advising that the appeal be dismissed, that where an English company was being wound up in England, or a British Virgin Islands company in the British Virgin Islands, all of its assets, including those located within the jurisdiction of foreign courts, were subject to the statutory trusts; that the rights and liabilities of claimants against the assets were the same regardless of their nationality or place of residence; that, where a creditor or member of a company in insolvent liquidation who was amenable to the personal jurisdiction of the court began or continued foreign proceedings which would interfere with the statutory trusts over the company's assets, an injunction would in principle be available to restrain their prosecution, irrespective of the nationality or residence of the creditor or member in question, and there was no principle that such an injunction would not issue so as to prohibit a foreign litigant from resorting to the courts of his own country or some foreign court; that, although as a general rule there was no objection in principle to a creditor invoking the purely adjudicatory jurisdiction of a foreign court provided that it was an appropriate jurisdiction and that litigation there was not vexatious or oppressive to other interested parties, it was in principle inimical to the proper winding up process for a creditor to seek or to enforce an order from a foreign court which would result in his enjoying prior access to any part of the insolvent estate; that, on an application for an injunction to restrain foreign proceedings which were calculated to give a creditor such prior access, it was not necessary to show that the creditor had

© 2015 The Incorporated Council of Law Reporting for England and Wales

acted vexatiously or oppressively by invoking the jurisdiction of the foreign court; that, as with any injunction, the court had a discretion to refuse relief if in the particular circumstances it would not serve the ends of justice; and that, accordingly, although it had not acted vexatiously or oppressively by invoking the jurisdiction of the Dutch court, since (i) the defendant had invested in a company incorporated in the British Virgin Islands and had, as a reasonable investor, to have expected that if that company became insolvent it would be wound up under the law of that jurisdiction, (ii) it had submitted to the jurisdiction of the courts of the British Virgin Islands and thereby to a statutory regime which precluded it from acting so as to prevent the assets subject to the statutory trust from being distributed in accordance with it, and (iii) there was nothing to suggest that allowing the defendant an advantage over other comparable claimants would be consistent with the ends of justice, the Court of Appeal had been entitled to exercise its discretion in the liquidators' favour and its order should stand (post, paras 24–28, 32–35, 38–40, 43, 45).

*In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871, PC and *Mitchell v Carter* [1997] 1 BCLC 673, CA applied.

Dictum of Lord Cranworth LC in *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416, 441, HL(E) explained.

*In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196 not applied.

*Per curiam.* (i) The true principle, which applies to all injunctions and not just anti-suit injunctions in the course of insolvency proceedings, is that the English and British Virgin Islands courts will not as a matter of discretion grant injunctions affecting matters outside their territorial jurisdiction if they are likely to be disregarded or would be "brutum fulmen". Various judicial statements suggesting a wider rule are in reality concerned either with personal jurisdiction over the person sought to be restrained or else with the practical efficacy of the remedy (post, para 34).

(ii) Where the foreign litigant undertakes to bring any assets realised in the foreign proceedings into the bankruptcy so that no advantage would be obtained over other creditors, the basis on which an anti-suit injunction might otherwise be justified will not apply (post, para 40).

The following cases are referred to in the judgment of the Board:

*Akers as a joint foreign representative of Saad Investments Co Ltd v Deputy Comr of Taxation* [2014] FCAFC 57; 311 ALR 167
*Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All ER 537, HL(E)
*Bank of Credit and Commerce International SA, In re* [1992] BCLC 570
*Barclays Bank plc v Homan* [1993] BCLC 680, Hoffmann J and CA
*Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2009] EWCA Civ 632; [2010] Ch 187; [2010] 2 WLR 349; [2009] Bus LR 1663, CA
*Bushby v Munday* (1821) 5 Madd 297
*Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416, HL(E)
*Castanho v Brown & Root (UK) Ltd* [1981] AC 557; [1980] 3 WLR 991; [1981] 1 All ER 143; [1981] 1 Lloyd's Rep 113, HL(E)
*Chapman, In re* (1872) LR 15 Eq 75
*Cole v Cunningham* (1890) 133 US 107
*HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR 852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)
*International Pulp and Paper Co, In re* (1876) 3 Ch D 594
*Kemsley v Barclays Bank plc* [2013] EWHC 1274 (Ch); [2013] BPIR 839
*Liddell's Settlement Trusts, In re* [1936] Ch 365; [1936] 1 All ER 239, CA
*Mitchell v Carter; In re Buckingham International plc* [1997] 1 BCLC 673, CA
*North Carolina Estate Co Ltd, In re* (1889) 5 TLR 328

© 2015 The Incorporated Council of Law Reporting for England and Wales

*Oriental Inland Steam Co, In re; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557
*Robertson, Ex p; In re Morton* (1875) LR 20 Eq 733
*Rubin v Eurofinance SA (Picard intervening)* [2012] UKSC 46; [2013] 1 AC 236; [2012] 3 WLR 1019; [2013] Bus LR 1; [2013] 1 All ER 521; [2013] 1 All ER (Comm) 513; [2012] 2 Lloyd's Rep 615, SC(E)
*Singularis Holdings Ltd v PriceWaterhouseCoopers* [2014] UKPC 36; [2015] 2 WLR 971, PC
*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871; [1987] 3 WLR 59; [1987] 3 All ER 510, PC
*Vocalion (Foreign) Ltd, In re* [1932] 2 Ch 196

The following additional cases were cited in argument:

*Airbus Industrie GIE v Patel* [1999] 1 AC 119; [1998] 2 WLR 686; [1998] 2 All ER 257; [1998] 1 Lloyd's Rep 631, HL(E)
*Deutsche Bank AG v Highland Crusader Offshore Partners LP* [2009] EWCA Civ 725; [2010] 1 WLR 1023; [2010] Bus LR 515; [2009] 2 All ER (Comm) 987; [2009] 2 Lloyd's Rep 617, CA

**APPEAL** from the Eastern Caribbean Court of Appeal

The claimants, Kenneth Krys and Joanna Lau, in their capacity as joint liquidators of the company, Fairfield Sentry Ltd, applied for an anti-suit injunction to restrain the defendant, Stichting Shell Pensioenfonds, from prosecuting ongoing proceedings in The Netherlands against the company. On 9 August 2011 Bannister J sitting in the Commercial Division of the High Court of the British Virgin Islands refused the application.

The claimants appealed. On 17 September 2012 the Eastern Caribbean Court of Appeal (Pereira, Mitchell and Belle JJA) allowed the appeal and made an order restraining the defendant from prosecuting its proceedings against the company in The Netherlands.

The defendant appealed. The issue for the Judicial Committee of the Privy Council was whether, when a company was being wound up in the jurisdiction where it was incorporated, an anti-suit injunction should issue to prohibit a creditor or member of the company from pursuing proceedings in another jurisdiction which are calculated to give him an unjustifiable priority over other creditors or members.

The facts are stated in the judgment.

*Catherine Newman QC* and *Arabella di Iorio* (instructed by *Herbert Smith Freehills LLP*) for the defendant.

Dutch law allows the courts of The Netherlands to grant pre-judgment attachment orders over assets in the jurisdiction or over assets of Dutch debtors. Since the company's choice of banker, Citco, is a Dutch company, the Amsterdam court had jurisdiction to grant attachments over debts owed by Citco to the company. The jurisdiction to garnish or attach does not depend on whether the Dutch court would have prior jurisdiction over the dispute between the person with the prior claim to the asset in the hands of the Dutch third party and the attacher.

The right of a creditor to invoke his right of payment from assets in The Netherlands is not disturbed by a non-recognised foreign bankruptcy. The right of the liquidator to speak for the company does not disturb any such domestic principle. A foreign country such as the British Virgin Islands ("BVI") which has no treaty arrangement with The Netherlands cannot

© 2015 The Incorporated Council of Law Reporting for England and Wales

A expect The Netherlands to abandon its own domestic law in favour of BVI law.

Statutory provisions preventing the continuation of litigation after the opening of an insolvency do not have extra-territorial effect. Before the court of the insolvency injuncts a foreigner from continuing proceedings in a foreign country (a fortiori his own) there must be a submission to the jurisdiction of the insolvency for all purposes or vexatious or oppressive
B conduct. A submission to the BVI court for the purpose of defending the anti-suit injunction application is not a submission for the purpose of bringing a claim in tort governed by the general law and not arising out of the insolvency. Nor was there any vexatious or oppressive conduct on the part of the defendant: *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010] Ch 187. There must be a good reason why the foreign court's
C decision to accept jurisdiction should not be respected: *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196. The natural forum for the litigation must be the domestic court. The company did not contend that the BVI court was the natural forum for the substantive litigation

It cannot be said that the company had no connection with The Netherlands. It had Dutch administrators and a Dutch bank account. The BVI must consider not only its own jurisdiction but also what the natural
D forum is for the resolution of the issues. [Reference was made to *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236.]

The defendant has not submitted to the jurisdiction of the BVI courts for all purposes although it respects the statutory scheme of the BVI liquidation. However, as in England, the statutory scheme of the BVI does not involve any provision which automatically provides for or requires the stay of
E foreign proceedings. The defendant is not amenable to the BVI jurisdiction for the purpose of making claims which are governed by the general law and not specifically governed by insolvency law. The defendant accepts that if the liquidator were to reject its proof, any appeal which it might wish to bring would have to be brought in the court of the insolvency proceedings. But the defendant does not accept that claims under the general law should be brought in the BVI courts.

F The justification for the grant of an anti-suit injunction in the present case cannot be found in contract, in statute or in an aspirational term like "modified universalism". Nor do the ordinary principles of private international law applicable to submission to the jurisdiction provide a route. The law relating to submission to the jurisdiction depends upon the foreigner submitting becoming involved in proceedings in the domestic
G courts to decide the self same issues in a way which is inconsistent with resisting submission to the jurisdiction. That rule does not result in the defendant becoming amenable to BVI jurisdiction for all purposes as a result of attempting to prove. In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733, by contrast, the creditor had accepted a dividend and attended a meeting.

H The BVI courts should not then use the anti-suit injunction simply to create a long-arm jurisdiction over foreigners or general law claims to establish rights where none exist.

There is no injustice to any creditor or redeeming member in permitting the defendant to litigate its claim in the Dutch court. In accepting jurisdiction to determine the defendant's damages claim the Dutch court was

© 2015 The Incorporated Council of Law Reporting for England and Wales

A not exercising a jurisdiction which is exorbitant, oppressive, vexatious or unjust to those interested in the company's estate, nor was it interfering with the due process of the BVI court or the liquidation of the company.

The company has not suggested that it would not get a fair trial in The Netherlands. It was legitimate for the defendant, which is a regulated pension fund established to provide retirement income for Dutch former employees of the Royal Dutch Shell group, to seek, by its substantive B proceedings, to advance its position from that of a member to that of a creditor.

*Paul Girolami QC, Andrew Westwood* and *William Hare* (instructed by *Wragge Lawrence Graham & Co LLP*) for the claimants.

The true issue is whether the Court of Appeal was correct to grant anti-suit relief against the defendant when the object and effect of the Dutch C proceedings, if successful, would be to enable the defendant, by recourse to an asset which it had attached, to make recovery on its claims in priority to and at the expense of other creditors in the compulsory liquidation of the company.

The position in the BVI in respect of the liquidation of a company is the same as that under English law. In England, on the making of an order D winding up a company incorporated in England, all the company's assets, wherever situated, are made subject to a statutory scheme for administration and distribution among the creditors and members in accordance with the Insolvency Act 1986. No creditor should be advantaged or disadvantaged by where the assets happen to be. The core of the scheme is pari passu distribution to all creditors, wherever situated and wherever their claims arise. E

For that purpose "creditor" is widely construed and extends to all manner of claims, including contractual and tortious claims for damages. A foreign creditor is treated no differently from a domestic creditor. Nor is a creditor treated differently because he is in a jurisdiction where more or fewer of the assets or of the creditors are located. The reason for the principal liquidation being considered as having a worldwide reach is that it tends to achieve, so far as possible, the fairest and most effective distribution of all the F company's assets to those entitled to share in them.

The scheme of the BVI legislation and of BVI policy are the same. [Reference was made to the British Virgin Islands Insolvency Act 2003, sections 2, 9, 12, 163, 175 and paragraph 5 of Schedule 3.]

The grounds for granting an anti-suit injunction are not confined to evidence of oppression or vexatiousness. One of the categories of case which G the authorities recognise as potentially justifying the grant of anti-suit relief is where there is a need to protect an insolvent or other estate which the court is in the course of administering; and one of the particular instances recognised as justifying relief in order to afford such protection is where a creditor is taking proceedings to get hold of an asset and thereby gain priority.

H The object and effect of the Dutch proceedings was to obtain priority over other creditors. The asset subject to conservatory attachment is money standing to the credit of a bank account in Dublin. That is an asset located in Ireland. There is no evidence of the company having any assets in The Netherlands. The Dutch proceedings are distinctly not proceedings for the

© 2015 The Incorporated Council of Law Reporting for England and Wales

administration of the company's assets located in The Netherlands for the benefit of the company's creditors as a whole, nor even for the body of its Dutch creditors; they are not proceedings relating to any asset located in The Netherlands at all. The sole basis upon which the Dutch court attached the asset was that Citco as garnishee is present in The Netherlands. Jurisdiction then to determine the substantive claim made by the defendant against the company was founded upon the attachments having been made. Under Dutch law any judgment obtained by the defendant will be enforced against the attached debt in priority to other creditors. The Court of Appeal rightly took the view that the defendant instituted the Dutch proceedings for the purpose of gaining priority. The question is not where there should be determined any underlying dispute as to the company's liability to the defendant, but rather whether the defendant should be able to take the benefit of that priority. [Reference was made to *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416; *In re Chapman* (1872) LR 15 Eq 75; *In re International Pulp and Paper Co* (1876) 3 Ch D 594; *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196 and *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010] Ch 187.]

The BVI court has jurisdiction to restrain a creditor from pursuing such proceedings. [Reference was made to *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557; *In re International Pulp and Paper Co* (1876) 3 Ch D 594; *In re North Carolina Estate Co* (1889) 5 TLR 328; *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 and *Kemsley v Barclays Bank plc* [2013] BPIR 839.]

By submitting a proof in the liquidation of the company the defendant claimed for itself the benefit of, and invoked its rights under, the BVI statutory scheme. Those were rights which would be protected under the BVI scheme. By doing so the defendant was making itself amenable to the jurisdiction of the BVI courts in matters relating to the liquidation of the company. It is the act of proof which is significant for the purposes of submission to the jurisdiction. A benefit need not have been received. [Reference was made to *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733 and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236.] There is no reason why the same principle should not apply to BVI law.

By supporting the decision of Bannister J which proceeded on the basis that the defendant was amenable to the jurisdiction of the BVI courts for present purposes, the defendant voluntarily recognised that the BVI courts had jurisdiction to hear and determine the application for an anti-suit injunction on the merits. In the circumstances the defendant is precluded from thereafter objecting to the court exercising its jurisdiction.

No considerations of comity apply to inhibit the grant of an anti-suit injunction and in all the circumstances the Court of Appeal was correct to restrain the defendant from pursuing the Dutch proceedings.

*Newman QC* replied.

26 November 2014. **LORD SUMPTION** and **LORD TOULSON JJSC** handed down the following judgment of the Board.

1 The question at issue on this appeal is whether, when a company is being wound up in the jurisdiction where it is incorporated, an anti-suit injunction should issue to prevent a creditor or member from pursuing

© 2015 The Incorporated Council of Law Reporting for England and Wales

proceedings in another jurisdiction which are calculated to give him an unjustifiable priority. This question falls to be decided under the law of the British Virgin Islands, which is not identical to the law of the United Kingdom, because of differences in their respective insolvency legislation. But for the purpose of the present issue, the laws of the two jurisdictions can be treated as the same.

*Bernard L Madoff Investment Securities LLC and Fairfield Sentry Ltd*

**2** Bernard L Madoff Investment Securities LLC ("BLMIS"), was a New York-based fund manager controlled by the eponymous Bernard Madoff. Although not all of the facts are yet known, it appears that over a period of at least 17 years he operated what was probably the largest Ponzi scheme in history, accepting sums variously estimated between $17 billion and $50 billion for investment. From at least the early 1990s there appear to have been no trades and no investments. Reports and returns to investors were fictitious and the corresponding documentation fabricated. On 11 December 2008, Mr Madoff was arrested, and in March 2009 pleaded guilty to a number of counts of fraud.

**3** Funds for investment were commonly entrusted to BLMIS by "feeder funds", of which the largest was Fairfield Sentry Ltd, the company whose winding up has given rise to this appeal. Fairfield Sentry is incorporated as a mutual fund in the British Virgin Islands. Its liquidators have stated that as at 31 October 2008 about 95% of its assets, amounting to some US$7·2 billion, were placed with BLMIS. Investors participated indirectly in these placements by acquiring shares in Fairfield Sentry at a price dependent on the net asset value per share published from time to time by the directors. Investors were entitled to withdraw funds by redeeming their shares under the provisions of the fund's articles of association, also at a price based on the published NAV per share. The information provided to investors was contained in a private placement memorandum, which made it clear that funds subscribed for shares would be placed for investment with BLMIS, and described in general terms the way that the scheme was supposed to work.

**4** Fairfield Sentry's business involved the use of a number of intermediaries. For present purposes three of them may be mentioned. Fairfield Greenwich Ltd was a Cayman-incorporated associate which acted as its investment manager. Dealings with investors were handled by Citco Fund Services (Europe) BV, a company incorporated in the Netherlands which served as Fairfield Sentry's administrative agent. Citco Bank Nederland BV, an associated company of Citco Fund Services, is a Dutch bank which acted as Fairfield Sentry's asset custodian under its agreements with subscribers. Citco Bank Nederland had a branch in Dublin. It maintained an account in the name of Fairfield Sentry in which substantial cash balances were held.

**5** The appellant, Stichting Shell Pensioenfonds, which we shall call "Shell", is a Dutch pension fund incorporated and with its seat in the Netherlands. Between 2003 and 2006, it subscribed US$45m for 46,708·1304 Fairfield Sentry shares, under five successive subscription agreements. These agreements were governed by New York law and contained submissions to the exclusive jurisdiction of the New York courts. Before the first of its placements, Shell obtained a side-letter dated 26 March

© 2015 The Incorporated Council of Law Reporting for England and Wales

A 2003 from Fairfield Sentry and its parent company Fairfield Greenwich Ltd containing various warranties, including a warranty that the contents of the private placement memorandum were correct and complete.

*The Dutch proceedings*

**6** On 12 December 2008, the day after Mr Madoff's arrest, Shell applied to redeem its shares. However, no redemption payment was B received and, six days later on 18 December, the directors of Fairfield Sentry suspended determinations of its Net Asset Value per share, thereby in practice bringing redemptions to an end.

**7** On 22 December 2008 Shell applied in the Amsterdam District Court for permission to obtain a pre-judgment garnishment or conservatory attachment over all assets of Fairfield Sentry held by Citco Bank up to a value C of US$80m, including any credit balance on its account with Citco Bank's Dublin branch. An order in those terms was made on the following day, 23 December 2008. In accordance with that order, attachments were made on 23 December 2008, 21 January 2009 and 16 March 2010 of sums in the Dublin account totalling about US$71m. It is common ground that no other assets of Fairfield Sentry are subject to the Dutch attachments. The initial D application for authority to attach was made ex parte. However, Fairfield Sentry was entitled to apply inter partes to lift the attachment and did so. The application was rejected by the District Court of Amsterdam on 16 February 2011.

**8** The effect of the attachments as a matter of Dutch law was the subject of argument in related proceedings in the Netherlands and of evidence in other related proceedings in Ireland. The parties are substantially agreed E about it. Three points should be noted:

(1) Where the asset attached is a debt, the fact that the debtor (in this case Citco Bank Nederland) is amenable to the jurisdiction of the Dutch courts is a sufficient basis on which to establish the jurisdiction of the Dutch courts to hear the substantive claim. Fairfield Sentry being resident outside the European Union, it is the only basis of jurisdiction available in the present F case. It was a term of the court's permission to attach assets of Fairfield Sentry that Shell should begin proceedings in support of its substantive claim within four months.

(2) The attachments do not, as a matter of Dutch law, create any kind of proprietary interest in the balances on the Dublin account. But they purport to conserve the funds in the account so that they will be available to satisfy any judgment which may be obtained against Fairfield Sentry in due course. G Subject to any relevant period of limitation, it would be open to any other person with claims against Fairfield Sentry to take the same course as Shell has done, and apply in the Dutch courts to attach its assets in the hands of Citco Bank. Where there is more than one judgment creditor with attachments over the same assets, the funds attached will then be shared between them.

H (3) In principle a claimant is entitled as of right to attach assets in support of an arguable claim, subject only to the reservation that an attachment will not be authorised if the substantive claim is unarguable or the attachment would put the garnishee at risk of having to pay twice. However, except in cases governed by the insolvency legislation of the European Union, the fact that the debtor is in liquidation elsewhere and that the attachment will

© 2015 The Incorporated Council of Law Reporting for England and Wales

prevent its assets from being distributed pari passu, is regarded as irrelevant to the exercise of the power to authorise an attachment. In rejecting Fairfield Sentry's challenge to the attachment order, the District Court of Amsterdam explained that Dutch law does not treat a foreign insolvency, even where it is proceeding in the jurisdiction of incorporation, as applying to assets located in the Netherlands. A

9 The four-month deadline for the commencement of proceedings on Shell's substantive claim was extended several times, and the proceedings were ultimately commenced within the extended time on 19 March 2010. The principal claim made was for US$45m damages for the alleged breaches of the representation and warranties contained in the side-letter of 26 March 2003. The present status of the Dutch proceedings is that they have been left to lie on the file pending the final resolution of the injunction proceedings in the BVI. B C

*The winding up proceedings*

10 On 21 July 2009, Fairfield Sentry was ordered by the High Court of the British Virgin Islands to be wound up and Mr Kenneth Krys and Ms Joanna Lau were appointed as its joint liquidators. There are broadly speaking three categories of claimant or potential claimant in the BVI liquidation. First, there are what one can loosely call trade creditors, unpaid suppliers of goods or services. The Board was told that the value of their claims was small. Second, there are redemption claims, from shareholders in Fairfield Sentry who submitted redemption notices before the determination of its NAV per share was suspended on 18 December 2008. The Board understands that there are persons claiming to fall within this category. However, on 14 August 2014 Bannister J in the High Court directed that subject to any contrary order of the court the assets should be distributed on the footing that no outstanding redemption moneys were due to any member or former member of Fairfield Sentry. Third, there are shareholders entitled to share in any surplus. Somewhat unusually, therefore, it is likely that by far the greater part of the recoveries made by the liquidators will be distributed to shareholders in Fairfield Sentry. No one, however, suggests that these distributions will represent more than a small part of the losses that they will have suffered by investing in the company. D E F

11 On 5 November 2009, Shell submitted a proof of debt in the liquidation for US$63,045,616·18. This amount was said to represent the redemption price of Shell's shares, calculated by reference to the NAV per share published by the directors of Sentry at 31 October 2008. It was claimed as a debt due under Shell's redemption notice of 12 December 2008. The joint liquidators rejected Shell's proof on 21 August 2014, as a result of Bannister J's direction of 14 August, subject to Shell's right if it objected to the assets being distributed in accordance with that direction to put forward its objection in writing by 17 October 2014. The Board was told that some other members claiming to be entitled to redeem have objected, and their objections will be heard by the BVI court later this year. But Shell has not objected, and the position at the time of the hearing of this appeal was that it was not intending to do so. G H

12 Manifestly, the effect of the attachments is that if Shell succeeds in its claim in the Dutch courts, it is likely to be able to satisfy its judgment-debt in full out of Fairfield Sentry's balance in the Dublin account, whereas others

© 2015 The Incorporated Council of Law Reporting for England and Wales

who have claims in the liquidation ranking with or ahead of theirs may recover only a dividend. Shell says that it would have been open to other claimants to obtain attachments through the Dutch courts against the Dublin account in support of their own claims against Fairfield Sentry. If that had happened, there would have to be a kind of mini-liquidation in the Netherlands in which Shell might or might not fare better than comparable claimants in the liquidation. Shell also says that if it had proved for its damages claim (as it was and remains entitled to do), it would arguably be entitled to rank as a creditor ahead of other members and might have recovered in full anyway. These conjectural possibilities depend on questions that are not before the Board, and for present purposes can be ignored. Miss Newman QC, who appeared for Shell, candidly acknowledged, as she did below, that the real purpose of the Dutch attachments is to obtain priority which Shell would not, or not necessarily get in the liquidation. The issue on this appeal is whether Shell was in principle entitled to do that, and if not whether an injunction can issue to stop it.

13 On 8 March 2011, shortly after the District Court of Amsterdam rejected Fairfield Sentry's challenge to the attachments, the joint liquidators applied in the High Court of the British Virgin Islands for an anti-suit injunction restraining Shell from prosecuting its proceedings in the Netherlands and requiring it to take all necessary steps to procure the release of the attachments. The application was heard inter partes by Bannister J in July 2011, who rejected it in a judgment delivered on 9 August. His main reason, in summary, was that as a matter of principle the BVI court would not prevent a foreign creditor from resorting to his own courts, even if he was amenable to the BVI court's jurisdiction. The Court of Appeal allowed the appeal and made an order in substantially the terms which the joint liquidators had asked for in their notice of appeal. The order restrained Shell from taking any further steps in the existing Dutch proceedings against Fairfield Sentry or commencing new ones, but did not refer in terms to the attachments. The Court of Appeal's reasons, in summary, were (i) that Shell was subject to the personal jurisdiction of the BVI court by virtue of having lodged a proof in the liquidation, (ii) the assertion by the Dutch courts of a jurisdiction to attach assets on the sole ground that it consisted in a debt owed to the insolvent company by a Dutch entity was exorbitant; and (iii) Shell should not be allowed to avail itself of that jurisdiction so as to gain a priority to which it was not entitled under the statutory rules of distribution applying in the British Virgin Islands.

*Anti-suit injunctions in insolvency cases*

14 In the British Virgin Islands, as in England, the making of an order to wind up a company divests it of the beneficial ownership of its assets, and subjects them to a statutory trust for their distribution in accordance with the rules of distribution provided for by statute: *Ayerst v C & K (Construction) Ltd* [1976] AC 167. In the case of a winding up of a BVI company in the BVI, this applies not just to assets located within the jurisdiction of the winding up court, but all assets world-wide. In England, this follows from the unqualified terms of section 144(1) of the Insolvency Act 1986. In the British Virgin Islands, it is provided for in terms by section 175(1) of the Insolvency Act 2003, combined with the inclusive definition of "asset" in section 2(1) ("every description of property, wherever

© 2015 The Incorporated Council of Law Reporting for England and Wales

situated"). It reflects the ordinary principle of private international law that only the jurisdiction of a person's domicile can effect a universal succession to its assets. They will fall to be distributed in the BVI liquidation pari passu among unsecured creditors and, to the extent of any surplus, among its members. A

15 This necessarily excludes a purely territorial approach in which each country is regarded as determining according to its own law the distribution of the assets of an insolvent company located within its territorial jurisdiction. The lex situs is of course relevant to the question what assets are truly part of the insolvent estate. It will generally determine whether the company had at the relevant time a proprietary interest in an asset, and if so what kind of interest. Thus, if execution is levied on an asset of the company within the territorial jurisdiction of a foreign court before the company is wound up, it will no longer be regarded by the winding up court as part of the insolvent estate. But short of a transfer of a proprietary interest in the asset prior to the winding up order, it is generally for the law of that jurisdiction to determine the distribution of the company's assets among its creditors and members, at any rate where the company is being wound up in the jurisdiction of its incorporation. In England and the BVI the court may, and commonly does, assert dominion over the local assets of an insolvent foreign company by conducting an ancillary winding up. But it does so in support of the principal winding up, and so far as it can in such a way as to ensure that creditors and members are treated equally regardless of the location of the assets. It does not seek to ring-fence local assets or local creditors. As Sir Nicolas Browne-Wilkinson V-C put it in *In re Bank of Credit and Commerce International SA* [1992] BCLC 570, 577: B C D

> "The attempt to put a ring fence around either the assets or the creditors to be found in any one jurisdiction is, at least under English law as I understand it, not correct, and destined to failure. I believe the position will prove to be the same in most other countries and jurisdictions." E

16 In the present case the attachments were obtained some six months before the company was ordered to be wound up in the British Virgin Islands. Therefore at the time that they were obtained there could have been no inconsistency with the law of the British Virgin Islands. If the effect of the attachments as a matter of Dutch law had been to charge the assets attached or otherwise transfer a proprietary interest in them to Shell, and if that were held to be effective in relation to an asset situated in Ireland, the interest thus created would have ranked prior to the statutory trust created on the winding up order and there would be no basis for an anti-suit injunction. It is, however, common ground that no alteration in the proprietary interests in the Dublin balance was effected at the time of the attachments and that no right to execute against the balance had yet arisen. Any proprietary interest which might come into existence in future on execution being levied against it would in the eyes of BVI law be postponed to the administration of the statutory trust. It must follow that since the date of the winding up order, 21 July 2009, the attachments, which exist only for the purpose of enabling property in the Dublin balance to be transferred to Shell if and when it recovers judgment in the Dutch proceedings, have been directly inconsistent F G H

© 2015 The Incorporated Council of Law Reporting for England and Wales

with the mandatory statutory scheme resulting from the winding up order in the British Virgin Islands.

17 The fundamental principle applicable to all anti-suit injunctions was stated at the outset of the history of this branch of jurisprudence by Leach V-C in *Bushby v Munday* (1821) 5 Madd 297, 307. The court does not purport to interfere with any foreign court, but may act personally on a defendant by restraining him from commencing or continuing proceedings in a foreign court where the ends of justice require.

18 The "ends of justice" is a deliberately imprecise expression. It encompasses a number of distinct legal policies whose application will vary with the subject matter and the circumstances. In *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416, Lord Cranworth LC (at pp 437–439) identified three categories of case which, without necessarily being comprehensive or mutually exclusive, have served generations of judges as tools of analysis. The first comprised cases of simultaneous proceedings in England and abroad on the same subject matter. If a party to litigation in England, where complete justice could be done, began proceedings abroad on the same subject matter, the court might restrain him on the ground that his conduct was a "vexatious harassing of the opposite party". The second category comprised cases in which foreign proceedings were being brought in an inappropriate forum to resolve questions which could more naturally and conveniently be resolved in England. Proceedings of this kind were vexatious in a larger sense. The court restrained them "on principles of convenience, to prevent litigation, which it has considered to be either unnecessary, and therefore vexatious, or else ill-adapted to secure complete justice". Third, there are cases which do not turn on the vexatious character of the foreign litigant's conduct, nor on the relative convenience of litigation in two alternative jurisdictions, in which foreign proceedings are restrained because they are "contrary to equity and good conscience". It is with this third category that the House of Lords was concerned. The appeal arose out of the administration by the English court of the insolvent estate of a deceased who appears to have been domiciled in England. The estate comprised property in both England and Scotland. The Carron Iron Co, which had claims against the estate, brought proceedings against the executors in Scotland, in which they obtained letters of arrestment. These attached the deceased's Scottish property and would have resulted in the application of that property to the satisfaction of their own claim in priority to claims in the liquidation. The House of Lords by a majority (Lord Cranworth LC and Lord Brougham, Lord St Leonards dissenting) refused an injunction to restrain the Scottish proceedings on the ground that the company was not amenable to the personal jurisdiction of the English court. The Board will return to that question below. But all three members of the House agreed on the principle on which such an injunction would issue if personal jurisdiction had existed. Lord Cranworth LC said, at p 440:

> "In general, after a decree under which the creditors of a testator may come in and obtain payment of their demands, the court does not permit a creditor to institute proceedings for himself. The decree is said to be a judgment, or in the nature of a judgment, for all the creditors. The court takes possession of the assets, and distributes them rateably, on principles

© 2015 The Incorporated Council of Law Reporting for England and Wales

> of equality, giving, however, due effect to any legal rights of preference which any one creditor may possess. To allow a creditor, after such a decree, to institute proceedings for himself, would give rise to great inconvenience and injustice: it would disturb the general principle of equal distribution which the court is always anxious to enforce, and would leave the executors exposed to actions after the assets have been taken out of their hands. Of the general justice, therefore, of the rule on which the court acts, no doubt can, I think, be entertained."

The basis of this conclusion, as the reasoning of all three members of the House shows, is that the court has an equitable jurisdiction to restrain the acts of persons amenable to the court's jurisdiction which was calculated to violate the statutory scheme of distribution.

19 The principle thus stated has been applied on a number of occasions. In *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557, a creditor proved in the liquidation of the Oriental Inland Steam Co in England but attempted to obtain priority to other creditors by attaching property of the company in India. He was restrained by injunction from proceeding in India, but obtained the value of his debt from the liquidator in return for lifting the attachment, without prejudice to the question whether he should be allowed to retain it. The Court of Appeal affirmed an order of Malins V-C requiring him to repay it. James LJ said, at p 559:

> "All the assets there would be liable to be torn to pieces by creditors there, notwithstanding the winding up, and there would be an utter incapacity of the courts there to proceed to effect an equitable distribution of them. The English Act of Parliament has enacted that in the case of a winding up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way . . . One creditor has, by means of an execution abroad, been able to obtain possession of part of those assets. The Vice-Chancellor was of opinion that this was the same as that of one cestui que trust getting possession of the trust property after the property had been affected with notice of the trust. If so, that cestui que trust must bring it in for distribution among the other cestuis que trust . So I, too, am of opinion, that these creditors cannot get any priority over their fellow-creditors by reason of their having got possession of the assets in this way. The assets must be distributed in *England* upon the footing of equality."

20 In *In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, Chitty J applied the same principle, observing that:

> "Under the Companies Act of 1862 it was clear that after a winding up order the assets of the company were to be collected and applied in discharge of its liabilities, and that the assets were fixed by the Act of Parliament with a trust for equal distribution among creditors (*In re Oriental Inland Steam Co* LR 9 Ch App 557, 559; *In re Vron Colliery Co* (1882) LR 20 Ch D 442). No creditor, therefore, could be allowed, by taking proceedings at his own will and pleasure, to destroy, waste, or

© 2015 The Incorporated Council of Law Reporting for England and Wales

impair assets which were subjected to a trust for the general benefit of all creditors alike."

**21** In *Mitchell v Carter* [1997] 1 BCLC 673, Millett LJ referred to the jurisdiction as well established. He said, at p 687:

> "a creditor who successfully completes a foreign execution is able to gain priority over the unsecured creditors. To prevent this, the English court has jurisdiction to restrain creditors from bringing or continuing the foreign execution process . . ."

**22** In the United States, the Supreme Court has independently arrived at the same position and recognised the right of the state of an insolvent's domicile to restrain proceedings in another state designed to obtain a more favourable distribution of the assets, notwithstanding the constitutional duty of each state to give full faith and credit to judicial proceedings in every other state: *Cole v Cunningham* (1890) 133 US 107. As Fuller CJ observed, delivering the opinion of the court, at p 122:

> "At the time of these proceedings, as for many years before, the Commonwealth of Massachusetts had an elaborate system of insolvent laws, designed to secure the equal distribution of the property of its debtors among their creditors. Under these insolvent laws, all preferences were avoided and all attachments in favour of particular creditors dissolved. The transfer of the debtor's property to his assignees in insolvency extended to all his property and assets, wherever situated. This was expressly provided as to such as might be outside the state . . . Nothing can be plainer than that the act of Butler, Hayden & Co in causing the property of the insolvent debtors to be attached in a foreign jurisdiction tended directly to defeat the operation of the insolvent law in its most essential features, and it is not easy to understand why such acts could not be restrained within the practice to which we have referred."

The court regarded this, as the English courts do, as the enforcement of an equitable right: see p 116.

**23** The leading modern case on the jurisdiction to restrain foreign proceedings is *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871. This was an alternative forum case, in which the Judicial Committee, sitting on appeal from Brunei, granted an injunction restraining proceedings in Texas on the ground that Texas was not the appropriate forum and the proceedings there were oppressive. Lord Goff of Chieveley, delivering the advice of the Board, pointed out that the insolvency cases proceeded on a different principle, which was based not on protecting litigants against vexation or oppression, but on the protection of the court's jurisdiction to do equity between claimants to an insolvent estate. At pp 892–893, he observed:

> "The decided cases, stretching back over a hundred years and more, provide however a useful source of experience from which guidance may be drawn. They show, moreover, judges seeking to apply the fundamental principles in certain categories of case, while at the same time never asserting that the jurisdiction is to be confined to those categories. Their Lordships were helpfully taken through many of the authorities by counsel in the present case. One such category of case

© 2015 The Incorporated Council of Law Reporting for England and Wales

> arises where an estate is being administered in this country, or a petition in bankruptcy has been presented in this country, or winding up proceedings have been commenced here, and an injunction is granted to restrain a person from seeking, by foreign proceedings, to obtain the sole benefit of certain foreign assets. In such cases, it may be said that the purpose of the injunction is to protect the jurisdiction of the English court . . . Another important category of case in which injunctions may be granted is where the plaintiff has commenced proceedings against the defendant in respect of the same subject matter both in this country and overseas, and the defendant has asked the English court to compel the plaintiff to elect in which country he shall alone proceed. In such cases, there is authority that the court will only restrain the plaintiff from pursuing the foreign proceedings if the pursuit of such proceedings is regarded as vexatious or oppressive: see *McHenry v Lewis* (1882) 22 Ch D 397 and *Peruvian Guano Co v Bockwoldt* (1883) 23 Ch D 225."

It is clear from Lord Goff's formulation that he was making the same distinction as Lord Cranworth made in the *Carron Iron* case between cases such as the insolvency cases, in which there is an equitable jurisdiction to enforce the statutory scheme of distribution according to its terms, and cases in which the court intervenes on the ground of vexation or oppression.

**24** The conduct of a creditor or member in invoking the jurisdiction of a foreign court so as to obtain prior access to the insolvent estate may well be vexatious or oppressive, in which case an injunction may be justified on that ground. An example is provided by the decision of the English Court of Appeal in *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010] Ch 187, where a creditor used a foreign attachment order in a manner which the court regarded as amounting to sharp practice. However, vexation and oppression are not a necessary part of the test for the exercise of the court's jurisdiction to grant an anti-suit injunction in a case where foreign proceedings are calculated to give the litigant prior access to assets subject to the statutory trust. In the Board's opinion there are powerful reasons of principle why this should be so. The whole concept of vexation or oppression as a ground for intervention, is directed to the protection of a litigant who is being vexed or oppressed by his opponent. Where a company is being wound up in the jurisdiction of its incorporation, other interests are engaged. The court acts not in interest of any particular creditor or member, but in that of the general body of creditors and members. Moreover, as the Board has recently observed in *Singularis Holdings Ltd v PriceWaterhouseCoopers* [2015] 2 WLR 971, para 23, there is a broader public interest in the ability of a court exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a worldwide basis, notwithstanding the territorial limits of its jurisdiction. In protecting its insolvency jurisdiction, to adopt Lord Goff's phrase, the court is not standing on its dignity. It intervenes because the proper distribution of the company's assets depends on its ability to get in those assets so that comparable claims to them may be dealt with fairly in accordance with a common set of rules applying equally to all of them. There is no jurisdiction other than that of the insolvent's domicile in which that result can be achieved. The alternative is a free-for-all in which the distribution of assets depends on the adventitious location of assets and the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A race to grab them is to the swiftest, and the best informed, best resourced or best lawyered.

**25** The Board is not prepared to say that Shell acted vexatiously or oppressively by invoking the jurisdiction of the Dutch courts, but for the reasons that it has given, this does not prevent the issue of an anti-suit injunction.

B **26** It does not, however, follow that an injunction must issue. There are at least two matters to be considered before that step can be justified. The first is whether Shell, as a foreign entity, is amenable to the court's jurisdiction. The second is whether, even on the footing that an anti-suit injunction is available in principle, it is right to make one as a matter of discretion. To those questions the Board will now turn.

C *Jurisdiction*

**27** As Chitty J pointed out in *In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, it necessarily follows from the fact that the court acts in personam against the foreign litigant, that the latter must be must be amenable to its personal jurisdiction. He must be present within the jurisdiction or amenable to being served with the proceedings out of the D jurisdiction, or else he must have submitted voluntarily.

**28** Subject to a reservation to which the Board will return, Miss Newman accepted that her clients had submitted to the jurisdiction of the BVI courts for the purpose of being amenable to an anti-suit injunction, by participating unconditionally in the injunction proceedings. Mr Girolami QC said that they had submitted not just by doing that but also by proving for the debt alleged to arise under their redemption notice of 12 December 2008. In E common with the Court of Appeal, the Board considers that Shell submitted in both ways. The Board will deal first with the consequences of the lodging of a proof of debt, about which the parties are fundamentally at odds, before turning to Miss Newman's reservation about the effect of participating in the injunction proceedings.

**29** In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733, a Scottish F merchant proved in the bankruptcy of his debtor for a debt of £367 and recovered a dividend without bringing into account £120 which he had obtained from the insolvent estate separately. He was held to be subject to the jurisdiction of the court in proceedings to recover the £120 for the benefit of the estate. Bacon CJ observed, at pp 737–738:

> "what is the consequence of creditors coming in under a liquidation or G bankruptcy? They come in under what is as much a compact as if each of them had signed and sealed and sworn to the terms of it—that the bankrupt's estate shall be duly administered among the creditors. That being so, the administration of the estate is cast on the court, and the court has jurisdiction to decide all questions of whatever kind, whether of law, fact, or whatever else the court may think necessary in order to effect complete distribution of the bankrupt's estate . . . can there be any doubt H that the appellant in this case has agreed, as far as he is concerned . . . the law of bankruptcy shall take effect as to him, and under this jurisdiction, to which he is not only subjected, but under which he has become an active party, and of which he has taken the benefit . . . [The appellant] is as much bound to perform the conditions of the compact, and to submit

© 2015 The Incorporated Council of Law Reporting for England and Wales

A to the jurisdiction of the court, as if he had never been out of the limits of *England*."

30 This was a case where the creditor had actually received a dividend. However, in *Akers as a joint foreign representative of Saad Investments Co Ltd v Deputy Comr of Taxation* (2014) 311 ALR 167, where no dividend had been received, the Full Court of the Federal Court of Australia held that in *Ex p Robertson* the submission consisted in the lodging of the proof and not the receipt of the dividend. Accordingly, at para 165: B

"formal submission of a proof of debt to the insolvency administration will generally be adequate to support a conclusion that the court supervising the administration thereafter has jurisdiction to make orders in matters connected with the administration against the creditor who has proved." C

The same view was taken by the Supreme Court in *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236. Lord Collins of Mapesbury (with whom on this point the rest of the court agreed) held at paras 165, 167, citing *Ex p Robertson*, that there was:

"no doubt that orders may be made against a foreign creditor who proves in an English liquidation or bankruptcy on the footing that by proving the foreign creditor submits to the jurisdiction of the English court . . . having chosen to submit to New Cap's Australian insolvency proceeding, the syndicate should be taken to have submitted to the jurisdiction of the Australian court responsible for the supervision of that proceeding. It should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding." D E

31 It has been suggested by Professor Briggs in a recent lecture in Singapore (*New Developments in Private International Law: A Busy 12 Months for the Supreme Court*, 21 November 2013) that this conclusion was "astonishing" because no proof had been admitted and no dividend had been paid. Miss Newman, adopting this criticism, submitted that Lord Collins was wrong on this point. The Board is satisfied that his statement was correct. The present case is not properly speaking a case of election, like those in which a party must elect between two mutually inconsistent remedies. In such cases he is usually not taken to elect until he has actually obtained one of the remedies. The question here is not what remedy is Shell entitled to have, but whether it has submitted to the jurisdiction of the court. A submission may consist in any procedural step consistent only with acceptance of the rules under which the court operates. These rules may expose the party submitting to consequences which extend well beyond the matters with which the relevant procedural step was concerned, as when the commencement of proceedings is followed by a counterclaim. In the present case the defendant lodged a proof. It cannot make any difference to the character of that act whether the proof is subsequently admitted or a dividend paid, any more than it makes a difference to the submission implicit in beginning an ordinary action whether it ultimately succeeds. This result is neither unjust nor contrary to principle, for by submitting a proof the creditor obtains an immediate benefit consisting in the right to have his claim considered by the liquidator and ultimately by the court according to its F G H

© 2015 The Incorporated Council of Law Reporting for England and Wales

merits and satisfied according to the rules of distribution if it is admitted. The Board would accept that the submission of a proof for claim A does not in itself preclude the creditor from taking proceedings outside the liquidation on claim B. But what he may not do is take any step outside the liquidation which will get him direct access to the insolvent's assets in priority to other creditors. This is because by proving for claim A, he has submitted to a statutory scheme for the distribution of those assets pari passu in satisfaction of his claim and those of other claimants.

32 Turning to Miss Newman's reservation, the argument was that Shell had not submitted to the jurisdiction of the BVI courts for all purposes. In particular, it was said to have submitted only for the purpose of claims under the Insolvency Act and Rules, and not for the purpose of claims governed by the general law, such as its claim in the Netherlands for misrepresentation and breach of warranty. This, it was said, was because the BVI courts have no subject matter jurisdiction over the damages claim that is being asserted in the Netherlands. The Board has no hesitation in rejecting this contention. It has no bearing on the question whether Shell submitted by participating in the injunction proceedings, because that submission necessarily involved an acceptance on its part of the court's jurisdiction to grant the injunction sought in those proceedings. The point appears to the Board to be equally irrelevant to the question whether Shell submitted by lodging a proof of debt for the redemption price. Liquidation is a mode of collective enforcement of claims arising under the general law. There is, in the present context, no relevant difference between the claim for which Shell proved (a debt arising from its redemption notice) and the claim for which it did not prove but which it has put forward in the Dutch proceedings (damages for misrepresentation and breach of warranty). They both arise under the general law. They are both capable of being proved in the liquidation. If they are proved, the BVI courts will have subject matter jurisdiction to adjudicate on them. And so far as they submitted by proving for anything in the liquidation, Shell submitted to a statutory regime which precluded it from acting so as to prevent the assets subject to the statutory trust from being distributed in accordance with it.

*Application to foreign litigants*

33 Against that background, the Board turns to Miss Newman's main point, which was that even on the footing that Shell submitted to the jurisdiction of the BVI court, that was not enough to make it amenable to an anti-suit injunction. This, she contended, was because there was a distinct principle that an anti-suit injunction will not issue so as to prevent a foreign litigant from resorting to the courts of his own country (or at any rate some foreign court).

34 In the Board's opinion, there is no such principle. Where an English company is being wound up in England or a BVI company in the BVI, all of its assets are subject to the statutory trusts including those which are located within the jurisdiction of foreign courts. The rights and liabilities of claimants against the assets are the same regardless of their nationality or place of residence. A distinction between foreign and English claimants would respond to no principle known to the law. The true principle, which applies to all injunctions and not just anti-suit injunctions in the course of insolvency proceedings, is that the English and BVI courts will not as a

© 2015 The Incorporated Council of Law Reporting for England and Wales

matter of discretion grant injunctions affecting matters outside their territorial jurisdiction if they are likely to be disregarded or would be, as the colourful phrase went, "brutum fulmen". With one exception, to which the Board will return, the various judicial statements suggesting a wider rule are in reality concerned either with personal jurisdiction over the person sought to be restrained or else with the practical efficacy of the remedy. A

**35** In the *Carron Iron* case 5 HL Cas 416 Lord Cranworth LC, having set out the principles on which the court acts, continued, at p 441: B

> "the first question is, whether there is any rule or principle of the Court of Chancery which, after a decree for administering a testator's assets, would induce it to interfere with a foreign creditor resident abroad, suing for his debt in the courts of his own country? Certainly not. Over such a creditor the courts here can exercise no jurisdiction whatever. He is altogether beyond their reach, and must be left to deal as he may with his own forum, and to obtain such relief as the courts of his own country may afford." C

The observation that over such a person the English court can exercise "no jurisdiction whatever" shows that Lord Cranworth LC was in fact addressing the question of personal jurisdiction. The issue which divided the House was whether the Carron Iron Co was domiciled in England as well as Scotland (as Lord St Leonards thought) or only in Scotland (as the majority thought). The injunction was refused for want of personal jurisdiction, not because the Carron Iron Co was a Scottish company proceeding in the courts of Scotland. That this was the issue is apparent from Lord Cranworth LC's observation at pp 442–443 that the position would have been different if the Carron Iron Co had "come under the decree, so as to obtain payment partially from the English assets" or had "sought or obtained any relief in this country". D E

**36** Cases in which the courts have been concerned with the practical efficacy of their injunctions include *In re Chapman* (1872) LR 15 Eq 75, 77. In that case, Bacon CJ refused an injunction to restrain proceedings brought by American creditors in New York on the ground that F

> "neither this court not the Court of Chancery ever grants injunctions that will be wholly ineffectual."

In *In re International Pulp and Paper Co* (1876) 3 Ch D 594, Jessel MR granted an injunction restraining proceedings brought by an Irish creditor in Ireland. He distinguished between creditors resident in another jurisdiction of the United Kingdom and those resident in a "purely foreign country" such as Turkey or Russia. They were both equally outside the territorial jurisdiction of an English court. The difference was that there were statutory procedures for enforcing English judgments in Ireland as if they were judgments of the Irish courts. Without such procedures, the English court's orders were likely to be disregarded by locally resident litigants. At p 599, Jessel MR said: G H

> "although it would be desirable in the interests of the person concerned in the litigation to make that creditor come in with the rest, yet the court cannot restrain the action for want of power—not from want of will or want of provisions in the Act of Parliament, but simply that the Act of

© 2015 The Incorporated Council of Law Reporting for England and Wales

Parliament cannot give this court jurisdiction over *Turkey* or over *Russia*. That is the only reason . . . Therefore, as to a purely foreign country, it is of no use asking for an order, because the order cannot be enforced."

In *In re North Carolina Estate Co Ltd* 5 TLR 328, Chitty J observed that it was:

"quite true . . . that Parliament did not legislate for a foreign country. The point, however, was would the court grant an injunction which was ineffectual, not as being against the foreign court but as being against a person who could not be reached?"

37 In some of the older cases, the foreign residence of a claimant combined with the foreign location of the relevant assets, was treated as a reason for expecting an order of the English courts to be disregarded. In an age when assets and persons were less mobile, the English courts were realistic enough to appreciate that the mere existence as a matter of English law of personal jurisdiction over a foreign resident offered no assurance that the injunction would in practice be observed. In modern conditions, with an increasingly unified global economy, the English courts have generally assumed that their injunctions will be obeyed by those who are subject to their personal jurisdiction, irrespective of their place of residence. The modern law takes the more robust position stated by the Court of Appeal in *In re Liddell's Settlement Trusts* [1936] Ch 365, 374 (Romer LJ), that it is "not the habit of this court in considering whether or not it will make an order to contemplate the possibility that it will not be obeyed". In *Castanho v Brown & Root (UK) Ltd* [1981] AC 557, 574 Lord Scarman, with the agreement of the rest of the House of Lords, regarded this retort as a sufficient answer to the submission that an anti-suit injunction should be refused because it was liable to be disregarded by a Portuguese party suing in Texas.

38 The case which on the face of it does most to advance Miss Newman's submission is the decision of Maugham J in *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196. Maugham J declined to issue an injunction restraining proceedings by a resident of Victoria in Melbourne. His reason, expressed at pp 209–210 was:

"I can find, however, no reason to doubt that a person domiciled abroad can sue in his own courts a company which, in carrying on business there, has incurred a debt or liability to him, whether or not that company is being wound up in this country, to which he owes no allegiance and with the laws of which he is not acquainted; though, as pointed out in Dicey, p 377, if he desires to benefit under the English winding up he must, generally speaking (see for an exception *Moor v Anglo-Italian Bank* (1879) 10 Ch D 681), give up for the benefit of other creditors any advantage which he may have obtained for himself by the proceedings abroad. If these views be well founded it is difficult to see why an English court should attempt to restrain such a creditor from enforcing his rights in his own country merely because it is possible to serve him with process here. To prevent a misconception I should point out that I am not here dealing with the case of a British subject or a corporation incorporated under our law, nor am I dealing with the case where the person sought to be restrained from proceedings abroad has

© 2015 The Incorporated Council of Law Reporting for England and Wales

> made himself a party to the proceedings in the liquidation, for instance by putting in a proof or in some other way." A

Maugham J concluded, at p 210, that where a foreigner is proceeding in his own courts:

> "in general it will be more conducive in such a case to substantial justice that the foreign proceedings should be allowed to proceed." B

These observations were not a statement of law. As Millett LJ observed in *Mitchell v Carter* [1997] 1 BCLC 673, they went to the court's discretion. What is thought to be "conducive to the ends of justice" is liable to change over time. The Court of Appeal in the present case considered that Maugham J's remarks could no longer be regarded as consistent with the policy of the law relating to international insolvencies. The Board is of the same view. C Maugham J's approach would be fair enough if the common law regarded insolvency proceedings as purely territorial. But it has not taken that view for many years, either in relation to its own winding up proceedings which have always been universal, or in relation to the corresponding proceedings of foreign courts dealing with the insolvency of their own companies. The object of the winding up court in dealing with an international insolvency is to ensure, so far as it properly can, that the D worldwide assets of the company and the worldwide claimants to those assets are treated on a common basis: see *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, para 30 (Lord Hoffmann); *Singularis Holdings Ltd v PriceWaterhouseCoopers* [2015] 2 WLR 971, para 19.

39 The Board concludes that where a creditor or member who is amenable to the personal jurisdiction of the court begins or continues E foreign proceedings which will interfere with the statutory trusts over the assets of a company in insolvent liquidation, in principle an injunction will be available to restrain their prosecution irrespective of the nationality or residence of the creditor in question.

40 The Board would accept that as a general rule, there can be no objection in principle to a creditor invoking the purely adjudicatory jurisdiction of a foreign court, provided that it is an appropriate jurisdiction F and that litigation there is not vexatious or oppressive to the liquidators or other interested parties. But it is in principle inimical to the proper winding up process for a creditor to seek or enforce an order from a foreign court which will result in his enjoying prior access to any part of the insolvent estate. In *Kemsley v Barclays Bank plc* [2013] BPIR 839, para 41 Roth J observed that where the foreign litigant undertakes to bring any assets G realised in the foreign proceedings into the bankruptcy so that no advantage would be obtained over other creditors, the basis on which an anti-suit injunction might otherwise be justified will not apply. The Board wishes to record its endorsement of that approach.

*Discretion*

H

41 As with any injunction, this is subject to the court's discretion to refuse relief if in the particular circumstances it would not serve the ends of justice. It is neither possible nor desirable to identify what circumstances might have that effect. But it has often, and rightly, been said that the jurisdiction to grant anti-suit injunctions is to be exercised with caution.

© 2015 The Incorporated Council of Law Reporting for England and Wales

There may in particular be factors at work other than the desire to obtain an advantage over comparably placed creditors or members which make it just to allow the foreign proceedings to continue, either without restriction or on terms which will sufficiently protect other interests. In the present case, the judge having concluded that the issue of an injunction would be contrary to principle, the Court of Appeal were entitled to overrule him and to exercise their own discretion. They exercised it in the liquidators' favour, and the Board will not interfere unless it is shown that they were guilty of some error of principle or misconception of fact, or that they were plainly wrong.

**42** The only substantial criticism made of the way that they exercised their discretion was that as a matter of comity they ought to have left to the Dutch courts the decision whether the Dutch proceedings should be allowed to proceed. The District Court of Amsterdam having rejected Fairfield Sentry's application to lift the attachments, it was said that the courts of the British Virgin Islands should have respected that decision. In the Board's opinion this submission misunderstands the role that comity plays in a decision of this kind. Where the issue is whether the BVI or the foreign court is the more appropriate or convenient forum, it can in principle be decided by either court. Comity will normally require that the foreign judge should decide whether an action in his own court should proceed: *Barclays Bank plc v Homan* [1993] BCLC 680, *Mitchell v Carter* [1997] 1 BCLC 673 (Millett LJ). In the present case, however, there is no room for deference to the Dutch court's decision. In the first place, the question does not turn on the relative convenience or appropriateness of litigation in the courts of the Netherlands and the BVI. Both courts can adjudicate on the substantive dispute, the Dutch courts in Shell's current proceedings, and the BVI court in ruling on a proof if Shell lodges one. But the BVI is the only forum in which priorities between claimants generally can be determined. The question before the Court of Appeal was whether Shell should be allowed to invoke the jurisdiction of the Dutch courts to obtain an unjustified priority in violation of a mandatory statutory scheme in the British Virgin Islands. Second, the relevant principles of Dutch law would prevent the Dutch courts from deciding in which court the issues would be better determined. It is apparent from the evidence of Dutch law and the judgment of the Amsterdam District Court rejecting Fairfield Sentry's application, that the decision does not involve identifying the most appropriate forum. Save in the case of unarguable claims or those in which an attachment would expose the garnishee to a real risk of having to pay twice, the issue of an attachment is a matter of right in the Netherlands. The Dutch courts have no regard to foreign insolvencies so far as they conflict with Dutch domestic law or limit the recovery of local creditors. Third, although when a company is being wound up under the law of the jurisdiction of its incorporation the distribution of its assets among creditors and members is in general a matter for that law, there may well be circumstances in which as a matter of discretion an English or BVI court might refuse an injunction on the ground that the foreign court had a special interest in asserting dominion over an asset forming part of the insolvent estate within its own territory. However, that question could not arise in the present case, because the relevant asset was not located in the Netherlands but in Ireland. The jurisdiction of the Dutch court under its own law to authorise the attachment of an Irish debt owed to a BVI company in liquidation in the BVI may fairly be described, as

© 2015 The Incorporated Council of Law Reporting for England and Wales

the Court of Appeal did, as exorbitant. There are cases, as Hoffmann J observed in *Barclays Bank plc v Homan* [1993] BCLC 680, 688, in which A

> "the judicial or legislative policies of England and the foreign court are so at variance that comity is overridden by the need to protect British national interests or prevent what it regards as a violation of the principles of customary international law".

In the Board's opinion, this is such a case. B

**43** There appears to the Board to be nothing to suggest that allowing Shell an advantage over other comparable claimants would be consistent with the ends of justice. Nor, in the circumstances, should Shell find this surprising. It invested in a company incorporated in the British Virgin Islands and must, as a reasonable investor, have expected that if that company became insolvent it would be wound up under the law of that jurisdiction. C

*The scope of the order*

**44** It is necessary, finally, to refer to an issue about the scope of the relief sought which arose in the course of the hearing of the appeal. The reasoning of the Court of Appeal was based on the inconsistency between the Dutch attachments and the statutory trust of Fairfield Sentry's assets. But its order, D following the form proposed in the notice of appeal, restrained Shell from pursuing the Dutch proceedings generally without any specific reference to the attachments. As the Board has pointed out, merely by invoking the adjudicatory jurisdiction of a foreign court, a creditor does not necessarily act inconsistently with the statutory trusts. The vice of the Dutch proceedings lay in the attachments. In the generality of such cases, absent E vexation or oppression, an order restraining the entire proceedings would be too wide. Miss Newman, however, objected to the order being modified so as to limit it to the attachments because no application to limit it in that way had been made in the Court of Appeal and an attempt to modify it after judgment failed. The result is that both parties were contending for an all or nothing solution. F

**45** In the particular circumstances of this case, the Board is persuaded that it should leave the order of the Court of Appeal as it stands. The effect of that order is that there can be no judgment on the merits in the Netherlands to which the attachment could relate. The order as framed therefore achieves the desired result of preventing the attachments from leading to execution against the Dublin account. In theory, it achieves more than that by also preventing the exercise of the Dutch court's adjudicatory G jurisdiction. But this is rather unreal. The sole substantial purpose of the Dutch proceedings was to obtain the attachments and the resulting priority. The attachments are also the sole basis in Dutch law for the Dutch court's exercise of any adjudicatory jurisdiction. Therefore an injunction requiring Shell to procure the lifting of the attachments would in reality have brought an end to the Dutch proceedings as a whole by removing their jurisdictional H basis, just as the order of the Court of Appeal does. This will not deprive Shell of any advantage to which it is legitimately entitled. It may prove in the liquidation for its damages for misrepresentation and breach of warranty. While the position as regards limitation has not been explored in detail on this appeal, Miss Newman was not able to assert that a proof of debt for the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A claims brought in the Netherlands would be time-barred in the British Virgin Islands, and nothing in the material before the Board suggests that it would be. Since the operative date for limitation purposes in the liquidation will be the date of the winding up order and the Dutch substantive proceedings were begun after that date, if the claim which Shell have brought in the Dutch courts is not time-barred there, there is no reason to think that a proof of debt would be time-barred either.

B **46** The practical inconvenience of the present state of affairs is that the Dutch proceedings and the attachments may remain for some time in existence without going anywhere, and that in the meantime the liquidators will be unable to access the balance on the Dublin account. As between responsible parties such as these, the Board would expect this problem to be resolved by agreement. If that does not happen, and the result is that the C money in Dublin remains in balk when the liquidators need it to fund distributions, it may well be appropriate for the liquidators to make a further application in the High Court for an order requiring the attachments to be released.

*Conclusion*

D **47** The Board will humbly advise Her Majesty that the appeal should be dismissed.

SHIRANIKHA HERBERT, Barrister

E

F

G

H

© 2015 The Incorporated Council of Law Reporting for England and Wales

# 1. - Compulsory winding up

**McPherson & Keay's Law of Company Liquidation 5th Ed.**

**Mainwork**

**Chapter 9 - Functions of the Liquidator**

**Section II. - Right to Assistance and Advice**

**C. - Advice of the court**

**1. - Compulsory winding up**

**9-044** In compulsory winding up the procedure for obtaining the advice of the court is for the liquidator to apply under s.168(3) or the inherent jurisdiction for directions in relation to particular matters arising in the winding up. Seeking assistance should not be seen as a sign of lack of ability or incompetence, necessarily. In fact a liquidator has a duty to seek directions if there is a difficulty at any stage during the course of the administration.[306] Unlike in a voluntary winding up, where the creditors and contributories can apply for directions,[307] they are not able under s.168, but they may instigate a decision procedure to enable them to obtain a decision from creditors to direct the liquidator to seek directions. There have been a number of recent Australian cases which have considered liquidators' applications and they may well be of use in determining issues coming before courts in the UK. This part of the chapter refers to those Australian decisions.

Section 168(3) may be traced back to s.23 of the Companies (Winding up) Act 1890 which was derived from s.89 of the Bankruptcy Act of 1883.[308] The role of the section is to provide a procedure for a liquidator to obtain some guidance from the court in conducting a liquidation and so as to give protection against a claim for breach of duty.[309] The provision is essentially concerned with action which is future at the time of the application being heard and it provides an administrative non-adversary proceeding.[310] This course is so frequently taken that little purpose would be served by attempting a catalogue of all the situations in which such an application may be made. Some examples which may be mentioned are where the liquidator wishes to know: whether to postpone the sale of certain assets[311]; whether testamentary gifts to a charitable company that had gone into liquidation were ineffective[312]; how to deal with a claim of a creditor[313]; whether to institute proceedings for misfeasance; whether to admit a particular debt or claim to proof in the winding up[314]; whether to make payments out of the assets[315]; whether to levy calls on contributories[316]; whether to seek guidance on how to deal with the affairs of two related companies whose affairs are intermingled[317]; whether to obtain guidance on questions of law[318]; whether to seek guidance on the sale of a cause of an action[319]; whether to know how litigation should be conducted[320]; and whether to seek resolution of issues of legal procedure.[321] Although a direction given on such an application does not amount to a judicial determination raising an estoppel,[322] the advantage of using this procedure is that, having obtained and followed the advice of the court with respect to a particular matter, the liquidator is then protected against any possible allegations of breach of duty which might subsequently be made against him or her by creditors or contributories of the company on the basis that the proceedings were not properly incurred.[323] In fact the courts have said that in cases of real doubt the correct procedure for a liquidator is to seek directions.

Liquidators are not to use an application for directions in at least two respects. First, where the liquidator seeks to have the court make a commercial decision for the liquidator[324]; directions on matters which fall within the liquidator's discretion should not be sought where the intention is to enable the liquidator to be absolved of responsibility for making a difficult commercial decision.[325] As Giles J said in *Re Spedley Securities Ltd (in liq)*[326]:

> "It is generally not appropriate in an application for directions to make the liquidator's commercial decisions for him where he has full power to act … and the liquidator should not seek directions as a kind of insurance that he has made the right commercial decision."[327]

© 2024 Thomson Reuters.

9-045 By the same token, if a difficulty arises in the course of the administration the liquidator is obliged to inform the court and take directions.[328] For instance, a court will give directions where the liquidator's proposed decision is being criticised by a creditor or creditors as being unreasonable or evidence of bad faith.[329] Liquidators have been given directions where they have been confronted with charges of acting unreasonably, even where the decision involved commercial judgment.[330] Merely because a creditor or someone else appears at the hearing for directions, that is not a reason for refraining to give directions to the liquidator if to do so is appropriate.[331]

Secondly, the procedure is not to be used where there is a dispute between two third parties over a right to claim company funds; the appropriate course of action is for the liquidator to commence substantive proceedings against the two parties and seek a declaratory order.[332]

Liquidators must be careful when deciding to apply for directions, because if the court takes the view that the application for directions was inappropriate, it can decline to order that the costs associated with the application are to be paid from company funds as a cost of the winding up.[333] This possible punishment, together with the fact that courts have, on a number of occasions, complained that liquidators have sought directions in relation to matters which came with their commercial judgment, may make a liquidator rather reluctant to seek directions. However, the Australian case of *Pace v Antlers Pty Ltd (in liq)*,[334] where it was held that a liquidator should have sought directions as to whether he was obliged to pay income tax assessments, and the liquidator was held to be in breach of his duty of care, is a sober reminder to liquidators that an application for directions should be initiated if there is any doubt in the liquidator's mind.

9-046 If the court takes the view that an application is legitimate then some advice or direction should be provided so that the court does not leave one of its officers "floundering".[335] The liquidator bears the responsibility of making a full and fair disclosure to the court of the material facts and the court's function is not to resolve factual conflicts.[336]

There are divergent opinions in Australia as to whether an order under the then equivalent of s.168(3) (s.479(3) of the Corporations Act 2001) can bind third parties to the liquidation in relation to substantive issues. The older view,[337] which has substantial modern support, is that an order could not be binding. In the words of McLelland J (as he then was):

> "Modern Australian authority confirms the view that section 479(3) 'does not enable the court to make binding orders in the nature of judgments' and that the function of a liquidator's application for directions 'is to give him advice as to his proper course of action in the liquidation; it is not to determine the rights and liabilities arising from the company's transactions before the liquidation."[338]

The opposite view was expressed by Northrop J in *ASC v Melbourne Asset Management Nominees Pty Ltd*.[339] His Honour said that an order might be binding, although McLelland CJ in Eq in *Re BPTC Ltd; sub nom. JW Murphy & PC Allen*[340] doubted the correctness of this position. It is submitted respectfully that the overwhelming amount of authority supports the view that directions are not binding, but are to give the liquidator advice as to a proper course of action in the administration.[341]

9-047 While courts have generally said that they are unable to bind other parties, they have made orders declaratory of substantive rights and intended to be binding on parties to the proceedings, where the proceedings have commenced as a liquidator's application for directions.[342] It has been said that court procedures are sufficiently flexible to enable directions proceedings to be changed to permit determination of substantive rights. The caveat expressed by McLelland J should be noted, namely that such a fundamental change in the nature of proceedings should not be allowed unless the court is satisfied that the persons affected consent to this action.[343]

If a liquidator or liquidators are of the view that the administration of two or more companies should be undertaken conjointly then an application for directions would be the correct procedure.[344]

© 2024 Thomson Reuters.

In general it appears that an ex parte hearing of the application for directions is permissible, but every case must be considered on its facts and where there are conflicting interests to be considered such a procedure may not be appropriate. [345]

## Footnotes

306 *Re Windsor Steam Coal Co [1929] Ch. 151* at 159; *Re Timberland Ltd; sub nom. Commissioner for Corporate Affairs v Harvey (1979) 4 A.C.L.R. 259*; *Pace v Antlers Pty Ltd (in liq) (1998) 16 A.C.L.C. 261* at 273.

307 Pursuant to 1986 Act s.112.

308 Bankruptcy Act of 1883 (46 & 47 Vict c.52). An earlier provision which provided for directions for the former form of liquidators (official managers) is s.34 of the Joint Stock Companies Winding Up Act 1848.

309 *State Bank of New South Wales v Turner Corp Ltd (1994) 14 A.C.S.R. 480* at 483. Also, see *Rodger v Gourlay (1984) 73 F.L.R. 264 at 265; (1984) 2 A.C.L.C. 594* at 595.

310 *Re J.W. Murphy & P.C. Allen (1996) 19 A.C.S.R. 569*.

311 See *Re Statewide Investments Ltd (in liq) (1982) 6 A.C.L.R. 265* where the liquidator was authorised to postpone the sale of the company's land by entering into a contract which required the land to be re-zoned. The contract promised a higher return for the company and its creditors.

312 *Alleyne v Attorney-General [1997] B.C.C. 370*.

313 *Re Polly Peck International Plc [1996] B.C.C. 486*.

314 Compare *Re Banque des Marchands de Moscou; sub nom. Wilenkin v Liquidator (No.2) [1953] 1 W.L.R 172*.

315 See *Re Chemical Plastics Ltd [1959] V.R. 570*; *Re Australian Home Finance Ltd [1956] V.L.R. 1*.

316 As in *Re Peter Lalor Home Building Co-operative Society Ltd [1958] V.R. 165*.

317 *Re Capital Project Homes Pty Ltd (1991) 6 A.C.S.R. 310*.

318 *Re Standard Insurance Co Ltd (1961) 80 W.N. (N.S.W.) 1355*; *Sanderson v Classic Car Insurances Pty Ltd (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114*; *Re John Frederick Lord as Liquidator of Silverline Technologies Pty Ltd [2005] NSWSC 620*.

319 *Craig v Humberclyde Industrial Finance Ltd [1999] 1 W.L.R. 129; [1998] 2 B.C.L.C. 526 CA*. In this case, the court excluded the defendant to the claim while considering the merits of the cause of action on which the official receiver sought directions. The court was of the view that it was appropriate to implement the Chancery Division procedure used when trustees sought directions as to whether to take proceedings against a beneficiary. This procedure permitted the entertaining of evidence in the absence of the beneficiary.

320 *Re Addstone Pty Ltd (in liq) (1997) 25 A.C.S.R. 357*.

321 *Sanderson v Classic Car Insurances Pty Ltd (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114*; *Re Ansett Australia Ltd (No.3) [2002] FCA 90; (2002) 115 F.C.R. 409*; *Re Dungowan Manly Pty Ltd (in liq) [2018] NSWSC 1083* at [17].

322 *Re Blackbird Pies (Management) Pty Ltd (No.2) [1970] Q.W.N. 14*; *TTC (SA) Pty Ltd (in liq), formerly Tom the Cheap (SA) Pty Ltd (1983) 1 A.C.L.C. 914*.

323 *Re Atkinson [1971] V.R. 612* at 615–616; *TRe Lemon Tree Passage & Districts RSL and Citizens Club Co-Operative Ltd (1988) 6 A.C.L.C. 24* at 27; *Coats v Southern Cross Airlines Holdings Ltd (1998) 145 F.L.R. 386; (1998) 16 A.C.L.C. 1393*.

324 *Shiraz Nominees (in liq) v Collinson (1985) 3 A.C.L.C. 706*.

325 *Shiraz Nominees (in liq) v Collinson (1985) 3 A.C.L.C. 706*; compare *Sanderson v Classic Car Insurances Pty Ltd (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114* (where the liquidator had made a commercial decision and sought the protection of the court's directions).

326 *Re Spedley Securities Ltd (in liq) (1992) 10 A.C.L.C. 1742*.

327 *Re Spedley Securities Ltd (in liq) (1992) 10 A.C.L.C. 1742* at 1744–1745. Also, see *Re Ansett Australia Ltd and Korda (2002) 40 A.C.S.R. 433* at [66].

328 *Re Windsor Steam Coal Co [1929] 1 Ch. 151* at 159; *Re Timberland Ltd; sub nom. Commissioner for Corporate Affairs v Harvey (1979) 4 A.C.L.R. 259*.

329 *Re Addstone Pty Ltd (in liq) (1997) 25 A.C.S.R. 357* at 363. See this case for an instance where the court felt it should give directions in a situation where the commercial decision of the liquidator was involved (at 371).

330 *Sanderson v Classic Car Insurances Pty Ltd (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114*.

© 2024 Thomson Reuters.

331 *Re Addstone Pty Ltd (in liq) (1997) 25 A.C.S.R. 357* at 363.

332 *Re Everything Australian Pty Ltd (1993) 11 A.C.L.C. 50* at 51; *Re AMN Pty Ltd (in liq) (1997) 15 A.C.L.C. 368*.

333 For example, see *Re AMN Pty Ltd (in liq) (1997) 15 A.C.L.C. 368 (Digest)*.

334 *Pace v Antlers Pty Ltd (in liq) (1998) 16 A.C.L.C. 261*.

335 *Re Lemon Tree Passage & Districts RSL & Citizens Club Co-Operative Ltd (1988) 6 A.C.L.C. 24* at 26 per Young J.

336 *Re Magic Aust Pty Ltd (in liq) (1992) 7 A.C.S.R. 742* at 746; *Editions Tom Thompson Pty Ltd v Pilley (1997) 15 A.C.L.C. 1331*.

337 *Re Blackbird Pies (Management) Pty Ltd (No.2) [1970] Q.W.N. 14*; *Re TTC (SA) Pty Ltd (in liq) (1983) 1 A.C.L.C. 914*; *Re Security Provident Fund Ltd (in liq) (1984) 73 F.L.R. 264* at 265; *Re Neander Constructions Pty Ltd (1988) 6 A.C.L.C. 865*; *Re GB Nathan & Co Pty Ltd (in liq) (1991) 24 N.S.W.L.R. 674* at 679–680; *(1991) 5 A.C.S.R. 673* at 678; *Re Magic Aust Pty Ltd (in liq) (1992) 7 A.C.S.R. 742* at 745; *Re Dallhold Investments Pty Ltd (1994) 53 F.C.R. 339*; *Re AMN Pty Ltd (in liq) (1997) 15 A.C.L.C. 368 (Digest)*; *Editions Tom Thompson Pty Ltd v Pilley (1997) 15 A.C.L.C. 1331*; *Re ACN 007 537 000 Pty Ltd (1997) 15 A.C.L.C. 1752* at 1756.

338 *Re GB Nathan & Co Pty Ltd (in liq) (1991) 24 N.S.W.L.R. 674* at 679–680; *(1991) 5 A.C.S.R 673* at 678.

339 *ASC v Melbourne Asset Management Nominees Pty Ltd (1994) 12 A.C.L.C. 364* at 376–379.

340 *Re BPTC Ltd; sub nom. JW Murphy & PC Allen (1996) 14 A.C.L.C. 845 at 846; (1996) 19 A.C.S.R. 569* at 570.

341 *Re GB Nathan & Co Pty Ltd (in liq) (1991) 24 N.S.W.L.R. 674 at 680; (1991) 5 A.C.S.R. 673* at 678.

342 *Re Staff Benefits Pty Ltd (in liq) (1979) 1 N.S.W.L.R. 207; (1979) 4 A.C.L.R. 54*; *Re GB Nathan & Co Pty Ltd (in liq) (1991) 24 N.S.W.L.R. 674* at 680; *(1991) 5 A.C.S.R. 673* at 678.

343 *Re Standard Insurance Co Pty Ltd (in liq) (1961) 80 W.N. 1355*; *Murdoch v Crawford [1986] V.R. 97*; *Re GB Nathan & Co Pty Ltd (in liq) (1991) 24 N.S.W.L.R. 674* at 679–680; *(1991) 5 A.C.S.R. 673* at 679.

344 *Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd (1997) 15 A.C.L.C. 833* at 839; *Re Charter Travel Co Ltd (1997) 15 A.C.L.C. 1685* at 1686. Courts will only make such an order where exceptional circumstances exist ( *(1997) 15 A.C.L.C. 1685* at 1686).

345 *Bank of Melbourne Ltd v HPM Pty Ltd (1998) 16 A.C.L.C. 427* at 429.

**End of Document**

**© 2024 SWEET & MAXWELL**

# 11.250 Vesting of property on liquidation

**Emmet & Farrand on Title**

**Volume 1**

**Part 3 - Parties**

**Chapter 11**

**Parties To Deeds A-L**

**Insolvent Companies**

**Section B Liquidation**

## Vesting of property on liquidation

11. 250 Whereas in bankruptcy title to the debtor's property automatically vests in the trustee in bankruptcy, in liquidation it remains in the company (although see s.145(1), rarely used, giving the court jurisdiction to direct that some or all of the property of the company shall vest in the liquidator in a compulsory liquidation). However, from the commencement of the liquidation the company ceases to hold its property for its own benefit, and from the making of the bankruptcy order/appointment of the liquidator custody and control of the property passes to the liquidator (s.144(1)) who is charged with the statutory duty of dealing with the assets in accordance with the statutory insolvency scheme. Consequently, from the commencement of the liquidation neither the company nor its creditors has any beneficial interest in the company's property: *Ayerst v C & K (Construction) Ltd [1976] AC 167*.

End of Document

© 2024 SWEET & MAXWELL

# C. - Ownership of property

**McPherson & Keay's Law of Company Liquidation 5th Ed.**

**Mainwork**

**Chapter 7 - Commencement and Effect of Winding Up**

**Section II. - Effect on the Company**

**C. - Ownership of property**

**7-006** First and foremost on this topic, it is important to note that winding up divests the company of the beneficial interest in its property.[43] In *Mitchell v Carter*,[44] Millett LJ (as he then was) said:

> "[T]he making of a winding-up order divests the company of the beneficial ownership of its assets which cease to be applicable for its own benefit. They become instead subject to a statutory scheme for distribution among the creditors and members of the company."[45]

However, the legal title remains in the company.[46]

It is possible for liquidators to apply[47] for and obtain an order vesting in them all of any portion of the property of the company, in which case it vests in liquidators in their official capacity[48] and enables them to bring and defend legal proceedings in respect of it in their own name.[49] Such applications are, however, extremely uncommon,[50] probably because the liquidator is given wide powers by the Act.[51] Ordinarily no vesting order is made and, unlike under a bankruptcy order,[52] winding up does not effect a transfer of company property, which continues to belong to the company[53] and does not pass to the liquidator.[54] A court will not make an order in favour of a liquidator in respect of any property, the ownership of which is disputed[55]; in such circumstances the liquidator should initiate substantive legal proceedings against the other claimants to the property.[56] If a vesting order is made the property does not, as indicated above, vest in the liquidator personally but vests in him or her in an official capacity. As a consequence, a liquidator cannot be held personally liable for any obligations that relate to the vested property.[57] The liquidator merely becomes the agent of the company and, as indicated earlier, the company retains the legal ownership of the property.[58] Unless a liquidator does obtain a vesting order, a caveat cannot be lodged in the name of the liquidator on the company's property.[59]

**7-007** It is equally clear that neither creditors nor members acquire any proprietary interest in the property by reason, or in consequence, of winding up. No doubt this follows logically from the foregoing principles but, since on winding up the assets cease to be available for the profit-making purposes of the company[60] and acquire instead the character of a fund destined for the payment of debts and for distribution among the members,[61] it might be thought that this would give the creditors and members some new form of right in the assets in question. Such a conception appears to underlie a number of dicta in early cases[62] declaring that the effect of winding up is to impose upon the assets of the company a trust for the discharge of its liabilities. Thus in *Re Oriental Inland Steam Co*,[63] a creditor levied execution on the assets in India of a company undergoing liquidation in England and withdrew only when his debt was paid in full by the liquidator. It was held that he was not entitled to retain this payment since, as James LJ remarked:

> "The English Act of Parliament has enacted that in the case of a winding up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; and, being so, it has ceased to be liable to be seized by the execution creditors of the company."[64]

© 2024 Thomson Reuters.

C. - Ownership of property, UKBC-MCPHERS 466032931 (2021)

Lord Diplock in the House of Lords in *Ayerst v C&K (Construction) Ltd*[65] said:

> "All that was intended to be conveyed by the use of the expression 'trust property' and 'trust' in these and subsequent cases … was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons."[66]

The Privy Council in *Cambridge Gas Transport Corp v Official Committee of Unsecured Creditors of Navigator Holdings Plc*[67] and more recently, again, in *Stichting Shell Pensioenfonds v Krys*[68] upheld the notion of a statutory trust.

**7-008** But these decisions do not go to the length of establishing that the assets are subject to a trust in the strict sense.[69] This is even taking into account the fact that subsequent to *Re Oriental Inland Steam Co* it was held in *Re Yagerphone Ltd*[70] that property received by a liquidator pursuant to a court order (after the court set aside a transaction as a preference) is impressed with a trust in favour of the body of unsecured creditors.[71] The reason is that although the effect of winding up is to deprive a company of what is described as the beneficial ownership of its property,[72] certain of the features of a trust are lacking. In particular, the creditors and contributories are not cestuis que trust and possess no right in rem in the property of the company.[73] As regards creditors, the point is illustrated by the New South Wales case of *Re Paul & Gray Ltd*.[74] Here the unpaid mortgagee of real property of a company in liquidation sought to evade the provisions of a New South Wales moratorium statute by arguing that the right of a creditor to prove in winding up was not a claim founded on a breach of agreement, covenant or condition, but was a right in rem to a proportionate part of the divisible assets of the company. This argument was rejected by the New South Wales Court of Appeal which held that liquidation did not impose a trust on the assets and that creditors retained the character of creditors and did not become cestuis que trust on winding up. A similar view was taken of the rights of shareholders in the South Australian case of *Re A Caveat; Ex p. Canowie Pastoral Co*[75] where it was held that winding up conferred upon the shareholders no such interest in the real property of the company as was capable of being protected by a caveat which one of them had lodged. To have countenanced this, it was said, would have been to ignore the distinction between the rights of the members and those of the company.[76] This position may, however, be different once the affairs of the company have been fully wound up.[77] In addition, it must be remembered that liquidation is a collective proceeding whereby the creditors accept a collective enforcement procedure[78] and a distribution of company assets according to a statutory scheme[79]; the creditors in a sense give up their rights to enforce their claims for a share in the assets of the company as administered by the liquidator.

## Footnotes

43 *Re Oriental Inland Steam Co (1874) 9 Ch. App. 557*; *Ayerst v C&K (Constructions) Ltd [1976] A.C. 107 HL*; *Savill and Abion Co Ltd v Commissioner of Inland Revenue [1956] 1 N.Z.L.R. 211*; *In Re Frederick Inns Ltd [1994] 1 I.L.R.M. 387*.

44 *Mitchell v Carter [1997] B.C.C. 907* at 912.

45 Approved by the Supreme Court in *The Joint Administrators of LB Holdings Intermediate 2 Ltd v the Joint Administrators of Lehman Brothers International (Europe) [2017] UKSC 38* at [54].

46 *Re Oriental Inland Steam Co (1874) 9 Ch. App. 557* at 560; *Ayerst v C&K (Constructions) Ltd [1976] A.C. 107* HL at 178, 180; *Cambridge Gas Transport Corp v Official Committee of Unsecured Creditors of Navigator Holdings Plc [2006] UKPC 26*. But a majority of the Australian High Court (Kirby J dissenting) declined to follow *Ayerst* and has held that on winding up there is not a change in beneficial ownership of company assets: *Commissioner of Taxation v Linter Australia Ltd (in liq) [2005] HCA 20; (2005) 220 C.L.R. 592*. For an interesting discussion of this issue, see *Mokal, "At the Intersection of Property and Insolvency: The Insolvent Company's Encumbered Assets" [2008] 20 Singapore Academy of Law Journal 495*; *Mokal, "Encumbered Assets and the Statutory Trust" (2008) 21 Insolv. Int. 129*.

47 1986 Act s.145(1).

48 *Graham v Edge (1888) 20 Q.B.D. 683*.

49 1986 Act s.145(2). See *Russian & English Bank v Baring Bros & Co [1935] Ch.120 at 125, 133–135; [1936] A.C. 405* at 435.

50 They are sometimes made in the case of an unregistered company.

51 See Sch.4 to the 1986 Act.

52 See 1986 Act s.306.

53 *Letsitele Stores Ltd v Roets 1958 (2) S.A. 224*; *John Mackintosh & Sons Ltd v Baker's Bargain Stores (Seaford) Ltd [1965] 1 W.L.R. 1182*.

54 *Re Oriental Inland Steam Co (1874) 9 Ch. App. 557* at 560; *Bank of Scotland v MacLeod [1914] A.C. 311* at 321; *Re H. J. Webb & Co; sub nom. Food Controller v Cork [1922] 2 Ch. 369 at 388; affirmed [1923] A.C. 647* at 671; *Ayerst v C&K (Construction) Ltd [1976] A.C. 167 HL*; *Tanning Research Laboratories Inc v O'Brien (1990) 8 A.C.L.C. 248* at 255 HCA.

55 *Evans v Bristile Ltd (1992) 10 A.C.L.C. 1415*.

56 *Evans v Bristile Ltd (1992) 10 A.C.L.C. 1415*.

57 *Graham v Edge (1888) 20 Q.B.D. 583*; *Re Ebsworth and Tidy's Contract (1889) 42 Ch.D. 23*.

58 *Re Oriental Inland Steam Co (1874) 9 Ch. App. 557* at 560; *Ayerst v C&K (Constructions) Ltd [1976] A.C. 107* at 180.

59 *Re Application by the Liquidator of Haupiri Courts Ltd [1969] N.Z.L.R. 348*; *Muroa Pty Ltd v O'Meara (1997) 15 A.C.L.C. 1427*.

60 Compare *Inland Revenue Commissioners v Olive Mill Ltd [1963] 1 W.L.R. 712* at 725.

61 *Ayerst v C&K (Construction) Ltd [1976] A.C. 167*.

62 Notably in *Re Albert Life Assurance Co, Delhi Bank's Case (1871) 15 Sol. Jo. 923*; *Re Oriental Inland Steam Co (1874) 9 Ch. App. 557* at 560; and see *Re Cyona Distributors Ltd [1966] Ch. 462; reversed [1967] Ch. 889*.

63 *Re Oriental Inland Steam Co (1874) 9 Ch. App. 557*; see also *Re Central Sugar Factories of Brazil [1894] 1 Ch. 369*.

64 *Re Oriental Inland Steam Co (1874) 9 Ch. App. at 559*. This principle was applied to voluntary winding up in *I.R.C. v Olive Mill Ltd [1963] 1 W.L.R. 712*.

65 *Ayerst v C&K (Construction) Ltd [1976] A.C. 167*.

66 *Ayerst v C&K (Construction) Ltd [1976] A.C. 167* at 180.

67 *Cambridge Gas Transport Corp v Official Committee of Unsecured Creditors of Navigator Holdings Plc [2006] UKPC 26* at [14].

68 *Stichting Shell Pensioenfonds v Krys [2014] UKPC 41; [2015] A.C. 616; [2015 B.C.C. 205* at [14], [19].

69 See the discussion in *Mokal, "At the Intersection of Property and Insolvency: The Insolvent Company's Encumbered Assets" [2008] 20 Singapore Academy of Law Journal 495*, where the learned commentator takes the view that it is wrong to talk of a statutory trust, although he does concede that there are good arguments that support the notion of the trust (at 504). Also, see *Mokal, "Encumbered Assets and the Statutory Trust" (2008) 21 Insolv. Int. 129*.

70 *Re Yagerphone Ltd [1935] Ch.392*.

71 *Re Yagerphone Ltd [1935] Ch.392* at 396. McPherson JA in *Starkey v Commissioner of Taxation ((1993) 11 A.C.L.C. 558* at 576), while not impugning the correctness of the decision, did not accept that a trust existed.

72 *Ayerst v C&K (Construction) Ltd [1976] A.C. 167*.

73 *United Fuel Investments Ltd v Union Gas Co (1965) 53 D.L.R. (2d) 12*; *Ayerst v C&K (Construction) Ltd [1976] A.C. 167* at 179.

74 *Re Paul & Gray Ltd (1932) 32 S.R. (N.S.W.) 386; reversing on this point 32 S.R. (N.S.W.) 184*.

75 *Re A Caveat; Ex p. Canowie Pastoral Co [1931] S.A.S.R. 502*.

76 *Re A Caveat; Ex p. Canowie Pastoral Co [1931] S.A.S.R. 502* at 505.

77 *Re Hills Waterfall Estate Co [1896] 1 Ch. 947* at 953; but contrast *Knowles v Scott [1891] 1 Ch. 717*; *Ayerst v C&K (Construction) Ltd [1976] A.C. 167* at 180; *Re Calgary & Edmonton Land Co Ltd [1975] 1 W.L.R. 355* at 363.

78 *Re Lines Bros Ltd [1983] Ch. 1* CA at 13.

79 *Re Lines Bros Ltd [1983] Ch. 1* at 14.

**End of Document**

© 2024 SWEET & MAXWELL

# Chapter 3 - The Principles of Corporate Insolvency Law

**Goode on Principles of Corporate Insolvency Law, 5th Ed.**

**Mainwork**

**Chapter 3 - The Principles of Corporate Insolvency Law**

**3-01** Although the Insolvency Act 1986, with its 545 sections and 19 schedules, obviously embodies the heart of corporate insolvency law, so that there is a natural temptation to commence any study of the subject by plunging straight into s.1 of the Act and working through the various statutory provisions in sequence, the Act itself is not the best starting point. One cannot understand corporate insolvency law without a thorough grasp of the fundamental principles underpinning the legislation. These are not brought together in the Act, nor, indeed, are they readily extracted from it. This is because corporate insolvency law for the most part recognises and adopts rights conferred by the general law and by contract. If, for example, we want to know the rights of a secured creditor when the debtor company goes into liquidation, we must first ascertain what rights he acquired before the winding-up. Only then can we assess, in the light of the statutory provisions, the legal impact of winding-up on the continued existence and enforceability of those rights. So also with rights under a contract. First, we must determine their scope under the general law; then we have to consider how far those rights are affected by the winding-up. An examination of the statutory provisions is thus the last part of the analysis, not the first; and it is the interplay between the general law and the particular principles and rules of insolvency legislation that should engage our special attention. This interplay is reflected in a number of basic principles of corporate insolvency law, and it is to these that I now turn. For convenience of exposition, winding-up is taken as the paradigm, though for the most part the principles apply equally to administration.

## First principle: corporate insolvency law recognises rights accrued under the general law prior to liquidation

**3-02** This principle is of cardinal importance. Its effect is that relative entitlements created before liquidation are preserved, so that insolvency law will in general respect the priority of proprietary over personal claims (and thus of secured over unsecured claims), the subjection of the company's proprietary or contractual rights to countervailing equities, such as rights of rescission, [1] the priority or subordination attached to securities by the terms of their issue and agreements between creditors for the subordination of secured or unsecured debt. In line with this principle, the general rule is that liquidation does not of itself terminate contracts or extinguish rights, though it does inhibit the pursuit of remedies.

> "The important point is that bankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them." [2]

So the starting position of insolvency law is that rights accrued prior to the insolvency proceeding [3] will be respected. To this principle there are important exceptions, and it is these which give the transactional side of corporate insolvency law its distinctive character. Most of the remaining principles are particular aspects of this first principle.

## Second principle: only the assets of the debtor company are available for its creditors

**3-03** This principle follows from the first. It is not the function of corporate insolvency to confiscate for the benefit of creditors assets in the company's possession or control which belong to others. Only that which is the property of the company at the time of

© 2024 Thomson Reuters.

liquidation or comes into its hands thereafter is available for its creditors. So assets held by the company on trust do not form part of its estate, nor do goods supplied to it under reservation of title. Similarly, assets over which the company has given security are not available to the creditors except to the extent of the company's equity of redemption. Again, there are exceptions to the principle. The assets available for creditors may be swelled by the office-holder bringing an action for wrongful or fraudulent trading, [4] or by the statutory avoidance or reversal of pre-liquidation transfers and transactions, for example, as transactions at an undervalue, preferences and floating charges which are void for want of registration or because they were given by an insolvent company for past consideration. [5] Transfers made after the commencement of the winding-up are also void unless sanctioned by the court, [6] and since the winding-up of a company not already in voluntary liquidation is deemed to relate back to the presentation of the petition, [7] assets of which the company had ceased to be the owner by the time of the winding-up order may be brought back into its estate. In addition, a percentage in value of assets subject to a floating charge has to be surrendered to form a fund available to unsecured creditors [8] and liquidation expenses have priority over claims secured by a floating charge. [9]

As a corollary of the rule that only the company's assets are available for its creditors, the liquidator has no power *as liquidator* to sell assets not beneficially owned by the company or subject to a security interest, [10] although if the company is a trustee with management powers under an active trust the liquidator may, with the consent of the beneficiaries or under an order of the court, manage the trust property on behalf of the beneficiaries and realise trust assets as part of that management. [11] Where the liquidator does so, his remuneration and expenses for so doing cannot be treated as expenses of the liquidation, being for the benefit of the trust beneficiaries rather than the company, and must be borne by the trust assets. [12] Conversely, any portion of the liquidator's work and expenses not attributable to the trust property ought in principle to be borne by the general creditors out of the company's free assets. [13] Nevertheless, the courts have in some cases been prepared to allow these to be taken, wholly or in part, from the trust assets, [14] although it is thought that this should be done only in exceptional cases, as where the trust assets form part of a commingled fund and it is difficult to distinguish between trust assets and assets beneficially owned by the company. In cases involving a commingled fund where the task of establishing each individual's beneficial entitlement would be complex and expensive, the courts have generally refused to apply the rule in *Clayton's Case* [15] and have directed that the fund, so far as comprising trust assets, be distributed among the beneficiaries pro rata. [16] Where the assets consisted partly of trust assets and partly of the company's own assets, Morritt J ordered that the trust moneys be notionally aggregated with the company's assets and that there should be paid from the trust assets the proportion of the liquidator's total remuneration which the trust assets bore to the aggregate fund. [17]

## Third principle: security interests and other real rights created prior to the insolvency proceeding are unaffected by the winding-up

3-04 This principle follows from the first two. In general, a creditor holding a security interest or other real right is unaffected by winding-up and may proceed to realise his security or assert other rights of property as if the company were not in liquidation. So firmly is this principle applied that where the instrument of charge provides for security in after-acquired property, the secured creditor can assert rights even over moneys or other assets falling in after the commencement of the winding-up, [18] provided that the consideration for these was already executed before that time, as opposed to being furnished by the liquidator himself, for example, by performance of a contract entered into by the company. [19] The position is the same in administration except that the administrator can dispose of assets subject to a floating charge as if they were not so subject and the floating charge then ranks for priority in relation to the proceeds of sale. [20]

## Fourth principle: the liquidator takes the assets subject to all limitations and defences

3-05

In asserting rights in the name of the company,[21] the liquidator stands in no better position than the company itself; he takes them as they stand, warts and all.[22] So where the company is a party to a contract, the other party remains entitled to raise any defences that could have been raised prior to the winding-up and to exercise any rights of termination given by the contract.[23] The same is true of equities. In general, an equity, that is, a person's right to impeach or qualify a transaction by which another party acquires an interest in an asset, survives the other party's liquidation. An equity is not in itself an interest in property, nor on the other hand is it a mere right in personam; rather, it is an inherent limitation of the interest that has been acquired. A typical equity is a right to rescind a contract by reason of some external vitiating factor such as fraud, misrepresentation or undue influence. This right of defeasance constitutes an inherent qualification of the contract rights. So where a party is induced by the company's fraud or misrepresentation to enter into a contract for the sale of goods or the transfer of other property to the company, he does not lose his right to rescind merely by reason of the winding-up.[24] The right of rescission can be a very useful remedy for an unpaid seller who was induced to sell by fraud or misrepresentation (for example, the furnishing of a cheque which the buyer company knew would be dishonoured), since ownership in the asset transferred revests in him upon rescission, whereas if he had asserted his right to the price under the contract of sale, he would have had to prove in competition with other creditors. Other types of equity are the right to apply for rectification of the contract or to have it set aside for mistake or breach of fiduciary duty; and the right of the holder of a crystallised floating charge to assert priority over a subsequent incumbrancer who took his security interest while the prior charge was still floating, but with notice of a negative pledge clause in the charge.[25]

These equities likewise survive the liquidation of the company against whom they are asserted. The pre-liquidation right of set-off is also an equity, but by exception to the general rule it is not exercisable against a party which has gone into liquidation, being displaced by the insolvency rules of set-off.[26]

The principle that the liquidator takes assets subject to all limitations and conditions must, however, be qualified by reference to the anti-deprivation rule, as explained immediately below.

## Fifth principle: a contractual provision for the removal of an asset from the estate of an insolvent company upon winding-up may be void as contrary to public policy

3-06 While under the previous principle corporate insolvency law treats a liquidator as taking the assets subject to defences and equities existing prior to the winding-up, it is another matter altogether where the advent of liquidation is itself the trigger for a contractual provision divesting the company of an asset. Such a provision may fall foul of the common law anti-deprivation rule[27]. The effect of the decision of the Supreme Court in *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd*[28] is that almost[29] any arrangement under which an interest of the debtor is limited or conditioned by reference to the commencement of insolvency proceedings falls in principle to be tested by application of this rule. But that rule is to be given a "common sense" application that prevents it from disturbing "bona fide commercial transactions which do not have as their predominant purpose, or one of their main purposes, the deprivation of the property of one of the parties on bankruptcy".[30] As argued below,[31] the result is that except where the proscribed intention or absence of good faith is obvious on the face of the agreement, arm's-length commercial transactions appear likely to survive the application of the anti-deprivation rule.

The common law anti-deprivation rule is related to, but distinct from, the common law pari passu rule. They are related in that they are "two sub-rules of the general principle that parties cannot contract out of the insolvency legislation".[32] They are distinct in that the anti-deprivation rule is aimed at transactions which improperly reduce the value of the company's assets, to the detriment of all unsecured creditors, while the pari passu rule, which is concerned to uphold the statutory policy of rateable distribution among creditors, is aimed at transactions which, although not reducing the net asset value of the company, unfairly benefit one creditor at the expense of others. This is reflected in differences in the elements of each rule.[33]

© 2024 Thomas Reuters.

## Sixth principle: unsecured creditors rank pari passu

3-07 As mentioned earlier,[34] the pari passu principle is one of the most fundamental principles of corporate insolvency law.[35] All unsecured creditors are required to share and share alike in a common pool of assets and realisations. This principle, formerly confined to winding-up, now applies also to administrations in which a distribution is made.[36] Arrangements that would have the effect of distributing an asset of a company in liquidation (or in a distributing administration) other than in accordance with the statutory provisions for rateable distribution are to that extent to be treated as ineffective.[37] This is the common law pari passu rule, which as stated above, is distinct from the anti-deprivation rule. As we shall see, the pari passu rule applies irrespective of whether insolvency proceedings are the trigger for the operation of the impugned provision, and the fact that the arrangement was a commercially sensible one entered into in good faith will not insulate it from the invalidating effect of the rule.[38] The rule is engaged only when a company has entered liquidation (or a notice of proposed distribution has been given in administration), but the statutory provisions for rateable distribution are buttressed by provisions invalidating as a preference transactions made by an insolvent company in the run-up to insolvency proceedings[39] that unfairly benefit one creditor at the expense of others.[40] The pari passu principle has many other facets which are discussed in detail, together with the exceptions to the principle, in a later chapter.[41]

It has been objected with some vigour that the pari passu principle is not a central principle of insolvency law at all.[42] Two grounds have been advanced for this contention. First, unsecured creditors usually receive little, if anything, by way of dividend. This is true, but the reason is not the lack of centrality of the pari passu principle, which has been adopted in every substantive insolvency enactment since the time of Henry VIII, but the fact that by its nature it applies only to the free assets of the company, and with the development of a huge range of security interests, trusts, reservation of title and other real rights, as well as various equities,[43] the amount of free assets in relation to unsecured claims is usually relatively small.[44] Moreover, it would be a mistake to measure the impact of the rule by reference to the amount distributed to the general body of creditors in a winding-up. The fact is that the rule has been applied in a wide diversity of situations to invalidate many hundreds of transactions and its mere existence may have discouraged as many again. It is true that the benefits of invalidation go in the first instance to swell the assets available for the expenses of the liquidation and the payment of preferential claims, and there are no doubt many cases in which unsecured creditors derive no benefit. Nevertheless, the rule may improve the prospects of a payment to unsecured creditors and, even where it does not, its effect is to preclude creditors who would benefit from the absence of the rule from diluting the assets available for distribution.

Secondly, it is argued that what the law disallows is not evasion of the pari passu principle as such, but rather attempts to by-pass the collective mechanism which an insolvency proceeding is designed to produce. If one takes references to the pari passu principle literally, there is force in this criticism in that evasion of the principle of collectivity, which is essentially procedural in character, would be outlawed whatever the order of distribution of assets under substantive insolvency law. In other words, what the courts are concerned to do is to bar devices that would by-pass the collective regime, with its restraints on individual enforcement, and allow an individual creditor to evade the statutory order of distribution, whatever that might be. Yet the fact that pari passu distribution is the general principle and the importance of its observance have been stressed in countless decisions by eminent judges[45] as well as by innumerable writers, including scholars from overseas describing their own insolvency laws. Is it, then, the case that all of these have been guilty of a “misunderstanding of the nature of the liquidation regime”?[46] Clearly not; they have simply invoked the pari passu rule as a form of shorthand to describe what is in fact the general statutory rule of distribution, and it is in that sense that it is referred to in the analysis of the rule which follows later.[47] This does not mean that references to the principle are hollow, for judges have also recognised that the general rule of distribution—that unsecured creditors must share pro rata in the company’s free assets—performs an equality function.[48]

© 2024 Thomson Reuters.

## Seventh principle: the pursuit of personal rights against the company is converted into a right to prove for a dividend in the liquidation

3-08 It is upon liquidation that the distinction between real and personal rights against a company becomes of crucial importance. So long as the company is solvent, it matters little in financial terms whether the claimant has a mere personal right to payment of a debt or damages or a proprietary interest in an asset from which he can obtain satisfaction of what is owed to him, for he can obtain a judgment on his personal claim and enforce it against any or all of the debtor company's assets or income so far as not subject to a prior interest in favour of a third party. But when the company becomes insolvent, so that there are insufficient assets to go round, the creditor with real rights in an asset (for example, a seller of goods under reservation of title, a mortgagee or chargee of property) can remove it from the maw of the general creditors, whereas the creditor with a purely personal right, although not deprived of the right itself, loses the ability to engage in individual pursuit of satisfaction and is required to lodge his claim with the liquidator in what is called a proof of debt and participate with other unsecured creditors in such pari passu distributions of dividend as the liquidator is able to make from realisation of the company's assets after allowing for the expenses of the liquidation and the claims of preferential creditors.

Fidelity to the first principle identified above suggests that this process of proof and distribution should be regarded as altering substantive entitlements only to the extent necessary to achieve a pro rata distribution,[49] with the result that (for example) an amount to which a creditor is contractually entitled that is left unsatisfied could, in the event of a surplus after payment of proved debts and statutory interest, be recoverable as a non-provable liability except where the statute otherwise provides, expressly or by necessary implication. In this respect the contrary view expressed, albeit in preliminary terms, by the majority of members of the Supreme Court in *Re Lehman Bros International (Europe) (in administration) (No.4)*[50] is to be regretted. It is hoped that this will be revisited when the opportunity arises.

## Eighth principle: on liquidation the company ceases to be the beneficial owner of its assets

3-09 Although winding-up does not of itself divest the company of legal title to its assets, it ceases to be the beneficial owner and holds the assets on trust to apply them in discharge of the company's liabilities in accordance with the statutory scheme of distribution.[51] The key decision on this point is that of the House of Lords in *Ayerst (Inspector of Taxes) v C. & K. (Construction) Ltd*,[52] where it was held that on winding-up a company ceased to be entitled to use its assets for its own benefit, so that on the sale of its business after the commencement of its winding-up its trade ceased to belong to the company beneficially and the purchaser could therefore not offset the company's unrelieved tax losses against its own tax assessment. So the fact that the company loses beneficial ownership on winding-up may have important tax consequences. A different approach was taken by the High Court of Australia in *Commissioner of Taxation v Linter Textiles Australia Ltd*,[53] Kirby J dissenting. In the majority view it is not correct to say that the company's beneficial ownership ceases on its going into liquidation. Rather, the position is that the company holds its property beneficially, but subject to the statutory scheme of liquidation under which the liquidator is to pay creditors and distribute any surplus among members.[54] In a strong dissenting judgment, Kirby J pointed out that the English decisions to the effect that the company lost beneficial ownership were not an attempt to import all of the features of trust law into the defined statutory relationships following a company liquidation. Rather, they were drawing an analogy to explain the construction and operation of the relevant statute. Noting that the decision in *Ayerst* was consistent with the approach taken by courts of New Zealand, Ireland and Hong Kong, Kirby J said:

> "I can see no reason of legal authority, principle or policy to justify this Court's taking a different course from that adopted by the unanimous opinion of the House of Lords on a precisely identical point of revenue law … There is no reason why we should take such a course. There are many reasons why we should not."[55]

The trust concept features in a number of other winding-up situations. Sums recovered by the liquidator in respect of wrongful trading, transactions at an undervalue and preferences are not considered to be assets of the company, but are held by the liquidator for the benefit of creditors in accordance with the statutory order of priority.[56] They are therefore not susceptible to capture by a secured creditor under an after-acquired property clause.[57] Sums paid and property transferred to the supervisor under a company voluntary arrangement are held on trust for the company voluntary arrangement (CVA) creditors, a trust which survives any subsequent winding-up of the company unless the CVA itself otherwise provides.[58] Such trust may also arise at an earlier stage if the terms of the proposal or the CVA itself indicate an intention to create a trust.[59]

There are, however, limits to the application of the *Ayerst* principle. In the first place, the statutory trust applies only in relation to property beneficially owned by the company. Therefore, it does not extend to property in the company's possession but belonging to another, for example, goods supplied under reservation of title, nor does it apply to assets given in security except to the extent of the company's equity of redemption.[60] Secondly, the liquidator is not for all purposes treated as distinct from the company itself. In *Re Stanford International Bank Ltd*,[61] a bank alleged to have been involved in a fraudulent "Ponzi" scheme was wound-up in Antigua, with the result that under Antiguan law its movable assets became vested in the liquidator. Upon an application by the UK Serious Fraud Office, on behalf of the US Department of Justice, a restraint order had been made under the Proceeds of Crime Act 2002 and subordinate legislation made thereunder freezing the company's assets as being allegedly the proceeds of a fraud on investors pending an application for a confiscation order.[62] The Antiguan liquidators contended that their status was not that of the company itself, but of a third party holding the assets for the benefit of creditors in the winding-up and that a restraint order ought therefore not to be made. The Court of Appeal held that the liquidators were not third parties, but stood in the shoes of the company itself and that while the original restraint order should be discharged on the ground that it was obtained by misrepresentation and non-disclosure, a new restraint order should be granted. However, Arden LJ considered that it was reasonably arguable that the unsecured creditors had an interest in the assets under the *Ayerst* principle and that a restraint order should not be made until the parties had had an opportunity to argue the position of unsecured creditors. The difficulty with this approach, which was doubted by other members of the court and had not been raised by any party to the proceedings, is that if it were correct, the underlying principle by which a restraint order made before liquidation or other insolvency proceeding has priority over the insolvency could never have effect. Moreover, s.84 of the Proceeds of Crime Act provides that references to property held by a person include references to property held by its liquidator. The only right of unsecured creditors in a winding-up is to have the assets realised, and the proceeds distributed, by the liquidator in accordance with the statutory regime. But those assets are susceptible to all restraints imposed by law.

## Ninth principle: no creditor has any interest in specie in the company's assets or realisations

3-10 The statutory trust upon which the company in winding-up holds the assets and realisations is not of a kind which confers on the creditors beneficial co-ownership or, indeed, a proprietary interest of any kind in the assets or realisations until completion of the liquidation.[63] Their rights are limited to invoking the protection of the court to ensure that the liquidator fulfils his statutory duties.[64] Their position is analogous to that of residuary legatees in an unadministered estate.[65] They have a right to compel performance of the executor's duties but no interest in the assets comprising the estate until completion of the administration, pending which beneficial ownership of the assets is in suspense, and to have the residue paid to them when the administration is completed.[66] The company thus holds the assets for statutory purposes, not for persons. Even the declaration of a dividend confers no right on the creditors to sue for the dividend; all they can do is to make an application to the court for an order requiring the liquidator to perform his duties.[67] These principles apply to preferential and ordinary creditors alike. So while preferential creditors can apply to the court to restrain a distribution which ignores their statutory priority, they have no proprietary interest in the assets or realisations as such. Moreover, until recently the liquidator's power to engage in litigation on behalf of the company[68] and treat the costs incurred as an expense of the liquidation ranking in priority to the claims of the holder of a floating charge and preferential creditors meant that they had no absolute right to prevent the liquidator from incurring expenditure in the pursuit of legal proceedings for the benefit of creditors generally, even if there were sufficient assets to pay the preferential creditors and the holder of a floating charge without any recoveries from the proceedings, so that these would be of no benefit to those creditors. However, some protection is now provided by the Insolvency Rules, the effect of which is that where the

© 2024 Thomson Reuters.

litigation expenses are likely to exceed £5,000 and to reduce the payment that would otherwise be made to preferential creditors or the holder of a floating charge, such expenses will not have priority over their claims unless their approval has been obtained for the litigation expenses.[69]

## Tenth principle: liquidation accelerates creditors' rights to payment

3-11 When a company goes into liquidation, its liability for payment of unmatured debts becomes notionally accelerated[70] to the extent that it has already been earned by performance. This results from the fact that a creditor has an immediate right of proof not only for debts already due to him, but for those payable in the future or on a contingency.[71] Debts payable in the future are provable in full, but if not due at the date of a dividend distribution are discounted for the purpose of computing the dividend,[72] while the value of contingent debts is estimated.[73] However, a claim qualifies as a debt for this purpose only to the extent that it has been earned, in the sense that the consideration for it is executed. For example, the principle of acceleration applies to a loan made before winding-up but maturing three years later, and to the future instalments payable at the time of winding-up in respect of the price of goods already delivered, for in both cases the consideration furnished by the creditor is executed. By contrast, a lessor cannot claim to accelerate the future rentals payable under a lease upon the winding-up of the lessee because these have not yet been earned; his remedy, if the liquidator retains possession for the benefit of the winding-up, is to recover each amount of rent as it falls due as an expense of the liquidation,[74] or if possession is not so retained, then to prove for each amount of rent as it falls due,[75] or alternatively, if the lease comes to an end through forfeiture by the lessor or disclaimer by the liquidator, to prove for the loss of the future rentals as unliquidated damages.[76]

## Eleventh principle: members of a company are not as such liable for its debts

3-12 It is a well-established principle of English company law, particularly relevant to insolvency, that where a body is created with corporate personality, contracts entered into in the name of that body are its contracts, not those of its members, and liabilities incurred under such contracts are the liabilities of the body corporate, for which the members do not have even a secondary liability unless otherwise provided by statute. In contrast to the position in Continental law and Scots law, a partnership firm is not considered by English law to have separate legal personality; the partnership is merely a business association of individual partners, who are jointly and severally liable for debts incurred in the name of the firm.[77] Under English law, the separation of the body corporate from its members and their insulation from liability are a necessary concomitant of corporate personality. This principle was reaffirmed by the Court of Appeal in its rulings in the International Tin Council litigation[78] and applies also to limited liability partnerships.[79] There was a brief period in the history of English law in which creditors had a direct right of action against members of a defaulting company, but such a right has been unknown to English law since 1855.[80] The principle applies as much to the one-man company as to others[81]; and in the celebrated decision in *Salomon v Salomon & Co*[82] the House of Lords saw nothing objectionable in the sole shareholder holding a debenture over the company's assets to secure payment to him of the price of the business he had sold to the company, thus enabling him as a secured creditor to obtain priority over unsecured creditors when the company became insolvent. It is no objection that the corporate form has been chosen by a controller so that they can avoid personal liability for trading debts; "on the contrary, that is what incorporation is all about".[83]

The principle that members of a company are not liable for its debts applies not only to companies controlled by individual members, but to wholly owned subsidiaries of other companies. So, in general, a parent company is not liable for the debts of its wholly owned subsidiary, nor does it incur a liability merely because it exercises overall control of the subsidiary through a group structure and group management and financial control, although if it interferes in day-to-day management it could be held to be a shadow director.[84]

© 2024 Thomson Reuters.

Members of a company will, of course, incur a liability where the company is registered, or re-registered, as an unlimited company, and may also do so where the company acts as their agent or where they undertake a collateral liability, for example, under a guarantee or other contract. Moreover, there are special situations in which the court is willing to pierce the corporate veil so as to identify the corporate identity with that of its shareholders, as where the company has been created and used as an engine of fraud [85]; but such cases are wholly exceptional, as the recent decision of the Supreme Court in *Prest v Petrodel* [86] confirms. Finally, although a European Economic Interest Grouping created under EEC regulations [87] and registered in this country has legal personality, [88] its members are jointly and severally liable for its debts without limit of liability. [89]

## Twelfth principle: on insolvency, directors' duties are altered so as to require enhanced regard for creditors' interests

3-13 When a company becomes insolvent or is bordering on insolvency, the duties owed by directors to the company under the general law are altered so as to require enhanced regard for creditors' interests. [90] When this rule is enlivened, it is complemented by a restriction on shareholders' ability to authorise a breach ex ante or ratify it ex post. [91] As we shall see, this rule has been particularly relied on in circumstances where the statutory wrongful trading rule cannot provide a remedy. [92]

## Thirteenth principle: in cross-border insolvencies, a principle of modified universalism applies

3-14 In general, where a main insolvency proceeding has been opened in a foreign jurisdiction, English courts should co-operate to ensure that all the insolvent company's assets are distributed to its creditors under a single system of distribution, [93] so that the role of the English courts is to aid the foreign insolvency. Recent decisions of the Supreme Court and of the Privy Council have exposed the limits of common law judicial assistance, [94] but they do not cast doubt on the basic principle. [95] Allied to this is the principle that in English insolvency proceedings there should be no discrimination against foreign creditors. [96]

**Footnotes**

1 In English insolvency proceedings, what constitutes an equity is governed by English law even if the asset in question is situated abroad or the transaction is otherwise governed by foreign law, and that equity will be enforced by an English court even if not recognised by the lex rei sitae. In *Re Scheibler Ex p. Holthausen (1874) 9 Ch. App. 722*, a firm of merchants, following negotiations for a line of credit with the appellants which were opened when the parties were in Prussia, deposited by way of security the title deeds to a house in Shanghai to cover their liabilities on bills of exchange, and then became bankrupt. The Court of Appeal held that the contract was governed by English law under which the deposit created a valid security interest binding on the trustee, but that even if it had been governed by German law the contract was personally binding on those who signed the agreement to deposit the title deeds, and who signed it as a personal contract, and was therefore binding on the trustee. A similar decision was given by Luxmoore J in *Anchor Line (Henderson Bros) Ltd [1937] Ch. 483*, citing *British South Africa Co v De Beers Consolidated Mines Ltd [1910] 1 Ch. 354*, per Swinfen Eady J at 387. In this respect, English insolvency law may have the unusual effect of expanding pre-insolvency entitlements under the applicable foreign law.

2 Cambridge Gas Transportation Corp v Official Committee of Unsecured Creditors of Navigator Holdings plc [2007] 1 A.C. 508, per Lord Hoffmann at [15]. In this respect the provisional views expressed in obiter by the majority in *Re*

© 2024 Thomson Reuters.

*Lehman Bros International (Europe) (in administration) (No.4) [2017] 2 W.L.R. 1497* as to the nature of the process of proof are to be regretted, and the view of Lord Sumption preferred. See below, para.3-08 and in more detail para.8-43.

3 But not contractual provisions under which liquidation or administration is the trigger for removal of an asset from the company, contrary to the anti-deprivation rule discussed in Ch.7. That rule is, however, to be applied "in a commercially sensitive manner, taking into account the policy of party autonomy and the upholding of proper commercial bargains": *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd [2012] 1 A.C. 383* at [106] per Lord Collins. Thus not every insolvency-triggered deprivation will fall foul of the rule: see below, para.3-06.

4 Civil actions for fraudulent trading and actions for wrongful trading can only be brought by a liquidator or (since the passage of the Small Business, Enterprise and Employment Act 2015) administrator, or their assignee: see ss.213, 214, 246ZA, 246ZB, and 246ZD of the Insolvency Act 1986, and above, paras 2-06 and below, para.14-01.

5 See below, Ch.13.

6 Insolvency Act 1986 s.127; and below, paras 13-121 et seq.

7 Insolvency Act 1986 s.129(2). See below, para.5-23.

8 Insolvency Act 1986 s.176A; Insolvency Act 1986 (Prescribed Part) Order 2003 (SI 2003/2097). See below, para.6-37.

9 Insolvency Act 1986 s.176ZA, which brought the position in liquidation in line with that in administration. See below, para.5-01.

10 The position of an administrator is somewhat different as he may sell property subject to a floating charge as if it were not subject to the charge and may dispose of property subject to any other form of security by order of the court (Insolvency Act 1986 Sch.B1 paras 70(1) and 71(1)). See below, paras 11-89 and 11-90. As to the position in relation to the sale of office-holder actions, see below, para.5-06.

11 For this purpose the court may, on an application for directions by a liquidator, utilise its inherent jurisdiction in relation to the supervision of trusts to give directions as to the way in which the claims of beneficiaries are to be established: *Re MF Global UK Ltd (in special administration) (No.3) [2013] 1 W.L.R. 3874*, in which this jurisdiction was utilised to establish a process analogous to proof and distribution in relation to trust assets of a company in special administration under the Investment Bank Special Administration (England and Wales) Rules 2011. As to the position of the administrator in relation to assets held on trust more generally, see the review of the authorities in *Re Allenfield Property Insurance Services Ltd (in administration) [2016] Lloyd's Rep. I.R. 217* at [46] et seq.

12 Re Berkeley Applegate (Investment Consultants) Ltd (No.3) (1989) 5 B.C.C. 803, per Peter Gibson J at 805; and *Re French Caledonia Travel Service Pty Ltd (2003) 204 A.L.R. 353 (NSW Supreme Court)*. Despite this, in *Re G.P. Stores Ltd, unreported 29 July 2004*, HH Judge Weeks QC ordered costs of the liquidator attributable in part to charged assets to be paid in the first instance out of the free assets of the company. See *Claire Sharp (2005) 18 Insolvency Intelligence 8*. As to the limits of the *Berkeley Applegate* allowance, which is discretionary, see *Elliot Green v Timothy Bramston (liquidator of Kingshouse Developments Ltd) [2011] B.P.I.R. 44*, and *Gillian v HEC Enterprises Ltd [2017] 1 B.C.L.C. 340* (an administration case).

13 Re French Caledonia Travel Service Pty. Ltd above, fn.12.

14 See, e.g. *Re London Local Residential Ltd [2004] 2 B.C.L.C. 72*. The basis of this decision by Evans-Lombe J is unclear, since his conclusion seems inconsistent with his earlier reasoning rejecting the deductibility of all of the liquidator's heads of expense not attributable to the administration of property allegedly held on trust.

15 Devaynes v Noble, Clayton's Case (1816) 1 Mer. 572, under which payments in a current account are allocated on the basis of first in, first out.

16 Barlow Clowes International Ltd v Vaughan [1992] B.C.L.C. 910; *Re Eastern Capital Futures Ltd [1989] B.C.L.C. 371*; and *French Caledonia Travel Service*, cited above fn.12.

17 Eastern Capital Futures, cited above fn.16.

18 Re Reis [1904] 2 K.B. 769; and *Re Lind [1915] 2 Ch. 345*. See Goode and Gullifer on Legal Problems of Credit and Security, ed. Louise Gullifer, 6th edn (London: Sweet & Maxwell, 2017), paras 2-13 and 2-14. Assets that were never property of the company cannot be captured by an after-acquired property clause. Such assets include the fruits of office-holder actions for wrongful and fraudulent trading and the avoidance of transactions at undervalue and preferences, or of the assignment of such actions: see below, paras 6-01 and 6-06 and, discussing the codifying effect of s.176ZB of the Insolvency Act 1986, para.6-36.

19 Re Collins [1925] Ch. 556. Where moneys come into the hands of the liquidator as the result of his procuring performance of the company's contract, these do not fall within the after-acquired property clause because they are at no time money of which the company is beneficial owner, but on the contrary from the moment of their receipt become subject to the so-called statutory trust for creditors upon which a company in liquidation is considered to hold its free assets. See *Ayerst (Inspector of Taxes) v C. & K. Construction Ltd [1976] A.C. 167*, and cases there cited, which embody the eighth principle referred to below. The trust is a trust for purposes, not for persons. See below, para.3-09.

© 2024 Thomson Reuters.

20 See above, fn.10.

21 Unlike a trustee in bankruptcy, in whom the bankrupt's estate vests immediately on his appointment taking effect (Insolvency Act 1986 s.306(1)), a liquidator does not acquire title to the assets of the company in liquidation unless this is vested in him by order of the court under s.145 of the Insolvency Act, a procedure rarely found necessary. What the liquidator acquires is control of the assets and the right to collect them in.

22 But the liquidator may by statute be able to assert *defences* which the company itself could not have raised prior to liquidation, e.g. that a security interest asserted by a creditor is void for want of registration or that a transaction relied on in proceedings against the company should be set aside as a transaction at an undervalue or a preference. Such defences will be discussed in detail in Ch.13.

23 Thus, in *Stone & Rolls Ltd v Moore Stephens [2009] 1 A.C. 1391*, the House of Lords held that where a person who was the sole directing mind and will of the company obtained funds from banks for sham transactions, so that the company was to be treated as the perpetrator of the crime, not a victim, auditors sued by the liquidator for negligence were entitled to plead ex turpi causa non oritur actio as a defence to the claim. See further below, para.6-17 fn.78. On the impact of the anti-deprivation rule on rights to terminate executory contracts by reason of the counterparty's entry into insolvency proceedings, see further below, para.7-24. At present the exercise of such rights is restrained by statute in administration only in relation to contracts for essential supplies, narrowly defined: see Insolvency Act 1986 ss.233-233A, and below, paras 7-29 and 11-72.

24 Re Eastgate [1905] 1 K.B. 465; and *Tilley v Bowman Ltd [1910] 1 K.B. 745*. It is suggested below, para.6-17, that the holding to the contrary in *Re Crown Holdings (London) Ltd (in liquidation) [2015] EWHC 1876 (Ch)* is wrong.

25 See Goode and Gullifer on Legal Problems of Credit and Security (2017), para.5-43.

26 Goode and Gullifer on Legal Problems of Credit and Security (2017), paras 7-79 et seq.; and Philip Wood, English and International Set-Off (London: Sweet & Maxwell, 1989), Ch.7. The insolvency rule of set-off applicable to a company in liquidation is contained in Insolvency Rules 2016 r.14.25 (previously Insolvency Rules 1986 r.4.90). The equivalent rule for administration is r.14.24 (previously r.2.85 of the Insolvency Rules 1986), but this applies only where the administrator has given notice of a proposed distribution. See below, paras 9-16, 9-48.

27 See Ch.7.

28 Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd [2012] 1 A.C. 383.

29 Exceptionally, some "well established categories" of limited interest are to be treated as insulated from the effects of the anti-deprivation rule, including forfeiture provisions in lease and license agreements: see below, para.7-20.

30 Belmont, cited above fn.28, per Lord Collins at [104]. See further below, paras 7-01 and 7-09 et seq.

31 Para.7-12.

32 Belmont, cited above fn.28, per Lord Collins at [1].

33 See below, para.7-04 et seq.

34 Above, para.2-27.

35 Insolvency Act 1986 s.107 (voluntary winding up); and Insolvency Rules 2016 r.14.12 (compulsory winding up and administration). See further below, para.8-02, and for a detailed discussion, Michael Bridge, "Collectivity, Management of Estates and the Pari Passu Rule in Winding up" in John Armour and Howard Bennett (eds), Vulnerable Transactions in Corporate Insolvency (Oxford: Hart Publishing, 2003), Ch.1.

36 See below, para.8-02.

37 See below, paras 7-03 and 8-02. The most recent statement of the rule can be found in the Supreme Court decision in *Belmont*, cited above fn.28, although that case was itself concerned with the anti-deprivation rule. As to whether a common law rule is necessary to reach the conclusion that a statutory provision that mandates pro rata distribution among unsecured creditors cannot be excluded by contract, see below, para.7-03. As to the impact of the rule on subordination arrangements, which are not invalidated, see below, para.8-08.

38 See below, paras 7-04 and 8-02.

39 The run-up period varies from six months to two years, depending on the circumstances.

40 Although the rule has a quite narrow focus that means some species of unfairness are not regulated by it: see below, paras 13-67 and 13-91.

41 See Ch.8.

42 Rizwaan Jameel Mokal, "Priority as Pathology: The Pari Passu Myth" [2001] C.L.J. 581.

43 See below, para.8-04.

44 See to similar effect Richard Calnan, Proprietary Interests and Insolvency (Oxford: Oxford University Press, 2010), para.1.147.

© 2024 Thomson Reuters.

45 See, e.g. *Buchler v Talbot [2004] 2 A.C. 298*, per Lord Nicholls at [32]; *Wight v Eckhardt Marine GmbH [2004] 1 A.C. 147*, per Lord Hoffmann at [28]–[32]; *Re Bank of Credit and Commerce International SA (No.8) [1998] A.C. 214*, per Lord Hoffmann at [5] and [9]; *Re Charter Reinsurance Co v Fagan [1997] A.C. 313*, per Mance J at 351; *Re J. Leslie Engineers Co Ltd [1976] 2 All E.R. 85*, per Oliver J at 95; *Re Dynamics Corp of America [1976] 2 All E.R. 669*, per Oliver J at 675; and *Re Harrington Motor Co Ex p. Chaplin [1928] Ch. 105*, per Atkin LJ at 122.

46 Mokal, "Priority as Pathology: The Pari Passu Myth" (above, fn.42), p.591.

47 See Ch.8.

48 See e.g. *Re Lehman Bros (International) Europe (in administration) (No.4) [2017] 2 W.L.R. 1497* at [20], in which Lord Neuberger describes the statutory provisions for rateable distribution as embodying "the fundamental principle of equality".

49 Or, as, at first instance, David Richards J put it in *Re Lehman Brothers International (Europe) (in administration) [2015] Ch. 1*, creditors' "contractual rights are compromised by the insolvency regime only for the purpose of achieving justice among creditors through a pari passu distribution" (at [110]).

50 Re Lehman Bros International (Europe) (in administration) (No.4) [2017] 2 W.L.R. 1497 at [97]-[111]. See further the analysis in para.8-43 below.

51 As to the applicability of this principle in administration, which is a matter of some controversy, see para.11-30, discussing *Harms Offshore AHT Taurus GmbH v Bloom [2010] Ch. 187*, *Revenue and Customs Commissioners v Football League Ltd [2012] Bus. L.R. 1539*, and *Re Lehman Bros Europe Ltd (in administration) (No.9) [2018] Bus. L.R. 439*.

52 Ayerst (Inspector of Taxes) v C. & K. (Construction) Ltd [1976] A.C. 167; see also *Pritchard v M H. Builders (Wilmslow) Ltd [1969] 2 All E.R. 670*. As to the special nature of the trust, see the ninth principle below.

53 Commissioner of Taxation v Linter Textiles Australia Ltd (2005) 215 A.L.R. 1.

54 Approving a passage from H.A.J. Ford and R.O. Austin (eds.), Ford and Austin's Principles of Corporations Law, 7th edn (Sydney: Butterworths, 1995), p.1013.

55 At [245].

56 See below, paras 6-36 and 13-134 et seq.

57 See below, para.6-36 (discussing the codifying effect of s.176ZB of the Insolvency Act 1986) and para.13-136.

58 See below, para.12-53.

59 See below, para.12-53.

60 See below, paras 6-44 and 6-45.

61 [2010] 3 W.L.R. 941. For other aspects of this case see below, para.16-29.

62 The Proceeds of Crime Act does not create a proprietary right over the assets of the insolvent company: it simply requires that the value of the tainted property be paid out of the company's assets (see *Re Stanford International Bank Ltd [2010] 3 W.L.R. 941*, per Hughes LJ at [162]). A restraint order cannot be made against a company which has already gone into liquidation (Proceeds of Crime Act 2002 s.426), and the same would appear to apply to a post-liquidation confiscation order in the absence of a pre-liquidation restraint order, although on this point there was a division of opinion between Hughes LJ and Mary Arden LJ, the former taking the view that a confiscation order could be made even after the commencement of a winding up. This, however, runs contrary to the statement in para.568 of the Explanatory Notes to the legislation and would seem to be incorrect.

63 Ayerst, cited above fn.52; *Buchler v Talbot [2004] 2 A.C. 298*, per Lord Hoffmann at [28]; and *Re Buckingham International Plc [1997] B.C.L.C. 673*, per Millett LJ at 683–684.

64 Buchler v Talbot, cited above fn.63; *Calgary and Edmonton Land Co Ltd v Dobinson [1974] Ch. 102*.

65 ibid.

66 Commissioner of Stamp Duties v Livingston [1965] A.C. 694; and *Re Hemming deceased [2009] Ch. 313*.

67 Prout v Gregory (1889) 24 Q.B.D. 281; *Spence v Coleman [1901] 2 K.B. 199*.

68 Insolvency Act 1986 Sch.4 para.4. There is no longer any requirement that the liquidator in compulsory winding up obtain sanction before the exercise of this power: see below para.5-04, explaining the effect of the Small Business, Enterprise and Employment Act 2015.

69 This is a very brief summary of the effect of the rather complex provisions contained in rr.7.108-116 of the Insolvency Rules 2016 (previously rr.4.218A-4.218E of the 1986 Rules).

70 It may also, of course, become contractually accelerated. For the effect of acceleration clauses in a winding up, see below, para.8-09.

71 Insolvency Rules 2016 rr.14.44 and 14.2(1) (see previously Insolvency Rules 1986 rr.4.94 and 12.3(1)).

72 Insolvency Rules 2016 r.14.44 (see previously Insolvency Rules 1986 r.11.13).

© 2024 Thomson Reuters.

73 Insolvency Rules 2016 r.14.14 (see previously Insolvency Rules 1986 r.4.86(1)). This is subject to the application of the hindsight principle, as noted below, paras 4-13 and 9-21.

74 Christopher Moran Holdings Ltd v Bairstow [2000] 2 A.C. 172 (on appeal from *Re Park Air Services plc [1997] 1 W.L.R. 1376*), per Lord Millett at 187; *Re ABC Coupler & Engineering Ltd (No.3) [1970] 1 W.L.R. 702*; *Re Oak Pits Colliery Co (1882) 21 Ch. D. 322*; *Re New Oriental Bank Corp (No.2) [1895] 1 Ch. 753*; and *Re Lundy Granite Co (1871) LR 6 Ch. 462*, per Sir W.M. James LJ at 466. The principle was extended to dilapidations in *Re Levi & Co [1919] 1 Ch. 416* (see further below, para.8-47) and also applies in an administration (*Goldacre (Offices) Ltd v Nortel Networks UK Ltd [2010] 3 W.L.R. 171*, approved by Lord Menzies in the Scottish case *Cheshire West and Chester BC v In the administration of Springfield Retail Ltd [2010] C.S.O.H. 115*. See further para.11-112.

75 See paras 6-22, 8-45. This is not an exception to the rule that post-liquidation debts are not provable; the rent accruing due after the time of commencement of the winding up is already a future debt at that time.

76 See below, para.8-47.

77 However, partnerships may now be formed with limited liability under the Limited Liability Partnerships Act 2000.

78 Maclaine Watson & Co Ltd v Department of Trade and Industry [1988] 3 All E.R. 257.

79 Limited Liability Partnerships Act 2000 s.1(2). Such partnerships are not discussed further in the present work.

80 As explained earlier (above, para.1-10), the first general statute providing for incorporation was the Joint Stock Companies Act 1844, under which the company had legal personality, but its members remained liable for its debts. That was changed by the Limited Liability Act 1855. Since that time, members of a company have never been *directly* liable as such to creditors. However, upon winding up, members of a limited liability company are liable to contribute to the assets of the company to the amount unpaid on their shares or, in the case of a company incorporated by guarantee, the amount they undertook to contribute to the assets of the company in the event of its being wound-up, and members of an unlimited company are liable to contribute to the assets without limitation in whatever amount is needed to cover the company's debts and the expenses of winding up. See Companies Act 2006 s.3 and Insolvency Act 1986 s.74.

81 Salomon v Salomon & Co [1897] A.C. 22.

82 Salomon v Salomon & Co [1897] A.C. 22.

83 Prest v Petrodel Resources Ltd [2013] 2 A.C. 415 at [34] per Lord Sumption.

84 See below, para.14-06.

85 Gilford Motor Co v Horne [1933] Ch. 935, but even this decision can be explained other than by reliance on a veil piercing doctrine: see *Prest v Petrodel Resources Ltd*, cited above fn.83, at [70]. See generally Paul Davies and Sarah Worthington, Gower: Principles of Modern Company Law, 10th edn (London: Sweet & Maxwell, 2016), Ch.8.

86 Above, fn.83.

87 Council Regulation 2137/85 of 25 July 1985 on the European Economic Interest Grouping (EEIG). The regulation has direct effect under Community law, but various matters were left to national law and are provided for by the European Economic Interest Grouping Regulations 1989 (SI 1989/638).

88 European Economic Interest Grouping Regulations 1989 (SI 1989/638) reg.3.

89 Council Regulation 2137/85 art.24(1).

90 West Mercia Safetywear Ltd v Dodd (1988) 4 B.C.C. 30. See further below, para.14-21.

91 Re Westminster Property Management Ltd (No.3) [2004] B.C.C. 581 at [32]; *Bilta (UK) Ltd (in liquidation) v Nazir [2016] A.C. 1* at [38]; *Singularis Holdings Ltd v Daiwa Capital Markets [2017] Bus L.R. 1386* at [129]–[130].

92 Specifically, in cases involving the authorisation of preferences. See below, para.14-21, and van *Zwieten, "Director Liability in Insolvency and its Vicinity" 38(2) Oxford Journal of Legal Studies 382*.

93 Re HIH Casualty and General Insurance Ltd [2008] 1 W.L.R. 852, per Lord Hoffmann at [6]; and *Cambridge Gas Transportation Corp v Official Committee of Unsecured Creditors of Navigator Holdings plc [2007] 1 A.C. 508*, per Lord Hoffmann at [16].

94 Rubin v Eurofinance SA [2013] 1 A.C. 23, discussed below, para.16-55, and *Singularis Holdings Ltd v PricewaterhouseCoopers [2015] A.C. 1675*. The latter makes clear that the common law power to recognise and assist in cross-border insolvency cases should not be equated with a power to do whatever the court could do in a domestic insolvency, or with the ability to apply legislation "by analogy" or "as if" domestic proceedings had been opened. See below, para.16-55 and 16-57.

95 As indicated below, para.16-08, fn.36.

96 See para.16-09.

End of Document © 2024 SWEET & MAXWELL

© 2024 Thomson Reuters. 

CHAPTER 9

# FUNCTIONS OF THE LIQUIDATOR

In the preceding chapter something was said of the duties to which the liquidator is subject under the general law by virtue of his or her position as a fiduciary agent of the company appointed to conduct what is essentially in the nature of a business. The present chapter attempts to deal in detail with the actual functions of the liquidator in winding up, using that expression in the widest possible sense to include not only the statutory duties of the liquidator as such, but also the means provided for performing them, the manner in which the liquidator's conduct of the winding up can be controlled and supervised, and the remedies which are available against the liquidator in the event of a breach of duty on his or her part. **9-001**

The principal object of winding up, is of course, to have the assets of the company collected and realised, its debts and liabilities discharged, and any remaining balance distributed among the members. These are typically the functions of the liquidator, and it is the liquidator, and only the liquidator, who is entitled to perform them. Neither the company,[1] nor even the court itself,[2] is able to delegate to some other person the performance of duties or the exercise of powers which are vested by the Insolvency Act 1986 (the Act) in the liquidator in winding up. The actions of no person or no body can in any way alter, interfere with, or override their fundamental obligation, which is to observe all statutory requirements and to conduct the winding up in strict accordance with the Act and the Insolvency Rules 2016 (the Rules).[3]

## I. POWERS OF THE LIQUIDATOR

The powers of liquidators, whether in compulsory or in voluntary winding up, are the product partly of legislative enactment and partly also of their position as the agents of companies in winding up. Questions to be considered here are the nature and extent of these powers, as well as the extent to which acts of liquidators are invalidated by being done in excess of power or without proper authority. **9-002**

---

1 The company is prohibited from transferring or assigning all its property to trustees for the benefit of all its creditors. See *London Joint City & Midland Bank v Herbert Dickinson & Co* [1922] W.N. 13.

2 See *Bakal v Petursson* [1953] 4 D.L.R. 449; *Re Swallow Footwear Ltd*, *Times*, 23 October 1956; (1956) 222 L.T.Jo. 229.

3 Insolvency (England and Wales) Rules 2016 (SI 2016/1024). *Re Dominion Trust Co*; sub nom. *Critchley's Case* (1916) 27 D.L.R. 580.

## A. The liquidator as agent

**9-003** Upon winding up, the directors of the company are displaced and their functions assumed by the liquidator,[4] who, in exercising his or her powers, acts as the agent of the company.[5] All the normal consequences incidental to the agency relationship are therefore present: the acts and the transactions into which they enter bind the company, not liquidators personally, and this is so whether the company is being wound up voluntarily or compulsorily. In *Re Farrow's Bank*,[6] the company was the lessee of premises under a lease containing a proviso for determination and re-entry in the event of breach of covenant not to assign; the company was put into compulsory liquidation and the liquidator took steps to assign the lease without obtaining the lessor's consent. It was held that this amounted to breach of covenant by the company (as lessor) since

> "the act is the act of the company acting through the liquidator … who is doing the act which he does strictly on behalf of the company".[7]

Likewise no personal liability attaches to the liquidator in respect of acts and transactions performed or entered into in his or her capacity as agent for the company.[8] Hence, if liquidators enter into a contract on the company's behalf,[9] or appoint a solicitor to assist in the performance of their duties,[10] the contract is made with, and the liability fixes upon, the company and not liquidators, since it is to the assets of the company and not to the liquidator personally that credit is given by the other party to the transaction.[11] This appears to be so even though liquidators fail to describe themselves expressly as a liquidator,[12] although some such indication of the liquidator's representative capacity is a wise precaution if disputes are to be avoided. The rule is the same where the liquidator occupies premises of the company for the purposes of the winding up: by doing so the liquidator incurs no

---

4 *Re Crest Realty Pty Ltd (No.2)* [1977] 1 N.S.W.L.R 664; (1977) 2 A.C.L.R. 502 at 508.

5 *Re Silver Valley Mines Ltd* (1882) 21 Ch. D. 381 CA; *Knowles v Scott* [1891] 1 Ch. 717. A consequence of the liquidator being an agent is that the liquidator is bound by those things which bound the company—the liquidator is in no better position: *A-G (Canada) v Standard Trust Co of New York* [1911] A.C. 498; *Multinational Gas & Petroleum Co Ltd v Multinational Gas & Petroleum Services Ltd* [1983] 1 Ch. 258 CA; *Pascoe Ltd v Lucas* (1998) 27 A.C.S.R. 737.

6 *Re Farrow's Bank* [1921] 2 Ch. 164; see also *Cohen v Popular Restaurants Ltd* [1917] 1 K.B. 480 (voluntary winding up); *Alexander Ward & Co Ltd v Samyang Navigation Co Ltd* [1978] 1 W.L.R. 673.

7 *Re Farrow's Bank* [1921] 2 Ch. 164 at 175.

8 *Re Silver Valley Mines Ltd* (1882) 21 Ch. D. 381 CA; *Stead Hazel & Co v Cooper* [1933] 1 K.B. 840; *Style & Mantle Ltd v Prices Taylors Ltd*, 1934 S.C. 548 at 553, 554; *Stewart v Engel* [2000] B.P.I.R. 383.

9 *Re Silver Valley Mines Ltd* (1882) 21 Ch. D. 381 CA; *Stead Hazel & Co v Cooper* [1933] 1 K.B. 840; *Style & Mantle Ltd v Prices Taylors Ltd*, 1934 S.C. 548 at 553, 554; *Stewart v Engel* [2000] B.P.I.R. 383.

10 *Re Anglo-Moravian Ry Co* (1875) 1 Ch. D. 130.

11 *Re Anglo-Moravian Ry Co* (1875) 1 Ch. D. 130 at 133. Nor under the general law does the liquidator incur personal liability for income tax by carrying on the business of the company: *Re Beni-Felkai Mining Co* [1934] Ch. 406 at 416.

12 *Stead Hazel & Co v Cooper* [1933] 1 K.B. 840 at 843.

personal liability for rent[13] or rates[14] for the premises are occupied not in a personal right but in the capacity as manager and servant of the company.[15]

## B. Statutory powers

Although the powers of a liquidator in compulsory and in voluntary winding up are basically alike, different provisions apply to each form of winding up and therefore it is probably appropriate to provide separate treatment. **9-004**

### *1. Compulsory winding up*

The power of a liquidator in compulsory winding up may be divided into primary, supplementary and delegated powers. The discussion below focuses on those powers set out in Sch.4 to the Act.[16] The powers in Sch.4 are by no means exhaustive; there are many other powers given elsewhere in the Act to the liquidator, such as s.236 to examine certain persons concerning the affairs of the company,[17] and s.178 to disclaim onerous property.[18] **9-005**

**(a) Primary powers** By original powers it is meant those powers which are conferred upon the liquidator directly by express provision in the Act. The principal source is s.167, which confers, together with Sch.4 to the Act, a variety of powers which are intended to facilitate performance by the liquidator of the duties in winding up. Most of these are directed to specific duties which are bound to be carried out and will be considered in the context of the particular duty to which they relate. However, it is appropriate here to say something in this section of the chapter about the powers most frequently invoked. In exercising the powers given to the liquidator, he or she acts according to s.167(3) subject to the control of the court,[19] and a creditor or a contributory might apply to the court for it to make a determination on what a liquidator has done, but the court is reluctant to interfere with the exercise of a liquidator's powers unless he or she is acting unreasonably,[20] or the conduct complained of is absurd[21] and courts are generally unwilling to compel a liquidator to exercise power in a manner contrary to what, in the liquidator's opinion, is in the best interests of the liquidation.[22] Section 167(3) only applies to court winding up, but in voluntary liquidations an application may be brought under s.112.[23] **9-006**

Until recently[24] certain of the powers conferred by s.167 in conjunction with Sch.4 could only be exercised with the sanction of the court or of the liquidation

13 *Warrender Estates Ltd v Simpson* (1933) 33 S.R. (N.S.W.) 390.
14 *Re Wearmouth Crown Glass Co* (1882) 19 Ch. D. 640.
15 *Warrender Estates Ltd v Simpson* (1933) 33 S.R. (N.S.W.) 390 at 395.
16 All references to sections in this chapter are references to sections in the Insolvency Act 1986 unless the contrary is indicated.
17 This is discussed in detail in Ch.15.
18 See below at paras 9-089–9-106.
19 See 1986 Act s.167(3).
20 *Pitman v Top Business Systems Ltd* [1984] B.C.L.C. 593; *Re Greenhaven Motors Ltd* [1997] B.C.C. 547.
21 *Leon v York-O-Matic Ltd* [1966] 1 W.L.R. 1450.
22 See *Re International Contract Co* [1872] W.N. 63; *Re East of England Banking Co*; sub nom. *Pearson's Case* (1871-72) L.R. 7 Ch. App. 309, where it was held that the court had no jurisdiction to compel the liquidator to enter into a compromise.
23 *Cooper v PRG Powerhouse Ltd* [2008] EWHC 498 (Ch).
24 Until the advent of s.120 of the Small Business, Enterprise and Employment Act 2015.

committee.[25] Other powers have always been able to be implemented without sanction.[26] Now s.167(1) of the Act provides that a liquidator may exercise any of the powers in Pts I–III of Sch.4 to the Act without the need for sanction. While the liquidator has more unfettered power, it is wise for him or her to seek approval in certain cases, such as where proposed litigation might be very expensive or involving significant risk. In *Re Longmeade Ltd*,[27] Snowden J set out the principles that should be applied by a liquidator in relation to the exercise of powers in situations where sanction was previously required. These are as follows:

- the institution of legal proceedings in a compulsory liquidation and in the name of the company was essentially a commercial decision;
- in taking that decision, the liquidators had to act in what they believed to be the best interests of the insolvent company and all those who had an interest in its estate;
- liquidators could, but were not obliged to, consult the creditors (or contributories) who had an interest in the estate;
- the liquidators should normally give weight to the reasoned views of the majority of such creditors (or contributories), provided that those views were uninfluenced by extraneous considerations;
- if all those who were interested in the insolvent estate are fully informed and were unanimously of the same view, the liquidators should ordinarily give effect to their wishes; and
- the court should not generally interfere with a commercial or administrative decision of liquidators after the event, unless it was a decision that was taken in bad faith or was a decision that no reasonable liquidator could have taken.[28]

Some of the more important specific powers granted to liquidators are discussed below.

**9-007** *(i) The power to effect compromises* This power is found in para.2 of Sch.4 to the Act. Formerly a liquidator was required to obtain sanction for any compromise decision, but that is no longer the case. However, a liquidator may still seek the sanction of the court in certain situations and so prior law on the issue of approval remains relevant. A liquidator would be justified in doing so where the decision to compromise was a particularly momentous one.[29]

The role of the court in relation to this power is

> "not of course a rubber stamp for whatever is put forward by the liquidator but it is not the role of the court to independently appraise the commercial soundness of the proposal. The court will not generally interfere unless there can be seen to be some lack of good faith, error in law or principle, or some real and substantive ground for doubting the prudence of the liquidator's proposal".[30]

The reason for this is that a liquidator is best placed to assess a compromise

---

25 See 1986 Act Pts I and II of Sch.4 as they once were prefaced.
26 See 1986 Act Pt III of Sch.4.
27 *Re Longmeade Ltd* [2016] EWHC 356 (Ch); [2016] B.P.I.R. 666.
28 *Re Longmeade Ltd* [2016] B.P.I.R. 666 at [66].
29 *Re Nortel Networks UK Ltd* [2016] EWHC 2769 (Ch) at [46]–[47].
30 *State Bank of New South Wales v Turner Corp Ltd* (1994) 14 A.C.S.R. 480 at 483 per Tamberlin J. The burden of establishing a lack of good faith, error in law or principle or some ground for doubt-

proposal with regard to the interests of the creditors.[31] While the court is not bound by the views of the liquidator it should not conduct a mini-trial of the merits of the issues that relate to the claim that is being compromised.[32]

The following discussion is focused on the situation where a liquidator feels that it is appropriate to seek court sanction. If a liquidator did not support a compromise, but felt that it should be brought before the courts, then unless there were exceptional circumstances a court would not approve of the compromise.[33] When deciding whether or not to support a decision to compromise, the court will usually rely on the liquidator's commercial judgment.[34] In considering the settlement of legal proceedings liquidators are expected to obtain advice from legal practitioners appropriate to the nature and value of the claims.[35] Where large sums are involved courts expect liquidators to secure the advice of an experienced counsel, someone with at least seven years' post-admission experience.[36] **9-008**

In determining whether to approve a compromise in relation to an insolvent company's affairs, a court's prime consideration is whether the compromise is for the benefit, and serving the interests, of the creditors or contributories interested in the assets of the company.[37] The fact that the liquidator might benefit personally from a compromise in that he or she might be relieved from liability in costs was not a reason for a court to refuse to sanction a compromise.[38] **9-009**

In hearing the application of a liquidator for approval it is not the role of the court to reconsider all of the issues which the liquidator has considered as if it were hearing a matter de novo; rather the court's role is

> "simply to review the liquidator's proposal, paying due regard to his or her commercial judgment and knowledge of all of the circumstances of the liquidation, satisfying itself that there is no error of law or ground for suspecting bad faith or impropriety, and weighing up whether there is any good reason to intervene in terms of the 'expeditious and beneficial administration' of the winding up …".[39]

The compromise was approved in *Re Bank of Credit and Commerce S.A. (No.4)*[40] where the court permitted the liquidators to enter into a contribution agreement whereby claims between BCCI companies and the majority of shareholders were settled in exchange for a payment into the winding up by the shareholders. The court

ing the liquidator's prudence is not light: *Re Geelong Building Society* (1996) 14 A.C.L.C. 334 at 338.

31 *Re Geelong Building Society* (1996) 14 A.C.L.C. 334 at 338. The Court must be careful in "second guessing the liquidator" (at 339).

32 *Rubin v Coote* [2009] EWHC 2266 (Ch); [2009] B.P.I.R. 262 (appeal dismissed: [2011] EWCA Civ 106; [2011] B.C.C. 596).

33 *Re Geelong Building Society* (1996) 14 A.C.L.C. 334 at 338. In such a case, it is probable that the correct course of action is for the liquidator to seek directions pursuant to s.168(3).

34 *Re Chase Corp (Australia) Equities Ltd* (1990) 8 A.C.L.C. 1118; *Re Spedley Securities Ltd (in liq)* (1992) 9 A.C.S.R. 83 at 85.

35 *State Bank of NSW v Turner Corp Ltd* (1994) 14 A.C.S.R. 480 at 483.

36 *Re Chase Corp (Australia) Equities Ltd* (1990) 8 A.C.L.C. 1118 at 1119.

37 *Re Edennote Ltd (No.2)* [1997] 2 B.C.L.C. 89; *Re Greenhaven Motors Ltd* [1999] B.C.C. 463; [1999] 1 B.C.L.C. 635 CA. Also see the Australian cases: *Re Spedley Securities Ltd (in liq)* (1992) 9 A.C.S.R. 83 at 85 and 86; *State Bank of NSW v Turner Corp Ltd* (1994) 14 A.C.S.R. 480 at 483; *Re Geelong Building Society* (1996) 14 A.C.L.C. 334 at 338; *Re Aslor Pty Ltd* (1997) 15 A.C.L.C. 1412 at 1413; (1997) 24 A.C.S.R. 612 at 613.

38 *Re Greenhaven Motors Ltd* [1999] B.C.C. 463; [1999] 1 B.C.L.C. 635 CA.

39 *Corporate Affairs Commission v ASC Timber Pty Ltd* (1998) 16 A.C.L.C. 1642 at 1650. Also see *Re GA Listing & Maintenance Pty Ltd* (1994) 15 A.C.S.R. 308.

40 *Re Bank of Credit and Commerce SA (No.4)* [1995] B.C.C. 453.

said that it was the only chance for the Bank's depositors (and creditors) to get anything from the company.

**9-010** Where a liquidator wishes to pool the assets of several companies whose affairs are connected closely and where money has been transferred between them, he or she might seek approval from a court on the basis that this would constitute a compromise,[41] and the decision of the liquidator might be somewhat controversial.

If the application of the liquidator relates to whether or not a compromise should be sanctioned, the court could ignore the wishes of those contributories who have no realistic prospect of a distribution.[42]

Finally, it is worth noting that in *Whitehouse v Wilson*[43] the Court of Appeal said that a liquidator would be acting properly in compromising a claim which he had for misfeasance against a director because if he did not do so, and pursued the claim, he would be doing so at the expense of the post-liquidation creditors of the company. The Court took the view that the action should not be pursued at the possible expense of the post-liquidation creditors.

**9-011** *(ii) The power to bring or defend actions* Inevitably a part of the job of many liquidators is to take proceedings in the courts to recover property or assert rights held by the company in order, eventually, to benefit the creditors. Paragraph 4 of Sch.4 grants liquidators power to bring or defend legal proceedings. The issue of litigation so pervades a consideration of winding up that it is rather difficult to know where to discuss matters surrounding the taking of proceedings, and also which to address as the liquidator will be like any other litigant in many cases, such as having to assess carefully advice of counsel as to the chances of the litigation succeeding. It is felt that it is appropriate to deal with most of the issues facing a liquidator at this point in the book, although some further issues, dealt with more appropriately elsewhere, are left until later. Foremost in this regard are matters related to specific proceedings and considered in Ch.11. Also, matters pertaining to the funding of proceedings are discussed later in this chapter when the duty of a liquidator to collect property is examined.[44]

Liquidators should bear in mind the caveat sounded by Lightman J in *RBG Resources Plc (in liq) v Rastogi*[45] that they are to exercise great care before deciding to bring or continue expensive proceedings for damages against impecunious persons, especially where serious allegations are involved.[46] Directors of insolvent companies that are being wound up may well be impecunious for several reasons, such as paying out on guarantees they gave in relation to the debts of their companies.

In all liquidations the liquidator previously had to secure a sanction if he or she wished to take legal proceedings under any one or more of ss.212, 213, 214, 238, 239, 242, 243 or 423.[47] This requirement was introduced as part of the Enterprise Act 2002 reforms in 2003. The requirement of obtaining approval was abolished by s.120 of the Small Business, Enterprise and Employment Act 2015. But as

---

41 *Re Transocean Equipment Manufacturing and Trading Ltd* [2004] All E.R. (D) 352 (Oct). The application in this case was successful.
42 *Re Barings Plc (in liq) (No.7)* [2002] B.P.I.R. 653; [2002] 1 B.C.L.C. 401.
43 *Whitehouse v Wilson* [2006] EWCA Civ 1688; [2007] B.C.C. 596; [2007] B.P.I.R. 230.
44 See below at paras 9-012–9-020.
45 *RBG Resources Plc (in liq) v Rastogi* [2005] EWHC 994 (Ch); [2005] 2 B.C.L.C. 692.
46 *RBG Resources Plc (in liq) v Rastogi* [2005] EWHC 994 (Ch); [2005] 2 B.C.L.C. 692 at [52].
47 1986 Act Sch.4 para.3A.

mentioned earlier, a liquidator still might feel that it is appropriate to seek sanction in some cases,

Liquidators will have a choice as to whether they bring proceedings in the name of the company or their own name as liquidator, except in relation to some actions, such as for avoidance of preferences under s.239 or claims for wrongful trading under s.214, as they are actions given to the liquidator personally and not to the company.[48] **9-012**

Invariably in a claim brought by the liquidator, the liquidator will make out and file one or more witness statements to support the claim. Care must be taken in what is included in such statements. Insolvency and Companies Court (ICC) Judge Barber was critical of the liquidators in *Hellard v Graiseley Investments Ltd*[49] where the liquidators had included opinion in their witness statement. There is now a new practice direction on witness statements for trials in the Business and Property Courts[50] and following this may rectify poor practice.

A major issue with litigation is the matter of legal and other costs. Clearly costs incurred by a liquidator in prosecuting or defending an action in either his or her name (where such power exists) or the name of the company are expenses that can be paid out of company assets and they enjoy a high priority under r.7.108(4)(a)(ii). Prior to the time when amendments to the Rules in 2002 came into effect,[51] liquidators could not claim as expenses their costs in litigation brought in their name.[52] But of course, even under the new situation, if the liquidator fails to retain sufficient assets to cover the costs then he or she could be held personally liable.[53] We will return to this issue shortly.

One matter that does not seem to be totally clear is whether a liquidator can claim an adverse costs order made against the liquidator or the company as expenses under r.7.108(4)(a)(ii). Certainly prior to the 2002 amendment, where liquidators initiated proceedings in their own name then they were personally liable for any costs awarded to the other party.[54] The reason was articulated by Oliver J in *Re Wilson Lovatt & Sons Ltd*[55]:

> "I cannot at the moment see why it should be contended that a liquidator who takes it on himself to institute proceedings, to bring parties before the Court, to subject them to costs, and as against whom it is quite clearly established that no order for security can be made, should then be entitled to plead that he is not responsible beyond the extent of the assets in his hands. I can see no reason at all why a liquidator should be entitled to an immunity which is not conferred on other litigants."[56]

It might be submitted that to include adverse costs orders within the rule is unfair **9-013**

---

48 See *Kirkpatrick v Snoozebox Ltd* [2014] B.C.C. 477. See 1986 Act Sch.4 para.3A.
49 *Hellard v Graiseley Investments Ltd* [2018] EWHC 2664 (Ch).
50 Practice Direction 57AC: Trial Witness Statements in the Business and Property Courts. This applied from 6 April 2021.
51 See of Insolvency (Amendment) (No.2) Rules 2002.
52 For example, see *Re M.C. Bacon Ltd (No.2)* [1990] B.C.L.C. 607; [1990] B.C.C. 430; *Re Floor Fourteen Ltd* [2002] B.C.C. 198 CA.
53 *Re Pacific Coast Syndicate Ltd* [1913] 2 Ch. 26.
54 *Van den Hurk v Martens & Co Ltd* [1920] 1 K.B. 850; *Re Tokenhouse Investments Ltd* [1934] St. R. Qd. 189; *Re Buena Vista Motors Pty Ltd (in liq)* [1971] 1 N.S.W.L.R. 72; *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274; *Re Speedifix Building Products Pty Ltd* (1987) 5 A.C.L.C. 866; *Re MC Bacon Ltd* [1991] Ch. 127.
55 *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274.
56 *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274 at 285.

as far as the party who succeeds against the liquidator is concerned; such a party should be paid before the r.7.108(4)(a) expenses. In the past it has been held that if costs were awarded against the liquidator in favour of the other party to the proceedings then those costs will be payable out of the company's assets in priority to those of the liquidator.[57]

In determining the issue of adverse costs, it might also be notable that r.4.220(2) (of the Insolvency Rules 1986) was not amended when r.4.218 was amended in 2002, and it continues to state now in the most recent equivalent provision (r.7.110(2)):

> "Nothing in those Rules [meaning rr.7.108 and 7.109] … affect the rights of any person to whom such costs are ordered to be paid."

Further, it could be said that the amendment to r.4.218 in 2002 was intended to overcome decisions where the liquidator was not entitled to recover his or her own legal expenses from company funds under this rule. Thus, someone with an adverse costs order is entitled to be paid in priority to liquidation expenses.[58] Oliver J in *Re Wilson Lovatt & Sons Ltd*[59] said, as indicated in the quotation above, that he could see powerful policy reasons for not insulating liquidators from having costs awarded against them. More recently ICC Judge Barber in *Hellard v Graiseley Investments Ltd*[60] said that a liquidator's position was no different from that of other parties to litigation. Earlier, Hildyard J had stated in *Hosking v Apax Partners LLP*[61] that it was appropriate in the case before him to award an adverse costs order order against liquidators on an indemnity basis, His Lordship was scathing as far as the bringing of the action was concerned. He said that:

> "My assessment is that this was high-risk litigation aggressively and very expensively pursued after failure of one sort or another in multiple jurisdictions, without demonstrable support in the contemporaneous documentary evidence; that the shape of the proceedings abroad, and the publicity the claims seem to have been calculated to attract, committed the Liquidators to an inappropriate form of action, it being difficult, perhaps impossible, to force the complaints into the structure of section 423 [of the Insolvency Act 1986]; that the case always depended on extracting in cross-examination support for a thesis which had no or no material support in the contemporaneous documentation and which it clearly contradicted …"[62]

**9-014** If a party, against which an action is brought by a liquidator in the name of the company, obtains an order for costs but the company does not have sufficient assets to pay the order, the successful party might seek to claim the costs from the liquidator personally. There is Australian authority to the effect that a court would not order costs against a liquidator personally provided that he or she had acted reasonably.[63] Other Australian authority has held that the courts have a discretion as to whether to order that the liquidator pays but an order should be exercised spar-

---

57 *Norglen Ltd v Reeds Rains Prudential* [1998] 1 All E.R. 218 at 232–233; [1998] B.C.C. 44 at 55–56.

58 See the arguments mounted in Gleghorn, "Re MT Realisations Ltd; recovering costs from an insolvent company" (2004) 20 I.L. & P. 105 against the amendment to the Rules covering adverse costs orders.

59 *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274 at 285.

60 *Hellard v Graiseley Investments Ltd* [2018] EWHC 2664 (Ch).

61 *Hosking v Apax Partners LLP* [2018] EWHC 2732 (Ch); [2019] 1 W.L.R. 3347.

62 *Hosking v Apax Partners LLP* [2019] 1 W.L.R. 3347 at [98].

63 For instance, see *International Cat Manufacturing Pty Ltd v Rodrick* [2014] QSC 307.

ingly, not by way of punishing an imprudent liquidator.[64] An order should only be made in circumstances that may make it just or appropriate for the successful party to be indemnified against his or her costs.[65]

There is the possibility, although not strong, that the English courts could make a costs order against the liquidator in exercising their power, under s.51(1) and (3) of the Senior Courts Act 1981 to order costs against non-parties.[66] Non-party costs orders are made against participating persons or bodies in relation to costs of litigation in which they are not formally involved. While what follows does not purport to be an exhaustive discussion of non-party orders of costs, a few words dealing with this are appropriate.

There has been a significant number of cases in the past few decades where this issue has been litigated.[67] A costs order will only be made against a non-party who has a substantial connection with the relevant proceedings,[68] such as the sole director of a company whose opposition to a winding-up order was orchestrated by the director.[69] In recent years several cases have been brought against professional litigation funders.[70] As discussed later there is a substantial amount of litigation in liquidation cases that are funded by such funders.

At the outset it is worth noting the observation of Lord Briggs (with whom Lady Black and Lord Kitchin agreed) in *Travelers Insurance Co Ltd v XYZ*[71] that the appellate courts have struggled to identify principles applicable across the board to the exercise of the jurisdiction to make a costs order against a non-party, save at the very highest level of generality,[72] and this has undoubtedly led to some uncertainty.

Whether a costs order will be made or not depends not on whether the non-party has acted "in bad faith, abuse of process, impropriety or procedural manipulation",[73] but rather on whether or not in all the circumstances it is just to exercise

---

64 *JGM Nominees Pty Ltd v Australvic Pty Ltd (in liq) (No. 3)* [2010] VSC 623 at [103].

65 *JGM Nominees Pty Ltd v Australvic Pty Ltd (in liq) (No. 3)* [2010] VSC 623 at [103].

66 For example, see *Aiden Shipping Co Ltd v Interbulk Ltd* [1986] A.C. 965 HL; *Globe Equities Ltd v Globe Legal Services Ltd* (1999) B.L.R. 232; *Times*, 14 April 1999 CA; *National Justice Compania Naviera SA v Prudential Assurance Co Ltd (No.2)* [2000] 1 W.L.R. 603 CA.

67 The cases in the area are voluminous now, but for some cases, mostly appellate cases, see, for example, *Dymocks Franchise Systems (NSW) Pty Ltd v Todd* [2004] UKPC 39; [2004] 1 W.L.R. 2807; [2005] 4 All E.R. 195 PC; *CIBC Mellon Trust Co Ltd v Stolzenberg* [2005] EWCA Civ 628; [2005] 2 B.C.L.C. 618; *Goodwood Recoveries Ltd v Breen* [2005] EWCA Civ 414; [2006] 1 W.L.R. 2723; *BE Studios Ltd v Smith & Williamson Ltd* [2005] EWHC 2730 (Ch); *Suisse Security Bank & Trust Ltd v Francis* [2006] UKPC 41; *Dolphin Quays Developments Ltd v Mills Mills v Birchall*; [2008] EWCA Civ 385; [2008] 1 W.L.R. 1829; [2008] Bus. L.R. 1520; *Raleigh UK Ltd v Mail Order Cycles Ltd* [2011] EWHC 883 (Ch); [2011] B.C.C 508; *Systemcare (UK) Ltd v Design Technology Ltd* [2011] EWCA Civ 546; [2012] 1 B.C.L.C. 14; *Deutsche Bank AG v Sebastian Holdings Inc* [2016] EWCA Civ 23.

68 *Symphony Group v Hodgson* [1994] Q.B. 179 at 191 CA; *National Justice Compania Naviera SA v Prudential Assurance Co Ltd (No.2) Times*, 15 October 1999 CA. But it was held in the latter case that a foreign non-party can be the subject of an order where he or she has a substantial connection with the proceedings.

69 *Re Aurum Marketing Ltd* [2000] 2 B.C.L.C. 645. But there is no general rule that the controlling shareholder and director of a one-man company are liable personally for costs merely because he or she caused the company to defend proceedings (at 650 per Mummery LJ).

70 For instance, see *Chapelgate Credit Opportunity Master Fund Ltd v Money* [2020] EWCA Civ 246; [2020] 2 B.C.L.C. 170.

71 *Travelers Insurance Co Ltd v XYZ* [2019] UKSC 48; [2019] 1 W.L.R. 6075.

72 *Travelers Insurance Co Ltd v XYZ* [2019] 1 W.L.R. 6075 at [28].

73 *Re Aurum Marketing Ltd* [2000] 2 B.C.L.C. 645 at 654 per Mummery LJ.

the power.[74] The Court of Appeal has said[75] that the ultimate issue was whether it was just to make an order under s.51. This approach was applied recently by ICC Judge Barber in *Re Viceroy Jones New Tech Ltd*,[76] a case involving a company that was in liquidation.

The discretion conferred by s.51 entitles a court, where justice requires it, to order a non-party to pay costs even though costs had not been awarded against any party to the proceedings.[77] The Court of Appeal in *Mills v Birchall*[78] said that the availability of security for costs was an important factor in the exercise of the discretion.[79] While the power to order a non-party is to be used with caution[80] and on occasions its exercise has been said to be exceptional,[81] it can be invoked in an appropriate case.[82] It is probably fair to say that there have been more applications for costs under this basis than was previously the case, but there are relatively few cases involving insolvency practitioners. "Exceptional" only means in this context that the case is outside the ordinary run of cases where parties pursue or defend claims for their own benefit and at their own expense.[83] In determining what is the test for exceptional circumstances, Phillips LJ in *T.G.A. Chapman Ltd v Christopher*[84] said that "the test was whether the case's characteristics were extraordinary in the context of the entire range of litigation that comes to the court".[85] In fact the Court of Appeal has said (the case did not involve a liquidator, but solicitors) that it was wrong to elevate the need for exceptional circumstances to the position of a pre-condition to the exercise of the power.[86] Subsequently, the Court of Appeal in

---

74 *Globe Equities Ltd v Globe Legal Services Ltd* (1999) B.L.R. 232 at 239–240; *Times*, 14 April 1999 CA; *Locabail (UK) Ltd v Bayfield Properties Ltd Times*, 29 February 2000; *Re Aurum Marketing Ltd* [2000] 2 B.C.L.C. 645 CA; *Dymocks Franchise Systems (NSW) Pty Ltd v Todd* [2004] UKPC 39; [2004] 1 W.L.R. 2807; [2005] 4 All E.R. 195. In *Re Aurum Marketing*, the Court of Appeal held that a sole director and shareholder of a company should pay personally the costs of the Secretary of State expended in obtaining a winding-up order.

75 *Systemcare (UK) Ltd v Design Technology Ltd* [2011] EWCA Civ 546; [2012] 1 B.C.L.C. 14.

76 *Re Viceroy Jones New Tech Ltd* [2020] EWHC 1155 (Ch) at [69].

77 *Nordstern Allgemeine Versicherungs AG v Internav Ltd Times*, 8 June 1999 CA.

78 *Mills v Birchall* [2008] EWCA Civ 385; [2008] B.C.C. 471.

79 *Mills v Birchall* [2008] B.C.C. 471 at [62].

80 *Dunfermline Building Society v Ghana Commercial Finance Ltd* [2014] EWHC 3397 (QB). Also, see the Australian decision in *Penmark International Interiors Pty Ltd v Amoveo Pty Ltd* [2013] VSC 563.

81 *Symphony Group v Hodgson* [1994] Q.B. 179 CA; *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 CA at 169; *Locabail (UK) Ltd v Bayfield Properties Ltd Times*, 29 February 2000; *Dymocks Franchise Systems (NSW) Pty Ltd v Todd* [2004] UKPC 39; [2004] 1 W.L.R. 2807; [2005] 4 All E.R. 195. See the discussion by de Kerloy, "The Personal Liability of Liquidators and Administrative Receivers for the Costs of an Unsuccessful Action" (2000) 4 R.A.L.Q. 13, 17–18 as to what might be deemed exceptional circumstances.

82 *Globe Equities Ltd v Globe Legal Services Ltd* (1999) B.L.R. 232; *Times*, 14 April 1999 CA. Lloyd LJ said in *Taylor v Pace Developments Ltd* ([1991] B.C.C. 406 at 408) that "[t]here is only one immutable rule in relation to costs, and that is that there are no immutable rules". To the same effect in *Re Aurum Marketing Ltd* [2000] 2 B.C.L.C. 645 at 650, Mummery LJ said that while there was guidance in the cases as to the various factors relevant to the exercise of the discretion, none of the authorities seek to legislate for how the discretion is to be exercised

83 *Dymocks Franchise Systems (NSW) Pty Ltd v Todd* [2004] UKPC 39; [2004] 1 W.L.R. 2807; [2005] 4 All E.R. 195 PC at [24]; *Dunfermline Building Society v Ghana Commercial Finance Limited* [2014] EWHC 3397 (QB).

84 *T.G.A. Chapman Ltd v Christopher* [1998] 2 All E.R. 873.

85 *T.G.A. Chapman Ltd v Christopher* [1998] 2 All E.R. 873 at 881.

86 *Globe Equities Ltd v Globe Legal Services Ltd* (1999) B.L.R. 232; *Times*, 14 April 1999 CA.

*Systemcare (UK) Ltd v Design Technology Ltd*[87] said that an order may be made even if it was found that the case was not exceptional; the ultimate question was whether it was just to make the order. The Court of Appeal in *Deutsche Bank AG v Sebastian Holdings Inc*[88] said that the only immutable principle that applied to this area was that the discretion to award costs had to be exercised justly. This view is found in several subsequent single judge decisions such as *Re Northwest Holdings Plc*[89] and *Merchantbridge & Co Ltd v Safron General Partner 1 Ltd*,[90] as well as in the decision of the Court of Appeal in *Re Aurum Marketing Ltd*.[91] This Court of Appeal decision and the decision in *Northwest Holdings* both dealt with petitions presented by the Secretary of State under s.124A.[92]

While it appears of some importance if the non-party has acted other than bona fide,[93] in *Housemaker Services Ltd v Cole*[94] the court said that it was necessary to establish something more than the fact that a claim had not been brought in good faith before a non-party could be held liable. After saying that, and as mentioned above, exceptional circumstances are not a pre-condition to the exercise of the power.

An example of a case involving a liquidator where non-party costs were sought was *Metalloy Supplies Ltd v MA (UK) Ltd*.[95] An order for costs was made against the liquidator but on appeal to the Court of Appeal that decision was reversed. The Court of Appeal seemed to indicate that if the non-party's only involvement was to have some management of an action then he or she should not usually be held liable for costs. This would appear to apply to a liquidator.[96] Waller LJ was of the view that where there was concern over costs, because an insolvent company was involved, the more preferable action for a party to take was to seek security for costs.[97] Notwithstanding this, Waller LJ affirmed that there was a jurisdiction to order a liquidator as a non-party to be liable personally for costs. However, his Lordship said that courts will only take such action in exceptional cases and impropriety on the part of the liquidator would have to be an element,[98] such as

---

87 *Systemcare (UK) Ltd v Design Technology Ltd* [2011] EWCA Civ 546; [2012] 1 B.C.L.C. 14.

88 *Deutsche Bank AG v Sebastian Holdings Inc* [2016] EWCA Civ 23.

89 *Re Northwest Holdings Plc* [2000] B.C.C. 731.

90 *Merchantbridge & Co Ltd v Safron General Partner 1 Ltd* [2011] EWHC 1524 (Comm); [2012] 2 B.C.L.C. 291.

91 *Re Aurum Marketing Ltd* [2000] 2 B.C.L.C. 645.

92 In these cases, the controller of companies were ordered to pay personally the Secretary of State's costs of the winding-up proceedings and it was further ordered that the company's costs were not to be paid until after all of the unsecured creditors had been paid.

93 *Floods of Queensferry Ltd v Shand Construction Ltd* [2002] EWCA Civ 918.

94 *Housemaker Services Ltd v Cole* [2017] EWHC 924 (Ch).

95 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165.

96 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 169–170.

97 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 170. Millett and Butler-Sloss LJJ agreed with this (at 172–173). For a case where an applicant succeeded in obtaining an order for security, see *Hart Investments Ltd v Larchpark Ltd* [2007] EWHC 291 (TCC); [2007] B.C.C. 541. See below at paras 9-017–9-020 for a list of the principles relating to applications for security for costs and some discussion of same.

98 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 170. It is not evidence of impropriety if the liquidator realises during the running of an action that there will be insufficient assets to pay costs should the company lose, and the liquidator continues the action: at 171. Neither is it improper for an impecunious company to initiate proceedings which are brought bona fide: at 172 per Millett LJ.

bringing proceedings in bad faith,[99] while merely acting unreasonably would not appear to suffice.[100] His Lordship took this view on the basis of public policy concerns.[101] Probably what is referred to here is the need for the public to have a company wound up and investigated and for proceedings to be taken where there has been misconduct and where money can be recouped for the creditors, and for the liquidator not to be dissuaded from proceeding where necessary because of concern over possible liability for paying costs. Other cases, such as *Petroleo Brasileiro SA v Petromec Inc*[102] and *Goodwood Recoveries Ltd v Breen*[103] seemed to suggest that impropriety was not a prerequisite and some of the comments by the Court of Appeal in *Metalloy Supplies*[104] have to be considered in light of the weight of case law that the ultimate issue was whether it was just to make an order under s.51. In *Locabail (UK) Ltd v Bayfield Properties Ltd*,[105] Mr Lawrence Collins QC (sitting as a deputy High Court judge) (as he then was) said that while maintenance and/or bad faith on the part of a person funding the litigation were relevant considerations, they were not prerequisites to a court making an order in relation to a non-party. In the Court of Appeal in *Mills v Birchall*,[106] Lawrence Collins LJ (as he then was) (with whom the other judges agreed) reiterated the essence of the comments that he made in *Locabail (UK) Ltd v Bayfield Properties Ltd*.[107]

At first instance in *Z v Travelers Insurance Co Ltd*[108] Thirlwell LJ said that she had to consider the issue of non-party costs with two principles in mind, namely whether the case was exceptional and whether the making of an order would accord with fairness and justice. On appeal the Court of Appeal said that the judge was quite correct to do this.[109] On a further appeal, this time to the Supreme Court,[110] Lord Briggs said that it *may* be that the issues of exceptionality and justice are what is to be considered in a non-party costs case, but he was not prepared to decide this.[111] His Lordship (and Lord Reed DPSC in a separate concurring judgment) expressed concern as to the lack of content, principle or precision in the concept of exceptionality as a useful test.[112] Notwithstanding the reluctance of the Supreme Court to hold that the principles of exceptionality and justice were the elements to be considered in determining non-party costs, the Court of Appeal had earlier approved of Thirlwell LJ's approach and it does have support in other authorities as discussed above.

While Lawrence Collins LJ in *Mills v Birchall*[113] emphasised the fact that impropriety was not generally a prerequisite for ordering costs, but was something

---

99 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 172 per Millett LJ.
100 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 171. Millett and Butler-Sloss LJJ agreed with this (at 172 and 173).
101 This approach has been adopted in Hong Kong: *Superspeed Ltd v Bank of Baroda* [2014] HKFI 1405.
102 *Petroleo Brasileiro SA v Petromec Inc* [2005] EWHC (Comm) 2430.
103 *Goodwood Recoveries Ltd v Breen* [2005] EWCA Civ 414; [2006] 1 W.L.R. 2723.
104 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165.
105 *Locabail (UK) Ltd v Bayfield Properties Ltd Times*, 29 February 2000.
106 *Mills v Birchall* [2008] EWCA Civ 385; [2008] B.C.C. 471.
107 *Locabail (UK) Ltd v Bayfield Properties Ltd Times*, 29 February 2000.
108 *Z v Travelers Insurance Co Ltd* [2017] EWHC 287 (QB); [2017] Lloyd's Rep. IR 269.
109 *Travelers Insurance Co Ltd v XYZ* [2018] EWCA Civ 1099; [2018] Lloyd's Rep. I.R. 636 at [46].
110 *Travelers Insurance Co Ltd v XYZ* [2019] 1 W.L.R. 6075.
111 *Travelers Insurance Co Ltd v XYZ* [2019] 1 W.L.R. 6075 at [30]
112 *Travelers Insurance Co Ltd v XYZ* [2019] 1 W.L.R. 6075 at [30]
113 *Mills v Birchall* [2008] EWCA Civ 385; [2008] B.C.C. 471.

that was an element in a court's exercise of its discretion,[114] his Lordship indicated that this is different where a liquidator is concerned.[115] He distinguished the position of a liquidator from that of a receiver and said that an order would be more readily made in relation to the latter. The case before the Court involved a receiver. The distinction made between the two office-holders was based on the fact that with a liquidator a costs order would have to be paid personally by the liquidator whereas a receiver could rely on his or her appointor's security. Of note in relation to a liquidation was the fact that Lawrence Collins LJ stated: "A costs order against receivers will be more readily made where the company is in liquidation and the receiver's agency has terminated, or where the successful party has not been able to obtain security for costs or adequate security for costs."[116] All in all, it would seem that the bar will be placed higher for a person to succeed against a liquidator than against a receiver and certainly against other persons such as directors.

It seems that in making a decision a court should exercise caution and consider the public interest benefit deriving from the liquidator being able to bring proceedings without the threat of being liable for costs.[117] If a party is concerned that a company will not be able to pay costs if the action is lost, he or she should seek security for costs or, at least, warn the liquidator that a costs order would be sought against the liquidator personally.[118] **9-015**

While costs orders against insolvency practitioners have not been common in England, costs have been awarded against non-parties in some notable Australian insolvency cases.[119] In the leading Australian case of *Knight v FP Special Assets Ltd*,[120] a majority of the High Court said:

> "For our part, we consider it appropriate to recognise a general category of cases in which an order for costs should be made against a non-party … to the litigation. That category of cases consists of circumstances where the party to the litigation is an insolvent person or man of straw, where the non-party has played an active part in the conduct of the litigation and where the non-party, or some person on whose behalf he or she is acting or by whom he or she has been appointed, has an interest in the subject of the litigation. Where the circumstances of a case fall within that category, an order for costs should be made against the non-party if the interests of justice require that it should be made."[121]

The Court of Appeal in *Metalloy Supplies Ltd v MA (UK) Ltd*[122] did not seek to follow this case; in fact Waller LJ distinguished it as the Australian case was dealing with receivers.[123] It is submitted that English courts are going to be most reluctant to order that a liquidator who brings or defends proceedings in the name **9-016**

---

[114] *Mills v Birchall* [2008] B.C.C. 471 at [66]. This accords with the earlier decisions of the Privy Council in *Dymocks Franchise Systems (NSW) Pty Ltd v Todd* [2004] UKPC 39; [2004] 1 W.L.R. 2807; [2005] 4 All E.R. 195 at [33]; and the Court of Appeal in *Goodwood Recoveries Ltd v Breen* [2005] EWCA Civ 414; [2006] 1 W.L.R. 2273 at [59].

[115] *Mills v Birchall* [2008] EWCA Civ 385; [2008] B.C.C. 471 at [65].

[116] *Mills v Birchall* [2008] EWCA Civ 385; [2008] B.C.C. 471 at [51].

[117] *Locabail (UK) Ltd v Bayfield Properties Ltd Times*, 29 February 2000.

[118] *Locabail (UK) Ltd v Bayfield Properties Ltd Times*, 29 February 2000; *Symphony Group v Hodgson* [1994] Q.B. 179 CA.

[119] For example, see *Knight v FP Special Assets Ltd* (1992) 174 C.L.R. 178; *Australian Forest Managers Ltd (in liq) v Bramley* (1996) 19 A.C.S.R. 398.

[120] *Knight v FP Special Assets Ltd* (1992) 174 C.L.R. 178; (1992) 10 A.C.L.C. 1129.

[121] *Knight v FP Special Assets Ltd* (1992) 174 C.L.R. 178 at 192–193; [1992] 10 A.C.L.C. 1129 at 1137 per Mason CJ and Deane J.

[122] *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165.

[123] *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 170.

of the company will be liable for costs. While this may seem to be harsh on parties sued by liquidators, one must bear in mind the fact that in an action brought by a liquidator on behalf a company in liquidation that the company is the real claimant[124]; the liquidator has nothing to gain personally, save perhaps an increase in his or her reputation. However, lest liquidators think that they have carte blanche, it is probably prudent for liquidators to ensure that they have the means to pay costs because the other party to proceedings is entitled to seek security for costs.

It has been held in Australia that a court is able to rule on whether a non-party, such as a liquidator, is liable for costs even when it has given judgment as to who bears the costs inter partes in the proceedings because this amounts to a fresh exercise of the court's discretion and not a re-agitation of issues already ruled on; an order sought for the payment of costs by a non-party is supplemental to the legal impact of the earlier judgment.[125]

If a liquidator is compelled by statute to embark on a course of litigation he or she will not be required to pay anything over and above the costs which are met by the available assets of the company.[126] The same can be said where the liquidator is the defendant to proceedings which were initiated in response to the exercise by the liquidator of his or her duties.[127] It was said by Cozens-Hardy MR in *Re Arthur Williams & Co*[128] that where

> "[a]n official liquidator is simply performing duties which are obligatory on him in a judicial or quasi-judicial character, he is not to be made to pay the costs, because he is acting in the performance of his official duties".[129]

**9-017** If costs were awarded against the liquidator, then he or she could, unless guilty of misconduct, be indemnified from the unsecured assets of the company, provided, of course, that there are sufficient assets to cover the costs.[130]

Because, out of concern that there may be insufficient funds in the company's coffers to pay for the prosecution or defence of an action, even if adverse costs can be regarded as expenses within r.7.108(4)(a)(ii), a liquidator will usually need to explore ways of obtaining some funding support. This topic is discussed later in relation to the duty to collect assets.[131]

As noted earlier, many claims that liquidators have in liquidations are funded by a third party. In *Burnden Holdings (UK) Ltd v Fielding*[132] Zacaroli J said that s.51 will only be exercised in relation to a funder, generally speaking, where a funder is funding the litigation as a commercial enterprise and will benefit from the action or seeks to control the litigation.

If a liquidator does commence an action in the name of the company, rather than in his or her own name,[133] then it is likely that the defendant will apply for an order

---

124 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 at 172.
125 *UTSA Pty Ltd (in liq) v Ultra Tune Pty Ltd* (1998) 28 A.C.S.R. 444 at 446–447.
126 *Re Buena Vista Motors Pty Ltd (in liq)* [1971] 1 N.S.W.L.R. 72 at 75. Also, see *Re Tokenhouse Investments Ltd* [1934] St. R. Qd. 189; *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274.
127 *Re Tokenhouse Investments Ltd* [1934] St. R. Qd. 189.
128 *Re Arthur Williams & Co* [1913] 2 K.B. 88.
129 *Re Arthur Williams & Co* [1913] 2 K.B. 88 at 93.
130 For example, see *Re Silver Valley Mines* (1882) 21 Ch. 381; *Re Pacific Coast Syndicate Ltd* [1913] 2 Ch. 26; *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274.
131 See below at paras 9-072–9-075.
132 *Burnden Holdings (UK) Ltd v Fielding* [2019] EWHC 2995; [2020] B.P.I.R. 110.
133 Although for some actions a liquidator has no choice and must commence actions in his or her name.

for security of costs pursuant to r.25.12 of the CPR.[134] If the company is insolvent, as it will be in most situations, that will tend to lead a court to making the order requested, although the court has a discretion. Security of costs exists

> "to prevent the injustice which would result if a plaintiff who was in effect immune from orders for costs were free to litigate at the defendant's expense even if unsuccessful".[135]

The court has a totally unfettered discretion whether or not to make an order,[136] and it will act in the light of all the relevant circumstances.[137] An application pursuant to r.25.12 involves an applicant satisfying the court of two matters.[138] First, it is just to make an order, given all of the circumstances.[139] Secondly, one or more of the conditions set out in r.25.13(2) apply. There is no exhaustive list of circumstances that a court might take into account where this condition is relied on.[140] The most relevant condition in the context of this book is that the court is satisfied that there is reason to believe that the company will be unable to pay the costs of the defendant if the defence is successful.[141] What is going to lead a court to the conclusion sought in the application is, naturally, dependent upon the facts, but the traditional view has been that a company in liquidation[142] is presumed to be insolvent unless evidence is given to the contrary.[143] In consequence, there has seldom been any difficulty about getting security for costs where the company is in liquidation, provided that the applicant acts promptly[144] and provided that the action or proceeding is one in which the company is the claimant.[145] However, to say that there is a presumption that security will be ordered against a company in **9-018**

---

[134] For an admirable discussion of security of costs in the corporate sphere, see Milman, "Security for Costs: Principles and Pragmatism in Corporate Litigation" in B.A.K. Rider (ed.), *The Realm of Company Law* (London: Kluwer Law International, 1998), pp.167 onwards.

[135] *C.T. Bowring & Co (Insurance) Ltd v Corsi & Partners Ltd* [1994] B.C.C. 713 CA at 724 per Millett LJ. For a listing of the principles involved, see *Hart Investments Ltd v Larchpark Ltd* [2007] EWHC 291 (TCC); [2007] B.C.C. 541 at [8]–[11].

[136] *Jeffcoat Holdings Ltd (in liq) v Paior* (1994) 14 A.C.S.R. 239 at 240.

[137] *Keary Developments Ltd v Tarmac Constructions Ltd* [1995] 3 All E.R. 534.

[138] *Sir Lindsay Parkinson & Co Ltd v Triplan Ltd* [1973] 2 All E.R. 273; *West's Process Engineering Pty Ltd v Westralian Sands Ltd* (1998) 16 A.C.L.C. 1010 at 1021.

[139] CPR r.25.13(1)(a).

[140] *Aidiniantz v The Sherlock Holmes International Society Ltd* [2015] EWHC 2882 (Ch); [2015] B.P.I.R. 1329.

[141] CPR r.25.13(1)(a).

[142] Including voluntary liquidation: *Victorian Mortgage, etc Bank v Australian Financial Co* (1892) 18 V.L.R. 754, though presumably not if the company is in members' voluntary winding up.

[143] *Northampton Coal Co v Midland Waggon Co* (1878) 7 Ch. D. 500; *Pure Spirit Co v Fowler* (1890) 25 Q.B.D. 235; *Rogers Ltd v MacPherson & Rogers Ltd* [1904] Q.W.N. 32. See also *Tudor Furnishers Ltd v Montague & Co* [1950] Ch. 113.

[144] Application for security may be made at any stage of proceedings: *Lydney & Wigpool Iron Ore Co v Bird* (1883) 23 Ch. D. 358, but will not be favourably received if the applicant delays after becoming aware that the company is in liquidation: *Jennings Ltd v Cole* [1934] N.Z.L.R. 56. In New Zealand, it has been held that the existence of a litigation funder was an important factor that influenced the exercise of the discretion to grant security: *Walker v Forbes* [2017] NZHC 1212.

[145] See *Re Anglo-Australian Investment Co* (1895) 9 W.N. (N.S.W.) 128. Also see, however, *G.A.I. Holdings (No.3) Pty Ltd (in liq) v G.A.I. Holdings (No.4) Pty Ltd* (1985) 4 A.C.L.C. 90 where an application for security for costs against a company in liquidation was refused principally because the company's impecuniosity was brought about by the defendant as a result of the debt which the company sought to recover. But note that in *Premier Motor Auctions Ltd v PricewaterhouseCoopers LLP and Lloyds Bank* [2016] EWHC 2610 (Ch) failed to obtain an order for security costs against liquidators as the judge concluded that the existence of ATE insurance meant that the jurisdictional threshold had not been met.

liquidation is, it is submitted, putting it too highly. It is submitted that the fact that a company is in insolvent liquidation must constitute a significant factor in favour of ordering security. It has been said that it is regarded as prima facie evidence that a company is unable to pay costs unless contrary evidence is adduced.[146] However, it cannot be put more strongly than that and maybe not as strongly as that. In the Court of Appeal in *Sir Lindsay Parkinson & Co Ltd v Triplan Ltd*,[147] Lord Denning MR said that the court has a complete discretion whether or not to order security even where it is clear that if found liable to pay costs the company would not be able to do so.[148] Subsequently the Court of Appeal in *B.J. Crabtree (Insulation) Ltd v G.P.T. Communications Systems*[149] emphasised the fact that the discretion of the court was to remain flexible and not to be limited by applying strict rules. Bingham LJ said that there could be "no rule of thumb as to the grant or refusal of an order for security." In line with this view Maugham LJ in *Ebury Garages Ltd v Agard*[150] said that there may be many cases where a company could be insolvent and the court would not order security to be lodged. But clearly the fact that a company is in liquidation will be a factor of great importance for the court as it exercises its discretion.[151] If a company is in liquidation a court may order it to give security even if there are other claimants.[152] It has been held in Australia that courts are not to approach cases under s.1335 of the Corporations Act 2001 (equivalent to the English power) with a predisposition to make an order as that would fetter the court's discretion.[153] In *Jeffcoat Holdings Ltd (in liq) v Paior*,[154] Burley J in the South Australian Supreme Court said that while an order is likely to be made where a company, which is impecunious, is in receivership after a secured creditor appointed a receiver and manager, things are not so clear where the action is initiated by a company in liquidation and creditors and contributories stand to benefit.[155] Factors that may be taken into account by a court in deciding whether to exercise its discretion are: would an order result in frustrating the claimant's action[156] and whether those who stand to benefit from the action being successful are without means.[157] In relation to the former, the claimant has the onus of proving that an order

---

[146] *Pure Spirit Co v Fowler* (1890) 25 Q.B.D. 235.
[147] *Sir Lindsay Parkinson & Co Ltd v Triplan Ltd* [1973] 1 Q.B. 609.
[148] *Sir Lindsay Parkinson & Co Ltd v Triplan Ltd* [1973] 1 Q.B. 609 at 626.
[149] *B.J. Crabtree (Insulation) Ltd v G.P.T. Communications Systems* (1990) 59 Build L.R. 43; and cited by Milman, "Security for Costs: Principles and Pragmatism in Corporate Litigation" in Rider (ed.), *The Realm of Company Law* (1998), p.177.
[150] *Ebury Garages Ltd v Agard* (1907) L.J. 204.
[151] *Spiel v Commodity Brokers Australia Pty Ltd* (1983) 8 A.C.L.R. 410 at 415; *Interwest Ltd v Tricontinental Corp Ltd* (1991) 9 A.C.L.C. 1218 at 1227; *Joye v Cortaus Ltd (in liq)* (1996) 20 A.C.S.R. 103 at 106.
[152] *John Bishop (Caterers) Ltd v National Union Bank Ltd* [1973] 1 All E.R. 707.
[153] *John Arnold's Surf Shop Pty Ltd (in liq) v Heller Factors Pty Ltd* (1979) 22 S.A.S.R. 20 at 34; *Spiel v Commodity Brokers Australia Pty Ltd* (1983) 8 A.C.L.R. 410 at 414–415; *Harper v Ariadne Australia Ltd* (1984) 2 A.C.L.C. 356 at 361; *Westralian Gold Mines Ltd v Westralian Minerals and Drilling Pty Ltd* (1986) 4 A.C.L.C. 167 at 169; *Interwest Ltd v Tricontinental Corp Ltd* (1991) 9 A.C.L.C. 1218 at 1226; *Health & Life Care Ltd v Price Waterhouse* (1993) 11 A.C.S.R. 326 at 330; *Jeffcoat Holdings Ltd (in liq) v Paior* (1994) 14 A.C.S.R. 239 at 240.
[154] *Jeffcoat Holdings Ltd (in liq) v Paior* (1994) 14 A.C.S.R. 239.
[155] *Jeffcoat Holdings Ltd (in liq) v Paior* (1994) 14 A.C.S.R. 239 at 242.
[156] *Bell Wholesale Co Pty Ltd v Gates Export Corp* (1983) 8 A.C.L.R. 483; *West's Process Engineering Pty Ltd v Westralian Sands Ltd* (1998) 16 A.C.L.C. 1010 at 1027 (Extract).
[157] *Bell Wholesale Co Pty Ltd v Gates Export Corp* (1983) 8 A.C.L.R. 483.

would frustrate the proceedings[158] and a court is not justified in refusing an order on the basis that to do so would frustrate the litigation unless the company establishes the fact that those who are behind the litigation and who would benefit from it are also without means.[159]

It would appear that in exercising its discretion a court may take into account the fact that the defendant would be, if successful, entitled to recover costs as a priority.[160] The Court has to undertake a balancing exercise, namely it must weigh the injustice to the claimant that would result from preventing it from pursuing a proper claim by an order for security, and against that, it must weigh the injustice to the defendant if no security is ordered and at a trial the claimant's claim fails and the defendant finds himself or herself unable to recover from the claimant the costs which had been incurred in defending the claim.[161] Delay in making an application for security was one of the circumstances to which a court would have regard when exercising its discretion whether to make an order.[162]

While courts have complete discretion as to whether to order security for costs, they are not to consider the merits of the case.[163] To refrain from making an order the court had to be satisfied in all the circumstances that the claim made would be stifled.[164] In order to be able to prove successfully that the provision of security would effectively stifle the claim a respondent to a security for costs application must adduce evidence of what has been done in order to obtain funding.[165] An applicant does not have to establish that the company respondent cannot pay the costs; rather it must be proved that there is credible testimony giving rise to a belief that a company may not be able to pay the costs.[166] It was incumbent on a liquidator to be full and candid when explaining his or her means and the position regarding any third party funding.[167]

In the judgment in *Eagle Ltd v Falcon Ltd*[168] the court commented that to succeed in obtaining an order as to security a defendant is not prevented from getting an order as to security if it cannot be established that the claimant is cash flow insolvent; it is sufficient if the defendant can establish that the claimant is balance sheet insolvent.

It has been said[169] that where persons complain of being deprived of some legal right which they are asking the court to enforce in their favour, they are a "claimant" for the purpose of CPR r.25.12, and a company will be treated as a claimant **9-019**

[158] *West's Process Engineering Pty Ltd v Westralian Sands Ltd* (1998) 16 A.C.L.C. 1010 at 1027.
[159] *Bell Wholesale Co Pty Ltd v Gates Export Corp* (1983) 8 A.C.L.R. 483.
[160] *Brian Smith v UIC Insurance Co Ltd* unreported 6 April 2000 QBD (Comm). In this case, the company was in provisional liquidation.
[161] *Keary Developments Ltd v Tarmac Constructions Ltd* [1995] 3 All E.R. 534 at 539.
[162] *Hniadzdzilau v Vajgel* [2015] EWHC 1334 (Ch).
[163] *Keary Developments Ltd v Tarmac Constructions Ltd* [1995] 3 All E.R. 534; *Pitman Blackstock White Solicitors Ltd v Lloyds Bank Plc* unreported 18 November 2016 QB per Sara Cockerill QC.
[164] *Keary Developments Ltd v Tarmac Constructions Ltd* [1995] 3 All E.R. 534 at 540; *Cherry Tree Investments Ltd v Landmain Ltd* [2012] EWCA Civ 33; *Seakom Ltd v Knowledgepool Group Ltd* [2014] EWCA Civ 1164; *Sabic (UK) Petrochemicals Ltd v Punj Lloyd Ltd* [2014] EWCA Civ 1288 at [19].
[165] *Premiermotor Auctions Ltd v PricewaterhouseCoopers LLP and Lloyds Bank* [2016] EWHC 2610 (Ch); *New Tasty Bakery Ltd v MA Enterprise (UK) Ltd* [2016] EWHC 1038 (IPEC).
[166] *Treloar Constructions Pty Ltd v McMillan* [2016] NSWCA 302.
[167] *Pitman Blackstock White Solicitors Ltd v Lloyds Bank Plc* unreported 18 November 2016 QB per Sara Cockerill QC.
[168] *Eagle Ltd v Falcon Ltd* [2012] EWHC 2261 (TCC).
[169] *Crystal Trustees v Fuss* (1940) 57 W.N. (N.S.W.) 107 at 108 per Davidson J.

if it institutes a cross-action against a party who is suing it,[170] though not if it merely prosecutes[171] or opposes[172] an appeal to a higher court. With cross-actions it would appear that security for costs will only be granted if the cross-action is independent and has a life of its own, that is, it is not related to the claim being made against the company.[173]

It has been mooted that an order for security might be regarded as constituting oppression and a breach of art.6 of the European Convention on Human Rights (applied by the Human Rights Act 1998).[174] In *Al Koronky v Time Life Entertainment Group Ltd*,[175] Sedley LJ agreed with the submission made to the Court of Appeal that art.6 has a bearing on the issue.[176] This might well be an issue that counsel for liquidators can seek to take forward in a given case so as to resist an application for security.

If proceedings are commenced in the name of the liquidator then security for costs will not be ordered,[177] generally speaking, unless the liquidator has acted improperly.[178] In Australia it has been said that a court may be more ready to make an order for security for costs where the liquidator is backed by a litigation funder.[179] However, in a recent decision,[180] Rose J did order a foreign liquidator to give security for costs. She did this on the basis that the liquidator was a foreign resident (in Russia) and that a costs order was likely to be unenforceable.[181]

**9-020** The amount of security ordered is a matter for the court,[182] for it has a discretion if it is an appropriate case to order security.[183] It can order up to the full amount of the likely costs and it need not be substantial provided that it is not merely

---

170 *Washoe Mining Co v Ferguson* (1866) L.R. 2 Eq. 371; *City of Moscow Gas Co v International Finance Co* (1871–72) L.R. 7 Ch. App. 628; *Specialised Building Materials Pty Ltd v E.U. Occusted Pty Ltd* (1981) 5 A.C.L.R. 653; *Heller Factors Pty Ltd v John Arnold's Surf Shop Pty Ltd (in liq)* (1979) 4 A.C.L.R. 26 and 492; but compare *Accidental & Marine Insurance Co v Mercati* (1866-67) L.R. 3 Eq. 200.

171 *Sinclair v Glasgow* (1904) 6 F. (Ct of Sess.) 818.

172 *Star Fire Insurance Co v Davidson* (1902) 5 F. (Ct of Sess.) 83. Security for costs can, however, be ordered against a company which institutes an appeal: *J. & M. O'Brien Enterprises Pty Ltd v Shell Co of Aust. Ltd* (1983) 7 A.C.L.R. 790. See also *Gemelle Investments Pty Ltd v Federal Commissioner of Taxation* (1982) 7 A.C.L.R. 3.

173 *Hutchison Telephone (UK) Ltd v Ultimate Response Ltd* [1997] B.C.L.C. 307 at 317–318; *Hart Investments Ltd v Larchpark Ltd* [2007] EWHC 291 (TCC); [2007] B.C.C. 541 at [11], [14].

174 Mitchell, "Credit crunch insolvency" (2008) 158 N.L.J. 1527, 1527–1528.

175 *Al Koronky v Time Life Entertainment Group Ltd* [2006] EWCA Civ 1123.

176 *Al Koronky v Time Life Entertainment Group Ltd* [2006] EWCA Civ 1123 at [30].

177 *Re Strand Wood Co* [1904] 2 Ch. 1 CA. In a later case (*Greener v E Kahn & Co Ltd* [1906] 2 K.B. 374 at 376), the Court of Appeal did require security of costs from the trustee of a deed of assignment of the property of insolvent person.

178 *Metalloy Supplies Ltd v MA (UK) Ltd* [1997] 1 B.C.L.C. 165 CA.

179 See *Green v CGU Insurance Ltd* [2008] N.S.W.C.A. 148.

180 *Cherkasov v Nogotkov* [2017] EWHC 756 (Ch).

181 *Cherkasov v Nogotkov* [2017] EWHC 756 (Ch) at [86].

182 2016 Rules r.25.12(3). In *Western of Canada Co v Walker* (1874-75) L.R. 10 Ch. App. 628, it was held to be desirable to require security only up to a certain stage, and then allow the application to be renewed. An order for security for costs is not intended to embrace costs to which the defendant might possibly become entitled as a result of an order of another court on appeal: *A. & R. Constructions Pty Ltd v Lees* (1982) 7 A.C.L.R. 900. The court does not attempt to give the defendant a certain and complete indemnity. See *Brendza v Robbie* (1953) 88 C.L.R. 171. As to the form of the security, see *Gemelle Investments Pty Ltd v Federal Commissioner of Taxation* (1982) 7 A.C.L.R. 3.

183 For a recent discussion of what is required under CPR r.25.12, see *Natas Group Ltd (in administration) v Styles and Wood Ltd* [2011] EWHC 3464 (TCC).

nominal.[184] In fixing security the court must have regard to the estimated or probable cost to which the defendant will be put.[185] Security may be ordered if the company which is bringing the proceedings went into liquidation after the hearing has started.[186]

If a company appeals from the making of a winding-up order, there is no general rule that it would be ordered to give security for costs.[187]

*(iii) To sell or otherwise dispose of the company's property* Naturally, the sale or disposition of company property occurs in most windings up as it enables the liquidator to obtain the funds needed to satisfy the claims of creditors, albeit partially in insolvency. This power is contained in para.6 of Sch.4 and can be exercised without any sanction. **9-021**

There are a number of methods of selling the assets of the company, including private contract, public auction, tender and clearance sale. The liquidator must choose the method and price which will give maximum benefit to the creditors. Naturally, the liquidator should seek to obtain as good a price as possible, given the market conditions. It is to be noted that a member of the liquidation committee is not entitled, while acting as a member, to be a purchaser either directly or indirectly of assets unless the leave of the court or the permission of the committee is obtained prior to the transaction.[188] As one would expect, a liquidator is unable to purchase assets, except with the leave of the court. The liquidator has a wide discretion in selling assets. The court will only interfere with sales if the liquidator has not acted as a reasonable liquidator would act.[189]

If selling by auction, it is prudent for the liquidator to set a reserve price. However courts will not usually question the action of the liquidator provided that he or she has not acted unreasonably.[190]

The area that has precipitated much discussion is whether a liquidator has the right to assign causes of action to third parties, and if so, in what circumstances can the power be exercised? **9-022**

There has been a great amount of uncertainty over the years in England as to whether a liquidator was entitled to assign an action and this was particularly the case where the action was granted to him or her personally, such as a claim that a transaction entered into before the commencement of liquidation was a preference within s.239 of the Act. Now the Act gives a liquidator express power to assign an action that the liquidator (in England and Wales) could bring under any of ss.213, 214, 238, 239 or 244.[191]

The definition of "property" in s.436 provides that except where the context

---

184 *Keary Developments Ltd v Tarmac Constructions Ltd* [1995] 3 All E.R. 534.

185 *Imperial Bank of China v Bank of Hindustan* (1866) 1 Ch. App. 437; *Dominion Brewery v Foster* (1897) 77 L.T. 507; *Sunday Times Newspaper Ltd v McIntosh* (1933) 33 S.R. (N.S.W.) 371; *Foss Export Agency Ltd v Trotman* (1949) 79 W.N. (N.S.W.) 1. But the court will not accept the defendant's estimate of the costs involved: *M.A. Productions Pty Ltd v Austarama Television Pty Ltd* (1982) 7 A.C.L.R. 97.

186 *Lydney & Wigpool Iron Co v Bird* (1883) 23 Ch. D. 353.

187 *Aidiniantz v The Sherlock Holmes International Society Ltd* [2015] EWHC 2882 (Ch); [2015] B.P.I.R. 1329.

188 2016 Rules r.17.25(2).

189 *Leon v York-O-Matic Ltd* [1966] 1 W.L.R. 1450; [1966] 3 All E.R. 277.

190 *Leon v York-O-Matic Ltd* [1966] 1 W.L.R. 1450; [1966] 3 All E.R. 277.

191 1986 Act s.246ZD. Paragraph 3A of Sch.4 to the 1986 Act empowers liquidators to bring proceedings under the provisions mentioned in the text.

otherwise requires, the word "includes money, goods, things in action …". In bankruptcy law it has been held that the right to sell property includes a power to sell a chose in action.[192] This has always been seen as an exception to the law against both maintenance, which is the assistance or encouragement of proceedings by someone who has no interest in the proceedings nor any motive recognised by the law as justifying interference in the proceedings, and against champerty, a form of maintenance[193] which involves assistance in, or encouragement of, proceedings in exchange for a promise to provide a share of the proceeds of the action. As far back as *Re Park Gate Waggon Works Co*[194] in 1881, the Court of Appeal held that the relevant companies legislation permitted a liquidator to sell the company's choses in action and that this was also an exception to the law forbidding maintenance.[195]

Where a liquidator is considering making an assignment of a cause of action, he or she, if not a lawyer, should not proceed on the basis of his or her own valuation.[196] Furthermore, according to the Court of Appeal in *Ultraframe (UK) Ltd v Rigby*,[197] it is desirable for the liquidator to follow the procedure laid out in *Stein v Blake*[198] by Lord Hoffmann, namely to agree the assignment on the basis that a right to a percentage of the proceeds of the action is reserved for the liquidator on behalf of the company. However, this will not always be possible or desirable and will depend on what the counter-party is offering for the assignment.

An appellate Australian court has held that the liquidator's power to sell the assets of the company does not extend to assigning a chose in action which is actually rendered non-assignable by reason of an express agreement entered into by the company.[199]

**9-023** *(iv) The power to act in the name of and on behalf of the company* The power which is often exercised in relation to a number of the duties of liquidators is the power found in para.7 of Sch.4 to do all acts and execute documents in the name and on behalf of the company.

In *Pyramid Building Society v Howell*,[200] the company in liquidation had advanced funds to S, and H and B had guaranteed repayment. S defaulted in paying and proceedings were commenced against H and B. The guarantee authorised certain officers of the company to execute a certificate which was evidence of the amount recoverable pursuant to the guarantee. H and B argued that as the certificate was signed by E, an agent appointed by the liquidator of the company, and not a designated officer of the company, it could not be relied on by the liquidator. The Victorian Supreme Court held that the power to sign the certificate was transferred

---

192 *Seear v Lawson* (1880) 15 Ch. D. 426 at 432–433 (Bankruptcy Act 1869); *Stein v Blake* [1996] 1 A.C. 243; *Citicorp Australia Ltd v Official Trustee* (1997) 141 A.L.R. 667. But a right of appeal against a tax assessment has been held not to be property and could not be assigned by a liquidator: *Re GP Aviation Group International Ltd (in liq)* [2013] EWHC 1447 (Ch); [2013] B.P.I.R. 576.

193 Referred to as "aggravated maintenance": *Guy v Churchill* (1888) 40 Ch. D. 481 at 489.

194 *Re Park Gate Waggon Works Co* (1881) 17 Ch. D. 234.

195 See *Bang & Olufsen UK Ltd v Ton Systeme Ltd* unreported 16 July 1993 CA (referred to in *Grovewood Holdings Plc v James Capel & Co Ltd* [1995] Ch. 80 at 85); *Grovewood Holdings Plc v James Capel & Co Ltd* [1995] Ch. 80; *Re Edennote Ltd* [1995] 2 B.C.L.C. 248.

196 *Ultraframe (UK) Ltd v Rigby* [2005] EWCA Civ 276 at [52].

197 *Ultraframe (UK) Ltd v Rigby* [2005] EWCA Civ 276 at [52].

198 *Stein v Blake* [1996] A.C. 243 at 260.

199 *Owners of Strata Plan 5290 v CGS and Co Pty Ltd* [2011] N.S.W.C.A. 168 at [64].

200 *Pyramid Building Society v Howell* (1994) 14 A.C.S.R. 633; (1994) 12 A.C.L.C. 953.

at winding up to the liquidator and he could transfer it to E.[201] If this was not correct, the Court said, it would lead to the absurd result whereby if the power to execute documents had been conferred on specified company officers, that power could never be exercised by the liquidator.[202]

While *Pyramid* involved a voluntary winding up, there is no good reason for distinguishing between voluntary and compulsory liquidation, particularly now that liquidators in the latter kind of liquidation do not require any longer the sanction of the court for exercising powers in Parts of Sch.4 to the Act as they originally needed to do.

Liquidators do not become liable on any contracts which they enter into provided that they make it plain that they are acting on behalf of the company.[203] **9-024**

*(v) Drawing bills of exchange* This power is contained in para.9 of Sch.4. In exercising this power a liquidator should ensure that he or she signs as liquidator as well as for and on behalf of the company in order to avoid personal liability on the cheque (or other instrument).[204] **9-025**

*(vi) Obtaining credit* This is found in para.10 of Sch.4. A liquidator may borrow as against the security of company property by granting say a mortgage over land, but the security granted is subject to the rights of existing secured creditors whose rights are fixed.[205] **9-026**

*(vii) To appoint agents* There are usually many tasks which a liquidator is not trained or qualified to do that must be done during the course of a winding up. As a consequence, the law permits the liquidator to engage professionals to act on his or her behalf.[206] Particularly of note are solicitors, auctioneers and real estate agents. **9-027**

*(viii) The incidental power* The basic duty of the liquidator is to bring about a complete liquidation of the company and in this connection one power merits special attention in the present context. This is the incidental power, contained in para.13 of Sch.4 which authorises the liquidator to do all such things as are necessary for winding up the affairs of the company and distributing its property.[207] Unquestionably this power is extremely wide[208]: it has been said to cover everything that a reasonable person might consider necessary[209] and to empower the liquidator to do anything which may be thought expedient with reference to the property of the company,[210] even to the extent of leasing[211] or mortgaging[212] company property or purchasing an asset for the purpose of resale.[213] **9-028**

**(b) Supplementary powers** Section 168 provides some supplementary pow- **9-029**

---

201 *Pyramid Building Society v Howell* (1994) 14 A.C.S.R. 633 at 636; (1994) 12 A.C.L.C. 953 at 955.
202 *Pyramid Building Society v Howell* (1994) 14 A.C.S.R. 633 at 636; (1994) 12 A.C.L.C. 953 at 955.
203 *Stead Hazel & Co v Cooper* [1933] 1 K.B. 840.
204 *Rolfe Lubell & Co v Keith* [1979] 1 All E.R. 860.
205 *Re Regent's Canal Ironworks Co* [1875] 3 Ch. D. 411.
206 1986 Act Sch.4 para.12.
207 In *Re Phoenix Oil and Transport Co Ltd (No.2)* ([1958] Ch. 565; [1958] 1 All E.R. 158) the provision was described as a "mopping-up provision".
208 *Re Cambrian Mining Co* (1882) 48 L.T. 114 at 116; *Bacich v Australian Broadcasting Corp* (1992) 10 A.C.L.C. 1420; *Mercantile Credits Ltd v Dallhold Investments Pty Ltd* (1994) 15 A.C.S.R. 230 at 233.
209 *Re Bairnsdale Food Products Ltd* [1948] V.L.R. 264 at 267 per Fullagar J.
210 *Re Cambrian Mining Co* (1882) 48 L.T. 114 at 116 per Kay J; *Bacich v Australian Broadcasting Corp* (1992) 29 N.S.W.L.R. 1; *Re Dallhold Investments Pty Ltd* (1994) 53 F.C.R. 339; *Butterell v*

ers for liquidators in compulsory liquidations (in England and Wales). The following powers are granted:

- to seek the decision of the creditors and contributories on relevant matters[214];
- to apply to the court for directions in relation to any particular matter arising in the winding up[215]; and
- to use his or her own discretion in the management of the assets and the distribution among the creditors.[216]

In relation to the seeking of decisions from the creditors and contributories, while a liquidator must seek the decision of creditors and contributories in certain cases, a court can override the duty of a liquidator to do so by directing him or her not to do so.[217]

9-030 (c) **Delegated powers** What is meant by delegated powers is those powers which the Act confers upon the court but the exercise of which is, by virtue of the Rules, delegated to the liquidator. In pursuance of s.160, the exercise of the following powers has been delegated to the liquidator:

- the seeking of decisions on any matter from the creditors and the contributories[218];
- the settling of lists of contributories, and, where required, the rectifying of the register of members[219];
- the collection and application of the assets[220];
- the requiring of the payment, delivery, conveyance, surrender or transfer of money, property, books and papers[221];
- the making of calls[222]; and
- the fixing of a time within which the debts and claims must be proved.[223]

---

*Docker Smith Pty Ltd* (1997) 23 A.C.S.R. 149; (1997) 15 A.C.L.C. 307. See also *Re South Eastern Ry Co* (1869) 20 L.T. 800.

211 *Re Premier Permanent Building Society* (1890) 16 V.L.R. 643; *Re Federal Bank of Australia* (1895) 6 B.C. (N.S.W.) 3. Conversely, a liquidator has power to challenge a lease granted to the directors of a company on the ground that the directors had abused their powers and not obtained an effective ratification from the members: *Russell Kinsela Pty Ltd (in liq) v Kinsela* (1983) 1 A.C.L.C. 1215.

212 *Re Cambrian Mining Co* (1882) 48 L.T. 114.

213 *Re Bairnsdale Food Products Ltd* [1948] V.L.R. 624.

214 1986 Act s.168(2).

215 1986 Act s.168(3).

216 1986 Act s.168(4).

217 *Re Barings Plc (In Liquidation) (No.1)* [2001] 2 B.C.L.C. 159 at 171; *Managa Properties Ltd v Brittain* [2009] EWHC 157 (Ch); *Re A Company* unreported 17 March 2017 Ch D per Marcus Smith J. These cases dealt with the need to call meetings, rather than to instigate decision procedures or the deemed consent procedure, which was what was required prior to recent times, but the thrust of the decisions should apply to the provisions of the Act and the Rules that now apply as far as seeking the decisions of creditors and contributories are concerned.

218 1986 Act s.160(1)(a). See Pt 15 of the Rules.

219 1986 Act s.160(1)(b). See 2016 Rules rr.7.79–7.80.

220 1986 Act s.160(1)(b). See 2016 Rules r.7.76(1).

221 1986 Act s.160(1)(c). See 2016 Rules r.7.78.

222 1986 Act s.160(1)(d). See 2016 Rules r.7.86.

223 1986 Act s.160(1)(e). See s.153.

In exercising these powers the liquidator acts as an officer of the court and is subject to its control.[224]

Although liquidators have very wide powers conferred on them, there is no general principle that all of the powers formerly exercisable by particular officers of a company are transferred to the liquidator.[225] The liquidator's office is entirely statutory and derives solely from the Act.[226] However, in a winding up the transfer of such powers, while not conceptually accurate, is in a general loose way descriptive of what occurs.[227]

### 2. *Voluntary winding up*

As with compulsory liquidations there are other powers granted by the Act to liquidators of companies in voluntary liquidation which are not mentioned under the heading of "Powers of the liquidator". These other powers are discussed elsewhere in appropriate places. In voluntary winding up, the liquidator's powers are regulated by s.165, which is, as far as creditors' voluntary liquidations (where the liquidator was appointed by the members) are concerned, subject to s.166. **9-031**

A liquidator in a creditors' voluntary winding used to be required, like a liquidator in a compulsory winding up, to obtain the approval of the court or the liquidation committee if exercising certain powers contained in Pt I of Sch.4, such as effecting compromises.[228] They no longer are required to do so.[229] Liquidators in members' voluntary liquidations were able to exercise the powers in Pt I of Sch.4 with the approval of a special resolution of the company. In all voluntary liquidations, the liquidator is now able to exercise all of the powers contained in Sch.4 without any need for sanction.[230]

Voluntary liquidators are able to exercise two powers of the court, namely the settling of a list of contributories[231] and the making of calls.[232] In addition liquidators may summon a general meeting of the company for the purpose of obtaining its sanction by special resolution or for any other purpose the liquidator may think fit.[233]

Section 166(2) provides that in creditors' voluntary liquidations (where the members appoint a liquidator) that the powers conferred on the liquidator by s.165 are not to be exercised, without the sanction of the court, before the company's creditors nominate a liquidator under s.100 or the procedure by which the creditors were to have provided a nomination concludes without a nomination having been made. This provision was introduced to prevent the practice of "centrebind-

---

[224] See 1986 Act s.160(1).

[225] *Re Cambrian Mining Co* (1882) 48 L.T. 114 at 116 per Kay J; *Re Dallhold Investments Pty Ltd* (1994) 53 F.C.R. 339; *Butterell v Docker Smith Pty Ltd* (1997) 23 A.C.S.R. 149; (1997) 15 A.C.L.C. 307.

[226] *Re Dallhold Investments Pty Ltd* (1994) 53 F.C.R. 339.

[227] *Butterell v Docker Smith Pty Ltd* (1997) 23 A.C.S.R. 149 at 156; (1997) 15 A.C.L.C. 307 at 313.

[228] See *Re Andrew Rhodes Ltd* [2005] All E.R. (D) 249 (Mar) for a case where the liquidator of a company in creditors' voluntary liquidation successfully obtained the sanction of the court for a compromise. Also, see *Whitehouse v Wilson* [2006] EWCA Civ 1688; [2007] B.P.I.R. 230; [2007] B.C.C. 596 for a case where a liquidator sought directions under s.112 that he was entitled to compromise his misfeasance claim against a director.

[229] See s.120 of the Small Business, Enterprise and Employment Act 2015.

[230] 1986 Act s.165(2).

[231] 1986 Act s.165(4)(a).

[232] 1986 Act s.165(4)(b).

[233] 1986 Act s.165(4)(c).

ing" which was discussed earlier.[234] The decision in *Re Aardvark TMC Ltd*[235] provided that s.166(2) does not apply to the power to disclaim, but this appears to be at odds with the case of *Re Business Dream Ltd*,[236] although in the latter the comments were obiter. All in all it would appear that the former decision is the stronger authority.

**9-032** Section 166(2) does not apply to three powers of liquidators, namely[237]:

- taking into the liquidator's custody or under his or her control all of the property to which the company is, or appears to be, entitled;
- disposing of perishable goods and other goods the value of which is likely to diminish if they are not disposed of forthwith; and
- taking all necessary action to protect the property of the company.

If the liquidator fails, without reasonable excuse, to comply with s.166 he or she is liable to a fine.[238]

In members' voluntary windings up the members may ask that the property of the company be transferred to them in specie and the liquidator is able to do so.[239]

### *3. General powers*

**9-033** Besides the powers set out in the Act or the Rules, liquidators are able to do other things which do not affect the assets or liabilities of the company. For example, in *Re ACLI Metals (London) Ltd*,[240] the court indicated that just because there was no statutory power permitting a liquidator to disclose company documents to a creditor, it did not stop the liquidator from making disclosure as such action did not affect the assets or liabilities of the company. If disclosure was beneficial to the company then disclosure could occur as it would fall within the incidental power of the liquidator.[241]

## C. Invalidity of acts

**9-034** The validity of acts done by a liquidator may be challenged on a variety of grounds: it may be established that the basis on which the appointment rests is in some respect defective; or that the statutory powers of a liquidator have been exceeded; or that, although the liquidator acted within the scope of his or her powers, there was a failure to obtain the necessary approval or sanction for the exercise of that power.

### *1. Defective appointment*

**9-035** The question of the validity of the acts of a liquidator whose appointment or qualifications are subsequently discovered to have been defective seems to have arisen principally in relation to liquidators appointed in voluntary winding up,

---

[234] See above at para.2-019. See *Re Centrebind Ltd* [1966] 3 All E.R. 889.
[235] *Re Aardvark TMC Ltd* [2013] EWHC 1774 (Ch) at [13].
[236] *Re Business Dream Ltd* [2011] EWHC 2860 (Ch); [2012] B.C.C. 115.
[237] 1986 Act s.166(3).
[238] 1986 Act s.166(7).
[239] See below at para.14-021.
[240] *Re ACLI Metals (London) Ltd* (1989) 5 B.C.C. 749.
[241] *Re ACLI Metals (London) Ltd* (1989) 5 B.C.C. 749.

although problems of this kind can certainly also arise in compulsory winding up. As regards the former, the courts have in the past frequently insisted upon strict compliance with the formal requirements with respect to the calling of meetings and passing of resolutions for voluntary liquidation,[242] and there have, as a result, been a number of cases where the validity of a liquidator's actions has been called in question on account of a failure to observe the necessary formalities.[243]

Section 232 of the Act provides that the acts of a liquidator are valid notwithstanding any defect in the appointment, nomination or qualifications of the liquidator. It has been said that this simply creates a rebuttable presumption in favour of the validity of acts done by the liquidator.[244] This view does not derive support from the terms of s.232, which, it has been said

> "may very well validate acts done by, say, liquidators who were not or, indeed, never could have been legally appointed, if there is nothing on the face of the proceedings to indicate that they have in any way been improperly appointed. The object is to validate their acts until those acts are called into question, or until, rather, the validity of their appointment is called into question; but even then the acts done by them up to that date are valid, although they could never have been legally done".[245]

At the same time there are obvious limits to the scope of the section: in the first place, it seems settled that it can only apply where there has been at least a purported appointment, in the form of a genuine attempt to appoint a liquidator[246]; secondly, the liquidator's acts are validated only in so far as the defects in qualification or appointment are discovered "afterwards",[247] i.e. after the acts in question have been done[248]: it follows that, once any such defects have been discovered, the liquidator cannot validly perform further acts in purported reliance upon this validating provision.[249] **9-036**

## 2. *Acts in excess of power*

There is remarkably little authority as to the effect of the exceeding of the statutory powers in the course of the performance of the liquidator's duties in winding up: perhaps this is due to the fact that the powers are widely expressed and have been generously interpreted by the courts.[250] But it is consistent with general principles of the law of agency that the company should not be bound where those powers are in fact exceeded by the liquidator.[251] Furthermore, it seems that notice of the extent of the liquidator's statutory powers will be imputed to persons deal- **9-037**

---

242 *Re Bridport Old Brewery Co* (1867) 2 Ch. App. 191; *Re Clayton & Busche Ltd* (1913) 33 N.Z.L.R. 245, where it was said that in the absence of strict compliance with the necessary formalities the liquidator could not make good title to the assets or enforce payment of moneys due.

243 In addition to the above cases, see *Re Equitable Insurance Association of New Zealand* (1892) 11 N.Z.L.R. 605; *Re Fraser & Co; Ex p. James* (1896) 22 V.L.R. 385.

244 *Re Fraser & Co; Ex p. James* (1896) 22 V.L.R. 385 at 388.

245 *Mercantile Bank of Australia Ltd v Dinwoodie* (1902) 28 V.L.R. 491 at 501 per Holroyd J in dealing with the same provision in Australia.

246 Compare *Morris v Kanssen* [1946] A.C. 459 which dealt with the qualification of directors.

247 As to this, see *Stevenson v Commissioner of Taxation* (1936) 37 S.R. (N.S.W.) 84.

248 *Re Bridport Old Brewery Co* (1867) 2 Ch. App. 191.

249 *Re Bridport Old Brewery Co* (1867) 2 Ch. App. 191.

250 The question is most likely to arise in relation to the liquidator's power to carry on business under Sch.4 para.6, in which case, however, the onus of proving that a contract is ultra vires is on the party who alleges this: *Hire Purchase Furnishing Co v Richens* (1880) 20 Q.B.D. 387.

251 This seems to have been assumed in *Hire Purchase Furnishing Co v Richens* (1880) 20 Q.B.D. 387;

ing with the liquidator who will thereby be disabled from pleading ignorance of the liquidator's want of authority[252]; but it is doubtful whether the same can apply, for example, in the case of a provisional liquidator whose powers have been expressly restricted by the court on appointment.

### II. Right to Assistance and Advice

9-038 Elsewhere we have noted that liquidators may appoint agents for the purpose of doing business of a ministerial nature which liquidators are unable to attend to themselves, and also that they may turn for guidance in the performance of their duties to the liquidation committee or to meetings of creditors or contributories. In addition, they are entitled to assistance and advice from a variety of other sources: they may apply for the appointment of a special manager; they may appoint a solicitor; and they may at any time apply to the court for directions or for the determination of any questions arising in the winding up.

#### A. Special manager

9-039 On the application of the liquidator[253] under s.177, and on the filing of a report of the reasons for the liquidator's application,[254] the court may appoint any person to act as the special manager of the business or property of the company. Such an application may be made when the liquidator is of the opinion that the nature of the business or property of the company, or the interests of the company's creditors or contributories or members generally, require the appointment of another person to manage the business or property.[255] A recent example was the appointment of special managers immediately after Snowden J ordered the winding up of British Steel.[256] The appointments were made in order to assist the official receiver in conducting the winding-up because the managers had specialist knowledge that the official receiver did not have and it was needed in a winding up which was expected to be complex.[257] It appears that this approach is being considered and has actually been employed more frequently in the past couple of years especially where the nature of the external debt and the underlying operational risk make administration unpalatable, certainly as far as insolvency practitioners are concerned.[258] The Insolvency Service has indicated that it will establish a Special Manager panel for appointments.[259] The Insolvency Service issued guidelines and criteria for those who wish to be placed on the panel and to provide special manager services in relation

---

*Re Great Eastern Electric Co* [1941] Ch. 241; and *Re Bairnsdale Food Products Ltd* [1948] V.L.R. 264; but see *Clark v Smith* [1940] 1 K.B. 126.

[252] *Re Bairnsdale Food Products Ltd* [1948] V.L.R. 264 at 267 per Fullager J.

[253] And a provisional liquidator.

[254] 2016 Rules rr.5.17(1) (members' voluntary), 6.37(1) (creditors' voluntary) and 7.93(1) (compulsory). The report is to include the liquidator's estimate of the value of the assets over which the manager is to be appointed: rr.5.17(2), 6.37(2), 7.93(2).

[255] 1986 Act s.177(2).

[256] *Re British Steel Ltd* [2019] EWHC 1304 (Ch); [2019] B.C.C. 974.

[257] For a discussion of the case and its ramifications, see Keay and Walton, "British Steel – is it a wind up?" (2019) 12(4) C.R.I. 125.

[258] D. Kelly and M. Jervis, "Special Managers the new Administrators?" available at: *https://www.pwc.co.uk/services/business-restructuring/insights/restructuring-trends/special-managers-the-new-administrators.html* [Accessed 16 September 2020].

[259] Dear IP Issue No.109, September 2020.

to complex compulsory liquidations.[260] Having said all of that, it has been suggested that the official receiver will only consider Special Manager appointments in the most extreme of circumstances.[261]

The special manager, who need not be a licensed insolvency practitioner, is granted powers by the court on appointment.[262] The court may direct that any provision in the Act that affects a liquidator shall have like effect in relation to the special manager for the purposes of carrying out the functions of a liquidator.[263]

The appointment may be renewed from time to time.[264] The remuneration of the manager is fixed by the court from time to time.[265] Just like with the appointment of a liquidator, the acts of a special manager are valid notwithstanding a defect in appointment or qualifications.[266]

The special manager is an officer of the court and under its control. The duties of a special manager are set out in s.177(5) and are, to:

- give such security as prescribed;
- prepare and keep such accounts as prescribed; and
- produce the accounts in accordance with the Rules to the Secretary of State or to such other persons as prescribed.

The appointment of a special manager does not take effect until the prescribed **9-040** security has been given to the applicant for the appointment.[267] The security given is not to be less than the value of the assets as estimated by the liquidator in his or her report under r.5.17(1), r.6.38(1) or r.7.93(1).[268] The cost of providing the security in a members' voluntary liquidation must be paid in the first instance by the special manager, but the special manager is entitled to be reimbursed as an expense of the winding up.[269] The same applies in a creditors' voluntary liquidation and the special manager is entitled to be reimbursed as an expense of the winding up, in the prescribed order of priority.[270] In a compulsory liquidation the situation is the same as with a creditors' voluntary where a winding-up order is made, but if a winding-up order is not made, the special manager is entitled to be reimbursed out of the property of the company, and the court may order accordingly.[271] If the required security is not given within the time stated in the order, or any extension granted, then the liquidator shall report the failure to the court which may then discharge the order of appointment.[272] If the court decides to discharge the manager or makes an order removing the special manager, then the court is to give directions as to whether any, and if so what, steps should be taken to appoint another manager.[273]

---

260 Dear IP Issue No.109, September 2020.
261 Kelly and Jervis, "Special Managers the new Administrators?"
262 1986 Act s.177(3).
263 1986 Act s.177(4).
264 2016 Rules rr.5.17(4), 6.37(4), 7.93(4).
265 2016 Rules rr.5.17(3)(k), 6.37(3)(k), 7.93(3)(j).
266 2016 Rules rr.5.17(5), 6.37(5), 7.93(6).
267 2016 Rules rr.5.18(1), 6.38(1), 7.94(1).
268 2016 Rules rr.5.18(3), 6.38(3), 7.94(3).
269 2016 Rules r.5.18(5).
270 2016 Rules r.6.38(5).
271 2016 Rules r.7.94(5).
272 2016 Rules rr.5.19(1), 6.39(1), 7.95(1).
273 2016 Rules rr.5.19(3), 6.39(3), 7.95(3).

On the giving of security the liquidator is to file in court a certificate as to the adequacy of the security.[274]

The manager must keep accounts and produce them to the liquidator, and the accounts must contain details of receipts and payments.[275] When the accounts have been approved, the special manager's receipts and payments must be added to those of the liquidator.[276]

If the liquidator comes to the view that the employment of the manager is no longer necessary or profitable for the company then the liquidator is to apply to the court for directions and the court may order the termination of the appointment.[277] Similarly, in a creditors' voluntary liquidation the liquidator is to apply to the court where the creditors decide that an appointment should be terminated.[278] In a members' voluntary the same thing should occur if the members pass a resolution requesting termination.[279] In a compulsory winding up, the liquidator is to apply to the court where the creditors decide that an appointment should be terminated.[280] Also, the special manager's appointment terminates if the winding-up petition is dismissed or in a case where a provisional liquidator was appointed, if the appointment is discharged without a winding-up order having been made.[281]

Usually applications to appoint a special manager are made only where the business or affairs of the company are too large, too remote or too specialised for the liquidator to be able to exercise personal control over their conduct or administration.[282] This was held to be the case in *Re British Steel*.[283]

## B. Solicitor

**9-041** The winding up of a company involves a considerable amount of business which is of a technical legal nature, such as conveyancing, taking and defending proceedings, applications to court, and conducting examinations of officers and other persons. Most liquidators tend not to be lawyers but accountants, and, while often having a good understanding of insolvency law, they are not expected to have the knowledge and experience of a lawyer.[284] Consequently, they are entitled to appoint solicitors to assist them in the performance of their duties by doing the necessary professional legal work and giving advice on matters of law.[285] The right to do so is, however, not intended to deprive or relieve liquidators of their functions and duty of personally conducting the winding up. As was once said in a Scottish case,[286] the relationship between liquidator and solicitor is

> "in some quarters neither understood nor appreciated, and solicitors sometimes act much

---

274 2016 Rules rr.5.18(4), 6.38(4), 7.94(4).

275 2016 Rules rr.5.20(1), 6.40(1), 7.96(1). Details relating to the keeping of accounts are set out in rr.5.20(2), 6.40(2), 7.96(2).

276 2016 Rules rr.5.20(3), 6.40(3), 7.96(3).

277 2016 Rules rr.5.21(1), 6.41(1), 7.97(2).

278 2016 Rules r.6.41(2).

279 2016 Rules r.5.21(2).

280 2016 Rules r.7.97(3).

281 2016 Rules r.7.97(1).

282 See, e.g. *Re U.S. Ltd* (1983) 1 B.C.C. 98, 985 (where a special manager was appointed to sell certain goods of the company).

283 *Re British Steel* [2019] B.C.C. 974.

284 *Re Windsor Steam Coal Co* [1929] 1 Ch. 151.

285 *Re Home and Colonial Insurance Co Ltd* [1930] 1 Ch. 102 at 125.

286 *Reekie v Dingwall* 1911 S.C. 808. Compare also *Re Nation Life Insurance Co Ltd* [1978] 1 W.L.R. 45 at 47.

more as if they were in charge of the liquidation, employing an accountant in the person of the liquidator to assist them, than themselves employed, as occasion requires, by their client, the liquidator … It is the liquidator's duty to perform the business of the liquidation himself and only to employ the solicitor in such matters as bring him into contact with the court, in matters which involve conveyancing, and in such other matters as justify himself in obtaining legal advice for his guidance. The solicitor properly comes on the scene only when his client, the liquidator, requires assistance, and to that end instructs him. He is not entitled to do work on his own initiative".[287]

The liquidator requires no sanction or approval for the appointment of a solicitor, but should take some care in making a choice and must, in compulsory windings up, give notice to the liquidation committee of his or her decision to appoint a solicitor.[288] Choosing someone to whom the liquidator knows the liquidation committee or the creditors or contributories will object,[289] or whose independence may be affected by reason of being the employer of a member of the liquidation committee,[290] or of being a partner of the liquidator, should be avoided.[291] Often the solicitors who obtain a winding-up order for a creditor will be instructed by the liquidator as his or her solicitors. This is permissible, and the court in *Re Baron Investments (Holdings) Ltd*[292] acknowledged that it was natural for such solicitors to be instructed as they were in a position to provide information which could form the basis for claims, especially for those that might be brought under s.212 for misfeasance. However, in *Avonwick Holdings Ltd v Shlosberg*,[293] the Court of Appeal indicated that it might well be inappropriate for the liquidator to use the solicitors that are acting for the creditor who petitioned for the winding up of the company as a conflict might well arise for the solicitors.[294]

It is always possible that there may be, as there was in *Re Recover Ltd (in liq)*,[295] an application made to have the solicitor for the liquidator removed by the court.[296] In the Australian case of *Williamson v Nilant*,[297] the judge acceded to an application to prevent the solicitors for the liquidator from acting for him. While the judge, McKechnie J, opined that it was not every case where a solicitor acts for a liquidator and a party interested in the liquidation that there will be a conflict, but there was in this case.[298] The solicitors acting for the liquidator were also acting for a shareholder of the company in liquidation and someone against whom the company issued proceedings before the commencement of winding up. The liquidator's solicitors had begun acting for the shareholder after the commencement of the winding up, taking over from the shareholder's previous solicitors.

---

287 *Reekie v Dingwall* 1911 S.C. 808 at 809 and 815. In the above quotation the word "solicitor" has been substituted for the Scottish term "law agent".
288 1986 Act s.167(2)(b).
289 Compare *Re Cooper's Ltd* (1897) 14 T.L.R. 144; *Re Consolidated Diesel Engine Manufacturers Ltd* [1915] 1 Ch. 192.
290 Compare *Re F. T. Hawkins & Co* [1952] Ch. 881.
291 *Re Universal Private Telegraph Co* (1870) 23 L.T. 884.
292 *Re Baron Investments (Holdings) Ltd* unreported 16 April 1999 Ch D.
293 *Avonwick Holdings Ltd v Shlosberg* [2016] EWCA 1138.
294 The case involved a bankruptcy but what the court had to say applies equally to liquidations.
295 *Re Recover Ltd (in liq)* [2003] EWHC 536 (Ch); [2003] 2 B.C.L.C. 186.
296 In this case it was in relation to proceedings that the liquidator had initiated. The application was based on the fact that the solicitor had an interest in the proceedings that he was conducting on behalf of the liquidator, he was likely to be called as a witness in the proceedings, and he had gained confidential information from earlier instructions that he was not entitled to use.
297 *Williamson v Nilant* [2002] WASC 225.
298 *Williamson v Nilant* [2002] WASC 225 at [22].

The liquidator may change solicitors at any time[299] but a solicitor's retainer is not affected by the removal of the liquidator.[300]

**9-042** The solicitor is, of course, entitled to charge for professional services, though not for merely administrative work[301] performed in the course of the winding up. The solicitor must, however, look to the assets of the company and not to the liquidator personally for payment,[302] unless there is some agreement to that effect. Solicitors are entitled to a lien in respect of moneys and documents of the company which come into their possession prior to liquidation but not in respect of those which were acquired in the course of the winding up.[303]

If a liquidator instructs solicitors to act for him or her, the solicitors do not, except in special circumstances, owe a duty of care to the creditors of the company being liquidated.[304] In instructing solicitors, a liquidator might wish to consider whether his or her instructions and any reports commissioned by solicitors are protected by litigation privilege. The Court of Appeal held in *Rawlinson and Hunter Trustees SA v Akers*[305] that at the time of commissioning advice litigation must be reasonably in prospect, and not a mere possibility, for litigation privilege to apply.

## C. Advice of the court

**9-043** One of the most useful facilities afforded the liquidator in winding up is the right of applying to the court for advice when difficult questions arise, and there are simple forms of procedure by which this can be done both in compulsory and in voluntary winding up. If a liquidator is faced with a situation where real doubt exists he or she should apply for directions. An example of where a liquidator should seek directions is where the liquidator is unsure whether or not to carry on the business of the company. However, it must be noted that courts do not agree readily to exercise the power to give directions.

### *1. Compulsory winding up*

**9-044** In compulsory winding up the procedure for obtaining the advice of the court is for the liquidator to apply under s.168(3) or the inherent jurisdiction for directions in relation to particular matters arising in the winding up. Seeking assistance should not be seen as a sign of lack of ability or incompetence, necessarily. In fact a liquidator has a duty to seek directions if there is a difficulty at any stage during the course of the administration.[306] Unlike in a voluntary winding up, where the creditors and contributories can apply for directions,[307] they are not able under s.168, but

---

299 *Re Continental Fire & Casualty Co* [1924] 3 D.L.R. 9.
300 *R. v Lord Mayor of London* [1893] 2 Q.B. 146.
301 Compare *Re Pryor* (1888) 59 L.T. 256.
302 *Re Anglo-Moravian Ry Co* (1876) 1 Ch. D. 130; *Re Nation Life Insurance Co Ltd* [1978] 1 W.L.R. 45 at 47.
303 *Re Capital Fire Insurance Association* (1883) 24 Ch. D. 408; *Re Anglo-Maltese Hydraulic Dock Co* (1885) 54 L.J. Ch. 730; *Re Rapid Road Transit Co* [1909] 1 Ch. 96; *Re Meter Cabs Ltd* [1911] 2 Ch. 557.
304 *A.J. Fabrication (Batley) Ltd v Grant Thornton* [2000] B.P.I.R. 1; *Times*, 5 August 1999.
305 *Rawlinson and Hunter Trustees SA v Akers* [2014] EWCA Civ 136.
306 *Re Windsor Steam Coal Co* [1929] Ch. 151 at 159; *Re Timberland Ltd*; sub nom. *Commissioner for Corporate Affairs v Harvey* (1979) 4 A.C.L.R. 259; *Pace v Antlers Pty Ltd (in liq)* (1998) 16 A.C.L.C. 261 at 273.
307 Pursuant to 1986 Act s.112.

they may instigate a decision procedure to enable them to obtain a decision from creditors to direct the liquidator to seek directions. There have been a number of recent Australian cases which have considered liquidators' applications and they may well be of use in determining issues coming before courts in the UK. This part of the chapter refers to those Australian decisions.

Section 168(3) may be traced back to s.23 of the Companies (Winding up) Act 1890 which was derived from s.89 of the Bankruptcy Act of 1883.[308] The role of the section is to provide a procedure for a liquidator to obtain some guidance from the court in conducting a liquidation and so as to give protection against a claim for breach of duty.[309] The provision is essentially concerned with action which is future at the time of the application being heard and it provides an administrative non-adversary proceeding.[310] This course is so frequently taken that little purpose would be served by attempting a catalogue of all the situations in which such an application may be made. Some examples which may be mentioned are where the liquidator wishes to know: whether to postpone the sale of certain assets[311]; whether testamentary gifts to a charitable company that had gone into liquidation were ineffective[312]; how to deal with a claim of a creditor[313]; whether to institute proceedings for misfeasance; whether to admit a particular debt or claim to proof in the winding up[314]; whether to make payments out of the assets[315]; whether to levy calls on contributories[316]; whether to seek guidance on how to deal with the affairs of two related companies whose affairs are intermingled[317]; whether to obtain guidance on questions of law[318]; whether to seek guidance on the sale of a cause of an action[319]; whether to know how litigation should be conducted[320]; and whether to seek resolution of issues of legal procedure.[321] Although a direction given on such an applica-

---

308 Bankruptcy Act of 1883 (46 & 47 Vict c.52). An earlier provision which provided for directions for the former form of liquidators (official managers) is s.34 of the Joint Stock Companies Winding Up Act 1848.

309 *State Bank of New South Wales v Turner Corp Ltd* (1994) 14 A.C.S.R. 480 at 483. Also, see *Rodger v Gourlay* (1984) 73 F.L.R. 264 at 265; (1984) 2 A.C.L.C. 594 at 595.

310 *Re J.W. Murphy & P.C. Allen* (1996) 19 A.C.S.R. 569.

311 See *Re Statewide Investments Ltd (in liq)* (1982) 6 A.C.L.R. 265 where the liquidator was authorised to postpone the sale of the company's land by entering into a contract which required the land to be re-zoned. The contract promised a higher return for the company and its creditors.

312 *Alleyne v Attorney-General* [1997] B.C.C. 370.

313 *Re Polly Peck International Plc* [1996] B.C.C. 486.

314 Compare *Re Banque des Marchands de Moscou*; sub nom. *Wilenkin v Liquidator (No.2)* [1953] 1 W.L.R 172.

315 See *Re Chemical Plastics Ltd* [1959] V.R. 570; *Re Australian Home Finance Ltd* [1956] V.L.R. 1.

316 As in *Re Peter Lalor Home Building Co-operative Society Ltd* [1958] V.R. 165.

317 *Re Capital Project Homes Pty Ltd* (1991) 6 A.C.S.R. 310.

318 *Re Standard Insurance Co Ltd* (1961) 80 W.N. (N.S.W.) 1355; *Sanderson v Classic Car Insurances Pty Ltd* (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114; *Re John Frederick Lord as Liquidator of Silverline Technologies Pty Ltd* [2005] NSWSC 620.

319 *Craig v Humberclyde Industrial Finance Ltd* [1999] 1 W.L.R. 129; [1998] 2 B.C.L.C. 526 CA. In this case, the court excluded the defendant to the claim while considering the merits of the cause of action on which the official receiver sought directions. The court was of the view that it was appropriate to implement the Chancery Division procedure used when trustees sought directions as to whether to take proceedings against a beneficiary. This procedure permitted the entertaining of evidence in the absence of the beneficiary.

320 *Re Addstone Pty Ltd (in liq)* (1997) 25 A.C.S.R. 357.

321 *Sanderson v Classic Car Insurances Pty Ltd* (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114; *Re Ansett Australia Ltd (No.3)* [2002] FCA 90; (2002) 115 F.C.R. 409; *Re Dungowan Manly Pty Ltd (in liq)* [2018] NSWSC 1083 at [17].

tion does not amount to a judicial determination raising an estoppel,[322] the advantage of using this procedure is that, having obtained and followed the advice of the court with respect to a particular matter, the liquidator is then protected against any possible allegations of breach of duty which might subsequently be made against him or her by creditors or contributories of the company on the basis that the proceedings were not properly incurred.[323] In fact the courts have said that in cases of real doubt the correct procedure for a liquidator is to seek directions.

Liquidators are not to use an application for directions in at least two respects. First, where the liquidator seeks to have the court make a commercial decision for the liquidator[324]; directions on matters which fall within the liquidator's discretion should not be sought where the intention is to enable the liquidator to be absolved of responsibility for making a difficult commercial decision.[325] As Giles J said in *Re Spedley Securities Ltd (in liq)*[326]:

> "It is generally not appropriate in an application for directions to make the liquidator's commercial decisions for him where he has full power to act … and the liquidator should not seek directions as a kind of insurance that he has made the right commercial decision."[327]

**9-045** By the same token, if a difficulty arises in the course of the administration the liquidator is obliged to inform the court and take directions.[328] For instance, a court will give directions where the liquidator's proposed decision is being criticised by a creditor or creditors as being unreasonable or evidence of bad faith.[329] Liquidators have been given directions where they have been confronted with charges of acting unreasonably, even where the decision involved commercial judgment.[330] Merely because a creditor or someone else appears at the hearing for directions, that is not a reason for refraining to give directions to the liquidator if to do so is appropriate.[331]

Secondly, the procedure is not to be used where there is a dispute between two third parties over a right to claim company funds; the appropriate course of action

---

[322] *Re Blackbird Pies (Management) Pty Ltd (No.2)* [1970] Q.W.N. 14; *TTC (SA) Pty Ltd (in liq), formerly Tom the Cheap (SA) Pty Ltd* (1983) 1 A.C.L.C. 914.

[323] *Re Atkinson* [1971] V.R. 612 at 615–616; *TRe Lemon Tree Passage & Districts RSL and Citizens Club Co-Operative Ltd* (1988) 6 A.C.L.C. 24 at 27; *Coats v Southern Cross Airlines Holdings Ltd* (1998) 145 F.L.R. 386; (1998) 16 A.C.L.C. 1393.

[324] *Shiraz Nominees (in liq) v Collinson* (1985) 3 A.C.L.C. 706.

[325] *Shiraz Nominees (in liq) v Collinson* (1985) 3 A.C.L.C. 706; compare *Sanderson v Classic Car Insurances Pty Ltd* (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114 (where the liquidator had made a commercial decision and sought the protection of the court's directions).

[326] *Re Spedley Securities Ltd (in liq)* (1992) 10 A.C.L.C. 1742.

[327] *Re Spedley Securities Ltd (in liq)* (1992) 10 A.C.L.C. 1742 at 1744–1745. Also, see *Re Ansett Australia Ltd and Korda* (2002) 40 A.C.S.R. 433 at [66].

[328] *Re Windsor Steam Coal Co* [1929] 1 Ch. 151 at 159; *Re Timberland Ltd*; sub nom. *Commissioner for Corporate Affairs v Harvey* (1979) 4 A.C.L.R. 259.

[329] *Re Addstone Pty Ltd (in liq)* (1997) 25 A.C.S.R. 357 at 363. See this case for an instance where the court felt it should give directions in a situation where the commercial decision of the liquidator was involved (at 371).

[330] *Sanderson v Classic Car Insurances Pty Ltd* (1985) 10 A.C.L.R. 115; (1986) 4 A.C.L.C. 114.

[331] *Re Addstone Pty Ltd (in liq)* (1997) 25 A.C.S.R. 357 at 363.

is for the liquidator to commence substantive proceedings against the two parties and seek a declaratory order.[332]

Liquidators must be careful when deciding to apply for directions, because if the court takes the view that the application for directions was inappropriate, it can decline to order that the costs associated with the application are to be paid from company funds as a cost of the winding up.[333] This possible punishment, together with the fact that courts have, on a number of occasions, complained that liquidators have sought directions in relation to matters which came with their commercial judgment, may make a liquidator rather reluctant to seek directions. However, the Australian case of *Pace v Antlers Pty Ltd (in liq)*,[334] where it was held that a liquidator should have sought directions as to whether he was obliged to pay income tax assessments, and the liquidator was held to be in breach of his duty of care, is a sober reminder to liquidators that an application for directions should be initiated if there is any doubt in the liquidator's mind.

If the court takes the view that an application is legitimate then some advice or direction should be provided so that the court does not leave one of its officers "floundering".[335] The liquidator bears the responsibility of making a full and fair disclosure to the court of the material facts and the court's function is not to resolve factual conflicts.[336] **9-046**

There are divergent opinions in Australia as to whether an order under the then equivalent of s.168(3) (s.479(3) of the Corporations Act 2001) can bind third parties to the liquidation in relation to substantive issues. The older view,[337] which has substantial modern support, is that an order could not be binding. In the words of McLelland J (as he then was):

> "Modern Australian authority confirms the view that section 479(3) 'does not enable the court to make binding orders in the nature of judgments' and that the function of a liquidator's application for directions 'is to give him advice as to his proper course of action in the liquidation; it is not to determine the rights and liabilities arising from the company's transactions before the liquidation."[338]

The opposite view was expressed by Northrop J in *ASC v Melbourne Asset Management Nominees Pty Ltd*.[339] His Honour said that an order might be binding, although McLelland CJ in Eq in *Re BPTC Ltd*; sub nom. *JW Murphy & PC Al-*

---

332 *Re Everything Australian Pty Ltd* (1993) 11 A.C.L.C. 50 at 51; *Re AMN Pty Ltd (in liq)* (1997) 15 A.C.L.C. 368.

333 For example, see *Re AMN Pty Ltd (in liq)* (1997) 15 A.C.L.C. 368 (Digest).

334 *Pace v Antlers Pty Ltd (in liq)* (1998) 16 A.C.L.C. 261.

335 *Re Lemon Tree Passage & Districts RSL & Citizens Club Co-Operative Ltd* (1988) 6 A.C.L.C. 24 at 26 per Young J.

336 *Re Magic Aust Pty Ltd (in liq)* (1992) 7 A.C.S.R. 742 at 746; *Editions Tom Thompson Pty Ltd v Pilley* (1997) 15 A.C.L.C. 1331.

337 *Re Blackbird Pies (Management) Pty Ltd (No.2)* [1970] Q.W.N. 14; *Re TTC (SA) Pty Ltd (in liq)* (1983) 1 A.C.L.C. 914; *Re Security Provident Fund Ltd (in liq)* (1984) 73 F.L.R. 264 at 265; *Re Neander Constructions Pty Ltd* (1988) 6 A.C.L.C. 865; *Re GB Nathan & Co Pty Ltd (in liq)* (1991) 24 N.S.W.L.R. 674 at 679–680; (1991) 5 A.C.S.R. 673 at 678; *Re Magic Aust Pty Ltd (in liq)* (1992) 7 A.C.S.R. 742 at 745; *Re Dallhold Investments Pty Ltd* (1994) 53 F.C.R. 339; *Re AMN Pty Ltd (in liq)* (1997) 15 A.C.L.C. 368 (Digest); *Editions Tom Thompson Pty Ltd v Pilley* (1997) 15 A.C.L.C. 1331; *Re ACN 007 537 000 Pty Ltd* (1997) 15 A.C.L.C. 1752 at 1756.

338 *Re GB Nathan & Co Pty Ltd (in liq)* (1991) 24 N.S.W.L.R. 674 at 679–680; (1991) 5 A.C.S.R 673 at 678.

339 *ASC v Melbourne Asset Management Nominees Pty Ltd* (1994) 12 A.C.L.C. 364 at 376–379.

*len*[340] doubted the correctness of this position. It is submitted respectfully that the overwhelming amount of authority supports the view that directions are not binding, but are to give the liquidator advice as to a proper course of action in the administration.[341]

**9-047** While courts have generally said that they are unable to bind other parties, they have made orders declaratory of substantive rights and intended to be binding on parties to the proceedings, where the proceedings have commenced as a liquidator's application for directions.[342] It has been said that court procedures are sufficiently flexible to enable directions proceedings to be changed to permit determination of substantive rights. The caveat expressed by McLelland J should be noted, namely that such a fundamental change in the nature of proceedings should not be allowed unless the court is satisfied that the persons affected consent to this action.[343]

If a liquidator or liquidators are of the view that the administration of two or more companies should be undertaken conjointly then an application for directions would be the correct procedure.[344]

In general it appears that an ex parte hearing of the application for directions is permissible, but every case must be considered on its facts and where there are conflicting interests to be considered such a procedure may not be appropriate.[345]

### 2. *Voluntary winding up*

**9-048** Where a liquidator[346] in voluntary winding up wishes to obtain the advice of the court the procedure is to apply under s.112 for the determination of any question arising in the winding up of the company. Also, s.112 permits a court to exercise any of the powers which it may exercise in a compulsory winding up. The test to be applied on an application made pursuant to s.112 is, according to *Re Autobrokers Ltd*,[347] that which was stated in *Re Barings Plc*,[348] namely "… whether … it will be conducive to both the proper operation of the process of liquidation and to justice between all those interested in the liquidation."

Although there was an indication in *Re County Marine Insurance Co*[349] that the jurisdiction of both ss.112(1) and 168(3) is much the same, Young J of the New South Wales Supreme Court in *Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd*[350] doubted that this was completely true when dealing with the Australian equivalents. This also seems to be indicated by the more recent English case of

---

340 *Re BPTC Ltd*; sub nom. *JW Murphy & PC Allen* (1996) 14 A.C.L.C. 845 at 846; (1996) 19 A.C.S.R. 569 at 570.

341 *Re GB Nathan & Co Pty Ltd (in liq)* (1991) 24 N.S.W.L.R. 674 at 680; (1991) 5 A.C.S.R. 673 at 678.

342 *Re Staff Benefits Pty Ltd (in liq)* (1979) 1 N.S.W.L.R. 207; (1979) 4 A.C.L.R. 54; *Re GB Nathan & Co Pty Ltd (in liq)* (1991) 24 N.S.W.L.R. 674 at 680; (1991) 5 A.C.S.R. 673 at 678.

343 *Re Standard Insurance Co Pty Ltd (in liq)* (1961) 80 W.N. 1355; *Murdoch v Crawford* [1986] V.R. 97; *Re GB Nathan & Co Pty Ltd (in liq)* (1991) 24 N.S.W.L.R. 674 at 679–680; (1991) 5 A.C.S.R. 673 at 679.

344 *Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd* (1997) 15 A.C.L.C. 833 at 839; *Re Charter Travel Co Ltd* (1997) 15 A.C.L.C. 1685 at 1686. Courts will only make such an order where exceptional circumstances exist ( (1997) 15 A.C.L.C. 1685 at 1686).

345 *Bank of Melbourne Ltd v HPM Pty Ltd* (1998) 16 A.C.L.C. 427 at 429.

346 Or any creditor or contributory: see s.112(1).

347 *Re Autobrokers Ltd* [2015] EWHC 2691 (Admin).

348 *Re Barings Plc* [2001] 2 B.C.L.C. 159.

349 *Re County Marine Insurance Co* (1870) L.R. 6 Ch. App. 104 at 114–115.

350 *Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd* (1997) 15 A.C.L.C. 833.

*Kean v Lucas*.[351] In this case Registrar Briggs (as he then was) observed that s.112 included wider language and s.168 did not include a threshold requirement, whereas s.112 did include one, and this requirement is considered shortly.[352] Section 168(3) merely states that a court may grant directions to a liquidator while s.112(2) provides the grounds when directions may be given, namely, if the court is satisfied that the determination of the question or the exercise of the power will be just and beneficial. Under s.112 a creditor[353] or contributory as well as a liquidator is entitled to apply for directions.[354] The inclusion of the latter might be particularly aimed at members' voluntary liquidations where contributories have a specific interest, something that they are not likely to have in most creditors' voluntary liquidations and compulsory liquidations. Young J in *Willcocks* pointed out that the court may, under the Australian equivalent of s.168(3), direct the liquidator, its officer, to commit a breach of trust or to do something which it is arguable that the liquidator has no power to do, while under s.112(2) the court is only given power to avoid expensive procedures.[355]

There has been a policy of giving a liberal construction to s.112,[356] to the point where it even includes the jurisdiction to grant an injunction preventing a meeting[357] but in *Re Blue Slate; CIR v Mills & Bloom*,[358] Hart J stated that an application under the section can only be entertained where its purpose is a legitimate purpose of winding-up. The liberal construction of the provision has led to a wide range of matters being brought before the court and settled in this way: for example, the question: whether a particular disposition amounts to a preference,[359] whether a debt is admissible to proof[360] or payable as a priority claim,[361] whether a call has been properly made,[362] who were the beneficial owners of shares,[363] whether a debenture created a valid charge,[364] whether the charge covering the book debts was a fixed or floating charge,[365] how funds remaining in the control of the liquidators should be distributed,[366] or a debenture was validly given,[367] guidance as to who were the beneficial owners of shares in the company,[368] and even questions of

---

351 *Kean v Lucas* [2017] EWHC 250 (Ch); [2017] B.C.C. 311 at [16].

352 *Kean v Lucas* [2017] B.C.C. 311 at [16].

353 This includes a secured creditor: *Re Alfred Priestman & Co (1929)* [1936] 2 All E.R. 1340.

354 In a compulsory winding up a resolution of the creditors or contributories may direct the liquidator to apply for court directions.

355 *Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd* (1997) 15 A.C.L.C. 833 at 835.

356 *Re Union Bank of Kingston-upon-Hull* (1880) 13 Ch. D. 808. While this is the case, the court's role is to decide matters according to the law: *Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd* (1997) 15 A.C.L.C. 833 at 836.

357 *Kean v Lucas* [2017] B.C.C. 311.

358 *Re Blue Slate, CIR v Mills & Bloom* [2003] EWHC 2022.

359 *Re Jackson & Bassford Ltd* [1906] 2 Ch. 467. But note that recently, in *Re Anglican Insurance Ltd* [2008] NSWSC 41 SC (NSW), the New South Wales Supreme Court said that it was not the task of the court to determine the rights and liabilities arising from the company's transactions entered into before the commencement of liquidation.

360 *Re Fruit & Vegetable Co* (1912) 12 S.R. (N.S.W.) 52; *Re Pastoral Finance Association Ltd* (1922) 23 S.R. (N.S.W.) 43.

361 *Re Peterson's Ltd* [1927] St.R.Qd 134; *Re David Hamilton & Co* [1928] N.Z.L.R. 419.

362 *Re David Hamilton & Co* [1928] N.Z.L.R. 419.

363 *Re Harvard Securities Ltd (in liq)* [1997] 2 B.C.L.C. 369.

364 *Re Double S. Printers Ltd (in liq)* [1999] B.C.C. 303.

365 *Re Spectrum Plus Ltd* [2003] EWHC 9 (Ch). The directions were needed to determine the fate of book debts. The litigation has since been finalised with a notable decision of the House of Lords: *National Westminster Bank Plc v Spectrum Plus Ltd* [2005] UKHL 41.

366 *Tombs v Moulinex SA* [2004] EWHC 454 (Ch). In this case, the issue was of importance as there

procedure[369] and the admissibility of evidence.[370] In *Whitehouse v Wilson*,[371] a liquidator applied via s.112 for directions as to whether he could accept a particular offer of compromise to his misfeasance claim against a director.[372] Furthermore, the value of this form of procedure is considerably enhanced by the fact that a determination made under s.112(1) has the effect of a decision binding on all parties properly represented before the court,[373] including, of course, the liquidator.[374]

**9-049** While the actual jurisdiction of the court is extremely wide, its exercise is a matter of discretion[375] since, as noted above, an application of this kind will not be entertained unless the court is satisfied that the determination of the question posed will be just and beneficial.[376] A statutory threshold test is provided within s.112 that did not exist in s.168 for compulsory liquidations, in that it required a liquidator to demonstrate that the determination of the question or the required exercise of power would be just and beneficial to the winding up and would be of advantage to the liquidation.[377] That required an objective consideration of class interests.[378] The courts could always come to the conclusion that the requested exercise of power could be just and beneficial for the winding up, but in their discretion decline to exercise the power.[379]

Precisely what limits are imposed by the requirement that the court must be satisfied that there will be a just and beneficial determination is not easy to ascertain, for there have been few reported cases in which such applications have been refused. It seems, however, that s.112(1) is to be regarded as providing a summary procedure which is not intended as a means of trying issues involving complex questions of fact[380] or the assessment of claims for unliquidated damages[381] which could more properly and more conveniently be made the subject of ordinary proceedings at common law.[382] It has been said that an application under s.112 will only be entertained where its purpose is a legitimate purpose of winding up.[383] The conditions governing the exercise of discretion are set out in s.112(2). In *IRC v Blueslate*,[384] an application for an order under s.112 that a liquidator disclose documents in his possession or control failed. The liquidator was contemplating taking

---

was some possibility of future consumer actions against the company as a result of products that it had sold prior to liquidation.

367 *Re Alfred Priestman & Co* [1936] 2 All E.R. 1340; *Re Evers Motor Co* [1962] Q.W.N. 6; see also *Re Anglo-Australian Investment Co (No.2)* (1895) 14 L.R. (N.S.W.) Eq. 110.

368 *Re Agrimarche Ltd* [2010] EWHC 1655 (Ch).

369 *Re Union Bank of Kingston-upon-Hull* (1880) 13 Ch. D. 808.

370 *Re L. G. Batten Pty Ltd* [1962] Q.W.N. 2.

371 *Whitehouse v Wilson* [2006] EWCA Civ 1688; [2007] B.P.I.R. 230.

372 *Whitehouse v Wilson* [2006] EWCA Civ 1688; [2007] B.P.I.R. 230 at [24].

373 *Re Anglo-Australian Investment Co (No.2)* (1893) 14 L.R. (N.S.W.) Eq. 110.

374 *Re Aynek Syndicate Ltd* [1936] 1 All E.R. 406.

375 *Re Centrifugal Butter Co* [1913] 1 Ch. 188.

376 See 1986 Act s.112(2).

377 *Kean v Lucas* [2017] EWHC 250 (Ch); [2017] B.C.C. 311; [2017] B.P.I.R. 689 at [16]. Also, see *S & D International (in liq) v MIG Property Services Pty Ltd* [2010] VSC 366.

378 *Kean v Lucas* [2017] B.C.C. 311 at [16].

379 *Kean v Lucas* [2017] B.C.C. 311.

380 See *Re Centrifugal Butter Co* [1913] 1 Ch. 188; as explained in *Re F & E Stanton Ltd* [1929] 1 Ch. 180.

381 *Crawford v McCulloch*, 1909 S.C. 1063.

382 *Crawford v McCulloch*,1909 S.C. 1063 at 1067.

383 *IRC v Blueslate* [2003] EWHC 2022 (Ch).

384 *IRC v Blueslate* [2003] EWHC 2022 (Ch).

action under s.212 (misfeasance provision)[385] against the s.112 applicant and the court said that the application really was an attempt to obtain pre-action disclosure. Hart J refused to make an order as he said that the application did not involve a legitimate purpose of the winding up.

It is questionable as to whether the provision can be used to get the court to set aside a contract.[386] The court does not have the power to give authority to the liquidator to do something which is ultra vires the company.[387]

As with s.168(3), liquidators are not able to seek to have the court make a commercial decision for the liquidator; directions on matters which fall within the liquidator's discretion should not be sought where the intention is to enable the liquidator to be absolved of responsibility for making a difficult commercial decision. For example, in *Re Stetzel Thomson & Co Ltd*,[388] the liquidators of a company in voluntary liquidation applied for directions (under the immediate precursor of s.112) in relation to a fund held by the company. The company conducted syndicates which wrote reinsurance business. The members of the syndicates were foreign insurance companies. The liquidators found a fund held by the company in various bank accounts. How the fund had arisen was unclear and it was uncertain who owned it. The court said that the case was unsuitable for directions to be given. The liquidators had to make up their own mind, administer the fund as they saw fit and resist any claims as best as they could.[389] Harman J did say that in a suitable case it was in order for a liquidator to seek directions concerning a fund which he or she held for the company.[390] **9-050**

Before considering an application for directions the court must be convinced that there is something more involved than the making of a business decision, and this could involve, besides an issue of law or fact, an issue of power, property or reasonableness.[391]

If the applicant fails to use the correct process then the court has a discretion to deal with the application provided that no injustice arises as a result of the wrong procedure.[392]

A court may decline to hear an application under s.112 where a company has sufficient funds and the matter can be best dealt with pursuant to ordinary litigation.[393] Even if the applicant for directions is using the process for a collateral purpose, such as to discover whether the company may have a cause of action against the liquidator, the court may still hear the application.[394] **9-051**

It has been held that a liquidator of more than one company in a group of companies may issue just the one application under s.112 when the matter involved

---

385 See Ch.16 below.
386 P. Davies et al, *Palmer's Corporate Insolvency Law* (1986), Vol.1, p.1040.
387 *Re Salisbury Railway and Market House Co Ltd* [1969] 1 Ch. 349.
388 *Re Stetzel Thomson & Co Ltd* (1988) 4 B.C.C. 74.
389 *Re Stetzel Thomson & Co Ltd* (1988) 4 B.C.C. 74 at 79.
390 *Re Stetzel Thomson & Co Ltd* (1988) 4 B.C.C. 74 at 78.
391 *Re Ansett Airlines Ltd (No.3)* [2002] FCA 90; (2002) 115 F.C.R. 409. In *Re Australian Capital Reserve Ltd (in liq)* [2008] FCA 1895, the court found that it could give directions, on the basis of reasonableness, where the liquidator sought directions as to whether it was justifiable for the liquidator to defer the payment of dividends to unsecured creditors.
392 *Re Continental Assurance Co of London Plc (in liq)* [1998] 1 B.C.L.C. 583.
393 *Re Stetzel Thompson & Co Ltd* (1988) 4 B.C.C. 74.
394 *Re Movitex Ltd* [1992] B.C.C. 101.

is common to all the companies.[395] This action could have a great cost benefit for the liquidations.

Any application that is made under the section should be made to the court which has jurisdiction to wind up the company.

Finally, the Victorian Court of Appeal in *Re Lonnex Pty Ltd (in liq) (No.2)*[396] held that liquidators should have their costs in seeking directions from the court paid out of the estate, provided that they were honestly and reasonably incurred. However, if liquidators appeal from a determination of the court, they do so at their own risk and must accept the consequences, so that if the liquidators are unsuccessful in their appeal they will be responsible personally for their own costs and that of any successful party and they cannot have recourse to the company's funds and assets. The only exception might be, it would seem from what the court said, where there was controversy as to legal principle.

## III. Duties of the Liquidator

**9-052** In general terms the principal duties of the liquidator are set out in s.143, namely to ensure that the assets of the company are got in, realised and distributed to the creditors and, if there is a surplus, distributed to the persons entitled to the assets.[397] The precise manner in which these duties are carried out is, for the most part, entrusted to the good judgment of the liquidator although there are a few matters—such as the making of calls on contributories, dealing with claims by creditors, and, in compulsory winding up, the administration of moneys and securities—in which the procedure to be followed by the liquidator is defined with some particularity. Subject to this, the liquidator must use his or her own discretion in the management of the affairs and property of the company, in incurring expenses, and in distributing the assets; the liquidator must at all times act honestly, with due care, and with such a degree of diligence and promptitude as will ensure that the winding up will be completed within a reasonable time: for although it does not say so in express terms, the policy of the Act carries the implication that the liquidator is to deal with the liabilities of the company and distribute its assets within a reasonable time,[398] though what is reasonable must necessarily depend upon the circumstances of the particular company in question.[399]

It is appropriate to note at this point, as we have done already, that the law is quite clear on the fact that the liquidator is a fiduciary. The duties that flow from this status were discussed in Ch.8.[400]

The duties of the liquidator are intertwined with many important elements of the winding-up process and it is appropriate to discuss some aspects of the liquidator's duties either completely or in depth at other places in the book.

**9-053** A liquidator may be disqualified under s.4 of the Company Directors' Disquali-

---

395 *Re William Pickles Plc (in liq)* [1996] 1 B.C.L.C. 681; [1996] B.C.C. 408.

396 *Re Lonnex Pty Ltd (in liq) (No.2)* [2019] VSCA 62.

397 See the comments of the New South Wales Supreme Court in *Re Partridge; Ex p. McDonald* (1961) 61 S.R. (N.S.W.) 622 at 629; and approved of in *Wimborne v Brien* (1997) 15 A.C.L.C. 793 at 797. See also *Ayerst v C&K (Construction) Ltd* [1976] A.C. 167 HL at 177.

398 *Re House Property & Investment Co* [1954] Ch. 576 at 612; *Pace v Antlers Pty Ltd (in liq)* (1998) 16 A.C.L.C. 261 at 273.

399 *Re House Property & Investment Co* [1954] Ch. 576 at 612; *Pace v Antlers Pty Ltd (in liq)* (1998) 16 A.C.L.C. 261 at 273.

400 See above at paras 8-049–8-057.

fication Act 1985 if guilty of, inter alia, a breach of duty while acting as a liquidator of a company.[401]

Before considering some of the duties of a liquidator, it should be noted that in *Re A&J Fabrications Ltd v Grant*,[402] Jacobs J held that liquidators can owe duties to creditors of the company. This entails the body of creditors and not individual creditors. In *Re A&J Fabrications Ltd v Grant*,[403] the majority creditors of a company in liquidation sued an accounting firm for negligence. The creditors had agreed with the firm that they would support the appointment of one of the firm's employees as liquidator with a view to the investigation of the directors of the company and the taking of proceedings against the directors. The creditors agreed to pay the costs of the firm to a certain amount. The claim of the creditors was based on the negligence of the liquidator in that action was not taken against the directors within the statutory time allowed. The liquidator's firm argued that it did not owe any duty and that the correct action was to proceed pursuant to s.212. Jacobs J said that in circumstances such as these liquidators could owe duties to the creditors with whom they had a contract. Also, Jacobs J held that if a liquidator is an employee of a firm then that firm owes a duty to the company as well as the liquidator himself or herself owing such a duty. His Lordship said that in this kind of case the liquidators only obtained their position because of the contract between the creditors and the firm and so the firm owed a duty to the creditors.

## A. Duty to lodge notice of appointment

Chronologically, the first duty of a voluntary liquidator is, within 14 days of appointment, to publish a notice to that effect in the *Gazette*[404] and to file a copy of the notice with the registrar of companies.[405] **9-054**

Where a liquidator is appointed by the Secretary of State pursuant to s.137(3) because the official receiver has either asked the Secretary of State to replace him or her with another or has convened a meeting of creditors to choose a liquidator to replace the official receiver and no choice has been made, the liquidator is to give notice of appointment to the company's creditors or, if the court allows, advertise the appointment in accordance with the directions of the court.[406] While the legislation gives no direction as to when advertising may be allowed, one would think that the provision is present to permit advertising where there are a significant number of creditors and advertising would be a less expensive mode of giving notice. The notice or advertisement is to state the procedure for the establishment of a liquidation committee under s.141.[407]

Where a company is wound up by the court and the official receiver automatically becomes the liquidator, two sealed copies of the winding-up order are to be **9-055**

401 For a case where this occurred, see *Wood v Mistry*; sub nom. *Re Assegaai Consultants Ltd* [2012] EWHC 1899 (Ch); [2013] 1 B.C.L.C. 389.
402 *Re A&J Fabrications Ltd v Grant* [1998] 2 B.C.L.C. 227.
403 *Re A&J Fabrications Ltd v Grant* [1998] 2 B.C.L.C. 227.
404 This is not to be regarded as notice to the world of the commencement of the winding up: *Official Custodian for Charities v Parway Estates Developments Ltd* [1984] 3 All E.R. 679 at 685. In appropriate cases, the liquidator should write to individuals and inform them of the liquidation.
405 1986 Act s.109. Also, see 2016 Rules r.6.23.
406 1986 Act s.137(4).
407 1986 Act s.137(5).

sent as reasonably as practicable to the official receiver by the court[408] who is to deliver one copy to the company,[409] and a copy to the registrar of companies, as required by s.130(1).[410] The official receiver is as soon as reasonably practicable to cause the order to be inserted in the *Gazette* and he or she may advertise notice of the order in such other manner as the official receiver thinks fit.[411] The notice is to state that a winding-up order has been made in relation to the company and the date of the order.[412]

## B. Duty to provide statement or report

**9-056** Rule 7.48(1) requires the official receiver, at least once, following the winding-up order, to send a report to creditors and contributories with respect to the proceedings in the winding up and the state of the affairs of the company.[413] Included with the report should be any estimate of the value of the prescribed part under s.176A, an estimate of the value of the company's net property,[414] and whether, and if so, why, the liquidator proposes to make an application to court under s.176A(5).[415] Nothing in r.7.48 is to be taken as requiring any such estimate to include any information, the disclosure of which could seriously prejudice the commercial interests of the company. If such information is excluded from the calculation the estimate shall be accompanied by a statement to that effect.[416] Rule 7.48(3) provides the court, on an application by the official receiver, with an overriding power to relieve the official receiver from complying with the duty to send a report to creditors and contributories with respect to the proceedings in the winding up and the state of the affairs of the company. In deciding whether to not give relief to the official receiver, the court must have regard to the costs of carrying out the duty, the amount of the assets available, and to the extent of the interest of creditors or contributories or any particular class of them.[417]

**9-057** The duty of the official receiver to send reports ceases if the winding-up proceedings are stayed by order of the court.[418]

As discussed earlier,[419] the usual situation which occurs on the making of a winding-up order is that the official receiver, by virtue of his position, becomes liquidator until another person becomes liquidator. Section 140 sets out two cases where a private insolvency practitioner may be appointed. One of these is where there was an administrator pursuant to an administration appointment in office immediately prior to the making of the winding-up order. If the former administrator of the company is appointed as liquidator, then if he or she becomes aware of any creditors not formerly known to him or her, the now liquidator is to send to those

---

408 2016 Rules r.7.22(1).
409 2016 Rules r.7.22(2)(a).
410 2016 Rules r.7.22(2)(b).
411 2016 Rules r.7.22(4).
412 2016 Rules r.7.22(5).
413 The contents of the report are set out in r.7.48(2).
414 2016 Rules r.7.49(1).
415 2016 Rules r.7.49(2).
416 2016 Rules r.7.49(3).
417 2016 Rules r.7.48(4).
418 2016 Rules r.7.48(5).
419 See above at paras 8-022–8-024.

creditors pursuant to para.49(4) and r.3.35 a copy of any statement or report made by the liquidator to creditors.[420]

Where a private liquidator is appointed, following another liquidator, he or she must as soon as reasonably practicable after being appointed, deliver a notice to the creditors of any matters about which the succeeding liquidator or trustee thinks the creditors should be informed.[421]

In voluntary liquidation, the liquidator must produce an annual progress report.[422] This must be sent to both the members and the creditors.[423] The reports in a voluntary winding up must cover the periods of 12 months starting on the date the liquidator is appointed and each subsequent period of 12 months.[424] The liquidator must send a copy of each progress report within two months after the end of the period covered by the report to the registrar of companies, the members, and the creditors.[425]

The liquidator in a compulsory liquidation must also send an annual progress report to the registrar of companies, the members, and the creditors.[426] As with voluntary liquidations, the reports must cover the periods of 12 months starting on the date the liquidator is appointed and each subsequent period of 12 months.[427] The contents of reports prepared by all liquidators are set out in r.18.3 of the Insolvency Rules 2016.

Naturally all of the above requirements concerning the duty to report are included in the Act to ensure that the creditors and contributories are advised of the company's affairs.

If the liquidator does not file, deliver or make any return or account or other docu- **9-058**
ment or give any notice and fails for 14 days to make good the default after service on him or her of notice requiring the making good of the default, the court may,[428] on an application by a creditor or contributory or by the registrar of companies, order the liquidator to make good the default within a specified time,[429] and also order that the liquidator pay the costs of and incidental to any application.[430]

## C. Duty to investigate affairs

One of the primary functions of the liquidator is to investigate the affairs of the **9-059**
company, including its promotion and formation, and the conduct of its business in the past. This matter is discussed in more detail in Ch.15, but it is appropriate in this context to say a little about the duty of the liquidator. Investigations must be concluded not only for the reason that it is necessary in order to enable discharge of the liquidator's duty of locating and collecting the assets of the company, but also because it may lead to an examination or prosecution of delinquent officers of the company which it is part of the liquidator's duty to set in motion. A liquidator must

420 2016 Rules rr.6.16(2), 7.50(2).
421 2016 Rules r.18.8(3).
422 1986 Act s.92A(1) (members' voluntary liquidation); s.104A(1) (creditors' voluntary liquidation). The relevant rules are found at rr.18.3, 18.4, 18.6.
423 1986 Act s.104A(1).
424 2016 Rules r.18.7(2).
425 2016 Rules r.18.7(6). Also, see 1986 Act s.192.
426 2016 Rules r.18.8(5). Also, see 1986 Act s.192.
427 2016 Rules r.18.8(2).
428 1986 Act s.170(1).
429 1986 Act s.170(2).
430 1986 Act s.170(3).

consider the conduct of the officers and whether any wrongdoing has been perpetrated. The gathering of information, especially in relation to past transactions and the conduct of the business can be a very difficult task, more so where the company's officers are hostile. One obvious source of information about the affairs of the company is its books and past accounts,[431] and the liquidator may think it appropriate to hold personal interviews and private examinations[432] of former officers, promoters, past employees, and other persons for the purpose of furthering investigations.

In a compulsory winding up, the official receiver may, on the making of a winding-up order, require, by notice, some or all of the persons referred to in s.131(3) to make out and submit to him a statement of affairs of the company.[433] The persons referred to in s.131(3) are the former officers of the company, those who have taken part in the formation of the company at any time within one year of the date of the winding-up order, employees of the company and former employees in employment within one year of the winding-up order and those who are or have been in the year before the date of the winding-up order officers or employees of a company which is or was in the year before the winding-up order an officer of the company being wound up.[434] The statement of affairs may lead the official receiver to further investigations. In any event the official receiver has the duty, under s.132, to investigate the cause of the failure of the company, if it has failed, and to generally investigate the promotion, formation, business, dealings and affairs of the company.

The official receiver may determine that it is necessary to seek the public examination of certain persons, namely the past or present officers of the company, liquidators, administrators or receivers of the company, or such persons who have been concerned, or taken part, in the promotion, formation, or management of the company.[435]

**9-060** The starting point, in compulsory liquidations, for any such investigation is a careful perusal of the statement of affairs, if the official receiver has required one, made under s.131. Voluntary liquidators, and for that matter liquidators in compulsory windings up may ask officers and employees of the company to complete questionnaires so that the liquidator can become more conversant with the company's history and affairs. While such persons have a duty under s.235 to co-operate with the liquidator, they may refuse to do so requiring the liquidator to take other action.

Liquidators may, for a variety of reasons (one of which is the fact that an officer or other person who may have important information will not assist the liquidator), seek the examination of the following persons[436]:

- an officer of the company;
- anyone who is known or suspected to have in his or her possession any property of the company or who is supposed to be indebted to the company; and/or
- anyone whom the court thinks is capable of giving information concerning

---

[431] As to recovery of books and documents of the company, see s.234 and below at paras 9-069–9-071.
[432] See s.236; see below at paras 15-033–15-083.
[433] 1986 Act s.131(1).
[434] This topic was discussed in more detail above at paras 7-051–7-055.
[435] 1986 Act s.133(1).
[436] See 1986 Act s.236(2).

the promotion, formation, business, dealings, affairs or property of the company.

The examination, if granted by the court, is held in private, in contrast to the examination initiated by the official receiver under s.133.

Besides ordering an examination, a court may also order, inter alia, that any officer or any person whom the court thinks is capable of giving information concerning the promotion, formation, business, dealings, affairs or property of the company, to produce any book, papers or other records in his or her possession.[437] **9-061**

It is likely that the report of the official receiver made pursuant to s.132 will be absolutely privileged such that a libel action could not be sustained against the official receiver for any comments made in the report. A report made under s.530 of the Companies Act 1985, a precursor of s.132, was held not to attract liability in defamation.[438]

The importance of conducting adequate investigations where directors have used the assets of the company for their own benefit and to the detriment of the company and its creditors is highlighted by what Merkel J of the Australian Federal Court had to say in *City & Suburban Pty Ltd v Smith*[439]:

> "In my view the facts of the present case ought to offer a salutary lesson to liquidators of companies … In such circumstances it is incumbent upon liquidators to investigate properly whether losses suffered by the company and profits or gains made by directors or their associated entities as a consequence of breaches of fiduciary duty are to be recouped. Often the circumstances will be complex and the proceedings required for recovery expensive. Obviously the resources available to a liquidator to undertake appropriate investigation will be of critical importance. However, subject to such matters, liquidators are required to conduct their investigation properly having regard to the circumstances of the case and to seek appropriate advice based upon the facts ascertained."[440]

If, in the course of their investigations, liquidators must provide a report on the conduct of directors, as required by s.7A(4) of the Company Directors' Disqualification Act 1986. The provision states that liquidators, either within three months of the passing of the resolution to wind up where a liquidation began as a creditors' voluntary winding up, or within six months of the date on which the liquidator, appointed in a members' voluntary winding up, formed the view that the company would not be able to discharge its debts in the time specified by the directors in their statutory declaration of insolvency, to send to the Secretary of State a conduct report which indicates any conduct which might assist the Secretary of State deciding whether to exercise the power under s.7 to apply for a disqualification of a director.[441] Also, if the liquidator discovers that a past or present officer of the company has committed an offence then he or she has a duty to advise the Secretary of State.[442] To assist the liquidator Sch.10 to the Act adumbrates criminal offences which may be committed by company officers. **9-062**

---

437 1986 Act s.236(3).
438 *Bottomley v Brougham* [1908] K.B. 584.
439 *City & Suburban Pty Ltd v Smith* (1998) 28 A.C.S.R. 328.
440 *City & Suburban Pty Ltd v Smith* (1998) 28 A.C.S.R. 328 at 341.
441 Also, see the Insolvent Companies (Reports on Conduct of Directors) Rules 2016 (SI 2016/680).
442 1986 Act s.218.

## D. Duty to keep records, books and accounts

9-063 It is necessary for the liquidator on demand to produce to the Secretary of State, and permit him or her to inspect, any accounts, books and other records kept either by the liquidator or by a predecessor in office.[443] This duty encompasses producing and allowing inspection at the liquidator's premises.[444] The liquidator must permit the Secretary of State to remove and take copies of any of the accounts, books and records kept by the liquidator wherever kept.[445]

In a compulsory winding up, the liquidator, on being authorised by the official receiver, during his or her tenure of office or on vacating office may at any time sell, destroy or otherwise dispose of the books, papers and records of the company.[446] In a voluntary winding up the last liquidator may, if the company is dissolved, at any time after the expiration of one year from the time of dissolution sell, destroy or otherwise dispose of the books, papers and records of the company.[447]

### 1. *Records and books*

9-064 As liquidators are insolvency practitioners, they are governed by the Insolvency Practitioners (Amendment) Regulations 2015.[448] They provide that in respect of each case in which an insolvency practitioner acts, the insolvency practitioner shall maintain records containing information sufficient to show and explain—(a) the administration of that case by the insolvency practitioner and the insolvency practitioner's staff; and (b) any decisions made by the insolvency practitioner which materially affect that case. Any records must be produced to the Secretary of State on reasonable notice.[449]

Regulation 10 of the Insolvency Regulations 1994 requires, inter alia, a liquidator in all liquidations, save for members' voluntary liquidations,[450] to prepare and keep separate financial records in respect of each company; and such other financial records as are required to explain the receipts and payments entered in the financial records, including an explanation of the source of any receipts and the destination of any payments.[451] The regulation provides that in the case of a winding up by the court, the liquidator is to obtain and keep bank statements relating to any local bank account in the name of the company.[452] A liquidator must submit financial records to the liquidation committee when required for inspection.[453]

According to reg.13 of the Insolvency Regulations 1994, all records kept by the liquidator are to be retained by him or her for a period of six years following one of: vacation of office; release as liquidator under s.174 (for the official receiver), unless they are delivered to another liquidator who succeeds him or her in office.[454] Where the liquidator is succeeded in office by another liquidator, the records are

[443] Insolvency Regulations 1994 (SI 1994/2507) reg.15(1).
[444] Insolvency Regulations 1994 reg.15(1).
[445] Insolvency Regulations 1994 reg.15(2).
[446] Insolvency Regulations 1994 reg.16(1).
[447] Insolvency Regulations 1994 reg.16(1).
[448] Insolvency Practitioners (Amendment) Regulations 2015 (SI 2015/391) reg.3.
[449] Insolvency Regulations 1994 regs 14–15.
[450] Insolvency Regulations 1994 reg.10(1).
[451] Insolvency Regulations 1994 reg.10(2).
[452] Insolvency Regulations 1994 reg.10(3).
[453] Insolvency Regulations 1994 reg.10(4).
[454] Insolvency Regulations 1994 reg.13(1).

to be delivered to that successor forthwith, unless, in the case of a winding up by the court, the winding up is for practical purposes complete and the successor is the official receiver, in which case the records are only to be delivered to the official receiver if the latter so requests.[455]

A prudent liquidator keeps a record of all such matters as may be necessary to give a correct view of the administration of the company's affairs. In addition to records of such matters as are prescribed, it is the invariable practice, particularly in cases where the business of the company is carried on during winding up, for the liquidator to keep such books and records as are usual in the circumstances for the kind of company in question.[456] **9-065**

### 2. *Accounts*

If required by the Secretary of State, the liquidator is to send to him or her an account in relation to the liquidator's receipts and payments covering such period as the Secretary of State may direct, and such account, if the Secretary of State requires, is to be certified by the liquidator.[457] If a liquidator vacates office prior to the finalisation of the winding up pursuant to s.146, then the liquidator shall within 14 days of vacating office, send to the Secretary of State an account of receipts and payments covering such period not covered by a previous account sent to the Secretary of State.[458] If no account has been sent previously by the liquidator then he or she is to send an account for the whole of the period of office.[459] **9-066**

In the case of a winding up by the court, where a statement of affairs has been submitted under the Act, any account sent under this regulation shall be accompanied by a summary of that statement of affairs and shall show the amount of any assets realised and explain the reasons for any non-realisation of any assets not realised.[460] Where a statement of affairs has not been submitted under the Act, any account sent under the Insolvency Regulations 1994 shall be accompanied by a summary of all known assets and their estimated values and shall show the amounts actually realised and explain the reasons for any non-realisation of any assets not realised.[461]

In members' voluntary liquidations, a liquidator is, for each prescribed period, to produce a progress report relating to the prescribed matters; and within such period commencing with the end of the prescribed period send a copy of the progress report to the members of the company and such other persons as may be prescribed.[462] In a similar manner in a creditors' voluntary liquidation, the liquidator must for each prescribed period produce a progress report relating to the prescribed matters; and within such period commencing with the end of the prescribed period send a copy of the progress report to the members and creditors

455 Insolvency Regulations 1994 reg.13(2).
456 *Re Timberland Ltd*; sub nom. *Commissioner for Corporate Affairs v Harvey* (1979) 4 A.C.L.R. 259 at 306.
457 Insolvency Regulations 1994 reg.14(1).
458 Insolvency Regulations 1994 reg.14(2). This regulation has not been amended to make it accord with changes to the Act and the Rules relating to the abolition of final meetings under s.146. The text has been written to take into account the situation as it now applies under the Act and Rules.
459 Insolvency Regulations 1994 reg.14(2).
460 Insolvency Regulations 1994 reg.14(4).
461 Insolvency Regulations 1994 reg.14(5).
462 1986 Act s.92A.

(other than opted-out creditors) of the company and such other persons as may be prescribed.[463]

### 3. *Minutes*

9-067 Although regs 8 and 26 of the Insolvency Regulations 1986 which required the liquidator to prepare and keep minutes of the proceedings at any meetings of creditors and contributories and meetings of the liquidation committee, have been repealed, and they have no counterparts in the 1994 Regulations, the Insolvency Service has indicated that liquidators should continue to prepare and keep such minutes.[464] Of course, with the changes in decision-making under the new Rules and the fact that there will be fewer meetings this is not such an important issue as it once was.

## E. Duty in relation to funds received

9-068 In the course of the winding up a liquidator will receive funds from various sources. The liquidator in a compulsory winding up is obliged by the Insolvency Regulations[465] to pay all moneys received while discharging his or her functions in the winding up to the Insolvency Service Account kept by the Secretary of State with the Bank of England to the company's credit every 14 days or immediately if the sum received is £5,000 or more.

The handling of funds by liquidators is governed by the Statement of Insolvency Practice 11.[466]

## F. Duty to collect assets

### 1. *General*

9-069 Upon appointment, the liquidator must take custody of and control all the property to which the company is, or appears to be, entitled.[467] In this context property is defined widely.[468] Yet, a liquidator has no right to assets held by the company in trust for others. Whether a trust exists is not always apparent.[469] An example of a situation where a liquidator is not able to use assets because they are held on trust is where money has been lent to the company in order for it to be applied for a specific purpose.[470] Where attaining this purpose is something that is

---

463 1986 Act s.104A.
464 Dear I.P. No.33, March 1995.
465 Insolvency Regulations 1994 reg.5(1).
466 Statement of Insolvency Practice 11, 1 January 2018.
467 1986 Act s.144(1); notwithstanding the form in which it is expressed, this subsection does not introduce the bankruptcy doctrine of reputed ownership into winding up: consequently a liquidator who takes possession of, and sells, property which does not belong to the company will be liable in conversion to the owner thereof: *Edwards v Bendall* (1953) 103 L.J. 351.
468 See 1986 Act s.436.
469 For example, see *Re Kayford Ltd* [1975] 1 W.L.R. 279.
470 *Barclays Bank Ltd v Quistclose Investments Ltd*; sub nom. *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] A.C. 567; [1968] 3 W.L.R. 1097.

prevented by the company's liquidation, then there is a resulting trust with the funds going back to the lender.[471]

Notwithstanding the fact that the power to collect assets is broad, it is probably not wide enough to permit a liquidator to use it to take proceedings that should be commenced in another manner.[472]

Legislation has always assisted liquidators to get hold of property of companies which they are winding up, but the Act now provides wider powers for liquidators. Under the Companies Act 1985 only liquidators in compulsory windings up could get this assistance. Now, s.234 of the Act,[473] which provides that the court may require any person to deliver to the liquidator any money, property or books to which the company appears to be entitled, is applicable to liquidators in voluntary liquidations.[474] Previously the Companies Act was more limited in that the court could only require persons falling into certain categories, namely any contributory, trustee, receiver, banker, agent or officer, but s.234(2) gives the court power in relation to any person. This is a most laudable innovation as it prevents any argument over whether a person is covered by any of the categories mentioned. Not a lot turns on the words, "property" or "books", as these words are interpreted expansively by the courts and are regarded as words which overlap.[475] Section 234(2) actually covers "books, papers or records" as these are broad terms.[476] Notwithstanding the fact that the power in s.234 is broad when it comes to papers and records, it does not confer a power on the liquidator to enable him or her to require the delivery of any record that might shed light on the affairs of the company.[477] While most applications are likely to address personal property, the provision does encompass land as "property" here has the same meaning as it has in s.436.[478]

Because of r.7.78(1), liquidators in compulsory windings up are able to exercise the power of the court set out in s.234. The provisions create a summary procedure for liquidators (and other office-holders) in obtaining payment, possession etc.[479] Rule 7.78(2) makes it clear that a person who is required to deliver up company property to a liquidator must comply without avoidable delay. Of course in some cases it may be necessary to obtain a court order to assist them, but this is likely to be in the form of a contempt of court order as the liquidator acts as an officer of the court in carrying out collection duties.[480] For the purposes of acquiring and retaining company property the liquidator occupies the position of a receiver of

---

471 *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] A.C. 567.

472 For instance, see *Byers v Yacht Bull Corp* [2010] EWHC 133 (Ch); [2010] B.C.C. 368 at [11].

473 For a discussion of the provision and particularly whether office-holders can use it to require parties to pay to them an alleged debt, see Keay, "The Office-Holder's Delivery Up Power and the Recovery of Debts" [2011] 4 *Corporate Rescue and Insolvency* 3.

474 The provision also applies to provisional liquidators, administrators and administrative receivers.

475 See the case of *Re Beppler & Jacobson Ltd* [2012] EWHC 4031 (Comm) and noted in (2012) Co. L.N. 327, paras 7–8.

476 *Chesterton v Emson* [2017] EWHC 3226 (Ch); [2018] B.P.I.R. 621. Books, papers and records have been held in *Le Roux v Viana 2008* (2) S.A. 173 to include any information relating to the company in liquidation where it is located on a computer's hard drive and where the computer is owned by a third party.

477 *Chesterton v Emson* [2018] B.P.I.R. 621.

478 *Everitt (As Liquidator of Property Securities Ltd) v Zeital* [2018] EWHC 1316 (Ch) at [66].

479 *Re Oakwell Collieries Co* [1879] W.N. 65; *Re Cosslett (Contractors) Ltd* [2001] UKHL 58; [2001] B.C.C. 740.

480 2016 Rules r.7.76(1).

property appointed by the court.[481] All of this means that interference with the liquidator's possession of company property constitutes a contempt of the court itself.[482] Voluntary liquidators must apply to the court for it to make an order in relation to property which the liquidator wishes to recover. Applications under s.234 are ordinarily placed in the Insolvency and Companies Applications list, unless they are of sufficient urgency to warrant a special hearing. The application must be commenced in the liquidator's own name, and not that of the company, as it is a cause of action personal to the liquidator.[483] But it should not be made ex parte except in very special circumstances.[484] Also, the provisions do not give a liquidator a better right to property than that held by the company.[485]

**9-070** Traditionally, the provisions have been used to enable office-holders to recover specific items of property. For instance, in *Re London Iron and Steel Co*,[486] an administrative receiver sought to recover motor cars that were alleged to be owned by the company.[487] The provision is not to be used if a liquidator is unable to identify with some degree of specificity the property to which the company is prima facie entitled.[488]

Pursuant to the precursors of s.234, courts held that they were not empowered to decide questions related to disputed ownership of property, however, it has been held that the present legislation allows courts to make such decisions.[489] This is because of the words, "to which the company appears to be entitled" together with the rules provided in Pt 12 of the Rules, which give courts the right to determine such matters.[490] But the courts are not entitled to deal with an issue of ownership of property if the property is subject to the jurisdiction of the courts of a foreign country.[491] Also, the section does not provide scope for the determination of complex legal issues relating to the property in question, such as title, and any matter involving third-party claims or the prosecution of a claim for specific performance.[492] The provision enables a liquidator to carry out his or her statutory functions by placing the apparent property of the company under the liquidator's control, but this process does not, therefore, necessarily involve any determination of title and the final resolution of such a dispute may fall to be made in subsequent proceedings.[493]

Section 234(3) and (4) indicate in what circumstances a liquidator may be liable where he or she seizes or disposes of any property which is not company

481 2016 Rules r.7.76(2).

482 *Re Henry Pound, Son & Hutchins* (1889) 42 Ch. D. 402 at 420 per Cotton LJ; *Krextile Holdings Pty Ltd v Widdows* [1974] V.R. 689 at 696.

483 *Re Cosslett (Contractors) Ltd* [2001] UKHL 58; [2001] B.C.C. 740.

484 *Re First Express Ltd* [1991] B.C.C. 782.

485 *Re Leyland DAF Ltd* [1994] B.C.C. 166.

486 *Re London Iron and Steel Co* [1990] B.C.C. 159.

487 Also, see *Re Cosslett (Contractors) Ltd)* [2001] B.C.C. 740 which involved the delivery up of washing plant used to separate coal-bearing shale from coal.

488 *Andrews v Mischel & Co Advisory Services Pty Ltd* [2014] VSC 140; (2014) 284 F.L.R. 320.

489 *Re London Iron & Steel Co Ltd* [1990] B.C.C. 159; *Re Cosslett (Contractors) Ltd* [2001] B.C.C. 740.

490 Examples of cases where courts have determined disputes under such applications are: *Euro Commercial Leasing Ltd v Cartwright & Lewis* [1995] B.C.C. 830; *Re Cosslett Contractors Ltd* [1998] Ch. 495; [1997] B.C.C. 724; compare *Re Leyland Daf Ltd* [1994] B.C.C. 166 where the ownership dispute was within the jurisdiction of a foreign court.

491 *Re Leyland DAF Ltd* [1994] B.C.C. 166.

492 *Ezair v Conn* [2020] EWCA Civ 687; [2020] B.C.C. 865 at [26]–[27].

493 *Re Cosslett (Contractors) Ltd* [2001] B.C.C. 740 at [26]–[28]; *Ezair v Conn* [2020] EWCA Civ 687 at [26].

property. If at the time of seizing or disposing of the property the liquidator believes and has reasonable grounds for believing that he or she is entitled to the property the liquidator is not liable to any person in respect of any loss or damage flowing from the seizure or disposal except in so far as he or she was negligent.[494] Where he or she is not negligent the liquidator has a lien on the property, or the proceeds of sale, for such expenses as were incurred in connection with the seizure or disposal.[495] These provisions apply whether or not the liquidator is acting pursuant to a court order. It has been suggested that while the provisions cover seizure and sale, they do not extend to liability for the wrongful interference with property or the proceeds of the sale of the property.[496]

In *Welsh Development Agency Ltd v Export Finance Co*,[497] the Court of Appeal said that protection from liability that is mentioned in s.234 does not embrace choses in action as the word "property" in s.234(3) relates to the seizure and disposal of tangible property. **9-071**

Palmer[498] gives the following account of the manner in which the liquidator should set about the task of getting in the property after appointment:

> "The liquidator should at once take possession of the books, deeds, and documents of the company; and ascertain by inquiry the whereabouts of any that are missing and apply for the delivery thereof. He should also, with all convenient speed, obtain possession of the assets of the company … so far as practicable or expedient."

The commentary went on to say that with assets where physical possession cannot be obtained, e.g. book debts owing to the company, the liquidator should perfect title as far as possible.

In so far as any property of the company may have been seized in execution, the liquidator should serve notice on the High Court enforcement officer requiring delivery of the property to the liquidator together with any money seized or received in part satisfaction of the execution.[499]

It may be necessary, in order for a liquidator to discharge this duty, to initiate proceedings in the courts for the recovery of assets transferred, or money paid, to third persons prior to the commencement of winding up. The liquidator may believe that the assets or money really is property which belongs to the company. Chapter 11 is, for the most part, devoted to an examination of such actions.

### 2. *The funding of legal proceedings*

The liquidator is bound to do all that can be done to augment the disposable assets of the company[500] and is equipped, as we have seen, with various statutory powers for recovering property or debts owing to the company. A general power given to the liquidator, and which permits him or her to set about recovering some **9-072**

---

494 See *Euromex Ventures Ltd v BNP Paribas Real Estate Advisory and Property Management UK Ltd* [2013] EWHC 3007 (Ch).

495 *Re Universal Distributing Co* (1933) 48 C.L.R. 171; *Re Mossgreen Pty Ltd* [2018] FCAFC 63.

496 L. Sealy and D. Milman, *Annotated Guide to the Insolvency Legislation*, 7th edn (Bicester: CCH, 2004), p.246.

497 *Welsh Development Agency Ltd v Export Finance Co* [1992] B.C.C. 270.

498 R.A.K. Wright and R. Buchanan, *Palmer's Company Precedents, Part 2: Winding Up Forms and Practice*, 17th edn (London: Stevens and Sons Ltd, 1960), p.658. As to recovery of contributions from members, see below at para.10-027.

499 1986 Act s.184.

500 *Re Tavistock Ironworks Co* (1871) 24 L.T. 605.

property or money, is the power to bring proceedings,[501] a power which was discussed earlier.[502] The liquidator may find that before the advent of liquidation the company commenced proceedings or filed a defence to proceedings initiated by some other party. In such cases the liquidator must take legal advice to ascertain whether it is advisable and prudent to continue to prosecute or defend proceedings or to seek some form of compromise with the company's opponents. The liquidator may ratify and adopt proceedings which were commenced on behalf of the company without authority.[503]

Legal proceedings should only be commenced after careful thought.[504] Risks should not be taken by the liquidator with funds of the company by engaging in costly litigation where there is no real prospect of success.[505] If creditors or contributories insist upon the taking of action in a doubtful case, the liquidator should refuse to proceed without first obtaining from them an indemnity against the costs of litigation.[506] Creditors or contributories may seek to have the liquidator's decision not to initiate or defend legal proceedings reviewed under s.168(5), and in the past leave has been given to persons other than the liquidator to take proceedings in the name of the company or that of the liquidator.[507] Despite the fact that this practice has been deprecated on the ground that the liquidator ceases to have control of the liquidation,[508] the practice is well established and sanctioned by high authority.[509] It has been acknowledged that permitting a contributory to run litigation has the disadvantage of removing the litigation from the hands of the liquidator, but it had the advantage, in many cases, of the litigation being conducted at the risk and expense of the contributory, the liquidator having no funds to pursue the proceedings and being apprehensive as to the contributory's financial position.[510] It has been pointed out that leave in this sort of case would not be granted if the litigation might or would be a drain on the assets of the company unless the proceedings would probably be successful.[511]

Before taking any legal action, liquidators should consider seeking information from the directors and others pursuant to s.235 and, in certain cases consider whether the examination of directors and others under s.236 is necessary or advisable. If liquidators do institute proceedings, they should always be ready to settle their claims where it is appropriate to do so and in the creditors' interests.

It should be noted that liquidators are no longer required before taking action,

---

501 1986 Act Sch.4 para.4.
502 See above at paras 9-011–9-020.
503 *Alexander Ward & Co Ltd v Samyang Navigation Co Ltd* [1975] 1 W.L.R. 673.
504 *RBG Resources Plc (in liq) v Rastogi* [2005] EWHC 994 (Ch); [2005] 2 B.C.L.C. 592 at [52].
505 *Re Tavistock Ironworks Co* (1871) 24 L.T. 605; *Re Silver Valley Mines* (1882) 21 Ch. D. 381; *Montreal Trust Co v Abitibi Power Co* [1937] 4 D.L.R. 369.
506 Note the comments of Morritt LJ in *Re Exchange Travel (Holdings) Ltd (No.3)* [1997] 2 B.C.L.C. 579 at 595 where his Lordship adverts to the fact that indemnities from creditors was a common practice. It is not so much so now.
507 See *Re Imperial Bank of China, India, & Japan* (1866) 1 Ch. App. 339; *Cape Breton Co v Fenn* (1881) 17 Ch. D. 198 at 208; *Re Dominion Portland Cement Co* (1919) 33 N.Z.L.R. 478; compare also *Lloyd-Owen v Bull* [1936] 4 D.L.R. 273 PC; *Fargro Ltd v Godfroy* [1986] 1 W.L.R. 1134 at 1136–1138.
508 *Re Anglo-Sardinian Antimony Co* [1894] W.N. 156; *Practice Note* [1894] W.N. 166; *Re Allebart Pty Ltd* [1971] 1 N.S.W.L.R. 24.
509 *Re Bank of Gibraltar and Malta* (1865) L.R. 1 Ch. App. 69; *Re Imperial Bank of China, India and Japan* (1866) L.R. 1 Ch. App. 339; *Lloyd-Owen v Bull* [1936] 4 D.L.R. 273 PC.
510 *Alliprandi v Griffith Vintners Pty Ltd (in liq)* (1991) 9 A.C.L.C. 1530 at 1532.
511 *Alliprandi v Griffith Vintners Pty Ltd (in liq)* (1991) 9 A.C.L.C. 1530 at 1532.

in relation to a number of claims, to secure the approval of either the liquidation committee (creditors' voluntary liquidations)[512] or the court (compulsory liquidations).[513] However, the liquidator may, in relation to some actions, deem it wise to seek approval or consult the creditors, such as where a claim may be very complicated, involve serious issues, is likely to cost a lot of money to litigate or be risky.

Even where a liquidator has advice that he or she has a good case, it is open to the liquidator to call for indemnities from creditors in relation to costs, and prudent liquidators have in the past obtained such indemnities. The Court of Appeal in *Re Exchange Travel (Holdings) Ltd (in liq) (No.3)*[514] sanctioned the giving of indemnities by creditors and said that it was permissible for the liquidator to agree that any fruits of the litigation would be used first to defray litigation costs paid for by creditors giving indemnities.[515] If effective indemnities are obtained then it will not matter if there are insufficient assets in the insolvent estate to cover an award of costs against the liquidator. Even if there are sufficient assets, the liquidator will not have to be concerned as to whether he or she can have access to them to meet any liability for costs. Indemnities can also be used to cover the liquidator's own costs. Of course, liquidators must ensure that those granting indemnities are persons or entities of substance. A drawback with this is that no funds are made available to pay solicitors and others so the liquidator might have to dip into his or her own pocket unless those who have done work agree to wait for payment or are willing to operate on a basis of payment only on success. **9-073**

In the past some liquidators in some cases have sought the establishment of "fighting funds" by creditors.[516] These involve creditors contributing a certain number of pence in the pound proportionately in accordance with the admitted level of their proofs of debt. The advantage with such a fund is that it will not be incumbent on the liquidator "to chase" money if he or she is ordered to pay costs. However, the liquidator must constantly monitor the level of the fund as it might be exhausted more quickly than first thought. Also, as Hamilton points out:

> "The liquidator should of course be conscious of the fact that it is not possible for him to simply 'stop' an application or action instituted by him without his opponent seeking a costs order."[517]

If the fund is exhausted and the action has not been finalised, then the liquidator may be left exposed and personally liable.

For the past 20 years it has been possible increasingly for a liquidator's burden to be relieved somewhat by the use of conditional fee agreements with legal advisers.[518] These agreements enable, if proceedings are successful, for lawyers to recover their usual legal fees plus an additional uplift agreed as a percentage of the **9-074**

---

512 1986 Act s.165(2)(b).
513 1986 Act s.167(1)(a).
514 *Re Exchange Travel (Holdings) Ltd (in liq) (No.3)* [1997] 2 B.C.L.C. 579.
515 *Re Exchange Travel (Holdings) Ltd (in liq) (No.3)* [1997] 2 B.C.L.C. 579 at 588.
516 Hamilton, "Aspects of Official Liquidators' Personal Liability for Costs of Litigation" (1989) 7 C. & S.L.J. 301.
517 Hamilton, "Aspects of Official Liquidators' Personal Liability for Costs of Litigation" (1989) 7 C. & S.L.J. 301 at 303. See *Re Speedifix Building Products Pty Ltd (in liq)* (1987) 5 A.C.L.C. 866 where the liquidators declined to continue their application for the avoidance of a pre-liquidation transaction because there were insufficient assets in the company. The respondent sought and obtained an order for the payment of its costs personally by the liquidators.
518 See Courts and Legal Services Act 1990 s.58; Conditional Fee Arrangements Order 1995 (SI 1995/

total fees, and one advantage of this is that there are no upfront fees to be paid. However, a drawback is, certainly as far as the lawyers are concerned, that if the liquidator is not successful the liquidator's own lawyers do not get paid. If, as usually occurs, costs go to the victor, the liquidator will be faced with having to pay the costs of the other party if there is not enough in the insolvent estate. Nevertheless, conditional fee agreements have been widely employed. Those liquidators who have engaged their lawyers on conditional fee agreement terms have often also taken out what is known as "after the event" insurance which covers any adverse costs order in the event that the litigation is unsuccessful. The taking out of the insurance would, as with other insurance, involve the payment of a premium to the insurer. But, as with creditors agreeing to cover costs, it does not generate any cash flow, and so a liquidator has to ask his or her solicitors to wait for payment until the insurer pays out.[519] Notwithstanding this drawback, the employment of conditional fee agreements, and often combined with after the event insurance, became very popular in insolvency litigation until April 2016, when we saw the introduction of what were known as "the Jackson reforms"[520] to insolvency litigation. The upshot of these reforms was that the liquidator was no longer entitled, as he or she once was, to claim the legal costs, the cost of any conditional fee agreement uplift and the cost of the after the event insurance premium from the other side. Such costs must now be paid out of any damages awarded, and thus the use of conditional fee agreements and after the event insurance is now, generally, a less attractive option. It is possible, but no longer common in practice, for an insurer to cover the fees of the liquidator's barrister, disbursements and a portion of the fees of the liquidator's solicitors.[521]

Another avenue for raising funds for litigation is where a liquidator secures third party funding (a litigation funder) from a person or company who agrees to cover the costs of the liquidator's litigation, including adverse costs orders and security for costs,[522] and this is something that is being done (and has been done for some time) very frequently now.[523] In June 2018, the Law Society stated that there is a vigorous market for the funding of insolvency claims.[524] There are a variety of

1674); Conditional Fee Arrangements Regulations 1995 (SI 1995/1675). For a discussion, see Crinson and Morphet, "Funding for actions brought by insolvency officeholders" (2011) 24 Insolv. Int. 108 at 110. For a case that involved a dispute between liquidators and their solicitors concerning a conditional fee agreement, see *Stevensdrake Ltd v Hunt (No.2)* [2016] EWHC 342 (Ch); [2016] B.C.C. 515.

519 Crinson and Morphet, "Funding for actions brought by insolvency officeholders" (2011) 24 Insolv. Int. 108 at 111.

520 The Reforms are based upon Lord Justice Jackson's recommendations found in *Review of Civil Litigation Costs: Final Report* TSO (December 2009) and found in the Legal Aid, Sentencing and Punishment of Offenders Act 2012. The reforms apply across the board to all civil litigation but when they were first brought into force, insolvency litigation was provided with a temporary "carve-out" until April 2016.

521 K. Crinson and S. Morphet, "Funding for actions brought by insolvency officeholders" (2011) 24 Insolv. Int. 108, 110–111.

522 Bowman and Hurford, "Litigation Funding for Insolvency Claims" (2016) 13 *International Corporate Rescue* 11, 11.

523 *Review of Civil Litigation Costs: Final Report* TSO (2009).

524 June 2018 (in response to Question 5 of the BEIS consultation *Insolvency and Corporate Governance* (20 March 2018) available at: *https://www.lawsociety.org.uk/policy-campaigns/consultation-responses/beis-consultation-on-insolvency-and-corporate-governance/* [Accessed 9 July 2018]).

structures that might be embraced.[525] One is where the third party agrees to cover the costs in exchange for the payment of a premium or some benefit, usually a portion of any moneys recovered by the liquidator pursuant to the litigation.[526] This type of funding was at one time difficult to obtain and quite expensive,[527] but in recent years a significant number of third party funders have appeared in the marketplace willing to fund litigation brought by liquidators or to take an assignment of the action, where it is permissible. Even some firms of insolvency practitioners to which a liquidator belongs will fund litigation on the basis that they will recoup from recoveries secured by the liquidator their costs together with an additional payment to reflect the risk that they have taken in supporting the proceedings.[528] A potential drawback here is that in such a case the firm might not be regarded as a pure funder facilitating access to justice when it comes to establishing costs liability and if the claim fails the firm might be held liable for the respondent's costs, at least to some extent.[529] It is commonplace for a funder to pay a sum of money upfront to the liquidator which is non-returnable even if the litigation fails. If the action is a success, the funder will retain a percentage of the net proceeds of the action, with the remaining percentage going to the liquidator on behalf of the company. The benefit of using a funder from the liquidator's perspective is that the action is often run by the funder and if it fails, the funder pays any adverse costs. Thus, the liquidator does not place at risk the property of the insolvent estate.

Until recently the problem which confronted a liquidator with third party funding was, inter alia, that what was being done could be categorised as indulging in maintenance and/or champerty. The former is the assistance or encouragement of proceedings by someone who has no interest in the proceedings nor any motive recognised by the law as justifying interference in the proceedings. The latter is a form of maintenance[530] in that assistance or encouragement of proceedings is provided in exchange for a promise to provide a share of the proceeds of the action. If a contract involves champerty or maintenance it is void on the basis of public policy grounds. While these doctrines may be archaic[531] they held sway for many years and they may still be applicable in some cases. However, exceptions to these rules have developed over time. One inveterate exception to the application of these doctrines is the rule that a trustee in bankruptcy (and a liquidator) is able to lawfully assign any of the bare causes of action of the bankrupt that have vested in the trustee on the basis that the trustee is to receive a share of any proceeds of ensuing litigation.[532] This exception (referred to here as "the insolvency exception" as it applies to liquidation and administration as well as bankruptcy) is based on the idea **9-075**

---

525 Bowman and Hurford, "Litigation Funding for Insolvency Claims" (2016) 13 *International Corporate Rescue* 11, 11.

526 P. Walton, "Insolvency Litigation—Past, Present and Future", a paper presented to the Insolvency Lawyers' Association Academic Forum, LSE (March 2017). Given the decision in *Hamilton v Al Fayed*, *Times*, 13 October 2000 CA, it would appear that a person or company funding proceedings could not be joined as a party to the litigation.

527 Crinson and Morphet, "Funding for actions brought by insolvency officeholders" (2011) 24 Insolv. Int. 108, 110.

528 Jay, "Funding insolvency litigation: a new dawn" (2015) CRI 183, 185. The author points out that this could lead to a variety of conflicts of interest. For a recent example, see *Burnden Holdings (UK) Ltd v Fielding* [2020] B.P.I.R. 110.

529 *Burnden Holdings (UK) Ltd v Fielding* [2020] B.P.I.R. 110.

530 Referred to as "aggravated maintenance": *Guy v Churchill* (1888) 40 Ch. D. 481 at 489.

531 See the comments of Oliver LJ in *Trendtex Trading v Credit Suisse* [1980] Q.B. 629 at 674 CA.

532 *Seear v Lawson* (1880) 15 Ch. D. 426; *Re Park Gate Waggon Works Co* (1881) 17 Ch. D. 234 CA;

that the legislature has granted to the liquidator the power to realise the assets of the company and the transfer of an action to a funder in return for the financing of it and the payment of a part of the proceeds has been treated as a sale of property.[533] As discussed earlier,[534] liquidators have a power to sell the company's property,[535] and this includes causes of action.[536] However, the insolvency exception is only aimed at the outright sale of causes of action and not the sale of a right to share in the fruits of an action.[537] The House of Lords in *Norglen Ltd (in liq) v Reeds Rains Prudential Ltd*[538] clearly accepted that the assignment of a chose in action was an exception to the law against champerty.

The fact of the matter is that liquidators were somewhat inhibited in two different ways by the case law. First, it was clear that a liquidator was able to assign a bare cause of action,[539] and this assignment could include assigning the power to manage proceedings to the assignee,[540] but a liquidator was not able to agree to assign an action which legislation gave specifically to him or her as liquidator—the liquidator is only able to assign company property, and actions given to the liquidator personally do not constitute company property. Secondly, there was case law that indicated that a liquidator, while able to assign a cause of action to a third party, in certain circumstances, he or she was unable, sometimes, to assign a portion of the fruits of a cause of action. In this latter respect what was crucial was the fact that the liquidator's power of the sale of the liquidator had been interpreted restrictively. But, legislation was introduced in October 2015 to address the problems caused by the case law, at least as far as liquidators and other corporate office-holders were concerned. Now s.246ZD of the Act[541] permits a liquidator or administrator to assign any actions, and this includes the proceeds of actions, to a third party.[542] Thus this enables liquidators to do what they could always do with bare causes of action.[543] An action or the proceedings of an action are now both capable of being assigned by a liquidator.[544] Also, it was made plain in *Re Totalbrand Ltd*[545] that the wording of s.246ZD(2) clearly permits the assignment of the right of action in

---

*Ramsey v Hartley* [1977] 1 W.L.R. 686 CA; *Bang & Olufsen UK Ltd v Ton Systeme Ltd* unreported 16 July 1993 CA; *Stein v Blake* [1996] 2 A.C. 243 HL; *Norglen Ltd v Reeds Rains Prudential* [1998] 1 All E.R. 218 at 232.

533 Recognised by Lightman J in *Grovewood Holdings Plc v James Capel & Co Ltd* [1995] B.C.C. 760 at 764.

534 See above at para.9-022.

535 See 1986 Act ss.165, 167 and para.6 of Sch.4.

536 *LF2 Ltd v Supperstone* [2018] EWHC 1776 (Ch); [2019] 1 B.C.L.C. 38.

537 See *Grovewood Holdings Plc v James Capel & Co Ltd* [1995] B.C.C. 760.

538 *Norglen Ltd (in liq) v Reeds Rains Prudential Ltd* [1998] B.C.C. 44.

539 *Grovewood Holdings Plc v James Capel & Co Ltd* [1995] B.C.C. 760; *Norglen Ltd v Reeds Rains Prudential* [1998] 1 All E.R. 218 HL; *Ruttle Plant Ltd v Secretary of State for the Environment, Food and Rural Affairs* [2008] EWHC 238 (TCC); [2008] B.P.I.R. 1395. And the assignee is permitted to hand over to the assignor a portion of the fruits of any judgment.

540 *Rawnsley v Weatherall Green & Smith North Ltd* [2009] EWHC 2482 (Ch); [2010] 1 B.C.L.C. 658; [2010] B.P.I.R. 449.

541 Implemented by s.118 of the Small Business Enterprise and Employment Act 2015.

542 For a judicial consideration of s.246ZD, see the judgment of Snowden J in *Re Totalbrand Ltd* [2020] EWHC 2917 (Ch) in denying a right to appeal against a decision of a district court judge.

543 For a case holding that office-holders could always assign bare causes of action, see *Empire Resolution Ltd v MPW Insurance Brokers Ltd* [1999] B.P.I.R. 486.

544 The ability to assign actions only applies to liquidators and other corporate office-holders; it is not available to trustees in bankruptcy to whom the old common law rules still apply. For discussion of the position that once applied to liquidation and now only applies to bankruptcy, see the 3rd edn (2013) of this book (pp.566–572).

545 *Re Totalbrand Ltd* [2020] EWHC 2917 (Ch).

which all of the proceeds would go to the assignee, the creditors getting a benefit in the form of the price which the assignee will have paid to obtain the claim.

The Australian High Court in *Campbell's Cash and Carry Pty Ltd v Fostif Pty Ltd*[546] accepted the fact some years ago that litigation funding is a reality of commercial life in Australia, and this has been recognised in the English courts, certainly since *Arkin v Borchard*,[547] and the use of it has risen increasingly.[548] Perhaps more importantly, the UK legislature has come to the same acceptance by introducing the legislation referred to above, even if rather belatedly. It is notable that Statements of Practice that are issued by the Insolvency Service countenance the need for office-holders to seek funding from third parties.

## G. Duty to preserve assets

### 1. *General*

Pending realisation and distribution of the assets, the liquidator must do all in his or her power to protect and preserve the assets of the company,[549] and not jeopardise them, for example, by insuring property where it is prudent to do so and by defending any actions brought against the company, though not to the extent of becoming over-litigious and resisting proceedings against which the company has no real defence.[550] In addition, the liquidator must preserve the goodwill of the company's business, if necessary, by carrying on that business during the winding up. **9-076**

If a company holds assets as a trustee, the liquidator is obliged to take reasonable steps to protect the assets.[551]

### 2. *Carrying on business*

Very often the goodwill of the business which the company is engaged in conducting is one of its more valuable assets, and since it would rapidly deteriorate if trading activities were brought to a sudden halt, the liquidator is empowered by para.5 of Sch.4 to carry on the business of the company in so far as this is necessary for the beneficial winding up of the business. The liquidator must have reasonable grounds for believing that carrying on the business is beneficial or else he or she may be held personally liable for any loss sustained.[552] The power confines a liquidator to acts relating to the business of the company as it existed when the company entered liquidation.[553] **9-077**

In carrying on business the liquidator may find it necessary to exercise some of

---

546 *Campbell's Cash and Carry Pty Ltd v Fostif Pty Ltd* [2006] HCA 41; (2006) 229 A.L.R. 58.

547 *Arkin v Borchard* [2005] EWCA Civ 655.

548 Jay, "Funding insolvency litigation: a new dawn" (2015) CRI 183, 184.

549 *Cleve v Financial Corp* (1873) 16 Eq. 363 at 381; *National Trust Co v Trust & Guarantee Co* (1912) 5 D.L.R. 459 at 465.

550 *General Share Trust Co v Wetley Brick Co* (1881) 22 Ch. D. 260; *Re Wyvern Developments Ltd* [1974] 1 W.L.R. 1097 at 1103.

551 *Re Crest Realty Pty Ltd (No.2)* [1977] 1 N.S.W.L.R 664; (1977) 2 A.C.L.R. 502; *Porter v Miller Street Pty Ltd* [2008] FCAFC 77.

552 See *Re Centralcrest Engineering Ltd* [2000] B.C.C. 727 where a liquidator was held liable for misfeasance in circumstances, where, inter alia, she allowed the continuation of trading when it was clear that she should have realised the assets quickly. The company liabilities grew considerably due to the continuation of trading.

553 *Re Crouch* [2007] NSWSC 1055; (2007) 214 F.L.R. 244 at [23].

the other powers conferred upon him or her by Sch.4, such as obtaining credit on the security of the company's property,[554] drawing, accepting, making and indorsing bills of exchange,[555] doing other acts and executing in the name and on behalf of the company all deeds, receipts and other documents.[556] The liquidator may also appoint an agent to do any business which he or she is unable to do or which it is unreasonable to expect the liquidator to do in person[557] and, where satisfied that the nature of the business requires it, the liquidator may apply to the court for the appointment of a special manager.[558]

It has been said that the liquidator's statutory authority to carry on business will be liberally construed[559]; but it is a power which nevertheless may be exercised only where the prescribed conditions exist and is not to be taken as authorising speculation with the assets in the hope of making a profit for the benefit of the creditors or shareholders.[560] In *Re Wreck Recovery & Salvage Co*,[561] the company, which had been formed to work a patented invention for raising sunken vessels, went into liquidation, and the majority shareholder (who was also the inventor) proposed at his own expense to raise certain wrecks with the object of proving the invention and so resuscitating the company. The Court of Appeal held that to justify the carrying on of the business it must be both necessary and for the beneficial winding up of the company:

> "Now the word 'necessary' means that it must not only be merely beneficial, but something more, though the necessity must be determined by the court having regard to all the circumstances of the case. It does not, of course, mean that no other course would be possible. Then it must [also] be for the 'beneficial winding up' of the business of the company, not with a view to its continuance."[562]

**9-078** In this case neither of the required conditions was fulfilled: it could not be regarded as necessary to carry on the business of the company because there was no evidence that the plant could not be sold at a good price and if the experiments undertaken by the company failed, its saleable value would be seriously diminished; nor was the project for the beneficial winding up of the company since it was intended simply to improve the value of its shares and thus bring about a reconstruction. On the other hand, it does not follow that, because subsequent events show the liquidator's decision in retrospect to have been unwise, the powers of a liquidator have necessarily been exceeded[563]; it is sufficient that, at the time, the liquidator bona fide and reasonably formed the opinion that it was necessary to carry

---

554 1986 Act Sch.4 para.10; e.g. in order to pay the wages of employees: *Ex p. Marsh, N.O. 1949* (2) S.A. 615.

555 1986 Act Sch.4 para.9.

556 1986 Act Sch.4 para.7.

557 1986 Act Sch.4 para.12.

558 1986 Act s.177; see above at paras 9-039–9-040.

559 *Re Wreck Recovery & Salvage Co* (1880) 15 Ch. D. 353 at 362 per Thesiger LJ.

560 Compare *Re Batey; Ex p. Emmanuel* (1881) 17 Ch. D. 35 at 39. It is highly improper for the liquidator to lend the company's money: *Re Anon.* (1866) 15 L.T. 868.

561 *Re Wreck Recovery & Salvage Co* (1880) 15 Ch. D. 353. This was a case of compulsory winding up.

562 *Re Wreck Recovery & Salvage Co* (1880) 15 Ch. D. 353 at 360 per Jessel MR; compare at 362 per Thesiger LJ; see also *British Waggon Co v Lea* (1880) 5 Q.B.D. 149; *Re Oriental Bank Corp* (1887) 56 L.T. 868; *Re Great Eastern Electric Co* [1941] Ch. 241.

563 The onus of proving that liquidators have exceeded their powers rests on the party who alleges this: *Hire Purchase Furnishing Co v Richens* (1888) 20 Q.B.D. 387.

on the business for the benefit of winding up or disposal of the company.[564] And it has been held that the liquidator is permitted to carry on the business so that it can be sold as a going concern at a higher price than would be received for the assets in a liquidation sale.[565] No time limit has been placed on the period for which a liquidator is permitted to carry on business as all companies will be different. In *Re Batey; Ex p. Emmanuel*[566] the court said that 12 months was a long period but it was not necessarily inappropriate.[567]

Transacting business with a company in liquidation can be a somewhat perilous course and some measure of protection is therefore afforded to persons who deal with such a company. In the first place, those who do business with the company are entitled to know that it is in the process of being wound up. Accordingly, so as to warn persons dealing with a company which is in liquidation every invoice, order for goods and business letter issued by or on behalf of the company, being a document on which the name of the company appears, must contain a statement that the company is being wound up.[568] This involves inserting the words "in liquidation" in brackets after the name of the company. If this is done a liquidator should not be personally liable in relation to any contracts entered into in relation to the business of the company.

Secondly, persons who give credit to a company whose business is being carried on by the liquidator are entitled to payment in priority to other creditors,[569] since the liabilities[570] so incurred, being in the nature of salvage,[571] form part of the costs, charges, and expenses of the winding up which must be paid in full before any other debts are discharged.[572]

If liquidators in a compulsory winding up decide to carry on the business of the company, they may apply to the Secretary of State for authorisation to open an account at a local bank, and the Secretary of State may authorise the liquidators to make payments into and out of the specified bank to the Insolvency Services Account if the Secretary of State is satisfied that administrative advantage can be gained from having the account.[573] If permission is given for an account to be opened then the account is to be held in the name of the company.[574] **9-079**

Except in members' voluntary liquidations, the liquidator who carries on business is to keep a separate and distinct account of the trading, and incorporate in the financial records which are to be kept the total weekly amounts of the receipts and payments made by him or her in relation to the trading account.[575]

---

564 *Re Great Eastern Electric Co* [1941] Ch. 241.
565 *Re Skay Fashions Pty Ltd (in liq)* (1986) 10 A.C.L.R. 743; *Warne v GDK Financial Solutions Pty Ltd* [2006] NSWSC 464; (2006) 233 A.L.R. 181 at [49].
566 *Re Batey; Ex p. Emmanuel* (1881) 17 Ch. D. 35.
567 *Re Batey; Ex p. Emmanuel* (1881) 17 Ch. D. 35 at 39.
568 1986 Act s.188(1).
569 *Re Davis & Co* [1945] Ch. 402; *Re Bishop Construction Co* (1914) 15 D.L.R. 911.
570 *Re National Arms & Ammunition Co* (1885) 28 Ch. D. 474.
571 *Re Davis & Co* [1945] Ch. 402; *Re Downer Enterprises Ltd* [1974] 1 W.L.R. 1460.
572 *Re Trent and Humber Ship Building Co* (1869) L.R. 8 Eq. 94; *Re Home Investment Society* (1880) 14 Ch. D. 167; *Re Pacific Coast Syndicate Ltd* [1913] 2 Ch. 26; *Re London Drapery Stores* [1898] 2 Ch. 684; *Re Movitex Ltd* [1990] B.C.C. 491. See s.175(2)(a). If a profit is made it forms part of the general funds available for division among all creditors, unless it was earned by means of mortgaged property: *Re J. G. Ward Farmers' Association* (1899) 18 N.Z.L.R. 158.
573 Insolvency Regulations 1994 (SI 1994/2507) reg.6(2).
574 Insolvency Regulations 1994 reg.6(4).
575 Insolvency Regulations 1994 reg.12(2).

## H. Duty to realise assets

**9-080** The whole object of winding up is, of course, to liquidate the assets so that the proceeds can be applied in satisfaction of the liabilities of the company and the surplus, if any, distributed among the shareholders. The duty of realising the assets of the company rests on the liquidator, who is authorised by para.6 of Sch.4 to sell or otherwise dispose of all or any part of the property of the company[576] and in doing so to execute in the name, on behalf, and under the seal of the company, any necessary deeds, receipts, and other documents.[577] The liquidator may be required by the purchaser to give assurances of title to property sold,[578] and, where there is a sale of the whole of the property en bloc, the liquidator is bound to put the purchaser into a position where the transfer of realty can be obtained and personalty is delivered and to assign all choses in action so as to divest the company completely of its title thereto.[579] Where, as frequently happens, property of the company is burdened by mortgages or charges or otherwise subject to securities, the liquidator is entitled to deduct a reasonable sum to meet the cost of realisation[580] before applying the proceeds in paying the principal debt and any outstanding interest to the secured creditor.[581]

Property may be sold in any manner whatsoever. Liquidators may sell by tender, by private contract or by public auction. It may be necessary for the liquidator to take advice on what would be the best way to sell items of property. It will nearly always be advisable for liquidators to take advice on what the value of the property to be sold is so that they ensure that property is not sold below value. Of course as a liquidator is not able to choose to withhold property from being sold and because buyers will often be aware that property is part of the estate of a company which is in liquidation, it must be expected that property may not be worth what it would be if sold by a going concern. The terms of sale are a matter for the discretion of the liquidator, but risks ought not to be taken and will seldom be justified in selling except for cash or on security.[582] Subject to this, the liquidator's fundamental duty is to realise the assets of the company in the most efficient way and to obtain the highest possible price for the assets, and, while the winding up should not be unnecessarily protracted,[583] it may sometimes be proper, in the interests of augment-

[576] The power to transfer is implied in the power to sell: *Re Ebsworth & Tidy's Contract* (1889) 42 Ch. D. 23 at 33 per North J, at 43 per Lord Esher MR. The transfer is a transfer by the company not by the liquidator personally: *Style & Mantle Ltd v Prices Tailors Ltd* 1934 S.C. 548 at 553 and 554.

[577] 1986 Act Sch.4 para.7.

[578] *Style & Mantle Ltd v Prices Tailors Ltd*, 1934 S.C. 548, but it is done on behalf of the company.

[579] *Stern, N.O. v Standard Trading Co 1955* (3) S.A. 423.

[580] But not the costs of preservation: *Re Regent's Canal Ironworks Co* (1875) 3 Ch. D. 411.

[581] *Re Marine Mansions Co* (1867) 4 Eq. 601; *Lathom v Greenwich Ferry Co* (1892) 36 Sol. Jo. 789; *Re Universal Distributing Co* (1933) 48 C.L.R. 171 at 174; *Buchler v Talbot* [2004] UKHL 9; [2004] 2 A.C. 298; [2004] 2 W.L.R. 582; [2004] 1 B.C.L.C. 281; *Stewart v Atco Controls Pty Ltd* [2014] HCA 15.

[582] *Re Marine Mansions Co* (1867) 4 Eq. 601; *Lathom v Greenwich Ferry Co* (1892) 36 Sol. Jo. 789; *Re Universal Distributing Co* (1933) 48 C.L.R. 171 at 174; *Buchler v Talbot* [2004] UKHL 9; [2004] 2 A.C. 298; [2004] 2 W.L.R. 582; [2004] 1 B.C.L.C. 281.

[583] See *Re Oriental Bank Corp* (1887) 56 L.T. 868 per Chitty J.

ing the assets, to sell on terms that payment be deferred,[584] or to lease the property and postpone selling it until conditions are more propitious.[585]

Circumstances in which the liquidator will be justified in purchasing property with a view to its resale must indeed be rare, but they arose in the case of *Re Bairnsdale Food Products Ltd*,[586] where an option to purchase premises leased to the company became exercisable during the winding up and was immediately followed by an offer from a third party to buy the subject property on most favourable terms. It was held that, in accepting both these offers, the liquidator had not exceeded his powers, since the double transaction which had been entered into did not in substance differ from a simple sale of the right conferred by the option. "If," said Fullagar J,

> "the liquidator could buy and sell the subject matter of that right so as to realize for the company the value of that right [and if] he made the purchase only for the purpose of resale … he was really doing no more than selling the assets of the company".[587]

Liquidators in both compulsory and voluntary winding up must note that if they dispose of any company property to a person who is connected with the company, notice must be given by the liquidator to the liquidation committee.[588] **9-081**

## I. Duty to settle a list of contributories

An important aspect of the liquidator's tasks is to determine which of the company's members are contributories of the company. These are persons who are liable to contribute to the assets of the company on a winding up.[589] The court has the duty to settle a list of contributories[590] and this power is delegated to liquidators in compulsory liquidations.[591] Also, under s.165(4)(a) the liquidator in a voluntary liquidation is given the power of the court to settle a list of contributories. It is appropriate to note that the court is entitled to dispense with a list of contributories in circumstances where it is not necessary to make calls on, or adjust the rights of, contributories.[592] This would occur where all shares are fully paid up, but in other situations dispensing with a list will depend on the facts and should only be done after due reflection.[593] The duty to settle a list is discussed in depth in Ch.10. **9-082**

---

584 *Re Mineral Securities Aust. Ltd* [1973] 2 N.S.W.L.R. 207.

585 *Re Premier Permanent Building Society* (1890) 16 V.L.R. 643; *Re Federal Bank of Australia* (1895) 6 B.C. (N.S.W.) 3; *Re GA Listing & Maintenance Pty Ltd* (1994) 15 A.C.S.R. 308.

586 *Re Bairnsdale Food Products Ltd* [1948] V.L.R. 264.

587 *Re Bairnsdale Food Products Ltd* [1948] V.L.R. 264 at 268.

588 1986 Act ss.165(6), 167(2)(a).

589 1986 Act s.79.

590 1986 Act s.148(1).

591 2016 Rules r.7.79.

592 1986 Act s.148(2). Although there is no corresponding provision which relates to voluntary winding up, one assumes that as a voluntary liquidator has the power of the court as far as settling a list, he or she would also have the power, in the appropriate case, to dispense with settling a list.

593 *Re Phoenix Oil and Transport Co Ltd* [1958] Ch. 565.

## J. Duty to ascertain and discharge liabilities

**9-083** The duty of discharging the liabilities of the company rests upon the liquidator both in compulsory[594] and in voluntary winding up.[595] Detailed discussion of the manner in which this duty is performed may be postponed to later chapters,[596] but some general consideration may be given here to the legal duties and powers of the liquidator in the matter of ascertaining and paying the debts of the company, as well as to his or her moral duty, as an officer of the court, to observe what is known as the rule in *Ex p. James*, and the power and duty to disclaim onerous property.

### *1. Legal duties*

**9-084** The general principle embodied in s.107 is that the property of the company is to be applied in satisfaction of its debts and liabilities before any distribution to shareholders can take place.[597] Generally speaking, all liabilities, whether present or future, certain or contingent, ascertained or sounding only in damages, must be paid.[598] The first task is to ascertain their extent and the identity of the respective creditors. This may be accomplished partly by examining the books of the company and the statement of affairs under s.99, in creditors' voluntary winding up, and in a compulsory winding up the statement of affairs submitted under s.131, if there is one[599]; but the liquidator is also required to invite claims by advertisement and, if necessary, by personal communication with creditors who have failed to prove their debts.[600]

Obviously part of the advertisement process involves the liquidator advertising his or her appointment generally in the *Gazette*.[601] In a creditors' voluntary winding up the liquidator is required to, within 28 days of the appointment of the liquidator deliver to the creditors and contributories a notice which must—(1) be accompanied by a statement of affairs or a summary where the notice is delivered to any contributory or creditor to whom the notice under r.6.14 was not delivered; (2) a report on the decision procedure or deemed consent procedure under r.6.14; and (3) be accompanied by certain information.[602] There are other procedures which must be complied with by the liquidator to ensure that creditors are advised of matters such as the distribution of dividends. These matters are dealt with in Ch.12.

To sum up, Lord Denning in *Austin Securities Ltd v Northgate & English Stores Ltd* said[603]:

> "It is the duty of a liquidator to inquire into all claims, to see whether they are well founded or not, to pay the good claims, to reject the bad, to settle the doubtful, or, if need

---

594 1986 Act s.148(1) and 2016 Rules r.7.76(1). See *Ayerst v C&K (Construction) Ltd* [1976] A.C. 167 at 177.

595 1986 Act ss.107 and 165(5). See *Ayerst v C&K (Construction) Ltd* [1976] A.C. 167 at 177.

596 See below at Chs 12 and 13.

597 Although s.107 is confined to voluntary winding up, the principle also applies in compulsory winding up: *Webb v Whiffin* (1872) L.R. 5 H.L. 711 at 735.

598 See Ch.2 of Pt 14 of the Rules and especially r.14.2. As to priority of payment of debts, see s.175.

599 *Butler v Broadhead* [1975] Ch. 97.

600 *Pulsford v Devenish* [1903] 2 Ch. 625 at 631; *Re Armstrong-Whitworth Securities Co* [1947] Ch. 673; *Austin Securities Ltd v Northgate & English Stores Ltd* [1969] 1 W.L.R. 529.

601 See above at para.8-036.

602 2016 Rules r.6.15(1).

603 *Austin Securities Ltd v Northgate & English Stores Ltd* [1969] 1 W.L.R. 529.

be, to contest them. It is only in this way that a liquidator can fulfil his duty … of seeing that the property of the company is applied in satisfaction of its liabilities pari passu."[604]

The liquidator is under a duty to ensure that no claims are admitted to proof in the winding up or paid unless the company's liability in respect thereof is clearly established to his or her satisfaction. In doubtful cases questions of both fact and law may be involved, and, as regards the former, the liquidator may insist on further evidence in support of the claim, or may refuse to admit it, leaving the creditor to exercise the right of appeal to the court. So far as questions of law are concerned, the general rule is that only those claims which are legally enforceable should be admitted and paid,[605] and if the liquidator is in any doubt at all he or she should apply to the court for its advice or direction. The position of the liquidator in this regard has been described by Maugham J in the following terms: **9-085**

"The liquidator in the matter of admitting proofs is [not] practically in the position of an insurer so that, in any event, and in all circumstances, he is liable if a debt is subsequently shown to have been wrongly admitted. On the other hand … there can be no doubt that, in the circumstances of the case, a high standard of care and diligence is required from a liquidator in voluntary winding up. He is, of course, paid for his services; and is able to obtain, wherever it is expedient, the assistance of solicitors and counsel; and, which is a most important consideration, he is entitled in every case of serious doubt or difficulty in relation to the performance of his statutory duties, to submit the matter to court and to obtain its guidance."[606]

In order to avoid the time and expense of legal proceedings, the liquidator may in some cases consider it expedient to enter into a compromise or arrangement[607] with creditors, or persons claiming to be creditors, in respect of any claim which would ordinarily be provable in the winding up.[608] Care should be taken by the liquidator in the matter, since it appears that, once a compromise has been properly effected, the liquidator loses any right to challenge the claim and is not entitled to reject a proof based upon it if it turns out that it was really unenforceable.[609]

The liquidator has a duty to ensure that no authentic creditor is denied what is owed to that creditor as a consequence of not being aware of the claim that he or she has against the company. Furthermore, a liquidator should examine all of the company's accounting records and compile a list of creditors as well as inquiring of the company's officers of any known claims against the company. Hence, a liquidator should not proceed to finalise an estate and dissolve the company if aware of claims and he or she does not bring them into account in the liquidation.[610]

Providing that the liquidation committee allows (and if there is no committee, the company's creditors), the liquidator may, in a creditors' voluntary or compulsory liquidation, divide in its existing form amongst creditors, according to its estimated value, any property which from its peculiar nature or other special circumstances **9-086**

---

[604] *Austin Securities Ltd v Northgate & English Stores Ltd* [1969] 1 W.L.R. 529 at 532.
[605] *Government of India v Taylor* [1955] A.C. 491.
[606] *Re Home & Colonial Insurance Co* [1930] 1 Ch. 102 at 125.
[607] As to the meaning of, and distinction between, these terms, see *Re Guardian Assurance Co Ltd* [1917] 1 Ch. 431; *Re Contal Radio Ltd* [1932] 2 Ch. 66 at 69.
[608] 1986 Act Sch.4 para.3.
[609] *Re Norske Lloyd Insurance Co* [1928] W.N. 99; but compare *Re Central Darjeeling Tea Co* [1866] W.N. 361.
[610] *Pulsford v Devenish* [1903] 2 Ch. 625 at 631; *Re Armstrong Whitworth Securities Ltd* [1947] Ch. 673; *Harry Goudias Pty Ltd v Port Adelaide Freezers Pty Ltd* (1992) 10 A.C.L.C. 499 at 502.

cannot be readily or advantageously sold.[611] Of course, as we will see shortly, the liquidator could always disclaim such property, but he or she would be reluctant to do so if the property has some value.

### 2. *The rule in Ex p. James*

**9-087** The requirement that the liquidator shall pay or discharge only those liabilities which are legally enforceable is to some extent qualified by what is known as the rule in *Ex p. James*. The rule derives from the law of bankruptcy. In that context the rule is that a trustee in bankruptcy who is an officer of the court and, as such, will not be permitted to do anything which would be regarded as dishonourable for an ordinary person to do,[612] will not be permitted to take advantage of his or her strict legal rights if this has the effect of unjustly enriching the estate at the expense of an innocent claimant. The court in *Re Condon; Ex p. James*[613] said that it would not allow a trustee to act in a way that does not accord with the standards which right-thinking people think should govern the conduct of a court or its officers. The rationale is that if the courts are to be respected by the community, they must distance themselves from any actions which do not measure up to proper standards of probity and fair dealing.[614] The result in *Ex p. James*[615] was that the trustee was ordered to restore moneys paid under a mistake of law which would otherwise have been irrecoverable, and the doctrine has since been considerably extended, even to the point of requiring repayment by the trustee of moneys lent to a bankrupt in ignorance of the fact that a receiving order had been made.[616] In England the courts have, since the decision in *Re Tyler*,[617] treated *Ex p. James* as standing for a wider principle than dealing with the recovery of payments made pursuant to a mistake of law.[618] It appears that the enrichment of the officer is the critical thing,[619] and it does not matter how that came about. In assessing the conduct of an office-holder, an objective test is applied so it does not matter if the office-holder himself or herself thinks what is being done is acceptable.[620]

---

611 2016 Rules r.14.13.

612 See *Scranton's Trustee v Pearse* [1922] 2 Ch. 87; *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 C.L.R. 465 at 482–483.

613 *Re Condon; Ex p. James* (1873-74) 9 Ch. App. 609; [1874-80] All E.R. Rep. 388.

614 Dawson, "The Administrator, Morality and the Court" [1996] J.B.L. 437 at 443. See *Re Tyler; Ex p. Official Receiver* [1907] 1 K.B. 865 at 871.

615 *Re Condon; Ex p. James* [1874-80] All E.R. Rep. 388. In *Re John Bateson & Co Ltd* [1985] B.C.L.C. 259 at 262, Harman J referred to the rule in *Ex p. James* as anomalous. For a recent mention of the rule (and implicit acceptance of it at the highest judicial level), see *Re Nortel GmbH* [2013] UKSC 52; [2014] A.C. 209 at [122].

616 *Re Thellusson; Ex p. Abdy* [1919] 2 K.B. 735.

617 *Re Tyler; Ex p. Official Receiver* [1907] 1 K.B. 865.

618 For example, see *In Re Clark (A Bankrupt)* [1975] 1 W.L.R. 559; [1975] 1 All E.R. 453. However, the circumstances under which the rule will be said to be breached, in suing to recover property to which the estate is legally entitled, are fairly limited and the rule has not been allowed to be used so as to recover unenforceable gambling debts: *Scranton's Trustee v Pearse* [1922] 2 Ch. 87. See also *India v Taylor* [1955] A.C. 491; [1955] 2 W.L.R. 303 at 513. Dawson in "The Administrator, Morality and the Court" [1996] J.B.L. 437, 454 submits that the rule may be subsumed under the law of restitution. The commentator asserts that if this was acknowledged then the courts would be seen to be applying law and not morality (at p.461).

619 For example, see *Green v Satsangi* [1998] 1 B.C.L.C. 458; [1998] B.P.I.R. 55.

620 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] EWCA Civ 321; [2020] 3 W.L.R. 147 at [38].

The rule has been applied to a liquidator in compulsory winding up[621] by reason of the fact that the liquidator too is an officer of the court acting under its control;[622] a court will direct its officer to carry out an obligation of conscience or equity.[623] Also, the rule applies equally in liquidations to official receivers.[624] Clearly, the rule applies to other corporate insolvency regimes.[625]

The rule, however, is not easily applied, as Latham CJ of the Australian High Court indicated in *Downs Distributing Co v Associated Blue Star Stores Ltd*.[626] In that case his Honour talked of "the difficulties involved in applying a criterion of honest and high-minded conduct".[627]

The rule (or principle) has been seen as elusive and difficult by many[628] perhaps because a number of phrases have been used to explain it,[629] and also because it has been said to be based on morality.[630] In the past it has been indicated that at the centre of the principle is that if an officer of the court is under an obligation of conscience then the court will direct the officer to fulfil that obligation[631]; courts will not permit their officers to take courses of action or to take advantage of a technical position in law where it would be dishonourable.[632]

According to Judge Weeks QC (sitting as a High Court judge) in *Re South West Car Sales Ltd (in liq)*[633]:

> "The principle underlying the rule in *Ex parte James* is that officers of the court should behave decently and honourably and not retain money which a decent and honourable man would think it dishonest to keep."[634]

The conditions which Walton J in *Re Clark*[635] said should be present before the rule can operate (and putting them in terms applicable to a winding up), are[636]:

- some form of enrichment of the property of the company by the liquidator who is relying on the rule[637];

---

[621] *Re Regent Finance & Guarantee Corp (1930) 69 L.J. Ch. 283;* [1930] W.N. 84; *Re Cider (NZ) Ltd* [1936] N.Z.L.R. 374; *Re Clifton Place Garage Ltd* [1970] Ch. 477; [1970] 2 W.L.R. 243 at 491; *Re Associated Dominions Assurance Co* (1962) 109 C.L.R. 516; *Re Wyvern Developments Ltd* [1974] 1 W.L.R. 1097; [1974] 2 All E.R. 535. The rule has been applied to public bodies (*R. v Tower Hamlets LBC; Ex p. Chetnik Developments Ltd* [1988] A.C. 858; [1988] 2 W.L.R. 654) and to the revenue authorities (*Sebel Products v Customs and Excise Commissioners* [1949] Ch. 409; [1949] 1 All E.R. 729).

[622] See above at para.8-039.

[623] *Star v Silvia* (1994) 12 A.C.L.C. 600; *Hall v Poolman* [2009] N.S.W.C.A. 64.

[624] *Re Wyvern Developments Ltd* [1974] 1 W.L.R. 1097 at 1105.

[625] *Re Nortel GmbH* [2014] A.C. 209 at [122].

[626] *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 C.L.R. 465.

[627] *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 C.L.R. 465 at 476.

[628] In *Re Wigzell* [1921] 2 K.B. 835 at 858 Scrutton LJ adverted to the inherent vagueness of the principle. As Young J noted in *Star v Silvia* (1994) 12 A.C.L.C. 600 at 603, the exact content of the rule has been the subject of judicial and academic debate.

[629] *Re Wigzell; Ex p. Hart* [1921] 2 K.B. 835 at 858.

[630] *Re Tyler; Ex p. Official Receiver* [1907] 1 K.B. 865 at 871.

[631] *Star v Silvia* (1994) 12 A.C.L.C. 600 at 603.

[632] *Re John Bateson & Co Ltd* [1985] B.C.L.C. 259 at 261.

[633] *Re South West Car Sales Ltd (in liq)* [1998] B.C.C. 163.

[634] *Re South West Car Sales Ltd (in liq)* [1998] B.C.C. 163 at 170.

[635] *Re Clark (A Bankrupt)* [1975] 1 W.L.R. 559.

[636] *Re Clark (A Bankrupt)* [1975] 1 W.L.R. 559 at 563–564.

[637] Walton J saw this as being a universal characteristic of all of the cases in which the rule has been applied ([1975] 1 W.L.R. 559 at 563).

- the one claiming relief under the rule must not be in a position to lodge a proof of debt in the liquidation;
- the rule applies to prevent a liquidator from having a claim to which he or she is legally entitled if in all the circumstances as an honest person the liquidator would have to admit that the claim would not be fair; and
- the rule does not necessarily restore the person who is invoking the rule to the status quo as it only operates to the extent needed to prevent the company's estate being enriched.[638]

Notwithstanding the above, given the fact that Etherton C in *Re London Scottish Finance Ltd*[639] did not disagree with the submission of the administrators in that case that administrators are not *normally* under any obligation to notify a person that he or she may have a claim against the company, it is likely that a court would not require liquidators to notify people of possible claims.

The prevailing tendency in Australia has been to restrict the scope of the rule.[640] In *Downs Distributing Co v Associated Blue Star Stores Ltd*,[641] Williams J of the Australian High Court suggested that the rule would only be able to be used in a limited number of cases. His Honour said:

> "But the cases as a whole appear to show that it is only in exceptional cases that the rule would be applied where the officer or his predecessor in office has not been personally concerned in the transaction."[642]

**9-088** Nevertheless, in *Lomas v Burlington Loam Management Ltd*,[643] David Richards J (as he then was) dealt with the rule in some detail and said:

> "The principle in *Ex parte James* has been described as anomalous but it is a well-established principle providing a means by which the court can control the conduct of its officers. Administrators, liquidators in a compulsory winding-up and trustees in bankruptcy are all officers of the court and subject to this jurisdiction. The case to which the principle owes its name, like a number of cases immediately following it, concerned the retention by a liquidator or trustee in bankruptcy of money paid under a mistake of law. At that time, money paid under a mistake of law was not recoverable, but the court directed that its officer should not stand on his strict legal rights but should return the funds, notwithstanding that the effect was to deprive the creditors of funds which would otherwise be available for distribution among them. The rationale for the principle was that, although irrecoverable at law, the officer of the court could not in all conscience retain the money, given the circumstances in which it had been paid. It would amount to an unjust enrichment of the estate. Although the principle was first developed and exercised in these circumstances, subsequent cases applied it in other circumstances and it cannot now be said to be confined to particular categories of case."[644]

The comment of the judge suggests that the principle is not to be given as narrow a scope as some cases have posited.

---

[638] These conditions may lend some support to the view of Dawson, "The Administrator, Morality and the Court" [1996] J.B.L. 437, 454 that the rule is within the general area of the law of restitution.
[639] *Re London Scottish Finance Ltd* [2013] EWHC 4047.
[640] *Hartogen Energy Ltd v Australian Gas Light Co* (1992) 10 A.C.L.C. 1324 at 1336. Compare the comments of the Full Court of the Federal Court in *Re Ah Toy* (1986) 4 A.C.L.C. 480 at 496.
[641] *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 C.L.R. 465.
[642] *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 C.L.R. 465 at 482.
[643] *Lomas v Burlington Loam Management Ltd* [2015] EWHC 2270 (Ch); [2015] B.P.I.R. 1162.
[644] *Lomas v Burlington Loam Management Ltd* [2015] B.P.I.R. 1162 at [74].

In *Re Clark*,[645] when Walton J set out what he saw as the conditions which must be present if the rule is to operate, and mentioned above, he was, in effect, saying that the rule is based on fairness and in *Ex p. James* the court was of the opinion that it was not fair for the trustees to retain the money that had been paid to them. Indeed the judge said that: "Stating the matter in very broad terms … the rule provides that where it would be unfair for a trustee to take full advantage of his legal rights as such, the court will order him not to do so …"[646]

In *Re Mark One (Oxford Street) Plc*[647] Jacob J said that an officer of the court is not permitted to rely upon his or her rights when it was not fair to do so. Lord Neuberger in *Re Nortel GmbH*[648] also linked the rule to an officer of the court not relying on his or her rights when it would be unfair to so do.[649] Fairness appears to be at the essence of the rule, and according to David Richards J in *Lomas v Burlington Loam Management Ltd*,[650] unfairness is all that is needed for the rule to apply.[651] As unfairness is a substantive legal concept and now well embedded in the law, it has been said that the rule should not be regarded as elusive as some have suggested that it is, and nor should it be seen as a moral as opposed to a legal principle.[652] Going back to the old decision of *Re Tyler*[653] one can see that fairness was indeed at the centre of the principle. In that case Buckley LJ said that to allow an office-holder to rely on a mistake would be "grievously unfair."[654] In the decision of *Hieber v Duckworth*,[655] the court applied the rule and said that it would be unfair for the liquidator to rely on strict legal rights as the result would be an unjustified enrichment of the company. However, in *Lehman Brothers Australia Ltd (in liq) v Lomas*[656] Hildyard J was not convinced that unfairness was the correct test. His Lordship felt that an unfairness test was based on a subjective standard and had become an "unruly horse".[657] Rather, he was of the view that the test was one of unconscionability, and the the Court of Appeal decision in *Re Wigzell*,[658] which, in the judge's view, espoused the notion of unconscionability as the basis for the principle, was binding on him.[659]

On appeal, in *Lehman Brothers Australia Ltd (in liq) v MacNamara*,[660] the Court of Appeal disagreed with Hildyard J's approach. David Richards LJ, with whose judgment Newey and Patten LJJ agreed, did not accept that *Re Wigzell* constituted

---

645 *Re Clark (A Bankrupt)* [1975] 1 W.L.R. 559.
646 *Re Clark (A Bankrupt)* [1975] 1 W.L.R. 559 at 563.
647 *Re Mark One (Oxford Street) Plc* [1998] B.C.C. 984.
648 *Re Nortel GmbH* [2014] A.C. 209.
649 *Re Nortel GmbH* [2014] A.C. 209 at [122].
650 *Lomas v Burlington Loam Management Ltd* [2015] B.P.I.R. 1162.
651 *Lomas v Burlington Loan Management Ltd* [2015] B.P.I.R. 1162 at [180].
652 *Lomas v Burlington Loan Management Ltd* [2015] B.P.I.R. 1162 at [183]. Also, see *Re Young (A Bankrupt)* [2017] B.P.I.R.1116 at [43].
653 *Re Tyler; Ex p. Official Receiver* [1907] 1 K.B. 865.
654 *Re Tyler; Ex p. Official Receiver* [1907] 1 K.B. 865 at 874.
655 *Hieber v Duckworth* unreported 26 June 2017 Ch. D. per Deputy Registrar Garwood.
656 *Lehman Brothers Australia Ltd (in liq) v Lomas* [2018] EWHC 2783 (Ch); [2019] B.C.C. 318 at [70].
657 *Heis v Financial Services Compensation Scheme Ltd* [2018] EWHC 1372 (Ch); [2019] B.P.I.R. 1096 at [143].
658 *Re Wigzell* [1921] 2 K.B. 835.
659 In doing this the judge was following his earlier decision in *Heis v Financial Services Compensation Scheme* [2019] B.P.I.R. 1096 at [143].
660 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] 3 W.L.R. 147.

binding authority for the application of an unconscionability test.[661] He said that the court in *Re Wigzell* referred to fairness and that there was a proper basis in the authorities for the unfairness test that Walton J in *Re Clark*,[662] and Lord Neuberger in *Re Nortel GmbH*[663] put forward.[664] His Lordship said that "unconscionable conduct carries connotations of oppression and the wrongful exploitation of one party by another … which do not reflect the circumstances in which the principle has been considered or applied."[665] The judge went on to say that he was not sure what Hildyard J meant when he said that a test of unfairness "with its ultimately subjective standard, would … become 'an unruly horse'." In the view of David Richards LJ fairness was an objective standard that required judgment in the way that it is applied to specific facts. While he accepted the fact that different judges might reach different views, that was the case with any standard falling short of dishonesty.[666] Thus, now it would appear to be settled that the test to apply to what a liquidator has done is whether it was unfair.

**9-089** An important question is whether a liquidator in voluntary winding up is subject to the rule. Such liquidators are not officers of the court[667] and there are conflicting decisions as to whether or not such liquidators are bound to observe the rule: in *Re David Hamilton & Co*[668] and *Re TH Knitwear (Wholesale) Ltd*[669] it was emphatically held that the rule did not apply in voluntary liquidation,[670] but it was applied by Swinfen-Eady J in *Re Temple Fire & Accident Assurance Co*,[671] apparently on the ground that otherwise there would be an anomalous difference in this respect between compulsory and voluntary windings up.[672] While not applying the rule because the facts before him did not warrant its application, Judge Weeks QC in *Re South West Car Sales Ltd (in liq)*[673] considered the rule in relation to a voluntary liquidation.[674] In *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd*,[675] the High Court of Australia considered *Ex p. James* in the context of a voluntary liquidation and did not refer to any existing dichotomy between compulsory and voluntary windings up.

It has been said that the rule can be understood as prescribing the manner in which courts controlled liquidators' exercise of power,[676] and that it relates to courts controlling officers of the court. Notwithstanding this, and the fact that a liquida-

---

661 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] 3 W.L.R. 147 at [64].
662 *Re Clark* [1975] 1 W.L.R. 559.
663 *Re Nortel GmbH* [2014] A.C. 209.
664 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] 3 W.L.R. 147 at [64].
665 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] 3 W.L.R. 147 at [65].
666 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] 3 W.L.R. 147 at [66].
667 *Re John Bateson & Co Ltd* [1985] B.C.L.C. 259.
668 *Re David Hamilton & Co* [1928] N.Z.L.R. 419.
669 *Re TH Knitwear (Wholesale) Ltd* [1988] Ch. 275.
670 Slade LJ did not think that it was of significance that the voluntary liquidator was applying to the court for directions ([1988] Ch. 275 at 289).
671 *Re Temple Fire & Accident Assurance Co* (1910) 129 L.T.Jo. 115; see *Re Harry Simpson & Co* (1966) 84 W.N. (Pt 1) (N.S.W.) 455 at 460.
672 This was the opinion of Wynn-Parry J in *Re Art Reproduction Co Ltd* [1952] 1 Ch. 89.
673 *Re South West Car Sales Ltd (in liq)* [1998] B.C.C. 163.
674 Judge Weeks QC noted that the liquidation to which the proceedings related was a creditors' voluntary winding up and therefore the liquidators were not officers of the court (at 170).
675 *Downs Distributing Co Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 C.L.R. 465.
676 *Hartogen Energy Ltd v Australian Gas Light Co* (1992) 10 A.C.L.C. 1324 at 1336; *Star v Silvia* (1994) 12 A.C.L.C. 600 at 603.

tor in a voluntary liquidation is not an officer of the court,[677] it is submitted that given the fact that many rules applied to compulsory liquidations can now be applied, either by statute or case law, to voluntary liquidations and vice versa, the rule should apply equally to liquidators in voluntary windings up. This would provide us with much needed consistency. Harman J, who in the initial parts of his judgment in *Re Bateson & Co Ltd*,[678] seemed to be against the idea that the rule applied to liquidators in voluntary liquidations, did acknowledge the strength of the argument that it would seem strange if the position as to the application of the rule differed between compulsory and voluntary liquidations given the fact that the respective powers of liquidators in the two types of liquidation are almost identical. It is submitted that while a liquidator in a voluntary liquidation is not an officer of the court, he or she should nevertheless operate under such an inveterate principle as the rule in *Ex p. James*. From a practical point of view applying a distinction between the two types of winding up could cause problems; as Dawson notes:

> "One can imagine a court being put in an impossible position where one creditor seeks either the appointment of an administrator or a compulsory liquidation [sic] in order to enable it to mount an argument based on *Ex parte James*, whilst another creditor seeks the appointment of … a voluntary liquidation [sic] so that the assets available to the latter creditor will not be depleted by the success of the former."[679]

It is notable that in *Re Agrimarche Ltd*,[680] Lewison J observed that it was odd that the same insolvency practitioner would be subject to the rule when acting as an administrator but not if the company moved from administration into a creditors' voluntary liquidation.[681]

Also, there are examples of other office bearers outside of the insolvency context who are not officers of the court, yet they have been held to be subject to the rule. It was stated by way of obiter in the House of Lords in *R. v Tower Hamlets London Borough Council*[682] by Lord Bridge, with whom the other judges agreed, that the principle applied to prevent a rating authority enforcing a liability for current rates without giving credit for a past overpayment of rates made under a mistake of law.[683]

A foreign office-holder is not subject to the rule as he or she is not an officer of the English courts, and this was not affected by the fact that the office-holder had applied successfully for the foreign proceedings under which he or she acted to be recognised by the English courts.[684]

It has been held that the rule in *Ex p. James* does not apply to dealings arising prior to the commencement of a winding up.[685]

While the latest Court of Appeal decision in *Lehman Brothers Australia Ltd (in liq) v MacNamara*,[686] may have clarified things more as far as the application of the rule is concerned, undoubtedly there will be occasions where a liquidator will be

---

677 *In re TH Knitwear (Wholesale) Ltd* [1988] Ch. 275; (1988) 4 B.C.C. 102.
678 *Re John Bateson & Co Ltd* [1985] B.C.L.C. 259 at 264.
679 Dawson, "The Administrator, Morality and the Court" [1996] J.B.L. 437 at 454.
680 *Re Agrimarche Ltd* [2010] EWHC 1655 (Ch); [2010] B.C.C. 775.
681 *Re Agrimarche Ltd* [2010] B.C.C. 775 at [25].
682 *R. v Tower Hamlets LBC; Ex p. Chetnik Developments Ltd* [1988] 2 W.L.R. 654.
683 *R. v Tower Hamlets LBC; Ex p. Chetnik Developments Ltd* [1988] 2 W.L.R. 654.
684 *Glasgow (Bankruptcy Trustee) v ELS Law Ltd* [2017] EWHC 3004 (Ch); [2018] P.N.L.R. 11 at [83]–[85].
685 *Re John Bateson & Co Ltd* [1985] B.C.L.C. 259 at 264.
686 *Lehman Brothers Australia Ltd (in liq) v MacNamara* [2020] 3 W.L.R. 147.

uncertain as to whether a course of action which he or she is contemplating would constitute a contravention of the rule. In such cases it might well be prudent for the liquidator to seek directions from the courts.

### *3. Disclaimer of onerous property*

**9-090** It is difficult to select the appropriate point for a discussion of the liquidator's power to disclaim onerous property of the company. The topic is one which does not readily fit into the scheme of things, partly no doubt because it possesses a double aspect: in one sense it may be regarded merely as an aspect of the liquidator's duty to discharge the liabilities of the company[687]; in another, its principal relevance is as a means of assisting the liquidator to realise or dispose of company assets without needlessly protracting the winding up. This is demonstrated by the fact that the power to disclaim conferred by s.178, and which corresponds to the provisions that apply in bankruptcy, is exercisable in the case of a solvent as well as an insolvent company. It was the second aspect which was prominent in *Re Nottingham General Cemetery Co*[688]: the company here had been incorporated by special Act to establish a cemetery, with power to grant to purchasers and their successors a perpetual right of burial in land owned by the company, which in its turn assumed the obligation of maintaining the cemetery and preventing the land from being devoted to other purposes. However, the cost of upkeep was such that at the date of winding up there were sufficient funds to maintain the cemetery for only another two and a half years. The creditors[689] wished these funds to be devoted to the purpose, but the liquidator applied for and was granted leave to disclaim (at this time leave of the court was required) on the ground that this would enable the liquidation to proceed in an orderly manner to its close,[690] whereas to refuse it would "clearly hamper the liquidation without giving any corresponding benefit to those who oppose it".[691]

The first power to disclaim was provided in s.23 of the Bankruptcy Act 1869. A similar provision, and almost identical to the provision in the Bankruptcy Act 1914, was applied to the corporate sphere in s.267 of the Companies Act 1929. Now s.178 of the Act provides for disclaimer.[692]

**9-091** **(a) Scope of the power** The power to disclaim, available to liquidators in both compulsory and voluntary liquidations, exists to permit a liquidator to reduce the liabilities of the company. It must be made clear that if a liquidator does not disclaim he or she is not held personally liable for the failure to perform any of the company's obligations emanating from its interest in onerous property. However, there might be a claim that liquidators have failed to fulfil their duties where disclaimer should have occurred. The power to disclaim extends generally to unprofitable contracts[693] and all property which is unsaleable or not readily saleable by reason of its binding the possessor thereof to the performance of any oner-

---

687 That is, by relieving it of an asset which is in effect a liability: *Re Nottingham General Cemetery Co* [1955] Ch. 683 at 695.
688 *Re Nottingham General Cemetery Co* [1955] Ch. 683.
689 Namely persons having rights of burial in the cemetery.
690 *Re Nottingham General Cemetery Co* [1955] Ch. 683 at 695.
691 *Re Nottingham General Cemetery Co* [1955] Ch. 683 at 697.
692 Its bankruptcy equivalent is now s.315 of the 1986 Act
693 1986 Act s.178(3)(a).

ous act or to the payment of a sum of money.[694] The essence appears to be that if the property was retained there would be a diminution of the benefits available for distribution to the creditors and contributories.[695] Does the liquidator have to demonstrate that reasonable steps were taken to sell the property? Some commentators have said that he or she does have to demonstrate reasonable steps,[696] while others have said that it is sufficient if the liquidator subjectively forms the view that the property is not readily saleable.[697] It is submitted that to save costs and time and to ensure that the liquidator is safe from complaint, it would be sufficient if the liquidator secured the opinion of an expert that the property was either not saleable or not readily saleable. After saying that, it may well be satisfactory if reliance was placed on the subjective view of the liquidator, given the view set out in *Re Hans Place Ltd*,[698] unless the liquidator's view was totally unreasonable to the point of being perverse.

Property may be regarded as onerous on other grounds besides unsaleability. For example, liabilities are directly enforceable against the property and not against the company, and the liabilities mean that the property is unsaleable.[699] More specifically, it includes unprofitable contracts,[700] and property that gives rise to liability to pay money or perform onerous acts.[701]

Cases which have dealt with the performance of onerous acts have involved "onerous covenants" imposed on the property, usually land. These have included covenants to build and maintain property, those contained in mortgages over real estate[702] and rates.[703] The transfer of shares may be subject to restrictions. Shares in publicly listed companies should be able, in the normal course of things, to be disposed of, but it will be in relation to shares on which there is some form of restriction on transfer or the shares are subject to unlimited liability that the problem presents itself for the liquidator.[704]

In relation to the meaning of "unprofitable" in the expression "unprofitable contracts" contained in s.178(3)(a), it would appear that a contract is unprofitable **9-092**
if the cost involved for the company in performing its obligations is greater than the benefit which the company will enjoy under the terms of the contract. The court in *Re Bastable*[705] said that a contract was not unprofitable if the amount of profit is little. Likewise the contract is not unprofitable merely because it is financially

---

[694] 1986 Act s.178(3)(b). Property that can be disclaimed includes a cause of action. See *Khan-Ghauri v Dunbar Bank Plc* [2001] B.P.I.R. 618; *Fosdick v Fox* [2017] EWHC 1737 (Ch); [2017] B.P.I.R. 1194.

[695] Mourell and Willoughby, "Disclaimers of Onerous Property under s.568 of the Corporations Law" (1994) 4 *Australian Journal of Corporate Law* 63, 67.

[696] This is the view taken by Mourell and Willoughby, "Disclaimers of Onerous Property under s.568 of the Corporations Law" (1994) 4 *Australian Journal of Corporate Law* 63.

[697] P. Loose and M. Griffiths, *Loose on Liquidators*, 5th edn (Bristol: Jordan Publishing, 2005), p.162.

[698] *Re Hans Place Ltd* [1992] B.C.C. 737.

[699] Sneddon, "Liability for Insolvent Polluters" (1997) 5 *Insolvency Law Journal* 65, 69. The learned commentator gives as an example, property which requires expensive repairs.

[700] 1986 Act s.178(3)(a).

[701] 1986 Act s.178(3)(b).

[702] For example, see *Re Mercer and Moore* (1880) 14 Ch. D. 287.

[703] *Re Middle Harbour Investments Ltd (in liq)* (1975–76) C.L.C. 40–629.

[704] Mourell and Willoughby, "Disclaimers of Onerous Property under s.568 of the Corporations Law" (1994) 4 *Australian Journal of Corporate Law* 63, 74.

[705] *Re Bastable* [1901] 2 K.B. 518.

disadvantageous.[706] Furthermore, it has been said that demonstrating that a better commercial bargain could be made by the liquidator compared with the bargain that was arranged originally (prior to liquidation) falls well short of establishing that the contract is unprofitable.[707] But the result will be different if a contract that had been entered into before liquidation would take a significant time to complete, for then it might be regarded as unprofitable. In *Dekala Pty Ltd (in liq) v Perth Land & Leisure Ltd*,[708] Young J (as he then was) of the New South Wales Supreme Court said that a contract which would take eight months to be completed was unprofitable because of the time period involved. The same approach was taken later in *Global Television Pty v Sportsvision Australia Pty Ltd*,[709] and the Court of Appeal in *Squires v AIG Europe (UK) Ltd*[710] approved of it, making it clear that a contract was deemed to be unprofitable if it was a contract that was to be performed over a substantial period of time and would delay the winding up.[711] In the last case the Court saw that the fact that a significant time was required to complete a contract is a critical issue in determining that a contract was unprofitable, as the need to perform future obligations would prejudice the liquidator's responsibility to realise the company's property and pay a dividend to creditors within a reasonable period of time.[712] The Court also said that before a contract can be seen as unprofitable it had to give rise to prospective liabilities.[713]

It is quite likely that liquidators will be confronted more and more in dealing with assets, and particularly contaminated land, with environmental problems as they wind up companies. In such cases liquidators may find that the land owned by the company is unsaleable because it is so polluted. A liquidator should seek to disclaim polluted land as soon as possible so as to avoid any claim that he or she has allowed an environmental problem to worsen. It has been suggested that if the relevant environmental agency was to clean up land owned by a company in liquidation which is disclaimed, it could be considered a person aggrieved by the disclaimer and therefore deemed to be a creditor of the company, being entitled to claim in the winding up.[714] However, in *Re Mineral Resources Ltd*,[715] Neuberger J (as he was then) said that the Environment Agency could not claim as that would undermine the public policy of making the polluter pay for damage done to the environment, especially in a liquidation of a solvent company; the creditors or members would be the ones who would end up paying.

The issue which has caused significant debate has been whether a liquidator is

---

706 *Squires v AIG Europe (UK) Ltd* [2006] EWCA Civ 7; [2006] B.C.C. 233. *Re SSSL Realisations (2002) Ltd (in liq)* [2006] Ch. 610.

707 *Re Bastable* [1901] 2 K.B. 518; *Old Style Confections Pty Ltd v Microbyte Investments Pty Ltd* (1994) 15 A.C.S.R. 191 at 201–202; *Capital Prime Properties Plc v Worthgate Ltd (in liq)* [2000] B.C.C. 525; *Squires v AIG Europe (UK) Ltd* [2006] EWCA Civ 7; [2006] B.C.C. 233. *Re SSSL Realisations (2002) Ltd (in liq)* [2006] Ch. 610.

708 *Dekala Pty Ltd (in liq) v Perth Land & Leisure Ltd* (1989) 17 N.S.W.L.R. 664.

709 *Global Television Pty v Sportsvision Australia Pty Ltd* [2000] NSWSC 960; (2000) 35 A.C.S.R. 484.

710 *Squires v AIG Europe (UK) Ltd* [2006] EWCA Civ 7; [2006] B.C.C. 233. *Re SSSL Realisations (2002) Ltd (in liq)* [2006] Ch. 610.

711 *Squires v AIG Europe (UK) Ltd* [2006] EWCA Civ 7; [2006] B.C.C. 233. *Re SSSL Realisations (2002) Ltd (in liq)* [2006] Ch. 610 at [36].

712 Compare the view of Professor Pennington, *Pennington's Corporate Insolvency Law*, 2nd edn (London: Butterworths, 1997), pp.151–152.

713 *Squires v AIG Europe (UK) Ltd* [2006] EWCA Civ 7; [2006] B.C.C. 233. *Re SSSL Realisations (2002) Ltd (in liq)* [2006] Ch. 610 at [36].

714 Sneddon, "Liability for Insolvent Polluters" (1997) 5 *Insolvency Law Journal* 65, 75.

715 *Re Mineral Resources Ltd* [1999] 1 All E.R. 746; [1999] B.C.C. 422.

able to disclaim a waste management licence. This was the main question in *Re Mineral Resources Ltd*. In that case a liquidator of a company in voluntary liquidation purported to disclaim what was treated as a waste management licence. The licence related to a landfill site. The Environment Agency ("the Agency") sought a declaration that a liquidator of a company was unable to disclaim a licence as onerous property and that the disclaimer in this case was of no effect. The Agency argued that a licence was not "property" within s.436 of the Act and as a consequence the liquidator could not disclaim it. The Agency's second line of argument was that even if the licence was property the provisions of the Environmental Protection Act 1990 (EPA) prevented a use of the power to disclaim. Neuberger J held that the licence was property within s.436. As to the second argument put by the Agency his Lordship noted that there was a conflict between the environmental legislation (and in particular s.35(11) of the EPA which preserves the existence of waste management licences until they are either revoked by the Agency or the agency accepts their surrender) requiring action that promoted a healthy environment, and the insolvency legislation and principles that promoted a fair and orderly winding up. Neuberger J accepted the argument of the Agency that the EPA constitutes a self-contained code relating to the grant, terms, revocation, surrender and transfer of waste management licences and that a licence holder is able only to divest himself or herself of a licence within the provisions of the code. The judge acknowledged that this left no room for determination of a licence by disclaimer. Consequently, as Neuberger J found, there was a conflict between a licence being disclaimable under s.178 of the Act and the provisions of the EPA.[716] He decided the conflict by holding that the provisions of the EPA prevailed over those of the Act. He said:

> "[W]hile I accept that provisions of the 1986 Act [Insolvency Act] relating to winding up and disclaimer are not merely for the benefit of individual shareholders, creditors, debtors and liquidators of companies, but also for the good administration of business and commerce, it appears to me that those interests are of a less wide ranging and important nature, both in the domestic sense and in the international sense, than the concerns embodied in the 1990 Act [EPA]."[717]

Neuberger J said that the provisions of the environmental legislation would prevail over the Act as it was in the public interest that a healthy environment was maintained. It seems that it was significant, for the decision of Neuberger J, that the effect of a licence being disclaimed was that the obligations of the licensee would end, and the Agency would not be able to prove in the winding up of the company for any loss or damage experienced as a consequence of disclaimer, because the Agency would not be under any statutory or contractual duty to carry out remedial work needed, and so could not claim to have sustained loss.[718] The judge noted that if there was a need to carry out work the loser, as a result of the disclaimer, would be the public.[719] **9-093**

Later in *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd*[720] the Court of Appeal was required to consider the issues canvassed above. The Court

---

716 *Re Mineral Resources Ltd* [1999] 1 All E.R. 746 at 757.
717 *Re Mineral Resources Ltd* [1999] 1 All E.R. 746 at 757.
718 *Re Mineral Resources Ltd* [1999] 1 All E.R. 746 at 758–759.
719 *Re Mineral Resources Ltd* [1999] 1 All E.R. 746 at 759.
720 *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555. See de Prez and Case, "The Power of Disclaimer and Environmental Licences" (2000) Insolv. L. 87; Keay and

upheld the view of Neuberger J that a waste management licence was property[721] within s.436 of the Act and constituted onerous property within s.178. Morritt LJ (with whom Roch LJ and Rattee J agreed) said that licences which under statute afforded the holder some sort of exemption from statutory prohibition could be categorised as "property" if they satisfied three conditions: there was a statutory regime conferring an entitlement on someone who fulfils certain conditions; the exemption was transferable; and the exemption had value.[722] His Lordship opined that waste management licences fulfilled all three conditions.[723] Morritt LJ disagreed with the view that Neuberger J espoused, and the Agency put forward in the appeal court, that the environmental legislation should take precedence over the insolvency legislation; his Lordship could not agree that the provisions of the Act and the provisions of the EPA were mutually inconsistent and irreconcilable. His Lordship accepted the argument of the official receiver, the liquidator in this case, that s.35(11) of the EPA only provided for unilateral termination of the licence by its holder, but did not preclude termination by other statutes.[724] The learned judge went on to say that the polluter pays principle propounded by the Agency did not extend to cases where the polluter could not pay so as to require unsecured creditors of the corporate polluter to end up paying.[725] Morritt LJ emphasised that an important aspect of the public policy requirement that creditors should share pari passu in the assets of companies in liquidation was the ability to disclaim onerous property, and that it would require specific and clear wording to exclude the operation of s.178 from specific items of property or specific insolvents.[726]

The conclusion of the Court was that the EPA provisions concerning termination of licences were limited to termination by the act of the parties and not by statutory force.[727] In disclaimer, as the termination is permitted under s.178 of the Act, termination occurs by force of statute.

**9-094** The decision in *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* has been applauded,[728] and while the Court of Appeal's loyalty to the pari passu principle and the need to protect the very vulnerable rights of unsecured creditors who appear to be the ones who regularly lose out, is laudable, one must question the justice and sense of the decision. First, it is not as if the unsecured creditors would be required to pay out anything if disclaimer was not permitted—they just would have to accept a reduced dividend. Secondly, the disclaimer provision has

---

de Prez, "Insolvency and Environmental Principles: A Case Study in a Conflict of Public Interests" (2001) 3 *Environmental Law Review* 90 for a discussion and critique of the case. For more recent discussions of disclaimer and environmental issues, see Mackie and Fogleman, "Self-insuring environmental liabilities: a residual risk-bearer's perspective" (2016) 16 *Journal of Corporate Law Studies* 293; Mamutse, "Environmental liabilities in insolvency—an area ripe for reform?" (2016) 8(3) *International Journal of Law in the Built Environment* 243.

[721] Note that in *Re Rae* [1995] B.C.C. 102, Warner J had held that a licence under the Sea Fish (Conservation) Act and which was disclaimed by a trustee in bankruptcy was property. A water use licence under the Water Environment (Controlled Activities) (Scotland) Regulations 2011 (SSI 2011/209) has been held not to be capable of being disclaimed in Scotland: *Joint Liquidators of the Scottish Coal Co Ltd, Petitioners* [2013] CSIH 108 reversing the decision in [2013] CSOH 124; 2013 S.L.T. 1055.

[722] *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555 at 566.

[723] *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555 at 567.

[724] *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555 at 567–568.

[725] *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555 at 568.

[726] *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555 at 569.

[727] *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* [1999] 2 B.C.L.C. 555 at 569.

[728] See Pickin, "Getting Rid of Waste Management Licences" (1999) 13 Insolv. Int. 79.

been used, traditionally, against private arrangements, but the decision in this case allows the provision to defeat the public interest in environmental protection,[729] which, it is submitted, should take precedence over the public interest in seeing an equal distribution of the assets of an insolvent company. The two interests are in conflict and the one with greater importance, the environmental, it is submitted, should have priority. Thirdly, there was no indication from the Court of Appeal that the Agency would be able to claim as a creditor in the winding up under s.178(6) for the costs associated with any outstanding or expected liabilities relating to the now unlicensed site, but even if the agency could claim it is likely that in many windings up that there will be little, if anything, available to cover the expenditure.[730] The decision of the Court of Appeal in a case decided subsequent to *Re Celtic Extraction Ltd*; sub nom. *Re Blue Stone Chemicals Ltd* while not dealing with disclaimer does provide a different insight into a conflict between insolvency and environmental principles. The case was *Re Rhondda Waste Disposal Co Ltd*[731] and in this case R Ltd ran a landfill site in Wales from which obnoxious odours emanated. The Agency had sent notices to R Ltd requiring it to cap the existing tip and monitor emissions. However, this did not happen due to the company's trading difficulties. After the service of the Agency notices on the company, R Ltd went into administration (pursuant to Pt II of the Act) because of the cost of attending to the work required by the Agency. The Agency had initiated criminal proceedings against the company after R Ltd had petitioned for the making of an administration order, but two days before the court made the order. It was held at first instance by HH Judge Moseley QC (sitting as a High Court judge) that the Agency required leave of the court to commence the criminal proceedings as s.10 of the Act stated, inter alia, that from the time of the presentation of the petition for administration until an order dismissing an administration order, no proceedings or legal process may be commenced or continued except with the leave of the court. The learned judge was influenced by the judgment of Morritt LJ in *Re Celtic Extraction* and accepted the fact that the polluter pays principle cannot apply where a company cannot pay. He refused to grant leave to the Agency. The Agency appealed.

While accepting that Judge Moseley was correct in that the Agency required leave, the Court of Appeal allowed the appeal[732] against the decision not to grant leave as, according to Scott Baker J, the case was a bad one involving pollution of the environment and serious detriment to the amenities of the locality. Also, Scott Baker J, who delivered the leading judgment, did indicate that when the public interest dictated, as it did in this case, leave to pursue criminal proceedings ought to be given readily, although this did not mean that leave would always be given. The judge said that Judge Moseley had erred in not granting leave because he wrongly regarded the interests of the company's creditors as trumping all other considerations. Robert Walker LJ (as he then was) agreed, and said that Judge Moseley had misdirected himself by limiting his attention to the interests of the creditors of the company. His Lordship went on to say that Judge Moseley had

[729] de Prez and Case, "The Power of Disclaimer and Environmental Licences" (2000) Insolv. L. 87.
[730] de Prez and Case, "The Power of Disclaimer and Environmental Licences" (2000) Insolv. L. 87.
[731] *Re Rhondda Waste Disposal Co Ltd* [2001] Ch. 57; [2000] B.C.C. 653.
[732] *Re Rhondda Waste Disposal Co Ltd* [2000] B.C.C. 653.

"paid insufficient attention to the wider public interest in the prosecution of what may be proved to have been serious offences arising out of operations which have ... plagued the lives of many residents".[733]

Prima facie the comments in this case, while not dealing directly with the issue of disclaimer, may cast doubts on whether the view espoused in *Re Celtic Extraction* will, necessarily, be followed in the future.

In the Australian decision, *Longley v Chief Executive of Department of Environment and Heritage and Protection*,[734] the appeal court reversed the decision of the judge at first instance[735] who held that the environmental obligations of the company that was in liquidation continued notwithstanding the disclaimer of the relevant land and licences (granted under environmental protection legislation) of the company to operate. The Queensland Court of Appeal, effectively taking the same line as the English Court of Appeal in *Re Celtic Extraction Ltd*, said that the insolvency priority regime was paramount and thus the liquidator could disclaim a contaminated mining property and onerous obligations the subject of an environmental protection order.[736] This decision was based on the legislation extant in one jurisdiction, Queensland, and courts in other Australian states may not take the same view. The decision is only persuasive in Australian jurisdictions as it might be in England and Wales.[737]

**9-095** One further matter that warrants mentioning is that if a liquidator does disclaim a waste management licence, then he or she is taken to have disclaimed any interest in a fund established to ensure that the company's liabilities pursuant to the licence are fulfilled.[738]

In many respects the power to disclaim conferred by s.178 closely follows the pattern set by the law of bankruptcy from which it is a direct importation.[739] There used to be some significant differences between the statutory provisions which applied to trustees and liquidators.[740] One was that a liquidator, but not a trustee in bankruptcy or the official receiver, was bound to obtain the leave of the court before disclaimer was possible. It was for this reason that the power to disclaim a lease was refused in *Re Katherine et Cie Ltd*,[741] where the effect would have been to deprive the lessors of the benefit of an undertaking to guarantee payment of the rent, and to substitute therefor a bare right to prove in the liquidation which in the circumstances was of little value.

Approval of the court for a disclaimer was once necessary, but it is not needed

---

733 *Re Rhondda Waste Disposal Co Ltd* [2000] B.C.C. 653 at [55].
734 *Longley v Chief Executive of Department of Environment and Heritage and Protection* [2018] QCA 32.
735 *Re Linc Energy Ltd* [2017] QSC 53.
736 The Australian High Court refused leave to appeal to it. Compare the situation in Canada where disclaimer does not have the same usefulness for liquidators. See *Oprhan Well Association v Grant Thornton Ltd* 2019 SCC 5.
737 Thus, subsequently the Victorian Supreme Court in *EPA v Australian Sawmilling Company Pty Ltd (in liq)* [2020] VSC 550 adopted a similar approach of the Queensland court at first instance, although it must be noted that the decisions involved different environmental legislation and some aspects of the reasoning in the Victorian judgment are questionable.
738 *Environment Agency v Hillridge Ltd* [2003] EWHC 3023 (Ch); [2004] 2 B.C.L.C. 358.
739 The power to disclaim is a power possessed by the liquidator and not by the company: *Re Nottingham General Cemetery Co* [1955] Ch. 683 at 695.
740 See *Ice Rinks, Re (Timaru) Ltd* [1955] N.Z.L.R. 641.
741 *Re Katherine et Cie Ltd* [1932] 1 Ch. 70; see also *Ice Rinks, Re (Timaru) Ltd* [1955] N.Z.L.R. 641 at 644.

now.[742] Notwithstanding that, a person who is affected by the proposed disclaimer could apply to the court under s.168(5) for a review of the liquidator's decision to disclaim[743] and it could interfere with a liquidator's decision to disclaim in relation to property if the liquidator had acted mala fides or in such a way that no reasonable liquidator would have so acted.[744] This view has meant that it has become increasingly difficult for a person to have a disclaimer set aside. If a court did decide to set aside the purported disclaimer the position pre-disclaimer would be restored.

A difference that does remain between bankruptcy and liquidation is that since a bankrupt estate vests in the trustee, the trustee, unlike the liquidator,[745] becomes personally liable in respect of onerous property if he or she fails to disclaim it.[746]

The liquidator may disclaim notwithstanding the fact that he or she has taken possession of property, attempted to sell it, or exercised an act of ownership in relation to it.[747] One would think that unprofitable contracts may be disclaimed notwithstanding that the company or the liquidator has attempted to assign, or has exercised rights in relation to, the contract or any property to which the contract relates.

Finally, for this section of the discussion of disclaimer, it is to be noted that there is no requirement that liquidators must vacate property immediately following disclaimer.[748]

**(b) Procedure** The procedure that applies to disclaimer, in both bankruptcy and liquidation is contained now in one Part of the Rules, namely Pt 19. Also, parts of ss.178–182 of the Act are relevant to liquidations.[749] **9-096**

The first thing which a liquidator must do where he or she decides to disclaim is to prepare and give notice of disclaimer.[750] This can be done at any time during the winding up—there is no time limit, as there was under the former law.[751] Also, as indicated above, unlike under the former law, the liquidator does not need to obtain the leave of the court to disclaim.[752] The notice is to contain those particulars specified in r.19.2(1), including details of the property disclaimed so as to enable the property to be identified.[753] If the property consists of land or buildings the nature of the interest must be stated in the notice.[754] The notice must be authenticated by the liquidator, and dated.[755] The date inserted will constitute the date of disclaimer.[756] As soon as reasonably practicable after authenticating the notice of disclaimer, the

742 Cases decided under the former law, when approval of the court was needed, are no longer relevant: *Re Hans Place Ltd* [1992] B.C.C. 737; [1992] B.C.L.C. 768.
743 For example, see *Re Hans Place Ltd* [1992] B.C.C. 737; [1992] B.C.L.C. 768. The applicant in this case was unsuccessful in having the decision of the liquidator overturned.
744 *Re Hans Place Ltd* [1992] B.C.C. 737 at 746.
745 *Stead Hazel & Co v Cooper* [1933] 1 K.B. 480.
746 *Titterton v Cooper* (1882) 9 Q.B.D. 473.
747 1986 Act s.178(2).
748 *MK Airlines Property Ltd v Katz* [2012] EWHC 2764 (Ch); [2014] B.C.C. 103.
749 Sections 315–321 of the 1986 Act are relevant to bankruptcies.
750 1986 Act s.178(2). The contents of the notice are mentioned in 2016 Rules r.19.2(1).
751 See Companies Act 1985 s.618(3) and repealed by the Act. This provision required disclaimer to be within 12 months of the commencement of winding up.
752 See Companies Act 1985 s.618(1) and repealed by the Insolvency Act.
753 2016 Rules r.19.2(1).
754 2016 Rules r.19.2(6).
755 2016 Rules r.19.2(2). Neither signing by the liquidator's solicitor (*Wilson v Wallani* (1880) 5 Ex. D.

liquidator must send a copy of the notice to the registrar of companies[757]; and where the disclaimer is of registered land as defined in s.132 of the Land Registration Act 2002, send a copy of the notice to the Chief Land Registrar.[758] Within seven business days of the date of the notice the liquidator is to send copies of the notice of the disclaimer to interested persons.[759] These persons are those who: claim an interest in the disclaimed property; are under any liability in relation to the property, not being a liability discharged by the disclaimer; and if the disclaimer is of an unprofitable contract, is a party to the contract or has an interest under it.[760] If it subsequently comes to the liquidator's knowledge that a person has an interest in the disclaimed property which would have entitled that person to receive a copy of the notice then the liquidator must deliver a copy to that person as soon as reasonably practicable.[761] The liquidator is not required to deliver or serve a copy of a notice if the liquidator is satisfied that the person has already been made aware of the disclaimer and its date, or the court, on the liquidator's application, orders that delivery or service of a copy is not required in the particular case.[762] Where a notice of disclaimer relates to leasehold property the liquidator must serve any copies of the notice of disclaimer which are required by s.179 within seven business days after the date of the notice of disclaimer.[763] A liquidator may at any time deliver a copy of the notice of the disclaimer to any other person whom he or she thinks ought, in the public interest or otherwise, to be informed of the disclaimer.[764]

A liquidator is not to give a notice of disclaimer where a person who is interested in the property has applied in writing to the liquidator or a predecessor liquidator requiring the liquidator to decide whether he or she would disclaim or not, and the period of 28 days inclusive of the date of the application, or such longer period allowed by the court, has expired without a notice of disclaimer having been given under s.178 in respect of that property.[765]

An interested party may make an application under s.178(5) to the liquidator in respect of any property and if the applicant does so then he or she must deliver the application to the liquidator and must provide proof of delivery in accordance with r.1.52 if requested.[766]

The liquidator must include in the records of the insolvency a record of those matters set out in r.19.7, namely:

"(a) the name and address of each person to whom a copy of the notice of disclaimer has been delivered or served under rules 19.3 to 19.6, with the nature of the person's interest;

---

155) nor by a member of the firm of which the liquidator is a member (*Re Teller Home Furnishers Pty Ltd (in liq)* [1967] V.R. 313) suffices.

756 2016 Rules r.19.2(7).

757 2016 Rules r.19.2(4).

758 2016 Rules r.19.2(3). See HM Land Registry's Practical Guide 35, pp.14–20 for further details on practice matters available at: *https://www.gov.uk/government/publications/corporate-insolvency/practice-guide-35-corporate-insolvency* [Accessed 6 August 2020].

759 2016 Rules r.19.3.

760 2016 Rules r.19.3(1).

761 2016 Rules r.19.3(2).

762 2016 Rules r.19.3(4).

763 2016 Rules r.19.4.

764 2016 Rules r.19.6.

765 1986 Act s.178(5). The application made by a person to a liquidator is covered by 2016 Rules r.19.9.

766 2016 Rules r.19.9(2). The Insolvency Service has a template available at: *https://www.gov.uk/government/publications/rule-199-application-by-interested-party-for-decision-on-disclaimer-company-winding-up* [Accessed 14 September 17].

(b) the date on which the copy of the notice was delivered to or served on that person;
(c) the date on which the liquidator delivered a copy of the notice to the registrar of companies;
(d) the date on which the trustee filed a copy of the notice with the court or on the bankruptcy file; and
(e) if applicable, the date on which a copy of the notice was delivered to the Chief Land Registrar."

It is in respect of leasehold interests that the power to disclaim is most commonly exercised[767]; indeed, it might be said that a liquidator is virtually under a duty to disclaim an onerous lease in order to free the company from its future liability to pay rent and to keep the premises in repair. It is probably a reason why there is a specific section, namely s.179, which deals with the disclaimer of leaseholds. As a result of the fact that leases are commonly disclaimed a special word on the subject is warranted here and a little later when the effect of disclaimer is discussed. **9-097**

A disclaimer of a leasehold interest is not effective unless a copy of the disclaimer has been served on every person claiming under the company as an underlessee or mortgagee and either no application is made under s.181 to the court claiming an interest before the end of the period of 14 days commencing from the date on which the last notice was served or where a s.181 application has been made, the court directs that the disclaimer shall take effect.[768] Where a direction is made the court may also, instead of or in addition to any order it makes under s.181, make such orders relating to fixtures, tenant's improvements and other matters arising out of the lease as it thinks fit.[769] But it has been held that a court does not have jurisdiction to make a vesting order for the benefit of a landlord on such terms that it shall be subject to and with the benefit of existing subleases.[770] A landlord is only able to become entitled to possession of property once all of the interests of all other relevant parties who had, or could obtain, an interest in the property had been cleared away by invoking the mechanism provided in s.182.[771]

Rule 19.10 provides that any disclaimer is presumed valid and effective unless it is proved that the liquidator has been in breach of duty in respect to the giving of notice of disclaimer or otherwise under ss.178–180.

**(c) Applications to the court by interested parties** Where disclaimer has occurred under s.178, a person who claims an interest in the disclaimed property, or a person who is under any liability in respect of the disclaimed property (not including a liability discharged by the disclaimer) may apply to the court.[772] The interest which is claimed must be proprietary in nature.[773] The application is to be made **9-098**

---

767 As to the difference between a contractual agreement to surrender a lease and a disclaimer, see *Torminster Properties Ltd v Green* [1983] 1 W.L.R. 676.
768 1986 Act s.179(1).
769 1986 Act s.179(2).
770 *Re ITM Corp Ltd (in liq)* [1997] B.C.C. 554; [1997] 2 B.C.L.C. 389.
771 *Re ITM Corp Ltd (in liq)* [1997] B.C.C. 554; [1997] 2 B.C.L.C. 389.
772 1986 Act s.181(1)–(2).
773 *Lloyds Bank SF Nominees v Aladdin Ltd (in liq)* [1996] 1 B.C.L.C. 720; *Re Ballast Plc*; sub nom. *St Paul Travelers Insurance Company Ltd v Dargan and Edwards* [2006] EWHC 3189 (Ch); [2007] B.C.C. 620; [2007] B.P.I.R. 117; *Re Mascall (Deceased)*; sub nom. *Sleight v The Crown Estate Commissioners* [2018] EWHC 3489 (Ch); [2019] B.P.I.R. 429 (dealing with the bankruptcy equivalent in s.320). In the first case, a person in occupation of premises of which he agreed to take an assignment subject to the consent of the landlord, did not have a proprietary interest within s.181(2)(a).

within three months[774] of either the applicant becoming aware of the disclaimer, or of the receipt of a copy of the liquidator's notice of disclaimer, whichever is the earlier.[775] The application must be supported by a witness statement in accordance with r.19.11(3) which includes those matters referred to in the paragraph.

The applicant must, not later than five business days before the date fixed, deliver to the liquidator notice of the venue, accompanied by copies of the application and the filed witness statement.[776] On hearing the application, the court may give directions as to any other persons to whom notice of the application and the grounds on which it is made should be delivered.[777] The court must deliver sealed copies of any order made on the application to the applicant and the liquidator.[778] If the property disclaimed is of a leasehold nature, and s.179 applies to suspend the effect of the disclaimer, the court's order must include a direction giving effect to the disclaimer.[779] However, this does not apply if, before the order is drawn up, other applications under s.181 are pending in relation to the same property.[780]

When hearing the application the court may make an order, on such terms as it thinks fit, for the vesting of the property in, or for the delivery to, a person entitled to it or a trustee for such a person, or a person subject to liability in respect of the disclaimed property and not being a liability that is discharged by the disclaimer.[781]

In *Re Spirit Motorsport Ltd (in liq)*,[782] directors of a company that was in liquidation sought to make an application as persons who were under a liability in respect of disclaimed property of their company. The property had been disclaimed by the Crown after it had received it as bona vacantia. The directors had guaranteed the debts of the company. Laddie J said that the directors could not make the application as they were not persons under a liability in respect of disclaimed property. A court is not to make an order where an application has been made by a person who is under any liability in respect of the disclaimed property except where it appears that it would be just to do so for the purpose of compensating the person subject to the liability.[783] In making a vesting order under s.181, the court has a wide discre-

---

Compare *Re Vedmay Ltd* [1994] 1 B.C.L.C. 676 where the court accepted that the claimants did not have a proprietary interest, rather they had the mere status of irremovability. However, the court said that as the claimants had a financial interest in the lease they could bring an application under s.181. In *Re Ballast*, it was held that any right granted to an insurer by way of subrogation did not constitute a proprietary interest in any cause of action which the company ("the assured") might have against another party (although it might have an interest in the proceedings of the action) until the action is assigned (at 41 and 100). For a critical discussion of the case, see Ho, "Of proprietary restitution, insurers' subrogation and insolvency set-off—the untenable case of Re Ballast" (2007) 23 I.L.& P. 103.

774 This period may be extended by a court: *W.H. Smith Ltd v Wyndham Investments Ltd* [1994] B.C.C. 699. For a recent case where the time was extended, see *Re Cadmus Management Ltd* [2016] EWHC 3330 (Ch); [2017] B.P.I.R. 317. The application for a vesting order was, however, refused.

775 2016 Rules r.19.11(2).

776 2016 Rules r.19.11(5).

777 2016 Rules r.19.11(6).

778 2016 Rules r.19.11(7).

779 2016 Rules r.19.11(8).

780 2016 Rules r.19.11(9).

781 1986 Act s.181(3).

782 *Re Spirit Motorsport Ltd (in liq)* [1996] 1 B.C.L.C. 684.

783 1986 Act s.181(4).

tion and it is wide enough to permit a court to order that the surplus proceeds of the sale of a lease, in which no one had an interest, be given back to the liquidator.[784]

It is important to note that s.182(1) sets out restrictions on the power of the court to vest property of a leasehold nature in any person claiming under the company as an underlessee or mortgagee. Vesting can only be ordered in favour of an underlessee or mortgagee where the terms of the order make the person subject to the same liabilities and obligations as the company was subject to under the lease at the commencement of the winding up or, if the court thinks fit, subject to the same liabilities and obligations as that person would be subject to if the lease had been assigned to him or her at the commencement of the winding up. Where s.182(1) is applicable and no person claiming as an underlessee or mortgagee is willing to accept an order pursuant to s.181 (vesting in or delivery to that person), the court may vest the company's estate or interest in the property in any person who is liable to perform the lessee's covenants in the lease.[785] The court has the power to vest the estate and interest in the property in such a person freed and discharged from all estates, incumbrances and interests which had been created by the company.[786] In the situation where a person claims as an underlessee or mortgagee, but declines to accept an order under s.181 then he or she is excluded from all interest in the property.[787]

**(d) Effect of disclaimer** The basic principle of the notion of disclaimer is that while it is likely to have an effect on others, the rights and obligations of such persons are to be affected as little as possible and only "to the extent necessary to achieve the primary object: the release of the company from all liability".[788] In *Capital Prime Properties Plc v Worthgate Ltd*,[789] Neuberger J followed on from this and said that when assessing the impact of disclaimer courts are to apply a test based on commercial sense and the disruption on others should be minimised. The judge said that there was nothing in s.178 which suggested that a disclaimer undoes contractual rights and benefits that had already vested.[790] The general effect of a disclaimer is to determine, as from the date of the disclaimer, the rights, interests and liabilities of the company in respect of the property disclaimed but does not affect the rights and liabilities of any other persons, except as necessary in order to release the company and its property from liability.[791] Since in most cases disclaimer inevitably does release the company from liability,[792] those affected by the disclaimer are given a right to prove as creditors of the company for the amount of the loss sustained[793] together with a right to apply for a vesting order or order for **9-099**

784 See *Lee v Lee* [1999] B.P.I.R. 926; [2000] B.C.C. 500 CA. This was a bankruptcy case and dealt with s.320.
785 1986 Act s.182(3).
786 1986 Act s.182(3).
787 1986 Act s.182(4). This provision is only able to apply to persons who have a proprietary interest in the property. It does not include someone who has a statutory tenancy: *Re Vedmay Ltd* [1994] 1 B.C.L.C. 676.
788 *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 HL at 644 per Lord Nicholls.
789 *Capital Prime Properties Plc v Worthgate Ltd* [2000] B.C.C. 525.
790 *Capital Prime Properties Plc v Worthgate Ltd* [2000] B.C.C. 525.
791 1986 Act s.178(4).
792 See *Re Katherine et Cie Ltd* [1932] 1 Ch. 70.
793 1986 Act s.178(6). For as discussion of the principles to be applied under this provision in relation to a disclaimed lease, see *Re Park Air Services Ltd* [1996] 1 B.C.L.C. 547.

delivery of the property disclaimed.[794] The effect of a vesting order under s.181 will be taken into account for the purpose of determining the extent of the loss sustained as a result of disclaimer.[795]

The precise consequences of a disclaimer vary according to the nature of the property disclaimed. A person suffering loss as a result of a disclaimer is required at common law to mitigate the damage sustained.[796] Where a lease is disclaimed it becomes a lease without an owner, but it does not cease to exist except when the usual ways of terminating a lease occur, namely expiration of the term, surrender or the landlord retakes possession.[797] If a disclaimer is made in relation to any land subject to a rentcharge, and that land vests by operation of law in the Crown or in any other person,[798] then according to s.180(2) the one in whom the property is vested (including the Crown) is not subject to personal liability in respect of any sums becoming due under the rentcharge except sums becoming due after possession or control of the land or the entering into of occupation following the making of the vesting order.

Unless a court makes a vesting order in relation to the interest of the company which is disclaimed, that interest vests in the Crown automatically as bona vacantia.[799] The company's rights under a contract do not vest in the Crown, but will terminate. The position with land is dealt with below.

**9-100** *(i) Freehold land* Such property is able to be classified as onerous property.[800] Although it may not be considered that a liquidator would want to disclaim freehold land, it seems that disclaimer of such property has increased in recent years,[801] often because of contamination of the land. Upon the liquidator's disclaiming of freehold land, the title to the interest disclaimed revests in the Crown on the basis of escheat[802] unless a vesting order is made in favour of some other person. Such an order might be made in favour of a consenting mortgagee or other incumbrancer in order to compensate for the company's failure to discharge its liability.

A legal charge and the leases of tenants would survive a disclaimer.[803] In *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd*,[804] a company disclaimed its freehold interest in land and over which a bank held a mortgage. The court said that as the disclaimer ended the freehold interest the Crown became the owner, but the mortgage survived the disclaimer and, hence, the bank was able to sell its interest in the property to tenants of the property.

**9-101** *(ii) Leasehold land*[805] With the disclaimer of leasehold interests, the legal position is quite straightforward where only the lessor and the company as lessee are

---

[794] 1986 Act s.181(2).
[795] 1986 Act s.181(5).
[796] *Re Hide* [1871-72] L.R. 7 Ch. App. 28.
[797] *W.H. Smith Ltd v Wyndham Investments Ltd* [1994] 2 B.C.L.C. 571; [1994] B.C.C. 699.
[798] 1986 Act s.180(1).
[799] *Re Mercer & Moore* (1880) 14 Ch. D. 287.
[800] *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd* [1995] B.C.C. 793 at 797.
[801] *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd* [1995] B.C.C. 793 at 797.
[802] *Re Mercer & Moore* (1880) 14 Ch. D. 287; *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd* [1995] B.C.C. 793. Land can never be without an owner: *Scmella Properties* at 798. The effect of escheat on subordinate interests is discussed in *Scmlla Properties* at 806–808.
[803] *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd* [1995] B.C.C. 793.
[804] *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd* [1995] B.C.C. 793.
[805] See McCartney, "Disclaimer of leases and its impact: the 'pecking order'" (2002) 18 I.L. & P. 79.

involved[806]: here the disclaimer terminates all the company's liabilities and rights, and the rights of the lessor,[807] and there is no need for an order vesting the property in the lessor since the effect is simply to accelerate the lessor's interest.[808] Where the company is the sub-lessee, the original lessee is not affected,[809] and is still liable until the lease expires or is determined,[810] and, as between a sub-lessor and the company (as sub-lessee), the position is the same as in the first example.[811] But it is more complicated where the company is the sub-lessor[812]; here the effect as between the company and sub-lessee is to extinguish the rights and liabilities of the latter.[813]

In *Hindcastle Ltd v Barbara Attenborough Associates Ltd*,[814] Lord Nicholls identified three categories of leaseholds involving land where disclaimer had an effect. They are[815]:

- a landlord and tenant are involved;
- a situation where others have a liability in relation to the lease; and
- a situation where others have an interest in the property.

In the most common situation, namely the first of the above situations and where the company is the tenant, the landlord's rights under the tenancy are determined,[816] but he or she has, under s.178(6), a right to prove in the winding up for loss sustained as a result of the disclaimer, such as non-receipt of future rent.[817] There is no scope for any rights or liabilities to be preserved by s.178(4).[818]

While the liabilities of a company pursuant to a lease are terminated when a liquidator disclaims an interest in the lease, this does not determine the covenants in the lease for all purposes.[819] What about where a person has guaranteed the lease payments which were to be paid by the company whose liquidator has disclaimed **9-102**

---

806 For a general account, see *Re Finley* (1888) 21 Q.B.D. 475; *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70; [1996] B.C.C. 636 HL.

807 The result is that the lessor is entitled to possession but not to future rent: *Re Park Air Services Plc* [1999] B.C.C. 135 at 140 HL.

808 *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70 at 87; [1996] B.C.C. 636 at 644; *Re Park Air Services Plc* [1999] B.C.C. 135 at 137.

809 *Hill v East & West India Dock Co* (1884) 9 App. Cas. 448; *Re Finley* (1888) 21 Ch. D. 475 at 485; *Warnford Investments Ltd v Duckworth* [1978] 2 W.L.R. 741.

810 *W.H.Smith Ltd v Wyndham Investments Ltd* [1994] 2 B.C.L.C. 571; [1994] B.C.C. 699.

811 *Scmlla Properties Ltd v Gesso Properties (BVI) Ltd* [1995] B.C.C. 793; the sub-lessor can prove for the loss sustained by reason of the company's failure to perform its covenants; *Re Ice Rinks (Timaru) Ltd* [1955] N.Z.L.R. 641 at 641.

812 See *Re A.E. Realisations (1985) Ltd* [1988] 1 W.L.R. 200; (1987) 3 B.C.C. 136.

813 *Re Finley* (1888) 21 Ch. D. 475.

814 *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70; [1996] B.C.C. 636.

815 *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70; [1996] B.C.C. 636 at 644–646.

816 *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70 at 90; [1996] B.C.C. 636 at 645 HL.

817 See s.178(6). How compensation is assessed in a leasehold situation was discussed by the House of Lords in *Re Park Air Services Plc* [1999] B.C.C. 135.

818 *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70 at 90; [1996] B.C.C. 636 at 645.

819 *Hill v East and West India Co* (1884) 9 App Cas 448; *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1994] 4 All E.R. 129; [1994] B.C.C. 705 CA; *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70; [1996] B.C.C. 636 HL; *Sandtara Pty Ltd v Abigroup Ltd* (1996) 19 A.C.S.R. 578. Compare *Stacey v Hill* [1901] 1 Q.B. 660; *Warnford Investments Ltd v Duckworth* [1978] 2 All E.R. 517; *Re Yarmarine (IW) Ltd* [1992] B.C.C. 28.

the lease? *Stacey v Hill*[820] held that a disclaimer of a lease led to the termination of the obligations of a guarantor or surety for future liabilities under the lease. This conflicted with the decision of the House of Lords in *Hill v East & West India Dock Co*[821] and produced some uncertainty in the law and some tortuous efforts to distinguish either of the cases. In 1996 the House of Lords in *Hindcastle Ltd v Barbara Attenborough Associates Ltd*,[822] resolved the problem by, inter alia, overruling *Stacey v Hill*. In that case a landlord granted a lease of commercial premises to X Ltd. Later X Ltd assigned it to Y Ltd which agreed to pay the rent and perform the lessee's covenants during the remaining part of the term of the lease. One of Y Ltd's directors, Z, agreed to guarantee the obligations of Y Ltd for 10 years. Subsequently, Y Ltd assigned the lease to A Ltd. A Ltd then went into creditors' voluntary liquidation and its liquidator disclaimed the lease. The landlord brought proceedings against X Ltd, Y Ltd and Z for unpaid rent and other money due both before and after the disclaimer. The landlord obtained summary judgment and X Ltd went into compulsory liquidation and was not involved any further in the proceedings. Y Ltd also went into liquidation and its liquidator disclaimed any liability pursuant to the lease. Z argued that this disclaimer had the effect of ending his liability as guarantor. At first instance Simon Goldblatt QC (sitting as a deputy High Court judge) gave judgment for the landlord. Y Ltd and Z appealed. The Court of Appeal dismissed the appeals.[823] Y Ltd and Z then appealed to the House of Lords.

The leading speech in the House of Lords was delivered by Lord Nicholls who stated that it is not a necessary legal concomitant of the termination of the company's liabilities that the guarantor's obligations to the landlord are also terminated.[824] His Lordship went on to say that the legal rights of recourse of the guarantor could be determined without releasing the guarantor from his liability to the landlord; this liability survived the extinguishment of the guarantor's right of recourse.[825] The problem that their Lordships had to deal with was: if the lease ended on disclaimer then the guarantor could not be held liable, but if the lease did not come to an end, so that rent could continue to accrue, what happens to the lease taking into account the fact that A Ltd's interest in the property had been disclaimed?[826] Lord Nicholls pointed out that the Act envisages the fact that a person may be liable to perform the covenants of the tenant even following disclaimer; a vesting order can be made under s.182.[827] His Lordship said that one must see the statute taking effect as a deeming provision so far as the preserved rights and obligations of persons other than the insolvent.[828] That is the rights and liabilities of persons such as guarantors are to remain as though the lease had continued and not been determined.[829] If no vesting order is made and the landlord takes possession then the obligations of persons such as a guarantor come to an end as far as the

---

[820] *Stacey v Hill* [1901] 1 Q.B. 660.
[821] *Hill v East & West India Dock Co* (1884) 9 App. Cas. 448.
[822] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70; [1996] B.C.C. 636.
[823] See *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1994] 4 All E.R. 129; [1994] B.C.C. 705.
[824] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70 at 88; [1996] B.C.C. 636 at 645.
[825] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 645.
[826] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 645.
[827] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 645.
[828] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 645.
[829] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 646.

future is concerned.[830] Later in his speech Lord Nicholls explained that the fundamental purpose of having a guarantee was to ensure that if insolvency of the principal debtor eventuated the creditor would be protected, so if the liability of the guarantor was terminated by the disclaimer of the principal debtor then the whole idea of having a guarantee would be made otiose.[831] The guarantor can, of course, prove in the estate of the principal debtor under s.178(6).

It follows from the House of Lords' decision in *Hindcastle* that if the landlord of a disclaimed lease assigns the lease to another, the latter could enforce the obligations of any guarantors of the company's liability under the lease.[832] What a guarantor needs to do when a debtor company disclaims a lease is to reduce his or her liability by finding a new tenant for the premises.[833]

The Court of Appeal has applied similar reasoning as that found in *Hindcastle* **9-103**
in relation to a charge which continued to exist after disclaimer of an agreement to sell the land over which the charge was held.[834]

For the most part it is the company that has entered liquidation who will be the tenant and will want to disclaim. But it is possible that the company could be the landlord. If it wishes, the company through its liquidator, is able to disclaim a lease that it had granted as landlord, according to the Australian case of *Re Willmott Forests Ltd (in liq)*.[835] In this case the Australian High Court said that if a liquidator wishes to disclaim a lease that the company had granted as landlord, then such disclaimer does extinguish the tenant's interest in the property. Effectively the High Court of Australia (affirming the decision of the Victorian Court of Appeal below) held that the principle in *Hindcastle* applies equally to the disclaimer of a lease by a landlord, as the disclaimer necessarily extinguishes the tenant's interest.[836] The Australian case has not thus far been considered in England and Wales but, given the *Hindcastle Ltd v Barbara Attenborough Associates Ltd* decision, it would seem likely that it will be and it may well be followed.

The result of the decision in *Hindcastle Ltd v Barbara Attenborough Associates Ltd* is that a guarantor of the obligations under a lease and the original lessee of the lease which has been assigned are able to be classified under s.181(2)(b) as persons who are under a liability in respect of disclaimed property and they could apply for a vesting order, which could possibly ameliorate their positions as they could rent out or use the premises.[837] Having said that, it would probably be preferable if the landlord entered into possession, thereby determining their obligations for future rent, and leaving them only liable for past amounts outstanding.

In Australia the decision in *Stacey v Hill*,[838] which once applied has also not been followed in recent times by an appellate court. In *Sandtara Pty Ltd v Abigroup Ltd*,[839] S granted a lease to C, the obligations of which were guaranteed by A. Subsequently C was wound up and C's liquidator disclaimed the lease. The

---

[830] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 646.
[831] *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1996] B.C.C. 636 at 650.
[832] *Scottish Widows Plc v Tripipatkul* [2004] B.C.C. 200; *RVB Investments Ltd v Bibby* [2013] EWHC 65 (Ch).
[833] *Bhogal v Mohinder Singh Cheema* [1999] B.P.I.R. 13.
[834] *Groveholt Ltd v Hughes* [2005] EWCA Civ 897; [2005] B.P.I.R. 1345.
[835] *Re Willmott Forests Ltd (in liq)* [2013] HCA 51.
[836] See the discussion of the *Willmott* decision in Cranston, "The impudence of liquidators: the scope and limits of disclaimer" (2014) 7 C.R. & I. 3.
[837] Compare the decision in *Re No.1 London Ltd* [1991] B.C.L.C. 501 as far as guarantors are concerned.
[838] *Stacey v Hill* [1901] 1 Q.B. 660.
[839] *Sandtara Pty Ltd v Abigroup Ltd* (1996) 19 A.C.S.R. 578.

disclaimer was not challenged. The parties agreed that the disclaimer ended the guarantee. S brought proceedings against A under the guarantee for damages in relation to rent which would have been due if there had been no disclaimer. At first instance, Bainton J of the New South Wales Supreme Court said, in relying on *Stacey v Hill*, that A was not liable as C was not liable for rent after the lease had been disclaimed and as a consequence the guarantor's obligation to pay, if the lessee did not pay, also terminated. On appeal S successfully had the decision overturned. The appeal court refused to follow *Stacey v Hill* and held that A remained liable to the lessee under the lease both in respect of unpaid rent that accrued before re-entry and in damages for loss of future rent.[840] The Court said that C was only released from its obligations under the lease and its obligations to indemnify A if it paid the rent payable; the provision did not release other parties, such as the guarantor.[841] Furthermore, the Court held that the guarantor's right to indemnity from the company is terminated by the disclaimer,[842] although the guarantor could prove in the winding up.[843]

**9-104** It has always been accepted that if a lease which has been assigned is in fact disclaimed, the disclaimer does not determine a continuing liability of the original lessee and anyone who guaranteed the liability of the original lessee (and assignor).[844] However, if a lease was entered into after 1 January 1996 and was assigned and the assignee disclaims then the original lessee will not, because of the Landlord and Tenant (Covenants) Act 1995, be liable for future rent and meeting the covenants of the assignee as he or she is automatically discharged from such liability on assignment of the lease.[845] But if an original lessee guaranteed rent payments and other covenants by a sub-lessee company that goes into liquidation and disclaims, after disclaimer the lessee would be liable under the guarantee for any breaches.[846] According to *Shaw v Doleman*,[847] the Landlord and Tenant (Covenants) Act 1995 made no difference as far as the liability of a guarantor was concerned, and the *Hindcastle* ruling applies. So, a disclaimer by a tenant company in liquidation which took an assignment of a lease will free the assignor from liability, but not if the assignor were to have given a guarantee to the landlord concerning compliance with the terms of the covenants.

Where a company holds a leasehold interest as a tenant and the company's liquidator disclaims the interest then the obligation to pay rates on the property reverts to the landlord, even though the tenant's obligations to pay rent were guaranteed and even if the landlord does not actually re-take possession.[848]

**9-105** *(iii) Shares* It is essential that the liquidator should disclaim any shares standing in the name of the company in order to free the company from liability for future calls. Of course, if the shares are fully paid there is nothing to be gained usually from disclaiming them.

---

840 *Sandtara Pty Ltd v Abigroup Ltd* (1996) 19 A.C.S.R. 578 at 581.
841 *Sandtara Pty Ltd v Abigroup Ltd* (1996) 19 A.C.S.R. 578 at 586.
842 *Sandtara Pty Ltd v Abigroup Ltd* (1996) 19 A.C.S.R. 578 at 589.
843 *Sandtara Pty Ltd v Abigroup Ltd* (1996) 19 A.C.S.R. 578.
844 *Hill v East & West India Dock Co* (1884) 9 App. Cas. 448; *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1994] B.C.C. 705; *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70; [1996] B.C.C. 636 HL.
845 See Landlord and Tenant (Covenants) Act 1995 ss.1(1), (3), 5(1)–(2), 31(1).
846 *Shaw v Doleman* [2009] EWCA Civ 279; [2009] B.C.C. 730.
847 *Shaw v Doleman* [2009] B.C.C. 730.
848 *Schroder Exempt Property Unit Trust v Birmingham City Council* [2014] EWHC 2207; [2014] B.C.C. 690.

*(iv) Contracts* Contracts not determined by the liquidation of the company may be disclaimed by the liquidator in the course of the winding up only where they are unprofitable. Disclaimer occurs sometimes where the contract is of a kind which imposes continuing obligations,[849] the effect being to bring the company's liabilities to an end, leaving the other party with a right of proving for damages in the winding up.[850] As noted earlier, a contract cannot be disclaimed merely because the property that is the subject of the contract can be sold by a liquidator more readily and at a higher price if a contract was not in place, as this will not in itself mean that the contract is unprofitable.[851] **9-106**

## K. Duty to distribute to creditors

After paying off expenses of the liquidation and other priority claims that are set out in r.6.42 for creditors' voluntary liquidations and r.7.108 in compulsory liquidations, the liquidator has a duty to distribute what remains, if anything, to the creditors. This distribution must be in accordance with the Act and will entail the payment of some creditors, such as the payment of employees within statutory limits, in priority to general creditors.[852] This duty is not able to be delegated to anyone else.[853] **9-107**

## L. Duty to distribute surplus assets

When all the assets of the company have been got in and realised, and all the debts and liabilities, including the costs of winding up, have been paid or provided for, which will not occur where a company was insolvent, the liquidator may proceed to distribute any surplus among the members of the company.[854] Their rights of sharing in the distribution may be prescribed in the memorandum or articles of association, but subject to these, the principle is one of equality.[855] In order to carry this into effect, it may be necessary for the liquidator to adjust the rights of the contributories inter se by making calls on those who have paid less on their shares than their fellow members in order to ensure that losses are evenly distributed among all the members of the company.[856] Once this stage has been reached the liquidator is virtually a bare trustee for the members,[857] who can call upon the liquidator to distribute the remaining assets either in their liquidated form or in specie.[858] Any amounts in the hands of the liquidator which have remained unclaimed or not distributed after dissolution or the liquidator's earlier vacation of office, and which represent unclaimed or undistributed assets of the company, are to be paid immediately to the Insolvency Service Account kept with the Bank of England[859] and anyone who believes that they are entitled to a sum of money may apply to the Department of Business, Energy and Industrial Strategy for payment. **9-108**

---

849 Compare *Re Premier Products Ltd* [1965] N.Z.L.R. 50.
850 See 1986 Act s.178(6).
851 *Re Blue Sennar Air Pty Ltd (in liq)* [2016] NSWSC 772.
852 This is discussed in detail in Ch.13 below.
853 *Cavanagh v Conway* [2015] NIQB 69.
854 See *Ayerst v C&K (Construction) Ltd* [1976] A.C. 167 HL at 177.
855 1986 Act s.107 and 2016 Rules r.14.12(1)–(2).
856 See below at paras 10-002–10-003.
857 *Miller & Maund Ltd v Commissioner of Stamp Duties* [1959] Tas. S.R. 94.
858 See *March v Martin* [1880] W.N. 111; *Re English & Foreign Credit Co* (1884) 1 T.L.R. 1.
859 Insolvency Regulations 1994 reg.18.

If, unusually, a company which is being wound up in insolvency and by way of compulsory liquidation, has a surplus, then s.154 provides that the court will distribute any surplus to those entitled to it. The liquidator is not permitted to make a distribution. He or she may only distribute it after obtaining special leave from the court.[860] The liquidator must apply to the court for an order under r.7.117. A list of persons to whom it is intended to return capital must accompany the application.[861] If an order is made then the liquidator is sent a sealed copy of the order[862] and the liquidator is to follow the procedures set out in r.7.118.

## M. Duty to bring about dissolution

**9-109** The final step in the winding up is to procure the dissolution of the company.[863] This occurs after the liquidator has completed the winding up, made the final distributions to creditors (in insolvent liquidations) and distributions representing surplus assets to members of the company in solvent liquidations. The procedure for doing so under the legislation pre-dating the Act used to vary according to whether the company had been wound up compulsorily or voluntarily. This is no longer the case. This topic is discussed in depth in Ch.17 below.

## IV. Supervision and Control of Liquidators

**9-110** It is clear that, in essence, liquidators, as experienced professionals, are trusted to act reasonably, carefully and properly, and as a consequence they have a good deal of freedom to conduct a winding up in accordance with their discretion. Notwithstanding that, the Act does make some provision for supervision and control over liquidators.

The creditors and contributories are able to exercise some measure of direct control over liquidators in the performance of their duties through the medium of decision procedures and meetings which it is their duty to seek or call from time to time.[864] Apart from this, however, it is primarily to the court and the Secretary of State that the creditors and contributories must look for effective protection against misconduct or errors on the part of liquidators. Liquidators may seek the decisions of creditors and contributories to ascertain their views[865] but they are not bound to follow those views. However, it would be normal for liquidators to give weight to the opinion of the majority of the creditors unless either the creditors were influenced unduly by extraneous considerations or where special circumstances existed.[866] According to Snowden J in *Re Longmeade Ltd*:

> "[I]f *all* the persons having an interest in the insolvent company are fully informed and of the same view, then it seems to me that the liquidator would ordinarily be obliged to give effect to that view. That follows from the fact that liquidation is a statutory scheme

[860] For an Australian case where this occurred, see *Re DS Millard & Son Pty Ltd* (1997) 15 A.C.L.C. 808; (1997) 24 A.C.S.R. 71.
[861] 2016 Rules r.7.117(2). Also, see r.7.117(3).
[862] 2016 Rules r.7.117(4).
[863] See Ch.17 below.
[864] See 1986 Act s.168(1)–(2).
[865] See 1986 Act s.195.
[866] *Re Longmeade Ltd* [2016] EWHC 356 (Ch); [2016] B.P.I.R. 666 at [51]. This case related to whether there should be a commencement of proceedings in order to benefit the company.

under which the property of the company can is to be realised and distributed for the benefit of those entitled …"[867]

As we will see shortly, creditors and contributories can initiate the process which leads courts to consider the actions of liquidators.

Under the Act this protection against the actions of the liquidator assumes four principal forms: by virtue of ss.171 and 172 the court may take cognisance of the conduct of liquidators and inquire into complaints in regard thereto and ultimately remove a liquidator[868]; by s.212(3) the court may examine the conduct of a liquidator[869]; and by s.168(5) for compulsory liquidations it may, on the application of a person aggrieved by an act or decision of a liquidator, confirm, reverse or modify any act or decision of the liquidator and make such order as it thinks just.[870] This power can be exercised by a court in a voluntary liquidation because s.112 provides that on an application by a creditor or contributory the court may exercise any of the powers which it can exercise if the company was subject to compulsory winding up. The final form of protection is found in s.167(3), which provides that the powers of a liquidator, conferred by s.167 (and incorporating those set out in Sch.4 to the Act), are subject to the control of the court and that a creditor or contributory may apply to the court in relation to any exercise or proposed exercise of any of the powers. Removal was discussed in detail in Ch.8. We turn our focus now to the examination of the conduct of a liquidator, the review of acts or decisions of liquidator and the control of a liquidator.

## A. Examination into conduct

On the application of a creditor, contributory or official receiver the court may engage in an examination of the conduct of a liquidator. Where there is such an examination the court may order a liquidator to repay, restore, account for money or property, or contribute such sum to the assets of the company by way of compensation in relation to any misfeasance or breach of fiduciary or other duty as the court thinks fit.[871] While little has been said in England about the provision, in the context of liquidators, the courts in Australia have found it necessary to discuss it on more than a few occasions. It has been held, in relation to the Australian equivalent of s.212(3),[872] that before a court will inquire into the conduct of a liquidator the complainant must make out a prima facie case, in the view of the court, that there is something which requires an inquiry to be conducted.[873] In *Burns Philp Investments Pty Ltd v Dickens*,[874] Young J of the New South Wales Supreme Court was confronted with the issue of whether an examination into conduct was **9-111**

867 *Re Longmeade Ltd* [2016] EWHC 356 (Ch); [2016] B.P.I.R. 666 at [53]. Whether it is the creditors or the contributories will depend on what sort of winding up is in existence and whether the company was solvent or not.

868 See above at paras 8-081–8-099.

869 The provision also permits the examination of the conduct of several people, besides a liquidator. These persons are enumerated in s.212(1). The provision is discussed in Ch.16 below.

870 For an example of an application under this provision, see *Re ACLI Metals (London) Ltd* (1989) 5 B.C.C. 749.

871 1986 Act s.212(3).

872 Corporations Act 2001 s.536.

873 *Re Siromath Pty Ltd (No.3)* (1991) 9 A.C.L.C. 1587 at 1590; *Burns Philp Investments Pty Ltd v Dickens* (1993) 11 A.C.L.C. 272; *Re Biposo Pty Ltd*; sub nom. *Condon v Rodgers* (1995) 120 F.L.R. 399 at 403; *Vink v Tuckwell* [2008] V.S.C. 100; [2008] 216 F.L.R. 309 at [84].

874 *Burns Philp Investments Pty Ltd v Dickens* (1993) 11 A.C.L.C. 272.

automatic or whether the court had to be persuaded that an examination should take place. His Honour said:

> "The court must be given some material to suggest that it would be in the public interest to conduct an inquiry. That means that the complaint of the plaintiffs must put forward material which, prima facie, satisfies the court of that matter. Just what will satisfy the court will obviously depend on the circumstances."[875]

If this is done then it is in the court's discretion whether it will engage in an inquiry.[876] In *Hall v Poolman*,[877] the New South Wales Court of Appeal did not favour the approach in *Burns*, preferring the view that an applicant only had to demonstrate that there was something about the liquidator's performance of duties or observance of requirements that provided a sufficient basis for inquiring into the conduct of a liquidator.

It would seem that the court must be satisfied that an examination is in the public interest.[878] It has been held that a court may consider any evidence that pertains generally as to the liquidator's fitness for office.[879]

**9-112** Australian courts are wary about allowing people to set in train an examination of a liquidator,[880] although some of the statements in *Hall v Poolman*[881] might be said to demonstrate a greater willingness to embrace claims against liquidators. It has been stated that if a creditor wishes to challenge the decision of a liquidator, apparently arrived at in good faith, then it is not appropriate to seek to employ the equivalent of s.212; rather it is more appropriate to appeal against the decision under the equivalent of s.168(5).[882] This is because the former is concerned with aspects of the conduct of liquidators which are likely to attract sanctions for disciplinary reasons.[883]

In Australia anyone who applies for an inquiry order must show a "sufficient basis" for making an order, that there is something that requires inquiry. The factors that are relevant to the exercise of the court's discretion in determining whether an order for an inquiry should be made are: the strength and nature of the allegations, any responses given by the liquidator, other available remedies, the stage of the liquidation, likely amounts of money involved, the availability of funds to pay for an inquiry, the legitimate interest of the applicant in the outcome and the likely benefit to be derived from conducting an inquiry.[884]

The court may, on examining the conduct of a liquidator, make orders where it is concluded that the liquidator is guilty of misfeasance.[885] Misfeasance is a broad term[886] as Evershed MR pointed out in *Re B Johnson & Co (Builders) Ltd*,[887] where his Lordship said, in relation to "misfeasance" in the context of a predecessor of

---

875 *Burns Philp Investments Pty Ltd v Dickens* (1993) 11 A.C.L.C. 272 at 273. This approach was essentially approved of in *Vink v Tuckwell* [2008] V.S.C. 100; [2008] 216 F.L.R. 309 at [84].
876 *Vink v Tuckwell* [2008] V.S.C. 100; [2008] 216 F.L.R. 309 at [84].
877 *Hall v Poolman* [2009] N.S.W.C.A. 64.
878 *Hall v Poolman* [2009] N.S.W.C.A. 64 at [86].
879 *A.S.I.C. v Edge* [2007] VSC 170; (2007) 211 F.L.R. 137 at [81] and [98].
880 *A.S.I.C. v Edge* [2007] VSC 170; (2007) 211 F.L.R. 137 at [81] and [98].
881 *Hall v Poolman* [2009] N.S.W.C.A. 64.
882 Corporations Act 2001 s.1321. See *Belvista Pty Ltd v Murphy* (1993) 11 A.C.S.R. 628 at 630.
883 *Northbourne Developments Pty Ltd v Reiby* (1990) 8 A.C.L.C. 39 at 43.
884 *Re Aboriginal Councils and Associations Act 1976 v Hennessy* [2001] FCA 371 at [6]; *ACN 153 364 491 Ltd (in liq) v GP No.1 Pty Ltd (in liq); Re GP No.1 Pty Ltd (in liq) (No.3)* [2020] FCA 694.
885 1986 Act s.212(1).
886 See below at paras 16-005–16-028 for a more detailed discussion of misfeasance.

s.212:

> "There is no such distinct wrongful act known to the law as 'misfeasance.' The acts which are covered by the section are acts which are wrongful, according to the established rules of law or equity, done by the person charged in his capacity as 'promoter, director,' etc [including a liquidator]. But it is clearly established that it is not every kind of wrongful act so done that is comprehended by the section. At one end of the scale it may, I think, be taken as prima facie clear that a wrongful act involving misapplication of property in the hands of the persons charged would be covered by its terms. At the other end of the scale, a claim based exclusively on common law negligence, an ordinary claim for damages simply, would not be covered by the section … But in between the two extremes that I have mentioned there is obviously a large range of conduct which may (or may not) be within the section."[888]

The Australian High Court in *Walker v Wimborne*[889] said, in relation to the then New South Wales' equivalent of s.212 (s.367B(1) of the Companies Act 1961 (N.S.W.)), after approving of the words of Evershed MR:

> "However, it is well established that 'misfeasance' in this context means 'misfeasance in the nature of a breach of trust, that is to say, it refers to something which the officer … has done wrongly by misapplying or retaining in his own hands any moneys of the company or by which the company's property has been wasted, or the company's credit improperly pledged."[890]

It should be noted that there are two limitations on applications brought pursuant to s.212(3). First, a contributory may only bring an application under s.212 if he or she first obtains the leave of the court. But unlike under other provisions where a contributory can have little influence in a winding up unless it can be demonstrated that the contributory will benefit from the winding up, s.212(5) states that leave of the court may be granted to contributories notwithstanding that they will not benefit from any court order. This must surely be because the legislature is most concerned that any improper or other questionable actions of the liquidator are brought to light whoever is the complainant; the role of the liquidator is critical and it is in the public interest that the law is seen to be providing access to all who may have knowledge of such actions of the liquidator. The second limitation is that if a liquidator has received a release then a person who intends be an applicant for an order under s.212(3) must obtain the leave of the court. **9-113**

## B. Review of acts or decisions

The jurisdiction conferred by s.168(5) in relation to compulsory liquidation (and to voluntary liquidation through s.112)[891] can only be exercised in consequence of an application by a person who is aggrieved by an act, omission or decision of the liquidator. Defining an applicant's locus standi in this way is a device commonly employed in the drafting of statutory provisions,[892] but despite innumerable attempts to clarify it, the meaning of the term has not yet been settled. The classic **9-114**

---

887 *Re B Johnson & Co (Builders) Ltd* [1955] Ch. 634.
888 *Re B Johnson & Co (Builders) Ltd* [1955] Ch. 634 at 648.
889 *Walker v Wimborne* (1976) 3 A.C.L.R. 529.
890 *Walker v Wimborne* (1976) 3 A.C.L.R. 529 at 533.
891 See *Re Hans Place Ltd* [1992] B.C.C. 737 at 741.
892 The use of this expression first appeared in s.90 of the Bankruptcy Act 1883 and was borrowed by

definition is that in *Ex p. Sidebotham*,[893] where James LJ expressed the view that, for a person to be aggrieved, that person must be

> "a man who has suffered a legal grievance, a man against whom a decision has been pronounced which has wrongfully deprived him of something or wrongfully refused him something, or wrongfully affected his title to something".[894]

This has been criticised as being too narrow, and it is probably incorrect to restrict the range of potential applicants to those with a definite legal grievance.[895] The words "any person aggrieved" are very wide at first sight and are not on the face of it limited to creditors and contributories but it was not the legislature's intention that the words would encompass just any outsider.[896] For practical purposes, however, the definition is at least wide enough to include a creditor whose proof of debt has been rejected by the liquidator,[897] a creditor who wishes to complain because the dividend received has been reduced due to the fact that the liquidator admitted another creditor's claim,[898] a creditor where a liquidator has disposed of an asset at a undervalue,[899] a creditor who is also a director and excluded from a creditors' meeting,[900] and it may cover any type of creditor,[901] even perhaps a post-liquidation creditor.[902]

In *Stanford v Akers and McDonald (as Joint liquidators of Chesterfield United Inc)*,[903] a decision of the Court of Appeal of the Eastern Caribbean Supreme, it was said that whether a person has standing as an aggrieved person within the equivalent of s.168(5) (s.273 of the BVI Insolvency Act 2003) is not founded on whether he or she has a relationship to the liquidation but rather it must be demonstrated that the person has a legitimate interest in the relief sought,[904] and the more remote the relationship of the person to the liquidation, the less likely he or she will have a legitimate interest. In an earlier decision involving consideration of the BVI equivalent of s.168(3), the Court of Appeal of the Eastern Caribbean Supreme Court[905] said that the mere fact that a person, such as a creditor, had "technical capacity" to apply to review a liquidator's decision, does not mean that that in itself is sufficient to permit the application to be considered. The person, in order to be

---

the Companies (Winding up) Act 1890 (s.24): *Mahomed v Morris (No.2)* [2001] B.C.C. 233; [2000] 2 B.C.L.C. 536 at 554 CA.

893 *Re S. Ex p. Sidebotham* (1880) 14 Ch. D. 458.

894 *Re S. Ex p. Sidebotham* (1880) 14 Ch. D. 458 at 465. This was accepted in Australia in *Northbourne Developments Pty Ltd v Reiby* (1990) 8 A.C.L.C. 39 at 42–43.

895 Nourse LJ in *Re Edennote Ltd* [1996] B.C.C. 718 at 721; [1996] 2 B.C.L.C. 389 at 393 said that "[i]t is neither necessary nor desirable to attempt a classification of those who may be persons aggrieved …".

896 *Mahomed v Morris (No.2)* [2001] B.C.C. 233 at [24], [26].

897 *Re Taylor* [1934] N.Z.L.R. 117 at 127 (bankruptcy); *Re Capital Project Homes Pty Ltd* (1992) 10 A.C.L.C. 75.

898 *Re Capital Project Homes Pty Ltd* (1992) 10 A.C.L.C. 75.

899 *Re Edennote Ltd* [1996] B.C.C. 718 at 721; [1996] 2 B.C.L.C. 389 at 393.

900 *Re Chevron Furnishers Pty Ltd (receiver and manager appointed) (in liq)* (1992) 10 A.C.L.C. 1537.

901 *Re Edennote Ltd* [1996] B.C.C. 718 at 721; [1996] 2 B.C.L.C. 389 CA at 393.

902 In *Re Movitex Ltd* [1992] B.C.C. 101 at 107 the Court of Appeal, while not stating that such a creditor could apply, did not rule out the possibility.

903 *Stanford v Akers and McDonald (as Joint liquidators of Chesterfield United Inc), Appeal BVIHCMAP 2017/0019* 12 July 2018 available at: *https://www.eccourts.org/kevin-gerald-stanford-v-stephen-john-akers-et-al/* [Accessed 7 August 2020].

904 *Stanford v Akers and McDonald (as Joint liquidators of Chesterfield United Inc), Appeal BVIHCMAP 2017/0019* 12 July 2018 at [16], [34]

905 *ABN AMRO Fund Services (Isle of Man) 24 Nominees Ltd v Krys, BVIHCMAP: 11-16, 23-28 of 2016*

aggrieved within in the provision, must be aggrieved in the technical capacity and not in some other capacity. An alleged debtor, that is where a debt is denied, is not a person aggrieved.[906]

Harman J in *Re Port (A Bankrupt) (No.516 of 1987)*; sub nom. *Port v Auger*[907] said that a party, to fall within a person aggrieved must show that he or she has "some substantial interest which has been adversely affected by whatever is complained of."[908]

Certainly "person aggrieved" includes a contributory in certain circumstances.[909] It might be possible to argue from what the Court of Appeal said in *Brake v Lowes*,[910] that it was too narrow an approach to focus on whether there was a surplus in the liquidation, and that for a member to be able to fall within a person aggrieved it might be possible to say that he or she does not have to demonstrate that there was going to be a surplus.[911] The court later rejected the submission of counsel that in order to have a legitimate interest in the relief claimed under s.168(5), it is necessary for the applicant to have a direct financial interest.[912] Also included is someone who is directly affected by the exercise of a liquidator's power and otherwise would not be able to challenge that exercise of power,[913] such as a person affected by a disclaimer of company property.[914] But there is a tendency to limit the court's power to review in certain respects. It has been said that:

> "It could not have been the intention of Parliament that any outsider to the liquidation, dissatisfied with some act or decision of the liquidator, could attack that act or decision by the special procedure of s.168(5)".[915]

Also, ordinarily the power under s.168(5) does not extend to interference with matters of day-to-day administration or with the exercise in good faith of the liquidator's discretionary powers, since this would make it virtually impossible to carry out the winding up.[916] In *Re ACLI Metals (London) Ltd*,[917] Warner J said that the holding company of a company in liquidation which sought to prevent a liquidator from disclosing company documents to a creditor of the company, other than for the purposes of the liquidation, because the creditor had claims against the holding company, was not a person aggrieved in its position as the holding company,

---

20 November 2017 at [32] available at: *https://www.eccourts.org/abn-amro-fund-services-v-kenneth-krys/* [Accessed 7 August 2020].

906 *BVIHCMAP: 11-16, 23-28 of 2016, 20 November 2017* at [33].

907 *Re Port (A Bankrupt) (No.516 of 1987)*; sub nom. *Port v Auger* [1994] 1 W.L.R. 862; [1994] 3 All E.R. 200. The court was addressing the bankruptcy equivalent of s.168(5), namely s.303(1).

908 [1994] 1 W.L.R. 862 at 874.

909 *Re Edennote Ltd* [1996] B.C.C. 718 at 721; [1996] 2 B.C.L.C. 389 at 393.

910 *Brake v Lowes* [2020] EWCA Civ 1491; [2021] P.N.L.R. 10.

911 *Brake v Lowes* [2021] P.N.L.R. 10 at [79].

912 *Brake v Lowes* [2021] P.N.L.R. 10 at [84].

913 *Mahomed v Morris (No.2)* [2001] B.C.C. 233 at 240 per Peter Gibson LJ. In this case, the applicants were held not to be entitled to bring an application under s.168(5). The applicants claimed to be interested as sureties by way of subrogation in certain assets of the company in liquidation.

914 *Re Hans Place Ltd* [1992] B.C.C. 737; B.C.L.C. 768; *Mahomed v Morris* [2000] 2 B.C.L.C. 536 (CA) at 555. In the latter case, Peter Gibson LJ said that the decision in *Re Hans Place Ltd* was the only decision cited to the court which involved any applicant other than a creditor or a contributory.

915 *Mahomed v Morris (No.2)* [2001] B.C.C. 233 at 240, 555 per Peter Gibson LJ. Also, see *Re Chirnside* [1929] V.L.R. 217 at 224 (bankruptcy).

916 *Re A Debtor* [1949] Ch. 236 at 241; *Leon v York-o-Matic Ltd* [1966] 1 W.L.R. 1450; *Re Wyvern Developments Ltd* [1974] 1 W.L.R. 1097.

917 *Re ACLI Metals (London) Ltd* (1989) 5 B.C.C. 749.

and was not seeking to rely on any right or interest recognised by the law.[918] The Court of Appeal in *Brake v Lowes*[919] said that the court will grant substantive relief under s.168(5) to put a bidding process, involving company property to be sold off, right or to require the process to be repeated where the liquidator has acted unfairly or outside his or her powers, but this does not permit a party who is a prospective bidder to be seen as a person aggrieved, and this is the case even if the party is invited to bid.[920]

**9-115** It has been said that the test to be applied under s.168(5) is similar to that controlling interference with the exercise of a discretion,[921] and also that the court is most reluctant to interfere with a decision of the liquidator and will not do so unless the decision of the liquidator is such that no reasonable liquidator could, properly instructed and advised,[922] in the circumstances arrive at it;[923] a court would not interfere with a liquidator's decision unless it did not withstand logical analysis.[924] Other case law has employed the test of perversity, that is, absent bad faith or fraud, did the liquidator act in a manner that is so utterly unreasonable or absurd that it is properly to be regarded as perverse?[925] An example of a case where the court held that the decision of a liquidator was unreasonable was *Hamilton v Official Receiver*.[926] In that case the official receiver as liquidator of a company refused to assign to a former controller of the company in liquidation a speculative claim which the company had against a firm of solicitors. Laddie J said that the refusal was unreasonable as the only offer to pay for an assignment of the cause of action had come from the former controller and the official receiver had no interest in taking action himself.[927] As a consequence his Lordship made an order requiring the official receiver to assign the action to the former controller. What the courts are concerned about is ensuring that liquidators' fiduciary and other duties and powers are properly exercised.[928] In *Re Edennote Ltd*,[929] Vinelott J said that the exercise of a liquidator's discretion may be called into question where either it is shown that he or she, though acting in good faith, took into account considerations which ought not to have been taken into account or it is shown that the liquidator failed to take into account considerations which should have been taken into account.[930] On appeal, Nourse LJ said, in accordance with what was noted above, that the court will

---

918 *Re ACLI Metals (London) Ltd* (1989) 5 B.C.C. 749 at 754.
919 *Brake v Lowes* [2021] P.N.L.R. 10 at [57].
920 *Brake v Lowes* [2021] P.N.L.R. 10 at [64].
921 *Re Equity Funds of Aust.* (1976) 2 A.C.L.R. 238 at 239 dealing with the Australian equivalent.
922 *Re Equity Funds of Aust.* (1976) 2 A.C.L.R. 238 at 239; *Associated Provincial Picture Houses Ltd v Wednesbury Corp* [1948] 1 K.B. 223; [1947] 2 All E.R. 680; *Re Edennote Ltd* [1996] B.C.C. 718 at 722; [1996] 2 B.C.L.C. 389 CA at 394.
923 *Re Peters* (1882) 47 L.T. 64; *Re Equity Funds of Aust.* (1976) 2 A.C.L.R. 238; *Yeomans v Walker* (1986) 10 A.C.L.R. 753; *Re Hans Place Ltd* [1992] B.C.C. 737; *Re Greenhaven Motors Ltd* [1997] B.C.C. 547; *Re Edennote Ltd* [1996] B.C.C. 718; [1996] 2 B.C.L.C. 389; *Hamilton v Official Receiver* [1998] B.P.I.R. 602.
924 *Re Meem SL Ltd (in administration)* [2017] EWHC 2688 (Ch); [2018] B.C.C. 652. This was an administration case, but it is submitted that the comments are equally applicable to a liquidator.
925 For example, see *Leon v York-O-Matic Ltd* [1966] 1 W.L.R. 1450; [1966] 3 All E.R. 277; *Re Edennote Ltd* [1996] B.C.C. 718 at 721; [1996] 2 B.C.L.C. 389 at 394.
926 *Hamilton v Official Receiver* [1998] B.P.I.R. 602.
927 *Hamilton v Official Receiver* [1998] B.P.I.R. 602 at 605.
928 *Craig v Humberclyde Industrial Finance Ltd* [1999] 1 W.L.R. 129; [1998] 2 B.C.L.C. 526 CA.
929 *Re Edennote Ltd* [1995] 2 B.C.L.C. 248.
930 *Re Edennote Ltd* [1995] 2 B.C.L.C. 248 at 257–258.

only interfere with the act of a liquidator if he has done something so utterly unreasonable and absurd that no reasonable man would have done it.[931]

It has been held in Australia that a person who seeks to invoke the former equivalent of s.168(5) (s.1321 of the Corporations Act 2001 (now repealed)[932]) cannot argue that it was not necessary to make out a case on the merits and that all that has to be established is that he or she is a person aggrieved by the liquidator's decision.[933]

In considering whether to review a decision of a liquidator a court must bear in mind the fact that it is well established that the commercial decisions of liquidators are accorded great weight.[934] Street CJ of the New South Wales Supreme Court provided the reason for this:

> "When the Court is required to pronounce upon the commercial prudence of a transaction it enters upon a slippery and uncertain field. Apart from the lawyer's disclaimer of expert qualifications in matters of business prudence, the very process of litigation and the necessary limitations upon the scope of admissible evidence, restrict the available material to far less than is necessary for the making of a commercial decision."[935]

His Honour had said earlier in his judgment that liquidators have, in the course of a winding up, the responsibility of making a number of decisions, some important and some trifling, and they are recognised as having both the appropriate qualifications and access to the information to enable them to make commercial decisions.[936] He then said that ultimately every challenge must probably depend on more broadly-stated considerations **9-116**

> "such as whether the liquidator's action has such importance, and can be seen to have such defects as to justify the Court exercising its supervisory power".[937]

In *Mitchell v Buckingham International Plc*,[938] Robert Walker LJ (as he then was) said that when liquidators are exercising their administrative powers to realise assets, courts will be "slow to substitute their judgment for the liquidator's on what is essentially a businessman's decision".[939]

If an application can be brought under s.168(5), the court is entitled, if the circumstances so demand, to undo a transaction entered into by a liquidator.[940]

In completing this aspect one should note that it is probably true to say that in compulsory winding up besides reliance on s.168(5), the court has an independent

931 *Re Edennote Ltd* [1996] 2 B.C.L.C. 389 at 394.
932 The relevant power is now found in the Insolvency Practice Schedule which is Sch.2 to the Corporations Act 2001.
933 *Westpac Banking Corp v Totterdell* (1997) 25 A.C.S.R. 769 at 771–772.
934 *Northbourne Developments Pty Ltd v Reiby Chambers Pty Ltd* (1989) 19 N.S.W.L.R. 434 at [440]; *Re Edennote Ltd* [1996] B.C.C. 718 at [720]; [1996] 2 B.C.L.C. 389 at 394; *Mitchell v Buckingham International Plc* [1998] 2 B.C.L.C. 369 CA at 390.
935 *Re Mineral Securities Australia Ltd (in liq)* [1973] N.S.W.L.R. 207 at 232; (1971–1973) C.L.C. 40–076 at [27,859].
936 *Re Mineral Securities Australia Ltd (in liq)* [1973] N.S.W.L.R. 207 at 232; (1971–1973) C.L.C. 40–076 at [27,588].
937 *Re Mineral Securities Australia Ltd (in liq)* [1973] N.S.W.L.R. 207 at 232; (1971–1973) C.L.C. 40–076 at [27,588].
938 *Mitchell v Buckingham International Plc* [1998] 2 B.C.L.C. 369.
939 *Mitchell v Buckingham International Plc* [1998] 2 B.C.L.C. 369 at 390.
940 *Re Edennote Ltd* [1996] B.C.C. 718 at [721]; [1996] 2 B.C.L.C. 389 at 393.

power to review a liquidator action or decision in view of the fact that the liquidator is an officer of the court who acts under its control.

## C. Control of the court

**9-117** Besides s.168(5), the Act puts another supervisory power in the hands of the courts. Section 167(3) provides that the powers of a liquidator, conferred by s.167 (and incorporating those set out in Sch.4 to the Act), are subject to the control of the court and that a creditor or contributory may apply to the court in relation to any exercise or proposed exercise of any of the powers. Although there is no provision which applies to voluntary liquidations, the court's supervisory role can be invoked under an application pursuant to s.112.[941] It appears that there is little difference between ss.167(3) and 168(5) as far as the law that applies to each,[942] and there is some overlap.[943] However, s.168(5) seems to be wider than s.167(3) in that an application may be brought by an "aggrieved person" while s.167(5) is limited to creditors and contributories. After saying that it must be noted that creditors and contributories will more often than not be the persons aggrieved by a decision of the liquidator and will seek to invoke s.168(5). Section 168(5) is also wider in that it is not restricted to dealing with applications in relation to powers granted to the liquidator under s.167 and Sch.4. For example, if a person affected by a liquidator's decision to disclaim property of the company wishes to take issue with the decision, he or she must bring an application pursuant to s.168(5).[944]

The law that has developed pursuant to each subsection seems to be used in interpreting and applying the other. As with a s.168(5) application, a court will not interfere with the exercise of a liquidator's powers unless he or she was doing something that was utterly unreasonable and absurd that no reasonable persons would do.[945]

To bring an application as a contributory in relation to an insolvent company one must establish that there would be a substantial prospect of assets being available to the shareholder on winding up.[946] At first instance in *Re Greenhaven Motors Ltd*[947] Harman J opined that the return that a shareholder would have to prove was likely to come to him or her was in the vicinity of £1,000. On appeal his Lordship was reversed[948] although there is nothing to suggest the comment above was disapproved of.

## D. The Human Rights Act

**9-118** Chapter 8[949] considered the possibility of creditors availing themselves of the Human Rights Act to challenge the activities of liquidators. Emphasis was placed upon

---

941 See *Cooper v PRG Powerhouse Ltd* [2008] EWHC 498 (Ch).
942 It is to be noted that one difference is that while s.167(3) only applies to companies wound up in England and Wales, s.168(5) also applies to companies wound up in Scotland.
943 This was acknowledged by Nourse LJ in *Re Edennote Ltd* [1996] B.C.C. 718 at 721; [1996] 2 B.C.L.C. 389 at 393.
944 *Re Hans Place Ltd* [1992] B.C.C. 737 at 746.
945 *Re Greenhaven Motors Ltd* [1997] B.C.C. 547 at 552; and applying *Re Peters* (1882) 47 L.T. 64; and *Re A Debtor* [1949] Ch. 236.
946 *Re Greenhaven Motors Ltd* [1997] B.C.C. 547.
947 *Re Greenhaven Motors Ltd* [1997] B.C.C. 547.
948 *Re Greenhaven Motors Ltd* [1999] B.C.C. 463; [1999] 1 B.C.L.C. 635.
949 See above at paras 8-044–8-046.

the decision of the European Court of Human Rights in *GJ v Luxembourg*.[950] Whether activities of, or the omissions by, liquidators could constitute a breach of the rights of creditors pursuant to art.6(1) of the Convention is far from clear, but as in *GJ v Luxembourg* it may form the basis of an argument, particularly where the provisions of the Act discussed above are unable to be employed.

## E. Costs

If proceedings founded on the one or more of the grounds discussed above are brought against a liquidator, he or she is entitled to claim legal costs associated with defending the proceedings. The reason for this is well expressed by Oliver J in *Re Wilson Lovatt & Sons Ltd*[951]: **9-119**

> "I can quite see that there may be a very powerful reasons of policy for a rule that a liquidator, when carrying out his functions and thus subjecting himself to the possibility of proceedings against him by parties who are discontented with the way in which he has carried out those functions, must be entitled to defend himself without being subjected to the risk of having costs awarded against him personally, because of course he cannot protect himself against claims being made. Unless there is some such rule it might be very difficult to get persons to take on the heavy responsibility of the liquidation of companies."[952]

## F. Disqualification

It should be stated at this point that a liquidator may be disqualified from acting as an insolvency practitioner under s.4 of the Company Directors' Disqualification Act 1985 if guilty of fraud or a breach of duty while acting as a liquidator of a company.[953] **9-120**

## V. Remedies for Breach of Duty

Assuming that a liquidator has not obtained a release, the creditors have a variety of remedies against the liquidator in respect of breaches of duty committed in the course of winding up. Of course the creditors may apply to the court to have the liquidator removed.[954] The power of the court to confirm, reverse or modify acts and decisions has already been discussed,[955] but it remains to consider in further detail some other remedies which have so far been referred to only in passing. In this regard it will be necessary to deal separately with the position before and after dissolution of the company. **9-121**

---

950 *GJ v Luxembourg* [2000] B.P.I.R. 1021.
951 *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274.
952 *Re Wilson Lovatt & Sons Ltd* [1977] 1 All E.R. 274 at 285.
953 For a case where this occurred, see *Wood v Mistry* [2012] EWHC 1899 (Ch); [2013] 1 B.C.L.C. 389. The liquidator was disqualified for 12 years.
954 See above at paras 8-081–8-100.
955 As to the court's power to remove a liquidator on grounds of misconduct, see above at paras 8-092–8-099.

## A. Before dissolution

9-122 Prior to dissolution of the company the remedies against the liquidator are dependent for their availability upon the fact that the company is still in existence and the liquidator is still in the process of conducting the winding up.

### *1. Injunction*

9-123 On some occasions it has been sought to prevent a liquidator from committing a breach of duty by applying for an injunction to restrain the taking of a particular course of action. Such orders have been granted where the liquidator was proposing to sell property in respect of which a creditor claimed a lien,[956] or to distribute the assets without making provision for the claimant's debt.[957] But the ample powers of supervision contained in the Act normally make it unnecessary to resort to independent proceedings of this kind in order to control the conduct of liquidators in the winding up.

### *2. Liability for losses*

9-124 Included among the court's powers of inquiry under s.212, the "misfeasance provision", and which is discussed in greater detail shortly,[958] is a jurisdiction to order the liquidator to make good any loss which the company has sustained by reason of any misfeasance or breach of any fiduciary or other duty in relation to the company.

The case of *Re Gold Co of Southern India*[959] gives some indication of the sort of situation in which the provision might be utilised. In this case one of two joint liquidators, who had failed to ensure that his co-liquidator paid the proceeds of a sale of property into the liquidation account, was declared liable for the amounts received by the defaulter and ordered to make good the deficiency in his accounts.

It was held in *Re D'Jan of London Ltd*[960] that s.212 permits a director to be sued for a breach of duty of care. It is submitted that the same reasoning may be applied to liquidators. Certainly in Australia it has been clearly held that liquidators can be sued for a breach of the common law duty.[961] Consequently, if this is correct, and as s.212 does not create new liabilities but simply provides a simple procedure for the recovery of property or compensation in a winding up, it would seem to be fair to say that the courts should accept that liquidators may be sued for a breach of their common law duty of care.

9-125 In determining the loss suffered by the company, the court compares the present worth of the assets with the value which the assets might have enjoyed but for the liquidator's misfeasance, breach of duty, neglect or omission. The court then makes allowance for the possibility that this difference between the present and potential worth of the assets might have occurred in the absence of breaches of duty. To

---

956 *Blakely v Dent* (1876) 15 W.R. 663.

957 *Re Telegraph Construction Co* (1870) 10 Eq. 384; *Oppenheimer v British & Foreign Exchange Bank* (1877) 6 Ch. D. 744; *Gooch v London Banking Association* (1885) 32 Ch. D. 41.

958 And later, see below at paras 16-005–16-028.

959 *Re Gold Co of Southern India Times*, 3 March 1883.

960 *Re D'Jan of London Ltd* [1993] B.C.C. 646.

961 *Sydlow Pty v Kotselas Pty Ltd* (1996) 14 A.C.L.C. 846.

achieve full restitution of the financial loss the court may also award interest on the loss so calculated.[962]

### 3. *Application to have default remedied*

Pursuant to s.170, a creditor, contributory or the registrar of companies may apply to the court for an order that a liquidator, who has defaulted in filing, delivering or making any return, account or other document or in giving notice which he or she is required to do by law and the liquidator has failed to rectify the default within 14 days of having had a notice served on him or her, make good the default. The court may specify that a default be remedied within a certain period of time. If a liquidator fails to comply with the order he or she is in contempt of court and this can have very serious consequences for the practitioner. In *Re S&A Conversions Ltd*,[963] a liquidator was sentenced to six months' imprisonment for contempt. Subsequently, in *Re Allan Ellis (Transport and Packing Services) Ltd*,[964] a three-month sentence was handed down to another liquidator. **9-126**

### 4. *Liability to account for profits*

In consequence of the fiduciary position which exists between a liquidator and the company which he or she is winding up, the liquidator is debarred from making profits, entering into contracts with the company, or utilising knowledge acquired in the course of discharging duties for the purpose of private gain. If the liquidator fails to observe this duty, any contract so made is liable to be set aside[965] and he or she may be made to account for benefits which have been received.[966] **9-127**

### 5. *Misfeasance proceedings*

In *Re Llynvi & Tondu Co*,[967] North J is reported to have said that the proper mode of recovering secret profits from a liquidator was not to surcharge the liquidator's accounts with the amount of the profit but to take proceedings against him or her for breach of duty. Whether or not it is the only way, there is no doubt that proceedings for breach of duty are the usual procedure in cases where it becomes necessary to examine the conduct of a liquidator[968] with a view to compelling repayment or restoration of any money or property which the liquidator has misapplied or become accountable for, or ordering the liquidator to make compensation for breach of duty or breach of trust.[969] **9-128**

Section 212 provides that on the application of a creditor, contributory or official receiver, the court may order the liquidator (and other officers of the company) to repay, restore, or account for money or property or to contribute such sum to the company's assets by way of compensation as the court thinks fit in respect of loss

---

962 *Re Timberland Ltd*; sub nom. *Commissioner for Corporate Affairs v Harvey* (1979) 4 A.C.L.R. 259.
963 *Re S&A Conversions Ltd* (1988) 4 B.C.C. 384 CA. This was after the court at first instance had ordered a term of two and half years in prison. The Court of Appeal reduced the sentence on appeal.
964 *Re Allan Ellis (Transport and Packing Services) Ltd* (1989) 5 B.C.C. 835.
965 *Silkstone Coal Co v Edey* [1900] 1 Ch. 167.
966 *Christie v Edwards* [1939] 1 D.L.R. 158.
967 *Re Llynvi & Tondu Co* (1889) 6 T.L.R. 11.
968 Such proceedings may be instituted by one joint liquidator against another: *Re Miranda Coal & Iron Co* (1892) 11 N.Z.L.R. 640.
969 For a general account of this topic, see below at paras 16-005–16-028.

sustained as a consequence of misapplying or retaining, or becoming accountable for, any money or property of the company, or being guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company. While s.212(3) enables a contributory to apply, this can only be done with the leave of the court. Such leave is not dependent on the contributory benefiting from any order that may be made by the court.[970] When a liquidator has had a release, then any application can only be brought against a liquidator after securing the leave of the court.[971]

Section 212 does not create extra obligations on the liquidator but provided a framework within which a liquidator might be made accountable.[972] Proceedings under precursors of s.212 have been instituted in a variety of situations, such as where the liquidator has made an imprudent compromise,[973] has sold assets at an undervalue,[974] has paid an unenforceable debt[975] or failed to discharge liabilities of the company.[976] A liquidator will not be able to escape liability even though he or she has sought and obtained professional legal advice if the advice given to the liquidator was based on the liquidator's incorrect and inadequate instructions to his or her legal advisors.[977]

However, the remedy is available only on certain conditions, some of which tend to diminish its usefulness rather considerably. It creates no new rights but simply provides a summary procedure for enforcing existing rights to money and property which are then passed into the general funds of the company, and it is therefore available only while the company is still in existence prior to dissolution. While predecessors of s.212 only could be invoked in respect of something akin to breach of trust,[978] so that ordinary common law negligence on the part of the liquidator was outside its scope, s.212 now seems to also cover common negligence.[979] Finally, even where the required conditions are satisfied, the court has a discretion under the section which in special circumstances it may exercise to relieve the liquidator wholly or in part of liability for the full consequences of any default. In *Re Home & Colonial Insurance Co*,[980] partial relief was granted to a liquidator who had paid an unenforeceable liability which had been regarded by all concerned as, at least in honour, binding upon the company; Maugham J ordered contribution of so much as was necessary to pay creditors in full, but considered that to order repayment of a larger amount would have resulted in a return to the members of more than the fair value of their shares.

---

970 1986 Act s.212(5). This overcomes the decision in *Re Rica Gold Washing Co* (1879) 11 Ch. D. 36.
971 1986 Act s.212(4).
972 *Re Top Brands Ltd v Sharma*; sub nom. *Mama Milla Ltd* [2014] EWHC 2753 (Ch); [2015] 1 B.C.L.C. 546; [2015] B.P.I.R. 621; and affirmed on appeal at [2014] EWCA Civ 761.
973 *Re Windsor Steam Coal Co* [1929] 1 Ch. 151.
974 *Re B. Johnson & Co (Builders) Ltd* [1955] Ch. 634, where, however, the liquidator was exonerated.
975 *Re Home & Colonial Insurance Co* [1930] 1 Ch. 102.
976 *Re Watchmakers' Alliance Ltd* (1905) Tax Cas.117; *Re New Zealand Joint Stock Corp* (1907) 23 T.L.R. 288; *Lord Advocate v Purvis*, 1958 S.C. 338.
977 *Re Top Brands Ltd v Sharma*; sub nom. *Mama Milla Ltd* [2014] EWHC 2753 (Ch); [2015] 1 B.C.L.C. 546; [2015] B.P.I.R. 621; and affirmed on appeal at [2014] EWCA Civ 761; [2016] B.C.C. 1.
978 *Re B. Johnson & Co (Builders) Ltd* [1955] Ch. 634.
979 See *Re D'Jan of London Ltd* [1993] B.C.C. 646.
980 *Re Home & Colonial Insurance Co* [1930] 1 Ch. 102.

### 6. *Disallowance of costs*

A liquidator who is unnecessarily litigious and who, without good reason, engages in fruitless legal proceedings may be deprived of the right which is otherwise allowed of receiving costs out of the assets.[981] This will be done where the liquidator has acted with manifest imprudence, the test being not whether, in similar circumstances, a gratuitous trustee would be denied costs, but whether, in taking or defending the proceedings, the liquidator has failed to exercise a reasonable degree of professional skill and care.[982] In *Re AMF International Ltd*,[983] a liquidation had commenced as a members' voluntary, and the liquidator paid a contributory. The applicant, a creditor of the company in liquidation, applied for its proof to be admitted and paid, and for a meeting of creditors to be summoned under s.95, and for the liquidator to be removed under s.108. The applicant sought an order of costs against the liquidator personally in relation to the application. The applicant was successful under r.4.143, now r.5.7, on the basis that the liquidator had acted improperly in paying the contributory before ensuring that there were sufficient funds to pay creditors. **9-129**

### 7. *Forfeiture of remuneration*

Although the Act does not expressly provide for it, it is submitted that the court certainly has the power, in the appropriate case, to deny remuneration where the liquidator's action or decision is impugned and where remuneration was claimed in relation to the relevant action or decision,[984] or under s.212 to deprive the liquidator of remuneration on account of any breach of duty committed. In bankruptcy this power is sometimes exercised in conjunction with an order for removal of the trustee, but, although a liquidator who is removed on grounds of misconduct may suffer forfeiture of remuneration,[985] the liquidator will not ordinarily be deprived of a right to receive expenses that have been paid out of the liquidator's own funds.[986] **9-130**

### 8. *Security lodged*

A person is unable to be a liquidator unless he or she is qualified to be an insolvency practitioner.[987] A person cannot be an insolvency practitioner unless there is in force security which meets the prescribed requirements.[988] This is a form of bonding. The prescribed requirements are set out in the Insolvency Practitioners' Regulations 2005.[989] The bonding is designed to ensure that there is compensation available for any person who has suffered pecuniary loss, especially creditors, due to the failure of liquidators to carry out their duties adequately and properly. **9-131**

---

981 *Re Silver Valley Mines* [1882] 21 Ch. D. 381.
982 *Re Silver Valley Mines* [1882] 21 Ch. D. 381 at 392 per Cotton LJ.
983 *Re AMF International Ltd* [1995] B.C.C. 439; [1995] 2 B.C.L.C. 529.
984 Under 1986 Act s.168(5) or s.112.
985 *Re Le Club Athletique Canadien Inc* (1918) 20 Que. P.R. 119.
986 *Re Le Club Athletique Canadien Inc* (1918) 20 Que. P.R. 119. *Re New Zealand Times Co* [1941] N.Z.L.R. 677.
987 See 1986 Act s.388(1)(a).
988 1986 Act.
989 Insolvency Practitioners' Regulations 2005 (SI 2005/524) reg.2 and Sch.2.

## B. After dissolution

9-132 All of the above remedies presuppose the continued existence of the company. The question whether any remedies are available against a liquidator after the company has been dissolved, following upon its winding up, is one of some difficulty. A liquidator cannot be made liable once a release has been obtained.[990]

### 1. *Action for breach of statutory duty*

9-133 An application cannot be made against a liquidator under s.212 as that provision provides in subs.(1) that the section applies if in the course of the winding up there is a breach of duty.

Section 107 (voluntary liquidations) and r.14.12(1) and (2) (compulsory liquidations) direct that the property of the company shall be applied first in satisfaction of its liabilities equally, and, subject thereto, distributed among the members of the company, unless any articles otherwise provide. This has been construed as imposing upon the liquidator an absolute duty, unlimited in point of time, and one which persists even after the affairs have been fully wound up and the company dissolved. Accordingly, in *Pulsford v Devenish*,[991] it was held that a liquidator who knowingly and wilfully failed to pay a debt of which he was aware, was personally liable in an action for damages for breach of statutory duty at the instance of the unpaid creditor. The principle appears to be firmly established[992]; moreover, in later decisions the requirement that the default should have been committed knowingly and wilfully has been discarded, and, according to the prevailing view, it is sufficient to show that the claimant's debt would or ought to have been paid had the liquidator performed his or her duties with the requisite degree of care and skill.[993]

### 2. *Liability to account for profits*

9-134 By a similar process of reasoning it has been held that not even dissolution of the company will relieve the liquidator of the obligation to account for moneys received in breach of the duty not to profit from the office. In *Christie v Edwards*,[994] it was decided by the Supreme Court of Canada that a liquidator could be made to account to the former shareholders for sums received by the company and retained by him in excess of what was required to discharge the liabilities in winding up. After referring to the equivalent of s.107, the court stated that relief of this kind is available even after dissolution in a representative form of action brought by or on behalf of all those beneficially interested in the assets.

---

990 *Toronto v Wade* [1932] 4 D.L.R. 928.

991 *Pulsford v Devenish* [1903] 2 Ch. 625.

992 It has been applied on several occasions: see *Brown v Cowan* (1912) 31 N.Z.L.R. 1219; *Argylls Ltd v Coxeter* (1913) 29 T.L.R. 355; *James Smith & Sons Ltd v Goodman* [1936] Ch. 216; *Re Jubilee Theatres Ltd* (1956) 3 D.L.R. (2d) 624; *Austin Securities Ltd v Northgate & English Stores Ltd* [1969] 1 W.L.R. 529; compare [1972] Ch. 498 (receiver for debenture-holders).

993 See cases cited in the preceding footnote.

994 *Christie v Edwards* [1940] S.C.R. 410; [1940] 2 D.L.R. 65.

### 3. *Liability as trustee*

We have seen that the courts have refused to treat liquidators, while discharging their duties in the winding up, as trustees for individual creditors or members, who consequently are unable to sue liquidators as for breach of trust.[995] But it was suggested in *Re Hill's Waterfall Estate & Gold Mining Co*[996] that, once all the liabilities have been discharged, and nothing further remains to be done except to distribute among the members assets to which they are entitled by virtue of a scheme of arrangement, then the individual shareholders become equitable owners of that property. It follows that a stage may be reached in the winding up of a company when the liquidator does become a bare trustee of assets distributable among the members and so would be unable to resist an action brought to compel transfer of the assets in question.[997] If this is correct, the liquidator's status as trustee would, it is submitted, remain unaffected by dissolution of the company.[998] **9-135**

## VI. Judicial Exculpation from Liability

If a liquidator is liable for a breach of duty, is he or she able to seek judicial absolution? Section 1157 of the Companies Act 2006 provides that a court is permitted to excuse an officer of a company from liability arising out of his or her negligence, breach of duty or breach of trust on the basis that he or she had acted honestly and reasonably, and, as a consequence of his or her actions, ought fairly to be excused from liability.[999] It is a section that has long been a part of companies legislation in the UK.[1000] The term "officer" is defined in the Companies Act, in the context of offences (in s.1121), and in s.1173. In the latter definition directors, managers and secretaries are covered, but not office-holders. Clearly directors have been held to come within the provision and there is a well-developed jurisprudence on when courts might exercise their discretion and excuse a director from liability.[1001] The issue here is whether a liquidator is an officer for the purposes of s.1157. The matter is not altogether clear. **9-136**

In *Rawnsley v Weatherall Green & Smith North Ltd*,[1002] HH Judge Behrens (sitting as a judge of the High Court), said that to his mind it was "seriously arguable that a liquidator is not within the ambit of s.1157."[1003] However, in a later case, *Re Powertrain Ltd (in liq)*,[1004] Newey J was of the view that a liquidator was an officer for the purposes of s.1157. His Lordship said that Judge Behrens was not referred to the authorities that he, Newey J, had been taken to by counsel and which suggest that a liquidator was an officer for the purposes of s.1157.[1005] Some concern with the latter decision has been expressed by the Technical Committee of the

---

995 See also *Leon v York-o-Matic Ltd* [1966] 1 W.L.R 1450.
996 *Re Hill's Waterfall Estate & Gold Mining Co* [1896] 1 Ch. 947.
997 *Miller & Maund Ltd v Commissioner of Stamp Duties* [1959] Tas. S.R. 94.
998 It is admittedly difficult to reconcile this with *Knowles v Scott* [1891] 1 Ch. 707; compare also *Ayerst v C&K (Constructions) Ltd* [1976] A.C. 167 at 180 HL.
999 This is in the same terms as the Trustee Act 1925, s.61 that applies to trustees.
1000 The previous section was s.727 of the Companies Act 1985.
1001 For a detailed discussion, see Keay, *Directors' Duties*, 3rd edn (LexisNexis, 2016), Ch.17.
1002 *Rawnsley v Weatherall Green & Smith North Ltd* [2009] EWHC 2482 (Ch); [2010] B.C.C. 406.
1003 *Rawnsley v Weatherall Green & Smith North Ltd* [2009] EWHC 2482 (Ch); [2010] B.C.C. 406 at [66].
1004 *Re Powertrain Ltd (in liq)* [2015] EWHC 3998 (Ch); [2016] B.C.C. 216.
1005 *Re Powertrain Ltd (in liq)* [2016] B.C.C. 216 at [13].

Insolvency Lawyers' Association[1006] on three bases. The concerns of the Committee have merit. First, the Committee referred to s.1173 of the Companies Act and noted that liquidator was not included within the definition of officer in that section. Although it is right that s.1173(1) of the Companies Act 2006 does not specifically provide that a liquidator is classified as an officer of the company, the section states that officer *includes* a director, manager and a secretary. This clearly is not an exhaustive definition and suggests that others could be within the definition, and, indeed, in other sections of the Companies Act liquidators are said to be officers of the company. An example is s.30(4).

Secondly, the Committee pointed out that in s.212 of the Insolvency Act 1986 the section expressly refers to an "officer of the company" and then separately to a "liquidator." The conclusion it draws is that a liquidator is not an officer of the company. Arguably, the approach to the drafting could well have been in order to avoid any doubt that a liquidator could be held responsible for misfeasance, as s.212 is found in a part of the Act that deals with provisions which address the liability of directors and others associated with the pre-liquidation management of the company, but not liquidators.

Thirdly, the judgment of Newey J was given on an unopposed application and a Practice Direction[1007] provides that judgments based on unopposed applications are of limited precedent value. The Committee also noted that Newey J relied on *Re Home Treat Ltd*[1008] which, it says, seems to have been a judgment given on an unopposed application and it in turn relied on *Re X Co Ltd*[1009] which involved an unopposed application. While the precedential strength of the judgment of Newey J in *Re Powertrain Ltd (in liq)* might not be as strong as one might like in order to bring certainty, and another judge might take up Judge Behrens' doubts and find that a liquidator is not within s.1157, it is submitted, with respect, that Newey J's decision is correct. His Lordship went on to grant the liquidators relief pursuant to s.1157(2) of the Companies Act from any liability for negligence, default, breach of duty or breach of trust which might arise as a result of the liquidators declaring and/or paying further dividends on the basis that was put to his Lordship at the hearing. Such a view would accord with the law in Australia. Its equivalent of s.1157, namely s.1318 of the Corporations Act 2001, specifically mentions liquidators (and other office-holders) as being able to invoke the provision.[1010]

---

[1006] Bulletin 676, 16 April 2016.
[1007] *Practice Direction (Citation of Authorities)* [2001] 1 W.L.R. 1001; [2001] 2 All E.R. 510 at [6.2].
[1008] *Re Home Treat Ltd* [1991] B.C.C. 165.
[1009] *Re X Co Ltd* [1907] 2 Ch. 92.
[1010] Corporations Act 2001 s.1318(4)(d).

# Cross-Border Insolvency: The Judicial Approach

*Sir Peter Millett**

The title of this article is possibly optimistic: it assumes that English and foreign judges share a common judicial approach to cross-border insolvency. Whatever the attitude of foreign judges may be, English judges are not a homogeneous corpus. There are 16 judges in the Chancery Division, and 35 Lords Justices in the Court of Appeal, all of whom may be concerned with cross-border insolvency, and all of whom are individuals of varying degrees of eccentricity. It may be doubted that they share a common approach to anything, except a desire to bring the case before them to an end as soon as decently possible.

Leaving such unworthy considerations on one side, however, three common themes can be discerned in the English authorities. These are the recognition of the need for (1) an international insolvency convention and, in the meantime, (2) co-operation between insolvency courts in different jurisdictions and (3) judicial restraint.

The huge increase in international trade in modern times and the development of a global market-place have inevitably led to an increase in the number, size and complexity of cross-border insolvencies. Novel problems have arisen since the creation of multinational trading corporations which, in many cases, have little or no economic connection with any particular place of incorporation. Legal theory, based on the territorial jurisdiction of the courts of the national state, has parted company with commercial reality and the needs of modern business. Economists are already warning of the obsolescence of the nation state as an economic unit in a world where wealth and power may be concentrated in corporations which have no local allegiance and which are able to transfer assets from one jurisdiction to another without difficulty and with great speed.

Insolvency practitioners and judges have long been familiar with insolvencies having a foreign element. The basic rules of UK domestic law are not in doubt: an English winding-up order is deemed to have worldwide effect; and in the winding-up the court applies English law, both procedural and substantive.

* A Lord Justice of Appeal of the United Kingdom. This article is based upon a lecture delivered in Lincoln's Inn on 5 February 1997 on behalf of the Centre for Commercial Law Studies, Queen Mary and Westfield College.

© 1997 John Wiley & Sons, Ltd.
CCC 1180-0518/97/020099-15$17.50 *Int. Insolv. Rev.*, Vol. 6: 99-113 (1997)

1991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



This is because procedural matters are ordinarily governed by the *lex fori*, while a liquidation under the Insolvency Act 1986 must be carried out in accordance with the provisions of that Act. The winding-up jurisdiction of an English court, however, is not limited to companies incorporated in England, but may extend to companies incorporated abroad. The jurisdiction is exercisable even though a company is already in liquidation in its country of incorporation or has been dissolved there. The basic rules are still applicable, at least in theory, where simultaneous winding-up proceedings are taking place in England and elsewhere. In such a case the liquidation being conducted in the country of incorporation is traditionally treated as the principal liquidation – any other liquidation being regarded as ancillary.

The consequences of an ancillary liquidation have not been fully worked out, but the general idea has been usefully restated by Sir Richard Scott V-C recently in *Re BCCI (No. 10)* [1997] 2 WLR 172 at 197 as follows: the primary function of an ancillary liquidation is to assist the principal liquidation, and is normally limited to the collection and protection of local assets and the settling of the list of local creditors, with a view to making these available to the liquidators in the principal liquidation. It is for the liquidators in the principal liquidation to declare dividends and distribute the assets to the worldwide creditors. However, the ancillary character of an English liquidation does not relieve the court of the obligation of applying English law, including English insolvency law, to the decision of all questions arising in the English liquidation.

The Vice-Chancellor in *Re BCCI (No. 10)* was following earlier English authority. In *Re Sudair International Airways Ltd* [1951] Ch. 165, Wynn-Parry J held that English law had to be applied in administering the assets situate in England, and thought that any other rule would result in the "utmost possible confusion". The case concerned a South African company which had been placed in liquidation in South Africa and later in England. The English court gave leave to a creditor to proceed with an execution in England which had been commenced after the presentation of the South African winding-up petition, but before the presentation of the English petition, even though the execution would have been void under South African law. For reasons which are explained below, it should not be assumed that the outcome would be the same today.

In *Re BCCI (No. 10)*, the English insolvency set-off rules were applied in an English ancillary liquidation, so that the English liquidators were directed to account to the principal liquidators in Luxembourg only for the net sums. It is difficult to see how any other conclusion could have been reached, given the traditional approach of the English courts to an ancillary liquidation; the application of the set-off rules forms part of the process of getting in debts (i.e. the collection of assets) and settling lists of creditors.

The aims of a court seised of an ancillary liquidation were stated more than a century ago, and are to avoid conflict with the court seised of the principal

 © 1997 John Wiley & Sons, Ltd.

10991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



liquidation, to have regard to the interests of all creditors, and to endeavour to keep the costs of the liquidation down. This approach gives full recognition to the fact that the jurisdiction of the court, even if theoretically worldwide, is, in practice, limited to assets and creditors within its own territory. It also gives full effect to the English doctrine (shared by other common law and civil law countries) that assets in one jurisdiction should not be ring-fenced in order to be available solely to the creditors in that jurisdiction, but should be available to creditors worldwide. However, as *Re BCCI (No. 10)* shows, this approach falls well short of the theoretical ideal that the distribution of assets should be governed by a single law, and therefore not affected by the location of particular assets or particular creditors. In a world in which multinational corporations trade in a global market-place, it is surely the only proper response to practical commercial needs, but which law should govern? At one time there would have been no difficulty in identifying the law of the *place of incorporation* as the appropriate law to govern a worldwide liquidation, but this is no longer necessarily appropriate. The *principal seat of business* is generally regarded as providing a better test today, but even that may not be realistic in the case of a large multinational corporation.

It must, however, be accepted that identifying the appropriate law cannot be accomplished by judges alone; it requires international agreement, which is very difficult to achieve as not all countries share the belief that local assets should not be ring-fenced. It is a belief common to the great international trading nations like the United Kingdom; however, smaller and developing countries, more likely to find a preponderance of a debtor's assets within their borders but a minority of its creditors, have a different perspective. Moreover, while insolvency set-off is considered to be fundamental to a fair distribution of the insolvent's assets, regarding it as unjust to require a man to pay his debt to the insolvent in full while restricting him to a dividend in the liquidation in respect of the debt owed to him, this is very much a minority view. However, civil law countries do not consider this unjust; they regard UK set-off rules as giving an unfair priority to one unsecured creditor over the others.

Pending an international insolvency convention, it is necessary to rely on the provisions of local statutes and the rules of private international law, which have not been fully worked out in this area. One difficulty is that, although a winding-up order is deemed to have a worldwide effect and an English liquidation must be conducted in accordance with the Insolvency Act 1986, it does not necessarily follow that every provision of the Act is applicable regardless of the absence of any relevant connection with this country. Even when the company being wound up is an English company, difficult questions may arise concerning the extraterritorial scope of a particular provision of the Act. Another difficulty is that the paradigm model of the principal and ancillary liquidation was constructed at a time when both types of liquidation were concerned with the collection and distribution of the assets of an insolvent company among its creditors. Modern insolvency procedures are increasingly

© 1997 John Wiley & Sons, Ltd. 

24-10076-mg Doc 41-2 Filed 02/12/24 Entered 02/12/24 16:33:48 Exhibit B to Declaration of Thomas Lowe KC Pg 569 of 622



concerned to achieve the rehabilitation of the company, or at least the preservation of its business, and the creditors' interests are subordinated, to different degrees in different jurisdictions, to the ultimate object of saving the enterprise. The paradigm concept of the principal and ancillary liquidation does not work well in such a situation. The inevitable consequence is that, increasingly, multinational companies are simultaneously subject to insolvency procedures in more than one country, none of which are ancillary or subservient to any other, and which may even seek to achieve different objectives. All this is likely to put great strain on the relations between courts of different jurisdictions, and make co-operation between them more difficult and urgent.

In English law, the territorial scope of a statutory provision in an Act of Parliament is a question of statutory construction and depends on the intention of Parliament. Unfortunately, the intention of Parliament is usually impossible to discern simply from the wording of the legislation itself, which is almost always in general terms. The starting-point is usually the formula stated in *ex parte Blain* (1879) 12 Ch. D. 522 that, unless the contrary is expressly enacted or plainly implied, UK legislation is applicable only to British subjects and foreigners present within the jurisdiction. This is a rule of construction only, and is easily displaced, particularly in the case of insolvency where such limitations make no sense, and it is impossible to ascribe such a capricious intention to Parliament.

Accordingly, it was held in *Re Paramount Airways Ltd* [1993] Ch. 223 that s. 238 of the Insolvency Act 1986, which enables the English court in winding-up proceedings to set aside a transaction entered into by the company with "any person" at an undervalue, applies whether or not the person in question is British or resident within the jurisdiction. Presumably, the same is true of the court's power to set aside a voidable preference under s. 239 of the Act, where similar wording is employed. It is surprising that the question has never arisen in relation to fraudulent preferences – cases in which it is alleged that the company has entered into a transaction with a view to defrauding its creditors – or other provisions enabling the liquidator to have antecedent transactions set aside. This may be because it has always been assumed, I think rightly, that the necessary connection between the company and the proposed defendant is usually supplied by the very transaction sought to be set aside. This was not the case in *Re Paramount Airways* where s. 238 was invoked for a purpose for which it was probably not intended. The company was in administration. The administrators alleged that Mr Ferriday, the company's managing director, had misappropriated moneys belonging to the company and caused them to be paid into an account of one of his own companies at a bank in Jersey, in reduction of that company's overdraft. The administrators brought proceedings against the Jersey bank, invoking s. 238. The bank conceded, for the purpose of the interlocutory proceedings, that the administrators had an arguable case under s. 238. However, the section is intended to deal with cases where a company has entered into a transaction directly with the defendant,

 © 1997 John Wiley & Sons, Ltd.



1991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



and has either paid too much or obtained too little (i.e. where the transaction itself is perfectly proper except for the inadequacy of the consideration). In such cases the transaction between the English company and the defendant supplies the necessary connection with England. The Jersey bank, however, gave no consideration to the company; however, it was not a donee as it gave full consideration to Mr Ferriday. The vice of the transaction was not that the bank gave no consideration to the company, but that Mr Ferriday gave no consideration. If Mr Ferriday had had a loan account with the company in sufficient credit and had debited the sum to the account there would have been no possible claim against the bank, merely a voidable preference claim against Mr Ferriday. This suggests that the transaction into which the Jersey bank entered should have been analysed as being with Mr Ferriday, not with the company; and that s. 238 was invoked to support a restitutionary claim based on knowing receipt. It was unnecessary to consider whether the section could be used for this purpose; but, if so, it plainly ought not to have had the effect of circumventing the jurisdictional and choice of law rules for an ordinary restitutionary claim.

*Re Paramount Airways*, therefore, was decided on unusual facts. However, the court's confirmation that the statutory provisions for setting aside antecedent transactions may have extraterritorial effect is welcome. The textbooks suggest that this is the case whether or not the company being wound up is an English company; however, courts should not allow any of the relevant sections to be invoked in an ancillary liquidation.

Pending an international insolvency convention, the basic approach is one of co-operation and judicial restraint. These are two sides of the same coin, and can be accommodated under the heading of judicial comity, or "do as you would be done by". English law has a long tradition of assistance and co-operation with other courts to enable foreign creditors to gain access to property situate in England. As has been seen, the existence of foreign insolvency proceedings does not bar the commencement of English insolvency proceedings, although their existence is a factor to be considered in deciding whether to make a winding-up order in this country. The English court will renounce jurisdiction if it considers that the interests of justice and convenience require the liquidation to be conducted solely abroad.

Statutory provisions for co-operation between the courts of England and Wales and the courts elsewhere in connection with the bankruptcy of individuals have existed since 1849, and were eventually enacted in s. 122 of the Bankruptcy Act 1914. This provided for the High Court, county courts, courts having jurisdiction in bankruptcy, and "every British court elsewhere having jurisdiction in bankruptcy or insolvency" to "act in aid of and be auxiliary to each other in all matters of bankruptcy". The Cork Committee recommended that this provision for mutual aid should be extended to winding-up proceedings, and that the reference to "British courts" should be replaced by a more modern and extensive provision. This has been achieved by s. 426 of the

© 1997 John Wiley & Sons, Ltd. 

,991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



Insolvency Act 1986, which refers to "relevant country or territory", meaning a country designated for the purpose by statutory instrument. The procedure is for the foreign liquidator to obtain from his local court a letter of request addressed to the English court seeking its assistance. The English court has a discretion as to the assistance it will give, but it may apply the law of either jurisdiction in doing so.

Section 426 has recently been subjected to a comprehensive review by the Court of Appeal in a judgment delivered by Morritt LJ. In *Hughes v Hannover Ruckversicherungs-Aktiengesellschaft* (unreported) 28 January 1997 he confirmed that the English court is not limited to granting relief in the exercise of its insolvency jurisdiction, and may grant relief in the exercise of its general jurisdiction, such as a *Mareva* injunction. Section 426(10) defines "insolvency law", but the only reference to insolvency law contained in the section is in subs. 1, where it serves to identify the court authorised to provide assistance (any court in any part of the United Kingdom exercising jurisdiction in relation to insolvency law), not to identify the source of the jurisdiction it may exercise.

Morritt LJ also considered the nature of the discretion which s. 426 confers on the court. He rejected both extreme views – i.e. that the section is mandatory, so that if it is possible to give the assistance sought the court must do so; and that the only obligation cast upon the English court is to entertain the application for assistance, everything else being a matter of complete and unfettered discretion. Instead, the true position is that in principle the assistance should be given if, in accordance with the law to be applied, the relief sought can properly be given. The fact that it has been requested is a weighty consideration, but it does not outweigh all others.

Section 426(5) extends the ordinary jurisdiction of the English court in two ways: first, the English court may apply its own law or the law of the requesting court; and, secondly, the English court may assume that the matters specified in the request fall within its own jurisdiction if "comparable matters" would do so. This has the effect that by virtue of the request the court can exercise a jurisdiction which neither court would possess alone. In *Re Dallhold Estates (UK) Pty Ltd* [1992] BCC 394 the English court, at the request of the Australian court, made an administration order in respect of a company incorporated in Australia. Except by the use of s. 426, neither the Australian nor the English court could have made such an order. At the time Australia had no form of administration procedure, while the English court could make an administration order only in respect of a company incorporated in England. However, Chadwick J correctly held that the section conferred an original jurisdiction on the English court, which enabled it to make the order at the request of the Australian court even though the company was not incorporated in England.

*Re BCCI SA and Re BCCI (Overseas) Ltd* [1993] BCC 787 was decided to the same effect. The court of the Cayman Islands issued a letter of request

 © 1997 John Wiley & Sons, Ltd.

addressed to the English court seeking its assistance in making orders against former officers of the company in respect of breaches of fiduciary duty, fraudulent trading, wrongful trading, and transactions at an undervalue. Rattee J held that s. 426 conferred the necessary jurisdiction, notwithstanding the absence of any corresponding provisions under the law of the Cayman Islands. In both cases the English court made an order which would have been authorised (in the case of an English company) under its own law, and relied upon the letter of request to overcome the limitation of its purely domestic jurisdiction to companies incorporated in England.

It is clear that if the situation in *Re Sudair International Airways Ltd* (above) arose today the judgment creditors could be prevented from gaining priority by continuing with the execution in England. The South African liquidators would be able to obtain a letter of request from the South African court for assistance and would ask the English court to stay the execution under s. 132(2) of the Act. Section 426(5) would enable the English court to ignore the fact that the company was not incorporated here.

However, s. 426 does not entitle an English court to ignore territorial limits upon the relief it can provide. In *Hughes* (above) the court declined to assist the Bermudan court by granting a worldwide, anti-suit injunction that was sought in order to restrain arbitration proceedings in the United States against a Bermudan company in liquidation in Bermuda. It would willingly have restrained proceedings in England, but there was no threat of this occurring. If the court in Bermuda had wanted to restrain proceedings in the United States it should have addressed its request for assistance to the appropriate US court.

The United States has a uniform Bankruptcy Code, and all insolvency cases are heard by specialist federal bankruptcy courts. The Bankruptcy Court for the Southern District of New York is the premier bankruptcy court in the United States, and is responsible for handling the majority of all corporate insolvencies (and the overwhelming majority of all filings under Chapter 11 of the Code). Sections 303 to 306 of the Code provide for assistance to be given to foreign insolvency proceedings. Section 304 sets out guidelines to be followed by a bankruptcy court which is asked to give assistance to foreign bankruptcy proceedings. Generally, the court is guided by what will best assure the economical and expeditious administration of the insolvent estate, provided this is consistent with due process, the fair treatment of US creditors, and comity. Section 305 permits the court to dismiss or suspend any pending US bankruptcy proceedings where there are current foreign insolvency proceedings, and the factors listed in s. 304 of the Code justify such a course. It has been suggested that s. 426 of the Insolvency Act 1986 should be replaced by the more extensive provisions of the US Code.

The other side of the coin is that when an English court has jurisdiction with extraterritorial effect such jurisdiction should be exercised with restraint. An English court has jurisdiction in appropriate cases to restrain persons subject to its jurisdiction from prosecuting proceedings before a foreign court. The power





10991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

has been exercised in the case of a company in insolvent liquidation in England to prevent a creditor resident in this country obtaining priority over other creditors by seizing the company's assets in a foreign country.[1] In *Re Vocalion (Foreign) Ltd* [1932] 2 Ch. 196 Maugham J did not doubt that the jurisdiction existed even in the case of a creditor who was properly served in England but who was resident abroad and was seeking merely to recover a debt due to him by resorting to the courts of his own country. However, Maugham J declined to exercise the jurisdiction in such a case.

In a case currently pending in the Court of Appeal creditors of an English company who were resident in England brought garnishee proceedings in Florida. Before the process was complete, the company was placed in administrative receivership and liquidation in England. The liquidators intervened in the Florida proceedings and asked for them to be stayed. The Florida court recognised that the real question was one of priorities in an English insolvency, and adjourned the proceedings to abide by the decision of the English court. The creditors then applied to the English court for an order authorising them to complete the garnishee proceedings and retain the proceeds for their own benefit. Rattee J ruled that he had no jurisdiction to make the order sought. The Court of Appeal must decide whether he was right or wrong. However, it would be unfortunate, to say the least, if the English insolvency court had no jurisdiction to decide a question of priority in an English liquidation; and doubly unfortunate if it could not do so even when the foreign court had expressly deferred to its decision.

Although an English court has power to grant anti-suit injunctions in order to restrain proceedings in a foreign court, it has often been said that such jurisdiction must be exercised with caution. In theory, the injunction operates *in personam* upon a person already subject to the jurisdiction of the English court, and, since it is not directed against the foreign court itself, it should not cause offence. This argument is not well received abroad. In *Laker Airways Ltd v Pan American World Airways* 559 F Supp 1124 (DDC 1983) where the English Court of Appeal stated that it was merely acting *in personam* by granting an injunction restraining Laker Airways from prosecuting an anti-trust suit in Washington DC, the US judge, Harold H. Greene, replied that the order was a direct interference with the proceedings in his court.

The position today is that there must be a good reason why the decision to stop the foreign proceedings should be made in this country rather than overseas. The normal assumption must be that a foreign judge is the person best qualified to decide whether the proceedings in his court should be allowed to continue. Comity demands a general policy of non-intervention.

These observations are taken from the illuminating judgment of Hoffmann J in the leading case concerning exercise of judicial restraint: *Re Maxwell*

1. *Re North Carolina Estate Co.* (1889) 5 TLR 328.

 © 1997 John Wiley & Sons, Ltd.



1991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

24-10076-mg Doc 41-2 Filed 02/12/24 Entered 02/12/24 16:33:48 Exhibit B to Declaration of Thomas Lowe KC Pg 574 of 622

1991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



*Communications Corporation plc (No. 2)* [1992] BCC 757. The company, which was incorporated in England, was simultaneously in administration in England and in Chapter 11 proceedings in New York. Shortly before the company went into administration (or Chapter 11) it paid $30 million to Barclays Bank in repayment of a loan facility which it had been granted by the bank. The loan facility was granted by a London branch of an English bank to an English company and was repayable in London. The transaction was governed by English law. However, the money represented the proceeds of sale of an asset located in the United States, and was paid into a New York branch of the bank. The bank asked the English court to restrain the administrators from bringing proceedings in New York to recover the money as a voidable preference. Proceedings to recover the money could not be brought in England since there was no desire on the part of the directors of the company to prefer the bank to the other creditors. No such requirement exists under New York law.

Hoffmann J refused to grant an injunction, and his decision was upheld by the Court of Appeal. Hoffmann J considered that the transaction was sufficiently connected with England for the English court to accept jurisdiction under s. 239 of the Insolvency Act 1986, but it did not follow that it would be unjust or unconscionable for the New York court to assume jurisdiction under the corresponding provision of the US Bankruptcy Code. He expressed no view whether the English court, faced with the mirror image of the facts before him, would accept or decline jurisdiction. The fact that the New York court might take a different view of the weight of the various connecting factors was not a sufficient ground for the English court to grant an injunction.

In that case Hoffmann J said that "an injunction could serve no useful purpose except to antagonise the New York court and prejudice the co-operation which had previously prevailed between the courts administering the Chapter 11 and the administration proceedings".[2] He did say that if the New York judge did not think that there was sufficient connection with the United States to justify preference proceedings she would dismiss them. Hoffmann J's confidence proved to be well-founded. Judge Tina Brozman of the New York Bankruptcy Court for the Southern District of New York duly dismissed the preference proceedings.[3]

The leading example of the failure to exercise judicial restraint is the well-known case of *Felixstowe Dock and Railway Co. v US Lines Inc* [1989] QB 360. The company was incorporated in the United States and carried on a worldwide shipping business. It operated in England and was registered under the Companies Acts. It filed under Chapter 11 in the United States. The New York Bankruptcy Court granted a worldwide restraining order staying all claims against the company within and outside the United States. The

2. Presumably, in stating that he did not intend to suggest that this was a useful purpose.

3. After she met Hoffmann J at an international insolvency convention in Australia (INSOL '93).

© 1997 John Wiley & Sons, Ltd. 

Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



reorganisation scheme submitted to the New York court provided for the company to close down its English and European operations and concentrate its activities in the United States. The plaintiffs, who were English and European trade creditors of the company, brought proceedings to recover payment for services supplied to the company, and obtained *Mareva* injunctions restraining the company from removing its assets from the jurisdiction. The company applied for the injunctions to be discharged, arguing that the English court should recognise the restraining order of the New York Bankruptcy Court and allow it to govern the disposition of the company's English assets. Hirst J refused the application; he was concerned that if the *Mareva* injunctions were discharged, the English assets would be removed from the jurisdiction and used to keep the company as a going concern in the United States without any corresponding benefit to the English creditors.

The decision did great harm to the relations between the courts of the two countries, and seriously damaged the esteem in which UK courts had previously been held by insolvency practitioners and judges abroad. There was clearly a very difficult issue to resolve – the relative weight to be given to the competing claims of the creditors outside the United States and the survival of the company and its business in the United States – but, with great respect to Hirst J, it was not for him to resolve. The English and European creditors had dealt with a US corporation (i.e. a corporation which was amenable to Chapter 11) and had to take the consequences. The creditors had a case because they were entirely excluded from the scope of the proposed reconstruction; but, in my view, it was a case which should have been presented to the New York court.

## The need for an international convention

Some of the problems discussed above will remain insoluble until an international insolvency convention is introduced. A number of UK judges have called attention to the need for such a convention. In *Re BCCI (No.3)* [1992] BCC 83 at 89, Sir Nicolas Browne-Wilkinson V-C expressed his "profound regret" that there was no international convention regulating international insolvency, and his hope that the case before him might concentrate people's minds on the need for such a convention. In *Re Paramount Airways Ltd* (above) his successor Sir Donald Nicholls V-C said that there was "a crying need" for an international insolvency convention. His view was echoed by Hoffmann J in *Re Maxwell Communications Corporation plc (No.2)* (above) where he said that the only satisfactory solution to the problems of jurisdictional conflicts in cross-border insolvencies is an international insolvency convention. In the absence of such a convention, the only way forward, Hoffmann J said, was by the exercise of jurisdictional self-restraint. Unfortunately, as he recognised, every jurisdiction cannot be expected to behave in the same way.

 © 1997 John Wiley & Sons, Ltd.

1991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



In fact, the need for a convention has long been recognised. However, there are great difficulties in harmonising insolvency law, or even in reaching any kind of consensus on the aims which insolvency law should seek to achieve. No branch of the law is moulded more by considerations of national economic policy and commercial philosophy. Attention has already been drawn to the lack of any consensus on whether local assets should be available primarily to local creditors or made universally available in a single pool to creditors worldwide. The disagreement is not due to differences in legal tradition; it is dictated by national economic policy. The different rules concerning the avoidance of preferences are not merely technical differences, but are also due to different perceptions of the nature of the mischief to be redressed. Is the problem the risk that a vigilant creditor who realises that his debtor is insolvent may gain an advantage over less vigilant creditors, or is it that a debtor who realises that he is insolvent may try to save his family and friends from the impending disaster? The Americans and Australians consider the former to be the problem; the English think the latter. The question is discussed in depth in the Report of the Cork Committee.[4]

In addition, there is no consensus on the objectives of a rescue operation and the proper balance between the interests of the creditors and the survival of the business. The differences between Chapter 11 of the US Bankruptcy Code and the English administration order procedure are not technical or accidental. The reasons are part historical, part social, and part structural. The Cork Committee took a close look at Chapter 11 and decided that the fundamental concept on which it is based, that of the debtor in possession, would not be acceptable to creditors in the United Kingdom. Instead, the Committee took administrative receivership as its model, with the result that it is far more creditor-oriented than Chapter 11. This difference is partly explained by the way in which insolvency is perceived in the two countries; Americans regard it as, at worst, a misfortune and, at best, a necessary precondition to commercial success; the British view insolvency as a form of commercial cheating. The difference is also explained by the fact that insolvency in the United States is handled by lawyers, who prefer to negotiate deals between competing interests and leave the business to be run by existing management; in the United Kingdom, however, insolvency is dealt with by accountants, who share the creditors' contempt for the existing management whose incompetence has ruined the business and who prefer to take over the management and leave the competing interests to be dealt with according to fixed legal rules.

The two systems are therefore different, and are based on incompatible philosophies. The Australian Bankruptcy Reform Committee took a close look at both systems and opted for a modified form of the UK administration order

4. *Insolvency Law and Practice* (Cmnd 8558, 1982), paras 1247–1256.

© 1997 John Wiley & Sons, Ltd. 

procedure. The Canadians also looked at both systems and, not surprisingly, opted for a modified form of Chapter 11. Only the Irish, true to their own national character, managed to opt for a combination of both.

In spite of the difficulties, the absence of an international insolvency convention is not for want of trying. A draft convention was produced by the Hague Conference in 1925, but it was not ratified by a single country. Another draft convention was adopted by the Council of Europe in February 1990. It has 23 signatories, including all 12 members of the European Community, but is not in force because insufficient countries have ratified it.

Within the European Community a working party was established in 1963 to examine the case for an insolvency convention. It was the opinion of a committee of experts that a separate insolvency convention was the only method of achieving harmony in this important area of commercial law. The working party produced a report in 1970 with a draft convention annexed, which met with almost universal opposition. Successive drafts were subjected to exhaustive analysis by national governments. The United Kingdom joined the Common Market in 1973, and appointed a committee under the chairmanship of Kenneth Cork (Cork Mark I) to examine the convention. Its report was predictably hostile.

Work on the convention ceased in the 1980s, but recommenced in 1990 when the working group was reconstituted. A final draft was produced for discussion in 1994, which formed the basis of the version approved by the Council of Ministers in 1995. The EU Convention on Insolvency Proceedings is designed to supersede all previous bilateral or other conventions entered into between the signatories. The outbreak of "the beef war" last Autumn prevented the United Kingdom ratifying the Convention and, as such, it has fallen for want of ratification within the time limit. The European Commission is now considering whether to incorporate the Convention into a directive. However, this means of introduction may be opposed by those who would probably welcome the Convention if it were introduced by any other mechanism.

If adopted, the Convention will prescribe a single seat for the exercise of the main insolvency proceedings where the main business of the insolvent is located. Simultaneous secondary proceedings may be brought in other jurisdictions where the debtor has an establishment. The jurisdiction of the court exercising a secondary jurisdiction will be limited to assets within its own territory. Secondary proceedings may be commenced before the main proceedings, but they do not thereby become the principal proceedings. The concept of "the court first seised", which plays such a prominent part under the Brussels Convention, has no place in the new Convention. The power of the debtor and the liquidator during the proceedings, the rules governing set-off, the admission of claims to proof, the ranking of claims, the avoidance of antecedent transactions (including preferences), the effect of the insolvency on current contracts etc. are all governed by the substantive law of the main

 © 1997 John Wiley & Sons, Ltd.



10991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

jurisdiction. As usual, the interpretation of the Convention will be entrusted to the European Court of Justice, from which national courts may obtain rulings.

Until the Convention is properly ratified insolvency practitioners, lawyers and judges will remain active. Two initiatives have been undertaken. First, the United Nations Commission on International Trade Law (UNCITRAL) has undertaken an International Insolvency Law Project, which is endeavouring to develop model clauses dealing with cross-border insolvencies for inclusion in national insolvency laws for adoption by emerging countries. Many of the leading English insolvency practitioners have assisted in this work.

If the first initiative is intended to be legislative, the second is judicial, although both are practitioner-led. The need for co-operation between the insolvency courts in different jurisdictions is too urgent to admit of delay. Necessity has spawned its customary offspring. In several major international insolvencies the courts have sanctioned schemes agreed by the office holders for the administration of the company simultaneously in two different jurisdictions. The first time this was put into practice involved Maxwell Communications Corporation, which was placed in administration in England and in Chapter 11 in New York. The English court appointed administrators, and the New York court appointed an examiner. A protocol establishing a scheme of corporate governance was agreed between the examiner and the administrators and, in January 1992, the protocol was approved and its implementation directed by the Bankruptcy Court for the Southern District of New York and the High Court in London. The key to the success of the protocol lay in the following factors: the acceptance by the New York court that the English administrators constituted the debtor in possession for the purpose of the Chapter 11 proceedings; the appointment of an experienced insolvency practitioner as examiner; and the mutual respect which the principal administrator, Mark Homan of Price Waterhouse, and the examiner, Richard Gitlin, showed each other.

A valuable precedent was set. Similar protocols have since been approved in a number of cases. In the case of Olympia & York Realty Company the New York Bankruptcy Court approved and directed the implementation of a protocol which reflected the provisions of a scheme for the corporate governance sanctioned by the court in Ontario. In December 1995, in the case of Commodore Business Machines Inc, the Supreme Court of the Bahamas retrospectively authorised the liquidators of two companies which were in compulsory liquidation in the Bahamas to enter into and implement the terms of a protocol which they had already entered into with the unofficial creditors' committee of unsecured creditors for the conduct of dual bankruptcy proceedings by the Supreme Court of the Bahamas and the New York Bankruptcy Court. The judgment of the Bahamian court is instructive. In authorising the liquidators to enter into the protocol *nunc pro tunc*, the judge said:

> "In principle I see nothing harmful in courts of different countries exercising their jurisdiction in their respective countries in such a way as to ensure that a





10991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

17991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



> winding-up of a large international business concern is as fair to all concerned – especially the unsecured creditors – as it is humanly possible to be, especially where what is sought is in no way contrary to the public policy of the Bahamas or so offensive to our sense of justice and fair play that it ought not to be respected.
>
> The idea behind the protocol ... is not to subordinate the courts of one jurisdiction to the courts of another but to recognise the legitimate jurisdiction of each court over the subject matter within its jurisdiction and to encourage the liquidators who will also become the debtors in possession if the protocol is approved to so manage the affairs of the companies in the United States and the liquidation in the Bahamas as to maximise the benefits to creditors and to minimise conflicts which could arise on the adoption of a confrontational attitude between courts each of which is undoubtedly exercising legitimate jurisdiction."

The court relied on the English decision in *Re P Macfayden & Co.* [1908] 1 KB 675 for its jurisdiction to approve the protocol. In that case the English court held that where a firm was bankrupt in England and abroad, it had jurisdiction to sanction an agreement between the trustee in bankruptcy in England and the official assignee abroad for a scheme of pooling all the assets and distributing them rateably among the creditors, notwithstanding that the Bankruptcy Act 1883 contained no express provision authorising such a scheme. There is no doubt that the English court has the necessary jurisdiction, and is willing to exercise it, as Hoffmann J has already done. However, it would be useful to have an express statutory power to which UK office holders can point in order to satisfy foreign courts of the UK's ability to reciprocate.

A Cross-Border Insolvency Concordat establishing the principles on which such protocols should be based has been developed under the aegis of the Council of the International Bar Association. It is intended to provide a framework within which individual protocols can be agreed. The Concordat recites that:

> "Flexibility in the rules appears to be indispensable in international bankruptcy. The situations which arise are so varied that any one rigid rule cannot solve all of them satisfactorily ... Neither the theory of territoriality nor the theory of ubiquity can cope adequately with the divergent situations."

The final version of the Concordat was adopted by the Council of the International Bar Association at its meeting in Madrid in May 1996. An earlier version, signed in Paris in September 1995, was annexed to and formed part of a protocol for the administration of Everfresh Beverages Inc jointly in New York and Toronto. The two bankruptcy courts co-ordinated their processes so that the approvals were both sought on 20 December 1995. Approval was granted by the New York court in the morning and by the Canadian court that same afternoon.

In May 1996 the Concordat formed the basis for another protocol, this time dealing with an individual who had filed under Chapter 11 in New York before being made personally bankrupt in Tel Aviv.

 © 1997 John Wiley & Sons, Ltd.

991107, 1997, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/iir.3940060202 by Test, Wiley Online Library on [12/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



This is plainly the road ahead. Should the situation which arose in *Felixstowe Dock and Railway Co.* (above) occur again, it is to be hoped that this is the way it will be dealt with. The English company would be put into some kind of insolvency process – administration or liquidation – and the office holders would appear in New York to negotiate and enter into a suitable protocol for the reorganisation of the company in a way which would ensure the survival of the company without treating the English creditors unfairly.

Perhaps the opening pessimism of this paper was overstated; some consistency in the approach of the English judiciary to cross-border insolvency can be detected. Its watchwords are flexibility, co-operation and judicial restraint.

© 1997 John Wiley & Sons, Ltd. 

**CAYMAN ISLANDS**

# COMPANIES ACT

**(2023 Revision)**

**Supplement No. 3 published with Legislation Gazette No. 1 dated 12th January, 2023.**

(4) In this section —

"**dissenting shareholder**" includes a shareholder who has not assented to the scheme or contract and any shareholder who has failed or refused to transfer that person's shares to the transferee company, in accordance with the scheme or contract.

# PART V - Company Restructuring and Winding up of Companies and Associations

## Preliminary

### Definitions

**89**. In this Part —

"**company**" includes a foreign company in respect of which the Court has made a winding up order;

"**contributory**" means —

(a) every person liable by virtue of section 49 to contribute to the assets of a company in the event that it is wound up under this Law; and

(b) every holder of fully paid up shares of a company;

"**controller**" means a person appointed by the Authority pursuant to the regulatory laws to take control of a company;

"**document**" includes any device by means of which information is recorded or stored;

"**foreign company**" means any body corporate incorporated outside the Islands;

"**foreign practitioner**" means a person who is qualified under the law of a foreign country to perform functions equivalent to those performed by official liquidators under this Act or by trustees in bankruptcy under the *Bankruptcy Act (1997 Revision)*;

"**limited partnership**" means an ordinary limited partnership registered in accordance with section 49 of the *Partnership Act (2013 Revision)* or an exempted limited partnership registered in accordance with section 9 of the *Exempted Limited Partnership Act (2021 Revision)*;

"**official liquidator**" means the liquidator of a company which is being wound up by order of the Court or under the supervision of the Court and includes a provisional liquidator;

"**prescribed**" means prescribed by the Insolvency Rules Committee;

"**professional service provider**" means a person who contracts to provide general managerial or administrative services to a company on an annual or continuing basis;

"**qualified insolvency practitioner**" means a person holding the qualifications specified in the regulations made by the Insolvency Rules Committee under section 155 or such other qualifications as the Court considers appropriate for the conduct of the winding up of a company;

"**Rules**" mean rules prescribed by the Insolvency Rules Committee;

"**shadow director**" means, in relation to a company, any person in accordance with whose directions or instructions the directors of the company are accustomed to act, but the person is not deemed to be a shadow director by reason only that the directors act on advice given by that person in a professional capacity; and

"**winding up order**" includes an order that a voluntary winding up continue under the supervision of the Court and references to a company being wound up by the Court includes a company which is being wound up under the supervision of the Court.

## Alternative modes of winding up

**90**. A company may be wound up —

(a) compulsorily by order of the Court;

(b) voluntarily —

(i) by virtue of a special resolution;

(ii) because the period, if any, fixed for the duration of the company by its articles of association has expired; or

(iii) because the event, if any, has occurred, on the occurrence of which its articles of association provide that the company shall be wound up; or

(c) under the supervision of the Court.

## Jurisdiction of the Court

**91**. The Court has jurisdiction to make winding up orders in respect of —

(a) an existing company;

(b) a company incorporated and registered under this Law;

(c) a body incorporated under any other law; and

(d) a foreign company which —

(i) has property located in the Islands;

(ii) is carrying on business in the Islands;

(iii) is the general partner of a limited partnership; or

(iv) is registered under Part IX.

## Company Restructuring

### Interpretation of "company"

**91A**. For the purposes of sections 91B, 91C, 91D, 91E, 91F, 91G, 91H, 91I and 91J, "**company**" means —

(a) any company liable to be wound up under section 91; or

(b) any other entity or partnership to which the provisions of this Part apply in respect of the entity's or partnership's winding up.

### Appointment of a restructuring officer

**91B**.(1) A company may present a petition to the Court for the appointment of a restructuring officer on the grounds that the company —

(a) is or is likely to become unable to pay its debts within the meaning of section 93; and

(b) intends to present a compromise or arrangement to its creditors (or classes thereof) either, pursuant to this Law, the law of a foreign country or by way of a consensual restructuring.

(2) A petition under subsection (1) may be presented by a company acting by its directors, without a resolution of its members or an express power in its articles of association.

(3) The Court may, on hearing a petition under subsection (1) —

(a) make an order appointing a restructuring officer;

(b) adjourn the hearing conditionally or unconditionally;

(c) dismiss the petition; or

(d) make any other order as the Court thinks fit, except an order placing the company into official liquidation, which the Court may only make in accordance with sections 92 and 95 if a winding up petition has been presented in accordance with sections 91G and 94.

(4) A restructuring officer appointed by the Court under subsection (3)(a) shall have the powers and carry out only such functions as the Court may confer on the restructuring officer in the order appointing the restructuring officer, including the power to act on behalf of the company.

(5) Where the Court makes an order under subsection (3)(a), the Court shall set out in the order —

(a) the manner and time within which the restructuring officer shall give notice of the restructuring officer's appointment to —

(i) the company's creditors, including any contingent or prospective creditors;

(ii) the company's contributories; and

(iii) the Authority, in respect of any company which is carrying on regulated business;

(b) the manner and extent to which the powers and functions of the restructuring officer shall affect and modify the powers and functions of the board of directors; and

(c) any other conditions to be imposed on the board of directors that the Court considers appropriate, in relation to the exercise by the board of directors of its powers and functions.

(6) Where a company which is carrying on a regulated business presents a petition under subsection (1), the directors of the company shall, immediately after presenting the petition, serve notice of the petition on the Authority.

(7) A director who fails to comply with subsection (6) commits an offence and is liable to a fine of ten thousand dollars.

### Appointment of an interim restructuring officer

**91C.** (1) A company may, where it is in the interests of the company to do so, make an *ex parte* application to the Court for the appointment of a restructuring officer on an interim basis pending the hearing of the petition under section 91B(1).

(2) An application under subsection (1) may be presented by a company acting by its directors without a resolution of its members or an express power in its articles of association.

(3) The Court may, on hearing an application under subsection (1), appoint a restructuring officer on an interim basis, on such terms and conditions as the Court thinks fit.

(4) A restructuring officer appointed on an interim basis by the Court under subsection (3) shall have the powers and carry out only such functions as the Court may confer on that restructuring officer in the order appointing the restructuring officer, including the power to act on behalf of the company.

(5) Where the Court makes an order under subsection (3), the Court shall set out in the order —

(a) the manner and time within which the restructuring officer shall give notice of the restructuring officer's appointment to —

(i) the company's creditors, including any contingent or prospective creditors;

(ii) the company's contributories; and

(iii) the Authority, in respect of any company which is carrying on regulated business;

(b) the manner and extent to which the powers and functions of the restructuring officer shall affect and modify the powers and functions of the board of directors; and

(c) any other conditions to be imposed on the board of directors that the Court considers appropriate, in relation to the exercise by the board of directors of its powers and functions.

(6) Where a company which is carrying on a regulated business makes an application under subsection (1), the directors of the company shall, immediately after making the application, serve notice of the application on the Authority.

(7) A director who fails to comply with subsection (6), commits an offence and is liable to a fine of ten thousand dollars.

### Restructuring officer

**91D.** (1) A restructuring officer appointed under section 91B or 91C shall be a qualified insolvency practitioner.

(2) Where two or more persons are appointed as restructuring officers under section 91B or 91C, they shall be authorised to act jointly and severally, unless their powers are expressly limited by an order of the Court.

(3) A restructuring officer appointed under section 91B or 91C is an officer of the Court.

(4) Notwithstanding subsection (1), where the Court has appointed a qualified insolvency practitioner to act as a restructuring officer, the Court may appoint a foreign practitioner to act as a restructuring officer in addition to the qualified insolvency practitioner.

(5) A foreign practitioner appointed by the Court to act as a restructuring officer shall not act as the sole restructuring officer of a company.

(6) The remuneration of a restructuring officer appointed under section 91B or 91C shall, on the application of the restructuring officer, be fixed by the Court from time to time in accordance with section 109.

(7) A restructuring officer, a creditor of the company, including a contingent or prospective creditor, or a contributory of the company may apply to the Court to determine any question arising in the course of carrying out the restructuring officer's functions.

### Variation or discharge of the order appointing a restructuring

**91E.** (1) At any time after the appointment of a restructuring officer by the Court under section 91B or 91C —

(a) the company acting by its directors;

(b) a restructuring officer appointed under section 91B or 91C;

(c) a creditor of the company, including a contingent or prospective creditor;

(d) a contributory of the company; or

(e) the Authority, in respect of any company which is carrying on a regulated business, may apply by way of summons to the Court for the variation or discharge of the order appointing the restructuring officer.

(2) An application under subsection (1)(a) may be presented by a company acting by its directors without a resolution of its members or an express power in its articles of association.

(3) The Court may, on hearing an application under subsection (1) —

(a) vary the order appointing the restructuring officer;

(b) discharge or continue the order appointing the restructuring officer;

(c) adjourn the hearing conditionally or unconditionally;

(d) dismiss the application; or

(e) make any other order as the Court thinks fit, except an order placing the company into official liquidation, which the Court may only make in accordance with sections 92 and 95 if a winding up petition has been presented in accordance with sections 91G and 94.

### Removal and replacement of restructuring officers

**91F.** (1) A restructuring officer may be removed from office and replaced by an alternative restructuring officer by order of the Court made on the application of —

(a) the company acting by its directors;

(b) a creditor of the company, including a contingent or prospective creditor;

(c) a contributory of the company; or

(d) the Authority, in respect of any company which is carrying on a regulated business.

(2) An application under subsection (1)(a) may be presented by a company acting by its directors without a resolution of its members or an express power in its articles of association.

(3) A restructuring officer who has been removed and replaced pursuant to subsection (1) shall prepare a report and accounts for the restructuring officer replacing the removed restructuring officer, within twenty-one days of the date of removal and replacement.

### Stay of proceedings

**91G.**(1) At any time —

(a) after the presentation of a petition for the appointment of a restructuring officer under section 91B, but before an order for the appointment of a restructuring officer is made, and when the petition has not been withdrawn or dismissed; and

(b) when an order for the appointment of a restructuring officer is made, until the order appointing the restructuring officer has been discharged,

no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company, no resolution shall be passed for the company to be wound up and no winding up petition may be presented against the company, except with the leave of the Court and subject to such terms as the Court may impose.

(2) Where at any time referred to in subsection (1), there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

(a) the company acting by its directors;

(b) a creditor of the company, including a contingent or prospective creditor;

(c) a contributory of the company; or

(d) the Authority, in respect of any company which is carrying on regulated business,

may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

(3) In this section —

(a) references to a suit, action or other proceedings include a suit, action or other proceedings in a foreign country; and

(b) references to other proceedings include any court supervised insolvency or restructuring proceedings against the company.

### Enforcement of creditors' security

**91H.** Notwithstanding the presentation of a petition for the appointment of a restructuring officer or the appointment of a restructuring officer by the Court under section 91B or 91C, a creditor who has security over the whole or part of the assets of the company is entitled to enforce the creditor's security without the leave of the Court and without reference to the restructuring officer appointed under section 91B or 91C.

**Power to compromise with creditors and members within restructuring officer proceeding**

**91I**. (1) Where a restructuring officer is appointed to a company and a compromise or arrangement is proposed between the company and its creditors or any class of them, or the company and its members or any class of them, the Court may, on the application of the restructuring officer, order a meeting of the creditors or class of creditors, or of the members of the company or class of members, as the case may be, to be summoned in such manner as the Court directs.

(2) If a majority in number representing seventy-five per cent in value of the creditors or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the creditors or the class of creditors, as the case may be, and also on the company.

(3) If seventy-five per cent in value of the members or class of members, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the members or class of members, as the case may be, and also on the company.

(4) An order made under subsection (2) or (3) shall have no effect until a copy of the order has been delivered to the Registrar for registration, and a copy of every such order shall be annexed to every copy of the memorandum of association of the company issued after the order has been made, or, in the case of a company not having a memorandum, of every copy so issued of the instrument constituting or defining the constitution of the company.

(5) If a company makes default in complying with subsection (4), the company and every officer of the company who is in default shall be liable to a fine of two dollars for each copy in respect of which default is made.

(6) In this section, "**arrangement**" includes a reorganisation of the share capital of the company by the consolidation of shares of different classes or by the division of shares into shares of different classes or by both those methods.

### Provisions for facilitating reconstruction and amalgamation of companies

**91J**. (1) Where an application is made to the Court under section 91I for the sanctioning of a compromise or arrangement proposed between a company and any such persons as are specified in that section, and it is shown to the Court that the compromise or arrangement has been proposed for the purpose of or in connection with a scheme for the reconstruction of any company or companies or the amalgamation of any two or more companies, and that under the scheme the whole or any part of the undertaking or the property of any company concerned in the scheme (in this section referred to as "**a transferor company**") is to be transferred to another company (in this section referred to as "**the transferee company**") the Court, may either by the order sanctioning the compromise or arrangement or by any subsequent order make provision for —

(a) the transfer to the transferee company of the whole or any part of the undertaking and of the property or liabilities of any transferor company;

(b) the allotting or appropriation by the transferee company of any shares, debentures, policies, or other like interests in that company which under the compromise or arrangement are to be allotted or appropriated by that company to or for any person;

(c) the continuation by or against the transferee company of any legal proceedings pending by or against any transferor company;

(d) the dissolution, without winding up, of any transferor company;

(e) the provisions to be made for any person who within such time and in such manner as the Court directs dissents from the compromise or arrangement; and

(f) such incidental, consequential and supplemental matters as are necessary to secure that the reconstruction or amalgamation is fully and effectively carried out.

(2) Where an order under this section provides for the transfer of property or liabilities, that property shall, by virtue of the order, be transferred to and vest in, and those liabilities shall, by virtue of the order, be transferred to and become the liabilities of, the transferee company, and any such property shall, if the order so directs, be freed from any charge which is, by virtue of the compromise or arrangement, to cease to have effect.

(3) Where an order is made under this section, every company in relation to which the order is made shall cause a copy thereof to be delivered to the Registrar for registration within seven days after the making of the order, and if default is made in complying with this subsection, the company and every officer of the company who is in default shall be liable to a default fine.

(4) In this section —

"**property**" includes property, rights and powers of every description;

"**liabilities**" includes duties; and

"**transferee company**" means any company or body corporate established in the Islands or in any other jurisdiction.

## Winding up by the Court

### Circumstances in which a company may be wound up by the Court

**92**. A company may be wound up by the Court if —

(a) the company has passed a special resolution requiring the company to be wound up by the Court;

(b) the company does not commence its business within a year from its incorporation, or suspends its business for a whole year;

(c) the period, if any, fixed for the duration of the company by the articles of association expires, or whenever the event, if any, occurs, upon the occurrence of which it is provided by the articles of association that the company is to be wound up;

(d) the company is unable to pay its debts; or

(e) the Court is of opinion that it is just and equitable that the company should be wound up.

### Definition of inability to pay debts

**93**. A company shall be deemed to be unable to pay its debts if —

(a) a creditor by assignment or otherwise to whom the company is indebted at law or in equity in a sum exceeding one hundred dollars then due, has served on the company by leaving at its registered office a demand under that person's hand requiring the company to pay the sum so due, and the company has for the space of three weeks succeeding the service of such demand, neglected to pay such sum, or to secure or compound for the same to the satisfaction of the creditor;

(b) execution of other process issued on a judgment, decree or order obtained in the Court in favour of any creditor at law or in equity in any proceedings instituted by such creditor against the company, is returned unsatisfied in whole or in part; or

(c) it is proved to the satisfaction of the Court that the company is unable to pay its debts.

### Application for winding up

**94**. (1) An application to the Court for the winding up of a company shall be by petition presented either by —

(a) the company;

(b) any creditor or creditors (including any contingent or prospective creditor or creditors);

(c) any contributory or contributories; or

(d) subject to subsection (4), the Authority pursuant to the regulatory laws.

(2) Where expressly provided for in the articles of association of a company, the directors of a company incorporated before the commencement of this amending Act have the authority to —

(a) present a winding up petition; or

(b) where a winding up petition has been presented, apply for the appointment of a provisional liquidator, on behalf of the company without the sanction of a resolution passed at a general meeting.

(2A) Subject to subsection (2B), the directors of a company incorporated after the commencement of this amending Act may present a winding up petition on behalf of the company on the grounds that the company is unable to pay its debts within the meaning of section 93 or where a winding up petition has been presented, applyon behalf of the company, for the appointment of a provisional liquidator.

(2B) The articles of association of a company may expressly remove or modify the directors' authority to present a winding up petition or apply for the appointment of a provisional liquidator on the company's behalf.

(3) A contributory is not entitled to present a winding up petition unless either —

(a) the shares in respect of which that person is a contributory, or some of them, are partly paid; or

(b) the shares in respect of which that person is a contributory, or some of them, either were —

(i) originally allotted to that person, or have been held by that person, and registered in that person's name for a period of at least six months immediately preceding the presentation of the winding up petition; or

(ii) have devolved on that person through the death of a former holder.

(4) A winding up petition may be presented by the Authority in respect of any company which is carrying on a regulated business in the Islands upon the grounds that it is not duly licensed or registered to do so under the regulatory laws or for any other reason as provided under the regulatory laws or any other law.

### Powers of the Court

**95**. (1) Upon hearing the winding up petition the Court may —

(a) dismiss the petition;

(b) adjourn the hearing conditionally or unconditionally;

(c) make a provisional order; or

(d) any other order that it thinks fit,

but the Court shall not refuse to make a winding up order on the ground only that the company's assets have been mortgaged or charged to an amount equal to or in excess of those assets or that the company has no assets.

(2) The Court shall dismiss a winding up petition or adjourn the hearing of a winding up petition on the ground that the petitioner is contractually bound not to present a petition against the company.

(3) If the petition is presented by members of the company as contributories on the ground that it is just and equitable that the company should be wound up, the Court shall have jurisdiction to make the following orders, as an alternative to a winding-up order, namely —

(a) an order regulating the conduct of the company's affairs in the future;

(b) an order requiring the company to refrain from doing or continuing an act complained of by the petitioner or to do an act which the petitioner has complained it has omitted to do;

(c) an order authorising civil proceedings to be brought in the name and on behalf of the company by the petitioner on such terms as the Court may direct; or

(d) an order providing for the purchase of the shares of any members of the company by other members or by the company itself and, in the case of a purchase by the company itself, a reduction of the company's capital accordingly.

(4) Where an alternative order under subsection (3) requires the company not to make any, or any specified, alteration in the memorandum or articles of association, the company does not have power, without the leave of the Court, to make any such alteration in breach of that requirement.

(5) Any alteration in a company's memorandum or articles of association made by virtue of an alternative order under subsection (3) is of the same effect as if duly made by resolution of the company, and the provisions of this Act shall apply to the memorandum or articles of association as so altered accordingly.

(6) A copy of an alternative order made under subsection (3) altering, or giving leave to alter, a company's memorandum or articles of association shall be filed by the company with the Registrar within fourteen days of the making of the order.

## Power to stay or restrain proceedings

**96**. At any time after the presentation of a winding up petition and before a winding up order has been made, the company or any creditor or contributory may —

(a) where any action or proceeding against the company, including a criminal proceeding, is pending in a summary court, the Court, the Court of Appeal or the Privy Council, apply to the court in which the action or proceeding is pending for a stay of proceedings therein; and

(b) where any action or proceeding is pending against the company in a foreign court, apply to the Court for an injunction to restrain further proceedings therein,

and the court to which application is made may, as the case may be, stay or restrain the proceedings accordingly on such terms as it thinks fit.

### Avoidance of attachments and stay of proceedings

**97**. (1) When a winding up order is made or a provisional liquidator is appointed, no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company except with the leave of the Court and subject to such terms as the Court may impose.

(1A) Where a winding up order is made or a provisional liquidator is appointed in respect of a company, and there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

(a) the company;

(b) a creditor of the company;

(c) a contributory of the company; or

(d) subject to section 94(4), the Authority, in respect of any company which is carrying on regulated business, may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

(2) When a winding up order has been made, any attachment, distress or execution put in force against the estate or effects of the company after the commencement of the winding up is void.

### Notice of winding up order

**98**. When a winding up order is made, the liquidator shall —

(a) file a copy of the winding up order with the Registrar; and

(b) publish notice of the winding up in the Gazette and any newspaper in which the winding up petition was advertised.

### Avoidance of property dispositions, etc.

**99**. When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.

### Commencement of winding up by the Court

**100**. (1) If, before the presentation of a petition for the winding up of a company by the Court —

(a) a resolution has been passed by the company for voluntary winding up;

(b) the period, if any, fixed for the duration of the company by the articles of association has expired;

(c) the event upon the occurrence of which it is provided by the articles of association that the company is to be wound up has occurred; or

(d) a restructuring officer has been appointed pursuant to section 91B or 91C and the order appointing the restructuring officer has not been discharged,

the winding up of the company is deemed to have commenced at the time of passing of the relevant resolution or the expiry of the relevant period or the occurrence of the relevant event or the date of the presentation of the petition to appoint a restructuring officer pursuant to section 91B.

(2) In any other circumstance not specified in subsection (1), the winding up of a company by the Court is deemed to commence at the time of the presentation of the petition for winding up.

### Company's statement of affairs

**101**. (1) Where the Court has made a winding up order or appointed a provisional liquidator, the liquidator may require some or all of the persons mentioned in subsection (3) to prepare and submit to that person a statement in the prescribed form as to the affairs of the company.

(2) The statement shall be verified by an affidavit sworn by the persons required to submit it and shall show —

(a) particulars of the company's assets and liabilities, including contingent and prospective liabilities;

(b) the names and addresses of any persons having possession of the company's assets;

(c) the assets of the company held by those persons;

(d) the names and addresses of the company's creditors;

(e) the securities held by those creditors;

(f) the dates when the securities were respectively given; and

(g) such further or other information that the liquidator may require.

(3) The persons referred to in subsection (1) are —

(a) persons who are or have been directors or officers of the company;

(b) persons who are or have been professional service providers to the company; and

(c) persons who are or have been employees of the company, during the period of one year immediately preceding the relevant date.

(4) Where any persons are required under this section to submit a statement of affairs to the liquidator, they shall do so, subject to subsection (5), before the end of the period of twenty-one days beginning with the day after that on which the prescribed notice of the requirement is given to them by the liquidator.

(5) The liquidator may release a person from an obligation imposed on that person under subsection (1) or, when giving the notice mentioned in subsection (4) or subsequently, the liquidator may extend the time for compliance; and if the liquidator refuses to extend the time for compliance, the Court may do so.

(6) In this section —

"**relevant date**" means —

(a) in a case where a provisional liquidator is appointed, the date of that person's appointment; and

(b) in any other case, the commencement of the winding up.

(7) A person who, without reasonable excuse, fails to comply with any obligation imposed under this section commits an offence and is liable on conviction to a fine of ten thousand dollars.

### Investigation by liquidator

**102**. (1) Where a winding up order is made by the Court, the liquidator shall be empowered to investigate —

(a) if the company has failed, the causes of the failure; and

(b) generally, the promotion, business, dealings and affairs of the company,

and to make such report, if any, to the Court as that person thinks fit.

(2) Subject to obtaining the directions of the Court, the liquidator shall have power to —

(a) assist the Authority and the Royal Cayman Islands Police Service to investigate the conduct of persons referred to in section 101(3); and

(b) institute and conduct a criminal prosecution of persons referred to in section 101(3).

(3) Subject to obtaining the prior approval of the company's creditors, if it is insolvent, or its contributories, if it is solvent, the directions given under

subsection (2) may include a direction that the whole or part of the costs of investigation and prosecution be paid out of the assets of the company.

### Duty to co-operate and the private examination of relevant persons

**103**. (1) This section applies to any person who, whether resident in the Islands or elsewhere —

(a) has made or concurred with the statement of affairs;

(b) is or has been a director or officer of the company;

(c) is or was a professional service provider to the company;

(d) has acted as a controller, advisor or liquidator of the company or receiver or manager of its property;

(e) not being a person falling within paragraphs (a) to (c), is or has been concerned or has taken part in the promotion, or management of the company,

and such person is referred to in this section as the "**relevant person**".

(2) It is the duty of every relevant person to co-operate with the official liquidator.

(3) While a company is being wound up, the official liquidator may at any time before its dissolution apply to the Court for an order —

(a) for the examination of any relevant person; or

(b) that a relevant person transfer or deliver up to the liquidator any property or documents belonging to the company.

(4) Unless the Court otherwise orders, the official liquidator shall make an application under subsection (3) if that person is requested in accordance with the rules to do so by one-half, in value, of the company's creditors or contributories.

(5) On an application made under subsection (3)(a), the Court may order that a relevant person —

(a) swear an affidavit in answer to written interrogatories;

(b) attend for oral examination by the official liquidator at a specified time and place, or

(c) do both things specified in paragraphs (a) and (b).

(6) The Court may direct that any creditor or contributory of the company be permitted by the official liquidator to participate in an oral examination.

(7) The Court shall have jurisdiction —

(a) to make an order under this section against a relevant person resident outside the Islands; and

(b) to issue a letter of request for the purpose of seeking the assistance of a foreign court in obtaining the evidence of a relevant person resident outside the jurisdiction.

## Official Liquidators

### Appointment and powers of provisional liquidator

**104**. (1) Subject to this section and any rules made under section 155, the Court may, at any time after the presentation of a winding up petition but before the making of a winding up order, appoint a liquidator provisionally.

(2) An application for the appointment of a provisional liquidator may be made under subsection (1) by a creditor or contributory of the company or, subject to subsection (6), the Authority, on the grounds that —

(a) there is a *prima facie* case for making a winding up order; and

(b) the appointment of a provisional liquidator is necessary in order to —

(i) prevent the dissipation or misuse of the company's assets;

(ii) prevent the oppression of minority shareholders; or

(iii) prevent mismanagement or misconduct on the part of the company's directors.

(3) An application for the appointment of a provisional liquidator may be made under subsection (1) by the company and on such an application the Court may appoint a provisional liquidator if it considers it appropriate to do so.

(4) A provisional liquidator shall carry out only such functions as the Court may confer on that person and that person's powers may be limited by the order appointing that person.

(5) The remuneration of the provisional liquidator shall be fixed by the Court from time to time on that person's application and the Court shall in fixing such remuneration act in accordance with rules made under section 155.

(6) An application for the appointment of a provisional liquidator may be presented by the Authority on the grounds under subsection (2), in respect of any company which is carrying on a regulated business in the Islands upon the grounds that it is not duly licensed or registered to do so under the regulatory laws or for any other reason as provided under the regulatory laws or any other law regardless of whether or not the Authority presented the winding up petition.

### Appointment of official liquidator

**105**. (1) For the purpose of conducting the proceedings in winding up a company and assisting the Court therein, there may be appointed one or more than one person to be called an official liquidator or official liquidators; and the Court may appoint to such office such person as it thinks fit, and if more persons than one are appointed to such office, the Court shall declare whether any act hereby required or authorised to be done by the official liquidator is to be done by all or any or more of such persons.

(2) The Court may also determine whether any and what security is to be given by an official liquidator on that person's appointment; and if no official liquidator is appointed, or during any vacancy in such office, all the property of the company shall be in the custody of the Court.

(3) The liquidator shall, within twenty-eight days of the date upon which the winding up order is made, summon —

(a) a meeting of the company's creditors if the order was made on the grounds that the company is insolvent; or

(b) a meeting of the company's contributories if the order was made on grounds other than insolvency,

for the purposes of resolving any other matters which the liquidator puts before the meeting.

(4) The Court may make an order dispensing with the need to summon a meeting under this section or extending the time within which it shall be summoned.

### Appointment of joint liquidators

**106**. When two or more persons are appointed to the office of liquidator, either provisionally or as official liquidators, they shall be authorised to act jointly and severally, unless their powers are expressly limited by order of the Court.

### Removal of official liquidators

**107**. An official liquidator may be removed from office by order of the Court made on the application of a creditor or contributory of the company.

### Qualifications of official liquidators

**108**. (1) A foreign practitioner may be appointed to act jointly with a qualified insolvency practitioner.

(2) Official liquidators are officers of the Court.

### Remuneration of official liquidators and restructuring officers

**109**. (1) The expenses properly incurred in the winding up, including the remuneration of the liquidator, are , subject to subsection (2), payable out of the company's assets in priority to all other claims.

(2) Where a company is wound up, the expenses properly incurred in any petition for a restructuring officer and during the term of appointment of the restructuring officer appointed —

(a) under section 91B(3)(a); or

(b) on an interim basis under section 91C(3), including the remuneration of the restructuring officer, are payable out of the company's assets in priority to all other claims.

(3) There shall be paid to a restructuring officer, including a restructuring officer appointed on an interim basis, and the official liquidator, such remuneration, by way of percentage or otherwise, that the Court may direct acting in accordance with rules made under section 155.

(4) If more than one restructuring officer, including a restructuring officer appointed on an interim basis, is appointed by the Court under section 91B or 91C, the remuneration paid under subsection (3) shall be distributed among the restructuring officers in such proportions as the Court may direct.

(5) If more than one official liquidator is appointed by the Court when a company is wound up, the remuneration paid under subsection (3) shall be distributed among the official liquidators in such proportions as the Court may direct.

### Function and powers of official liquidators

**110**. (1) It is the function of an official liquidator —

(a) to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and

(b) to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.

(2) The official liquidator may —

(a) with the sanction of the Court, exercise any of the powers specified in Part I of Schedule 3; and

(b) with or without that sanction, exercise any of the general powers specified in Part II of Schedule 3.

(3) The exercise by the liquidator of the powers conferred by this section is subject to the control of the Court, and subject to subsection (5), any creditor or contributory may apply to the Court with respect to the exercise or proposed exercise of such powers (hereinafter referred to as a "sanction application").

(4) In the case of —

(a) a solvent company, a sanction application may only be made by a contributory and the creditors shall have no right to be heard;

(b) an insolvent company, a sanction application may only be made by a creditor and the contributories shall have no right to be heard; and

(c) a company whose solvency is doubtful, a sanction application may be made by both contributories and creditors and both contributories and creditors shall have a right to be heard.

(5) For the purposes of exercising the powers specified under paragraph 3 of Part 1 of Schedule 3, a person shall be treated as related to a company if the person —

(a) has acted for the company as a professional service provider;

(b) is or was a shareholder or director of the company or of any other company in the same group as the company;

(c) has a direct or indirect beneficial interest in the shares of the company; or

(d) is a creditor or debtor of the company.

.

## General Powers of the Court

### Power to stay winding up

**111**. (1) The Court may at any time after an order for winding up, on the application either of the liquidator or any creditor or contributory, and on proof to the satisfaction of the Court that all proceedings in the winding up ought to be stayed, make an order staying the proceedings either all together or for a limited time, on such terms and conditions as the Court thinks fit.

(2) The Court may at any time after the liquidation has commenced under section 116(c), but before the final meeting has been held as provided for in section 127, on the application of the liquidator accompanied by —

(a) a special resolution stating that the company will not be wound up and setting out the reasons for such decision;

(b) proof of a recall notice published in the Gazette; and

(c) such other documents as the Court may consider necessary,

make an order to recall the liquidation, place the company into active status and place the company back into good standing as it was prior to the commencement of liquidation under section 116(c), on such terms and conditions as the Court thinks fit.

(3) A company shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in the records relating to the company.

### Settlement of list of contributories

**112**. (1) The liquidator shall settle a list of contributories, if any, for which purpose that person shall have power to adjust the rights of contributories amongst themselves.

(2) In the case of a solvent liquidation of a company which has issued redeemable shares at prices based upon its net asset value from time to time, the liquidator shall have power to settle and, if necessary rectify the company's register of members, thereby adjusting the rights of members amongst themselves.

(3) A contributory who is dissatisfied with the liquidator's determination may appeal to the Court against such determination.

### Power to make calls

**113**. (1) The Court may, at any time after making a winding up order, and either before or after it has ascertained the sufficiency of the company's assets, make calls on all or any of the contributories for the time being settled on the list of the contributories —

(a) to the extent of their liability, for the payment of any money which the Court considers necessary to satisfy the company's debts and liabilities and the expenses of winding up; and

(b) to the adjustment of the rights of the contributories among themselves,

and make an order for payment of any call so made.

(2) In making a call the Court may take into consideration the probability that some of the contributories may partly or wholly fail to pay it.

### Inspection of documents by creditors, etc.

**114**. (1) At any time after making a winding up order the Court may make such orders as it thinks fit for —

(a) the inspection of the company's documents by creditors and contributories; and

(b) the preparation of reports by the official liquidator and the provision of such reports to the company's creditors and contributories.

(2) A contributory shall be entitled to make an application under this section notwithstanding that the company is or may be insolvent and the Court shall not refuse to make an order upon the application of a contributory merely by reason of the fact that the company is or may be insolvent.

### Meetings to ascertain wishes of creditors or contributories

**115**. (1) The Court shall, as to all matters relating to the winding up, have regard to wishes of the creditors or contributories and for that purpose it may direct reports to be prepared by the official liquidator and meetings of creditors or contributories to be summoned.

(2) If it considers it necessary to do so, the Court may direct that separate meetings be held of different classes of creditors or contributories.

(3) Subject to Rules made under section 155, meetings may be requisitioned by creditors, if the company is insolvent, or by contributories if the company is solvent.

(4) The votes of creditors and contributories shall be counted by reference to —

(a) the value of their debts, in the case of creditors;

(b) the number of votes, in the case of contributories whose shares carry voting rights under the articles of association of the company; and

(c) the par value of all the shares held, in the case of contributories whose shares do not carry votes under the articles of association of the company and, where there are no par value shares, the net asset value of the company shown.

## Voluntary Winding up

### Circumstances in which a company may be wound up voluntarily

**116**. A company incorporated and registered under this Act or an existing company may be wound up voluntarily —

(a) when the period, if any, fixed for the duration of the company by its memorandum or articles of association expires;

(b) if the event, if any, occurs, on the occurrence of which the memorandum or articles of association provide that the company is to be wound up;

(c) if the company resolves by special resolution that it be wound up voluntarily; or

(d) if the company in general meeting resolves by ordinary resolution that it be wound up voluntarily because it is unable to pay its debts.

### Commencement of winding up

**117**. (1) A voluntary winding up is deemed to commence —

(a) at the time of the passing of the resolution for winding up; or

(b) on the expiry of the period or the occurrence of the event specified in the company's memorandum or articles of association,

notwithstanding that a supervision order is subsequently made by the Court.

(2) Subject to any contrary provision in its memorandum or articles of association, the voluntary winding up of an exempted limited duration company is taken to have commenced upon the expiry of a period of ninety days starting on —

(a) the death, insanity, bankruptcy, dissolution, withdrawal, retirement or resignation of a member of the company;

(b) the redemption, repurchase or cancellation of all the shares of a member of the company; or

(c) the occurrence of any event which, under the memorandum or articles of association of the company, terminates the membership of a member of the company,

unless there remain at least two members of the company and the company is continued in existence by the unanimous resolution of the remaining members pursuant to amended memorandum and articles of association adopted during that period of ninety days.

### Effect on business and status of the company

**118**. (1) In the case of a voluntary winding up, the company shall from the commencement of its winding up cease to carry on its business except so far as it may be beneficial for its winding up.

(2) Notwithstanding anything to the contrary contained in the company's articles of association, its corporate state and powers shall continue until the company is dissolved.

### Appointment of voluntary liquidator

**119**. (1) One or more liquidators shall be appointed for the purpose of winding up the company's affairs and distributing its assets.

(2) When the winding up has commenced in accordance with the company's memorandum or articles of association upon the termination of a fixed period or the occurrence of an event —

(a) the persons designated as liquidators in the memorandum or articles of association shall become such liquidators automatically from the commencement of the winding up; or

(b) if no such person is designated in the memorandum or articles of association or the person designated is unable or unwilling to act, the directors shall convene a general meeting of the company for the purpose of appointing a liquidator.

(3) Except in the case of a person designated as liquidator in the company's memorandum or articles of association, the appointment of a voluntary liquidator shall take effect upon the filing of that person's consent to act with the Registrar.

(4) If a vacancy occurs by death, resignation or otherwise in the office of voluntary liquidator appointed by the company —

(a) the company in a general meeting may fill the vacancy; or

(b) the Court may fill the vacancy on the application of any contributory or creditor.

(5) On the appointment of a voluntary liquidator all the powers of the directors cease, except so far as the company in a general meeting or the liquidator sanctions their continuance.

(6) When two or more persons are appointed as voluntary liquidators jointly, they shall be authorised to act jointly and severally unless their powers are expressly limited by the resolution or articles of association under which they are appointed.

### Qualifications of voluntary liquidators

**120**. Any person, including a director or officer of the company, may be appointed as its voluntary liquidator.

### Removal of voluntary liquidators

**121**. (1) A voluntary liquidator may be removed from office by a resolution of the company in a general meeting convened especially for that purpose.

(2) A general meeting of the company for the purpose of considering a resolution to remove its voluntary liquidator may be convened by any shareholder or shareholders holding not less than one fifth of the company's issued share capital.

(3) Whether or not a general meeting has been convened in accordance with subsection (2), any contributory may apply to the Court for an order that a voluntary liquidator be removed from office on the grounds that that person is not a fit and proper person to hold office.

### Resignation of voluntary liquidator

**122**. (1) Where two or more persons are appointed as joint voluntary liquidators, they may resign by filing a notice of resignation with the Registrar, so long as at least one of them continues in office.

(2) Except as provided in subsection (1), a voluntary liquidator wishing to resign shall —

(a) prepare a report and accounts; and

(b) convene a general meeting of the company for the purpose of accepting that person's resignation and releasing that person from the performance of any further duties, and shall cease to hold office with effect from the date upon which the resolution is passed.

(3) In the event that the company fails to pass a resolution accepting that person's resignation, the voluntary liquidator may apply to the Court for an order that that person be released from the performance of any further duties.

### Notice of voluntary winding up

**123**. (1) Within twenty-eight days of the commencement of a voluntary winding up, the liquidator or, in the absence of any liquidator, the directors shall —

(a) file notice of the winding up with the Registrar;

(b) file the liquidator's consent to act with the Registrar;

(c) file the director's declaration of solvency with the Registrar (if the supervision of the court is not sought);

(d) in the case of a company carrying on a regulated business, serve notice of the winding up upon the Authority; and

(e) publish notice of the winding up in the Gazette.

(2) A director or liquidator who fails to comply with this section commits an offence and is liable to a fine of ten thousand dollars.

### Application for supervision order

**124**. (1) Where a company is being wound up voluntarily its liquidator shall apply to the Court for an order that the liquidation continue under the supervision of the Court unless, within twenty-eight days of the commencement of the liquidation, the directors have signed a declaration of solvency in the prescribed form in accordance with subsection (2).

(2) A declaration of solvency means a declaration or affidavit in the prescribed form to the effect that a full enquiry into the company's affairs has been made and that to the best of the directors' knowledge and belief the company will be able to pay its debts in full together with interest at the prescribed rate, within such period, not exceeding twelve months from the commencement of the winding up, as may be specified in the declaration.

(3) A person who knowingly makes a declaration under this section without having reasonable grounds for the opinion that the company will be able to pay its debts in full, together with interest at the prescribed rate, within the period specified commits an offence and is liable on summary conviction to a fine of ten thousand dollars and to imprisonment for two years.

### Avoidance of share transfers

**125**. Any transfer of shares, not being a transfer with the sanction of the liquidator, and any alteration in the status of the company's members made after the commencement of a voluntary winding up is void.

### General meeting at year's end

**126**. (1) In the event of a voluntary winding up continuing for more than one year, the liquidators shall summon a general meeting of the company at the end of the first year from the commencement of the winding up and at the end of each succeeding year and such meetings shall be held within three months of each anniversary of the commencement of the liquidation.

(2) At each meeting the liquidator shall lay before the meeting a report and account of that person's acts and dealings and the conduct of the winding up during the preceding year.

(3) A liquidator who fails to comply with this section commits an offence and is liable on conviction to a fine of ten thousand dollars.

### Final meeting prior to dissolution

**127**. (1) As soon as the company's affairs are fully wound up, the liquidator shall make a report and an account of the winding up showing how it has been conducted and how the company's property has been disposed of and thereupon shall call a general meeting of the company for the purpose of laying before it the account and giving an explanation for it.

(2) At least twenty-one days before the meeting the liquidator shall send a notice specifying the time, place and object of the meeting to each contributory in any manner authorised by the company's articles of association and published in the Gazette.

(3) The liquidator shall, no later than seven days after the meeting, make a return to the Registrar in the prescribed form specifying —

(a) the date upon which the meeting was held; and

(b) if a quorum was present, particulars of the resolutions, if any, passed at the meeting.

(4) A liquidator who fails to call a general meeting of the company as required by subsection (1) or fails to make a return as required by subsection (3) commits an offence and is liable on conviction to a fine of ten thousand dollars.

### Effect of winding up on share capital of company limited by guarantee

**128**. Where a company limited by guarantee and having a capital divided into shares is being wound up voluntarily, any share capital that may not have been called upon shall be deemed to be an asset of the company, and to be a specialty debt due from each member to the company to the extent of any sums that may be unpaid on any shares held by that person, and payable at such time as may be appointed by the liquidator.

### Reference of questions to Court

**129**. (1) The voluntary liquidator or any contributory may apply to the Court to determine any question arising in the voluntary winding up of a company or to exercise, as respects the enforcing of calls or any other matter, all or any of the powers which the Court might exercise if the company were being wound up under the supervision of the Court.

(2) The Court, if satisfied that the determination of the question or the required exercise of power will be just and beneficial, may accede wholly or partly to the application on such terms and conditions as it thinks fit, or make such other order on the application as it thinks just.

(3) The voluntary liquidator shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in that person's records relating to the company.

### Expenses of voluntary winding up

**130**. (1) The expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims.

(2) The rate and amount of the liquidator's remuneration shall be fixed and payment authorised by resolution of the company.

(3) Each report and account laid before the company in general meetings by its liquidator shall contain all such information, including the rate at which the liquidator's remuneration is calculated and particulars of the work done, as may be necessary to enable the members to determine what expenses have been properly incurred and what remuneration is properly payable to the liquidator.

(4) If the company fails to approve the liquidator's remuneration and expenses or the liquidator is dissatisfied with the decision of the company, that person may apply to the Court which shall fix the rate and amount of that person's remuneration and expenses.

## Winding up subject to the supervision of the Court

### Application for supervision order

**131**. When a resolution has been passed by a company to wind up voluntarily, the liquidator or any contributory or creditor may apply to the Court for an order for the continuation of the winding up under the supervision of the Court, notwithstanding that the declaration of solvency has been made in accordance with section 124, on the grounds that —

(a) the company is or is likely to become insolvent; or

(b) the supervision of the Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories and creditors.

### Appointment of official liquidator

**132**. (1) When making a supervision order the Court —

(a) shall appoint one or more qualified insolvency practitioners; and

(b) may, in addition, appoint one or more foreign practitioners,

as liquidator or liquidators of the company and section 105 shall apply as if the Court had made a winding up order.

(2) Unless a voluntary liquidator is appointed as an official liquidator, that person shall prepare a final report and accounts within twenty-eight days from the date of the supervision order.

### Effect of supervision order

**133**. A supervision order shall take effect for all purposes as if it was an order that the company be wound up by the Court except that —

(a) the liquidation commenced in accordance with section 117; and

(b) the prior actions of the voluntary liquidator shall be valid and binding upon the company and its official liquidator.

## Offences of fraud, etc.

### Fraud, etc. in anticipation of winding up

**134**. (1) Where a company is ordered to be wound up by the Court, or passes a resolution for voluntary winding up, any person, who is or was an officer, professional service provider, voluntary liquidator, restructuring officer or controller of the company and who, within the twelve months immediately preceding the commencement of the winding up, has —

(a) concealed any part of the company's property to the value of ten thousand dollars or more or concealed any debt due to or from the company;

(b) removed any part of the company's property to the value of ten thousand dollars or more;

(c) concealed, destroyed, mutilated or falsified any documents affecting or relating to the company's property or affairs;

(d) made any false entry in any documents affecting or relating to the company's property or affairs;

(e) parted with, altered or made any omission in any document affecting or relating to the company's property or affairs; or

(f) pawned, pledged or disposed of any property of the company which has been obtained on credit and has not been paid for (unless the pawning, pledging or disposal was in the ordinary way of the company's business),

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine and to imprisonment for five years.

(2) In this section —

"**officer**" includes a shadow director.

### Transactions in fraud of creditors

**135**. Where a company is ordered to be wound up by the Court or passes a resolution for voluntary winding up, any officer, restructuring officer, controller or professional service provider of the company who —

(a) has made or caused to be made any gift or transfer of, or charge on, or has caused or connived at the levying of any execution against, the company's property; or

(b) has concealed or removed any part of the company's property,

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine and to imprisonment for five years.

### Misconduct in course of winding up

**136**. (1) Where a company is being wound up, whether by the Court or voluntarily, a person who is or was a director, officer, restructuring officer, controller or professional service provider of the company and who —

(a) does not to the best of that person's knowledge and belief fully and truly discover to the liquidator —

(i) all the company's property (except such part as has been disposed of in the ordinary way of the company's business);

(ii) the date on which and manner in which the company's property or any part thereof property was disposed of, if it was disposed of;

(iii) the persons to whom any property was transferred, if it was disposed of; or

(iv) the consideration paid for any property which was disposed of;

(b) does not deliver up to the liquidator or does not deliver up in accordance with the directions of the liquidator any of the company's property which is in that person's custody or under that person's control, and which that person is required by law to deliver up;

(c) does not deliver up to the liquidator or does not deliver up, in accordance with the directions of the liquidator, all documents in that person's custody

or under that person's control which belong to the company and which that person is required by law to deliver up;

(d) knows or believes that a false debt has been proved by any person in the winding up and fails to inform the liquidator of such knowledge or belief as soon as practicable;

(e) prevents the production of any document affecting or relating to the company's property or affairs; or

(f) destroys, mutilates, alters or falsifies any books, papers or securities, or makes or is privy to the making of any false or fraudulent entry in any register, book of account or document belonging to the company,

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine of twenty five thousand dollars or to imprisonment for a term of five years, or to both.

(2) In this section —

"**officer**" includes a shadow director.

### Material omissions from statement relating to company's affairs

**137**. (1) Where a company is being wound up, whether by the Court or voluntarily, a person who is or was a director, an officer, a manager, restructuring officer, controller or a professional service provider of the company, commits an offence if that person makes any material omission in any statement relating to the company's affairs, with intent to defraud the company's creditors or contributories.

(2) A person who commits an offence under subsection (1) is liable on conviction to a fine of twenty-five thousand dollars or to imprisonment for a term of five years, or to both.

(3) In this section —

"**officer**" includes a shadow director.

## General provisions

### Getting in the company's property

**138**. (1) Where any person has in that person's possession any property or documents to which the company appears to be entitled, the Court may require that person to pay, transfer or deliver such property or documents to the official liquidator.

(2) Where the official liquidator seizes or disposes of any property which that person reasonably believed belonged to the company, that person shall not be personally liable for any loss or damage caused to its true owner except in so far as such loss or damage is caused by that person's own negligence.

### Provable debts

**139**. (1) All debts payable on a contingency and all claims against the company whether present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company and the official liquidator shall make a just estimate so far as is possible of the value of all such debts or claims as may be subject to any contingency or sound only in damages or which for some other reason do not bear a certain value.

(2) Foreign taxes, fines and penalties shall be admissible to proof against the company only if and to the extent that a judgment in respect of the same would be enforceable against the company pursuant to the *Foreign Judgments Reciprocal Enforcement Act (1996 Revision)* or any laws permitting the enforcement of foreign taxes, fines and penalties.

### Distribution of the company's property

**140**. (1) Subject to subsection (2), the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.

(2) The collection in and application of the property of the company referred to in subsection (1) is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors and to any agreement between the company and any creditors that the claims of such creditors shall be subordinated or otherwise deferred to the claims of any other creditors and to any contractual rights of set-off or netting of claims between the company and any person or persons (including without limitation any bilateral or any multi-lateral set-off or netting arrangements between the company and any person or persons) and subject to any agreement between the company and any person or persons to waive or limit the same.

(3) In the absence of any contractual right of set-off or non set-off, an account shall be taken of what is due from each party to the other in respect of their mutual dealings, and the sums due from one party shall be set-off against the sums due from the other.

(4) Sums due from the company to another party shall not be included in the account taken under subsection (3) if that other party had notice at the time they became due that a petition for the winding up of the company was pending.

(5) Only the balance, if any, of the account taken under subsection (3) shall be provable in the liquidation or, as the case may be, payable to the liquidator as part of the assets.

### Preferential debts

**141**. (1) In the case of an insolvent company, the debts described in Schedule 2 shall be paid in priority to all other debts.

(2) The preferential debts shall —

(a) rank equally amongst themselves and be paid in full unless the assets available, after having exercised any rights of set-off or netting of claims, are insufficient to meet them in which case they shall abate in equal proportions; and

(b) so far as the assets of the company available for payment of general creditors are insufficient to meet them, have priority over the claims of holders of debentures secured by, or holders of any floating charge created by the company, and be paid accordingly out of any property comprised in or subject to that charge.

### Secured creditors

**142**. (1) Notwithstanding that a winding up order has been made, a creditor who has security over the whole or part of the assets of a company is entitled to enforce that person's security without the leave of the Court and without reference to the liquidator.

(2) Where the liquidator sells assets on behalf of a secured creditor, that person is entitled to deduct from the proceeds of sale a sum by way of remuneration equivalent to that which is or would be payable under section 109.

### Preferential charge on goods distrained

**143**. In the event of a landlord or other person entitled to receive rent distraining or having distrained on any goods or effects of the company within three months preceding the date of the winding up order, the debts to which priority is given by section 141 shall be a first charge on the goods or effects so distrained on or the proceeds of sale thereof.

### Effect of execution or attachment

**144**. (1) Where a creditor has issued execution against the goods or land of a company or has attached any debt due to it, and the company is subsequently wound up, that person is not entitled to retain the benefit of the execution or attachment against the liquidator unless that person has completed the execution or attachment before the commencement of the winding up.

(2) Notwithstanding subsection (1) —

(a) where a creditor has had notice of a meeting having been called at which a resolution for voluntary winding up is to be proposed, the date on which that person had notice is substituted for the purpose of subsection (1) for the date of commencement of the winding up;

(b) a person who purchases in good faith under a sale by the bailiff any goods of a company on which execution has been levied in all cases acquires a good title to them against the liquidator; and

(c) the rights conferred by subsection (1) on the liquidator may be set aside by the Court in favour of the creditor to such extent and subject to such terms as the Court thinks fit.

(3) For the purposes of this Act —

(a) an execution against goods is completed by seizure and sale;

(b) an execution against securities is completed upon making a charging order absolute;

(c) an attachment of a debt is completed by receipt of the debt; and

(d) an execution against land is completed by the registration of a charging order.

### Voidable preference

**145**. (1) Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be voidable upon the application of the company's liquidator if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

(2) A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

(3) For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

### Avoidance of dispositions made at an undervalue

**146**. (1) In this section and section 147 —

(a) "**disposition**" has the meaning ascribed in Part VI of the *Trusts Act (2021 Revision)*;

(b) "**intent to defraud**" means an intention to wilfully defeat an obligation owed to a creditor;

(c) "**obligation**" means an obligation or liability (which includes a contingent liability) which existed on or prior to the date of the relevant disposition;

(d) "**transferee**" means the person to whom a relevant disposition is made and shall include any successor in title; and

(e) "**undervalue**" in relation to a disposition of a company's property means —

(i) the provision of no consideration for the disposition; or

(ii) a consideration for the disposition the value of which in money or monies worth is significantly less than the value of the property which is the subject of the disposition.

(2) Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

(3) The burden of establishing an intent to defraud for the purposes of this section shall be upon the official liquidator.

(4) No action or proceedings shall be commenced by an official liquidator under this section more than six years after the date of the relevant disposition.

(5) In the event that any disposition is set aside under this section, then if the Court is satisfied that the transferee has not acted in bad faith —

(a) the transferee shall have a first and paramount charge over the property, the subject of the disposition, of an amount equal to the entire costs properly incurred by the transferee in the defence of the action or proceedings; and

(b) the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith).

## Fraudulent trading

**147**. (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

## Supply of utilities

**148**. (1) If a request is made by or with the concurrence of the liquidator (including a provisional liquidator) or a restructuring officer for the giving, after the effective date, of any of the supplies mentioned in subsection (2), the supplier —

(a) may make it a condition of the giving of the supply that the liquidator (including a provisional liquidator) or restructuring officer personally guarantees the payment of any charges in respect of the supply; but

(b) shall not make it a condition of the giving of the supply, or do anything which has the effect of making it a condition of the giving of the supply,

that any outstanding charges in respect of a supply given to the company before the effective date are paid.

(2) The supplies referred to in subsection (1) are —

(a) a supply of electricity;

(b) a supply of water; and

(c) a supply of telecommunication services.

(3) In this section —

"**effective date**" means —

(a) the date on which the provisional liquidator was appointed;

(b) the date on which the winding up order was made; or

(c) the date on which the restructuring officer was appointed.

### Interest on debts

**149**. (1) Subject to subsection (5), in a winding up interest is payable in accordance with this section on any debt proved in the winding up, including so much of any such debt as represents interest on the remainder of the debt.

(2) Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the period during which they have been outstanding since the company went into liquidation.

(3) All interest under this section ranks equally, whether or not the debts on which it is payable ranked equally.

(4) The rate of interest payable under this section in respect of any debt is the greater of —

(a) the rate applicable to the currency of the liquidation prescribed from time to time by the *Judgment Debts (Rates of Interest) Rules (2021 Revision)* made under section 34 of the *Judicature Act (2021 Revision)*; and

(b) the rate applicable to that debt apart from the winding up.

(5) No interest shall be payable if the liquidation is concluded in less than six months or the accrued amount is less than five hundred dollars.

### Currency of the liquidation

**150**. (1) In the case of a solvent liquidation, a company's creditors are entitled to receive payment of their debts in the currency of the obligation.

(2) In the case of an insolvent liquidation, a company's liabilities shall be translated into the functional currency of the company at the exchange rates ruling —

(a) on the date of the commencement of the voluntary liquidation; or

(b) on the day upon which the winding up order is made.

(3) For the purposes of this section the functional currency of a company is the currency of the primary economic environment in which it operated as at the commencement of the liquidation.

## Dissolution of a Company

### Dissolution following voluntary winding up

**151**. (1) The Registrar shall, within three days of receiving a liquidator's return under section 127(3), register such return.

(2) Upon the expiration of three months from the registration of the return the company is deemed to be dissolved.

(3) Notwithstanding subsection (2), the Court may, on the application of the liquidator or any other person who appears to the Court to be interested, make an order deferring the date at which the dissolution of the company is to take effect to such date as the Court thinks fit.

(4) An application under this section shall not be made after the company is deemed to have been dissolved.

(5) An order of the Court made under this section shall be registered with the Registrar within seven days of the date upon which it was made.

### Dissolution following winding up by the Court

**152**. (1) When the affairs of the company have been completely wound up, the Court shall make an order that the company be dissolved from the date of that order or such other date as the Court thinks fit, and the company shall be dissolved accordingly.

(2) The effect of an order for dissolution in respect of a segregated portfolio is that its creditors' claims against the company shall be extinguished, notwithstanding that the company has not been liquidated and dissolved.

(3) The official liquidator shall file the order for dissolution with the Registrar.

(4) An official liquidator who fails to file the order for dissolution with the Registrar within fourteen days from the date, upon which it was perfected, commits an offence and is liable on summary conviction to a penalty of ten dollars for every day during which that person is so in default.

### Unclaimed dividends and undistributed assets

**153**. (1) Any unclaimed dividends or undistributed assets in the possession or control of the liquidator or former liquidator of a company shall be held by that person as trustee upon trust for the benefit of the contributories or creditors to whom such funds are owed.

(2) At the end of one year after the dissolution of the company, the former liquidator shall transfer any funds or other assets held on trust by that person to the Minister charged with responsibility for Finance who shall manage them in accordance with Part VIII of the *Public Management and Finance Act (2020 Revision)*.

## Insolvency rules and regulations

### Insolvency Rules Committee

**154**. (1) There shall be established an Insolvency Rules Committee comprising —

(a) the Chief Justice or other judge nominated by the Chief Justice in that person's place who shall be chairperson;

(b) the Attorney General or that person's nominee;

(c) two attorneys-at-law appointed by the Chief Justice on the recommendation of the Cayman Islands Legal Practitioners Association;

(d) a qualified insolvency practitioner appointed by the Chief Justice upon the recommendation of the Cayman Islands Institute of Professional Accountants;

(e) a person appointed by the Chief Justice who, in that person's opinion, demonstrates a wide knowledge of law, finance, financial regulation or insolvency practice; and

(f) a qualified insolvency practitioner appointed by the Chief Justice on the recommendation of the Recovery and Insolvency Specialists Association.

(2) The quorum of the Insolvency Rules Committee shall be the chairperson and three other members of the Committee; and the chairperson shall have a casting vote.

### Powers of the Insolvency Rules Committee

**155**. (1) The Insolvency Rules Committee shall have power —

(a) to make rules and prescribe forms for the purpose of giving effect to Parts IV, V and XVI;

(b) to prescribe court fees to be paid in connection with —

(i) applications under Part IV;

(ii) winding up proceedings under Part V; and

(iii) applications under Part XVI; and

(c) to make rules for the purpose of specifying —

(i) the qualifications which must be held by a person appointed to the office of official liquidator;

**CAYMAN ISLANDS**

**Companies Act**

**(2023 Revision)**

# COMPANIES WINDING UP RULES

**(2023 Consolidation)**

**Supplement No. 4 published with Legislation Gazette No. 1 dated 12th January, 2023.**

# ORDER 11

## SANCTION APPLICATIONS

### Introduction (O.11, r.1)

**1**. (1) Any application to Court made by —

(a) the official liquidator for a order sanctioning the official liquidator's exercise or proposed exercise of any power conferred upon the official liquidator by Part I of the Third Schedule of the Law or otherwise; or

(b) a creditor or contributory for an order directing the official liquidator to exercise or refrain from exercising any of the official liquidator's powers in a particular way,

is referred to in these Rules as a "**sanction application**".

(2) Sanction applications shall be made by summons in CWR Form No 16.

### Service of Sanction Applications (O.11, r.2)

**2**. (1) Every sanction application made by the official liquidator shall be served on —

(a) each member of the liquidation committee ; or

(b) counsel to the liquidation committee, if an attorney has been appointed by the liquidation committee with authority to act generally; and

(c) such other creditors or contributories as the Court may direct.

(2) Every sanction application made by the liquidation committee shall be served on —

(a) the official liquidator; and

(b) such creditors or contributories as the Court may direct.

(3) Every sanction application made by a creditor or contributory (other than the liquidation committee) shall be served on —

(a) the official liquidator; and

(b) each member of the liquidation committee; or

(c) counsel to the liquidation committee, if an attorney has been appointed by the liquidation committee with authority to act generally; and

(d) such other creditors or contributories as the Court may direct.

(4) A sanction application shall not be heard on less than 4 clear days' notice.

(5) The Court may direct that the hearing of a sanction application be advertised.

## Hearing of Sanction Applications (O.11, r.3)

**3**. (1) Sanction applications shall be heard in chambers unless —

(a) the Court has directed that the application be advertised, in which case it must be heard in open court; or

(b) the Court directs, for some special reason, that it should be heard in open court.

(2) It shall be the duty of the official liquidator to attend and be prepared to assist the Court in respect of any sanction application made by the liquidation committee or any creditor or contributory.

(3) The Court may direct that, when a sanction application gives rise to an issue in respect of the substantive rights as between the company and any creditor or contributory or any class thereof, it shall be adjudicated as an inter partes proceeding as between shareholders, creditors or any class of shareholders or creditors (as the case may be), for which purpose the Court may —

(a) make a representation order; and/or

(b) direct that the official liquidator's role shall be limited in such way as the the Court thinks fit; or

(c) direct that the official liquidator shall take no further part in the proceeding.

(4) In addition to those who are entitled to be served in accordance with Rule 2, the Court may allow the following classes of persons to be heard —

(a) any other creditor, if the company is insolvent;

(b) any other contributory, if the company is solvent;

(c) any other creditor or contributory, if the official liquidator has determined that the company should be regarded as of doubtful solvency.

## Evidence for Use in Sanction Applications (O.11, r.4)

**4**. (1) When a sanction application is made by the official liquidator —

(a) that person may rely upon affidavit evidence; and/or

(b) that person may rely upon the whole or part of any report or reports which have been filed in Court, whether or not such reports were prepared specifically for the purpose of the application.

(2) When a sanction application is made by the liquidation committee or any creditor or contributory —

(a) the application must be supported by an affidavit containing full particulars of the grounds upon which the application is made; and

(b) it shall be the duty of the official liquidator to swear an affidavit in reply or make a report which states whether the official liquidator —

(i) supports the application; or

(ii) opposes the application, in which case the official liquidator's affidavit or report must contain the evidence and analysis upon which the official liquidator relies in opposition to the application; or

(iii) adopts a neutral position, in which case the official liquidator's affidavit or report must contain any evidence, not already before the Court, which the official liquidator considers to be relevant to the Court's decision.

(3) An affidavit sworn by the official liquidator may contain statements of the official liquidator's opinions.