**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

In re:                                                            **FOR PUBLICATION**

    SILICON VALLEY BANK (CAYMAN ISLANDS          Chapter 15
    BRANCH) (in Official Liquidation),
                                                                  Case No. 24-10076 (MG)

              Debtor in a Foreign Proceeding.

-----------------------------------------------------------------------x

<u>**MEMORANDUM OPINION AND ORDER DISMISSING CHAPTER 15 PETITION**</u>

*A P P E A R A N C E S :*

HOLLAND & KNIGHT LLP
*Counsel for the Joint Official Liquidators of Silicon Valley Bank (Cayman Islands Branch) (in Official Liquidation)*
31 West 52nd Street
New York, New York 10019
By:    Warren E. Gluck, Esq.
        John J. Monaghan, Esq.
        Paul M. Aguggia, Esq.
        Marie E. Larsen, Esq.
        Richard A. Bixter, Jr., Esq.

DENTONS US LLP
*Counsel to the Federal Deposit Insurance Corporation, in its corporate capacity and its capacity as Receiver for Silicon Valley Bank, Santa Clara, and as Receiver for Silicon Valley Bridge Bank, N.A.*
1221 Avenue of the Americas
New York, New York 10020
By:    Lynn P. Harrison III, Esq.
        Stephen S. Kudenholdt, Esq.

1900 K Street, NW
Washington, D.C. 20006
By:    Sam J. Alberts, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

As has been widely publicized, Silicon Valley Bank (the "Bank"), a California-incorporated bank that was insured by the Federal Deposit Insurance Corporation ("FDIC"), failed and the FDIC was appointed as its receiver on March 10, 2023.  The unregulated parent company, SVB Financial Group, filed a chapter 11 case on March 17, 2023 that is pending in this Court.  (*See generally* Case No. 23-10367.)  While FDIC deposit insurance is ordinarily limited to $250,000 for insured deposits, in the case of the Bank, the Secretary of the Treasury, the Chairman of the Federal Reserve Board and the Chairman of the FDIC invoked the "systemic risk exception" and announced that the Bank's depositors would be repaid the full amount of their deposits.  Certain depositors, including the holding company of the Bank, have not been repaid the full amount of their deposits and are currently litigating the legal effect of the systemic risk exception.  This opinion concerns depositors in the Bank's Cayman Island branch that are *not* being repaid any amount from FDIC insurance and are treated as unsecured creditors of the Bank in the receivership proceeding.

At the time the Bank failed, the Bank had a branch in the Cayman Islands ("SVB Cayman") that was *not* separately incorporated, but was a branch of the Bank that was licensed by the Cayman Islands Monetary Authority ("CIMA") to operate in the Cayman Islands.  SVB Cayman had a mail drop but no employees in the Cayman Islands.

SVB Cayman offered its customers three types of Eurodollar deposit accounts.  When the Bank failed, customers of SVB Cayman had deposited a total of $866 million in the three types of accounts—SVB Eurodollar Sweep Accounts, SVB Eurodollar Money Market Accounts, and SVB Eurodollar Operating Accounts.  Under the SVB Eurodollar Sweep Account opening agreement, when the depositors opened a Sweep Account (but not a Money Market or Operating

2

Account), a parallel deposit account was automatically opened in their name in the Bank's
California office, into which the Cayman Sweep Account deposits were periodically swept.
Deposit accounts in the Bank's California office were *not* opened for the Money Market or
Operating Accounts. The deposit agreements for all three types of Cayman accounts made clear
that deposits in those Cayman accounts were *not insured* by the FDIC.

Many of the SVB Cayman account holders filed claims in the FDIC receivership. With
respect to deposits in the Sweep Accounts, the FDIC determined that the depositors would be
repaid in full from FDIC insurance. With respect to the deposits in the Money Market or
Operating Accounts, the FDIC denied insurance coverage and only allowed the depositors'
claims as unsecured creditors that would be paid only after higher priority (insured) claims are
paid in full. In what seems characteristic of the FDIC, the FDIC rejected the claims filed by the
JOLs (defined below) and the depositors in the Money Market and Operating Accounts with a
short statement, without any further explanation, that the claim "[was] not proved to the
satisfaction of the receiver."[1]

The rejection of the insurance coverage claims by the SVB Cayman depositors led them
to search for another means to press their claims for insurance coverage, as it seems doubtful that
SVB Cayman depositors' unsecured creditor claim will receive *any* recovery.[2] As discussed

---

[1]    The language of the denial tracks the language in 12 U.S.C. § 1821(d)(5)(D)(i): "The receiver may disallow
any portion of any claim by a creditor or claim of security, preference, or priority which is not proved to the
satisfaction of the receiver." Another subsection of FIRREA relating to expedited consideration of claims provides
that the FDIC shall "(ii) notify the claimant of the determination, and if the claim is disallowed, provide a statement
of each reason for the disallowance and the procedure for obtaining agency review or judicial determination." 12
U.S.C. § 1821(d)(8)(B)(iii). One would ordinarily expect an administrative agency that rejects claims that in this
case exceed $500 million would explain more than that the claim "is not proved to the satisfaction of the Receiver."
The FDIC's denial brings to mind a quote from Kafka: "'And why am I under arrest?' he then asked. 'That's
something we're not allowed to tell you. Go into your room and wait there. Proceedings are underway and you'll
learn about everything all in good time.'" Franz Kafka, The Trial (1914).

[2]    The JOLs indicate that, to date, they have received claims from 295 Cayman creditors totaling
$284,457,173.26 in the Cayman Proceeding, which represents a subset of the overall Cayman creditors.

below, in the hope of obtaining a better result, SVB Cayman depositors responded by filing a

winding-up application in the Cayman Islands court. The Cayman court granted the application

and appointed three joint official liquidators ("JOLs") who now seek recognition and other relief

under Chapter 15 of the Bankruptcy Code.

For the reasons explained below, this effort fails, and the Chapter 15 petition is

**DISMISSED**.

## I.  BACKGROUND

Pending before the Court is the (I) the *Verified Petition for Recognition of Foreign*

*Insolvency Proceeding Pursuant to Sections 1504, 1509, 1515, 1517, 1520, and 1521 of the*

*Bankruptcy Code* of the JOLs (the "Verified Petition," ECF Doc. # 1) seeking, among other

things, recognition of the Cayman winding-up proceeding (the "Cayman Proceeding") as a

foreign main proceeding and the JOLs as the foreign representatives of SVB Cayman pursuant to

section 1517 of the Bankruptcy Code, and (II) the application of Andrew Childe, Niall

Ledwidge, and Michael Pearson in their capacities as the duly appointed JOLs of SVB Cayman

for provisional relief seeking discovery from the FDIC pursuant to section 1519(a)(3) and

1521(a)(4). SVB Cayman is in official liquidation under the supervision of the Grand Court of

the Cayman Islands, Financial Services Division (the "Grand Court") in Cause No. FSD 163 of

2023 (DDJ) pursuant to the Cayman Islands Companies Act (2023 Revision) (the "Companies

Act") and associated regulations. (Verified Petition at 2.)

In connection with the initial provisional relief sought, the JOLs filed (i) a memorandum

of law in support of provisional relief (ECF Doc. # 4) and (ii) the declaration of Michael

Pearson, one of the JOLs, in support of recognition and provisional relief (the "Pearson

Declaration," ECF Doc. # 2).

On January 19, 2024, the Court entered an order to show cause ("OSC," ECF Doc. # 6),

scheduling a hearing on provisional relief for January 31, 2024.  (OSC ¶ 4.)  The JOLs sought

discovery from the FDIC, focused on learning the basis for the FDIC's denial of the JOLs' claim.

On January 26, 2024, the FDIC filed an objection (the "FDIC Provisional Relief Objection,"

ECF Doc. # 12) to provisional relief, along with the declaration of Luis Mayorga, a Senior

Complex Financial Institution Resolution Specialist at the FDIC, in support of the FDIC

Provisional Relief Objection (the "Mayorga Provisional Relief Declaration," ECF Doc. # 13).

On February 5, 2024, the JOLs filed an amended reply in further support of provisional relief

(ECF Doc. # 26).

The FDIC argued, among other things, that even if Cayman Islands Proceeding is

recognized as foreign main proceeding, the Bankruptcy Court cannot order discovery from the

FDIC because the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.

L. No. 101-73, 103 Stat. 183, *reprinted in* 1989 U.S.C.C.A.N. 183 ("FIRREA"), 12 U.S.C. §

1821, *et seq.,* and related regulations limit the power of any court (other than a district court in

which review of the denial of a claim may be maintained) to permit discovery.  The JOLs

explained that they needed discovery in order to draft a fulsome complaint challenging the

FDIC's denial of their claim.  None of the books and records of SVB Cayman that are needed to

draft the complaint, the JOLs argue, are located in the Cayman Islands or are otherwise available

to them.

The Court held a hearing on provisional relief on January 31, 2024, in accordance with

the OSC.  After the hearing, the Court entered an order scheduling a consolidated hearing on

provisional relief and recognition of the Cayman liquidation proceeding for February 14, 2024

(the "Scheduling Order," ECF Doc. # 22).  As set forth in the Scheduling Order, assuming that

the bankruptcy court could not or would not order the requested discovery, it was not clear

whether the Court could grant the JOLs standing without first ruling on recognition.[3]

(Scheduling Order at 2.)  If the Cayman Proceeding was recognized as a foreign main or

nonmain proceeding, the JOLs would have standing under section 1509 and could seek discovery

in any district court action they filed seeking to review denial of their claim.

       The FDIC contends that SVB Cayman is not eligible to be a debtor in a chapter 15 case,

because it is *not* a separate corporation, but rather a branch of Silicon Valley Bank, a California-

incorporated bank, which is in an FDIC receivership.  Silicon Valley Bank is ineligible to be a

debtor pursuant to section 109(b) of Bankruptcy Code ("A person may be a debtor under chapter

7 of this title only if such person is not . . . (2) a . . . bank . . . which is an insured bank as defined

in section 3(h) of the Federal Deposit Insurance Act . . . .").  11 U.S.C. § 109(b).  Section 109(b)

indisputably applies to Silicon Valley Bank, making the Bank ineligible to file a bankruptcy case

under Chapters 7 or 11.  Section 109(b) also applies in a case under Chapter 15, making the Bank

ineligible for Chapter 15 as well.  *See Drawbridge Special Opportunities Master Fund LP v.*

*Barnet (In re Barnet)*, 737 F.3d 238, 249–50 (2d Cir. 2013) (concluding that Congress intended

for Chapter 1 of the Bankruptcy Code, which includes section 109, to apply to Chapter 15).  That

result is *not* changed because the Bank closed and ceased any ongoing business in California or

the Cayman Islands.  The SVB Cayman branch is not a separate business entity.

       On February 9, 2024, the FDIC filed an objection to recognition (the "FDIC Recognition

Objection," ECF Doc. # 30).  In support of the FDIC Recognition Objection, the FDIC also filed

the (i) second declaration of Luis Mayorga (the "Mayorga Recognition Declaration," ECF Doc. #

31); (ii) declaration of Terrance D. Holmes (the "Holmes Declaration," ECF Doc. # 32), a senior

---

[3]     Sections 1519(a)(3) and, by its reference, 1521(a)(4) permit discovery as provisional remedy before
recognition.

claims administration analyst with the Division of Resolutions and Receiverships at the FDIC; and (iii) declaration of Thomas Lowe KC, a barrister and King's Counsel at Wilberforce Chambers (the "Lowe Declaration," ECF Doc. # 41).

On February 12, 2024, the JOLs filed a reply memorandum of law in support of recognition (ECF Doc. # 38).   In connection with the relief sought, the JOLs filed the (i) affirmation of Dr. Riz Mokal, (the "Mokal Affirmation," ECF Doc. # 39) providing Dr. Mokal's opinion regarding Cayman Islands law in support of the Provisional Relief Application; (ii) supplemental declaration of Niall Ledwidge in support of recognition and provisional relief (the "Supplemental Ledwidge Declaration," ECF Doc. # 40); and (iii) declaration of Niall Ledwidge (the "Ledwidge Declaration," ECF Doc. # 42) in support of recognition and provisional relief.

On February 14, 2024, the Court held a hearing on provisional relief and recognition.  At the hearing, the Court admitted into evidence the JOLs' exhibits 1 and 2, the Ledwidge Declaration, the Supplemental Ledwidge Declaration without attached exhibits 4 through 6, and the Mokal Affirmation.  The Court also admitted the FDIC's exhibits OO and PP, the Holmes Declaration, the Mayorga Provisional Relief and Recognition Declarations, and the Lowe Declaration.  In total, six witnesses—Regis Dale, Thomas Mills, Niall Ledwidge, Dr. Riz Mokal, Thomas Lowe, and Luis Mayorga—were cross-examined in court.  This Opinion includes the Court's findings of fact and conclusions of law based on the record during the February 14 hearing.

### A.      SVB Cayman

1. <u>Generally</u>

The Bank was an FDIC-insured, state-chartered bank founded in 1983 and headquartered in California, established to provide banking services to technology companies in the Silicon

Valley region.  (Verified Petition ¶ 25.)  On August 16, 2007, the Bank registered in the Cayman
Islands as a foreign company under Part IX of the Companies Act.  (*Id.* ¶ 26.).  The Bank applied
for and was granted a Class "B" banking license from CIMA  under the Cayman Islands Banks
and Trust Companies Act (2021 Revision) (the "BTC Act") on August 30, 2007.  (*Id.* ¶ 27.)
Following the Bank's registration in the Cayman Islands and obtaining of a Class "B" license
from CIMA, SVB Cayman was established as the Bank's active branch in the Cayman Islands.
(*Id.* ¶ 28.)

As a holder of a "B" class banking license under the BTC Act, SVB Cayman was not
permitted to take deposits from any person residing in the Cayman Islands, "other than another
licensee or an exempted or ordinary non-resident company that is not carrying on business in the
Cayman Islands." (*Id.* ¶ 27.)  While the Bank maintained affiliate relationships and joint
ventures with foreign banks in China and the United Kingdom, the JOLs indicate that SVB
Cayman was the only "deposit-taking foreign branch" maintained by the Bank and its primary
purpose was for deposit products.  (*Id*. ¶¶ 25, 29.)

Before the FDIC commenced the receivership proceeding, SVB Cayman had maintained
a registered office at Cainvest Bank & Trust, 103 South Church St., 5th Floor, Georgetown,
Grand Cayman, Cayman Islands.  (*Id.* ¶ 30.)  Since the appointment of the JOLs, SVB Cayman's
registered office relocated to FFP Cayman, 2nd Floor Harbour Centre, 159 Mary Street,
Georgetown, Grand Cayman, Cayman Islands, which, to date, remains SVB Cayman's registered
office.  (*Id.*)

## 2. Cayman Regulation of SVB Cayman

SVB Cayman was "at all times overseen, regulated, and licensed by CIMA." (*Id.* ¶ 32.)
CIMA serves as the Cayman Islands' primary financial services regulator and SVB Cayman was

8

otherwise subject to the Cayman Islands Banking laws. (*Id.*)  The BTC Act, as well as the

Cayman Island Monetary Authority Enforcement Manual ("Enforcement Manual") promulgated

thereunder, provides CIMA with broad authority to regulate a foreign branch in the Cayman

Islands (such as SVB Cayman), including but not limited to the authority to seek the involuntary

winding up of the foreign branch. (*See id.* ¶ 34 ("The BTC Act provides express statutory

authority for CIMA to seek liquidation of a foreign branch which falls under the regulatory

authority of CIMA."); *id.* ¶ 37 ("The Enforcement Manual provides CIMA with broad powers to

regulate the holders of banking licenses in the Cayman Islands.").)

3.   <u>Intra-Group Service Level Agreement</u>

The relationship between the Bank and SVB Cayman was governed by an Intra-Group

Service Level Agreement (the "SLA," Pearson Declaration, Ex. 8), entered into by and between

SVB Cayman, as recipient, and Silicon Valley Bank (US Head Office), as provider. (*Id.* ¶ 49.)

Pursuant to the terms of the SLA, the Bank's California office fulfilled SVB Cayman's staffing

needs in select areas such as finance, IT services, and legal and risk management, which the

JOLs refer to as the "shared services." (*Id.* ¶ 51.)  The SLA provides that SVB Cayman is

regulated by CIMA while the Bank is separately regulated by the California Department of

Business Oversight and the Federal Reserve. (*Id.* ¶ 50.)  Notwithstanding the foregoing, the

SLA acknowledged, however, that the Bank and SVB Cayman were in fact one legal entity.

(*See* Pearson Declaration, Ex. 8 § 31.1 ("Whilst this Agreement has been written based on the

principles of the law, both Parties recognize that it is an *intra-entity* agreement and therefore has

no formal legal basis.") (emphasis added).)

4. <u>SVB Cayman Deposit Products</u>

SVB Cayman offered three types of accounts to customers: (i) the SVB Eurodollar Sweep Account; (ii) the SVB Eurodollar Operating Account; and (iii) the SVB Eurodollar Money Market Account (collectively, the "SVB Cayman Deposit Accounts"). (*Id.* ¶ 39.) As of the Bank's collapse in March 2023, an aggregate total of approximately $866 million was deposited in all three accounts. (*Id.*) The governing account agreements for each of the SVB Cayman Deposit Accounts contained identical language indicating that deposits were (i) "deposits of [SVB Cayman] and [were] subject to the laws of the Cayman Islands" and (ii) "NOT domestic deposits, [were] NOT insured by the FDIC and [were] NOT guaranteed in any way by the United States government or any government agency thereof." (*Id.* ¶¶ 42, 44, 46.) Each of the SVB Cayman Deposit Accounts is addressed in turn.

a. *SVB Eurodollar Sweep Account*

The SVB Eurodollar Sweep Account was a business account maintained at SVB Cayman. (*Id.* ¶ 40; *see* Pearson Declaration, Ex. 5 (the "Sweep Agreement").) At the time of the Bank's collapse, there were 44 active SVB Eurodollar Sweep Accounts with $389,562,086 in total account balances. (Verified Petition ¶ 40.) The Sweep Agreement also provided that deposits in the SVB Eurodollar Sweep Accounts would be transferred or "swept" to deposit accounts opened at the Bank in the depositor's name. (*See* Sweep Agreement at 3 (defining "Deposit Account" to refer to the individual depositor's "demand deposit account at a U.S. office of Silicon Valley Bank").)

b. *SVB Eurodollar Money Market Account*

The SVB Eurodollar Money Market Account was a "traditional, interest-bearing business money market account" for SVB Cayman customers established "at [SVB Cayman's] branch

office." (Verified Petition ¶ 43; *see* Pearson Declaration, Ex. 6.)   There were 106 active SVB

Eurodollar Money Market Accounts with an aggregate total of $108,400,111 in account balances

as of March 2023.  (Verified Petition ¶ 43.)  No doubt reflecting the absence of FDIC insurance

and other U.S. regulatory controls, the SVB Eurodollar Money Market Accounts earned interest

higher rates than most U.S.-regulated accounts.

### c.  SVB Eurodollar Operating Account

Lastly, the SVB Eurodollar Operating Account was a non-interest bearing "traditional

business operating account" also established "at [SVB Cayman's] branch office."  (*Id.* ¶ 45;

Pearson Declaration, Ex. 7.)  As of March 2023, there were 484 active SVB Eurodollar

Operating Accounts, containing a total of $368,212,751 in account balances.  (Verified Petition ¶

45.)

### 5.  SVB Cayman's Domestic Account

The JOLs state that before the Bank's collapse, it was the "regular practice for SVB

Cayman to deposit all of its cash with [the Bank] in a deposit account located in the United

States."  (*Id.* ¶ 47.)  The Verified Petition also alleges that this account was a domestic account

(the "SVB Cayman Domestic Account") held at the Bank's main headquarters "with account

number xxxx0000 and the notation 'non-interest bearing deposits' and 'foreign offices,' under

circumstances where it was made clear that this was only SVB Cayman's bank account (as there

were no other foreign deposit taking branches) and that the credits located in this domestic

account were SVB Cayman's sole asset and located in the United States."  (*Id.*)

The JOLs contend that the Bank's main headquarters also maintained "domestic, United

States sitused accounts for each and all of the three products offered at SVB Cayman" and all

"credits were geographically located in the United States."  (*Id.* ¶¶ 47, 48.)  The accounts are

comprised of: (i) the SVB Cayman Sweep (xxxx5000); (ii) the Cayman Eurodollar MMA (xxxx6000); (iii) the SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) the Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) the Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).  (*Id.* ¶ 48.)

**B.**   **SVB's Collapse and Sale to First Citizens Bank**

The Bank collapsed in March 2023 after customers withdrew more than $40 billion, resulting in a negative cash balance of $958 million at the close of business as of March 9, 2023. (*Id.* ¶ 58.)  On March 10, 2023, the California Department of Financial Protection and Innovation ordered that the Bank's property and business be placed into a receivership.  (*Id.* ¶ 59.) Accordingly, the FDIC has been acting as receiver for the Bank and its successor bridge bank since March 2023 (the "SVB Receivership").  (*Id.* ¶ 60.)

On March 12, 2023, the Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg released a joint statement, which announced that (i) all assets of the Bank were transferred to FDIC-R; (ii) all depositors of the Bank would have full access to their money on Monday morning, March 13, 2023; and (iii) all depositors of the Bank would be made whole, beyond the standard insured amount of $250,000.  (*Id.* ¶ 64.)  The JOLs assert that the joint statement press release removed the $250,000 insurance cap and requirement that the insured accountholder be a "[U.S.] person within the meaning of the Federal Deposit Insurance Act," leaving only "the geographic credit situs limitation intact."  (*Id.* ¶ 65.)

On March 13, 2023, the FDIC-R transferred all deposits, both insured and uninsured, and substantially all assets of the Bank and SVB Cayman to Silicon Valley Bridge Bank, N.A. (the "Bridge Bank").  (*Id.* ¶ 61.)

12

On March 27, 2023, the FDIC entered into a purchase and assumption agreement with First Citizens Bank & Trust Company ("First Citizens"), which provided for, among other things, (i) the purchase of approximately $72 billion of the Bridge Bank's assets at a discount and (ii) the express option for First Citizens to purchase the Canadian, German, and Hong Kong foreign branches of the Bank. (*Id.* ¶ 67.) SVB Cayman was not purchased or transferred to First Citizens and was "excluded from the [SVB] Receivership and its process." (*Id.*)

### C.    Alleged "Orphaning" of Certain SVB Cayman Accounts and Treatment of the SVB Cayman Domestic Account

On March 31, 2023, depositors holding SVB Eurodollar Money Market Accounts and SVB Eurodollar Operating Accounts received a notice that balances held by customers in accounts at SVB Cayman were "not deposits" and therefore, the depositors were deemed "general unsecured creditors" with priority "junior . . . to both insured and uninsured depositors." (*Id.* ¶ 68.) Meanwhile depositors holding SVB Eurodollar Sweep Accounts were granted "insured deposit status." (*Id.* ¶ 69.) The JOLs state that the stated justification for this treatment was that certain amounts of the funds associated with the SVB Eurodollar Sweep Accounts had "swept back" into an FDIC-insured deposit account located in the United States at or around the time of the Bank's entry into receivership.[4] (*Id.* ¶ 70.)

The JOLs also indicate that the FDIC did not provide them with notice concerning the "status of the SVB Cayman Domestic Account," which constitutes a "depository liability owed by [the Bank] to SVB Cayman" and is located in the U.S. (*Id.* ¶ 78.) The JOLs assert that, given the foregoing, the SVB Cayman Domestic Account would "appear to fall within the fully-insured accounts covered by Secretary Yellen's invocation of the [systemic-risk exception]." (*Id.*)

---

[4]    The FDIC clarified at the hearing held on February 14 that the depositors were compensated as they had "U.S. parallel accounts . . . [that] were actually based in the United States . . . [and] not . . . in the Caymans" and such accounts were held "in the name of the individual depositors." (Feb. 14, 2024 Hr'g Tr. 42:10–21.)

The JOLs argue that the "insured depositor" treatment of holders of SVB Eurodollar Sweep Accounts was a "discretionary" and "arbitrary decision" on the part of the FDIC, particularly in light of the fact that "all of the accounts' credits were located in SVB accounts located in the United States at all times." (*Id.* ¶¶ 71, 72.)  Accordingly, the JOLs assert that this treatment was "wrong." (*Id.* ¶ 72.)  Notably, they indicate that their investigations have revealed that "more than 90% of the uninsured depositors of SVB Cayman are of Chinese origin or China-investment connected, while the demographics of the SVB Cayman insured depositors are mixed." (*Id.* ¶ 73.)

> ### D.    Commencement of the Cayman Proceeding

On June 13, 2023, certain SVB Cayman customers classified as uninsured, general creditors of the SVB Receivership, submitted a Winding Up Petition to the Grand Court seeking, *inter alia*, the winding up of SVB Cayman under the Companies Act, and the appointment of joint official liquidators for SVB Cayman. (*Id.* ¶ 79.)  On June 30, 2023, the Grand Court of the Cayman Islands issued the Winding Up Order (the "Winding Up Order"). (*Id.* ¶ 80.)

The Winding Up Order provided for the following:

- the wind up of the Bank under provisions of the Companies Act; and

- the appointment of the JOLs as joint official liquidators of the Bank *but limited their powers to "acting in respect of the assets and affairs of the Cayman Islands branch of [the Bank] and its creditors."*

(Pearson Declaration, Ex. 14 ¶¶ 1, 2 (emphasis added).)

Subsequently, on July 21, 2023, the Grand Court entered a judgment explaining the justifications for the Winding Up Order (the "July 2023 Opinion," Pearson Declaration, Ex. 15). In the July 2023 Opinion, the Grand Court found that "jurisdiction existed under section 91(d)(iv) of the Companies Act for the Grand Court to order SVB Cayman's winding up, *notwithstanding* the SVB Receivership, and confirmed that doing so is just and equitable given

the public interest in investigating and understanding its depositors-creditors' position relative to

[the Bank], and to protect their interests." (Verified Petition ¶ 83 (emphasis in original).) The

July 2023 Opinion also made clear that the Winding Up Order relates to the Bank, the "foreign

company [as] the relevant legal entity," and that the Bank maintained an "active branch" in the

Cayman Islands. (Pearson Declaration, Ex. 15 ¶¶ 53–56.)

      **E.**      **JOL's Government Outreach and SVB Cayman's Provisional Proof of Claim**

      On July 10, 2023, the FDIC-imposed bar date to file claims in the SVB Receivership, the

JOLs filed a provisional and placeholder proof of claim (the "Provisional POC"). (*Id.* ¶ 90; *see*

*also* Pearson Declaration, Ex. 17 (reflecting that the provisional proof of claim was filed on July

10, 2023).) The JOLs indicate that the FDIC "agreed to consider a supplement to the Provisional

POC at a later date," notwithstanding the July 10 bar date. (*Id.* ¶ 90.)

      The JOLs sought to have a "high-level meeting" with the FDIC in January 2024 and,

pending such, "neither commenced a Chapter 15 recognition application nor supplemented the

[Provisional POC]." (*Id.* ¶¶ 94, 95.) While parties were still engaged in scheduling the "high-

level meeting," the FDIC mailed a Claim Denial Letter to SVB Cayman on December 26, 2023

(the "Claim Denial Letter"), which was received on January 3, 2024 by counsel who filed the

Provisional POC. (*Id.* ¶ 96.) The FDIC-R indicated in the Claim Denial Letter, in a single

sentence, that it was disallowing SVB Cayman's Provisional POC as it was "not proven to the

satisfaction of the Receiver." (*Id.*; *see also* Pearson Declaration, Ex. 18 at 1.) No further

explanation was provided.

      The JOLs indicate the Claim Denial Letter appears to constitute a "final resolution" and

"trigger[s] a 60-day window to commence litigation in response to the Claim Denial Letter."

(Verified Petition ¶ 97.) They state that they requested to speak with the FDIC to discuss the

15

Claim Denial Letter, but the FDIC has "declined to discuss the Claim Denial Letter or its implications further." (*Id.* ¶¶ 97, 98.)

### F.    SVB Cayman's Former Clients

In addition to the JOLs and the Provisional POC, the FDIC indicates that "[m]any Cayman [former clients] have filed claims in the SVB Receivership, some of which have been allowed." (Mayorga Provisional Relief Declaration ¶ 14.)  Specifically, all but 11 of the approximately 615 of SVB Cayman's former clients with positive balances in the SVB Cayman Deposit Accounts have submitted claims to the FDIC-R in its capacity as receiver for the Bank. (FDIC Recognition Objection at 2 n.5.)  Of the 605 claims filed by such creditors, the FDIC indicates that 501 have been fully allowed, 18 have been partially allowed, and 76 have been disallowed. (*Id.*)  Of the remaining 10 timely filed claims, six were duplicative claims and four were ultimately withdrawn. (*Id.*)  Additionally, of the 94 claims that were fully or partially disallowed, 67 holders of such claims are currently challenging the FDIC's denial of their claims in the SVB Receivership in the case captioned *Knight League Limited v. FDIC*, Case No. 23-cv-03063-APM, U.S. Dist. Ct., Dist. of Colum., seeking determinations on a *de novo* basis. (*See* Mayorga Provisional Relief Declaration ¶ 15; FDIC Recognition Objection at 2 n.5.)

### G.    The Provisional Relief Application

After filing the Chapter 15 petition but before scheduling the recognition hearing, the JOLs sought discovery from the FDIC as provisional relief under sections 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code,[5] arguing that discovery is necessary and appropriate under

---

[5]    Section 1519(a)(3) provides as follows:

From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including— . . .

the circumstances to prepare a pleading of the causes of action that SVB Cayman is required to file on or before February 23, 2024 in a district court seeking review of the FDIC's denial of the JOLs' claims.  (*See generally* ECF Doc. # 3.)  Discovery is often granted as provisional relief before a recognition hearing.  Here, however, the JOLs acknowledge that under FIRREA they must seek judicial review of the FDIC's denial of their claim in one of two district courts.  The JOLs may be entitled to discovery, but even if the SVB Cayman Proceeding could be recognized as a foreign main proceeding (which the Court has concluded it cannot), discovery, if it is permissible, must be authorized by the district court in which the JOLs' soon-to-be-filed district court action is pending.

### H.      The FDIC Objection to Provisional Relief

The FDIC opposed the provisional relief sought on several grounds.  First, the FDIC asserts that the Court lacks subject matter jurisdiction pursuant to section 1821(j) of FIRREA (12 U.S.C. § 1821(j)), and that venue is improper.  (FDIC Provisional Relief Objection at 16, 18–19.) Specifically, section 1821(j) provides that, "[e]xcept as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."  12

---

(3) any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

11 U.S.C. § 1519(a)(3).

Section 1521(a)(4) provides as follows:

(a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including— . . .

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities.

11 U.S.C. § 1521(a)(4).

U.S.C. § 1821(j).  Accordingly, the FDIC argues that governing law mandates that claims

disputes and any related discovery against FDIC receiverships must comply with the

requirements and procedures set forth in FIRREA.  (FDIC Provisional Relief Objection at 16–

18.)

Aside from subject-matter jurisdiction and venue, the FDIC further argues that the JOLs

bear the burden to establish that provisional relief is warranted and have failed to do so.  (*Id.* at

19, 21.)  In support of its contention, the FDIC argues that SVB Cayman cannot show likelihood

of success on the merits as (i) it is not permitted to be a Chapter 15 debtor under either sections

109(a) or 109(b) of the Bankruptcy Code; (ii) the Cayman Proceeding cannot be recognized as a

"foreign main proceeding" as SVB Cayman's "center of main interests" ("COMI") is in the

United States; and (iii) the Cayman Proceeding does not meet the Bankruptcy Code's definition

of "foreign proceeding" generally.  Moreover, the FDIC maintains that irreparable harm will not

result if the Court ultimately declines to grant provisional relief and that, on the whole, the

balance of harms weighs in factor of the FDIC.  Lastly, the FDIC argues that, granting the relief

sought would also not be in the public interest, which in this instance is the "interest to conduct a

fair claims assessment and allowance process pursuant to the law established by Congress in the

[Federal Deposit Insurance] Act."  (*Id.* at 42.)

The FDIC also argues that any discovery the JOLs seek from the FDIC must be done in

compliance with the regulations promulgated pursuant to the Supreme Court's ruling in *United*

*States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), which govern litigation-related requests for

FDIC-held material.  (*Id.* at 43–44; *see* 12 C.F.R. § 309.6(b)(8) (providing that an administrative

request for records or testimony must be made to the FDIC's general counsel who determines

whether to "disclose or authorize . . . disclosure . . . in response to a valid judicial subpoena,

court order, or other legal process"); 12 C.F.R. § 309.7(c) (indicating that the FDIC may not

provide the requested information or testimony absent authorization from its general counsel).)

I.       **The FDIC Objection to Recognition**

The FDIC argues that the Court lacks subject matter jurisdiction to grant recognition as

FIRREA establishes a "comprehensive, mandatory claims process" and does not permit judicial

oversight of a bank receivership.  (FDIC Recognition Objection at 5.)  Granting recognition, the

FDIC argues, would run afoul of FIRREA's prohibition on courts interfering with the ability of

the FDIC to act as the receiver of a failed financial institution.  (*Id.* at 6 (stating that section

1821(j) of FIRREA "makes clear that no court may take an action that restrains of [sic] affects

the powers or functions of the FDIC as receiver of a failed financial institution").)

In addition, the FDIC asserts that recognition of the Cayman Proceeding is improper

since SVB Cayman neither qualifies as a "person" under section 109(a) of the Bankruptcy Code

nor, as a branch of a U.S. bank, a debtor under section 109(b).  (*Id.* at 8–13.)  The FDIC further

argues that the Cayman Proceeding cannot be recognized as a foreign main or nonmain

proceeding because SVB Cayman's COMI is in the United States and there is otherwise no basis

for nonmain recognition.  (*Id.* at 14–17.)  Finally, as for the Cayman Proceeding itself, the FDIC

states that it is not a collective proceeding and that granting recognition generally would be

contrary to public policy and the public interest.  (*Id.* at 17, 22–23.)

II.       <u>**LEGAL STANDARD**</u>

A.       **Eligibility to be a Chapter 15 Debtor**

A gating issue to granting Chapter 15 relief is whether a foreign debtor seeking relief

under Chapter 15 satisfies the debtor eligibility requirements set forth in section 109(a) of the

Bankruptcy Code.  *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 698 (Bankr. S.D.N.Y. 2017)

(citing *In re Barnet*, 737 F.3d at 247–51). Section 109(a) provides that "only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor" under the Bankruptcy Code. 11 U.S.C. § 109(a). The Bankruptcy Code defines a "person" to include an "individual, partnership, and corporation, but does not include [a] governmental unit." 11 U.S.C. § 101(41).

Courts in this Circuit have held that section 109(a) can be satisfied by bank accounts in the United States, including by an undrawn retainer, or via a debtor's contract rights. *See, e.g., In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("Some courts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a)."); *In re Berau Capital Res. PTE Ltd.*, 540 B.R. 80, 83–84 (Bankr. S.D.N.Y. 2015) ("Contracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor . . . . The Court concludes that the presence of the New York choice of law and forum selection clauses . . . satisfies the section 109(a) 'property in the United States' eligibility requirement") (internal citations omitted).

In addition, section 1501(c) of the Bankruptcy Code also provides in relevant part that "[Chapter 15] does not apply to— (1) a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b)." 11 U.S.C. § 1501(c)(1). In other words, Chapter 15 does not apply to entities that are ineligible for relief under section 109(b). 8 COLLIER ON BANKRUPTCY ¶ 1501.05 (16th ed. 2023).

Section 109(b)(2) excludes the following from qualifying as a debtor:

> [A] domestic insurance company, *bank*, savings bank, cooperative bank . . . or industrial bank *or similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act*, except that an uninsured State member bank, or a corporation organized under section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing organization pursuant to section 409 [1] of the Federal Deposit

20

Insurance Corporation Improvement Act of 1991 may be a debtor if a
petition is filed at the direction of the Board of Governors of the Federal
Reserve System.

11 U.S.C. § 109(b)(2) (emphasis added).  Section 3(h) of the Federal Deposit Insurance Act

defines an "insured bank" to mean "any bank (including a foreign bank having an insured

branch) the deposits of which are insured in accordance with the provisions of [the Federal

Deposit Insurance Act]."  12 U.S.C. § 1813(h).

Moreover, section 109(b)(3) also excludes "a foreign bank, savings bank, cooperative

bank . . . that has a branch or agency (as defined in section 1(b) of the International Banking Act

of 1978) in the United States" from qualifying as a debtor.  11 U.S.C. § 109(b)(3)(B).  The effect

of these exclusions is that "foreign representatives of foreign banks which are subject to foreign

proceedings will not be eligible for Chapter 15 recognition if the foreign banks have a branch or

agency in the United States."  8 COLLIER ON BANKRUPTCY ¶ 1501.05 (16th ed. 2023).

### B.    Recognition of a Foreign Proceeding

Where a debtor meets the foregoing eligibility requirements and is not otherwise

excluded from Chapter 15, a foreign proceeding may be recognized if the requirements of

section 1517(a) are satisfied.  *In re Ocean Rig UDW Inc.*, 570 B.R. at 698.  Subject to the public

policy exception contained in section 1506 of the Bankruptcy Code, a foreign proceeding must

be recognized if the following requirements are met:

(1) such foreign proceeding for which recognition is sought is a foreign
main proceeding or foreign nonmain proceeding within the meaning of
section 1502;

(2) the foreign representative applying for recognition is a person or body;
and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

21

Additionally, a Chapter 15 case is properly commenced by the filing of a petition for recognition by a "foreign representative."  *See* 11 U.S.C. §§ 1504, 1515(a).  The Bankruptcy Code defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).

### C.     Provisional Relief Under Section 1519 of the Bankruptcy Code

Section 1519 of the Bankruptcy Code permits the Court to grant certain forms of provisional relief "where relief is urgently needed to protect the assets of the debtor or the interests of the creditors."  11 U.S.C. § 1519(a).  Specifically, section 1519 provides, among other things, that the court may grant "any relief referred to in paragraph (3), (4) or (7) of section 1521(a)."  11 U.S.C. § 1519(a)(3).  In relevant part, paragraphs (4) of section 1521(a) provides that upon recognition of a foreign proceeding, whether main or nonmain, a court may grant any appropriate relief at the request of the foreign representative "providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities."  11 U.S.C. §§ 1521(a)(4).

In deciding whether to grant provisional relief in a Chapter 15 case under section 1519(a) of the Bankruptcy Code, a court will apply the "standards, procedure, and limitations" applicable for the entry of a preliminary injunction.  11 U.S.C. § 1519(e); *see also In re Beechwood Re*, No. 19-11560 (MG), 2019 WL 3025283, at *2 (Bankr. S.D.N.Y. July 10, 2019) ("[T]he Court applies the standards for issuance of a preliminary injunction to determine whether the provisional relief should be granted.").  Therefore, in the context of a Chapter 15 proceeding, provisional relief is warranted when: (1) there is a likelihood of success on the merits (*i.e.*, obtaining recognition of

22

the foreign proceeding); (2) there is risk of "imminent irreparable harm" in the absence of relief;

(3) the balance of the harms tips the movant's favor; and (4) the public interest weighs in favor

of an injunction. *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 181 (Bankr. S.D.N.Y.

2022) (quoting *Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem.

Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009)).

### III.    DISCUSSION

#### A.    SVB Cayman is Ineligible for Chapter 15 Relief

As a threshold matter, SVB Cayman is ineligible in be in Chapter 15 pursuant to sections

109(b) and 1501(c) of the Bankruptcy Code.  It possessed no separate legal existence outside of

the Bank, which was indisputably U.S.-incorporated and ineligible for bankruptcy relief pursuant

to section 109(b)(2) as a domestic FDIC-insured bank.  (*See* Verified Petition ¶ 25 ("Founded in

1983, [the Bank] was an FDIC-insured, state-chartered bank headquartered in California").)

Moreover, the closing of the Bank and the commencement of the SVB Receivership did not

result in the Bank's and, consequently, SVB Cayman's transmogrification into an entity eligible

for bankruptcy.[6]  Rather, SVB Cayman remains, for all intents and purposes of this proceeding,

what Silicon Valley Bank has always been—a bank that is ineligible to be a debtor under the

Bankruptcy Code.

#### 1.    SVB Cayman Was Not a Separate Legal Entity

The JOLs themselves acknowledge that SVB Cayman was not a separate legal entity

from the Bank.  Niall Ledwidge, one of the JOLs, testified before this Court that SVB Cayman

was part and parcel to the Bank and possessed no legal existence outside of the Bank itself.  (*See*

Feb. 14, 2024 Hr'g Tr. 118:19–119:2 ("Q: Mr. Ledwidge . . . it's correct that the entity that is

---

[6]    This is unlike Gregor Samsa who, in Kafka's *The Metamorphosis*, "awoke one morning from uneasy dreams [and] found himself transformed."  FRANZ KAFKA, THE METAMORPHOSIS (1915).

registered—or was registered in the Cayman Islands was Silicon Valley Bank, correct?  A:

Correct.  Q: All right.  There's no separate entity called Cayman Islands Branch, or the branch

was not separately incorporated?  A: I believe there was just one legal entity . . . There wasn't—

there was no subsidiary . . . in the Cayman Islands."); *id.* at 120:5–13 ("Q: [Y]ou agree the

branch was part of the [B]ank, correct?  A: I agree.  Q: And you agree that the [B]ank is in a

receivership in the United States, correct?  A: Yes.  Q: And you would agree that the FDIC is

administering the assets and liabilities of the [B]ank; is that correct?  A: Yes.").)

Moreover, SVB Cayman's operations were that of the Bank's.  Mr. Ledwidge testified

that SVB Cayman itself possessed no employees.  (*See* Feb. 14, 2024 Hr'g Tr. 96:3–5 ("Q: [T]he

Cayman Islands branch had no employees within the Cayman Islands itself?  A: Not that I'm

aware of.").)  Rather, as set forth in the Verified Petition, SVB Cayman "looked to [the Bank's]

California office for staffing needs in select service areas such as finance, IT services, legal and

risk management" pursuant to the SLA.  (Verified Petition ¶¶ 49, 51.)  The JOLs, in fact, refer to

these "select service areas" as "shared services."  (*Id.* ¶ 51.)  Notably, the SLA, which the JOLs

indicate govern the "relationship between [the Bank] and SVB Cayman," provides that it is an

"*intra-entity* agreement and therefore has no formal legal basis."  (*Id.* ¶ 49; Pearson Declaration,

Ex. 8 § 31.1 (emphasis added).)  Additionally, all transfers were done electronically and via wire.

Thomas Mills—a SVB Cayman depositor and witness for the JOLs—testified that, to his

knowledge, transfers from his fund's account were all done electronically.  (Feb. 14, 2024 Hr'g

Tr. 80:6–10 ("Q: Is it correct that this was all done electronically?  A: I believe so.  Q: Okay.  So

nobody actually went to the Cayman branch and withdrew funds, whether it was by check or

cash, correct?  A: I believe that's correct.").)

Accordingly, the JOLs have not shown that SVB Cayman possessed anything more than a mail-drop presence in the Cayman Islands. *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 277 (Bankr. S.D.N.Y. 2019) ("[A]s a prerequisite for any relief under Chapter 15, a base level connection between the foreign debtor and the foreign jurisdiction that prevents a debtor from commencing a case in a jurisdiction where it has nothing more than a mail-drop presence" is required.) (quoting William H. Schrag, William C. Heuer, and Robert E. Cortes, *Cross-Border Insolvencies and Chapter 15: Recent U.S. Case Law Determining Whether a Foreign Proceeding Is "Main" or "Nonmain" or Neither*, 17 J. BANKR. L. & PRAC. 5 Art. 4 (Aug. 2008)); *see e.g., In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 338–39 (S.D.N.Y. 2008) (concluding that auditing activities, preparation of incorporation papers by a third party, and alleged review of insider transactions at the time of filing were insufficient to establish presence or "nontransitory economic activity" in the Cayman Islands, particularly where there was a lack of assets in the Caymans). SVB Cayman's existence was inseparable from that of Silicon Valley Bank and, by virtue of such, is a bank.

2. *Irish Bank* and *Colorado Industrial Bank* Are Distinguishable

In support of their proposition that SVB Cayman may nonetheless qualify for Chapter 15 relief notwithstanding its status as a bank, the JOLs rely on *In re Irish Bank Resolution Corp. Ltd.*, 538 B.R. 692 (D. Del. 2015) ("*Irish Bank I*") and *In re Colorado Indus. Bank of Fort Collins*, 84 B.R. 735 (Bankr. D. Colo. 1988). Both are distinguishable from the case here.

In *Irish Bank I*, the District Court of Delaware reviewed the Delaware bankruptcy court's Chapter 15 recognition of the Irish liquidation proceedings of Irish Bank Resolution Corporation Limited ("IRBC"), an Irish-incorporated company located in Dublin, Ireland. *Irish Bank I*, 538 B.R. at 694–95. It affirmed the bankruptcy court's conclusion that IRBC qualified to be a

25

Chapter 15 debtor solely on grounds that IRBC did not have a branch or agency in the U.S. as

required under section 109(b)(3)(B) at the time its Chapter 15 petition filing. *Id.* at 696–97

(quoting *In re Irish Bank Resolution Corp. Ltd.*, 2014 WL 9953792, at *11 (Bankr. D. Del. 2014)

("*Irish Bank II*")); *see also* 11 U.S.C. § 103(b)(3)(B) (identifying by exclusion a "foreign bank . .

. that has a branch or agency (as defined in section 1(b) of the International Banking Act of

1978) in the United States").  In contrast, unlike IRBC, which was a standalone Irish company,

SVB Cayman was a branch of the U.S.-incorporated and FDIC-insured Silicon Valley Bank and,

as the JOLs conceded, was not a separate legal entity.  Accordingly, the *Irish Bank* ruling does

not apply.

In *Colorado Industrial Bank*, the Colorado bankruptcy court held that a state-chartered

industrial bank was eligible to be a debtor in Chapter 11 since it was undisputed that the bank

was not an "insured bank" under section 3(h) of the Federal Deposit Insurance Act as it lacked

FDIC insurance.  *See Colorado Indus. Bank of Fort Collins*, 84 B.R. at 737–38.  In light of the

foregoing, the Court concluded that the bank was not excluded from Chapter 11 since section

109(b)(2) was limited to, in relevant part, an "industrial bank or similar institution which is an

insured bank as defined in section 3(h) of the Federal Deposit Insurance Act."  *Id.* at 737

(quoting 11 U.S.C. § 109(b)(2)).  Here, the JOLs concede that Silicon Valley Bank was FDIC

insured.  (*See* Verified Petition ¶ 25 (stating that Silicon Valley Bank "was an FDIC-insured,

state-chartered bank headquartered in California").)  Accordingly, *Colorado Industrial Bank* is

inapplicable as well.

### 3.  The Court Need Not Address SVB Cayman's Eligibility Pursuant to Section 109(a)

Given the Court's conclusion that SVB Cayman is prohibited from being in Chapter 15

under section 109(b)(2), the Court need not reach the issue whether SVB Cayman satisfies the

eligibility requirements set forth in section 109(a) of the Bankruptcy Code.  Section 109(b)(2)

serves as an exclusionary provision, carving out certain entities from seeking and obtaining

certain relief under the Bankruptcy Code.  As the Court has already concluded that SVB Cayman

is excluded pursuant to section 109(b)(2), it need not go further.

Accordingly, the Chapter 15 petition of SVB Cayman must be dismissed.

### B.    While Recognition and Provisional Relief Cannot be Granted, the JOLs Are Not Without Remedy

While recognition and provisional relief cannot be granted as SVB Cayman is prohibited

from seeking Chapter 15 relief generally, the JOLs are not without remedy.  Section 1509(f) of

the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, the

failure of a foreign representative to commence a case or to obtain recognition under this chapter

does not affect any right the foreign representative may have to sue in a court in the United

States to collect or recover a claim which is the property of the debtor."[7]  11 U.S.C. § 1509(f).

---

[7]     While section 1509(f) permits a foreign debtor to sue in a U.S. court to collect or recover on a claim involving property of the debtor even in the absence of recognition, a broader question exists whether comity applies to allow courts to recognize foreign judgments in insolvency cases absent Chapter 15 recognition.  It remains an unsettled question.  The legislative history of Chapter 15 provides that it is the "exclusive door to ancillary assistance to foreign proceedings." H.R. REP. NO. 109-31, at 110 (2005).  However, courts, turning to principles of international comity, have nonetheless given deference to foreign courts and their judgments without recognition of a Chapter 15 case. *See e.g.*, *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-CV-00007, 2021 WL 3706909, at *3–4 (E.D.N.Y. Aug. 6, 2021) (concluding that Chapter 15 applied "only in limited circumstances" and therefore, the lack of a Chapter 15 petition did not preclude a representative of a foreign bank from intervening in pending litigation); *Moyal v. Münsterland Gruppe GmbH & Co. KG*, 539 F. Supp. 3d 305, 309 n.1 (S.D.N.Y. 2021) (deeming "absurd" the notion that Chapter 15 recognition should be a prerequisite to seeking relief as it would "fly in the face of comity principles"); *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 30–31 (2d Cir. 2017) (finding that "Chapter 15 [did] not apply when a court in the United States simply gives preclusive effect to factual findings from an otherwise unrelated foreign liquidation proceeding" in light of its "limited purpose").

The Third Circuit recently sought to offer clarity on the matter in *Vertiv, Inc. v. Wayne Burt PTE, Ltd.*, 92 F.4th 169 (3d Cir. 2024), setting forth a "refreshed" version of the test it articulated in *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187 (3d Cir. 1994) to "govern adjudicatory comity with regard to pending foreign bankruptcy proceedings." *Vertiv*, 92 F.4th at 169.  Generally, adjudicatory comity is a "discretionary act of deference to a foreign court" and examines whether a court should "decline to exercise jurisdiction over matters more appropriate adjudged elsewhere." *Id.* (quoting *Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014)) (quotation marks omitted).  The case, which involved a defendant company in liquidation proceedings in Singapore, explored the question whether dismissal of a breach of contract action was appropriate in light of principles of international comity.  While the parties disagreed over the appropriate test to apply when

Whether or not SVB Cayman can be in Chapter 15, (i) the JOLs are likely proper "foreign representatives" with respect to SVB Cayman and (ii) the Cayman Proceeding was properly commenced and would have otherwise likely constituted a "foreign proceeding."

With respect to the JOLs, the Bankruptcy Code defines "foreign representative" to be a "person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Here, the JOLs are "persons" as defined under 11 U.S.C. § 101(41) and, pursuant to the Winding Up Order, were appointed as the joint official liquidators of [the Bank] with powers to "act jointly and severally in their capacity as liquidators of [the Bank]" but "limited to acting in respect to the assets and affairs of the Cayman Islands branch of [the Bank] and its creditors." (Pearson Declaration, Ex. 14 ¶¶ 2, 3.) Accordingly, the JOLs are likely "foreign representatives" within the definition set forth in section 101(24).

Additionally, as both the JOLs' and the FDIC's Cayman law experts testified, the Cayman Proceeding was properly commenced under Cayman law and, therefore, would have otherwise likely constituted a "foreign proceeding." (*See* Feb. 14, 2024 Hr'g Tr. at 131:6–8 (Dr. Mokal testifying that a "careful delimitation of the terms of [Justice Doyle's] order [left him] no doubt whatsoever that . . . Justice Doyle made a standard, ancillary winding up order"); *id.* at 184:20–25 (Mr. Lowe testifying that the Court need not sit in a court of review of the Winding Up Order as what Justice Doyle "did was entirely correct" and he was "not suggesting [Justice

---

addressing international comity, the district court ultimately decided in the affirmative, holding that extension of comity to the Singaporean court proceedings was appropriate under either. Without ruling on the merits, the Third Circuit "clarified the standard courts should apply when deciding whether to abstain from adjudicating a case in deference to what is essentially a pending foreign bankruptcy proceeding" and remanded the case to the district court to apply its guidance. *Id.*

Doyle] did anything wrong").)  Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court, and (4) for the purpose of reorganization or liquidation.  11 U.S.C. § 101(23).  As this Court has previously recognized, Cayman liquidation proceedings commenced under Part V of the Companies Law, which governs the winding up of companies in the Cayman Islands, are "collective judicial proceedings."  *See In re Ocean Rig UDW Inc.*, 570 B.R. at 701–02 (concluding, among other things, that the Cayman liquidation proceedings commenced under Part V of the Companies Law are unquestionably collective judicial proceedings); *see also id.* at 702 (citing to other cases in the same district that held that insolvency or debt adjustment proceedings, including provisional liquidations and schemes of arrangement under Cayman Islands laws, qualify as foreign proceedings under Chapter 15 of the Bankruptcy Code).

Here, it is undisputed that the Cayman Proceedings are pending in the Cayman Islands, a foreign country, and that SVB Cayman, as part of the Bank, is to be wound up under the supervision of the Grand Court.  (*See* Pearson Declaration, Ex. 14 ¶ 1 (stating that the Bank is to be "wound up by the Court under the provisions of the [Companies Act]").)  Indeed, the FDIC's own expert witness testified that Justice Doyle's Winding Up Order was correctly issued.  (*See* Feb. 14, 2024 Hr'g Tr. at 257:8–13 (The Court pointing out that Mr. Lowe "testified at length [and] acknowledged that Justice Doyle was correct in his order . . . [and] acted correctly in entering his judgment").)  However, as SVB Cayman was unable to overcome the gating section 109(b)(2) issue, the Court cannot grant recognition or provisional relief at this juncture and must dismiss the Chapter 15 petition.

## IV.    <u>CONCLUSION</u>

Accordingly, for the reasons discussed, the Chapter 15 petition is **DISMISSED**.

**IT IS SO ORDERED.**

Dated: February 22, 2024
       New York, New York

                        _Martin Glenn_
                        MARTIN GLENN
          Chief United States Bankruptcy Judge